EILEEN HANNAFORD, as mother and Natural Guardian of P.H., a minor, as surviving Child of KEVIN J. HANNAFORD;

BARBARA RACHKO, Individually, as surviving Spouse, and Administratrix of the Estate of BRYAN JACK, Deceased;
JAMES T. JACK, Individually, and Personal Representative of the Estate of JAMES H. JACK, Deceased, as surviving Father of BRYAN JACK;
JAMES T. JACK, Individually, and Executor of the Estate of HELEN M. JACK, Deceased, as surviving Mother of BRYAN JACK;
JAMES T. JACK, as surviving Sibling of BRYAN JACK;

THOMAS S. JOHNSON, Individually, and Administrator of the Estate of SCOTT JOHNSON, Deceased;
THOMAS S. JOHNSON, as surviving Father of SCOTT JOHNSON;
MARGARET ANN JOHNSON, as surviving Mother of SCOTT JOHNSON;
MARGARET WAGER, Executrix of the Estate of THOMAS P. JOHNSON, Deceased, as surviving Sibling of SCOTT JOHNSON;
MARGARET WAGER, as surviving Sibling of SCOTT JOHNSON;

MICHELE JONES FERRELL, Individually, as surviving Spouse, and Executrix of the Estate of DONALD T. JONES, II, Deceased;
MICHELE JONES FERRELL, as Mother and Natural Guardian of D.T.J., a minor, as surviving Child of DONALD T. JONES, II;
TAYLOR N. JONES, as surviving Child of DONALD T. JONES, II;
JUDITH JONES, Individually, and Executrix of the Estate of DONALD T. JONES, SR., as surviving Father of DONALD T. JONES, II;
JUDITH JONES, as surviving Mother of DONALD T. JONES, II;
WILLIAM B. JONES, as surviving Sibling of DONALD T. JONES, II;

LORI KANE, Individually, as surviving Spouse, and Administratrix of the Estate of HOWARD KANE, Deceased;

JASON B. KANE, as surviving Child of HOWARD KANE; ROCHELLE KANE, as surviving Mother of HOWARD KANE;
ADAM KANE, Individually, and Executor of the Estate of BRUCE KANE, Deceased, as surviving Father of HOWARD KANE;
ADAM KANE, as surviving Sibling of HOWARD KANE;
HOLLY ANN TANZ, as surviving Sibling of HOWARD KANE;

ROSE KELLER D'ALESSANDRO, Individually, as surviving Spouse, and Administratrix of the Estate of JOSEPH J. KELLER, Deceased;
ROSE KELLER D'ALESSANDRO, as Mother and Natural Guardian of S.K., a minor, as surviving Child of JOSEPH J. KELLER;
JOSEPH DANIEL KELLER, as surviving Child of JOSEPH J. KELLER;
JUNE SASLOW, as surviving Mother of JOSEPH J. KELLER;
JENNIFER LUTZ, as surviving Sibling of JOSEPH J. KELLER;

H. MICHAEL KEDEN, Executor of the Estate of ADAM J. LEWIS, Deceased;
PATRICIA D. LEWIS, as surviving Spouse of ADAM J. LEWIS;
PATRICIA D. LEWIS, as mother and Natural Guardian of S.L., a minor, as surviving Child of ADAM J. LEWIS;
REILLY LEWIS, as surviving Child of ADAM J. LEWIS;
ARTHUR LEWIS, as surviving Child of ADAM J. LEWIS;
CAROLINE LEWIS, as surviving Child of ADAM J. LEWIS;
GERALDINE LEWIS, as surviving Mother of ADAM J. LEWIS;
PAMELA PASSERETTA, as surviving Sibling of ADAM J. LEWIS;
KATHRYN HEBERT, as surviving Sibling of ADAM J. LEWIS;

CAMERON F. MACRAE, III, Individually, and Administrator of the Estate of CATHERINE F. MACRAE, Deceased;

CAMERON F. MACRAE, III, as surviving Father of
CATHERINE F. MACRAE;
ANN B. MACRAE, as surviving Mother of CATHERINE
F. MACRAE;
ANN C. MACRAE, as surviving Sibling of CATHERINE
F. MACRAE;

AUDREY MAGNUSON, Individually, as surviving
Spouse, and Executrix of the Estate of RONALD E.
MAGNUSON, Deceased;
JEFFREY A. MAGNUSON, as surviving Child of
RONALD E. MAGNUSON;
SHERYL A. MAGNUSON, as surviving Child of
RONALD E. MAGNUSON;
KNUT MAGNUSON, as surviving Sibling of RONALD
E. MAGNUSON;

KATHERINE MAHER, Individually, as surviving
Spouse, and Executrix of the Estate DANIEL L. MAHER,
Deceased;
DANIEL R. MAHER, as surviving Child of DANIEL L.
MAHER;
JOSEPH MAHER, as surviving Child of DANIEL L.
MAHER;
JAMES MAHER, Individually, and Executor of the Estate
of JEANNE MAHER, Deceased, as surviving Mother of
DANIEL L. MAHER;
JAMES MAHER, as surviving Sibling of DANIEL L.
MAHER;
JEANNE BRANDOFINO, as surviving Sibling of
DANIEL L. MAHER;
CHRISTINA MAHER, Executrix of the Estate of
RAYMOND MAHER, JR., Deceased, as surviving
Sibling of DANIEL L. MAHER;

MARGARET MEYER, Individually, as surviving
Spouse, and Executrix of the Estate of DAVID R.
MEYER, Deceased;
HEIDI MENNONA, as surviving Child of DAVID R.
MEYER;
HEATHER VULPONE, as surviving Child of DAVID R.
MEYER;
DAWN MEYER-FUCHS, as surviving Child of DAVID
R. MEYER;
KRISTINE MEYER, as surviving Sibling of DAVID R.
MEYER;

CHARLES MEYER, as surviving Sibling of DAVID R. MEYER;

ELLEN ROBB and FRANK MONTANARO, Individually, and Co-Administrators of the Estate of KRISTEN MONTANARO, Deceased;
ELLEN ROBB, as surviving Mother of KRISTEN MONTANARO;
FRANK MONTANARO, as surviving Father of KRISTEN MONTANARO;
JAMIE MONTANARO, as surviving Sibling of KRISTEN MONTANARO;
KAREN MONTANARO, as surviving Sibling of KRISTEN MONTANARO;

