discipline, hand-to-hand combat, weaponry (including the use of knives and blades to murder),

hostage taking, religious indoctrination, English language skills and U.S. culture.

42.     For years prior to and including September 11, 2001, Saudi Arabia's IIRO, AHIF

and MWL provided substantial funding and other material support for the Afghan terrorist

training camps attended by the 19 hijackers in Afghanistan, including but not limited to the

following:

> a.     Saudi Arabia's IIRO was the principal source of funding and other
>
> material support to establish and operate the Afghan terrorist training camps, as
>
> confirmed by:

> i.     a 1996 C.I.A. report, which stated that the IIRO funded six terrorist
> training camps in Afghanistan;

> ii.     a 2003 report by the United Nations Security Council, which stated that
> "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to
> September 11";

> iii.     a 2004 U.S. State Department cable, which described the IIRO as "the
> principal sponsor of terrorist training camps in Afghanistan during the Taliban regime",
> *i.e.* from 1996 through and including September 11, 2001;

> iv.     a 2003 report which stated that an IIRO employee, Abu Nasir, was
> informed by his superiors in the 1990s that approximately 40 to 50 percent of IIRO's
> charitable funds was being diverted to finance terrorist training camps in Afghanistan and
> Kashmir;

> v.     a January 2001 French intelligence report;

> vi.     the statement of Zacarias Moussaoui;

> vii.     U.S. reports regarding the September 11th Attacks which tied the IIRO to
> funding of the Afghan training camps; and

> viii.     in 2001 through and including September 11, 2001, at least one IIRO
> employee was also a trainer at the Afghan terrorist training camps;

b.      Saudi Arabia's AHIF provided major funding to establish and

operate the Afghan training camps, as confirmed by:

i.      the statement of Zacarias Moussaoui;

ii.      U.S. reports regarding the September 11th Attacks tied the AHIF to funding of the Afghan training camps; and

iii.      in the 1990s through and including September 11, 2001, a representative of Saudi Arabia's AHIF in Belgium was a recruiter for al Qaeda Afghan terrorist training camps;

c.      the MWL, IIRO and AHIF paid for transportation for al Qaeda

operatives to attend the Afghan terrorist training camps;

d.      the MWL, IIRO and AHIF paid for building materials and

electrical supplies necessary to construct the Afghan terrorist training camps; and

e.      the MWL, IIRO and AHIF funded and provided material support

for the Afghan terrorist training camps in additional ways, as will be determined

through further investigation, disclosures and discovery of Saudi Arabia.

### C.  Saudi Arabia's logistical support of al Qaeda

43.      During the decade prior to and including September 11, 2001, and during the

period that al Qaeda was actively planning the September 11th Attacks, Saudi Arabia provided

material logistical support and resources to al Qaeda, including, but not limited to the following:

a.      U.S. State Department officials concluded that Osama Bin Laden

"used the entire IIRO network for his terrorist activities";

b.      in the late 1990s through and including September 11, 2001, the

office and guesthouse of Saudi Arabia's IIRO in Kandahar, Afghanistan was

operated as a way-station and safe house for al Qaeda operatives travelling to the

Afghan terrorist training camps;

c.      in or around October 1998 through and including September 11, 2001, Saudi Arabia announced that it closed its Embassy/Ambassador's residence in Kabul, Afghanistan (following al Qaeda's bombings of U.S. Embassies in Tanzania and Kenya) and thereafter, the Director of the AHIF in Afghanistan was instructed by "Riyadh" (the capital city of Saudi Arabia and location of the headquarters office of Saudi Arabia's AHIF) to open an office at that Embassy/Ambassador's residence; and, the AHIF operated such an office and provided material support and resources to al Qaeda through that office;

d.      in or around October 1998 through and including September 11, 2001, Saudi Arabia's Embassy/Ambassador's residence in Kabul was used as a "guesthouse", i.e. safe house, by al Qaeda; and, Osama Bin Laden and numerous other al Qaeda operatives, likely including several of the 19 hijackers, stayed at that safe house;

e.      from 1998 through and including September 11, 2001, Saudi Arabia provided funding and military equipment to the Taliban, including through Saudi Arabia's charity organizations, including but not limited to the AHIF, to support the use of Afghanistan as a safe haven for al Qaeda;

f.      from 1998 through and including September 11, 2001, Saudi Arabia facilitated and provided support and services for the Taliban controlled airline, Afghan Ariana Airlines, to conduct flights between Afghanistan and Saudi Arabia which Saudi Arabia knew were being conducted as a supply service for al Qaeda to shuttle guns, money and al Qaeda recruits and operatives to Afghanistan;

423

g.      prior to and including September 11, 2001, Saudi Arabia Embassy diplomats in Bosnia coordinated financial support from Saudi Arabia's AHIF to al Qaeda operatives;

h.      in 1997 through and including September 11, 2001, Saudi Arabia's AHIF operated a program in Azerbaijan that provided training for AHIF employees in money laundering techniques to fund al Qaeda using bank accounts, money transfer companies and cash couriers and those employees were then deployed to Pakistan and used those money laundering techniques to receive funds from the AHIF in Saudi Arabia and send those funds to al Qaeda in Pakistan and Afghanistan, as described herein;

i.      from 1998 through and including September 11, 2001, Saudi Arabia's BIF, assisted al Qaeda and Osama Bin Laden with the procurement and transport of materials and weapons, and the transfer of al Qaeda funds, including via the use of "front companies" in various countries, including but not limited to Sudan, Turkey and the U.A.E.;

j.      Saudi Arabia's state-run Imam Muhammad Ibn Saud Islamic University ("Imam University") employed numerous instructors who were al Qaeda operatives or sympathizers, recruited and indoctrinated its students to join al Qaeda, and at least five of the 19 hijackers responsible for the September 11th Attacks, together with other al Qaeda operatives who attended Imam University, were likely recruited as al Qaeda operatives by Saudi Arabia's employees and agents;

k.      in or around July 2001, Saudi Arabia's passport office and authorities issued a passport under a false name to Khalid Sheikh Mohamed, a Pakistani citizen who worked with and for al Qaeda to plan, carry out and mastermind the September 11th Attacks;

l.      from 1996 through and including September 11, 2001, Saudi Arabia assisted various of its employees and agents who provided material support and resources to al Qaeda for the September 11th Attacks to obtain fraudulent visas to enter the United States, in violation of federal law, and failed to advise U.S. officials, including the U.S. Attorney General, that the employees and agents were working for Saudi Arabia inside the United States, in violation of federal law, including but not limited to the following:

