# Exhibit 1

# THE 9/11 COMMISSION REPORT

# CONTENTS

*List of Illustrations and Tables   ix*

*Member List   xi*

*Staff List   xiii–xiv*

*Preface   xv*


1. "WE HAVE SOME PLANES"   1
   1.1   Inside the Four Flights   1
   1.2   Improvising a Homeland Defense   14
   1.3   National Crisis Management   35

2. THE FOUNDATION OF THE NEW TERRORISM   47
   2.1   A Declaration of War   47
   2.2   Bin Ladin's Appeal in the Islamic World   48
   2.3   The Rise of Bin Ladin and al Qaeda (1988–1992)   55
   2.4   Building an Organization, Declaring
         War on the United States (1992–1996)   59
   2.5   Al Qaeda's Renewal in Afghanistan (1996–1998)   63

3. COUNTERTERRORISM EVOLVES   71
   3.1   From the Old Terrorism to the New:
         The First World Trade Center Bombing   71
   3.2   Adaptation—and Nonadaptation—
         in the Law Enforcement Community   73
   3.3   . . . and in the Federal Aviation Administration   82
   3.4   . . . and in the Intelligence Community   86

3.5   ... and in the State Department and the Defense Department   93

3.6   ... and in the White House   98

3.7   ... and in the Congress   102

4. RESPONSES TO AL QAEDA'S INITIAL ASSAULTS   108

4.1   Before the Bombings in Kenya and Tanzania   108

4.2   Crisis: August 1998   115

4.3   Diplomacy   121

4.4   Covert Action   126

4.5   Searching for Fresh Options   134

5. AL QAEDA AIMS AT THE AMERICAN HOMELAND   145

5.1   Terrorist Entrepreneurs   145

5.2   The "Planes Operation"   153

5.3   The Hamburg Contingent   160

5.4   A Money Trail?   169

6. FROM THREAT TO THREAT   174

6.1   The Millennium Crisis   174

6.2   Post-Crisis Reflection: Agenda for 2000   182

6.3   The Attack on the USS *Cole*   190

6.4   Change and Continuity   198

6.5   The New Administration's Approach   203

7. THE ATTACK LOOMS   215

7.1   First Arrivals in California   215

7.2   The 9/11 Pilots in the United States   223

7.3   Assembling the Teams   231

7.4   Final Strategies and Tactics   241

8. "THE SYSTEM WAS BLINKING RED"   254

8.1   The Summer of Threat   254

8.2   Late Leads—Mihdhar, Moussaoui, and KSM   266

9. HEROISM AND HORROR   278

9.1   Preparedness as of September 11   278

9.2   September 11, 2001   285

9.3   Emergency Response at the Pentagon   311

9.4   Analysis   315

10. WARTIME   325

    10.1   Immediate Responses at Home   326

    10.2   Planning for War   330

    10.3   "Phase Two" and the Question of Iraq   334

11. FORESIGHT—AND HINDSIGHT   339

    11.1   Imagination   339

    11.2   Policy   348

    11.3   Capabilities   350

    11.4   Management   353

12. WHAT TO DO? A GLOBAL STRATEGY   361

    12.1   Reflecting on a Generational Challenge   361

    12.2   Attack Terrorists and Their Organizations   365

    12.3   Prevent the Continued Growth of Islamist Terrorism   374

    12.4   Protect against and Prepare for Terrorist Attacks   383

13. HOW TO DO IT? A DIFFERENT WAY OF
    ORGANIZING THE GOVERNMENT   399

    13.1   Unity of Effort across the Foreign-Domestic Divide   400

    13.2   Unity of Effort in the Intelligence Community   407

    13.3   Unity of Effort in Sharing Information   416

    13.4   Unity of Effort in the Congress   419

    13.5   Organizing America's Defenses in the United States   423

*Appendix A: Common Abbreviations*   429

*Appendix B: Table of Names*   431

*Appendix C: Commission Hearings*   439

*Notes*   449

# LIST OF ILLUSTRATIONS
# AND TABLES

| p. 15 | FAA Air Traffic Control Centers |
| p. 15 | Reporting structure, Northeast Air Defense Sector |
| p. 32–33 | Flight paths and timelines |
| p. 49 | Usama Bin Ladin |
| p. 64 | Map of Afghanistan |
| p. 148 | Khalid Sheikh Mohammed |
| p. 238–239 | The 9/11 hijackers |
| p. 279 | The World Trade Center Complex as of 9/11 |
| p. 284 | The World Trade Center radio repeater system |
| p. 288 | The World Trade Center North Tower stairwell with deviations |
| p. 312 | The Twin Towers following the impact of American Airlines Flight 11 and United Airlines Flight 175 |
| p. 313 | The Pentagon after being struck by American Airlines Flight 77 |
| p. 313 | American Airlines Flight 93 crash site, Shanksville, Pennsylvania |
| p. 413 | Unity of effort in managing intelligence |



# COMMISSION MEMBERS

Thomas H. Kean
CHAIR

Lee H. Hamilton
VICE CHAIR

Richard Ben-Veniste

Bob Kerrey

Fred F. Fielding

John F. Lehman

Jamie S. Gorelick

Timothy J. Roemer

Slade Gorton

James R. Thompson

# COMMISSION
# STAFF

Philip Zelikow, *Executive Director*
Christopher A. Kojm, *Deputy Executive Director*
Daniel Marcus, *General Counsel*

Joanne M. Accolla
*Staff Assistant*

Alexis Albion
*Professional Staff Member*

Scott H. Allan, Jr.
*Counsel*

John A. Azzarello
*Counsel*

Caroline Barnes
*Professional Staff Member*

Warren Bass
*Professional Staff Member*

Ann M. Bennett
*Information Control Officer*

Mark S. Bittinger
*Professional Staff Member*

Madeleine Blot
*Counsel*

Antwion M. Blount
*Systems Engineer*

Sam Brinkley
*Professional Staff Member*

Geoffrey Scott Brown
*Research Assistant*

Daniel Byman
*Professional Staff Member*

Dianna Campagna
*Manager of Operations*

Samuel M. W. Caspersen
*Counsel*

Melissa A. Coffey
*Staff Assistant*

Lance Cole
*Consultant*

Marquittia L. Coleman
*Staff Assistant*

Marco A. Cordero
*Professional Staff Member*

Rajesh De
*Counsel*

George W. Delgrosso
*Investigator*

Gerald L. Dillingham
*Professional Staff Member*

Thomas E. Dowling
*Professional Staff Member*

Steven M. Dunne
*Deputy General Counsel*

Thomas R. Eldridge
*Counsel*

Alice Falk
*Editor*

John J. Farmer, Jr.
*Senior Counsel & Team Leader*

Alvin S. Felzenberg
*Deputy for Communications*

Lorry M. Fenner
*Professional Staff Member*

Susan Ginsburg
*Senior Counsel & Team Leader*

T. Graham Giusti
*Security Officer*

Nicole Marie Grandrimo
*Professional Staff Member*

Douglas N. Greenburg
*Counsel*

Barbara A. Grewe
*Senior Counsel, Special Projects*

Elinore Flynn Hartz
*Family Liaison*

Leonard R. Hawley
*Professional Staff Member*

L. Christine Healey
*Senior Counsel & Team Leader*

Karen Heitkotter
*Executive Secretary*

Walter T. Hempel II
*Professional Staff Member*

C. Michael Hurley
*Senior Counsel & Team Leader*

Dana J. Hyde
*Counsel*

John W. Ivicic
*Security Officer*

Michael N. Jacobson
*Counsel*

Hunter W. Jamerson
*Intern*

Bonnie D. Jenkins
*Counsel*

Reginald F. Johnson
*Staff Assistant*

R. William Johnstone
*Professional Staff Member*

Stephanie L. Kaplan
*Special Assistant & Managing Editor*

Miles L. Kara, Sr.
*Professional Staff Member*

Janice L. Kephart
*Counsel*

Hyon Kim
*Counsel*

Katarzyna Kozaczuk
*Financial Assistant*

Gordon Nathaniel Lederman
*Counsel*

Daniel J. Leopold
*Staff Assistant*

Sarah Webb Linden
*Professional Staff Member*

Douglas J. MacEachin
*Professional Staff Member & Team Leader*

Ernest R. May
*Senior Adviser*

Joseph McBride
*Intern*

James Miller
*Professional Staff Member*

Kelly Moore
*Professional Staff Member*

Charles M. Pereira
*Professional Staff Member*

John Raidt
*Professional Staff Member*

John Roth
*Senior Counsel & Team Leader*

Peter Rundlet
*Counsel*

Lloyd D. Salvetti
*Professional Staff Member*

Kevin J. Scheid
*Professional Staff Member & Team Leader*

Kevin Shaeffer
*Professional Staff Member*

Tracy J. Shycoff
*Deputy for Administration & Finance*

Dietrich L. Snell
*Senior Counsel & Team Leader*

Jonathan DeWees Stull
*Communications Assistant*

Lisa Marie Sullivan
*Staff Assistant*

Quinn John Tamm, Jr.
*Professional Staff Member*

Catharine S. Taylor
*Staff Assistant*

Yoel Tobin
*Counsel*

Emily Landis Walker
*Professional Staff Member & Family Liaison*

Garth Wermter
*Senior IT Consultant*

Serena B. Wille
*Counsel*

Peter Yerkes
*Public Affairs Assistant*

# PREFACE

WE PRESENT THE NARRATIVE of this report and the recommendations that flow from it to the President of the United States, the United States Congress, and the American people for their consideration. Ten Commissioners—five Republicans and five Democrats chosen by elected leaders from our nation's capital at a time of great partisan division—have come together to present this report without dissent.

We have come together with a unity of purpose because our nation demands it. September 11, 2001, was a day of unprecedented shock and suffering in the history of the United States. The nation was unprepared. How did this happen, and how can we avoid such tragedy again?

To answer these questions, the Congress and the President created the National Commission on Terrorist Attacks Upon the United States (Public Law 107-306, November 27, 2002).

Our mandate was sweeping. The law directed us to investigate "facts and circumstances relating to the terrorist attacks of September 11, 2001," including those relating to intelligence agencies, law enforcement agencies, diplomacy, immigration issues and border control, the flow of assets to terrorist organizations, commercial aviation, the role of congressional oversight and resource allocation, and other areas determined relevant by the Commission.

In pursuing our mandate, we have reviewed more than 2.5 million pages of documents and interviewed more than 1,200 individuals in ten countries. This included nearly every senior official from the current and previous administrations who had responsibility for topics covered in our mandate.

We have sought to be independent, impartial, thorough, and nonpartisan. From the outset, we have been committed to share as much of our investigation as we can with the American people. To that end, we held 19 days of hearings and took public testimony from 160 witnesses.

Our aim has not been to assign individual blame. Our aim has been to provide the fullest possible account of the events surrounding 9/11 and to identify lessons learned.

We learned about an enemy who is sophisticated, patient, disciplined, and lethal. The enemy rallies broad support in the Arab and Muslim world by demanding redress of political grievances, but its hostility toward us and our values is limitless. Its purpose is to rid the world of religious and political pluralism, the plebiscite, and equal rights for women. It makes no distinction between military and civilian targets. *Collateral damage* is not in its lexicon.

We learned that the institutions charged with protecting our borders, civil aviation, and national security did not understand how grave this threat could be, and did not adjust their policies, plans, and practices to deter or defeat it. We learned of fault lines within our government—between foreign and domestic intelligence, and between and within agencies. We learned of the pervasive problems of managing and sharing information across a large and unwieldy government that had been built in a different era to confront different dangers.

At the outset of our work, we said we were looking backward in order to look forward. We hope that the terrible losses chronicled in this report can create something positive—an America that is safer, stronger, and wiser. That September day, we came together as a nation. The test before us is to sustain that unity of purpose and meet the challenges now confronting us.

We need to design a balanced strategy for the long haul, to attack terrorists and prevent their ranks from swelling while at the same time protecting our country against future attacks. We have been forced to think about the way our government is organized. The massive departments and agencies that prevailed in the great struggles of the twentieth century must work together in new ways, so that all the instruments of national power can be combined. Congress needs dramatic change as well to strengthen oversight and focus accountability.

As we complete our final report, we want to begin by thanking our fellow Commissioners, whose dedication to this task has been profound. We have reasoned together over every page, and the report has benefited from this remarkable dialogue. We want to express our considerable respect for the intellect and judgment of our colleagues, as well as our great affection for them.

We want to thank the Commission staff. The dedicated professional staff, headed by Philip Zelikow, has contributed innumerable hours to the completion of this report, setting aside other important endeavors to take on this

all-consuming assignment. They have conducted the exacting investigative work upon which the Commission has built. They have given good advice, and faithfully carried out our guidance. They have been superb.

We thank the Congress and the President. Executive branch agencies have searched records and produced a multitude of documents for us. We thank officials, past and present, who were generous with their time and provided us with insight. The PENTTBOM team at the FBI, the Director's Review Group at the CIA, and Inspectors General at the Department of Justice and the CIA provided great assistance. We owe a huge debt to their investigative labors, painstaking attention to detail, and readiness to share what they have learned. We have built on the work of several previous Commissions, and we thank the Congressional Joint Inquiry, whose fine work helped us get started. We thank the City of New York for assistance with documents and witnesses, and the Government Printing Office and W.W. Norton & Company for helping to get this report to the broad public.

We conclude this list of thanks by coming full circle: We thank the families of 9/11, whose persistence and dedication helped create the Commission. They have been with us each step of the way, as partners and witnesses. They know better than any of us the importance of the work we have undertaken.

We want to note what we have done, and not done. We have endeavored to provide the most complete account we can of the events of September 11, what happened and why. This final report is only a summary of what we have done, citing only a fraction of the sources we have consulted. But in an event of this scale, touching so many issues and organizations, we are conscious of our limits. We have not interviewed every knowledgeable person or found every relevant piece of paper. New information inevitably will come to light. We present this report as a foundation for a better understanding of a landmark in the history of our nation.

We have listened to scores of overwhelming personal tragedies and astounding acts of heroism and bravery. We have examined the staggering impact of the events of 9/11 on the American people and their amazing resilience and courage as they fought back. We have admired their determination to do their best to prevent another tragedy while preparing to respond if it becomes necessary. We emerge from this investigation with enormous sympathy for the victims and their loved ones, and with enhanced respect for the American people. We recognize the formidable challenges that lie ahead.

We also approach the task of recommendations with humility. We have

made a limited number of them. We decided consciously to focus on recommendations we believe to be most important, whose implementation can make the greatest difference. We came into this process with strong opinions about what would work. All of us have had to pause, reflect, and sometimes change our minds as we studied these problems and considered the views of others. We hope our report will encourage our fellow citizens to study, reflect—and act.

*Thomas H. Kean*
CHAIR

*Lee H. Hamilton*
VICE CHAIR

# THE 9/11
# COMMISSION
# REPORT

# 1

# "WE HAVE
SOME PLANES"

Tuesday, September 11, 2001, dawned temperate and nearly cloudless in the eastern United States. Millions of men and women readied themselves for work. Some made their way to the Twin Towers, the signature structures of the World Trade Center complex in New York City. Others went to Arlington, Virginia, to the Pentagon. Across the Potomac River, the United States Congress was back in session. At the other end of Pennsylvania Avenue, people began to line up for a White House tour. In Sarasota, Florida, President George W. Bush went for an early morning run.

For those heading to an airport, weather conditions could not have been better for a safe and pleasant journey. Among the travelers were Mohamed Atta and Abdul Aziz al Omari, who arrived at the airport in Portland, Maine.

## 1.1 INSIDE THE FOUR FLIGHTS

**Boarding the Flights**

**Boston: American 11 and United 175.** Atta and Omari boarded a 6:00 A.M. flight from Portland to Boston's Logan International Airport.[1]

When he checked in for his flight to Boston, Atta was selected by a computerized prescreening system known as CAPPS (Computer Assisted Passenger Prescreening System), created to identify passengers who should be subject to special security measures. Under security rules in place at the time, the only consequence of Atta's selection by CAPPS was that his checked bags were held off the plane until it was confirmed that he had boarded the aircraft. This did not hinder Atta's plans.[2]

Atta and Omari arrived in Boston at 6:45. Seven minutes later, Atta apparently took a call from Marwan al Shehhi, a longtime colleague who was at another terminal at Logan Airport. They spoke for three minutes.[3] It would be their final conversation.

Between 6:45 and 7:40, Atta and Omari, along with Satam al Suqami, Wail al Shehri, and Waleed al Shehri, checked in and boarded American Airlines Flight 11, bound for Los Angeles. The flight was scheduled to depart at 7:45.[4]

In another Logan terminal, Shehhi, joined by Fayez Banihammad, Mohand al Shehri, Ahmed al Ghamdi, and Hamza al Ghamdi, checked in for United Airlines Flight 175, also bound for Los Angeles. A couple of Shehhi's colleagues were obviously unused to travel; according to the United ticket agent, they had trouble understanding the standard security questions, and she had to go over them slowly until they gave the routine, reassuring answers.[5] Their flight was scheduled to depart at 8:00.

The security checkpoints through which passengers, including Atta and his colleagues, gained access to the American 11 gate were operated by Globe Security under a contract with American Airlines. In a different terminal, the single checkpoint through which passengers for United 175 passed was controlled by United Airlines, which had contracted with Huntleigh USA to perform the screening.[6]

In passing through these checkpoints, each of the hijackers would have been screened by a walk-through metal detector calibrated to detect items with at least the metal content of a .22-caliber handgun. Anyone who might have set off that detector would have been screened with a hand wand—a procedure requiring the screener to identify the metal item or items that caused the alarm. In addition, an X-ray machine would have screened the hijackers' carry-on belongings. The screening was in place to identify and confiscate weapons and other items prohibited from being carried onto a commercial flight.[7] None of the checkpoint supervisors recalled the hijackers or reported anything suspicious regarding their screening.[8]

While Atta had been selected by CAPPS in Portland, three members of his hijacking team—Suqami, Wail al Shehri, and Waleed al Shehri—were selected in Boston. Their selection affected only the handling of their checked bags, not their screening at the checkpoint. All five men cleared the checkpoint and made their way to the gate for American 11. Atta, Omari, and Suqami took their seats in business class (seats 8D, 8G, and 10B, respectively). The Shehri brothers had adjacent seats in row 2 (Wail in 2A, Waleed in 2B), in the first-class cabin. They boarded American 11 between 7:31 and 7:40. The aircraft pushed back from the gate at 7:40.[9]

Shehhi and his team, none of whom had been selected by CAPPS, boarded United 175 between 7:23 and 7:28 (Banihammad in 2A, Shehri in 2B, Shehhi in 6C, Hamza al Ghamdi in 9C, and Ahmed al Ghamdi in 9D). Their aircraft pushed back from the gate just before 8:00.[10]

**Washington Dulles: American 77.** Hundreds of miles southwest of Boston, at Dulles International Airport in the Virginia suburbs of Washington, D.C., five more men were preparing to take their early morning flight. At 7:15, a pair

of them, Khalid al Mihdhar and Majed Moqed, checked in at the American Airlines ticket counter for Flight 77, bound for Los Angeles. Within the next 20 minutes, they would be followed by Hani Hanjour and two brothers, Nawaf al Hazmi and Salem al Hazmi.[11]

Hani Hanjour, Khalid al Mihdhar, and Majed Moqed were flagged by CAPPS. The Hazmi brothers were also selected for extra scrutiny by the airline's customer service representative at the check-in counter. He did so because one of the brothers did not have photo identification nor could he understand English, and because the agent found both of the passengers to be suspicious. The only consequence of their selection was that their checked bags were held off the plane until it was confirmed that they had boarded the aircraft.[12]

All five hijackers passed through the Main Terminal's west security screening checkpoint; United Airlines, which was the responsible air carrier, had contracted out the work to Argenbright Security.[13] The checkpoint featured closed-circuit television that recorded all passengers, including the hijackers, as they were screened. At 7:18, Mihdhar and Moqed entered the security checkpoint.

Mihdhar and Moqed placed their carry-on bags on the belt of the X-ray machine and proceeded through the first metal detector. Both set off the alarm, and they were directed to a second metal detector. Mihdhar did not trigger the alarm and was permitted through the checkpoint. After Moqed set it off, a screener wanded him. He passed this inspection.[14]

About 20 minutes later, at 7:35, another passenger for Flight 77, Hani Hanjour, placed two carry-on bags on the X-ray belt in the Main Terminal's west checkpoint, and proceeded, without alarm, through the metal detector. A short time later, Nawaf and Salem al Hazmi entered the same checkpoint. Salem al Hazmi cleared the metal detector and was permitted through; Nawaf al Hazmi set off the alarms for both the first and second metal detectors and was then hand-wanded before being passed. In addition, his over-the-shoulder carry-on bag was swiped by an explosive trace detector and then passed. The video footage indicates that he was carrying an unidentified item in his back pocket, clipped to its rim.[15]

When the local civil aviation security office of the Federal Aviation Administration (FAA) later investigated these security screening operations, the screeners recalled nothing out of the ordinary. They could not recall that any of the passengers they screened were CAPPS selectees. We asked a screening expert to review the videotape of the hand-wanding, and he found the quality of the screener's work to have been "marginal at best." The screener should have "resolved" what set off the alarm; and in the case of both Moqed and Hazmi, it was clear that he did not.[16]

At 7:50, Majed Moqed and Khalid al Mihdhar boarded the flight and were seated in 12A and 12B in coach. Hani Hanjour, assigned to seat 1B (first class),

soon followed. The Hazmi brothers, sitting in 5E and 5F, joined Hanjour in the first-class cabin.[17]

**Newark: United 93.** Between 7:03 and 7:39, Saeed al Ghamdi, Ahmed al Nami, Ahmad al Haznawi, and Ziad Jarrah checked in at the United Airlines ticket counter for Flight 93, going to Los Angeles. Two checked bags; two did not. Haznawi was selected by CAPPS. His checked bag was screened for explosives and then loaded on the plane.[18]

The four men passed through the security checkpoint, owned by United Airlines and operated under contract by Argenbright Security. Like the checkpoints in Boston, it lacked closed-circuit television surveillance so there is no documentary evidence to indicate when the hijackers passed through the checkpoint, what alarms may have been triggered, or what security procedures were administered. The FAA interviewed the screeners later; none recalled anything unusual or suspicious.[19]

The four men boarded the plane between 7:39 and 7:48. All four had seats in the first-class cabin; their plane had no business-class section. Jarrah was in seat 1B, closest to the cockpit; Nami was in 3C, Ghamdi in 3D, and Haznawi in 6B.[20]

The 19 men were aboard four transcontinental flights.[21] They were planning to hijack these planes and turn them into large guided missiles, loaded with up to 11,400 gallons of jet fuel. By 8:00 A.M. on the morning of Tuesday, September 11, 2001, they had defeated all the security layers that America's civil aviation security system then had in place to prevent a hijacking.

### The Hijacking of American 11

American Airlines Flight 11 provided nonstop service from Boston to Los Angeles. On September 11, Captain John Ogonowski and First Officer Thomas McGuinness piloted the Boeing 767. It carried its full capacity of nine flight attendants. Eighty-one passengers boarded the flight with them (including the five terrorists).[22]

The plane took off at 7:59. Just before 8:14, it had climbed to 26,000 feet, not quite its initial assigned cruising altitude of 29,000 feet. All communications and flight profile data were normal. About this time the "Fasten Seatbelt" sign would usually have been turned off and the flight attendants would have begun preparing for cabin service.[23]

At that same time, American 11 had its last routine communication with the ground when it acknowledged navigational instructions from the FAA's air traffic control (ATC) center in Boston. Sixteen seconds after that transmission, ATC instructed the aircraft's pilots to climb to 35,000 feet. That message and all subsequent attempts to contact the flight were not acknowledged. From this and other evidence, we believe the hijacking began at 8:14 or shortly thereafter.[24]

Reports from two flight attendants in the coach cabin, Betty Ong and Madeline "Amy" Sweeney, tell us most of what we know about how the hijacking happened. As it began, some of the hijackers—most likely Wail al Shehri and Waleed al Shehri, who were seated in row 2 in first class—stabbed the two unarmed flight attendants who would have been preparing for cabin service.[25]

We do not know exactly how the hijackers gained access to the cockpit; FAA rules required that the doors remain closed and locked during flight. Ong speculated that they had "jammed their way" in. Perhaps the terrorists stabbed the flight attendants to get a cockpit key, to force one of them to open the cockpit door, or to lure the captain or first officer out of the cockpit. Or the flight attendants may just have been in their way.[26]

At the same time or shortly thereafter, Atta—the only terrorist on board trained to fly a jet—would have moved to the cockpit from his business-class seat, possibly accompanied by Omari. As this was happening, passenger Daniel Lewin, who was seated in the row just behind Atta and Omari, was stabbed by one of the hijackers—probably Satam al Suqami, who was seated directly behind Lewin. Lewin had served four years as an officer in the Israeli military. He may have made an attempt to stop the hijackers in front of him, not realizing that another was sitting behind him.[27]

The hijackers quickly gained control and sprayed Mace, pepper spray, or some other irritant in the first-class cabin, in order to force the passengers and flight attendants toward the rear of the plane. They claimed they had a bomb.[28]

About five minutes after the hijacking began, Betty Ong contacted the American Airlines Southeastern Reservations Office in Cary, North Carolina, via an AT&T airphone to report an emergency aboard the flight. This was the first of several occasions on 9/11 when flight attendants took action outside the scope of their training, which emphasized that in a hijacking, they were to communicate with the cockpit crew. The emergency call lasted approximately 25 minutes, as Ong calmly and professionally relayed information about events taking place aboard the airplane to authorities on the ground.[29]

At 8:19, Ong reported: "The cockpit is not answering, somebody's stabbed in business class—and I think there's Mace—that we can't breathe—I don't know, I think we're getting hijacked." She then told of the stabbings of the two flight attendants.[30]

At 8:21, one of the American employees receiving Ong's call in North Carolina, Nydia Gonzalez, alerted the American Airlines operations center in Fort Worth, Texas, reaching Craig Marquis, the manager on duty. Marquis soon realized this was an emergency and instructed the airline's dispatcher responsible for the flight to contact the cockpit. At 8:23, the dispatcher tried unsuccessfully to contact the aircraft. Six minutes later, the air traffic control specialist in American's operations center contacted the FAA's Boston Air Traffic Control Center about the flight. The center was already aware of the problem.[31]

Boston Center knew of a problem on the flight in part because just before 8:25 the hijackers had attempted to communicate with the passengers. The microphone was keyed, and immediately one of the hijackers said, "Nobody move. Everything will be okay. If you try to make any moves, you'll endanger yourself and the airplane. Just stay quiet." Air traffic controllers heard the transmission; Ong did not. The hijackers probably did not know how to operate the cockpit radio communication system correctly, and thus inadvertently broadcast their message over the air traffic control channel instead of the cabin public-address channel. Also at 8:25, and again at 8:29, Amy Sweeney got through to the American Flight Services Office in Boston but was cut off after she reported someone was hurt aboard the flight. Three minutes later, Sweeney was reconnected to the office and began relaying updates to the manager, Michael Woodward.[32]

At 8:26, Ong reported that the plane was "flying erratically." A minute later, Flight 11 turned south. American also began getting identifications of the hijackers, as Ong and then Sweeney passed on some of the seat numbers of those who had gained unauthorized access to the cockpit.[33]

Sweeney calmly reported on her line that the plane had been hijacked; a man in first class had his throat slashed; two flight attendants had been stabbed—one was seriously hurt and was on oxygen while the other's wounds seemed minor; a doctor had been requested; the flight attendants were unable to contact the cockpit; and there was a bomb in the cockpit. Sweeney told Woodward that she and Ong were trying to relay as much information as they could to people on the ground.[34]

At 8:38, Ong told Gonzalez that the plane was flying erratically again. Around this time Sweeney told Woodward that the hijackers were Middle Easterners, naming three of their seat numbers. One spoke very little English and one spoke excellent English. The hijackers had gained entry to the cockpit, and she did not know how. The aircraft was in a rapid descent.[35]

At 8:41, Sweeney told Woodward that passengers in coach were under the impression that there was a routine medical emergency in first class. Other flight attendants were busy at duties such as getting medical supplies while Ong and Sweeney were reporting the events.[36]

At 8:41, in American's operations center, a colleague told Marquis that the air traffic controllers declared Flight 11 a hijacking and "think he's [American 11] headed toward Kennedy [airport in New York City]. They're moving everybody out of the way. They seem to have him on a primary radar. They seem to think that he is descending."[37]

At 8:44, Gonzalez reported losing phone contact with Ong. About this same time Sweeney reported to Woodward, "Something is wrong. We are in a rapid descent . . . we are all over the place." Woodward asked Sweeney to look out the window to see if she could determine where they were. Sweeney responded: "We are flying low. We are flying very, very low. We are flying way

too low." Seconds later she said, "Oh my God we are way too low." The phone call ended.[38]

At 8:46:40, American 11 crashed into the North Tower of the World Trade Center in New York City.[39] All on board, along with an unknown number of people in the tower, were killed instantly.

**The Hijacking of United 175**

United Airlines Flight 175 was scheduled to depart for Los Angeles at 8:00. Captain Victor Saracini and First Officer Michael Horrocks piloted the Boeing 767, which had seven flight attendants. Fifty-six passengers boarded the flight.[40]

United 175 pushed back from its gate at 7:58 and departed Logan Airport at 8:14. By 8:33, it had reached its assigned cruising altitude of 31,000 feet. The flight attendants would have begun their cabin service.[41]

The flight had taken off just as American 11 was being hijacked, and at 8:42 the United 175 flight crew completed their report on a "suspicious transmission" overheard from another plane (which turned out to have been Flight 11) just after takeoff. This was United 175's last communication with the ground.[42]

The hijackers attacked sometime between 8:42 and 8:46. They used knives (as reported by two passengers and a flight attendant), Mace (reported by one passenger), and the threat of a bomb (reported by the same passenger). They stabbed members of the flight crew (reported by a flight attendant and one passenger). Both pilots had been killed (reported by one flight attendant). The eyewitness accounts came from calls made from the rear of the plane, from passengers originally seated further forward in the cabin, a sign that passengers and perhaps crew had been moved to the back of the aircraft. Given similarities to American 11 in hijacker seating and in eyewitness reports of tactics and weapons, as well as the contact between the presumed team leaders, Atta and Shehhi, we believe the tactics were similar on both flights.[43]

The first operational evidence that something was abnormal on United 175 came at 8:47, when the aircraft changed beacon codes twice within a minute. At 8:51, the flight deviated from its assigned altitude, and a minute later New York air traffic controllers began repeatedly and unsuccessfully trying to contact it.[44]

At 8:52, in Easton, Connecticut, a man named Lee Hanson received a phone call from his son Peter, a passenger on United 175. His son told him: "I think they've taken over the cockpit—An attendant has been stabbed— and someone else up front may have been killed. The plane is making strange moves. Call United Airlines—Tell them it's Flight 175, Boston to LA." Lee Hanson then called the Easton Police Department and relayed what he had heard.[45]

Also at 8:52, a male flight attendant called a United office in San Francisco, reaching Marc Policastro. The flight attendant reported that the flight had been hijacked, both pilots had been killed, a flight attendant had been stabbed, and

the hijackers were probably flying the plane. The call lasted about two minutes, after which Policastro and a colleague tried unsuccessfully to contact the flight.[46]

At 8:58, the flight took a heading toward New York City.[47]

At 8:59, Flight 175 passenger Brian David Sweeney tried to call his wife, Julie. He left a message on their home answering machine that the plane had been hijacked. He then called his mother, Louise Sweeney, told her the flight had been hijacked, and added that the passengers were thinking about storming the cockpit to take control of the plane away from the hijackers.[48]

At 9:00, Lee Hanson received a second call from his son Peter:

> It's getting bad, Dad—A stewardess was stabbed—They seem to have knives and Mace—They said they have a bomb—It's getting very bad on the plane—Passengers are throwing up and getting sick—The plane is making jerky movements—I don't think the pilot is flying the plane—I think we are going down—I think they intend to go to Chicago or someplace and fly into a building—Don't worry, Dad—If it happens, it'll be very fast—My God, my God.[49]

The call ended abruptly. Lee Hanson had heard a woman scream just before it cut off. He turned on a television, and in her home so did Louise Sweeney. Both then saw the second aircraft hit the World Trade Center.[50]

At 9:03:11, United Airlines Flight 175 struck the South Tower of the World Trade Center.[51] All on board, along with an unknown number of people in the tower, were killed instantly.

### The Hijacking of American 77

American Airlines Flight 77 was scheduled to depart from Washington Dulles for Los Angeles at 8:10. The aircraft was a Boeing 757 piloted by Captain Charles F. Burlingame and First Officer David Charlebois. There were four flight attendants. On September 11, the flight carried 58 passengers.[52]

American 77 pushed back from its gate at 8:09 and took off at 8:20. At 8:46, the flight reached its assigned cruising altitude of 35,000 feet. Cabin service would have begun. At 8:51, American 77 transmitted its last routine radio communication. The hijacking began between 8:51 and 8:54. As on American 11 and United 175, the hijackers used knives (reported by one passenger) and moved all the passengers (and possibly crew) to the rear of the aircraft (reported by one flight attendant and one passenger). Unlike the earlier flights, the Flight 77 hijackers were reported by a passenger to have box cutters. Finally, a passenger reported that an announcement had been made by the "pilot" that the plane had been hijacked. Neither of the firsthand accounts mentioned any stabbings or the threat or use of either a bomb or Mace, though both witnesses began the flight in the first-class cabin.[53]

At 8:54, the aircraft deviated from its assigned course, turning south. Two minutes later the transponder was turned off and even primary radar contact with the aircraft was lost. The Indianapolis Air Traffic Control Center repeatedly tried and failed to contact the aircraft. American Airlines dispatchers also tried, without success.[54]

At 9:00, American Airlines Executive Vice President Gerard Arpey learned that communications had been lost with American 77. This was now the second American aircraft in trouble. He ordered all American Airlines flights in the Northeast that had not taken off to remain on the ground. Shortly before 9:10, suspecting that American 77 had been hijacked, American headquarters concluded that the second aircraft to hit the World Trade Center might have been Flight 77. After learning that United Airlines was missing a plane, American Airlines headquarters extended the ground stop nationwide.[55]

At 9:12, Renee May called her mother, Nancy May, in Las Vegas. She said her flight was being hijacked by six individuals who had moved them to the rear of the plane. She asked her mother to alert American Airlines. Nancy May and her husband promptly did so.[56]

At some point between 9:16 and 9:26, Barbara Olson called her husband, Ted Olson, the solicitor general of the United States. She reported that the flight had been hijacked, and the hijackers had knives and box cutters. She further indicated that the hijackers were not aware of her phone call, and that they had put all the passengers in the back of the plane. About a minute into the conversation, the call was cut off. Solicitor General Olson tried unsuccessfully to reach Attorney General John Ashcroft.[57]

Shortly after the first call, Barbara Olson reached her husband again. She reported that the pilot had announced that the flight had been hijacked, and she asked her husband what she should tell the captain to do. Ted Olson asked for her location and she replied that the aircraft was then flying over houses. Another passenger told her they were traveling northeast. The Solicitor General then informed his wife of the two previous hijackings and crashes. She did not display signs of panic and did not indicate any awareness of an impending crash. At that point, the second call was cut off.[58]

At 9:29, the autopilot on American 77 was disengaged; the aircraft was at 7,000 feet and approximately 38 miles west of the Pentagon.[59] At 9:32, controllers at the Dulles Terminal Radar Approach Control "observed a primary radar target tracking eastbound at a high rate of speed." This was later determined to have been Flight 77.

At 9:34, Ronald Reagan Washington National Airport advised the Secret Service of an unknown aircraft heading in the direction of the White House. American 77 was then 5 miles west-southwest of the Pentagon and began a 330-degree turn. At the end of the turn, it was descending through 2,200 feet, pointed toward the Pentagon and downtown Washington. The hijacker pilot then advanced the throttles to maximum power and dove toward the Pentagon.[60]

At 9:37:46, American Airlines Flight 77 crashed into the Pentagon, traveling at approximately 530 miles per hour.[61] All on board, as well as many civilian and military personnel in the building, were killed.

### The Battle for United 93

At 8:42, United Airlines Flight 93 took off from Newark (New Jersey) Liberty International Airport bound for San Francisco. The aircraft was piloted by Captain Jason Dahl and First Officer Leroy Homer, and there were five flight attendants. Thirty-seven passengers, including the hijackers, boarded the plane. Scheduled to depart the gate at 8:00, the Boeing 757's takeoff was delayed because of the airport's typically heavy morning traffic.[62]

The hijackers had planned to take flights scheduled to depart at 7:45 (American 11), 8:00 (United 175 and United 93), and 8:10 (American 77). Three of the flights had actually taken off within 10 to 15 minutes of their planned departure times. United 93 would ordinarily have taken off about 15 minutes after pulling away from the gate. When it left the ground at 8:42, the flight was running more than 25 minutes late.[63]

As United 93 left Newark, the flight's crew members were unaware of the hijacking of American 11. Around 9:00, the FAA, American, and United were facing the staggering realization of apparent multiple hijackings. At 9:03, they would see another aircraft strike the World Trade Center. Crisis managers at the FAA and the airlines did not yet act to warn other aircraft.[64] At the same time, Boston Center realized that a message transmitted just before 8:25 by the hijacker pilot of American 11 included the phrase, "We have some planes."[65]

No one at the FAA or the airlines that day had ever dealt with multiple hijackings. Such a plot had not been carried out anywhere in the world in more than 30 years, and never in the United States. As news of the hijackings filtered through the FAA and the airlines, it does not seem to have occurred to their leadership that they needed to alert other aircraft in the air that they too might be at risk.[66]

United 175 was hijacked between 8:42 and 8:46, and awareness of that hijacking began to spread after 8:51. American 77 was hijacked between 8:51 and 8:54. By 9:00, FAA and airline officials began to comprehend that attackers were going after multiple aircraft. American Airlines' nationwide ground stop between 9:05 and 9:10 was followed by a United Airlines ground stop. FAA controllers at Boston Center, which had tracked the first two hijackings, requested at 9:07 that Herndon Command Center "get messages to airborne aircraft to increase security for the cockpit." There is no evidence that Herndon took such action. Boston Center immediately began speculating about other aircraft that might be in danger, leading them to worry about a transcontinental flight—Delta 1989—that in fact was not hijacked. At 9:19, the FAA's New England regional office called Herndon and asked that Cleveland Center advise Delta 1989 to use extra cockpit security.[67]

Several FAA air traffic control officials told us it was the air carriers' responsibility to notify their planes of security problems. One senior FAA air traffic control manager said that it was simply not the FAA's place to order the airlines what to tell their pilots.[68] We believe such statements do not reflect an adequate appreciation of the FAA's responsibility for the safety and security of civil aviation.

The airlines bore responsibility, too. They were facing an escalating number of conflicting and, for the most part, erroneous reports about other flights, as well as a continuing lack of vital information from the FAA about the hijacked flights. We found no evidence, however, that American Airlines sent any cockpit warnings to its aircraft on 9/11. United's first decisive action to notify its airborne aircraft to take defensive action did not come until 9:19, when a United flight dispatcher, Ed Ballinger, took the initiative to begin transmitting warnings to his 16 transcontinental flights: "Beware any cockpit intrusion—Two a/c [aircraft] hit World Trade Center." One of the flights that received the warning was United 93. Because Ballinger was still responsible for his other flights as well as Flight 175, his warning message was not transmitted to Flight 93 until 9:23.[69]

By all accounts, the first 46 minutes of Flight 93's cross-country trip proceeded routinely. Radio communications from the plane were normal. Heading, speed, and altitude ran according to plan. At 9:24, Ballinger's warning to United 93 was received in the cockpit. Within two minutes, at 9:26, the pilot, Jason Dahl, responded with a note of puzzlement: "Ed, confirm latest mssg plz—Jason."[70]

The hijackers attacked at 9:28. While traveling 35,000 feet above eastern Ohio, United 93 suddenly dropped 700 feet. Eleven seconds into the descent, the FAA's air traffic control center in Cleveland received the first of two radio transmissions from the aircraft. During the first broadcast, the captain or first officer could be heard declaring "Mayday" amid the sounds of a physical struggle in the cockpit. The second radio transmission, 35 seconds later, indicated that the fight was continuing. The captain or first officer could be heard shouting: "Hey get out of here—get out of here—get out of here."[71]

On the morning of 9/11, there were only 37 passengers on United 93—33 in addition to the 4 hijackers. This was below the norm for Tuesday mornings during the summer of 2001. But there is no evidence that the hijackers manipulated passenger levels or purchased additional seats to facilitate their operation.[72]

The terrorists who hijacked three other commercial flights on 9/11 operated in five-man teams. They initiated their cockpit takeover within 30 minutes of takeoff. On Flight 93, however, the takeover took place 46 minutes after takeoff and there were only four hijackers. The operative likely intended to round out the team for this flight, Mohamed al Kahtani, had been refused entry by a suspicious immigration inspector at Florida's Orlando International Airport in August.[73]

Because several passengers on United 93 described three hijackers on the plane, not four, some have wondered whether one of the hijackers had been able to use the cockpit jump seat from the outset of the flight. FAA rules allow use of this seat by documented and approved individuals, usually air carrier or FAA personnel. We have found no evidence indicating that one of the hijackers, or anyone else, sat there on this flight. All the hijackers had assigned seats in first class, and they seem to have used them. We believe it is more likely that Jarrah, the crucial pilot-trained member of their team, remained seated and inconspicuous until after the cockpit was seized; and once inside, he would not have been visible to the passengers.[74]

At 9:32, a hijacker, probably Jarrah, made or attempted to make the following announcement to the passengers of Flight 93: "Ladies and Gentlemen: Here the captain, please sit down keep remaining sitting. We have a bomb on board. So, sit." The flight data recorder (also recovered) indicates that Jarrah then instructed the plane's autopilot to turn the aircraft around and head east.[75]

The cockpit voice recorder data indicate that a woman, most likely a flight attendant, was being held captive in the cockpit. She struggled with one of the hijackers who killed or otherwise silenced her.[76]

Shortly thereafter, the passengers and flight crew began a series of calls from GTE airphones and cellular phones. These calls between family, friends, and colleagues took place until the end of the flight and provided those on the ground with firsthand accounts. They enabled the passengers to gain critical information, including the news that two aircraft had slammed into the World Trade Center.[77]

At 9:39, the FAA's Cleveland Air Route Traffic Control Center overheard a second announcement indicating that there was a bomb on board, that the plane was returning to the airport, and that they should remain seated.[78] While it apparently was not heard by the passengers, this announcement, like those on Flight 11 and Flight 77, was intended to deceive them. Jarrah, like Atta earlier, may have inadvertently broadcast the message because he did not know how to operate the radio and the intercom. To our knowledge none of them had ever flown an actual airliner before.

At least two callers from the flight reported that the hijackers knew that passengers were making calls but did not seem to care. It is quite possible Jarrah knew of the success of the assault on the World Trade Center. He could have learned of this from messages being sent by United Airlines to the cockpits of its transcontinental flights, including Flight 93, warning of cockpit intrusion and telling of the New York attacks. But even without them, he would certainly have understood that the attacks on the World Trade Center would already have unfolded, given Flight 93's tardy departure from Newark. If Jarrah did know that the passengers were making calls, it might not have occurred to him that they were certain to learn what had happened in New York, thereby defeating his attempts at deception.[79]

At least ten passengers and two crew members shared vital information with family, friends, colleagues, or others on the ground. All understood the plane had been hijacked. They said the hijackers wielded knives and claimed to have a bomb. The hijackers were wearing red bandanas, and they forced the passengers to the back of the aircraft.[80]

Callers reported that a passenger had been stabbed and that two people were lying on the floor of the cabin, injured or dead—possibly the captain and first officer. One caller reported that a flight attendant had been killed.[81]

One of the callers from United 93 also reported that he thought the hijackers might possess a gun. But none of the other callers reported the presence of a firearm. One recipient of a call from the aircraft recounted specifically asking her caller whether the hijackers had guns. The passenger replied that he did not see one. No evidence of firearms or of their identifiable remains was found at the aircraft's crash site, and the cockpit voice recorder gives no indication of a gun being fired or mentioned at any time. We believe that if the hijackers had possessed a gun, they would have used it in the flight's last minutes as the passengers fought back.[82]

Passengers on three flights reported the hijackers' claim of having a bomb. The FBI told us they found no trace of explosives at the crash sites. One of the passengers who mentioned a bomb expressed his belief that it was not real. Lacking any evidence that the hijackers attempted to smuggle such illegal items past the security screening checkpoints, we believe the bombs were probably fake.[83]

During at least five of the passengers' phone calls, information was shared about the attacks that had occurred earlier that morning at the World Trade Center. Five calls described the intent of passengers and surviving crew members to revolt against the hijackers. According to one call, they voted on whether to rush the terrorists in an attempt to retake the plane. They decided, and acted.[84]

At 9:57, the passenger assault began. Several passengers had terminated phone calls with loved ones in order to join the revolt. One of the callers ended her message as follows: "Everyone's running up to first class. I've got to go. Bye."[85]

The cockpit voice recorder captured the sounds of the passenger assault muffled by the intervening cockpit door. Some family members who listened to the recording report that they can hear the voice of a loved one among the din. We cannot identify whose voices can be heard. But the assault was sustained.[86]

In response, Jarrah immediately began to roll the airplane to the left and right, attempting to knock the passengers off balance. At 9:58:57, Jarrah told another hijacker in the cockpit to block the door. Jarrah continued to roll the airplane sharply left and right, but the assault continued. At 9:59:52, Jarrah changed tactics and pitched the nose of the airplane up and down to disrupt

the assault. The recorder captured the sounds of loud thumps, crashes, shouts, and breaking glasses and plates. At 10:00:03, Jarrah stabilized the airplane.[87]

Five seconds later, Jarrah asked, "Is that it? Shall we finish it off?" A hijacker responded, "No. Not yet. When they all come, we finish it off." The sounds of fighting continued outside the cockpit. Again, Jarrah pitched the nose of the aircraft up and down. At 10:00:26, a passenger in the background said, "In the cockpit. If we don't we'll die!" Sixteen seconds later, a passenger yelled, "Roll it!" Jarrah stopped the violent maneuvers at about 10:01:00 and said, "Allah is the greatest! Allah is the greatest!" He then asked another hijacker in the cockpit, "Is that it? I mean, shall we put it down?" to which the other replied, "Yes, put it in it, and pull it down."[88]

The passengers continued their assault and at 10:02:23, a hijacker said, "Pull it down! Pull it down!" The hijackers remained at the controls but must have judged that the passengers were only seconds from overcoming them. The airplane headed down; the control wheel was turned hard to the right. The airplane rolled onto its back, and one of the hijackers began shouting "Allah is the greatest. Allah is the greatest." With the sounds of the passenger counterattack continuing, the aircraft plowed into an empty field in Shanksville, Pennsylvania, at 580 miles per hour, about 20 minutes' flying time from Washington, D.C.[89]

Jarrah's objective was to crash his airliner into symbols of the American Republic, the Capitol or the White House. He was defeated by the alerted, unarmed passengers of United 93.

## 1.2 IMPROVISING A HOMELAND DEFENSE

### The FAA and NORAD

On 9/11, the defense of U.S. airspace depended on close interaction between two federal agencies: the FAA and the North American Aerospace Defense Command (NORAD). The most recent hijacking that involved U.S. air traffic controllers, FAA management, and military coordination had occurred in 1993.[90] In order to understand how the two agencies interacted eight years later, we will review their missions, command and control structures, and working relationship on the morning of 9/11.

**FAA Mission and Structure.** As of September 11, 2001, the FAA was mandated by law to regulate the safety and security of civil aviation. From an air traffic controller's perspective, that meant maintaining a safe distance between airborne aircraft.[91]

Many controllers work at the FAA's 22 Air Route Traffic *Control Centers*. They are grouped under regional offices and coordinate closely with the national Air Traffic Control System *Command Center*, located in Herndon,



*FAA Air Traffic Control Centers*



*Reporting structure, Northeast Air Defense Sector*
Graphics courtesy of ESRI

Virginia, which oversees daily traffic flow within the entire airspace system. FAA headquarters is ultimately responsible for the management of the National Airspace System. The *Operations Center* located at FAA headquarters receives notifications of incidents, including accidents and hijackings.[92]

FAA Control Centers often receive information and make operational decisions independently of one another. On 9/11, the four hijacked aircraft were monitored mainly by the centers in Boston, New York, Cleveland, and Indianapolis. Each center thus had part of the knowledge of what was going on across the system. What Boston knew was not necessarily known by centers in New York, Cleveland, or Indianapolis, or for that matter by the Command Center in Herndon or by FAA headquarters in Washington.

Controllers track airliners such as the four aircraft hijacked on 9/11 primarily by watching the data from a signal emitted by each aircraft's transponder equipment. Those four planes, like all aircraft traveling above 10,000 feet, were required to emit a unique transponder signal while in flight.[93]

On 9/11, the terrorists turned off the transponders on three of the four hijacked aircraft. With its transponder off, it is possible, though more difficult, to track an aircraft by its primary radar returns. But unlike transponder data, primary radar returns do not show the aircraft's identity and altitude. Controllers at centers rely so heavily on transponder signals that they usually do not display primary radar returns on their radar scopes. But they can change the configuration of their scopes so they can see primary radar returns. They did this on 9/11 when the transponder signals for three of the aircraft disappeared.[94]

Before 9/11, it was not unheard of for a commercial aircraft to deviate slightly from its course, or for an FAA controller to lose radio contact with a pilot for a short period of time. A controller could also briefly lose a commercial aircraft's transponder signal, although this happened much less frequently. However, the simultaneous loss of radio and transponder signal would be a rare and alarming occurrence, and would normally indicate a catastrophic system failure or an aircraft crash. In all of these instances, the job of the controller was to reach out to the aircraft, the parent company of the aircraft, and other planes in the vicinity in an attempt to reestablish communications and set the aircraft back on course. Alarm bells would not start ringing until these efforts—which could take five minutes or more—were tried and had failed.[95]

**NORAD Mission and Structure.** NORAD is a binational command established in 1958 between the United States and Canada. Its mission was, and is, to defend the airspace of North America and protect the continent. That mission does not distinguish between internal and external threats; but because NORAD was created to counter the Soviet threat, it came to define its job as defending against external attacks.[96]

The threat of Soviet bombers diminished significantly as the Cold War ended, and the number of NORAD alert sites was reduced from its Cold War high of 26. Some within the Pentagon argued in the 1990s that the alert sites

should be eliminated entirely. In an effort to preserve their mission, members of the air defense community advocated the importance of air sovereignty against emerging "asymmetric threats" to the United States: drug smuggling, "non-state and state-sponsored terrorists," and the proliferation of weapons of mass destruction and ballistic missile technology.[97]

NORAD perceived the dominant threat to be from cruise missiles. Other threats were identified during the late 1990s, including terrorists' use of aircraft as weapons. Exercises were conducted to counter this threat, but they were not based on actual intelligence. In most instances, the main concern was the use of such aircraft to deliver weapons of mass destruction.

Prior to 9/11, it was understood that an order to shoot down a commercial aircraft would have to be issued by the National Command Authority (a phrase used to describe the president and secretary of defense). Exercise planners also assumed that the aircraft would originate from outside the United States, allowing time to identify the target and scramble interceptors. The threat of terrorists hijacking commercial airliners within the United States—and using them as guided missiles—was not recognized by NORAD before 9/11.[98]

Notwithstanding the identification of these emerging threats, by 9/11 there were only seven alert sites left in the United States, each with two fighter aircraft on alert. This led some NORAD commanders to worry that NORAD was not postured adequately to protect the United States.[99]

In the United States, NORAD is divided into three sectors. On 9/11, all the hijacked aircraft were in NORAD's Northeast Air Defense Sector (also known as NEADS), which is based in Rome, New York. That morning NEADS could call on two alert sites, each with one pair of ready fighters: Otis Air National Guard Base in Cape Cod, Massachusetts, and Langley Air Force Base in Hampton, Virginia.[100] Other facilities, not on "alert," would need time to arm the fighters and organize crews.

NEADS reported to the Continental U.S. NORAD Region (CONR) headquarters, in Panama City, Florida, which in turn reported to NORAD headquarters, in Colorado Springs, Colorado.

**Interagency Collaboration.** The FAA and NORAD had developed protocols for working together in the event of a hijacking. As they existed on 9/11, the protocols for the FAA to obtain military assistance from NORAD required multiple levels of notification and approval at the highest levels of government.[101]

FAA guidance to controllers on hijack procedures assumed that the aircraft pilot would notify the controller via radio or by "squawking" a transponder code of "7500"—the universal code for a hijack in progress. Controllers would notify their supervisors, who in turn would inform management all the way up to FAA headquarters in Washington. Headquarters had a hijack coordinator, who was the director of the FAA Office of Civil Aviation Security or his or her designate.[102]

If a hijack was confirmed, procedures called for the hijack coordinator on

duty to contact the Pentagon's National Military Command Center (NMCC) and to ask for a military escort aircraft to follow the flight, report anything unusual, and aid search and rescue in the event of an emergency. The NMCC would then seek approval from the Office of the Secretary of Defense to provide military assistance. If approval was given, the orders would be transmitted down NORAD's chain of command.[103]

The NMCC would keep the FAA hijack coordinator up to date and help the FAA centers coordinate directly with the military. NORAD would receive tracking information for the hijacked aircraft either from joint use radar or from the relevant FAA air traffic control facility. Every attempt would be made to have the hijacked aircraft squawk 7500 to help NORAD track it.[104]

The protocols did not contemplate an intercept. They assumed the fighter escort would be discreet, "vectored to a position five miles directly behind the hijacked aircraft," where it could perform its mission to monitor the aircraft's flight path.[105]

In sum, the protocols in place on 9/11 for the FAA and NORAD to respond to a hijacking presumed that

- the hijacked aircraft would be readily identifiable and would not attempt to disappear;
- there would be time to address the problem through the appropriate FAA and NORAD chains of command; and
- the hijacking would take the traditional form: that is, it would not be a suicide hijacking designed to convert the aircraft into a guided missile.

On the morning of 9/11, the existing protocol was unsuited in every respect for what was about to happen.

### American Airlines Flight 11

**FAA Awareness.** Although the Boston Center air traffic controller realized at an early stage that there was something wrong with American 11, he did not immediately interpret the plane's failure to respond as a sign that it had been hijacked. At 8:14, when the flight failed to heed his instruction to climb to 35,000 feet, the controller repeatedly tried to raise the flight. He reached out to the pilot on the emergency frequency. Though there was no response, he kept trying to contact the aircraft.[106]

At 8:21, American 11 turned off its transponder, immediately degrading the information available about the aircraft. The controller told his supervisor that he thought something was seriously wrong with the plane, although neither suspected a hijacking. The supervisor instructed the controller to follow standard procedures for handling a "no radio" aircraft.[107]

The controller checked to see if American Airlines could establish communication with American 11. He became even more concerned as its route changed, moving into another sector's airspace. Controllers immediately began to move aircraft out of its path, and asked other aircraft in the vicinity to look for American 11.[108]

At 8:24:38, the following transmission came from American 11:

**American 11:** We have some planes. Just stay quiet, and you'll be okay. We are returning to the airport.

The controller only heard something unintelligible; he did not hear the specific words "we have some planes." The next transmission came seconds later:

**American 11:** Nobody move. Everything will be okay. If you try to make any moves, you'll endanger yourself and the airplane. Just stay quiet.[109]

The controller told us that he then knew it was a hijacking. He alerted his supervisor, who assigned another controller to assist him. He redoubled his efforts to ascertain the flight's altitude. Because the controller didn't understand the initial transmission, the manager of Boston Center instructed his quality assurance specialist to "pull the tape" of the radio transmission, listen to it closely, and report back.[110]

Between 8:25 and 8:32, in accordance with the FAA protocol, Boston Center managers started notifying their chain of command that American 11 had been hijacked. At 8:28, Boston Center called the Command Center in Herndon to advise that it believed American 11 had been hijacked and was heading toward New York Center's airspace.

By this time, American 11 had taken a dramatic turn to the south. At 8:32, the Command Center passed word of a possible hijacking to the Operations Center at FAA headquarters. The duty officer replied that security personnel at headquarters had just begun discussing the apparent hijack on a conference call with the New England regional office. FAA headquarters began to follow the hijack protocol but did not contact the NMCC to request a fighter escort.[111]

The Herndon Command Center immediately established a teleconference between Boston, New York, and Cleveland Centers so that Boston Center could help the others understand what was happening.[112]

At 8:34, the Boston Center controller received a third transmission from American 11:

**American 11:** Nobody move please. We are going back to the airport. Don't try to make any stupid moves.[113]

In the succeeding minutes, controllers were attempting to ascertain the altitude of the southbound flight.[114]

**Military Notification and Response.** Boston Center did not follow the protocol in seeking military assistance through the prescribed chain of command. In addition to notifications within the FAA, Boston Center took the initiative, at 8:34, to contact the military through the FAA's Cape Cod facility. The center also tried to contact a former alert site in Atlantic City, unaware it had been phased out. At 8:37:52, Boston Center reached NEADS. This was the first notification received by the military—at any level—that American 11 had been hijacked:[115]

> **FAA:** Hi. Boston Center TMU [Traffic Management Unit], we have a problem here. We have a hijacked aircraft headed towards New York, and we need you guys to, we need someone to scramble some F-16s or something up there, help us out.
> **NEADS:** Is this real-world or exercise?
> **FAA:** No, this is not an exercise, not a test.[116]

NEADS ordered to battle stations the two F-15 alert aircraft at Otis Air Force Base in Falmouth, Massachusetts, 153 miles away from New York City. The air defense of America began with this call.[117]

At NEADS, the report of the hijacking was relayed immediately to Battle Commander Colonel Robert Marr. After ordering the Otis fighters to battle stations, Colonel Marr phoned Major General Larry Arnold, commanding general of the First Air Force and NORAD's Continental Region. Marr sought authorization to scramble the Otis fighters. General Arnold later recalled instructing Marr to "go ahead and scramble them, and we'll get authorities later." General Arnold then called NORAD headquarters to report.[118]

F-15 fighters were scrambled at 8:46 from Otis Air Force Base. But NEADS did not know where to send the alert fighter aircraft, and the officer directing the fighters pressed for more information: "I don't know where I'm scrambling these guys to. I need a direction, a destination." Because the hijackers had turned off the plane's transponder, NEADS personnel spent the next minutes searching their radar scopes for the primary radar return. American 11 struck the North Tower at 8:46. Shortly after 8:50, while NEADS personnel were still trying to locate the flight, word reached them that a plane had hit the World Trade Center.[119]

Radar data show the Otis fighters were airborne at 8:53. Lacking a target, they were vectored toward military-controlled airspace off the Long Island coast. To avoid New York area air traffic and uncertain about what to do, the fighters were brought down to military airspace to "hold as needed." From 9:09 to 9:13, the Otis fighters stayed in this holding pattern.[120]

In summary, NEADS received notice of the hijacking nine minutes before it struck the North Tower. That nine minutes' notice before impact was the most the military would receive of any of the four hijackings.[121]

### United Airlines Flight 175

**FAA Awareness.** One of the last transmissions from United Airlines Flight 175 is, in retrospect, chilling. By 8:40, controllers at the FAA's New York Center were seeking information on American 11. At approximately 8:42, shortly after entering New York Center's airspace, the pilot of United 175 broke in with the following transmission:

> **UAL 175:** New York UAL 175 heavy.
> **FAA:** UAL 175 go ahead.
> **UAL 175:** Yeah. We figured we'd wait to go to your center. Ah, we heard a suspicious transmission on our departure out of Boston, ah, with someone, ah, it sounded like someone keyed the mikes and said ah everyone ah stay in your seats.
> **FAA:** Oh, okay. I'll pass that along over here.[122]

Minutes later, United 175 turned southwest without clearance from air traffic control. At 8:47, seconds after the impact of American 11, United 175's transponder code changed, and then changed again. These changes were not noticed for several minutes, however, because the same New York Center controller was assigned to both American 11 and United 175. The controller knew American 11 was hijacked; he was focused on searching for it after the aircraft disappeared at 8:46.[123]

At 8:48, while the controller was still trying to locate American 11, a New York Center manager provided the following report on a Command Center teleconference about American 11:

> **Manager, New York Center:** Okay. This is New York Center. We're watching the airplane. I also had conversation with American Airlines, and they've told us that they believe that one of their stewardesses was stabbed and that there are people in the cockpit that have control of the aircraft, and that's all the information they have right now.[124]

The New York Center controller and manager were unaware that American 11 had already crashed.

At 8:51, the controller noticed the transponder change from United 175 and tried to contact the aircraft. There was no response. Beginning at 8:52, the controller made repeated attempts to reach the crew of United 175. Still no response. The controller checked his radio equipment and contacted another

controller at 8:53, saying that "we may have a hijack" and that he could not find the aircraft.[125]

Another commercial aircraft in the vicinity then radioed in with "reports over the radio of a commuter plane hitting the World Trade Center." The controller spent the next several minutes handing off the other flights on his scope to other controllers and moving aircraft out of the way of the unidentified aircraft (believed to be United 175) as it moved southwest and then turned northeast toward New York City.[126]

At about 8:55, the controller in charge notified a New York Center manager that she believed United 175 had also been hijacked. The manager tried to notify the regional managers and was told that they were discussing a hijacked aircraft (presumably American 11) and refused to be disturbed. At 8:58, the New York Center controller searching for United 175 told another New York controller "we might have a hijack over here, two of them."[127]

Between 9:01 and 9:02, a manager from New York Center told the Command Center in Herndon:

> **Manager, New York Center:** We have several situations going on here. It's escalating big, big time. We need to get the military involved with us.... We're, we're involved with something else, we have other aircraft that may have a similar situation going on here.[128]

The "other aircraft" referred to by New York Center was United 175. Evidence indicates that this conversation was the only notice received by either FAA headquarters or the Herndon Command Center prior to the second crash that there had been a second hijacking.

While the Command Center was told about this "other aircraft" at 9:01, New York Center contacted New York terminal approach control and asked for help in locating United 175.

> **Terminal:** I got somebody who keeps coasting but it looks like he's going into one of the small airports down there.
> **Center:** Hold on a second. I'm trying to bring him up here and get you—There he is right there. Hold on.
> **Terminal:** Got him just out of 9,500—9,000 now.
> **Center:** Do you know who he is?
> **Terminal:** We're just, we just we don't know who he is. We're just picking him up now.
> **Center (at 9:02):** Alright. Heads up man, it looks like another one coming in.[129]

The controllers observed the plane in a rapid descent; the radar data terminated over Lower Manhattan. At 9:03, United 175 crashed into the South Tower.[130]

Meanwhile, a manager from Boston Center reported that they had deciphered what they had heard in one of the first hijacker transmissions from American 11:

**Boston Center:** Hey . . . you still there?

**New England Region:** Yes, I am.

**Boston Center:** . . . as far as the tape, Bobby seemed to think the guy said that "we have planes." Now, I don't know if it was because it was the accent, or if there's more than one, but I'm gonna, I'm gonna reconfirm that for you, and I'll get back to you real quick. Okay?

**New England Region:** Appreciate it.

**Unidentified Female Voice:** They have what?

**Boston Center:** Planes, as in plural.

**Boston Center:** It sounds like, we're talking to New York, that there's another one aimed at the World Trade Center.

**New England Region:** There's another aircraft?

**Boston Center:** A second one just hit the Trade Center.

**New England Region:** Okay. Yeah, we gotta get—we gotta alert the military real quick on this.[131]

Boston Center immediately advised the New England Region that it was going to stop all departures at airports under its control. At 9:05, Boston Center confirmed for both the FAA Command Center and the New England Region that the hijackers aboard American 11 said "we have *planes*." At the same time, New York Center declared "ATC zero"—meaning that aircraft were not permitted to depart from, arrive at, or travel through New York Center's airspace until further notice.[132]

Within minutes of the second impact, Boston Center instructed its controllers to inform all aircraft in its airspace of the events in New York and to advise aircraft to heighten cockpit security. Boston Center asked the Herndon Command Center to issue a similar cockpit security alert nationwide. We have found no evidence to suggest that the Command Center acted on this request or issued any type of cockpit security alert.[133]

**Military Notification and Response.** The first indication that the NORAD air defenders had of the second hijacked aircraft, United 175, came in a phone call from New York Center to NEADS at 9:03. The notice came at about the time the plane was hitting the South Tower.[134]

By 9:08, the mission crew commander at NEADS learned of the second explosion at the World Trade Center and decided against holding the fighters in military airspace away from Manhattan:

**Mission Crew Commander, NEADS:** This is what I foresee that we probably need to do. We need to talk to FAA. We need to tell 'em if

this stuff is gonna keep on going, we need to take those fighters, put 'em over Manhattan. That's best thing, that's the best play right now. So coordinate with the FAA. Tell 'em if there's more out there, which we don't know, let's get 'em over Manhattan. At least we got some kind of play.[135]

The FAA cleared the airspace. Radar data show that at 9:13, when the Otis fighters were about 115 miles away from the city, the fighters exited their holding pattern and set a course direct for Manhattan. They arrived at 9:25 and established a combat air patrol (CAP) over the city.[136]

Because the Otis fighters had expended a great deal of fuel in flying first to military airspace and then to New York, the battle commanders were concerned about refueling. NEADS considered scrambling alert fighters from Langley Air Force Base in Virginia to New York, to provide backup. The Langley fighters were placed on battle stations at 9:09.[137] NORAD had no indication that any other plane had been hijacked.

**American Airlines Flight 77**
**FAA Awareness.** American 77 began deviating from its flight plan at 8:54, with a slight turn toward the south. Two minutes later, it disappeared completely from radar at Indianapolis Center, which was controlling the flight.[138]

The controller tracking American 77 told us he noticed the aircraft turning to the southwest, and then saw the data disappear. The controller looked for primary radar returns. He searched along the plane's projected flight path and the airspace to the southwest where it had started to turn. No primary targets appeared. He tried the radios, first calling the aircraft directly, then the airline. Again there was nothing. At this point, the Indianapolis controller had no knowledge of the situation in New York. He did not know that other aircraft had been hijacked. He believed American 77 had experienced serious electrical or mechanical failure, or both, and was gone.[139]

Shortly after 9:00, Indianapolis Center started notifying other agencies that American 77 was missing and had possibly crashed. At 9:08, Indianapolis Center asked Air Force Search and Rescue at Langley Air Force Base to look for a downed aircraft. The center also contacted the West Virginia State Police and asked whether any reports of a downed aircraft had been received. At 9:09, it reported the loss of contact to the FAA regional center, which passed this information to FAA headquarters at 9:24.[140]

By 9:20, Indianapolis Center learned that there were other hijacked aircraft, and began to doubt its initial assumption that American 77 had crashed. A discussion of this concern between the manager at Indianapolis and the Command Center in Herndon prompted it to notify some FAA field facilities that American 77 was lost. By 9:21, the Command Center, some FAA field facilities, and American Airlines had started to search for American 77. They feared

it had been hijacked. At 9:25, the Command Center advised FAA headquarters of the situation.[141]

The failure to find a primary radar return for American 77 led us to investigate this issue further. Radar reconstructions performed after 9/11 reveal that FAA radar equipment tracked the flight from the moment its transponder was turned off at 8:56. But for 8 minutes and 13 seconds, between 8:56 and 9:05, this primary radar information on American 77 was not displayed to controllers at Indianapolis Center.[142] The reasons are technical, arising from the way the software processed radar information, as well as from poor primary radar coverage where American 77 was flying.

According to the radar reconstruction, American 77 reemerged as a primary target on Indianapolis Center radar scopes at 9:05, east of its last known position. The target remained in Indianapolis Center's airspace for another six minutes, then crossed into the western portion of Washington Center's airspace at 9:10. As Indianapolis Center continued searching for the aircraft, two managers and the controller responsible for American 77 looked to the west and southwest along the flight's projected path, not east—where the aircraft was now heading. Managers did not instruct other controllers at Indianapolis Center to turn on their primary radar coverage to join in the search for American 77.[143]

In sum, Indianapolis Center never saw Flight 77 turn around. By the time it reappeared in primary radar coverage, controllers had either stopped looking for the aircraft because they thought it had crashed or were looking toward the west. Although the Command Center learned Flight 77 was missing, neither it nor FAA headquarters issued an all points bulletin to surrounding centers to search for primary radar targets. American 77 traveled undetected for 36 minutes on a course heading due east for Washington, D.C.[144]

By 9:25, FAA's Herndon Command Center and FAA headquarters knew two aircraft had crashed into the World Trade Center. They knew American 77 was lost. At least some FAA officials in Boston Center and the New England Region knew that a hijacker on board American 11 had said "we have some planes." Concerns over the safety of other aircraft began to mount. A manager at the Herndon Command Center asked FAA headquarters if they wanted to order a "nationwide ground stop." While this was being discussed by executives at FAA headquarters, the Command Center ordered one at 9:25.[145]

The Command Center kept looking for American 77. At 9:21, it advised the Dulles terminal control facility, and Dulles urged its controllers to look for primary targets. At 9:32, they found one. Several of the Dulles controllers "observed a primary radar target tracking eastbound at a high rate of speed" and notified Reagan National Airport. FAA personnel at both Reagan National and Dulles airports notified the Secret Service. The aircraft's identity or type was unknown.[146]

Reagan National controllers then vectored an unarmed National Guard C-130H cargo aircraft, which had just taken off en route to Minnesota, to iden-

tify and follow the suspicious aircraft. The C-130H pilot spotted it, identified it as a Boeing 757, attempted to follow its path, and at 9:38, seconds after impact, reported to the control tower: "looks like that aircraft crashed into the Pentagon sir."[147]

**Military Notification and Response.** NORAD heard nothing about the search for American 77. Instead, the NEADS air defenders heard renewed reports about a plane that no longer existed: American 11.

At 9:21, NEADS received a report from the FAA:

**FAA:** Military, Boston Center. I just had a report that American 11 is still in the air, and it's on its way towards—heading towards Washington.

**NEADS:** Okay. American 11 is still in the air?

**FAA:** Yes.

**NEADS:** On its way towards Washington?

**FAA:** That was another—it was evidently another aircraft that hit the tower. That's the latest report we have.

**NEADS:** Okay.

**FAA:** I'm going to try to confirm an ID for you, but I would assume he's somewhere over, uh, either New Jersey or somewhere further south.

**NEADS:** Okay. So American 11 isn't the hijack at all then, right?

**FAA:** No, he is a hijack.

**NEADS:** He—American 11 is a hijack?

**FAA:** Yes.

**NEADS:** And he's heading into Washington?

**FAA:** Yes. This could be a third aircraft.[148]

The mention of a "third aircraft" was not a reference to American 77. There was confusion at that moment in the FAA. Two planes had struck the World Trade Center, and Boston Center had heard from FAA headquarters in Washington that American 11 was still airborne. We have been unable to identify the source of this mistaken FAA information.

The NEADS technician who took this call from the FAA immediately passed the word to the mission crew commander, who reported to the NEADS battle commander:

**Mission Crew Commander, NEADS:** Okay, uh, American Airlines is still airborne. Eleven, the first guy, he's heading towards Washington. Okay? I think we need to scramble Langley right now. And I'm gonna take the fighters from Otis, try to chase this guy down if I can find him.[149]

After consulting with NEADS command, the crew commander issued the order at 9:23: "Okay . . . scramble Langley. Head them towards the Washington area. . . . [I]f they're there then we'll run on them. . . . These guys are smart." That order was processed and transmitted to Langley Air Force Base at 9:24. Radar data show the Langley fighters airborne at 9:30. NEADS decided to keep the Otis fighters over New York. The heading of the Langley fighters was adjusted to send them to the Baltimore area. The mission crew commander explained to us that the purpose was to position the Langley fighters between the reported southbound American 11 and the nation's capital.[150]

At the suggestion of the Boston Center's military liaison, NEADS contacted the FAA's Washington Center to ask about American 11. In the course of the conversation, a Washington Center manager informed NEADS: "We're looking—we also lost American 77." The time was 9:34.[151] This was the first notice to the military that American 77 was missing, and it had come by chance. If NEADS had not placed that call, the NEADS air defenders would have received no information whatsoever that the flight was even missing, although the FAA had been searching for it. No one at FAA headquarters ever asked for military assistance with American 77.

At 9:36, the FAA's Boston Center called NEADS and relayed the discovery about an unidentified aircraft closing in on Washington: "Latest report. Aircraft VFR [visual flight rules] six miles southeast of the White House. . . . Six, southwest. Six, southwest of the White House, deviating away." This startling news prompted the mission crew commander at NEADS to take immediate control of the airspace to clear a flight path for the Langley fighters: "Okay, we're going to turn it . . . crank it up. . . . Run them to the White House." He then discovered, to his surprise, that the Langley fighters were not headed north toward the Baltimore area as instructed, but east over the ocean. "I don't care how many windows you break," he said. "Damn it. . . . Okay. Push them back."[152]

The Langley fighters were heading east, not north, for three reasons. First, unlike a normal scramble order, this order did not include a distance to the target or the target's location. Second, a "generic" flight plan—prepared to get the aircraft airborne and out of local airspace quickly—incorrectly led the Langley fighters to believe they were ordered to fly due east (090) for 60 miles. Third, the lead pilot and local FAA controller incorrectly assumed the flight plan instruction to go "090 for 60" superseded the original scramble order.[153]

After the 9:36 call to NEADS about the unidentified aircraft a few miles from the White House, the Langley fighters were ordered to Washington, D.C. Controllers at NEADS located an unknown primary radar track, but "it kind of faded" over Washington. The time was 9:38. The Pentagon had been struck by American 77 at 9:37:46. The Langley fighters were about 150 miles away.[154]

Right after the Pentagon was hit, NEADS learned of another possible hijacked aircraft. It was an aircraft that in fact had not been hijacked at all. After the second World Trade Center crash, Boston Center managers recognized that

both aircraft were transcontinental 767 jetliners that had departed Logan Airport. Remembering the "we have some planes" remark, Boston Center guessed that Delta 1989 might also be hijacked. Boston Center called NEADS at 9:41 and identified Delta 1989, a 767 jet that had left Logan Airport for Las Vegas, as a possible hijack. NEADS warned the FAA's Cleveland Center to watch Delta 1989. The Command Center and FAA headquarters watched it too. During the course of the morning, there were multiple erroneous reports of hijacked aircraft. The report of American 11 heading south was the first; Delta 1989 was the second.[155]

NEADS never lost track of Delta 1989, and even ordered fighter aircraft from Ohio and Michigan to intercept it. The flight never turned off its transponder. NEADS soon learned that the aircraft was not hijacked, and tracked Delta 1989 as it reversed course over Toledo, headed east, and landed in Cleveland.[156] But another aircraft was heading toward Washington, an aircraft about which NORAD had heard nothing: United 93.

### United Airlines Flight 93

**FAA Awareness.** At 9:27, after having been in the air for 45 minutes, United 93 acknowledged a transmission from the Cleveland Center controller. This was the last normal contact the FAA had with the flight.[157]

Less than a minute later, the Cleveland controller and the pilots of aircraft in the vicinity heard "a radio transmission of unintelligible sounds of possible screaming or a struggle from an unknown origin."[158]

The controller responded, seconds later: "Somebody call Cleveland?" This was followed by a second radio transmission, with sounds of screaming. The Cleveland Center controllers began to try to identify the possible source of the transmissions, and noticed that United 93 had descended some 700 feet. The controller attempted again to raise United 93 several times, with no response. At 9:30, the controller began to poll the other flights on his frequency to determine if they had heard the screaming; several said they had.[159]

At 9:32, a third radio transmission came over the frequency: "Keep remaining sitting. We have a bomb on board." The controller understood, but chose to respond: "Calling Cleveland Center, you're unreadable. Say again, slowly." He notified his supervisor, who passed the notice up the chain of command. By 9:34, word of the hijacking had reached FAA headquarters.[160]

FAA headquarters had by this time established an open line of communication with the Command Center at Herndon and instructed it to poll all its centers about suspect aircraft. The Command Center executed the request and, a minute later, Cleveland Center reported that "United 93 may have a bomb on board." At 9:34, the Command Center relayed the information concerning United 93 to FAA headquarters. At approximately 9:36, Cleveland advised the Command Center that it was still tracking United 93 and specifically inquired whether someone had requested the military to launch fighter aircraft to intercept the aircraft. Cleveland even told the Command Center it was prepared to

contact a nearby military base to make the request. The Command Center told Cleveland that FAA personnel well above them in the chain of command had to make the decision to seek military assistance and were working on the issue.[161]

Between 9:34 and 9:38, the Cleveland controller observed United 93 climbing to 40,700 feet and immediately moved several aircraft out its way. The controller continued to try to contact United 93, and asked whether the pilot could confirm that he had been hijacked.[162] There was no response.

Then, at 9:39, a fourth radio transmission was heard from United 93:

**Ziad Jarrah:** Uh, this is the captain. Would like you all to remain seated. There is a bomb on board and are going back to the airport, and to have our demands [unintelligible]. Please remain quiet.

The controller responded: "United 93, understand you have a bomb on board. Go ahead." The flight did not respond.[163]

From 9:34 to 10:08, a Command Center facility manager provided frequent updates to Acting Deputy Administrator Monte Belger and other executives at FAA headquarters as United 93 headed toward Washington, D.C. At 9:41, Cleveland Center lost United 93's transponder signal. The controller located it on primary radar, matched its position with visual sightings from other aircraft, and tracked the flight as it turned east, then south.[164]

At 9:42, the Command Center learned from news reports that a plane had struck the Pentagon. The Command Center's national operations manager, Ben Sliney, ordered all FAA facilities to instruct all aircraft to land at the nearest airport. This was an unprecedented order. The air traffic control system handled it with great skill, as about 4,500 commercial and general aviation aircraft soon landed without incident.[165]

At 9:46 the Command Center updated FAA headquarters that United 93 was now "twenty-nine minutes out of Washington, D.C."

At 9:49, 13 minutes after Cleveland Center had asked about getting military help, the Command Center suggested that someone at headquarters should decide whether to request military assistance:

**FAA Headquarters:** They're pulling Jeff away to go talk about United 93.

**Command Center:** Uh, do we want to think, uh, about scrambling aircraft?

**FAA Headquarters:** Oh, God, I don't know.

**Command Center:** Uh, that's a decision somebody's gonna have to make probably in the next ten minutes.

**FAA Headquarters:** Uh, ya know everybody just left the room.[166]

At 9:53, FAA headquarters informed the Command Center that the deputy director for air traffic services was talking to Monte Belger about scrambling

aircraft. Then the Command Center informed headquarters that controllers had lost track of United 93 over the Pittsburgh area. Within seconds, the Command Center received a visual report from another aircraft, and informed headquarters that the aircraft was 20 miles northwest of Johnstown. United 93 was spotted by another aircraft, and, at 10:01, the Command Center advised FAA headquarters that one of the aircraft had seen United 93 "waving his wings." The aircraft had witnessed the hijackers' efforts to defeat the passengers' counterattack.[167]

United 93 crashed in Pennsylvania at 10:03:11, 125 miles from Washington, D.C. The precise crash time has been the subject of some dispute. The 10:03:11 impact time is supported by previous National Transportation Safety Board analysis and by evidence from the Commission staff's analysis of radar, the flight data recorder, the cockpit voice recorder, infrared satellite data, and air traffic control transmissions.[168]

Five minutes later, the Command Center forwarded this update to headquarters:

> **Command Center:** O.K. Uh, there is now on that United 93.
> **FAA Headquarters:** Yes.
> **Command Center:** There is a report of black smoke in the last position I gave you, fifteen miles south of Johnstown.
> **FAA Headquarters:** From the airplane or from the ground?
> **Command Center:** Uh, they're speculating it's from the aircraft.
> **FAA Headquarters:** Okay.
> **Command Center:** Uh, who, it hit the ground. That's what they're speculating, that's speculation only.[169]

The aircraft that spotted the "black smoke" was the same unarmed Air National Guard cargo plane that had seen American 77 crash into the Pentagon 27 minutes earlier. It had resumed its flight to Minnesota and saw the smoke from the crash of United 93, less than two minutes after the plane went down. At 10:17, the Command Center advised headquarters of its conclusion that United 93 had indeed crashed.[170]

Despite the discussions about military assistance, no one from FAA headquarters requested military assistance regarding United 93. Nor did any manager at FAA headquarters pass any of the information it had about United 93 to the military.

**Military Notification and Response.** NEADS first received a call about United 93 from the military liaison at Cleveland Center at 10:07. Unaware that the aircraft had already crashed, Cleveland passed to NEADS the aircraft's last known latitude and longitude. NEADS was never able to locate United 93 on radar because it was already in the ground.[171]

At the same time, the NEADS mission crew commander was dealing with the arrival of the Langley fighters over Washington, D.C., sorting out what their orders were with respect to potential targets. Shortly after 10:10, and having no knowledge either that United 93 had been heading toward Washington or that it had crashed, he explicitly instructed the Langley fighters: "negative— negative clearance to shoot" aircraft over the nation's capital.[172]

The news of a reported bomb on board United 93 spread quickly at NEADS. The air defenders searched for United 93's primary radar return and tried to locate other fighters to scramble. NEADS called Washington Center to report:

**NEADS:** I also want to give you a heads-up, Washington.
**FAA (DC):** Go ahead.
**NEADS:** United nine three, have you got information on that yet?
**FAA:** Yeah, he's down.
**NEADS:** He's down?
**FAA:** Yes.
**NEADS:** When did he land? 'Cause we have got confirmation—
**FAA:** He did not land.
**NEADS:** Oh, he's down? Down?
**FAA:** Yes. Somewhere up northeast of Camp David.
**NEADS:** Northeast of Camp David.
**FAA:** That's the last report. They don't know exactly where.[173]

The time of notification of the crash of United 93 was 10:15.[174] The NEADS air defenders never located the flight or followed it on their radar scopes. The flight had already crashed by the time they learned it was hijacked.

### Clarifying the Record

The defense of U.S. airspace on 9/11 was not conducted in accord with pre-existing training and protocols. It was improvised by civilians who had never handled a hijacked aircraft that attempted to disappear, and by a military unprepared for the transformation of commercial aircraft into weapons of mass destruction. As it turned out, the NEADS air defenders had nine minutes' notice on the first hijacked plane, no advance notice on the second, no advance notice on the third, and no advance notice on the fourth.

We do not believe that the true picture of that morning reflects discredit on the operational personnel at NEADS or FAA facilities. NEADS commanders and officers actively sought out information, and made the best judgments they could on the basis of what they knew. Individual FAA controllers, facility managers, and Command Center managers thought outside the box in recommending a nationwide alert, in ground-stopping local traffic, and, ultimately, in deciding to land all aircraft and executing that unprecedented order flawlessly.

## American Airlines Flight 11 (AA 11)
*Boston to Los Angeles*



## United Airlines Flight 175 (UA 175)
*Boston to Los Angeles*



| | |
|---|---|
| 7:59 | Takeoff |
| 8:14 | Last routine radio communication; likely takeover |
| 8:19 | Flight attendant notifies AA of hijacking |
| 8:21 | Transponder is turned off |
| 8:23 | AA attempts to contact the cockpit |
| 8:25 | Boston Center aware of hijacking |
| 8:38 | Boston Center notifies NEADS of hijacking |
| 8:46 | NEADS scrambles Otis fighter jets in search of AA 11 |
| 8:46:40 | AA 11 crashes into 1 WTC (North Tower) |
| 8:53 | Otis fighter jets airborne |
| 9:16 | AA headquarters aware that Flight 11 has crashed into WTC |
| 9:21 | Boston Center advises NEADS that AA 11 is airborne heading for Washington |
| 9:24 | NEADS scrambles Langley fighter jets in search of AA 11 |

| | |
|---|---|
| 8:14 | Takeoff |
| 8:42 | Last radio communication |
| 8:42-8:46 | Likely takeover |
| 8:47 | Transponder code changes |
| 8:52 | Flight attendant notifies UA of hijacking |
| 8:54 | UA attempts to contact the cockpit |
| 8:55 | New York Center suspects hijacking |
| 9:03:11 | Flight 175 crashes into 2 WTC (South Tower) |
| 9:15 | New York Center advises NEADS that UA 175 was the second aircraft crashed into WTC |
| 9:20 | UA headquarters aware that Flight 175 had crashed into WTC |

## American Airlines Flight 77 (AA 77)
### *Washington, D.C., to Los Angeles*



## United Airlines Flight 93 (UA 93)
### *Newark to San Francisco*



| | |
|---|---|
| 8:20 | Takeoff |
| 8:51 | Last routine radio communication |
| 8:51–8:54 | Likely takeover |
| 8:54 | Flight 77 makes unauthorized turn to south |
| 8:56 | Transponder is turned off |
| 9:05 | AA headquarters aware that Flight 77 is hijacked |
| 9:25 | Herndon Command Center orders nationwide ground stop |
| 9:32 | Dulles tower observes radar of fast-moving aircraft (later identified as AA 77) |
| 9:34 | FAA advises NEADS that AA 77 is missing |
| 9:37:46 | AA 77 crashes into the Pentagon |
| 10:30 | AA headquarters confirms Flight 77 crash into Pentagon |

| | |
|---|---|
| 8:42 | Takeoff |
| 9:24 | Flight 93 receives warning from UA about possible cockpit intrusion |
| 9:27 | Last routine radio communication |
| 9:28 | Likely takeover |
| 9:34 | Herndon Command Center advises FAA headquarters that UA 93 is hijacked |
| 9:36 | Flight attendant notifies UA of hijacking; UA attempts to contact the cockpit |
| 9:41 | Transponder is turned off |
| 9:57 | Passenger revolt begins |
| 10:03:11 | Flight 93 crashes in field in Shanksville, PA |
| 10:07 | Cleveland Center advises NEADS of UA 93 hijacking |
| 10:15 | UA headquarters aware that Flight 93 has crashed in PA; Washington Center advises NEADS that Flight 93 has crashed in PA |

More than the actual events, inaccurate government accounts of those events made it appear that the military was notified in time to respond to two of the hijackings, raising questions about the adequacy of the response. Those accounts had the effect of deflecting questions about the military's capacity to obtain timely and accurate information from its own sources. In addition, they overstated the FAA's ability to provide the military with timely and useful information that morning.

In public testimony before this Commission in May 2003, NORAD officials stated that at 9:16, NEADS received hijack notification of United 93 from the FAA.[175] This statement was incorrect. There was no hijack to report at 9:16. United 93 was proceeding normally at that time.

In this same public testimony, NORAD officials stated that at 9:24, NEADS received notification of the hijacking of American 77.[176] This statement was also incorrect. The notice NEADS received at 9:24 was that American 11 had not hit the World Trade Center and was heading for Washington, D.C.[177]

In their testimony and in other public accounts, NORAD officials also stated that the Langley fighters were scrambled to respond to the notifications about American 77,[178] United 93, or both. These statements were incorrect as well. The fighters were scrambled because of the report that American 11 was heading south, as is clear not just from taped conversations at NEADS but also from taped conversations at FAA centers; contemporaneous logs compiled at NEADS, Continental Region headquarters, and NORAD; and other records. Yet this response to a phantom aircraft was not recounted in a single public timeline or statement issued by the FAA or Department of Defense. The inaccurate accounts created the impression that the Langley scramble was a logical response to an actual hijacked aircraft.

In fact, not only was the scramble prompted by the mistaken information about American 11, but NEADS never received notice that American 77 was hijacked. It was notified at 9:34 that American 77 was lost. Then, minutes later, NEADS was told that an unknown plane was 6 miles southwest of the White House. Only then did the already scrambled airplanes start moving directly toward Washington, D.C.

Thus the military did not have 14 minutes to respond to American 77, as testimony to the Commission in May 2003 suggested. It had at most one or two minutes to react to the unidentified plane approaching Washington, and the fighters were in the wrong place to be able to help. They had been responding to a report about an aircraft that did not exist.

Nor did the military have 47 minutes to respond to United 93, as would be implied by the account that it received notice of the flight's hijacking at 9:16. By the time the military learned about the flight, it had crashed.

We now turn to the role of national leadership in the events that morning.

## 1.3 NATIONAL CRISIS MANAGEMENT

When American 11 struck the World Trade Center at 8:46, no one in the White House or traveling with the President knew that it had been hijacked. While that information circulated within the FAA, we found no evidence that the hijacking was reported to any other agency in Washington before 8:46.[179]

Most federal agencies learned about the crash in New York from CNN.[180] Within the FAA, the administrator, Jane Garvey, and her acting deputy, Monte Belger, had not been told of a confirmed hijacking before they learned from television that a plane had crashed.[181] Others in the agency were aware of it, as we explained earlier in this chapter.

Inside the National Military Command Center, the deputy director of operations and his assistant began notifying senior Pentagon officials of the incident. At about 9:00, the senior NMCC operations officer reached out to the FAA operations center for information. Although the NMCC was advised of the hijacking of American 11, the scrambling of jets was not discussed.[182]

In Sarasota, Florida, the presidential motorcade was arriving at the Emma E. Booker Elementary School, where President Bush was to read to a class and talk about education. White House Chief of Staff Andrew Card told us he was standing with the President outside the classroom when Senior Advisor to the President Karl Rove first informed them that a small, twin-engine plane had crashed into the World Trade Center. The President's reaction was that the incident must have been caused by pilot error.[183]

At 8:55, before entering the classroom, the President spoke to National Security Advisor Condoleezza Rice, who was at the White House. She recalled first telling the President it was a twin-engine aircraft—and then a commercial aircraft—that had struck the World Trade Center, adding "that's all we know right now, Mr. President."[184]

At the White House, Vice President Dick Cheney had just sat down for a meeting when his assistant told him to turn on his television because a plane had struck the North Tower of the World Trade Center. The Vice President was wondering "how the hell could a plane hit the World Trade Center" when he saw the second aircraft strike the South Tower.[185]

Elsewhere in the White House, a series of 9:00 meetings was about to begin. In the absence of information that the crash was anything other than an accident, the White House staff monitored the news as they went ahead with their regular schedules.[186]

**The Agencies Confer**

When they learned a second plane had struck the World Trade Center, nearly everyone in the White House told us, they immediately knew it was not an accident. The Secret Service initiated a number of security enhancements

around the White House complex. The officials who issued these orders did not know that there were additional hijacked aircraft, or that one such aircraft was en route to Washington. These measures were precautionary steps taken because of the strikes in New York.[187]

**The FAA and White House Teleconferences.** The FAA, the White House, and the Defense Department each initiated a multiagency teleconference before 9:30. Because none of these teleconferences—at least before 10:00—included the right officials from both the FAA and Defense Department, none succeeded in meaningfully coordinating the military and FAA response to the hijackings.

At about 9:20, security personnel at FAA headquarters set up a hijacking teleconference with several agencies, including the Defense Department. The NMCC officer who participated told us that the call was monitored only periodically because the information was sporadic, it was of little value, and there were other important tasks. The FAA manager of the teleconference also remembered that the military participated only briefly before the Pentagon was hit. Both individuals agreed that the teleconference played no role in coordinating a response to the attacks of 9/11. Acting Deputy Administrator Belger was frustrated to learn later in the morning that the military had not been on the call.[188]

At the White House, the video teleconference was conducted from the Situation Room by Richard Clarke, a special assistant to the president long involved in counterterrorism. Logs indicate that it began at 9:25 and included the CIA; the FBI; the departments of State, Justice, and Defense; the FAA; and the White House shelter. The FAA and CIA joined at 9:40. The first topic addressed in the White House video teleconference—at about 9:40—was the physical security of the President, the White House, and federal agencies. Immediately thereafter it was reported that a plane had hit the Pentagon. We found no evidence that video teleconference participants had any prior information that American 77 had been hijacked and was heading directly toward Washington. Indeed, it is not clear to us that the video teleconference was fully under way before 9:37, when the Pentagon was struck.[189]

Garvey, Belger, and other senior officials from FAA headquarters participated in this video teleconference at various times. We do not know who from Defense participated, but we know that in the first hour none of the personnel involved in managing the crisis did. And none of the information conveyed in the White House video teleconference, at least in the first hour, was being passed to the NMCC. As one witness recalled, "[It] was almost like there were parallel decisionmaking processes going on; one was a voice conference orchestrated by the NMCC . . . and then there was the [White House video teleconference]. . . . [I]n my mind they were competing venues for command and control and decisionmaking."[190]

At 10:03, the conference received reports of more missing aircraft, "2 pos-

sibly 3 aloft," and learned of a combat air patrol over Washington. There was discussion of the need for rules of engagement. Clarke reported that they were asking the President for authority to shoot down aircraft. Confirmation of that authority came at 10:25, but the commands were already being conveyed in more direct contacts with the Pentagon.[191]

**The Pentagon Teleconferences.** Inside the National Military Command Center, the deputy director for operations immediately thought the second strike was a terrorist attack. The job of the NMCC in such an emergency is to gather the relevant parties and establish the chain of command between the National Command Authority—the president and the secretary of defense—and those who need to carry out their orders.[192]

On the morning of September 11, Secretary Rumsfeld was having breakfast at the Pentagon with a group of members of Congress. He then returned to his office for his daily intelligence briefing. The Secretary was informed of the second strike in New York during the briefing; he resumed the briefing while awaiting more information. After the Pentagon was struck, Secretary Rumsfeld went to the parking lot to assist with rescue efforts.[193]

Inside the NMCC, the deputy director for operations called for an all-purpose "significant event" conference. It began at 9:29, with a brief recap: two aircraft had struck the World Trade Center, there was a confirmed hijacking of American 11, and Otis fighters had been scrambled. The FAA was asked to provide an update, but the line was silent because the FAA had not been added to the call. A minute later, the deputy director stated that it had just been confirmed that American 11 was still airborne and heading toward D.C. He directed the transition to an air threat conference call. NORAD confirmed that American 11 was airborne and heading toward Washington, relaying the erroneous FAA information already mentioned. The call then ended, at about 9:34.[194]

It resumed at 9:37 as an air threat conference call,* which lasted more than eight hours. The President, Vice President, Secretary of Defense, Vice Chairman of the Joint Chiefs of Staff, and Deputy National Security Advisor Stephen Hadley all participated in this teleconference at various times, as did military personnel from the White House underground shelter and the President's military aide on Air Force One.[195]

Operators worked feverishly to include the FAA, but they had equipment problems and difficulty finding secure phone numbers. NORAD asked three times before 10:03 to confirm the presence of the FAA in the teleconference. The FAA representative who finally joined the call at 10:17 had no familiarity with or responsibility for hijackings, no access to decisionmakers, and none of the information available to senior FAA officials.[196]

---

* All times given for this conference call are estimates, which we and the Department of Defense believe to be accurate within a ± 3 minute margin of error.

We found no evidence that, at this critical time, NORAD's top commanders, in Florida or Cheyenne Mountain, coordinated with their counterparts at FAA headquarters to improve awareness and organize a common response. Lower-level officials improvised—for example, the FAA's Boston Center bypassed the chain of command and directly contacted NEADS after the first hijacking. But the highest-level Defense Department officials relied on the NMCC's air threat conference, in which the FAA did not participate for the first 48 minutes.[197]

At 9:39, the NMCC's deputy director for operations, a military officer, opened the call from the Pentagon, which had just been hit. He began: "An air attack against North America may be in progress. NORAD, what's the situation?" NORAD said it had conflicting reports. Its latest information was "of a possible hijacked aircraft taking off out of JFK en route to Washington D.C." The NMCC reported a crash into the mall side of the Pentagon and requested that the Secretary of Defense be added to the conference.[198]

At 9:44, NORAD briefed the conference on the possible hijacking of Delta 1989. Two minutes later, staff reported that they were still trying to locate Secretary Rumsfeld and Vice Chairman Myers. The Vice Chairman joined the conference shortly before 10:00; the Secretary, shortly before 10:30. The Chairman was out of the country.[199]

At 9:48, a representative from the White House shelter asked if there were any indications of another hijacked aircraft. The deputy director for operations mentioned the Delta flight and concluded that "that would be the fourth possible hijack." At 9:49, the commander of NORAD directed all air sovereignty aircraft to battle stations, fully armed.[200]

At 9:59, an Air Force lieutenant colonel working in the White House Military Office joined the conference and stated he had just talked to Deputy National Security Advisor Stephen Hadley. The White House requested (1) the implementation of continuity of government measures, (2) fighter escorts for Air Force One, and (3) a fighter combat air patrol over Washington, D.C.[201]

By 10:03, when United 93 crashed in Pennsylvania, there had been no mention of its hijacking and the FAA had not yet been added to the teleconference.[202]

### The President and the Vice President

The President was seated in a classroom when, at 9:05, Andrew Card whispered to him: "A second plane hit the second tower. America is under attack." The President told us his instinct was to project calm, not to have the country see an excited reaction at a moment of crisis. The press was standing behind the children; he saw their phones and pagers start to ring. The President felt he should project strength and calm until he could better understand what was happening.[203]

The President remained in the classroom for another five to seven minutes,

while the children continued reading. He then returned to a holding room shortly before 9:15, where he was briefed by staff and saw television coverage. He next spoke to Vice President Cheney, Dr. Rice, New York Governor George Pataki, and FBI Director Robert Mueller. He decided to make a brief statement from the school before leaving for the airport. The Secret Service told us they were anxious to move the President to a safer location, but did not think it imperative for him to run out the door.[204]

Between 9:15 and 9:30, the staff was busy arranging a return to Washington, while the President consulted his senior advisers about his remarks. No one in the traveling party had any information during this time that other aircraft were hijacked or missing. Staff was in contact with the White House Situation Room, but as far as we could determine, no one with the President was in contact with the Pentagon. The focus was on the President's statement to the nation. The only decision made during this time was to return to Washington.[205]

The President's motorcade departed at 9:35, and arrived at the airport between 9:42 and 9:45. During the ride the President learned about the attack on the Pentagon. He boarded the aircraft, asked the Secret Service about the safety of his family, and called the Vice President. According to notes of the call, at about 9:45 the President told the Vice President: "Sounds like we have a minor war going on here, I heard about the Pentagon. We're at war . . . somebody's going to pay."[206]

About this time, Card, the lead Secret Service agent, the President's military aide, and the pilot were conferring on a possible destination for Air Force One. The Secret Service agent felt strongly that the situation in Washington was too unstable for the President to return there, and Card agreed. The President strongly wanted to return to Washington and only grudgingly agreed to go elsewhere. The issue was still undecided when the President conferred with the Vice President at about the time Air Force One was taking off. The Vice President recalled urging the President not to return to Washington. Air Force One departed at about 9:54 without any fixed destination. The objective was to get up in the air—as fast and as high as possible—and then decide where to go.[207]

At 9:33, the tower supervisor at Reagan National Airport picked up a hotline to the Secret Service and told the Service's operations center that "an aircraft [is] coming at you and not talking with us." This was the first specific report to the Secret Service of a direct threat to the White House. No move was made to evacuate the Vice President at this time. As the officer who took the call explained, "[I was] about to push the alert button when the tower advised that the aircraft was turning south and approaching Reagan National Airport."[208]

American 77 began turning south, away from the White House, at 9:34. It continued heading south for roughly a minute, before turning west and beginning to circle back. This news prompted the Secret Service to order the immediate evacuation of the Vice President just before 9:36. Agents propelled him

out of his chair and told him he had to get to the bunker. The Vice President entered the underground tunnel leading to the shelter at 9:37.[209]

Once inside, Vice President Cheney and the agents paused in an area of the tunnel that had a secure phone, a bench, and television. The Vice President asked to speak to the President, but it took time for the call to be connected. He learned in the tunnel that the Pentagon had been hit, and he saw television coverage of smoke coming from the building.[210]

The Secret Service logged Mrs. Cheney's arrival at the White House at 9:52, and she joined her husband in the tunnel. According to contemporaneous notes, at 9:55 the Vice President was still on the phone with the President advising that three planes were missing and one had hit the Pentagon. We believe this is the same call in which the Vice President urged the President not to return to Washington. After the call ended, Mrs. Cheney and the Vice President moved from the tunnel to the shelter conference room.[211]

**United 93 and the Shootdown Order**
On the morning of 9/11, the President and Vice President stayed in contact not by an open line of communication but through a series of calls. The President told us he was frustrated with the poor communications that morning. He could not reach key officials, including Secretary Rumsfeld, for a period of time. The line to the White House shelter conference room—and the Vice President—kept cutting off.[212]

The Vice President remembered placing a call to the President just after entering the shelter conference room. There is conflicting evidence about when the Vice President arrived in the shelter conference room. We have concluded, from the available evidence, that the Vice President arrived in the room shortly before 10:00, perhaps at 9:58. The Vice President recalled being told, just after his arrival, that the Air Force was trying to establish a combat air patrol over Washington.[213]

The Vice President stated that he called the President to discuss the rules of engagement for the CAP. He recalled feeling that it did no good to establish the CAP unless the pilots had instructions on whether they were authorized to shoot if the plane would not divert. He said the President signed off on that concept. The President said he remembered such a conversation, and that it reminded him of when he had been an interceptor pilot. The President emphasized to us that he had authorized the shootdown of hijacked aircraft.[214]

The Vice President's military aide told us he believed the Vice President spoke to the President just after entering the conference room, but he did not hear what they said. Rice, who entered the room shortly after the Vice President and sat next to him, remembered hearing him inform the President, "Sir, the CAPs are up. Sir, they're going to want to know what to do." Then she recalled hearing him say, "Yes sir." She believed this conversation occurred a few minutes, perhaps five, after they entered the conference room.[215]

We believe this call would have taken place sometime before 10:10 to 10:15.

Among the sources that reflect other important events of that morning, there is no documentary evidence for this call, but the relevant sources are incomplete. Others nearby who were taking notes, such as the Vice President's chief of staff, Scooter Libby, who sat next to him, and Mrs. Cheney, did not note a call between the President and Vice President immediately after the Vice President entered the conference room.[216]

At 10:02, the communicators in the shelter began receiving reports from the Secret Service of an inbound aircraft—presumably hijacked—heading toward Washington. That aircraft was United 93. The Secret Service was getting this information directly from the FAA. The FAA may have been tracking the progress of United 93 on a display that showed its projected path to Washington, not its actual radar return. Thus, the Secret Service was relying on projections and was not aware the plane was already down in Pennsylvania.[217]

At some time between 10:10 and 10:15, a military aide told the Vice President and others that the aircraft was 80 miles out. Vice President Cheney was asked for authority to engage the aircraft.[218] His reaction was described by Scooter Libby as quick and decisive, "in about the time it takes a batter to decide to swing." The Vice President authorized fighter aircraft to engage the inbound plane. He told us he based this authorization on his earlier conversation with the President. The military aide returned a few minutes later, probably between 10:12 and 10:18, and said the aircraft was 60 miles out. He again asked for authorization to engage. The Vice President again said yes.[219]

At the conference room table was White House Deputy Chief of Staff Joshua Bolten. Bolten watched the exchanges and, after what he called "a quiet moment," suggested that the Vice President get in touch with the President and confirm the engage order. Bolten told us he wanted to make sure the President was told that the Vice President had executed the order. He said he had not heard any prior discussion on the subject with the President.[220]

The Vice President was logged calling the President at 10:18 for a two-minute conversation that obtained the confirmation. On Air Force One, the President's press secretary was taking notes; Ari Fleischer recorded that at 10:20, the President told him that he had authorized a shootdown of aircraft if necessary.[221]

Minutes went by and word arrived of an aircraft down in Pennsylvania. Those in the shelter wondered if the aircraft had been shot down pursuant to this authorization.[222]

At approximately 10:30, the shelter started receiving reports of another hijacked plane, this time only 5 to 10 miles out. Believing they had only a minute or two, the Vice President again communicated the authorization to "engage or "take out" the aircraft. At 10:33, Hadley told the air threat conference call: "I need to get word to Dick Myers that our reports are there's an inbound aircraft flying low 5 miles out. The Vice President's guidance was we need to take them out."[223]

Once again, there was no immediate information about the fate of the

inbound aircraft. In the apt description of one witness, "It drops below the radar screen and it's just continually hovering in your imagination; you don't know where it is or what happens to it." Eventually, the shelter received word that the alleged hijacker 5 miles away had been a medevac helicopter.[224]

### Transmission of the Authorization from the White House to the Pilots

The NMCC learned of United 93's hijacking at about 10:03. At this time the FAA had no contact with the military at the level of national command. The NMCC learned about United 93 from the White House. It, in turn, was informed by the Secret Service's contacts with the FAA.[225]

NORAD had no information either. At 10:07, its representative on the air threat conference call stated that NORAD had "no indication of a hijack heading to DC at this time."[226]

Repeatedly between 10:14 and 10:19, a lieutenant colonel at the White House relayed to the NMCC that the Vice President had confirmed fighters were cleared to engage inbound aircraft if they could verify that the aircraft was hijacked.[227]

The commander of NORAD, General Ralph Eberhart, was en route to the NORAD operations center in Cheyenne Mountain, Colorado, when the shootdown order was communicated on the air threat conference call. He told us that by the time he arrived, the order had already been passed down NORAD's chain of command.[228]

It is not clear how the shootdown order was communicated within NORAD. But we know that at 10:31, General Larry Arnold instructed his staff to broadcast the following over a NORAD instant messaging system: "10:31 Vice president has cleared to us to intercept tracks of interest and shoot them down if they do not respond per [General Arnold]."[229]

In upstate New York, NEADS personnel first learned of the shootdown order from this message:

> **Floor Leadership:** You need to read this. . . . The Region Commander has declared that we can shoot down aircraft that do not respond to our direction. Copy that?
>
> **Controllers:** Copy that, sir.
>
> **Floor Leadership:** So if you're trying to divert somebody and he won't divert—
>
> **Controllers:** DO [Director of Operations] is saying no.
>
> **Floor Leadership:** No? It came over the chat. . . . You got a conflict on that direction?
>
> **Controllers:** Right now no, but—
>
> **Floor Leadership:** Okay? Okay, you read that from the Vice President, right? Vice President has cleared. Vice President has cleared us to

intercept traffic and shoot them down if they do not respond per [General Arnold].[230]

In interviews with us, NEADS personnel expressed considerable confusion over the nature and effect of the order.

The NEADS commander told us he did not pass along the order because he was unaware of its ramifications. Both the mission commander and the senior weapons director indicated they did not pass the order to the fighters circling Washington and New York because they were unsure how the pilots would, or should, proceed with this guidance. In short, while leaders in Washington believed that the fighters above them had been instructed to "take out" hostile aircraft, the only orders actually conveyed to the pilots were to "ID type and tail."[231]

In most cases, the chain of command authorizing the use of force runs from the president to the secretary of defense and from the secretary to the combatant commander. The President apparently spoke to Secretary Rumsfeld for the first time that morning shortly after 10:00. No one can recall the content of this conversation, but it was a brief call in which the subject of shootdown authority was not discussed.[232]

At 10:39, the Vice President updated the Secretary on the air threat conference:

> **Vice President:** There's been at least three instances here where we've had reports of aircraft approaching Washington—a couple were confirmed hijack. And, pursuant to the President's instructions I gave authorization for them to be taken out. Hello?
>
> **SecDef:** Yes, I understand. Who did you give that direction to?
>
> **Vice President:** It was passed from here through the [operations] center at the White House, from the [shelter].
>
> **SecDef:** OK, let me ask the question here. Has that directive been transmitted to the aircraft?
>
> **Vice President:** Yes, it has.
>
> **SecDef:** So we've got a couple of aircraft up there that have those instructions at this present time?
>
> **Vice President:** That is correct. And it's my understanding they've already taken a couple of aircraft out.
>
> **SecDef:** We can't confirm that. We're told that one aircraft is down but we do not have a pilot report that did it.[233]

As this exchange shows, Secretary Rumsfeld was not in the NMCC when the shootdown order was first conveyed. He went from the parking lot to his office (where he spoke to the President), then to the Executive Support Center, where he participated in the White House video teleconference. He moved

to the NMCC shortly before 10:30, in order to join Vice Chairman Myers. Secretary Rumsfeld told us he was just gaining situational awareness when he spoke with the Vice President at 10:39. His primary concern was ensuring that the pilots had a clear understanding of their rules of engagement.[234]

The Vice President was mistaken in his belief that shootdown authorization had been passed to the pilots flying at NORAD's direction. By 10:45 there was, however, another set of fighters circling Washington that had entirely different rules of engagement. These fighters, part of the 113th Wing of the District of Columbia Air National Guard, launched out of Andrews Air Force Base in Maryland in response to information passed to them by the Secret Service. The first of the Andrews fighters was airborne at 10:38.[235]

General David Wherley—the commander of the 113th Wing—reached out to the Secret Service after hearing secondhand reports that it wanted fighters airborne. A Secret Service agent had a phone in each ear, one connected to Wherley and the other to a fellow agent at the White House, relaying instructions that the White House agent said he was getting from the Vice President. The guidance for Wherley was to send up the aircraft, with orders to protect the White House and take out any aircraft that threatened the Capitol. General Wherley translated this in military terms to flying "weapons free"—that is, the decision to shoot rests in the cockpit, or in this case in the cockpit of the lead pilot. He passed these instructions to the pilots that launched at 10:42 and afterward.[236]

Thus, while the fighter pilots under NORAD direction who had scrambled out of Langley never received any type of engagement order, the Andrews pilots were operating weapons free—a permissive rule of engagement. The President and the Vice President indicated to us they had not been aware that fighters had been scrambled out of Andrews, at the request of the Secret Service and outside the military chain of command.[237] There is no evidence that NORAD headquarters or military officials in the NMCC knew—during the morning of September 11—that the Andrews planes were airborne and operating under different rules of engagement.

### What If?

NORAD officials have maintained consistently that had the passengers not caused United 93 to crash, the military would have prevented it from reaching Washington, D.C. That conclusion is based on a version of events that we now know is incorrect. The Langley fighters were not scrambled in response to United 93; NORAD did not have 47 minutes to intercept the flight; NORAD did not even know the plane was hijacked until after it had crashed. It is appropriate, therefore, to reconsider whether United 93 would have been intercepted.

Had it not crashed in Pennsylvania at 10:03, we estimate that United 93

could not have reached Washington any earlier than 10:13, and probably would have arrived before 10:23. There was only one set of fighters circling Washington during that time frame—the Langley F-16s. They were armed and under NORAD's control. After NEADS learned of the hijacking at 10:07, NORAD would have had from 6 to 16 minutes to locate the flight, receive authorization to shoot it down, and communicate the order to the pilots, who (in the same span) would have had to authenticate the order, intercept the flight, and execute the order.[238]

At that point in time, the Langley pilots did not know the threat they were facing, did not know where United 93 was located, and did not have shootdown authorization.

First, the Langley pilots were never briefed about the reason they were scrambled. As the lead pilot explained, "I reverted to the Russian threat. . . . I'm thinking cruise missile threat from the sea. You know you look down and see the Pentagon burning and I thought the bastards snuck one by us. . . . [Y]ou couldn't see any airplanes, and no one told us anything." The pilots knew their mission was to divert aircraft, but did not know that the threat came from hijacked airliners.[239]

Second, NEADS did not have accurate information on the location of United 93. Presumably FAA would have provided such information, but we do not know how long that would have taken, nor how long it would have taken NEADS to locate the target.

Third, NEADS needed orders to pass to the pilots. At 10:10, the pilots over Washington were emphatically told, "negative clearance to shoot." Shootdown authority was first communicated to NEADS at 10:31. It is possible that NORAD commanders would have ordered a shootdown in the absence of the authorization communicated by the Vice President, but given the gravity of the decision to shoot down a commercial airliner, and NORAD's caution that a mistake not be made, we view this possibility as unlikely.[240]

NORAD officials have maintained that they would have intercepted and shot down United 93. We are not so sure. We are sure that the nation owes a debt to the passengers of United 93. Their actions saved the lives of countless others, and may have saved either the Capitol or the White House from destruction.

The details of what happened on the morning of September 11 are complex, but they play out a simple theme. NORAD and the FAA were unprepared for the type of attacks launched against the United States on September 11, 2001. They struggled, under difficult circumstances, to improvise a homeland defense against an unprecedented challenge they had never before encountered and had never trained to meet.

At 10:02 that morning, an assistant to the mission crew commander at NORAD's Northeast Air Defense Sector in Rome, New York, was working

with his colleagues on the floor of the command center. In a brief moment of reflection, he was recorded remarking that "This is a new type of war."[241]

He was, and is, right. But the conflict did not begin on 9/11. It had been publicly declared years earlier, most notably in a declaration faxed early in 1998 to an Arabic-language newspaper in London. Few Americans had noticed it. The fax had been sent from thousands of miles away by the followers of a Saudi exile gathered in one of the most remote and impoverished countries on earth.

2

# THE FOUNDATION OF
# THE NEW TERRORISM

## 2.1 A DECLARATION OF WAR

In February 1998, the 40-year-old Saudi exile Usama Bin Ladin and a fugitive Egyptian physician, Ayman al Zawahiri, arranged from their Afghan headquarters for an Arabic newspaper in London to publish what they termed a fatwa issued in the name of a "World Islamic Front." A fatwa is normally an interpretation of Islamic law by a respected Islamic authority, but neither Bin Ladin, Zawahiri, nor the three others who signed this statement were scholars of Islamic law. Claiming that America had declared war against God and his messenger, they called for the murder of any American, anywhere on earth, as the "individual duty for every Muslim who can do it in any country in which it is possible to do it."[1]

Three months later, when interviewed in Afghanistan by ABC-TV, Bin Ladin enlarged on these themes.[2] He claimed it was more important for Muslims to kill Americans than to kill other infidels. "It is far better for anyone to kill a single American soldier than to squander his efforts on other activities," he said. Asked whether he approved of terrorism and of attacks on civilians, he replied: "We believe that the worst thieves in the world today and the worst terrorists are the Americans. Nothing could stop you except perhaps retaliation in kind. We do not have to differentiate between military or civilian. As far as we are concerned, they are all targets."

*Note: Islamic names often do not follow the Western practice of the consistent use of surnames. Given the variety of names we mention, we chose to refer to individuals by the last word in the names by which they are known: Nawaf al Hazmi as Hazmi, for instance, omitting the article "al" that would be part of their name in their own societies. We generally make an exception for the more familiar English usage of "Bin" as part of a last name, as in Bin Ladin. Further, there is no universally accepted way to transliterate Arabic words and names into English. We have relied on a mix of common sense, the sound of the name in Arabic, and common usage in source materials, the press, or government documents. When we quote from a source document, we use its transliteration, e.g., "al Qida" instead of al Qaeda.*

Though novel for its open endorsement of indiscriminate killing, Bin Ladin's 1998 declaration was only the latest in the long series of his public and private calls since 1992 that singled out the United States for attack.

In August 1996, Bin Ladin had issued his own self-styled fatwa calling on Muslims to drive American soldiers out of Saudi Arabia. The long, disjointed document condemned the Saudi monarchy for allowing the presence of an army of infidels in a land with the sites most sacred to Islam, and celebrated recent suicide bombings of American military facilities in the Kingdom. It praised the 1983 suicide bombing in Beirut that killed 241 U.S. Marines, the 1992 bombing in Aden, and especially the 1993 firefight in Somalia after which the United States "left the area carrying disappointment, humiliation, defeat and your dead with you."[3]

Bin Ladin said in his ABC interview that he and his followers had been preparing in Somalia for another long struggle, like that against the Soviets in Afghanistan, but "the United States rushed out of Somalia in shame and disgrace." Citing the Soviet army's withdrawal from Afghanistan as proof that a ragged army of dedicated Muslims could overcome a superpower, he told the interviewer: "We are certain that we shall—with the grace of Allah—prevail over the Americans." He went on to warn that "If the present injustice continues . . . , it will inevitably move the battle to American soil."[4]

Plans to attack the United States were developed with unwavering single-mindedness throughout the 1990s. Bin Ladin saw himself as called "to follow in the footsteps of the Messenger and to communicate his message to all nations,"[5] and to serve as the rallying point and organizer of a new kind of war to destroy America and bring the world to Islam.

## 2.2 BIN LADIN'S APPEAL IN THE ISLAMIC WORLD

It is the story of eccentric and violent ideas sprouting in the fertile ground of political and social turmoil. It is the story of an organization poised to seize its historical moment. How did Bin Ladin—with his call for the indiscriminate killing of Americans—win thousands of followers and some degree of approval from millions more?

The history, culture, and body of beliefs from which Bin Ladin has shaped and spread his message are largely unknown to many Americans. Seizing on symbols of Islam's past greatness, he promises to restore pride to people who consider themselves the victims of successive foreign masters. He uses cultural and religious allusions to the holy Qur'an and some of its interpreters. He appeals to people disoriented by cyclonic change as they confront modernity and globalization. His rhetoric selectively draws from multiple sources—Islam, history, and the region's political and economic malaise. He also stresses grievances against the United States widely shared in the Muslim world. He



©Reuters 2004

*Usama Bin Ladin at a news conference in Afghanistan in 1998*

inveighed against the presence of U.S. troops in Saudi Arabia, the home of Islam's holiest sites. He spoke of the suffering of the Iraqi people as a result of sanctions imposed after the Gulf War, and he protested U.S. support of Israel.

## Islam

Islam (a word that literally means "surrender to the will of God") arose in Arabia with what Muslims believe are a series of revelations to the Prophet Mohammed from the one and only God, the God of Abraham and of Jesus. These revelations, conveyed by the angel Gabriel, are recorded in the Qur'an. Muslims believe that these revelations, given to the greatest and last of a chain of prophets stretching from Abraham through Jesus, complete God's message to humanity. The Hadith, which recount Mohammed's sayings and deeds as recorded by his contemporaries, are another fundamental source. A third key element is the Sharia, the code of law derived from the Qur'an and the Hadith.

Islam is divided into two main branches, Sunni and Shia. Soon after the

Prophet's death, the question of choosing a new leader, or *caliph*, for the Muslim community, or *Ummah*, arose. Initially, his successors could be drawn from the Prophet's contemporaries, but with time, this was no longer possible. Those who became the Shia held that any leader of the Ummah must be a direct descendant of the Prophet; those who became the Sunni argued that lineal descent was not required if the candidate met other standards of faith and knowledge. After bloody struggles, the Sunni became (and remain) the majority sect. (The Shia are dominant in Iran.) The Caliphate—the institutionalized leadership of the Ummah—thus was a Sunni institution that continued until 1924, first under Arab and eventually under Ottoman Turkish control.

Many Muslims look back at the century after the revelations to the Prophet Mohammed as a golden age. Its memory is strongest among the Arabs. What happened then—the spread of Islam from the Arabian Peninsula throughout the Middle East, North Africa, and even into Europe within less than a century—seemed, and seems, miraculous.[6] Nostalgia for Islam's past glory remains a powerful force.

Islam is both a faith and a code of conduct for all aspects of life. For many Muslims, a good government would be one guided by the moral principles of their faith. This does not necessarily translate into a desire for clerical rule and the abolition of a secular state. It does mean that some Muslims tend to be uncomfortable with distinctions between religion and state, though Muslim rulers throughout history have readily separated the two.

To extremists, however, such divisions, as well as the existence of parliaments and legislation, only prove these rulers to be false Muslims usurping God's authority over all aspects of life. Periodically, the Islamic world has seen surges of what, for want of a better term, is often labeled "fundamentalism."[7] Denouncing waywardness among the faithful, some clerics have appealed for a return to observance of the literal teachings of the Qur'an and Hadith. One scholar from the fourteenth century from whom Bin Ladin selectively quotes, Ibn Taimiyyah, condemned both corrupt rulers and the clerics who failed to criticize them. He urged Muslims to read the Qur'an and the Hadith for themselves, not to depend solely on learned interpreters like himself but to hold one another to account for the quality of their observance.[8]

The extreme Islamist version of history blames the decline from Islam's golden age on the rulers and people who turned away from the true path of their religion, thereby leaving Islam vulnerable to encroaching foreign powers eager to steal their land, wealth, and even their souls.

## Bin Ladin's Worldview

Despite his claims to universal leadership, Bin Ladin offers an extreme view of Islamic history designed to appeal mainly to Arabs and Sunnis. He draws on fundamentalists who blame the eventual destruction of the Caliphate on leaders who abandoned the pure path of religious devotion.[9] He repeatedly calls on his followers to embrace martyrdom since "the walls of oppression and

humiliation cannot be demolished except in a rain of bullets."[10] For those yearning for a lost sense of order in an older, more tranquil world, he offers his "Caliphate" as an imagined alternative to today's uncertainty. For others, he offers simplistic conspiracies to explain their world.

Bin Ladin also relies heavily on the Egyptian writer Sayyid Qutb. A member of the Muslim Brotherhood[11] executed in 1966 on charges of attempting to overthrow the government, Qutb mixed Islamic scholarship with a very superficial acquaintance with Western history and thought. Sent by the Egyptian government to study in the United States in the late 1940s, Qutb returned with an enormous loathing of Western society and history. He dismissed Western achievements as entirely material, arguing that Western society possesses "nothing that will satisfy its own conscience and justify its existence."[12]

Three basic themes emerge from Qutb's writings. First, he claimed that the world was beset with barbarism, licentiousness, and unbelief (a condition he called *jahiliyya*, the religious term for the period of ignorance prior to the revelations given to the Prophet Mohammed). Qutb argued that humans can choose only between Islam and jahiliyya. Second, he warned that more people, including Muslims, were attracted to jahiliyya and its material comforts than to his view of Islam; jahiliyya could therefore triumph over Islam. Third, no middle ground exists in what Qutb conceived as a struggle between God and Satan. All Muslims—as he defined them—therefore must take up arms in this fight. Any Muslim who rejects his ideas is just one more nonbeliever worthy of destruction.[13]

Bin Ladin shares Qutb's stark view, permitting him and his followers to rationalize even unprovoked mass murder as righteous defense of an embattled faith. Many Americans have wondered, "Why do 'they' hate us?" Some also ask, "What can we do to stop these attacks?"

Bin Ladin and al Qaeda have given answers to both these questions. To the first, they say that America had attacked Islam; America is responsible for all conflicts involving Muslims. Thus Americans are blamed when Israelis fight with Palestinians, when Russians fight with Chechens, when Indians fight with Kashmiri Muslims, and when the Philippine government fights ethnic Muslims in its southern islands. America is also held responsible for the governments of Muslim countries, derided by al Qaeda as "your agents." Bin Ladin has stated flatly, "Our fight against these governments is not separate from our fight against you."[14] These charges found a ready audience among millions of Arabs and Muslims angry at the United States because of issues ranging from Iraq to Palestine to America's support for their countries' repressive rulers.

Bin Ladin's grievance with the United States may have started in reaction to specific U.S. policies but it quickly became far deeper. To the second question, what America could do, al Qaeda's answer was that America should abandon the Middle East, convert to Islam, and end the immorality and godlessness of its society and culture: "It is saddening to tell you that you are the worst civilization witnessed by the history of mankind." If the United States did not

comply, it would be at war with the Islamic nation, a nation that al Qaeda's leaders said "desires death more than you desire life."[15]

### History and Political Context

Few fundamentalist movements in the Islamic world gained lasting political power. In the nineteenth and twentieth centuries, fundamentalists helped articulate anticolonial grievances but played little role in the overwhelmingly secular struggles for independence after World War I. Western-educated lawyers, soldiers, and officials led most independence movements, and clerical influence and traditional culture were seen as obstacles to national progress.

After gaining independence from Western powers following World War II, the Arab Middle East followed an arc from initial pride and optimism to today's mix of indifference, cynicism, and despair. In several countries, a dynastic state already existed or was quickly established under a paramount tribal family. Monarchies in countries such as Saudi Arabia, Morocco, and Jordan still survive today. Those in Egypt, Libya, Iraq, and Yemen were eventually overthrown by secular nationalist revolutionaries.

The secular regimes promised a glowing future, often tied to sweeping ideologies (such as those promoted by Egyptian President Gamal Abdel Nasser's Arab Socialism or the Ba'ath Party of Syria and Iraq) that called for a single, secular Arab state. However, what emerged were almost invariably autocratic regimes that were usually unwilling to tolerate any opposition—even in countries, such as Egypt, that had a parliamentary tradition. Over time, their policies—repression, rewards, emigration, and the displacement of popular anger onto scapegoats (generally foreign)—were shaped by the desire to cling to power.

The bankruptcy of secular, autocratic nationalism was evident across the Muslim world by the late 1970s. At the same time, these regimes had closed off nearly all paths for peaceful opposition, forcing their critics to choose silence, exile, or violent opposition. Iran's 1979 revolution swept a Shia theocracy into power. Its success encouraged Sunni fundamentalists elsewhere.

In the 1980s, awash in sudden oil wealth, Saudi Arabia competed with Shia Iran to promote its Sunni fundamentalist interpretation of Islam, Wahhabism. The Saudi government, always conscious of its duties as the custodian of Islam's holiest places, joined with wealthy Arabs from the Kingdom and other states bordering the Persian Gulf in donating money to build mosques and religious schools that could preach and teach their interpretation of Islamic doctrine.

In this competition for legitimacy, secular regimes had no alternative to offer. Instead, in a number of cases their rulers sought to buy off local Islamist movements by ceding control of many social and educational issues. Emboldened rather than satisfied, the Islamists continued to push for power—a trend especially clear in Egypt. Confronted with a violent Islamist movement that killed President Anwar Sadat in 1981, the Egyptian government combined

harsh repression of Islamic militants with harassment of moderate Islamic scholars and authors, driving many into exile. In Pakistan, a military regime sought to justify its seizure of power by a pious public stance and an embrace of unprecedented Islamist influence on education and society.

These experiments in political Islam faltered during the 1990s: the Iranian revolution lost momentum, prestige, and public support, and Pakistan's rulers found that most of its population had little enthusiasm for fundamentalist Islam. Islamist revival movements gained followers across the Muslim world, but failed to secure political power except in Iran and Sudan. In Algeria, where in 1991 Islamists seemed almost certain to win power through the ballot box, the military preempted their victory, triggering a brutal civil war that continues today. Opponents of today's rulers have few, if any, ways to participate in the existing political system. They are thus a ready audience for calls to Muslims to purify their society, reject unwelcome modernization, and adhere strictly to the Sharia.

**Social and Economic Malaise**
In the 1970s and early 1980s, an unprecedented flood of wealth led the then largely unmodernized oil states to attempt to shortcut decades of development. They funded huge infrastructure projects, vastly expanded education, and created subsidized social welfare programs. These programs established a widespread feeling of entitlement without a corresponding sense of social obligations. By the late 1980s, diminishing oil revenues, the economic drain from many unprofitable development projects, and population growth made these entitlement programs unsustainable. The resulting cutbacks created enormous resentment among recipients who had come to see government largesse as their right. This resentment was further stoked by public understanding of how much oil income had gone straight into the pockets of the rulers, their friends, and their helpers.

Unlike the oil states (or Afghanistan, where real economic development has barely begun), the other Arab nations and Pakistan once had seemed headed toward balanced modernization. The established commercial, financial, and industrial sectors in these states, supported by an entrepreneurial spirit and widespread understanding of free enterprise, augured well. But unprofitable heavy industry, state monopolies, and opaque bureaucracies slowly stifled growth. More importantly, these state-centered regimes placed their highest priority on preserving the elite's grip on national wealth. Unwilling to foster dynamic economies that could create jobs attractive to educated young men, the countries became economically stagnant and reliant on the safety valve of worker emigration either to the Arab oil states or to the West. Furthermore, the repression and isolation of women in many Muslim countries have not only seriously limited individual opportunity but also crippled overall economic productivity.[16]

By the 1990s, high birthrates and declining rates of infant mortality had

produced a common problem throughout the Muslim world: a large, steadily increasing population of young men without any reasonable expectation of suitable or steady employment—a sure prescription for social turbulence. Many of these young men, such as the enormous number trained only in religious schools, lacked the skills needed by their societies. Far more acquired valuable skills but lived in stagnant economies that could not generate satisfying jobs.

Millions, pursuing secular as well as religious studies, were products of educational systems that generally devoted little if any attention to the rest of the world's thought, history, and culture. The secular education reflected a strong cultural preference for technical fields over the humanities and social sciences. Many of these young men, even if able to study abroad, lacked the perspective and skills needed to understand a different culture.

Frustrated in their search for a decent living, unable to benefit from an education often obtained at the cost of great family sacrifice, and blocked from starting families of their own, some of these young men were easy targets for radicalization.

### Bin Ladin's Historical Opportunity

Most Muslims prefer a peaceful and inclusive vision of their faith, not the violent sectarianism of Bin Ladin. Among Arabs, Bin Ladin's followers are commonly nicknamed *takfiri*, or "those who define other Muslims as unbelievers," because of their readiness to demonize and murder those with whom they disagree. Beyond the theology lies the simple human fact that most Muslims, like most other human beings, are repelled by mass murder and barbarism whatever their justification.

"All Americans must recognize that the face of terror is not the true face of Islam," President Bush observed. "Islam is a faith that brings comfort to a billion people around the world. It's a faith that has made brothers and sisters of every race. It's a faith based upon love, not hate."[17] Yet as political, social, and economic problems created flammable societies, Bin Ladin used Islam's most extreme, fundamentalist traditions as his match. All these elements—including religion—combined in an explosive compound.

Other extremists had, and have, followings of their own. But in appealing to societies full of discontent, Bin Ladin remained credible as other leaders and symbols faded. He could stand as a symbol of resistance—above all, resistance to the West and to America. He could present himself and his allies as victorious warriors in the one great successful experience for Islamic militancy in the 1980s: the Afghan jihad against the Soviet occupation.

By 1998, Bin Ladin had a distinctive appeal, as he focused on attacking America. He argued that other extremists, who aimed at local rulers or Israel, did not go far enough. They had not taken on what he called "the head of the snake."[18]

Finally, Bin Ladin had another advantage: a substantial, worldwide organization. By the time he issued his February 1998 declaration of war, Bin Ladin had nurtured that organization for nearly ten years. He could attract, train, and use recruits for ever more ambitious attacks, rallying new adherents with each demonstration that his was the movement of the future.

## 2.3 THE RISE OF BIN LADIN AND AL QAEDA (1988–1992)

A decade of conflict in Afghanistan, from 1979 to 1989, gave Islamist extremists a rallying point and training field. A Communist government in Afghanistan gained power in 1978 but was unable to establish enduring control. At the end of 1979, the Soviet government sent in military units to ensure that the country would remain securely under Moscow's influence. The response was an Afghan national resistance movement that defeated Soviet forces.[19]

Young Muslims from around the world flocked to Afghanistan to join as volunteers in what was seen as a "holy war"—*jihad*—against an invader. The largest numbers came from the Middle East. Some were Saudis, and among them was Usama Bin Ladin.

Twenty-three when he arrived in Afghanistan in 1980, Bin Ladin was the seventeenth of 57 children of a Saudi construction magnate. Six feet five and thin, Bin Ladin appeared to be ungainly but was in fact quite athletic, skilled as a horseman, runner, climber, and soccer player. He had attended Abdul Aziz University in Saudi Arabia. By some accounts, he had been interested there in religious studies, inspired by tape recordings of fiery sermons by Abdullah Azzam, a Palestinian and a disciple of Qutb. Bin Ladin was conspicuous among the volunteers not because he showed evidence of religious learning but because he had access to some of his family's huge fortune. Though he took part in at least one actual battle, he became known chiefly as a person who generously helped fund the anti–Soviet jihad.[20]

Bin Ladin understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization. This organization included a financial support network that came to be known as the "Golden Chain," put together mainly by financiers in Saudi Arabia and the Persian Gulf states. Donations flowed through charities or other nongovernmental organizations (NGOs). Bin Ladin and the "Afghan Arabs" drew largely on funds raised by this network, whose agents roamed world markets to buy arms and supplies for the mujahideen, or "holy warriors."[21]

Mosques, schools, and boardinghouses served as recruiting stations in many parts of the world, including the United States. Some were set up by Islamic extremists or their financial backers. Bin Ladin had an important part in this

activity. He and the cleric Azzam had joined in creating a "Bureau of Services" (Mektab al Khidmat, or MAK), which channeled recruits into Afghanistan.[22]

The international environment for Bin Ladin's efforts was ideal. Saudi Arabia and the United States supplied billions of dollars worth of secret assistance to rebel groups in Afghanistan fighting the Soviet occupation. This assistance was funneled through Pakistan: the Pakistani military intelligence service (Inter-Services Intelligence Directorate, or ISID), helped train the rebels and distribute the arms. But Bin Ladin and his comrades had their own sources of support and training, and they received little or no assistance from the United States.[23]

April 1988 brought victory for the Afghan jihad. Moscow declared it would pull its military forces out of Afghanistan within the next nine months. As the Soviets began their withdrawal, the jihad's leaders debated what to do next.

Bin Ladin and Azzam agreed that the organization successfully created for Afghanistan should not be allowed to dissolve. They established what they called a base or foundation (al Qaeda) as a potential general headquarters for future jihad.[24] Though Azzam had been considered number one in the MAK, by August 1988 Bin Ladin was clearly the leader (*emir*) of al Qaeda. This organization's structure included as its operating arms an intelligence component, a military committee, a financial committee, a political committee, and a committee in charge of media affairs and propaganda. It also had an Advisory Council (Shura) made up of Bin Ladin's inner circle.[25]

Bin Ladin's assumption of the helm of al Qaeda was evidence of his growing self-confidence and ambition. He soon made clear his desire for unchallenged control and for preparing the mujahideen to fight anywhere in the world. Azzam, by contrast, favored continuing to fight in Afghanistan until it had a true Islamist government. And, as a Palestinian, he saw Israel as the top priority for the next stage.[26]

Whether the dispute was about power, personal differences, or strategy, it ended on November 24, 1989, when a remotely controlled car bomb killed Azzam and both of his sons. The killers were assumed to be rival Egyptians. The outcome left Bin Ladin indisputably in charge of what remained of the MAK and al Qaeda.[27]

Through writers like Qutb, and the presence of Egyptian Islamist teachers in the Saudi educational system, Islamists already had a strong intellectual influence on Bin Ladin and his al Qaeda colleagues. By the late 1980s, the Egyptian Islamist movement—badly battered in the government crackdown following President Sadat's assassination—was centered in two major organizations: the Islamic Group and the Egyptian Islamic Jihad. A spiritual guide for both, but especially the Islamic Group, was the so-called Blind Sheikh, Omar Abdel Rahman. His preaching had inspired the assassination of Sadat. After being in and out of Egyptian prisons during the 1980s, Abdel Rahman found

refuge in the United States. From his headquarters in Jersey City, he distributed messages calling for the murder of unbelievers.[28]

The most important Egyptian in Bin Ladin's circle was a surgeon, Ayman al Zawahiri, who led a strong faction of the Egyptian Islamic Jihad. Many of his followers became important members in the new organization, and his own close ties with Bin Ladin led many to think of him as the deputy head of al Qaeda. He would in fact become Bin Ladin's deputy some years later, when they merged their organizations.[29]

### Bin Ladin Moves to Sudan

By the fall of 1989, Bin Ladin had sufficient stature among Islamic extremists that a Sudanese political leader, Hassan al Turabi, urged him to transplant his whole organization to Sudan. Turabi headed the National Islamic Front in a coalition that had recently seized power in Khartoum.[30] Bin Ladin agreed to help Turabi in an ongoing war against African Christian separatists in southern Sudan and also to do some road building. Turabi in return would let Bin Ladin use Sudan as a base for worldwide business operations and for preparations for jihad.[31] While agents of Bin Ladin began to buy property in Sudan in 1990,[32] Bin Ladin himself moved from Afghanistan back to Saudi Arabia.

In August 1990, Iraq invaded Kuwait. Bin Ladin, whose efforts in Afghanistan had earned him celebrity and respect, proposed to the Saudi monarchy that he summon mujahideen for a jihad to retake Kuwait. He was rebuffed, and the Saudis joined the U.S.-led coalition. After the Saudis agreed to allow U.S. armed forces to be based in the Kingdom, Bin Ladin and a number of Islamic clerics began to publicly denounce the arrangement. The Saudi government exiled the clerics and undertook to silence Bin Ladin by, among other things, taking away his passport. With help from a dissident member of the royal family, he managed to get out of the country under the pretext of attending an Islamic gathering in Pakistan in April 1991.[33] By 1994, the Saudi government would freeze his financial assets and revoke his citizenship.[34] He no longer had a country he could call his own.

Bin Ladin moved to Sudan in 1991 and set up a large and complex set of intertwined business and terrorist enterprises. In time, the former would encompass numerous companies and a global network of bank accounts and nongovernmental institutions. Fulfilling his bargain with Turabi, Bin Ladin used his construction company to build a new highway from Khartoum to Port Sudan on the Red Sea coast. Meanwhile, al Qaeda finance officers and top operatives used their positions in Bin Ladin's businesses to acquire weapons, explosives, and technical equipment for terrorist purposes. One founding member, Abu Hajer al Iraqi, used his position as head of a Bin Ladin investment company to carry out procurement trips from western Europe to the Far East. Two others, Wadi al Hage and Mubarak Douri, who had become acquainted in Tuc-

son, Arizona, in the late 1980s, went as far afield as China, Malaysia, the Philippines, and the former Soviet states of Ukraine and Belarus.[35]

Bin Ladin's impressive array of offices covertly provided financial and other support for terrorist activities. The network included a major business enterprise in Cyprus; a "services" branch in Zagreb; an office of the Benevolence International Foundation in Sarajevo, which supported the Bosnian Muslims in their conflict with Serbia and Croatia; and an NGO in Baku, Azerbaijan, that was employed as well by Egyptian Islamic Jihad both as a source and conduit for finances and as a support center for the Muslim rebels in Chechnya. He also made use of the already-established Third World Relief Agency (TWRA) headquartered in Vienna, whose branch office locations included Zagreb and Budapest. (Bin Ladin later set up an NGO in Nairobi as a cover for operatives there.)[36]

Bin Ladin now had a vision of himself as head of an international jihad confederation. In Sudan, he established an "Islamic Army Shura" that was to serve as the coordinating body for the consortium of terrorist groups with which he was forging alliances. It was composed of his own al Qaeda Shura together with leaders or representatives of terrorist organizations that were still independent. In building this Islamic army, he enlisted groups from Saudi Arabia, Egypt, Jordan, Lebanon, Iraq, Oman, Algeria, Libya, Tunisia, Morocco, Somalia, and Eritrea. Al Qaeda also established cooperative but less formal relationships with other extremist groups from these same countries; from the African states of Chad, Mali, Niger, Nigeria, and Uganda; and from the Southeast Asian states of Burma, Thailand, Malaysia, and Indonesia. Bin Ladin maintained connections in the Bosnian conflict as well.[37] The groundwork for a true global terrorist network was being laid.

Bin Ladin also provided equipment and training assistance to the Moro Islamic Liberation Front in the Philippines and also to a newly forming Philippine group that called itself the Abu Sayyaf Brigade, after one of the major Afghan jihadist commanders.[38] Al Qaeda helped Jemaah Islamiya (JI), a nascent organization headed by Indonesian Islamists with cells scattered across Malaysia, Singapore, Indonesia, and the Philippines. It also aided a Pakistani group engaged in insurrectionist attacks in Kashmir. In mid-1991, Bin Ladin dispatched a band of supporters to the northern Afghanistan border to assist the Tajikistan Islamists in the ethnic conflicts that had been boiling there even before the Central Asian departments of the Soviet Union became independent states.[39]

This pattern of expansion through building alliances extended to the United States. A Muslim organization called al Khifa had numerous branch offices, the largest of which was in the Farouq mosque in Brooklyn. In the mid-1980s, it had been set up as one of the first outposts of Azzam and Bin Ladin's MAK.[40] Other cities with branches of al Khifa included Atlanta, Boston, Chicago, Pittsburgh, and Tucson.[41] Al Khifa recruited American Muslims to

fight in Afghanistan; some of them would participate in terrorist actions in the United States in the early 1990s and in al Qaeda operations elsewhere, including the 1998 attacks on U.S. embassies in East Africa.

## 2.4 BUILDING AN ORGANIZATION, DECLARING WAR ON THE UNITED STATES (1992–1996)

Bin Ladin began delivering diatribes against the United States before he left Saudi Arabia. He continued to do so after he arrived in Sudan. In early 1992, the al Qaeda leadership issued a fatwa calling for jihad against the Western "occupation" of Islamic lands. Specifically singling out U.S. forces for attack, the language resembled that which would appear in Bin Ladin's public fatwa in August 1996. In ensuing weeks, Bin Ladin delivered an often-repeated lecture on the need to cut off "the head of the snake."[42]

By this time, Bin Ladin was well-known and a senior figure among Islamist extremists, especially those in Egypt, the Arabian Peninsula, and the Afghanistan-Pakistan border region. Still, he was just one among many diverse terrorist barons. Some of Bin Ladin's close comrades were more peers than subordinates. For example, Usama Asmurai, also known as Wali Khan, worked with Bin Ladin in the early 1980s and helped him in the Philippines and in Tajikistan. The Egyptian spiritual guide based in New Jersey, the Blind Sheikh, whom Bin Ladin admired, was also in the network. Among sympathetic peers in Afghanistan were a few of the warlords still fighting for power and Abu Zubaydah, who helped operate a popular terrorist training camp near the border with Pakistan. There were also rootless but experienced operatives, such as Ramzi Yousef and Khalid Sheikh Mohammed, who—though not necessarily formal members of someone else's organization—were traveling around the world and joining in projects that were supported by or linked to Bin Ladin, the Blind Sheikh, or their associates.[43]

In now analyzing the terrorist programs carried out by members of this network, it would be misleading to apply the label "al Qaeda operations" too often in these early years. Yet it would also be misleading to ignore the significance of these connections. And in this network, Bin Ladin's agenda stood out. While his allied Islamist groups were focused on local battles, such as those in Egypt, Algeria, Bosnia, or Chechnya, Bin Ladin concentrated on attacking the "far enemy"—the United States.

### Attacks Known and Suspected

After U.S. troops deployed to Somalia in late 1992, al Qaeda leaders formulated a fatwa demanding their eviction. In December, bombs exploded at two hotels in Aden where U.S. troops routinely stopped en route to Somalia, killing two, but no Americans. The perpetrators are reported to have belonged to a

group from southern Yemen headed by a Yemeni member of Bin Ladin's Islamic Army Shura; some in the group had trained at an al Qaeda camp in Sudan.[44]

Al Qaeda leaders set up a Nairobi cell and used it to send weapons and trainers to the Somali warlords battling U.S. forces, an operation directly supervised by al Qaeda's military leader.[45] Scores of trainers flowed to Somalia over the ensuing months, including most of the senior members and weapons training experts of al Qaeda's military committee. These trainers were later heard boasting that their assistance led to the October 1993 shootdown of two U.S. Black Hawk helicopters by members of a Somali militia group and to the subsequent withdrawal of U.S. forces in early 1994.[46]

In November 1995, a car bomb exploded outside a Saudi–U.S. joint facility in Riyadh for training the Saudi National Guard. Five Americans and two officials from India were killed. The Saudi government arrested four perpetrators, who admitted being inspired by Bin Ladin. They were promptly executed. Though nothing proves that Bin Ladin ordered this attack, U.S. intelligence subsequently learned that al Qaeda leaders had decided a year earlier to attack a U.S. target in Saudi Arabia, and had shipped explosives to the peninsula for this purpose. Some of Bin Ladin's associates later took credit.[47]

In June 1996, an enormous truck bomb detonated in the Khobar Towers residential complex in Dhahran, Saudi Arabia, that housed U.S. Air Force personnel. Nineteen Americans were killed, and 372 were wounded. The operation was carried out principally, perhaps exclusively, by Saudi Hezbollah, an organization that had received support from the government of Iran. While the evidence of Iranian involvement is strong, there are also signs that al Qaeda played some role, as yet unknown.[48]

In this period, other prominent attacks in which Bin Ladin's involvement is at best cloudy are the 1993 bombing of the World Trade Center, a plot that same year to destroy landmarks in New York, and the 1995 Manila air plot to blow up a dozen U.S. airliners over the Pacific. Details on these plots appear in chapter 3.

Another scheme revealed that Bin Ladin sought the capability to kill on a mass scale. His business aides received word that a Sudanese military officer who had been a member of the previous government cabinet was offering to sell weapons-grade uranium. After a number of contacts were made through intermediaries, the officer set the price at $1.5 million, which did not deter Bin Ladin. Al Qaeda representatives asked to inspect the uranium and were shown a cylinder about 3 feet long, and one thought he could pronounce it genuine. Al Qaeda apparently purchased the cylinder, then discovered it to be bogus.[49] But while the effort failed, it shows what Bin Ladin and his associates hoped to do. One of the al Qaeda representatives explained his mission: "it's easy to kill more people with uranium."[50]

Bin Ladin seemed willing to include in the confederation terrorists from

almost every corner of the Muslim world. His vision mirrored that of Sudan's Islamist leader, Turabi, who convened a series of meetings under the label Popular Arab and Islamic Conference around the time of Bin Ladin's arrival in that country. Delegations of violent Islamist extremists came from all the groups represented in Bin Ladin's Islamic Army Shura. Representatives also came from organizations such as the Palestine Liberation Organization, Hamas, and Hezbollah.[51]

Turabi sought to persuade Shiites and Sunnis to put aside their divisions and join against the common enemy. In late 1991 or 1992, discussions in Sudan between al Qaeda and Iranian operatives led to an informal agreement to cooperate in providing support—even if only training—for actions carried out primarily against Israel and the United States. Not long afterward, senior al Qaeda operatives and trainers traveled to Iran to receive training in explosives. In the fall of 1993, another such delegation went to the Bekaa Valley in Lebanon for further training in explosives as well as in intelligence and security. Bin Ladin reportedly showed particular interest in learning how to use truck bombs such as the one that had killed 241 U.S. Marines in Lebanon in 1983. The relationship between al Qaeda and Iran demonstrated that Sunni–Shia divisions did not necessarily pose an insurmountable barrier to cooperation in terrorist operations. As will be described in chapter 7, al Qaeda contacts with Iran continued in ensuing years.[52]

Bin Ladin was also willing to explore possibilities for cooperation with Iraq, even though Iraq's dictator, Saddam Hussein, had never had an Islamist agenda—save for his opportunistic pose as a defender of the faithful against "Crusaders" during the Gulf War of 1991. Moreover, Bin Ladin had in fact been sponsoring anti-Saddam Islamists in Iraqi Kurdistan, and sought to attract them into his Islamic army.[53]

To protect his own ties with Iraq, Turabi reportedly brokered an agreement that Bin Ladin would stop supporting activities against Saddam. Bin Ladin apparently honored this pledge, at least for a time, although he continued to aid a group of Islamist extremists operating in part of Iraq (Kurdistan) outside of Baghdad's control. In the late 1990s, these extremist groups suffered major defeats by Kurdish forces. In 2001, with Bin Ladin's help they re-formed into an organization called Ansar al Islam. There are indications that by then the Iraqi regime tolerated and may even have helped Ansar al Islam against the common Kurdish enemy.[54]

With the Sudanese regime acting as intermediary, Bin Ladin himself met with a senior Iraqi intelligence officer in Khartoum in late 1994 or early 1995. Bin Ladin is said to have asked for space to establish training camps, as well as assistance in procuring weapons, but there is no evidence that Iraq responded to this request.[55] As described below, the ensuing years saw additional efforts to establish connections.

**Sudan Becomes a Doubtful Haven**

Not until 1998 did al Qaeda undertake a major terrorist operation of its own, in large part because Bin Ladin lost his base in Sudan. Ever since the Islamist regime came to power in Khartoum, the United States and other Western governments had pressed it to stop providing a haven for terrorist organizations. Other governments in the region, such as those of Egypt, Syria, Jordan, and even Libya, which were targets of some of these groups, added their own pressure. At the same time, the Sudanese regime began to change. Though Turabi had been its inspirational leader, General Omar al Bashir, president since 1989, had never been entirely under his thumb. Thus as outside pressures mounted, Bashir's supporters began to displace those of Turabi.

The attempted assassination in Ethiopia of Egyptian President Hosni Mubarak in June 1995 appears to have been a tipping point. The would-be killers, who came from the Egyptian Islamic Group, had been sheltered in Sudan and helped by Bin Ladin.[56] When the Sudanese refused to hand over three individuals identified as involved in the assassination plot, the UN Security Council passed a resolution criticizing their inaction and eventually sanctioned Khartoum in April 1996.[57]

A clear signal to Bin Ladin that his days in Sudan were numbered came when the government advised him that it intended to yield to Libya's demands to stop giving sanctuary to its enemies. Bin Ladin had to tell the Libyans who had been part of his Islamic army that he could no longer protect them and that they had to leave the country. Outraged, several Libyan members of al Qaeda and the Islamic Army Shura renounced all connections with him.[58]

Bin Ladin also began to have serious money problems. International pressure on Sudan, together with strains in the world economy, hurt Sudan's currency. Some of Bin Ladin's companies ran short of funds. As Sudanese authorities became less obliging, normal costs of doing business increased. Saudi pressures on the Bin Ladin family also probably took some toll. In any case, Bin Ladin found it necessary both to cut back his spending and to control his outlays more closely. He appointed a new financial manager, whom his followers saw as miserly.[59]

Money problems proved costly to Bin Ladin in other ways. Jamal Ahmed al Fadl, a Sudanese-born Arab, had spent time in the United States and had been recruited for the Afghan war through the Farouq mosque in Brooklyn. He had joined al Qaeda and taken the oath of fealty to Bin Ladin, serving as one of his business agents. Then Bin Ladin discovered that Fadl had skimmed about $110,000, and he asked for restitution. Fadl resented receiving a salary of only $500 a month while some of the Egyptians in al Qaeda were given $1,200 a month. He defected and became a star informant for the United States. Also testifying about al Qaeda in a U.S. court was L'Houssaine Kherchtou, who told of breaking with Bin Ladin because of Bin Ladin's professed inability to provide him with money when his wife needed a caesarian section.[60]

In February 1996, Sudanese officials began approaching officials from the

United States and other governments, asking what actions of theirs might ease foreign pressure. In secret meetings with Saudi officials, Sudan offered to expel Bin Ladin to Saudi Arabia and asked the Saudis to pardon him. U.S. officials became aware of these secret discussions, certainly by March. Saudi officials apparently wanted Bin Ladin expelled from Sudan. They had already revoked his citizenship, however, and would not tolerate his presence in their country. And Bin Ladin may have no longer felt safe in Sudan, where he had already escaped at least one assassination attempt that he believed to have been the work of the Egyptian or Saudi regimes, or both. In any case, on May 19, 1996, Bin Ladin left Sudan—significantly weakened, despite his ambitions and organizational skills. He returned to Afghanistan.[61]

## 2.5 AL QAEDA'S RENEWAL IN AFGHANISTAN (1996–1998)

Bin Ladin flew on a leased aircraft from Khartoum to Jalalabad, with a refueling stopover in the United Arab Emirates.[62] He was accompanied by family members and bodyguards, as well as by al Qaeda members who had been close associates since his organization's 1988 founding in Afghanistan. Dozens of additional militants arrived on later flights.[63]

Though Bin Ladin's destination was Afghanistan, Pakistan was the nation that held the key to his ability to use Afghanistan as a base from which to revive his ambitious enterprise for war against the United States.

For the first quarter century of its existence as a nation, Pakistan's identity had derived from Islam, but its politics had been decidedly secular. The army was—and remains—the country's strongest and most respected institution, and the army had been and continues to be preoccupied with its rivalry with India, especially over the disputed territory of Kashmir.

From the 1970s onward, religion had become an increasingly powerful force in Pakistani politics. After a coup in 1977, military leaders turned to Islamist groups for support, and fundamentalists became more prominent. South Asia had an indigenous form of Islamic fundamentalism, which had developed in the nineteenth century at a school in the Indian village of Deoband.[64] The influence of the Wahhabi school of Islam had also grown, nurtured by Saudi-funded institutions. Moreover, the fighting in Afghanistan made Pakistan home to an enormous—and generally unwelcome—population of Afghan refugees; and since the badly strained Pakistani education system could not accommodate the refugees, the government increasingly let privately funded religious schools serve as a cost-free alternative. Over time, these schools produced large numbers of half-educated young men with no marketable skills but with deeply held Islamic views.[65]

Pakistan's rulers found these multitudes of ardent young Afghans a source



of potential trouble at home but potentially useful abroad. Those who joined the Taliban movement, espousing a ruthless version of Islamic law, perhaps could bring order in chaotic Afghanistan and make it a cooperative ally. They thus might give Pakistan greater security on one of the several borders where Pakistani military officers hoped for what they called "strategic depth."[66]

It is unlikely that Bin Ladin could have returned to Afghanistan had Pakistan disapproved. The Pakistani military intelligence service probably had advance knowledge of his coming, and its officers may have facilitated his travel. During his entire time in Sudan, he had maintained guesthouses and training camps in Pakistan and Afghanistan. These were part of a larger network used by diverse organizations for recruiting and training fighters for Islamic insurgencies in such places as Tajikistan, Kashmir, and Chechnya. Pakistani intelligence officers reportedly introduced Bin Ladin to Taliban leaders in Kandahar, their main base of power, to aid his reassertion of control over camps near

Khowst, out of an apparent hope that he would now expand the camps and make them available for training Kashmiri militants.[67]

Yet Bin Ladin was in his weakest position since his early days in the war against the Soviet Union. The Sudanese government had canceled the registration of the main business enterprises he had set up there and then put some of them up for public sale. According to a senior al Qaeda detainee, the government of Sudan seized everything Bin Ladin had possessed there.[68]

He also lost the head of his military committee, Abu Ubaidah al Banshiri, one of the most capable and popular leaders of al Qaeda. While most of the group's key figures had accompanied Bin Ladin to Afghanistan, Banshiri had remained in Kenya to oversee the training and weapons shipments of the cell set up some four years earlier. He died in a ferryboat accident on Lake Victoria just a few days after Bin Ladin arrived in Jalalabad, leaving Bin Ladin with a need to replace him not only in the Shura but also as supervisor of the cells and prospective operations in East Africa.[69] He had to make other adjustments as well, for some al Qaeda members viewed Bin Ladin's return to Afghanistan as occasion to go off in their own directions. Some maintained collaborative relationships with al Qaeda, but many disengaged entirely.[70]

For a time, it may not have been clear to Bin Ladin that the Taliban would be his best bet as an ally. When he arrived in Afghanistan, they controlled much of the country, but key centers, including Kabul, were still held by rival warlords. Bin Ladin went initially to Jalalabad, probably because it was in an area controlled by a provincial council of Islamic leaders who were not major contenders for national power. He found lodgings with Younis Khalis, the head of one of the main mujahideen factions. Bin Ladin apparently kept his options open, maintaining contacts with Gulbuddin Hekmatyar, who, though an Islamic extremist, was also one of the Taliban's most militant opponents. But after September 1996, when first Jalalabad and then Kabul fell to the Taliban, Bin Ladin cemented his ties with them.[71]

That process did not always go smoothly. Bin Ladin, no longer constrained by the Sudanese, clearly thought that he had new freedom to publish his appeals for jihad. At about the time when the Taliban were making their final drive toward Jalalabad and Kabul, Bin Ladin issued his August 1996 fatwa, saying that "We . . . have been prevented from addressing the Muslims," but expressing relief that "by the grace of Allah, a safe base here is now available in the high Hindu Kush mountains in Khurasan." But the Taliban, like the Sudanese, would eventually hear warnings, including from the Saudi monarchy.[72]

Though Bin Ladin had promised Taliban leaders that he would be circumspect, he broke this promise almost immediately, giving an inflammatory interview to CNN in March 1997. The Taliban leader Mullah Omar promptly "invited" Bin Ladin to move to Kandahar, ostensibly in the interests of Bin Ladin's own security but more likely to situate him where he might be easier to control.[73]

There is also evidence that around this time Bin Ladin sent out a number of feelers to the Iraqi regime, offering some cooperation. None are reported to have received a significant response. According to one report, Saddam Hussein's efforts at this time to rebuild relations with the Saudis and other Middle Eastern regimes led him to stay clear of Bin Ladin.[74]

In mid-1998, the situation reversed; it was Iraq that reportedly took the initiative. In March 1998, after Bin Ladin's public fatwa against the United States, two al Qaeda members reportedly went to Iraq to meet with Iraqi intelligence. In July, an Iraqi delegation traveled to Afghanistan to meet first with the Taliban and then with Bin Ladin. Sources reported that one, or perhaps both, of these meetings was apparently arranged through Bin Ladin's Egyptian deputy, Zawahiri, who had ties of his own to the Iraqis. In 1998, Iraq was under intensifying U.S. pressure, which culminated in a series of large air attacks in December.[75]

Similar meetings between Iraqi officials and Bin Ladin or his aides may have occurred in 1999 during a period of some reported strains with the Taliban. According to the reporting, Iraqi officials offered Bin Ladin a safe haven in Iraq. Bin Ladin declined, apparently judging that his circumstances in Afghanistan remained more favorable than the Iraqi alternative. The reports describe friendly contacts and indicate some common themes in both sides' hatred of the United States. But to date we have seen no evidence that these or the earlier contacts ever developed into a collaborative operational relationship. Nor have we seen evidence indicating that Iraq cooperated with al Qaeda in developing or carrying out any attacks against the United States.[76]

Bin Ladin eventually enjoyed a strong financial position in Afghanistan, thanks to Saudi and other financiers associated with the Golden Chain. Through his relationship with Mullah Omar—and the monetary and other benefits that it brought the Taliban—Bin Ladin was able to circumvent restrictions; Mullah Omar would stand by him even when other Taliban leaders raised objections. Bin Ladin appeared to have in Afghanistan a freedom of movement that he had lacked in Sudan. Al Qaeda members could travel freely within the country, enter and exit it without visas or any immigration procedures, purchase and import vehicles and weapons, and enjoy the use of official Afghan Ministry of Defense license plates. Al Qaeda also used the Afghan state-owned Ariana Airlines to courier money into the country.[77]

The Taliban seemed to open the doors to all who wanted to come to Afghanistan to train in the camps. The alliance with the Taliban provided al Qaeda a sanctuary in which to train and indoctrinate fighters and terrorists, import weapons, forge ties with other jihad groups and leaders, and plot and staff terrorist schemes. While Bin Ladin maintained his own al Qaeda guesthouses and camps for vetting and training recruits, he also provided support to and bene-

fited from the broad infrastructure of such facilities in Afghanistan made available to the global network of Islamist movements. U.S. intelligence estimates put the total number of fighters who underwent instruction in Bin Ladin–supported camps in Afghanistan from 1996 through 9/11 at 10,000 to 20,000.[78]

In addition to training fighters and special operators, this larger network of guesthouses and camps provided a mechanism by which al Qaeda could screen and vet candidates for induction into its own organization. Thousands flowed through the camps, but no more than a few hundred seem to have become al Qaeda members. From the time of its founding, al Qaeda had employed training and indoctrination to identify "worthy" candidates.[79]

Al Qaeda continued meanwhile to collaborate closely with the many Middle Eastern groups—in Egypt, Algeria, Yemen, Lebanon, Morocco, Tunisia, Somalia, and elsewhere—with which it had been linked when Bin Ladin was in Sudan. It also reinforced its London base and its other offices around Europe, the Balkans, and the Caucasus. Bin Ladin bolstered his links to extremists in South and Southeast Asia, including the Malaysian-Indonesian JI and several Pakistani groups engaged in the Kashmir conflict.[80]

The February 1998 fatwa thus seems to have been a kind of public launch of a renewed and stronger al Qaeda, after a year and a half of work. Having rebuilt his fund-raising network, Bin Ladin had again become the rich man of the jihad movement. He had maintained or restored many of his links with terrorists elsewhere in the world. And he had strengthened the internal ties in his own organization.

The inner core of al Qaeda continued to be a hierarchical top-down group with defined positions, tasks, and salaries. Most but not all in this core swore fealty (or *bayat*) to Bin Ladin. Other operatives were committed to Bin Ladin or to his goals and would take assignments for him, but they did not swear bayat and maintained, or tried to maintain, some autonomy. A looser circle of adherents might give money to al Qaeda or train in its camps but remained essentially independent. Nevertheless, they constituted a potential resource for al Qaeda.[81]

Now effectively merged with Zawahiri's Egyptian Islamic Jihad,[82] al Qaeda promised to become the general headquarters for international terrorism, without the need for the Islamic Army Shura. Bin Ladin was prepared to pick up where he had left off in Sudan. He was ready to strike at "the head of the snake."

Al Qaeda's role in organizing terrorist operations had also changed. Before the move to Afghanistan, it had concentrated on providing funds, training, and weapons for actions carried out by members of allied groups. The attacks on the U.S. embassies in East Africa in the summer of 1998 would take a different form—planned, directed, and executed by al Qaeda, under the direct supervision of Bin Ladin and his chief aides.

### The Embassy Bombings

As early as December 1993, a team of al Qaeda operatives had begun casing targets in Nairobi for future attacks. It was led by Ali Mohamed, a former Egyptian army officer who had moved to the United States in the mid-1980s, enlisted in the U.S. Army, and became an instructor at Fort Bragg. He had provided guidance and training to extremists at the Farouq mosque in Brooklyn, including some who were subsequently convicted in the February 1993 attack on the World Trade Center. The casing team also included a computer expert whose write-ups were reviewed by al Qaeda leaders.[83]

The team set up a makeshift laboratory for developing their surveillance photographs in an apartment in Nairobi where the various al Qaeda operatives and leaders based in or traveling to the Kenya cell sometimes met. Banshiri, al Qaeda's military committee chief, continued to be the operational commander of the cell; but because he was constantly on the move, Bin Ladin had dispatched another operative, Khaled al Fawwaz, to serve as the on-site manager. The technical surveillance and communications equipment employed for these casing missions included state-of-the-art video cameras obtained from China and from dealers in Germany. The casing team also reconnoitered targets in Djibouti.[84]

As early as January 1994, Bin Ladin received the surveillance reports, complete with diagrams prepared by the team's computer specialist. He, his top military committee members—Banshiri and his deputy, Abu Hafs al Masri (also known as Mohammed Atef)—and a number of other al Qaeda leaders reviewed the reports. Agreeing that the U.S. embassy in Nairobi was an easy target because a car bomb could be parked close by, they began to form a plan. Al Qaeda had begun developing the tactical expertise for such attacks months earlier, when some of its operatives—top military committee members and several operatives who were involved with the Kenya cell among them—were sent to Hezbollah training camps in Lebanon.[85]

The cell in Kenya experienced a series of disruptions that may in part account for the relatively long delay before the attack was actually carried out. The difficulties Bin Ladin began to encounter in Sudan in 1995, his move to Afghanistan in 1996, and the months spent establishing ties with the Taliban may also have played a role, as did Banshiri's accidental drowning.

In August 1997, the Kenya cell panicked. The London *Daily Telegraph* reported that Madani al Tayyib, formerly head of al Qaeda's finance committee, had turned himself over to the Saudi government. The article said (incorrectly) that the Saudis were sharing Tayyib's information with the U.S. and British authorities.[86] At almost the same time, cell members learned that U.S. and Kenyan agents had searched the Kenya residence of Wadi al Hage, who had become the new on-site manager in Nairobi, and that Hage's telephone was being tapped. Hage was a U.S. citizen who had worked with Bin Ladin in Afgha-

nistan in the 1980s, and in 1992 he went to Sudan to become one of al Qaeda's major financial operatives. When Hage returned to the United States to appear before a grand jury investigating Bin Ladin, the job of cell manager was taken over by Harun Fazul, a Kenyan citizen who had been in Bin Ladin's advance team to Sudan back in 1990. Harun faxed a report on the "security situation" to several sites, warning that "the crew members in East Africa is [*sic*] in grave danger" in part because "America knows . . . that the followers of [Bin Ladin] . . . carried out the operations to hit Americans in Somalia." The report provided instructions for avoiding further exposure.[87]

On February 23, 1998, Bin Ladin issued his public fatwa. The language had been in negotiation for some time, as part of the merger under way between Bin Ladin's organization and Zawahiri's Egyptian Islamic Jihad. Less than a month after the publication of the fatwa, the teams that were to carry out the embassy attacks were being pulled together in Nairobi and Dar es Salaam. The timing and content of their instructions indicate that the decision to launch the attacks had been made by the time the fatwa was issued.[88]

The next four months were spent setting up the teams in Nairobi and Dar es Salaam. Members of the cells rented residences, and purchased bomb-making materials and transport vehicles. At least one additional explosives expert was brought in to assist in putting the weapons together. In Nairobi, a hotel room was rented to put up some of the operatives. The suicide trucks were purchased shortly before the attack date.[89]

While this was taking place, Bin Ladin continued to push his public message. On May 7, the deputy head of al Qaeda's military committee, Mohammed Atef, faxed to Bin Ladin's London office a new fatwa issued by a group of sheikhs located in Afghanistan. A week later, it appeared in *Al Quds al Arabi*, the same Arabic-language newspaper in London that had first published Bin Ladin's February fatwa, and it conveyed the same message—the duty of Muslims to carry out holy war against the enemies of Islam and to expel the Americans from the Gulf region. Two weeks after that, Bin Ladin gave a videotaped interview to ABC News with the same slogans, adding that "we do not differentiate between those dressed in military uniforms and civilians; they are all targets in this *fatwa*."[90]

By August 1, members of the cells not directly involved in the attacks had mostly departed from East Africa. The remaining operatives prepared and assembled the bombs, and acquired the delivery vehicles. On August 4, they made one last casing run at the embassy in Nairobi. By the evening of August 6, all but the delivery teams and one or two persons assigned to remove the evidence trail had left East Africa. Back in Afghanistan, Bin Ladin and the al Qaeda leadership had left Kandahar for the countryside, expecting U.S. retaliation. Declarations taking credit for the attacks had already been faxed to the joint al Qaeda–Egyptian Islamic Jihad office in Baku, with instructions to stand by

for orders to "instantly" transmit them to *Al Quds al Arabi*. One proclaimed "the formation of the Islamic Army for the Liberation of the Holy Places," and two others—one for each embassy—announced that the attack had been carried out by a "company" of a "battalion" of this "Islamic Army."[91]

On the morning of August 7, the bomb-laden trucks drove into the embassies roughly five minutes apart—about 10:35 A.M. in Nairobi and 10:39 A.M. in Dar es Salaam. Shortly afterward, a phone call was placed from Baku to London. The previously prepared messages were then faxed to London.[92]

The attack on the U.S. embassy in Nairobi destroyed the embassy and killed 12 Americans and 201 others, almost all Kenyans. About 5,000 people were injured. The attack on the U.S. embassy in Dar es Salaam killed 11 more people, none of them Americans. Interviewed later about the deaths of the Africans, Bin Ladin answered that "when it becomes apparent that it would be impossible to repel these Americans without assaulting them, even if this involved the killing of Muslims, this is permissible under Islam." Asked if he had indeed masterminded these bombings, Bin Ladin said that the World Islamic Front for jihad against "Jews and Crusaders" had issued a "crystal clear" fatwa. If the instigation for jihad against the Jews and the Americans to liberate the holy places "is considered a crime," he said, "let history be a witness that I am a criminal."[93]

# 3

# COUNTERTERRORISM
# EVOLVES

IN CHAPTER 2, we described the growth of a new kind of terrorism, and a new terrorist organization—especially from 1988 to 1998, when Usama Bin Ladin declared war and organized the bombing of two U.S. embassies. In this chapter, we trace the parallel evolution of government efforts to counter terrorism by Islamic extremists against the United States.

We mention many personalities in this report. As in any study of the U.S. government, some of the most important characters are institutions. We will introduce various agencies, and how they adapted to a new kind of terrorism.

## 3.1 FROM THE OLD TERRORISM TO THE NEW: THE FIRST WORLD TRADE CENTER BOMBING

At 18 minutes after noon on February 26, 1993, a huge bomb went off beneath the two towers of the World Trade Center. This was not a suicide attack. The terrorists parked a truck bomb with a timing device on Level B-2 of the underground garage, then departed. The ensuing explosion opened a hole seven stories up. Six people died. More than a thousand were injured. An FBI agent at the scene described the relatively low number of fatalities as a miracle.[1]

President Bill Clinton ordered his National Security Council to coordinate the response. Government agencies swung into action to find the culprits. The Counterterrorist Center located at the CIA combed its files and queried sources around the world. The National Security Agency (NSA), the huge Defense Department signals collection agency, ramped up its communications intercept network and searched its databases for clues.[2] The New York Field Office of the FBI took control of the local investigation and, in the end, set a pattern for future management of terrorist incidents.

Four features of this episode have significance for the story of 9/11.

First, the bombing signaled a new terrorist challenge, one whose rage and malice had no limit. Ramzi Yousef, the Sunni extremist who planted the bomb, said later that he had hoped to kill 250,000 people.[3]

Second, the FBI and the Justice Department did excellent work investigating the bombing. Within days, the FBI identified a truck remnant as part of a Ryder rental van reported stolen in Jersey City the day before the bombing.[4]

Mohammed Salameh, who had rented the truck and reported it stolen, kept calling the rental office to get back his $400 deposit. The FBI arrested him there on March 4, 1993. In short order, the Bureau had several plotters in custody, including Nidal Ayyad, an engineer who had acquired chemicals for the bomb, and Mahmoud Abouhalima, who had helped mix the chemicals.[5]

The FBI identified another conspirator, Ahmad Ajaj, who had been arrested by immigration authorities at John F. Kennedy International Airport in September 1992 and charged with document fraud. His traveling companion was Ramzi Yousef, who had also entered with fraudulent documents but claimed political asylum and was admitted. It quickly became clear that Yousef had been a central player in the attack. He had fled to Pakistan immediately after the bombing and would remain at large for nearly two years.[6]

The arrests of Salameh, Abouhalima, and Ayyad led the FBI to the Farouq mosque in Brooklyn, where a central figure was Sheikh Omar Abdel Rahman, an extremist Sunni Muslim cleric who had moved to the United States from Egypt in 1990. In speeches and writings, the sightless Rahman, often called the "Blind Sheikh," preached the message of Sayyid Qutb's *Milestones*, characterizing the United States as the oppressor of Muslims worldwide and asserting that it was their religious duty to fight against God's enemies. An FBI informant learned of a plan to bomb major New York landmarks, including the Holland and Lincoln tunnels. Disrupting this "landmarks plot," the FBI in June 1993 arrested Rahman and various confederates.[7]

As a result of the investigations and arrests, the U.S. Attorney for the Southern District of New York prosecuted and convicted multiple individuals, including Ajaj, Salameh, Ayyad, Abouhalima, the Blind Sheikh, and Ramzi Yousef, for crimes related to the World Trade Center bombing and other plots.

An unfortunate consequence of this superb investigative and prosecutorial effort was that it created an impression that the law enforcement system was well-equipped to cope with terrorism. Neither President Clinton, his principal advisers, the Congress, nor the news media felt prompted, until later, to press the question of whether the procedures that put the Blind Sheikh and Ramzi Yousef behind bars would really protect Americans against the new virus of which these individuals were just the first symptoms.[8]

Third, the successful use of the legal system to address the first World Trade Center bombing had the side effect of obscuring the need to examine the character and extent of the new threat facing the United States. The trials did not bring the Bin Ladin network to the attention of the public and policymakers.

The FBI assembled, and the U.S. Attorney's office put forward, some evidence showing that the men in the dock were not the only plotters. Materials taken from Ajaj indicated that the plot or plots were hatched at or near the Khaldan camp, a terrorist training camp on the Afghanistan-Pakistan border. Ajaj had left Texas in April 1992 to go there to learn how to construct bombs. He had met Ramzi Yousef in Pakistan, where they discussed bombing targets in the United States and assembled a "terrorist kit" that included bomb-making manuals, operations guidance, videotapes advocating terrorist action against the United States, and false identification documents.[9]

Yousef was captured in Pakistan following the discovery by police in the Philippines in January 1995 of the Manila air plot, which envisioned placing bombs on board a dozen trans-Pacific airliners and setting them off simultaneously. Khalid Sheikh Mohammed—Yousef's uncle, then located in Qatar—was a fellow plotter of Yousef's in the Manila air plot and had also wired him some money prior to the Trade Center bombing. The U.S. Attorney obtained an indictment against KSM in January 1996, but an official in the government of Qatar probably warned him about it. Khalid Sheikh Mohammed evaded capture (and stayed at large to play a central part in the 9/11 attacks).[10]

The law enforcement process is concerned with proving the guilt of persons apprehended and charged. Investigators and prosecutors could not present all the evidence of possible involvement of individuals other than those charged, although they continued to pursue such investigations, planning or hoping for later prosecutions. The process was meant, by its nature, to mark for the public the events as finished—case solved, justice done. It was not designed to ask if the events might be harbingers of worse to come. Nor did it allow for aggregating and analyzing facts to see if they could provide clues to terrorist tactics more generally—methods of entry and finance, and mode of operation inside the United States.

Fourth, although the bombing heightened awareness of a new terrorist danger, successful prosecutions contributed to widespread underestimation of the threat. The government's attorneys stressed the seriousness of the crimes, and put forward evidence of Yousef's technical ingenuity. Yet the public image that persisted was not of clever Yousef but of stupid Salameh going back again and again to reclaim his $400 truck rental deposit.

## 3.2 ADAPTATION—AND NONADAPTATION—IN THE LAW ENFORCEMENT COMMUNITY

Legal processes were the primary method for responding to these early manifestations of a new type of terrorism. Our overview of U.S. capabilities for dealing with it thus begins with the nation's vast complex of law enforcement agencies.

**The Justice Department and the FBI**

At the federal level, much law enforcement activity is concentrated in the Department of Justice. For countering terrorism, the dominant agency under Justice is the Federal Bureau of Investigation. The FBI does not have a general grant of authority but instead works under specific statutory authorizations. Most of its work is done in local offices called field offices. There are 56 of them, each covering a specified geographic area, and each quite separate from all others. Prior to 9/11, the special agent in charge was in general free to set his or her office's priorities and assign personnel accordingly.[11]

The office's priorities were driven by two primary concerns. First, performance in the Bureau was generally measured against statistics such as numbers of arrests, indictments, prosecutions, and convictions. Counterterrorism and counterintelligence work, often involving lengthy intelligence investigations that might never have positive or quantifiable results, was not career-enhancing. Most agents who reached management ranks had little counterterrorism experience. Second, priorities were driven at the local level by the field offices, whose concerns centered on traditional crimes such as white-collar offenses and those pertaining to drugs and gangs. Individual field offices made choices to serve local priorities, not national priorities.[12]

The Bureau also operates under an "office of origin" system. To avoid duplication and possible conflicts, the FBI designates a single office to be in charge of an entire investigation. Because the New York Field Office indicted Bin Ladin prior to the East Africa bombings, it became the office of origin for all Bin Ladin cases, including the East Africa bombings and later the attack on the USS *Cole*. Most of the FBI's institutional knowledge on Bin Ladin and al Qaeda resided there. This office worked closely with the U.S. Attorney for the Southern District of New York to identify, arrest, prosecute, and convict many of the perpetrators of the attacks and plots. Field offices other than the specified office of origin were often reluctant to spend much energy on matters over which they had no control and for which they received no credit.[13]

The FBI's domestic intelligence gathering dates from the 1930s. With World War II looming, President Franklin D. Roosevelt ordered FBI Director J. Edgar Hoover to investigate foreign and foreign-inspired subversion—Communist, Nazi, and Japanese. Hoover added investigation of possible espionage, sabotage, or subversion to the duties of field offices. After the war, foreign intelligence duties were assigned to the newly established Central Intelligence Agency. Hoover jealously guarded the FBI's domestic portfolio against all rivals. Hoover felt he was accountable only to the president, and the FBI's domestic intelligence activities kept growing. In the 1960s, the FBI was receiving significant assistance within the United States from the CIA and from Army Intelligence. The legal basis for some of this assistance was dubious.

Decades of encouragement to perform as a domestic intelligence agency abruptly ended in the 1970s. Two years after Hoover's death in 1972, congres-

sional and news media investigations of the Watergate scandals of the Nixon administration expanded into general investigations of foreign and domestic intelligence by the Church and Pike committees.[14] They disclosed domestic intelligence efforts, which included a covert action program that operated from 1956 to 1971 against domestic organizations and, eventually, domestic dissidents. The FBI had spied on a wide range of political figures, especially individuals whom Hoover wanted to discredit (notably the Reverend Martin Luther King, Jr.), and had authorized unlawful wiretaps and surveillance. The shock registered in public opinion polls, where the percentage of Americans declaring a "highly favorable" view of the FBI dropped from 84 percent to 37 percent. The FBI's Domestic Intelligence Division was dissolved.[15]

In 1976, Attorney General Edward Levi adopted domestic security guidelines to regulate intelligence collection in the United States and to deflect calls for even stronger regulation. In 1983, Attorney General William French Smith revised the Levi guidelines to encourage closer investigation of potential terrorism. He also loosened the rules governing authorization for investigations and their duration. Still, his guidelines, like Levi's, took account of the reality that suspicion of "terrorism," like suspicion of "subversion," could lead to making individuals targets for investigation more because of their beliefs than because of their acts. Smith's guidelines also took account of the reality that potential terrorists were often members of extremist religious organizations and that investigation of terrorism could cross the line separating state and church.[16]

In 1986, Congress authorized the FBI to investigate terrorist attacks against Americans that occur outside the United States. Three years later, it added authority for the FBI to make arrests abroad without consent from the host country. Meanwhile, a task force headed by Vice President George H. W. Bush had endorsed a concept already urged by Director of Central Intelligence William Casey—a Counterterrorist Center, where the FBI, the CIA, and other organizations could work together on international terrorism. While it was distinctly a CIA entity, the FBI detailed officials to work at the Center and obtained leads that helped in the capture of persons wanted for trial in the United States.

The strengths that the FBI brought to counterterrorism were nowhere more brilliantly on display than in the case of Pan American Flight 103, bound from London to New York, which blew up over Lockerbie, Scotland, in December 1988, killing 270 people. Initial evidence pointed to the government of Syria and, later, Iran. The Counterterrorist Center reserved judgment on the perpetrators of the attack. Meanwhile, FBI technicians, working with U.K. security services, gathered and analyzed the widely scattered fragments of the airliner. In 1991, with the help of the Counterterrorist Center, they identified one small fragment as part of a timing device—to the technicians, as distinctive as DNA. It was a Libyan device. Together with other evidence, the FBI put together a

case pointing conclusively to the Libyan government. Eventually Libya acknowledged its responsibility.[17] Pan Am 103 became a cautionary tale against rushing to judgment in attributing responsibility for a terrorist act. It also showed again how—given a case to solve—the FBI remained capable of extraordinary investigative success.

## FBI Organization and Priorities

In 1993, President Clinton chose Louis Freeh as the Director of the Bureau. Freeh, who would remain Director until June 2001, believed that the FBI's work should be done primarily by the field offices. To emphasize this view he cut headquarters staff and decentralized operations. The special agents in charge gained power, influence, and independence.[18]

Freeh recognized terrorism as a major threat. He increased the number of legal attaché offices abroad, focusing in particular on the Middle East. He also urged agents not to wait for terrorist acts to occur before taking action. In his first budget request to Congress after the 1993 World Trade Center bombing, he stated that "merely solving this type of crime is not enough; it is equally important that the FBI thwart terrorism before such acts can be perpetrated." Within headquarters, he created a Counterterrorism Division that would complement the Counterterrorist Center at the CIA and arranged for exchanges of senior FBI and CIA counterterrorism officials. He pressed for more cooperation between legal attachés and CIA stations abroad.[19]

Freeh's efforts did not, however, translate into a significant shift of resources to counterterrorism. FBI, Justice, and Office of Management and Budget officials said that FBI leadership seemed unwilling to shift resources to terrorism from other areas such as violent crime and drug enforcement; other FBI officials blamed Congress and the OMB for a lack of political will and failure to understand the FBI's counterterrorism resource needs. In addition, Freeh did not impose his views on the field offices. With a few notable exceptions, the field offices did not apply significant resources to terrorism and often reprogrammed funds for other priorities.[20]

In 1998, the FBI issued a five-year strategic plan led by its deputy director, Robert "Bear" Bryant. For the first time, the FBI designated national and economic security, including counterterrorism, as its top priority. Dale Watson, who would later become the head of the new Counterterrorism Division, said that after the East Africa bombings, "the light came on" that cultural change had to occur within the FBI. The plan mandated a stronger intelligence collection effort. It called for a nationwide automated system to facilitate information collection, analysis, and dissemination. It envisioned the creation of a professional intelligence cadre of experienced and trained agents and analysts. If successfully implemented, this would have been a major step toward addressing terrorism systematically, rather than as individual unrelated cases. But the plan did not succeed.[21]

First, the plan did not obtain the necessary human resources. Despite des-

ignating "national and economic security" as its top priority in 1998, the FBI did not shift human resources accordingly. Although the FBI's counterterrorism budget tripled during the mid-1990s, FBI counterterrorism spending remained fairly constant between fiscal years 1998 and 2001. In 2000, there were still twice as many agents devoted to drug enforcement as to counterterrorism.[22]

Second, the new division intended to strengthen the FBI's strategic analysis capability faltered. It received insufficient resources and faced resistance from senior managers in the FBI's operational divisions. The new division was supposed to identify trends in terrorist activity, determine what the FBI did not know, and ultimately drive collection efforts. However, the FBI had little appreciation for the role of analysis. Analysts continued to be used primarily in a tactical fashion—providing support for existing cases. Compounding the problem was the FBI's tradition of hiring analysts from within instead of recruiting individuals with the relevant educational background and expertise.[23]

Moreover, analysts had difficulty getting access to the FBI and intelligence community information they were expected to analyze. The poor state of the FBI's information systems meant that such access depended in large part on an analyst's personal relationships with individuals in the operational units or squads where the information resided. For all of these reasons, prior to 9/11 relatively few strategic analytic reports about counterterrorism had been completed. Indeed, the FBI had never completed an assessment of the overall terrorist threat to the U.S. homeland.[24]

Third, the FBI did not have an effective intelligence collection effort. Collection of intelligence from human sources was limited, and agents were inadequately trained. Only three days of a 16-week agents' course were devoted to counterintelligence and counterterrorism, and most subsequent training was received on the job. The FBI did not have an adequate mechanism for validating source reporting, nor did it have a system for adequately tracking and sharing source reporting, either internally or externally. The FBI did not dedicate sufficient resources to the surveillance and translation needs of counterterrorism agents. It lacked sufficient translators proficient in Arabic and other key languages, resulting in a significant backlog of untranslated intercepts.[25]

Finally, the FBI's information systems were woefully inadequate. The FBI lacked the ability to know what it knew: there was no effective mechanism for capturing or sharing its institutional knowledge. FBI agents did create records of interviews and other investigative efforts, but there were no reports officers to condense the information into meaningful intelligence that could be retrieved and disseminated.[26]

In 1999, the FBI created separate Counterterrorism and Counterintelligence divisions. Dale Watson, the first head of the new Counterterrorism Division, recognized the urgent need to increase the FBI's counterterrorism capability. His plan, called MAXCAP 05, was unveiled in 2000: it set the goal

of bringing the Bureau to its "maximum feasible capacity" in counterterror-ism by 2005. Field executives told Watson that they did not have the analysts, linguists, or technically trained experts to carry out the strategy. In a report pro-vided to Director Robert Mueller in September 2001, one year after Watson presented his plan to field executives, almost every FBI field office was assessed to be operating below "maximum capacity." The report stated that "the goal to 'prevent terrorism' requires a dramatic shift in emphasis from a reactive capa-bility to highly functioning intelligence capability which provides not only leads and operational support, but clear strategic analysis and direction."[27]

### Legal Constraints on the FBI and "the Wall"

The FBI had different tools for law enforcement and intelligence.[28] For crim-inal matters, it could apply for and use traditional criminal warrants. For intel-ligence matters involving international terrorism, however, the rules were different. For many years the attorney general could authorize surveillance of foreign powers and agents of foreign powers without any court review, but in 1978 Congress passed the Foreign Intelligence Surveillance Act.[29] This law reg-ulated intelligence collection directed at foreign powers and agents of foreign powers in the United States. In addition to requiring court review of proposed surveillance (and later, physical searches), the 1978 act was interpreted by the courts to require that a search be approved only if its "primary purpose" was to obtain foreign intelligence information. In other words, the authorities of the FISA law could not be used to circumvent traditional criminal warrant requirements. The Justice Department interpreted these rulings as saying that criminal prosecutors could be briefed on FISA information but could not direct or control its collection.[30]

Throughout the 1980s and early 1990s, Justice prosecutors had informal arrangements for obtaining information gathered in the FISA process, the understanding being that they would not improperly exploit that process for their criminal cases. Whether the FBI shared with prosecutors information pertinent to possible criminal investigations was left solely to the judgment of the FBI.[31]

But the prosecution of Aldrich Ames for espionage in 1994 revived con-cerns about the prosecutors' role in intelligence investigations. The Department of Justice's Office of Intelligence Policy and Review (OIPR) is responsible for reviewing and presenting all FISA applications to the FISA Court. It worried that because of the numerous prior consultations between FBI agents and pros-ecutors, the judge might rule that the FISA warrants had been misused. If that had happened, Ames might have escaped conviction. Richard Scruggs, the act-ing head of OIPR, complained to Attorney General Janet Reno about the lack of information-sharing controls. On his own, he began imposing information-sharing procedures for FISA material. The Office of Intelligence Policy and Review became the gatekeeper for the flow of FISA information to criminal prosecutors.[32]

In July 1995, Attorney General Reno issued formal procedures aimed at managing information sharing between Justice Department prosecutors and the FBI. They were developed in a working group led by the Justice Department's Executive Office of National Security, overseen by Deputy Attorney General Jamie Gorelick.[33] These procedures—while requiring the sharing of intelligence information with prosecutors—regulated the manner in which such information could be shared from the intelligence side of the house to the criminal side.

These procedures were almost immediately misunderstood and misapplied. As a result, there was far less information sharing and coordination between the FBI and the Criminal Division in practice than was allowed under the department's procedures. Over time the procedures came to be referred to as "the wall." The term "the wall" is misleading, however, because several factors led to a series of barriers to information sharing that developed.[34]

The Office of Intelligence Policy and Review became the sole gatekeeper for passing information to the Criminal Division. Though Attorney General Reno's procedures did not include such a provision, the Office assumed the role anyway, arguing that its position reflected the concerns of Judge Royce Lamberth, then chief judge of the Foreign Intelligence Surveillance Court. The Office threatened that if it could not regulate the flow of information to criminal prosecutors, it would no longer present the FBI's warrant requests to the FISA Court. The information flow withered.[35]

The 1995 procedures dealt only with sharing between agents and criminal prosecutors, not between two kinds of FBI agents, those working on intelligence matters and those working on criminal matters. But pressure from the Office of Intelligence Policy Review, FBI leadership, and the FISA Court built barriers between agents—even agents serving on the same squads. FBI Deputy Director Bryant reinforced the Office's caution by informing agents that too much information sharing could be a career stopper. Agents in the field began to believe—incorrectly—that no FISA information could be shared with agents working on criminal investigations.[36]

This perception evolved into the still more exaggerated belief that the FBI could not share *any* intelligence information with criminal investigators, even if no FISA procedures had been used. Thus, relevant information from the National Security Agency and the CIA often failed to make its way to criminal investigators. Separate reviews in 1999, 2000, and 2001 concluded independently that information sharing was not occurring, and that the intent of the 1995 procedures was ignored routinely.[37] We will describe some of the unfortunate consequences of these accumulated institutional beliefs and practices in chapter 8.

There were other legal limitations. Both prosecutors and FBI agents argued that they were barred by court rules from sharing grand jury information, even though the prohibition applied only to that small fraction that had been presented to a grand jury, and even that prohibition had exceptions. But as inter-

preted by FBI field offices, this prohibition could conceivably apply to much of the information unearthed in an investigation. There were also restrictions, arising from executive order, on the commingling of domestic information with foreign intelligence. Finally the NSA began putting caveats on its Bin Ladin–related reports that required prior approval before sharing their contents with criminal investigators and prosecutors. These developments further blocked the arteries of information sharing.[38]

**Other Law Enforcement Agencies**

The Justice Department is much more than the FBI. It also has a U.S. Marshals Service, almost 4,000 strong on 9/11 and especially expert in tracking fugitives, with much local police knowledge. The department's Drug Enforcement Administration had, as of 2001, more than 4,500 agents.[39] There were a number of occasions when DEA agents were able to introduce sources to the FBI or CIA for counterterrorism use.

The Immigration and Naturalization Service (INS), with its 9,000 Border Patrol agents, 4,500 inspectors, and 2,000 immigration special agents, had perhaps the greatest potential to develop an expanded role in counterterrorism. However, the INS was focused on the formidable challenges posed by illegal entry over the southwest border, criminal aliens, and a growing backlog in the applications for naturalizing immigrants. The White House, the Justice Department, and above all the Congress reinforced these concerns. In addition, when Doris Meissner became INS Commissioner in 1993, she found an agency seriously hampered by outdated technology and insufficient human resources. Border Patrol agents were still using manual typewriters; inspectors at ports of entry were using a paper watchlist; the asylum and other benefits systems did not effectively deter fraudulent applicants.[40]

Commissioner Meissner responded in 1993 to the World Trade Center bombing by providing seed money to the State Department's Consular Affairs Bureau to automate its terrorist watchlist, used by consular officers and border inspectors. The INS assigned an individual in a new "lookout" unit to work with the State Department in watchlisting suspected terrorists and with the intelligence community and the FBI in determining how to deal with them when they appeared at ports of entry. By 1998, 97 suspected terrorists had been denied admission at U.S. ports of entry because of the watchlist.[41]

How to conduct deportation cases against aliens who were suspected terrorists caused significant debate. The INS had immigration law expertise and authority to bring the cases, but the FBI possessed the classified information sometimes needed as evidence, and information-sharing conflicts resulted. New laws in 1996 authorized the use of classified evidence in removal hearings, but the INS removed only a handful of the aliens with links to terrorist activity (none identified as associated with al Qaeda) using classified evidence.[42]

Midlevel INS employees proposed comprehensive counterterrorism pro-

posals to management in 1986, 1995, and 1997. No action was taken on them. In 1997, a National Security Unit was set up to handle alerts, track potential terrorist cases for possible immigration enforcement action, and work with the rest of the Justice Department. It focused on the FBI's priorities of Hezbollah and Hamas, and began to examine how immigration laws could be brought to bear on terrorism. For instance, it sought unsuccessfully to require that CIA security checks be completed before naturalization applications were approved.[43] Policy questions, such as whether resident alien status should be revoked upon the person's conviction of a terrorist crime, were not addressed.

Congress, with the support of the Clinton administration, doubled the number of Border Patrol agents required along the border with Mexico to one agent every quarter mile by 1999. It rejected efforts to bring additional resources to bear in the north. The border with Canada had one agent for every 13.25 miles. Despite examples of terrorists entering from Canada, awareness of terrorist activity in Canada and its more lenient immigration laws, and an inspector general's report recommending that the Border Patrol develop a northern border strategy, the only positive step was that the number of Border Patrol agents was not cut any further.[44]

Inspectors at the ports of entry were not asked to focus on terrorists. Inspectors told us they were not even aware that when they checked the names of incoming passengers against the automated watchlist, they were checking in part for terrorists. In general, border inspectors also did not have the information they needed to make fact-based determinations of admissibility. The INS initiated but failed to bring to completion two efforts that would have provided inspectors with information relevant to counterterrorism—a proposed system to track foreign student visa compliance and a program to establish a way of tracking travelers' entry to and exit from the United States.[45]

In 1996, a new law enabled the INS to enter into agreements with state and local law enforcement agencies through which the INS provided training and the local agencies exercised immigration enforcement authority. Terrorist watchlists were not available to them. Mayors in cities with large immigrant populations sometimes imposed limits on city employee cooperation with federal immigration agents. A large population lives outside the legal framework. Fraudulent documents could be easily obtained. Congress kept the number of INS agents static in the face of the overwhelming problem.[46]

The chief vehicle for INS and for state and local participation in law enforcement was the Joint Terrorism Task Force (JTTF), first tried out in New York City in 1980 in response to a spate of incidents involving domestic terrorist organizations. This task force was managed by the New York Field Office of the FBI, and its existence provided an opportunity to exchange information and, as happened after the first World Trade Center bombing, to enlist local officers, as well as other agency representatives, as partners in the FBI investigation. The FBI expanded the number of JTTFs throughout the 1990s, and by

9/11 there were 34. While useful, the JTTFs had limitations. They set priorities in accordance with regional and field office concerns, and most were not fully staffed. Many state and local entities believed they had little to gain from having a full-time representative on a JTTF.[47]

Other federal law enforcement resources, also not seriously enlisted for counterterrorism, were to be found in the Treasury Department.

Treasury housed the Secret Service, the Customs Service, and the Bureau of Alcohol, Tobacco, and Firearms. Given the Secret Service's mission to protect the president and other high officials, its agents did become involved with those of the FBI whenever terrorist assassination plots were rumored.

The Customs Service deployed agents at all points of entry into the United States. Its agents worked alongside INS agents, and the two groups sometimes cooperated. In the winter of 1999–2000, as will be detailed in chapter 6, questioning by an especially alert Customs inspector led to the arrest of an al Qaeda terrorist whose apparent mission was to bomb Los Angeles International Airport.

The Bureau of Alcohol, Tobacco, and Firearms was used on occasion by the FBI as a resource. The ATF's laboratories and analysis were critical to the investigation of the February 1993 bombing of the World Trade Center and the April 1995 bombing of the Alfred P. Murrah Federal Building in Oklahoma City.[48]

Before 9/11, with the exception of one portion of the FBI, very little of the sprawling U.S. law enforcement community was engaged in countering terrorism. Moreover, law enforcement could be effective only after specific individuals were identified, a plot had formed, or an attack had already occurred. Responsible individuals had to be located, apprehended, and transported back to a U.S. court for prosecution. As FBI agents emphasized to us, the FBI and the Justice Department do not have cruise missiles. They declare war by indicting someone. They took on the lead role in addressing terrorism because they were asked to do so.[49]

## 3.3 . . . AND IN THE FEDERAL AVIATION ADMINISTRATION

The Federal Aviation Administration (FAA) within the Department of Transportation had been vested by Congress with the sometimes conflicting mandate of regulating the safety and security of U.S. civil aviation while also promoting the civil aviation industry. The FAA had a security mission to protect the users of commercial air transportation against terrorism and other criminal acts. In the years before 9/11, the FAA perceived sabotage as a greater threat to aviation than hijacking. First, no domestic hijacking had occurred in a decade. Second, the commercial aviation system was perceived as more vulnerable to explosives than to weapons such as firearms. Finally, explosives were

perceived as deadlier than hijacking and therefore of greater consequence. In 1996, a presidential commission on aviation safety and security chaired by Vice President Al Gore reinforced the prevailing concern about sabotage and explosives on aircraft. The Gore Commission also flagged, as a new danger, the possibility of attack by surface-to-air missiles. Its 1997 final report did not discuss the possibility of suicide hijackings.[50]

The FAA set and enforced aviation security rules, which airlines and airports were required to implement. The rules were supposed to produce a "layered" system of defense. This meant that the failure of any one layer of security would not be fatal, because additional layers would provide backup security. But each layer relevant to hijackings—intelligence, passenger prescreening, checkpoint screening, and onboard security—was seriously flawed prior to 9/11. Taken together, they did not stop any of the 9/11 hijackers from getting on board four different aircraft at three different airports.[51]

The FAA's policy was to use intelligence to identify both specific plots and general threats to civil aviation security, so that the agency could develop and deploy appropriate countermeasures. The FAA's 40-person intelligence unit was supposed to receive a broad range of intelligence data from the FBI, CIA, and other agencies so that it could make assessments about the threat to aviation. But the large volume of data contained little pertaining to the presence and activities of terrorists in the United States. For example, information on the FBI's effort in 1998 to assess the potential use of flight training by terrorists and the Phoenix electronic communication of 2001 warning of radical Middle Easterners attending flight school were not passed to FAA headquarters. Several top FAA intelligence officials called the domestic threat picture a serious blind spot.[52]

Moreover, the FAA's intelligence unit did not receive much attention from the agency's leadership. Neither Administrator Jane Garvey nor her deputy routinely reviewed daily intelligence, and what they did see was screened for them. She was unaware of a great amount of hijacking threat information from her own intelligence unit, which, in turn, was not deeply involved in the agency's policymaking process. Historically, decisive security action took place only after a disaster had occurred or a specific plot had been discovered.[53]

The next aviation security layer was passenger prescreening. The FAA directed air carriers not to fly individuals known to pose a "direct" threat to civil aviation. But as of 9/11, the FAA's "no-fly" list contained the names of just 12 terrorist suspects (including 9/11 mastermind Khalid Sheikh Mohammed), even though government watchlists contained the names of many thousands of known and suspected terrorists. This astonishing mismatch existed despite the Gore Commission's having called on the FBI and CIA four years earlier to provide terrorist watchlists to improve prescreening. The long-time chief of the FAA's civil aviation security division testified that he was not even aware of the State Department's TIPOFF list of known and suspected ter-

rorists (some 60,000 before 9/11) until he heard it mentioned during the Commission's January 26, 2004, public hearing. The FAA had access to some TIPOFF data, but apparently found it too difficult to use.[54]

The second part of prescreening called on the air carriers to implement an FAA-approved computerized algorithm (known as CAPPS, for Computer Assisted Passenger Prescreening System) designed to identify passengers whose profile suggested they might pose more than a minimal risk to aircraft. Although the algorithm included hijacker profile data, at that time only passengers checking bags were eligible to be selected by CAPPS for additional scrutiny. Selection entailed only having one's checked baggage screened for explosives or held off the airplane until one had boarded. Primarily because of concern regarding potential discrimination and the impact on passenger throughput, "selectees" were no longer required to undergo extraordinary screening of their carry-on baggage as had been the case before the system was computerized in 1997.[55] This policy change also reflected the perception that nonsuicide sabotage was the primary threat to civil aviation.

Checkpoint screening was considered the most important and obvious layer of security. Walk-through metal detectors and X-ray machines operated by trained screeners were employed to stop prohibited items. Numerous government reports indicated that checkpoints performed poorly, often failing to detect even obvious FAA test items. Many deadly and dangerous items did not set off metal detectors, or were hard to distinguish in an X-ray machine from innocent everyday items.[56]

While FAA rules did not expressly prohibit knives with blades under 4 inches long, the airlines' checkpoint operations guide (which was developed in cooperation with the FAA), explicitly permitted them. The FAA's basis for this policy was (1) the agency did not consider such items to be menacing, (2) most local laws did not prohibit individuals from carrying such knives, and (3) such knives would have been difficult to detect unless the sensitivity of metal detectors had been greatly increased. A proposal to ban knives altogether in 1993 had been rejected because small cutting implements were difficult to detect and the number of innocent "alarms" would have increased significantly, exacerbating congestion problems at checkpoints.[57]

Several years prior to 9/11, an FAA requirement for screeners to conduct "continuous" and "random" hand searches of carry-on luggage at checkpoints had been replaced by explosive trace detection or had simply become ignored by the air carriers. Therefore, secondary screening of individuals and their carry-on bags to identify weapons (other than bombs) was nonexistent, except for passengers who triggered the metal detectors. Even when small knives were detected by secondary screening, they were usually returned to the traveler. Reportedly, the 9/11 hijackers were instructed to use items that would be undetectable by airport checkpoints.[58]

In the pre-9/11 security system, the air carriers played a major role. As the

Inspector General of the Department of Transportation told us, there were great pressures from the air carriers to control security costs and to "limit the impact of security requirements on aviation operations, so that the industry could concentrate on its primary mission of moving passengers and aircraft. . . . [T]hose counterpressures in turn manifested themselves as significant weaknesses in security." A longtime FAA security official described the air carriers' approach to security regulation as "decry, deny and delay" and told us that while "the air carriers had seen the enlightened hand of self-interest with respect to safety, they hadn't seen it in the security arena."[59]

The final layer, security on board commercial aircraft, was not designed to counter suicide hijackings. The FAA-approved "Common Strategy" had been elaborated over decades of experience with scores of hijackings, beginning in the 1960s. It taught flight crews that the best way to deal with hijackers was to accommodate their demands, get the plane to land safely, and then let law enforcement or the military handle the situation. According to the FAA, the record had shown that the longer a hijacking persisted, the more likely it was to end peacefully. The strategy operated on the fundamental assumption that hijackers issue negotiable demands (most often for asylum or the release of prisoners) and that, as one FAA official put it, "suicide wasn't in the game plan" of hijackers. FAA training material provided no guidance for flight crews should violence occur.[60]

This prevailing Common Strategy of cooperation and nonconfrontation meant that even a hardened cockpit door would have made little difference in a hijacking. As the chairman of the Security Committee of the Air Line Pilots Association observed when proposals were made in early 2001 to install reinforced cockpit doors in commercial aircraft, "Even if you make a vault out of the door, if they have a noose around my flight attendant's neck, I'm going to open the door." Prior to 9/11, FAA regulations mandated that cockpit doors permit ready access into and out of the cockpit in the event of an emergency. Even so, rules implemented in the 1960s required air crews to keep the cockpit door closed and locked in flight. This requirement was not always observed or vigorously enforced.[61]

As for law enforcement, there were only 33 armed and trained federal air marshals as of 9/11. They were not deployed on U.S. domestic flights, except when in transit to provide security on international departures. This policy reflected the FAA's view that domestic hijacking was in check—a view held confidently as no terrorist had hijacked a U.S. commercial aircraft anywhere in the world since 1986.[62]

In the absence of any recent aviation security incident and without "specific and credible" evidence of a plot directed at civil aviation, the FAA's leadership focused elsewhere, including on operational concerns and the ever-present issue of safety. FAA Administrator Garvey recalled that "every day in 2001 was like the day before Thanksgiving." Heeding calls for improved air

service, Congress concentrated its efforts on a "passenger bill of rights," to improve capacity, efficiency, and customer satisfaction in the aviation system. There was no focus on terrorism.[63]

## 3.4 . . . AND IN THE INTELLIGENCE COMMUNITY

The National Security Act of 1947 created the position of Director of Central Intelligence (DCI). Independent from the departments of Defense, State, Justice, and other policy departments, the DCI heads the U.S. intelligence community and provides intelligence to federal entities.

The sole element of the intelligence community independent from a cabinet agency is the CIA. As an independent agency, it collects, analyzes, and disseminates intelligence from all sources. The CIA's number one customer is the president of the United States, who also has the authority to direct it to conduct covert operations.[64] Although covert actions represent a very small fraction of the Agency's entire budget, these operations have at times been controversial and over time have dominated the public's perception of the CIA.

The DCI is confirmed by the Senate but is not technically a member of the president's cabinet. The director's power under federal law over the loose, confederated "intelligence community" is limited.[65] He or she states the community's priorities and coordinates development of intelligence agency budget requests for submission to Congress.

This responsibility gives many the false impression that the DCI has line authority over the heads of these agencies and has the power to shift resources within these budgets as the need arises. Neither is true. In fact, the DCI's real authority has been directly proportional to his personal closeness to the president, which has waxed and waned over the years, and to others in government, especially the secretary of defense.

Intelligence agencies under the Department of Defense account for approximately 80 percent of all U.S. spending for intelligence, including some that supports a national customer base and some that supports specific Defense Department or military service needs.[66] As they are housed in the Defense Department, these agencies are keenly attentive to the military's strategic and tactical requirements.

One of the intelligence agencies in Defense with a national customer base is the National Security Agency, which intercepts and analyzes foreign communications and breaks codes. The NSA also creates codes and ciphers to protect government information. Another is the recently renamed National Geospatial-Intelligence Agency (NGA), which provides and analyzes imagery and produces a wide array of products, including maps, navigation tools, and surveillance intelligence. A third such agency in Defense is the National Reconnaissance Office. It develops, procures, launches, and maintains in orbit

information-gathering satellites that serve other government agencies.

The Defense Intelligence Agency supports the secretary of defense, Joint Chiefs of Staff, and military field commanders. It does some collection through human sources as well as some technical intelligence collection. The Army, Navy, Air Force, and Marine Corps have their own intelligence components that collect information, help them decide what weapons to acquire, and serve the tactical intelligence needs of their respective services.

In addition to those from the Department of Defense, other elements in the intelligence community include the national security parts of the FBI; the Bureau of Intelligence and Research in the State Department; the intelligence component of the Treasury Department; the Energy Department's Office of Intelligence and Counterintelligence, the former of which, through leveraging the expertise of the national laboratory system, has special competence in nuclear weapons; the Office of Intelligence of the Coast Guard; and, today, the Directorate of Intelligence Analysis and Infrastructure Protection in the Department of Homeland Security.

### The National Security Agency

The National Security Agency's intercepts of terrorist communications often set off alarms elsewhere in the government. Often, too, its intercepts are conclusive elements in the analyst's jigsaw puzzle. NSA engineers build technical systems to break ciphers and to make sense of today's complex signals environment. Its analysts listen to conversations between foreigners not meant for them. They also perform "traffic analysis"—studying technical communications systems and codes as well as foreign organizational structures, including those of terrorist organizations.

Cold War adversaries used very hierarchical, familiar, and predictable military command and control methods. With globalization and the telecommunications revolution, and with loosely affiliated but networked adversaries using commercial devices and encryption, the technical impediments to signals collection grew at a geometric rate. At the same time, the end of the Cold War and the resultant cuts in national security funding forced intelligence agencies to cut systems and seek economies of scale. Modern adversaries are skilled users of communications technologies. The NSA's challenges, and its opportunities, increased exponentially in "volume, variety, and velocity."[67]

The law requires the NSA to not deliberately collect data on U.S. citizens or on persons in the United States without a warrant based on foreign intelligence requirements. Also, the NSA was supposed to let the FBI know of any indication of crime, espionage, or "terrorist enterprise" so that the FBI could obtain the appropriate warrant. Later in this story, we will learn that while the NSA had the technical capability to report on communications with suspected terrorist facilities in the Middle East, the NSA did not seek FISA Court warrants to collect communications between individuals in the United States and

foreign countries, because it believed that this was an FBI role. It also did not want to be viewed as targeting persons in the United States and possibly violating laws that governed NSA's collection of foreign intelligence.[68]

An almost obsessive protection of sources and methods by the NSA, and its focus on foreign intelligence, and its avoidance of anything domestic would, as will be seen, be important elements in the story of 9/11.

### Technology as an Intelligence Asset and Liability

The application of newly developed scientific technology to the mission of U.S. war fighters and national security decisionmakers is one of the great success stories of the twentieth century. It did not happen by accident. Recent wars have been waged and won decisively by brave men and women using advanced technology that was developed, authorized, and paid for by conscientious and diligent executive and legislative branch leaders many years earlier.

The challenge of technology, however, is a daunting one. It is expensive, sometimes fails, and often can create problems as well as solve them. Some of the advanced technologies that gave us insight into the closed-off territories of the Soviet Union during the Cold War are of limited use in identifying and tracking individual terrorists.

Terrorists, in turn, have benefited from this same rapid development of communication technologies. They simply could buy off the shelf and harvest the products of a $3 trillion a year telecommunications industry. They could acquire without great expense communication devices that were varied, global, instantaneous, complex, and encrypted.

The emergence of the World Wide Web has given terrorists a much easier means of acquiring information and exercising command and control over their operations. The operational leader of the 9/11 conspiracy, Mohamed Atta, went online from Hamburg, Germany, to research U.S. flight schools. Targets of intelligence collection have become more sophisticated. These changes have made surveillance and threat warning more difficult.

Despite the problems that technology creates, Americans' love affair with it leads them to also regard it as the solution. But technology produces its best results when an organization has the doctrine, structure, and incentives to exploit it. For example, even the best information technology will not improve information sharing so long as the intelligence agencies' personnel and security systems reward protecting information rather than disseminating it.

### The CIA

The CIA is a descendant of the Office of Strategic Services (OSS), which President Roosevelt created early in World War II after having first thought the FBI might take that role. The father of the OSS was William J. "Wild Bill" Donovan, a Wall Street lawyer. He recruited into the OSS others like himself—well traveled, well connected, well-to-do professional men and women.[69]

An innovation of Donovan's, whose legacy remains part of U.S. intelligence today, was the establishment of a Research and Analysis Branch. There large numbers of scholars from U.S. universities pored over accounts from spies, communications intercepted by the armed forces, transcripts of radio broadcasts, and publications of all types, and prepared reports on economic, political, and social conditions in foreign theaters of operation.

At the end of World War II, to Donovan's disappointment, President Harry Truman dissolved the Office of Strategic Services. Four months later, the President directed that "all Federal foreign intelligence activities be planned, developed and coordinated so as to assure the most effective accomplishment of the intelligence mission related to the national security," under a National Intelligence Authority consisting of the secretaries of State, War, and the Navy, and a personal representative of the president. This body was to be assisted by a Central Intelligence Group, made up of persons detailed from the departments of each of the members and headed by a Director of Central Intelligence.[70]

Subsequently, President Truman agreed to the National Security Act of 1947, which, among other things, established the Central Intelligence Agency, under the Director of Central Intelligence. Lobbying by the FBI, combined with fears of creating a U.S. Gestapo,[71] led to the FBI's being assigned responsibility for internal security functions and counterespionage. The CIA was specifically accorded "no police, subpoena, or law enforcement powers or internal security functions."[72] This structure built in tensions between the CIA and the Defense Department's intelligence agencies, and between the CIA and the FBI.

**Clandestine and Covert Action.** With this history, the CIA brought to the era of 9/11 many attributes of an elite organization, viewing itself as serving on the nation's front lines to engage America's enemies. Officers in its Clandestine Service, under what became the Directorate of Operations, fanned out into stations abroad. Each chief of station was a very important person in the organization, given the additional title of the DCI's representative in that country. He (occasionally she) was governed by an operating directive that listed operational priorities issued by the relevant regional division of the Directorate, constrained by centrally determined allocations of resources.

Because the conduct of espionage was a high-risk activity, decisions on the clandestine targeting, recruitment, handling, and termination of secret sources and the dissemination of collected information required Washington's approval and action. But in this decentralized system, analogous in some ways to the culture of the FBI field offices in the United States, everyone in the Directorate of Operations presumed that it was the job of headquarters to support the field, rather than manage field activities.

In the 1960s, the CIA suffered exposure of its botched effort to land Cuban exiles at the Bay of Pigs. The Vietnam War brought on more criticism. A promi-

nent feature of the Watergate era was investigations of the CIA by committees headed by Frank Church in the Senate and Otis Pike in the House. They published evidence that the CIA had secretly planned to assassinate Fidel Castro and other foreign leaders. The President had not taken plain responsibility for these judgments. CIA officials had taken most of the blame, saying they had done so in order to preserve the President's "plausible deniability."[73]

After the Watergate era, Congress established oversight committees to ensure that the CIA did not undertake covert action contrary to basic American law. Case officers in the CIA's Clandestine Service interpreted legislation, such as the Hughes-Ryan Amendment requiring that the president approve and report to Congress any covert action, as sending a message to them that covert action often leads to trouble and can severely damage one's career. Controversies surrounding Central American covert action programs in the mid-1980s led to the indictment of several senior officers of the Clandestine Service. During the 1990s, tension sometimes arose, as it did in the effort against al Qaeda, between policymakers who wanted the CIA to undertake more aggressive covert action and wary CIA leaders who counseled prudence and making sure that the legal basis and presidential authorization for their actions were undeniably clear.

The Clandestine Service felt the impact of the post–Cold War peace dividend, with cuts beginning in 1992. As the number of officers declined and overseas facilities were closed, the DCI and his managers responded to developing crises in the Balkans or in Africa by "surging," or taking officers from across the service to use on the immediate problem. In many cases the surge officers had little familiarity with the new issues. Inevitably, some parts of the world and some collection targets were not fully covered, or not covered at all. This strategy also placed great emphasis on close relations with foreign liaison services, whose help was needed to gain information that the United States itself did not have the capacity to collect.

The nadir for the Clandestine Service was in 1995, when only 25 trainees became new officers.[74] In 1998, the DCI was able to persuade the administration and the Congress to endorse a long-range rebuilding program. It takes five to seven years of training, language study, and experience to bring a recruit up to full performance.[75]

**Analysis.** The CIA's Directorate of Intelligence retained some of its original character of a university gone to war. Its men and women tended to judge one another by the quantity and quality of their publications (in this case, classified publications). Apart from their own peers, they looked for approval and guidance to policymakers. During the 1990s and today, particular value is attached to having a contribution included in one of the classified daily "newspapers"—the Senior Executive Intelligence Brief—or, better still, selected for inclusion in the President's Daily Brief.[76]

The CIA had been created to wage the Cold War. Its steady focus on one or two primary adversaries, decade after decade, had at least one positive effect: it created an environment in which managers and analysts could safely invest time and resources in basic research, detailed and reflective. Payoffs might not be immediate. But when they wrote their estimates, even in brief papers, they could draw on a deep base of knowledge.

When the Cold War ended, those investments could not easily be reallocated to new enemies. The cultural effects ran even deeper. In a more fluid international environment with uncertain, changing goals and interests, intelligence managers no longer felt they could afford such a patient, strategic approach to long-term accumulation of intellectual capital. A university culture with its versions of books and articles was giving way to the culture of the newsroom.

During the 1990s, the rise of round-the-clock news shows and the Internet reinforced pressure on analysts to pass along fresh reports to policymakers at an ever-faster pace, trying to add context or supplement what their customers were receiving from the media. Weaknesses in all-source and strategic analysis were highlighted by a panel, chaired by Admiral David Jeremiah, that critiqued the intelligence community's failure to foresee the nuclear weapons tests by India and Pakistan in 1998, as well as by a 1999 panel, chaired by Donald Rumsfeld, that discussed the community's limited ability to assess the ballistic missile threat to the United States. Both reports called attention to the dispersal of effort on too many priorities, the declining attention to the craft of strategic analysis, and security rules that prevented adequate sharing of information. Another Cold War craft had been an elaborate set of methods for warning against surprise attack, but that too had faded in analyzing new dangers like terrorism.[77]

**Security.** Another set of experiences that would affect the capacity of the CIA to cope with the new terrorism traced back to the early Cold War, when the Agency developed a concern, bordering on paranoia, about penetration by the Soviet KGB. James Jesus Angleton, who headed counterintelligence in the CIA until the early 1970s, became obsessed with the belief that the Agency harbored one or more Soviet "moles." Although the pendulum swung back after Angleton's forced retirement, it did not go very far. Instances of actual Soviet penetration kept apprehensions high.[78] Then, in the early 1990s, came the Aldrich Ames espionage case, which intensely embarrassed the CIA. Though obviously unreliable, Ames had been protected and promoted by fellow officers while he paid his bills by selling to the Soviet Union the names of U.S. operatives and agents, a number of whom died as a result.

The concern about security vastly complicated information sharing. Information was compartmented in order to protect it against exposure to skilled and technologically sophisticated adversaries. There were therefore numerous restrictions on handling information and a deep suspicion about sending infor-

mation over newfangled electronic systems, like email, to other agencies of the U.S. government.[79]

Security concerns also increased the difficulty of recruiting officers qualified for counterterrorism. Very few American colleges or universities offered programs in Middle Eastern languages or Islamic studies. The total number of undergraduate degrees granted in Arabic in all U.S. colleges and universities in 2002 was six.[80] Many who had traveled much outside the United States could expect a very long wait for initial clearance. Anyone who was foreign-born or had numerous relatives abroad was well-advised not even to apply. With budgets for the CIA shrinking after the end of the Cold War, it was not surprising that, with some notable exceptions, new hires in the Clandestine Service tended to have qualifications similar to those of serving officers: that is, they were suited for traditional agent recruitment or for exploiting liaison relationships with foreign services but were not equipped to seek or use assets inside the terrorist network.

**Early Counterterrorism Efforts**

In the 1970s and 1980s, terrorism had been tied to regional conflicts, mainly in the Middle East. The majority of terrorist groups either were sponsored by governments or, like the Palestine Liberation Organization, were militants trying to create governments.

In the mid-1980s, on the basis of a report from a task force headed by Vice President George Bush and after terrorist attacks at airports in Rome and Athens, the DCI created a Counterterrorist Center to unify activities across the Directorate of Operations and the Directorate of Intelligence. The Counterterrorist Center had representation from the FBI and other agencies. In the formal table of organization it reported to the DCI, but in fact most of the Center's chiefs belonged to the Clandestine Service and usually looked for guidance to the head of the Directorate of Operations.[81]

The Center stimulated and coordinated collection of information by CIA stations, compiled the results, and passed selected reports to appropriate stations, the Directorate of Intelligence analysts, other parts of the intelligence community, or to policymakers. The Center protected its bureaucratic turf. The Director of Central Intelligence had once had a national intelligence officer for terrorism to coordinate analysis; that office was abolished in the late 1980s and its duties absorbed in part by the Counterterrorist Center. Though analysts assigned to the Center produced a large number of papers, the focus was support to operations. A CIA inspector general's report in 1994 criticized the Center's capacity to provide warning of terrorist attacks.[82]

Subsequent chapters will raise the issue of whether, despite tremendous talent, energy, and dedication, the intelligence community failed to do enough in coping with the challenge from Bin Ladin and al Qaeda. Confronted with such questions, managers in the intelligence community often responded that they had meager resources with which to work.[83]

Cuts in national security expenditures at the end of the Cold War led to budget cuts in the national foreign intelligence program from fiscal years 1990 to 1996 and essentially flat budgets from fiscal years 1996 to 2000 (except for the so-called Gingrich supplemental to the FY1999 budget and two later, smaller supplementals). These cuts compounded the difficulties of the intelligence agencies. Policymakers were asking them to move into the digitized future to fight against computer-to-computer communications and modern communication systems, while maintaining capability against older systems, such as high-frequency radios and ultra-high- and very-high-frequency (line of sight) systems that work like old-style television antennas. Also, demand for imagery increased dramatically following the success of the 1991 Gulf War. Both these developments, in turn, placed a premium on planning the next generation of satellite systems, the cost of which put great pressure on the rest of the intelligence budget. As a result, intelligence agencies experienced staff reductions, affecting both operators and analysts.[84]

Yet at least for the CIA, part of the burden in tackling terrorism arose from the background we have described: an organization capable of attracting extraordinarily motivated people but institutionally averse to risk, with its capacity for covert action atrophied, predisposed to restrict the distribution of information, having difficulty assimilating new types of personnel, and accustomed to presenting descriptive reportage of the latest intelligence. The CIA, to put it another way, needed significant change in order to get maximum effect in counterterrorism. President Clinton appointed George Tenet as DCI in 1997, and by all accounts terrorism was a priority for him. But Tenet's own assessment, when questioned by the Commission, was that in 2004, the CIA's clandestine service was still at least five years away from being fully ready to play its counterterrorism role.[85] And while Tenet was clearly the leader of the CIA, the intelligence community's confederated structure left open the question of who really was in charge of the entire U.S. intelligence effort.

## 3.5 . . . AND IN THE STATE DEPARTMENT AND THE DEFENSE DEPARTMENT

### The State Department

The Commission asked Deputy Secretary of State Richard Armitage in 2004 why the State Department had so long pursued what seemed, and ultimately proved, to be a hopeless effort to persuade the Taliban regime in Afghanistan to deport Bin Ladin. Armitage replied: "We do what the State Department does, we don't go out and fly bombers, we don't do things like that[;] . . . we do *our* part in these things."[86]

Fifty years earlier, the person in Armitage's position would not have spoken of the Department of State as having such a limited role. Until the late 1950s, the department dominated the processes of advising the president and Con-

gress on U.S. relations with the rest of the world. The National Security Council was created in 1947 largely as a result of lobbying from the Pentagon for a forum where the military could object if they thought the State Department was setting national objectives that the United States did not have the wherewithal to pursue.

The State Department retained primacy until the 1960s, when the Kennedy and Johnson administrations turned instead to Robert McNamara's Defense Department, where a mini–state department was created to analyze foreign policy issues. President Richard Nixon then concentrated policy planning and policy coordination in a powerful National Security Council staff, overseen by Henry Kissinger.

In later years, individual secretaries of state were important figures, but the department's role continued to erode. State came into the 1990s overmatched by the resources of other departments and with little support for its budget either in the Congress or in the president's Office of Management and Budget.

Like the FBI and the CIA's Directorate of Operations, the State Department had a tradition of emphasizing service in the field over service in Washington. Even ambassadors, however, often found host governments not only making connections with the U.S. government through their own missions in Washington, but working through the CIA station or a Defense attaché. Increasingly, the embassies themselves were overshadowed by powerful regional commanders in chief reporting to the Pentagon.[87]

### Counterterrorism

In the 1960s and 1970s, the State Department managed counterterrorism policy. It was the official channel for communication with the governments presumed to be behind the terrorists. Moreover, since terrorist incidents of this period usually ended in negotiations, an ambassador or other embassy official was the logical person to represent U.S. interests.

Keeping U.S. diplomatic efforts against terrorism coherent was a recurring challenge. In 1976, at the direction of Congress, the department elevated its coordinator for combating terrorism to the rank equivalent to an assistant secretary of state. As an "ambassador at large," this official sought to increase the visibility of counterterrorism matters within the department and to help integrate U.S. policy implementation among government agencies. The prolonged crisis of 1979–1981, when 53 Americans were held hostage at the U.S. embassy in Tehran, ended the State Department leadership in counterterrorism. President Carter's assertive national security advisor, Zbigniew Brzezinski, took charge, and the coordination function remained thereafter in the White House.

President Reagan's second secretary of state, George Shultz, advocated active U.S. efforts to combat terrorism, often recommending the use of military force. Secretary of Defense Caspar Weinberger opposed Shultz, who made little head-

way against Weinberger, or even within his own department. Though Shultz elevated the status and visibility of counterterrorism coordination by appointing as coordinator first L. Paul Bremer and then Robert Oakley, both senior career ambassadors of high standing in the Foreign Service, the department continued to be dominated by regional bureaus for which terrorism was not a first-order concern.

Secretaries of state after Shultz took less personal interest in the problem. Only congressional opposition prevented President Clinton's first secretary of state, Warren Christopher, from merging terrorism into a new bureau that would have also dealt with narcotics and crime. The coordinator under Secretary Madeleine Albright told the Commission that his job was seen as a minor one within the department.[88] Although the description of his status has been disputed, and Secretary Albright strongly supported the August 1998 strikes against Bin Ladin, the role played by the Department of State in counterterrorism was often cautionary before 9/11. This was a reflection of the reality that counterterrorism priorities nested within broader foreign policy aims of the U.S. government.

State Department consular officers around the world, it should not be forgotten, were constantly challenged by the problem of terrorism, for they handled visas for travel to the United States. After it was discovered that Abdel Rahman, the Blind Sheikh, had come and gone almost at will, State initiated significant reforms to its watchlist and visa-processing policies. In 1993, Congress passed legislation allowing State to retain visa-processing fees for border security; those fees were then used by the department to fully automate the terrorist watchlist. By the late 1990s, State had created a worldwide, real-time electronic database of visa, law enforcement, and watchlist information, the core of the post-9/11 border screening systems. Still, as will be seen later, the system had many holes.[89]

### The Department of Defense

The Department of Defense is the behemoth among federal agencies. With an annual budget larger than the gross domestic product of Russia, it is an empire. The Defense Department is part civilian, part military. The civilian secretary of defense has ultimate control, under the president. Among the uniformed military, the top official is the chairman of the Joint Chiefs of Staff, who is supported by a Joint Staff divided into standard military staff compartments—J-2 (intelligence), J-3 (operations), and so on.

Because of the necessary and demanding focus on the differing mission of each service, and their long and proud traditions, the Army, Navy, Air Force, and Marine Corps have often fought ferociously over roles and missions in war fighting and over budgets and posts of leadership. Two developments diminished this competition.

The first was the passage by Congress in 1986 of the Goldwater-Nichols

Act, which, among other things, mandated that promotion to high rank required some period of duty with a different service or with a joint (i.e., multiservice) command. This had strong and immediate effects, loosening the loyalties of senior officers to their separate services and causing them to think more broadly about the military establishment as a whole.[90] However, it also may have lessened the diversity of military advice and options presented to the president. The Goldwater-Nichols example is seen by some as having lessons applicable to lessening competition and increasing cooperation in other parts of the federal bureaucracy, particularly the law enforcement and intelligence communities.

The second, related development was a significant transfer of planning and command responsibilities from the service chiefs and their staffs to the joint and unified commands outside of Washington, especially those for Strategic Forces and for four regions: Europe, the Pacific, the Center, and the South. Posts in these commands became prized assignments for ambitious officers, and the voices of their five commanders in chief became as influential as those of the service chiefs.

### Counterterrorism

The Pentagon first became concerned about terrorism as a result of hostage taking in the 1970s. In June 1976, Palestinian terrorists seized an Air France plane and landed it at Entebbe in Uganda, holding 105 Israelis and other Jews as hostages. A special Israeli commando force stormed the plane, killed all the terrorists, and rescued all but one of the hostages. In October 1977, a West German special force dealt similarly with a Lufthansa plane sitting on a tarmac in Mogadishu: every terrorist was killed, and every hostage brought back safely. The White House, members of Congress, and the news media asked the Pentagon whether the United States was prepared for similar action. The answer was no. The Army immediately set about creating the Delta Force, one of whose missions was hostage rescue.

The first test for the new force did not go well. It came in April 1980 during the Iranian hostage crisis, when Navy helicopters with Marine pilots flew to a site known as Desert One, some 200 miles southeast of Tehran, to rendezvous with Air Force planes carrying Delta Force commandos and fresh fuel. Mild sandstorms disabled three of the helicopters, and the commander ordered the mission aborted. But foul-ups on the ground resulted in the loss of eight aircraft, five airmen, and three marines. Remembered as "Desert One," this failure remained vivid for members of the armed forces. It also contributed to the later Goldwater-Nichols reforms.

In 1983 came Hezbollah's massacre of the Marines in Beirut. President Reagan quickly withdrew U.S. forces from Lebanon—a reversal later routinely cited by jihadists as evidence of U.S. weakness. A detailed investigation produced a list of new procedures that would become customary for forces

deployed abroad. They involved a number of defensive measures, including caution not only about strange cars and trucks but also about unknown aircraft overhead. "Force protection" became a significant claim on the time and resources of the Department of Defense.

A decade later, the military establishment had another experience that evoked both Desert One and the withdrawal from Beirut. The first President Bush had authorized the use of U.S. military forces to ensure humanitarian relief in war-torn Somalia. Tribal factions interfered with the supply missions. By the autumn of 1993, U.S. commanders concluded that the main source of trouble was a warlord, Mohammed Farrah Aidid. An Army special force launched a raid on Mogadishu to capture him. In the course of a long night, two Black Hawk helicopters were shot down, 73 Americans were wounded, 18 were killed, and the world's television screens showed images of an American corpse dragged through the streets by exultant Somalis. Under pressure from Congress, President Clinton soon ordered the withdrawal of U.S. forces. "Black Hawk down" joined "Desert One" as a symbol among Americans in uniform, code phrases used to evoke the risks of daring exploits without maximum preparation, overwhelming force, and a well-defined mission.

In 1995–1996, the Defense Department began to invest effort in planning how to handle the possibility of a domestic terrorist incident involving weapons of mass destruction (WMD). The idea of a domestic command for homeland defense began to be discussed in 1997, and in 1999 the Joint Chiefs developed a concept for the establishment of a domestic Unified Command. Congress killed the idea. Instead, the Department established the Joint Forces Command, located at Norfolk, Virginia, making it responsible for military response to domestic emergencies, both natural and man-made.[91]

Pursuant to the Nunn-Lugar-Domenici Domestic Preparedness Program, the Defense Department began in 1997 to train first responders in 120 of the nation's largest cities. As a key part of its efforts, Defense created National Guard WMD Civil Support Teams to respond in the event of a WMD terrorist incident. A total of 32 such National Guard teams were authorized by fiscal year 2001. Under the command of state governors, they provided support to civilian agencies to assess the nature of the attack, offer medical and technical advice, and coordinate state and local responses.[92]

The Department of Defense, like the Department of State, had a coordinator who represented the department on the interagency committee concerned with counterterrorism. By the end of President Clinton's first term, this official had become the assistant secretary of defense for special operations and low-intensity conflict.[93]

The experience of the 1980s had suggested to the military establishment that if it were to have a role in counterterrorism, it would be a traditional military role—to act against state sponsors of terrorism. And the military had what seemed an excellent example of how to do it. In 1986, a bomb went off at a

disco in Berlin, killing two American soldiers. Intelligence clearly linked the bombing to Libya's Colonel Muammar Qadhafi. President Reagan ordered air strikes against Libya. The operation was not cost free: the United States lost two planes. Evidence accumulated later, including the 1988 bombing of Pan Am 103, clearly showed that the operation did not curb Qadhafi's interest in terrorism. However, it was seen at the time as a success. The lesson then taken from Libya was that terrorism could be stopped by the use of U.S. air power that inflicted pain on the authors or sponsors of terrorist acts.

This lesson was applied, using Tomahawk missiles, early in the Clinton administration. George H. W. Bush was scheduled to visit Kuwait to be honored for his rescue of that country in the Gulf War of 1991. Kuwaiti security services warned Washington that Iraqi agents were planning to assassinate the former president. President Clinton not only ordered precautions to protect Bush but asked about options for a reprisal against Iraq. The Pentagon proposed 12 targets for Tomahawk missiles. Debate in the White House and at the CIA about possible collateral damage pared the list down to three, then to one—Iraqi intelligence headquarters in central Baghdad. The attack was made at night, to minimize civilian casualties. Twenty-three missiles were fired. Other than one civilian casualty, the operation seemed completely successful: the intelligence headquarters was demolished. No further intelligence came in about terrorist acts planned by Iraq.[94]

The 1986 attack in Libya and the 1993 attack on Iraq symbolized for the military establishment effective use of military power for counterterrorism—limited retaliation with air power, aimed at deterrence. What remained was the hard question of how deterrence could be effective when the adversary was a loose transnational network.

## 3.6 . . . AND IN THE WHITE HOUSE

Because coping with terrorism was not (and is not) the sole province of any component of the U.S. government, some coordinating mechanism is necessary. When terrorism was not a prominent issue, the State Department could perform this role. When the Iranian hostage crisis developed, this procedure went by the board: National Security Advisor Zbigniew Brzezinski took charge of crisis management.

The Reagan administration continued and formalized the practice of having presidential staff coordinate counterterrorism. After the killing of the marines in Beirut, President Reagan signed National Security Directive 138, calling for a "shift . . . from passive to active defense measures" and reprogramming or adding new resources to effect the shift. It directed the State Department "to intensify efforts to achieve cooperation of other governments" and the CIA to "intensify use of liaison and other intelligence capabilities and also

to develop plans and capability to preempt groups and individuals planning strikes against U.S. interests."[95]

Speaking to the American Bar Association in July 1985, the President characterized terrorism as "an act of war" and declared: "There can be no place on earth left where it is safe for these monsters to rest, to train, or practice their cruel and deadly skills. We must act together, or unilaterally, if necessary to ensure that terrorists have no sanctuary—anywhere."[96] The air strikes against Libya were one manifestation of this strategy.

Through most of President Reagan's second term, the coordination of counterterrorism was overseen by a high-level interagency committee chaired by the deputy national security adviser. But the Reagan administration closed with a major scandal that cast a cloud over the notion that the White House should guide counterterrorism.

President Reagan was concerned because Hezbollah was taking Americans hostage and periodically killing them. He was also constrained by a bill he signed into law that made it illegal to ship military aid to anticommunist Contra guerrillas in Nicaragua, whom he strongly supported. His national security adviser, Robert McFarlane, and McFarlane's deputy, Admiral John Poindexter, thought the hostage problem might be solved and the U.S. position in the Middle East improved if the United States quietly negotiated with Iran about exchanging hostages for modest quantities of arms. Shultz and Weinberger, united for once, opposed McFarlane and Poindexter.

A staffer for McFarlane and Poindexter, Marine Lieutenant Colonel Oliver North, developed a scheme to trade U.S. arms for hostages and divert the proceeds to the Contras to get around U.S. law. He may have had encouragement from Director of Central Intelligence William Casey.[97]

When the facts were revealed in 1986 and 1987, it appeared to be the 1970s all over again: a massive abuse of covert action. Now, instead of stories about poisoned cigars and Mafia hit men, Americans heard testimony about a secret visit to Tehran by McFarlane, using an assumed name and bearing a chocolate cake decorated with icing depicting a key. An investigation by a special counsel resulted in the indictment of McFarlane, Poindexter, North, and ten others, including several high-ranking officers from the CIA's Clandestine Service. The investigations spotlighted the importance of accountability and official responsibility for faithful execution of laws. For the story of 9/11, the significance of the Iran-Contra affair was that it made parts of the bureaucracy reflexively skeptical about any operating directive from the White House.[98]

As the national security advisor's function expanded, the procedures and structure of the advisor's staff, conventionally called the National Security Council staff, became more formal. The advisor developed recommendations for presidential directives, differently labeled by each president. For President Clinton, they were to be Presidential Decision Directives; for President George W. Bush, National Security Policy Directives. These documents and many oth-

ers requiring approval by the president worked their way through interagency committees usually composed of departmental representatives at the assistant secretary level or just below it. The NSC staff had senior directors who would sit on these interagency committees, often as chair, to facilitate agreement and to represent the wider interests of the national security advisor.

When President Clinton took office, he decided right away to coordinate counterterrorism from the White House. On January 25, 1993, Mir Amal Kansi, an Islamic extremist from Pakistan, shot and killed two CIA employees at the main highway entrance to CIA headquarters in Virginia. (Kansi drove away and was captured abroad much later.) Only a month afterward came the World Trade Center bombing and, a few weeks after that, the Iraqi plot against former President Bush.

President Clinton's first national security advisor, Anthony Lake, had retained from the Bush administration the staffer who dealt with crime, narcotics, and terrorism (a portfolio often known as "drugs and thugs"), the veteran civil servant Richard Clarke. President Clinton and Lake turned to Clarke to do the staff work for them in coordinating counterterrorism. Before long, he would chair a midlevel interagency committee eventually titled the Counterterrorism Security Group (CSG). We will later tell of Clarke's evolution as adviser on and, in time, manager of the U.S. counterterrorist effort.

When explaining the missile strike against Iraq provoked by the plot to kill President Bush, President Clinton stated: "From the first days of our Revolution, America's security has depended on the clarity of the message: Don't tread on us. A firm and commensurate response was essential to protect our sovereignty, to send a message to those who engage in state-sponsored terrorism, to deter further violence against our people, and to affirm the expectation of civilized behavior among nations."[99]

In his State of the Union message in January 1995, President Clinton promised "comprehensive legislation to strengthen our hand in combating terrorists, whether they strike at home or abroad." In February, he sent Congress proposals to extend federal criminal jurisdiction, to make it easier to deport terrorists, and to act against terrorist fund-raising. In early May, he submitted a bundle of strong amendments. The interval had seen the news from Tokyo in March that a doomsday cult, Aum Shinrikyo, had released sarin nerve gas in a subway, killing 12 and injuring thousands. The sect had extensive properties and laboratories in Japan and offices worldwide, including one in New York. Neither the FBI nor the CIA had ever heard of it. In April had come the bombing of the Murrah federal building in Oklahoma City; immediate suspicions that it had been the work of Islamists turned out to be wrong, and the bombers proved to be American antigovernment extremists named Timothy McVeigh and Terry Nichols. President Clinton proposed to amend his earlier proposals by increasing wiretap and electronic surveillance authority for the FBI, requiring that explosives carry traceable taggants, and providing substantial new money not only for the FBI and CIA but also for local police.[100]

President Clinton issued a classified directive in June 1995, Presidential Decision Directive 39, which said that the United States should "deter, defeat and respond vigorously to all terrorist attacks on our territory and against our citizens." The directive called terrorism both a matter of national security and a crime, and it assigned responsibilities to various agencies. Alarmed by the incident in Tokyo, President Clinton made it the very highest priority for his own staff and for all agencies to prepare to detect and respond to terrorism that involved chemical, biological, or nuclear weapons.[101]

During 1995 and 1996, President Clinton devoted considerable time to seeking cooperation from other nations in denying sanctuary to terrorists. He proposed significantly larger budgets for the FBI, with much of the increase designated for counterterrorism. For the CIA, he essentially stopped cutting allocations and supported requests for supplemental funds for counterterrorism.[102]

When announcing his new national security team after being reelected in 1996, President Clinton mentioned terrorism first in a list of several challenges facing the country.[103] In 1998, after Bin Ladin's fatwa and other alarms, President Clinton accepted a proposal from his national security advisor, Samuel "Sandy" Berger, and gave Clarke a new position as national coordinator for security, infrastructure protection, and counterterrorism. He issued two Presidential Decision Directives, numbers 62 and 63, that built on the assignments to agencies that had been made in Presidential Decision Directive 39; laid out ten program areas for counterterrorism; and enhanced, at least on paper, Clarke's authority to police these assignments. Because of concerns especially on the part of Attorney General Reno, this new authority was defined in precise and limiting language. Clarke was only to "provide advice" regarding budgets and to "coordinate the development of interagency agreed guidelines" for action.[104]

Clarke also was awarded a seat on the cabinet-level Principals Committee when it met on his issues—a highly unusual step for a White House staffer. His interagency body, the CSG, ordinarily reported to the Deputies Committee of subcabinet officials, unless Berger asked them to report directly to the principals. The complementary directive, number 63, defined the elements of the nation's critical infrastructure and considered ways to protect it. Taken together, the two directives basically left the Justice Department and the FBI in charge at home and left terrorism abroad to the CIA, the State Department, and other agencies, under Clarke's and Berger's coordinating hands.

Explaining the new arrangement and his concerns in another commencement speech, this time at the Naval Academy, in May 1998, the President said:

First, we will use our new integrated approach to intensify the fight against all forms of terrorism: to capture terrorists, no matter where they hide; to work with other nations to eliminate terrorist sanctuaries overseas; to respond rapidly and effectively to protect Americans from terrorism at

home and abroad. Second, we will launch a comprehensive plan to detect, deter, and defend against attacks on our critical infrastructures, our power systems, water supplies, police, fire, and medical services, air traffic control, financial services, telephone systems, and computer networks. . . . Third, we will undertake a concerted effort to prevent the spread and use of biological weapons and to protect our people in the event these terrible weapons are ever unleashed by a rogue state, a terrorist group, or an international criminal organization. . . . Finally, we must do more to protect our civilian population from biological weapons.[105]

Clearly, the President's concern about terrorism had steadily risen. That heightened worry would become even more obvious early in 1999, when he addressed the National Academy of Sciences and presented his most somber account yet of what could happen if the United States were hit, unprepared, by terrorists wielding either weapons of mass destruction or potent cyberweapons.

## 3.7 . . . AND IN THE CONGRESS

Since the beginning of the Republic, few debates have been as hotly contested as the one over executive versus legislative powers. At the Constitutional Convention, the founders sought to create a strong executive but check its powers. They left those powers sufficiently ambiguous so that room was left for Congress and the president to struggle over the direction of the nation's security and foreign policies.

The most serious question has centered on whether or not the president needs congressional authorization to wage war. The current status of that debate seems to have settled into a recognition that a president can deploy military forces for small and limited operations, but needs at least congressional support if not explicit authorization for large and more open-ended military operations.

This calculus becomes important in this story as both President Clinton and President Bush chose not to seek a declaration of war on Bin Ladin after he had declared and begun to wage war on us, a declaration that they did not acknowledge publicly. Not until after 9/11 was a congressional authorization sought.

The most substantial change in national security oversight in Congress took place following World War II. The Congressional Reorganization Act of 1946 created the modern Armed Services committees that have become so powerful today. One especially noteworthy innovation was the creation of the Joint House-Senate Atomic Energy Committee, which is credited by many with the development of our nuclear deterrent capability and was also criticized for wielding too much power relative to the executive branch.

Ironically, this committee was eliminated in the 1970s as Congress was undertaking the next most important reform of oversight in response to the Church and Pike investigations into abuses of power. In 1977, the House and Senate created select committees to exercise oversight of the executive branch's conduct of intelligence operations.

## The Intelligence Committees

The House and Senate select committees on intelligence share some important characteristics. They have limited authorities. They do not have exclusive authority over intelligence agencies. Appropriations are ultimately determined by the Appropriations committees. The Armed Services committees exercise jurisdiction over the intelligence agencies within the Department of Defense (and, in the case of the Senate, over the Central Intelligence Agency). One consequence is that the rise and fall of intelligence budgets are tied directly to trends in defense spending.

The president is required by law to ensure the congressional Intelligence committees are kept fully and currently informed of the intelligence activities of the United States. The committees allow the CIA to some extent to withhold information in order to protect sources, methods, and operations. The CIA must bring presidentially authorized covert action Findings and Memoranda of Notification to the Intelligence committees, and it must detail its failures. The committees conduct their most important work in closed hearings or briefings in which security over classified material can be maintained.

Members of the Intelligence committees serve for a limited time, a restriction imposed by each chamber. Many members believe these limits prevent committee members from developing the necessary expertise to conduct effective oversight.

Secrecy, while necessary, can also harm oversight. The overall budget of the intelligence community is classified, as are most of its activities. Thus, the Intelligence committees cannot take advantage of democracy's best oversight mechanism: public disclosure. This makes them significantly different from other congressional oversight committees, which are often spurred into action by the work of investigative journalists and watchdog organizations.

## Adjusting to the Post–Cold War Era

The unexpected and rapid end of the Cold War in 1991 created trauma in the foreign policy and national security community both in and out of government. While some criticized the intelligence community for failing to forecast the collapse of the Soviet Union (and used this argument to propose drastic cuts in intelligence agencies), most recognized that the good news of being relieved of the substantial burden of maintaining a security structure to meet the Soviet challenge was accompanied by the bad news of increased insecurity. In many directions, the community faced threats and intelligence challenges that it was largely unprepared to meet.

So did the intelligence oversight committees. New digitized technologies, and the demand for imagery and continued capability against older systems, meant the need to spend more on satellite systems at the expense of human efforts. In addition, denial and deception became more effective as targets learned from public sources what our intelligence agencies were doing. There were comprehensive reform proposals of the intelligence community, such as those offered by Senators Boren and McCurdy. That said, Congress still took too little action to address institutional weaknesses.[106]

With the Cold War over, and the intelligence community roiled by the Ames spy scandal, a presidential commission chaired first by former secretary of defense Les Aspin and later by former secretary of defense Harold Brown examined the intelligence community's future. After it issued recommendations addressing the DCI's lack of personnel and budget authority over the intelligence community, the Intelligence committees in 1996 introduced implementing legislation to remedy these problems.

The Department of Defense and its congressional authorizing committees rose in opposition to the proposed changes. The President and DCI did not actively support these changes. Relatively small changes made in 1996 gave the DCI consultative authority and created a new deputy for management and assistant DCIs for collection and analysis. These reforms occurred only after the Senate Select Committee on Intelligence took the unprecedented step of threatening to bring down the defense authorization bill. Indeed, rather than increasing the DCI's authorities over national intelligence, the 1990s witnessed movement in the opposite direction through, for example, the transfer of the CIA's imaging analysis capability to the new imagery and mapping agency created within the Department of Defense.

### Congress Adjusts

Congress as a whole, like the executive branch, adjusted slowly to the rise of transnational terrorism as a threat to national security. In particular, the growing threat and capabilities of Bin Ladin were not understood in Congress. As the most representative branch of the federal government, Congress closely tracks trends in what public opinion and the electorate identify as key issues. In the years before September 11, terrorism seldom registered as important. To the extent that terrorism did break through and engage the attention of the Congress as a whole, it would briefly command attention after a specific incident, and then return to a lower rung on the public policy agenda.

Several points about Congress are worth noting. First, Congress always has a strong orientation toward domestic affairs. It usually takes on foreign policy and national security issues after threats are identified and articulated by the administration. In the absence of such a detailed—and repeated—articulation, national security tends not to rise very high on the list of congressional priorities. Presidents are selective in their use of political capital for international issues.

In the decade before 9/11, presidential discussion of and congressional and public attention to foreign affairs and national security were dominated by other issues—among them, Haiti, Bosnia, Russia, China, Somalia, Kosovo, NATO enlargement, the Middle East peace process, missile defense, and globalization. Terrorism infrequently took center stage; and when it did, the context was often terrorists' tactics—a chemical, biological, nuclear, or computer threat—not terrorist organizations.[107]

Second, Congress tends to follow the overall lead of the president on budget issues with respect to national security matters. There are often sharp arguments about individual programs and internal priorities, but by and large the overall funding authorized and appropriated by the Congress comes out close to the president's request. This tendency was certainly illustrated by the downward trends in spending on defense, intelligence, and foreign affairs in the first part of the 1990s. The White House, to be sure, read the political signals coming from Capitol Hill, but the Congress largely acceded to the executive branch's funding requests. In the second half of the decade, Congress appropriated some 98 percent of what the administration requested for intelligence programs. Apart from the Gingrich supplemental of $1.5 billion for overall intelligence programs in fiscal year 1999, the key decisions on overall allocation of resources for national security issues in the decade before 9/11—including counterterrorism funding—were made in the president's Office of Management and Budget.[108]

Third, Congress did not reorganize itself after the end of the Cold War to address new threats. Recommendations by the Joint Committee on the Organization of Congress were implemented, in part, in the House of Representatives after the 1994 elections, but there was no reorganization of national security functions. The Senate undertook no appreciable changes. Traditional issues—foreign policy, defense, intelligence—continued to be handled by committees whose structure remained largely unaltered, while issues such as transnational terrorism fell between the cracks. Terrorism came under the jurisdiction of at least 14 different committees in the House alone, and budget and oversight functions in the House and Senate concerning terrorism were also splintered badly among committees. Little effort was made to consider an integrated policy toward terrorism, which might range from identifying the threat to addressing vulnerabilities in critical infrastructure; and the piecemeal approach in the Congress contributed to the problems of the executive branch in formulating such a policy.[109]

Fourth, the oversight function of Congress has diminished over time. In recent years, traditional review of the administration of programs and the implementation of laws has been replaced by "a focus on personal investigations, possible scandals, and issues designed to generate media attention." The unglamorous but essential work of oversight has been neglected, and few members past or present believe it is performed well. DCI Tenet told us: "We ran

from threat to threat to threat. . . . [T]here was not a system in place to say, 'You got to go back and do this and this and this.'" Not just the DCI but the entire executive branch needed help from Congress in addressing the questions of counterterrorism strategy and policy, looking past day-to-day concerns. Members of Congress, however, also found their time spent on such everyday matters, or in looking back to investigate mistakes, and often missed the big questions—as did the executive branch. Staff tended as well to focus on parochial considerations, seeking to add or cut funding for individual (often small) programs, instead of emphasizing comprehensive oversight projects.[110]

Fifth, on certain issues, other priorities pointed Congress in a direction that was unhelpful in meeting the threats that were emerging in the months leading up to 9/11. Committees with oversight responsibility for aviation focused overwhelmingly on airport congestion and the economic health of the airlines, not aviation security. Committees with responsibility for the INS focused on the Southwest border, not on terrorists. Justice Department officials told us that committees with responsibility for the FBI tightly restricted appropriations for improvements in information technology, in part because of concerns about the FBI's ability to manage such projects. Committees responsible for South Asia spent the decade of the 1990s imposing sanctions on Pakistan, leaving presidents with little leverage to alter Pakistan's policies before 9/11. Committees with responsibility for the Defense Department paid little heed to developing military responses to terrorism and stymied intelligence reform. All committees found themselves swamped in the minutiae of the budget process, with little time for consideration of longer-term questions, or what many members past and present told us was the proper conduct of oversight.[111]

Each of these trends contributed to what can only be described as Congress's slowness and inadequacy in treating the issue of terrorism in the years before 9/11. The legislative branch adjusted little and did not restructure itself to address changing threats.[112] Its attention to terrorism was episodic and splintered across several committees. Congress gave little guidance to executive branch agencies, did not reform them in any significant way, and did not systematically perform oversight to identify, address, and attempt to resolve the many problems in national security and domestic agencies that became apparent in the aftermath of 9/11.

Although individual representatives and senators took significant steps, the overall level of attention in the Congress to the terrorist threat was low. We examined the number of hearings on terrorism from January 1998 to September 2001. The Senate Armed Services Committee held nine—four related to the attack on the USS *Cole.* The House Armed Services Committee also held nine, six of them by a special oversight panel on terrorism. The Senate Foreign Relations Committee and its House counterpart both held four. The Senate Select Committee on Intelligence, in addition to its annual worldwide threat hearing, held eight; its House counterpart held perhaps two exclusively

devoted to counterterrorism, plus the briefings by its terrorist working group. The Senate and House intelligence panels did not raise public and congressional attention on Bin Ladin and al Qaeda prior to the joint inquiry into the attacks of September 11, perhaps in part because of the classified nature of their work. Yet in the context of committees that each hold scores of hearings every year on issues in their jurisdiction, this list is not impressive. Terrorism was a second- or third-order priority within the committees of Congress responsible for national security.[113]

In fact, Congress had a distinct tendency to push questions of emerging national security threats off its own plate, leaving them for others to consider. Congress asked outside commissions to do the work that arguably was at the heart of its own oversight responsibilities.[114] Beginning in 1999, the reports of these commissions made scores of recommendations to address terrorism and homeland security but drew little attention from Congress. Most of their impact came after 9/11.

# 4

# RESPONSES TO AL QAEDA'S INITIAL ASSAULTS

## 4.1 BEFORE THE BOMBINGS IN KENYA AND TANZANIA

Although the 1995 National Intelligence Estimate had warned of a new type of terrorism, many officials continued to think of terrorists as agents of states (Saudi Hezbollah acting for Iran against Khobar Towers) or as domestic criminals (Timothy McVeigh in Oklahoma City). As we pointed out in chapter 3, the White House is not a natural locus for program management. Hence, government efforts to cope with terrorism were essentially the work of individual agencies.

President Bill Clinton's counterterrorism Presidential Decision Directives in 1995 (no. 39) and May 1998 (no. 62) reiterated that terrorism was a national security problem, not just a law enforcement issue. They reinforced the authority of the National Security Council (NSC) to coordinate domestic as well as foreign counterterrorism efforts, through Richard Clarke and his interagency Counterterrorism Security Group (CSG). Spotlighting new concerns about unconventional attacks, these directives assigned tasks to lead agencies but did not differentiate types of terrorist threats. Thus, while Clarke might prod or push agencies to act, what actually happened was usually decided at the State Department, the Pentagon, the CIA, or the Justice Department. The efforts of these agencies were sometimes energetic and sometimes effective. Terrorist plots were disrupted and individual terrorists were captured. But the United States did not, before 9/11, adopt as a clear strategic objective the elimination of al Qaeda.

**Early Efforts against Bin Ladin**
Until 1996, hardly anyone in the U.S. government understood that Usama Bin Ladin was an inspirer and organizer of the new terrorism. In 1993, the CIA noted that he had paid for the training of some Egyptian terrorists in Sudan. The State Department detected his money in aid to the Yemeni terrorists who

set a bomb in an attempt to kill U.S. troops in Aden in 1992. State Department sources even saw suspicious links with Omar Abdel Rahman, the "Blind Sheikh" in the New York area, commenting that Bin Ladin seemed "committed to financing 'Jihads' against 'anti Islamic' regimes worldwide." After the department designated Sudan a state sponsor of terrorism in 1993, it put Bin Ladin on its TIPOFF watchlist, a move that might have prevented his getting a visa had he tried to enter the United States. As late as 1997, however, even the CIA's Counterterrorist Center continued to describe him as an "extremist financier."[1]

In 1996, the CIA set up a special unit of a dozen officers to analyze intelligence on and plan operations against Bin Ladin. David Cohen, the head of the CIA's Directorate of Operations, wanted to test the idea of having a "virtual station"—a station based at headquarters but collecting and operating against a subject much as stations in the field focus on a country. Taking his cue from National Security Advisor Anthony Lake, who expressed special interest in terrorist finance, Cohen formed his virtual station as a terrorist financial links unit. He had trouble getting any Directorate of Operations officer to run it; he finally recruited a former analyst who was then running the Islamic Extremist Branch of the Counterterrorist Center. This officer, who was especially knowledgeable about Afghanistan, had noticed a recent stream of reports about Bin Ladin and something called al Qaeda, and suggested to Cohen that the station focus on this one individual. Cohen agreed. Thus was born the Bin Ladin unit.[2]

In May 1996, Bin Ladin left Sudan for Afghanistan. A few months later, as the Bin Ladin unit was gearing up, Jamal Ahmed al Fadl walked into a U.S. embassy in Africa, established his bona fides as a former senior employee of Bin Ladin, and provided a major breakthrough of intelligence on the creation, character, direction, and intentions of al Qaeda. Corroborating evidence came from another walk-in source at a different U.S. embassy. More confirmation was supplied later that year by intelligence and other sources, including material gathered by FBI agents and Kenyan police from an al Qaeda cell in Nairobi.[3]

By 1997, officers in the Bin Ladin unit recognized that Bin Ladin was more than just a financier. They learned that al Qaeda had a military committee that was planning operations against U.S. interests worldwide and was actively trying to obtain nuclear material. Analysts assigned to the station looked at the information it had gathered and "found connections everywhere," including links to the attacks on U.S. troops in Aden and Somalia in 1992 and 1993 and to the Manila air plot in the Philippines in 1994–1995.[4]

The Bin Ladin station was already working on plans for offensive operations against Bin Ladin. These plans were directed at both physical assets and sources of finance. In the end, plans to identify and attack Bin Ladin's money sources did not go forward.[5]

In late 1995, when Bin Ladin was still in Sudan, the State Department and the CIA learned that Sudanese officials were discussing with the Saudi gov-

ernment the possibility of expelling Bin Ladin. U.S. Ambassador Timothy Carney encouraged the Sudanese to pursue this course. The Saudis, however, did not want Bin Ladin, giving as their reason their revocation of his citizenship.[6]

Sudan's minister of defense, Fatih Erwa, has claimed that Sudan offered to hand Bin Ladin over to the United States. The Commission has found no credible evidence that this was so. Ambassador Carney had instructions only to push the Sudanese to expel Bin Ladin. Ambassador Carney had no legal basis to ask for more from the Sudanese since, at the time, there was no indictment outstanding.[7]

The chief of the Bin Ladin station, whom we will call "Mike," saw Bin Ladin's move to Afghanistan as a stroke of luck. Though the CIA had virtually abandoned Afghanistan after the Soviet withdrawal, case officers had reestablished old contacts while tracking down Mir Amal Kansi, the Pakistani gunman who had murdered two CIA employees in January 1993. These contacts contributed to intelligence about Bin Ladin's local movements, business activities, and security and living arrangements, and helped provide evidence that he was spending large amounts of money to help the Taliban. The chief of the Counterterrorist Center, whom we will call "Jeff," told Director George Tenet that the CIA's intelligence assets were "near to providing real-time information about Bin Ladin's activities and travels in Afghanistan." One of the contacts was a group associated with particular tribes among Afghanistan's ethnic Pashtun community.[8]

By the fall of 1997, the Bin Ladin unit had roughed out a plan for these Afghan tribals to capture Bin Ladin and hand him over for trial either in the United States or in an Arab country. In early 1998, the cabinet-level Principals Committee apparently gave the concept its blessing.[9]

On their own separate track, getting information but not direction from the CIA, the FBI's New York Field Office and the U.S. Attorney for the Southern District of New York were preparing to ask a grand jury to indict Bin Ladin. The Counterterrorist Center knew that this was happening.[10] The eventual charge, conspiring to attack U.S. defense installations, was finally issued from the grand jury in June 1998—as a sealed indictment. The indictment was publicly disclosed in November of that year.

When Bin Ladin moved to Afghanistan in May 1996, he became a subject of interest to the State Department's South Asia bureau. At the time, as one diplomat told us, South Asia was seen in the department and the government generally as a low priority. In 1997, as Madeleine Albright was beginning her tenure as secretary of state, an NSC policy review concluded that the United States should pay more attention not just to India but also to Pakistan and Afghanistan.[11] With regard to Afghanistan, another diplomat said, the United States at the time had "no policy."[12]

In the State Department, concerns about India-Pakistan tensions often crowded out attention to Afghanistan or Bin Ladin. Aware of instability and

growing Islamic extremism in Pakistan, State Department officials worried most about an arms race and possible war between Pakistan and India. After May 1998, when both countries surprised the United States by testing nuclear weapons, these dangers became daily first-order concerns of the State Department.[13]

In Afghanistan, the State Department tried to end the civil war that had continued since the Soviets' withdrawal. The South Asia bureau believed it might have a carrot for Afghanistan's warring factions in a project by the Union Oil Company of California (UNOCAL) to build a pipeline across the country. While there was probably never much chance of the pipeline actually being built, the Afghan desk hoped that the prospect of shared pipeline profits might lure faction leaders to a conference table. U.S. diplomats did not favor the Taliban over the rival factions. Despite growing concerns, U.S. diplomats were willing at the time, as one official said, to "give the Taliban a chance."[14]

Though Secretary Albright made no secret of thinking the Taliban "despicable," the U.S. ambassador to the United Nations, Bill Richardson, led a delegation to South Asia—including Afghanistan—in April 1998. No U.S. official of such rank had been to Kabul in decades. Ambassador Richardson went primarily to urge negotiations to end the civil war. In view of Bin Ladin's recent public call for all Muslims to kill Americans, Richardson asked the Taliban to expel Bin Ladin. They answered that they did not know his whereabouts. In any case, the Taliban said, Bin Ladin was not a threat to the United States.[15]

In sum, in late 1997 and the spring of 1998, the lead U.S. agencies each pursued their own efforts against Bin Ladin. The CIA's Counterterrorist Center was developing a plan to capture and remove him from Afghanistan. Parts of the Justice Department were moving toward indicting Bin Ladin, making possible a criminal trial in a New York court. Meanwhile, the State Department was focused more on lessening Indo-Pakistani nuclear tensions, ending the Afghan civil war, and ameliorating the Taliban's human rights abuses than on driving out Bin Ladin. Another key actor, Marine General Anthony Zinni, the commander in chief of the U.S. Central Command, shared the State Department's view.[16]

## The CIA Develops a Capture Plan

Initially, the DCI's Counterterrorist Center and its Bin Ladin unit considered a plan to ambush Bin Ladin when he traveled between Kandahar, the Taliban capital where he sometimes stayed the night, and his primary residence at the time, Tarnak Farms. After the Afghan tribals reported that they had tried such an ambush and failed, the Center gave up on it, despite suspicions that the tribals' story might be fiction. Thereafter, the capture plan focused on a nighttime raid on Tarnak Farms.[17]

A compound of about 80 concrete or mud-brick buildings surrounded by a 10-foot wall, Tarnak Farms was located in an isolated desert area on the outskirts of the Kandahar airport. CIA officers were able to map the entire site, identifying the houses that belonged to Bin Ladin's wives and the one where

Bin Ladin himself was most likely to sleep. Working with the tribals, they drew up plans for the raid. They ran two complete rehearsals in the United States during the fall of 1997.[18]

By early 1998, planners at the Counterterrorist Center were ready to come back to the White House to seek formal approval. Tenet apparently walked National Security Advisor Sandy Berger through the basic plan on February 13. One group of tribals would subdue the guards, enter Tarnak Farms stealthily, grab Bin Ladin, take him to a desert site outside Kandahar, and turn him over to a second group. This second group of tribals would take him to a desert landing zone already tested in the 1997 Kansi capture. From there, a CIA plane would take him to New York, an Arab capital, or wherever he was to be arraigned. Briefing papers prepared by the Counterterrorist Center acknowledged that hitches might develop. People might be killed, and Bin Ladin's supporters might retaliate, perhaps taking U.S. citizens in Kandahar hostage. But the briefing papers also noted that there was risk in not acting. "Sooner or later," they said, "Bin Ladin will attack U.S. interests, perhaps using WMD [weapons of mass destruction]."[19]

Clarke's Counterterrorism Security Group reviewed the capture plan for Berger. Noting that the plan was in a "very early stage of development," the NSC staff then told the CIA planners to go ahead and, among other things, start drafting any legal documents that might be required to authorize the covert action. The CSG apparently stressed that the raid should target Bin Ladin himself, not the whole compound.[20]

The CIA planners conducted their third complete rehearsal in March, and they again briefed the CSG. Clarke wrote Berger on March 7 that he saw the operation as "somewhat embryonic" and the CIA as "months away from doing anything."[21]

"Mike" thought the capture plan was "the perfect operation." It required minimum infrastructure. The plan had now been modified so that the tribals would keep Bin Ladin in a hiding place for up to a month before turning him over to the United States—thereby increasing the chances of keeping the U.S. hand out of sight. "Mike" trusted the information from the Afghan network; it had been corroborated by other means, he told us. The lead CIA officer in the field, Gary Schroen, also had confidence in the tribals. In a May 6 cable to CIA headquarters, he pronounced their planning "almost as professional and detailed . . . as would be done by any U.S. military special operations element." He and the other officers who had worked through the plan with the tribals judged it "about as good as it can be." (By that, Schroen explained, he meant that the chance of capturing or killing Bin Ladin was about 40 percent.) Although the tribals thought they could pull off the raid, if the operation were approved by headquarters and the policymakers, Schroen wrote there was going to be a point when "we step back and keep our fingers crossed that the [tribals] prove as good (and as lucky) as they think they will be."[22]

Military officers reviewed the capture plan and, according to "Mike," "found no showstoppers." The commander of Delta Force felt "uncomfortable" with having the tribals hold Bin Ladin captive for so long, and the commander of Joint Special Operations Forces, Lieutenant General Michael Canavan, was worried about the safety of the tribals inside Tarnak Farms. General Canavan said he had actually thought the operation too complicated for the CIA—"out of their league"—and an effort to get results "on the cheap." But a senior Joint Staff officer described the plan as "generally, not too much different than we might have come up with ourselves." No one in the Pentagon, so far as we know, advised the CIA or the White House not to proceed.[23]

In Washington, Berger expressed doubt about the dependability of the tribals. In his meeting with Tenet, Berger focused most, however, on the question of what was to be done with Bin Ladin if he were actually captured. He worried that the hard evidence against Bin Ladin was still skimpy and that there was a danger of snatching him and bringing him to the United States only to see him acquitted.[24]

On May 18, CIA's managers reviewed a draft Memorandum of Notification (MON), a legal document authorizing the capture operation. A 1986 presidential finding had authorized worldwide covert action against terrorism and probably provided adequate authority. But mindful of the old "rogue elephant" charge, senior CIA managers may have wanted something on paper to show that they were not acting on their own.

Discussion of this memorandum brought to the surface an unease about paramilitary covert action that had become ingrained, at least among some CIA senior managers. James Pavitt, the assistant head of the Directorate of Operations, expressed concern that people might get killed; it appears he thought the operation had at least a slight flavor of a plan for an assassination. Moreover, he calculated that it would cost several million dollars. He was not prepared to take that money "out of hide," and he did not want to go to all the necessary congressional committees to get special money. Despite Pavitt's misgivings, the CIA leadership cleared the draft memorandum and sent it on to the National Security Council.[25]

Counterterrorist Center officers briefed Attorney General Janet Reno and FBI Director Louis Freeh, telling them that the operation had about a 30 percent chance of success. The Center's chief, "Jeff," joined John O'Neill, the head of the FBI's New York Field Office, in briefing Mary Jo White, the U.S. Attorney for the Southern District of New York, and her staff. Though "Jeff" also used the 30 percent success figure, he warned that someone would surely be killed in the operation. White's impression from the New York briefing was that the chances of capturing Bin Ladin alive were nil.[26]

From May 20 to 24, the CIA ran a final, graded rehearsal of the operation, spread over three time zones, even bringing in personnel from the region. The FBI also participated. The rehearsal went well. The Counterterrorist Center

planned to brief cabinet-level principals and their deputies the following week, giving June 23 as the date for the raid, with Bin Ladin to be brought out of Afghanistan no later than July 23.[27]

On May 20, Director Tenet discussed the high risk of the operation with Berger and his deputies, warning that people might be killed, including Bin Ladin. Success was to be defined as the exfiltration of Bin Ladin out of Afghanistan.[28] A meeting of principals was scheduled for May 29 to decide whether the operation should go ahead.

The principals did not meet. On May 29, "Jeff" informed "Mike" that he had just met with Tenet, Pavitt, and the chief of the Directorate's Near Eastern Division. The decision was made not to go ahead with the operation. "Mike" cabled the field that he had been directed to "stand down on the operation for the time being." He had been told, he wrote, that cabinet-level officials thought the risk of civilian casualties—"collateral damage"—was too high. They were concerned about the tribals' safety, and had worried that "the purpose and nature of the operation would be subject to unavoidable misinterpretation and misrepresentation—and probably recriminations—in the event that Bin Ladin, despite our best intentions and efforts, did not survive."[29]

Impressions vary as to who actually decided not to proceed with the operation. Clarke told us that the CSG saw the plan as flawed. He was said to have described it to a colleague on the NSC staff as "half-assed" and predicted that the principals would not approve it. "Jeff" thought the decision had been made at the cabinet level. Pavitt thought that it was Berger's doing, though perhaps on Tenet's advice. Tenet told us that given the recommendation of his chief operations officers, he alone had decided to "turn off" the operation. He had simply informed Berger, who had not pushed back. Berger's recollection was similar. He said the plan was never presented to the White House for a decision.[30]

The CIA's senior management clearly did not think the plan would work. Tenet's deputy director of operations wrote to Berger a few weeks later that the CIA assessed the tribals' ability to capture Bin Ladin and deliver him to U.S. officials as low. But working-level CIA officers were disappointed. Before it was canceled, Schroen described it as the "best plan we are going to come up with to capture [Bin Ladin] while he is in Afghanistan and bring him to justice."[31] No capture plan before 9/11 ever again attained the same level of detail and preparation. The tribals' reported readiness to act diminished. And Bin Ladin's security precautions and defenses became more elaborate and formidable.

At this time, 9/11 was more than three years away. It was the duty of Tenet and the CIA leadership to balance the risks of inaction against jeopardizing the lives of their operatives and agents. And they had reason to worry about failure: millions of dollars down the drain; a shoot-out that could be seen as an assassination; and, if there were repercussions in Pakistan, perhaps a coup. The decisions of the U.S. government in May 1998 were made, as Berger has put

it, from the vantage point of the driver looking through a muddy windshield moving forward, not through a clean rearview mirror.[32]

**Looking for Other Options**

The Counterterrorist Center continued to track Bin Ladin and to contemplate covert action. The most hopeful possibility seemed now to lie in diplomacy—but not diplomacy managed by the Department of State, which focused primarily on India-Pakistan nuclear tensions during the summer of 1998. The CIA learned in the spring of 1998 that the Saudi government had quietly disrupted Bin Ladin cells in its country that were planning to attack U.S. forces with shoulder-fired missiles. They had arrested scores of individuals, with no publicity. When thanking the Saudis, Director Tenet took advantage of the opening to ask them to help against Bin Ladin. The response was encouraging enough that President Clinton made Tenet his informal personal representative to work with the Saudis on terrorism, and Tenet visited Riyadh in May and again in early June.[33]

Saudi Crown Prince Abdullah, who had taken charge from the ailing King Fahd, promised Tenet an all-out secret effort to persuade the Taliban to expel Bin Ladin so that he could be sent to the United States or to another country for trial. The Kingdom's emissary would be its intelligence chief, Prince Turki bin Faisal. Vice President Al Gore later added his thanks to those of Tenet, both making clear that they spoke with President Clinton's blessing. Tenet reported that it was imperative to get an indictment against Bin Ladin. The New York grand jury issued its sealed indictment a few days later, on June 10. Tenet also recommended that no action be taken on other U.S. options, such as the covert action plan.[34]

Prince Turki followed up in meetings during the summer with Mullah Omar and other Taliban leaders. Apparently employing a mixture of possible incentives and threats, Turki received a commitment that Bin Ladin would be expelled, but Mullah Omar did not make good on this promise.[35]

On August 5, Clarke chaired a CSG meeting on Bin Ladin. In the discussion of what might be done, the note taker wrote, "there was a dearth of bright ideas around the table, despite a consensus that the [government] ought to pursue every avenue it can to address the problem."[36]

## 4.2 CRISIS: AUGUST 1998

On August 7, 1998, National Security Advisor Berger woke President Clinton with a phone call at 5:35 A.M. to tell him of the almost simultaneous bombings of the U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania. Suspicion quickly focused on Bin Ladin. Unusually good intelligence, chiefly from

the yearlong monitoring of al Qaeda's cell in Nairobi, soon firmly fixed responsibility on him and his associates.[37]

Debate about what to do settled very soon on one option: Tomahawk cruise missiles. Months earlier, after cancellation of the covert capture operation, Clarke had prodded the Pentagon to explore possibilities for military action. On June 2, General Hugh Shelton, the chairman of the Joint Chiefs of Staff, had directed General Zinni at Central Command to develop a plan, which he had submitted during the first week of July. Zinni's planners surely considered the two previous times the United States had used force to respond to terrorism, the 1986 strike on Libya and the 1993 strike against Iraq. They proposed firing Tomahawks against eight terrorist camps in Afghanistan, including Bin Ladin's compound at Tarnak Farms.[38] After the embassy attacks, the Pentagon offered this plan to the White House.

The day after the embassy bombings, Tenet brought to a principals meeting intelligence that terrorist leaders were expected to gather at a camp near Khowst, Afghanistan, to plan future attacks. According to Berger, Tenet said that several hundred would attend, including Bin Ladin. The CIA described the area as effectively a military cantonment, away from civilian population centers and overwhelmingly populated by jihadists. Clarke remembered sitting next to Tenet in a White House meeting, asking Tenet "You thinking what I'm thinking?" and his nodding "yes."[39] The principals quickly reached a consensus on attacking the gathering. The strike's purpose was to kill Bin Ladin and his chief lieutenants.[40]

Berger put in place a tightly compartmented process designed to keep all planning secret. On August 11, General Zinni received orders to prepare detailed plans for strikes against the sites in Afghanistan. The Pentagon briefed President Clinton about these plans on August 12 and 14. Though the principals hoped that the missiles would hit Bin Ladin, NSC staff recommended the strike whether or not there was firm evidence that the commanders were at the facilities.[41]

Considerable debate went to the question of whether to strike targets outside of Afghanistan, including two facilities in Sudan. One was a tannery believed to belong to Bin Ladin. The other was al Shifa, a Khartoum pharmaceutical plant, which intelligence reports said was manufacturing a precursor ingredient for nerve gas with Bin Ladin's financial support. The argument for hitting the tannery was that it could hurt Bin Ladin financially. The argument for hitting al Shifa was that it would lessen the chance of Bin Ladin's having nerve gas for a later attack.[42]

Ever since March 1995, American officials had had in the backs of their minds Aum Shinrikyo's release of sarin nerve gas in the Tokyo subway. President Clinton himself had expressed great concern about chemical and biological terrorism in the United States. Bin Ladin had reportedly been heard to speak of wanting a "Hiroshima" and at least 10,000 casualties. The CIA reported

that a soil sample from the vicinity of the al Shifa plant had tested positive for EMPTA, a precursor chemical for VX, a nerve gas whose lone use was for mass killing. Two days before the embassy bombings, Clarke's staff wrote that Bin Ladin "has invested in and almost certainly has access to VX produced at a plant in Sudan."[43] Senior State Department officials believed that they had received a similar verdict independently, though they and Clarke's staff were probably relying on the same report. Mary McCarthy, the NSC senior director responsible for intelligence programs, initially cautioned Berger that the "bottom line" was that "we will need much better intelligence on this facility before we seriously consider any options." She added that the link between Bin Ladin and al Shifa was "rather uncertain at this point." Berger has told us that he thought about what might happen if the decision went against hitting al Shifa, and nerve gas was used in a New York subway two weeks later.[44]

By the early hours of the morning of August 20, President Clinton and all his principal advisers had agreed to strike Bin Ladin camps in Afghanistan near Khowst, as well as hitting al Shifa. The President took the Sudanese tannery off the target list because he saw little point in killing uninvolved people without doing significant harm to Bin Ladin. The principal with the most qualms regarding al Shifa was Attorney General Reno. She expressed concern about attacking two Muslim countries at the same time. Looking back, she said that she felt the "premise kept shifting."[45]

Later on August 20, Navy vessels in the Arabian Sea fired their cruise missiles. Though most of them hit their intended targets, neither Bin Ladin nor any other terrorist leader was killed. Berger told us that an after-action review by Director Tenet concluded that the strikes had killed 20–30 people in the camps but probably missed Bin Ladin by a few hours. Since the missiles headed for Afghanistan had had to cross Pakistan, the Vice Chairman of the Joint Chiefs was sent to meet with Pakistan's army chief of staff to assure him the missiles were not coming from India. Officials in Washington speculated that one or another Pakistani official might have sent a warning to the Taliban or Bin Ladin.[46]

The air strikes marked the climax of an intense 48-hour period in which Berger notified congressional leaders, the principals called their foreign counterparts, and President Clinton flew back from his vacation on Martha's Vineyard to address the nation from the Oval Office. The President spoke to the congressional leadership from Air Force One, and he called British Prime Minister Tony Blair, Pakistani Prime Minister Nawaz Sharif, and Egyptian President Hosni Mubarak from the White House.[47] House Speaker Newt Gingrich and Senate Majority Leader Trent Lott initially supported the President. The next month, Gingrich's office dismissed the cruise missile attacks as "pinpricks."[48]

At the time, President Clinton was embroiled in the Lewinsky scandal, which continued to consume public attention for the rest of that year and the first months of 1999. As it happened, a popular 1997 movie, *Wag the Dog*, features a

president who fakes a war to distract public attention from a domestic scandal. Some Republicans in Congress raised questions about the timing of the strikes. Berger was particularly rankled by an editorial in the *Economist* that said that only the future would tell whether the U.S. missile strikes had "created 10,000 new fanatics where there would have been none."[49]

Much public commentary turned immediately to scalding criticism that the action was too aggressive. The Sudanese denied that al Shifa produced nerve gas, and they allowed journalists to visit what was left of a seemingly harmless facility. President Clinton, Vice President Gore, Berger, Tenet, and Clarke insisted to us that their judgment was right, pointing to the soil sample evidence. No independent evidence has emerged to corroborate the CIA's assessment.[50]

Everyone involved in the decision had, of course, been aware of President Clinton's problems. He told them to ignore them. Berger recalled the President saying to him "that they were going to get crap either way, so they should do the right thing."[51] All his aides testified to us that they based their advice solely on national security considerations. We have found no reason to question their statements.

The failure of the strikes, the "wag the dog" slur, the intense partisanship of the period, and the nature of the al Shifa evidence likely had a cumulative effect on future decisions about the use of force against Bin Ladin. Berger told us that he did not feel any sense of constraint.[52]

The period after the August 1998 embassy bombings was critical in shaping U.S. policy toward Bin Ladin. Although more Americans had been killed in the 1996 Khobar Towers attack, and many more in Beirut in 1983, the overall loss of life rivaled the worst attacks in memory. More ominous, perhaps, was the demonstration of an operational capability to coordinate two nearly simultaneous attacks on U.S. embassies in different countries.

Despite the availability of information that al Qaeda was a global network, in 1998 policymakers knew little about the organization. The reams of new information that the CIA's Bin Ladin unit had been developing since 1996 had not been pulled together and synthesized for the rest of the government. Indeed, analysts in the unit felt that they were viewed as alarmists even within the CIA. A National Intelligence Estimate on terrorism in 1997 had only briefly mentioned Bin Ladin, and no subsequent national estimate would authoritatively evaluate the terrorism danger until after 9/11. Policymakers knew there was a dangerous individual, Usama Bin Ladin, whom they had been trying to capture and bring to trial. Documents at the time referred to Bin Ladin "and his associates" or Bin Ladin and his "network." They did not emphasize the existence of a structured worldwide organization gearing up to train thousands of potential terrorists.[53]

In the critical days and weeks after the August 1998 attacks, senior policymakers in the Clinton administration had to reevaluate the threat posed by Bin

Ladin. Was this just a new and especially venomous version of the ordinary terrorist threat America had lived with for decades, or was it radically new, posing a danger beyond any yet experienced?

Even after the embassy attacks, Bin Ladin had been responsible for the deaths of fewer than 50 Americans, most of them overseas. An NSC staffer working for Richard Clarke told us the threat was seen as one that could cause hundreds of casualties, not thousands.[54] Even officials who acknowledge a vital threat intellectually may not be ready to act on such beliefs at great cost or at high risk.

Therefore, the government experts who believed that Bin Ladin and his network posed such a novel danger needed a way to win broad support for their views, or at least spotlight the areas of dispute. The Presidential Daily Brief and the similar, more widely circulated daily reports for high officials—consisting mainly of brief reports of intelligence "news" without much analysis or context—did not provide such a vehicle. The national intelligence estimate has often played this role, and is sometimes controversial for this very reason. It played no role in judging the threat posed by al Qaeda, either in 1998 or later.

In the late summer and fall of 1998, the U.S. government also was worrying about the deployment of military power in two other ongoing conflicts. After years of war in the Balkans, the United States had finally committed itself to significant military intervention in 1995–1996. Already maintaining a NATO-led peacekeeping force in Bosnia, U.S. officials were beginning to consider major combat operations against Serbia to protect Muslim civilians in Kosovo from ethnic cleansing. Air strikes were threatened in October 1998; a full-scale NATO bombing campaign against Serbia was launched in March 1999.[55]

In addition, the Clinton administration was facing the possibility of major combat operations against Iraq. Since 1996, the UN inspections regime had been increasingly obstructed by Saddam Hussein. The United States was threatening to attack unless unfettered inspections could resume. The Clinton administration eventually launched a large-scale set of air strikes against Iraq, Operation Desert Fox, in December 1998. These military commitments became the context in which the Clinton administration had to consider opening another front of military engagement against a new terrorist threat based in Afghanistan.

## A Follow-On Campaign?

Clarke hoped the August 1998 missile strikes would mark the beginning of a sustained campaign against Bin Ladin. Clarke was, as he later admitted, "obsessed" with Bin Ladin, and the embassy bombings gave him new scope for pursuing his obsession. Terrorism had moved high up among the President's concerns, and Clarke's position had elevated accordingly. The CSG, unlike most standing interagency committees, did not have to report through the Deputies Committee. Although such a reporting relationship had been prescribed in

the May 1998 presidential directive (after expressions of concern by Attorney General Reno, among others), that directive contained an exception that permitted the CSG to report directly to the principals if Berger so elected. In practice, the CSG often reported not even to the full Principals Committee but instead to the so-called Small Group formed by Berger, consisting only of those principals cleared to know about the most sensitive issues connected with counterterrorism activities concerning Bin Ladin or the Khobar Towers investigation.[56]

For this inner cabinet, Clarke drew up what he called "Political-Military Plan Delenda." The Latin *delenda*, meaning that something "must be destroyed," evoked the famous Roman vow to destroy its rival, Carthage. The overall goal of Clarke's paper was to "immediately eliminate any significant threat to Americans" from the "Bin Ladin network."[57] The paper called for diplomacy to deny Bin Ladin sanctuary; covert action to disrupt terrorist activities, but above all to capture Bin Ladin and his deputies and bring them to trial; efforts to dry up Bin Ladin's money supply; and preparation for follow-on military action. The status of the document was and remained uncertain. It was never formally adopted by the principals, and participants in the Small Group now have little or no recollection of it. It did, however, guide Clarke's efforts.

The military component of Clarke's plan was its most fully articulated element. He envisioned an ongoing campaign of strikes against Bin Ladin's bases in Afghanistan or elsewhere, whenever target information was ripe. Acknowledging that individual targets might not have much value, he cautioned Berger not to expect ever again to have an assembly of terrorist leaders in his sights. But he argued that rolling attacks might persuade the Taliban to hand over Bin Ladin and, in any case, would show that the action in August was not a "one-off" event. It would show that the United States was committed to a relentless effort to take down Bin Ladin's network.[58]

Members of the Small Group found themselves unpersuaded of the merits of rolling attacks. Defense Secretary William Cohen told us Bin Ladin's training camps were primitive, built with "rope ladders"; General Shelton called them "jungle gym" camps. Neither thought them worthwhile targets for very expensive missiles. President Clinton and Berger also worried about the *Economist*'s point—that attacks that missed Bin Ladin could enhance his stature and win him new recruits. After the United States launched air attacks against Iraq at the end of 1998 and against Serbia in 1999, in each case provoking worldwide criticism, Deputy National Security Advisor James Steinberg added the argument that attacks in Afghanistan offered "little benefit, lots of blowback against [a] bomb-happy U.S."[59]

During the last week of August 1998, officials began considering possible follow-on strikes. According to Clarke, President Clinton was inclined to launch further strikes sooner rather than later. On August 27, Under Secretary of Defense for Policy Walter Slocombe advised Secretary Cohen that the avail-

able targets were not promising. The experience of the previous week, he wrote, "has only confirmed the importance of defining a clearly articulated rationale for military action" that was effective as well as justified. But Slocombe worried that simply striking some of these available targets did not add up to an effective strategy.[60]

Defense officials at a lower level, in the Office of the Assistant Secretary for Special Operations and Low-Intensity Conflict, tried to meet Slocombe's objections. They developed a plan that, unlike Clarke's, called not for particular strikes but instead for a broad change in national strategy and in the institutional approach of the Department of Defense, implying a possible need for large-scale operations across the whole spectrum of U.S. military capabilities. It urged the department to become a lead agency in driving a national counterterrorism strategy forward, to "champion a national effort to take up the gauntlet that international terrorists have thrown at our feet." The authors expressed concern that "we have not fundamentally altered our philosophy or our approach" even though the terrorist threat had grown. They outlined an eight-part strategy "to be more proactive and aggressive." The future, they warned, might bring "horrific attacks," in which case "we will have no choice nor, unfortunately, will we have a plan." The assistant secretary, Allen Holmes, took the paper to Slocombe's chief deputy, Jan Lodal, but it went no further. Its lead author recalls being told by Holmes that Lodal thought it was too aggressive. Holmes cannot recall what was said, and Lodal cannot remember the episode or the paper at all.[61]

## 4.3 DIPLOMACY

After the August missile strikes, diplomatic options to press the Taliban seemed no more promising than military options. The United States had issued a formal warning to the Taliban, and also to Sudan, that they would be held directly responsible for any attacks on Americans, wherever they occurred, carried out by the Bin Ladin network as long as they continued to provide sanctuary to it.[62]

For a brief moment, it had seemed as if the August strikes might have shocked the Taliban into thinking of giving up Bin Ladin. On August 22, the reclusive Mullah Omar told a working-level State Department official that the strikes were counterproductive but added that he would be open to a dialogue with the United States on Bin Ladin's presence in Afghanistan.[63] Meeting in Islamabad with William Milam, the U.S. ambassador to Pakistan, Taliban delegates said it was against their culture to expel someone seeking sanctuary but asked what would happen to Bin Ladin should he be sent to Saudi Arabia.[64]

Yet in September 1998, when the Saudi emissary, Prince Turki, asked Mullah Omar whether he would keep his earlier promise to expel Bin Ladin, the

Taliban leader said no. Both sides shouted at each other, with Mullah Omar denouncing the Saudi government. Riyadh then suspended its diplomatic relations with the Taliban regime. (Saudi Arabia, Pakistan, and the United Arab Emirates were the only countries that recognized the Taliban as the legitimate government of Afghanistan.) Crown Prince Abdullah told President Clinton and Vice President Gore about this when he visited Washington in late September. His account confirmed reports that the U.S. government had received independently.[65]

Other efforts with the Saudi government centered on improving intelligence sharing and permitting U.S. agents to interrogate prisoners in Saudi custody. The history of such cooperation in 1997 and 1998 had been strained.[66] Several officials told us, in particular, that the United States could not get direct access to an important al Qaeda financial official, Madani al Tayyib, who had been detained by the Saudi government in 1997.[67] Though U.S. officials repeatedly raised the issue, the Saudis provided limited information. In his September 1998 meeting with Crown Prince Abdullah, Vice President Gore, while thanking the Saudi government for their responsiveness, renewed the request for direct U.S. access to Tayyib.[68] The United States never obtained this access.

An NSC staff–led working group on terrorist finances asked the CIA in November 1998 to push again for access to Tayyib and to see "if it is possible to elaborate further on the ties between Usama bin Ladin and prominent individuals in Saudi Arabia, including especially the Bin Ladin family."[69] One result was two NSC-led interagency trips to Persian Gulf states in 1999 and 2000. During these trips the NSC, Treasury, and intelligence representatives spoke with Saudi officials, and later interviewed members of the Bin Ladin family, about Usama's inheritance. The Saudis and the Bin Ladin family eventually helped in this particular effort and U.S. officials ultimately learned that Bin Ladin was not financing al Qaeda out of a personal inheritance.[70] But Clarke was frustrated about how little the Agency knew, complaining to Berger that four years after "we first asked CIA to track down [Bin Ladin]'s finances" and two years after the creation of the CIA's Bin Ladin unit, the Agency said it could only guess at how much aid Bin Ladin gave to terrorist groups, what were the main sources of his budget, or how he moved his money.[71]

The other diplomatic route to get at Bin Ladin in Afghanistan ran through Islamabad. In the summer before the embassy bombings, the State Department had been heavily focused on rising tensions between India and Pakistan and did not aggressively challenge Pakistan on Afghanistan and Bin Ladin. But State Department counterterrorism officials wanted a stronger position; the department's acting counterterrorism coordinator advised Secretary Albright to designate Pakistan as a state sponsor of terrorism, noting that despite high-level Pakistani assurances, the country's military intelligence service continued "activities in support of international terrorism" by supporting attacks on civilian targets in Kashmir. This recommendation was opposed by the State Department's South Asia bureau, which was concerned that it would damage already

sensitive relations with Pakistan in the wake of the May 1998 nuclear tests by both Pakistan and India. Secretary Albright rejected the recommendation on August 5, 1998, just two days before the embassy bombings.[72] She told us that, in general, putting the Pakistanis on the terrorist list would eliminate any influence the United States had over them.[73] In October, an NSC counterterrorism official noted that Pakistan's pro-Taliban military intelligence service had been training Kashmiri jihadists in one of the camps hit by U.S. missiles, leading to the death of Pakistanis.[74]

After flying to Nairobi and bringing home the coffins of the American dead, Secretary Albright increased the department's focus on counterterrorism. According to Ambassador Milam, the bombings were a "wake-up call," and he soon found himself spending 45 to 50 percent of his time working the Taliban–Bin Ladin portfolio.[75] But Pakistan's military intelligence service, known as the ISID (Inter-Services Intelligence Directorate), was the Taliban's primary patron, which made progress difficult.

Additional pressure on the Pakistanis—beyond demands to press the Taliban on Bin Ladin—seemed unattractive to most officials of the State Department. Congressional sanctions punishing Pakistan for possessing nuclear arms prevented the administration from offering incentives to Islamabad.[76] In the words of Deputy Secretary of State Strobe Talbott, Washington's Pakistan policy was "stick-heavy." Talbott felt that the only remaining sticks were additional sanctions that would have bankrupted the Pakistanis, a dangerous move that could have brought "total chaos" to a nuclear-armed country with a significant number of Islamic radicals.[77]

The Saudi government, which had a long and close relationship with Pakistan and provided it oil on generous terms, was already pressing Sharif with regard to the Taliban and Bin Ladin. A senior State Department official concluded that Saudi Crown Prince Abdullah put "a tremendous amount of heat" on the Pakistani prime minister during the prince's October 1998 visit to Pakistan.[78]

The State Department urged President Clinton to engage the Pakistanis. Accepting this advice, President Clinton invited Sharif to Washington, where they talked mostly about India but also discussed Bin Ladin. After Sharif went home, the President called him and raised the Bin Ladin subject again. This effort elicited from Sharif a promise to talk with the Taliban.[79]

Mullah Omar's position showed no sign of softening. One intelligence report passed to Berger by the NSC staff quoted Bin Ladin as saying that Mullah Omar had given him a completely free hand to act in any country, though asking that he not claim responsibility for attacks in Pakistan or Saudi Arabia. Bin Ladin was described as grabbing his beard and saying emotionally, "By Allah, by God, the Americans will still be amazed. The so-called United States will suffer the same fate as the Russians. Their state will collapse, too."[80]

Debate in the State Department intensified after December 1998, when Michael Sheehan became counterterrorism coordinator. A onetime special

forces officer, he had worked with Albright when she was ambassador to the United Nations and had served on the NSC staff with Clarke. He shared Clarke's obsession with terrorism, and had little hesitation about locking horns with the regional bureaus. Through every available channel, he repeated the earlier warning to the Taliban of the possible dire consequences—including military strikes—if Bin Ladin remained their guest and conducted additional attacks. Within the department, he argued for designating the Taliban regime a state sponsor of terrorism. This was technically difficult to do, for calling it a state would be tantamount to diplomatic recognition, which the United States had thus far withheld. But Sheehan urged the use of any available weapon against the Taliban. He told us that he thought he was regarded in the department as "a one-note Johnny nutcase."[81]

In early 1999, the State Department's counterterrorism office proposed a comprehensive diplomatic strategy for all states involved in the Afghanistan problem, including Pakistan. It specified both carrots and hard-hitting sticks—among them, certifying Pakistan as uncooperative on terrorism. Albright said the original carrots and sticks listed in a decision paper for principals may not have been used as "described on paper" but added that they were used in other ways or in varying degrees. But the paper's author, Ambassador Sheehan, was frustrated and complained to us that the original plan "had been watered down to the point that nothing was then done with it."[82]

The cautiousness of the South Asia bureau was reinforced when, in May 1999, Pakistani troops were discovered to have infiltrated into an especially mountainous area of Kashmir. A limited war began between India and Pakistan, euphemistically called the "Kargil crisis," as India tried to drive the Pakistani forces out. Patience with Pakistan was wearing thin, inside both the State Department and the NSC. Bruce Riedel, the NSC staff member responsible for Pakistan, wrote Berger that Islamabad was "behaving as a rogue state in two areas—backing Taliban/UBL terror and provoking war with India."[83]

Discussion within the Clinton administration on Afghanistan then concentrated on two main alternatives. The first, championed by Riedel and Assistant Secretary of State Karl Inderfurth, was to undertake a major diplomatic effort to end the Afghan civil war and install a national unity government. The second, favored by Sheehan, Clarke, and the CIA, called for labeling the Taliban a terrorist group and ultimately funneling secret aid to its chief foe, the Northern Alliance. This dispute would go back and forth throughout 1999 and ultimately become entangled with debate about enlisting the Northern Alliance as an ally for covert action.[84]

Another diplomatic option may have been available: nurturing Afghan exile groups as a possible moderate governing alternative to the Taliban. In late 1999, Washington provided some support for talks among the leaders of exile Afghan groups, including the ousted Rome-based King Zahir Shah and Hamid Karzai, about bolstering anti-Taliban forces inside Afghanistan and linking the

Northern Alliance with Pashtun groups. One U.S. diplomat later told us that the exile groups were not ready to move forward and that coordinating fractious groups residing in Bonn, Rome, and Cyprus proved extremely difficult.[85]

Frustrated by the Taliban's resistance, two senior State Department officials suggested asking the Saudis to offer the Taliban $250 million for Bin Ladin. Clarke opposed having the United States facilitate a "huge grant to a regime as heinous as the Taliban" and suggested that the idea might not seem attractive to either Secretary Albright or First Lady Hillary Rodham Clinton—both critics of the Taliban's record on women's rights.[86] The proposal seems to have quietly died.

Within the State Department, some officials delayed Sheehan and Clarke's push either to designate Taliban-controlled Afghanistan as a state sponsor of terrorism or to designate the regime as a foreign terrorist organization (thereby avoiding the issue of whether to recognize the Taliban as Afghanistan's government). Sheehan and Clarke prevailed in July 1999, when President Clinton issued an executive order effectively declaring the Taliban regime a state sponsor of terrorism.[87] In October, a UN Security Council Resolution championed by the United States added economic and travel sanctions.[88]

With UN sanctions set to come into effect in November, Clarke wrote Berger that "the Taliban appear to be up to something."[89] Mullah Omar had shuffled his "cabinet" and hinted at Bin Ladin's possible departure. Clarke's staff thought his most likely destination would be Somalia; Chechnya seemed less appealing with Russia on the offensive. Clarke commented that Iraq and Libya had previously discussed hosting Bin Ladin, though he and his staff had their doubts that Bin Ladin would trust secular Arab dictators such as Saddam Hussein or Muammar Qadhafi. Clarke also raised the "remote possibility" of Yemen, which offered vast uncontrolled spaces. In November, the CSG discussed whether the sanctions had rattled the Taliban, who seemed "to be looking for a face-saving way out of the Bin Ladin issue."[90]

In fact none of the outside pressure had any visible effect on Mullah Omar, who was unconcerned about commerce with the outside world. Omar had virtually no diplomatic contact with the West, since he refused to meet with non-Muslims. The United States learned that at the end of 1999, the Taliban Council of Ministers unanimously reaffirmed that their regime would stick by Bin Ladin. Relations between Bin Ladin and the Taliban leadership were sometimes tense, but the foundation was deep and personal.[91] Indeed, Mullah Omar had executed at least one subordinate who opposed his pro–Bin Ladin policy.[92]

The United States would try tougher sanctions in 2000. Working with Russia (a country involved in an ongoing campaign against Chechen separatists, some of whom received support from Bin Ladin), the United States persuaded the United Nations to adopt Security Council Resolution 1333, which included an embargo on arms shipments to the Taliban, in December 2000.[93] The aim of the resolution was to hit the Taliban where it was most sensitive—

on the battlefield against the Northern Alliance—and criminalize giving them arms and providing military "advisers," which Pakistan had been doing.[94] Yet the passage of the resolution had no visible effect on Omar, nor did it halt the flow of Pakistani military assistance to the Taliban.[95]

U.S. authorities had continued to try to get cooperation from Pakistan in pressing the Taliban to stop sheltering Bin Ladin. President Clinton contacted Sharif again in June 1999, partly to discuss the crisis with India but also to urge Sharif, "in the strongest way I can," to persuade the Taliban to expel Bin Ladin.[96] The President suggested that Pakistan use its control over oil supplies to the Taliban and over Afghan imports through Karachi. Sharif suggested instead that Pakistani forces might try to capture Bin Ladin themselves. Though no one in Washington thought this was likely to happen, President Clinton gave the idea his blessing.[97]

The President met with Sharif in Washington in early July. Though the meeting's main purpose was to seal the Pakistani prime minister's decision to withdraw from the Kargil confrontation in Kashmir, President Clinton complained about Pakistan's failure to take effective action with respect to the Taliban and Bin Ladin. Sharif came back to his earlier proposal and won approval for U.S. assistance in training a Pakistani special forces team for an operation against Bin Ladin. Then, in October 1999, Sharif was deposed by General Pervez Musharraf, and the plan was terminated.[98]

At first, the Clinton administration hoped that Musharraf's coup might create an opening for action on Bin Ladin. A career military officer, Musharraf was thought to have the political strength to confront and influence the Pakistani military intelligence service, which supported the Taliban. Berger speculated that the new government might use Bin Ladin to buy concessions from Washington, but neither side ever developed such an initiative.[99]

By late 1999, more than a year after the embassy bombings, diplomacy with Pakistan, like the efforts with the Taliban, had, according to Under Secretary of State Thomas Pickering, "borne little fruit."[100]

## 4.4 COVERT ACTION

As part of the response to the embassy bombings, President Clinton signed a Memorandum of Notification authorizing the CIA to let its tribal assets use force to capture Bin Ladin and his associates. CIA officers told the tribals that the plan to capture Bin Ladin, which had been "turned off" three months earlier, was back on. The memorandum also authorized the CIA to attack Bin Ladin in other ways. Also, an executive order froze financial holdings that could be linked to Bin Ladin.[101]

The counterterrorism staff at CIA thought it was gaining a better understanding of Bin Ladin and his network. In preparation for briefing the Senate

Select Committee on Intelligence on September 2, Tenet was told that the intelligence community knew more about Bin Ladin's network "than about any other top tier terrorist organization."[102]

The CIA was using this knowledge to disrupt a number of Bin Ladin–associated cells. Working with Albanian authorities, CIA operatives had raided an al Qaeda forgery operation and another terrorist cell in Tirana. These operations may have disrupted a planned attack on the U.S. embassy in Tirana, and did lead to the rendition of a number of al Qaeda–related terrorist operatives. After the embassy bombings, there were arrests in Azerbaijan, Italy, and Britain. Several terrorists were sent to an Arab country. The CIA described working with FBI operatives to prevent a planned attack on the U.S. embassy in Uganda, and a number of suspects were arrested. On September 16, Abu Hajer, one of Bin Ladin's deputies in Sudan and the head of his computer operations and weapons procurement, was arrested in Germany. He was the most important Bin Ladin lieutenant captured thus far. Clarke commented to Berger with satisfaction that August and September had brought the "greatest number of terrorist arrests in a short period of time that we have ever arranged/facilitated."[103]

Given the President's August Memorandum of Notification, the CIA had already been working on new plans for using the Afghan tribals to capture Bin Ladin. During September and October, the tribals claimed to have tried at least four times to ambush Bin Ladin. Senior CIA officials doubted whether any of these ambush attempts had actually occurred. But the tribals did seem to have success in reporting where Bin Ladin was.[104]

This information was more useful than it had been in the past; since the August missile strikes, Bin Ladin had taken to moving his sleeping place frequently and unpredictably and had added new bodyguards. Worst of all, al Qaeda's senior leadership had stopped using a particular means of communication almost immediately after a leak to the *Washington Times*.[105] This made it much more difficult for the National Security Agency to intercept his conversations. But since the tribals seemed to know where Bin Ladin was or would be, an alternative to capturing Bin Ladin would be to mark his location and call in another round of missile strikes.

On November 3, the Small Group met to discuss these problems, among other topics. Preparing Director Tenet for a Small Group meeting in mid-November, the Counterterrorist Center stressed, "At this point we cannot predict when or if a capture operation will be executed by our assets."[106]

U.S. counterterrorism officials also worried about possible domestic attacks. Several intelligence reports, some of dubious sourcing, mentioned Washington as a possible target. On October 26, Clarke's CSG took the unusual step of holding a meeting dedicated to trying "to evaluate the threat of a terrorist attack in the United States by the Usama bin Ladin network."[107] The CSG members were "urged to be as creative as possible in their thinking" about preventing a Bin Ladin attack on U.S. territory. Participants noted that while the FBI had

been given additional resources for such efforts, both it and the CIA were having problems exploiting leads by tracing U.S. telephone numbers and translating documents obtained in cell disruptions abroad. The Justice Department reported that the current guidelines from the Attorney General gave sufficient legal authority for domestic investigation and surveillance.[108]

Though intelligence gave no clear indication of what might be afoot, some intelligence reports mentioned chemical weapons, pointing toward work at a camp in southern Afghanistan called Derunta. On November 4, 1998, the U.S. Attorney's Office for the Southern District of New York unsealed its indictment of Bin Ladin, charging him with conspiracy to attack U.S. defense installations. The indictment also charged that al Qaeda had allied itself with Sudan, Iran, and Hezbollah. The original sealed indictment had added that al Qaeda had "reached an understanding with the government of Iraq that al Qaeda would not work against that government and that on particular projects, specifically including weapons development, al Qaeda would work cooperatively with the Government of Iraq."[109] This passage led Clarke, who for years had read intelligence reports on Iraqi-Sudanese cooperation on chemical weapons, to speculate to Berger that a large Iraqi presence at chemical facilities in Khartoum was "probably a direct result of the Iraq–Al Qida agreement." Clarke added that VX precursor traces near al Shifa were the "exact formula used by Iraq."[110] This language about al Qaeda's "understanding" with Iraq had been dropped, however, when a superseding indictment was filed in November 1998.[111]

On Friday, December 4, 1998, the CIA included an article in the Presidential Daily Brief describing intelligence, received from a friendly government, about a threatened hijacking in the United States. This article was declassified at our request.

The same day, Clarke convened a meeting of his CSG to discuss both the

---

*The following is the text of an item from the Presidential Daily Brief received by President William J. Clinton on December 4, 1998. Redacted material is indicated in brackets.*

SUBJECT: Bin Ladin Preparing to Hijack US Aircraft and Other Attacks

1. Reporting [——] suggests Bin Ladin and his allies are preparing for attacks in the US, including an aircraft hijacking to obtain the release of Shaykh 'Umar 'Abd al-Rahman, Ramzi Yousef, and Muhammad Sadiq 'Awda. One source quoted a senior member of the Gama'at al-Islamiyya (IG) saying that, as of late October, the IG had completed planning for

an operation in the US on behalf of Bin Ladin, but that the operation was on hold. A senior Bin Ladin operative from Saudi Arabia was to visit IG counterparts in the US soon thereafter to discuss options—perhaps including an aircraft hijacking.

- IG leader Islambuli in late September was planning to hijack a US airliner during the "next couple of weeks" to free 'Abd al-Rahman and the other prisoners, according to what may be a different source.
- The same source late last month said that Bin Ladin might implement plans to hijack US aircraft before the beginning of Ramadan on 20 December and that two members of the operational team had evaded security checks during a recent trial run at an unidentified New York airport. [—]

2. Some members of the Bin Ladin network have received hijack training, according to various sources, but no group directly tied to Bin Ladin's al-Qa'ida organization has ever carried out an aircraft hijacking. Bin Ladin could be weighing other types of operations against US aircraft. According to [—] the IG in October obtained SA-7 missiles and intended to move them from Yemen into Saudi Arabia to shoot down an Egyptian plane or, if unsuccessful, a US military or civilian aircraft.

- A [—] in October told us that unspecified "extremist elements" in Yemen had acquired SA-7s. [—]

3. [—] indicate the Bin Ladin organization or its allies are moving closer to implementing anti-US attacks at unspecified locations, but we do not know whether they are related to attacks on aircraft. A Bin Ladin associate in Sudan late last month told a colleague in Kandahar that he had shipped a group of containers to Afghanistan. Bin Ladin associates also talked about the movement of containers to Afghanistan before the East Africa bombings.

- In other [—] Bin Ladin associates last month discussed picking up a package in Malaysia. One told his colleague in Malaysia that "they" were in the "ninth month [of pregnancy]."
- An alleged Bin Ladin supporter in Yemen late last month remarked to his mother that he planned to work in "commerce" from abroad and said his impending "marriage," which would take place soon, would be a "surprise." "Commerce" and "marriage" often are codewords for terrorist attacks. [—]

hijacking concern and the antiaircraft missile threat. To address the hijacking warning, the group agreed that New York airports should go to maximum security starting that weekend. They agreed to boost security at other East coast airports. The CIA agreed to distribute versions of the report to the FBI and FAA to pass to the New York Police Department and the airlines. The FAA issued a security directive on December 8, with specific requirements for more intensive air carrier screening of passengers and more oversight of the screening process, at all three New York City area airports.[112]

The intelligence community could learn little about the source of the information. Later in December and again in early January 1999, more information arrived from the same source, reporting that the planned hijacking had been stalled because two of the operatives, who were sketchily described, had been arrested near Washington, D.C. or New York. After investigation, the FBI could find no information to support the hijack threat; nor could it verify any arrests like those described in the report. The FAA alert at the New York area airports ended on January 31, 1999.[113]

On December 17, the day after the United States and Britain began their Desert Fox bombing campaign against Iraq, the Small Group convened to discuss intelligence suggesting imminent Bin Ladin attacks on the U.S. embassies in Qatar and Ethiopia. The next day, Director Tenet sent a memo to the President, the cabinet, and senior officials throughout the government describing reports that Bin Ladin planned to attack U.S. targets very soon, possibly over the next few days, before Ramadan celebrations began. Tenet said he was "greatly concerned."[114]

With alarms sounding, members of the Small Group considered ideas about how to respond to or prevent such attacks. Generals Shelton and Zinni came up with military options. Special Operations Forces were later told that they might be ordered to attempt very high-risk in-and-out raids either in Khartoum, to capture a senior Bin Ladin operative known as Abu Hafs the Mauritanian—who appeared to be engineering some of the plots—or in Kandahar, to capture Bin Ladin himself. Shelton told us that such operations are not risk free, invoking the memory of the 1993 "Black Hawk down" fiasco in Mogadishu.[115]

The CIA reported on December 18 that Bin Ladin might be traveling to Kandahar and could be targeted there with cruise missiles. Vessels with Tomahawk cruise missiles were on station in the Arabian Sea, and could fire within a few hours of receiving target data.[116]

On December 20, intelligence indicated Bin Ladin would be spending the night at the Haji Habash house, part of the governor's residence in Kandahar. The chief of the Bin Ladin unit, "Mike," told us that he promptly briefed Tenet and his deputy, John Gordon. From the field, the CIA's Gary Schroen advised: "Hit him tonight—we may not get another chance." An urgent teleconference of principals was arranged.[117]

The principals considered a cruise missile strike to try to kill Bin Ladin. One issue they discussed was the potential collateral damage—the number of innocent bystanders who would be killed or wounded. General Zinni predicted a number well over 200 and was concerned about damage to a nearby mosque. The senior intelligence officer on the Joint Staff apparently made a different calculation, estimating half as much collateral damage and not predicting damage to the mosque. By the end of the meeting, the principals decided against recommending to the President that he order a strike. A few weeks later, in January 1999, Clarke wrote that the principals had thought the intelligence only half reliable and had worried about killing or injuring perhaps 300 people. Tenet said he remembered doubts about the reliability of the source and concern about hitting the nearby mosque. "Mike" remembered Tenet telling him that the military was concerned that a few hours had passed since the last sighting of Bin Ladin and that this persuaded everyone that the chance of failure was too great.[118]

Some lower-level officials were angry. "Mike" reported to Schroen that he had been unable to sleep after this decision. "I'm sure we'll regret not acting last night," he wrote, criticizing the principals for "worrying that some stray shrapnel might hit the Habash mosque and 'offend' Muslims." He commented that they had not shown comparable sensitivity when deciding to bomb Muslims in Iraq. The principals, he said, were "obsessed" with trying to get others—Saudis, Pakistanis, Afghan tribals—to "do what we won't do." Schroen was disappointed too. "We should have done it last night," he wrote. "We may well come to regret the decision not to go ahead."[119] The Joint Staff's deputy director for operations agreed, even though he told us that later intelligence appeared to show that Bin Ladin had left his quarters before the strike would have occurred. Missing Bin Ladin, he said, "would have caused us a hell of a problem, but it was a shot we should have taken, and we would have had to pay the price."[120]

The principals began considering other, more aggressive covert alternatives using the tribals. CIA officers suggested that the tribals would prefer to try a raid rather than a roadside ambush because they would have better control, it would be less dangerous, and it played more to their skills and experience. But everyone knew that if the tribals were to conduct such a raid, guns would be blazing. The current Memorandum of Notification instructed the CIA to capture Bin Ladin and to use lethal force only in self-defense. Work now began on a new memorandum that would give the tribals more latitude. The intention was to say that they could use lethal force if the attempted capture seemed impossible to complete successfully.[121]

Early drafts of this highly sensitive document emphasized that it authorized only a capture operation. The tribals were to be paid only if they captured Bin Ladin, not if they killed him. Officials throughout the government approved this draft. But on December 21, the day after principals decided not to launch

the cruise missile strike against Kandahar, the CIA's leaders urged strengthening the language to allow the tribals to be paid whether Bin Ladin was captured *or* killed. Berger and Tenet then worked together to take this line of thought even further.[122]

They finally agreed, as Berger reported to President Clinton, that an extraordinary step was necessary. The new memorandum would allow the killing of Bin Ladin if the CIA and the tribals judged that capture was not feasible (a judgment it already seemed clear they had reached). The Justice Department lawyer who worked on the draft told us that what was envisioned was a group of tribals assaulting a location, leading to a shoot-out. Bin Ladin and others would be captured if possible, but probably would be killed. The administration's position was that under the law of armed conflict, killing a person who posed an imminent threat to the United States would be an act of self-defense, not an assassination. On Christmas Eve 1998, Berger sent a final draft to President Clinton, with an explanatory memo. The President approved the document.[123]

Because the White House considered this operation highly sensitive, only a tiny number of people knew about this Memorandum of Notification. Berger arranged for the NSC's legal adviser to inform Albright, Cohen, Shelton, and Reno. None was allowed to keep a copy. Congressional leaders were briefed, as required by law. Attorney General Reno had sent a letter to the President expressing her concern: she warned of possible retaliation, including the targeting of U.S. officials. She did not pose any legal objection. A copy of the final document, along with the carefully crafted instructions that were to be sent to the tribals, was given to Tenet.[124]

A message from Tenet to CIA field agents directed them to communicate to the tribals the instructions authorized by the President: the United States preferred that Bin Ladin and his lieutenants be captured, but if a successful capture operation was not feasible, the tribals were permitted to kill them. The instructions added that the tribals must avoid killing others unnecessarily and must not kill or abuse Bin Ladin or his lieutenants if they surrendered. Finally, the tribals would not be paid if this set of requirements was not met.[125]

The field officer passed these instructions to the tribals word for word. But he prefaced the directions with a message: "From the American President down to the average man in the street, we want him [Bin Ladin] stopped." If the tribals captured Bin Ladin, the officer assured them that he would receive a fair trial under U.S. law and be treated humanely. The CIA officer reported that the tribals said they "fully understand the contents, implications and the spirit of the message" and that that their response was, "We will try our best to capture Bin Ladin alive and will have no intention of killing or harming him on purpose." The tribals explained that they wanted to prove that their standards of behavior were more civilized than those of Bin Ladin and his band of terrorists. In an additional note addressed to Schroen, the tribals noted that if they were to adopt Bin Ladin's ethics, "we would have finished the job long before,"

but they had been limited by their abilities and "by our beliefs and laws we have to respect."[126]

Schroen and "Mike" were impressed by the tribals' reaction. Schroen cabled that the tribals were not in it for the money but as an investment in the future of Afghanistan. "Mike" agreed that the tribals' reluctance to kill was not a "showstopper." "From our view," he wrote, "that seems in character and fair enough."[127]

Policymakers in the Clinton administration, including the President and his national security advisor, told us that the President's intent regarding covert action against Bin Ladin was clear: he wanted him dead. This intent was never well communicated or understood within the CIA. Tenet told the Commission that except in one specific case (discussed later), the CIA was authorized to kill Bin Ladin only in the context of a capture operation. CIA senior managers, operators, and lawyers confirmed this understanding. "We always talked about how much easier it would have been to kill him," a former chief of the Bin Ladin unit said.[128]

In February 1999, another draft Memorandum of Notification went to President Clinton. It asked him to allow the CIA to give exactly the same guidance to the Northern Alliance as had just been given to the tribals: they could kill Bin Ladin if a successful capture operation was not feasible. On this occasion, however, President Clinton crossed out key language he had approved in December and inserted more ambiguous language. No one we interviewed could shed light on why the President did this. President Clinton told the Commission that he had no recollection of why he rewrote the language.[129]

Later in 1999, when legal authority was needed for enlisting still other collaborators and for covering a wider set of contingencies, the lawyers returned to the language used in August 1998, which authorized force only in the context of a capture operation. Given the closely held character of the document approved in December 1998, and the subsequent return to the earlier language, it is possible to understand how the former White House officials and the CIA officials might disagree as to whether the CIA was ever authorized by the President to kill Bin Ladin.[130]

The dispute turned out to be somewhat academic, as the limits of available legal authority were not tested. Clarke commented to Berger that "despite 'expanded' authority for CIA's sources to engage in direct action, they have shown no inclination to do so." He added that it was his impression that the CIA thought the tribals unlikely to act against Bin Ladin and hence relying on them was "unrealistic."[131] Events seemed to bear him out, since the tribals did not stage an attack on Bin Ladin or his associates during 1999.

The tribals remained active collectors of intelligence, however, providing good but not predictive information about Bin Ladin's whereabouts. The CIA also tried to improve its intelligence reporting on Bin Ladin by what Tenet's assistant director for collection, the indefatigable Charles Allen, called an "all-out, all-agency, seven-days-a-week" effort.[132] The effort might have had an

effect. On January 12, 1999, Clarke wrote Berger that the CIA's confidence in the tribals' reporting had increased. It was now higher than it had been on December 20.[133]

In February 1999, Allen proposed flying a U-2 mission over Afghanistan to build a baseline of intelligence outside the areas where the tribals had coverage. Clarke was nervous about such a mission because he continued to fear that Bin Ladin might leave for someplace less accessible. He wrote Deputy National Security Advisor Donald Kerrick that one reliable source reported Bin Ladin's having met with Iraqi officials, who "may have offered him asylum." Other intelligence sources said that some Taliban leaders, though not Mullah Omar, had urged Bin Ladin to go to Iraq. If Bin Ladin actually moved to Iraq, wrote Clarke, his network would be at Saddam Hussein's service, and it would be "virtually impossible" to find him. Better to get Bin Ladin in Afghanistan, Clarke declared.[134] Berger suggested sending one U-2 flight, but Clarke opposed even this. It would require Pakistani approval, he wrote; and "Pak[istan's] intel[ligence service] is in bed with" Bin Ladin and would warn him that the United States was getting ready for a bombing campaign: "Armed with that knowledge, old wily Usama will likely boogie to Baghdad."[135] Though told also by Bruce Riedel of the NSC staff that Saddam Hussein wanted Bin Ladin in Baghdad, Berger conditionally authorized a single U-2 flight. Allen meanwhile had found other ways of getting the information he wanted. So the U-2 flight never occurred.[136]

## 4.5 SEARCHING FOR FRESH OPTIONS

### "Boots on the Ground?"

Starting on the day the August 1998 strikes were launched, General Shelton had issued a planning order to prepare follow-on strikes and think beyond just using cruise missiles.[137] The initial strikes had been called Operation Infinite Reach. The follow-on plans were given the code name Operation Infinite Resolve.

At the time, any actual military action in Afghanistan would have been carried out by General Zinni's Central Command. This command was therefore the locus for most military planning. Zinni was even less enthusiastic than Cohen and Shelton about follow-on cruise missile strikes. He knew that the Tomahawks did not always hit their targets. After the August 20 strikes, President Clinton had had to call Pakistani Prime Minister Sharif to apologize for a wayward missile that had killed several people in a Pakistani village. Sharif had been understanding, while commenting on American "overkill."[138]

Zinni feared that Bin Ladin would in the future locate himself in cities, where U.S. missiles could kill thousands of Afghans. He worried also lest Pakistani authorities not get adequate warning, think the missiles came from India,

and do something that everyone would later regret. Discussing potential repercussions in the region of his military responsibility, Zinni said, "It was easy to take the shot from Washington and walk away from it. We had to live there."[139]

Zinni's distinct preference would have been to build up counterterrorism capabilities in neighboring countries such as Uzbekistan. But he told us that he could not drum up much interest in or money for such a purpose from Washington, partly, he thought, because these countries had dictatorial governments.[140]

After the decision—in which fear of collateral damage was an important factor—not to use cruise missiles against Kandahar in December 1998, Shelton and officers in the Pentagon developed plans for using an AC-130 gunship instead of cruise missile strikes. Designed specifically for the special forces, the version of the AC-130 known as "Spooky" can fly in fast or from high altitude, undetected by radar; guided to its zone by extraordinarily complex electronics, it is capable of rapidly firing precision-guided 25, 40, and 105 mm projectiles. Because this system could target more precisely than a salvo of cruise missiles, it had a much lower risk of causing collateral damage. After giving Clarke a briefing and being encouraged to proceed, Shelton formally directed Zinni and General Peter Schoomaker, who headed the Special Operations Command, to develop plans for an AC-130 mission against Bin Ladin's headquarters and infrastructure in Afghanistan. The Joint Staff prepared a decision paper for deployment of the Special Operations aircraft.[141]

Though Berger and Clarke continued to indicate interest in this option, the AC-130s were never deployed. Clarke wrote at the time that Zinni opposed their use, and John Maher, the Joint Staff's deputy director of operations, agreed that this was Zinni's position. Zinni himself does not recall blocking the option. He told us that he understood the Special Operations Command had never thought the intelligence good enough to justify actually moving AC-130s into position. Schoomaker says, on the contrary, that he thought the AC-130 option feasible.[142]

The most likely explanation for the two generals' differing recollections is that both of them thought serious preparation for any such operations would require a long-term redeployment of Special Operations forces to the Middle East or South Asia. The AC-130s would need bases because the aircraft's unrefueled range was only a little over 2,000 miles. They needed search-and-rescue backup, which would have still less range. Thus an AC-130 deployment had to be embedded in a wider political and military concept involving Pakistan or other neighboring countries to address issues relating to basing and overflight. No one ever put such an initiative on the table. Zinni therefore cautioned about simply ordering up AC-130 deployments for a quick strike; Schoomaker planned for what he saw as a practical strike option; and the underlying issues were not fully engaged. The Joint Staff decision paper was never turned into an interagency policy paper.

The same was true for the option of using ground units from the Special Operations Command. Within the command, some officers—such as Schoomaker—wanted the mission of "putting boots on the ground" to get at Bin Ladin and al Qaeda. At the time, Special Operations was designated as a "supporting command," not a "supported command": that is, it supported a theater commander and did not prepare its own plans for dealing with al Qaeda. Schoomaker proposed to Shelton and Cohen that Special Operations become a supported command, but the proposal was not adopted. Had it been accepted, he says, he would have taken on the al Qaeda mission instead of deferring to Zinni. Lieutenant General William Boykin, the current deputy under secretary of defense for intelligence and a founding member of Delta Force, told us that "opportunities were missed because of an unwillingness to take risks and a lack of vision and understanding."[143]

President Clinton relied on the advice of General Shelton, who informed him that without intelligence on Bin Ladin's location, a commando raid's chance of failure was high. Shelton told President Clinton he would go forward with "boots on the ground" if the President ordered him to do so; however, he had to ensure that the President was completely aware of the large logistical problems inherent in a military operation.[144]

The Special Operations plans were apparently conceived as another quick strike option—an option to insert forces after the United States received actionable intelligence. President Clinton told the Commission that "if we had had really good intelligence about . . . where [Usama Bin Ladin] was, I would have done it." Zinni and Schoomaker did make preparations for possible very high risk in-and-out operations to capture or kill terrorists. Cohen told the Commission that the notion of putting military personnel on the ground without some reasonable certitude that Bin Ladin was in a particular location would have resulted in the mission's failure and the loss of life in a fruitless effort.[145] None of these officials was aware of the ambitious plan developed months earlier by lower-level Defense officials.

In our interviews, some military officers repeatedly invoked the analogy of Desert One and the failed 1980 hostage rescue mission in Iran.[146] They were dubious about a quick strike approach to using Special Operations Forces, which they thought complicated and risky. Such efforts would have required bases in the region, but all the options were unappealing. Pro-Taliban elements of Pakistan's military might warn Bin Ladin or his associates of pending operations. With nearby basing options limited, an alternative was to fly from ships in the Arabian Sea or from land bases in the Persian Gulf, as was done after 9/11. Such operations would then have to be supported from long distances, overflying the airspace of nations that might not have been supportive or aware of U.S. efforts.[147]

However, if these hurdles were addressed, and if the military could then operate regularly in the region for a long period, perhaps clandestinely, it might

attempt to gather intelligence and wait for an opportunity. One Special Operations commander said his view of actionable intelligence was that if you "give me the action, I will give you the intelligence."[148] But this course would still be risky, in light both of the difficulties already mentioned and of the danger that U.S. operations might fail disastrously. We have found no evidence that such a long-term political-military approach for using Special Operations Forces in the region was proposed to or analyzed by the Small Group, even though such capability had been honed for at least a decade within the Defense Department.

Therefore the debate looked to some like bold proposals from civilians meeting hypercaution from the military. Clarke saw it this way. Of the military, he said to us, "They were very, very, very reluctant."[149] But from another perspective, poorly informed proposals for bold action were pitted against experienced professional judgment. That was how Secretary of Defense Cohen viewed it. He said to us: "I would have to place my judgment call in terms of, do I believe that the chairman of the Joint Chiefs, former commander of Special Forces command, is in a better position to make a judgment on the feasibility of this than, perhaps, Mr. Clarke?"[150]

Beyond a large-scale political-military commitment to build up a covert or clandestine capability using American personnel on the ground, either military or CIA, there was a still larger option that could have been considered—invading Afghanistan itself. Every official we questioned about the possibility of an invasion of Afghanistan said that it was almost unthinkable, absent a provocation such as 9/11, because of poor prospects for cooperation from Pakistan and other nations and because they believed the public would not support it. Cruise missiles were and would remain the only military option on the table.

**The Desert Camp, February 1999**

Early in 1999, the CIA received reporting that Bin Ladin was spending much of his time at one of several camps in the Afghan desert south of Kandahar. At the beginning of February, Bin Ladin was reportedly located in the vicinity of the Sheikh Ali camp, a desert hunting camp being used by visitors from a Gulf state. Public sources have stated that these visitors were from the United Arab Emirates.[151]

Reporting from the CIA's assets provided a detailed description of the hunting camp, including its size, location, resources, and security, as well as of Bin Ladin's smaller, adjacent camp.[152] Because this was not in an urban area, missiles launched against it would have less risk of causing collateral damage. On February 8, the military began to ready itself for a possible strike.[153] The next day, national technical intelligence confirmed the location and description of the larger camp and showed the nearby presence of an official aircraft of the United Arab Emirates. But the location of Bin Ladin's quarters could not be pinned down so precisely.[154] The CIA did its best to answer a host of questions

about the larger camp and its residents and about Bin Ladin's daily schedule and routines to support military contingency planning. According to reporting from the tribals, Bin Ladin regularly went from his adjacent camp to the larger camp where he visited the Emiratis; the tribals expected him to be at the hunting camp for such a visit at least until midmorning on February 11.[155] Clarke wrote to Berger's deputy on February 10 that the military was then doing targeting work to hit the main camp with cruise missiles and should be in position to strike the following morning.[156] Speaker of the House Dennis Hastert appears to have been briefed on the situation.[157]

No strike was launched. By February 12 Bin Ladin had apparently moved on, and the immediate strike plans became moot.[158] According to CIA and Defense officials, policymakers were concerned about the danger that a strike would kill an Emirati prince or other senior officials who might be with Bin Ladin or close by. Clarke told us the strike was called off after consultations with Director Tenet because the intelligence was dubious, and it seemed to Clarke as if the CIA was presenting an option to attack America's best counterterrorism ally in the Gulf. The lead CIA official in the field, Gary Schroen, felt that the intelligence reporting in this case was very reliable; the Bin Ladin unit chief, "Mike," agreed. Schroen believes today that this was a lost opportunity to kill Bin Ladin before 9/11.[159]

Even after Bin Ladin's departure from the area, CIA officers hoped he might return, seeing the camp as a magnet that could draw him for as long as it was still set up. The military maintained readiness for another strike opportunity.[160] On March 7, 1999, Clarke called a UAE official to express his concerns about possible associations between Emirati officials and Bin Ladin. Clarke later wrote in a memorandum of this conversation that the call had been approved at an interagency meeting and cleared with the CIA.[161] When the former Bin Ladin unit chief found out about Clarke's call, he questioned CIA officials, who denied having given such a clearance.[162] Imagery confirmed that less than a week after Clarke's phone call the camp was hurriedly dismantled, and the site was deserted.[163] CIA officers, including Deputy Director for Operations Pavitt, were irate. "Mike" thought the dismantling of the camp erased a possible site for targeting Bin Ladin.[164]

The United Arab Emirates was becoming both a valued counterterrorism ally of the United States and a persistent counterterrorism problem. From 1999 through early 2001, the United States, and President Clinton personally, pressed the UAE, one of the Taliban's only travel and financial outlets to the outside world, to break off its ties and enforce sanctions, especially those relating to flights to and from Afghanistan.[165] These efforts achieved little before 9/11.

In July 1999, UAE Minister of State for Foreign Affairs Hamdan bin Zayid threatened to break relations with the Taliban over Bin Ladin.[166] The Taliban did not take him seriously, however. Bin Zayid later told an American diplo-

mat that the UAE valued its relations with the Taliban because the Afghan rad-
icals offered a counterbalance to "Iranian dangers" in the region, but he also
noted that the UAE did not want to upset the United States.[167]

### Looking for New Partners

Although not all CIA officers had lost faith in the tribals' capabilities—many
judged them to be good reporters—few believed they would carry out an
ambush of Bin Ladin. The chief of the Counterterrorist Center compared rely-
ing on the tribals to playing the lottery.[168] He and his associates, supported by
Clarke, pressed for developing a partnership with the Northern Alliance, even
though doing so might bring the United States squarely behind one side in
Afghanistan's long-running civil war.

The Northern Alliance was dominated by Tajiks and drew its strength
mainly from the northern and eastern parts of Afghanistan. In contrast, Taliban
members came principally from Afghanistan's most numerous ethnic group, the
Pashtuns, who are concentrated in the southern part of the country, extending
into the North-West Frontier and Baluchistan provinces of Pakistan.[169]

Because of the Taliban's behavior and its association with Pakistan, the
Northern Alliance had been able at various times to obtain assistance from
Russia, Iran, and India. The alliance's leader was Afghanistan's most renowned
military commander, Ahmed Shah Massoud. Reflective and charismatic, he had
been one of the true heroes of the war against the Soviets. But his bands had
been charged with more than one massacre, and the Northern Alliance was
widely thought to finance itself in part through trade in heroin. Nor had Mas-
soud shown much aptitude for governing except as a ruthless warlord. Never-
theless, Tenet told us Massoud seemed the most interesting possible new ally
against Bin Ladin.[170]

In February 1999, Tenet sought President Clinton's authorization to enlist
Massoud and his forces as partners. In response to this request, the President
signed the Memorandum of Notification whose language he personally
altered. Tenet says he saw no significance in the President's changes. So far as
he was concerned, it was the language of August 1998, expressing a preference
for capture but accepting the possibility that Bin Ladin could not be brought
out alive. "We were plowing the same ground," Tenet said.[171]

CIA officers described Massoud's reaction when he heard that the United
States wanted him to capture and not kill Bin Ladin. One characterized Mas-
soud's body language as "a wince." Schroen recalled Massoud's response as "You
guys are crazy—you haven't changed a bit." In Schroen's opinion, the capture
proviso inhibited Massoud and his forces from going after Bin Ladin but did
not completely stop them.[172] The idea, however, was a long shot. Bin Ladin's
usual base of activity was near Kandahar, far from the front lines of Taliban oper-
ations against the Northern Alliance.

**Kandahar, May 1999**

It was in Kandahar that perhaps the last, and most likely the best, opportunity arose for targeting Bin Ladin with cruise missiles before 9/11. In May 1999, CIA assets in Afghanistan reported on Bin Ladin's location in and around Kandahar over the course of five days and nights. The reporting was very detailed and came from several sources. If this intelligence was not "actionable," working-level officials said at the time and today, it was hard for them to imagine how any intelligence on Bin Ladin in Afghanistan would meet the standard. Communications were good, and the cruise missiles were ready. "This was in our strike zone," a senior military officer said. "It was a fat pitch, a home run." He expected the missiles to fly. When the decision came back that they should stand down, not shoot, the officer said, "we all just slumped." He told us he knew of no one at the Pentagon or the CIA who thought it was a bad gamble. Bin Ladin "should have been a dead man" that night, he said.[173]

Working-level CIA officials agreed. While there was a conflicting intelligence report about Bin Ladin's whereabouts, the experts discounted it. At the time, CIA working-level officials were told by their managers that the strikes were not ordered because the military doubted the intelligence and worried about collateral damage. Replying to a frustrated colleague in the field, the Bin Ladin unit chief wrote: "having a chance to get [Bin Ladin] three times in 36 hours and foregoing the chance each time has made me a bit angry. . . . [T]he DCI finds himself alone at the table, with the other princip[als] basically saying 'we'll go along with your decision Mr. Director,' and implicitly saying that the Agency will hang alone if the attack doesn't get Bin Ladin."[174] But the military officer quoted earlier recalled that the Pentagon had been willing to act. He told us that Clarke informed him and others that Tenet assessed the chance of the intelligence being accurate as 50–50. This officer believed that Tenet's assessment was the key to the decision.[175]

Tenet told us he does not remember any details about this episode, except that the intelligence came from a single uncorroborated source and that there was a risk of collateral damage. The story is further complicated by Tenet's absence from the critical principals meeting on this strike (he was apparently out of town); his deputy, John Gordon, was representing the CIA. Gordon recalled having presented the intelligence in a positive light, with appropriate caveats, but stating that this intelligence was about as good as it could get.[176]

Berger remembered only that in all such cases, the call had been Tenet's. Berger felt sure that Tenet was eager to get Bin Ladin. In his view, Tenet did his job responsibly. "George would call and say, 'We just don't have it,'" Berger said.[177]

The decision not to strike in May 1999 may now seem hard to understand. In fairness, we note two points: First, in December 1998, the principals' wariness about ordering a strike appears to have been vindicated: Bin Ladin left his room unexpectedly, and if a strike had been ordered he would not have been

hit. Second, the administration, and the CIA in particular, was in the midst of intense scrutiny and criticism in May 1999 because faulty intelligence had just led the United States to mistakenly bomb the Chinese embassy in Belgrade during the NATO war against Serbia. This episode may have made officials more cautious than might otherwise have been the case.[178]

From May 1999 until September 2001, policymakers did not again actively consider a missile strike against Bin Ladin.[179] The principals did give some further consideration in 1999 to more general strikes, reviving Clarke's "Delenda" notion of hitting camps and infrastructure to disrupt al Qaeda's organization. In the first months of 1999, the Joint Staff had developed broader target lists to undertake a "focused campaign" against the infrastructure of Bin Ladin's network and to hit Taliban government sites as well. General Shelton told us that the Taliban targets were "easier" to hit and more substantial.[180]

Part of the context for considering broader strikes in the summer of 1999 was renewed worry about Bin Ladin's ambitions to acquire weapons of mass destruction. In May and June, the U.S. government received a flurry of ominous reports, including more information about chemical weapons training or development at the Derunta camp and possible attempts to amass nuclear material at Herat.[181]

By late June, U.S. and other intelligence services had concluded that al Qaeda was in pre-attack mode, perhaps again involving Abu Hafs the Mauritanian. On June 25, at Clarke's request, Berger convened the Small Group in his office to discuss the alert, Bin Ladin's WMD programs, and his location. "Should we pre-empt by attacking UBL facilities?" Clarke urged Berger to ask his colleagues.[182]

In his handwritten notes on the meeting paper, Berger jotted down the presence of 7 to 11 families in the Tarnak Farms facility, which could mean 60–65 casualties. Berger noted the possible "slight impact" on Bin Ladin and added, "if he responds, we're blamed."[183] The NSC staff raised the option of waiting until after a terrorist attack, and then retaliating, including possible strikes on the Taliban. But Clarke observed that Bin Ladin would probably empty his camps after an attack.[184]

The military route seemed to have reached a dead end. In December 1999, Clarke urged Berger to ask the principals to ask themselves: "Why have there been no real options lately for direct US military action?"[185] There are no notes recording whether the question was discussed or, if it was, how it was answered.

Reports of possible attacks by Bin Ladin kept coming in throughout 1999. They included a threat to blow up the FBI building in Washington, D.C. In September, the CSG reviewed a possible threat to a flight out of Los Angeles or New York.[186] These warnings came amid dozens of others that flooded in.

With military and diplomatic options practically exhausted by the summer of 1999, the U.S. government seemed to be back where it had been in the summer of 1998—relying on the CIA to find some other option. That

picture also seemed discouraging. Several disruptions and renditions aimed against the broader al Qaeda network had succeeded.[187] But covert action efforts in Afghanistan had not been fruitful.

In mid-1999, new leaders arrived at the Counterterrorist Center and the Bin Ladin unit. The new director of CTC, replacing "Jeff," was Cofer Black. The new head of the section that included the Bin Ladin unit was "Richard." Black, "Richard," and their colleagues began working on a new operational strategy for attacking al Qaeda; their starting point was to get better intelligence, relying more on the CIA's own sources and less on the tribals.[188]

In July 1999, President Clinton authorized the CIA to work with several governments to capture Bin Ladin, and extended the scope of efforts to Bin Ladin's principal lieutenants. The President reportedly also authorized a covert action under carefully limited circumstances which, if successful, would have resulted in Bin Ladin's death.[189] Attorney General Reno again expressed concerns on policy grounds. She was worried about the danger of retaliation. The CIA also developed the short-lived effort to work with a Pakistani team that we discussed earlier, and an initiative to work with Uzbekistan. The Uzbeks needed basic equipment and training. No action could be expected before March 2000, at the earliest.[190]

In fall 1999, DCI Tenet unveiled the CIA's new Bin Ladin strategy. It was called, simply, "the Plan." The Plan proposed continuing disruption and rendition operations worldwide. It announced a program for hiring and training better officers with counterterrorism skills, recruiting more assets, and trying to penetrate al Qaeda's ranks. The Plan aimed to close gaps in technical intelligence collection (signal and imagery) as well. In addition, the CIA would increase contacts with the Northern Alliance rebels fighting the Taliban.[191]

With a new operational strategy, the CIA evaluated its capture options. None scored high marks. The CIA had no confidence in the Pakistani effort. In the event that Bin Ladin traveled to the Kandahar region in southern Afghanistan, the tribal network there was unlikely to attack a heavily guarded Bin Ladin; the Counterterrorist Center rated the chance of success at less than 10 percent. To the northwest, the Uzbeks might be ready for a cross-border sortie in six months; their chance of success was also rated at less than 10 percent.[192]

In the northeast were Massoud's Northern Alliance forces—perhaps the CIA's best option. In late October, a group of officers from the Counterterrorist Center flew into the Panjshir Valley to meet up with Massoud, a hazardous journey in rickety helicopters that would be repeated several times in the future. Massoud appeared committed to helping the United States collect intelligence on Bin Ladin's activities and whereabouts and agreed to try to capture him if the opportunity arose. The Bin Ladin unit was satisfied that its reporting on Bin Ladin would now have a second source. But it also knew that Massoud would act against Bin Ladin only if his own interests and those of the

United States intersected. By early December, the CIA rated this possibility at less than 15 percent.[193]

Finally, the CIA considered the possibility of putting U.S. personnel on the ground in Afghanistan. The CIA had been discussing this option with Special Operations Command and found enthusiasm on the working level but reluctance at higher levels. CIA saw a 95 percent chance of Special Operations Command forces capturing Bin Ladin if deployed—but less than a 5 percent chance of such a deployment. Sending CIA officers into Afghanistan was to be considered "if the <u>gain</u> clearly outweighs the <u>risk</u>"—but at this time no such gains presented themselves to warrant the risk.[194]

As mentioned earlier, such a protracted deployment of U.S. Special Operations Forces into Afghanistan, perhaps as part of a team joined to a deployment of the CIA's own officers, would have required a major policy initiative (probably combined with efforts to secure the support of at least one or two neighboring countries) to make a long-term commitment, establish a durable presence on the ground, and be prepared to accept the associated risks and costs. Such a military plan was never developed for interagency consideration before 9/11. As 1999 came to a close, the CIA had a new strategic plan in place for capturing Bin Ladin, but no option was rated as having more than a 15 percent chance of achieving that objective.

# 5

# AL QAEDA AIMS AT THE
# AMERICAN HOMELAND

## 5.1 TERRORIST ENTREPRENEURS

By early 1999, al Qaeda was already a potent adversary of the United States. Bin Ladin and his chief of operations, Abu Hafs al Masri, also known as Mohammed Atef, occupied undisputed leadership positions atop al Qaeda's organizational structure. Within this structure, al Qaeda's worldwide terrorist operations relied heavily on the ideas and work of enterprising and strong-willed field commanders who enjoyed considerable autonomy. To understand how the organization actually worked and to introduce the origins of the 9/11 plot, we briefly examine three of these subordinate commanders: Khalid Sheikh Mohammed (KSM), Riduan Isamuddin (better known as Hambali), and Abd al Rahim al Nashiri. We will devote the most attention to Khalid Sheikh Mohammed, the chief manager of the "planes operation."

**Khalid Sheikh Mohammed**
No one exemplifies the model of the terrorist entrepreneur more clearly than Khalid Sheikh Mohammed, the principal architect of the 9/11 attacks. KSM followed a rather tortuous path to his eventual membership in al Qaeda.[1] Highly educated and equally comfortable in a government office or a terrorist safehouse, KSM applied his imagination, technical aptitude, and managerial skills to hatching and planning an extraordinary array of terrorist schemes. These ideas included conventional car bombing, political assassination, aircraft bombing, hijacking, reservoir poisoning, and, ultimately, the use of aircraft as missiles guided by suicide operatives.

Like his nephew Ramzi Yousef (three years KSM's junior), KSM grew up in Kuwait but traces his ethnic lineage to the Baluchistan region straddling Iran and Pakistan. Raised in a religious family, KSM claims to have joined the Muslim Brotherhood at age 16 and to have become enamored of violent jihad at youth camps in the desert. In 1983, following his graduation from secondary

**Detainee Interrogation Reports**

Chapters 5 and 7 rely heavily on information obtained from captured al Qaeda members. A number of these "detainees" have firsthand knowledge of the 9/11 plot.

Assessing the truth of statements by these witnesses—sworn enemies of the United States—is challenging. Our access to them has been limited to the review of intelligence reports based on communications received from the locations where the actual interrogations take place. We submitted questions for use in the interrogations, but had no control over whether, when, or how questions of particular interest would be asked. Nor were we allowed to talk to the interrogators so that we could better judge the credibility of the detainees and clarify ambiguities in the reporting. We were told that our requests might disrupt the sensitive interrogation process.

We have nonetheless decided to include information from captured 9/11 conspirators and al Qaeda members in our report. We have evaluated their statements carefully and have attempted to corroborate them with documents and statements of others. In this report, we indicate where such statements provide the foundation for our narrative. We have been authorized to identify by name only ten detainees whose custody has been confirmed officially by the U.S. government.[2]

school, KSM left Kuwait to enroll at Chowan College, a small Baptist school in Murfreesboro, North Carolina. After a semester at Chowan, KSM transferred to North Carolina Agricultural and Technical State University in Greensboro, which he attended with Yousef's brother, another future al Qaeda member. KSM earned a degree in mechanical engineering in December 1986.[3]

Although he apparently did not attract attention for extreme Islamist beliefs or activities while in the United States, KSM plunged into the anti-Soviet Afghan jihad soon after graduating from college. Visiting Pakistan for the first time in early 1987, he traveled to Peshawar, where his brother Zahid introduced him to the famous Afghan *mujahid* Abdul Rasul Sayyaf, head of the Hizbul-Ittihad El-Islami (Islamic Union Party). Sayyaf became KSM's mentor and provided KSM with military training at Sayyaf's Sada camp. KSM claims he then fought the Soviets and remained at the front for three months before being summoned to perform administrative duties for Abdullah Azzam. KSM next took a job working for an electronics firm that catered to the communications needs of Afghan groups, where he learned about drills used to excavate caves in Afghanistan.[4]

Between 1988 and 1992, KSM helped run a nongovernmental organization

(NGO) in Peshawar and Jalalabad; sponsored by Sayyaf, it was designed to aid young Afghan mujahideen. In 1992, KSM spent some time fighting alongside the mujahideen in Bosnia and supporting that effort with financial donations. After returning briefly to Pakistan, he moved his family to Qatar at the suggestion of the former minister of Islamic affairs of Qatar, Sheikh Abdallah bin Khalid bin Hamad al Thani. KSM took a position in Qatar as project engineer with the Qatari Ministry of Electricity and Water. Although he engaged in extensive international travel during his tenure at the ministry—much of it in furtherance of terrorist activity—KSM would hold his position there until early 1996, when he fled to Pakistan to avoid capture by U.S. authorities.[5]

KSM first came to the attention of U.S. law enforcement as a result of his cameo role in the first World Trade Center bombing. According to KSM, he learned of Ramzi Yousef's intention to launch an attack inside the United States in 1991 or 1992, when Yousef was receiving explosives training in Afghanistan. During the fall of 1992, while Yousef was building the bomb he would use in that attack, KSM and Yousef had numerous telephone conversations during which Yousef discussed his progress and sought additional funding. On November 3, 1992, KSM wired $660 from Qatar to the bank account of Yousef's co-conspirator, Mohammed Salameh. KSM does not appear to have contributed any more substantially to this operation.[6]

Yousef's instant notoriety as the mastermind of the 1993 World Trade Center bombing inspired KSM to become involved in planning attacks against the United States. By his own account, KSM's animus toward the United States stemmed not from his experiences there as a student, but rather from his violent disagreement with U.S. foreign policy favoring Israel. In 1994, KSM accompanied Yousef to the Philippines, and the two of them began planning what is now known as the Manila air or "Bojinka" plot—the intended bombing of 12 U.S. commercial jumbo jets over the Pacific during a two-day span. This marked the first time KSM took part in the actual planning of a terrorist operation. While sharing an apartment in Manila during the summer of 1994, he and Yousef acquired chemicals and other materials necessary to construct bombs and timers. They also cased target flights to Hong Kong and Seoul that would have onward legs to the United States. During this same period, KSM and Yousef also developed plans to assassinate President Clinton during his November 1994 trip to Manila, and to bomb U.S.-bound cargo carriers by smuggling jackets containing nitrocellulose on board.[7]

KSM left the Philippines in September 1994 and met up with Yousef in Karachi following their casing flights. There they enlisted Wali Khan Amin Shah, also known as Usama Asmurai, in the Manila air plot. During the fall of 1994, Yousef returned to Manila and successfully tested the digital watch timer he had invented, bombing a movie theater and a Philippine Airlines flight en route to Tokyo. The plot unraveled after the Philippine authorities discovered Yousef's bomb-making operation in Manila; but by that time, KSM was safely



*Khalid Sheikh Mohammed, mastermind of the 9/11 plot, at the time of his capture in 2003*

back at his government job in Qatar. Yousef attempted to follow through on the cargo carriers plan, but he was arrested in Islamabad by Pakistani authorities on February 7, 1995, after an accomplice turned him in.[8]

KSM continued to travel among the worldwide jihadist community after Yousef's arrest, visiting the Sudan, Yemen, Malaysia, and Brazil in 1995. No clear evidence connects him to terrorist activities in those locations. While in Sudan, he reportedly failed in his attempt to meet with Bin Ladin. But KSM did see Atef, who gave him a contact in Brazil. In January 1996, well aware that U.S. authorities were chasing him, he left Qatar for good and fled to Afghanistan, where he renewed his relationship with Rasul Sayyaf.[9]

Just as KSM was reestablishing himself in Afghanistan in mid-1996, Bin Ladin and his colleagues were also completing their migration from Sudan. Through Atef, KSM arranged a meeting with Bin Ladin in Tora Bora, a mountainous redoubt from the Afghan war days. At the meeting, KSM presented the al Qaeda leader with a menu of ideas for terrorist operations. According to KSM, this meeting was the first time he had seen Bin Ladin since 1989. Although they had fought together in 1987, Bin Ladin and KSM did not yet enjoy an especially close working relationship. Indeed, KSM has acknowledged

that Bin Ladin likely agreed to meet with him because of the renown of his nephew, Yousef.[10]

At the meeting, KSM briefed Bin Ladin and Atef on the first World Trade Center bombing, the Manila air plot, the cargo carriers plan, and other activities pursued by KSM and his colleagues in the Philippines. KSM also presented a proposal for an operation that would involve training pilots who would crash planes into buildings in the United States. This proposal eventually would become the 9/11 operation.[11]

KSM knew that the successful staging of such an attack would require personnel, money, and logistical support that only an extensive and well-funded organization like al Qaeda could provide. He thought the operation might appeal to Bin Ladin, who had a long record of denouncing the United States.[12]

From KSM's perspective, Bin Ladin was in the process of consolidating his new position in Afghanistan while hearing out others' ideas, and had not yet settled on an agenda for future anti–U.S. operations. At the meeting, Bin Ladin listened to KSM's ideas without much comment, but did ask KSM formally to join al Qaeda and move his family to Afghanistan.[13]

KSM declined. He preferred to remain independent and retain the option of working with other mujahideen groups still operating in Afghanistan, including the group led by his old mentor, Sayyaf. Sayyaf was close to Ahmed Shah Massoud, the leader of the Northern Alliance. Therefore working with him might be a problem for KSM because Bin Ladin was building ties to the rival Taliban.

After meeting with Bin Ladin, KSM says he journeyed onward to India, Indonesia, and Malaysia, where he met with Jemaah Islamiah's Hambali. Hambali was an Indonesian veteran of the Afghan war looking to expand the jihad into Southeast Asia. In Iran, KSM rejoined his family and arranged to move them to Karachi; he claims to have relocated by January 1997.[14]

After settling his family in Karachi, KSM tried to join the mujahid leader Ibn al Khattab in Chechnya. Unable to travel through Azerbaijan, KSM returned to Karachi and then to Afghanistan to renew contacts with Bin Ladin and his colleagues. Though KSM may not have been a member of al Qaeda at this time, he admits traveling frequently between Pakistan and Afghanistan in 1997 and the first half of 1998, visiting Bin Ladin and cultivating relationships with his lieutenants, Atef and Sayf al Adl, by assisting them with computer and media projects.[15]

According to KSM, the 1998 bombings of the U.S. embassies in Nairobi and Dar es Salaam marked a watershed in the evolution of the 9/11 plot. KSM claims these bombings convinced him that Bin Ladin was truly committed to attacking the United States. He continued to make himself useful, collecting news articles and helping other al Qaeda members with their outdated computer equipment. Bin Ladin, apparently at Atef's urging, finally decided to give KSM the green light for the 9/11 operation sometime in late 1998 or early 1999.[16]

KSM then accepted Bin Ladin's standing invitation to move to Kandahar and work directly with al Qaeda. In addition to supervising the planning and preparations for the 9/11 operation, KSM worked with and eventually led al Qaeda's media committee. But KSM states he refused to swear a formal oath of allegiance to Bin Ladin, thereby retaining a last vestige of his cherished autonomy.[17]

At this point, late 1998 to early 1999, planning for the 9/11 operation began in earnest. Yet while the 9/11 project occupied the bulk of KSM's attention, he continued to consider other possibilities for terrorist attacks. For example, he sent al Qaeda operative Issa al Britani to Kuala Lumpur, Malaysia, to learn about the jihad in Southeast Asia from Hambali. Thereafter, KSM claims, at Bin Ladin's direction in early 2001, he sent Britani to the United States to case potential economic and "Jewish" targets in New York City. Furthermore, during the summer of 2001, KSM approached Bin Ladin with the idea of recruiting a Saudi Arabian air force pilot to commandeer a Saudi fighter jet and attack the Israeli city of Eilat. Bin Ladin reportedly liked this proposal, but he instructed KSM to concentrate on the 9/11 operation first. Similarly, KSM's proposals to Atef around this same time for attacks in Thailand, Singapore, Indonesia, and the Maldives were never executed, although Hambali's Jemaah Islamiah operatives did some casing of possible targets.[18]

KSM appears to have been popular among the al Qaeda rank and file. He was reportedly regarded as an effective leader, especially after the 9/11 attacks. Co-workers describe him as an intelligent, efficient, and even-tempered manager who approached his projects with a single-minded dedication that he expected his colleagues to share. Al Qaeda associate Abu Zubaydah has expressed more qualified admiration for KSM's innate creativity, emphasizing instead his ability to incorporate the improvements suggested by others. Nashiri has been similarly measured, observing that although KSM floated many general ideas for attacks, he rarely conceived a specific operation himself.[19] Perhaps these estimates reflect a touch of jealousy; in any case, KSM was plainly a capable coordinator, having had years to hone his skills and build relationships.

### Hambali

Al Qaeda's success in fostering terrorism in Southeast Asia stems largely from its close relationship with Jemaah Islamiah (JI). In that relationship, Hambali became the key coordinator. Born and educated in Indonesia, Hambali moved to Malaysia in the early 1980s to find work. There he claims to have become a follower of the Islamist extremist teachings of various clerics, including one named Abdullah Sungkar. Sungkar first inspired Hambali to share the vision of establishing a radical Islamist regime in Southeast Asia, then furthered Hambali's instruction in jihad by sending him to Afghanistan in 1986. After undergoing training at Rasul Sayyaf's Sada camp (where KSM would later train), Hambali fought against the Soviets; he eventually returned to Malaysia after 18

months in Afghanistan. By 1998, Hambali would assume responsibility for the Malaysia/Singapore region within Sungkar's newly formed terrorist organization, the JI.[20]

Also by 1998, Sungkar and JI spiritual leader Abu Bakar Bashir had accepted Bin Ladin's offer to ally JI with al Qaeda in waging war against Christians and Jews.[21] Hambali met with KSM in Karachi to arrange for JI members to receive training in Afghanistan at al Qaeda's camps. In addition to his close working relationship with KSM, Hambali soon began dealing with Atef as well. Al Qaeda began funding JI's increasingly ambitious terrorist plans, which Atef and KSM sought to expand. Under this arrangement, JI would perform the necessary casing activities and locate bomb-making materials and other supplies. Al Qaeda would underwrite operations, provide bomb-making expertise, and deliver suicide operatives.[22]

The al Qaeda–JI partnership yielded a number of proposals that would marry al Qaeda's financial and technical strengths with JI's access to materials and local operatives. Here, Hambali played the critical role of coordinator, as he distributed al Qaeda funds earmarked for the joint operations. In one especially notable example, Atef turned to Hambali when al Qaeda needed a scientist to take over its biological weapons program. Hambali obliged by introducing a U.S.-educated JI member, Yazid Sufaat, to Ayman al Zawahiri in Kandahar. In 2001, Sufaat would spend several months attempting to cultivate anthrax for al Qaeda in a laboratory he helped set up near the Kandahar airport.[23]

Hambali did not originally orient JI's operations toward attacking the United States, but his involvement with al Qaeda appears to have inspired him to pursue American targets. KSM, in his post-capture interrogations, has taken credit for this shift, claiming to have urged the JI operations chief to concentrate on attacks designed to hurt the U.S. economy.[24] Hambali's newfound interest in striking against the United States manifested itself in a spate of terrorist plans. Fortunately, none came to fruition.

In addition to staging actual terrorist attacks in partnership with al Qaeda, Hambali and JI assisted al Qaeda operatives passing through Kuala Lumpur. One important occasion was in December 1999–January 2000. Hambali accommodated KSM's requests to help several veterans whom KSM had just finished training in Karachi. They included Tawfiq bin Attash, also known as Khallad, who later would help bomb the USS *Cole*, and future 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar. Hambali arranged lodging for them and helped them purchase airline tickets for their onward travel. Later that year, Hambali and his crew would provide accommodations and other assistance (including information on flight schools and help in acquiring ammonium nitrate) for Zacarias Moussaoui, an al Qaeda operative sent to Malaysia by Atef and KSM.[25]

Hambali used Bin Ladin's Afghan facilities as a training ground for JI recruits. Though he had a close relationship with Atef and KSM, he maintained JI's institutional independence from al Qaeda. Hambali insists that he did not

discuss operations with Bin Ladin or swear allegiance to him, having already given such a pledge of loyalty to Bashir, Sungkar's successor as JI leader. Thus, like any powerful bureaucrat defending his domain, Hambali objected when al Qaeda leadership tried to assign JI members to terrorist projects without notifying him.[26]

### Abd al Rahim al Nashiri

KSM and Hambali both decided to join forces with al Qaeda because their terrorist aspirations required the money and manpower that only a robust organization like al Qaeda could supply. On the other hand, Abd al Rahim al Nashiri—the mastermind of the *Cole* bombing and the eventual head of al Qaeda operations in the Arabian Peninsula—appears to have originally been recruited to his career as a terrorist by Bin Ladin himself.

Having already participated in the Afghan jihad, Nashiri accompanied a group of some 30 mujahideen in pursuit of jihad in Tajikistan in 1996. When serious fighting failed to materialize, the group traveled to Jalalabad and encountered Bin Ladin, who had recently returned from Sudan. Bin Ladin addressed them at length, urging the group to join him in a "jihad against the Americans." Although all were urged to swear loyalty to Bin Ladin, many, including Nashiri, found the notion distasteful and refused. After several days of indoctrination that included a barrage of news clippings and television documentaries, Nashiri left Afghanistan, first returning to his native Saudi Arabia and then visiting his home in Yemen. There, he says, the idea for his first terrorist operation took shape as he noticed many U.S. and other foreign ships plying the waters along the southwest coast of Yemen.[27]

Nashiri returned to Afghanistan, probably in 1997, primarily to check on relatives fighting there and also to learn about the Taliban. He again encountered Bin Ladin, still recruiting for "the coming battle with the United States." Nashiri pursued a more conventional military jihad, joining the Taliban forces in their fight against Ahmed Massoud's Northern Alliance and shuttling back and forth between the front and Kandahar, where he would see Bin Ladin and meet with other mujahideen. During this period, Nashiri also led a plot to smuggle four Russian-made antitank missiles into Saudi Arabia from Yemen in early 1998 and helped an embassy bombing operative obtain a Yemeni passport.[28]

At some point, Nashiri joined al Qaeda. His cousin, Jihad Mohammad Ali al Makki, also known as Azzam, was a suicide bomber for the Nairobi attack. Nashiri traveled between Yemen and Afghanistan. In late 1998, Nashiri proposed mounting an attack against a U.S. vessel. Bin Ladin approved. He directed Nashiri to start the planning and send operatives to Yemen, and he later provided money.[29]

Nashiri reported directly to Bin Ladin, the only other person who, according to Nashiri, knew all the details of the operation. When Nashiri had difficulty finding U.S. naval vessels to attack along the western coast of Yemen, Bin

Ladin reportedly instructed him to case the Port of Aden, on the southern coast, instead.[30] The eventual result was an attempted attack on the USS *The Sullivans* in January 2000 and the successful attack, in October 2000, on the USS *Cole*.

Nashiri's success brought him instant status within al Qaeda. He later was recognized as the chief of al Qaeda operations in and around the Arabian Peninsula. While Nashiri continued to consult Bin Ladin on the planning of subsequent terrorist projects, he retained discretion in selecting operatives and devising attacks. In the two years between the *Cole* bombing and Nashiri's capture, he would supervise several more proposed operations for al Qaeda. The October 6, 2002, bombing of the French tanker *Limburg* in the Gulf of Aden also was Nashiri's handiwork. Although Bin Ladin urged Nashiri to continue plotting strikes against U.S. interests in the Persian Gulf, Nashiri maintains that he actually delayed one of these projects because of security concerns.[31] Those concerns, it seems, were well placed, as Nashiri's November 2002 capture in the United Arab Emirates finally ended his career as a terrorist.

## 5.2 THE "PLANES OPERATION"

According to KSM, he started to think about attacking the United States after Yousef returned to Pakistan following the 1993 World Trade Center bombing. Like Yousef, KSM reasoned he could best influence U.S. policy by targeting the country's economy. KSM and Yousef reportedly brainstormed together about what drove the U.S. economy. New York, which KSM considered the economic capital of the United States, therefore became the primary target. For similar reasons, California also became a target for KSM.[32]

KSM claims that the earlier bombing of the World Trade Center taught him that bombs and explosives could be problematic, and that he needed to graduate to a more novel form of attack. He maintains that he and Yousef began thinking about using aircraft as weapons while working on the Manila air/Bojinka plot, and speculated about striking the World Trade Center and CIA headquarters as early as 1995.[33]

Certainly KSM was not alone in contemplating new kinds of terrorist operations. A study reportedly conducted by Atef, while he and Bin Ladin were still in Sudan, concluded that traditional terrorist hijacking operations did not fit the needs of al Qaeda, because such hijackings were used to negotiate the release of prisoners rather than to inflict mass casualties. The study is said to have considered the feasibility of hijacking planes and blowing them up in flight, paralleling the Bojinka concept. Such a study, if it actually existed, yields significant insight into the thinking of al Qaeda's leaders: (1) they rejected hijackings aimed at gaining the release of imprisoned comrades as too complex, because al Qaeda had no friendly countries in which to land a plane and

then negotiate; (2) they considered the bombing of commercial flights in midair—as carried out against Pan Am Flight 103 over Lockerbie, Scotland—a promising means to inflict massive casualties; and (3) they did not yet consider using hijacked aircraft as weapons against other targets.[34]

KSM has insisted to his interrogators that he always contemplated hijacking and crashing large commercial aircraft. Indeed, KSM describes a grandiose original plan: a total of ten aircraft to be hijacked, nine of which would crash into targets on both coasts—they included those eventually hit on September 11 plus CIA and FBI headquarters, nuclear power plants, and the tallest buildings in California and the state of Washington. KSM himself was to land the tenth plane at a U.S. airport and, after killing all adult male passengers on board and alerting the media, deliver a speech excoriating U.S. support for Israel, the Philippines, and repressive governments in the Arab world. Beyond KSM's rationalizations about targeting the U.S. economy, this vision gives a better glimpse of his true ambitions. This is theater, a spectacle of destruction with KSM as the self-cast star—the superterrorist.[35]

KSM concedes that this proposal received a lukewarm response from al Qaeda leaders skeptical of its scale and complexity. Although Bin Ladin listened to KSM's proposal, he was not convinced that it was practical. As mentioned earlier, Bin Ladin was receiving numerous ideas for potential operations—KSM's proposal to attack U.S. targets with commercial airplanes was only one of many.[36]

KSM presents himself as an entrepreneur seeking venture capital and people. He simply wanted al Qaeda to supply the money and operatives needed for the attack while retaining his independence. It is easy to question such a statement. Money is one thing; supplying a cadre of trained operatives willing to die is much more. Thus, although KSM contends he would have been just as likely to consider working with any comparable terrorist organization, he gives no indication of what other groups he thought could supply such exceptional commodities.[37]

KSM acknowledges formally joining al Qaeda, in late 1998 or 1999, and states that soon afterward, Bin Ladin also made the decision to support his proposal to attack the United States using commercial airplanes as weapons. Though KSM speculates about how Bin Ladin came to share his preoccupation with attacking America, Bin Ladin in fact had long been an opponent of the United States. KSM thinks that Atef may have persuaded Bin Ladin to approve this specific proposal. Atef's role in the entire operation is unquestionably very significant but tends to fade into the background, in part because Atef himself is not available to describe it. He was killed in November 2001 by an American air strike in Afghanistan.[38]

Bin Ladin summoned KSM to Kandahar in March or April 1999 to tell him that al Qaeda would support his proposal. The plot was now referred to within al Qaeda as the "planes operation."[39]

**The Plan Evolves**

Bin Ladin reportedly discussed the planes operation with KSM and Atef in a series of meetings in the spring of 1999 at the al Matar complex near Kandahar. KSM's original concept of using one of the hijacked planes to make a media statement was scrapped, but Bin Ladin considered the basic idea feasible. Bin Ladin, Atef, and KSM developed an initial list of targets. These included the White House, the U.S. Capitol, the Pentagon, and the World Trade Center. According to KSM, Bin Ladin wanted to destroy the White House and the Pentagon, KSM wanted to strike the World Trade Center, and all of them wanted to hit the Capitol. No one else was involved in the initial selection of targets.[40]

Bin Ladin also soon selected four individuals to serve as suicide operatives: Khalid al Mihdhar, Nawaf al Hazmi, Khallad, and Abu Bara al Yemeni. During the al Matar meetings, Bin Ladin told KSM that Mihdhar and Hazmi were so eager to participate in an operation against the United States that they had already obtained U.S. visas. KSM states that they had done so on their own after the suicide of their friend Azzam (Nashiri's cousin) in carrying out the Nairobi bombing. KSM had not met them. His only guidance from Bin Ladin was that the two should eventually go to the United States for pilot training.[41]

Hazmi and Mihdhar were Saudi nationals, born in Mecca. Like the others in this initial group of selectees, they were already experienced mujahideen. They had traveled together to fight in Bosnia in a group that journeyed to the Balkans in 1995. By the time Hazmi and Mihdhar were assigned to the planes operation in early 1999, they had visited Afghanistan on several occasions.[42]

Khallad was another veteran mujahid, like much of his family. His father had been expelled from Yemen because of his extremist views. Khallad had grown up in Saudi Arabia, where his father knew Bin Ladin, Abdullah Azzam, and Omar Abdel Rahman (the "Blind Sheikh"). Khallad departed for Afghanistan in 1994 at the age of 15. Three years later, he lost his lower right leg in a battle with the Northern Alliance, a battle in which one of his brothers died. After this experience, he pledged allegiance to Bin Ladin—whom he had first met as a child in Jeddah—and volunteered to become a suicide operative.[43]

When Khallad applied for a U.S. visa, however, his application was denied. Earlier in 1999, Bin Ladin had sent Khallad to Yemen to help Nashiri obtain explosives for the planned ship-bombing and to obtain a visa to visit the United States, so that he could participate in an operation there. Khallad applied under another name, using the cover story that he would be visiting a medical clinic to obtain a new prosthesis for his leg. Another al Qaeda operative gave Khallad the name of a person living in the United States whom Khallad could use as a point of contact on a visa application. Khallad contacted this individual to help him get an appointment at a U.S. clinic. While Khallad was waiting for the letter from the clinic confirming the appointment, however, he was arrested by Yemeni authorities. The arrest resulted from mistaken identity: Khallad was driving the car of another conspirator in the ship-bombing plot who was wanted by the Yemeni authorities.[44]

Khallad was released sometime during the summer of 1999, after his father and Bin Ladin intervened on his behalf. Khallad learned later that the al Qaeda leader, apparently concerned that Khallad might reveal Nashiri's operation while under interrogation, had contacted a Yemeni official to demand Khallad's release, suggesting that Bin Ladin would not confront the Yemenis if they did not confront him. This account has been corroborated by others. Giving up on acquiring a U.S. visa and concerned that the United States might learn of his ties to al Qaeda, Khallad returned to Afghanistan.[45]

Travel issues thus played a part in al Qaeda's operational planning from the very start. During the spring and summer of 1999, KSM realized that Khallad and Abu Bara, both of whom were Yemenis, would not be able to obtain U.S. visas as easily as Saudi operatives like Mihdhar and Hazmi. Although Khallad had been unable to acquire a U.S. visa, KSM still wanted him and Abu Bara, as well as another Yemeni operative from Bin Ladin's security detail, to participate in the planes operation. Yet because individuals with Saudi passports could travel much more easily than Yemeni, particularly to the United States, there were fewer martyrdom opportunities for Yemenis. To overcome this problem, KSM decided to split the planes operation into two components.[46]

The first part of the planes operation—crashing hijacked aircraft into U.S. targets—would remain as planned, with Mihdhar and Hazmi playing key roles. The second part, however, would now embrace the idea of using suicide operatives to blow up planes, a refinement of KSM's old Manila air plot. The operatives would hijack U.S.-flagged commercial planes flying Pacific routes across East Asia and destroy them in midair, possibly with shoe bombs, instead of flying them into targets. (An alternate scenario apparently involved flying planes into U.S. targets in Japan, Singapore, or Korea.) This part of the operation has been confirmed by Khallad, who said that they contemplated hijacking several planes, probably originating in Thailand, South Korea, Hong Kong, or Malaysia, and using Yemenis who would not need pilot training because they would simply down the planes. All the planes hijacked in the United States and East Asia were to be crashed or exploded at about the same time to maximize the attack's psychological impact.[47]

### Training and Deployment to Kuala Lumpur

In the fall of 1999, the four operatives selected by Bin Ladin for the planes operation were chosen to attend an elite training course at al Qaeda's Mes Aynak camp in Afghanistan. Bin Ladin personally selected the veteran fighters who received this training, and several of them were destined for important operations. One example is Ibrahim al Thawar, or Nibras, who would participate in the October 12, 2000, suicide attack on the USS *Cole*. According to KSM, this training was not given specifically in preparation for the planes operation or any other particular al Qaeda venture. Although KSM claims not to have been involved with the training or to have met with the future 9/11 hijackers at Mes

Aynak, he says he did visit the camp while traveling from Kandahar to Kabul with Bin Ladin and others.[48]

The Mes Aynak training camp was located in an abandoned Russian copper mine near Kabul. The camp opened in 1999, after the United States had destroyed the training camp near Khowst with cruise missiles in August 1998, and before the Taliban granted al Qaeda permission to open the al Faruq camp in Kandahar. Thus, for a brief period in 1999, Mes Aynak was the only al Qaeda camp operating in Afghanistan. It offered a full range of instruction, including an advanced commando course taught by senior al Qaeda member Sayf al Adl. Bin Ladin paid particular attention to the 1999 training session. When Salah al Din, the trainer for the session, complained about the number of trainees and said that no more than 20 could be handled at once, Bin Ladin insisted that everyone he had selected receive the training.[49]

The special training session at Mes Aynak was rigorous and spared no expense. The course focused on physical fitness, firearms, close quarters combat, shooting from a motorcycle, and night operations. Although the subjects taught differed little from those offered at other camps, the course placed extraordinary physical and mental demands on its participants, who received the best food and other amenities to enhance their strength and morale.[50]

Upon completing the advanced training at Mes Aynak, Hazmi, Khallad, and Abu Bara went to Karachi, Pakistan. There KSM instructed them on Western culture and travel. Much of his activity in mid-1999 had revolved around the collection of training and informational materials for the participants in the planes operation. For instance, he collected Western aviation magazines; telephone directories for American cities such as San Diego and Long Beach, California; brochures for schools; and airline timetables, and he conducted Internet searches on U.S. flight schools. He also purchased flight simulator software and a few movies depicting hijackings. To house his students, KSM rented a safehouse in Karachi with money provided by Bin Ladin.[51]

In early December 1999, Khallad and Abu Bara arrived in Karachi. Hazmi joined them there a few days later. On his way to Karachi, Hazmi spent a night in Quetta at a safehouse where, according to KSM, an Egyptian named Mohamed Atta simultaneously stayed on his way to Afghanistan for jihad training.[52]

Mihdhar did not attend the training in Karachi with the others. KSM says that he never met with Mihdhar in 1999 but assumed that Bin Ladin and Atef had briefed Mihdhar on the planes operation and had excused him from the Karachi training.[53]

The course in Karachi apparently lasted about one or two weeks. According to KSM, he taught the three operatives basic English words and phrases. He showed them how to read phone books, interpret airline timetables, use the Internet, use code words in communications, make travel reservations, and rent an apartment. Khallad adds that the training involved using flight simulator com-

puter games, viewing movies that featured hijackings, and reading flight sched-
ules to determine which flights would be in the air at the same time in different
parts of the world. They used the game software to increase their familiarity with
aircraft models and functions, and to highlight gaps in cabin security. While in
Karachi, they also discussed how to case flights in Southeast Asia. KSM told them
to watch the cabin doors at takeoff and landing, to observe whether the captain
went to the lavatory during the flight, and to note whether the flight attendants
brought food into the cockpit. KSM, Khallad, and Hazmi also visited travel agen-
cies to learn the visa requirements for Asian countries.[54]

The four trainees traveled to Kuala Lumpur: Khallad, Abu Bara, and Hazmi
came from Karachi; Mihdhar traveled from Yemen. As discussed in chapter 6,
U.S. intelligence would analyze communications associated with Mihdhar,
whom they identified during this travel, and Hazmi, whom they could have
identified but did not.[55]

According to KSM, the four operatives were aware that they had volun-
teered for a suicide operation, either in the United States or in Asia. With dif-
ferent roles, they had different tasks. Hazmi and Mihdhar were sent to Kuala
Lumpur before proceeding to their final destination—the United States.
According to KSM, they were to use Yemeni documents to fly to Malaysia, then
proceed to the United States using their Saudi passports to conceal their prior
travels to and from Pakistan. KSM had doctored Hazmi's Saudi passport so it
would appear as if Hazmi had traveled to Kuala Lumpur from Saudi Arabia via
Dubai. Khallad and Abu Bara went to Kuala Lumpur to study airport security
and conduct casing flights. According to Khallad, he and Abu Bara departed for
Malaysia in mid–December 1999. Hazmi joined them about ten days later after
briefly returning to Afghanistan to attend to some passport issues.[56]

Khallad had originally scheduled his trip in order to receive a new prosthe-
sis at a Kuala Lumpur clinic called Endolite, and Bin Ladin suggested that he
use the opportunity to case flights as well. According to Khallad, Malaysia was
an ideal destination because its government did not require citizens of Saudi
Arabia or other Gulf states to have a visa. Malaysian security was reputed to be
lax when it came to Islamist jihadists. Also, other mujahideen wounded in com-
bat had reportedly received treatment at the Endolite clinic and successfully
concealed the origins of their injuries. Khallad said he got the money for the
prosthesis from his father, Bin Ladin, and another al Qaeda colleague.[57]

According to Khallad, when he and Abu Bara arrived in Kuala Lumpur they
contacted Hambali to let him know where they were staying, since he was to
be kept informed of al Qaeda activities in Southeast Asia. Hambali picked up
Khallad and Abu Bara and brought them to his home, enlisting the help of a
colleague who spoke better Arabic. Hambali then took them to the clinic.[58]

On December 31, Khallad flew from Kuala Lumpur to Bangkok; the next
day, he flew to Hong Kong aboard a U.S. airliner. He flew in first class, which
he realized was a mistake because this seating assignment on that flight did not
afford him a view of the cockpit. He claims to have done what he could to case

the flight, testing security by carrying a box cutter in his toiletries kit onto the flight to Hong Kong. Khallad returned to Bangkok the following day. At the airport, the security officials searched his carry-on bag and even opened the toiletries kit, but just glanced at the contents and let him pass. On this flight, Khallad waited until most of the first-class passengers were dozing, then got up and removed the kit from his carry-on. None of the flight attendants took notice.[59]

After completing his casing mission, Khallad returned to Kuala Lumpur. Hazmi arrived in Kuala Lumpur soon thereafter and may even have stayed briefly with Khallad and Abu Bara at Endolite. Mihdhar arrived on January 5, probably one day after Hazmi. All four operatives stayed at the apartment of Yazid Sufaat, the Malaysian JI member who made his home available at Hambali's request. According to Khallad, he and Hazmi spoke about the possibility of hijacking planes and crashing them or holding passengers as hostages, but only speculatively. Khallad admits being aware at the time that Hazmi and Mihdhar were involved in an operation involving planes in the United States but denies knowing details of the plan.[60]

While in Kuala Lumpur, Khallad wanted to go to Singapore to meet Nibras and Fahd al Quso, two of the operatives in Nashiri's ship-bombing operation. An attempt to execute that plan by attacking the USS *The Sullivans* had failed just a few days earlier. Nibras and Quso were bringing Khallad money from Yemen, but were stopped in Bangkok because they lacked visas to continue on to Singapore. Also unable to enter Singapore, Khallad moved the meeting to Bangkok. Hazmi and Mihdhar decided to go there as well, reportedly because they thought it would enhance their cover as tourists to have passport stamps from a popular tourist destination such as Thailand. With Hambali's help, the three obtained tickets for a flight to Bangkok and left Kuala Lumpur together. Abu Bara did not have a visa permitting him to return to Pakistan, so he traveled to Yemen instead.[61]

In Bangkok, Khallad took Hazmi and Mihdhar to one hotel, then went to another hotel for his meeting on the maritime attack plan. Hazmi and Mihdhar soon moved to that same hotel, but Khallad insists that the two sets of operatives never met with each other or anyone else. After conferring with the ship-bombing operatives, Khallad returned to Karachi and then to Kandahar, where he reported on his casing mission to Bin Ladin.[62]

Bin Ladin canceled the East Asia part of the planes operation in the spring of 2000. He evidently decided it would be too difficult to coordinate this attack with the operation in the United States. As for Hazmi and Mihdhar, they had left Bangkok a few days before Khallad and arrived in Los Angeles on January 15, 2000.[63]

Meanwhile, the next group of al Qaeda operatives destined for the planes operation had just surfaced in Afghanistan. As Hazmi and Mihdhar were deploying from Asia to the United States, al Qaeda's leadership was recruiting and training four Western-educated men who had recently arrived in Kandahar. Though they hailed from four different countries—Egypt, the United Arab

Emirates, Lebanon, and Yemen—they had formed a close-knit group as students in Hamburg, Germany. The new recruits had come to Afghanistan aspiring to wage jihad in Chechnya. But al Qaeda quickly recognized their potential and enlisted them in its anti-U.S. jihad.

## 5.3 THE HAMBURG CONTINGENT

Although Bin Ladin, Atef, and KSM initially contemplated using established al Qaeda members to execute the planes operation, the late 1999 arrival in Kandahar of four aspiring jihadists from Germany suddenly presented a more attractive alternative. The Hamburg group shared the anti-U.S. fervor of the other candidates for the operation, but added the enormous advantages of fluency in English and familiarity with life in the West, based on years that each member of the group had spent living in Germany. Not surprisingly, Mohamed Atta, Ramzi Binalshibh, Marwan al Shehhi, and Ziad Jarrah would all become key players in the 9/11 conspiracy.

### Mohamed Atta

Mohamed Atta was born on September 1, 1968, in Kafr el Sheikh, Egypt, to a middle-class family headed by his father, an attorney. After graduating from Cairo University with a degree in architectural engineering in 1990, Atta worked as an urban planner in Cairo for a couple of years. In the fall of 1991, he asked a German family he had met in Cairo to help him continue his education in Germany. They suggested he come to Hamburg and invited him to live with them there, at least initially. After completing a course in German, Atta traveled to Germany for the first time in July 1992. He resided briefly in Stuttgart and then, in the fall of 1992, moved to Hamburg to live with his host family. After enrolling at the University of Hamburg, he promptly transferred into the city engineering and planning course at the Technical University of Hamburg-Harburg, where he would remain registered as a student until the fall of 1999. He appears to have applied himself fairly seriously to his studies (at least in comparison to his jihadist friends) and actually received his degree shortly before traveling to Afghanistan. In school, Atta came across as very intelligent and reasonably pleasant, with an excellent command of the German language.[64]

When Atta arrived in Germany, he appeared religious, but not fanatically so. This would change, especially as his tendency to assert leadership became increasingly pronounced. According to Binalshibh, as early as 1995 Atta sought to organize a Muslim student association in Hamburg. In the fall of 1997, he joined a working group at the Quds mosque in Hamburg, a group designed to bridge the gap between Muslims and Christians. Atta proved a poor bridge, however, because of his abrasive and increasingly dogmatic personality. But

among those who shared his beliefs, Atta stood out as a decisionmaker. Atta's friends during this period remember him as charismatic, intelligent, and persuasive, albeit intolerant of dissent.[65]

In his interactions with other students, Atta voiced virulently anti-Semitic and anti-American opinions, ranging from condemnations of what he described as a global Jewish movement centered in New York City that supposedly controlled the financial world and the media, to polemics against governments of the Arab world. To him, Saddam Hussein was an American stooge set up to give Washington an excuse to intervene in the Middle East. Within his circle, Atta advocated violent jihad. He reportedly asked one individual close to the group if he was "ready to fight for [his] belief" and dismissed him as too weak for jihad when the person declined. On a visit home to Egypt in 1998, Atta met one of his college friends. According to this friend, Atta had changed a great deal, had grown a beard, and had "obviously adopted fundamentalism" by that time.[66]

## Ramzi Binalshibh

Ramzi Binalshibh was born on May 1, 1972, in Ghayl Bawazir, Yemen. There does not seem to be anything remarkable about his family or early background. A friend who knew Binalshibh in Yemen remembers him as "religious, but not too religious." From 1987 to 1995, Binalshibh worked as a clerk for the International Bank of Yemen. He first attempted to leave Yemen in 1995, when he applied for a U.S. visa. After his application was rejected, he went to Germany and applied for asylum under the name Ramzi Omar, claiming to be a Sudanese citizen seeking asylum. While his asylum petition was pending, Binalshibh lived in Hamburg and associated with individuals from several mosques there. In 1997, after his asylum application was denied, Binalshibh went home to Yemen but returned to Germany shortly thereafter under his true name, this time registering as a student in Hamburg. Binalshibh continually had academic problems, failing tests and cutting classes; he was expelled from one school in September 1998.[67]

According to Binalshibh, he and Atta first met at a mosque in Hamburg in 1995. The two men became close friends and became identified with their shared extremist outlook. Like Atta, by the late 1990s Binalshibh was decrying what he perceived to be a "Jewish world conspiracy." He proclaimed that the highest duty of every Muslim was to pursue jihad, and that the highest honor was to die during the jihad. Despite his rhetoric, however, Binalshibh presented a more amiable figure than the austere Atta, and was known within the community as being sociable, extroverted, polite, and adventuresome.[68]

In 1998, Binalshibh and Atta began sharing an apartment in the Harburg section of Hamburg, together with a young student from the United Arab Emirates named Marwan al Shehhi.[69]

### Marwan al Shehhi

Marwan al Shehhi was born on May 9, 1978, in Ras al Khaimah, the United Arab Emirates. His father, who died in 1997, was a prayer leader at the local mosque. After graduating from high school in 1995, Shehhi joined the Emirati military and received half a year of basic training before gaining admission to a military scholarship program that would fund his continued study in Germany.[70]

Shehhi first entered Germany in April 1996. After sharing an apartment in Bonn for two months with three other scholarship students, Shehhi moved in with a German family, with whom he resided for several months before moving into his own apartment. During this period, he came across as very religious, praying five times a day. Friends also remember him as convivial and "a regular guy," wearing Western clothes and occasionally renting cars for trips to Berlin, France, and the Netherlands.[71]

As a student, Shehhi was less than a success. Upon completing a course in German, he enrolled at the University of Bonn in a program for technical, mathematical, and scientific studies. In June 1997, he requested a leave from his studies, citing the need to attend to unspecified "problems" in his home country. Although the university denied his request, Shehhi left anyway, and consequently was compelled to repeat the first semester of his studies. In addition to having academic difficulties at this time, Shehhi appeared to become more extreme in the practice of his faith; for example, he specifically avoided restaurants that cooked with or served alcohol. In late 1997, he applied for permission to complete his course work in Hamburg, a request apparently motivated by his desire to join Atta and Binalshibh. Just how and when the three of them first met remains unclear, although they seemed to know each other already when Shehhi relocated to Hamburg in early 1998. Atta and Binalshibh moved into his apartment in April.[72]

The transfer to Hamburg did not help Shehhi's academic progress; he was directed by the scholarship program administrators at the Emirati embassy to repeat his second semester starting in August 1998, but back in Bonn. Shehhi initially flouted this directive, however, and did not reenroll at the University of Bonn until the following January, barely passing his course there. By the end of July 1999, he had returned to Hamburg, applying to study shipbuilding at the Technical University and, more significantly, residing once again with Atta and Binalshibh, in an apartment at 54 Marienstrasse.[73]

After Shehhi moved in with Atta and Binalshibh, his evolution toward Islamic fundamentalism became more pronounced. A fellow Emirati student who came to Hamburg to visit Shehhi noticed he no longer lived as comfortably as before. Shehhi now occupied an old apartment with a roommate, had no television, and wore inexpensive clothes. When asked why he was living so frugally, Shehhi responded that he was living the way the Prophet had lived.[74] Similarly, when someone asked why he and Atta never laughed, Shehhi retorted, "How can you laugh when people are dying in Palestine?"[75]

## Ziad Jarrah

Born on May 11, 1975, in Mazraa, Lebanon, Ziad Jarrah came from an affluent family and attended private, Christian schools. Like Atta, Binalshibh, and Shehhi, Jarrah aspired to pursue higher education in Germany. In April 1996, he and a cousin enrolled at a junior college in Greifswald, in northeastern Germany. There Jarrah met and became intimate with Aysel Senguen, the daughter of Turkish immigrants, who was preparing to study dentistry.[76]

Even with the benefit of hindsight, Jarrah hardly seems a likely candidate for becoming an Islamic extremist. Far from displaying radical beliefs when he first moved to Germany, he arrived with a reputation for knowing where to find the best discos and beaches in Beirut, and in Greifswald was known to enjoy student parties and drinking beer. Although he continued to share an apartment in Greifswald with his cousin, Jarrah was mostly at Senguen's apartment. Witnesses interviewed by German authorities after 9/11, however, recall that Jarrah started showing signs of radicalization as early as the end of 1996. After returning from a trip home to Lebanon, Jarrah started living more strictly according to the Koran. He read brochures in Arabic about jihad, held forth to friends on the subject of holy war, and professed disaffection with his previous life and a desire not to leave the world "in a natural way."[77]

In September 1997, Jarrah abruptly switched his intended course of study from dentistry to aircraft engineering—at the Technical University of Hamburg-Harburg. His motivation for this decision remains unclear. The rationale he expressed to Senguen—that he had been interested in aviation since playing with toy airplanes as a child—rings somewhat hollow. In any event, Jarrah appears already to have had Hamburg contacts by this time, some of whom may have played a role in steering him toward Islamic extremism.[78]

Following his move to Hamburg that fall, he began visiting Senguen in Greifswald on weekends, until she moved to the German city of Bochum one year later to enroll in dental school. Around the same time, he began speaking increasingly about religion, and his visits to Senguen became less and less frequent. He began criticizing her for not being religious enough and for dressing too provocatively. He grew a full beard and started praying regularly. He refused to introduce her to his Hamburg friends because, he told her, they were religious Muslims and her refusal to become more observant embarrassed him. At some point in 1999, Jarrah told Senguen that he was planning to wage a jihad because there was no greater honor than to die for Allah. Although Jarrah's transformation generated numerous quarrels, their breakups invariably were followed by reconciliation.[79]

## Forming a Cell

In Hamburg, Jarrah had a succession of living accommodations, but he apparently never resided with his future co-conspirators. It is not clear how and when he became part of Atta's circle. He became particularly friendly with Binalshibh after meeting him at the Quds mosque in Hamburg, which Jarrah

began attending regularly in late 1997. The worshippers at this mosque featured an outspoken, flamboyant Islamist named Mohammed Haydar Zammar. A well-known figure in the Muslim community (and to German and U.S. intelligence agencies by the late 1990s), Zammar had fought in Afghanistan and relished any opportunity to extol the virtues of violent jihad. Indeed, a witness has reported hearing Zammar press Binalshibh to fulfill his duty to wage jihad. Moreover, after 9/11, Zammar reportedly took credit for influencing not just Binalshibh but the rest of the Hamburg group. In 1998, Zammar encouraged them to participate in jihad and even convinced them to go to Afghanistan.[80]

Owing to Zammar's persuasion or some other source of inspiration, Atta, Binalshibh, Shehhi, and Jarrah eventually prepared themselves to translate their extremist beliefs into action. By late 1999, they were ready to abandon their student lives in Germany in favor of violent jihad. This final stage in their evolution toward embracing Islamist extremism did not entirely escape the notice of the people around them. The foursome became core members of a group of radical Muslims, often hosting sessions at their Marienstrasse apartment that involved extremely anti-American discussions. Meeting three to four times a week, the group became something of a "sect" whose members, according to one participant in the meetings, tended to deal only with each other.[81] Atta's rent checks for the apartment provide evidence of the importance that the apartment assumed as a center for the group, as he would write on them the notation "Dar el Ansar," or "house of the followers."[82]

In addition to Atta, Binalshibh, Shehhi, and Jarrah, the group included other extremists, some of whom also would attend al Qaeda training camps and, in some instances, would help the 9/11 hijackers as they executed the plot:

- Said Bahaji, son of a Moroccan immigrant, was the only German citizen in the group. Educated in Morocco, Bahaji returned to Germany to study electrical engineering at the Technical University of Hamburg-Harburg. He spent five months in the German army before obtaining a medical discharge, and lived with Atta and Binalshibh at 54 Marienstrasse for eight months between November 1998 and July 1999. Described as an insecure follower with no personality and with limited knowledge of Islam, Bahaji nonetheless professed his readiness to engage in violence. Atta and Binalshibh used Bahaji's computer for Internet research, as evidenced by documents and diskettes seized by German authorities after 9/11.[83]

- Zakariya Essabar, a Moroccan citizen, moved to Germany in February 1997 and to Hamburg in 1998, where he studied medical technology. Soon after moving to Hamburg, Essabar met Binalshibh and the others through a Turkish mosque. Essabar turned extremist fairly suddenly, probably in 1999, and reportedly pressured one acquaintance with physical force to become more religious, grow a beard, and

compel his wife to convert to Islam. Essabar's parents were said to have made repeated but unsuccessful efforts to sway him from this lifestyle. Shortly before the 9/11 attacks, he would travel to Afghanistan to communicate the date for the attacks to the al Qaeda leadership.[84]

- Mounir el Motassadeq, another Moroccan, came to Germany in 1993, moving to Hamburg two years later to study electrical engineering at the Technical University. A witness has recalled Motassadeq saying that he would kill his entire family if his religious beliefs demanded it. One of Motassadeq's roommates recalls him referring to Hitler as a "good man" and organizing film sessions that included speeches by Bin Ladin. Motassadeq would help conceal the Hamburg group's trip to Afghanistan in late 1999.[85]

- Abdelghani Mzoudi, also a Moroccan, arrived in Germany in the summer of 1993, after completing university courses in physics and chemistry. Mzoudi studied in Dortmund, Bochum, and Muenster before moving to Hamburg in 1995. Mzoudi described himself as a weak Muslim when he was home in Morocco, but much more devout when he was back in Hamburg. In April 1996, Mzoudi and Motassadeq witnessed the execution of Atta's will.[86]

During the course of 1999, Atta and his group became ever more extreme and secretive, speaking only in Arabic to conceal the content of their conversations.[87] When the four core members of the Hamburg cell left Germany to journey to Afghanistan late that year, it seems unlikely that they already knew about the planes operation; no evidence connects them to al Qaeda before that time. Witnesses have attested, however, that their pronouncements reflected ample predisposition toward taking some action against the United States.[88] In short, they fit the bill for Bin Ladin, Atef, and KSM.

**Going to Afghanistan**

The available evidence indicates that in 1999, Atta, Binalshibh, Shehhi, and Jarrah decided to fight in Chechnya against the Russians. According to Binalshibh, a chance meeting on a train in Germany caused the group to travel to Afghanistan instead. An individual named Khalid al Masri approached Binalshibh and Shehhi (because they were Arabs with beards, Binalshibh thinks) and struck up a conversation about jihad in Chechnya. When they later called Masri and expressed interest in going to Chechnya, he told them to contact Abu Musab in Duisburg, Germany. Abu Musab turned out to be Mohamedou Ould Slahi, a significant al Qaeda operative who, even then, was well known to U.S. and German intelligence, though neither government apparently knew he was operating in Germany in late 1999. When telephoned by Binalshibh and Shehhi, Slahi reportedly invited these promising recruits to come see him in Duisburg.[89]

Binalshibh, Shehhi, and Jarrah made the trip. When they arrived, Slahi

explained that it was difficult to get to Chechnya at that time because many travelers were being detained in Georgia. He recommended they go to Afghanistan instead, where they could train for jihad before traveling onward to Chechnya. Slahi instructed them to obtain Pakistani visas and then return to him for further directions on how to reach Afghanistan. Although Atta did not attend the meeting, he joined in the plan with the other three. After obtaining the necessary visas, they received Slahi's final instructions on how to travel to Karachi and then Quetta, where they were to contact someone named Umar al Masri at the Taliban office.[90]

Following Slahi's advice, Atta and Jarrah left Hamburg during the last week of November 1999, bound for Karachi. Shehhi left for Afghanistan around the same time; Binalshibh, about two weeks later. Binalshibh remembers that when he arrived at the Taliban office in Quetta, there was no one named Umar al Masri. The name, apparently, was simply a code; a group of Afghans from the office promptly escorted him to Kandahar. There Binalshibh rejoined Atta and Jarrah, who said they already had pledged loyalty to Bin Ladin and urged him to do the same. They also informed him that Shehhi had pledged as well and had already left for the United Arab Emirates to prepare for the mission. Binalshibh soon met privately with Bin Ladin, accepted the al Qaeda leader's invitation to work under him, and added his own pledge to those of his Hamburg colleagues. By this time, Binalshibh claims, he assumed he was volunteering for a martyrdom operation.[91]

Atta, Jarrah, and Binalshibh then met with Atef, who told them they were about to undertake a highly secret mission. As Binalshibh tells it, Atef instructed the three to return to Germany and enroll in flight training. Atta— whom Bin Ladin chose to lead the group—met with Bin Ladin several times to receive additional instructions, including a preliminary list of approved targets: the World Trade Center, the Pentagon, and the U.S. Capitol.[92] The new recruits also learned that an individual named Rabia al Makki (Nawaf al Hazmi) would be part of the operation.[93]

In retrospect, the speed with which Atta, Shehhi, Jarrah, and Binalshibh became core members of the 9/11 plot—with Atta designated its operational leader—is remarkable. They had not yet met with KSM when all this occurred. It is clear, then, that Bin Ladin and Atef were very much in charge of the operation. That these candidates were selected so quickly—before comprehensive testing in the training camps or in operations—demonstrates that Bin Ladin and Atef probably already understood the deficiencies of their initial team, Hazmi and Mihdhar. The new recruits from Germany possessed an ideal combination of technical skill and knowledge that the original 9/11 operatives, veteran fighters though they were, lacked. Bin Ladin and Atef wasted no time in assigning the Hamburg group to the most ambitious operation yet planned by al Qaeda.

Bin Ladin and Atef also plainly judged that Atta was best suited to be the

tactical commander of the operation. Such a quick and critical judgment invites speculation about whether they had already taken Atta's measure at some earlier meeting. To be sure, some gaps do appear in the record of Atta's known whereabouts during the preceding years. One such gap is February–March 1998, a period for which there is no evidence of his presence in Germany and when he conceivably could have been in Afghanistan.[94] Yet to date, neither KSM, Binalshibh, nor any other al Qaeda figure interrogated about the 9/11 plot has claimed that Atta or any other member of the Hamburg group traveled to Afghanistan before the trip in late 1999.

While the four core Hamburg cell members were in Afghanistan, their associates back in Hamburg handled their affairs so that their trip could be kept secret. Motassadeq appears to have done the most. He terminated Shehhi's apartment lease, telling the landlord that Shehhi had returned to the UAE for family reasons, and used a power of attorney to pay bills from Shehhi's bank account.[95] Motassadeq also assisted Jarrah, offering to look after Aysel Senguen in Jarrah's absence. Said Bahaji attended to similar routine matters for Atta and Binalshibh, thereby helping them remain abroad without drawing attention to their absence.[96]

**Preparing for the Operation**

In early 2000, Atta, Jarrah, and Binalshibh returned to Hamburg. Jarrah arrived first, on January 31, 2000.[97] According to Binalshibh, he and Atta left Kandahar together and proceeded first to Karachi, where they met KSM and were instructed by him on security and on living in the United States. Shehhi apparently had already met with KSM before returning to the UAE. Atta returned to Hamburg in late February, and Binalshibh arrived shortly thereafter. Shehhi's travels took him to the UAE (where he acquired a new passport and a U.S. visa), Saudi Arabia, Bahrain, and one or more other destinations. Shehhi also returned to Germany, possibly sometime in March.[98]

After leaving Afghanistan, the hijackers made clear efforts to avoid appearing radical. Once back in Hamburg, they distanced themselves from conspicuous extremists like Zammar, whom they knew attracted unwanted attention from the authorities.[99] They also changed their appearance and behavior. Atta wore Western clothing, shaved his beard, and no longer attended extremist mosques. Jarrah also no longer wore a full beard and, according to Senguen, acted much more the way he had when she first met him. And when Shehhi, while still in the UAE in January 2000, held a belated wedding celebration (he actually had been married in 1999), a friend of his was surprised to see that he had shaved off his beard and was acting like his old self again.[100]

But Jarrah's apparent efforts to appear less radical did not completely conceal his transformation from his Lebanese family, which grew increasingly concerned about his fanaticism. Soon after Jarrah returned to Germany, his father asked Jarrah's cousin—a close companion from boyhood—to intercede. The

cousin's ensuing effort to persuade Jarrah to depart from "the path he was taking" proved unavailing.[101] Yet Jarrah clearly differed from the other hijackers in that he maintained much closer contact with his family and continued his intimate relationship with Senguen. These ties may well have caused him to harbor some doubts about going through with the plot, even as late as the summer of 2001, as discussed in chapter 7.

After leaving Afghanistan, the four began researching flight schools and aviation training. In early January 2000, Ali Abdul Aziz Ali—a nephew of KSM living in the UAE who would become an important facilitator in the plot—used Shehhi's credit card to order a Boeing 747-400 flight simulator program and a Boeing 767 flight deck video, together with attendant literature; Ali had all these items shipped to his employer's address. Jarrah soon decided that the schools in Germany were not acceptable and that he would have to learn to fly in the United States. Binalshibh also researched flight schools in Europe, and in the Netherlands he met a flight school director who recommended flight schools in the United States because they were less expensive and required shorter training periods.[102]

In March 2000, Atta emailed 31 different U.S. flight schools on behalf of a small group of men from various Arab countries studying in Germany who, while lacking prior training, were interested in learning to fly in the United States. Atta requested information about the cost of the training, potential financing, and accommodations.[103]

Before seeking visas to enter the United States, Atta, Shehhi, and Jarrah obtained new passports, each claiming that his old passport had been lost. Presumably they were concerned that the Pakistani visas in their old passports would raise suspicions about possible travel to Afghanistan. Shehhi obtained his visa on January 18, 2000; Atta, on May 18; and Jarrah, on May 25.[104] Binalshibh's visa request was rejected, however, as were his three subsequent applications.[105] Binalshibh proved unable to obtain a visa, a victim of the generalized suspicion that visa applicants from Yemen—especially young men applying in another country (Binalshibh first applied in Berlin)—might join the ranks of undocumented aliens seeking work in the United States. Before 9/11, security concerns were not a major factor in visa issuance unless the applicant already was on a terrorist watchlist, and none of these four men was. Concerns that Binalshibh intended to immigrate to the United States doomed his chances to participate firsthand in the 9/11 attacks. Although Binalshibh had to remain behind, he would provide critical assistance from abroad to his co-conspirators.

Once again, the need for travel documents dictated al Qaeda's plans.

## Travel

It should by now be apparent how significant travel was in the planning undertaken by a terrorist organization as far-flung as al Qaeda. The story of the plot includes references to dozens of international trips. Operations required travel,

as did basic communications and the movement of money. Where electronic communications were regarded as insecure, al Qaeda relied even more heavily on couriers.

KSM and Abu Zubaydah each played key roles in facilitating travel for al Qaeda operatives. In addition, al Qaeda had an office of passports and host country issues under its security committee. The office was located at the Kandahar airport and was managed by Atef. The committee altered papers, including passports, visas, and identification cards.[106]

Moreover, certain al Qaeda members were charged with organizing passport collection schemes to keep the pipeline of fraudulent documents flowing. To this end, al Qaeda required jihadists to turn in their passports before going to the front lines in Afghanistan. If they were killed, their passports were recycled for use.[107] The operational mission training course taught operatives how to forge documents. Certain passport alteration methods, which included substituting photos and erasing and adding travel cachets, were also taught. Manuals demonstrating the technique for "cleaning" visas were reportedly circulated among operatives. Mohamed Atta and Zakariya Essabar were reported to have been trained in passport alteration.[108]

The purpose of all this training was twofold: to develop an institutional capacity for document forgery and to enable operatives to make necessary adjustments in the field. It was well-known, for example, that if a Saudi traveled to Afghanistan via Pakistan, then on his return to Saudi Arabia his passport, bearing a Pakistani stamp, would be confiscated. So operatives either erased the Pakistani visas from their passports or traveled through Iran, which did not stamp visas directly into passports.[109]

## 5.4 A MONEY TRAIL?

Bin Ladin and his aides did not need a very large sum to finance their planned attack on America. The 9/11 plotters eventually spent somewhere between $400,000 and $500,000 to plan and conduct their attack. Consistent with the importance of the project, al Qaeda funded the plotters. KSM provided his operatives with nearly all the money they needed to travel to the United States, train, and live. The plotters' tradecraft was not especially sophisticated, but it was good enough. They moved, stored, and spent their money in ordinary ways, easily defeating the detection mechanisms in place at the time.[110] The origin of the funds remains unknown, although we have a general idea of how al Qaeda financed itself during the period leading up to 9/11.

### General Financing

As we explained in chapter 2, Bin Ladin did not fund al Qaeda through a personal fortune and a network of businesses in Sudan. Instead, al Qaeda relied primarily on a fund-raising network developed over time. The CIA

now estimates that it cost al Qaeda about $30 million per year to sustain its activities before 9/11 and that this money was raised almost entirely through donations.[111]

For many years, the United States thought Bin Ladin financed al Qaeda's expenses through a vast personal inheritance. Bin Ladin purportedly inherited approximately $300 million when his father died, and was rumored to have had access to these funds to wage jihad while in Sudan and Afghanistan and to secure his leadership position in al Qaeda. In early 2000, the U.S. government discovered a different reality: roughly from 1970 through 1994, Bin Ladin received about $1 million per year—a significant sum, to be sure, but not a $300 million fortune that could be used to fund jihad.[112] Then, as part of a Saudi government crackdown early in the 1990s, the Bin Ladin family was forced to find a buyer for Usama's share of the family company in 1994. The Saudi government subsequently froze the proceeds of the sale. This action had the effect of divesting Bin Ladin of what otherwise might indeed have been a large fortune.[113]

Nor were Bin Ladin's assets in Sudan a source of money for al Qaeda. When Bin Ladin lived in Sudan from 1991 to 1996, he owned a number of businesses and other assets. These could not have provided significant income, as most were small or not economically viable. When Bin Ladin left in 1996, it appears that the Sudanese government expropriated all his assets: he left Sudan with practically nothing. When Bin Ladin arrived in Afghanistan, he relied on the Taliban until he was able to reinvigorate his fund-raising efforts by drawing on ties to wealthy Saudi individuals that he had established during the Afghan war in the 1980s.[114]

Al Qaeda appears to have relied on a core group of financial facilitators who raised money from a variety of donors and other fund-raisers, primarily in the Gulf countries and particularly in Saudi Arabia.[115] Some individual donors surely knew, and others did not, the ultimate destination of their donations. Al Qaeda and its friends took advantage of Islam's strong calls for charitable giving, *zakat*. These financial facilitators also appeared to rely heavily on certain imams at mosques who were willing to divert zakat donations to al Qaeda's cause.[116]

Al Qaeda also collected money from employees of corrupt charities.[117] It took two approaches to using charities for fund-raising. One was to rely on al Qaeda sympathizers in specific foreign branch offices of large, international charities—particularly those with lax external oversight and ineffective internal controls, such as the Saudi-based al Haramain Islamic Foundation.[118] Smaller charities in various parts of the globe were funded by these large Gulf charities and had employees who would siphon the money to al Qaeda.[119]

In addition, entire charities, such as the al Wafa organization, may have wittingly participated in funneling money to al Qaeda. In those cases, al Qaeda operatives controlled the entire organization, including access to bank

accounts.120 Charities were a source of money and also provided significant cover, which enabled operatives to travel undetected under the guise of working for a humanitarian organization.

It does not appear that any government other than the Taliban financially supported al Qaeda before 9/11, although some governments may have contained al Qaeda sympathizers who turned a blind eye to al Qaeda's fundraising activities.121 Saudi Arabia has long been considered the primary source of al Qaeda funding, but we have found no evidence that the Saudi government as an institution or senior Saudi officials individually funded the organization. (This conclusion does not exclude the likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda.)122

Still, al Qaeda found fertile fund-raising ground in Saudi Arabia, where extreme religious views are common and charitable giving was both essential to the culture and subject to very limited oversight.123 Al Qaeda also sought money from wealthy donors in other Gulf states.

Al Qaeda frequently moved the money it raised by *hawala*, an informal and ancient trust-based system for transferring funds.124 In some ways, al Qaeda had no choice after its move to Afghanistan in 1996: first, the banking system there was antiquated and undependable; and second, formal banking was risky due to the scrutiny that al Qaeda received after the August 1998 East Africa embassy bombings, including UN resolutions against it and the Taliban.125 Bin Ladin relied on the established hawala networks operating in Pakistan, in Dubai, and throughout the Middle East to transfer funds efficiently. Hawaladars associated with al Qaeda may have used banks to move and store money, as did various al Qaeda fund-raisers and operatives outside of Afghanistan, but there is little evidence that Bin Ladin or core al Qaeda members used banks while in Afghanistan.126

Before 9/11, al Qaeda spent funds as quickly as it received them. Actual terrorist operations represented a relatively small part of al Qaeda's estimated $30 million annual operating budget. Al Qaeda funded salaries for jihadists, training camps, airfields, vehicles, arms, and the development of training manuals. Bin Ladin provided approximately $10–$20 million per year to the Taliban in return for safe haven. Bin Ladin also may have used money to create alliances with other terrorist organizations, although it is unlikely that al Qaeda was funding an overall jihad program. Rather, Bin Ladin selectively provided start-up funds to new groups or money for specific terrorist operations.127

Al Qaeda has been alleged to have used a variety of illegitimate means, particularly drug trafficking and conflict diamonds, to finance itself. While the drug trade was a source of income for the Taliban, it did not serve the same purpose for al Qaeda, and there is no reliable evidence that Bin Ladin was involved in or made his money through drug trafficking.128 Similarly, we have seen no persuasive evidence that al Qaeda funded itself by trading in African conflict diamonds.129 There also have been claims that al Qaeda financed itself through

manipulation of the stock market based on its advance knowledge of the 9/11 attacks. Exhaustive investigations by the Securities and Exchange Commission, FBI, and other agencies have uncovered no evidence that anyone with advance knowledge of the attacks profited through securities transactions.[130]

To date, the U.S. government has not been able to determine the origin of the money used for the 9/11 attacks. Ultimately the question is of little practical significance. Al Qaeda had many avenues of funding. If a particular funding source had dried up, al Qaeda could have easily tapped a different source or diverted funds from another project to fund an operation that cost $400,000–$500,000 over nearly two years.

### The Funding of the 9/11 Plot

As noted above, the 9/11 plotters spent somewhere between $400,000 and $500,000 to plan and conduct their attack. The available evidence indicates that the 19 operatives were funded by al Qaeda, either through wire transfers or cash provided by KSM, which they carried into the United States or deposited in foreign accounts and accessed from this country. Our investigation has uncovered no credible evidence that any person in the United States gave the hijackers substantial financial assistance. Similarly, we have seen no evidence that any foreign government—or foreign government official—supplied any funding.[131]

We have found no evidence that the Hamburg cell members (Atta, Shehhi, Jarrah, and Binalshibh) received funds from al Qaeda before late 1999. It appears they supported themselves. KSM, Binalshibh, and another plot facilitator, Mustafa al Hawsawi, each received money, in some cases perhaps as much as $10,000, to perform their roles in the plot.[132]

After the Hamburg recruits joined the 9/11 conspiracy, al Qaeda began giving them money. Our knowledge of the funding during this period, before the operatives entered the United States, remains murky. According to KSM, the Hamburg cell members each received $5,000 to pay for their return to Germany from Afghanistan after they had been selected to join the plot, and they received additional funds for travel from Germany to the United States. Financial transactions of the plotters are discussed in more detail in chapter 7.

### Requirements for a Successful Attack

As some of the core operatives prepared to leave for the United States, al Qaeda's leaders could have reflected on what they needed to be able to do in order to organize and conduct a complex international terrorist operation to inflict catastrophic harm. We believe such a list of requirements would have included

- leaders able to evaluate, approve, and supervise the planning and direction of the operation;
- communications sufficient to enable planning and direction of the operatives and those who would be helping them;

- a personnel system that could recruit candidates, vet them, indoctri-
  nate them, and give them necessary training;
- an intelligence effort to gather required information and form assess-
  ments of enemy strengths and weaknesses;
- the ability to move people; and
- the ability to raise and move the necessary money.

The information we have presented about the development of the planes operation shows how, by the spring and summer of 2000, al Qaeda was able to meet these requirements.

By late May 2000, two operatives assigned to the planes operation were already in the United States. Three of the four Hamburg cell members would soon arrive.

6

# FROM THREAT
# TO THREAT

IN CHAPTERS 3 AND 4 we described how the U.S. government adjusted its existing agencies and capacities to address the emerging threat from Usama Bin Ladin and his associates. After the August 1998 bombings of the American embassies in Kenya and Tanzania, President Bill Clinton and his chief aides explored ways of getting Bin Ladin expelled from Afghanistan or possibly capturing or even killing him. Although disruption efforts around the world had achieved some successes, the core of Bin Ladin's organization remained intact.

President Clinton was deeply concerned about Bin Ladin. He and his national security advisor, Samuel "Sandy" Berger, ensured they had a special daily pipeline of reports feeding them the latest updates on Bin Ladin's reported location.[1] In public, President Clinton spoke repeatedly about the threat of terrorism, referring to terrorist training camps but saying little about Bin Ladin and nothing about al Qaeda. He explained to us that this was deliberate—intended to avoid enhancing Bin Ladin's stature by giving him unnecessary publicity. His speeches focused especially on the danger of nonstate actors and of chemical and biological weapons.[2]

As the millennium approached, the most publicized worries were not about terrorism but about computer breakdowns—the Y2K scare. Some government officials were concerned that terrorists would take advantage of such breakdowns.[3]

## 6.1 THE MILLENNIUM CRISIS

### "Bodies Will Pile Up in Sacks"

On November 30, 1999, Jordanian intelligence intercepted a telephone call between Abu Zubaydah, a longtime ally of Bin Ladin, and Khadr Abu Hoshar, a Palestinian extremist. Abu Zubaydah said, "The time for training is over." Suspecting that this was a signal for Abu Hoshar to commence a terrorist

operation, Jordanian police arrested Abu Hoshar and 15 others and informed Washington.[4]

One of the 16, Raed Hijazi, had been born in California to Palestinian parents; after spending his childhood in the Middle East, he had returned to northern California, taken refuge in extremist Islamist beliefs, and then made his way to Abu Zubaydah's Khaldan camp in Afghanistan, where he learned the fundamentals of guerrilla warfare. He and his younger brother had been recruited by Abu Hoshar into a loosely knit plot to attack Jewish and American targets in Jordan.[5]

After late 1996, when Abu Hoshar was arrested and jailed, Hijazi moved back to the United States, worked as a cabdriver in Boston, and sent money back to his fellow plotters. After Abu Hoshar's release, Hijazi shuttled between Boston and Jordan gathering money and supplies. With Abu Hoshar, he recruited in Turkey and Syria as well as Jordan; with Abu Zubaydah's assistance, Abu Hoshar sent these recruits to Afghanistan for training.[6]

In late 1998, Hijazi and Abu Hoshar had settled on a plan. They would first attack four targets: the SAS Radisson Hotel in downtown Amman, the border crossings from Jordan into Israel, and two Christian holy sites, at a time when all these locations were likely to be thronged with American and other tourists. Next, they would target a local airport and other religious and cultural sites. Hijazi and Abu Hoshar cased the intended targets and sent reports to Abu Zubaydah, who approved their plan. Finally, back in Amman from Boston, Hijazi gradually accumulated bomb-making materials, including sulfuric acid and 5,200 pounds of nitric acid, which were then stored in an enormous subbasement dug by the plotters over a period of two months underneath a rented house.[7]

In early 1999, Hijazi and Abu Hoshar contacted Khalil Deek, an American citizen and an associate of Abu Zubaydah who lived in Peshawar, Pakistan, and who, with Afghanistan-based extremists, had created an electronic version of a terrorist manual, the *Encyclopedia of Jihad*. They obtained a CD-ROM of this encyclopedia from Deek.[8] In June, with help from Deek, Abu Hoshar arranged with Abu Zubaydah for Hijazi and three others to go to Afghanistan for added training in handling explosives. In late November 1999, Hijazi reportedly swore before Abu Zubaydah the *bayat* to Bin Ladin, committing himself to do anything Bin Ladin ordered. He then departed for Jordan and was at a waypoint in Syria when Abu Zubaydah sent Abu Hoshar the message that prompted Jordanian authorities to roll up the whole cell.[9]

After the arrests of Abu Hoshar and 15 others, the Jordanians tracked Deek to Peshawar, persuaded Pakistan to extradite him, and added him to their catch. Searches in Amman found the rented house and, among other things, 71 drums of acids, several forged Saudi passports, detonators, and Deek's *Encyclopedia*. Six of the accomplices were sentenced to death. In custody, Hijazi's younger brother said that the group's motto had been "The season is coming, and bodies will pile up in sacks."[10]

**Diplomacy and Disruption**

On December 4, as news came in about the discoveries in Jordan, National Security Council (NSC) Counterterrorism Coordinator Richard Clarke wrote Berger, "If George's [Tenet's] story about a planned series of UBL attacks at the Millennium is true, we will need to make some decisions NOW." He told us he held several conversations with President Clinton during the crisis. He suggested threatening reprisals against the Taliban in Afghanistan in the event of any attacks on U.S. interests, anywhere, by Bin Ladin. He further proposed to Berger that a strike be made during the last week of 1999 against al Qaeda camps in Afghanistan—a proposal not adopted.[11]

Warned by the CIA that the disrupted Jordanian plot was probably part of a larger series of attacks intended for the millennium, some possibly involving chemical weapons, the Principals Committee met on the night of December 8 and decided to task Clarke's Counterterrorism Security Group (CSG) to develop plans to deter and disrupt al Qaeda plots.[12]

Michael Sheehan, the State Department member of the CSG, communicated warnings to the Taliban that they would be held responsible for future al Qaeda attacks. "Mike was not diplomatic," Clarke reported to Berger. With virtually no evidence of a Taliban response, a new approach was made to Pakistan.[13] General Anthony Zinni, the commander of Central Command (CENTCOM), was designated as the President's special envoy and sent to ask General Musharraf to "take whatever action you deem necessary to resolve the Bin Laden problem at the earliest possible time." But Zinni came back empty-handed. As Ambassador William Milam reported from Islamabad, Musharraf was "unwilling to take the political heat at home."[14]

The CIA worked hard with foreign security services to detain or at least keep an eye on suspected Bin Ladin associates. Tenet spoke to 20 of his foreign counterparts. Disruption and arrest operations were mounted against terrorists in eight countries.[15] In mid-December, President Clinton signed a Memorandum of Notification (MON) giving the CIA broader authority to use foreign proxies to detain Bin Ladin lieutenants, without having to transfer them to U.S. custody. The authority was to capture, not kill, though lethal force might be used if necessary.[16] Tenet would later send a message to all CIA personnel overseas, saying, "The threat could not be more real. . . . Do whatever is necessary to disrupt UBL's plans. . . . The American people are counting on you and me to take every appropriate step to protect them during this period." The State Department issued a worldwide threat advisory to its posts overseas.[17]

Then, on December 14, an Algerian jihadist was caught bringing a load of explosives into the United States.

**Ressam's Arrest**

Ahmed Ressam, 23, had illegally immigrated to Canada in 1994. Using a falsified passport and a bogus story about persecution in Algeria, Ressam entered

Montreal and claimed political asylum. For the next few years he supported himself with petty crime. Recruited by an alumnus of Abu Zubaydah's Khaldan camp, Ressam trained in Afghanistan in 1998, learning, among other things, how to place cyanide near the air intake of a building to achieve maximum lethality at minimum personal risk. Having joined other Algerians in planning a possible attack on a U.S. airport or consulate, Ressam left Afghanistan in early 1999 carrying precursor chemicals for explosives disguised in toiletry bottles, a notebook containing bomb assembly instructions, and $12,000. Back in Canada, he went about procuring weapons, chemicals, and false papers.[18]

In early summer 1999, having learned that not all of his colleagues could get the travel documents to enter Canada, Ressam decided to carry out the plan alone. By the end of the summer he had chosen three Los Angeles–area airports as potential targets, ultimately fixing on Los Angeles International (LAX) as the largest and easiest to operate in surreptitiously. He bought or stole chemicals and equipment for his bomb, obtaining advice from three Algerian friends, all of whom were wanted by authorities in France for their roles in past terrorist attacks there. Ressam also acquired new confederates. He promised to help a New York–based partner, Abdelghani Meskini, get training in Afghanistan if Meskini would help him maneuver in the United States.[19]

In December 1999, Ressam began his final preparations. He called an Afghanistan-based facilitator to inquire into whether Bin Ladin wanted to take credit for the attack, but he did not get a reply. He spent a week in Vancouver preparing the explosive components with a close friend. The chemicals were so caustic that the men kept their windows open, despite the freezing temperatures outside, and sucked on cough drops to soothe their irritated throats.[20] While in Vancouver, Ressam also rented a Chrysler sedan for his travel into the United States, and packed the explosives in the trunk's spare tire well.[21]

On December 14, 1999, Ressam drove his rental car onto the ferry from Victoria, Canada, to Port Angeles, Washington. Ressam planned to drive to Seattle and meet Meskini, with whom he would travel to Los Angeles and case

**A Case Study in Terrorist Travel**
Following a familiar terrorist pattern, Ressam and his associates used fraudulent passports and immigration fraud to travel. In Ressam's case, this involved flying from France to Montreal using a photo-substituted French passport under a false name. Under questioning, Ressam admitted the passport was fraudulent and claimed political asylum. He was released pending a hearing, which he failed to attend. His political asylum claim was denied. He was arrested again, released again, and given another hearing date. Again, he did not show. He was arrested four times

for thievery, usually from tourists, but was neither jailed nor deported. He also supported himself by selling stolen documents to a friend who was a document broker for Islamist terrorists.[22]

Ressam eventually obtained a genuine Canadian passport through a document vendor who stole a blank baptismal certificate from a Catholic church. With this document he was able to obtain a Canadian passport under the name of Benni Antoine Noris. This enabled him to travel to Pakistan, and from there to Afghanistan for his training, and then return to Canada. Impressed, Abu Zubaydah asked Ressam to get more genuine Canadian passports and to send them to him for other terrorists to use.[23]

Another conspirator, Abdelghani Meskini, used a stolen identity to travel to Seattle on December 11, 1999, at the request of Mokhtar Haouari, another conspirator. Haouari provided fraudulent passports and visas to assist Ressam and Meskini's planned getaway from the United States to Algeria, Pakistan, and Afghanistan.[24] One of Meskini's associates, Abdel Hakim Tizegha, also filed a claim for political asylum. He was released pending a hearing, which was adjourned and rescheduled five times. His claim was finally denied two years after his initial filing. His attorney appealed the decision, and Tizegha was allowed to remain in the country pending the appeal. Nine months later, his attorney notified the court that he could not locate his client. A warrant of deportation was issued.[25]

LAX. They planned to detonate the bomb on or around January 1, 2000. At the Immigration and Naturalization Service (INS) preinspection station in Victoria, Ressam presented officials with his genuine but fraudulently obtained Canadian passport, from which he had torn the Afghanistan entry and exit stamps. The INS agent on duty ran the passport through a variety of databases but, since it was not in Ressam's name, he did not pick up the pending Canadian arrest warrants. After a cursory examination of Ressam's car, the INS agents allowed Ressam to board the ferry.[26]

Late in the afternoon of December 14, Ressam arrived in Port Angeles. He waited for all the other cars to depart the ferry, assuming (incorrectly) that the last car off would draw less scrutiny. Customs officers assigned to the port, noticing Ressam's nervousness, referred him to secondary inspection. When asked for additional identification, Ressam handed the Customs agent a Price Costco membership card in the same false name as his passport. As that agent began an initial pat-down, Ressam panicked and tried to run away.[27]

Inspectors examining Ressam's rental car found the explosives concealed in the spare tire well, but at first they assumed the white powder and viscous liquid were drug-related—until an inspector pried apart and identified one of the four timing devices concealed within black boxes. Ressam was placed under arrest. Investigators guessed his target was in Seattle. They did not learn about the Los Angeles airport planning until they reexamined evidence seized in Montreal in 2000; they obtained further details when Ressam began cooperating in May 2001.[28]

## Emergency Cooperation

After the disruption of the plot in Amman, it had not escaped notice in Washington that Hijazi had lived in California and driven a cab in Boston and that Deek was a naturalized U.S. citizen who, as Berger reminded President Clinton, had been in touch with extremists in the United States as well as abroad.[29] Before Ressam's arrest, Berger saw no need to raise a public alarm at home—although the FBI put all field offices on alert.[30]

Now, following Ressam's arrest, the FBI asked for an unprecedented number of special wiretaps. Both Berger and Tenet told us that their impression was that more Foreign Intelligence Surveillance Act (FISA) wiretap requests were processed during the millennium alert than ever before.[31]

The next day, writing about Ressam's arrest and links to a cell in Montreal, Berger informed the President that the FBI would advise police in the United States to step up activities but would still try to avoid undue public alarm by stressing that the government had no specific information about planned attacks.[32]

At a December 22 meeting of the Small Group of principals, FBI Director Louis Freeh briefed officials from the NSC staff, CIA, and Justice on wiretaps and investigations inside the United States, including a Brooklyn entity tied to the Ressam arrest, a seemingly unreliable foreign report of possible attacks on seven U.S. cities, two Algerians detained on the Canadian border, and searches in Montreal related to a jihadist cell. The Justice Department released a statement on the alert the same day.[33]

Clarke's staff warned, "*Foreign terrorist sleeper cells are present in the US and attacks in the US are likely*."[34] Clarke asked Berger to try to make sure that the domestic agencies remained alert. "Is there a threat to civilian aircraft?" he wrote. Clarke also asked the principals in late December to discuss a foreign security service report about a Bin Ladin plan to put bombs on transatlantic flights.[35]

The CSG met daily. Berger said that the principals met constantly.[36] Later, when asked what made her decide to ask Ressam to step out of his vehicle, Diana Dean, a Customs inspector who referred Ressam to secondary inspection, testified that it was her "training and experience."[37] It appears that the heightened sense of alert at the national level played no role in Ressam's detention.

There was a mounting sense of public alarm. The earlier Jordanian arrests had been covered in the press, and Ressam's arrest was featured on network evening news broadcasts throughout the Christmas season.[38]

The FBI was more communicative during the millennium crisis than it had ever been. The senior FBI official for counterterrorism, Dale Watson, was a regular member of the CSG, and Clarke had good relations both with him and with some of the FBI agents handling al Qaeda–related investigations, including John O'Neill in New York. As a rule, however, neither Watson nor these agents brought much information to the group. The FBI simply did not produce the kind of intelligence reports that other agencies routinely wrote and disseminated. As law enforcement officers, Bureau agents tended to write up only witness interviews. Written case analysis usually occurred only in memoranda to supervisors requesting authority to initiate or expand an investigation.[39]

But during the millennium alert, with its direct links into the United States from Hijazi, Deek, and Ressam, FBI officials were briefing in person about ongoing investigations, not relying on the dissemination of written reports. Berger told us that it was hard for FBI officials to hold back information in front of a cabinet-rank group. After the alert, according to Berger and members of the NSC staff, the FBI returned to its normal practice of withholding written reports and saying little about investigations or witness interviews, taking the position that any information related to pending investigations might be presented to a grand jury and hence could not be disclosed under then-prevailing federal law.[40]

The terrorist plots that were broken up at the end of 1999 display the variety of operations that might be attributed, however indirectly, to al Qaeda. The Jordanian cell was a loose affiliate; we now know that it sought approval and training from Afghanistan, and at least one key member swore loyalty to Bin Ladin. But the cell's plans and preparations were autonomous. Ressam's ties to al Qaeda were even looser. Though he had been recruited, trained, and prepared in a network affiliated with the organization and its allies, Ressam's own plans were, nonetheless, essentially independent.

Al Qaeda, and Bin Ladin himself, did have at least one operation of their very own in mind for the millennium period. In chapter 5 we introduced an al Qaeda operative named Nashiri. Working with Bin Ladin, he was developing a plan to attack a ship near Yemen. On January 3, an attempt was made to attack a U.S. warship in Aden, the USS *The Sullivans*. The attempt failed when the small boat, overloaded with explosives, sank. The operatives salvaged their equipment without the attempt becoming known, and they put off their plans for another day.

Al Qaeda's "planes operation" was also coming along. In January 2000, the United States caught a glimpse of its preparations.

### A Lost Trail in Southeast Asia

In late 1999, the National Security Agency (NSA) analyzed communications associated with a suspected terrorist facility in the Middle East, indicating that several members of "an operational cadre" were planning to travel to Kuala Lumpur in early January 2000. Initially, only the first names of three were known—"Nawaf," "Salem," and "Khalid." NSA analysts surmised correctly that Salem was Nawaf's younger brother. Seeing links not only with al Qaeda but specifically with the 1998 embassy bombings, a CIA desk officer guessed that "something more nefarious [was] afoot."[41]

In chapter 5, we discussed the dispatch of two operatives to the United States for their part in the planes operation—Nawaf al Hazmi and Khalid al Mihdhar. Two more, Khallad and Abu Bara, went to Southeast Asia to case flights for the part of the operation that was supposed to unfold there.[42] All made their way to Southeast Asia from Afghanistan and Pakistan, except for Mihdhar, who traveled from Yemen.[43]

Though Nawaf's trail was temporarily lost, the CIA soon identified "Khalid" as Khalid al Mihdhar.[44] He was located leaving Yemen and tracked until he arrived in Kuala Lumpur on January 5, 2000.[45] Other Arabs, unidentified at the time, were watched as they gathered with him in the Malaysian capital.[46]

On January 8, the surveillance teams reported that three of the Arabs had suddenly left Kuala Lumpur on a short flight to Bangkok.[47] They identified one as Mihdhar. They later learned that one of his companions was named Alhazmi, although it was not yet known that he was "Nawaf." The only identifier available for the third person was part of a name—Salahsae.[48] In Bangkok, CIA officers received the information too late to track the three men as they came in, and the travelers disappeared into the streets of Bangkok.[49]

The Counterterrorist Center (CTC) had briefed the CIA leadership on the gathering in Kuala Lumpur, and the information had been passed on to Berger and the NSC staff and to Director Freeh and others at the FBI (though the FBI noted that the CIA had the lead and would let the FBI know if a domestic angle arose). The head of the Bin Ladin unit kept providing updates, unaware at first even that the Arabs had left Kuala Lumpur, let alone that their trail had been lost in Bangkok.[50] When this bad news arrived, the names were put on a Thai watchlist so that Thai authorities could inform the United States if any of them departed from Thailand.[51]

Several weeks later, CIA officers in Kuala Lumpur prodded colleagues in Bangkok for additional information regarding the three travelers.[52] In early March 2000, Bangkok reported that Nawaf al Hazmi, now identified for the first time with his full name, had departed on January 15 on a United Airlines flight to Los Angeles. As for Khalid al Mihdhar, there was no report of his departure even though he had accompanied Hazmi on the United flight to Los Angeles.[53] No one outside of the Counterterrorist Center was told any of this. The CIA did not try to register Mihdhar or Hazmi with the State Department's

TIPOFF watchlist—either in January, when word arrived of Mihdhar's visa, or in March, when word came that Hazmi, too, had had a U.S. visa and a ticket to Los Angeles.[54]

None of this information—about Mihdhar's U.S. visa or Hazmi's travel to the United States—went to the FBI, and nothing more was done to track any of the three until January 2001, when the investigation of another bombing, that of the USS *Cole*, reignited interest in Khallad. We will return to that story in chapter 8.

## 6.2 POST-CRISIS REFLECTION: AGENDA FOR 2000

After the millennium alert, elements of the U.S. government reviewed their performance. The CIA's leadership was told that while a number of plots had been disrupted, the millennium might be only the "kick-off" for a period of extended attacks.[55] Clarke wrote Berger on January 11, 2000, that the CIA, the FBI, Justice, and the NSC staff had come to two main conclusions. First, U.S. disruption efforts thus far had "not put too much of a dent" in Bin Ladin's network. If the United States wanted to "roll back" the threat, disruption would have to proceed at "a markedly different tempo." Second, "sleeper cells" and "a variety of terrorist groups" had turned up at home.[56] As one of Clarke's staff noted, only a "chance discovery" by U.S. Customs had prevented a possible attack.[57] Berger gave his approval for the NSC staff to commence an "after-action review," anticipating new budget requests. He also asked DCI Tenet to review the CIA's counterterrorism strategy and come up with a plan for "where we go from here."[58]

The NSC staff advised Berger that the United States had only been "nibbling at the edges" of Bin Ladin's network and that more terror attacks were a question not of "if" but rather of "when" and "where."[59] The Principals Committee met on March 10, 2000, to review possible new moves. The principals ended up agreeing that the government should take three major steps. First, more money should go to the CIA to accelerate its efforts to "seriously attrit" al Qaeda. Second, there should be a crackdown on foreign terrorist organizations in the United States. Third, immigration law enforcement should be strengthened, and the INS should tighten controls on the Canadian border (including stepping up U.S.–Canada cooperation). The principals endorsed the proposed programs; some, like expanding the number of Joint Terrorism Task Forces, moved forward, and others, like creating a centralized translation unit for domestic intelligence intercepts in Arabic and other languages, did not.[60]

### Pressing Pakistan

While this process moved along, diplomacy continued its rounds. Direct pressure on the Taliban had proved unsuccessful. As one NSC staff note put it,

"Under the Taliban, Afghanistan is not so much a state sponsor of terrorism as it is a state sponsored by terrorists."[61] In early 2000, the United States began a high-level effort to persuade Pakistan to use its influence over the Taliban.

In January 2000, Assistant Secretary of State Karl Inderfurth and the State Department's counterterrorism coordinator, Michael Sheehan, met with General Musharraf in Islamabad, dangling before him the possibility of a presidential visit in March as a reward for Pakistani cooperation. Such a visit was coveted by Musharraf, partly as a sign of his government's legitimacy. He told the two envoys that he would meet with Mullah Omar and press him on Bin Ladin. They left, however, reporting to Washington that Pakistan was unlikely in fact to do anything, "given what it sees as the benefits of Taliban control of Afghanistan."[62]

President Clinton was scheduled to travel to India. The State Department felt that he should not visit India without also visiting Pakistan. The Secret Service and the CIA, however, warned in the strongest terms that visiting Pakistan would risk the President's life. Counterterrorism officials also argued that Pakistan had not done enough to merit a presidential visit. But President Clinton insisted on including Pakistan in the itinerary for his trip to South Asia.[63] His one-day stopover on March 25, 2000, was the first time a U.S. president had been there since 1969. At his meeting with Musharraf and others, President Clinton concentrated on tensions between Pakistan and India and the dangers of nuclear proliferation, but also discussed Bin Ladin. President Clinton told us that when he pulled Musharraf aside for a brief, one-on-one meeting, he pleaded with the general for help regarding Bin Ladin. "I offered him the moon when I went to see him, in terms of better relations with the United States, if he'd help us get Bin Ladin and deal with another issue or two."[64]

The U.S. effort continued. Early in May, President Clinton urged Musharraf to carry through on his promise to visit Afghanistan and press Mullah Omar to expel Bin Ladin.[65] At the end of the month, Under Secretary of State Thomas Pickering followed up with a trip to the region.[66] In June, DCI Tenet traveled to Pakistan with the same general message.[67] By September, the United States was becoming openly critical of Pakistan for supporting a Taliban military offensive aimed at completing the conquest of Afghanistan.[68]

In December, taking a step proposed by the State Department some months earlier, the United States led a campaign for new UN sanctions, which resulted in UN Security Council Resolution 1333, again calling for Bin Ladin's expulsion and forbidding any country to provide the Taliban with arms or military assistance.[69] This, too, had little if any effect. The Taliban did not expel Bin Ladin. Pakistani arms continued to flow across the border.

Secretary of State Madeleine Albright told us, "We did not have a strong hand to play with the Pakistanis. Because of the sanctions required by U.S. law, we had few carrots to offer."[70] Congress had blocked most economic and military aid to Pakistan because of that country's nuclear arms program and Musharraf's coup. Sheehan was critical of Musharraf, telling us that the Pakistani leader "blew a chance to remake Pakistan."[71]