BETH K. MURPHY, Individually, as surviving Spouse, and Administratrix of the Estate of KEVIN J. MURPHY, Deceased;
CONNOR J. MURPHY, as surviving Child of KEVIN J. MURPHY;
CAITLYN B. MURPHY, as surviving Child of KEVIN J. MURPHY;
SALLY F. RYAN, Individually, and Personal Representative of the Estate of TIMOTHY F. MURPHY, JR., Deceased, as surviving Father of KEVIN J. MURPHY;
SALLY F. RYAN, as surviving Mother of KEVIN J. MURPHY;
MICHAEL MURPHY, as surviving Sibling of KEVIN J. MURPHY;
TIMOTHY P. MURPHY, as surviving Sibling of KEVIN J. MURPHY;
JOHN F. MURPHY, as surviving Sibling of KEVIN J. MURPHY;
MARY BETH DOUGHERTY, as surviving Sibling of KEVIN J. MURPHY;

ARLENE ORSINI, Individually, as surviving Spouse, and Executrix of the Estate of RONALD ORSINI, Deceased;
DANIELLE ORSINI PANDOLFI, as surviving Child of RONALD ORSINI;
ROBERT ORSINI, as surviving Sibling of RONALD ORSINI;
BARBARA STANG, as surviving Sibling of RONALD ORSINI;

JOAN PARKER, Individually, as surviving Spouse, and Administratrix of the Estate of PHILIP LACEY PARKER, Deceased;
STEPHANIE PARKER, as surviving Child of PHILIP LACEY PARKER;

JENNIFER PRICE-SALKEVER, Individually, and Administratrix of the Estate of JEAN H. PETERSON, Deceased;
JENNIFER PRICE-SALKEVER, as surviving Child of JEAN H. PETERSON;
CATHERINE AUSTIN STOVER, as surviving Child of JEAN H. PETERSON;
GRACE PRICE SHERWOOD, as surviving Child of JEAN H. PETERSON;
RICHARD HOADLEY, Individually, and Executor of the Estate of WALTER E. HOADLEY, Deceased, as surviving Father of JEAN H. PETERSON;
RICHARD HOADLEY, Individually, and Executor of the Estate of VIRGINIA A. HOADLEY, Deceased, as surviving Mother of JEAN H. PETERSON;
RICHARD HOADLEY, as surviving Sibling of JEAN H. PETERSON;

MARGARET ECKERT, Personal Representative of the Estate of SEAN ROONEY, Deceased;
MARGARET ECKERT, Individually, and Executrix of the Estate of BEVERLY ECKERT, Deceased, as surviving Spouse of SEAN ROONEY;
CYNTHIA BLEST, Individually, and Executrix of the Estate of ROSEMARY ROONEY, Deceased, as surviving Mother of SEAN ROONEY;
CYNTHIA BLEST, as surviving Sibling of SEAN ROONEY;
MAURA ROONEY, as surviving Sibling of SEAN ROONEY;
SHEILA ROONEY, as surviving Sibling of SEAN ROONEY;
BRENDAN ROONEY, as surviving Sibling of SEAN ROONEY;
BRIAN ROONEY, as surviving Sibling of SEAN ROONEY;

PATRICIA RYAN, Individually, as surviving Spouse, and Executrix of the Estate of JOHN J. RYAN, Deceased;

395

LAURA RYAN, as surviving Child of JOHN J. RYAN;
KRISTEN RYAN, as surviving Child of JOHN J. RYAN;
COLIN RYAN, as surviving Child of JOHN J. RYAN;

JOHN SANDERS, Individually, and Administrator of the
Estate of STACEY SANDERS, Deceased;
JOHN SANDERS, as surviving Father of STACEY
SANDERS;
MARTHA SANDERS, as surviving Mother of STACEY
SANDERS;
LAURA SANDERS WYATT, as surviving Sibling of
STACEY SANDERS;

TOMOKO T. SCHLAG, Individually, as surviving
Spouse, and Executrix of the Estate of STEVEN F.
SCHLAG, Deceased;
DAKOTA I. SCHLAG, as surviving Child of STEVEN F.
SCHLAG;
GARRETT M. SCHLAG, as surviving Child of STEVEN
F. SCHLAG;
SIERRA A. SCHLAG, as surviving Child of STEVEN F.
SCHLAG;
DONALD SCHLAG, as surviving Father of STEVEN F.
SCHLAG;
PATRICIA SCHLAG, as surviving Mother of STEVEN
F. SCHLAG;
JEAN NEBBIA, as surviving Sibling of STEVEN F.
SCHLAG;
ELLEN HUGHES, as surviving Sibling of STEVEN F.
SCHLAG;

SUZANNE SISOLAK PENAVIC, Individually, as
surviving Spouse, and Administratrix of the Estate of
JOSEPH M. SISOLAK, Deceased;
ELLEN SISOLAK, Individually, and Executrix of the
Estate of PAUL SISOLAK, Deceased, as surviving Father
of JOSEPH M. SISOLAK;
ANNA J. POWELL, as surviving Mother of JOSEPH M.
SISOLAK;
TERESA RELLER, as surviving Sibling of JOSEPH M.
SISOLAK;
YVONNE SISOLAK, Individually, and Executrix of the
Estate of THOMAS P. SISOLAK, Deceased, as surviving
Sibling of JOSEPH M. SISOLAK;

MARY SMITH, Individually, as surviving Spouse, and Administratrix of the Estate of DANIEL SMITH, Deceased;
ELIZABETH SMITH, as surviving Child of DANIEL SMITH;
MICHAEL SMITH, as surviving Child of DANIEL SMITH;
MCCARTHY SMITH, as surviving Sibling of Daniel Smith, Deceased, SEAN PATRICK SMITH, as surviving Sibling of DANIEL SMITH;
SUSAN HICKS, as surviving Sibling of DANIEL SMITH;

CAROL ANN SUAREZ and MANUEL T. SUAREZ, Individually, and Co-Administrators of the Estate of DAVID S. SUAREZ, Deceased;
CAROL ANN SUAREZ, as surviving Mother of DAVID S. SUAREZ;
MANUEL T. SUAREZ, as surviving Father of DAVID S. SUAREZ;
BRYAN A. SUAREZ, as surviving Sibling of DAVID S. SUAREZ;
KRISTEN M. CARPENTER, as surviving Sibling of DAVID S. SUAREZ;