- Omar Abdi Mohamed, who first entered the U.S. on a fraudulent religious worker visa in 1995, and did not declare that he was actually working for Saudi Arabia, and was ultimately prosecuted, convicted and deported from the United States in 2006 for those false statements;

- Omar al Bayoumi, who repeatedly entered the U.S. on a student visa for several years prior to and including 1999-2000, even though he was not attending school, was collecting salary for a "ghost job" while actually working for Saudi Arabia, and provided material support and resources for the al Qaeda hijackers, as described herein;

- Osama Basnan, who entered the U.S. on a tourist visa in 1996, when he was working for Saudi Arabia, and provided material support and resources for the al Qaeda hijackers, as described herein, and did not leave the U.S. until August 2002, after he was convicted for visa fraud and deported;

m.      Saudi Arabia's passport offices and authorities provided al Qaeda operatives, including several of the 19 hijackers involved in the September 11th Attacks, with new, "cleansed" passports to allow them to travel and obtain visas without suspicion, including but not limited to removing references to travel through Pakistan to the Afghan terrorist training camps;

n.      Saudi Arabia's SRC, MWL, IIRO, WAMY and/or AHIF provided Osama Bin Laden and other al Qaeda operatives with identification cards and visas for travel, including to the Afghan terrorist training camps;

o.      Saudi Arabia's AHIF provided secret courier services for al Qaeda, including but not limited to such services provided by AHIF employee and/or agent Abdirashid Aidid, who was based in Pakistan in 2000;

p.      Saudi Arabia's AHIF faxed coded messages for al Qaeda, including but not limited to a message sent from AHIF in Albania to an al Qaeda operative in London in 1998 related to an al Qaeda plot in the summer of 1998 to attack the U.S. Embassy in Tirana, Albania;

q.      in 1998-99, Saudi Arabia's IIRO and AHIF provided computers and other materials to al Qaeda in Afghanistan;

r.      in 1999-2000, Saudi Arabia provided Wahhabist books and literature to al Qaeda in Kandahar, Afghanistan that were used to indoctrinate the Taliban leadership and al Qaeda recruits, including the 19 hijackers involved in the September 11th Attacks;

s.      in 1992-1996, al Qaeda sent operatives to fight in the Bosnian war, including two of the 19 hijackers, and Saudi Arabia's charity organizations, including the SHC, WAMY, BIF and AHIF, provided those al Qaeda operatives with employment, identification, food, weapons and equipment, and the SHC employed various al Qaeda operatives, including Ali Ahmed Ali Hamad, Abdelsamad al Bahrani, Hassam al Din, Abu Miqdad al Dosari, Abu Abdelmalik al Libi, and Yusuf Rahman in Bosnia, and Abdullah al Matrafi in Mecca;

t.      from 1992 to 1996, a high ranking Saudi Arabia official, the SHC and IIRO sent millions of dollars to the Third World Relief organization, an al Qaeda front, with the knowledge that a substantial portion of such contributions would fund al Qaeda, including the transportation of al Qaeda operatives to the war in Bosnia, and the purchase of various weapons, including but not limited to grenade launchers, rifles, guns and chemical cartridges;

u.      in 1993, Saudi Arabia's SHC, which at the time was run by a top ranking Saudi Arabia official, as confirmed by the U.S. Defense Intelligence Agency, provided weapons to a Somali faction who were being trained by al Qaeda and those weapons were used to kill numerous U.S. servicemen who were providing security for a U.N. humanitarian mission in Somalia; and,

v.      prior to and including September 11, 2001, Saudi Arabia provided logistical support to al Qaeda in additional ways, as will be determined through further investigation, disclosures and discovery of Saudi Arabia.

### D.  Saudi Arabia's material support for al Qaeda's planning and execution of the September 11th Attacks

44.      Saudi Arabia provided material support and resources for al Qaeda and the 19 hijackers directly linked to the actual planning and execution of the September 11th Attacks, including but not limited to the following:

a.      as detailed above, Saudi Arabia was responsible for the financing of the plot through various schemes that funded al Qaeda at the same time that the 19 hijackers were being handed or sent money (¶39c - h, ¶39q, ¶43h); paid Saudi Arabia's agents and employees for their work to assist the hijackers (¶39i - l);

provided money for the recruitment and support of al Qaeda's Hamburg cell (¶39m - p); bankrolled the Afghan terrorist training camps attended by all 19 hijackers (¶40 - 42); and, logistical help used by the hijackers and their support network, including safe houses and identification (¶43b - d, ¶43k - n);

b.     in or before January 2000, a senior Saudi Arabia official at Saudi Arabia's Embassy in Washington, D.C. gave instructions to Saudi diplomat Fahad al Thumairy and Omar al Bayoumi, another agent and employee working for Saudi Arabia, including for its Embassy in Washington, D.C., its Consulate in Los Angeles, Ministry of Higher Education, Ministry of Islamic Affairs, Ministry of Defense, and/or other agencies, to meet with and provide cover, advice, planning, safe houses and other material support and resources to al Qaeda hijackers Khalid al Mihdhar and Nawaf al Hazmi, the first of the 19 hijackers to arrive in the United States;