MICHELE TANNER, Individually, as surviving Spouse, and Executrix of the Estate of MICHAEL TANNER, Deceased;
SASHA TANNER, as surviving Child of MICHAEL TANNER; GIANNA TANNER, as surviving Child of MICHAEL TANNER;
RENEE ABBATE, Individually, and Execurtix of the Estate of MARY TANNER, Deceased, as surviving Mother of MICHAEL TANNER;
RENEE ABBATE, as surviving Sibling of MICHAEL TANNER;
KENNETH C. TANNER, as surviving Sibling of MICHAEL TANNER;
MARIA MARASCIULO, as surviving Sibling of MICHAEL TANNER;
NICOLE TANNER-D'AMBROSIO, as surviving Sibling of MICHAEL TANNER;

JENNIFER TARANTINO, Individually, as surviving Spouse, and Executrix of the Estate of KENNETH JOSEPH TARANTINO, Deceased;

JENNIFER TARANTINO, as Mother and Natural Guardian of J.J.T., a minor, as surviving Child of KENNETH JOSEPH TARANTINO;
KENNETH JAMES TARANTINO, as surviving Child of KENNETH JOSEPH TARANTINO;

AMY C. VASEL, Individually, as surviving Spouse, and Administratrix of the Estate of SCOTT VASEL, Deceased;
AMY C. VASEL, as Mother and Natural Guardian of M.J.V., a minor, as surviving Child of SCOTT VASEL;
RYAN A. VASEL, as surviving Child of SCOTT VASEL;
JANYNE V. DEMBICKI, Individually, and Executrix of the Estate of CHARLES VASEL, Deceased, as surviving Father of SCOTT VASEL;
JANYNE V. DEMBICKI, Individually, and Executrix of the Estate of MYNDA VASEL, Deceased, as surviving Mother of SCOTT VASEL;
JANYNE V. DEMBICIKI, as surviving Sibling of SCOTT VASEL;

KATHLEEN M. WISNIEWSKI, Individually, as surviving Spouse, and Administratrix of the Estate of ALAN L. WISNIEWSKI, Deceased;
JESSICA M. WISNIEWSKI, as surviving Child of ALAN L. WISNIEWSKI;
ERICA C. WISNIEWSKI, as surviving Child of ALAN L. WISNIEWSKI;
MATTHEW P. WISNIEWSKI, as surviving Child of ALAN L. WISNIEWSKI;
THOMAS WARENKIEWICZ, as Executor of the Estate of MURIEL WISNIEWSKI, Deceased, as surviving Mother of ALAN L. WISNIEWSKI;

CHIEMI YORK, Individually, as surviving Spouse, and Administratrix of the Estate of KEVIN P. YORK, Deceased;
CHIEMI YORK, as Mother and Natural Guardian for A.Y., a minor, as surviving Child of KEVIN P. YORK;
CONNOR YORK, as surviving Child of KEVIN P. YORK;
JOHN YORK, as surviving Father of KEVIN P. YORK;
TIMOTHY YORK, as surviving Sibling of KEVIN P. YORK;

ROSEANN ZISA, Individually, as surviving Spouse, and
Administratrix of the Estate of SALVATORE ZISA,
Deceased;
CHRISTINA ZISA, as surviving Child of SALVATORE
ZISA;
JOSEPH ZISA, as surviving Child of SALVATORE
ZISA;
ROSEMARIE MARTIE, Individually, and Executrix of
the Estate of JOSEPH ZISA, Deceased, as surviving
Father of SALVATORE ZISA;
JOSEPHINE    ZISA,    as    surviving    Mother    of
SALVATORE ZISA;
ANTHONY ZISA, as surviving Sibling of SALVATORE
ZISA;
JANE PRESTO, as surviving Sibling of SALVATORE
ZISA;
PHYLLIS   A.   KELLY,   as   surviving   Sibling   of
SALVATORE ZISA;

-------------------------------------------------------------------x

CHERYL SCHNEIDER, Individually and
as surviving spouse and the Executrix of the
ESTATE OF IAN SCHNEIDER, Deceased;

NANCY DIMINO, Individually and
as surviving spouse and as the Executrix of
the ESTATE OF STEPHEN DIMINO, Deceased;

MATILDE SALCEDO, Individually and as the
as the surviving spouse and the Personal Representative
of the ESTATE OF ESMERLIN SALCEDO, Deceased;

SUSAN CONNORS, Individually and
as surviving spouse and as the Executrix of the
ESTATE OF JONATHAN M. CONNORS, Deceased;
GERARD JEAN BAPTISTE, Individually, as surviving
Parent,
and as the Personal Representative of the
ESTATE OF GERARD BAPTISTE, Deceased;

DEBORA ANN CRISMAN, Indivdually as surviving
Parent, and as the Personal Representative of the
ESTATE OF DANIEL HAL CRISMAN, Deceased;

* Denotes that the respective plaintiff or Estate was not a
citizen on September 11th, 2001.

**Jonathan C. Reiter Law Firm, PLLC**

399

Plaintiffs,

v.

# KINGDOM OF SAUDI ARABIA,

Defendant.

----------------------------------------------------------------X

## **COMPLAINT**

Plaintiffs, by and through their undersigned counsel, hereby allege:

1.      Plaintiffs are the surviving spouses, children, parents, siblings and estate

representatives of the victims murdered in the September 11, 2001 terrorist attacks on the United

States (the "September 11th Attacks") and individuals who suffered personal injuries in the

September 11th Attacks.

2.      Plaintiffs bring this action against the defendant Kingdom of Saudi Arabia under

the 2016 Justice Against Sponsors of Terrorism Act (JASTA), which Congress enacted over a

Presidential veto

> to provide civil litigants with the broadest possible basis, consistent with the Constitution
> of the United States, to seek relief against…foreign countries, wherever acting and
> wherever they may be found, that have provided material support, directly or indirectly,
> to foreign organizations or persons that engage in terrorist activities against the United
> States…

28 U.S.C. §2333 note; as a result, JASTA establishes federal court jurisdiction over the tortious

acts of a foreign state anywhere in the world that cause injury and death in a terrorist attack in

the United States.