c.     in or around January 2000, Thumairy met in person in Los Angeles with Mihdhar and Hazmi upon their arrival in the United States, assisted them with transportation and housing, including arranging an apartment for the hijackers at the Avalon Westside apartments in Los Angeles, and met with and directed Bayoumi and others, including but not limited to Oualid Benomrane and Mohdar Abdullah, to provide material support and resources to hijackers Mihdhar and Hazmi;

d.     from January 2000 through and including September 11, 2001, Bayoumi, acting in the course and scope of his employment with Saudi Arabia and/or as an agent of Saudi Arabia, provided money, cover, advice, planning, safe

houses and other material support and resources to al Qaeda hijackers Mihdhar and Hazmi, including: helping them learn English and American culture and assimilate into the U.S. without drawing attention to themselves; finding them apartments in San Diego; co-signing their lease and providing money for the rent and security deposit; lending them his cellphone; assisting them to open bank accounts; introducing them to others who could provide them with information and assistance, including but not limited to: (i) Osama Basnan, a Saudi Arabia employee and agent working for Saudi Arabia, (ii) Yazeed al Salmi (the nephew of Bayoumi's superior in Saudi Arabia's Ministry of Defense), (iii) Anwar al Aulaqi, an al Qaeda operative in San Diego and Virginia (later designated by the United States as a Specially Designated Global Terrorist), who had meetings not only with Mihdhar and Hazmi, but also with hijacker Hani Hanjour, and provided them with guidance, encouragement and other material support and resources, and (iv) Osama Nooh and Lafi al Harb, two Saudi Arabia Naval officers attending U.S. Navy training in San Diego; and, otherwise assisting them with their preparations for the September 11th Attacks;

  e.   from January 2000 and thereafter before September 11, 2001, Mohdar Abdullah, at the direction of Thumairy and/or Bayoumi, provided material support and resources to hijackers Mihdhar and Hazmi, including but not limited to: assisting them to acclimate and live in California; providing them with transportation to various locations; helping them obtain social security numbers and genuine California driver's licenses; aiding them to locate and obtain phony and illegal California driver's licenses; assisting them to locate and apply to

language and flight schools; performing surveillance of airport facilities with
them; assisting them with visa issues to maintain their legal status in the United
States; and, regularly having meals and various social contacts with them;

f.      from January 2000 and thereafter before September 11, 2001,
Oualid Benomrane, at the direction of Thumairy and another employee or agent
of Saudi Arabia at its Los Angeles Consulate, and for compensation paid by Saudi
Arabia, provided material support and resources to hijackers Mihdhar and Hazmi,
including but not limited to: providing them with transportation to various
locations, assisting them as a translator and helping them to learn English; and,
Benomrane told U.S. law enforcement authorities that: (i) Thumairy asked him to
assist Mihdhar and Hazmi and told him not to tell anyone about the two men and
to keep their presence in California to himself, (ii) Thumairy told him that the two
men were in Los Angeles to visit their sick father in a local hospital and (iii) the
Saudi Consulate had picked up the two men at the Los Angeles airport and found
an apartment for them;

g.      from January 2000 and thereafter before September 11, 2001,
Osama Basnan, a known al Qaeda supporter acting in the course and scope of his
employment with Saudi Arabia and/or as an agent of Saudi Arabia, met with and
had hundreds of phone conversations with Bayoumi, lived across the street from
hijackers Mihdhar and Hazmi in San Diego and met with and provided material
support and resources to them, including putting them in contact with a
commercial airline pilot, Khaled al-Kayed;

      h.      Basnan was working at the Saudi Arabia Embassy in Washington, D.C. in 1992 when he held an event to honor Omar Abdul Rahman, the "Blind Sheikh," who was an al Qaeda supporter convicted in 1995 for his role in masterminding a foiled terrorist attack against various New York City bridges, tunnels and landmarks; in 1998, Basnan and his wife received $25,000 through the Saudi Embassy in Washington, D.C. that was reimbursed to the Embassy by Yasin Kadi, a known al Qaeda financial operative; from February 1999 through and including May 2002, Basnan's wife was paid $2,000-$3,000 each month via checks from that same Embassy; prior to September 11, 2001, Basnan spoke of Osama Bin Laden "as if he were a God"; either Basnan or an associate had phone contacts with the members of al Qaeda's Hamburg cell and Basnan placed regular calls to members of Osama Bin Laden's family; and, after the September 11th Attacks, Basnan celebrated at a party saying that the hijackers were "heroes" and remarked "what a wonderful glorious day it had been" and he later bragged that "that he did more for the hijackers than Bayoumi did";

      i.      in or around June 2000, pursuant to the instructions of Thumiary and/or Bayoumi, Mohdar Abdullah brought Mihdhar and Hazmi to Los Angeles for private meetings held at the King Fahad Mosque and a Los Angeles motel with another al Qaeda operative;

      j.      from June 2000 and thereafter before September 11, 2001, after a trip to Saudi Arabia by Bayoumi, the nephew of his superior in the Ministry of Defense, Yazid Salmi, travelled to San Diego, and Bayoumi found Salmi

accommodation with hijacker Hazmi, and Salmi provided money, including $1,900 in traveller's checks, to Hazmi in September 2000;

k.      in November 1999, Hamdan Shalawi and Mohamed Qudhaieen, both known al Qaeda operatives and/or associates and Imam University graduates, were employed and paid by Saudi Arabia to attend graduate school in Arizona and perform other duties as requested by the Saudi Arabia Embassy in Washington, D.C., and were acting in the course and scope of their employment with Saudi Arabia and/or as agents of Saudi Arabia when they travelled on a commercial airline flight from Phoenix to Washington, D.C. and intentionally attempted on at least two occasions to gain entry to the airplane's cockpit to test and learn U.S. airline security procedures in a "dry run" of the September 11th Attacks;

l.      Shalawi and Qudhaieen were travelling on that flight using tickets paid for by Saudi Arabia with the ostensible purpose of attending a symposium at Saudi Arabia's Institute of Islamic and Arabic Sciences in America (IIASA) with high ranking Saudi Arabia officials, including Abdullah Naseef, former MWL Secretary-General and Vice-Chairman of the Shura Council;

m.      in the late 1980s Shalawi attended and received terrorist training at Masadat al Ansar, then Osama Bin Laden's main training camp; before and after the "dry run," Shalawi and/or Qudhaieen met with others involved in the planning and execution of the September 11th Attacks, including (i) hijacker Hani Hanjour, who they met from 1997-1999 at the Saudi Arabia-funded Tempe Islamic Center in Tempe, AZ; (ii) Thumairy, who they met at the opening of the King Fahad