3.      Plaintiffs seek such relief against the Kingdom of Saudi Arabia for the attributable

acts of the Kingdom's governmental Ministries and bodies, alter-egos, and officers, employees

and agents acting within the scope of their office, employment or agency by knowingly

400

providing material support and resources to the al Qaeda terrorist organization and facilitating the September 11th Attacks, in that, as set forth in detail herein, they:

      a.    raised, laundered and paid substantial financial support to al Qaeda to fund its budget and terrorist activities, including the preparation and execution of the September 11th Attacks;

      b.    funded the terrorist training camps in Afghanistan where al Qaeda indoctrinated and taught their hijackers the skills they used to carry out the September 11th Attacks;

      c.    provided critical logistical support and resources to al Qaeda around the world, funding safe houses, furnishing false passport and travel documents, transferring al Qaeda money, weapons and equipment across international borders and other assistance, all of which enabled al Qaeda to conduct the September 11th Attacks;

      d.    actively supported al Qaeda in its final preparations for the September 11th Attacks through a network of the Kingdom's officers, employees and/or agents who met with and aided the hijackers, providing them with money, cover, advice, contacts, transportation, assistance with language and U.S. culture, identification, access to pilot training and other material support and resources.

4.    The defendant Kingdom of Saudi Arabia is a foreign state within the meaning of 28 U.S.C. §1603(a), and "Saudi Arabia" as used hereinafter refers to the Kingdom of Saudi Arabia, its government Ministries and other bodies (including but not limited to its Ministry of Islamic Affairs, Ministry of the Interior, Ministry of Foreign Affairs and Embassies throughout

the world), its alter-egos, and its officials, employees, or agents not only in the United States but throughout the world, while acting within the scope of their office, employment, or agency.

5.     The defendant Kingdom of Saudi Arabia is subject to jurisdiction pursuant to 28 U.S.C. §1330 and JASTA's 28 U.S.C. §1605B, in that, as set forth in detail below, this action: seeks money damages against the Kingdom of Saudi Arabia for injury and death caused by the September 11th Attacks, which constitute an act of "international terrorism" in the United States as defined in 18 U.S.C. §2331; alleges that the September 11th Attacks and the resulting injuries and deaths were caused by a tortious act or acts of Saudi Arabia, by providing material support and resources to and facilitating the al Qaeda leaders, planners and hijackers responsible for the September 11th Attacks, and that such act or acts constitute more than mere negligence, and were intentional, knowing, reckless, willful and/or grossly negligent.

6.     The defendant Kingdom of Saudi Arabia is also subject to jurisdiction pursuant to 28 U.S.C. §1330 and 28 U.S.C. §1605(a)(5), in that, as set forth in detail below, this action seeks money damages against the Kingdom of Saudi Arabia for injury and death occurring in the United States and caused by the tortious act or omission of the Kingdom of Saudi Arabia and/or one or more of its officials or employees acting within the scope of their office or employment.

7.     Venue in this District is proper pursuant to 28 U.S.C. §§1391(b)(2) and 1391(f)(1), as a substantial part of the events giving rise to this litigation occurred within this District, as well as 28 U.S.C. §2334(a).

8.     The plaintiffs who are the estate representatives of a decedent are listed as such in the caption, have been duly appointed by a court prior to the commencement of this action and have the legal authority to bring this action to recover the damages set forth herein, including

wrongful death damages on behalf of all legally entitled beneficiaries of the decedent and

survival damages for the decedent's personal injuries.

9.      For years prior to and on September 11, 2001, Saudi Arabia established, owned,

operated and controlled a series of state-run "charity" organizations, namely

- the Muslim World League (MWL),
- the International Islamic Relief Organization (IIRO),
- the Rabita Trust,
- the World Assembly of Muslim Youth (WAMY),
- the Benevolence International Foundation (BIF),
- the al Haramain Islamic Foundation (AHIF),
- the Saudi High Commission for Relief of Bosnia and Herzegovina (SHC),
- the Saudi Joint Relief Committee for Kosovo and Albania (SJRC), and
- the Saudi Red Crescent (SRC),

and these organizations are referred to hereinafter as "Saudi Arabia's charity organizations" and,

as further described herein, each of these organizations (i) were so closely related to Saudi

Arabia that they must be considered as part of Saudi Arabia, and/or (ii) were government agents

of Saudi Arabia and/or (iii) were alter-egos of Saudi Arabia, because Saudi Arabia: established,

controlled, operated and regulated each organization through its King, Council of Ministers, the

Supreme Council of Islamic Affairs, the Council of Senior Ulema, Ministry of Islamic Affairs,

Ministry of Foreign Affairs, other Ministries and bodies and Saudi Arabia's Embassies

throughout the world; maintained significant, repeated and extensive control of the day-to-day

operations of each organization; provided each organization with virtually all of its funding and

determined how its funds were distributed; established guidelines, plans and policies that each

organization was required to follow; appointed Saudi Arabia officials and employees to the lead

positions within each organization; staffed each organization with Saudi Arabia's officials and

employees; hired, fired and directed each organization's officers and employees; required each

organization to obtain its approval for ordinary business decisions, including purchases, the

locations of its operations and offices, banking, budgeting and grant decisions; used each

organization's personnel and property as its own; ignored the separate legal status, if any, of each

organization; treated each organization as a part of Saudi Arabia; used each organization to

perform its core governmental functions, including foreign affairs and the advancement of Saudi

Arabia's state religion of Wahhabism throughout the world; and operated, controlled and used

each organization in such a manner that it would work a fraud or injustice to regard the

organization as a legal entity separate from Saudi Arabia.

## I.
### Saudi Arabia's knowledge of
### al Qaeda and its terrorist agenda against
### the United States prior to September 11, 2001

10.     In 1986-89, Saudi Arabia's MWL, IIRO, WAMY, BIF, SRC and AHIF

collaborated with Osama Bin Laden to open offices in Pakistan and Afghanistan as a means to

establish al Qaeda and provide material support and resources for its terrorist operations, and a

top ranking Saudi Arabia official together with other officials, employees and agents of Saudi

Arabia joined in this effort including:

- SRC Director-Pakistan Wael Jelaidan, a close friend and schoolmate of Osama Bin
  Laden, who along with the SRC's Aqeel Abdulaziz al Aqeel, founded the AHIF in
  Pakistan in 1988 as a division of the SRC and in 1989 took charge of the MWL/IIRO
  office in Pakistan;

- MWL's Mohamed Khalifa, Osama Bin Laden's brother-in-law, who established the
  offices of the MWL and IIRO in Peshawar, Pakistan in 1986 using funds provided by
  Osama Bin Laden, pursuant to the instructions of Abdullah Naseef, then MWL's
  Secretary General;

- WAMY's Adel Batterjee, a close friend of Osama Bin Laden who in 1988-89 established
  the operations of the WAMY and BIF (then called Lajnat al Bir al Islamiyah, or LBI) in
  Pakistan;

- a top ranking Saudi Arabia official who controlled the Afghan Jihad Support Committee
  and used it to provide funding for al Qaeda through the various charities, in conjunction

with a 1988 speech of Osama Bin Laden in Saudi Arabia that solicited contributions to
that Committee;

- MWL's Naseef, who met at MWL's office in Peshawar, Pakistan in 1988 with Osama
  Bin Laden and discussed how the MWL could provide operational support for al Qaeda,
  including but not limited to using MWL's offices as a base for al Qaeda operations and
  providing covert assistance to al Qaeda operatives to cross international borders;

and with the material support and resources provided by Saudi Arabia's officials, employees and

agents, and its MWL, IIRO, WAMY, BIF, SRC and AHIF, Osama Bin Laden, Wael Jelaidan,

Mohamed Khalifa, Abdullah Naseef, Adel Batterjee and others founded al Qaeda in Pakistan in

late 1988 - early 1989.