Mosque in Culver City, CA in 1998; and (iii) several of the muscle hijackers involved in the September 11th Attacks, who underwent training in the fall and winter of 2000-2001 at an Afghan terrorist training camp at the same time as Shalawi; as a result of attending that camp, Shalawi was watchlisted by the United States as a potential terrorist and denied a visa when he attempted to re-enter the United States in August 2001 (likely as part of an al Qaeda terrorist operation); and, in 2000-2001 both Shalawi and Qudhaieen continued their work for Saudi Arabia, and were employed as teachers as Imam University;

       n.      from 1996 through 1999, a top ranking Saudi Arabia official sent money to a construction business in Spain that was operated as a ploy to fund al Qaeda's Spanish cell, which used the money it received to: (i) conduct surveillance and take videotapes of potential terrorist targets, including the World Trade Center, for al Qaeda in the United States, (ii) send tapes of those targets to Osama Bin Laden for his review; and (iii) establish a logistical cell in Turkey to assist the movement of al Qaeda recruits from Europe to Chechnya and Afghanistan, a route taken by members of al Qaeda's Hamburg cell, including several of the 19 hijackers;

       o.      it is likely that additional employees and agents of Saudi Arabia provided the 19 hijackers with material support and resources to carry out the September 11th Attacks, including but not limited to:

    i.      Saleh al Hussayen, a Saudi Arabia Interior Ministry employee who stayed at the same hotel as the hijackers on the evening of September 10, 2001;

    ii.      Saudi Arabia's pilots, who were uniquely situated to furnish the highly specialized flight training obtained by the hijackers, as demonstrated by the flight skills the hijackers used to carry out the September 11th Attacks, including Fahad Bakalka, a

Saudi Arabia pilot who flew for the Royal Family, Osama Bin Laden and Saudi Arabia's National Commercial Bank and was a friend of two of the 19 hijackers, and Mohamed Tahsin, who also flew for Saudi Arabia's National Commercial Bank and was investigated by the FBI for being a financial associate of one of the 19 hijackers;

iii.    Sayid Rageah, a WAMY employee and fund raiser for al Qaeda who was the Imam at a mosque in Maryland visited by the hijackers on September 10, 2001;

iv.    from 1999 through and including September 11, 2001, Abdullah Bin Laden, nephew of Osama Bin Laden, was Saudi Arabia's Administrative Officer at its United States Embassy and Head of WAMY's branch office in the United States, and maintained a close business and personal relationship with Mohamed Harunani, a WAMY contractor (Abdullah Bin Laden was listed as the emergency contact for Harunani's children and they frequently called and sent messages to each other), and Harunani was in contact with several of the al Qaeda hijackers and operatives from the Hamburg cell, including Mohamed Atta and Marwan al Shehhi;

p.    the AHIF's Director in Belgium, Tarek Maroufi, was hired by the AHIF in January 2001 despite his known history as an al Qaeda operative who served a prison sentence for a prior terrorist attack in Belgium, and Maroufi organized the September 9, 2001 murder of Ahmad Shah Massoud, the commander of the Northern Alliance, an opposition force fighting the Taliban and al Qaeda in Afghanistan, by recruiting the assassins and providing them with fake Belgian passports, and Massoud's assassination was arranged to reduce the risk of an attack from Northern Alliance forces that al Qaeda expected would follow from the September 11th Attacks;

q.    in interviews conducted by U.S. authorities following the September 11th Attacks, Saudi Arabia's officers, employees and agents repeatedly lied about their key contacts and information concerning the material assistance they provided to the hijackers and al Qaeda, including:

i.    Thumairy falsely stated that: he did not recognize Bayoumi's name and had never seen Bayoumi in Los Angeles (but they had met on several occasions there and exchanged numerous phone calls); he did not know Abdullah or Benomrane (despite

meeting with them and asking them to help the two hijackers); neither he, the King Fahad Mosque nor the Saudi Consulate rented more than one apartment at the Avalon Westside apartments in Los Angeles (where they actually had extensive additional rentals and where Thumairy arranged for the hijackers to stay upon their arrival);

ii.     Bayoumi falsely stated that: he had only a random several minute encounter with the hijackers at a Los Angeles restaurant (when witnesses said he had lunch with them); after leaving the restaurant he tried to visit the King Fahad Mosque but couldn't find it and returned home without ever visiting it (but a witness confirmed that Bayoumi visited the mosque before and after going to the restaurant); he didn't know where the hijackers stayed immediately following their arrival in San Diego (although Bayoumi himself filled out an application form for the hijackers' apartment which stated that the hijackers had been living with him since their arrival); following his initial contacts with the hijackers, Bayoumi could recall only one occasion when he saw one of the hijackers and it was by chance and from a distance (while Bayoumi lived next door to the hijackers and a witness stated that he saw Bayoumi with the hijackers at their apartment on numerous occasions); he did not tell Mohdar to provide assistance to the hijackers (while Mohdar told authorities that Bayoumi asked him to drive the hijackers around San Diego and help them enroll in classes); he did not have any relationship with Basnan (but investigators concluded they were extremely close, with over 700 phone calls exchanged between them); no one told him to help the hijackers (while Thumairy and a superior in Washington, D.C. gave Bayoumi such instructions and Bayoumi's phone records confirm those contacts);