11.     At all relevant times mentioned herein, Saudi Arabia: adopted an extremist

version of Islam, Wahhabism, as the state religion; declared that its propagation was a core

function of the state; and, sought to advance it around the world through Saudi Arabia's Ministry

of Islamic Affairs, Embassies, Saudi Arabia's charity organizations and other government

agents.

12.     As detailed herein, Saudi Arabia knew from at least the early 1990s that al Qaeda

had begun to pursue and carry out terrorist attacks against the United States, and used

Wahhabism to justify its campaign of anti-American violence, but Saudi Arabia's charitable

organizations and Saudi Arabia's officials, employees and agents continued to provide material

support and resources for al Qaeda through and including September 11, 2001.

13.     From 1988 to 1990, Saudi Arabia knew that Osama Bin Laden made public

speeches at his family's mosque in Jeddah and other locations in Saudi Arabia where he declared

that the United States was the primary target of al Qaeda; as an example, in 1990 he stated that:

The Americans won't stop their support of Jews in Palestine until we give them a
lot of blows.  They won't stop until we do jihad against them.

14.     For years prior to September 11, 2001, as further detailed herein, Saudi Arabia, including but not limited to its Embassies, its Ministry of Islamic Affairs, its Ministry of the Interior and Saudi Arabia's charity organizations, had a relationship and communications with Osama Bin Laden and al Qaeda's operatives, associates and activities throughout the world.

15.     For at least a decade prior to and on September 11, 2001, as detailed herein, Saudi Arabia knew that numerous officials, employees and agents of Saudi Arabia were al Qaeda operatives or sympathizers who actively supported al Qaeda's terrorist agenda against the United States.

16.     For years prior to and including September 11, 2001, Saudi Arabia's passport offices and authorities applied a secret marker/indicator to the passports of persons who had known ties to al Qaeda, and this marker/indicator was found in the passports of at least three of the 19 hijackers responsible for the September 11th Attacks, including Nawaf al Hazmi and Khalid al Mihdhar, and others who assisted them, including Omar al Bayoumi, a Saudi Arabia employee and agent who aided the hijackers in 2000-2001 in California, as detailed herein, and information about this marker/indicator was not known by United States consular officers, immigration or law enforcement agencies.

17.     For at least a decade prior to and on September 11, 2001, as detailed herein, Saudi Arabia had knowledge of the violent goals of al Qaeda and its leader Osama Bin Laden to wage terrorist attacks against the United States and its citizens and that al Qaeda had engaged in numerous terrorist attacks and attempted attacks against United States targets.

18.     For at least a decade prior to and on September 11, 2001, support for al Qaeda's terrorist agenda against the United States was pervasive among officials and employees of Saudi Arabia, and Saudi Arabia was duplicitous: it presented a public face to the United States and

other Western countries of a nation fighting al Qaeda and terrorism while at the same time, as detailed herein, Saudi government actors gave al Qaeda substantial material support and resources.

19.     For many years prior to and on September 11, 2001, Saudi Arabia knew of many attempts by al Qaeda to conduct terrorist attacks directed against the United States, including the December 1992 attempt by al Qaeda to attack the United States by bombing two hotels in Sanaa, Yemen where al Qaeda thought U.S. military personnel were staying.

20.     On or shortly after February 26, 1993, Saudi Arabia knew that terrorists affiliated with al Qaeda exploded a truck bomb in the parking garage of the World Trade Center in New York City, with the intent to topple one of the towers into the other, resulting in 6 deaths and over 1,000 injuries.

21.     In or about October 1993, Saudi Arabia knew that al Qaeda was involved in the attack on U.S. military forces in Somalia that resulted in 18 deaths and numerous injuries to U.S. soldiers.

22.     From at least early in 1995, Saudi Arabia knew of an al Qaeda plan to attack the United States called the "Bojinka" plot to simultaneously bomb 10 or more commercial aircraft operated by United States carriers over the Pacific and that al Qaeda did a test run of that plot on December 11, 1994, when it bombed a Philippine Airlines flight, killing one passenger and injuring numerous others.

23.     From at least 1996 through and on September 11, 2001, the United States shared with Saudi Arabia specific information about the threat of al Qaeda terrorist attacks against the United States, including the specific threat of hijacking by al Qaeda of commercial aircraft operated by U.S. carriers.

24. Specifically, from the first half of 1996 through and including September 11, 2001, the United States urgently told Saudi Arabia that it needed background and financial information and other assistance regarding al Qaeda's leader Osama Bin Laden in order to disrupt or interdict the threat of al Qaeda terrorist attacks against the United States and its nationals.

25. In May 1996, Saudi Arabia knew that Osama Bin Laden had to move al Qaeda's base of operations from Sudan to Afghanistan and that Osama Bin Laden's flight from Sudan to Afghanistan received air traffic control services and clearance from Saudi Arabia to overfly its territory.

26. In August 1996, Saudi Arabia knew that al Qaeda through its leader Osama Bin Laden declared and publicized a fatwa for jihad urging the use of terrorism to attack the United States and United States citizens.

27. From 1996 through and including September 11, 2001, Saudi Arabia knew that the Taliban rulers in Afghanistan were providing a safe haven for al Qaeda, Osama Bin Laden and their terrorist operations, including the Afghan terrorist training camps and safe houses described herein.

28. In February 1998, Saudi Arabia knew that al Qaeda through its leader Osama Bin Laden declared and publicized a second fatwa for jihad urging the use of terrorism to attack the United States and its nationals in all nations throughout the world.