iii.     Basnan was found by the authorities to have an "utter lack of credibility on virtually every material subject," and falsely claimed not to know Bayoumi (despite their numerous contacts and phone calls); denied knowing Omar Bakarbashat, a friend and supporter of the hijackers (despite the fact that Bakarbashat was Basnan's brother-in-law); and, denied ever seeing the hijackers or saying that he did (yet boasted to a witness that he provided more support to the hijackers than Bayoumi and lived across the street from them for several months);

iv.     Saleh al Hussayen faked a seizure during his interview with the authorities, was taken to the hospital, where doctors found him in good health, and thereafter Hussayen quickly fled the United States;

v.     Omar Abdi Mohamed falsely stated that the WSRA "charity" was an entity in name only, had never received funds and had no money (yet over $350,000 was received into and sent out from WSRA's bank account) and failed to reveal that he had been employed by Saudi Arabia's Ministry of Islamic Affairs for 10 years;

vi.     Qudhaieen falsely stated that: he never got near the cockpit on the dry run flight (while witnesses saw him try to enter and rattle the cockpit door on at least two occasions); he did not know Thumairy (but later recanted and admitted that he knew Thumairy); and,

vii.     Shalawi said he was enrolled and present at Arizona State University during the entire 2000-2001 academic year (but did not tell the authorities that he went to an al Qaeda Afghan terrorist training camp in the fall of 2000);

r.     several of the 19 hijackers and others who assisted in the

September 11th Attacks were provided employment by Saudi Arabia, despite

Saudi Arabia's knowledge that they were associated with al Qaeda, including but

not limited to:

i.     Hani Hanjour, a hijacker who worked for the IIRO from 1989-1991 in Pakistan and Afghanistan and likely received payments from Saudi Arabia to attend schools in the United States at various times starting in 1992, including from December 2000 through and including September 11, 2001;

ii.     Mohand Shehri, a hijacker who worked for the IIRO in logistics, moving goods from Peshawar, Pakistan to Kabul, Afghanistan, starting in 1999, and;

iii.     Wail al Shehri, a hijacker who worked for Saudi Arabia as a teacher on a Saudi Arabia military base from 1999 through 2001, during which time he trained at al Qaeda camps in Afghanistan;

iv.     Omar Abdi Mohamed, an employee of Saudi Arabia's Ministry of Islamic Affairs, who, pursuant to directions from a superior in the Ministry, fraudulently obtained a visa to enter the United States and provided substantial funding for al Qaeda through the WSRA charity, as detailed herein;

v.     Omar al Bayoumi, an employee of Saudi Arabia who provided substantial assistance to the hijackers, and who had an indicator in his Saudi Arabia passport of ties to al Qaeda, as detailed herein;

vi.     Fahad al Thumairy, a Saudi Arabia diplomat at its Los Angeles consulate, who provided material assistance to the hijackers and was denied entry to the United States after the September 11th Attacks because of his ties to terrorism;

vii.     Osama Basnan, a Saudi Arabia employee and/or agent and frequent contact of Bayoumi who was a known al Qaeda associate and/or operative;

viii.     Hamdan Shalawi, a Saudi Arabia employee and al Qaeda operative who attended Osama Bin Laden's main terrorist training camp in Afghanistan the late 1980s; and,

ix.     Mohamed Qudhaieen, a Saudi Arabia employee and known al Qaeda associate.

s.      prior to and including September 11, 2001, Saudi Arabia provided material support and resources directly linked to the actual planning and execution of the September 11th Attacks in additional ways, as will be determined through further investigation, disclosures and discovery of Saudi Arabia.

## III.
### Saudi Arabia's domination and control of its charitable organizations

45.    As set forth herein, at all relevant times prior to and on September 11, 2001, Saudi Arabia used its charitable organizations to perform core governmental functions, and those organizations acted as Saudi Arabia's alter-ego and/or agent.

46.    At all relevant times prior to and on September 11, 2001, the MWL, IIRO and Rabita Trust were each part of Saudi Arabia, alter-egos of Saudi Arabia and/or agents of Saudi Arabia, and it would work a fraud or injustice to regard them as legal entities separate from Saudi Arabia, as evidenced by the following:

a. in pleadings filed before this Court, the MWL and IIRO asserted they were   immune from suit because of their status as a foreign sovereign, namely Saudi Arabia;

b. the MWL, IIRO and Rabita Trust were founded by Saudi Arabia, and were closely related organizations with shared employees, bank accounts and offices and their daily operations were overseen by MWL's Secretary General, who was appointed and directed by Saudi Arabia;

c. the Secretary General of the MWL was a Saudi Arabia Minister-level appointment named by Royal Decree and served as the President of the IIRO, appointed the Secretary General of the IIRO, and had the power to hire and fire IIRO employees;

d. the Rabita Trust was part of the MWL and the MWL ran the operations of the Rabita Trust on a day-to-day basis and had the power to hire and fire Rabita Trust employees;

e. MWL, IIRO and Rabita Trust received directions from and sought the approval of Saudi Arabia's King, Minister of Islamic Affairs and other senior officials of Saudi Arabia regarding all aspects of their operations, including but not limited to personnel, finances, bank accounts, donations, funding, travel and project decisions, such as:

i. the approval of the King was obtained for fund raising campaigns;

ii. the MWL sought approval from the Ministry of Islamic Affairs to make trips to foreign countries;

iii. Saudi Embassy officials provided the IIRO with strict instructions regarding making statements to the press;

iv. the Supreme Council of Islamic Affairs directed the MWL to provide project aid, including for Burmese refugees in 1999;

v. the IIRO's Secretary General confirmed in a September 2000 letter that the IIRO was overseen by the Dawa Committee of the Ministry of Islamic Affairs;

f.  the existence of the MWL, IIRO and Rabita Trust was subject to the ongoing approval of Saudi Arabia and could be terminated at any time by Saudi Arabia;