29. For at least one year prior to and including August 7, 1998, Saudi Arabia's AHIF knew that al Qaeda was planning to conduct a terrorist attack against the United States Embassies in Kenya and Tanzania, and had specific information that the planned attack against the U.S. Embassy in Kenya would be a suicide bombing carried out by crashing a vehicle into

the Embassy gate and Saudi Arabia's AHIF and IIRO provided material support and resources to al Qaeda to carry out the attack.

30.    On or shortly after August 7, 1998, Saudi Arabia knew that al Qaeda carried out the twin suicide bombing attacks of the United States Embassies in Kenya and Tanzania that resulted in over 200 deaths.

31.    On or shortly after August 20, 1998, Saudi Arabia knew that President Clinton issued Executive Order 13099, defining al Qaeda and its leader Osama Bin Laden as terrorists because of their role in the U.S. Embassy bombings and ordered the U.S. military to conduct a cruise missile strike to destroy al Qaeda terrorist bases in Afghanistan.

32.    On or shortly after October 8, 1999, Saudi Arabia knew, from public announcements made by the U.S. government and other sources, that al Qaeda was formally designated by the U.S. Secretary of State under section 219 of the Immigration and Nationality Act, 8 U.S.C. §1189, as a Foreign Terrorist Organization, and Saudi Arabia subsequently knew that the designation of al Qaeda as a Foreign Terrorist Organization remained in force from October 1999 through and including September 11, 2001.

33.    In or shortly after December 1999, Saudi Arabia knew that al Qaeda prepared and attempted to execute a "millennium" bomb attack on the United States, planned for January 1, 2000 at the Los Angeles International Airport, but was thwarted by U.S. and Canadian authorities.

34.    On or shortly after October 12, 2000, Saudi Arabia knew that al Qaeda bombed the U.S.S. Cole while it was being refueled in Yemen, resulting in 17 deaths and numerous injuries to U.S. Navy sailors.

35.     From May 2001 to September 11, 2001, Saudi Arabia knew that the United States made urgent requests for assistance from Saudi Arabia concerning an individual in Saudi Arabia who was in contact with a senior al Qaeda operational coordinator concerning an upcoming al Qaeda terrorist attack against the United States; a high level U.S. government officer later stated that had those requests been heeded, the September 11th Attacks could have been avoided.

**II.**
**Saudi Arabia's tortious acts were a**
**proximate cause of the September 11th Attacks**

36.     The planning for the September 11th Attacks began in 1996 with initial discussions among al Qaeda members of the feasibility of hijacking planes and crashing them into landmarks in the United States and Osama Bin Laden's suggestion that large passenger aircraft be used as the mode of attack; between 1997 and 1999, al Qaeda reconnaissance teams travelled to the U.S. to look at potential targets; in November 1999, a "dry run" was conducted on a U.S. passenger flight to test cockpit security; during 1999 and 2000, the hijackers were recruited by al Qaeda, mainly in Saudi Arabia, and then indoctrinated and trained at various terrorist camps in Afghanistan; in January 2000, the first two hijackers arrived in the United States, and in 2000 and 2001 additional hijackers came to the United States, received flight training and made their final preparations, and then assembled in September 2001 to conduct the attacks.

37.     On September 11, 2001, the 19 al Qaeda hijackers violently broke into the cockpits of four commercial airliners and piloted those planes as weapons in a coordinated terrorist attack on the United States and its citizens, flying two planes into the World Trade Center Towers in New York and a third plane into the Pentagon in Virginia; the fourth plane

crashed in Shanksville, Pennsylvania as the passengers fought with the hijackers over control of the aircraft and thwarted their plans to destroy the U.S. Capitol or White House.

38.     As detailed herein, at each stage of al Qaeda's planning and execution leading up to the September 11th Attacks, Saudi Arabia knowingly provided al Qaeda with support, financing and resources that were material, substantial and critical to the success of the September 11th Attacks.

### A.  Saudi Arabia's direct funding of al Qaeda

39.     During the decade prior to and including September 11, 2001, Saudi Arabia was responsible for substantial funding of al Qaeda that was vital to the operation of that terrorist organization and its preparations for and realization of the September 11th Attacks, including but not limited to the following:

> a.     Saudi Arabia's MWL, IIRO, Rabita Trust, WAMY, BIF, AHIF, SJC, SHC and SRC made substantial financial contributions to al Qaeda, as confirmed by U.S., French, German, Swiss and Saudi Arabia government reports, United Nations reports, the statement of al Qaeda's Zacarias Moussaoui and other sources;

> b.     top ranking Saudi Arabia officials made substantial financial contributions to al Qaeda;

> c.     from 1995 through and including September 11, 2001, Saudi Arabia, acting through its employees and agents, including Khalid al Suwailem, a diplomat and senior official of the Ministry of Islamic Affairs at the Saudi Arabia Embassy in Washington, D.C. and Omar Abdi Mohamed, employed by Saudi Arabia's Ministry of Islamic Affairs with the job title of "Propagator":

fraudulently sought and obtained a visa for Mohamed to enter the United States as a "religious worker" and intentionally disguised the fact that Mohamed was a Saudi Arabia employee; had Mohamed form and operate the Western Somali Relief Agency (WSRA), a California non-profit corporation in San Diego, California; and, used WSRA in a scheme to send substantial funds to al Qaeda;

      d.     from 1998 through and including September 11, 2001, Saudi Arabia, acting through its aforesaid employees and agents of Saudi Arabia's Ministry of Islamic Affairs: (i) fraudulently obtained and/or maintained 26 U.S.C. §501(c)(3) charitable status for WSRA from the Internal Revenue Service, despite the fact that WSRA never performed any charitable acts; (ii) used WSRA to receive money from various sources affiliated with al Qaeda, including but not limited to the AHIF, and (iii) had WSRA send over $350,000 to al Qaeda, via Dahab Shil, a money transfer agency used by al Qaeda, including but not limited to the Dahab Shil office in Karachi, Pakistan, which was founded, staffed and controlled by al Qaeda;

      e.     during the same time period that Saudi Arabia's employees and agents sent over $350,000 via WSRA to al Qaeda, including through the Dahab Shil office in Karachi, Pakistan, Khalid Sheikh Mohamed, the mastermind of the September 11th attacks, was located in Karachi and was handing and sending a total of approximately $400,000 in cash to the hijackers which constituted the primary funding for the September 11th Attacks;

      f.     from 1998 through and including September 11, 2001, Saudi Arabia, acting through its employees and agents, including but not limited to