g.  MWL's Secretary General from 1995-2000, Abdullah bin Saleh al Obaid, confirmed under oath that he was appointed to his position by Royal Decree of Saudi Arabia and that the MWL was "sponsored and financially supported by the Saudi Government";

h.  Saudi Arabia's Minister of Islamic Affairs Saleh bin Abdulaziz Al Ash-Shaikh described MWL as a "public" institution of Saudi Arabia;

i.  the annual budget of the MWL, IIRO and Rabita Trust was funded almost exclusively by Saudi Arabia and, for example, MWL's financial records for 2000-01 show that 98.5% of MWL's revenues were paid by Saudi Arabia;

j.  the policies followed by MWL, IIRO and Rabita Trust were determined by a Constitutive Council chaired by the Grand Mufti appointed by the King of Saudi Arabia;

k.  the highest officers of the MWL, IIRO and Rabita Trust responsible for their operations simultaneously held other positions as officials with Saudi Arabia, and reported to higher ranking officials of Saudi Arabia, including but not limited to:

439

   i. MWL's Secretary General was a member of Saudi Arabia's Supreme Council of Islamic Affairs;

   ii. MWL's Jurisprudence Council member was the Head of Saudi Arabia's Shura Council;

   iii. IIRO's Board Director was a member of the Shura Council;

   iv. Rabita Trust's Secretary General was the Executive Director of Saudi Arabia's SJRC;

   v. MWL's Constituent Council Chair was Chair of the Senior Council of Saudi Arabia's Ulema;

   l. employees of the MWL, IIRO and Rabita Trust were simultaneously employed by Saudi Arabia in another capacity, often as employees of a Saudi Arabia Embassy or other Saudi Arabia agency, and reported on a day-to-day basis to more senior employees and officers of Saudi Arabia;

   m. lower level employees of the MWL, IIRO and Rabita Trust reported on a day-to-day basis to more senior MWL, IIRO and Rabita Trust employees and officers who simultaneously worked for Saudi Arabia in another capacity, often as employees of a Saudi Arabia Embassy or other Saudi Arabia agency, and who in turn reported on a day-to-day basis to even more senior employees and officers of Saudi Arabia;

   n. MWL, IIRO and Rabita Trust officials and employees received Saudi Arabia diplomatic passports and traveled in the name of and as representatives of Saudi Arabia;

o.  the employees and officers of the MWL, IIRO and Rabita Trust considered themselves to be employees and officers of Saudi Arabia subject to the exclusive control of Saudi Arabia;

p.  an MWL employee and Director of IIRO in Canada, testified in 1999 that the MWL "is a fully government funded organization" and that "[i]n other words, I work for the government of Saudi Arabia" and "am an employee of that government...."; that "the IIRO is the relief branch of that organization [the MWL] which means that we are controlled in all of our activities and plans by the government of Saudi Arabia..."; and, that the MWL and IIRO "has to abide by the policy of the Government of Saudi Arabia..." and that "[i]f anybody deviates from that, he would be fired; he would not work at all with IIRO or with the [MWL]...";

q.  Saudi Arabia gave the employees of the MWL, IIRO and Rabita Trust the same protections and privileges that it provided to its own employees working abroad;

r.  Saudi Arabia's Embassies paid the salaries of MWL and IIRO employees and/or had the MWL and IIRO pay the salaries of the employees of Saudi Arabia's embassies;

s.  the MWL, IIRO and Rabita Trust shared offices that were provided by Saudi Arabia, at locations chosen by Saudi

441

Arabia, including but not limited to offices located inside Saudi Arabia's embassies around the world, and, as an example, an MWL office in Pakistan operated from the Saudi Arabia Ministry of Islamic Affairs office at the Saudi Embassy;

t.  Saudi Arabia's Embassy bank accounts held the funds of the MWL and IIRO, commingled Saudi Arabia's Embassy funds with the funds of the MWL and IIRO and used Saudi Arabia Embassy bank accounts to receive and disburse MWL and IIRO funds;

u.  Saudi Arabia's Embassies made purchasing decisions for the MWL and IIRO;

v.  Saudi Arabia's Embassies provided the MWL and IIRO with supplies and equipment and/or had the MWL and IIRO provide Saudi embassies with supplies and equipment;

w. Saudi Arabia's Embassy officials reviewed and determined whether or not to grant funding applications made by third parties to the MWL and IIRO;

x.  Saudi Arabia's Embassy officials mediated disputes between the MWL and IIRO and other Saudi Arabia charity organizations;

y.  Saudi Arabia's Embassy officials contacted and lobbied foreign governments on behalf of the MWL and IIRO

442

and their employees, including allowing the MWL and IIRO

to maintain their presence in foreign countries, legal disputes

and obtaining diplomatic license plates;

z.  Saudi Arabia authorized the MWL to provide loans

to Saudi Arabia's Embassy staff;

aa.        the MWL had official Saudi Arabia

clearance to view classified Saudi Arabia documents from the

Saudi Arabia Council of Ministers; and

bb.        such additional facts as set forth herein or

that may be determined through further investigation and

discovery.