Fahad al Thumairy, funded al Qaeda by sending substantial sums of money from Saudi Arabia through the King Fahad Mosque, also known as the Ibn Tamiyah Mosque, in Culver City, California, to al Qaeda, or through various organizations, individuals and/or private businesses, including but not limited to charities and/or other businesses, to al Qaeda;

g.      from 1998 through and including September 11, 2001, Fahad al Thumairy: (i) was an accredited diplomat working at Saudi Arabia's Los Angeles Consulate for Saudi Arabia's Ministry of Islamic Affairs; (ii) reported to more senior officials of Saudi Arabia's Ministry of Islamic Affairs at Saudi Arabia's Embassy in Washington, D.C.; (iii) had been selected for his job in Los Angeles by Saudi Arabia's Head of Islamic Affairs in Washington, D.C.; and (iv) was an extremist Imam at the King Fahad Mosque, which was founded and funded by Saudi Arabia;

h.      from 1998 through and including September 11, 2001, Saudi Arabia funded al Qaeda by sending substantial sums of money through the Islamic Center of San Diego, or through various organizations, individuals and/or private businesses, including but not limited to U.S.-based Somali charities and/or other businesses, to al Qaeda;

i.      Saudi Arabia hired and paid employees and agents, including Omar al-Bayoumi and Osama Basnan, who Saudi Arabia knew were al Qaeda operatives and/or sympathizers and who provided al Qaeda with substantial assistance to prepare for the September 11th Attacks;

j.      Bayoumi was employed by Saudi Arabia from the 1970s, and starting in 1995 through and including September 11, 2001, he was assigned by Saudi Arabia to work in San Diego and was compensated by Saudi Arabia through various "ghost jobs" that Bayoumi never actually performed;

k.      in 2000, Bayoumi had a ghost job as a "Senior DSS Programmer" and Saudi Arabia was paying him $3,000 per month when, as detailed herein, he was instructed by two officials from Saudi Arabia's Ministry of Islamic Affairs to provide substantial assistance for two al Qaeda hijackers in California, and Saudi Arabia paid Bayoumi an additional $4,000 per month, categorized as "Other Allowances," that was tied to his work to assist those hijackers and raised his total compensation to $7,000 per month from April 2000 through September 2001, after which that additional monthly payment ended and his compensation reverted to $3,000 per month;

l.      Basnan, who also provided material support and services to the hijackers in California, as detailed herein, received approximately $75,000 in a series of transfers from the Riggs Bank account of the Saudi Arabia Embassy in Washington, D.C. from 1998 through September 2001, including $25,000 paid by the Embassy to Basnan and his wife in 1998 that was reimbursed to the Embassy by Yasin Kadi, a known al Qaeda financial operative, who wired the Embassy $25,000 in May 1998 from his Swiss bank account;

m.      from the late 1990s through and including September 11, 2001, Ahmed al Dubayan and Mohamed Jaber Hassan Fakihi, working for Saudi Arabia's Ministry of Islamic Affairs in Germany and acting in the course and

scope of their jobs for Saudi Arabia as Head of its Islamic Affairs Office at the Saudi Arabia Embassy in Bonn and/or Berlin, provided substantial funds of approximately $800,000 from the Saudi Embassy to support al Qaeda in Germany, including the al Nur Mosque in Berlin;

n.      in addition, Dubayan, Fakihi and the Ministry of Islamic Affairs arranged for the AHIF, with the approval and direct involvement of AHIF's General Director, Aqeel Abdulaziz al Aqeel, to provide funds in excess of $1,000,000 to support al Qaeda through the al Nur Mosque;

o.      the funds were paid by Saudi Arabia's Embassy and the AHIF to the al Nur Mosque at the specific instructions of al Qaeda operatives and Osama Bin Laden; that Mosque was frequented by members of the Hamburg al Qaeda cell led by Mohamed Atta that coordinated and carried out the September 11th Attacks; and, U.S. authorities concluded that Fakihi was "more than just a sympathizer of bin Laden" and was "organizationally involved" with al Qaeda;

p.      from 1996 through and including September 11, 2001, Saudi Arabia funded al Qaeda's recruitment efforts in Germany by sending money to individuals, organizations and/or businesses there, including but not limited to al Qaeda financial operative Mamoun Darkazanli,  Darkazanli Import Export and Abdelfatah Zammar, and those funds underwrote the recruitment by Mamoun Darkazanli, Abdelfatah Zammar and Mohamed Zammar at the al Quds Mosque in Hamburg, Germany of the Hamburg al Qaeda cell members that participated in the September 11th Attacks, including hijackers Mohamed Atta, Ziad Jarrah and

Marwan al Shehhi and other al Qaeda operatives who helped carry out the
September 11th Attacks, including Ramzi bin al-Shibh;

       q.     starting in 2000 through and including September 11, 2001, AHIF
collected over $1,000,000 for al Qaeda from donors in Saudi Arabia and
instructed AHIF's employee and/or agent Abdulaziz Abdulrahman al Baddah to
send those funds to al Qaeda via the Dahab Shil office in Karachi, Pakistan and Al
Wafa Humanitarian Organization in Pakistan;

       r.     from 1988 through and including September 11, 2001, senior
managers of Saudi Arabia's IIRO, through its office in Pakistan, laundered and
diverted IIRO funds to al Qaeda and used false distribution lists of orphan
beneficiaries in Afghanistan as a subterfuge to direct funds to al Qaeda, as
confirmed by Jamal al Fadl, an al Qaeda defector, and senior officials at the
headquarters offices of the MWL and IIRO were aware that IIRO funds were
being diverted to al Qaeda in 1994, if not sooner, yet the practice continued;

       s.     the IIRO's funding of al Qaeda was further confirmed by a 2001
Ernst & Young accounting investigation, which reviewed IIRO records from
1996-2001 and detailed numerous serious discrepancies in IIRO's financial
statements and accounts, including but not limited to that: over half of the funds
transferred from IIRO's headquarters could not be accounted for; over $3 million
of expenditures could not be explained; about $250,000 purportedly spent on aid
to Afghan orphans went missing; signatures on financial documents were faked or
forged; invoices for construction were falsified; and, funds were sent to fictitious
companies created by IIRO directors;