47.        At all relevant times prior to and on September 11, 2001, WAMY and BIF were

each part of Saudi Arabia, alter-egos of Saudi Arabia and/or agents of Saudi Arabia, and it would

work a fraud or injustice to regard them as legal entities separate from Saudi Arabia, as

evidenced by the following:

a.        from its inception in 1972, WAMY was established and operated by Saudi Arabia

pursuant to a Royal Decree of Saudi Arabia;

b.        BIF was established as a part of WAMY in 1987 and WAMY funded the

operations of BIF and had the power to hire and fire BIF employees;

c.        the day-to-day operations of WAMY and BIF were subject to the control and

direction of Saudi Arabia's Ministry of Islamic Affairs, Embassies and top ranking officials;

d.        the existence of WAMY and BIF were subject to the ongoing approval of Saudi

Arabia and could be terminated at any time by Saudi Arabia;

e.      the annual budget of WAMY and BIF was funded by Saudi Arabia, and Mutaz

Saleh Abu Unuq, Financial Director of WAMY, confirmed in a 2003 affidavit that he reviewed

WAMY's finances from 1994 through and including September 11, 2001, and stated that Saudi

Arabia funded "a large portion" of WAMY's budget, including but not limited to grants to

WAMY from the Saudi Arabia Ministry of Finance upon the recommendation of the Saudi

Arabia Supreme Council of Islamic Affairs;

f.      WAMY and BIF were governed by WAMY's President and that position was

held by Saudi Arabia's Minister of Islamic Affairs, including from 1999 through and including

September 11, 2001, when Saleh bin Abdulaziz Al Ash-Shaikh, simultaneously acted for Saudi

Arabia as WAMY's President and as Saudi Arabia's Minister of Islamic Affairs;

g.      Saudi Arabia's Minister of Islamic Affairs and WAMY's President Saleh bin

Abdulaziz Al Ash-Shaikh described WAMY as a "public" charity of Saudi Arabia.

h.      Saudi Arabia appointed WAMY's President, Secretary General and members of

WAMY's General Assembly, who, together with WAMY's President, directed WAMY and BIF;

i.      WAMY and BIF received directions from and sought the approval of Saudi

Arabia's King, Minister of Islamic Affairs and other senior officials of Saudi Arabia regarding

all aspects of their operations, including but not limited to finances, personnel, donations,

funding, travel and project decisions, such as:

   i.      from 1999 through and including September 11, 2001, WAMY's
   President was Saudi Arabia's Minister of Islamic Affairs;

   ii.      in February 2000, WAMY's Secretary General confirmed to the Saudi
   government that WAMY operated in accordance with the instructions of Saudi Arabia's
   Minister for Islamic Affairs;

   iii.      WAMY's annual report was submitted to and reviewed by a top ranking
   official of Saudi Arabia;

      iv.        A top ranking official of Saudi Arabia instructed WAMY to provide university placement for specific foreign students;

      v.        Saudi Arabia's Ministry of Islamic Affairs selected and appointed WAMY's overseas employees;

      vi.        Saudi Arabia's Ministry of Islamic Affairs directed WAMY to provide assistance to specific mosques and Islamic centers;

      j.       all of the officers of WAMY and BIF were appointed by Saudi Arabia and many of those officers hold other positions as officials with Saudi Arabia, including but not limited to Dr. Maneh el Johani, WAMY's Secretary General from 1987 through and including September 11, 2001, who also served as a member of Saudi Arabia's Shura Council and head of its Islamic Affairs Committee and Abdullah Naseef, WAMY's vice-chairman and Vice-Chairman of the Shura Council (who, as set forth herein, met with and assisted Osama Bin Laden to establish al Qaeda);

      k.       employees of WAMY and BIF employees were simultaneously employed by Saudi Arabia in another capacity, as employees of a Saudi Arabia Embassy or other Saudi Arabia agency, and reported on a day-to-day basis to more senior employees and officers of Saudi Arabia, for example, Abdullah bin Laden, Osama Bin Laden's nephew and Saudi Arabia's Administrative Officer of its United States Embassy for nearly a decade, was at the same time the Head of WAMY's branch office in the United States;

      l.       lower level employees of WAMY and BIF reported on a day-to-day basis to more senior WAMY and BIF employees and officers who simultaneously worked for Saudi Arabia in another capacity, as employees of a Saudi Arabia Embassy or other Saudi Arabia agency, and who in turn reported on a day-to-day basis to even more senior employees and officers of Saudi Arabia;

m.      employees and officials of WAMY received Saudi Arabia diplomatic passports and traveled in the name of and as representatives of Saudi Arabia;

n.      employees and officers of WAMY and BIF considered themselves to be employees and officers of Saudi Arabia subject to the exclusive control of Saudi Arabia;

o.      Saudi Arabia gave the employees of WAMY and BIF the same protections and privileges that it provided to its own employees working abroad;

p.      Saudi Arabia's U.S. Embassy paid the salaries of WAMY employees, including for example Abdullah Bin Laden and Mohamed Faris;

q.      the offices of WAMY and BIF were provided by Saudi Arabia, at locations chosen by Saudi Arabia, including but not limited to offices inside Saudi Arabia's embassies around the world;

r.      Saudi Arabia's Embassy bank accounts held the funds of the WAMY, commingled Saudi Arabia's Embassy funds with the funds of the WAMY and used Saudi Arabia Embassy bank accounts to receive and disburse WAMY funds;

s.      Saudi Arabia's Embassies provided WAMY and BIF with supplies, services and equipment and/or had WAMY and BIF provide Saudi Arabia's embassies with supplies, services and equipment; and

t.      such additional facts as set forth herein or that may be determined through further investigation and discovery.

48.      At all relevant times prior to and on September 11, 2001, the AHIF was part of Saudi Arabia, an alter-ego of Saudi Arabia and/or an agent of Saudi Arabia, and it would work a fraud or injustice to regard it as a legal entity separate from Saudi Arabia, as evidenced by the following:

a.      in 1988-89, Wael Jelaidan, then the Director of Saudi Arabia's SRC's Pakistan office, directed an SRC employee, Aqeel Abdulaziz al Aqeel, to create the AHIF in Quetta, Pakistan as a division of Saudi Arabia's SRC, and the AHIF was established as a division of the SRC; in 1992 the AHIF established its headquarters office in Saudi Arabia's capital, Riyadh, under the official patronage of a top ranking Saudi Arabia official and Saleh bin Abdulaziz Al Ash-Shaikh, who was later appointed as Deputy and then Minister of Islamic Affairs;