   t.  from 1993 through 1998, Saudi Arabia's IIRO funded al Qaeda by sending approximately $500,000 from the IIRO to the IIRO's endowment arm, Sana-Bell, administered by the IIRO's Suliman al Ali, for a purported real estate project in Fort Washington, MD, managed by Soliman Biheiri, and all or the large majority of that money, along with contributions made by Osama Bin Laden's mother and sisters, Abdullah Bin Laden, Osama Bin Laden's nephew, Yasin Kadi, an al Qaeda operative, and others, altogether totaling approximately $2 million, went missing, and Biheiri's accountant told the FBI that funds were transferred overseas to al Qaeda, or through various organizations, individuals and/or private businesses to al Qaeda, and Biheiri was tried in the Eastern District of Virginia and convicted on federal charges for passport fraud and making false official statements to obstruct a terrorism investigation;

   u.  from 2000 through and including September 11, 2001, Saudi Arabia's WAMY funded al Qaeda by sending over $50,000 to WAMY's account in Canada which was channeled through BIF's orphan program in Afghanistan to al Qaeda, or through various organizations, individuals and/or private businesses to al Qaeda, and less than 25% of the funding for BIF's orphan program was actually used for orphans;

   v.  in 1996-1999, under the pretext of doing construction work in Bosnia, Saudi Arabia's SHC funneled hundreds of thousands of dollars to al Qaeda through companies established by al Qaeda operatives Wael Jelaidan, Yasin Kadi and Shafiq Ayadi, who were later designated by the United States as

Specially Designated Global Terrorists because of their activities to support al Qaeda for the decade prior to the September 11th Attacks;

w.      from 1998 through and including September 11, 2001, Saudi Arabia created the SJRC and appointed Wael Jelaidan, a Saudi Arabia employee since 1985 and former Director of the MWL, as its Executive Director, despite the fact that Saudi Arabia knew that Jelaidan was an active al Qaeda operative and one of the founders of al Qaeda;

x.      Jelaidan proceeded to use his position as SJRC Executive Director in Albania and Kosovo to provide financial and logistical support to al Qaeda through businesses in Albania that were owned and operated by (i) Yasin Kadi, a known al Qaeda financial operative, (ii) Abdelatif Saleh, a known al Qaeda operative and financial supporter with ties to Osama Bin Laden and (iii) Jelaidan himself;

y.      in September 1999, Jelaidan was declared as an "undesirable" by Albania and ordered to leave the country because of his links to a 1998 al Qaeda terrorist plot against the U.S. Embassy in Albania, yet after his expulsion Saudi Arabia continued to retain Jelaidan as SJRC's Executive Director, and Jelaidan was invited to join top ranking Saudi Arabia officials on Saudi Arabia government business trips;

z.      in 1997-2000, Saudi Arabia's BIF sent approximately $80,000 to al Qaeda through a front company named Maram, in Istanbul, Turkey, ostensibly a trading company, that was founded, owned and run by al Qaeda, through its

operatives Mahmdou Salim (also a BIF employee), Wael Jelaidan and Mohamed

Bayazid (BIF's President);

aa.      in or around February 2000, Saudi Arabia's AHIF sent

approximately $150,000 to al Qaeda through a money laundering scheme

whereby funds were received by the AHIF in its U.S. bank account and then

withdrawn from that account and illegally carried out of the U.S. in the form of

cash and traveler's checks by Soliman al Buthe, a senior member of the Saudi

government for the city of Riyadh, an AHIF officer and President of AHIF in the

U.S., and then distributed through various channels to al Qaeda;

bb.      in the late 1980s, Saudi Arabia's MWL sent its employee and

agent Mohamed Khalifa, Osama Bin Laden's brother-in-law, to found a

MWL/IIRO office in the Philippines and thereafter in or around 1994, money

from Saudi Arabia's IIRO through its Philippines' office was used to fund an al

Qaeda affiliated terrorist cell headed by Ramzi Yousef, the 1993 World Trade

Center bomber, to carry out terrorist attacks against the United States, including

the 1995 Bojinka plot and its test run, the December 1994 Philippine Airlines

bombing, which were forerunners of the September 11th Attacks;

cc.      following the September 11th Attacks, the United States formally

declared in Exec. Order No. 13224 (as issued in 2001 and updated in 2001, 2002,

2004, 2006 and 2008) that all or portions of four of Saudi Arabia's charity

organizations, namely the AHIF, IIRO, Rabita Trust and BIF, and numerous

employees of Saudi Arabia's charity organizations, including Wael Jelaidan

(MWL, IIRO, SRC, SJRC, Rabita Trust), Abdelhamid al Mujil (IIRO), Soliman al

Buthe (AHIF), Aqeel al Aqeel (AHIF), Adel Batterjee (WAMY, BIF), Enaam

Arnaout (MWL, WAMY, BIF) were Specially Designated Global Terrorists,

based on the material support and resources they provided to al Qaeda prior to the

September 11th Attacks; and

      dd.    prior to and including September 11, 2001, Saudi Arabia funded al

Qaeda in additional ways, as will be determined through further investigation,

disclosures and discovery of Saudi Arabia.

### B.  Saudi Arabia's material support of the Afghan terrorist training camps used to indoctrinate and provide terrorist training for the 19 hijackers

40.    Each of the 19 hijackers and others involved in supporting the September 11th

Attacks were indoctrinated and given their terrorist training necessary to prepare for and execute

the September 11th Attacks at one or more al Qaeda terrorist training camps located in

Afghanistan, hereinafter called the "Afghan terrorist training camps", including:

- "Al Farouq 1" (hijackers Nawaf al Hazmi and Khalid al Mihdhar);

- "Al Farouq 2" (hijackers Abdelaziz al Omari, Ahmed al Ghamdi, Ahmed al Haznawi, Ahmed al Nami, Fayez Banihammad, Hamza al Ghamdi, Hani Hanjour, Mohand Shehri, Salem al Hazmi, Sayid al Ghamdi, Wail al Shehri and Walid al Shehri);

- "Khalden" (hijackers Khalid al Mihdhar, Majed al Moqed, Satam al Suqami);

- "al Matar" (hijackers Abdelaziz al Omari, Ahmed al Ghamdi, Ahmed al Haznawi, Ahmed al Nami, Fayez Banihammad, Hamza al Ghamdi, Mohand Shehri, Salem al Hazmi, Sayid al Ghamdi, Wail al Shehri and Walid al Shehri);

- "Mes Aynak" (hijackers Nawaf al Hazmi and Khalid al Mihdhar); and

- "Tarnak Farms" (hijackers Ziad Jarrah, Mohamed Atta and Marwan al Shehhi).

41.    Those Afghan terrorist training camps provided training to the 19 hijackers in

various skills that they used to execute the September 11th Attacks, including aircraft hijacking,