b.      AHIF was governed by AHIF's Chairman and that position was held by Saudi Arabia's Minister of Islamic Affairs, including from 1999 through and including September 11, 2001, when Saleh bin Abdulaziz Al Ash-Shaikh simultaneously held positions for Saudi Arabia as AHIF's Chairman and as Saudi Arabia's Minister of Islamic Affairs;

c.      Saudi Arabia's Ministry of Islamic Affairs appoints AHIF's Board of Directors, General Director and senior management; according to the affidavit testimony of AHIF's Financial and Administrative Manager, Khalid bin Obaid Azzahri, "[AHIF] operates under the supervision of the Saudi Minister of Islamic Affairs, who appoints its Board of Directors and senior management personnel";

d.      AHIF's General Director from AHIF's inception through and including September 11, 2001, Aqeel Abdulaziz al Aqeel, confirmed that "we work under the supervision of Saudi government" and U.S. government investigations showed that at least two Saudi Arabia ministers supervised AHIF;

e.      the annual budget of AHIF was funded by Saudi Arabia, and AHIF's General Director Al Aqeel acknowledged that more than 95% of AHIF's funding came directly from Saudi Arabia;

f.      the day-to-day operations of AHIF were subject to the control and direction of Saudi Arabia's Ministry of Islamic Affairs and Embassies;

g.      the existence of AHIF was subject to the ongoing approval of Saudi Arabia and could be terminated at any time by Saudi Arabia, and in or around June 2004 Saudi Arabia made the decision to terminate AHIF and Saudi Arabia retained the assets of AHIF as its own;

h.      AHIF received directions from and sought the approval of Saudi Arabia's King, Minister of Islamic Affairs, Ministry of Islamic Affairs, the Islamic Affairs Bureaus within Saudi Arabia's Embassies and other officials of Saudi Arabia regarding all aspects of their operations, including but not limited to personnel decisions, finances, bank accounts, funding, travel and project decisions;

i.      many of AHIF's officers and employees held other positions as officials with Saudi Arabia, including its Chairman, its accountant at AHIF's headquarters, Abdulaziz al Shoumar, and AHIF's officer and President of its U.S. branch, Soliman al Buthe, and reported on a day-to-day basis to more senior employees and officers of Saudi Arabia;

j.      lower level employees of AHIF reported on a day-to-day basis to more senior AHIF employees and officers who simultaneously worked for Saudi Arabia in another capacity, often as employees of a Saudi Arabia Embassy or other Saudi Arabia agency, and who in turn reported on a day-to-day basis to even more senior employees and officers of Saudi Arabia;

k.      offices of the AHIF were provided by Saudi Arabia, at locations chosen by Saudi Arabia, including but not limited to offices inside Saudi Arabia's embassies around the world and at Saudi Arabia's embassies and the Ministry of Islamic Affairs, where the AHIF's Administrative Board operated;

l.      Saudi Arabia's embassies provided AHIF with supplies, services and equipment and/or had AHIF provide Saudi Arabia's embassies with supplies, services and equipment;

m.      employees of AHIF deemed themselves employees of Saudi Arabia bound to follow policies and dictates set by Saudi Arabia;

n.      after Saudi Arabia withdrew its Ambassador from the Saudi Arabia Embassy in Kabul, Afghanistan, the Director of the AHIF in Afghanistan was instructed to take possession of that Embassy, and the AHIF occupied that Embassy, as described herein;

o.      Saudi Arabia Embassy officials offered to conceal AHIF documents from law enforcement agencies; and

p.      such additional facts as set forth herein or that may be determined through further investigation and discovery.

49.      At all relevant times prior to and on September 11, 2001, the SHC was part of Saudi Arabia, an alter-ego of Saudi Arabia and/or an agent of Saudi Arabia, and it would work a fraud or injustice to regard it as a legal entity separate from Saudi Arabia, as evidenced by the following:

a.      in a pleading previously filed before this Court, the SHC specifically asserted that it was immune from suit because of its status as a foreign sovereign, namely Saudi Arabia;

b.      according to affidavit testimony of the Minister of State of the Council of Ministers of Saudi Arabia, Dr. Mutlib bin Abdullah al Nafissa, the SHC "is an arm of the Saudi Arabian government" and "[a]ctions taken by the SHC properly are viewed as actions of the Government of Saudi Arabia...";

c.      according to affidavit testimony of Saud bin Mohammad al Roshood, Director of the Executive Office of the SHC, the SHC was created by a decision of the President of the

Council of Ministers of Saudi Arabia, has been continuously headed by Prince (now King) Salman, and SHC's Executive Committee and Supreme Commission of the SHC include Saudi Arabia officials;

     d.     the Director of the SHC was a Saudi Arabia employee and member of the Saudi Arabia civil service and reported to other Saudi Arabia employees;

     e.     Saudi Arabia provided all of the funding to operate the SHC; all of the fund raising of the SHC was sanctioned by Saudi Arabia; and, Saudi Arabia was the largest source of charity funding for the SHC;

     f.     the existence of the SHC was subject to the ongoing approval of Saudi Arabia and could be terminated at any time by Saudi Arabia;

     g.     Saudi Arabia decided the recipients and amounts of grants made by the SHC;

     h.     employees of SHC were considered to be employees of Saudi Arabia and members of the civil service of Saudi Arabia and deemed themselves employees of Saudi Arabia bound to follow policies and dictates set by Saudi Arabia;

     i.     the SHC was staffed with civil servant employees of Saudi Arabia detailed from other Saudi Arabia ministries and administrative organs, and such employees were paid by their respective ministries and administrative organs, rather than by the SHC; and

     j.     such additional facts as set forth herein or that may be determined through further investigation and discovery.

     50.     At all relevant times prior to and on September 11, 2001, the SJRC was part of Saudi Arabia, an alter-ego of Saudi Arabia and/or an agent of Saudi Arabia, and it would work a fraud or injustice to regard it as a legal entity separate from Saudi Arabia, as evidenced by the following: