**Building New Capabilities: The CIA**

The after-action review had treated the CIA as the lead agency for any offensive against al Qaeda, and the principals, at their March 10 meeting, had endorsed strengthening the CIA's capability for that role. To the CTC, that meant proceeding with "the Plan," which it had put forward half a year earlier—hiring and training more case officers and building up the capabilities of foreign security services that provided intelligence via liaison. On occasion, as in Jordan in December 1999, these liaison services took direct action against al Qaeda cells.[72]

In the CTC and higher up, the CIA's managers believed that they desperately needed funds just to continue their current counterterrorism effort, for they reckoned that the millennium alert had already used up all of the Center's funds for the current fiscal year; the Bin Ladin unit had spent 140 percent of its allocation. Tenet told us he met with Berger to discuss funding for counterterrorism just two days after the principals' meeting.[73]

While Clarke strongly favored giving the CIA more money for counterterrorism, he differed sharply with the CIA's managers about where it should come from. They insisted that the CIA had been shortchanged ever since the end of the Cold War. Their ability to perform any mission, counterterrorism included, they argued, depended on preserving what they had, restoring what they had lost since the beginning of the 1990s, and building from there—with across-the-board recruitment and training of new case officers, and the reopening of closed stations. To finance the counterterrorism effort, Tenet had gone to congressional leaders after the 1998 embassy bombings and persuaded them to give the CIA a special supplemental appropriation. Now, in the aftermath of the millennium alert, Tenet wanted a boost in overall funds for the CIA *and* another supplemental appropriation specifically for counterterrorism.[74]

To Clarke, this seemed evidence that the CIA's leadership did not give sufficient priority to the battle against Bin Ladin and al Qaeda. He told us that James Pavitt, the head of the CIA's Directorate of Operations, "said if there's going to be money spent on going after Bin Ladin, it should be given to him. . . . My view was that he had had a lot of money to do it and a long time to do it, and I didn't want to put more good money after bad."[75] The CIA had a very different attitude: Pavitt told us that while the CIA's Bin Ladin unit did "extraordinary and commendable work," his chief of station in London "was just as much part of the al Qaeda struggle as an officer sitting in [the Bin Ladin unit]."[76]

The dispute had large managerial implications, for Clarke had found allies in the Office of Management and Budget (OMB). They had supplied him with the figures he used to argue that CIA spending on counterterrorism from its baseline budget had shown almost no increase.[77]

Berger met twice with Tenet in April to try to resolve the dispute. The Deputies Committee met later in the month to review fiscal year 2000 and 2001 budget priorities and offsets for the CIA and other agencies. In the end,

Tenet obtained a modest supplemental appropriation, which funded counterterrorism without requiring much reprogramming of baseline funds. But the CIA still believed that it remained underfunded for counterterrorism.[78]

**Terrorist Financing**

The second major point on which the principals had agreed on March 10 was the need to crack down on terrorist organizations and curtail their fund-raising.

The embassy bombings of 1998 had focused attention on al Qaeda's finances. One result had been the creation of an NSC–led interagency committee on terrorist financing. On its recommendation, the President had designated Bin Ladin and al Qaeda as subject to sanctions under the International Emergency Economic Powers Act. This gave the Treasury Department's Office of Foreign Assets Control (OFAC) the ability to search for and freeze any Bin Ladin or al Qaeda assets that reached the U.S. financial system. But since OFAC had little information to go on, few funds were frozen.[79]

In July 1999, the President applied the same designation to the Taliban for harboring Bin Ladin. Here, OFAC had more success. It blocked more than $34 million in Taliban assets held in U.S. banks. Another $215 million in gold and $2 million in demand deposits, all belonging to the Afghan central bank and held by the Federal Reserve Bank of New York, were also frozen.[80] After October 1999, when the State Department formally designated al Qaeda a "foreign terrorist organization," it became the duty of U.S. banks to block its transactions and seize its funds.[81] Neither this designation nor UN sanctions had much additional practical effect; the sanctions were easily circumvented, and there were no multilateral mechanisms to ensure that other countries' financial systems were not used as conduits for terrorist funding.[82]

Attacking the funds of an institution, even the Taliban, was easier than finding and seizing the funds of a clandestine worldwide organization like al Qaeda. Although the CIA's Bin Ladin unit had originally been inspired by the idea of studying terrorist financial links, few personnel assigned to it had any experience in financial investigations. Any terrorist-financing intelligence appeared to have been collected collaterally, as a consequence of gathering other intelligence. This attitude may have stemmed in large part from the chief of this unit, who did not believe that simply following the money from point A to point B revealed much about the terrorists' plans and intentions. As a result, the CIA placed little emphasis on terrorist financing.[83]

Nevertheless, the CIA obtained a general understanding of how al Qaeda raised money. It knew relatively early, for example, about the loose affiliation of financial institutions, businesses, and wealthy individuals who supported extremist Islamic activities.[84] Much of the early reporting on al Qaeda's financial situation and its structure came from Jamal Ahmed al Fadl, whom we have mentioned earlier in the report.[85] After the 1998 embassy bombings, the U.S. government tried to develop a clearer picture of Bin Ladin's finances. A U.S.

interagency group traveled to Saudi Arabia twice, in 1999 and 2000, to get information from the Saudis about their understanding of those finances. The group eventually concluded that the oft-repeated assertion that Bin Ladin was funding al Qaeda from his personal fortune was in fact not true.

The officials developed a new theory: al Qaeda was getting its money elsewhere, and the United States needed to focus on other sources of funding, such as charities, wealthy donors, and financial facilitators. Ultimately, although the intelligence community devoted more resources to the issue and produced somewhat more intelligence,[86] it remained difficult to distinguish al Qaeda's financial transactions among the vast sums moving in the international financial system. The CIA was not able to find or disrupt al Qaeda's money flows.[87]

The NSC staff thought that one possible solution to these weaknesses in the intelligence community was to create an all-source terrorist-financing intelligence analysis center. Clarke pushed for the funding of such a center at Treasury, but neither Treasury nor the CIA was willing to commit the resources.[88]

Within the United States, various FBI field offices gathered intelligence on organizations suspected of raising funds for al Qaeda or other terrorist groups. By 9/11, FBI agents understood that there were extremist organizations operating within the United States supporting a global jihadist movement and with substantial connections to al Qaeda. The FBI operated a web of informants, conducted electronic surveillance, and had opened significant investigations in a number of field offices, including New York, Chicago, Detroit, San Diego, and Minneapolis. On a national level, however, the FBI never used the information to gain a systematic or strategic understanding of the nature and extent of al Qaeda fundraising.[89]

Treasury regulators, as well as U.S. financial institutions, were generally focused on finding and deterring or disrupting the vast flows of U.S. currency generated by drug trafficking and high-level international fraud. Large-scale scandals, such as the use of the Bank of New York by Russian money launderers to move millions of dollars out of Russia, captured the attention of the Department of the Treasury and of Congress.[90] Before 9/11, Treasury did not consider terrorist financing important enough to mention in its national strategy for money laundering.[91]

**Border Security**
The third point on which the principals had agreed on March 10 was the need for attention to America's porous borders and the weak enforcement of immigration laws. Drawing on ideas from government officials, Clarke's working group developed a menu of proposals to bolster border security. Some reworked or reiterated previous presidential directives.[92] They included

- creating an interagency center to target illegal entry and human traffickers;

- imposing tighter controls on student visas;[93]
- taking legal action to prevent terrorists from coming into the United States and to remove those already here, detaining them while awaiting removal proceedings;[94]
- further increasing the number of immigration agents to FBI Joint Terrorism Task Forces to help investigate immigration charges against individuals suspected of terrorism;[95]
- activating a special court to enable the use of classified evidence in immigration-related national security cases;[96] and
- both implementing new security measures for U.S. passports and working with the United Nations and foreign governments to raise global security standards for travel documents.[97]

Clarke's working group compiled new proposals as well, such as

- undertaking a Joint Perimeter Defense program with Canada to establish cooperative intelligence and law enforcement programs, leading to joint operations based on shared visa and immigration data and joint border patrols;
- staffing land border crossings 24/7 and equipping them with video cameras, physical barriers, and means to detect weapons of mass destruction (WMD); and
- addressing the problem of migrants—possibly including terrorists—who destroy their travel documents so they cannot be returned to their countries of origin.[98]

These proposals were praiseworthy in principle. In practice, however, they required action by weak, chronically underfunded executive agencies and powerful congressional committees, which were more responsive to well-organized interest groups than to executive branch interagency committees. The changes sought by the principals in March 2000 were only beginning to occur before 9/11.

**"Afghan Eyes"**
In early March 2000, when President Clinton received an update on U.S. covert action efforts against Bin Ladin, he wrote in the memo's margin that the United States could surely do better. Military officers in the Joint Staff told us that they shared this sense of frustration. Clarke used the President's comment to push the CSG to brainstorm new ideas, including aid to the Northern Alliance.[99]

Back in December 1999, Northern Alliance leader Ahmed Shah Massoud had offered to stage a rocket attack against Bin Ladin's Derunta training complex. Officers at the CIA had worried that giving him a green light might cross the line into violation of the assassination ban. Hence, Massoud was told not

to take any such action without explicit U.S. authorization.[100] In the spring of 2000, after the CIA had sent out officers to explore possible closer relationships with both the Uzbeks and the Northern Alliance, discussions took place in Washington between U.S. officials and delegates sent by Massoud.[101]

The Americans agreed that Massoud should get some modest technical help so he could work on U.S. priorities—collecting intelligence on and possibly acting against al Qaeda. But Massoud wanted the United States both to become his ally in trying to overthrow the Taliban and to recognize that they were fighting common enemies. Clarke and Cofer Black, the head of the Counterterrorist Center, wanted to take this next step. Proposals to help the Northern Alliance had been debated in the U.S. government since 1999 and, as we mentioned in chapter 4, the U.S. government as a whole had been wary of endorsing them, largely because of the Northern Alliance's checkered history, its limited base of popular support in Afghanistan, and Pakistan's objections.[102]

CIA officials also began pressing proposals to use their ties with the Northern Alliance to get American agents on the ground in Afghanistan for an extended period, setting up their own base for covert intelligence collection and activity in the Panjshir Valley and lessening reliance on foreign proxies. "There's no substitute for face-to-face," one officer told us.[103] But the CIA's institutional capacity for such direct action was weak, especially if it was not working jointly with the U.S. military. The idea was turned down as too risky.[104]

In the meantime, the CIA continued to work with its tribal assets in southern Afghanistan. In early August, the tribals reported an attempt to ambush Bin Ladin's convoy as he traveled on the road between Kabul and Kandahar city—their first such reported interdiction attempt in more than a year and a half. But it was not a success. According to the tribals' own account, when they approached one of the vehicles, they quickly determined that women and children were inside and called off the ambush. Conveying this information to the NSC staff, the CIA noted that they had no independent corroboration for this incident, but that the tribals had acted within the terms of the CIA's authorities in Afghanistan.[105]

In 2000, plans continued to be developed for potential military operations in Afghanistan. Navy vessels that could launch missiles into Afghanistan were still on call in the north Arabian Sea.[106] In the summer, the military refined its list of strikes and Special Operations possibilities to a set of 13 options within the Operation Infinite Resolve plan.[107] Yet planning efforts continued to be limited by the same operational and policy concerns encountered in 1998 and 1999. Although the intelligence community sometimes knew where Bin Ladin was, it had been unable to provide intelligence considered sufficiently reliable to launch a strike. Above all, the United States did not have American eyes on the target. As one military officer put it, we had our hand on the door, but we couldn't open the door and walk in.[108]

At some point during this period, President Clinton expressed his frustration with the lack of military options to take out Bin Ladin and the al Qaeda leadership, remarking to General Hugh Shelton, "You know, it would scare the shit out of al-Qaeda if suddenly a bunch of black ninjas rappelled out of helicopters into the middle of their camp."[109] Although Shelton told the Commission he did not remember the statement, President Clinton recalled this remark as "one of the many things I said." The President added, however, that he realized nothing would be accomplished if he lashed out in anger. Secretary of Defense William Cohen thought that the President might have been making a hypothetical statement. Regardless, he said, the question remained how to get the "ninjas" into and out of the theater of operations.[110] As discussed in chapter 4, plans of this kind were never carried out before 9/11.

In late 1999 or early 2000, the Joint Staff's director of operations, Vice Admiral Scott Fry, directed his chief information operations officer, Brigadier General Scott Gration, to develop innovative ways to get better intelligence on Bin Ladin's whereabouts. Gration and his team worked on a number of different ideas aimed at getting reliable American eyes on Bin Ladin in a way that would reduce the lag time between sighting and striking.[111]

One option was to use a small, unmanned U.S. Air Force drone called the Predator, which could survey the territory below and send back video footage. Another option—eventually dismissed as impractical—was to place a powerful long-range telescope on a mountain within range of one of Bin Ladin's training camps. Both proposals were discussed with General Shelton, the chairman of the Joint Chiefs of Staff, and then briefed to Clarke's office at the White House as the CSG was searching for new ideas. In the spring of 2000, Clarke brought in the CIA's assistant director for collection, Charles Allen, to work together with Fry on a joint CIA-Pentagon effort that Clarke dubbed "Afghan Eyes."[112] After much argument between the CIA and the Defense Department about who should pay for the program, the White House eventually imposed a cost-sharing agreement. The CIA agreed to pay for Predator operations as a 60-day "proof of concept" trial run.[113]

The Small Group backed Afghan Eyes at the end of June 2000. By mid-July, testing was completed and the equipment was ready, but legal issues were still being ironed out.[114] By August 11, the principals had agreed to deploy the Predator.[115] The NSC staff considered how to use the information the drones would be relaying from Afghanistan. Clarke's deputy, Roger Cressey, wrote to Berger that emergency CSG and Principals Committee meetings might be needed to act on video coming in from the Predator if it proved able to lock in Bin Ladin's location. In the memo's margin, Berger wrote that before considering action, "I will want more than verified location: we will need, at least, data on pattern of movements to provide some assurance he will remain in place." President Clinton was kept up to date.[116]

On September 7, the Predator flew for the first time over Afghanistan. When

Clarke saw video taken during the trial flight, he described the imagery to Berger as "truly astonishing," and he argued immediately for more flights seeking to find Bin Ladin and target him for cruise missile or air attack. Even if Bin Ladin were not found, Clarke said, Predator missions might identify additional worthwhile targets, such as other al Qaeda leaders or stocks of chemical or biological weapons.[117]

Clarke was not alone in his enthusiasm. He had backing from Cofer Black and Charles Allen at the CIA. Ten out of 15 trial missions of the Predator over Afghanistan were rated successful. On the first flight, a Predator saw a security detail around a tall man in a white robe at Bin Ladin's Tarnak Farms compound outside Kandahar. After a second sighting of the "man in white" at the compound on September 28, intelligence community analysts determined that he was probably Bin Ladin.[118]

During at least one trial mission, the Taliban spotted the Predator and scrambled MiG fighters to try, without success, to intercept it. Berger worried that a Predator might be shot down, and warned Clarke that a shootdown would be a "bonanza" for Bin Ladin and the Taliban.[119]

Still, Clarke was optimistic about Predator—as well as progress with disruptions of al Qaeda cells elsewhere. Berger was more cautious, praising the NSC staff's performance but observing that this was no time for complacency. "Unfortunately," he wrote, "the light at the end of the tunnel is another tunnel."[120]

## 6.3 THE ATTACK ON THE USS *COLE*

Early in chapter 5 we introduced, along with Khalid Sheikh Mohammed, two other men who became operational coordinators for al Qaeda: Khallad and Nashiri. As we explained, both were involved during 1998 and 1999 in preparing to attack a ship off the coast of Yemen with a boatload of explosives. They had originally targeted a commercial vessel, specifically an oil tanker, but Bin Ladin urged them to look for a U.S. warship instead. In January 2000, their team had attempted to attack a warship in the port of Aden, but the attempt failed when the suicide boat sank. More than nine months later, on October 12, 2000, al Qaeda operatives in a small boat laden with explosives attacked a U.S. Navy destroyer, the USS *Cole*. The blast ripped a hole in the side of the *Cole*, killing 17 members of the ship's crew and wounding at least 40.[121]

The plot, we now know, was a full-fledged al Qaeda operation, supervised directly by Bin Ladin. He chose the target and location of the attack, selected the suicide operatives, and provided the money needed to purchase explosives and equipment. Nashiri was the field commander and managed the operation in Yemen. Khallad helped in Yemen until he was arrested in a case of mistaken

identity and freed with Bin Ladin's help, as we also mentioned earlier. Local al Qaeda coordinators included Jamal al Badawi and Fahd al Quso, who was supposed to film the attack from a nearby apartment. The two suicide operatives chosen were Hassan al Khamri and Ibrahim al Thawar, also known as Nibras. Nibras and Quso delivered money to Khallad in Bangkok during Khallad's January 2000 trip to Kuala Lumpur and Bangkok.[122]

In September 2000, Bin Ladin reportedly told Nashiri that he wanted to replace Khamri and Nibras. Nashiri was angry and disagreed, telling others he would go to Afghanistan and explain to Bin Ladin that the new operatives were already trained and ready to conduct the attack. Prior to departing, Nashiri gave Nibras and Khamri instructions to execute the attack on the next U.S. warship that entered the port of Aden.[123]

While Nashiri was in Afghanistan, Nibras and Khamri saw their chance. They piloted the explosives-laden boat alongside the USS *Cole*, made friendly gestures to crew members, and detonated the bomb. Quso did not arrive at the apartment in time to film the attack.[124]

Back in Afghanistan, Bin Ladin anticipated U.S. military retaliation. He ordered the evacuation of al Qaeda's Kandahar airport compound and fled—first to the desert area near Kabul, then to Khowst and Jalalabad, and eventually back to Kandahar. In Kandahar, he rotated between five to six residences, spending one night at each residence. In addition, he sent his senior advisor, Mohammed Atef, to a different part of Kandahar and his deputy, Ayman al Zawahiri, to Kabul so that all three could not be killed in one attack.[125]

There was no American strike. In February 2001, a source reported that an individual whom he identified as the big instructor (probably a reference to Bin Ladin) complained frequently that the United States had not yet attacked. According to the source, Bin Ladin wanted the United States to attack, and if it did not he would launch something bigger.[126]

The attack on the USS *Cole* galvanized al Qaeda's recruitment efforts. Following the attack, Bin Ladin instructed the media committee, then headed by Khalid Sheikh Mohammed, to produce a propaganda video that included a reenactment of the attack along with images of the al Qaeda training camps and training methods; it also highlighted Muslim suffering in Palestine, Kashmir, Indonesia, and Chechnya. Al Qaeda's image was very important to Bin Ladin, and the video was widely disseminated. Portions were aired on Al Jazeera, CNN, and other television outlets. It was also disseminated among many young men in Saudi Arabia and Yemen, and caused many extremists to travel to Afghanistan for training and jihad. Al Qaeda members considered the video an effective tool in their struggle for preeminence among other Islamist and jihadist movements.[127]

**Investigating the Attack**

Teams from the FBI, the Naval Criminal Investigative Service, and the CIA were immediately sent to Yemen to investigate the attack. With difficulty, Barbara Bodine, the U.S. ambassador to Yemen, tried to persuade the Yemeni government to accept these visitors and allow them to carry arms, though the Yemenis balked at letting Americans openly carry long guns (rifles, shotguns, automatic weapons). Meanwhile, Bodine and the leader of the FBI team, John O'Neill, clashed repeatedly—to the point that after O'Neill had been rotated out of Yemen but wanted to return, Bodine refused the request. Despite the initial tension, the Yemeni and American investigations proceeded. Within a few weeks, the outline of the story began to emerge.[128]

On the day of the *Cole* attack, a list of suspects was assembled that included al Qaeda's affiliate Egyptian Islamic Jihad. U.S. counterterrorism officials told us they immediately assumed that al Qaeda was responsible. But as Deputy DCI John McLaughlin explained to us, it was not enough for the attack to smell, look, and taste like an al Qaeda operation. To make a case, the CIA needed not just a guess but a link to someone known to be an al Qaeda operative.[129]

Within the first weeks after the attack, the Yemenis found and arrested both Badawi and Quso, but did not let the FBI team participate in the interrogations. The CIA described initial Yemeni support after the *Cole* as "slow and inadequate." President Clinton, Secretary Albright, and DCI Tenet all intervened to help. Because the information was secondhand, the U.S. team could not make its own assessment of its reliability.[130]

On November 11, the Yemenis provided the FBI with new information from the interrogations of Badawi and Quso, including descriptions of individuals from whom the detainees had received operational direction. One of them was Khallad, who was described as having lost his leg. The detainees said that Khallad helped direct the *Cole* operation from Afghanistan or Pakistan. The Yemenis (correctly) judged that the man described as Khallad was Tawfiq bin Attash.[131]

An FBI special agent recognized the name Khallad and connected this news with information from an important al Qaeda source who had been meeting regularly with CIA and FBI officers. The source had called Khallad Bin Ladin's "run boy," and described him as having lost one leg in an explosives accident at a training camp a few years earlier. To confirm the identification, the FBI agent asked the Yemenis for their photo of Khallad. The Yemenis provided the photo on November 22, reaffirming their view that Khallad had been an intermediary between the plotters and Bin Ladin. (In a meeting with U.S. officials a few weeks later, on December 16, the source identified Khallad from the Yemeni photograph.)[132]

U.S. intelligence agencies had already connected Khallad to al Qaeda terrorist operations, including the 1998 embassy bombings. By this time the Yeme-

nis also had identified Nashiri, whose links to al Qaeda and the 1998 embassy bombings were even more well-known.[133]

In other words, the Yemenis provided strong evidence connecting the *Cole* attack to al Qaeda during the second half of November, identifying individual operatives whom the United States knew were part of al Qaeda. During December the United States was able to corroborate this evidence. But the United States did not have evidence about Bin Ladin's personal involvement in the attacks until Nashiri and Khallad were captured in 2002 and 2003.

## Considering a Response

The *Cole* attack prompted renewed consideration of what could be done about al Qaeda. According to Clarke, Berger upbraided DCI Tenet so sharply after the *Cole* attack—repeatedly demanding to know why the United States had to put up with such attacks—that Tenet walked out of a meeting of the principals.[134]

The CIA got some additional covert action authorities, adding several other individuals to the coverage of the July 1999 Memorandum of Notification that allowed the United States to develop capture operations against al Qaeda leaders in a variety of places and circumstances. Tenet developed additional options, such as strengthening relationships with the Northern Alliance and the Uzbeks and slowing recent al Qaeda–related activities in Lebanon.[135]

On the diplomatic track, Berger agreed on October 30, 2000, to let the State Department make another approach to Taliban Deputy Foreign Minister Abdul Jalil about expelling Bin Ladin. The national security advisor ordered that the U.S. message "be stern and foreboding." This warning was similar to those issued in 1998 and 1999. Meanwhile, the administration was working with Russia on new UN sanctions against Mullah Omar's regime.[136]

President Clinton told us that before he could launch further attacks on al Qaeda in Afghanistan, or deliver an ultimatum to the Taliban threatening strikes if they did not immediately expel Bin Ladin, the CIA or the FBI had to be sure enough that they would "be willing to stand up in public and say, we believe that he [Bin Ladin] did this." He said he was very frustrated that he could not get a definitive enough answer to do something about the *Cole* attack.[137] Similarly, Berger recalled that to go to war, a president needs to be able to say that his senior intelligence and law enforcement officers have concluded who is responsible. He recalled that the intelligence agencies had strong suspicions, but had reached "no conclusion by the time we left office that it was al Qaeda."[138]

Our only sources for what intelligence officials thought at the time are what they said in informal briefings. Soon after the *Cole* attack and for the remainder of the Clinton administration, analysts stopped distributing written reports about who was responsible. The topic was obviously sensitive, and both Ambassador Bodine in Yemen and CIA analysts in Washington presumed that the government did not want reports circulating around the agencies that

might become public, impeding law enforcement actions or backing the President into a corner.[139]

Instead the White House and other principals relied on informal updates as more evidence came in. Though Clarke worried that the CIA might be equivocating in assigning responsibility to al Qaeda, he wrote Berger on November 7 that the analysts had described their case by saying that "it has web feet, flies, and quacks." On November 10, CIA analysts briefed the Small Group of principals on their preliminary findings that the attack was carried out by a cell of Yemeni residents with some ties to the transnational mujahideen network. According to the briefing, these residents likely had some support from al Qaeda. But the information on outside sponsorship, support, and direction of the operation was inconclusive. The next day, Berger and Clarke told President Clinton that while the investigation was continuing, it was becoming increasingly clear that al Qaeda had planned and directed the bombing.[140]

In mid-November, as the evidence of al Qaeda involvement mounted, Berger asked General Shelton to reevaluate military plans to act quickly against Bin Ladin. General Shelton tasked General Tommy Franks, the new commander of CENTCOM, to look again at the options. Shelton wanted to demonstrate that the military was imaginative and knowledgeable enough to move on an array of options, and to show the complexity of the operations. He briefed Berger on the "Infinite Resolve" strike options developed since 1998, which the Joint Staff and CENTCOM had refined during the summer into a list of 13 possibilities or combinations. CENTCOM added a new "phased campaign" concept for wider-ranging strikes, including attacks against the Taliban. For the first time, these strikes envisioned an air campaign against Afghanistan of indefinite duration. Military planners did not include contingency planning for an invasion of Afghanistan. The concept was briefed to Deputy National Security Advisor Donald Kerrick on December 20, and to other officials.[141]

On November 25, Berger and Clarke wrote President Clinton that although the FBI and CIA investigations had not reached a formal conclusion, they believed the investigations would soon conclude that the attack had been carried out by a large cell whose senior members belonged to al Qaeda. Most of those involved had trained in Bin Ladin–operated camps in Afghanistan, Berger continued. So far, Bin Ladin had not been tied personally to the attack and nobody had heard him directly order it, but two intelligence reports suggested that he was involved. When discussing possible responses, though, Berger referred to the premise—al Qaeda responsibility—as an "unproven assumption."[142]

In the same November 25 memo, Berger informed President Clinton about a closely held idea: a last-chance ultimatum for the Taliban. Clarke was developing the idea with specific demands: immediate extradition of Bin Ladin and his lieutenants to a legitimate government for trial, observable closure of all ter-

rorist facilities in Afghanistan, and expulsion of all terrorists from Afghanistan within 90 days. Noncompliance would mean U.S. "force directed at the Taliban itself" and U.S. efforts to ensure that the Taliban would never defeat the Northern Alliance. No such ultimatum was issued.[143]

Nearly a month later, on December 21, the CIA made another presentation to the Small Group of principals on the investigative team's findings. The CIA's briefing slides said that their "preliminary judgment" was that Bin Ladin's al Qaeda group "supported the attack" on the *Cole*, based on strong circumstantial evidence tying key perpetrators of the attack to al Qaeda. The CIA listed the key suspects, including Nashiri. In addition, the CIA detailed the timeline of the operation, from the mid-1999 preparations, to the failed attack on the USS *The Sullivans* on January 3, 2000, through a meeting held by the operatives the day before the attack.[144]

The slides said that so far the CIA had "no definitive answer on [the] crucial question of outside direction of the attack—how and by whom." The CIA noted that the Yemenis claimed that Khallad helped direct the operation from Afghanistan or Pakistan, possibly as Bin Ladin's intermediary, but that it had not seen the Yemeni evidence. However, the CIA knew from both human sources and signals intelligence that Khallad was tied to al Qaeda. The prepared briefing concluded that while some reporting about al Qaeda's role might have merit, those reports offered few specifics. Intelligence gave some ambiguous indicators of al Qaeda direction of the attack.[145]

This, President Clinton and Berger told us, was not the conclusion they needed in order to go to war or deliver an ultimatum to the Taliban threatening war. The election and change of power was not the issue, President Clinton added. There was enough time. If the agencies had given him a definitive answer, he said, he would have sought a UN Security Council ultimatum and given the Taliban one, two, or three days before taking further action against both al Qaeda and the Taliban. But he did not think it would be responsible for a president to launch an invasion of another country just based on a "preliminary judgment."[146]

Other advisers have echoed this concern. Some of Secretary Albright's advisers warned her at the time to be sure the evidence conclusively linked Bin Ladin to the *Cole* before considering any response, especially a military one, because such action might inflame the Islamic world and increase support for the Taliban. Defense Secretary Cohen told us it would not have been prudent to risk killing civilians based only on an assumption that al Qaeda was responsible. General Shelton added that there was an outstanding question as to who was responsible and what the targets were.[147]

Clarke recalled that while the Pentagon and the State Department had reservations about retaliation, the issue never came to a head because the FBI and the CIA never reached a firm conclusion. He thought they were "holding back." He said he did not know why, but his impression was that Tenet and

Reno possibly thought the White House "didn't really want to know," since the principals' discussions by November suggested that there was not much White House interest in conducting further military operations against Afghanistan in the administration's last weeks. He thought that, instead, President Clinton, Berger, and Secretary Albright were concentrating on a last-minute push for a peace agreement between the Palestinians and the Israelis.[148]

Some of Clarke's fellow counterterrorism officials, such as the State Department's Sheehan and the FBI's Watson, shared his disappointment that no military response occurred at the time. Clarke recently recalled that an angry Sheehan asked rhetorically of Defense officials: "Does al Qaeda have to attack the Pentagon to get their attention?"[149]

On the question of evidence, Tenet told us he was surprised to hear that the White House was awaiting a conclusion from him on responsibility for the *Cole* attack before taking action against al Qaeda. He did not recall Berger or anyone else telling him that they were waiting for the magic words from the CIA and the FBI. Nor did he remember having any discussions with Berger or the President about retaliation. Tenet told us he believed that it was up to him to present the case. Then it was up to the principals to decide if the case was good enough to justify using force. He believed he laid out what was knowable relatively early in the investigation, and that this evidence never really changed until after 9/11.[150]

A CIA official told us that the CIA's analysts chose the term "preliminary judgment" because of their notion of how an intelligence standard of proof differed from a legal standard. Because the attack was the subject of a criminal investigation, they told us, the term *preliminary* was used to avoid locking the government in with statements that might later be obtained by defense lawyers in a future court case. At the time, Clarke was aware of the problem of distinguishing between an intelligence case and a law enforcement case. Asking U.S. law enforcement officials to concur with an intelligence-based case before their investigation had been concluded "could give rise to charges that the administration had acted before final culpability had been determined."[151]

There was no interagency consideration of just what military action might have looked like in practice—either the Pentagon's new "phased campaign" concept or a prolonged air campaign in Afghanistan. Defense officials, such as Under Secretary Walter Slocombe and Vice Admiral Fry, told us the military response options were still limited. Bin Ladin continued to be elusive. They felt, just as they had for the past two years, that hitting inexpensive and rudimentary training camps with costly missiles would not do much good and might even help al Qaeda if the strikes failed to kill Bin Ladin.[152]

In late 2000, the CIA and the NSC staff began thinking about the counterterrorism policy agenda they would present to the new administration. The Counterterrorist Center put down its best ideas for the future, assuming it was free of any prior policy or financial constraints. The paper was therefore infor-

mally referred to as the "Blue Sky" memo; it was sent to Clarke on December 29. The memo proposed

- A major effort to support the Northern Alliance through intelligence sharing and increased funding so that it could stave off the Taliban army and tie down al Qaeda fighters. This effort was not intended to remove the Taliban from power, a goal that was judged impractical and too expensive for the CIA alone to attain.
- Increased support to the Uzbeks to strengthen their ability to fight terrorism and assist the United States in doing so.
- Assistance to anti-Taliban groups and proxies who might be encouraged to passively resist the Taliban.

The CIA memo noted that there was "no single 'silver bullet' available to deal with the growing problems in Afghanistan." A multifaceted strategy would be needed to produce change.[153]

No action was taken on these ideas in the few remaining weeks of the Clinton administration. Berger did not recall seeing or being briefed on the Blue Sky memo. Nor was the memo discussed during the transition with incoming top Bush administration officials. Tenet and his deputy told us they pressed these ideas as options after the new team took office.[154]

As the Clinton administration drew to a close, Clarke and his staff developed a policy paper of their own, the first such comprehensive effort since the Delenda plan of 1998. The resulting paper, entitled "Strategy for Eliminating the Threat from the Jihadist Networks of al Qida: Status and Prospects," reviewed the threat and the record to date, incorporated the CIA's new ideas from the Blue Sky memo, and posed several near-term policy options.

Clarke and his staff proposed a goal to "roll back" al Qaeda over a period of three to five years. Over time, the policy should try to weaken and eliminate the network's infrastructure in order to reduce it to a "rump group" like other formerly feared but now largely defunct terrorist organizations of the 1980s. "Continued anti–al Qida operations at the current level will prevent some attacks," Clarke's office wrote, "but will not seriously attrit their ability to plan and conduct attacks." The paper backed covert aid to the Northern Alliance, covert aid to Uzbekistan, and renewed Predator flights in March 2001. A sentence called for military action to destroy al Qaeda command-and-control targets and infrastructure and Taliban military and command assets. The paper also expressed concern about the presence of al Qaeda operatives in the United States.[155]

## 6.4 CHANGE AND CONTINUITY

On November 7, 2000, American voters went to the polls in what turned out to be one of the closest presidential contests in U.S. history—an election campaign during which there was a notable absence of serious discussion of the al Qaeda threat or terrorism. Election night became a 36-day legal fight. Until the Supreme Court's 5–4 ruling on December 12 and Vice President Al Gore's concession, no one knew whether Gore or his Republican opponent, Texas Governor George W. Bush, would become president in 2001.

The dispute over the election and the 36-day delay cut in half the normal transition period. Given that a presidential election in the United States brings wholesale change in personnel, this loss of time hampered the new administration in identifying, recruiting, clearing, and obtaining Senate confirmation of key appointees.

**From the Old to the New**
The principal figures on Bush's White House staff would be National Security Advisor Condoleezza Rice, who had been a member of the NSC staff in the administration of George H.W. Bush; Rice's deputy, Stephen Hadley, who had been an assistant secretary of defense under the first Bush; and Chief of Staff Andrew Card, who had served that same administration as deputy chief of staff, then secretary of transportation. For secretary of state, Bush chose General Colin Powell, who had been national security advisor for President Ronald Reagan and then chairman of the Joint Chiefs of Staff. For secretary of defense he selected Donald Rumsfeld, a former member of Congress, White House chief of staff, and, under President Gerald Ford, already once secretary of defense. Bush decided fairly soon to keep Tenet as Director of Central Intelligence. Louis Freeh, who had statutory ten-year tenure, would remain director of the FBI until his voluntary retirement in the summer of 2001.

Bush and his principal advisers had all received briefings on terrorism, including Bin Ladin. In early September 2000, Acting Deputy Director of Central Intelligence John McLaughlin led a team to Bush's ranch in Crawford, Texas, and gave him a wide-ranging, four-hour review of sensitive information. Ben Bonk, deputy chief of the CIA's Counterterrorist Center, used one of the four hours to deal with terrorism. To highlight the danger of terrorists obtaining chemical, biological, radiological, or nuclear weapons, Bonk brought along a mock-up suitcase to evoke the way the Aum Shinrikyo doomsday cult had spread deadly sarin nerve agent on the Tokyo subway in 1995. Bonk told Bush that Americans would die from terrorism during the next four years.[156] During the long contest after election day, the CIA set up an office in Crawford to pass intelligence to Bush and some of his key advisers.[157] Tenet, accompanied by his deputy director for operations, James Pavitt, briefed President-elect Bush at Blair House during the transition. President Bush told

us he asked Tenet whether the CIA could kill Bin Ladin, and Tenet replied that killing Bin Ladin would have an effect but would not end the threat. President Bush told us Tenet said to him that the CIA had all the authority it needed.[158]

In December, Bush met with Clinton for a two-hour, one-on-one discussion of national security and foreign policy challenges. Clinton recalled saying to Bush, "I think you will find that by far your biggest threat is Bin Ladin and the al Qaeda." Clinton told us that he also said, "One of the great regrets of my presidency is that I didn't get him [Bin Ladin] for you, because I tried to."[159] Bush told the Commission that he felt sure President Clinton had mentioned terrorism, but did not remember much being said about al Qaeda. Bush recalled that Clinton had emphasized other issues such as North Korea and the Israeli-Palestinian peace process.[160]

In early January, Clarke briefed Rice on terrorism. He gave similar presentations—describing al Qaeda as both an adaptable global network of jihadist organizations and a lethal core terrorist organization—to Vice President–elect Cheney, Hadley, and Secretary of State–designate Powell. One line in the briefing slides said that al Qaeda had sleeper cells in more than 40 countries, including the United States.[161] Berger told us that he made a point of dropping in on Clarke's briefing of Rice to emphasize the importance of the issue. Later the same day, Berger met with Rice. He says that he told her the Bush administration would spend more time on terrorism in general and al Qaeda in particular than on anything else. Rice's recollection was that Berger told her she would be surprised at how much more time she was going to spend on terrorism than she expected, but that the bulk of their conversation dealt with the faltering Middle East peace process and North Korea. Clarke said that the new team, having been out of government for eight years, had a steep learning curve to understand al Qaeda and the new transnational terrorist threat.[162]

### Organizing a New Administration

During the short transition, Rice and Hadley concentrated on staffing and organizing the NSC.[163] Their policy priorities differed from those of the Clinton administration. Those priorities included China, missile defense, the collapse of the Middle East peace process, and the Persian Gulf.[164] Generally aware that terrorism had changed since the first Bush administration, they paid particular attention to the question of how counterterrorism policy should be coordinated. Rice had asked University of Virginia history professor Philip Zelikow to advise her on the transition.[165] Hadley and Zelikow asked Clarke and his deputy, Roger Cressey, for a special briefing on the terrorist threat and how Clarke's Transnational Threats Directorate and Counterterrorism Security Group functioned.[166]

In the NSC during the first Bush administration, many tough issues were addressed at the level of the Deputies Committee. Issues did not go to the principals unless the deputies had been unable to resolve them. Presidential Deci-

sion Directive 62 of the Clinton administration had said specifically that Clarke's Counterterrorism Security Group should report through the Deputies Committee or, at Berger's discretion, directly to the principals. Berger had in practice allowed Clarke's group to function as a parallel deputies committee, reporting directly to those members of the Principals Committee who sat on the special Small Group. There, Clarke himself sat as a de facto principal.

Rice decided to change the special structure that had been built to coordinate counterterrorism policy. It was important to sound policymaking, she felt, that Clarke's interagency committee—like all others—report to the principals through the deputies.[167]

Rice made an initial decision to hold over both Clarke and his entire counterterrorism staff, a decision that she called rare for a new administration. She decided also that Clarke should retain the title of national counterterrorism coordinator, although he would no longer be a de facto member of the Principals Committee on his issues. The decision to keep Clarke, Rice said, was "not uncontroversial," since he was known as someone who "broke china," but she and Hadley wanted an experienced crisis manager. No one else from Berger's staff had Clarke's detailed knowledge of the levers of government. [168]

Clarke was disappointed at what he perceived as a demotion. He also worried that reporting through the Deputies Committee would slow decisionmaking on counterterrorism.[169]

The result, amid all the changes accompanying the transition, was significant continuity in counterterrorism policy. Clarke and his Counterterrorism Security Group would continue to manage coordination. Tenet remained Director of Central Intelligence and kept the same chief subordinates, including Black and his staff at the Counterterrorist Center. Shelton remained chairman of the Joint Chiefs, with the Joint Staff largely the same. At the FBI, Director Freeh and Assistant Director for Counterterrorism Dale Watson remained. Working-level counterterrorism officials at the State Department and the Pentagon stayed on, as is typically the case. The changes were at the cabinet and subcabinet level and in the CSG's reporting arrangements. At the subcabinet level, there were significant delays in the confirmation of key officials, particularly at the Defense Department.

The procedures of the Bush administration were to be at once more formal and less formal than its predecessor's. President Clinton, a voracious reader, received his daily intelligence briefings in writing. He often scrawled questions and comments in the margins, eliciting written responses. The new president, by contrast, reinstated the practice of face-to-face briefings from the DCI. President Bush and Tenet met in the Oval Office at 8:00 A.M., with Vice President Cheney, Rice, and Card usually also present. The President and the DCI both told us that these daily sessions provided a useful opportunity for exchanges on intelligence issues.[170]

The President talked with Rice every day, and she in turn talked by phone at least daily with Powell and Rumsfeld. As a result, the President often felt less

need for formal meetings. If, however, he decided that an event or an issue called for action, Rice would typically call on Hadley to have the Deputies Committee develop and review options. The President said that this process often tried his patience but that he understood the necessity for coordination.[171]

### Early Decisions

Within the first few days after Bush's inauguration, Clarke approached Rice in an effort to get her—and the new President—to give terrorism very high priority and to act on the agenda that he had pushed during the last few months of the previous administration. After Rice requested that all senior staff identify desirable major policy reviews or initiatives, Clarke submitted an elaborate memorandum on January 25, 2001. He attached to it his 1998 Delenda Plan and the December 2000 strategy paper. "We _urgently_ need . . . a Principals level review on the _al Qida_ network," Clarke wrote.[172]

He wanted the Principals Committee to decide whether al Qaeda was "a first order threat" or a more modest worry being overblown by "chicken little" alarmists. Alluding to the transition briefing that he had prepared for Rice, Clarke wrote that al Qaeda "is not some narrow, little terrorist issue that needs to be included in broader regional policy." Two key decisions that had been deferred, he noted, concerned covert aid to keep the Northern Alliance alive when fighting began again in Afghanistan in the spring, and covert aid to the Uzbeks. Clarke also suggested that decisions should be made soon on messages to the Taliban and Pakistan over the al Qaeda sanctuary in Afghanistan, on possible new money for CIA operations, and on "when and how . . . to respond to the attack on the USS Cole."[173]

The national security advisor did not respond directly to Clarke's memorandum. No Principals Committee meeting on al Qaeda was held until September 4, 2001 (although the Principals Committee met frequently on other subjects, such as the Middle East peace process, Russia, and the Persian Gulf).[174] But Rice and Hadley began to address the issues Clarke had listed. What to do or say about the _Cole_ had been an obvious question since inauguration day. When the attack occurred, 25 days before the election, candidate Bush had said to CNN, "I hope that we can gather enough intelligence to figure out who did the act and take the necessary action. There must be a consequence."[175] Since the Clinton administration had not responded militarily, what was the Bush administration to do?

On January 25, Tenet briefed the President on the _Cole_ investigation. The written briefing repeated for top officials of the new administration what the CIA had told the Clinton White House in November. This included the "preliminary judgment" that al Qaeda was responsible, with the caveat that no evidence had yet been found that Bin Ladin himself ordered the attack. Tenet told us he had no recollection of a conversation with the President about this briefing.[176]

In his January 25 memo, Clarke had advised Rice that the government should respond to the _Cole_ attack, but "should take advantage of the policy that

'we will respond at a time, place and manner of our own choosing' and not be forced into knee-jerk responses."[177] Before Vice President Cheney visited the CIA in mid-February, Clarke sent him a memo—outside the usual White House document-management system—suggesting that he ask CIA officials "what additional information is needed before CIA can definitively conclude that al-Qida was responsible" for the *Cole*.[178] In March 2001, the CIA's briefing slides for Rice were still describing the CIA's "preliminary judgment" that a "strong circumstantial case" could be made against al Qaeda but noting that the CIA continued to lack "conclusive information on external command and control" of the attack.[179] Clarke and his aides continued to provide Rice and Hadley with evidence reinforcing the case against al Qaeda and urging action.[180]

The President explained to us that he had been concerned lest an ineffectual air strike just serve to give Bin Ladin a propaganda advantage. He said he had not been told about Clinton administration warnings to the Taliban. The President told us that he had concluded that the United States must use ground forces for a job like this.[181]

Rice told us that there was never a formal, recorded decision not to retaliate specifically for the *Cole* attack. Exchanges with the President, between the President and Tenet, and between herself and Powell and Rumsfeld had produced a consensus that "tit-for-tat" responses were likely to be counterproductive. This had been the case, she thought, with the cruise missile strikes of August 1998. The new team at the Pentagon did not push for action. On the contrary, Rumsfeld thought that too much time had passed and his deputy, Paul Wolfowitz, thought that the *Cole* attack was "stale." Hadley said that in the end, the administration's real response to the *Cole* would be a new, more aggressive strategy against al Qaeda.[182]

The administration decided to propose to Congress a substantial increase in counterterrorism funding for national security agencies, including the CIA and the FBI. This included a 27 percent increase in counterterrorism funding for the CIA.[183]

**Starting a Review**

In early March, the administration postponed action on proposals for increasing aid to the Northern Alliance and the Uzbeks. Rice noted at the time that a more wide-ranging examination of policy toward Afghanistan was needed first. She wanted the review very soon.[184]

Rice and others recalled the President saying, "I'm tired of swatting at flies."[185] The President reportedly also said, "I'm tired of playing defense. I want to play offense. I want to take the fight to the terrorists."[186] President Bush explained to us that he had become impatient. He apparently had heard proposals for rolling back al Qaeda but felt that catching terrorists one by one or even cell by cell was not an approach likely to succeed in the long run. At the same time, he said, he understood that policy had to be developed slowly so that diplomacy and financial and military measures could mesh with one another.[187]

Hadley convened an informal Deputies Committee meeting on March 7, when some of the deputies had not yet been confirmed. For the first time, Clarke's various proposals—for aid to the Northern Alliance and the Uzbeks and for Predator missions—went before the group that, in the Bush NSC, would do most of the policy work. Though they made no decisions on these specific proposals, Hadley apparently concluded that there should be a presidential national security policy directive (NSPD) on terrorism.[188]

Clarke would later express irritation about the deputies' insistence that a strategy for coping with al Qaeda be framed within the context of a regional policy. He doubted that the benefits would compensate for the time lost. The administration had in fact proceeded with Principals Committee meetings on topics including Iraq and Sudan without prior contextual review, and Clarke favored moving ahead similarly with a narrow counterterrorism agenda.[189] But the President's senior advisers saw the al Qaeda problem as part of a puzzle that could not be assembled without filling in the pieces for Afghanistan and Pakistan. Rice deferred a Principals Committee meeting on al Qaeda until the deputies had developed a new policy for their consideration.

The full Deputies Committee discussed al Qaeda on April 30. CIA briefing slides described al Qaeda as the "most dangerous group we face," citing its "leadership, experience, resources, safe haven in Afghanistan, [and] focus on attacking U.S." The slides warned, "There will be more attacks."[190]

At the meeting, the deputies endorsed covert aid to Uzbekistan. Regarding the Northern Alliance, they "agreed to make no major commitment at this time." Washington would first consider options for aiding other anti-Taliban groups.[191] Meanwhile, the administration would "initiate a comprehensive review of U.S. policy on Pakistan" and explore policy options on Afghanistan, "including the option of supporting regime change."[192] Working-level officials were also to consider new steps on terrorist financing and America's perennially troubled public diplomacy efforts in the Muslim world, where NSC staff warned that "we have by and large ceded the court of public opinion" to al Qaeda.

While Clarke remained concerned about the pace of the policy review, he now saw a greater possibility of persuading the deputies to recognize the changed nature of terrorism.[193] The process of fleshing out that strategy was under way.

## 6.5 THE NEW ADMINISTRATION'S APPROACH

The Bush administration in its first months faced many problems other than terrorism. They included the collapse of the Middle East peace process and, in April, a crisis over a U.S. "spy plane" brought down in Chinese territory. The new administration also focused heavily on Russia, a new nuclear strategy that allowed missile defenses, Europe, Mexico, and the Persian Gulf.

In the spring, reporting on terrorism surged dramatically. In chapter 8, we will explore this reporting and the ways agencies responded. These increasingly alarming reports, briefed to the President and top officials, became part of the context in which the new administration weighed its options for policy on al Qaeda.

Except for a few reports that the CSG considered and apparently judged to be unreliable, none of these pointed specifically to possible al Qaeda action inside the United States—although the CSG continued to be concerned about the domestic threat. The mosaic of threat intelligence came from the Counterterrorist Center, which collected only abroad. Its reports were not supplemented by reports from the FBI. Clarke had expressed concern about an al Qaeda presence in the United States, and he worried about an attack on the White House by "Hizbollah, Hamas, al Qida and other terrorist organizations."[194]

In May, President Bush announced that Vice President Cheney would himself lead an effort looking at preparations for managing a possible attack by weapons of mass destruction and at more general problems of national preparedness. The next few months were mainly spent organizing the effort and bringing an admiral from the Sixth Fleet back to Washington to manage it. The Vice President's task force was just getting under way when the 9/11 attack occurred.[195]

On May 29, at Tenet's request, Rice and Tenet converted their usual weekly meeting into a broader discussion on al Qaeda; participants included Clarke, CTC chief Cofer Black, and "Richard," a group chief with authority over the Bin Ladin unit. Rice asked about "taking the offensive" and whether any approach could be made to influence Bin Ladin or the Taliban. Clarke and Black replied that the CIA's ongoing disruption activities *were* "taking the offensive" and that Bin Ladin could not be deterred. A wide-ranging discussion then ensued about "breaking the back" of Bin Ladin's organization.[196]

Tenet emphasized the ambitious plans for covert action that the CIA had developed in December 2000. In discussing the draft authorities for this program in March, CIA officials had pointed out that the spending level envisioned for these plans was larger than the CIA's entire current budget for counterterrorism covert action. It would be a multiyear program, requiring such levels of spending for about five years.[197]

The CIA official, "Richard," told us that Rice "got it." He said he agreed with his conclusions about what needed to be done, although he complained to us that the policy process did not follow through quickly enough.[198] Clarke and Black were asked to develop a range of options for attacking Bin Ladin's organization, from the least to most ambitious.[199]

Rice and Hadley asked Clarke and his staff to draw up the new presidential directive. On June 7, Hadley circulated the first draft, describing it as "an admittedly ambitious" program for confronting al Qaeda.[200] The draft NSPD's goal was to "eliminate the al Qida network of terrorist groups as a

threat to the United States and to friendly governments." It called for a multi-year effort involving diplomacy, covert action, economic measures, law enforcement, public diplomacy, and if necessary military efforts. The State Department was to work with other governments to end all al Qaeda sanctuaries, and also to work with the Treasury Department to disrupt terrorist financing. The CIA was to develop an expanded covert action program including significant additional funding and aid to anti-Taliban groups. The draft also tasked OMB with ensuring that sufficient funds to support this program were found in U.S. budgets from fiscal years 2002 to 2006.[201]

Rice viewed this draft directive as the embodiment of a comprehensive new strategy employing all instruments of national power to eliminate the al Qaeda threat. Clarke, however, regarded the new draft as essentially similar to the proposal he had developed in December 2000 and put forward to the new administration in January 2001.[202] In May or June, Clarke asked to be moved from his counterterrorism portfolio to a new set of responsibilities for cybersecurity. He told us that he was frustrated with his role and with an administration that he considered not "serious about al Qaeda."[203] If Clarke was frustrated, he never expressed it to her, Rice told us.[204]

## Diplomacy in Blind Alleys

**Afghanistan.** The new administration had already begun exploring possible diplomatic options, retracing many of the paths traveled by its predecessors. U.S. envoys again pressed the Taliban to turn Bin Ladin "over to a country where he could face justice" and repeated, yet again, the warning that the Taliban would be held responsible for any al Qaeda attacks on U.S. interests.[205] The Taliban's representatives repeated their old arguments. Deputy Secretary of State Richard Armitage told us that while U.S. diplomats were becoming more active on Afghanistan through the spring and summer of 2001, "it would be wrong for anyone to characterize this as a dramatic shift from the previous administration."[206]

In deputies meetings at the end of June, Tenet was tasked to assess the prospects for Taliban cooperation with the United States on al Qaeda. The NSC staff was tasked to flesh out options for dealing with the Taliban. Revisiting these issues tried the patience of some of the officials who felt they had already been down these roads and who found the NSC's procedures slow. "We weren't going fast enough," Armitage told us. Clarke kept arguing that moves against the Taliban and al Qaeda should not have to wait months for a larger review of U.S. policy in South Asia. "For the government," Hadley said to us, "we moved it along as fast as we could move it along."[207]

As all hope in moving the Taliban faded, debate revived about giving covert assistance to the regime's opponents. Clarke and the CIA's Cofer Black renewed the push to aid the Northern Alliance. Clarke suggested starting with modest aid, just enough to keep the Northern Alliance in the fight and tie down al Qaeda terrorists, without aiming to overthrow the Taliban.[208]

Rice, Hadley, and the NSC staff member for Afghanistan, Zalmay Khalilzad, told us they opposed giving aid to the Northern Alliance alone. They argued that the program needed to have a big part for Pashtun opponents of the Taliban. They also thought the program should be conducted on a larger scale than had been suggested. Clarke concurred with the idea of a larger program, but he warned that delay risked the Northern Alliance's final defeat at the hands of the Taliban.[209]

During the spring, the CIA, at the NSC's request, had developed draft legal authorities—a presidential finding—to undertake a large-scale program of covert assistance to the Taliban's foes. The draft authorities expressly stated that the goal of the assistance was *not* to overthrow the Taliban. But even this program would be very costly. This was the context for earlier conversations, when in March Tenet stressed the need to consider the impact of such a large program on the political situation in the region and in May Tenet talked to Rice about the need for a multiyear financial commitment.[210]

By July, the deputies were moving toward agreement that some last effort should be made to convince the Taliban to shift position and then, if that failed, the administration would move on the significantly enlarged covert action program. As the draft presidential directive was circulated in July, the State Department sent the deputies a lengthy historical review of U.S. efforts to engage the Taliban about Bin Ladin from 1996 on. "These talks have been fruitless," the State Department concluded.[211]

Arguments in the summer brought to the surface the more fundamental issue of whether the U.S. covert action program should seek to overthrow the regime, intervening decisively in the civil war in order to change Afghanistan's government. By the end of a deputies meeting on September 10, officials formally agreed on a three-phase strategy. First an envoy would give the Taliban a last chance. If this failed, continuing diplomatic pressure would be combined with the planned covert action program encouraging anti-Taliban Afghans of all major ethnic groups to stalemate the Taliban in the civil war and attack al Qaeda bases, while the United States developed an international coalition to undermine the regime. In phase three, if the Taliban's policy still did not change, the deputies agreed that the United States would try covert action to topple the Taliban's leadership from within.[212]

The deputies agreed to revise the al Qaeda presidential directive, then being finalized for presidential approval, in order to add this strategy to it. Armitage explained to us that after months of continuing the previous administration's policy, he and Powell were bringing the State Department to a policy of overthrowing the Taliban. From his point of view, once the United States made the commitment to arm the Northern Alliance, even covertly, it was taking action to initiate regime change, and it should give those opponents the strength to achieve complete victory.[213]

**Pakistan.** The Bush administration immediately encountered the dilemmas that arose from the varied objectives the United States was trying to accom-

plish in its relationship with Pakistan. In February 2001, President Bush wrote General Musharraf on a number of matters. He emphasized that Bin Ladin and al Qaeda were "a direct threat to the United States and its interests that must be addressed." He urged Musharraf to use his influence with the Taliban on Bin Ladin and al Qaeda.[214] Powell and Armitage reviewed the possibility of acquiring more carrots to dangle in front of Pakistan. Given the generally negative view of Pakistan on Capitol Hill, the idea of lifting sanctions may have seemed far-fetched, but perhaps no more so than the idea of persuading Musharraf to antagonize the Islamists in his own government and nation.[215]

On June 18, Rice met with the visiting Pakistani foreign minister, Abdul Sattar. She "really let him have it" about al Qaeda, she told us.[216] Other evidence corroborates her account. But, as she was upbraiding Sattar, Rice recalled thinking that the Pakistani diplomat seemed to have heard it all before. Sattar urged senior U.S. policymakers to engage the Taliban, arguing that such a course would take time but would produce results. In late June, the deputies agreed to review U.S. objectives. Clarke urged Hadley to split off all other issues in U.S.–Pakistani relations and just focus on demanding that Pakistan move vigorously against terrorism—to push the Pakistanis to do *before* an al Qaeda attack what Washington would demand that they do after. He had made similar requests in the Clinton administration; he had no more success with Rice than he had with Berger.[217]

On August 4, President Bush wrote President Musharraf to request his support in dealing with terrorism and to urge Pakistan to engage actively against al Qaeda. The new administration was again registering its concerns, just as its predecessor had, but it was still searching for new incentives to open up diplomatic possibilities. For its part, Pakistan had done little. Assistant Secretary of State Christina Rocca described the administration's plan to break this logjam as a move from "half engagement" to "enhanced engagement." The administration was not ready to confront Islamabad and threaten to rupture relations. Deputy Secretary Armitage told us that before 9/11, the envisioned new approach to Pakistan had not yet been attempted.[218]

**Saudi Arabia.** The Bush administration did not develop new diplomatic initiatives on al Qaeda with the Saudi government before 9/11. Vice President Cheney called Crown Prince Abdullah on July 5, 2001, to seek Saudi help in preventing threatened attacks on American facilities in the Kingdom. Secretary of State Powell met with the crown prince twice before 9/11. They discussed topics like Iraq, not al Qaeda. U.S.–Saudi relations in the summer of 2001 were marked by sometimes heated disagreements about ongoing Israeli-Palestinian violence, not about Bin Ladin.[219]

### Military Plans

The confirmation of the Pentagon's new leadership was a lengthy process. Deputy Secretary Wolfowitz was confirmed in March 2001 and Under Secre-

tary of Defense for Policy Douglas Feith in July. Though the new officials were briefed about terrorism and some of the earlier planning, including that for Operation Infinite Resolve, they were focused, as Secretary Rumsfeld told us, on creating a twenty-first-century military.[220]

At the Joint Chiefs of Staff, General Shelton did not recall much interest by the new administration in military options against al Qaeda in Afghanistan. He could not recall any specific guidance on the topic from the secretary. Brian Sheridan—the outgoing assistant secretary of defense for special operations and low-intensity conflict (SOLIC), the key counterterrorism policy office in the Pentagon—never briefed Rumsfeld. He departed on January 20; he had not been replaced by 9/11.[221]

Rumsfeld noted to us his own interest in terrorism, which came up often in his regular meetings with Tenet. He thought that the Defense Department, before 9/11, was not organized adequately or prepared to deal with new threats like terrorism. But his time was consumed with getting new officials in place and working on the foundation documents of a new defense policy, the quadrennial defense review, the defense planning guidance, and the existing contingency plans. He did not recall any particular counterterrorism issue that engaged his attention before 9/11, other than the development of the Predator unmanned aircraft system.[222]

The commander of Central Command, General Franks, told us that he did not regard the existing plans as serious. To him a real military plan to address al Qaeda would need to go all the way, following through the details of a full campaign (including the political-military issues of where operations would be based) and securing the rights to fly over neighboring countries.[223]

The draft presidential directive circulated in June 2001 began its discussion of the military by reiterating the Defense Department's lead role in protecting its forces abroad. The draft included a section directing Secretary Rumsfeld to "develop contingency plans" to attack both al Qaeda and Taliban targets in Afghanistan. The new section did not specifically order planning for the use of ground troops, or clarify how this guidance differed from the existing Infinite Resolve plans.[224]

Hadley told us that by circulating this section, a draft Annex B to the directive, the White House was putting the Pentagon on notice that it would need to produce new military plans to address this problem.[225] "The military didn't particularly want this mission," Rice told us.[226]

With this directive still awaiting President Bush's signature, Secretary Rumsfeld did not order his subordinates to begin preparing any new military plans against either al Qaeda or the Taliban before 9/11.

President Bush told us that before 9/11, he had not seen good options for special military operations against Bin Ladin. Suitable bases in neighboring countries were not available and, even if the U.S. forces were sent in, it was not clear where they would go to find Bin Ladin.[227]

President Bush told us that before 9/11 there was an appetite in the government for killing Bin Ladin, not for war. Looking back in 2004, he equated the presidential directive with a readiness to invade Afghanistan. The problem, he said, would have been how to do that if there had not been another attack on America. To many people, he said, it would have seemed like an ultimate act of unilateralism. But he said that he was prepared to take that on.[228]

## Domestic Change and Continuity

During the transition, Bush had chosen John Ashcroft, a former senator from Missouri, as his attorney general. On his arrival at the Justice Department, Ashcroft told us, he faced a number of problems spotlighting the need for reform at the FBI.[229]

In February, Clarke briefed Attorney General Ashcroft on his directorate's issues. He reported that at the time, the attorney general acknowledged a "steep learning curve," and asked about the progress of the *Cole* investigation.[230] Neither Ashcroft nor his predecessors received the President's Daily Brief. His office did receive the daily intelligence report for senior officials that, during the spring and summer of 2001, was carrying much of the same threat information.

The FBI was struggling to build up its institutional capabilities to do more against terrorism, relying on a strategy called MAXCAP 05 that had been unveiled in the summer of 2000. The FBI's assistant director for counterterrorism, Dale Watson, told us that he felt the new Justice Department leadership was not supportive of the strategy. Watson had the sense that the Justice Department wanted the FBI to get back to the investigative basics: guns, drugs, and civil rights. The new administration did seek an 8 percent increase in overall FBI funding in its initial budget proposal for fiscal year 2002, including the largest proposed percentage increase in the FBI's counterterrorism program since fiscal year 1997. The additional funds included the FBI's support of the 2002 Winter Olympics in Salt Lake City, Utah (a onetime increase), enhanced security at FBI facilities, and improvements to the FBI's WMD incident response capability.[231]

In May, the Justice Department began shaping plans for building a budget for fiscal year 2003, the process that would usually culminate in an administration proposal at the beginning of 2002. On May 9, the attorney general testified at a congressional hearing concerning federal efforts to combat terrorism. He said that "one of the nation's most fundamental responsibilities is to protect its citizens . . . from terrorist attacks." The budget guidance issued the next day, however, highlighted gun crimes, narcotics trafficking, and civil rights as priorities. Watson told us that he almost fell out of his chair when he saw this memo, because it did not mention counterterrorism. Longtime FBI Director Louis Freeh left in June 2001, after announcing the indictment in the Khobar Towers case that he had worked so long to obtain. Thomas Pickard was the act-

ing director during the summer. Freeh's successor, Robert Mueller, took office just before 9/11.[232]

The Justice Department prepared a draft fiscal year 2003 budget that maintained but did not increase the funding level for counterterrorism in its pending fiscal year 2002 proposal. Pickard appealed for more counterterrorism enhancements, an appeal the attorney general denied on September 10.[233]

Ashcroft had also inherited an ongoing debate on whether and how to modify the 1995 procedures governing intelligence sharing between the FBI and the Justice Department's Criminal Division. But in August 2001, Ashcroft's deputy, Larry Thompson, issued a memorandum reaffirming the 1995 procedures with the clarification that evidence of "any federal felony" was to be immediately reported by the FBI to the Criminal Division. The 1995 procedures remained in effect until after 9/11.[234]

### Covert Action and the Predator

In March 2001, Rice asked the CIA to prepare a new series of authorities for covert action in Afghanistan. Rice's recollection was that the idea had come from Clarke and the NSC senior director for intelligence, Mary McCarthy, and had been linked to the proposal for aid to the Northern Alliance and the Uzbeks. Rice described the draft document as providing for "consolidation plus," superseding the various Clinton administration documents. In fact, the CIA drafted two documents. One was a finding that did concern aid to opponents of the Taliban regime; the other was a draft Memorandum of Notification, which included more open-ended language authorizing possible lethal action in a variety of situations. Tenet delivered both to Hadley on March 28. The CIA's notes for Tenet advised him that "in response to the NSC request for drafts that will help the policymakers review their options, each of the documents has been crafted to provide the Agency with the broadest possible discretion permissible under the law." At the meeting, Tenet argued for deciding on a policy before deciding on the legal authorities to implement it. Hadley accepted this argument, and the draft MON was put on hold.[235]

As the policy review moved forward, the planned covert action program for Afghanistan was included in the draft presidential directive, as part of an "Annex A" on intelligence activities to "eliminate the al Qaeda threat."[236] The main debate during the summer of 2001 concentrated on the one new mechanism for a lethal attack on Bin Ladin—an armed version of the Predator drone.

In the first months of the new administration, questions concerning the Predator became more and more a central focus of dispute. Clarke favored resuming Predator flights over Afghanistan as soon as weather permitted, hoping that they still might provide the elusive "actionable intelligence" to target Bin Ladin with cruise missiles. Learning that the Air Force was thinking of

equipping Predators with warheads, Clarke became even more enthusiastic about redeployment.[237]

The CTC chief, Cofer Black, argued against deploying the Predator for reconnaissance purposes. He recalled that the Taliban had spotted a Predator in the fall of 2000 and scrambled their MiG fighters. Black wanted to wait until the armed version was ready. "I do not believe the possible recon value out-weighs the risk of possible program termination when the stakes are raised by the Taliban parading a charred Predator in front of CNN," he wrote. Military officers in the Joint Staff shared this concern.[238] There is some dispute as to whether or not the Deputies Committee endorsed resuming reconnaissance flights at its April 30, 2001, meeting. In any event, Rice and Hadley ultimately went along with the CIA and the Pentagon, holding off on reconnaissance flights until the armed Predator was ready.[239]

The CIA's senior management saw problems with the armed Predator as well, problems that Clarke and even Black and Allen were inclined to mini-mize. One (which also applied to reconnaissance flights) was money. A Preda-tor cost about $3 million. If the CIA flew Predators for its own reconnaissance or covert action purposes, it might be able to borrow them from the Air Force, but it was not clear that the Air Force would bear the cost if a vehicle went down. Deputy Secretary of Defense Wolfowitz took the position that the CIA should have to pay for it; the CIA disagreed.[240]

Second, Tenet in particular questioned whether he, as Director of Central Intelligence, should operate an armed Predator. "This was new ground," he told us. Tenet ticked off key questions: What is the chain of command? Who takes the shot? Are America's leaders comfortable with the CIA doing this, going outside of normal military command and control? Charlie Allen told us that when these questions were discussed at the CIA, he and the Agency's execu-tive director, A. B. "Buzzy" Krongard, had said that either one of them would be happy to pull the trigger, but Tenet was appalled, telling them that they had no authority to do it, nor did he.[241]

Third, the Hellfire warhead carried by the Predator needed work. It had been built to hit tanks, not people. It needed to be designed to explode in a different way, and even then had to be targeted with extreme precision. In the configuration planned by the Air Force through mid-2001, the Predator's mis-sile would not be able to hit a moving vehicle.[242]

White House officials had seen the Predator video of the "man in white." On July 11, Hadley tried to hurry along preparation of the armed system. He directed McLaughlin, Wolfowitz, and Joint Chiefs Vice Chairman Richard Myers to deploy Predators capable of being armed no later than September 1. He also directed that they have cost-sharing arrangements in place by August 1. Rice told us that this attempt by Hadley to dictate a solution had failed and that she eventually had to intervene herself.[243]

On August 1, the Deputies Committee met again to discuss the armed

Predator. They concluded that it was legal for the CIA to kill Bin Ladin or one of his deputies with the Predator. Such strikes would be acts of self-defense that would not violate the ban on assassinations in Executive Order 12333. The big issues—who would pay for what, who would authorize strikes, and who would pull the trigger—were left for the principals to settle. The Defense Department representatives did not take positions on these issues.[244]

The CIA's McLaughlin had also been reticent. When Hadley circulated a memorandum attempting to prod the deputies to reach agreement, McLaughlin sent it back with a handwritten comment on the cost-sharing: "we question whether it is advisable to make such an investment before the decision is taken on flying an armed Predator." For Clarke, this came close to being a final straw. He angrily asked Rice to call Tenet. "Either al Qida is a threat worth acting against or it is not," Clarke wrote. "CIA leadership has to decide which it is and cease these bi-polar mood swings."[245]

These debates, though, had little impact in advancing or delaying efforts to make the Predator ready for combat. Those were in the hands of military officers and engineers. General John Jumper had commanded U.S. air forces in Europe and seen Predators used for reconnaissance in the Balkans. He started the program to develop an armed version and, after returning in 2000 to head the Air Combat Command, took direct charge of it.

There were numerous technical problems, especially with the Hellfire missiles. The Air Force tests conducted during the spring were inadequate, so missile testing needed to continue and modifications needed to be made during the summer. Even then, Jumper told us, problems with the equipment persisted. Nevertheless, the Air Force was moving at an extraordinary pace. "In the modern era, since the 1980s," Jumper said to us, "I would be shocked if you found anything that went faster than this."[246]

### September 2001

The Principals Committee had its first meeting on al Qaeda on September 4. On the day of the meeting, Clarke sent Rice an impassioned personal note. He criticized U.S. counterterrorism efforts past and present. The "real question" before the principals, he wrote, was "are we serious about dealing with the al Qida threat? . . . Is al Qida a big deal? . . . *Decision makers should imagine themselves on a future day when the CSG has not succeeded in stopping al Qida attacks and hundreds of Americans lay dead in several countries, including the US,"* Clarke wrote. "What would those decision makers wish that they had done earlier? That future day could happen at any time."[247]

Clarke then turned to the *Cole.* "*The fact that the USS Cole was attacked during the last Administration does not absolve us of responding for the attack*," he wrote. "Many in al Qida and the Taliban may have drawn the wrong lesson from the Cole: that they can kill Americans without there being a US response, without out there being a price. . . . One might have thought that with a \$250m hole

in a destroyer and 17 dead sailors, the Pentagon might have wanted to respond. Instead, they have often talked about the fact that there is 'nothing worth hitting in Afghanistan' and said 'the cruise missiles cost more than the jungle gyms and mud huts' at terrorist camps." Clarke could not understand "*why we continue to allow the existence of large scale al Qida bases where we know people are being trained to kill Americans.*"[248]

Turning to the CIA, Clarke warned that its bureaucracy, which was "masterful at passive aggressive behavior," would resist funding the new national security presidential directive, leaving it a "hollow shell of words without deeds." The CIA would insist its other priorities were more important. Invoking President Bush's own language, Clarke wrote, "*You are left with a modest effort to swat flies*, to try to prevent specific al Qida attacks by using [intelligence] to detect them and friendly governments' police and intelligence officers to stop them. *You are left waiting for the big attack*, with lots of casualties, after which some major US retaliation will be in order[.]"[249]

Rice told us she took Clarke's memo as a warning not to get dragged down by bureaucratic inertia.[250] While his arguments have force, we also take Clarke's jeremiad as something more. After nine years on the NSC staff and more than three years as the president's national coordinator, he had often failed to persuade these agencies to adopt his views, or to persuade his superiors to set an agenda of the sort he wanted or that the whole government could support.

Meanwhile, another counterterrorism veteran, Cofer Black, was preparing his boss for the principals meeting. He advised Tenet that the draft presidential directive envisioned an ambitious covert action program, but that the authorities for it had not yet been approved and the funding still had not been found. If the CIA was reluctant to use the Predator, Black did not mention it. He wanted "a timely decision from the Principals," adding that the window for missions within 2001 was a short one. The principals would have to decide whether Rice, Tenet, Rumsfeld, or someone else would give the order to fire.[251]

At the September 4 meeting, the principals approved the draft presidential directive with little discussion.[252] Rice told us that she had, at some point, told President Bush that she and his other advisers thought it would take three years or so for their al Qaeda strategy to work.[253] They then discussed the armed Predator.

Hadley portrayed the Predator as a useful tool, although perhaps not for immediate use. Rice, who had been advised by her staff that the armed Predator was not ready for deployment, commented about the potential for using the armed Predator in the spring of 2002.[254]

The State Department supported the armed Predator, although Secretary Powell was not convinced that Bin Ladin was as easy to target as had been suggested. Treasury Secretary Paul O'Neill was skittish, cautioning about the implications of trying to kill an individual.[255]

The Defense Department favored strong action. Deputy Secretary Wolfowitz questioned the United States' ability to deliver Bin Ladin and bring him to justice. He favored going after Bin Ladin as part of a larger air strike, similar to what had been done in the 1986 U.S. strike against Libya. General Myers emphasized the Predator's value for surveillance, perhaps enabling broader air strikes that would go beyond Bin Ladin to attack al Qaeda's training infrastructure.[256]

The principals also discussed which agency—CIA or Defense—should have the authority to fire a missile from the armed Predator.[257]

At the end, Rice summarized the meeting's conclusions. The armed Predator capability was needed but not ready. The Predator would be available for the military to consider along with its other options. The CIA should consider flying reconnaissance-only missions. The principals—including the previously reluctant Tenet—thought that such reconnaissance flights were a good idea, combined with other efforts to get actionable intelligence. Tenet deferred an answer on the additional reconnaissance flights, conferred with his staff after the meeting, and then directed the CIA to press ahead with them.[258]

A few days later, a final version of the draft presidential directive was circulated, incorporating two minor changes made by the principals.[259]

On September 9, dramatic news arrived from Afghanistan. The leader of the Northern Alliance, Ahmed Shah Massoud, had granted an interview in his bungalow near the Tajikistan border with two men whom the Northern Alliance leader had been told were Arab journalists. The supposed reporter and cameraman—actually al Qaeda assassins—then set off a bomb, riddling Massoud's chest with shrapnel. He died minutes later.

On September 10, Hadley gathered the deputies to finalize their three-phase, multiyear plan to pressure and perhaps ultimately topple the Taliban leadership.[260]

That same day, Hadley instructed DCI Tenet to have the CIA prepare new draft legal authorities for the "broad covert action program" envisioned by the draft presidential directive. Hadley also directed Tenet to prepare a separate section "authorizing a broad range of other covert activities, including authority to capture or to use lethal force" against al Qaeda command-and-control elements. This section would supersede the Clinton-era documents. Hadley wanted the authorities to be flexible and broad enough "to cover any additional UBL-related covert actions contemplated."[261]

Funding still needed to be located. The military component remained unclear. Pakistan remained uncooperative. The domestic policy institutions were largely uninvolved. But the pieces were coming together for an integrated policy dealing with al Qaeda, the Taliban, and Pakistan.

# 7

# THE ATTACK LOOMS

## 7.1 FIRST ARRIVALS IN CALIFORNIA

In chapter 5 we described the Southeast Asia travels of Nawaf al Hazmi, Khalid al Mihdhar, and others in January 2000 on the first part of the "planes operation." In that chapter we also described how Mihdhar was spotted in Kuala Lumpur early in January 2000, along with associates who were not identified, and then was lost to sight when the group passed through Bangkok. On January 15, Hazmi and Mihdhar arrived in Los Angeles. They spent about two weeks there before moving on to San Diego.[1]

**Two Weeks in Los Angeles**
Why Hazmi and Mihdhar came to California, we do not know for certain. Khalid Sheikh Mohammed (KSM), the organizer of the planes operation, explains that California was a convenient point of entry from Asia and had the added benefit of being far away from the intended target area.[2]

Hazmi and Mihdhar were ill-prepared for a mission in the United States. Their only qualifications for this plot were their devotion to Usama Bin Ladin, their veteran service, and their ability to get valid U.S. visas. Neither had spent any substantial time in the West, and neither spoke much, if any, English.[3]

It would therefore be plausible that they or KSM would have tried to identify, in advance, a friendly contact for them in the United States. In detention, KSM denies that al Qaeda had any agents in Southern California. We do not credit this denial.[4] We believe it is unlikely that Hazmi and Mihdhar—neither of whom, in contrast to the Hamburg group, had any prior exposure to life in the West—would have come to the United States without arranging to receive assistance from one or more individuals informed in advance of their arrival.[5]

KSM says that though he told others involved in the conspiracy to stay away from mosques and to avoid establishing personal contacts, he made an exception in this case and instructed Hazmi and Mihdhar to pose as newly arrived

Saudi students and seek assistance at local mosques. He counted on their break-ing off any such relationships once they moved to the East Coast.[6] Our inability to ascertain the activities of Hazmi and Mihdhar during their first two weeks in the United States may reflect al Qaeda tradecraft designed to protect the identity of anyone who may have assisted them during that period.

Hazmi and Mihdhar were directed to enroll in English-language classes upon arriving in Southern California, so that they could begin pilot training as soon as possible. KSM claims to have steered the two to San Diego on the basis of his own research, which supposedly included thumbing through a San Diego phone book acquired at a Karachi flea market. Contradicting himself, he also says that, as instructed, they attempted to enroll in three language schools in Los Angeles.[7]

After the pair cleared Immigration and Customs at Los Angeles International Airport, we do not know where they went.[8] They appear to have obtained assistance from the Muslim community, specifically the community surrounding the King Fahd mosque in Culver City, one of the most prominent mosques in Southern California.

It is fairly certain that Hazmi and Mihdhar spent time at the King Fahd mosque and made some acquaintances there. One witness interviewed by the FBI after the September 11 attacks has said he first met the hijackers at the mosque in early 2000. Furthermore, one of the people who would befriend them—a man named Mohdar Abdullah—recalled a trip with Hazmi and Mihdhar to Los Angeles in June when, on their arrival, the three went to the King Fahd mosque. There Hazmi and Mihdhar greeted various individuals whom they appeared to have met previously, including a man named "Khallam." In Abdullah's telling, when Khallam visited the al Qaeda operatives at their motel that evening, Abdullah was asked to leave the room so that Hazmi, Mihdhar, and Khallam could meet in private. The identity of Khallam and his purpose in meeting with Hazmi and Mihdhar remain unknown.[9]

To understand what Hazmi and Mihdhar did in their first weeks in the United States, evidently staying in Los Angeles, we have investigated whether anyone associated with the King Fahd mosque assisted them. This subject has received substantial attention in the media. Some have speculated that Fahad al Thumairy—an imam at the mosque and an accredited diplomat at the Saudi Arabian consulate from 1996 until 2003—may have played a role in helping the hijackers establish themselves on their arrival in Los Angeles. This speculation is based, at least in part, on Thumairy's reported leadership of an extremist faction at the mosque.[10]

A well-known figure at the King Fahd mosque and within the Los Angeles Muslim community, Thumairy was reputed to be an Islamic fundamentalist and a strict adherent to orthodox Wahhabi doctrine. Some Muslims concerned about his preaching have said he "injected non-Islamic themes into his guidance/prayers at the [King Fahd] Mosque" and had followers "supportive of the events of September 11, 2001."[11] Thumairy appears to have associ-

ated with a particularly radical faction within the community of local worshippers, and had a network of contacts in other cities in the United States. After 9/11, Thumairy's conduct was a subject of internal debate among some Saudi officials. He apparently lost his position at the King Fahd mosque, possibly because of his immoderate reputation. On May 6, 2003, Thumairy attempted to reenter the United States from Saudi Arabia but was refused entry, based on a determination by the State Department that he might be connected with terrorist activity.[12]

When interviewed by both the FBI and the Commission staff, Thumairy has denied preaching anti-Western sermons, much less promoting violent jihad. More to the point, he claimed not to recognize either Hazmi or Mihdhar. Both denials are somewhat suspect. (He likewise denied knowing Omar al Bayoumi—a man from San Diego we will discuss shortly—even though witnesses and telephone records establish that the two men had contact with each other. Similarly, Thumairy's claim not to know Mohdar Abdullah is belied by Abdullah's contrary assertion.) On the other hand, Thumairy undoubtedly met with and provided religious counseling to countless individuals during his tenure at the King Fahd mosque, so he might not remember two transients like Hazmi and Mihdhar several years later.[13]

The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar. Yet, after exploring the available leads, we have not found evidence that Thumairy provided assistance to the two operatives.[14]

We do not pick up their trail until February 1, 2000, when they encountered Omar al Bayoumi and Caysan Bin Don at a halal food restaurant on Venice Boulevard in Culver City, a few blocks away from the King Fahd mosque. Bayoumi and Bin Don have both told us that they had driven up from San Diego earlier that day so that Bayoumi could address a visa issue and collect some papers from the Saudi consulate. Bayoumi heard Hazmi and Mihdhar speaking in what he recognized to be Gulf Arabic and struck up a conversation. Since Bin Don knew only a little Arabic, he had to rely heavily on Bayoumi to translate for him.[15]

Mihdhar and Hazmi said they were students from Saudi Arabia who had just arrived in the United States to study English. They said they were living in an apartment near the restaurant but did not specify the address. They did not like Los Angeles and were having a hard time, especially because they did not know anyone. Bayoumi told them how pleasant San Diego was and offered to help them settle there. The two pairs then left the restaurant and went their separate ways.[16]

Bayoumi and Bin Don have been interviewed many times about the February 1, 2000, lunch. For the most part, their respective accounts corroborate each other. However, Bayoumi has said that he and Bin Don attempted to visit the King Fahd mosque after lunch but could not find it. Bin Don, on the other

hand, recalls visiting the mosque twice that day for prayers, both before and after the meal. Bin Don's recollection is spotty and inconsistent. Bayoumi's version can be challenged as well, since the mosque is close to the restaurant and Bayoumi had visited it, and the surrounding area, on multiple occasions, including twice within six weeks of February 1. We do not know whether the lunch encounter occurred by chance or design. We know about it because Bayoumi told law enforcement that it happened.[17]

Bayoumi, then 42 years old, was in the United States as a business student, supported by a private contractor for the Saudi Civil Aviation Authority, where Bayoumi had worked for over 20 years.[18] The object of considerable media speculation following 9/11, he lives now in Saudi Arabia, well aware of his notoriety. Both we and the FBI have interviewed him and investigated evidence about him.

Bayoumi is a devout Muslim, obliging and gregarious. He spent much of his spare time involved in religious study and helping run a mosque in El Cajon, about 15 miles from San Diego. It is certainly possible that he has dissembled about some aspects of his story, perhaps to counter suspicion. On the other hand, we have seen no credible evidence that he believed in violent extremism or knowingly aided extremist groups.[19] Our investigators who have dealt directly with him and studied his background find him to be an unlikely candidate for clandestine involvement with Islamist extremists.

### The Move to San Diego

By February 4, Hazmi and Mihdhar had come to San Diego from Los Angeles, possibly driven by Mohdar Abdullah. Abdullah, a Yemeni university student in his early 20s, is fluent in both Arabic and English, and was perfectly suited to assist the hijackers in pursuing their mission.[20]

After 9/11, Abdullah was interviewed many times by the FBI. He admitted knowing of Hazmi and Mihdhar's extremist leanings and Mihdhar's involvement with the Islamic Army of Aden (a group with ties to al Qaeda) back in Yemen. Abdullah clearly was sympathetic to those extremist views. During a post-9/11 search of his possessions, the FBI found a notebook (belonging to someone else) with references to planes falling from the sky, mass killing, and hijacking. Further, when detained as a material witness following the 9/11 attacks, Abdullah expressed hatred for the U.S. government and "stated that the U.S. brought 'this' on themselves."[21]

When interviewed by the FBI after 9/11, Abdullah denied having advance knowledge of attacks. In May 2004, however, we learned of reports about Abdullah bragging to fellow inmates at a California prison in September–October 2003 that he had known Hazmi and Mihdhar were planning a terrorist attack. The stories attributed to Abdullah are not entirely consistent with each other. Specifically, according to one inmate, Abdullah claimed an unnamed individual had notified him that Hazmi and Mihdhar would be arriv-

ing in Los Angeles with plans to carry out an attack. Abdullah allegedly told the same inmate that he had driven the two al Qaeda operatives from Los Angeles to San Diego, but did not say when this occurred. We have been unable to corroborate this account.[22]

Another inmate has recalled Abdullah claiming he first heard about the hijackers' terrorist plans after they arrived in San Diego, when they told him they planned to fly an airplane into a building and invited him to join them on the plane. According to this inmate, Abdullah also claimed to have found out about the 9/11 attacks three weeks in advance, a claim that appears to dovetail with evidence that Abdullah may have received a phone call from Hazmi around that time, that he stopped making calls from his telephone after August 25, 2001, and that, according to his friends, he started acting strangely.[23]

Although boasts among prison inmates often tend to be unreliable, this evidence is obviously important. To date, neither we nor the FBI have been able to verify Abdullah's alleged jailhouse statements, despite investigative efforts.

We thus do not know when or how Hazmi and Mihdhar first came to San Diego. We do know that on February 4, they went to the Islamic Center of San Diego to find Omar al Bayoumi and take him up on his offer of help. Bayoumi obliged by not only locating an apartment but also helping them fill out the lease application, co-signing the lease and, when the real estate agent refused to take cash for a deposit, helping them open a bank account (which they did with a $9,900 deposit); he then provided a certified check from his own account for which the al Qaeda operatives reimbursed him on the spot for the deposit. Neither then nor later did Bayoumi give money to either Hazmi or Mihdhar, who had received money from KSM.[24]

Hazmi and Mihdhar moved in with no furniture and practically no possessions. Soon after the move, Bayoumi used their apartment for a party attended by some 20 male members of the Muslim community. At Bayoumi's request, Bin Don videotaped the gathering with Bayoumi's video camera. Hazmi and Mihdhar did not mingle with the other guests and reportedly spent most of the party by themselves off camera, in a back room.[25]

Hazmi and Mihdhar immediately started looking for a different place to stay. Based on their comment to Bayoumi about the first apartment being expensive, one might infer that they wanted to save money. They may also have been reconsidering the wisdom of living so close to the video camera–wielding Bayoumi, who Hazmi seemed to think was some sort of Saudi spy. Just over a week after moving in, Hazmi and Mihdhar filed a 30-day notice of intention to vacate. Bayoumi apparently loaned them his cell phone to help them check out possibilities for new accommodations.[26]

Their initial effort to move turned out poorly. An acquaintance arranged with his landlord to have Mihdhar take over his apartment. Mihdhar put down a $650 deposit and signed a lease for the apartment effective March 1. Several weeks later, Mihdhar sought a refund of his deposit, claiming he no longer

intended to move in because the apartment was too messy. When the landlord refused to refund the deposit, Mihdhar became belligerent. The landlord remembers him "ranting and raving" as if he were "psychotic."[27]

Hazmi and Mihdhar finally found a room to rent in the home of an individual they had met at a mosque in San Diego. According to the homeowner, the future hijackers moved in on May 10, 2000. Mihdhar moved out after only about a month. On June 9, he left San Diego to return to Yemen. Hazmi, on the other hand, stayed at this house for the rest of his time in California, until mid-December; he would then leave for Arizona with a newly arrived 9/11 hijacker-pilot, Hani Hanjour.[28]

While in San Diego, Hazmi and Mihdhar played the part of recently arrived foreign students. They continued to reach out to members of the Muslim community for help. At least initially, they found well-meaning new acquaintances at the Islamic Center of San Diego, which was only a stone's throw from the apartment where they first lived. For example, when they purchased a used car (with cash), they bought it from a man who lived across the street from the Islamic Center and who let them use his address in registering the vehicle, an accommodation "to help a fellow Muslim brother." Similarly, in April, when their cash supply may have been dwindling, Hazmi persuaded the administrator of the Islamic Center to let him use the administrator's bank account to receive a $5,000 wire transfer from someone in Dubai, in the United Arab Emirates (this was KSM's nephew, Ali Abdul Aziz Ali).[29]

Hazmi and Mihdhar visited other mosques as well, mixing comfortably as devout worshippers. During the operatives' critical first weeks in San Diego, Mohdar Abdullah helped them. Translating between English and Arabic, he assisted them in obtaining California driver's licenses and with applying to language and flight schools. Abdullah also introduced them to his circle of friends; he shared an apartment with some of those friends near the Rabat mosque in La Mesa, a few miles from the hijackers' residence.[30]

Abdullah has emerged as a key associate of Hazmi and Mihdhar in San Diego. Detained after 9/11 (first as a material witness, then on immigration charges), he was deported to Yemen on May 21, 2004, after the U.S. Attorney for the Southern District of California declined to prosecute him on charges arising out of his alleged jailhouse admissions concerning the 9/11 operatives. The Department of Justice declined to delay his removal pending further investigation of this new information.[31]

Other friends of Abdullah also translated for Hazmi and Mihdhar and helped them adjust to life in San Diego. Some held extremist beliefs or were well acquainted with known extremists. For example, immediately after 9/11, Osama Awadallah, a Yemeni whose telephone number was found in Hazmi's Toyota at Washington Dulles International Airport, was found to possess photos, videos, and articles relating to Bin Ladin. Awadallah also had lived in a house where copies of Bin Ladin's fatwas and other similar materials were distributed

to the residents. Omar Bakarbashat, a Saudi, also met Hazmi and Mihdhar at the Rabat mosque. He admitted helping Hazmi to learn English and taking over the operatives' first apartment in San Diego after they moved out. Bakarbashat apparently had downloaded stridently anti-American Web pages to his computer's hard drive.[32]

Another potentially significant San Diego contact for Hazmi and Mihdhar was Anwar Aulaqi, an imam at the Rabat mosque. Born in New Mexico and thus a U.S. citizen, Aulaqi grew up in Yemen and studied in the United States on a Yemeni government scholarship. We do not know how or when Hazmi and Mihdhar first met Aulaqi. The operatives may even have met or at least talked to him the same day they first moved to San Diego. Hazmi and Mihdhar reportedly respected Aulaqi as a religious figure and developed a close relationship with him.[33]

When interviewed after 9/11, Aulaqi said he did not recognize Hazmi's name but did identify his picture. Although Aulaqi admitted meeting with Hazmi several times, he claimed not to remember any specifics of what they discussed. He described Hazmi as a soft-spoken Saudi student who used to appear at the mosque with a companion but who did not have a large circle of friends.[34]

Aulaqi left San Diego in mid-2000, and by early 2001 had relocated to Virginia. As we will discuss later, Hazmi eventually showed up at Aulaqi's mosque in Virginia, an appearance that may not have been coincidental. We have been unable to learn enough about Aulaqi's relationship with Hazmi and Mihdhar to reach a conclusion.[35]

In sum, although the evidence is thin as to specific motivations, our overall impression is that soon after arriving in California, Hazmi and Mihdhar sought out and found a group of young and ideologically like-minded Muslims with roots in Yemen and Saudi Arabia, individuals mainly associated with Mohdar Abdullah and the Rabat mosque. The al Qaeda operatives lived openly in San Diego under their true names, listing Hazmi in the telephone directory. They managed to avoid attracting much attention.

### Flight Training Fails; Mihdhar Bails Out
Hazmi and Mihdhar came to the United States to learn English, take flying lessons, and become pilots as quickly as possible. They turned out, however, to have no aptitude for English. Even with help and tutoring from Mohdar Abdullah and other bilingual friends, Hazmi and Mihdhar's efforts to learn proved futile. This lack of language skills in turn became an insurmountable barrier to learning how to fly.[36]

A pilot they consulted at one school, the Sorbi Flying Club in San Diego, spoke Arabic. He explained to them that their flight instruction would begin with small planes. Hazmi and Mihdhar emphasized their interest in learning to fly jets, Boeing aircraft in particular, and asked where they might enroll to train

on jets right away. Convinced that the two were either joking or dreaming, the pilot responded that no such school existed. Other instructors who worked with Hazmi and Mihdhar remember them as poor students who focused on learning to control the aircraft in flight but took no interest in takeoffs or landings. By the end of May 2000, Hazmi and Mihdhar had given up on learning how to fly.[37]

Mihdhar's mind seems to have been with his family back in Yemen, as evidenced by calls he made from the apartment telephone. When news of the birth of his first child arrived, he could stand life in California no longer. In late May and early June of 2000, he closed his bank account, transferred the car registration to Hazmi, and arranged his return to Yemen. According to KSM, Mihdhar was bored in San Diego and foresaw no problem in coming back to the United States since he had not overstayed his visa. Hazmi and Mohdar Abdullah accompanied him to Los Angeles on June 9. After visiting the King Fahd mosque one last time with his friends, Mihdhar left the country the following day.[38]

KSM kept in fairly close touch with his operatives, using a variety of methods. When Bin Ladin called KSM back from Pakistan to Afghanistan in the spring of 2000, KSM asked Khallad (whom we introduced in chapter 5) to maintain email contact with Hazmi in the United States. Mihdhar's decision to strand Hazmi in San Diego enraged KSM, who had not authorized the departure and feared it would compromise the plan. KSM attempted to drop Mihdhar from the planes operation and would have done so, he says, had he not been overruled by Bin Ladin.[39]

Following Mihdhar's departure, Hazmi grew lonely and worried that he would have trouble managing by himself. He prayed with his housemate each morning at 5:00 A.M. and attended services at the Islamic Center. He borrowed his housemate's computer for Internet access, following news coverage of fighting in Chechnya and Bosnia. With his housemate's help, Hazmi also used the Internet to search for a wife (after obtaining KSM's approval to marry). This search did not succeed. Although he developed a close relationship with his housemate, Hazmi preferred not to use the house telephone, continuing the practice he and Mihdhar had adopted of going outside to make phone calls.[40]

After Mihdhar left, other students moved into the house. One of these, Yazeed al Salmi, stands out. In July 2000, Salmi purchased $4,000 in traveler's checks at a bank in Riyadh, Saudi Arabia. On September 5, Hazmi deposited $1,900 of the traveler's checks into his bank account, after withdrawing the same amount in cash. It is possible that Hazmi was simply cashing the traveler's checks for a friend. We do not know; Salmi claims not to remember the transaction. After 9/11, Salmi reportedly confided to Mohdar Abdullah that he had previously known terrorist pilot Hani Hanjour. After living in the same house with Hazmi for about a month, Salmi moved to the La Mesa apartment shared by Abdullah and others.[41]

By the fall of 2000, Hazmi no longer even pretended to study English or take flying lessons. Aware that his co-conspirators in Afghanistan and Pakistan would be sending him a new colleague shortly, he bided his time and worked for a few weeks at a gas station in La Mesa where some of his friends, including Abdullah, were employed. On one occasion, Hazmi told a fellow employee that he was planning to find a better job, and let slip a prediction that he would become famous.[42]

On December 8, 2000, Hani Hanjour arrived in San Diego, having traveled from Dubai via Paris and Cincinnati. Hazmi likely picked up Hanjour at the airport. We do not know where Hanjour stayed; a few days later, both men left San Diego. Before departing, they visited the gas station in La Mesa, where Hazmi reportedly introduced Hanjour as a "long time friend from Saudi Arabia." Hazmi told his housemate that he and his friend "Hani" were headed for San Jose to take flying lessons and told his friends that he would stay in touch. Hazmi promised to return to San Diego soon, and he and Hanjour drove off.[43]

Hazmi did not sever all contact with his friends in San Diego. According to Abdullah, after Hazmi left San Diego in December 2000, he telephoned Abdullah twice: in December 2000 or January 2001, Hazmi said he was in San Francisco and would be attending flight school there; about two weeks later, he said he was attending flight school in Arizona. Some evidence, which we will discuss later, indicates that Hazmi contacted Abdullah again, in August 2001. In addition, during the month following Hazmi's departure from San Diego, he emailed his housemate three times, including a January 2001 email that Hazmi signed "Smer," an apparent attempt to conceal his identity that struck the housemate as strange at the time. Hazmi also telephoned his housemate that he and his friend had decided to take flight lessons in Arizona, and that Mihdhar was now back in Yemen. That was their last contact. When the housemate emailed Hazmi in February and March of 2001 to find out how he was faring, Hazmi did not reply. [44]

The housemate who rented the room to Hazmi and Mihdhar during 2000 is an apparently law-abiding citizen with long-standing, friendly contacts among local police and FBI personnel. He did not see anything unusual enough in the behavior of Hazmi or Mihdhar to prompt him to report to his law enforcement contacts. Nor did those contacts ask him for information about his tenants/housemates.

## 7.2 THE 9/11 PILOTS IN THE UNITED STATES

### The Hamburg Pilots Arrive in the United States

In the early summer of 2000, the Hamburg group arrived in the United States to begin flight training. Marwan al Shehhi came on May 29, arriving in Newark on a flight from Brussels. He went to New York City and waited there for

Mohamed Atta to join him. On June 2, Atta traveled to the Czech Republic by bus from Germany and then flew from Prague to Newark the next day. According to Ramzi Binalshibh, Atta did not meet with anyone in Prague; he simply believed it would contribute to operational security to fly out of Prague rather than Hamburg, the departure point for much of his previous international travel.[45]

Atta and Shehhi had not settled on where they would obtain their flight training. In contrast, Ziad Jarrah had already arranged to attend the Florida Flight Training Center (FFTC) in Venice, Florida. Jarrah arrived in Newark on June 27 and then flew to Venice. He immediately began the private pilot program at FFTC, intending to get a multi-engine license. Jarrah moved in with some of the flight instructors affiliated with his school and bought a car.[46]

While Jarrah quickly settled into training in Florida, Atta and Shehhi kept searching for a flight school. After visiting the Airman Flight School in Norman, Oklahoma (where Zacarias Moussaoui would enroll several months later and where another al Qaeda operative, Ihab Ali, had taken lessons in the mid-1990s), Atta started flight instruction at Huffman Aviation in Venice, Florida, and both Atta and Shehhi subsequently enrolled in the Accelerated Pilot Program at that school. By the end of July, both of them took solo flights, and by mid-August they passed the private pilot airman test. They trained through the summer at Huffman, while Jarrah continued his training at FFTC.[47]

The Hamburg operatives paid for their flight training primarily with funds wired from Dubai by KSM's nephew, Ali Abdul Aziz Ali. Between June 29 and September 17, 2000, Ali sent Shehhi and Atta a total of $114,500 in five transfers ranging from $5,000 to $70,000. Ali relied on the unremarkable nature of his transactions, which were essentially invisible amid the billions of dollars flowing daily across the globe.[48] Ali was not required to provide identification in sending this money and the aliases he used were not questioned.[49]

In mid-September, Atta and Shehhi applied to change their immigration status from tourist to student, stating their intention to study at Huffman until September 1, 2001. In late September, they decided to enroll at Jones Aviation in Sarasota, Florida, about 20 miles north of Venice. According to the instructor at Jones, the two were aggressive, rude, and sometimes even fought with him to take over the controls during their training flights. In early October, they took the Stage I exam for instruments rating at Jones Aviation and failed. Very upset, they said they were in a hurry because jobs awaited them at home. Atta and Shehhi then returned to Huffman.[50]

In the meantime, Jarrah obtained a single-engine private pilot certificate in early August. Having reached that milestone, he departed on the first of five foreign trips he would take after first entering the United States. In October, he flew back to Germany to visit his girlfriend, Aysel Senguen. The two traveled to Paris before Jarrah returned to Florida on October 29. His relationship with her remained close throughout his time in the United States. In addition

to his trips, Jarrah made hundreds of phone calls to her and communicated frequently by email.[51]

Jarrah was supposed to be joined at FFTC by Ramzi Binalshibh, who even sent the school a deposit. But Binalshibh could not obtain a U.S. visa. His first applications in May and June 2000 were denied because he lacked established ties in Germany ensuring his return from a trip to the United States. In September, he went home to Yemen to apply for a visa from there, but was denied on grounds that he also lacked sufficient ties to Yemen. In October, he tried one last time, in Berlin, applying for a student visa to attend "aviation language school," but the prior denials were noted and this application was denied as well, as incomplete.[52]

Unable to participate directly in the operation, Binalshibh instead took on the role of coordinating between KSM and the operatives in the United States. Apart from sending a total of about $10,000 in wire transfers to Atta and Shehhi during the summer of 2000, one of Binalshibh's first tasks in his new role as plot coordinator was to assist another possible pilot, Zacarias Moussaoui.[53]

In the fall of 2000, KSM had sent Moussaoui to Malaysia for flight training, but Moussaoui did not find a school he liked. He worked instead on other terrorist schemes, such as buying four tons of ammonium nitrate for bombs to be planted on cargo planes flying to the United States. When KSM found out, he recalled Moussaoui back to Pakistan and directed him to go to the United States for flight training. In early October, Moussaoui went to London. When Binalshibh visited London in December, he stayed at the same 16-room dormitory where Moussaoui was still residing. From London, Moussaoui sent inquiries to the Airman Flight School in Norman, Oklahoma.[54]

Confronting training or travel problems with Hazmi, Mihdhar, Binalshibh, and Moussaoui, al Qaeda was looking for another possible pilot candidate. A new recruit with just the right background conveniently presented himself in Afghanistan.

### The Fourth Pilot: Hani Hanjour

Hani Hanjour, from Ta'if, Saudi Arabia, first came to the United States in 1991 to study at the Center for English as a Second Language at the University of Arizona. He seems to have been a rigorously observant Muslim. According to his older brother, Hani Hanjour went to Afghanistan for the first time in the late 1980s, as a teenager, to participate in the jihad and, because the Soviets had already withdrawn, worked for a relief agency there.[55]

In 1996, Hanjour returned to the United States to pursue flight training, after being rejected by a Saudi flight school. He checked out flight schools in Florida, California, and Arizona; and he briefly started at a couple of them before returning to Saudi Arabia. In 1997, he returned to Florida and then, along with two friends, went back to Arizona and began his flight training there in earnest. After about three months, Hanjour was able to obtain his private

pilot's license. Several more months of training yielded him a commercial pilot certificate, issued by the Federal Aviation Administration (FAA) in April 1999. He then returned to Saudi Arabia.[56]

Hanjour reportedly applied to the civil aviation school in Jeddah after returning home, but was rejected. He stayed home for a while and then told his family he was going to the United Arab Emirates to work for an airline. Where Hanjour actually traveled during this time period is unknown. It is possible he went to the training camps in Afghanistan.[57]

The fact that Hanjour spent so much time in Arizona may be significant. A number of important al Qaeda figures attended the University of Arizona in Tucson or lived in Tucson in the 1980s and early 1990s.[58] Some of Hanjour's known Arizona associates from the time of his flight training in the late 1990s have also raised suspicion.[59] FBI investigators have speculated that al Qaeda may have directed other extremist Muslims in the Phoenix area to enroll in aviation training. It is clear that when Hanjour lived in Arizona in the 1990s, he associated with several individuals holding extremist beliefs who have been the subject of counterterrorism investigations. Some of them trained with Hanjour to be pilots. Others had apparent connections to al Qaeda, including training in Afghanistan.[60]

By the spring of 2000, Hanjour was back in Afghanistan. According to KSM, Hanjour was sent to him in Karachi for inclusion in the plot after Hanjour was identified in al Qaeda's al Faruq camp as a trained pilot, on the basis of background information he had provided. Hanjour had been at a camp in Afghanistan for a few weeks when Bin Ladin or Atef apparently realized that he was a trained pilot; he was told to report to KSM, who then trained Hanjour for a few days in the use of code words.[61]

On June 20, Hanjour returned home to Saudi Arabia. He obtained a U.S. student visa on September 25 and told his family he was returning to his job in the UAE. Hanjour did go to the UAE, but to meet facilitator Ali Abdul Aziz Ali.[62]

Ali opened a bank account in Dubai for Hanjour and providing the initial funds for his trip. On December 8, Hanjour traveled to San Diego. His supposed destination was an English as a second language program in Oakland, California, which he had scheduled before leaving Saudi Arabia but never attended. Instead, as mentioned earlier, he joined Nawaf al Hazmi in San Diego.[63]

Hazmi and Hanjour left San Diego almost immediately and drove to Arizona. Settling in Mesa, Hanjour began refresher training at his old school, Arizona Aviation. He wanted to train on multi-engine planes, but had difficulties because his English was not good enough. The instructor advised him to discontinue but Hanjour said he could not go home without completing the training. In early 2001, he started training on a Boeing 737 simulator at Pan Am International Flight Academy in Mesa. An instructor there found his work well below standard and discouraged him from continuing. Again, Hanjour per-

severed; he completed the initial training by the end of March 2001. At that point, Hanjour and Hazmi vacated their apartment and started driving east, anticipating the arrival of the "muscle hijackers"—the operatives who would storm the cockpits and control the passengers. By as early as April 4, Hanjour and Hazmi had arrived in Falls Church, Virginia.[64]

The three pilots in Florida continued with their training. Atta and Shehhi finished up at Huffman and earned their instrument certificates from the FAA in November. In mid-December 2000, they passed their commercial pilot tests and received their licenses. They then began training to fly large jets on a flight simulator. At about the same time, Jarrah began simulator training, also in Florida but at a different center. By the end of 2000, less than six months after their arrival, the three pilots on the East Coast were simulating flights on large jets.[65]

### Travels in Early 2001

Jarrah, Atta, and Shehhi, having progressed in their training, all took foreign trips during the holiday period of 2000–2001. Jarrah flew through Germany to get home to Beirut. A few weeks later, he returned to Florida via Germany, with Aysel Senguen. She stayed with him in Florida for ten days, even accompanying him to a flight training session. We do not know whether Atta or al Qaeda leaders knew about Jarrah's trips and Senguen's visit. The other operatives had broken off regular contact with their families. At the end of January 2001, Jarrah again flew to Beirut, to visit his sick father. After staying there for several weeks, Jarrah visited Senguen in Germany for a few days before returning to the United States at the end of February.[66]

While Jarrah took his personal trips, Atta traveled to Germany in early January 2001 for a progress meeting with Ramzi Binalshibh. Binalshibh says Atta told him to report to the al Qaeda leadership in Afghanistan that the three Hamburg pilots had completed their flight training and were awaiting orders. Atta also disclosed that a fourth pilot, Hanjour, had joined Hazmi. Upon returning to Florida, Atta wired Binalshibh travel money. Binalshibh proceeded to Afghanistan, made his report, and spent the next several months there and in Pakistan.[67]

When Atta returned to Florida, Shehhi left for Morocco, traveling to Casablanca in mid-January. Shehhi's family, concerned about not having heard from him, reported him missing to the UAE government. The UAE embassy in turn contacted the Hamburg police and a UAE representative tried to find him in Germany, visiting mosques and Shehhi's last address in Hamburg. After learning that his family was looking for him, Shehhi telephoned them on January 20 and said he was still living and studying in Hamburg. The UAE government then told the Hamburg police they could call off the search.[68]

Atta and Shehhi both encountered some difficulty reentering the United States, on January 10 and January 18, respectively. Because neither presented a

**Atta's Alleged Trip to Prague**

Mohamed Atta is known to have been in Prague on two occasions: in December 1994, when he stayed one night at a transit hotel, and in June 2000, when he was en route to the United States. On the latter occasion, he arrived by bus from Germany, on June 2, and departed for Newark the following day.[69]

The allegation that Atta met with an Iraqi intelligence officer in Prague in April 2001 originates from the reporting of a single source of the Czech intelligence service. Shortly after 9/11, the source reported having seen Atta meet with Ahmad Khalil Ibrahim Samir al Ani, an Iraqi diplomat, at the Iraqi Embassy in Prague on April 9, 2001, at 11:00 A.M. This information was passed to CIA headquarters.

The U.S. legal attaché ("Legat") in Prague, the representative of the FBI, met with the Czech service's source. After the meeting, the assessment of the Legat and the Czech officers present was that they were 70 percent sure that the source was sincere and believed his own story of the meeting. Subsequently, the Czech intelligence service publicly stated that there was a 70 percent probability that the meeting between Atta and Ani had taken place. The Czech Interior Minister also made several statements to the press about his belief that the meeting had occurred, and the story was widely reported.

The FBI has gathered evidence indicating that Atta was in Virginia Beach on April 4 (as evidenced by a bank surveillance camera photo), and in Coral Springs, Florida on April 11, where he and Shehhi leased an apartment. On April 6, 9, 10, and 11, Atta's cellular telephone was used numerous times to call various lodging establishments in Florida from cell sites within Florida. We cannot confirm that he placed those calls. But there are no U.S. records indicating that Atta departed the country during this period. Czech officials have reviewed their flight and border records as well for any indication that Atta was in the Czech Republic in April 2001, including records of anyone crossing the border who even looked Arab. They have also reviewed pictures from the area near the Iraqi embassy and have not discovered photos of anyone who looked like Atta. No evidence has been found that Atta was in the Czech Republic in April 2001.

According to the Czech government, Ani, the Iraqi officer alleged to have met with Atta, was about 70 miles away from Prague on April 8–9 and did not return until the afternoon of the ninth, while the source was firm that the sighting occurred at 11:00 A.M. When questioned about the reported April 2001 meeting, Ani—now in custody—has denied ever

meeting or having any contact with Atta. Ani says that shortly after 9/11, he became concerned that press stories about the alleged meeting might hurt his career. Hoping to clear his name, Ani asked his superiors to approach the Czech government about refuting the allegation. He also denies knowing of any other Iraqi official having contact with Atta.

These findings cannot absolutely rule out the possibility that Atta was in Prague on April 9, 2001. He could have used an alias to travel and a passport under that alias, but this would be an exception to his practice of using his true name while traveling (as he did in January and would in July when he took his next overseas trip). The FBI and CIA have uncovered no evidence that Atta held any fraudulent passports.

KSM and Binalshibh both deny that an Atta–Ani meeting occurred. There was no reason for such a meeting, especially considering the risk it would pose to the operation. By April 2001, all four pilots had completed most of their training, and the muscle hijackers were about to begin entering the United States.

The available evidence does not support the original Czech report of an Atta–Ani meeting.[70]

student visa, both of them had to persuade INS inspectors that they should be admitted so that they could continue their flight training. Neither operative had any problem clearing Customs.[71]

After returning to Florida from their trips, Atta and Shehhi visited Georgia, staying briefly in Norcross and Decatur, and renting a single-engine plane to fly with an instructor in Lawrenceville. By February 19, Atta and Shehhi were in Virginia. They rented a mailbox in Virginia Beach, cashed a check, and then promptly returned to Georgia, staying in Stone Mountain. We have found no explanation for these travels. In mid-March, Jarrah was in Georgia as well, staying in Decatur. There is no evidence that the three pilots met, although Jarrah and Atta apparently spoke on the phone. At the end of the month, Jarrah left the United States again and visited Senguen in Germany for two weeks. In early April, Atta and Shehhi returned to Virginia Beach and closed the mailbox they had opened in February.[72]

By the time Atta and Shehhi returned to Virginia Beach from their travels in Georgia, Hazmi and Hanjour had also arrived in Virginia, in Falls Church. They made their way to a large mosque there, the Dar al Hijra mosque, sometime in early April.[73]

As we mentioned earlier, one of the imams at this mosque was the same Anwar Aulaqi with whom Hazmi had spent time at the Rabat mosque in San Diego. Aulaqi had moved to Virginia in January 2001. He remembers Hazmi

from San Diego but has denied having any contact with Hazmi or Hanjour in Virginia.[74]

At the Dar al Hijra mosque, Hazmi and Hanjour met a Jordanian named Eyad al Rababah. Rababah says he had gone to the mosque to speak to the imam, Aulaqi, about finding work. At the conclusion of services, which normally had 400 to 500 attendees, Rababah says he happened to meet Hazmi and Hanjour. They were looking for an apartment; Rababah referred them to a friend who had one to rent. Hazmi and Hanjour moved into the apartment, which was in Alexandria.[75]

Some FBI investigators doubt Rababah's story. Some agents suspect that Aulaqi may have tasked Rababah to help Hazmi and Hanjour. We share that suspicion, given the remarkable coincidence of Aulaqi's prior relationship with Hazmi. As noted above, the Commission was unable to locate and interview Aulaqi. Rababah has been deported to Jordan, having been convicted after 9/11 in a fraudulent driver's license scheme.[76]

Rababah, who had lived in Connecticut, New York, and New Jersey, told investigators that he had recommended Paterson, New Jersey, as a place with an Arabic-speaking community where Hazmi and Hanjour might want to settle. They asked for his help in getting them an apartment in Paterson. Rababah tried without success. He says he then suggested that Hazmi and Hanjour travel with him to Connecticut where they could look for a place to live.[77]

On May 8, Rababah went to Hazmi and Hanjour's apartment to pick them up for the trip to Connecticut. There he says he found them with new roommates—Ahmed al Ghamdi and Majed Moqed. These two men had been sent to America to serve as muscle hijackers and had arrived at Dulles Airport on May 2. Rababah drove Hanjour to Fairfield, Connecticut, followed by Hazmi, who had Moqed and Ghamdi in his car. After a short stay in Connecticut, where they apparently called area flight schools and real estate agents, Rababah drove the four to Paterson to have dinner and show them around. He says that they returned with him to Fairfield that night, and that he never saw them again.[78]

Within a few weeks, Hanjour, Hazmi, and several other operatives moved to Paterson and rented a one-room apartment. When their landlord later paid a visit, he found six men living there—Nawaf al Hazmi, now joined by his younger brother Salem, Hanjour, Moqed, probably Ahmed al Ghamdi, and Abdul Aziz al Omari; Hazmi's old friend Khalid al Mihdhar would soon join them.[79]

Atta and Shehhi had already returned to Florida. On April 11, they moved into an apartment in Coral Springs. Atta stayed in Florida, awaiting the arrival of the first muscle hijackers.[80]

Shehhi, on the other hand, bought a ticket to Cairo and flew there from Miami on April 18. We do not know much more about Shehhi's reason for traveling to Egypt in April than we know about his January trip to Morocco.

Shehhi did meet with Atta's father, who stated in a post-9/11 interview that Shehhi just wanted to pick up Atta's international driver's license and some money. This story is not credible. Atta already had the license with him and presented it during a traffic stop on April 26 while Shehhi was still abroad. Shehhi spent about two weeks in Egypt, obviously more time than would have been needed just to meet with Atta's father. Shehhi could have traveled elsewhere during this time, but no records indicating additional travel have been discovered.[81]

Shehhi returned to Miami on May 2. That day, Atta and Jarrah were together, about 30 miles to the north, visiting a Department of Motor Vehicles office in Lauderdale Lakes, Florida, to get Florida driver's licenses. Back in Virginia, Hazmi and Hanjour were about to leave for Connecticut and New Jersey. As the summer approached, the lead operatives were settled in Florida and New Jersey, waiting for the rest of their contingent to join them.[82]

## 7.3 ASSEMBLING THE TEAMS

During the summer and early autumn of 2000, Bin Ladin and senior al Qaeda leaders in Afghanistan started selecting the muscle hijackers—the operatives who would storm the cockpits and control the passengers. Despite the phrase widely used to describe them, the so-called muscle hijackers were not at all physically imposing; most were between 5' 5" and 5' 7" in height.[83]

### Recruitment and Selection for 9/11

Twelve of the 13 muscle hijackers (excluding Nawaf al Hazmi and Mihdhar) came from Saudi Arabia: Satam al Suqami, Wail al Shehri, Waleed al Shehri, Abdul Aziz al Omari, Ahmed al Ghamdi, Hamza al Ghamdi, Mohand al Shehri, Majed Moqed, Salem al Hazmi, Saeed al Ghamdi, Ahmad al Haznawi, and Ahmed al Nami. The remaining recruit, Fayez Banihammad, came from the UAE. He appears to have played a unique role among the muscle hijackers because of his work with one of the plot's financial facilitators, Mustafa al Hawsawi.[84]

Saudi authorities interviewed the relatives of these men and have briefed us on what they found. The muscle hijackers came from a variety of educational and societal backgrounds. All were between 20 and 28 years old; most were unemployed with no more than a high school education and were unmarried.[85]

Four of them—Ahmed al Ghamdi, Saeed al Ghamdi, Hamza al Ghamdi, and Ahmad al Haznawi—came from a cluster of three towns in the al Bahah region, an isolated and underdeveloped area of Saudi Arabia, and shared the same tribal affiliation. None had a university degree. Their travel patterns and information from family members suggest that the four may have been in contact with each other as early as the fall of 1999.[86]

Five more—Wail al Shehri, Waleed al Shehri, Abdul Aziz al Omari, Mohand al Shehri, and Ahmed al Nami—came from Asir Province, a poor region in southwestern Saudi Arabia that borders Yemen; this weakly policed area is sometimes called "the wild frontier." Wail and Waleed al Shehri were brothers. All five in this group had begun university studies. Omari had graduated with honors from high school, had attained a degree from the Imam Muhammad Ibn Saud Islamic University, was married, and had a daughter.[87]

The three remaining muscle hijackers from Saudi Arabia were Satam al Suqami, Majed Moqed, and Salem al Hazmi. Suqami came from Riyadh. Moqed hailed from a small town called Annakhil, west of Medina. Suqami had very little education, and Moqed had dropped out of university. Neither Suqami nor Moqed appears to have had ties to the other, or to any of the other operatives, before getting involved with extremists, probably by 1999.[88]

Salem al Hazmi, a younger brother of Nawaf, was born in Mecca. Salem's family recalled him as a quarrelsome teenager. His brother Nawaf probably recommended him for recruitment into al Qaeda. One al Qaeda member who knew them says that Nawaf pleaded with Bin Ladin to allow Salem to participate in the 9/11 operation.[89]

Detainees have offered varying reasons for the use of so many Saudi operatives. Binalshibh argues that al Qaeda wanted to send a message to the government of Saudi Arabia about its relationship with the United States. Several other al Qaeda figures, however, have stated that ethnicity generally was not a factor in the selection of operatives unless it was important for security or operational reasons.[90]

KSM, for instance, denies that Saudis were chosen for the 9/11 plot to drive a wedge between the United States and Saudi Arabia, and stresses practical reasons for considering ethnic background when selecting operatives. He says that so many were Saudi because Saudis comprised the largest portion of the pool of recruits in the al Qaeda training camps. KSM estimates that in any given camp, 70 percent of the mujahideen were Saudi, 20 percent were Yemeni, and 10 percent were from elsewhere. Although Saudi and Yemeni trainees were most often willing to volunteer for suicide operations, prior to 9/11 it was easier for Saudi operatives to get into the United States.[91]

Most of the Saudi muscle hijackers developed their ties to extremists two or three years before the attacks. Their families often did not consider these young men religious zealots. Some were perceived as devout, others as lacking in faith. For instance, although Ahmed al Ghamdi, Hamza al Ghamdi, and Saeed al Ghamdi attended prayer services regularly and Omari often served as an imam at his mosque in Saudi Arabia, Suqami and Salem al Hazmi appeared unconcerned with religion and, contrary to Islamic law, were known to drink alcohol.[92]

Like many other al Qaeda operatives, the Saudis who eventually became the muscle hijackers were targeted for recruitment outside Afghanistan—probably in Saudi Arabia itself. Al Qaeda recruiters, certain clerics, and—in a

few cases—family members probably all played a role in spotting potential candidates. Several of the muscle hijackers seem to have been recruited through contacts at local universities and mosques.[93]

According to the head of one of the training camps in Afghanistan, some were chosen by unnamed Saudi sheikhs who had contacts with al Qaeda. Omari, for example, is believed to have been a student of a radical Saudi cleric named Sulayman al Alwan. His mosque, which is located in al Qassim Province, is known among more moderate clerics as a "terrorist factory." The province is at the very heart of the strict Wahhabi movement in Saudi Arabia. Saeed al Ghamdi and Mohand al Shehri also spent time in al Qassim, both breaking with their families. According to his father, Mohand al Shehri's frequent visits to this area resulted in his failing exams at his university in Riyadh. Saeed al Ghamdi transferred to a university in al Qassim, but he soon stopped talking to his family and dropped out of school without informing them.[94]

The majority of these Saudi recruits began to break with their families in late 1999 and early 2000. According to relatives, some recruits began to make arrangements for extended absences. Others exhibited marked changes in behavior before disappearing. Salem al Hazmi's father recounted that Salem—who had had problems with alcohol and petty theft—stopped drinking and started attending mosque regularly three months before he disappeared.[95]

Several family members remembered that their relatives had expressed a desire to participate in jihad, particularly in Chechnya. None had mentioned going to Afghanistan. These statements might be true or cover stories. The four recruits from the al Ghamdi tribe, for example, all told their families that they were going to Chechnya. Only two—Ahmed al Ghamdi and Saeed al Ghamdi—had documentation suggesting travel to a Russian republic.[96]

Some aspiring Saudi mujahideen, intending to go to Chechnya, encountered difficulties along the way and diverted to Afghanistan. In 1999, Ibn al Khattab—the primary commander of Arab nationals in Chechnya—reportedly had started turning away most foreign mujahideen because of their inexperience and inability to adjust to the local conditions. KSM states that several of the 9/11 muscle hijackers faced problems traveling to Chechnya and so went to Afghanistan, where they were drawn into al Qaeda.[97]

Khallad has offered a more detailed story of how such diversions occurred. According to him, a number of Saudi mujahideen who tried to go to Chechnya in 1999 to fight the Russians were stopped at the Turkish-Georgian border. Upon arriving in Turkey, they received phone calls at guesthouses in places such as Istanbul and Ankara, informing them that the route to Chechnya via Georgia had been closed. These Saudis then decided to travel to Afghanistan, where they could train and wait to make another attempt to enter Chechnya during the summer of 2000. While training at al Qaeda camps, a dozen of them heard Bin Ladin's speeches, volunteered to become suicide operatives, and eventually were selected as muscle hijackers for the planes operation. Khallad says he met a number of them at the Kandahar airport, where they were help-

ing to provide extra security. He encouraged Bin Ladin to use them. Khallad claims to have been closest with Saeed al Ghamdi, whom he convinced to become a martyr and whom he asked to recruit a friend, Ahmed al Ghamdi, to the same cause. Although Khallad claims not to recall everyone from this group who was later chosen for the 9/11 operation, he says they also included Suqami, Waleed and Wail al Shehri, Omari, Nami, Hamza al Ghamdi, Salem al Hazmi, and Moqed.[98]

According to KSM, operatives volunteered for suicide operations and, for the most part, were not pressured to martyr themselves. Upon arriving in Afghanistan, a recruit would fill out an application with standard questions, such as, What brought you to Afghanistan? How did you travel here? How did you hear about us? What attracted you to the cause? What is your educational background? Where have you worked before? Applications were valuable for determining the potential of new arrivals, for filtering out potential spies from among them, and for identifying recruits with special skills. For instance, as pointed out earlier, Hani Hanjour noted his pilot training. Prospective operatives also were asked whether they were prepared to serve as suicide operatives; those who answered in the affirmative were interviewed by senior al Qaeda lieutenant Muhammad Atef.[99]

KSM claims that the most important quality for any al Qaeda operative was willingness to martyr himself. Khallad agrees, and claims that this criterion had preeminence in selecting the planes operation participants. The second most important criterion was demonstrable patience, Khallad says, because the planning for such attacks could take years.[100]

Khallad claims it did not matter whether the hijackers had fought in jihad previously, since he believes that U.S. authorities were not looking for such operatives before 9/11. But KSM asserts that young mujahideen with clean records were chosen to avoid raising alerts during travel. The al Qaeda training camp head mentioned above adds that operatives with no prior involvement in activities likely to be known to international security agencies were purposefully selected for the 9/11 attacks.[101]

Most of the muscle hijackers first underwent basic training similar to that given other al Qaeda recruits. This included training in firearms, heavy weapons, explosives, and topography. Recruits learned discipline and military life. They were subjected to artificial stresses to measure their psychological fitness and commitment to jihad. At least seven of the Saudi muscle hijackers took this basic training regime at the al Faruq camp near Kandahar. This particular camp appears to have been the preferred location for vetting and training the potential muscle hijackers because of its proximity to Bin Ladin and senior al Qaeda leadership. Two others—Suqami and Moqed—trained at Khaldan, another large basic training facility located near Kabul, where Mihdhar had trained in the mid-1990s.[102]

By the time operatives for the planes operation were picked in mid-2000, some of them had been training in Afghanistan for months, others were just

arriving for the first time, and still others may have been returning after prior visits to the camps. According to KSM, Bin Ladin would travel to the camps to deliver lectures and meet the trainees personally. If Bin Ladin believed a trainee held promise for a special operation, that trainee would be invited to the al Qaeda leader's compound at Tarnak Farms for further meetings.[103]

KSM claims that Bin Ladin could assess new trainees very quickly, in about ten minutes, and that many of the 9/11 hijackers were selected in this manner. Bin Ladin, assisted by Atef, personally chose all the future muscle hijackers for the planes operation, primarily between the summer of 2000 and April 2001. Upon choosing a trainee, Bin Ladin would ask him to swear loyalty for a suicide operation. After the selection and oath-swearing, the operative would be sent to KSM for training and the filming of a martyrdom video, a function KSM supervised as head of al Qaeda's media committee.[104]

KSM sent the muscle hijacker recruits on to Saudi Arabia to obtain U.S. visas. He gave them money (about $2,000 each) and instructed them to return to Afghanistan for more training after obtaining the visas. At this early stage, the operatives were not told details about the operation. The majority of the Saudi muscle hijackers obtained U.S. visas in Jeddah or Riyadh between September and November of 2000.[105]

KSM told potential hijackers to acquire new "clean" passports in their home countries before applying for a U.S. visa. This was to avoid raising suspicion about previous travel to countries where al Qaeda operated. Fourteen of the 19 hijackers, including nine Saudi muscle hijackers, obtained new passports. Some of these passports were then likely doctored by the al Qaeda passport division in Kandahar, which would add or erase entry and exit stamps to create "false trails" in the passports.[106]

In addition to the operatives who eventually participated in the 9/11 attacks as muscle hijackers, Bin Ladin apparently selected at least nine other Saudis who, for various reasons, did not end up taking part in the operation: Mohamed Mani Ahmad al Kahtani, Khalid Saeed Ahmad al Zahrani, Ali Abd al Rahman al Faqasi al Ghamdi, Saeed al Baluchi, Qutaybah al Najdi, Zuhair al Thubaiti, Saeed Abdullah Saeed al Ghamdi, Saud al Rashid, and Mushabib al Hamlan. A tenth individual, a Tunisian with Canadian citizenship named Abderraouf Jdey, may have been a candidate to participate in 9/11, or he may have been a candidate for a later attack. These candidate hijackers either backed out, had trouble obtaining needed travel documents, or were removed from the operation by the al Qaeda leadership. Khallad believes KSM wanted between four and six operatives per plane. KSM states that al Qaeda had originally planned to use 25 or 26 hijackers but ended up with only the 19.[107]

**Final Training and Deployment to the United States**
Having acquired U.S. visas in Saudi Arabia, the muscle hijackers returned to Afghanistan for special training in late 2000 to early 2001. The training reportedly was conducted at the al Matar complex by Abu Turab al Jordani, one of

only a handful of al Qaeda operatives who, according to KSM, was aware of the full details of the planned planes operation. Abu Turab taught the operatives how to conduct hijackings, disarm air marshals, and handle explosives. He also trained them in bodybuilding and provided them with a few basic English words and phrases.[108]

According to KSM, Abu Turab even had the trainees butcher a sheep and a camel with a knife to prepare to use knives during the hijackings. The recruits learned to focus on storming the cockpit at the earliest opportunity when the doors first opened, and to worry about seizing control over the rest of the plane later. The operatives were taught about other kinds of attack as well, such as truck bombing, so that they would not be able to disclose the exact nature of their operation if they were caught. According to KSM, the muscle did not learn the full details—including the plan to hijack planes and fly them into buildings—before reaching the United States.[109]

After training in Afghanistan, the operatives went to a safehouse maintained by KSM in Karachi and stayed there temporarily before being deployed to the United States via the UAE. The safehouse was run by al Qaeda operative Abd al Rahim Ghulum Rabbani, also known as Abu Rahmah, a close associate of KSM who assisted him for three years by finding apartments and lending logistical support to operatives KSM would send.

According to an al Qaeda facilitator, operatives were brought to the safehouse by a trusted Pakistani al Qaeda courier named Abdullah Sindhi, who also worked for KSM. The future hijackers usually arrived in groups of two or three, staying at the safe house for as long as two weeks. The facilitator has identified each operative whom he assisted at KSM's direction in the spring of 2001. Before the operatives left Pakistan, each of them received $10,000 from KSM for future expenses.[110]

From Pakistan, the operatives transited through the UAE en route to the United States. In the Emirates they were assisted primarily by al Qaeda operatives Ali Abdul Aziz Ali and Mustafa al Hawsawi. Ali apparently assisted nine future hijackers between April and June 2001 as they came through Dubai. He helped them with plane tickets, traveler's checks, and hotel reservations; he also taught them about everyday aspects of life in the West, such as purchasing clothes and ordering food. Dubai, a modern city with easy access to a major airport, travel agencies, hotels, and Western commercial establishments, was an ideal transit point.[111]

Ali reportedly assumed the operatives he was helping were involved in a big operation in the United States, he did not know the details.[112] When he asked KSM to send him an assistant, KSM dispatched Hawsawi, who had worked on al Qaeda's media committee in Kandahar. Hawsawi helped send the last four operatives (other than Mihdhar) to the United States from the UAE. Hawsawi would consult with Atta about the hijackers' travel schedules to the United States and later check with Atta to confirm that each had arrived. Hawsawi told

the muscle hijackers that they would be met by Atta at the airport. Hawsawi also facilitated some of the operation's financing.[113]

The muscle hijackers began arriving in the United States in late April 2001. In most cases, they traveled in pairs on tourist visas and entered the United States in Orlando or Miami, Florida; Washington, D.C.; or New York. Those arriving in Florida were assisted by Atta and Shehhi, while Hazmi and Hanjour took care of the rest. By the end of June, 14 of the 15 muscle hijackers had crossed the Atlantic.[114]

The muscle hijackers supplied an infusion of funds, which they carried as a mixture of cash and traveler's checks purchased in the UAE and Saudi Arabia. Seven muscle hijackers are known to have purchased a total of nearly $50,000 in traveler's checks that were used in the United States. Moreover, substantial deposits into operatives' U.S. bank accounts immediately followed the entry of other muscle hijackers, indicating that those newcomers brought money with them as well. In addition, muscle hijacker Banihammad came to the United States after opening bank accounts in the UAE into which were deposited the equivalent of approximately $30,000 on June 25, 2001. After his June 27 arrival in the United States, Banihammad made Visa and ATM withdrawals from his UAE accounts.[115]

The hijackers made extensive use of banks in the United States, choosing both branches of major international banks and smaller regional banks. All of the hijackers opened accounts in their own name, and used passports and other identification documents that appeared valid on their face. Contrary to numerous published reports, there is no evidence the hijackers ever used false Social Security numbers to open any bank accounts. While the hijackers were not experts on the use of the U.S. financial system, nothing they did would have led the banks to suspect criminal behavior, let alone a terrorist plot to commit mass murder.[116]

The last muscle hijacker to arrive was Khalid al Mihdhar. As mentioned earlier, he had abandoned Hazmi in San Diego in June 2000 and returned to his family in Yemen. Mihdhar reportedly stayed in Yemen for about a month before Khallad persuaded him to return to Afghanistan. Mihdhar complained about life in the United States. He met with KSM, who remained annoyed at his decision to go AWOL. But KSM's desire to drop him from the operation yielded to Bin Ladin's insistence to keep him.[117]

By late 2000, Mihdhar was in Mecca, staying with a cousin until February 2001, when he went home to visit his family before returning to Afghanistan. In June 2001, Mihdhar returned once more to Mecca to stay with his cousin for another month. Mihdhar said that Bin Ladin was planning five attacks on the United States. Before leaving, Mihdhar asked his cousin to watch over his home and family because of a job he had to do.[118]

On July 4, 2001, Mihdhar left Saudi Arabia to return to the United States, arriving at John F. Kennedy International Airport in New York. Mihdhar gave







**American Airlines Flight 11**

Left to right, *Mohamed Atta,* pilot*; Waleed al Shehri, Wail al Shehri, Satam al Suqami, Abdulaziz al Omari,* hijackers







**United Airlines Flight 175**

Left to right, *Marwan al Shehhi,* pilot*; Fayez Banihammad, Ahmed al Ghamdi, Hamza al Ghamdi, Mohand al Shehri,* hijackers







**American Airlines Flight 77**

Left to right, *Hani Hanjour,* pilot*; Nawaf al Hazmi, Khalid al Mihdhar, Majed Moqed, Salem al Hazmi,* hijackers






**United Airlines Flight 93**

Left to right, *Ziad Jarrah* pilot*; Saeed al Ghamdi, Ahmad al Haznawi, Ahmed al Nami,* hijackers

his intended address as the Marriott Hotel, New York City, but instead spent one night at another New York hotel. He then joined the group of hijackers in Paterson, reuniting with Nawaf al Hazmi after more than a year. With two months remaining, all 19 hijackers were in the United States and ready to take the final steps toward carrying out the attacks.[119]

## Assistance from Hezbollah and Iran to al Qaeda

As we mentioned in chapter 2, while in Sudan, senior managers in al Qaeda maintained contacts with Iran and the Iranian-supported worldwide terrorist organization Hezbollah, which is based mainly in southern Lebanon and Beirut. Al Qaeda members received advice and training from Hezbollah.

Intelligence indicates the persistence of contacts between Iranian security officials and senior al Qaeda figures after Bin Ladin's return to Afghanistan. Khallad has said that Iran made a concerted effort to strengthen relations with al Qaeda after the October 2000 attack on the USS *Cole*, but was rebuffed because Bin Ladin did not want to alienate his supporters in Saudi Arabia. Khallad and other detainees have described the willingness of Iranian officials to facilitate the travel of al Qaeda members through Iran, on their way to and from Afghanistan. For example, Iranian border inspectors would be told not to place telltale stamps in the passports of these travelers. Such arrangements were particularly beneficial to Saudi members of al Qaeda.[120]

Our knowledge of the international travels of the al Qaeda operatives selected for the 9/11 operation remains fragmentary. But we now have evidence suggesting that 8 to 10 of the 14 Saudi "muscle" operatives traveled into or out of Iran between October 2000 and February 2001.[121]

In October 2000, a senior operative of Hezbollah visited Saudi Arabia to coordinate activities there. He also planned to assist individuals in Saudi Arabia in traveling to Iran during November. A top Hezbollah commander and Saudi Hezbollah contacts were involved.[122]

Also in October 2000, two future muscle hijackers, Mohand al Shehri and Hamza al Ghamdi, flew from Iran to Kuwait. In November, Ahmed al Ghamdi apparently flew to Beirut, traveling—perhaps by coincidence—on the same flight as a senior Hezbollah operative. Also in November, Salem al Hazmi apparently flew from Saudi Arabia to Beirut.[123]

In mid-November, we believe, three of the future muscle hijackers, Wail al Shehri, Waleed al Shehri, and Ahmed al Nami, all of whom had obtained their U.S. visas in late October, traveled in a group from Saudi Arabia to Beirut and then onward to Iran. An associate of a senior Hezbollah operative was on the same flight that took the future hijackers to Iran. Hezbollah officials in Beirut and Iran were expecting the arrival of a group during the same time period. The travel of this group was important enough to merit the attention of senior figures in Hezbollah.[124]

Later in November, two future muscle hijackers, Satam al Suqami and Majed

Moqed, flew into Iran from Bahrain. In February 2001, Khalid al Mihdhar may have taken a flight from Syria to Iran, and then traveled further within Iran to a point near the Afghan border.[125]

KSM and Binalshibh have confirmed that several of the 9/11 hijackers (at least eight, according to Binalshibh) transited Iran on their way to or from Afghanistan, taking advantage of the Iranian practice of not stamping Saudi passports. They deny any other reason for the hijackers' travel to Iran. They also deny any relationship between the hijackers and Hezbollah.[126]

In sum, there is strong evidence that Iran facilitated the transit of al Qaeda members into and out of Afghanistan before 9/11, and that some of these were future 9/11 hijackers. There also is circumstantial evidence that senior Hezbollah operatives were closely tracking the travel of some of these future muscle hijackers into Iran in November 2000. However, we cannot rule out the possibility of a remarkable coincidence—that is, that Hezbollah was actually focusing on some other group of individuals traveling from Saudi Arabia during this same time frame, rather than the future hijackers.[127]

We have found no evidence that Iran or Hezbollah was aware of the planning for what later became the 9/11 attack. At the time of their travel through Iran, the al Qaeda operatives themselves were probably not aware of the specific details of their future operation.

After 9/11, Iran and Hezbollah wished to conceal any past evidence of cooperation with Sunni terrorists associated with al Qaeda. A senior Hezbollah official disclaimed any Hezbollah involvement in 9/11.[128]

We believe this topic requires further investigation by the U.S. government.

## 7.4 FINAL STRATEGIES AND TACTICS

**Final Preparations in the United States**

During the early summer of 2001, Atta, assisted by Shehhi, was busy coordinating the arrival of most of the muscle hijackers in southern Florida—picking them up at the airport, finding them places to stay, and helping them settle in the United States.[129]

The majority settled in Florida. Some opened bank accounts, acquired mailboxes, and rented cars. Several also joined local gyms, presumably to stay fit for the operation. Upon first arriving, most stayed in hotels and motels; but by mid-June, they settled in shared apartments relatively close to one another and Atta.[130] Though these muscle hijackers did not travel much after arriving in the United States, two of them, Waleed al Shehri and Satam al Suqami, took unusual trips.

On May 19, Shehri and Suqami flew from Fort Lauderdale to Freeport, the Bahamas, where they had reservations at the Bahamas Princess Resort. The two were turned away by Bahamian officials on arrival, however, because they

lacked visas; they returned to Florida that same day. They likely took this trip to renew Suqami's immigration status, as Suqami's legal stay in the United States ended May 21.[131]

On July 30, Shehri traveled alone from Fort Lauderdale to Boston. He flew to San Francisco the next day, where he stayed one night before returning via Las Vegas. While this travel may have been a casing flight—Shehri traveled in first class on the same type of aircraft he would help hijack on September 11 (a Boeing 767) and the trip included a layover in Las Vegas—Shehri was neither a pilot nor a plot leader, as were the other hijackers who took surveillance flights.[132]

The three Hamburg pilots—Atta, Shehhi, and Jarrah—took the first of their cross-country surveillance flights early in the summer. Shehhi flew from New York to Las Vegas via San Francisco in late May. Jarrah flew from Baltimore to Las Vegas via Los Angeles in early June. Atta flew from Boston to Las Vegas via San Francisco at the end of June. Each traveled in first class, on United Airlines. For the east-west transcontinental leg, each operative flew on the same type of aircraft he would pilot on September 11 (Atta and Shehhi, a Boeing 767; Jarrah, a Boeing 757).[133] Hanjour and Hazmi, as noted below, took similar cross-country surveillance flights in August.

Jarrah and Hanjour also received additional training and practice flights in the early summer. A few days before departing on his cross-country test flight, Jarrah flew from Fort Lauderdale to Philadelphia, where he trained at Hortman Aviation and asked to fly the Hudson Corridor, a low-altitude "hallway" along the Hudson River that passes New York landmarks like the World Trade Center. Heavy traffic in the area can make the corridor a dangerous route for an inexperienced pilot. Because Hortman deemed Jarrah unfit to fly solo, he could fly this route only with an instructor.[134]

Hanjour, too, requested to fly the Hudson Corridor about this same time, at Air Fleet Training Systems in Teterboro, New Jersey, where he started receiving ground instruction soon after settling in the area with Hazmi. Hanjour flew the Hudson Corridor, but his instructor declined a second request because of what he considered Hanjour's poor piloting skills. Shortly thereafter, Hanjour switched to Caldwell Flight Academy in Fairfield, New Jersey, where he rented small aircraft on several occasions during June and July. In one such instance on July 20, Hanjour—likely accompanied by Hazmi—rented a plane from Caldwell and took a practice flight from Fairfield to Gaithersburg, Maryland, a route that would have allowed them to fly near Washington, D.C. Other evidence suggests that Hanjour may even have returned to Arizona for flight simulator training earlier in June.[135]

There is no indication that Atta or Shehhi received any additional flight training in June. Both were likely too busy organizing the newly arrived muscle hijackers and taking their cross-country surveillance flights. Atta, moreover, needed to coordinate with his second-in-command, Nawaf al Hazmi.[136]

Although Atta and Hazmi appear to have been in Virginia at about the same time in early April, they probably did not meet then. Analysis of late April communications associated with KSM indicates that they had wanted to get together in April but could not coordinate the meeting.[137] Atta and Hazmi probably first met in the United States only when Hazmi traveled round-trip from Newark to Miami between June 19 and June 25.

After he returned to New Jersey, Hazmi's behavior began to closely parallel that of the other hijackers. He and Hanjour, for instance, soon established new bank accounts, acquired a mailbox, rented cars, and started visiting a gym. So did the four other hijackers who evidently were staying with them in New Jersey. Several also obtained new photo identification, first in New Jersey and then at the Virginia Department of Motor Vehicles, where Hazmi and Hanjour had obtained such documents months earlier, likely with help from their Jordanian friend, Rababah.[138]

Atta probably met again with Hazmi in early July. Returning from his initial cross-country surveillance flight, Atta flew into New York. Rather than return immediately to Florida, he checked into a New Jersey hotel. He picked up tickets to travel to Spain at a travel agency in Paterson on July 4 before departing for Fort Lauderdale. Now that the muscle hijackers had arrived, he was ready to meet with Ramzi Binalshibh for the last time.[139]

## The Meeting in Spain

After meeting with Atta in Berlin in January 2001, Binalshibh had spent much of the spring of 2001 in Afghanistan and Pakistan, helping move the muscle hijackers as they passed through Karachi. During the Berlin meeting, the two had agreed to meet later in the year in Kuala Lumpur to discuss the operation in person again. In late May, Binalshibh reported directly to Bin Ladin at an al Qaeda facility known as "Compound Six" near Kandahar.[140]

Bin Ladin told Binalshibh to instruct Atta and the others to focus on their security and that of the operation, and to advise Atta to proceed as planned with the targets discussed before Atta left Afghanistan in early 2000—the World Trade Center, the Pentagon, the White House, and the Capitol. According to Binalshibh, Bin Ladin said he preferred the White House over the Capitol, asking Binalshibh to confirm that Atta understood this preference. Binalshibh says Bin Ladin had given the same message to Waleed al Shehri for conveyance to Atta earlier that spring. Binalshibh also received permission to meet Atta in Malaysia. Atef provided money for the trip, which KSM would help Binalshibh arrange in Karachi.[141]

In early June, Binalshibh traveled by taxi from Kandahar to Quetta, Pakistan, where al Qaeda courier Abu Rahmah took him to KSM. According to Binalshibh, KSM provided a plane ticket to Malaysia and a fraudulent Saudi passport to use for the trip. KSM told him to ask Atta to select a date for the attacks. Binalshibh was to return to Germany and then inform KSM of the date. KSM

also gave Binalshibh the email address of Zacarias Moussaoui for future contact. Binalshibh then left for Kuala Lumpur.[142]

Binalshibh contacted Atta upon arriving in Malaysia and found a change in plan. Atta could not travel because he was too busy helping the new arrivals settle in the United States. After remaining in Malaysia for approximately three weeks, Binalshibh went to Bangkok for a few days before returning to Germany. He and Atta agreed to meet later at a location to be determined.[143]

In early July, Atta called Binalshibh to suggest meeting in Madrid, for reasons Binalshibh claims not to know. He says he preferred Berlin, but that he and Atta knew too many people in Germany and feared being spotted together. Unable to buy a ticket to Madrid at the height of the tourist season, Binalshibh booked a seat on a flight to Reus, near Barcelona, the next day. Atta was already en route to Madrid, so Binalshibh phoned Shehhi in the United States to inform him of the change in itinerary.[144]

Atta arrived in Madrid on July 8. He spent the night in a hotel and made three calls from his room, most likely to coordinate with Binalshibh. The next day, Atta rented a car and drove to Reus to pick up Binalshibh; the two then drove to the nearby town of Cambrils. Hotel records show Atta renting rooms in the same area until July 19, when he returned his rental car in Madrid and flew back to Fort Lauderdale. On July 16, Binalshibh returned to Hamburg, using a ticket Atta had purchased for him earlier that day. According to Binalshibh, they did not meet with anyone else while in Spain.[145]

Binalshibh says he told Atta that Bin Ladin wanted the attacks carried out as soon as possible. Bin Ladin, Binalshibh conveyed, was worried about having so many operatives in the United States. Atta replied that he could not yet provide a date because he was too busy organizing the arriving hijackers and still needed to coordinate the timing of the flights so that the crashes would occur simultaneously. Atta said he required about five to six weeks before he could provide an attack date. Binalshibh advised Atta that Bin Ladin had directed that the other operatives not be informed of the date until the last minute. Atta was to provide Binalshibh with advance notice of at least a week or two so that Binalshibh could travel to Afghanistan and report the date personally to Bin Ladin.[146]

As to targets, Atta understood Bin Ladin's interest in striking the White House. Atta said he thought this target too difficult, but had tasked Hazmi and Hanjour to evaluate its feasibility and was awaiting their answer. Atta said that those two operatives had rented small aircraft and flown reconnaissance flights near the Pentagon. Atta explained that Hanjour was assigned to attack the Pentagon, Jarrah the Capitol, and that both Atta and Shehhi would hit the World Trade Center. If any pilot could not reach his intended target, he was to crash the plane. If Atta could not strike the World Trade Center, he planned to crash his aircraft directly into the streets of New York. Atta told Binalshibh that each pilot had volunteered for his assigned target, and that the assignments were subject to change.[147]

During the Spain meeting, Atta also mentioned that he had considered targeting a nuclear facility he had seen during familiarization flights near New York—a target they referred to as "electrical engineering." According to Binalshibh, the other pilots did not like the idea. They thought a nuclear target would be difficult because the airspace around it was restricted, making reconnaissance flights impossible and increasing the likelihood that any plane would be shot down before impact. Moreover, unlike the approved targets, this alternative had not been discussed with senior al Qaeda leaders and therefore did not have the requisite blessing. Nor would a nuclear facility have particular symbolic value. Atta did not ask Binalshibh to pass this idea on to Bin Ladin, Atef, or KSM, and Binalshibh says he did not mention it to them until after September 11.[148]

Binalshibh claims that during their time in Spain, he and Atta also discussed how the hijackings would be executed. Atta said he, Shehhi, and Jarrah had encountered no problems carrying box cutters on cross-country surveillance flights. The best time to storm the cockpit would be about 10–15 minutes after takeoff, when the cockpit doors typically were opened for the first time. Atta did not believe they would need any other weapons. He had no firm contingency plan in case the cockpit door was locked. While he mentioned general ideas such as using a hostage or claiming to have a bomb, he was confident the cockpit doors would be opened and did not consider breaking them down a viable idea. Atta told Binalshibh he wanted to select planes departing on long flights because they would be full of fuel, and that he wanted to hijack Boeing aircraft because he believed them easier to fly than Airbus aircraft, which he understood had an autopilot feature that did not allow them to be crashed into the ground.[149]

Finally, Atta confirmed that the muscle hijackers had arrived in the United States without incident. They would be divided into teams according to their English-speaking ability. That way they could assist each other before the operation and each team would be able to command the passengers in English. According to Binalshibh, Atta complained that some of the hijackers wanted to contact their families to say goodbye, something he had forbidden. Atta, moreover, was nervous about his future communications with Binalshibh, whom he instructed to obtain new telephones upon returning to Germany. Before Binalshibh left Spain, he gave Atta eight necklaces and eight bracelets that Atta had asked him to buy when he was recently in Bangkok, believing that if the hijackers were clean shaven and well dressed, others would think them wealthy Saudis and give them less notice.[150]

As directed, upon returning from Spain, Binalshibh obtained two new phones, one to communicate with Atta and another to communicate with KSM and others, such as Zacarias Moussaoui. Binalshibh soon contacted KSM and, using code words, reported the results of his meeting with Atta. This important exchange occurred in mid-July.[151]

The conversation covered various topics. For example, Jarrah was to send Binalshibh certain personal materials from the hijackers, including copies of their

passports, which Binalshibh in turn would pass along to KSM, probably for subsequent use in al Qaeda propaganda.[152]

The most significant part of the mid-July conversation concerned Jarrah's troubled relationship with Atta. KSM and Binalshibh both acknowledge that Jarrah chafed under Atta's authority over him. Binalshibh believes the disagreement arose in part from Jarrah's family visits. Moreover, Jarrah had been on his own for most of his time in the United States because Binalshibh's visa difficulty had prevented the two of them from training together. Jarrah thus felt excluded from the decisionmaking. Binalshibh had to act as a broker between Jarrah and Atta.[153]

Concerned that Jarrah might withdraw from the operation at this late stage, KSM emphasized the importance of Atta and Jarrah's resolving their differences. Binalshibh claims that such concern was unwarranted, and in their mid-July discussion reassured KSM that Atta and Jarrah would reconcile and be ready to move forward in about a month, after Jarrah visited his family. Noting his concern and the potential for delay, KSM at one point instructed Binalshibh to send "the skirts" to "Sally"—a coded instruction to Binalshibh to send funds to Zacarias Moussaoui. While Binalshibh admits KSM did direct him to send Moussaoui money during the mid-July conversation, he denies knowing exactly why he received this instruction—though he thought the money was being provided "within the framework" of the 9/11 operation.[154]

KSM may have instructed Binalshibh to send money to Moussaoui in order to help prepare Moussaoui as a potential substitute pilot for Jarrah. On July 20, 2001, Aysel Senguen, Jarrah's girlfriend, purchased a one-way ticket for Jarrah from Miami to Dusseldorf. On Jarrah's previous four trips from the United States to see Senguen and his family in Lebanon, he had always traveled with a round-trip ticket. When Jarrah departed Miami on July 25, Atta appears to have driven him to the airport, another unique circumstance.[155]

Binalshibh picked up Jarrah at the airport in Dusseldorf on July 25. Jarrah wanted to see Senguen as soon as possible, so he and Binalshibh arranged to meet a few days later. When they did, they had an emotional conversation during which Binalshibh encouraged Jarrah to see the plan through.[156]

While Jarrah was in Germany, Binalshibh and Moussaoui were in contact to arrange for the transfer of funds. Binalshibh received two wire transfers from Hawsawi in the UAE totaling $15,000 and, within days, relayed almost all of this money to Moussaoui in two installments.[157]

Moussaoui had been taking flight lessons at the Airman Flight School in Norman, Oklahoma, since February but stopped in late May. Although at that point he had only about 50 hours of flight time and no solo flights to his credit, Moussaoui began making inquiries about flight materials and simulator training for Boeing 747s. On July 10, he put down a $1,500 deposit for flight simulator training at Pan Am International Flight Academy in Eagan, Minnesota, and by the end of the month, he had received a simulator schedule to train from

August 13 through August 20. Moussaoui also purchased two knives and inquired of two manufacturers of GPS equipment whether their products could be converted for aeronautical use—activities that closely resembled those of the 9/11 hijackers during their final preparations for the attacks.[158]

On August 10, shortly after getting the money from Binalshibh, Moussaoui left Oklahoma with a friend and drove to Minnesota. Three days later, Moussaoui paid the $6,800 balance owed for his flight simulator training at Pan Am in cash and began his training. His conduct, however, raised the suspicions of his flight instructor. It was unusual for a student with so little training to be learning to fly large jets without any intention of obtaining a pilot's license or other goal. On August 16, once the instructor reported his suspicion to the authorities, Moussaoui was arrested by the INS on immigration charges.[159]

KSM denies ever considering Moussaoui for the planes operation. Instead he claims that Moussaoui was slated to participate in a "second wave" of attacks. KSM also states that Moussaoui had no contact with Atta, and we are unaware of evidence contradicting this assertion.[160]

Yet KSM has also stated that by the summer of 2001, he was too busy with the planes operation to continue planning for any second-wave attacks. Moreover, he admits that only three potential pilots were ever recruited for the alleged second wave, Moussaoui plus two others who, by midsummer of 2001, had backed out of the plot.[161] We therefore believe that the effort to push Moussaoui forward in August 2001 lends credence to the suspicion that he was being primed as a possible pilot in the immediate planes operation.

Binalshibh says he assumed Moussaoui was to take his place as another pilot in the 9/11 operation. Recounting a post-9/11 discussion with KSM in Kandahar, Binalshibh claims KSM mentioned Moussaoui as being part of the 9/11 operation. Although KSM never referred to Moussaoui by name, Binalshibh understood he was speaking of the operative to whom Binalshibh had wired money. Binalshibh says KSM did not approve of Moussaoui but believes KSM did not remove him from the operation only because Moussaoui had been selected and assigned by Bin Ladin himself.[162]

KSM did not hear about Moussaoui's arrest until after September 11. According to Binalshibh, had Bin Ladin and KSM learned prior to 9/11 that Moussaoui had been detained, they might have canceled the operation. When Binalshibh discussed Moussaoui's arrest with KSM after September 11, KSM congratulated himself on not having Moussaoui contact the other operatives, which would have compromised the operation. Moussaoui had been in contact with Binalshibh, of course, but this was not discovered until after 9/11.[163]

As it turned out, Moussaoui was not needed to replace Jarrah. By the time Moussaoui was arrested in mid-August, Jarrah had returned to the United States from his final trip to Germany, his disagreement with Atta apparently resolved. The operatives began their final preparations for the attacks.[164]

**Readying the Attacks**

A week after he returned from meeting Binalshibh in Spain, Atta traveled to Newark, probably to coordinate with Hazmi and give him additional funds. Atta spent a few days in the area before returning to Florida on July 30. The month of August was busy, as revealed by a set of contemporaneous Atta-Binalshibh communications that were recovered after September 11.[165]

On August 3, for example, Atta and Binalshibh discussed several matters, such as the best way for the operatives to purchase plane tickets and the assignment of muscle hijackers to individual teams. Atta and Binalshibh also revisited the question of whether to target the White House. They discussed targets in coded language, pretending to be students discussing various fields of study: "architecture" referred to the World Trade Center, "arts" the Pentagon, "law" the Capitol, and "politics" the White House.[166]

Binalshibh reminded Atta that Bin Ladin wanted to target the White House. Atta again cautioned that this would be difficult. When Binalshibh persisted, Atta agreed to include the White House but suggested they keep the Capitol as an alternate target in case the White House proved too difficult. Atta also suggested that the attacks would not happen until after the first week in September, when Congress reconvened.[167]

Atta and Binalshibh also discussed "the friend who is coming as a tourist"—a cryptic reference to candidate hijacker Mohamed al Kahtani (mentioned above), whom Hawsawi was sending the next day as "the last one" to "complete the group." On August 4, Atta drove to the Orlando airport to meet Kahtani. Upon arrival, however, Kahtani was denied entry by immigration officials because he had a one-way ticket and little money, could not speak English, and could not adequately explain what he intended to do in the United States. He was sent back to Dubai. Hawsawi contacted KSM, who told him to help Kahtani return to Pakistan.[168]

On August 7, Atta flew from Fort Lauderdale to Newark, probably to coordinate with Hazmi. Two days later, Ahmed al Ghamdi and Abdul Aziz al Omari, who had been living in New Jersey with Hazmi and Hanjour, flew to Miami—probably signifying that the four hijacking teams had finally been assigned. While Atta was in New Jersey, he, Hazmi, and Hanjour all purchased tickets for another set of surveillance flights. Like Shehhi, Jarrah, Atta, and Waleed al Shehri before them, Hazmi and Hanjour each flew in first class on the same type of aircraft they would hijack on 9/11 (a Boeing 757), and on transcontinental flights that connected to Las Vegas. This time, however, Atta himself also flew directly to Las Vegas, where all three stayed on August 13–14. Beyond Las Vegas's reputation for welcoming tourists, we have seen no credible evidence explaining why, on this occasion and others, the operatives flew to or met in Las Vegas.[169]

Through August, the hijackers kept busy with their gym training and the pilots took frequent practice flights on small rented aircraft. The operatives also

began to make purchases suggesting that the planning was coming to an end. In mid-August, for example, they bought small knives that may actually have been used in the attacks. On August 22, moreover, Jarrah attempted to purchase four GPS units from a pilot shop in Miami. He was able to buy only one unit, which he picked up a few days later when he also purchased three aeronautical charts.[170]

Perhaps most significant, however, was the purchase of plane tickets for September 11. On August 23, Atta again flew to Newark, probably to meet with Hazmi and select flights. All 19 tickets were booked and purchased between August 25 and September 5.[171]

It therefore appears that the attack date was selected by the third week of August. This timing is confirmed by Binalshibh, who claims Atta called him with the date in mid-August. According to Binalshibh, Atta used a riddle to convey the date in code—a message of two branches, a slash, and a lollipop (to non-Americans, 11/9 would be interpreted as September 11). Binalshibh says he called Atta back to confirm the date before passing it to KSM.[172]

KSM apparently received the date from Binalshibh in a message sent through Binalshibh's old Hamburg associate, Zakariya Essabar. Both Binalshibh and KSM claim that Essabar was not privy to the meaning of the message and had no foreknowledge of the attacks. According to Binalshibh, shortly after the date was chosen, he advised Essabar and another Hamburg associate, Said Bahaji, that if they wanted to go to Afghanistan, now was the time because it would soon become more difficult. Essabar made reservations on August 22 and departed Hamburg for Karachi on August 30; Bahaji purchased his tickets on August 20 and departed Hamburg for Karachi on September 3.[173]

Binalshibh also made arrangements to leave for Pakistan during early September, before the attacks, as did Ali and Hawsawi, the plot facilitators in the UAE. During these final days, Binalshibh and Atta kept in contact by phone, email, and instant messaging. Although Atta had forbidden the hijackers to contact their families, he apparently placed one last call to his own father on September 9. Atta also asked Binalshibh to contact the family of one hijacker, pass along goodbyes from others, and give regards to KSM. Jarrah alone appears to have left a written farewell—a sentimental letter to Aysel Senguen.[174]

Hazmi, however, may not have been so discreet. He may have telephoned his former San Diego companion, Mohdar Abdullah, in late August. Several bits of evidence indicate that others in Abdullah's circle may have received word that something big would soon happen. As noted earlier, Abdullah's behavior reportedly changed noticeably. Prior to September 11, both he and Yazeed al Salmi suddenly became intent on proceeding with their planned marriages. One witness quotes Salmi as commenting after the 9/11 attacks, "I knew they were going to do something, that is why I got married." Moreover, as of August 2001, Iyad Kreiwesh and other employees at the Texaco station where Hazmi had worked suddenly were anticipating attention from law enforcement

authorities in the near future. Finally, according to an uncorroborated witness account, early on the morning of September 10, Abdullah, Osama Awadallah, Omar Bakarbashat, and others behaved suspiciously at the gas station. According to the witness, after the group met, Awadallah said "it is finally going to happen" as the others celebrated by giving each other high fives.[175]

### Dissent within the al Qaeda Leadership

While tactical preparations for the attack were nearing completion, the entire operation was being questioned at the top, as al Qaeda and the Taliban argued over strategy for 2001. Our focus has naturally been on the specifics of the planes operation. But from the perspective of Bin Ladin and Atef, this operation was only one, admittedly key, element of their unfolding plans for the year. Living in Afghanistan, interacting constantly with the Taliban, the al Qaeda leaders would never lose sight of the situation in that country.

Bin Ladin's consistent priority was to launch a major attack directly against the United States. He wanted the planes operation to proceed as soon as possible. Mihdhar reportedly told his cousin during the summer of 2001 that Bin Ladin was reputed to have remarked, "I will make it happen even if I do it by myself."[176]

According to KSM, Bin Ladin had been urging him to advance the date of the attacks. In 2000, for instance, KSM remembers Bin Ladin pushing him to launch the attacks amid the controversy after then-Israeli opposition party leader Ariel Sharon's visit to the Temple Mount in Jerusalem. KSM claims Bin Ladin told him it would be enough for the hijackers simply to down planes rather than crash them into specific targets. KSM says he resisted the pressure.[177]

KSM claims to have faced similar pressure twice more in 2001. According to him, Bin Ladin wanted the operation carried out on May 12, 2001, seven months to the day after the *Cole* bombing. KSM adds that the 9/11 attacks had originally been envisioned for May 2001. The second time he was urged to launch the attacks early was in June or July 2001, supposedly after Bin Ladin learned from the media that Sharon would be visiting the White House. On both occasions KSM resisted, asserting that the hijacking teams were not ready. Bin Ladin pressed particularly strongly for the latter date in two letters stressing the need to attack early. The second letter reportedly was delivered by Bin Ladin's son-in-law, Aws al Madani.[178]

Other evidence corroborates KSM's account. For instance, Mihdhar told his cousin that the attacks were to happen in May, but were postponed twice, first to July, then to September. Moreover, one candidate hijacker remembers a general warning being issued in the al Qaeda camps in July or early August, just like the warnings issued two weeks before the *Cole* bombing and ten days before the eventual 9/11 attacks. During the midsummer alert, al Qaeda members dispersed with their families, security was increased, and Bin Ladin disappeared for about 30 days, until the alert was canceled.[179]

While the details of the operation were strictly compartmented, by the time

of the alert, word had begun to spread that an attack against the United States was coming. KSM notes that it was generally well known by the summer of 2001 that he was planning some kind of operation against the United States. Many were even aware that he had been preparing operatives to go to the United States, leading some to conclude that al Qaeda was planning a near-term attack on U.S. soil. Moreover, Bin Ladin had made several remarks that summer hinting at an upcoming attack and generating rumors throughout the worldwide jihadist community. Bin Ladin routinely told important visitors to expect significant attacks against U.S. interests soon and, during a speech at the al Faruq camp, exhorted trainees to pray for the success of an attack involving 20 martyrs. Others have confirmed hearing indications of an impending attack and have verified that such news, albeit without specific details, had spread across al Qaeda.[180]

Although Bin Ladin's top priority apparently was to attack the United States, others had a different view. The Taliban leaders put their main emphasis on the year's military offensive against the Northern Alliance, an offensive that ordinarily would begin in the late spring or summer. They certainly hoped that this year's offensive would finally finish off their old enemies, driving them from Afghanistan. From the Taliban's perspective, an attack against the United States might be counterproductive. It might draw the Americans into the war against them, just when final victory seemed within their grasp.[181]

There is evidence that Mullah Omar initially opposed a major al Qaeda operation directly against the United States in 2001. Furthermore, by July, with word spreading of a coming attack, a schism emerged among the senior leadership of al Qaeda. Several senior members reportedly agreed with Mullah Omar. Those who reportedly sided with Bin Ladin included Atef, Sulayman Abu Ghayth, and KSM. But those said to have opposed him were weighty figures in the organization—including Abu Hafs the Mauritanian, Sheikh Saeed al Masri, and Sayf al Adl. One senior al Qaeda operative claims to recall Bin Ladin arguing that attacks against the United States needed to be carried out immediately to support insurgency in the Israeli-occupied territories and protest the presence of U.S. forces in Saudi Arabia. Beyond these rhetorical appeals, Bin Ladin also reportedly thought an attack against the United States would benefit al Qaeda by attracting more suicide operatives, eliciting greater donations, and increasing the number of sympathizers willing to provide logistical assistance.[182]

Mullah Omar is reported to have opposed this course of action for ideological reasons rather than out of fear of U.S. retaliation. He is said to have preferred for al Qaeda to attack Jews, not necessarily the United States. KSM contends that Omar faced pressure from the Pakistani government to keep al Qaeda from engaging in operations outside Afghanistan. Al Qaeda's chief financial manager, Sheikh Saeed, argued that al Qaeda should defer to the Taliban's wishes. Another source says that Sheikh Saeed opposed the operation, both out of deference to Omar and because he feared the U.S. response to an

attack. Abu Hafs the Mauritanian reportedly even wrote Bin Ladin a message basing opposition to the attacks on the Qur'an.[183]

According to KSM, in late August, when the operation was fully planned, Bin Ladin formally notified the al Qaeda Shura Council that a major attack against the United States would take place in the coming weeks. When some council members objected, Bin Ladin countered that Mullah Omar lacked authority to prevent al Qaeda from conducting jihad outside Afghanistan. Though most of the Shura Council reportedly disagreed, Bin Ladin persisted. The attacks went forward.[184]

The story of dissension within al Qaeda regarding the 9/11 attacks is probably incomplete. The information on which the account is based comes from sources who were not privy to the full scope of al Qaeda and Taliban planning. Bin Ladin and Atef, however, probably would have known, at least, that

- The general Taliban offensive against the Northern Alliance would rely on al Qaeda military support.
- Another significant al Qaeda operation was making progress during the summer—a plot to assassinate the Northern Alliance leader, Ahmed Shah Massoud. The operatives, disguised as journalists, were in Massoud's camp and prepared to kill him sometime in August. Their appointment to see him was delayed.[185]

But on September 9, the Massoud assassination took place. The delayed Taliban offensive against the Northern Alliance was apparently coordinated to begin as soon as he was killed, and it got under way on September 10.[186]

As they deliberated earlier in the year, Bin Ladin and Atef would likely have remembered that Mullah Omar was dependent on them for the Massoud assassination and for vital support in the Taliban military operations. KSM remembers Atef telling him that al Qaeda had an agreement with the Taliban to eliminate Massoud, after which the Taliban would begin an offensive to take over Afghanistan. Atef hoped Massoud's death would also appease the Taliban when the 9/11 attacks happened. There are also some scant indications that Omar may have been reconciled to the 9/11 attacks by the time they occurred.[187]

### Moving to Departure Positions

In the days just before 9/11, the hijackers returned leftover funds to al Qaeda and assembled in their departure cities. They sent the excess funds by wire transfer to Hawsawi in the UAE, about $26,000 altogether.[188]

The hijackers targeting American Airlines Flight 77, to depart from Dulles, migrated from New Jersey to Laurel, Maryland, about 20 miles from Washington, D.C. They stayed in a motel during the first week in September and spent

time working out at a gym. On the final night before the attacks, they lodged at a hotel in Herndon, Virginia, close to the airport.[189]

Further north, the hijackers targeting United Airlines Flight 93, to depart from Newark, gathered in that city from their base in Florida on September 7. Just after midnight on September 8–9, Jarrah received a speeding ticket in Maryland as he headed north on I-95. He joined the rest of his team at their hotel.[190]

Atta was still busy coordinating the teams. On September 7, he flew from Fort Lauderdale to Baltimore, presumably to meet with the Flight 77 team in Laurel. On September 9, he flew from Baltimore to Boston. By then, Shehhi had arrived there, and Atta was seen with him at his hotel. The next day, Atta picked up Omari at another hotel, and the two drove to Portland, Maine, for reasons that remain unknown. In the early morning hours of September 11, they boarded a commuter flight to Boston to connect to American Airlines Flight 11. The two spent their last night pursuing ordinary activities: making ATM withdrawals, eating pizza, and shopping at a convenience store. Their three fellow hijackers for Flight 11 stayed together in a hotel in Newton, Massachusetts, just outside of Boston.[191]

Shehhi and his team targeting United Airlines Flight 175 from Logan Airport spent their last hours at two Boston hotels.[192] The plan that started with a proposal by KSM in 1996 had evolved to overcome numerous obstacles. Now 19 men waited in nondescript hotel rooms to board four flights the next morning.

# 8

# "THE SYSTEM WAS BLINKING RED"

## 8.1 THE SUMMER OF THREAT

As 2001 began, counterterrorism officials were receiving frequent but fragmentary reports about threats. Indeed, there appeared to be possible threats almost everywhere the United States had interests—including at home.

To understand how the escalation in threat reporting was handled in the summer of 2001, it is useful to understand how threat information in general is collected and conveyed. Information is collected through several methods, including signals intelligence and interviews of human sources, and gathered into intelligence reports. Depending on the source and nature of the reporting, these reports may be highly classified—and therefore tightly held—or less sensitive and widely disseminated to state and local law enforcement agencies. Threat reporting must be disseminated, either through individual reports or through threat advisories. Such advisories, intended to alert their recipients, may address a specific threat or be a general warning.

Because the amount of reporting is so voluminous, only a select fraction can be chosen for briefing the president and senior officials. During 2001, Director of Central Intelligence George Tenet was briefed regularly regarding threats and other operational information relating to Usama Bin Ladin.[1] He in turn met daily with President Bush, who was briefed by the CIA through what is known as the President's Daily Brief (PDB). Each PDB consists of a series of six to eight relatively short articles or briefs covering a broad array of topics; CIA staff decides which subjects are the most important on any given day. There were more than 40 intelligence articles in the PDBs from January 20 to September 10, 2001, that related to Bin Ladin. The PDB is considered highly sensitive and is distributed to only a handful of high-level officials.[2]

The Senior Executive Intelligence Brief (SEIB), distributed to a broader group of officials, has a similar format and generally covers the same subjects as the PDB. It usually contains less information so as to protect sources and

methods. Like their predecessors, the Attorney General, the FBI Director, and Richard Clarke, the National Security Council (NSC) counterterrorism coordinator, all received the SEIB, not the PDB.[3] Clarke and his staff had extensive access to terrorism reporting, but they did not have access to internal, nondisseminated information at the National Security Agency (NSA), CIA, or FBI.

**The Drumbeat Begins**

In the spring of 2001, the level of reporting on terrorist threats and planned attacks increased dramatically to its highest level since the millennium alert. At the end of March, the intelligence community disseminated a terrorist threat advisory, indicating a heightened threat of Sunni extremist terrorist attacks against U.S. facilities, personnel, and other interests.[4]

On March 23, in connection with discussions about possibly reopening Pennsylvania Avenue in front of the White House, Clarke warned National Security Advisor Condoleezza Rice that domestic or foreign terrorists might use a truck bomb—their "weapon of choice"—on Pennsylvania Avenue. That would result, he said, in the destruction of the West Wing and parts of the residence.[5] He also told her that he thought there were terrorist cells within the United States, including al Qaeda.

The next week, Rice was briefed on the activities of Abu Zubaydah and on CIA efforts to locate him. As pointed out in chapter 6, Abu Zubaydah had been a major figure in the millennium plots. Over the next few weeks, the CIA repeatedly issued warnings—including calls from DCI Tenet to Clarke—that Abu Zubaydah was planning an operation in the near future. One report cited a source indicating that Abu Zubaydah was planning an attack in a country that CIA analysts thought might be Israel, or perhaps Saudi Arabia or India. Clarke relayed these reports to Rice.[6]

In response to these threats, the FBI sent a message to all its field offices on April 13, summarizing reporting to date. It asked the offices to task all resources, including human sources and electronic databases, for any information pertaining to "current operational activities relating to Sunni extremism." It did not suggest that there was a domestic threat.[7]

The interagency Counterterrorism Security Group (CSG) that Clarke chaired discussed the Abu Zubaydah reports on April 19. The next day, a briefing to top officials reported "Bin Ladin planning multiple operations." When the deputies discussed al Qaeda policy on April 30, they began with a briefing on the threat.[8]

In May 2001, the drumbeat of reporting grew louder with reports to top officials that "Bin Ladin public profile may presage attack" and "Bin Ladin network's plans advancing." In early May, a walk-in to the FBI claimed there was a plan to launch attacks on London, Boston, and New York. Attorney General John Ashcroft was briefed by the CIA on May 15 regarding al Qaeda generally and the current threat reporting specifically. The next day brought a report

that a phone call to a U.S. embassy had warned that Bin Ladin supporters were planning an attack in the United States using "high explosives." On May 17, based on the previous day's report, the first item on the CSG's agenda was "UBL: Operation Planned in U.S."[9] The anonymous caller's tip could not be corroborated.

Late May brought reports of a possible hostage plot against Americans abroad to force the release of prisoners, including Sheikh Omar Abdel Rahman, the "Blind Sheikh," who was serving a life sentence for his role in the 1993 plot to blow up sites in New York City. The reporting noted that operatives might opt to hijack an aircraft or storm a U.S. embassy. This report led to a Federal Aviation Administration (FAA) information circular to airlines noting the potential for "an airline hijacking to free terrorists incarcerated in the United States." Other reporting mentioned that Abu Zubaydah was planning an attack, possibly against Israel, and expected to carry out several more if things went well. On May 24 alone, counterterrorism officials grappled with reports alleging plots in Yemen and Italy, as well as a report about a cell in Canada that an anonymous caller had claimed might be planning an attack against the United States.[10]

Reports similar to many of these were made available to President Bush in morning intelligence briefings with DCI Tenet, usually attended by Vice President Dick Cheney and National Security Advisor Rice. While these briefings discussed general threats to attack America and American interests, the specific threats mentioned in these briefings were all overseas.

On May 29, Clarke suggested that Rice ask DCI Tenet what more the United States could do to stop Abu Zubaydah from launching "a series of major terrorist attacks," probably on Israeli targets, but possibly on U.S. facilities. Clarke wrote to Rice and her deputy, Stephen Hadley, "When these attacks occur, as they likely will, we will wonder what more we could have done to stop them." In May, CIA Counterterrorist Center (CTC) Chief Cofer Black told Rice that the current threat level was a 7 on a scale of 1 to 10, as compared to an 8 during the millennium.[11]

### High Probability of Near-Term "Spectacular" Attacks

Threat reports surged in June and July, reaching an even higher peak of urgency. The summer threats seemed to be focused on Saudi Arabia, Israel, Bahrain, Kuwait, Yemen, and possibly Rome, but the danger could be anywhere—including a possible attack on the G-8 summit in Genoa. A June 12 CIA report passing along biographical background information on several terrorists mentioned, in commenting on Khalid Sheikh Mohammed, that he was recruiting people to travel to the United States to meet with colleagues already there so that they might conduct terrorist attacks on Bin Ladin's behalf. On June 22, the CIA notified all its station chiefs about intelligence suggesting a possible al Qaeda suicide attack on a U.S. target over the next few days. DCI Tenet asked that all U.S. ambassadors be briefed.[12]

That same day, the State Department notified all embassies of the terrorist threat and updated its worldwide public warning. In June, the State Department initiated the Visa Express program in Saudi Arabia as a security measure, in order to keep long lines of foreigners away from vulnerable embassy spaces. The program permitted visa applications to be made through travel agencies, instead of directly at the embassy or consulate.[13]

A terrorist threat advisory distributed in late June indicated a high probability of near-term "spectacular" terrorist attacks resulting in numerous casualties. Other reports' titles warned, "Bin Ladin Attacks May be Imminent" and "Bin Ladin and Associates Making Near-Term Threats." The latter reported multiple attacks planned over the coming days, including a "severe blow" against U.S. and Israeli "interests" during the next two weeks.[14]

On June 21, near the height of the threat reporting, U.S. Central Command raised the force protection condition level for U.S. troops in six countries to the highest possible level, Delta. The U.S. Fifth Fleet moved out of its port in Bahrain, and a U.S. Marine Corps exercise in Jordan was halted. U.S. embassies in the Persian Gulf conducted an emergency security review, and the embassy in Yemen was closed. The CSG had foreign emergency response teams, known as FESTs, ready to move on four hours' notice and kept up the terrorism alert posture on a "rolling 24 hour basis."[15]

On June 25, Clarke warned Rice and Hadley that six separate intelligence reports showed al Qaeda personnel warning of a pending attack. An Arabic television station reported Bin Ladin's pleasure with al Qaeda leaders who were saying that the next weeks "will witness important surprises" and that U.S. and Israeli interests will be targeted. Al Qaeda also released a new recruitment and fund-raising tape. Clarke wrote that this was all too sophisticated to be merely a psychological operation to keep the United States on edge, and the CIA agreed. The intelligence reporting consistently described the upcoming attacks as occurring on a calamitous level, indicating that they would cause the world to be in turmoil and that they would consist of possible multiple—but not necessarily simultaneous—attacks.[16]

On June 28, Clarke wrote Rice that the pattern of al Qaeda activity indicating attack planning over the past six weeks "had reached a crescendo." "A series of new reports continue to convince me and analysts at State, CIA, DIA [Defense Intelligence Agency], and NSA that a major terrorist attack or series of attacks is likely in July," he noted. One al Qaeda intelligence report warned that something "very, very, very, very" big was about to happen, and most of Bin Ladin's network was reportedly anticipating the attack. In late June, the CIA ordered all its station chiefs to share information on al Qaeda with their host governments and to push for immediate disruptions of cells.[17]

The headline of a June 30 briefing to top officials was stark: "Bin Ladin Planning High-Profile Attacks." The report stated that Bin Ladin operatives expected near-term attacks to have dramatic consequences of catastrophic pro-

portions. That same day, Saudi Arabia declared its highest level of terror alert. Despite evidence of delays possibly caused by heightened U.S. security, the planning for attacks was continuing.[18]

On July 2, the FBI Counterterrorism Division sent a message to federal agencies and state and local law enforcement agencies summarizing information regarding threats from Bin Ladin. It warned that there was an increased volume of threat reporting, indicating a potential for attacks against U.S. targets abroad from groups "aligned with or sympathetic to Usama Bin Ladin." Despite the general warnings, the message further stated, "The FBI has no information indicating a credible threat of terrorist attack in the United States." However, it went on to emphasize that the possibility of attack in the United States could not be discounted. It also noted that the July 4 holiday might heighten the threats. The report asked recipients to "exercise extreme vigilance" and "report suspicious activities" to the FBI. It did not suggest specific actions that they should take to prevent attacks.[19]

Disruption operations against al Qaeda–affiliated cells were launched involving 20 countries. Several terrorist operatives were detained by foreign governments, possibly disrupting operations in the Gulf and Italy and perhaps averting attacks against two or three U.S. embassies. Clarke and others told us of a particular concern about possible attacks on the Fourth of July. After it passed uneventfully, the CSG decided to maintain the alert.[20]

To enlist more international help, Vice President Cheney contacted Saudi Crown Prince Abdullah on July 5. Hadley apparently called European counterparts, while Clarke worked with senior officials in the Gulf. In late July, because of threats, Italy closed the airspace over Genoa and mounted antiaircraft batteries at the Genoa airport during the G-8 summit, which President Bush attended.[21]

At home, the CSG arranged for the CIA to brief intelligence and security officials from several domestic agencies. On July 5, representatives from the Immigration and Naturalization Service (INS), the FAA, the Coast Guard, the Secret Service, Customs, the CIA, and the FBI met with Clarke to discuss the current threat. Attendees report that they were told not to disseminate the threat information they received at the meeting. They interpreted this direction to mean that although they could brief their superiors, they could not send out advisories to the field. An NSC official recalls a somewhat different emphasis, saying that attendees were asked to take the information back to their home agencies and "do what you can" with it, subject to classification and distribution restrictions. A representative from the INS asked for a summary of the information that she could share with field offices. She never received one.[22]

That same day, the CIA briefed Attorney General Ashcroft on the al Qaeda threat, warning that a significant terrorist attack was imminent. Ashcroft was told that preparations for multiple attacks were in late stages or already com-

plete and that little additional warning could be expected. The briefing addressed only threats outside the United States.[23]

The next day, the CIA representative told the CSG that al Qaeda members believed the upcoming attack would be "spectacular," qualitatively different from anything they had done to date.[24]

Apparently as a result of the July 5 meeting with Clarke, the interagency committee on federal building security was tasked to examine security measures. This committee met on July 9, when 37 officials from 27 agencies and organizations were briefed on the "current threat level" in the United States. They were told that not only the threat reports from abroad but also the recent convictions in the East Africa bombings trial, the conviction of Ahmed Ressam, and the just-returned Khobar Towers indictments reinforced the need to "exercise extreme vigilance." Attendees were expected to determine whether their respective agencies needed enhanced security measures.[25]

On July 18, 2001, the State Department provided a warning to the public regarding possible terrorist attacks in the Arabian Peninsula.[26]

Acting FBI Director Thomas Pickard told us he had one of his periodic conference calls with all special agents in charge on July 19. He said one of the items he mentioned was the need, in light of increased threat reporting, to have evidence response teams ready to move at a moment's notice, in case of an attack.[27] He did not task field offices to try to determine whether any plots were being considered within the United States or to take any action to disrupt any such plots.

In mid-July, reporting started to indicate that Bin Ladin's plans had been delayed, maybe for as long as two months, but not abandoned. On July 23, the lead item for CSG discussion was still the al Qaeda threat, and it included mention of suspected terrorist travel to the United States.[28]

On July 31, an FAA circular appeared alerting the aviation community to "reports of possible near-term terrorist operations . . . particularly on the Arabian Peninsula and/or Israel." It stated that the FAA had no credible evidence of specific plans to attack U.S. civil aviation, though it noted that some of the "currently active" terrorist groups were known to "plan and train for hijackings" and were able to build and conceal sophisticated explosive devices in luggage and consumer products.[29]

Tenet told us that in his world "the system was blinking red." By late July, Tenet said, it could not "get any worse."[30] Not everyone was convinced. Some asked whether all these threats might just be deception. On June 30, the SEIB contained an article titled "Bin Ladin Threats Are Real." Yet Hadley told Tenet in July that Deputy Secretary of Defense Paul Wolfowitz questioned the reporting. Perhaps Bin Ladin was trying to study U.S. reactions. Tenet replied that he had already addressed the Defense Department's questions on this point; the reporting was convincing. To give a sense of his anxiety at the time, one senior

official in the Counterterrorist Center told us that he and a colleague were considering resigning in order to go public with their concerns.[31]

**The Calm Before the Storm**
On July 27, Clarke informed Rice and Hadley that the spike in intelligence about a near-term al Qaeda attack had stopped. He urged keeping readiness high during the August vacation period, warning that another report suggested an attack had just been postponed for a few months "but will still happen."[32]

On August 1, the FBI issued an advisory that in light of the increased volume of threat reporting and the upcoming anniversary of the East Africa embassy bombings, increased attention should be paid to security planning. It noted that although most of the reporting indicated a potential for attacks on U.S. interests abroad, the possibility of an attack in the United States could not be discounted.[33]

On August 3, the intelligence community issued an advisory concluding that the threat of impending al Qaeda attacks would likely continue indefinitely. Citing threats in the Arabian Peninsula, Jordan, Israel, and Europe, the advisory suggested that al Qaeda was lying in wait and searching for gaps in security before moving forward with the planned attacks.[34]

During the spring and summer of 2001, President Bush had on several occasions asked his briefers whether any of the threats pointed to the United States. Reflecting on these questions, the CIA decided to write a briefing article summarizing its understanding of this danger. Two CIA analysts involved in preparing this briefing article believed it represented an opportunity to communicate their view that the threat of a Bin Ladin attack in the United States remained both current and serious.[35] The result was an article in the August 6 Presidential Daily Brief titled "Bin Ladin Determined to Strike in US." It was the 36th PDB item briefed so far that year that related to Bin Ladin or al Qaeda, and the first devoted to the possibility of an attack in the United States.

The President told us the August 6 report was historical in nature. President Bush said the article told him that al Qaeda was dangerous, which he said he had known since he had become President. The President said Bin Ladin had long been talking about his desire to attack America. He recalled some operational data on the FBI, and remembered thinking it was heartening that 70 investigations were under way. As best he could recollect, Rice had mentioned that the Yemenis' surveillance of a federal building in New York had been looked into in May and June, but there was no actionable intelligence.

He did not recall discussing the August 6 report with the Attorney General or whether Rice had done so. He said that if his advisers had told him there was a cell in the United States, they would have moved to take care of it. That never happened.[36]

Although the following day's SEIB repeated the title of this PDB, it did not contain the reference to hijackings, the alert in New York, the alleged casing

*The following is the text of an item from the Presidential Daily Brief received by President George W. Bush on August 6, 2001.[37] Redacted material is indicated by brackets.*

Bin Ladin Determined To Strike in US

***Clandestine, foreign government, and media reports indicate Bin Ladin since 1997 has wanted to conduct terrorist attacks in the US.*** Bin Ladin implied in US television interviews in 1997 and 1998 that his followers would follow the example of World Trade Center bomber Ramzi Yousef and "bring the fighting to America."

  After US missile strikes on his base in Afghanistan in 1998, Bin Ladin told followers he wanted to retaliate in Washington, according to a [—] service.
  An Egyptian Islamic Jihad (EIJ) operative told an [—] service at the same time that Bin Ladin was planning to exploit the operative's access to the US to mount a terrorist strike.

***The millennium plotting in Canada in 1999 may have been part of Bin Ladin's first serious attempt to implement a terrorist strike in the US.*** Convicted plotter Ahmed Ressam has told the FBI that he conceived the idea to attack Los Angeles International Airport himself, but that Bin Ladin lieutenant Abu Zubaydah encouraged him and helped facilitate the operation. Ressam also said that in 1998 Abu Zubaydah was planning his own US attack.

  Ressam says Bin Ladin was aware of the Los Angeles operation.

***Although Bin Ladin has not succeeded, his attacks against the US Embassies in Kenya and Tanzania in 1998 demonstrate that he prepares operations years in advance and is not deterred by setbacks.*** Bin Ladin associates surveilled our Embassies in Nairobi and Dar es Salaam as early as 1993, and some members of the Nairobi cell planning the bombings were arrested and deported in 1997.

***Al-Qa'ida members—including some who are US citizens—have resided in or traveled to the US for years, and the group apparently maintains a support structure that could aid attacks.*** Two al-Qua' da members found

guilty in the conspiracy to bomb our embassies in East Africa were US citizens, and a senior EIJ member lived in California in the mid-1990s.

A clandestine source said in 1998 that a Bin Ladin cell in New York was recruiting Muslim-American youth for attacks.

*We have not been able to corroborate some of the more sensational threat reporting, such as that from a [—] service in 1998 saying that Bin Ladin wanted to hijack a US aircraft to gain the release of "Blind Shaykh" 'Umar 'Abd al-Rahman and other US-held extremists.*

Nevertheless, FBI information since that time indicates patterns of suspicious activity in this country consistent with preparations for hijackings or other types of attacks, including recent surveillance of federal buildings in New York.
     The FBI is conducting approximately 70 full field investigations throughout the US that it considers Bin Ladin-related. CIA and the FBI are investigating a call to our Embassy in the UAE in May saying that a group of Bin Ladin supporters was in the US planning attacks with explosives.

of buildings in New York, the threat phoned in to the embassy, or the fact that the FBI had approximately 70 ongoing bin Ladin–related investigations.[38] No CSG or other NSC meeting was held to discuss the possible threat of a strike in the United States as a result of this report.

Late in the month, a foreign service reported that Abu Zubaydah was considering mounting terrorist attacks in the United States, after postponing possible operations in Europe. No targets, timing, or method of attack were provided.[39]

We have found no indication of any further discussion before September 11 among the President and his top advisers of the possibility of a threat of an al Qaeda attack in the United States. DCI Tenet visited President Bush in Crawford, Texas, on August 17 and participated in PDB briefings of the President between August 31 (after the President had returned to Washington) and September 10. But Tenet does not recall any discussions with the President of the domestic threat during this period.[40]

Most of the intelligence community recognized in the summer of 2001 that the number and severity of threat reports were unprecedented. Many officials told us that they knew something terrible was planned, and they were desperate to stop it. Despite their large number, the threats received contained few

specifics regarding time, place, method, or target. Most suggested that attacks were planned against targets overseas; others indicated threats against unspecified "U.S. interests." We cannot say for certain whether these reports, as dramatic as they were, related to the 9/11 attacks.

### Government Response to the Threats

National Security Advisor Rice told us that the CSG was the "nerve center" for running the crisis, although other senior officials were involved over the course of the summer. In addition to his daily meetings with President Bush, and weekly meetings to go over other issues with Rice, Tenet was speaking regularly with Secretary of State Colin Powell and Secretary of Defense Donald Rumsfeld. The foreign policy principals routinely talked on the telephone every day on a variety of topics.[41]

Hadley told us that before 9/11, he and Rice did not feel they had the job of coordinating domestic agencies. They felt that Clarke and the CSG (part of the NSC) were the NSC's bridge between foreign and domestic threats.[42]

There was a clear disparity in the levels of response to foreign versus domestic threats. Numerous actions were taken overseas to disrupt possible attacks— enlisting foreign partners to upset terrorist plans, closing embassies, moving military assets out of the way of possible harm. Far less was done domestically— in part, surely, because to the extent that specifics did exist, they pertained to threats overseas. As noted earlier, a threat against the embassy in Yemen quickly resulted in its closing. Possible domestic threats were more vague. When reports did not specify where the attacks were to take place, officials presumed that they would again be overseas, though they did not rule out a target in the United States. Each of the FBI threat advisories made this point.[43]

Clarke mentioned to National Security Advisor Rice at least twice that al Qaeda sleeper cells were likely in the United States. In January 2001, Clarke forwarded a strategy paper to Rice warning that al Qaeda had a presence in the United States. He noted that two key al Qaeda members in the Jordanian cell involved in the millennium plot were naturalized U.S. citizens and that one jihadist suspected in the East Africa bombings had "informed the FBI that an extensive network of al Qida 'sleeper agents' currently exists in the US." He added that Ressam's abortive December 1999 attack revealed al Qaeda supporters in the United States.[44] His analysis, however, was based not on new threat reporting but on past experience.

The September 11 attacks fell into the void between the foreign and domestic threats. The foreign intelligence agencies were watching overseas, alert to foreign threats to U.S. interests there. The domestic agencies were waiting for evidence of a domestic threat from sleeper cells within the United States. No one was looking for a foreign threat to domestic targets. The threat that was coming was not from sleeper cells. It was foreign—but from foreigners who had infiltrated into the United States.

A second cause of this disparity in response is that domestic agencies did not know what to do, and no one gave them direction. Cressey told us that the CSG did not tell the agencies how to respond to the threats. He noted that the agencies that were operating overseas did not need direction on how to respond; they had experience with such threats and had a "playbook." In contrast, the domestic agencies did not have a game plan. Neither the NSC (including the CSG) nor anyone else instructed them to create one.[45]

This lack of direction was evident in the July 5 meeting with representatives from the domestic agencies. The briefing focused on overseas threats. The domestic agencies were not questioned about how they planned to address the threat and were not told what was expected of them. Indeed, as noted earlier, they were specifically told they could not issue advisories based on the briefing.[46] The domestic agencies' limited response indicates that they did not perceive a call to action.

Clarke reflected a different perspective in an email to Rice on September 15, 2001. He summarized the steps taken by the CSG to alert domestic agencies to the possibility of an attack in the United States. Clarke concluded that domestic agencies, including the FAA, knew that the CSG believed a major al Qaeda attack was coming and could be in the United States.

Although the FAA had authority to issue security directives mandating new security procedures, none of the few that were released during the summer of 2001 increased security at checkpoints or on board aircraft. The information circulars mostly urged air carriers to "exercise prudence" and be alert. Prior to 9/11, the FAA did present a CD-ROM to air carriers and airport authorities describing the increased threat to civil aviation. The presentation mentioned the possibility of suicide hijackings but said that "fortunately, we have no indication that any group is currently thinking in that direction."[47] The FAA conducted 27 special security briefings for specific air carriers between May 1, 2001, and September 11, 2001. Two of these briefings discussed the hijacking threat overseas. None discussed the possibility of suicide hijackings or the use of aircraft as weapons. No new security measures were instituted.[48]

Rice told us she understood that the FBI had tasked its 56 U.S. field offices to increase surveillance of suspected terrorists and to reach out to informants who might have information about terrorist plots. An NSC staff document at the time describes such a tasking as having occurred in late June but does not indicate whether it was generated by the NSC or the FBI. Other than the previously described April 13 communication sent to all FBI field offices, however, the FBI could not find any record of having received such a directive. The April 13 document asking field offices to gather information on Sunni extremism did not mention any possible threat within the United States and did not order surveillance of suspected operatives. The NSC did not specify what the FBI's directives should contain and did not review what had been issued earlier.[49]

Acting FBI Director Pickard told us that in addition to his July 19 conference call, he mentioned the heightened terrorist threat in individual calls with the special agents in charge of field offices during their annual performance review discussions. In speaking with agents around the country, we found little evidence that any such concerns had reached FBI personnel beyond the New York Field Office.[50]

The head of counterterrorism at the FBI, Dale Watson, said he had many discussions about possible attacks with Cofer Black at the CIA. They had expected an attack on July 4. Watson said he felt deeply that something was going to happen. But he told us the threat information was "nebulous." He wished he had known more. He wished he had had "500 analysts looking at Usama Bin Ladin threat information instead of two."[51]

Attorney General Ashcroft was briefed by the CIA in May and by Pickard in early July about the danger. Pickard said he met with Ashcroft once a week in late June, through July, and twice in August. There is a dispute regarding Ashcroft's interest in Pickard's briefings about the terrorist threat situation. Pickard told us that after two such briefings Ashcroft told him that he did not want to hear about the threats anymore. Ashcroft denies Pickard's charge. Pickard says he continued to present terrorism information during further briefings that summer, but nothing further on the "chatter" the U.S. government was receiving.[52]

The Attorney General told us he asked Pickard whether there was intelligence about attacks in the United States and that Pickard said no. Pickard said he replied that he could not assure Ashcroft that there would be no attacks in the United States, although the reports of threats were related to overseas targets. Ashcroft said he therefore assumed the FBI was doing what it needed to do. He acknowledged that in retrospect, this was a dangerous assumption. He did not ask the FBI what it was doing in response to the threats and did not task it to take any specific action. He also did not direct the INS, then still part of the Department of Justice, to take any specific action.[53]

In sum, the domestic agencies never mobilized in response to the threat. They did not have direction, and did not have a plan to institute. The borders were not hardened. Transportation systems were not fortified. Electronic surveillance was not targeted against a domestic threat.[54] State and local law enforcement were not marshaled to augment the FBI's efforts. The public was not warned.

The terrorists exploited deep institutional failings within our government. The question is whether extra vigilance might have turned up an opportunity to disrupt the plot. As seen in chapter 7, al Qaeda's operatives made mistakes. At least two such mistakes created opportunities during 2001, especially in late August.

## 8.2 LATE LEADS—MIHDHAR, MOUSSAOUI, AND KSM

In chapter 6 we discussed how intelligence agencies successfully detected some of the early travel in the planes operation, picking up the movements of Khalid al Mihdhar and identifying him, and seeing his travel converge with someone they perhaps could have identified but did not—Nawaf al Hazmi—as well as with less easily identifiable people such as Khallad and Abu Bara. These observations occurred in December 1999 and January 2000. The trail had been lost in January 2000 without a clear realization that it had been lost, and without much effort to pick it up again. Nor had the CIA placed Mihdhar on the State Department's watchlist for suspected terrorists, so that either an embassy or a port of entry might take note if Mihdhar showed up again.

On four occasions in 2001, the CIA, the FBI, or both had apparent opportunities to refocus on the significance of Hazmi and Mihdhar and reinvigorate the search for them. After reviewing those episodes we will turn to the handling of the Moussaoui case and some late leads regarding Khalid Sheikh Mohammed.

### January 2001: Identification of Khallad

Almost one year after the original trail had been lost in Bangkok, the FBI and the CIA were working on the investigation of the *Cole* bombing. They learned of the link between a captured conspirator and a person called "Khallad." They also learned that Khallad was a senior security official for Bin Ladin who had helped direct the bombing (we introduced Khallad in chapter 5, and returned to his role in the *Cole* bombing in chapter 6).[55]

One of the members of the FBI's investigative team in Yemen realized that he had heard of Khallad before, from a joint FBI/CIA source four months earlier. The FBI agent obtained from a foreign government a photo of the person believed to have directed the *Cole* bombing. It was shown to the source, and he confirmed that the man in that photograph was the same Khallad he had described.[56]

In December 2000, on the basis of some links associated with Khalid al Mihdhar, the CIA's Bin Ladin unit speculated that Khallad and Khalid al Mihdhar might be one and the same.[57]

The CIA asked that a Kuala Lumpur surveillance photo of Mihdhar be shown to the joint source who had identified Khallad. In early January 2001, two photographs from the Kuala Lumpur meeting were shown to the source. One was a known photograph of Mihdhar, the other a photograph of a then unknown subject. The source did not recognize Mihdhar. But he indicated he was 90 percent certain that the other individual was Khallad.[58]

This meant that Khallad and Mihdhar were two different people. It also meant that there was a link between Khallad and Mihdhar, making Mihdhar seem even more suspicious.[59] Yet we found no effort by the CIA to renew the long-abandoned search for Mihdhar or his travel companions.

In addition, we found that the CIA did not notify the FBI of this identification. DCI Tenet and Cofer Black testified before Congress's Joint Inquiry into 9/11 that the FBI had access to this identification from the beginning. But drawing on an extensive record, including documents that were not available to the CIA personnel who drafted that testimony, we conclude this was not the case. The FBI's primary *Cole* investigators had no knowledge that Khallad had been in Kuala Lumpur with Mihdhar and others until after the September 11 attacks. Because the FBI had not been informed in January 2000 about Mihdhar's possession of a U.S. visa, it had not then started looking for him in the United States. Because it did not know of the links between Khallad and Mihdhar, it did not start looking for him in January 2001.[60]

This incident is an example of how day-to-day gaps in information sharing can emerge even when there is mutual goodwill. The information was from a joint FBI/CIA source who spoke essentially no English and whose languages were not understood by the FBI agent on the scene overseas. Issues of travel and security necessarily kept short the amount of time spent with the source. As a result, the CIA officer usually did not translate either questions or answers for his FBI colleague and friend.[61]

For interviews without simultaneous translation, the FBI agent on the scene received copies of the reports that the CIA disseminated to other agencies regarding the interviews. But he was not given access to the CIA's internal operational reports, which contained more detail. It was there—in reporting to which FBI investigators did not have access—that information regarding the January 2001 identification of Khallad appeared. The CIA officer does not recall this particular identification and thus cannot say why it was not shared with his FBI colleague. He might not have understood the possible significance of the new identification.[62]

In June 2000, Mihdhar left California and returned to Yemen. It is possible that if, in January 2001, the CIA had resumed its search for him, placed him on the State Department's TIPOFF watchlist, or provided the FBI with the information, he might have been found—either before or at the time he applied for a new visa in June 2001, or when he returned to the United States on July 4.

### Spring 2001: Looking Again at Kuala Lumpur

By mid-May 2001, as the threat reports were surging, a CIA official detailed to the International Terrorism Operations Section at the FBI wondered where the attacks might occur. We will call him "John." Recalling the episode about the Kuala Lumpur travel of Mihdhar and his associates, "John" searched the CIA's databases for information regarding the travel. On May 15, he and an official at the CIA reexamined many of the old cables from early 2000, including the information that Mihdhar had a U.S. visa, and that Hazmi had come to Los Angeles on January 15, 2000.[63]

The CIA official who reviewed the cables took no action regarding them.

"John," however, began a lengthy exchange with a CIA analyst, whom we will call "Dave," to figure out what these cables meant. "John" was aware of how dangerous Khallad was—at one point calling him a "major league killer." He concluded that "something bad was definitely up." Despite the U.S. links evident in this traffic, "John" made no effort to determine whether any of these individuals was in the United States. He did not raise that possibility with his FBI counterpart. He was focused on Malaysia.[64]

"John" described the CIA as an agency that tended to play a "zone defense." He was worrying solely about Southeast Asia, not the United States. In contrast, he told us, the FBI tends to play "man-to-man."[65]

Desk officers at the CIA's Bin Ladin unit did not have "cases" in the same sense as an FBI agent who works an investigation from beginning to end. Thus, when the trail went cold after the Kuala Lumpur meeting in January 2000, the desk officer moved on to different things. By the time the March 2000 cable arrived with information that one of the travelers had flown to Los Angeles, the case officer was no longer responsible for follow-up. While several individuals at the Bin Ladin unit opened the cable when it arrived in March 2000, no action was taken.[66]

The CIA's zone defense concentrated on "where," not "who." Had its information been shared with the FBI, a combination of the CIA's zone defense and the FBI's man-to-man approach might have been productive.

### June 2001: The Meeting in New York

"John's" review of the Kuala Lumpur meeting did set off some more sharing of information, getting the attention of an FBI analyst whom we will call "Jane." "Jane" was assigned to the FBI's *Cole* investigation. She knew that another terrorist involved in that operation, Fahd al Quso, had traveled to Bangkok in January 2000 to give money to Khallad.[67]

"Jane" and the CIA analyst, "Dave," had been working together on *Cole*-related issues. Chasing Quso's trail, "Dave" suggested showing some photographs to FBI agents in New York who were working on the *Cole* case and had interviewed Quso.[68]

"John" gave three Kuala Lumpur surveillance pictures to "Jane" to show to the New York agents. She was told that one of the individuals in the photographs was someone named Khalid al Mihdhar. She did not know why the photographs had been taken or why the Kuala Lumpur travel might be significant, and she was not told that someone had identified Khallad in the photographs. When "Jane" did some research in a database for intelligence reports, Intelink, she found the original NSA reports on the planning for the meeting. Because the CIA had not disseminated reports on its tracking of Mihdhar, "Jane" did not pull up any information about Mihdhar's U.S. visa or about travel to the United States by Hazmi or Mihdhar.[69]

"Jane," "Dave," and an FBI analyst who was on detail to the CIA's Bin Ladin

unit went to New York on June 11 to meet with the agents about the *Cole* case. "Jane" brought the surveillance pictures. At some point in the meeting she showed the photographs to the agents and asked whether they recognized Quso in any of them. The agents asked questions about the photographs—Why were they taken? Why were these people being followed? Where are the rest of the photographs?[70]

The only information "Jane" had about the meeting—other than the photographs—were the NSA reports that she had found on Intelink. These reports, however, contained caveats that their contents could not be shared with criminal investigators without the permission of the Justice Department's Office of Intelligence Policy and Review (OIPR). Therefore "Jane" concluded that she could not pass on information from those reports to the agents. This decision was potentially significant, because the signals intelligence she did not share linked Mihdhar to a suspected terrorist facility in the Middle East. The agents would have established a link to the suspected facility from their work on the embassy bombings case. This link would have made them very interested in learning more about Mihdhar.[71] The sad irony is that the agents who found the source were being kept from obtaining the fruits of their own work.

"Dave," the CIA analyst, knew more about the Kuala Lumpur meeting. He knew that Mihdhar possessed a U.S. visa, that his visa application indicated that he intended to travel to New York, that Hazmi had traveled to Los Angeles, and that a source had put Mihdhar in the company of Khallad. No one at the meeting asked him what he knew; he did not volunteer anything. He told investigators that as a CIA analyst, he was not authorized to answer FBI questions regarding CIA information. "Jane" said she assumed that if "Dave" knew the answers to questions, he would have volunteered them. The New York agents left the meeting without obtaining information that might have started them looking for Mihdhar.[72]

Mihdhar had been a weak link in al Qaeda's operational planning. He had left the United States in June 2000, a mistake KSM realized could endanger the entire plan—for to continue with the operation, Mihdhar would have to travel to the United States again. And unlike other operatives, Mihdhar was not "clean": he had jihadist connections. It was just such connections that had brought him to the attention of U.S. officials.

Nevertheless, in this case KSM's fears were not realized. Mihdhar received a new U.S. visa two days after the CIA-FBI meeting in New York. He flew to New York City on July 4. No one was looking for him.

**August 2001: The Search for Mihdhar and Hazmi Begins and Fails**

During the summer of 2001 "John," following a good instinct but not as part of any formal assignment, asked "Mary," an FBI analyst detailed to the CIA's Bin Ladin unit, to review all the Kuala Lumpur materials one more time. She had been at the New York meeting with "Jane" and "Dave" but had not

looked into the issues yet herself. "John" asked her to do the research in her free time.[73]

"Mary" began her work on July 24. That day, she found the cable reporting that Mihdhar had a visa to the United States. A week later, she found the cable reporting that Mihdhar's visa application—what was later discovered to be his first application—listed New York as his destination. On August 21, she located the March 2000 cable that "noted with interest" that Hazmi had flown to Los Angeles in January 2000. She immediately grasped the significance of this information.[74]

"Mary" and "Jane" promptly met with an INS representative at FBI headquarters. On August 22, the INS told them that Mihdhar had entered the United States on January 15, 2000, and again on July 4, 2001. "Jane" and "Mary" also learned that there was no record that Hazmi had left the country since January 2000, and they assumed he had left with Mihdhar in June 2000. They decided that if Mihdhar was in the United States, he should be found.[75]

They divided up the work. "Mary" asked the Bin Ladin unit to draft a cable requesting that Mihdhar and Hazmi be put on the TIPOFF watchlist. Both Hazmi and Mihdhar were added to this watchlist on August 24.[76]

"Jane" took responsibility for the search effort inside the United States. As the information indicated that Mihdhar had last arrived in New York, she began drafting what is known as a lead for the FBI's New York Field Office. A lead relays information from one part of the FBI to another and requests that a particular action be taken. She called an agent in New York to give him a "heads-up" on the matter, but her draft lead was not sent until August 28. Her email told the New York agent that she wanted him to get started as soon as possible, but she labeled the lead as "Routine"—a designation that informs the receiving office that it has 30 days to respond.[77]

The agent who received the lead forwarded it to his squad supervisor. That same day, the supervisor forwarded the lead to an intelligence agent to open an intelligence case—an agent who thus was behind "the wall" keeping FBI intelligence information from being shared with criminal prosecutors. He also sent it to the *Cole* case agents and an agent who had spent significant time in Malaysia searching for another Khalid: Khalid Sheikh Mohammad.[78]

The suggested goal of the investigation was to locate Mihdhar, determine his contacts and reasons for being in the United States, and possibly conduct an interview. Before sending the lead, "Jane" had discussed it with "John," the CIA official on detail to the FBI. She had also checked with the acting head of the FBI's Bin Ladin unit. The discussion seems to have been limited to whether the search should be classified as an intelligence investigation or as a criminal one. It appears that no one informed higher levels of management in either the FBI or CIA about the case.[79] There is no evidence that the lead, or the search for these terrorist suspects, was substantively discussed at any level

above deputy chief of a section within the Counterterrorism Division at FBI headquarters.

One of the *Cole* case agents read the lead with interest, and contacted "Jane" to obtain more information. "Jane" argued, however, that because the agent was designated a "criminal" FBI agent, not an intelligence FBI agent, the wall kept him from participating in any search for Mihdhar. In fact, she felt he had to destroy his copy of the lead because it contained NSA information from reports that included caveats ordering that the information not be shared without OIPR's permission. The agent asked "Jane" to get an opinion from the FBI's National Security Law Unit (NSLU) on whether he could open a criminal case on Mihdhar.[80]

"Jane" sent an email to the *Cole* case agent explaining that according to the NSLU, the case could be opened only as an intelligence matter, and that if Mihdhar was found, only designated intelligence agents could conduct or even be present at any interview. She appears to have misunderstood the complex rules that could apply to this situation.[81]

The FBI agent angrily responded:

> Whatever has happened to this—someday someone will die—and wall or not—the public will not understand why we were not more effective and throwing every resource we had at certain "problems."
>
> Let's hope the National Security Law Unit will stand behind their decisions then, especially since the biggest threat to us now, UBL, is getting the most "protection."

"Jane" replied that she was not making up the rules; she claimed that they were in the relevant manual and "ordered by the [FISA] Court and every office of the FBI is required to follow them including FBI NY."[82]

It is now clear that everyone involved was confused about the rules governing the sharing and use of information gathered in intelligence channels. Because Mihdhar was being sought for his possible connection to or knowledge of the *Cole* bombing, he could be investigated or tracked under the existing *Cole* criminal case. No new criminal case was needed for the criminal agent to begin searching for Mihdhar. And as NSA had approved the passage of its information to the criminal agent, he could have conducted a search using all available information. As a result of this confusion, the criminal agents who were knowledgeable about al Qaeda and experienced with criminal investigative techniques, including finding suspects and possible criminal charges, were thus excluded from the search.[83]

The search was assigned to one FBI agent, and it was his very first counterterrorism lead. Because the lead was "routine," he was given 30 days to open an intelligence case and make some unspecified efforts to locate Mihdhar. He started the process a few days later. He checked local New York databases for

criminal record and driver's license information and checked the hotel listed on Mihdhar's U.S. entry form. Finally, on September 11, the agent sent a lead to Los Angeles, because Mihdhar had initially arrived in Los Angeles in January 2000.[84]

We believe that if more resources had been applied and a significantly different approach taken, Mihdhar and Hazmi might have been found. They had used their true names in the United States. Still, the investigators would have needed luck as well as skill to find them prior to September 11 even if such searches had begun as early as August 23, when the lead was first drafted.[85]

Many FBI witnesses have suggested that even if Mihdhar had been found, there was nothing the agents could have done except follow him onto the planes. We believe this is incorrect. Both Hazmi and Mihdhar could have been held for immigration violations or as material witnesses in the *Cole* bombing case. Investigation or interrogation of them, and investigation of their travel and financial activities, could have yielded evidence of connections to other participants in the 9/11 plot. The simple fact of their detention could have derailed the plan. In any case, the opportunity did not arise.

**Phoenix Memo**

The Phoenix memo was investigated thoroughly by the Joint Inquiry and the Department of Justice Inspector General.[86] We will recap it briefly here. In July 2001, an FBI agent in the Phoenix field office sent a memo to FBI headquarters and to two agents on international terrorism squads in the New York Field Office, advising of the "possibility of a coordinated effort by Usama Bin Ladin" to send students to the United States to attend civil aviation schools. The agent based his theory on the "inordinate number of individuals of investigative interest" attending such schools in Arizona.[87]

The agent made four recommendations to FBI headquarters: to compile a list of civil aviation schools, establish liaison with those schools, discuss his theories about Bin Ladin with the intelligence community, and seek authority to obtain visa information on persons applying to flight schools. His recommendations were not acted on. His memo was forwarded to one field office. Managers of the Usama Bin Ladin unit and the Radical Fundamentalist unit at FBI headquarters were addressees, but they did not even see the memo until after September 11. No managers at headquarters saw the memo before September 11, and the New York Field Office took no action.[88]

As its author told investigators, the Phoenix memo was not an alert about suicide pilots. His worry was more about a Pan Am Flight 103 scenario in which explosives were placed on an aircraft. The memo's references to aviation training were broad, including aeronautical engineering.[89] If the memo had been distributed in a timely fashion and its recommendations acted on promptly, we do not believe it would have uncovered the plot. It might well, however, have sensitized the FBI so that it might have taken the Moussaoui matter more seriously the next month.

## Zacarias Moussaoui

On August 15, 2001, the Minneapolis FBI Field Office initiated an intelligence investigation on Zacarias Moussaoui. As mentioned in chapter 7, he had entered the United States in February 2001, and had begun flight lessons at Airman Flight School in Norman, Oklahoma. He resumed his training at the Pan Am International Flight Academy in Eagan, Minnesota, starting on August 13. He had none of the usual qualifications for flight training on Pan Am's Boeing 747 flight simulators. He said he did not intend to become a commercial pilot but wanted the training as an "ego boosting thing." Moussaoui stood out because, with little knowledge of flying, he wanted to learn how to "take off and land" a Boeing 747.[90]

The agent in Minneapolis quickly learned that Moussaoui possessed jihadist beliefs. Moreover, Moussaoui had $32,000 in a bank account but did not provide a plausible explanation for this sum of money. He had traveled to Pakistan but became agitated when asked if he had traveled to nearby countries while in Pakistan (Pakistan was the customary route to the training camps in Afghanistan). He planned to receive martial arts training, and intended to purchase a global positioning receiver. The agent also noted that Moussaoui became extremely agitated whenever he was questioned regarding his religious beliefs. The agent concluded that Moussaoui was "an Islamic extremist preparing for some future act in furtherance of radical fundamentalist goals." He also believed Moussaoui's plan was related to his flight training.[91]

Moussaoui can be seen as an al Qaeda mistake and a missed opportunity. An apparently unreliable operative, he had fallen into the hands of the FBI. As discussed in chapter 7, Moussaoui had been in contact with and received money from Ramzi Binalshibh. If Moussaoui had been connected to al Qaeda, questions should instantly have arisen about a possible al Qaeda plot that involved piloting airliners, a possibility that had never been seriously analyzed by the intelligence community.

The FBI agent who handled the case in conjunction with the INS representative on the Minneapolis Joint Terrorism Task Force suspected that Moussaoui might be planning to hijack a plane. Minneapolis and FBI headquarters debated whether Moussaoui should be arrested immediately or surveilled to obtain additional information. Because it was not clear whether Moussaoui could be imprisoned, the FBI case agent decided the most important thing was to prevent Moussaoui from obtaining any further training that he could use to carry out a potential attack.[92]

As a French national who had overstayed his visa, Moussaoui could be detained immediately. The INS arrested Moussaoui on the immigration violation. A deportation order was signed on August 17, 2001.[93]

The agents in Minnesota were concerned that the U.S. Attorney's Office in Minneapolis would find insufficient probable cause of a crime to obtain a criminal warrant to search Moussaoui's laptop computer.[94] Agents at FBI headquarters believed there was insufficient probable cause. Minneapolis therefore

sought a special warrant under the Foreign Intelligence Surveillance Act to conduct the search (we introduced FISA in chapter 3).

To do so, however, the FBI needed to demonstrate probable cause that Moussaoui was an agent of a foreign power, a demonstration that was not required to obtain a criminal warrant but was a statutory requirement for a FISA warrant.[95] The case agent did not have sufficient information to connect Moussaoui to a "foreign power," so he reached out for help, in the United States and overseas.

The FBI agent's August 18 message requested assistance from the FBI legal attaché in Paris. Moussaoui had lived in London, so the Minneapolis agent sought assistance from the legal attaché there as well. By August 24, the Minneapolis agent had also contacted an FBI detailee and a CIA desk officer at the Counterterrorist Center about the case.[96]

The FBI legal attaché's office in Paris first contacted the French government on August 16 or 17, shortly after speaking to the Minneapolis case agent on the telephone. On August 22 and 27, the French provided information that made a connection between Moussaoui and a rebel leader in Chechnya, Ibn al Khattab. This set off a spirited debate between the Minneapolis Field Office, FBI headquarters, and the CIA as to whether the Chechen rebels and Khattab were sufficiently associated with a terrorist organization to constitute a "foreign power" for purposes of the FISA statute. FBI headquarters did not believe this was good enough, and its National Security Law Unit declined to submit a FISA application.[97]

After receiving the written request for assistance, the legal attaché in London had promptly forwarded it to his counterparts in the British government, hand-delivering the request on August 21. On August 24, the CIA also sent a cable to London and Paris regarding "subjects involved in suspicious 747 flight training" that described Moussaoui as a possible "suicide hijacker." On August 28, the CIA sent a request for information to a different service of the British government; this communication warned that Moussaoui might be expelled to Britain by the end of August. The FBI office in London raised the matter briefly with British officials as an aside, after a meeting about a more urgent matter on September 3, and sent the British service a written update on September 5. The case was not handled by the British as a priority amid a large number of other terrorist-related inquiries.[98]

On September 4, the FBI sent a teletype to the CIA, the FAA, the Customs Service, the State Department, the INS, and the Secret Service summarizing the known facts regarding Moussaoui. It did not report the case agent's personal assessment that Moussaoui planned to hijack an airplane. It did contain the FAA's comment that it was not unusual for Middle Easterners to attend flight training schools in the United States.[99]

Although the Minneapolis agents wanted to tell the FAA from the beginning about Moussaoui, FBI headquarters instructed Minneapolis that it could

not share the more complete report the case agent had prepared for the FAA. The Minneapolis supervisor sent the case agent in person to the local FAA office to fill in what he thought were gaps in the FBI headquarters teletype.[100] No FAA actions seem to have been taken in response.

There was substantial disagreement between Minneapolis agents and FBI headquarters as to what Moussaoui was planning to do. In one conversation between a Minneapolis supervisor and a headquarters agent, the latter complained that Minneapolis's FISA request was couched in a manner intended to get people "spun up." The supervisor replied that was precisely his intent. He said he was "trying to keep someone from taking a plane and crashing into the World Trade Center." The headquarters agent replied that this was not going to happen and that they did not know if Moussaoui was a terrorist.[101]

There is no evidence that either FBI Acting Director Pickard or Assistant Director for Counterterrorism Dale Watson was briefed on the Moussaoui case prior to 9/11. Michael Rolince, the FBI assistant director heading the Bureau's International Terrorism Operations Section (ITOS), recalled being told about Moussaoui in two passing hallway conversations but only in the context that he might be receiving telephone calls from Minneapolis complaining about how headquarters was handling the matter. He never received such a call. Although the acting special agent in charge of Minneapolis called the ITOS supervisors to discuss the Moussaoui case on August 27, he declined to go up the chain of command at FBI headquarters and call Rolince.[102]

On August 23, DCI Tenet was briefed about the Moussaoui case in a briefing titled "Islamic Extremist Learns to Fly."[103] Tenet was also told that Moussaoui wanted to learn to fly a 747, paid for his training in cash, was interested to learn the doors do not open in flight, and wanted to fly a simulated flight from London to New York. He was told that the FBI had arrested Moussaoui because of a visa overstay and that the CIA was working the case with the FBI. Tenet told us that no connection to al Qaeda was apparent to him at the time. Seeing it as an FBI case, he did not discuss the matter with anyone at the White House or the FBI. No connection was made between Moussaoui's presence in the United States and the threat reporting during the summer of 2001.[104]

On September 11, after the attacks, the FBI office in London renewed their appeal for information about Moussaoui. In response to U.S. requests, the British government supplied some basic biographical information about Moussaoui. The British government informed us that it also immediately tasked intelligence collection facilities for information about Moussaoui. On September 13, the British government received new, sensitive intelligence that Moussaoui had attended an al Qaeda training camp in Afghanistan. It passed this intelligence to the United States on the same day. Had this information been available in late August 2001, the Moussaoui case would almost certainly have received intense, high-level attention.[105]

The FBI also learned after 9/11 that the millennium terrorist Ressam, who

by 2001 was cooperating with investigators, recognized Moussaoui as some-one who had been in the Afghan camps.[106] As mentioned above, before 9/11 the FBI agents in Minneapolis had failed to persuade supervisors at headquarters that there was enough evidence to seek a FISA warrant to search Moussaoui's computer hard drive and belongings. Either the British information or the Ressam identification would have broken the logjam.

A maximum U.S. effort to investigate Moussaoui conceivably could have unearthed his connections to Binalshibh. Those connections might have brought investigators to the core of the 9/11 plot. The Binalshibh connection was recognized shortly after 9/11, though it was not an easy trail to find. Discovering it would have required quick and very substantial cooperation from the German government, which might well have been difficult to obtain.

However, publicity about Moussaoui's arrest and a possible hijacking threat might have derailed the plot.[107] With time, the search for Mihdhar and Hazmi and the investigation of Moussaoui might also have led to a breakthrough that would have disrupted the plot.

### Khalid Sheikh Mohammed

Another late opportunity was presented by a confluence of information regarding Khalid Sheikh Mohammed received by the intelligence community in the summer of 2001. The possible links between KSM, Moussaoui, and an individual only later identified as Ramzi Binalshibh would remain undiscovered, however.

Although we readily equate KSM with al Qaeda today, this was not the case before 9/11. KSM, who had been indicted in January 1996 for his role in the Manila air plot, was seen primarily as another freelance terrorist, associated with Ramzi Yousef. Because the links between KSM and Bin Ladin or al Qaeda were not recognized at the time, responsibility for KSM remained in the small Islamic Extremist Branch of the Counterterrorist Center, not in the Bin Ladin unit.

Moreover, because KSM had already been indicted, he became targeted for arrest. In 1997, the Counterterrorist Center added a Renditions Branch to help find wanted fugitives. Responsibility for KSM was transferred to this branch, which gave the CIA a "man-to-man" focus but was not an analytical unit. When subsequent information came, more critical for analysis than for tracking, no unit had the job of following up on what the information might mean.[108]

For example, in September 2000, a source had reported that an individual named Khalid al-Shaykh al-Ballushi was a key lieutenant in al Qaeda. Al-Ballushi means "from Baluchistan," and KSM is from Baluchistan. Recognizing the possible significance of this information, the Bin Ladin unit sought more information. When no information was forthcoming, the Bin Ladin unit

dropped the matter.[109] When additional pieces of the puzzle arrived in the spring and summer of 2001, they were not put together.

The first piece of the puzzle concerned some intriguing information associated with a person known as "Mukhtar" that the CIA had begun analyzing in April 2001. The CIA did not know who Mukhtar was at the time—only that he associated with al Qaeda lieutenant Abu Zubaydah and that, based on the nature of the information, he was evidently involved in planning possible terrorist activities.[110]

The second piece of the puzzle was some alarming information regarding KSM. On June 12, 2001, a CIA report said that "Khaled" was actively recruiting people to travel outside Afghanistan, including to the United States where colleagues were reportedly already in the country to meet them, to carry out terrorist-related activities for Bin Ladin. CIA headquarters presumed from the details of the reporting that this person was Khalid Sheikh Mohammed. In July, the same source was shown a series of photographs and identified a photograph of Khalid Sheikh Mohammed as the Khaled he had previously discussed.[111]

The final piece of the puzzle arrived at the CIA's Bin Ladin unit on August 28 in a cable reporting that KSM's nickname was Mukhtar. No one made the connection to the reports about Mukhtar that had been circulated in the spring. This connection might also have underscored concern about the June reporting that KSM was recruiting terrorists to travel, including to the United States. Only after 9/11 would it be discovered that Muhktar/KSM had communicated with a phone that was used by Binalshibh, and that Binalshibh had used the same phone to communicate with Moussaoui, as discussed in chapter 7. As in the Moussaoui situation already described, the links to Binalshibh might not have been an easy trail to find and would have required substantial cooperation from the German government. But time was short, and running out.[112]

### Time Runs Out

As Tenet told us, "the system was blinking red" during the summer of 2001. Officials were alerted across the world. Many were doing everything they possibly could to respond to the threats.

Yet no one working on these late leads in the summer of 2001 connected the case in his or her in-box to the threat reports agitating senior officials and being briefed to the President. Thus, these individual cases did not become national priorities. As the CIA supervisor "John" told us, no one looked at the bigger picture; no analytic work foresaw the lightning that could connect the thundercloud to the ground.[113]

We see little evidence that the progress of the plot was disturbed by any government action. The U.S. government was unable to capitalize on mistakes made by al Qaeda. Time ran out.

9

# HEROISM AND HORROR

## 9.1 PREPAREDNESS AS OF SEPTEMBER 11

Emergency response is a product of preparedness. On the morning of September 11, 2001, the last best hope for the community of people working in or visiting the World Trade Center rested not with national policymakers but with private firms and local public servants, especially the first responders: fire, police, emergency medical service, and building safety professionals.

### Building Preparedness

**The World Trade Center.** The World Trade Center (WTC) complex was built for the Port Authority of New York and New Jersey. Construction began in 1966, and tenants began to occupy its space in 1970. The Twin Towers came to occupy a unique and symbolic place in the culture of New York City and America.

The WTC actually consisted of seven buildings, including one hotel, spread across 16 acres of land. The buildings were connected by an underground mall (the concourse). The Twin Towers (1 WTC, or the North Tower, and 2 WTC, or the South Tower) were the signature structures, containing 10.4 million square feet of office space. Both towers had 110 stories, were about 1,350 feet high, and were square; each wall measured 208 feet in length. On any given workday, up to 50,000 office workers occupied the towers, and 40,000 people passed through the complex.[1]

Each tower contained three central stairwells, which ran essentially from top to bottom, and 99 elevators. Generally, elevators originating in the lobby ran to "sky lobbies" on higher floors, where additional elevators carried passengers to the tops of the buildings.[2]

Stairwells A and C ran from the 110th floor to the raised mezzanine level of the lobby. Stairwell B ran from the 107th floor to level B6, six floors below ground, and was accessible from the West Street lobby level, which was one



*The World Trade Center Complex as of 9/11*
Rendering by Marco Crupi

floor below the mezzanine. All three stairwells ran essentially straight up and down, except for two deviations in stairwells A and C where the staircase jutted out toward the perimeter of the building. On the upper and lower boundaries of these deviations were transfer hallways contained within the stairwell proper. Each hallway contained smoke doors to prevent smoke from rising from lower to upper portions of the building; they were kept closed but not locked. Doors leading from tenant space into the stairwells were never kept locked; reentry from the stairwells was generally possible on at least every fourth floor.[3]

Doors leading to the roof were locked. There was no rooftop evacuation plan. The roofs of both the North Tower and the South Tower were sloped and cluttered surfaces with radiation hazards, making them impractical for helicopter landings and as staging areas for civilians. Although the South Tower roof had a helipad, it did not meet 1994 Federal Aviation Administration guidelines.[4]

**The 1993 Terrorist Bombing of the WTC and the Port Authority's Response.** Unlike most of America, New York City and specifically the World

Trade Center had been the target of terrorist attacks before 9/11. At 12:18 P.M. on February 26, 1993, a 1,500-pound bomb stashed in a rental van was detonated on a parking garage ramp beneath the Twin Towers. The explosion killed six people, injured about 1,000 more, and exposed vulnerabilities in the World Trade Center's and the city's emergency preparedness.[5]

The towers lost power and communications capability. Generators had to be shut down to ensure safety, and elevators stopped. The public-address system and emergency lighting systems failed. The unlit stairwells filled with smoke and were so dark as to be impassable. Rescue efforts by the Fire Department of New York (FDNY) were hampered by the inability of its radios to function in buildings as large as the Twin Towers. The 911 emergency call system was overwhelmed. The general evacuation of the towers' occupants via the stairwells took more than four hours.[6]

Several small groups of people who were physically unable to descend the stairs were evacuated from the roof of the South Tower by New York Police Department (NYPD) helicopters. At least one person was lifted from the North Tower roof by the NYPD in a dangerous helicopter rappel operation— 15 hours after the bombing. General knowledge that these air rescues had occurred appears to have left a number of civilians who worked in the Twin Towers with the false impression that helicopter rescues were part of the WTC evacuation plan and that rescue from the roof was a viable, if not favored, option for those who worked on upper floors. Although they were considered after 1993, helicopter evacuations in fact were not incorporated into the WTC fire safety plan.[7]

To address the problems encountered during the response to the 1993 bombing, the Port Authority spent an initial $100 million to make physical, structural, and technological improvements to the WTC, as well as to enhance its fire safety plan and reorganize and bolster its fire safety and security staffs.[8]

Substantial enhancements were made to power sources and exits. Fluorescent signs and markings were added in and near stairwells. The Port Authority also installed a sophisticated computerized fire alarm system with redundant electronics and control panels, and state-of-the-art fire command stations were placed in the lobby of each tower.[9]

To manage fire emergency preparedness and operations, the Port Authority created the dedicated position of fire safety director. The director supervised a team of deputy fire safety directors, one of whom was on duty at the fire command station in the lobby of each tower at all times. He or she would be responsible for communicating with building occupants during an emergency.[10]

The Port Authority also sought to prepare civilians better for future emergencies. Deputy fire safety directors conducted fire drills at least twice a year, with advance notice to tenants. "Fire safety teams" were selected from among civilian employees on each floor and consisted of a fire warden, deputy fire wardens, and searchers. The standard procedure for fire drills was for fire wardens

to lead co-workers in their respective areas to the center of the floor, where they would use the emergency intercom phone to obtain specific information on how to proceed. Some civilians have told us that their evacuation on September 11 was greatly aided by changes and training implemented by the Port Authority in response to the 1993 bombing.[11]

But during these drills, civilians were not directed into the stairwells, or provided with information about their configuration and about the existence of transfer hallways and smoke doors. Neither full nor partial evacuation drills were held. Moreover, participation in drills that were held varied greatly from tenant to tenant. In general, civilians were never told not to evacuate up. The standard fire drill announcement advised participants that in the event of an actual emergency, they would be directed to descend to at least three floors below the fire. Most civilians recall simply being taught to await the instructions that would be provided at the time of an emergency. Civilians were not informed that rooftop evacuations were not part of the evacuation plan, or that doors to the roof were kept locked. The Port Authority acknowledges that it had no protocol for rescuing people trapped above a fire in the towers.[12]

Six weeks before the September 11 attacks, control of the WTC was transferred by net lease to a private developer, Silverstein Properties. Select Port Authority employees were designated to assist with the transition. Others remained on-site but were no longer part of the official chain of command. However, on September 11, most Port Authority World Trade Department employees—including those not on the designated "transition team"—reported to their regular stations to provide assistance throughout the morning. Although Silverstein Properties was in charge of the WTC on September 11, the WTC fire safety plan remained essentially the same.[13]

### Preparedness of First Responders
On 9/11, the principal first responders were from the Fire Department of New York, the New York Police Department, the Port Authority Police Department (PAPD), and the Mayor's Office of Emergency Management (OEM).

**Port Authority Police Department.** On September 11, 2001, the Port Authority of New York and New Jersey Police Department consisted of 1,331 officers, many of whom were trained in fire suppression methods as well as in law enforcement. The PAPD was led by a superintendent. There was a separate PAPD command for each of the Port Authority's nine facilities, including the World Trade Center.[14]

Most Port Authority police commands used ultra-high-frequency radios. Although all the radios were capable of using more than one channel, most PAPD officers used one local channel. The local channels were low-wattage and worked only in the immediate vicinity of that command. The PAPD also had an agencywide channel, but not all commands could access it.[15]

As of September 11, the Port Authority lacked any standard operating procedures to govern how officers from multiple commands would respond to and then be staged and utilized at a major incident at the WTC. In particular, there were no standard operating procedures covering how different commands should communicate via radio during such an incident.

**The New York Police Department.** The 40,000-officer NYPD was headed by a police commissioner, whose duties were not primarily operational but who retained operational authority. Much of the NYPD's operational activities were run by the chief of department. In the event of a major emergency, a leading role would be played by the Special Operations Division. This division included the Aviation Unit, which provided helicopters for surveys and rescues, and the Emergency Service Unit (ESU), which carried out specialized rescue missions. The NYPD had specific and detailed standard operating procedures for the dispatch of officers to an incident, depending on the incident's magnitude.[16]

The NYPD precincts were divided into 35 different radio zones, with a central radio dispatcher assigned to each. In addition, there were several radio channels for citywide operations. Officers had portable radios with 20 or more available channels, so that the user could respond outside his or her precinct. ESU teams also had these channels but at an operation would use a separate point-to-point channel (which was not monitored by a dispatcher).[17]

The NYPD also supervised the city's 911 emergency call system. Its approximately 1,200 operators, radio dispatchers, and supervisors were civilian employees of the NYPD. They were trained in the rudiments of emergency response. When a 911 call concerned a fire, it was transferred to FDNY dispatch.[18]

**The Fire Department of New York.** The 11,000-member FDNY was headed by a fire commissioner who, unlike the police commissioner, lacked operational authority. Operations were headed by the chief of department—the sole five-star chief.[19]

The FDNY was organized in nine separate geographic divisions. Each division was further divided into between four to seven battalions. Each battalion contained typically between three and four engine companies and two to four ladder companies. In total, the FDNY had 205 engine companies and 133 ladder companies. On-duty ladder companies consisted of a captain or lieutenant and five firefighters; on-duty engine companies consisted of a captain or lieutenant and normally four firefighters. Ladder companies' primary function was to conduct rescues; engine companies focused on extinguishing fires.[20]

The FDNY's Specialized Operations Command (SOC) contained a limited number of units that were of particular importance in responding to a terrorist attack or other major incident. The department's five rescue companies and seven squad companies performed specialized and highly risky rescue operations.[21]

The logistics of fire operations were directed by Fire Dispatch Operations Division, which had a center in each of the five boroughs. All 911 calls concerning fire emergencies were transferred to FDNY dispatch.[22]

As of September 11, FDNY companies and chiefs responding to a fire used analog, point-to-point radios that had six normal operating channels. Typically, the companies would operate on the same tactical channel, which chiefs on the scene would monitor and use to communicate with the firefighters. Chiefs at a fire operation also would use a separate command channel. Because these point-to-point radios had weak signal strength, communications on them could be heard only by other FDNY personnel in the immediate vicinity. In addition, the FDNY had a dispatch frequency for each of the five boroughs; these were not point-to-point channels and could be monitored from around the city.[23]

The FDNY's radios performed poorly during the 1993 WTC bombing for two reasons. First, the radios signals often did not succeed in penetrating the numerous steel and concrete floors that separated companies attempting to communicate; and second, so many different companies were attempting to use the same point-to-point channel that communications became unintelligible.[24]

The Port Authority installed, at its own expense, a repeater system in 1994 to greatly enhance FDNY radio communications in the difficult high-rise environment of the Twin Towers. The Port Authority recommended leaving the repeater system on at all times. The FDNY requested, however, that the repeater be turned on only when it was actually needed because the channel could cause interference with other FDNY operations in Lower Manhattan. The repeater system was installed at the Port Authority police desk in 5 WTC, to be activated by members of the Port Authority police when the FDNY units responding to the WTC complex so requested. However, in the spring of 2000 the FDNY asked that an activation console for the repeater system be placed instead in the lobby fire safety desk of each of the towers, making FDNY personnel entirely responsible for its activation. The Port Authority complied.[25]

Between 1998 and 2000, fewer people died from fires in New York City than in any three-year period since accurate measurements began in 1946. Firefighter deaths—a total of 22 during the 1990s—compared favorably with the most tranquil periods in the department's history.[26]

**Office of Emergency Management and Interagency Preparedness.** In 1996, Mayor Rudolph Giuliani created the Mayor's Office of Emergency Management, which had three basic functions. First, OEM's Watch Command was to monitor the city's key communications channels—including radio frequencies of FDNY dispatch and the NYPD—and other data. A second purpose of the OEM was to improve New York City's response to major incidents, including terrorist attacks, by planning and conducting exercises and drills that would involve multiple city agencies, particularly the NYPD and FDNY. Third, the OEM would play a crucial role in managing the city's overall response to an



*The World Trade Center Radio Repeater System*
Rendering by Marco Crupi

incident. After OEM's Emergency Operations Center was activated, designated liaisons from relevant agencies, as well as the mayor and his or her senior staff, would respond there. In addition, an OEM field responder would be sent to the scene to ensure that the response was coordinated.[27]

The OEM's headquarters was located at 7 WTC. Some questioned locating it both so close to a previous terrorist target and on the 23rd floor of a building (difficult to access should elevators become inoperable). There was no backup site.[28]

In July 2001, Mayor Giuliani updated a directive titled "Direction and Control of Emergencies in the City of New York." Its purpose was to eliminate "potential conflict among responding agencies which may have areas

of overlapping expertise and responsibility." The directive sought to accomplish this objective by designating, for different types of emergencies, an appropriate agency as "Incident Commander." This Incident Commander would be "responsible for the management of the City's response to the emergency," while the OEM was "designated the 'On Scene Interagency Coordinator.'"[29]

Nevertheless, the FDNY and NYPD each considered itself operationally autonomous. As of September 11, they were not prepared to comprehensively coordinate their efforts in responding to a major incident. The OEM had not overcome this problem.

## 9.2 SEPTEMBER 11, 2001

As we turn to the events of September 11, we are mindful of the unfair perspective afforded by hindsight. Nevertheless, we will try to describe what happened in the following 102 minutes:

- the 17 minutes from the crash of the hijacked American Airlines Flight 11 into 1 World Trade Center (the North Tower) at 8:46 until the South Tower was hit
- the 56 minutes from the crash of the hijacked United Airlines Flight 175 into 2 World Trade Center (the South Tower) at 9:03 until the collapse of the South Tower
- the 29 minutes from the collapse of the South Tower at 9:59 until the collapse of the North Tower at 10:28

**From 8:46 until 9:03 A.M.**
At 8:46:40, the hijacked American Airlines Flight 11 flew into the upper portion of the North Tower, cutting through floors 93 to 99. Evidence suggests that all three of the building's stairwells became impassable from the 92nd floor up. Hundreds of civilians were killed instantly by the impact. Hundreds more remained alive but trapped.[30]

**Civilians, Fire Safety Personnel, and 911 Calls**
**North Tower.** A jet fuel fireball erupted upon impact and shot down at least one bank of elevators. The fireball exploded onto numerous lower floors, including the 77th and 22nd; the West Street lobby level; and the B4 level, four stories below ground. The burning jet fuel immediately created thick, black smoke that enveloped the upper floors and roof of the North Tower. The roof of the South Tower was also engulfed in smoke because of prevailing light winds from the northwest.[31]

Within minutes, New York City's 911 system was flooded with eyewit-

ness accounts of the event. Most callers correctly identified the target of the attack. Some identified the plane as a commercial airliner.[32]

The first response came from private firms and individuals—the people and companies in the building. Everything that would happen to them during the next few minutes would turn on their circumstances and their preparedness, assisted by building personnel on-site.

Hundreds of civilians trapped on or above the 92nd floor gathered in large and small groups, primarily between the 103rd and 106th floors. A large group was reported on the 92nd floor, technically below the impact but unable to descend. Civilians were also trapped in elevators. Other civilians below the impact zone—mostly on floors in the 70s and 80s, but also on at least the 47th and 22nd floors—were either trapped or waiting for assistance.[33]

It is unclear when the first full building evacuation order was attempted over the public-address system. The deputy fire safety director in the lobby, while immediately aware that a major incident had occurred, did not know for approximately ten minutes that a commercial jet had directly hit the building. Following protocol, he initially gave announcements to those floors that had generated computerized alarms, advising those tenants to descend to points of safety—at least two floors below the smoke or fire—and to wait there for further instructions. The deputy fire safety director has told us that he began instructing a full evacuation within about ten minutes of the explosion. But the first FDNY chiefs to arrive in the lobby were advised by the Port Authority fire safety director—who had reported to the lobby although he was no longer the designated fire safety director—that the full building evacuation announcement had been made within one minute of the building being hit.[34]

Because of damage to building systems caused by the impact of the plane, public-address announcements were not heard in many locations. For the same reason, many civilians may have been unable to use the emergency intercom phones, as they had been advised to do in fire drills. Many called 911.[35]

The 911 system was not equipped to handle the enormous volume of calls it received. Some callers were unable to connect with 911 operators, receiving an "all circuits busy" message. Standard operating procedure was for calls relating to fire emergencies to be transferred from 911 operators to FDNY dispatch operators in the appropriate borough (in this case, Manhattan). Transfers were often plagued by delays and were in some cases unsuccessful. Many calls were also prematurely disconnected.[36]

The 911 operators and FDNY dispatchers had no information about either the location or the magnitude of the impact zone and were therefore unable to provide information as fundamental as whether callers were above or below the fire. Because the operators were not informed of NYPD Aviation's determination of the impossibility of rooftop rescues from the Twin Towers on that day, they could not knowledgeably answer when callers asked whether to go up or down. In most instances, therefore, the operators and the FDNY dispatchers relied on standard operating procedures for high-rise fires—that civil-

ians should stay low, remain where they are, and wait for emergency personnel to reach them. This advice was given to callers from the North Tower for locations both above and below the impact zone. Fire chiefs told us that the evacuation of tens of thousands of people from skyscrapers can create many new problems, especially for individuals who are disabled or in poor health. Many of the injuries after the 1993 bombing occurred during the evacuation.[37]

Although the guidance to stay in place may seem understandable in cases of conventional high-rise fires, FDNY chiefs in the North Tower lobby determined at once that all building occupants should attempt to evacuate immediately. By 8:57, FDNY chiefs had instructed the PAPD and building personnel to evacuate the South Tower as well, because of the magnitude of the damage caused by the first plane's impact.[38]

These critical decisions were not conveyed to 911 operators or to FDNY dispatchers. Departing from protocol, a number of operators told callers that they could break windows, and several operators advised callers to evacuate if they could.[39] Civilians who called the Port Authority police desk located at 5 WTC were advised to leave if they could.[40]

Most civilians who were not obstructed from proceeding began evacuating without waiting for instructions over the intercom system. Some remained to wait for help, as advised by 911 operators. Others simply continued to work or delayed to collect personal items, but in many cases were urged to leave by others. Some Port Authority civilian employees remained on various upper floors to help civilians who were trapped and to assist in the evacuation.[41]

While evacuating, some civilians had trouble reaching the exits because of damage caused by the impact. Some were confused by deviations in the increasingly crowded stairwells, and impeded by doors that appeared to be locked but actually were jammed by debris or shifting that resulted from the impact of the plane. Despite these obstacles, the evacuation was relatively calm and orderly.[42]

Within ten minutes of impact, smoke was beginning to rise to the upper floors in debilitating volumes and isolated fires were reported, although there were some pockets of refuge. Faced with insufferable heat, smoke, and fire, and with no prospect for relief, some jumped or fell from the building.[43]

**South Tower.** Many civilians in the South Tower were initially unaware of what had happened in the other tower. Some believed an incident had occurred in their building; others were aware that a major explosion had occurred on the upper floors of the North Tower. Many people decided to leave, and some were advised to do so by fire wardens. In addition, Morgan Stanley, which occupied more than 20 floors of the South Tower, evacuated its employees by the decision of company security officials.[44]

Consistent with protocol, at 8:49 the deputy fire safety director in the South Tower told his counterpart in the North Tower that he would wait to hear from "the boss from the Fire Department or somebody" before ordering an evacuation.[45] At about this time, an announcement over the public-address system in



SMOKE DOORS

TRANSFER HALLWAY

76th FLOOR

NORTH TOWER
TRANSFER HALLWAY
HIGHLIGHTED

*The World Trade Center North Tower Stairwell with Deviation*
Rendering by Marco Crupi

the South Tower stated that the incident had occurred in the other building and advised tenants, generally, that their building was safe and that they should remain on or return to their offices or floors. A statement from the deputy fire safety director informing tenants that the incident had occurred in the other building was consistent with protocol; the expanded advice did not correspond to any existing written protocol, and did not reflect any instruction known to have been given to the deputy fire safety director that day. We do not know the reason for the announcement, as both the deputy fire safety director believed to have made it and the director of fire safety for the WTC complex perished in the South Tower's collapse. Clearly, however, the prospect of another plane hitting the second building was beyond the contemplation of anyone giving advice. According

to one of the first fire chiefs to arrive, such a scenario was unimaginable, "beyond our consciousness." As a result of the announcement, many civilians remained on their floors. Others reversed their evacuation and went back up.[46]

Similar advice was given in person by security officials in both the ground-floor lobby—where a group of 20 that had descended by the elevators was personally instructed to go back upstairs—and in the upper sky lobby, where many waited for express elevators to take them down. Security officials who gave this advice were not part of the fire safety staff.[47]

Several South Tower occupants called the Port Authority police desk in 5 WTC. Some were advised to stand by for further instructions; others were strongly advised to leave.[48]

It is not known whether the order by the FDNY to evacuate the South Tower was received by the deputy fire safety director making announcements there. However, at approximately 9:02—less than a minute before the building was hit—an instruction over the South Tower's public-address system advised civilians, generally, that they could begin an orderly evacuation if conditions warranted. Like the earlier advice to remain in place, it did not correspond to any prewritten emergency instruction.[49]

### FDNY Initial Response

**Mobilization.** The FDNY response began within five seconds of the crash. By 9:00, many senior FDNY leaders, including 7 of the 11 most highly ranked chiefs in the department, as well as the Commissioner and many of his deputies and assistants, had begun responding from headquarters in Brooklyn. While en route over the Brooklyn Bridge, the Chief of Department and the Chief of Operations had a clear view of the situation on the upper floors of the North Tower. They determined that because of the fire's magnitude and location near the top of the building, their mission would be primarily one of rescue. They called for a fifth alarm, which would bring additional engine and ladder companies, as well as for two more elite rescue units. The Chief of Department arrived at about 9:00; general FDNY Incident Command was transferred to his location on the West Side Highway. In all, 22 of the 32 senior chiefs and commissioners arrived at the WTC before 10:00.[50]

As of 9:00, the units that were dispatched (including senior chiefs responding to headquarters) included approximately 235 firefighters. These units consisted of 21 engine companies, nine ladder companies, four of the department's elite rescue teams, the department's single Hazmat team, two of the city's elite squad companies, and support staff. In addition, at 8:53 nine Brooklyn units were staged on the Brooklyn side of the Brooklyn–Battery Tunnel to await possible dispatch orders.[51]

**Operations.** A battalion chief and two ladder and two engine companies arrived at the North Tower at approximately 8:52. As they entered the lobby, they encountered badly burned civilians who had been caught in the path of

the fireball. Floor-to-ceiling windows in the northwest corner of the West Street level of the lobby had been blown out; some large marble tiles had been dislodged from the walls; one entire elevator bank was destroyed by the fireball. Lights were functioning, however, and the air was clear of smoke.[52]

As the highest-ranking officer on the scene, the battalion chief initially was the FDNY incident commander. Minutes later, the on-duty division chief for Lower Manhattan arrived and took over. Both chiefs immediately began speaking with the former fire safety director and other building personnel to learn whether building systems were working. They were advised that all 99 elevators in the North Tower appeared to be out, and there were no assurances that sprinklers or standpipes were working on upper floors. Chiefs also spoke with Port Authority police personnel and an OEM representative.[53]

After conferring with the chiefs in the lobby, one engine and one ladder company began climbing stairwell C at about 8:57, with the goal of approaching the impact zone as scouting units and reporting back to the chiefs in the lobby. The radio channel they used was tactical 1. Following FDNY high-rise fire protocols, other units did not begin climbing immediately, as the chiefs worked to formulate a plan before sending them up. Units began mobilizing in the lobby, lining up and awaiting their marching orders.[54]

Also by approximately 8:57, FDNY chiefs had asked both building personnel and a Port Authority police officer to evacuate the South Tower, because in their judgment the impact of the plane into the North Tower made the entire complex unsafe—not because of concerns about a possible second plane.[55]

The FDNY chiefs in the increasingly crowded North Tower lobby were confronting critical choices with little to no information. They had ordered units up the stairs to report back on conditions, but did not know what the impact floors were; they did not know if any stairwells into the impact zone were clear; and they did not know whether water for firefighting would be available on the upper floors. They also did not know what the fire and impact zone looked like from the outside.[56]

They did know that the explosion had been large enough to send down a fireball that blew out elevators and windows in the lobby and that conditions were so dire that some civilians on upper floors were jumping or falling from the building. They also knew from building personnel that some civilians were trapped in elevators and on specific floors. According to Division Chief for Lower Manhattan Peter Hayden, "We had a very strong sense we would lose firefighters and that we were in deep trouble, but we had estimates of 25,000 to 50,000 civilians, and we had to try to rescue them."[57]

The chiefs concluded that this would be a rescue operation, not a firefighting operation. One of the chiefs present explained:

> We realized that, because of the impact of the plane, that there was some structural damage to the building, and most likely that the fire suppres-

sion systems within the building were probably damaged and possibly inoperable. . . . We knew that at the height of the day there were as many as 50,000 people in this building. We had a large volume of fire on the upper floors. Each floor was approximately an acre in size. Several floors of fire would have been beyond the fire-extinguishing capability of the forces that we had on hand. So we determined, very early on, that this was going to be strictly a rescue mission. We were going to vacate the building, get everybody out, and then we were going to get out.[58]

The specifics of the mission were harder to determine, as they had almost no information about the situation 80 or more stories above them. They also received advice from senior FDNY chiefs that while the building might eventually suffer a partial collapse on upper floors, such structural failure was not imminent. No one anticipated the possibility of a total collapse.[59]

Emergency medical services (EMS) personnel were directed to one of four triage areas being set up around the perimeter of the WTC. Some entered the lobby to respond to specific casualty reports. In addition, many ambulance paramedics from private hospitals were rushing to the WTC complex.[60]

**NYPD Initial Response**

Numerous NYPD officers saw the plane strike the North Tower and immediately reported it to NYPD communications dispatchers.[61]

At 8:58, while en route, the NYPD Chief of Department raised the NYPD's mobilization to level 4, thereby sending to the WTC approximately 22 lieutenants, 100 sergeants, and 800 police officers from all over the city. The Chief of Department arrived at Church and Vesey at 9:00.[62]

At 9:01, the NYPD patrol mobilization point was moved to West and Vesey in order to handle the greater number of patrol officers dispatched in the higher-level mobilization. These officers would be stationed around the perimeter of the complex to direct the evacuation of civilians. Many were diverted on the way to the scene by intervening emergencies related to the attack.[63]

At 8:50, the Aviation Unit of the NYPD dispatched two helicopters to the WTC to report on conditions and assess the feasibility of a rooftop landing or of special rescue operations. En route, the two helicopters communicated with air traffic controllers at the area's three major airports and informed them of the commercial airplane crash at the World Trade Center. The air traffic controllers had been unaware of the incident.[64]

At 8:56, an NYPD ESU team asked to be picked up at the Wall Street heliport to initiate rooftop rescues. At 8:58, however, after assessing the North Tower roof, a helicopter pilot advised the ESU team that they could not land on the roof, because "it is too engulfed in flames and heavy smoke condition."[65]

By 9:00, a third NYPD helicopter was responding to the WTC complex.

NYPD helicopters and ESU officers remained on the scene throughout the morning, prepared to commence rescue operations on the roof if conditions improved. Both FDNY and NYPD protocols called for FDNY personnel to be placed in NYPD helicopters in the event of an attempted rooftop rescue at a high-rise fire. No FDNY personnel were placed in NYPD helicopters on September 11.[66]

The 911 operators and FDNY dispatchers were not advised that rooftop rescues were not being undertaken. They thus were not able to communicate this fact to callers, some of whom spoke of attempting to climb to the roof.[67]

Two on-duty NYPD officers were on the 20th floor of the North Tower at 8:46. They climbed to the 29th floor, urging civilians to evacuate, but did not locate a group of civilians trapped on the 22nd floor.[68]

Just before 9:00, an ESU team began to walk from Church and Vesey to the North Tower lobby, with the goal of climbing toward and setting up a triage center on the upper floors for the severely injured. A second ESU team would follow them to assist in removing those individuals.[69]

Numerous officers responded in order to help injured civilians and to urge those who could walk to vacate the area immediately. Putting themselves in danger of falling debris, several officers entered the plaza and successfully rescued at least one injured, nonambulatory civilian, and attempted to rescue others.[70]

Also by about 9:00, transit officers began shutting down subway stations in the vicinity of the World Trade Center and evacuating civilians from those stations.[71]

Around the city, the NYPD cleared major thoroughfares for emergency vehicles to access the WTC. The NYPD and PAPD coordinated the closing of bridges and tunnels into Manhattan.[72]

### PAPD Initial Response

The Port Authority's on-site commanding police officer was standing in the concourse when a fireball erupted out of elevator shafts and exploded onto the mall concourse, causing him to dive for cover. The on-duty sergeant initially instructed the officers in the WTC Command to meet at the police desk in 5 WTC. Soon thereafter, he instructed officers arriving from outside commands to meet him at the fire safety desk in the North Tower lobby. A few of these officers from outside commands were given WTC Command radios.[73]

One Port Authority police officer at the WTC immediately began climbing stairwell C in the North Tower.[74] Other officers began performing rescue and evacuation operations on the ground floors and in the PATH (Port Authority Trans-Hudson) station below the WTC complex.

Within minutes of impact, Port Authority police officers from the PATH, bridges, tunnels, and airport commands began responding to the WTC. The PAPD lacked written standard operating procedures for personnel responding from outside commands to the WTC during a major incident. In addition, offi-

cers from some PAPD commands lacked interoperable radio frequencies. As a result, there was no comprehensive coordination of PAPD's overall response.[75]

At 9:00, the PAPD commanding officer of the WTC ordered an evacuation of all civilians in the World Trade Center complex, because of the magnitude of the calamity in the North Tower. This order was given over WTC police radio channel W, which could not be heard by the deputy fire safety director in the South Tower.[76]

Also at 9:00, the PAPD Superintendent and Chief of Department arrived separately and made their way to the North Tower.[77]

### OEM Initial Response
By 8:48, officials in OEM headquarters on the 23rd floor of 7 WTC—just to the north of the North Tower—began to activate the Emergency Operations Center by calling such agencies as the FDNY, NYPD, Department of Health, and the Greater Hospital Association and instructing them to send their designated representatives to the OEM. In addition, the Federal Emergency Management Agency (FEMA) was called and asked to send at least five federal Urban Search and Rescue Teams (such teams are located throughout the United States). At approximately 8:50, a senior representative from the OEM arrived in the lobby of the North Tower and began to act as the OEM field responder to the incident. He soon was joined by several other OEM officials, including the OEM Director.[78]

### Summary
In the 17-minute period between 8:46 and 9:03 A.M. on September 11, New York City and the Port Authority of New York and New Jersey had mobilized the largest rescue operation in the city's history. Well over a thousand first responders had been deployed, an evacuation had begun, and the critical decision that the fire could not be fought had been made.

Then the second plane hit.

### From 9:03 until 9:59 A.M.
At 9:03:11, the hijacked United Airlines Flight 175 hit 2 WTC (the South Tower) from the south, crashing through the 77th to 85th floors. What had been the largest and most complicated rescue operation in city history instantly doubled in magnitude. The plane banked as it hit the building, leaving portions of the building undamaged on impact floors. As a consequence—and in contrast to the situation in the North Tower—one of the stairwells (A) initially remained passable from at least the 91st floor down, and likely from top to bottom.[79]

### Civilians, Fire Safety Personnel, and 911 Calls
**South Tower.** At the lower end of the impact, the 78th-floor sky lobby, hundreds had been waiting to evacuate when the plane hit. Many had attempted but failed to squeeze into packed express elevators. Upon impact, many were

killed or severely injured; others were relatively unharmed. We know of at least one civilian who seized the initiative and shouted that anyone who could walk should walk to the stairs, and anyone who could help should help others in need of assistance. As a result, at least two small groups of civilians descended from that floor. Others remained on the floor to help the injured and move victims who were unable to walk to the stairwell to aid their rescue.[80]

Still others remained alive in the impact zone above the 78th floor. Damage was extensive, and conditions were highly precarious. The only survivor known to have escaped from the heart of the impact zone described the 81st floor—where the wing of the plane had sliced through his office—as a "demolition" site in which everything was "broken up" and the smell of jet fuel was so strong that it was almost impossible to breathe. This person escaped by means of an unlikely rescue, aided by a civilian fire warden descending from a higher floor, who, critically, had been provided with a flashlight.[81]

At least four people were able to descend stairwell A from the 81st floor or above. One left the 84th floor immediately after the building was hit. Even at that point, the stairway was dark, smoky, and difficult to navigate; glow strips on the stairs and handrails were a significant help. Several flights down, however, the evacuee became confused when he reached a smoke door that caused him to believe the stairway had ended. He was able to exit that stairwell and switch to another.[82]

Many civilians in and above the impact zone ascended the stairs. One small group reversed its descent down stairwell A after being advised by another civilian that they were approaching a floor "in flames." The only known survivor has told us that their intention was to exit the stairwell in search of clearer air. At the 91st floor, joined by others from intervening floors, they perceived themselves to be trapped in the stairwell and began descending again. By this time, the stairwell was "pretty black," intensifying smoke caused many to pass out, and fire had ignited in the 82nd-floor transfer hallway.[83]

Others ascended to attempt to reach the roof but were thwarted by locked doors. At approximately 9:30 a "lock release" order—which would unlock all areas in the complex controlled by the buildings' computerized security system, including doors leading to the roofs—was transmitted to the Security Command Center located on the 22nd floor of the North Tower. Damage to the software controlling the system, resulting from the impact of the plane, prevented this order from being executed.[84]

Others, attempting to descend, were frustrated by jammed or locked doors in stairwells or confused by the structure of the stairwell deviations. By the lower 70s, however, stairwells A and B were well-lit, and conditions were generally normal.[85]

Some civilians remained on affected floors, and at least one ascended from a lower point into the impact zone, to help evacuate colleagues or assist the injured.[86]

Within 15 minutes after the impact, debilitating smoke had reached at least

one location on the 100th floor, and severe smoke conditions were reported throughout floors in the 90s and 100s over the course of the following half hour. By 9:30, a number of civilians who had failed to reach the roof remained on the 105th floor, likely unable to descend because of intensifying smoke in the stairwell. There were reports of tremendous smoke on that floor, but at least one area remained less affected until shortly before the building collapsed. There were several areas between the impact zone and the uppermost floors where conditions were better. At least a hundred people remained alive on the 88th and 89th floors, in some cases calling 911 for direction.[87]

The 911 system remained plagued by the operators' lack of awareness of what was occurring. Just as in the North Tower, callers from below and above the impact zone were advised to remain where they were and wait for help. The operators were not given any information about the inability to conduct rooftop rescues and therefore could not advise callers that they had essentially been ruled out. This lack of information, combined with the general advice to remain where they were, may have caused civilians above the impact not to attempt to descend, although stairwell A may have been passable.[88]

In addition, the 911 system struggled with the volume of calls and rigid standard operating procedures according to which calls conveying crucial information had to wait to be transferred to either EMS or FDNY dispatch.[89] According to one civilian who was evacuating down stairwell A from the heart of the impact zone and who stopped on the 31st floor in order to call 911,

> I told them when they answered the phone, where I was, that I had passed somebody on the 44th floor, injured—they need to get a medic and a stretcher to this floor, and described the situation in brief, and the person then asked for my phone number, or something, and they said—they put me on hold. "You gotta talk to one of my supervisors"—and suddenly I was on hold. And so I waited a considerable amount of time. Somebody else came back on the phone, I repeated the story. And then it happened again. I was on hold a second time, and needed to repeat the story for a third time. But I told the third person that I am only telling you once. I am getting out of the building, here are the details, write it down, and do what you should do.[90]

Very few 911 calls were received from floors below the impact, but at least one person was advised to remain on the 73rd floor despite the caller's protests that oxygen was running out. The last known 911 call from this location came at 9:52.[91]

Evidence suggests that the public-address system did not continue to function after the building was hit. A group of people trapped on the 97th floor, however, made repeated references in calls to 911 to having heard "announcements" to go down the stairs. Evacuation tones were heard in locations both above and below the impact zone.[92]

By 9:35, the West Street lobby level of the South Tower was becoming over-whelmed by injured people who had descended to the lobby but were having difficulty going on. Those who could continue were directed to exit north or east through the concourse and then out of the WTC complex.[93]

By 9:59, at least one person had descended from as high as the 91st floor of that tower, and stairwell A was reported to have been almost empty. Stairwell B was also reported to have contained only a handful of descending civilians at an earlier point in the morning. But just before the tower collapsed, a team of NYPD ESU officers encountered a stream of civilians descending an unidentified stairwell in the 20s. These civilians may have been descending from at or above the impact zone.[94]

**North Tower.** In the North Tower, civilians continued their evacuation. On the 91st floor, the highest floor with stairway access, all civilians but one were uninjured and able to descend. While some complained of smoke, heat, fumes, and crowding in the stairwells, conditions were otherwise fairly normal on floors below the impact. At least one stairwell was reported to have been "clear and bright" from the upper 80s down.[95]

Those who called 911 from floors below the impact were generally advised to remain in place. One group trapped on the 83rd floor pleaded repeatedly to know whether the fire was above or below them, specifically asking if 911 oper-ators had any information from the outside or from the news. The callers were transferred back and forth several times and advised to stay put. Evidence sug-gests that these callers died.[96]

At 8:59, the Port Authority police desk at Newark Airport told a third party that a group of Port Authority civilian employees on the 64th floor should evacuate. (The third party was not at the WTC, but had been in phone con-tact with the group on the 64th floor.) At 9:10, in response to an inquiry from the employees themselves, the Port Authority police desk in Jersey City con-firmed that employees on the 64th floor should "be careful, stay near the stair-wells, and wait for the police to come up." When the third party inquired again at 9:31, the police desk at Newark Airport advised that they "absolutely" evac-uate. The third party informed the police desk that the employees had previ-ously received contrary advice from the FDNY, which could only have come via 911. These workers were not trapped, yet unlike most occupants on the upper floors, they had chosen not to descend immediately after impact. They eventually began to descend the stairs, but most of them died in the collapse of the North Tower.[97]

All civilians who reached the lobby were directed by NYPD and PAPD offi-cers into the concourse, where other police officers guided them to exit the concourse and complex to the north and east so that they might avoid falling debris and victims.[98]

By 9:55, only a few civilians were descending above the 25th floor in stair-

well B; these primarily were injured, handicapped, elderly, or severely over-weight civilians, in some cases being assisted by other civilians.[99]

By 9:59, tenants from the 91st floor had already descended the stairs and exited the concourse. However, a number of civilians remained in at least stairwell C, approaching lower floors. Other evacuees were killed earlier by debris falling on the street.[100]

### FDNY Response

**Increased Mobilization.** Immediately after the second plane hit, the FDNY Chief of Department called a second fifth alarm.[101]

By 9:15, the number of FDNY personnel en route to or present at the scene was far greater than the commanding chiefs at the scene had requested. Five factors account for this disparity. First, while the second fifth alarm had called for 20 engine and 8 ladder companies, in fact 23 engine and 13 ladder companies were dispatched. Second, several other units self-dispatched. Third, because the attacks came so close to the 9:00 shift change, many firefighters just going off duty were given permission by company officers to "ride heavy" and became part of those on-duty teams, under the leadership of that unit's officer. Fourth, many off-duty firefighters responded from firehouses separately from the on-duty unit (in some cases when expressly told not to) or from home. The arrival of personnel in excess of that dispatched was particularly pronounced in the department's elite units. Fifth, numerous additional FDNY personnel—such as fire marshals and firefighters in administrative positions—who lacked a predetermined operating role also reported to the WTC.[102]

**The Repeater System.** Almost immediately after the South Tower was hit, senior FDNY chiefs in the North Tower lobby huddled to discuss strategy for the operations in the two towers. Of particular concern to the chiefs—in light of FDNY difficulties in responding to the 1993 bombing—was communications capability. One of the chiefs recommended testing the repeater channel to see if it would work.[103]

Earlier, an FDNY chief had asked building personnel to activate the repeater channel, which would enable greatly-enhanced FDNY portable radio communications in the high-rises. One button on the repeater system activation console in the North Tower was pressed at 8:54, though it is unclear by whom. As a result of this activation, communication became possible between FDNY portable radios on the repeater channel. In addition, the repeater's master handset at the fire safety desk could hear communications made by FDNY portable radios on the repeater channel. The activation of *transmission* on the master handset required, however, that a second button be pressed. That second button was never activated on the morning of September 11.[104]

At 9:05, FDNY chiefs tested the WTC complex's repeater system. Because the second button had not been activated, the chief on the master handset could

not transmit. He was also apparently unable to hear another chief who was attempting to communicate with him from a portable radio, either because of a technical problem or because the volume was turned down on the console (the normal setting when the system was not in use). Because the repeater channel seemed inoperable—the master handset appeared unable to transmit or receive communications—the chiefs in the North Tower lobby decided not to use it. The repeater system was working at least partially, however, on portable FDNY radios, and firefighters subsequently used repeater channel 7 in the South Tower.[105]

**FDNY North Tower Operations.** Command and control decisions were affected by the lack of knowledge of what was happening 30, 60, 90, and 100 floors above. According to one of the chiefs in the lobby, "One of the most critical things in a major operation like this is to have information. We didn't have a lot of information coming in. We didn't receive any reports of what was seen from the [NYPD] helicopters. It was impossible to know how much damage was done on the upper floors, whether the stairwells were intact or not."[106] According to another chief present, "People watching on TV certainly had more knowledge of what was happening a hundred floors above us than we did in the lobby. . . . [W]ithout critical information coming in . . . it's very difficult to make informed, critical decisions[.]"[107]

As a result, chiefs in the lobby disagreed over whether anyone at or above the impact zone possibly could be rescued, or whether there should be even limited firefighting for the purpose of cutting exit routes through fire zones.[108]

Many units were simply instructed to ascend toward the impact zone and report back to the lobby via radio. Some units were directed to assist specific groups of individuals trapped in elevators or in offices well below the impact zone. One FDNY company successfully rescued some civilians who were trapped on the 22nd floor as a result of damage caused by the initial fireball.[109]

An attempt was made to track responding units' assignments on a magnetic board, but the number of units and individual firefighters arriving in the lobby made this an overwhelming task. As the fire companies were not advised to the contrary, they followed protocol and kept their radios on tactical channel 1, which would be monitored by the chiefs in the lobby. Those battalion chiefs who would climb would operate on a separate command channel, which also would be monitored by the chiefs in the lobby.[110]

Fire companies began to ascend stairwell B at approximately 9:07, laden with about 100 pounds of heavy protective clothing, self-contained breathing apparatuses, and other equipment (including hoses for engine companies and heavy tools for ladder companies).[111]

Firefighters found the stairways they entered intact, lit, and clear of smoke. Unbeknownst to the lobby command post, one battalion chief in the North Tower found a working elevator, which he took to the 16th floor before beginning to climb.[112]

In ascending stairwell B, firefighters were passing a steady and heavy stream of descending civilians. Firemen were impressed with the composure and total lack of panic shown by almost all civilians. Many civilians were in awe of the firefighters and found their mere presence to be calming.[113]

Firefighters periodically stopped on particular floors and searched to ensure that no civilians were still on it. In a few instances healthy civilians were found on floors, either because they still were collecting personal items or for no apparent reason; they were told to evacuate immediately. Firefighters deputized healthy civilians to be in charge of others who were struggling or injured.[114]

Climbing up the stairs with heavy protective clothing and equipment was hard work even for physically fit firefighters. As firefighters began to suffer varying levels of fatigue, some became separated from others in their unit.[115]

At 9:32, a senior chief radioed all units in the North Tower to return to the lobby, either because of a false report of a third plane approaching or because of his judgment about the deteriorating condition of the building. Once the rumor of the third plane was debunked, other chiefs continued operations, and there is no evidence that any units actually returned to the lobby. At the same time, a chief in the lobby was asked to consider the possibility of a rooftop rescue but was unable to reach FDNY dispatch by radio or phone. Out on West Street, however, the FDNY Chief of Department had already dismissed any rooftop rescue as impossible.[116]

As units climbed higher, their ability to communicate with chiefs on tactical 1 became more limited and sporadic, both because of the limited effectiveness of FDNY radios in high-rises and because so many units on tactical 1 were trying to communicate at once. When attempting to reach a particular unit, chiefs in the lobby often heard nothing in response.[117]

Just prior to 10:00, in the North Tower one engine company had climbed to the 54th floor, at least two other companies of firefighters had reached the sky lobby on the 44th floor, and numerous units were located between the 5th and 37th floors.[118]

**FDNY South Tower and Marriott Hotel Operations.** Immediately after the repeater test, a senior chief and a battalion chief commenced operations in the South Tower lobby. Almost at once they were joined by an OEM field responder. They were not, however, joined right away by a sizable number of fire companies, as units that had been in or en route to the North Tower lobby at 9:03 were not reallocated to the South Tower.[119]

A battalion chief and a ladder company found a working elevator to the 40th floor and from there proceeded to climb stairwell B. Another ladder company arrived soon thereafter, and began to rescue civilians trapped in an elevator between the first and second floors. The senior chief in the lobby expressed frustration about the lack of units he initially had at his disposal for South Tower operations.[120]

Unlike the commanders in the North Tower, the senior chief in the lobby

and the ascending battalion chief kept their radios on repeater channel 7. For the first 15 minutes of the operations, communications among them and the ladder company climbing with the battalion chief worked well. Upon learning from a company security official that the impact zone began at the 78th floor, a ladder company transmitted this information, and the battalion chief directed an engine company staged on the 40th floor to attempt to find an elevator to reach that upper level.[121]

To our knowledge, no FDNY chiefs outside the South Tower realized that the repeater channel was functioning and being used by units in that tower. The senior chief in the South Tower lobby was initially unable to communicate his requests for more units to chiefs either in the North Tower lobby or at the outdoor command post.[122]

From approximately 9:21 on, the ascending battalion chief was unable to reach the South Tower lobby command post because the senior chief in the lobby had ceased to communicate on repeater channel 7. The vast majority of units that entered the South Tower did not communicate on the repeater channel.[123]

The first FDNY fatality of the day occurred at approximately 9:30, when a civilian landed on and killed a fireman near the intersection of West and Liberty streets.[124]

By 9:30, chiefs in charge of the South Tower still were in need of additional companies. Several factors account for the lag in response. First, only two units that had been dispatched to the North Tower prior to 9:03 reported immediately to the South Tower. Second, units were not actually sent until approximately five minutes after the FDNY Chief of Department ordered their dispatch. Third, those units that had been ordered at 8:53 to stage at the Brooklyn–Battery Tunnel—and thus very close to the WTC complex—were not dispatched after the plane hit the South Tower. Fourth, units parked further north on West Street, then proceeded south on foot and stopped at the overall FDNY command post on West Street, where in some cases they were told to wait. Fifth, some units responded directly to the North Tower. (Indeed, radio communications indicated that in certain cases some firemen believed that the South Tower was 1 WTC when in fact it was 2 WTC.) Sixth, some units couldn't find the staging area (at West Street south of Liberty) for the South Tower. Finally, the jumpers and debris that confronted units attempting to enter the South Tower from its main entrance on Liberty Street caused some units to search for indirect ways to enter that tower, most often through the Marriott Hotel, or simply to remain on West Street.[125]

A chief at the overall outdoor command post was under the impression that he was to assist in lobby operations of the South Tower, and in fact his aide already was in that lobby. But because of his lack of familiarity with the WTC complex and confusion over how to get to there, he instead ended up in the Marriott at about 9:35. Here he came across about 14 units, many of which had been trying to find safe access to the South Tower. He directed them to

secure the elevators and conduct search-and-rescue operations on the upper floors of the Marriott. Four of these companies searched the spa on the hotel's top floor—the 22nd floor—for civilians, and found none.[126]

Feeling satisfied with the scope of the operation in the Marriott, the chief in the lobby there directed some units to proceed to what he thought was the South Tower. In fact, he pointed them to the North Tower. Three of the FDNY companies who had entered the North Tower from the Marriott found a working elevator in a bank at the south end of the lobby, which they took to the 23rd floor.[127]

In response to the shortage of units in the South Tower, at 9:37 an additional second alarm was requested by the chief at the West and Liberty streets staging area. At this time, the units that earlier had been staged on the Brooklyn side of the Brooklyn-Battery Tunnel were dispatched to the South Tower; some had gone through the tunnel already and had responded to the Marriott, not the South Tower.[128]

Between 9:45 and 9:58, the ascending battalion chief continued to lead FDNY operations on the upper floors of the South Tower. At 9:50, an FDNY ladder company encountered numerous seriously injured civilians on the 70th floor. With the assistance of a security guard, at 9:53 a group of civilians trapped in an elevator on the 78th-floor sky lobby were found by an FDNY company. They were freed from the elevator at 9:58. By that time the battalion chief had reached the 78th floor on stairwell A; he reported that it looked open to the 79th floor, well into the impact zone. He also reported numerous civilian fatalities in the area.[129]

**FDNY Command and Control Outside the Towers.** The overall command post consisted of senior chiefs, commissioners, the field communications van (Field Comm), numerous units that began to arrive after the South Tower was hit, and EMS chiefs and personnel.[130]

Field Comm's two main functions were to relay information between the overall operations command post and FDNY dispatch and to track all units operating at the scene on a large magnetic board. Both of these missions were severely compromised by the magnitude of the disaster on September 11. First, the means of transmitting information were unreliable. For example, while FDNY dispatch advised Field Comm that 100 people were reported via 911 to be trapped on the 105th floor of the North Tower, and Field Comm then attempted to convey that report to chiefs at the outdoor command post, this information did not reach the North Tower lobby. Second, Field Comm's ability to keep track of which units were operating where was limited, because many units reported directly to the North Tower, the South Tower, or the Marriott. Third, efforts to track units by listening to tactical 1 were severely hampered by the number of units using that channel; as many people tried to speak at once, their transmissions overlapped and often became indecipherable. In the opinion of one of the members of the Field

Comm group, tactical 1 simply was not designed to handle the number of units operating on it that morning.[131]

The primary Field Comm van had access to the NYPD's Special Operations channel (used by NYPD Aviation), but it was in the garage for repairs on September 11. The backup van lacked that capability.[132]

The Chief of Department, along with civilian commissioners and senior EMS chiefs, organized ambulances on West Street to expedite the transport of injured civilians to hospitals.[133]

To our knowledge, none of the chiefs present believed that a total collapse of either tower was possible. One senior chief did articulate his concern that upper floors could begin to collapse in a few hours, and that firefighters thus should not ascend above floors in the 60s. That opinion was not conveyed to chiefs in the North Tower lobby, and there is no evidence that it was conveyed to chiefs in the South Tower lobby either.[134]

Although the Chief of Department had general authority over operations, tactical decisions remained the province of the lobby commanders. The highest-ranking officer in the North Tower was responsible for communicating with the Chief of Department. They had two brief conversations. In the first, the senior lobby chief gave the Chief of Department a status report and confirmed that this was a rescue, not firefighting, operation. In the second conversation, at about 9:45, the Chief of Department suggested that given how the North Tower appeared to him, the senior lobby chief might want to consider evacuating FDNY personnel.[135]

At 9:46, the Chief of Department called an additional fifth alarm, and at 9:54 an additional 20 engine and 6 ladder companies were sent to the WTC. As a result, more than one-third of all FDNY companies now had been dispatched to the WTC. At about 9:57, an EMS paramedic approached the FDNY Chief of Department and advised that an engineer in front of 7 WTC had just remarked that the Twin Towers in fact were in imminent danger of a total collapse.[136]

**NYPD Response**

Immediately after the second plane hit, the Chief of Department of the NYPD ordered a second Level 4 mobilization, bringing the total number of NYPD officers responding to close to 2,000.[137]

The NYPD Chief of Department called for Operation Omega, which required the protection of sensitive locations around the city. NYPD headquarters were secured and all other government buildings were evacuated.[138]

The ESU command post at Church and Vesey streets coordinated all NYPD ESU rescue teams. After the South Tower was hit, the ESU officer running this command post decided to send one ESU team (each with approximately six police officers) up each of the Twin Towers' stairwells. While he continued to monitor the citywide SOD channel, which NYPD helicopters were using, he also monitored the point-to-point tactical channel that the ESU teams climbing in the towers would use.[139]

The first NYPD ESU team entered the West Street–level lobby of the North Tower and prepared to begin climbing at about 9:15 A.M. They attempted to check in with the FDNY chiefs present, but were rebuffed. OEM personnel did not intervene. The ESU team began to climb the stairs. Shortly thereafter, a second NYPD ESU team entered the South Tower. The OEM field responder present ensured that they check in with the FDNY chief in charge of the lobby, and it was agreed that the ESU team would ascend and support FDNY personnel.[140]

A third ESU team subsequently entered the North Tower at its elevated mezzanine lobby level and made no effort to check in with the FDNY command post. A fourth ESU team entered the South Tower. By 9:59, a fifth ESU team was next to 6 WTC and preparing to enter the North Tower.[141]

By approximately 9:50, the lead ESU team had reached the 31st floor, observing that there appeared to be no more civilians still descending. This ESU team encountered a large group of firefighters and administered oxygen to some of them who were exhausted.[142]

At about 9:56, the officer running the ESU command post on Church and Vesey streets had a final radio communication with one of the ESU teams in the South Tower. The team then stated that it was ascending via stairs, was somewhere in the 20s, and was making slow progress because of the numerous descending civilians crowding the stairwell.[143]

Three plainclothes NYPD officers without radios or protective gear had begun ascending either stairwell A or C of the North Tower. They began checking every other floor above the 12th for civilians. Only occasionally did they find any, and in those few cases they ordered the civilians to evacuate immediately. While checking floors, they used office phones to call their superiors. In one phone call an NYPD chief instructed them to leave the North Tower, but they refused to do so. As they climbed higher, they encountered increasing smoke and heat. Shortly before 10:00 they arrived on the 54th floor.[144]

Throughout this period (9:03 to 9:59), a group of NYPD and Port Authority police officers, as well as two Secret Service agents, continued to assist civilians leaving the North Tower. They were positioned around the mezzanine lobby level of the North Tower, directing civilians leaving stairwells A and C to evacuate down an escalator to the concourse. The officers instructed those civilians who seemed composed to evacuate the complex calmly but rapidly. Other civilians exiting the stairs who were either injured or exhausted collapsed at the foot of these stairs; officers then assisted them out of the building.[145]

When civilians reached the concourse, another NYPD officer stationed at the bottom of the escalator directed them to exit through the concourse to the north and east and then out of the WTC complex. This exit route ensured that civilians would not be endangered by falling debris and people on West Street, on the plaza between the towers, and on Liberty Street.[146]

Some officers positioned themselves at the top of a flight of stairs by 5 WTC that led down into the concourse, going into the concourse when necessary

to evacuate injured or disoriented civilians. Numerous other NYPD officers were stationed throughout the concourse, assisting burned, injured, and disoriented civilians, as well as directing all civilians to exit to the north and east. NYPD officers were also in the South Tower lobby to assist in civilian evacuation. NYPD officers stationed on Vesey Street between West Street and Church Street urged civilians not to remain in the area and instead to keep walking north.[147]

At 9:06, the NYPD Chief of Department instructed that no units were to land on the roof of either tower. At about 9:30, one of the helicopters present advised that a rooftop evacuation still would not be possible. One NYPD helicopter pilot believed one portion of the North Tower roof to be free enough of smoke that a hoist could be lowered in order to rescue people, but there was no one on the roof. This pilot's helicopter never attempted to hover directly over the tower. Another helicopter did attempt to do so, and its pilot stated that the severity of the heat from the jet fuel–laden fire in the North Tower would have made it impossible to hover low enough for a rescue, because the high temperature would have destabilized the helicopter.[148]

At 9:51, an aviation unit warned units of large pieces of debris hanging from the building. Prior to 9:59, no NYPD helicopter pilot predicted that either tower would collapse.[149]

**Interaction of 911 Calls and NYPD Operations.** At 9:37, a civilian on the 106th floor of the South Tower reported to a 911 operator that a lower floor—the "90-something floor"—was collapsing. This information was conveyed inaccurately by the 911 operator to an NYPD dispatcher. The dispatcher further confused the substance of the 911 call by telling NYPD officers at the WTC complex that "the 106th floor is crumbling" at 9:52, 15 minutes after the 911 call was placed. The NYPD dispatcher conveyed this message on the radio frequency used in precincts in the vicinity of the WTC and subsequently on the Special Operations Division channel, but not on City Wide channel 1.[150]

### PAPD Response

Initial responders from outside PAPD commands proceeded to the police desk in 5 WTC or to the fire safety desk in the North Tower lobby. Some officers were then assigned to assist in stairwell evacuations; others were assigned to expedite evacuation in the plaza, concourse, and PATH station. As information was received of civilians trapped above ground-level floors of the North Tower, other PAPD officers were instructed to climb to those floors for rescue efforts. Still others began climbing toward the impact zone.[151]

At 9:11, the PAPD Superintendent and an inspector began walking up stairwell B of the North Tower to assess damage near and in the impact zone. The PAPD Chief and several other PAPD officers began ascending a stairwell in

order to reach the Windows on the World restaurant on the 106th floor, from which calls had been made to the PAPD police desk reporting at least 100 people trapped.[152]

Many PAPD officers from different commands responded on their own initiative. By 9:30, the PAPD central police desk requested that responding officers meet at West and Vesey and await further instructions. In the absence of a predetermined command structure to deal with an incident of this magnitude, a number of PAPD inspectors, captains, and lieutenants stepped forward at around 9:30 to formulate an on-site response plan. They were hampered by not knowing how many officers were responding to the site and where those officers were operating. Many of the officers who responded to this command post lacked suitable protective equipment to enter the complex.[153]

By 9:58, one PAPD officer had reached the 44th-floor sky lobby of the North Tower. Also in the North Tower, one team of PAPD officers was in the mid-20s and another was in the lower 20s. Numerous PAPD officers were also climbing in the South Tower, including the PAPD ESU team. Many PAPD officers were on the ground floors of the complex—some assisting in evacuation, others manning the PAPD desk in 5 WTC or assisting at lobby command posts.[154]

**OEM Response**
After the South Tower was hit, OEM senior leadership decided to remain in its "bunker" and continue conducting operations, even though all civilians had been evacuated from 7 WTC. At approximately 9:30, a senior OEM official ordered the evacuation of the facility, after a Secret Service agent in 7 WTC advised him that additional commercial planes were not accounted for. Prior to its evacuation, no outside agency liaisons had reached OEM. OEM field responders were stationed in each tower's lobby, at the FDNY overall command post, and, at least for some period of time, at the NYPD command post at Church and Vesey.[155]

**Summary**
The emergency response effort escalated with the crash of United 175 into the South Tower. With that escalation, communications as well as command and control became increasingly critical and increasingly difficult. First responders assisted thousands of civilians in evacuating the towers, even as incident commanders from responding agencies lacked knowledge of what other agencies and, in some cases, their own responders were doing.

**From 9:59 until 10:28 A.M.**
At 9:58:59, the South Tower collapsed in ten seconds, killing all civilians and emergency personnel inside, as well a number of individuals—both first responders and civilians—in the concourse, in the Marriott, and on neighboring streets. The building collapsed into itself, causing a ferocious windstorm and

creating a massive debris cloud. The Marriott hotel suffered significant damage as a result of the collapse of the South Tower.[156]

### Civilian Response in the North Tower

The 911 calls placed from most locations in the North Tower grew increasingly desperate as time went on. As late as 10:28, people remained alive in some locations, including on the 92nd and 79th floors. Below the impact zone, it is likely that most civilians who were physically and emotionally capable of descending had exited the tower. The civilians who were nearing the bottom of stairwell C were assisted out of the building by NYPD, FDNY, and PAPD personnel. Others, who experienced difficulty evacuating, were being helped by first responders on lower floors.[157]

### FDNY Response

**Immediate Impact of the Collapse of the South Tower.** The FDNY overall command post and posts in the North Tower lobby, the Marriott lobby, and the staging area on West Street south of Liberty all ceased to operate upon the collapse of the South Tower, as did EMS staging areas, because of their proximity to the building.[158]

Those who had been in the North Tower lobby had no way of knowing that the South Tower had suffered a complete collapse. Chiefs who had fled from the overall command post on the west side of West Street took shelter in the underground parking garage at 2 World Financial Center and were not available to influence FDNY operations for the next ten minutes or so.[159]

When the South Tower collapsed, firefighters on upper floors of the North Tower heard a violent roar, and many were knocked off their feet; they saw debris coming up the stairs and observed that the power was lost and emergency lights activated. Nevertheless, those firefighters not standing near windows facing south had no way of knowing that the South Tower had collapsed; many surmised that a bomb had exploded, or that the North Tower had suffered a partial collapse on its upper floors.[160]

We do not know whether the repeater channel continued to function after 9:59.[161]

**Initial Evacuation Instructions and Communications.** The South Tower's total collapse was immediately communicated on the Manhattan dispatch channel by an FDNY boat on the Hudson River; but to our knowledge, no one at the site received this information, because every FDNY command post had been abandoned—including the overall command post, which included the Field Comm van. Despite his lack of knowledge of what had happened to the South Tower, a chief in the process of evacuating the North Tower lobby sent out an order within a minute of the collapse: "Command to all units in Tower 1, evacuate the building." Another chief from the North Tower lobby soon followed with an additional evacuation order issued on tactical 1.[162]

Evacuation orders did not follow the protocol for giving instructions when a building's collapse may be imminent—a protocol that includes constantly repeating "Mayday, Mayday, Mayday"—during the 29 minutes between the fall of the South Tower and that of the North Tower. In addition, most of the evacuation instructions did not mention that the South Tower had collapsed. However, at least three firefighters heard evacuation instructions which stated that the North Tower was in danger of "imminent collapse."[163]

**FDNY Personnel above the Ground Floors of the North Tower.** Within minutes, some firefighters began to hear evacuation orders over tactical 1. At least one chief also gave the evacuation instruction on the command channel used only by chiefs in the North Tower, which was much less crowded.[164]

At least two battalion chiefs on upper floors of the North Tower—one on the 23rd floor and one on the 35th floor—heard the evacuation instruction on the command channel and repeated it to everyone they came across. The chief on the 23rd floor apparently aggressively took charge to ensure that all firefighters on the floors in the immediate area were evacuating. The chief on the 35th floor also heard a separate radio communication stating that the South Tower had collapsed (which the chief on the 23rd floor may have heard as well). He subsequently acted with a sense of urgency, and some firefighters heard the evacuation order for the first time when he repeated it on tactical 1. This chief also had a bullhorn and traveled to each of the stairwells and shouted the evacuation order: "All FDNY, get the fuck out!" As a result of his efforts, many firefighters who had not been in the process of evacuating began to do so.[165]

Other firefighters did not receive the evacuation transmissions, for one of four reasons: First, some FDNY radios did not pick up the transmission because of the difficulties of radio communications in high-rises. Second, the numbers trying to use tactical 1 after the South Tower collapsed may have drowned out some evacuation instructions. According to one FDNY lieutenant who was on the 31st floor of the North Tower at the time, "[Tactical] channel 1 just might have been so bogged down that it may have been impossible to get that order through."[166] Third, some firefighters in the North Tower were off-duty and did not have radios. Fourth, some firefighters in the North Tower had been dispatched to the South Tower and likely were on the different tactical channel assigned to that tower.[167]

FDNY personnel in the North Tower who received the evacuation orders did not respond uniformly. Some units—including one whose officer knew that the South Tower had collapsed—either delayed or stopped their evacuation in order to assist nonambulatory civilians. Some units whose members had become separated during the climb attempted to regroup so they could descend together. Some units began to evacuate but, according to eyewitnesses, did not hurry. At least several firefighters who survived believed that they and others would have evacuated more urgently had they known of the South Tower's complete collapse. Other firefighters continued to sit and rest on floors

while other companies descended past them and reminded them that they were supposed to evacuate. Some firefighters were determined not to leave the building while other FDNY personnel remained inside and, in one case, convinced others to remain with them. In another case, firefighters had successfully descended to the lobby, where another firefighter then persuaded them to reascend in order to look for specific FDNY personnel.[168]

Other FDNY personnel did not hear the evacuation order on their radio but were advised orally to leave the building by other firefighters and police who were themselves evacuating.[169]

By 10:24, approximately five FDNY companies reached the bottom of stairwell B and entered the North Tower lobby. They stood in the lobby for more than a minute, not certain what to do, as no chiefs were present. Finally, one firefighter—who had earlier seen from a window that the South Tower had collapsed—urged that they all leave, as this tower could fall as well. The units then proceeded to exit onto West Street. While they were doing so, the North Tower began its pancake collapse, killing some of these men.[170]

**Other FDNY Personnel.** The Marriott Hotel suffered significant damage in the collapse of the South Tower. Those in the lobby were knocked down and enveloped in the darkness of a debris cloud. Some were hurt but could walk. Others were more severely injured, and some were trapped. Several firefighters came across a group of about 50 civilians who had been taking shelter in the restaurant and assisted them in evacuating. Up above, at the time of the South Tower's collapse four companies were descending the stairs single file in a line of approximately 20 men. Four survived.[171]

At the time of the South Tower's collapse, two FDNY companies were either at the eastern side of the North Tower lobby, near the mall concourse, or actually in the mall concourse, trying to reach the South Tower. Many of these men were thrown off their feet by the collapse of the South Tower; they then attempted to regroup in the darkness of the debris cloud and evacuate civilians and themselves, not knowing that the South Tower had collapsed. Several of these firefighters subsequently searched the PATH station below the concourse—unaware that the PAPD had cleared the area of all civilians by 9:19.[172]

At about 10:15, the FDNY Chief of Department and the Chief of Safety, who had returned to West Street from the parking garage, confirmed that the South Tower had collapsed. The Chief of Department issued a radio order for all units to evacuate the North Tower, repeating it about five times. He then directed that the FDNY command post be moved further north on West Street and told FDNY units in the area to proceed north on West Street toward Chambers Street. At approximately 10:25, he radioed for two ladder companies to respond to the Marriott, where he was aware that both FDNY personnel and civilians were trapped.[173]

Many chiefs, including several of those who had been in the North Tower lobby, did not learn that the South Tower had collapsed until 30 minutes or

more after the event. According to two eyewitnesses, however, one senior FDNY chief who knew that the South Tower had collapsed strongly expressed the opinion that the North Tower would not collapse, because unlike the South Tower, it had not been hit on a corner.[174]

After the South Tower collapsed, some firefighters on the streets neighboring the North Tower remained where they were or came closer to the North Tower. Some of these firefighters did not know that the South Tower had collapsed, but many chose despite that knowledge to remain in an attempt to save additional lives. According to one such firefighter, a chief who was preparing to mount a search-and-rescue mission in the Marriott, "I would never think of myself as a leader of men if I had headed north on West Street after [the] South Tower collapsed." Just outside the North Tower on West Street one firefighter was directing others exiting the building, telling them when no jumpers were coming down and it was safe to run out. A senior chief had grabbed an NYPD bullhorn and was urging firefighters exiting onto West Street to continue running north, well away from the WTC. Three of the most senior and respected members of the FDNY were involved in attempting to rescue civilians and firefighters from the Marriott.[175]

**NYPD Response**

A member of the NYPD Aviation Unit radioed that the South Tower had collapsed immediately after it happened, and further advised that all people in the WTC complex and nearby areas should be evacuated. At 10:04, NYPD aviation reported that the top 15 stories of the North Tower "were glowing red" and that they might collapse. At 10:08, a helicopter pilot warned that he did not believe the North Tower would last much longer.[176]

Immediately after the South Tower collapsed, many NYPD radio frequencies became overwhelmed with transmissions relating to injured, trapped, or missing officers. As a result, NYPD radio communications became strained on most channels. Nevertheless, they remained effective enough for the two closest NYPD mobilization points to be moved further from the WTC at 10:06.[177]

Just like most firefighters, the ESU rescue teams in the North Tower had no idea that the South Tower had collapsed. However, by 10:00 the ESU officer running the command post at Church and Vesey ordered the evacuation of all ESU units from the WTC complex. This officer, who had observed the South Tower collapse, reported it to ESU units in the North Tower in his evacuation instruction.[178]

This instruction was clearly heard by the two ESU units already in the North Tower and the other ESU unit preparing to enter the tower. The ESU team on the 31st floor found the full collapse of the South Tower so unfathomable that they radioed back to the ESU officer at the command post and asked him to repeat his communication. He reiterated his urgent message.[179]

The ESU team on the 31st floor conferred with the FDNY personnel there to ensure that they, too, knew that they had to evacuate, then proceeded down

stairwell B. During the descent, they reported seeing many firefighters who were resting and did not seem to be in the process of evacuating. They further reported advising these firefighters to evacuate, but said that at times they were not acknowledged. In the opinion of one of the ESU officers, some of these firefighters essentially refused to take orders from cops. At least one firefighter who was in the North Tower has supported that assessment, stating that he was not going to take an evacuation instruction from a cop that morning. However, another firefighter reports that ESU officers ran past him without advising him to evacuate.[180]

The ESU team on the 11th floor began descending stairwell C after receiving the evacuation order. Once near the mezzanine level—where stairwell C ended—this team spread out in chain formation, stretching from several floors down to the mezzanine itself. They used their flashlights to provide a path of beacons through the darkness and debris for civilians climbing down the stairs. Eventually, when no one else appeared to be descending, the ESU team exited the North Tower and ran one at a time to 6 WTC, dodging those who still were jumping from the upper floors of the North Tower by acting as spotters for each other. They remained in the area, conducting additional searches for civilians; all but two of them died.[181]

After surviving the South Tower's collapse, the ESU team that had been preparing to enter the North Tower spread into chain formation and created a path for civilians (who had exited from the North Tower mezzanine) to evacuate the WTC complex by descending the stairs on the north side of 5 and 6 WTC, which led down to Vesey Street. They remained at this post until the North Tower collapsed, yet all survived.[182]

The three plainclothes NYPD officers who had made it up to the 54th floor of the North Tower felt the building shake violently at 9:59 as the South Tower collapsed (though they did not know the cause). Immediately thereafter, they were joined by three firefighters from an FDNY engine company. One of the firefighters apparently heard an evacuation order on his radio, but responded in a return radio communication, "We're not fucking coming out!" However, the firefighters urged the police officers to descend because they lacked the protective gear and equipment needed to handle the increasing smoke and heat. The police officers reluctantly began descending, checking that the lower floors were clear of civilians. They proceeded down stairwell B, poking their heads into every floor and briefly looking for civilians.[183]

Other NYPD officers helping evacuees on the mezzanine level of the North Tower were enveloped in the debris cloud that resulted from the South Tower's collapse. They struggled to regroup in the darkness and to evacuate both themselves and civilians they encountered. At least one of them died in the collapse of the North Tower. At least one NYPD officer from this area managed to evacuate out toward 5 WTC, where he teamed up with a Port Authority police officer and acted as a spotter in advising the civilians who were still exiting

when they could safely run from 1 WTC to 5 WTC and avoid being struck by people and debris falling from the upper floors.[184]

At the time of the collapse of the South Tower, there were numerous NYPD officers in the concourse, some of whom are believed to have died there. Those who survived struggled to evacuate themselves in darkness, assisting civilians as they exited the concourse in all directions.[185]

**Port Authority Response**
The collapse of the South Tower forced the evacuation of the PAPD command post on West and Vesey, compelling PAPD officers to move north. There is no evidence that PAPD officers without WTC Command radios received an evacuation order by radio. Some of these officers in the North Tower decided to evacuate, either on their own or in consultation with other first responders they came across. Some greatly slowed their own descent in order to assist nonambulatory civilians.[186]

**After 10:28 A.M.**
The North Tower collapsed at 10:28:25 A.M., killing all civilians alive on upper floors, an undetermined number below, and scores of first responders. The FDNY Chief of Department, the Port Authority Police Department Superintendent, and many of their senior staff were killed. Incredibly, twelve firefighters, one PAPD officer, and three civilians who were descending stairwell B of the North Tower survived its collapse.[187]

On September 11, the nation suffered the largest loss of life—2,973—on its soil as a result of hostile attack in its history. The FDNY suffered 343 fatalities—the largest loss of life of any emergency response agency in history. The PAPD suffered 37 fatalities—the largest loss of life of any police force in history. The NYPD suffered 23 fatalities—the second largest loss of life of any police force in history, exceeded only by the number of PAPD officers lost the same day.[188]

Mayor Giuliani, along with the Police and Fire commissioners and the OEM director, moved quickly north and established an emergency operations command post at the Police Academy. Over the coming hours, weeks, and months, thousands of civilians and city, state, and federal employees devoted themselves around the clock to putting New York City back on its feet.[189]

## 9.3 EMERGENCY RESPONSE AT THE PENTAGON

If it had happened on any other day, the disaster at the Pentagon would be remembered as a singular challenge and an extraordinary national story. Yet the calamity at the World Trade Center that same morning included catastrophic damage 1,000 feet above the ground that instantly imperiled tens of thousands of people. The two experiences are not comparable. Nonetheless, broader les-



© Tamara Beckwith, *New York Post*

*The Twin Towers following the impact of American Airlines Flight 11 and
United Airlines Flight 175*



© Reuters 2004

*The Pentagon, after being struck by American Airlines Flight 77*



© Reuters 2004

*United Airlines Flight 93 crash site, Shanksville, Pennsylvania*

sons in integrating multiagency response efforts are apparent when we analyze the response at the Pentagon.

The emergency response at the Pentagon represented a mix of local, state, and federal jurisdictions and was generally effective. It overcame the inherent complications of a response across jurisdictions because the Incident Command System, a formalized management structure for emergency response, was in place in the National Capital Region on 9/11.[190]

Because of the nature of the event—a plane crash, fire, and partial building collapse—the Arlington County Fire Department served as incident commander. Different agencies had different roles. The incident required a major rescue, fire, and medical response from Arlington County at the U.S. military's headquarters—a facility under the control of the secretary of defense. Since it was a terrorist attack, the Department of Justice was the lead federal agency in charge (with authority delegated to the FBI for operational response). Additionally, the terrorist attack affected the daily operations and emergency management requirements of Arlington County and all bordering and surrounding jurisdictions.[191]

At 9:37, the west wall of the Pentagon was hit by hijacked American Airlines Flight 77, a Boeing 757. The crash caused immediate and catastrophic damage. All 64 people aboard the airliner were killed, as were 125 people inside the Pentagon (70 civilians and 55 military service members). One hundred six people were seriously injured and transported to area hospitals.[192]

While no emergency response is flawless, the response to the 9/11 terrorist attack on the Pentagon was mainly a success for three reasons: first, the strong professional relationships and trust established among emergency responders; second, the adoption of the Incident Command System; and third, the pursuit of a regional approach to response. Many fire and police agencies that responded had extensive prior experience working together on regional events and training exercises. Indeed, at the time preparations were under way at many of these agencies to ensure public safety at the annual meetings of the International Monetary Fund and the World Bank scheduled to be held later that month in Washington, D.C.[193]

Local, regional, state, and federal agencies immediately responded to the Pentagon attack. In addition to county fire, police, and sheriff's departments, the response was assisted by the Metropolitan Washington Airports Authority, Ronald Reagan Washington National Airport Fire Department, Fort Myer Fire Department, the Virginia State Police, the Virginia Department of Emergency Management, the FBI, FEMA, a National Medical Response Team, the Bureau of Alcohol, Tobacco, and Firearms, and numerous military personnel within the Military District of Washington.[194]

Command was established at 9:41. At the same time, the Arlington County Emergency Communications Center contacted the fire departments of Fairfax County, Alexandria, and the District of Columbia to request mutual aid.

The incident command post provided a clear view of and access to the crash site, allowing the incident commander to assess the situation at all times.[195]

At 9:55, the incident commander ordered an evacuation of the Pentagon impact area because a partial collapse was imminent; it occurred at 9:57, and no first responder was injured.[196]

At 10:15, the incident commander ordered a full evacuation of the command post because of the warning of an approaching hijacked aircraft passed along by the FBI. This was the first of three evacuations caused by reports of incoming aircraft, and the evacuation order was well communicated and well coordinated.[197]

Several factors facilitated the response to this incident, and distinguish it from the far more difficult task in New York. There was a single incident, and it was not 1,000 feet above ground. The incident site was relatively easy to secure and contain, and there were no other buildings in the immediate area. There was no collateral damage beyond the Pentagon.[198]

Yet the Pentagon response encountered difficulties that echo those experienced in New York. As the "Arlington County: After-Action Report" notes, there were significant problems with both self-dispatching and communications: "Organizations, response units, and individuals proceeding on their own initiative directly to an incident site, without the knowledge and permission of the host jurisdiction and the Incident Commander, complicate the exercise of command, increase the risks faced by bonafide responders, and exacerbate the challenge of accountability." With respect to communications, the report concludes: "Almost all aspects of communications continue to be problematic, from initial notification to tactical operations. Cellular telephones were of little value. . . . Radio channels were initially oversaturated. . . . Pagers seemed to be the most reliable means of notification when available and used, but most firefighters are not issued pagers."[199]

It is a fair inference, given the differing situations in New York City and Northern Virginia, that the problems in command, control, and communications that occurred at both sites will likely recur in any emergency of similar scale. The task looking forward is to enable first responders to respond in a coordinated manner with the greatest possible awareness of the situation.

## 9.4 ANALYSIS

Like the national defense effort described in chapter 1, the emergency response to the attacks on 9/11 was necessarily improvised. In New York, the FDNY, NYPD, the Port Authority, WTC employees, and the building occupants themselves did their best to cope with the effects of an unimaginable catastrophe—unfolding furiously over a mere 102 minutes—for which they were unprepared in terms of both training and mindset. As a result of the

efforts of first responders, assistance from each other, and their own good instincts and goodwill, the vast majority of civilians below the impact zone were able to evacuate the towers.

The National Institute of Standards and Technology has provided a preliminary estimation that between 16,400 and 18,800 civilians were in the WTC complex as of 8:46 A.M. on September 11. At most 2,152 individuals died at the WTC complex who were not (1) fire or police first responders, (2) security or fire safety personnel of the WTC or individual companies, (3) volunteer civilians who ran to the WTC after the planes' impact to help others, or (4) on the two planes that crashed into the Twin Towers. Out of this total number of fatalities, we can account for the workplace location of 2,052 individuals, or 95.35 percent. Of this number, 1,942 or 94.64 percent either worked or were supposed to attend a meeting at or above the respective impact zones of the Twin Towers; only 110, or 5.36 percent of those who died, worked below the impact zone. While a given person's office location at the WTC does not definitively indicate where that individual died that morning or whether he or she could have evacuated, these data strongly suggest that the evacuation was a success for civilians below the impact zone.[200]

Several factors influenced the evacuation on September 11. It was aided greatly by changes made by the Port Authority in response to the 1993 bombing and by the training of both Port Authority personnel and civilians after that time. Stairwells remained lit near unaffected floors; some tenants relied on procedures learned in fire drills to help them to safety; others were guided down the stairs by fire safety officials based in the lobby. Because of damage caused by the impact of the planes, the capability of the sophisticated building systems may have been impaired. Rudimentary improvements, however, such as the addition of glow strips to the handrails and stairs, were credited by some as the reason for their survival. The general evacuation time for the towers dropped from more than four hours in 1993 to under one hour on September 11 for most civilians who were not trapped or physically incapable of enduring a long descent.

First responders also played a significant role in the success of the evacuation. Some specific rescues are quantifiable, such as an FDNY company's rescue of civilians trapped on the 22d floor of the North Tower, or the success of FDNY, PAPD, and NYPD personnel in carrying nonambulatory civilians out of both the North and South Towers. In other instances, intangibles combined to reduce what could have been a much higher death total. It is impossible to measure how many more civilians who descended to the ground floors would have died but for the NYPD and PAPD personnel directing them—via safe exit routes that avoided jumpers and debris—to leave the complex urgently but calmly. It is impossible to measure how many more civilians would have died but for the determination of many members of the FDNY, PAPD, and NYPD to continue assisting civilians after the South Tower collapsed. It is

impossible to measure the calming influence that ascending firefighters had on descending civilians or whether but for the firefighters' presence the poor behavior of a very few civilians could have caused a dangerous and panicked mob flight. But the positive impact of the first responders on the evacuation came at a tremendous cost of first responder lives lost.[201]

### Civilian and Private-Sector Challenges

The "first" first responders on 9/11, as in most catastrophes, were private-sector civilians. Because 85 percent of our nation's critical infrastructure is controlled not by government but by the private sector, private-sector civilians are likely to be the first responders in any future catastrophes. For that reason, we have assessed the state of private sector and civilian preparedness in order to formulate recommendations to address this critical need. Our recommendations grow out of the experience of the civilians at the World Trade Center on 9/11.

**Lack of Protocol for Rooftop Rescues.** Civilians at or above the impact zone in the North Tower had the smallest hope of survival. Once the plane struck, they were prevented from descending because of damage to or impassable conditions in the building's three stairwells. The only hope for those on the upper floors of the North Tower would have been a swift and extensive air rescue. Several factors made this impossible. Doors leading to the roof were kept locked for security reasons, and damage to software in the security command station prevented a lock release order from taking effect. Even if the doors had not been locked, structural and radiation hazards made the rooftops unsuitable staging areas for a large number of civilians; and even if conditions permitted general helicopter evacuations—which was not the case—only several people could be lifted at a time.

The WTC lacked any plan for evacuation of civilians on upper floors of the WTC in the event that all stairwells were impassable below.

**Lack of Comprehensive Evacuation of South Tower Immediately after the North Tower Impact.** No decision has been criticized more than the decision of building personnel not to evacuate the South Tower immediately after the North Tower was hit. A firm and prompt evacuation order would likely have led many to safety. Even a strictly "advisory" announcement would not have dissuaded those who decided for themselves to evacuate. The advice to stay in place was understandable, however, when considered in its context. At that moment, no one appears to have thought a second plane could hit the South Tower. The evacuation of thousands of people was seen as inherently dangerous. Additionally, conditions were hazardous in some areas outside the towers.[202]

Less understandable, in our view, is the instruction given to some civilians

who had reached the lobby to return to their offices. They could have been held in the lobby or perhaps directed through the underground concourse.

Despite the initial advice given over its public-address system, the South Tower was ordered to be evacuated by the FDNY and PAPD within 12 minutes of the North Tower's being hit. If not for a second, unanticipated attack, the evacuation presumably would have proceeded.

**Impact of Fire Safety Plan and Fire Drills on Evacuation.** Once the South Tower was hit, civilians on upper floors wasted time ascending the stairs instead of searching for a clear path down, when stairwell A was at least initially passable. Although rooftop rescues had not been conclusively ruled out, civilians were not informed in fire drills that roof doors were locked, that rooftop areas were hazardous, and that no helicopter evacuation plan existed.

In both towers, civilians who were able to reach the stairs and descend were also stymied by the deviations in the stairways and by smoke doors. This confusion delayed the evacuation of some and may have obstructed that of others. The Port Authority has acknowledged that in the future, tenants should be made aware of what conditions they will encounter during descent.

**Impact of 911 Calls on Evacuation.** The NYPD's 911 operators and FDNY dispatch were not adequately integrated into the emergency response. In several ways, the 911 system was not ready to cope with a major disaster. These operators and dispatchers were one of the only sources of information for individuals at and above the impact zone of the towers. The FDNY ordered both towers fully evacuated by 8:57, but this guidance was not conveyed to 911 operators and FDNY dispatchers, who for the next hour often continued to advise civilians not to self-evacuate, regardless of whether they were above or below the impact zones. Nor were 911 operators or FDNY dispatchers advised that rooftop rescues had been ruled out. This failure may have been harmful to civilians on the upper floors of the South Tower who called 911 and were not told that their only evacuation hope was to attempt to descend, not to ascend. In planning for future disasters, it is important to integrate those taking 911 calls into the emergency response team and to involve them in providing up-to-date information and assistance to the public.

**Preparedness of Individual Civilians.** One clear lesson of September 11 is that individual civilians need to take responsibility for maximizing the probability that they will survive, should disaster strike. Clearly, many building occupants in the World Trade Center did not take preparedness seriously. Individuals should know the exact location of every stairwell in their workplace. In addition, they should have access at all times to flashlights, which were deemed invaluable by some civilians who managed to evacuate the WTC on September 11.

**Challenges Experienced by First Responders**
**The Challenge of Incident Command.** As noted above, in July 2001, Mayor Giuliani updated a directive titled "Direction and Control of Emergencies in the City of New York." The directive designated, for different types of emergencies, an appropriate agency as "Incident Commander"; it would be "responsible for the management of the City's response to the emergency." The directive also provided that where incidents are "so multifaceted that no one agency immediately stands out as the Incident Commander, OEM will assign the role of Incident Commander to an agency as the situation demands."[203]

To some degree, the Mayor's directive for incident command was followed on 9/11. It was clear that the lead response agency was the FDNY, and that the other responding local, federal, bistate, and state agencies acted in a supporting role. There was a tacit understanding that FDNY personnel would have primary responsibility for evacuating civilians who were above the ground floors of the Twin Towers, while NYPD and PAPD personnel would be in charge of evacuating civilians from the WTC complex once they reached ground level. The NYPD also greatly assisted responding FDNY units by clearing emergency lanes to the WTC.[204]

In addition, coordination occurred at high levels of command. For example, the Mayor and Police Commissioner consulted with the Chief of the Department of the FDNY at approximately 9:20. There were other instances of coordination at operational levels, and information was shared on an ad hoc basis. For example, an NYPD ESU team passed the news of their evacuation order to firefighters in the North Tower.[205]

It is also clear, however, that the response operations lacked the kind of integrated communications and unified command contemplated in the directive. These problems existed both within and among individual responding agencies.

**Command and Control within First Responder Agencies.** For a unified incident management system to succeed, each participant must have command and control of its own units and adequate internal communications. This was not always the case at the WTC on 9/11.

Understandably lacking experience in responding to events of the magnitude of the World Trade Center attacks, the FDNY as an institution proved incapable of coordinating the numbers of units dispatched to different points within the 16-acre complex. As a result, numerous units were congregating in the undamaged Marriott Hotel and at the overall command post on West Street by 9:30, while chiefs in charge of the South Tower still were in desperate need of units. With better understanding of the resources already available, additional units might not have been dispatched to the South Tower at 9:37.

The task of accounting for and coordinating the units was rendered difficult, if not impossible, by internal communications breakdowns resulting from

the limited capabilities of radios in the high-rise environment of the WTC and from confusion over which personnel were assigned to which frequency. Furthermore, when the South Tower collapsed the overall FDNY command post ceased to operate, which compromised the FDNY's ability to understand the situation; an FDNY marine unit's immediate radio communication to FDNY dispatch that the South Tower had fully collapsed was not conveyed to chiefs at the scene. The FDNY's inability to coordinate and account for the different radio channels that would be used in an emergency of this scale contributed to the early lack of units in the South Tower, whose lobby chief initially could not communicate with anyone outside that tower.[206]

Though almost no one at 9:50 on September 11 was contemplating an imminent total collapse of the Twin Towers, many first responders and civilians were contemplating the possibility of imminent additional terrorist attacks throughout New York City. Had any such attacks occurred, the FDNY's response would have been severely compromised by the concentration of so many of its off-duty personnel, particularly its elite personnel, at the WTC.

The Port Authority's response was hampered by the lack of both standard operating procedures and radios capable of enabling multiple commands to respond in unified fashion to an incident at the WTC. Many officers reporting from the tunnel and airport commands could not hear instructions being issued over the WTC Command frequency. In addition, command and control was complicated by senior Port Authority Police officials becoming directly involved in frontline rescue operations.

The NYPD experienced comparatively fewer internal command and control and communications issues. Because the department has a history of mobilizing thousands of officers for major events requiring crowd control, its technical radio capability and major incident protocols were more easily adapted to an incident of the magnitude of 9/11. In addition, its mission that day lay largely outside the towers themselves. Although there were ESU teams and a few individual police officers climbing in the towers, the vast majority of NYPD personnel were staged outside, assisting with crowd control and evacuation and securing other sites in the city. The NYPD ESU division had firm command and control over its units, in part because there were so few of them (in comparison to the number of FDNY companies) and all reported to the same ESU command post. It is unclear, however, whether non-ESU NYPD officers operating on the ground floors, and in a few cases on upper floors, of the WTC were as well coordinated.

Significant shortcomings within the FDNY's command and control capabilities were painfully exposed on September 11. To its great credit, the department has made a substantial effort in the past three years to address these. While significant problems in the command and control of the PAPD also were exposed on September 11, it is less clear that the Port Authority has adopted new training exercises or major incident protocols to address these shortcomings.[207]

**Lack of Coordination among First Responder Agencies.** Any attempt to establish a unified command on 9/11 would have been further frustrated by the lack of communication and coordination among responding agencies. Certainly, the FDNY was not "responsible for the management of the City's response to the emergency," as the Mayor's directive would have required. The command posts were in different locations, and OEM headquarters, which could have served as a focal point for information sharing, did not play an integrating role in ensuring that information was shared among agencies on 9/11, even prior to its evacuation. There was a lack of comprehensive coordination between FDNY, NYPD, and PAPD personnel climbing above the ground floors in the Twin Towers.

Information that was critical to informed decisionmaking was not shared among agencies. FDNY chiefs in leadership roles that morning have told us that their decision making capability was hampered by a lack of information from NYPD aviation. At 9:51 A.M., a helicopter pilot cautioned that "large pieces" of the South Tower appeared to be about to fall and could pose a danger to those below. Immediately after the tower's collapse, a helicopter pilot radioed that news. This transmission was followed by communications at 10:08, 10:15, and 10:22 that called into question the condition of the North Tower. The FDNY chiefs would have benefited greatly had they been able to communicate with personnel in a helicopter.

The consequence of the lack of real-time intelligence from NYPD aviation should not be overstated. Contrary to a widely held misperception, no NYPD helicopter predicted the fall of either tower before the South Tower collapsed, and no NYPD personnel began to evacuate the WTC complex prior to that time. Furthermore, the FDNY, as an institution, was in possession of the knowledge that the South Tower had collapsed as early as the NYPD, as its fall had been immediately reported by an FDNY boat on a dispatch channel. Because of internal breakdowns within the department, however, this information was not disseminated to FDNY personnel on the scene.

The FDNY, PAPD, and NYPD did not coordinate their units that were searching the WTC complex for civilians. In many cases, redundant searches of specific floors and areas were conducted. It is unclear whether fewer first responders in the aggregate would have been in the Twin Towers if there had been an integrated response, or what impact, if any, redundant searches had on the total number of first responder fatalities.

Whether the lack of coordination between the FDNY and NYPD on September 11 had a catastrophic effect has been the subject of controversy. We believe that there are too many variables for us to responsibly quantify those consequences. It is clear that the lack of coordination did not affect adversely the evacuation of civilians. It is equally clear, however, that the Incident Command System did not function to integrate awareness among agencies or to facilitate interagency response.[208]

If New York and other major cities are to be prepared for future terrorist

attacks, different first responder agencies within each city must be fully coordinated, just as different branches of the U.S. military are. Coordination entails a unified command that comprehensively deploys all dispatched police, fire, and other first responder resources.

In May 2004, New York City adopted an emergency response plan that expressly contemplates two or more agencies jointly being lead agency when responding to a terrorist attack but does not mandate a comprehensive and unified incident command that can deploy and monitor all first responder resources from one overall command post. In our judgment, this falls short of an optimal response plan, which requires clear command and control, common training, and the trust that such training creates. The experience of the military suggests that integrated into such a coordinated response should be a unified field intelligence unit, which should receive and combine information from all first responders—including 911 operators. Such a field intelligence unit could be valuable in large and complex incidents.

**Radio Communication Challenges: The Effectiveness and Urgency of Evacuation Instructions.** As discussed above, the location of the NYPD ESU command post was crucial in making possible an urgent evacuation order explaining the South Tower's full collapse. Firefighters most certainly would have benefited from that information.

A separate matter is the varied success at conveying evacuation instructions to personnel in the North Tower after the South Tower's collapse. The success of NYPD ESU instruction is attributable to a combination of (1) the strength of the radios, (2) the relatively small numbers of individuals using them, and (3) use of the correct channel by all.

The same three factors worked against successful communication among FDNY personnel. First, the radios' effectiveness was drastically reduced in the high-rise environment. Second, tactical channel 1 was simply overwhelmed by the number of units attempting to communicate on it at 10:00. Third, some firefighters were on the wrong channel or simply lacked radios altogether.

It is impossible to know what difference it made that units in the North Tower were not using the repeater channel after 10:00. While the repeater channel was at least partially operational before the South Tower collapsed, we do not know whether it continued to be operational after 9:59.

Even without the repeater channel, *at least* 24 of the *at most* 32 companies who were dispatched to and actually in the North Tower received the evacuation instruction—either via radio or directly from other first responders. Nevertheless, many of these firefighters died, either because they delayed their evacuation to assist civilians, attempted to regroup their units, lacked urgency, or some combination of these factors. In addition, many other firefighters not dispatched to the North Tower also died in its collapse. Some had their radios on the wrong channel. Others were off-duty and lacked radios. In view of these

considerations, we conclude that the technical failure of FDNY radios, while a contributing factor, was not the primary cause of the many firefighter fatalities in the North Tower.[209]

The FDNY has worked hard in the past several years to address its radio deficiencies. To improve radio capability in high-rises, the FDNY has internally developed a "post radio" that is small enough for a battalion chief to carry to the upper floors and that greatly repeats and enhances radio signal strength.[210]

The story with respect to Port Authority police officers in the North Tower is less complicated; most of them lacked access to the radio channel on which the Port Authority police evacuation order was given. Since September 11, the Port Authority has worked hard to integrate the radio systems of their different commands.

.   .   .

THE LESSON OF 9/11 for civilians and first responders can be stated simply: in the new age of terror, they—we—are the primary targets. The losses America suffered that day demonstrated both the gravity of the terrorist threat and the commensurate need to prepare ourselves to meet it.

The first responders of today live in a world transformed by the attacks on 9/11. Because no one believes that every conceivable form of attack can be prevented, civilians and first responders will again find themselves on the front lines. We must plan for that eventuality. A rededication to preparedness is perhaps the best way to honor the memories of those we lost that day.

# 10

# WARTIME

AFTER THE ATTACKS had occurred, while crisis managers were still sorting out a number of unnerving false alarms, Air Force One flew to Barksdale Air Force Base in Louisiana. One of these alarms was of a reported threat against Air Force One itself, a threat eventually run down to a misunderstood communication in the hectic White House Situation Room that morning.[1]

While the plan at the elementary school had been to return to Washington, by the time Air Force One was airborne at 9:55 A.M. the Secret Service, the President's advisers, and Vice President Cheney were strongly advising against it. President Bush reluctantly acceded to this advice and, at about 10:10, Air Force One changed course and began heading due west. The immediate objective was to find a safe location—not too far away—where the President could land and speak to the American people. The Secret Service was also interested in refueling the aircraft and paring down the size of the traveling party. The President's military aide, an Air Force officer, quickly researched the options and, sometime around 10:20, identified Barksdale Air Force Base as an appropriate interim destination.[2]

When Air Force One landed at Barksdale at about 11:45, personnel from the local Secret Service office were still en route to the airfield. The motorcade consisted of a military police lead vehicle and a van; the proposed briefing theater had no phones or electrical outlets. Staff scrambled to prepare another room for the President's remarks, while the lead Secret Service agent reviewed the security situation with superiors in Washington. The President completed his statement, which for security reasons was taped and not broadcast live, and the traveling party returned to Air Force One. The next destination was discussed: once again the Secret Service recommended against returning to Washington, and the Vice President agreed. Offutt Air Force Base in Nebraska was chosen because of its elaborate command and control facilities, and because it could accommodate overnight lodging for 50 persons. The Secret Service wanted a place where the President could spend several days, if necessary.[3]

Air Force One arrived at Offutt at 2:50 P.M. At about 3:15, President Bush met with his principal advisers through a secure video teleconference.[4] Rice said President Bush began the meeting with the words, "We're at war,"[5] and that Director of Central Intelligence George Tenet said the agency was still assessing who was responsible, but the early signs all pointed to al Qaeda.[6] That evening the Deputies Committee returned to the pending presidential directive they had labored over during the summer.[7]

The secretary of defense directed the nation's armed forces to Defense Condition 3, an increased state of military readiness.[8] For the first time in history, all nonemergency civilian aircraft in the United States were grounded, stranding tens of thousands of passengers across the country. Contingency plans for the continuity of government and the evacuation of leaders had been implemented.[9] The Pentagon had been struck; the White House or the Capitol had narrowly escaped direct attack. Extraordinary security precautions were put in place at the nation's borders and ports.

In the late afternoon, the President overruled his aides' continuing reluctance to have him return to Washington and ordered Air Force One back to Andrews Air Force Base. He was flown by helicopter back to the White House, passing over the still-smoldering Pentagon. At 8:30 that evening, President Bush addressed the nation from the White House. After emphasizing that the first priority was to help the injured and protect against any further attacks, he said: "We will make no distinction between the terrorists who committed these acts and those who harbor them." He quoted Psalm 23—"though I walk through the valley of the shadow of death . . ." No American, he said, "will ever forget this day."[10]

Following his speech, President Bush met again with his National Security Council (NSC), expanded to include Secretary of Transportation Norman Mineta and Joseph Allbaugh, the director of the Federal Emergency Management Agency. Secretary of State Colin Powell, who had returned from Peru after hearing of the attacks, joined the discussion. They reviewed the day's events.[11]

## 10.1 IMMEDIATE RESPONSES AT HOME

As the urgent domestic issues accumulated, White House Deputy Chief of Staff Joshua Bolten chaired a temporary "domestic consequences" group.[12] The agenda in those first days is worth noting, partly as a checklist for future crisis planners. It began with problems of how to help victims and stanch the flowing losses to the American economy, such as

- Organizing federal emergency assistance. One question was what kind of public health advice to give about the air quality in Lower Manhattan in the vicinity of the fallen buildings.[13]

- Compensating victims. They evaluated legislative options, eventually setting up a federal compensation fund and defining the powers of a special master to run it.
- Determining federal assistance. On September 13, President Bush promised to provide $20 billion for New York City, in addition to the $20 billion his budget director had already guessed might be needed for the country as a whole.[14]
- Restoring civil aviation. On the morning of September 13, the national airspace reopened for use by airports that met newly improvised security standards.
- Reopening the financial markets. After extraordinary emergency efforts involving the White House, the Treasury Department, and the Securities and Exchange Commission, aided by unprecedented cooperation among the usually competitive firms of the financial industry, the markets reopened on Monday, September 17.[15]
- Deciding when and how to return border and port security to more normal operations.
- Evaluating legislative proposals to bail out the airline industry and cap its liability.

The very process of reviewing these issues underscored the absence of an effective government organization dedicated to assessing vulnerabilities and handling problems of protection and preparedness. Though a number of agencies had some part of the task, none had security as its primary mission.

By September 14, Vice President Cheney had decided to recommend, at least as a first step, a new White House entity to coordinate all the relevant agencies rather than tackle the challenge of combining them in a new department. This new White House entity would be a homeland security adviser and Homeland Security Council—paralleling the National Security Council system. Vice President Cheney reviewed the proposal with President Bush and other advisers. President Bush announced the new post and its first occupant—Pennsylvania governor Tom Ridge—in his address to a joint session of Congress on September 20.[16]

Beginning on September 11, Immigration and Naturalization Service agents working in cooperation with the FBI began arresting individuals for immigration violations whom they encountered while following up leads in the FBI's investigation of the 9/11 attacks. Eventually, 768 aliens were arrested as "special interest" detainees. Some (such as Zacarias Moussaoui) were actually in INS custody before 9/11; most were arrested after. Attorney General John Ashcroft told us that he saw his job in directing this effort as "risk minimization," both to find out who had committed the attacks and to prevent a subsequent attack. Ashcroft ordered all special interest immigration hearings closed to the public, family members, and press; directed government attorneys

to seek denial of bond until such time as they were "cleared" of terrorist connections by the FBI and other agencies; and ordered the identity of the detainees kept secret. INS attorneys charged with prosecuting the immigration violations had trouble getting information about the detainees and any terrorist connections; in the chaos after the attacks, it was very difficult to reach law enforcement officials, who were following up on other leads. The clearance process approved by the Justice Department was time-consuming, lasting an average of about 80 days.[17]

We have assessed this effort to detain aliens of "special interest." The detainees were lawfully held on immigration charges. Records indicate that 531 were deported, 162 were released on bond, 24 received some kind of immigration benefits, 12 had their proceedings terminated, and 8—one of whom was Moussaoui—were remanded to the custody of the U.S. Marshals Service. The inspector general of the Justice Department found significant problems in the way the 9/11 detainees were treated.[18] In response to a request about the counterterrorism benefits of the 9/11 detainee program, the Justice Department cited six individuals on the special interest detainee list, noting that two (including Moussaoui) were linked directly to a terrorist organization and that it had obtained new leads helpful to the investigation of the 9/11 terrorist attacks.[19] A senior al Qaeda detainee has stated that U.S. government efforts after the 9/11 attacks to monitor the American homeland, including review of Muslims' immigration files and deportation of nonpermanent residents, forced al Qaeda to operate less freely in the United States.[20]

The government's ability to collect intelligence inside the United States, and the sharing of such information between the intelligence and law enforcement communities, was not a priority before 9/11. Guidelines on this subject issued in August 2001 by Deputy Attorney General Larry Thompson essentially recapitulated prior guidance. However, the attacks of 9/11 changed everything. Less than one week after September 11, an early version of what was to become the Patriot Act (officially, the USA PATRIOT Act) began to take shape.[21] A central provision of the proposal was the removal of "the wall" on information sharing between the intelligence and law enforcement communities (discussed in chapter 3). Ashcroft told us he was determined to take every conceivable action, within the limits of the Constitution, to identify potential terrorists and deter additional attacks.[22] The administration developed a proposal that eventually passed both houses of Congress by large majorities and was signed into law on October 26.[23]

**Flights of Saudi Nationals Leaving the United States**

Three questions have arisen with respect to the departure of Saudi nationals from the United States in the immediate aftermath of 9/11: (1) Did any flights of Saudi nationals take place before national airspace reopened on September 13, 2001? (2) Was there any political intervention to facilitate the departure of Saudi nationals? (3) Did the FBI screen Saudi nationals thoroughly before their departure?

First, we found no evidence that any flights of Saudi nationals, domestic or international, took place before the reopening of national airspace on the morning of September 13, 2001.[24] To the contrary, every flight we have identified occurred after national airspace reopened.[25]

Second, we found no evidence of political intervention. We found no evidence that anyone at the White House above the level of Richard Clarke participated in a decision on the departure of Saudi nationals. The issue came up in one of the many video teleconferences of the interagency group Clarke chaired, and Clarke said he approved of how the FBI was dealing with the matter when it came up for interagency discussion at his level. Clarke told us, "I asked the FBI, Dale Watson . . . to handle that, to check to see if that was all right with them, to see if they wanted access to any of these people, and to get back to me. And if they had no objections, it would be fine with me." Clarke added, "I have no recollection of clearing it with anybody at the White House."[26]

Although White House Chief of Staff Andrew Card remembered someone telling him about the Saudi request shortly after 9/11, he said he had not talked to the Saudis and did not ask anyone to do anything about it. The President and Vice President told us they were not aware of the issue at all until it surfaced much later in the media. None of the officials we interviewed recalled any intervention or direction on this matter from any political appointee.[27]

Third, we believe that the FBI conducted a satisfactory screening of Saudi nationals who left the United States on charter flights.[28] The Saudi government was advised of and agreed to the FBI's requirements that passengers be identified and checked against various databases before the flights departed.[29] The Federal Aviation Administration representative working in the FBI operations center made sure that the

FBI was aware of the flights of Saudi nationals and was able to screen the passengers before they were allowed to depart.[30]

The FBI interviewed all persons of interest on these flights prior to their departures. They concluded that none of the passengers was connected to the 9/11 attacks and have since found no evidence to change that conclusion. Our own independent review of the Saudi nationals involved confirms that no one with known links to terrorism departed on these flights.[31]

## 10.2 PLANNING FOR WAR

By late in the evening of September 11, the President had addressed the nation on the terrible events of the day. Vice President Cheney described the President's mood as somber.[32] The long day was not yet over. When the larger meeting that included his domestic department heads broke up, President Bush chaired a smaller meeting of top advisers, a group he would later call his "war council."[33] This group usually included Vice President Cheney, Secretary of State Powell, Secretary of Defense Donald Rumsfeld, General Hugh Shelton, Vice Chairman of the Joint Chiefs (later to become chairman) General Myers, DCI Tenet, Attorney General Ashcroft, and FBI Director Robert Mueller. From the White House staff, National Security Advisor Condoleezza Rice and Chief of Staff Card were part of the core group, often joined by their deputies, Stephen Hadley and Joshua Bolten.

In this restricted National Security Council meeting, the President said it was a time for self-defense. The United States would punish not just the perpetrators of the attacks, but also those who harbored them. Secretary Powell said the United States had to make it clear to Pakistan, Afghanistan, and the Arab states that the time to act was now. He said we would need to build a coalition. The President noted that the attacks provided a great opportunity to engage Russia and China. Secretary Rumsfeld urged the President and the principals to think broadly about who might have harbored the attackers, including Iraq, Afghanistan, Libya, Sudan, and Iran. He wondered aloud how much evidence the United States would need in order to deal with these countries, pointing out that major strikes could take up to 60 days to assemble.[34]

President Bush chaired two more meetings of the NSC on September 12. In the first meeting, he stressed that the United States was at war with a new and different kind of enemy. The President tasked principals to go beyond their pre-9/11 work and develop a strategy to eliminate terrorists and punish those who support them. As they worked on defining the goals and objectives of the upcoming campaign, they considered a paper that went beyond al Qaeda to

propose the "elimination of terrorism as a threat to our way of life," an aim that would include pursuing other international terrorist organizations in the Middle East.[35]

Rice chaired a Principals Committee meeting on September 13 in the Situation Room to refine how the fight against al Qaeda would be conducted. The principals agreed that the overall message should be that anyone supporting al Qaeda would risk harm. The United States would need to integrate diplomacy, financial measures, intelligence, and military actions into an overarching strategy. The principals also focused on Pakistan and what it could do to turn the Taliban against al Qaeda. They concluded that if Pakistan decided not to help the United States, it too would be at risk.[36]

The same day, Deputy Secretary of State Richard Armitage met with the Pakistani ambassador to the United States, Maleeha Lodhi, and the visiting head of Pakistan's military intelligence service, Mahmud Ahmed. Armitage said that the United States wanted Pakistan to take seven steps:

- to stop al Qaeda operatives at its border and end all logistical support for Bin Ladin;
- to give the United States blanket overflight and landing rights for all necessary military and intelligence operations;
- to provide territorial access to U.S. and allied military intelligence and other personnel to conduct operations against al Qaeda;
- to provide the United States with intelligence information;
- to continue to publicly condemn the terrorist acts;
- to cut off all shipments of fuel to the Taliban and stop recruits from going to Afghanistan; and,
- if the evidence implicated bin Ladin and al Qaeda and the Taliban continued to harbor them, to break relations with the Taliban government.[37]

Pakistan made its decision swiftly. That afternoon, Secretary of State Powell announced at the beginning of an NSC meeting that Pakistani President Musharraf had agreed to every U.S. request for support in the war on terrorism. The next day, the U.S. embassy in Islamabad confirmed that Musharraf and his top military commanders had agreed to all seven demands. "Pakistan will need full US support as it proceeds with us," the embassy noted. "Musharraf said the GOP [government of Pakistan] was making substantial concessions in allowing use of its territory and that he would pay a domestic price. His standing in Pakistan was certain to suffer. To counterbalance that he needed to show that Pakistan was benefiting from his decisions."[38]

At the September 13 NSC meeting, when Secretary Powell described Pakistan's reply, President Bush led a discussion of an appropriate ultimatum to the Taliban. He also ordered Secretary Rumsfeld to develop a military plan against

the Taliban. The President wanted the United States to strike the Taliban, step back, wait to see if they got the message, and hit them hard if they did not. He made clear that the military should focus on targets that would influence the Taliban's behavior.[39]

President Bush also tasked the State Department, which on the following day delivered to the White House a paper titled "Game Plan for a Political-Military Strategy for Pakistan and Afghanistan." The paper took it as a given that Bin Ladin would continue to act against the United States even while under Taliban control. It therefore detailed specific U.S. demands for the Taliban: surrender Bin Ladin and his chief lieutenants, including Ayman al Zawahiri; tell the United States what the Taliban knew about al Qaeda and its operations; close all terrorist camps; free all imprisoned foreigners; and comply with all UN Security Council resolutions.[40]

The State Department proposed delivering an ultimatum to the Taliban: produce Bin Ladin and his deputies and shut down al Qaeda camps within 24 to 48 hours, or the United States will use all necessary means to destroy the terrorist infrastructure. The State Department did not expect the Taliban to comply. Therefore, State and Defense would plan to build an international coalition to go into Afghanistan. Both departments would consult with NATO and other allies and request intelligence, basing, and other support from countries, according to their capabilities and resources. Finally, the plan detailed a public U.S. stance: America would use all its resources to eliminate terrorism as a threat, punish those responsible for the 9/11 attacks, hold states and other actors responsible for providing sanctuary to terrorists, work with a coalition to eliminate terrorist groups and networks, and avoid malice toward any people, religion, or culture.[41]

President Bush recalled that he quickly realized that the administration would have to invade Afghanistan with ground troops.[42] But the early briefings to the President and Secretary Rumsfeld on military options were disappointing.[43] Tommy Franks, the commanding general of Central Command (CENTCOM), told us that the President was dissatisfied. The U.S. military, Franks said, did not have an off-the-shelf plan to eliminate the al Qaeda threat in Afghanistan. The existing Infinite Resolve options did not, in his view, amount to such a plan.[44]

All these diplomatic and military plans were reviewed over the weekend of September 15–16, as President Bush convened his war council at Camp David.[45] Present were Vice President Cheney, Rice, Hadley, Powell, Armitage, Rumsfeld, Ashcroft, Mueller, Tenet, Deputy Secretary of Defense Paul Wolfowitz, and Cofer Black, chief of the DCI's Counterterrorist Center.

Tenet described a plan for collecting intelligence and mounting covert operations. He proposed inserting CIA teams into Afghanistan to work with Afghan warlords who would join the fight against al Qaeda.[46] These CIA teams would act jointly with the military's Special Operations units. President Bush later praised this proposal, saying it had been a turning point in his thinking.[47]

General Shelton briefed the principals on the preliminary plan for Afghanistan that the military had put together. It drew on the Infinite Resolve "phased campaign" plan the Pentagon had begun developing in November 2000 as an addition to the strike options it had been refining since 1998. But Shelton added a new element—the possible significant use of ground forces—and that is where President Bush reportedly focused his attention.[48]

After hearing from his senior advisers, President Bush discussed with Rice the contents of the directives he would issue to set all the plans into motion. Rice prepared a paper that President Bush then considered with principals on Monday morning, September 17. "The purpose of this meeting," he recalled saying, "is to assign tasks for the first wave of the war against terrorism. It starts today."[49]

In a written set of instructions slightly refined during the morning meeting, President Bush charged Ashcroft, Mueller, and Tenet to develop a plan for homeland defense. President Bush directed Secretary of State Powell to deliver an ultimatum to the Taliban along the lines that his department had originally proposed. The State Department was also tasked to develop a plan to stabilize Pakistan and to be prepared to notify Russia and countries near Afghanistan when hostilities were imminent.[50]

In addition, Bush and his advisers discussed new legal authorities for covert action in Afghanistan, including the administration's first Memorandum of Notification on Bin Ladin. Shortly thereafter, President Bush authorized broad new authorities for the CIA.[51]

President Bush instructed Rumsfeld and Shelton to develop further the Camp David military plan to attack the Taliban and al Qaeda if the Taliban rejected the ultimatum. The President also tasked Rumsfeld to ensure that robust measures to protect American military forces against terrorist attack were implemented worldwide. Finally, he directed Treasury Secretary Paul O'Neill to craft a plan to target al Qaeda's funding and seize its assets.[52] NSC staff members had begun leading meetings on terrorist fund-raising by September 18.[53]

Also by September 18, Powell had contacted 58 of his foreign counterparts and received offers of general aid, search-and-rescue equipment and personnel, and medical assistance teams.[54] On the same day, Deputy Secretary of State Armitage was called by Mahmud Ahmed regarding a two-day visit to Afghanistan during which the Pakistani intelligence chief had met with Mullah Omar and conveyed the U.S. demands. Omar's response was "not negative on all these points."[55] But the administration knew that the Taliban was unlikely to turn over Bin Ladin.[56]

The pre-9/11 draft presidential directive on al Qaeda evolved into a new directive, National Security Presidential Directive 9, now titled "Defeating the Terrorist Threat to the United States." The directive would now extend to a global war on terrorism, not just on al Qaeda. It also incorporated the President's determination not to distinguish between terrorists and those who harbor them. It included a determination to use military force if necessary to end

al Qaeda's sanctuary in Afghanistan. The new directive—formally signed on October 25, after the fighting in Afghanistan had already begun—included new material followed by annexes discussing each targeted terrorist group. The old draft directive on al Qaeda became, in effect, the first annex.[57] The United States would strive to eliminate all terrorist networks, dry up their financial support, and prevent them from acquiring weapons of mass destruction. The goal was the "elimination of terrorism as a threat to our way of life."[58]

## 10.3 "PHASE TWO" AND THE QUESTION OF IRAQ

President Bush had wondered immediately after the attack whether Saddam Hussein's regime might have had a hand in it. Iraq had been an enemy of the United States for 11 years, and was the only place in the world where the United States was engaged in ongoing combat operations. As a former pilot, the President was struck by the apparent sophistication of the operation and some of the piloting, especially Hanjour's high-speed dive into the Pentagon. He told us he recalled Iraqi support for Palestinian suicide terrorists as well. Speculating about other possible states that could be involved, the President told us he also thought about Iran.[59]

Clarke has written that on the evening of September 12, President Bush told him and some of his staff to explore possible Iraqi links to 9/11. "See if Saddam did this," Clarke recalls the President telling them. "See if he's linked in any way."[60] While he believed the details of Clarke's account to be incorrect, President Bush acknowledged that he might well have spoken to Clarke at some point, asking him about Iraq.[61]

Responding to a presidential tasking, Clarke's office sent a memo to Rice on September 18, titled "Survey of Intelligence Information on Any Iraq Involvement in the September 11 Attacks." Rice's chief staffer on Afghanistan, Zalmay Khalilzad, concurred in its conclusion that only some anecdotal evidence linked Iraq to al Qaeda. The memo found no "compelling case" that Iraq had either planned or perpetrated the attacks. It passed along a few foreign intelligence reports, including the Czech report alleging an April 2001 Prague meeting between Atta and an Iraqi intelligence officer (discussed in chapter 7) and a Polish report that personnel at the headquarters of Iraqi intelligence in Baghdad were told before September 11 to go on the streets to gauge crowd reaction to an unspecified event. Arguing that the case for links between Iraq and al Qaeda was weak, the memo pointed out that Bin Ladin resented the secularism of Saddam Hussein's regime. Finally, the memo said, there was no confirmed reporting on Saddam cooperating with Bin Ladin on unconventional weapons.[62]

On the afternoon of 9/11, according to contemporaneous notes, Secretary Rumsfeld instructed General Myers to obtain quickly as much information as

possible. The notes indicate that he also told Myers that he was not simply interested in striking empty training sites. He thought the U.S. response should consider a wide range of options and possibilities. The secretary said his instinct was to hit Saddam Hussein at the same time—not only Bin Ladin. Secretary Rumsfeld later explained that at the time, he had been considering either one of them, or perhaps someone else, as the responsible party.[63]

According to Rice, the issue of what, if anything, to do about Iraq was really engaged at Camp David. Briefing papers on Iraq, along with many others, were in briefing materials for the participants. Rice told us the administration was concerned that Iraq would take advantage of the 9/11 attacks. She recalled that in the first Camp David session chaired by the President, Rumsfeld asked what the administration should do about Iraq. Deputy Secretary Wolfowitz made the case for striking Iraq during "this round" of the war on terrorism.[64]

A Defense Department paper for the Camp David briefing book on the strategic concept for the war on terrorism specified three priority targets for initial action: al Qaeda, the Taliban, and Iraq. It argued that of the three, al Qaeda and Iraq posed a strategic threat to the United States. Iraq's long-standing involvement in terrorism was cited, along with its interest in weapons of mass destruction.[65]

Secretary Powell recalled that Wolfowitz—not Rumsfeld—argued that Iraq was ultimately the source of the terrorist problem and should therefore be attacked.[66] Powell said that Wolfowitz was not able to justify his belief that Iraq was behind 9/11. "Paul was always of the view that Iraq was a problem that had to be dealt with," Powell told us. "And he saw this as one way of using this event as a way to deal with the Iraq problem." Powell said that President Bush did not give Wolfowitz's argument "much weight."[67] Though continuing to worry about Iraq in the following week, Powell said, President Bush saw Afghanistan as the priority.[68]

President Bush told Bob Woodward that the decision not to invade Iraq was made at the morning session on September 15. Iraq was not even on the table during the September 15 afternoon session, which dealt solely with Afghanistan.[69] Rice said that when President Bush called her on Sunday, September 16, he said the focus would be on Afghanistan, although he still wanted plans for Iraq should the country take some action or the administration eventually determine that it had been involved in the 9/11 attacks.[70]

At the September 17 NSC meeting, there was some further discussion of "phase two" of the war on terrorism.[71] President Bush ordered the Defense Department to be ready to deal with Iraq if Baghdad acted against U.S. interests, with plans to include possibly occupying Iraqi oil fields.[72]

Within the Pentagon, Deputy Secretary Wolfowitz continued to press the case for dealing with Iraq. Writing to Rumsfeld on September 17 in a memo headlined "Preventing More Events," he argued that if there was even a 10 percent chance that Saddam Hussein was behind the 9/11 attack, maximum pri-

ority should be placed on eliminating that threat. Wolfowitz contended that the odds were "far more" than 1 in 10, citing Saddam's praise for the attack, his long record of involvement in terrorism, and theories that Ramzi Yousef was an Iraqi agent and Iraq was behind the 1993 attack on the World Trade Center.[73] The next day, Wolfowitz renewed the argument, writing to Rumsfeld about the interest of Yousef's co-conspirator in the 1995 Manila air plot in crashing an explosives-laden plane into CIA headquarters, and about information from a foreign government regarding Iraqis' involvement in the attempted hijacking of a Gulf Air flight. Given this background, he wondered why so little thought had been devoted to the danger of suicide pilots, seeing a "failure of imagination" and a mind-set that dismissed possibilities.[74]

On September 19, Rumsfeld offered several thoughts for his commanders as they worked on their contingency plans. Though he emphasized the worldwide nature of the conflict, the references to specific enemies or regions named only the Taliban, al Qaeda, and Afghanistan.[75] Shelton told us the administration reviewed all the Pentagon's war plans and challenged certain assumptions underlying them, as any prudent organization or leader should do.[76]

General Tommy Franks, the commanding general of Central Command, recalled receiving Rumsfeld's guidance that each regional commander should assess what these plans meant for his area of responsibility. He knew he would soon be striking the Taliban and al Qaeda in Afghanistan. But, he told us, he now wondered how that action was connected to what might need to be done in Somalia, Yemen, or Iraq.[77]

On September 20, President Bush met with British Prime Minister Tony Blair, and the two leaders discussed the global conflict ahead. When Blair asked about Iraq, the President replied that Iraq was not the immediate problem. Some members of his administration, he commented, had expressed a different view, but he was the one responsible for making the decisions.[78]

Franks told us that he was pushing independently to do more robust planning on military responses in Iraq during the summer before 9/11—a request President Bush denied, arguing that the time was not right. (CENTCOM also began dusting off plans for a full invasion of Iraq during this period, Franks said.) The CENTCOM commander told us he renewed his appeal for further military planning to respond to Iraqi moves shortly after 9/11, both because he personally felt that Iraq and al Qaeda might be engaged in some form of collusion and because he worried that Saddam might take advantage of the attacks to move against his internal enemies in the northern or southern parts of Iraq, where the United States was flying regular missions to enforce Iraqi no-fly zones. Franks said that President Bush again turned down the request.[79]

. . .

HAVING ISSUED DIRECTIVES to guide his administration's preparations for war, on Thursday, September 20, President Bush addressed the nation before a joint session of Congress. "Tonight," he said, "we are a country awakened to

danger."[80] The President blamed al Qaeda for 9/11 and the 1998 embassy bombings and, for the first time, declared that al Qaeda was "responsible for bombing the USS *Cole*."[81] He reiterated the ultimatum that had already been conveyed privately. "The Taliban must act, and act immediately," he said. "They will hand over the terrorists, or they will share in their fate."[82] The President added that America's quarrel was not with Islam: "The enemy of America is not our many Muslim friends; it is not our many Arab friends. Our enemy is a radical network of terrorists, and every government that supports them." Other regimes faced hard choices, he pointed out: "Every nation, in every region, now has a decision to make: Either you are with us, or you are with the terrorists."[83]

President Bush argued that the new war went beyond Bin Ladin. "Our war on terror begins with al Qaeda, but it does not end there," he said. "It will not end until every terrorist group of global reach has been found, stopped, and defeated." The President had a message for the Pentagon: "The hour is coming when America will act, and you will make us proud." He also had a message for those outside the United States. "This is civilization's fight," he said. "We ask every nation to join us."[84]

President Bush approved military plans to attack Afghanistan in meetings with Central Command's General Franks and other advisers on September 21 and October 2. Originally titled "Infinite Justice," the operation's code word was changed—to avoid the sensibilities of Muslims who associate the power of infinite justice with God alone—to the operational name still used for operations in Afghanistan: "Enduring Freedom."[85]

The plan had four phases.

- In *Phase One,* the United States and its allies would move forces into the region and arrange to operate from or over neighboring countries such as Uzbekistan and Pakistan. This occurred in the weeks following 9/11, aided by overwhelming international sympathy for the United States.
- In *Phase Two*, air strikes and Special Operations attacks would hit key al Qaeda and Taliban targets. In an innovative joint effort, CIA and Special Operations forces would be deployed to work together with each major Afghan faction opposed to the Taliban. The Phase Two strikes and raids began on October 7. The basing arrangements contemplated for Phase One were substantially secured—after arduous effort—by the end of that month.
- In *Phase Three*, the United States would carry out "decisive operations" using all elements of national power, including ground troops, to topple the Taliban regime and eliminate al Qaeda's sanctuary in Afghanistan. Mazar-e-Sharif, in northern Afghanistan, fell to a coalition assault by Afghan and U.S. forces on November 9. Four days later the Taliban had fled from Kabul. By early December, all major cities

had fallen to the coalition. On December 22, Hamid Karzai, a Pashtun leader from Kandahar, was installed as the chairman of Afghanistan's interim administration. Afghanistan had been liberated from the rule of the Taliban.

In December 2001, Afghan forces, with limited U.S. support, engaged al Qaeda elements in a cave complex called Tora Bora. In March 2002, the largest engagement of the war was fought, in the mountainous Shah-i-Kot area south of Gardez, against a large force of al Qaeda jihadists. The three-week battle was substantially successful, and almost all remaining al Qaeda forces took refuge in Pakistan's equally mountainous and lightly governed frontier provinces. As of July 2004, Bin Ladin and Zawahiri are still believed to be at large.

- In *Phase Four*, civilian and military operations turned to the indefinite task of what the armed forces call "security and stability operations."

Within about two months of the start of combat operations, several hundred CIA operatives and Special Forces soldiers, backed by the striking power of U.S. aircraft and a much larger infrastructure of intelligence and support efforts, had combined with Afghan militias and a small number of other coalition soldiers to destroy the Taliban regime and disrupt al Qaeda. They had killed or captured about a quarter of the enemy's known leaders. Mohammed Atef, al Qaeda's military commander and a principal figure in the 9/11 plot, had been killed by a U.S. air strike. According to a senior CIA officer who helped devise the overall strategy, the CIA provided intelligence, experience, cash, covert action capabilities, and entrée to tribal allies. In turn, the U.S. military offered combat expertise, firepower, logistics, and communications.[86] With these initial victories won by the middle of 2002, the global conflict against Islamist terrorism became a different kind of struggle.

# 11
# FORESIGHT—AND HINDSIGHT

In composing this narrative, we have tried to remember that we write with the benefit and the handicap of hindsight. Hindsight can sometimes see the past clearly—with 20/20 vision. But the path of what happened is so brightly lit that it places everything else more deeply into shadow. Commenting on Pearl Harbor, Roberta Wohlstetter found it "much easier *after* the event to sort the relevant from the irrelevant signals. After the event, of course, a signal is always crystal clear; we can now see what disaster it was signaling since the disaster has occurred. But before the event it is obscure and pregnant with conflicting meanings."[1]

As time passes, more documents become available, and the bare facts of what happened become still clearer. Yet the picture of *how* those things happened becomes harder to reimagine, as that past world, with its preoccupations and uncertainty, recedes and the remaining memories of it become colored by what happened and what was written about it later. With that caution in mind, we asked ourselves, before we judged others, whether the insights that seem apparent now would really have been meaningful at the time, given the limits of what people then could reasonably have known or done.

We believe the 9/11 attacks revealed four kinds of failures: in imagination, policy, capabilities, and management.

## 11.1 IMAGINATION

### Historical Perspective
The 9/11 attack was an event of surpassing disproportion. America had suffered surprise attacks before—Pearl Harbor is one well-known case, the 1950 Chinese attack in Korea another. But these were attacks by major powers.

While by no means as threatening as Japan's act of war, the 9/11 attack was in some ways more devastating. It was carried out by a tiny group of people,

not enough to man a full platoon. Measured on a governmental scale, the resources behind it were trivial. The group itself was dispatched by an organization based in one of the poorest, most remote, and least industrialized countries on earth. This organization recruited a mixture of young fanatics and highly educated zealots who could not find suitable places in their home societies or were driven from them.

To understand these events, we attempted to reconstruct some of the context of the 1990s. Americans celebrated the end of the Cold War with a mixture of relief and satisfaction. The people of the United States hoped to enjoy a peace dividend, as U.S. spending on national security was cut following the end of the Soviet military threat.

The United States emerged into the post–Cold War world as the globe's preeminent military power. But the vacuum created by the sudden demise of the Soviet Union created fresh sources of instability and new challenges for the United States. President George H.W. Bush dealt with the first of these in 1990 and 1991 when he led an international coalition to reverse Iraq's invasion of Kuwait. Other examples of U.S. leaders' handling new threats included the removal of nuclear weapons from Ukraine, Belarus, and Kazakhstan; the Nunn-Lugar threat reduction program to help contain new nuclear dangers; and international involvement in the wars in Bosnia and Kosovo.

America stood out as an object for admiration, envy, and blame. This created a kind of cultural asymmetry. To us, Afghanistan seemed very far away. To members of al Qaeda, America seemed very close. In a sense, they were more globalized than we were.

### Understanding the Danger

If the government's leaders understood the gravity of the threat they faced and understood at the same time that their policies to eliminate it were not likely to succeed any time soon, then history's judgment will be harsh. Did they understand the gravity of the threat?

The U.S. government responded vigorously when the attack was on our soil. Both Ramzi Yousef, who organized the 1993 bombing of the World Trade Center, and Mir Amal Kansi, who in 1993 killed two CIA employees as they waited to go to work in Langley, Virginia, were the objects of relentless, uncompromising, and successful efforts to bring them back to the United States to stand trial for their crimes.

Before 9/11, al Qaeda and its affiliates had killed fewer than 50 Americans, including the East Africa embassy bombings and the *Cole* attack. The U.S. government took the threat seriously, but not in the sense of mustering anything like the kind of effort that would be gathered to confront an enemy of the first, second, or even third rank. The modest national effort exerted to contain Serbia and its depredations in the Balkans between 1995 and 1999, for example, was orders of magnitude larger than that devoted to al Qaeda.

As best we can determine, neither in 2000 nor in the first eight months of 2001 did any polling organization in the United States think the subject of terrorism sufficiently on the minds of the public to warrant asking a question about it in a major national survey. Bin Ladin, al Qaeda, or even terrorism was not an important topic in the 2000 presidential campaign. Congress and the media called little attention to it.

If a president wanted to rally the American people to a warlike effort, he would need to publicize an assessment of the growing al Qaeda danger. Our government could spark a full public discussion of who Usama Bin Ladin was, what kind of organization he led, what Bin Ladin or al Qaeda intended, what past attacks they had sponsored or encouraged, and what capabilities they were bringing together for future assaults. We believe American and international public opinion might have been different—and so might the range of options for a president—had they been informed of these details. Recent examples of such debates include calls to arms against such threats as Serbian ethnic cleansing, biological attacks, Iraqi weapons of mass destruction, global climate change, and the HIV/AIDS epidemic.

While we now know that al Qaeda was formed in 1988, at the end of the Soviet occupation of Afghanistan, the intelligence community did not describe this organization, at least in documents we have seen, until 1999. A National Intelligence Estimate distributed in July 1995 predicted future terrorist attacks against the United States—and *in* the United States. It warned that this danger would increase over the next several years. It specified as particular points of vulnerability the White House, the Capitol, symbols of capitalism such as Wall Street, critical infrastructure such as power grids, areas where people congregate such as sports arenas, and civil aviation generally. It warned that the 1993 World Trade Center bombing had been intended to kill a lot of people, not to achieve any more traditional political goal.

This 1995 estimate described the greatest danger as "transient groupings of individuals" that lacked "strong organization but rather are loose affiliations." They operate "outside traditional circles but have access to a worldwide network of training facilities and safehavens."[2] This was an excellent summary of the emerging danger, based on what was then known.

In 1996–1997, the intelligence community received new information making clear that Bin Ladin headed his own terrorist group, with its own targeting agenda and operational commanders. Also revealed was the previously unknown involvement of Bin Ladin's organization in the 1992 attack on a Yemeni hotel quartering U.S. military personnel, the 1993 shootdown of U.S. Army Black Hawk helicopters in Somalia, and quite possibly the 1995 Riyadh bombing of the American training mission to the Saudi National Guard.

The 1997 update of the 1995 estimate did not discuss the new intelligence. It did state that the terrorist danger depicted in 1995 would persist. In the update's summary of key points, the only reference to Bin Ladin was this sen-

tence: "Iran and its surrogates, as well as terrorist financier Usama Bin Ladin and his followers, have stepped up their threats and surveillance of US facilities abroad in what also may be a portent of possible additional attacks in the United States."[3] Bin Ladin was mentioned in only two other sentences in the six-page report. The al Qaeda organization was not mentioned. The 1997 update was the last national estimate on the terrorism danger completed before 9/11.[4]

From 1998 to 2001, a number of very good analytical papers were distributed on specific topics. These included Bin Ladin's political philosophy, his command of a global network, analysis of information from terrorists captured in Jordan in December 1999, al Qaeda's operational style, and the evolving goals of the Islamist extremist movement. Many classified articles for morning briefings were prepared for the highest officials in the government with titles such as "Bin Ladin Threatening to Attack US Aircraft [with antiaircraft missiles]" (June 1998), "Strains Surface Between Taliban and Bin Ladin" (January 1999), "Terrorist Threat to US Interests in Caucasus" (June 1999), "Bin Ladin to Exploit Looser Security During Holidays" (December 1999), "Bin Ladin Evading Sanctions" (March 2000), "Bin Ladin's Interest in Biological, Radiological Weapons" (February 2001), "Taliban Holding Firm on Bin Ladin for Now" (March 2001), "Terrorist Groups Said Cooperating on US Hostage Plot" (May 2001), and "Bin Ladin Determined to Strike in the US" (August 2001).[5]

Despite such reports and a 1999 paper on Bin Ladin's command structure for al Qaeda, there were no complete portraits of his strategy or of the extent of his organization's involvement in past terrorist attacks. Nor had the intelligence community provided an authoritative depiction of his organization's relationships with other governments, or the scale of the threat his organization posed to the United States.

Though Deputy DCI John McLaughlin said to us that the cumulative output of the Counterterrorist Center (CTC) "dramatically eclipsed" any analysis that could have appeared in a fresh National Intelligence Estimate, he conceded that most of the work of the Center's 30- to 40-person analytic group dealt with collection issues.[6] In late 2000, DCI George Tenet recognized the deficiency of strategic analysis against al Qaeda. To tackle the problem within the CTC he appointed a senior manager, who briefed him in March 2001 on "creating a strategic assessment capability." The CTC established a new strategic assessments branch during July 2001. The decision to add about ten analysts to this effort was seen as a major bureaucratic victory, but the CTC labored to find them. The new chief of this branch reported for duty on September 10, 2001.[7]

Whatever the weaknesses in the CIA's portraiture, both Presidents Bill Clinton and George Bush and their top advisers told us they got the picture—they understood Bin Ladin was a danger. But given the character and pace of their policy efforts, we do not believe they fully understood just how many people

al Qaeda might kill, and how soon it might do it. At some level that is hard to define, we believe the threat had not yet become compelling.

It is hard now to recapture the conventional wisdom before 9/11. For example, a *New York Times* article in April 1999 sought to debunk claims that Bin Ladin was a terrorist leader, with the headline "U.S. Hard Put to Find Proof Bin Laden Directed Attacks."[8] The head of analysis at the CTC until 1999 discounted the alarms about a catastrophic threat as relating only to the danger of chemical, biological, or nuclear attack—and he downplayed even that, writing several months before 9/11: "It would be a mistake to redefine counterterrorism as a task of dealing with 'catastrophic,' 'grand,' or 'super' terrorism, when in fact these labels do not represent most of the terrorism that the United States is likely to face or most of the costs that terrorism imposes on U.S. interests."[9]

Beneath the acknowledgment that Bin Ladin and al Qaeda presented serious dangers, there was uncertainty among senior officials about whether this was just a new and especially venomous version of the ordinary terrorist threat America had lived with for decades, or was radically new, posing a threat beyond any yet experienced. Such differences affect calculations about whether or how to go to war.

Therefore, those government experts who saw Bin Ladin as an unprecedented new danger needed a way to win broad support for their views, or at least spotlight the areas of dispute, and perhaps prompt action across the government. The national estimate has often played this role, and is sometimes controversial for this very reason.[10] Such assessments, which provoke widespread thought and debate, have a major impact on their recipients, often in a wider circle of decisionmakers. The National Intelligence Estimate is noticed in the Congress, for example. But, as we have said, none was produced on terrorism between 1997 and 9/11.

By 2001 the government still needed a decision at the highest level as to whether al Qaeda was or was not "a first order threat," Richard Clarke wrote in his first memo to Condoleezza Rice on January 25, 2001. In his blistering protest about foot-dragging in the Pentagon and at the CIA, sent to Rice just a week before 9/11, he repeated that the "real question" for the principals was "are we serious about dealing with the al Qida threat? . . . Is al Qida a big deal?"

One school of thought, Clarke wrote in this September 4 note, implicitly argued that the terrorist network was a nuisance that killed a score of Americans every 18–24 months. If that view was credited, then current policies might be proportionate. Another school saw al Qaeda as the "point of the spear of radical Islam." But no one forced the argument into the open by calling for a national estimate or a broader discussion of the threat. The issue was never joined as a collective debate by the U.S. government, including the Congress, before 9/11.

We return to the issue of proportion—and imagination. Even Clarke's note

challenging Rice to imagine the day after an attack posits a strike that kills "hundreds" of Americans. He did not write "thousands."

## Institutionalizing Imagination:
## The Case of Aircraft as Weapons

Imagination is not a gift usually associated with bureaucracies. For example, before Pearl Harbor the U.S. government had excellent intelligence that a Japanese attack was coming, especially after peace talks stalemated at the end of November 1941. These were days, one historian notes, of "excruciating uncertainty." The most likely targets were judged to be in Southeast Asia. An attack was coming, "but officials were at a loss to know where the blow would fall or what more might be done to prevent it."[11] In retrospect, available intercepts pointed to Japanese examination of Hawaii as a possible target. But, another historian observes, "in the face of a clear warning, alert measures bowed to routine."[12]

It is therefore crucial to find a way of routinizing, even bureaucratizing, the exercise of imagination. Doing so requires more than finding an expert who can imagine that aircraft could be used as weapons. Indeed, since al Qaeda and other groups had already used suicide vehicles, namely truck bombs, the leap to the use of other vehicles such as boats (the *Cole* attack) or planes is not far-fetched.

Yet these scenarios were slow to work their way into the thinking of aviation security experts. In 1996, as a result of the TWA Flight 800 crash, President Clinton created a commission under Vice President Al Gore to report on shortcomings in aviation security in the United States. The Gore Commission's report, having thoroughly canvassed available expertise in and outside of government, did not mention suicide hijackings or the use of aircraft as weapons. It focused mainly on the danger of placing bombs onto aircraft—the approach of the Manila air plot. The Gore Commission did call attention, however, to lax screening of passengers and what they carried onto planes.

In late 1998, reports came in of a possible al Qaeda plan to hijack a plane. One, a December 4 Presidential Daily Briefing for President Clinton (reprinted in chapter 4), brought the focus back to more traditional hostage taking; it reported Bin Ladin's involvement in planning a hijack operation to free prisoners such as the "Blind Sheikh," Omar Abdel Rahman. Had the contents of this PDB been brought to the attention of a wider group, including key members of Congress, it might have brought much more attention to the need for permanent changes in domestic airport and airline security procedures.[13]

Threat reports also mentioned the possibility of using an aircraft filled with explosives. The most prominent of these mentioned a possible plot to fly an explosives-laden aircraft into a U.S. city. This report, circulated in September 1998, originated from a source who had walked into an American consulate in East Asia. In August of the same year, the intelligence community had received information that a group of Libyans hoped to crash a plane into the

World Trade Center. In neither case could the information be corroborated. In addition, an Algerian group hijacked an airliner in 1994, most likely intending to blow it up over Paris, but possibly to crash it into the Eiffel Tower.[14]

In 1994, a private airplane had crashed onto the south lawn of the White House. In early 1995, Abdul Hakim Murad—Ramzi Yousef's accomplice in the Manila airlines bombing plot—told Philippine authorities that he and Yousef had discussed flying a plane into CIA headquarters.[15]

Clarke had been concerned about the danger posed by aircraft since at least the 1996 Atlanta Olympics. There he had tried to create an air defense plan using assets from the Treasury Department, after the Defense Department declined to contribute resources. The Secret Service continued to work on the problem of airborne threats to the Washington region. In 1998, Clarke chaired an exercise designed to highlight the inadequacy of the solution. This paper exercise involved a scenario in which a group of terrorists commandeered a Learjet on the ground in Atlanta, loaded it with explosives, and flew it toward a target in Washington, D.C. Clarke asked officials from the Pentagon, Federal Aviation Administration (FAA), and Secret Service what they could do about the situation. Officials from the Pentagon said they could scramble aircraft from Langley Air Force Base, but they would need to go to the President for rules of engagement, and there was no mechanism to do so. There was no clear resolution of the problem at the exercise.[16]

In late 1999, a great deal of discussion took place in the media about the crash off the coast of Massachusetts of EgyptAir Flight 990, a Boeing 767. The most plausible explanation that emerged was that one of the pilots had gone berserk, seized the controls, and flown the aircraft into the sea. After the 1999–2000 millennium alerts, when the nation had relaxed, Clarke held a meeting of his Counterterrorism Security Group devoted largely to the possibility of a possible airplane hijacking by al Qaeda.[17]

In his testimony, Clarke commented that he thought that warning about the possibility of a suicide hijacking would have been just one more speculative theory among many, hard to spot since the volume of warnings of "al Qaeda threats and other terrorist threats, was in the tens of thousands—probably hundreds of thousands."[18] Yet the possibility was imaginable, and imagined. In early August 1999, the FAA's Civil Aviation Security intelligence office summarized the Bin Ladin hijacking threat. After a solid recitation of all the information available on this topic, the paper identified a few principal scenarios, one of which was a "suicide hijacking operation." The FAA analysts judged such an operation unlikely, because "it does not offer an opportunity for dialogue to achieve the key goal of obtaining Rahman and other key captive extremists. . . . A suicide hijacking is assessed to be an option of last resort."[19]

Analysts could have shed some light on what kind of "opportunity for dialogue" al Qaeda desired.[20] The CIA did not write any analytical assessments of possible hijacking scenarios.

One prescient pre-9/11 analysis of an aircraft plot was written by a Justice Department trial attorney. The attorney had taken an interest, apparently on his own initiative, in the legal issues that would be involved in shooting down a U.S. aircraft in such a situation.[21]

The North American Aerospace Defense Command imagined the possible use of aircraft as weapons, too, and developed exercises to counter such a threat—from planes coming to the United States from overseas, perhaps carrying a weapon of mass destruction. None of this speculation was based on actual intelligence of such a threat. One idea, intended to test command and control plans and NORAD's readiness, postulated a hijacked airliner coming from overseas and crashing into the Pentagon. The idea was put aside in the early planning of the exercise as too much of a distraction from the main focus (war in Korea), and as too unrealistic. As we pointed out in chapter 1, the military planners assumed that since such aircraft would be coming from overseas; they would have time to identify the target and scramble interceptors.[22]

We can therefore establish that at least some government agencies were concerned about the hijacking danger and had speculated about various scenarios. The challenge was to flesh out and test those scenarios, then figure out a way to turn a scenario into constructive action.

Since the Pearl Harbor attack of 1941, the intelligence community has devoted generations of effort to understanding the problem of forestalling a surprise attack. Rigorous analytic methods were developed, focused in particular on the Soviet Union, and several leading practitioners within the intelligence community discussed them with us. These methods have been articulated in many ways, but almost all seem to have at least four elements in common: (1) think about how surprise attacks might be launched; (2) identify telltale indicators connected to the most dangerous possibilities; (3) where feasible, collect intelligence on these indicators; and (4) adopt defenses to deflect the most dangerous possibilities or at least trigger an earlier warning.

After the end of the Gulf War, concerns about lack of warning led to a major study conducted for DCI Robert Gates in 1992 that proposed several recommendations, among them strengthening the national intelligence officer for warning. We were told that these measures languished under Gates's successors. Responsibility for warning related to a terrorist attack passed from the national intelligence officer for warning to the CTC. An Intelligence Community Counterterrorism Board had the responsibility to issue threat advisories.[23]

With the important exception of analysis of al Qaeda efforts in chemical, biological, radiological, and nuclear weapons, we did not find evidence that the methods to avoid surprise attack that had been so laboriously developed over the years were regularly applied.

Considering what was not done suggests possible ways to institutionalize imagination. To return to the four elements of analysis just mentioned:

1. The CTC did not analyze how an aircraft, hijacked or explosives-laden, might be used as a weapon. It did not perform this kind of analysis from the enemy's perspective ("red team" analysis), even though suicide terrorism had become a principal tactic of Middle Eastern terrorists. If it had done so, we believe such an analysis would soon have spotlighted a critical constraint for the terrorists—finding a suicide operative able to fly large jet aircraft. They had never done so before 9/11.

2. The CTC did not develop a set of telltale indicators for this method of attack. For example, one such indicator might be the discovery of possible terrorists pursuing flight training to fly large jet aircraft, or seeking to buy advanced flight simulators.

3. The CTC did not propose, and the intelligence community collection management process did not set, requirements to monitor such telltale indicators. Therefore the warning system was not looking for information such as the July 2001 FBI report of potential terrorist interest in various kinds of aircraft training in Arizona, or the August 2001 arrest of Zacarias Moussaoui because of his suspicious behavior in a Minnesota flight school. In late August, the Moussaoui arrest was briefed to the DCI and other top CIA officials under the heading "Islamic Extremist Learns to Fly."[24] Because the system was not tuned to comprehend the potential significance of this information, the news had no effect on warning.

4. Neither the intelligence community nor aviation security experts analyzed systemic defenses within an aircraft or against terrorist-controlled aircraft, suicidal or otherwise. The many threat reports mentioning aircraft were passed to the FAA. While that agency continued to react to specific, credible threats, it did not try to perform the broader warning functions we describe here. No one in the government was taking on that role for domestic vulnerabilities.

   Richard Clarke told us that he was concerned about the danger posed by aircraft in the context of protecting the Atlanta Olympics of 1996, the White House complex, and the 2001 G-8 summit in Genoa. But he attributed his awareness more to Tom Clancy novels than to warnings from the intelligence community. He did not, or could not, press the government to work on the systemic issues of how to strengthen the layered security defenses to protect aircraft against hijackings or put the adequacy of air defenses against suicide hijackers on the national policy agenda.

The methods for detecting and then warning of surprise attack that the U.S. government had so painstakingly developed in the decades after Pearl Harbor

did not fail; instead, they were not really tried. They were not employed to ana-
lyze the enemy that, as the twentieth century closed, was most likely to launch
a surprise attack directly against the United States.

## 11.2 POLICY

The road to 9/11 again illustrates how the large, unwieldy U.S. government
tended to underestimate a threat that grew ever greater. The terrorism fostered
by Bin Ladin and al Qaeda was different from anything the government had
faced before. The existing mechanisms for handling terrorist acts had been trial
and punishment for acts committed by individuals; sanction, reprisal, deter-
rence, or war for acts by hostile governments. The actions of al Qaeda fit nei-
ther category. Its crimes were on a scale approaching acts of war, but they were
committed by a loose, far-flung, nebulous conspiracy with no territories or cit-
izens or assets that could be readily threatened, overwhelmed, or destroyed.

Early in 2001, DCI Tenet and Deputy Director for Operations James Pavitt
gave an intelligence briefing to President-elect Bush, Vice President–elect
Cheney, and Rice; it included the topic of al Qaeda. Pavitt recalled conveying
that Bin Ladin was one of the gravest threats to the country.[25]

Bush asked whether killing Bin Ladin would end the problem. Pavitt said
he and the DCI had answered that killing Bin Ladin would have an impact,
but would not stop the threat. The CIA later provided more formal assessments
to the White House reiterating that conclusion. It added that in the long term,
the only way to deal with the threat was to end al Qaeda's ability to use
Afghanistan as a sanctuary for its operations.[26]

Perhaps the most incisive of the advisors on terrorism to the new adminis-
tration was the holdover Richard Clarke. Yet he admits that his policy advice,
even if it had been accepted immediately and turned into action, would not
have prevented 9/11.[27]

We must then ask when the U.S. government had reasonable opportunities
to mobilize the country for major action against al Qaeda and its Afghan sanc-
tuary. The main opportunities came after the new information the U.S. gov-
ernment received in 1996–1997, after the embassy bombings of August 1998,
after the discoveries of the Jordanian and Ressam plots in late 1999, and after
the attack on the USS *Cole* in October 2000.

The U.S. policy response to al Qaeda before 9/11 was essentially defined
following the embassy bombings of August 1998. We described those decisions
in chapter 4. It is worth noting that they were made by the Clinton adminis-
tration under extremely difficult domestic political circumstances. Opponents
were seeking the President's impeachment. In addition, in 1998–99 President
Clinton was preparing the government for possible war against Serbia, and he

had authorized major air strikes against Iraq.

The tragedy of the embassy bombings provided an opportunity for a full examination, across the government, of the national security threat that Bin Ladin posed. Such an examination could have made clear to all that issues were at stake that were much larger than the domestic politics of the moment. But the major policy agencies of the government did not meet the threat.

The diplomatic efforts of the Department of State were largely ineffective. Al Qaeda and terrorism was just one more priority added to already-crowded agendas with countries like Pakistan and Saudi Arabia. After 9/11 that changed.

Policymakers turned principally to the CIA and covert action to implement policy. Before 9/11, no agency had more responsibility—or did more—to attack al Qaeda, working day and night, than the CIA. But there were limits to what the CIA was able to achieve in its energetic worldwide efforts to disrupt terrorist activities or use proxies to try to capture or kill Bin Ladin and his lieutenants. As early as mid-1997, one CIA officer wrote to his supervisor: "All we're doing is holding the ring until the cavalry gets here."[28]

Military measures failed or were not applied. Before 9/11 the Department of Defense was not given the mission of ending al Qaeda's sanctuary in Afghanistan.

Officials in both the Clinton and Bush administrations regarded a full U.S. invasion of Afghanistan as practically inconceivable before 9/11. It was never the subject of formal interagency deliberation.

Lesser forms of intervention could also have been considered. One would have been the deployment of U.S. military or intelligence personnel, or special strike forces, to Afghanistan itself or nearby—openly, clandestinely (secretly), or covertly (with their connection to the United States hidden). Then the United States would no longer have been dependent on proxies to gather actionable intelligence. However, it would have needed to secure basing and overflight support from neighboring countries. A significant political, military, and intelligence effort would have been required, extending over months and perhaps years, with associated costs and risks. Given how hard it has proved to locate Bin Ladin even today when there are substantial ground forces in Afghanistan, its odds of sucess are hard to calculate. We have found no indication that President Clinton was offered such an intermediate choice, or that this option was given any more consideration than the idea of invasion.

These policy challenges are linked to the problem of imagination we have already discussed. Since we believe that both President Clinton and President Bush were genuinely concerned about the danger posed by al Qaeda, approaches involving more direct intervention against the sanctuary in Afghanistan apparently must have seemed—if they were considered at all—to be disproportionate to the threat.

Insight for the future is thus not easy to apply in practice. It is hardest to mount a major effort while a problem still seems minor. Once the danger has fully materialized, evident to all, mobilizing action is easier—but it then may be too late.

Another possibility, short of putting U.S. personnel on the ground, was to issue a blunt ultimatum to the Taliban, backed by a readiness to at least launch an indefinite air campaign to disable that regime's limited military capabilities and tip the balance in Afghanistan's ongoing civil war. The United States had warned the Taliban that they would be held accountable for further attacks by Bin Ladin against Afghanistan's U.S. interests. The warning had been given in 1998, again in late 1999, once more in the fall of 2000, and again in the summer of 2001. Delivering it repeatedly did not make it more effective.

As evidence of al Qaeda's responsibility for the *Cole* attack came in during November 2000, National Security Advisor Samuel Berger asked the Pentagon to develop a plan for a sustained air campaign against the Taliban. Clarke developed a paper laying out a formal, specific ultimatum. But Clarke's plan apparently did not advance to formal consideration by the Small Group of principals. We have found no indication that the idea was briefed to the new administration or that Clarke passed his paper to them, although the same team of career officials spanned both administrations.

After 9/11, President Bush announced that al Qaeda was responsible for the attack on the USS *Cole*. Before 9/11, neither president took any action. Bin Ladin's inference may well have been that attacks, at least at the level of the *Cole*, were risk free.[29]

## 11.3 CAPABILITIES

Earlier chapters describe in detail the actions decided on by the Clinton and Bush administrations. Each president considered or authorized covert actions, a process that consumed considerable time—especially in the Clinton administration—and achieved little success beyond the collection of intelligence. After the August 1998 missile strikes in Afghanistan, naval vessels remained on station in or near the region, prepared to fire cruise missiles. General Hugh Shelton developed as many as 13 different strike options, and did not recommend any of them. The most extended debate on counterterrorism in the Bush administration before 9/11 had to do with missions for the unmanned Predator—whether to use it just to locate Bin Ladin or to wait until it was armed with a missile, so that it could find him and also attack him. Looking back, we are struck with the narrow and unimaginative menu of options for action offered to both President Clinton and President Bush.

Before 9/11, the United States tried to solve the al Qaeda problem with the

same government institutions and capabilities it had used in the last stages of the Cold War and its immediate aftermath. These capabilities were insufficient, but little was done to expand or reform them.

For covert action, of course, the White House depended on the Counterterrorist Center and the CIA's Directorate of Operations. Though some officers, particularly in the Bin Ladin unit, were eager for the mission, most were not. The higher management of the directorate was unenthusiastic. The CIA's capacity to conduct paramilitary operations with its own personnel was not large, and the Agency did not seek a large-scale general expansion of these capabilities before 9/11. James Pavitt, the head of this directorate, remembered that covert action, promoted by the White House, had gotten the Clandestine Service into trouble in the past. He had no desire to see this happen again. He thought, not unreasonably, that a truly serious counterterrorism campaign against an enemy of this magnitude would be business primarily for the military, not the Clandestine Service.[30]

As for the Department of Defense, some officers in the Joint Staff were keen to help. Some in the Special Operations Command have told us that they worked on plans for using Special Operations Forces in Afghanistan and that they hoped for action orders. JCS Chairman General Shelton and General Anthony Zinni at Central Command had a different view. Shelton felt that the August 1998 attacks had proved a waste of good ordnance and thereafter consistently opposed firing expensive Tomahawk missiles merely at "jungle gym" terrorist training infrastructure.[31] In this view, he had complete support from Defense Secretary William Cohen. Shelton was prepared to plan other options, but he was also prepared to make perfectly clear his own strong doubts about the wisdom of any military action that risked U.S. lives unless the intelligence was "actionable."[32]

The high price of keeping counterterrorism policy within the restricted circle of the Counterterrorism Security Group and the highest-level principals was nowhere more apparent than in the military establishment. After the August 1998 missile strike, other members of the JCS let the press know their unhappiness that, in conformity with the Goldwater-Nichols reforms, Shelton had been the only member of the JCS to be consulted. Although follow-on military options were briefed more widely, the vice director of operations on the Joint Staff commented to us that intelligence and planning documents relating to al Qaeda arrived in a ziplock red package and that many flag and general officers never had the clearances to see its contents.[33]

At no point before 9/11 was the Department of Defense fully engaged in the mission of countering al Qaeda, though this was perhaps the most dangerous foreign enemy then threatening the United States. The Clinton administration effectively relied on the CIA to take the lead in preparing long-term offensive plans against an enemy sanctuary. The Bush administration adopted this approach, although its emerging new strategy envisioned some yet unde-

fined further role for the military in addressing the problem. Within Defense, both Secretary Cohen and Secretary Donald Rumsfeld gave their principal attention to other challenges.

America's homeland defenders faced outward. NORAD itself was barely able to retain any alert bases. Its planning scenarios occasionally considered the danger of hijacked aircraft being guided to American targets, but only aircraft that were coming from overseas. We recognize that a costly change in NORAD's defense posture to deal with the danger of suicide hijackers, before such a threat had ever actually been realized, would have been a tough sell. But NORAD did not canvass available intelligence and try to make the case.

The most serious weaknesses in agency capabilities were in the domestic arena. In chapter 3 we discussed these institutions—the FBI, the Immigration and Naturalization Service, the FAA, and others. The major pre-9/11 effort to strengthen domestic agency capabilities came in 2000, as part of a millennium after-action review. President Clinton and his principal advisers paid considerable attention then to border security problems, but were not able to bring about significant improvements before leaving office. The NSC-led interagency process did not effectively bring along the leadership of the Justice and Transportation departments in an agenda for institutional change.

The FBI did not have the capability to link the collective knowledge of agents in the field to national priorities. The acting director of the FBI did not learn of his Bureau's hunt for two possible al Qaeda operatives in the United States or about his Bureau's arrest of an Islamic extremist taking flight training until September 11. The director of central intelligence knew about the FBI's Moussaoui investigation weeks before word of it made its way even to the FBI's own assistant director for counterterrorism.

Other agencies deferred to the FBI. In the August 6 PDB reporting to President Bush of 70 full-field investigations related to al Qaeda, news the President said he found heartening, the CIA had simply restated what the FBI had said. No one looked behind the curtain.

The FAA's capabilities to take aggressive, anticipatory security measures were especially weak. Any serious policy examination of a suicide hijacking scenario, critiquing each of the layers of the security system, could have suggested changes to fix glaring vulnerabilities—expanding no-fly lists, searching passengers identified by the CAPPS screening system, deploying Federal Air Marshals domestically, hardening cockpit doors, alerting air crew to a different kind of hijacking than what they had been trained to expect, or adjusting the training of controllers and managers in the FAA and NORAD.

Government agencies also sometimes display a tendency to match capabilities to mission by defining away the hardest part of their job. They are often passive, accepting what are viewed as givens, including that efforts to identify and fix glaring vulnerabilities to dangerous threats would be too costly, too controversial, or too disruptive.

## 11.4 MANAGEMENT

### Operational Management

Earlier in this report we detailed various missed opportunities to thwart the 9/11 plot. Information was not shared, sometimes inadvertently or because of legal misunderstandings. Analysis was not pooled. Effective operations were not launched. Often the handoffs of information were lost across the divide separating the foreign and domestic agencies of the government.

However the specific problems are labeled, we believe they are symptoms of the government's broader inability to adapt how it manages problems to the new challenges of the twenty-first century. The agencies are like a set of specialists in a hospital, each ordering tests, looking for symptoms, and prescribing medications. What is missing is the attending physician who makes sure they work as a team.

One missing element was effective management of transnational operations. Action officers should have drawn on all available knowledge in the government. This management should have ensured that information was shared and duties were clearly assigned across agencies, and across the foreign-domestic divide.

Consider, for example, the case of Mihdhar, Hazmi, and their January 2000 trip to Kuala Lumpur, detailed in chapter 6. In late 1999, the National Security Agency (NSA) analyzed communications associated with a man named Khalid, a man named Nawaf, and a man named Salem. Working-level officials in the intelligence community knew little more than this. But they correctly concluded that "Nawaf" and "Khalid" might be part of "an operational cadre" and that "something nefarious might be afoot."

The NSA did not think its job was to research these identities. It saw itself as an agency to support intelligence consumers, such as CIA. The NSA tried to respond energetically to any request made. But it waited to be asked.

If NSA had been asked to try to identify these people, the agency would have started by checking its own database of earlier information from these same sources. Some of this information had been reported; some had not. But it was all readily accessible in the database. NSA's analysts would promptly have discovered who Nawaf was, that his full name might be Nawaf al Hazmi, and that he was an old friend of Khalid.

With this information and more that was available, managers could have more effectively tracked the movement of these operatives in southeast Asia. With the name "Nawaf al Hazmi," a manager could then have asked the State Department also to check that name. State would promptly have found its own record on Nawaf al Hazmi, showing that he too had been issued a visa to visit the United States. Officials would have learned that the visa had been issued at the same place—Jeddah—and on almost the same day as the one given to Khalid al Mihdhar.

When the travelers left Kuala Lumpur for Bangkok, local officials were able to identify one of the travelers as Khalid al Mihdhar. After the flight left, they learned that one of his companions had the name Alhazmi. But the officials did not know what that name meant.

The information arrived at Bangkok too late to track these travelers as they came in. Had the authorities there already been keeping an eye out for Khalid al Mihdhar as part of a general regional or worldwide alert, they might have tracked him coming in. Had they been alerted to look for a possible companion named Nawaf al Hazmi, they might have noticed him too. Instead, they were notified only after Kuala Lumpur sounded the alarm. By that time, the travelers had already disappeared into the streets of Bangkok.

On January 12, the head of the CIA's al Qaeda unit told his bosses that surveillance in Kuala Lumpur was continuing. He may not have known that in fact Mihdhar and his companions had dispersed and the tracking was falling apart. U.S. officials in Bangkok regretfully reported the bad news on January 13. The names they had were put on a watchlist in Bangkok, so that Thai authorities might notice if the men left the country. On January 14, the head of the CIA's al Qaeda unit again updated his bosses, telling them that officials were continuing to track the suspicious individuals who had now dispersed to various countries.

Unfortunately, there is no evidence of any tracking efforts actually being undertaken by anyone after the Arabs disappeared into Bangkok. No other effort was made to create other opportunities to spot these Arab travelers in case the screen in Bangkok failed. Just from the evidence in Mihdhar's passport, one of the logical possible destinations and interdiction points would have been the United States. Yet no one alerted the INS or the FBI to look for these individuals. They arrived, unnoticed, in Los Angeles on January 15.

In early March 2000, Bangkok reported that Nawaf al Hazmi, now identified for the first time with his full name, had departed on January 15 on a United Airlines flight to Los Angeles. Since the CIA did not appreciate the significance of that name or notice the cable, we have found no evidence that this information was sent to the FBI.

Even if watchlisting had prevented or at least alerted U.S. officials to the entry of Hazmi and Mihdhar, we do not think it is likely that watchlisting, by itself, have prevented the 9/11 attacks. Al Qaeda adapted to the failure of some of its operatives to gain entry into the United States. None of these future hijackers was a pilot. Alternatively, had they been permitted entry and surveilled, some larger results might have been possible had the FBI been patient.

These are difficult what-ifs. The intelligence community might have judged that the risks of conducting such a prolonged intelligence operation were too high—potential terrorists might have been lost track of, for example. The pre-9/11 FBI might not have been judged capable of conducting such an operation. But surely the intelligence community would have preferred to have the chance to make these choices.

From the details of this case, or from the other opportunities we catalogue in the text box, one can see how hard it is for the intelligence community to assemble enough of the puzzle pieces gathered by different agencies to make some sense of them and then develop a fully informed joint plan. Accomplishing all this is especially difficult in a transnational case. We sympathize with the working-level officers, drowning in information and trying to decide what is important or what needs to be done when no particular action has been requested of them.

Who had the job of managing the case to make sure these things were done? One answer is that everyone had the job. The CIA's deputy director for operations, James Pavitt, stressed to us that the responsibility resided with all involved. Above all he emphasized the primacy of the field. The field had the lead in managing operations. The job of headquarters, he stressed, was to support the field, and do so without delay. If the field asked for information or other support, the job of headquarters was to get it—right away.[34]

This is a traditional perspective on operations and, traditionally, it has had great merit. It reminded us of the FBI's pre-9/11 emphasis on the primacy of its field offices. When asked about how this traditional structure would adapt to the challenge of managing a transnational case, one that hopped from place to place as this one did, the deputy director argued that all involved were

---

**Operational Opportunities**

1. January 2000: the CIA does not watchlist Khalid al Mihdhar or notify the FBI when it learned Mihdhar possessed a valid U.S. visa.

2. January 2000: the CIA does not develop a transnational plan for tracking Mihdhar and his associates so that they could be followed to Bangkok and onward, including the United States.

3. March 2000: the CIA does not watchlist Nawaf al Hazmi or notify the FBI when it learned that he possessed a U.S. visa and had flown to Los Angeles on January 15, 2000.

4. January 2001: the CIA does not inform the FBI that a source had identified Khallad, or Tawfiq bin Attash, a major figure in the October 2000 bombing of the USS *Cole*, as having attended the meeting in Kuala Lumpur with Khalid al Mihdhar.

5. May 2001: a CIA official does not notify the FBI about Mihdhar's U.S. visa, Hazmi's U.S. travel, or Khallad's having attended the Kuala Lumpur meeting (identified when he reviewed all of the relevant traffic because of the high level of threats).

6. June 2001: FBI and CIA officials do not ensure that all relevant information regarding the Kuala Lumpur meeting was shared with the *Cole* investigators at the June 11 meeting.

7. August 2001: the FBI does not recognize the significance of the information regarding Mihdhar and Hazmi's possible arrival in the United States and thus does not take adequate action to share information, assign resources, and give sufficient priority to the search.

8. August 2001: FBI headquarters does not recognize the significance of the information regarding Moussaoui's training and beliefs and thus does not take adequate action to share information, involve higher-level officials across agencies, obtain information regarding Moussaoui's ties to al Qaeda, and give sufficient priority to determining what Moussaoui might be planning.

9. August 2001: the CIA does not focus on information that Khalid Sheikh Mohammed is a key al Qaeda lieutenant or connect information identifying KSM as the "Mukhtar" mentioned in other reports to the analysis that could have linked "Mukhtar" with Ramzi Binalshibh and Moussaoui.

10. August 2001: the CIA and FBI do not connect the presence of Mihdhar, Hazmi, and Moussaoui to the general threat reporting about imminent attacks.

responsible for making it work. Pavitt underscored the responsibility of the particular field location where the suspects were being tracked at any given time. On the other hand, he also said that the Counterterrorist Center was supposed to manage all the moving parts, while what happened on the ground was the responsibility of managers in the field.[35]

Headquarters tended to support and facilitate, trying to make sure everyone was in the loop. From time to time a particular post would push one way, or headquarters would urge someone to do something. But headquarters never really took responsibility for the successful management of this case. Hence the managers at CIA headquarters did not realize that omissions in planning had occurred, and they scarcely knew that the case had fallen apart.

The director of the Counterterrorist Center at the time, Cofer Black, recalled to us that this operation was one among many and that, at the time, it was "considered interesting, but not heavy water yet." He recalled the failure to get the word to Bangkok fast enough, but has no evident recollection of why the case then dissolved, unnoticed.[36]

The next level down, the director of the al Qaeda unit in CIA at the time recalled that he did not think it was his job to direct what should or should not be done. He did not pay attention when the individuals dispersed and things fell apart. There was no conscious decision to stop the operation after the trail was temporarily lost in Bangkok. He acknowledged, however, that perhaps there had been a letdown for his overworked staff after the extreme tension and long hours in the period of the millennium alert.[37]

The details of this case illuminate real management challenges, past and future. The U.S. government must find a way of pooling intelligence and using it to guide the planning of and assignment of responsibilities for *joint operations* involving organizations as disparate as the CIA, the FBI, the State Department, the military, and the agencies involved in homeland security.

## Institutional Management

Beyond those day-to-day tasks of bridging the foreign-domestic divide and matching intelligence with plans, the challenges include broader management issues pertaining to how the top leaders of the government set priorities and allocate resources. Once again it is useful to illustrate the problem by examining the CIA, since before 9/11 this agency's role was so central in the government's counterterrorism efforts.

On December 4, 1998, DCI Tenet issued a directive to several CIA officials and his deputy for community management, stating: "We are at war. I want no resources or people spared in this effort, either inside CIA or the Community."[38] The memorandum had little overall effect on mobilizing the CIA or the intelligence community.[39]

The memo was addressed only to CIA officials and the deputy for community management, Joan Dempsey. She faxed the memo to the heads of the major intelligence agencies after removing covert action sections. Only a handful of people received it. The NSA director at the time, Lieutenant General Kenneth Minihan, believed the memo applied only to the CIA and not the NSA, because no one had informed him of any NSA shortcomings. For their part, CIA officials thought the memorandum was intended for the rest of the intelligence community, given that they were already doing all they could and believed that the rest of the community needed to pull its weight.[40]

The episode indicates some of the limitations of the DCI's authority over the direction and priorities of the intelligence community, especially its elements within the Department of Defense. The DCI has to direct agencies without controlling them. He does not receive an appropriation for their activities, and therefore does not control their purse strings. He has little insight into how they spend their resources. Congress attempted to strengthen the DCI's authority in 1996 by creating the positions of deputy DCI for community management and assistant DCIs for collection, analysis and production, and administration. But the authority of these positions is limited, and the vision of central management clearly has not been realized.

The DCI did not develop a management strategy for a war against Islamist terrorism before 9/11. Such a management strategy would define the capabilities the intelligence community must acquire for such a war—from language training to collection systems to analysts. Such a management strategy would necessarily extend beyond the CTC to the components that feed its expertise and support its operations, linked transparently to counterterrorism objectives. It would then detail the proposed expenditures and organizational changes required to acquire and implement these capabilities.

DCI Tenet and his deputy director for operations told us they did have a management strategy for a war on terrorism. It was to rebuild the CIA. They said the CIA as a whole had been badly damaged by prior budget constraints and that capabilities needed to be restored across the board. Indeed, the CTC budget had not been cut while the budgets had been slashed in many other parts of the Agency. By restoring funding across the CIA, a rising tide would lift all boats. They also stressed the synergy between improvements of every part of the Agency and the capabilities that the CTC or stations overseas could draw on in the war on terror.[41]

As some officials pointed out to us, there is a tradeoff in this management approach. In an attempt to rebuild everything at once, the highest priority efforts might not get the maximum support that they need. Furthermore, this approach attempted to channel relatively strong outside support for combating terrorism into backing for across-the-board funding increases. Proponents of the counterterrorism agenda might respond by being less inclined to loosen the purse strings than they would have been if offered a convincing counterterrorism budget strategy. The DCI's management strategy was also focused mainly on the CIA.

Lacking a management strategy for the war on terrorism or ways to see how funds were being spent across the community, DCI Tenet and his aides found it difficult to develop an overall intelligence community budget for a war on terrorism.

Responsibility for domestic intelligence gathering on terrorism was vested solely in the FBI, yet during almost all of the Clinton administration the relationship between the FBI Director and the President was nearly nonexistent. The FBI Director would not communicate directly with the President. His key personnel shared very little information with the National Security Council and the rest of the national security community. As a consequence, one of the critical working relationships in the counterterrorism effort was broken.

### The Millennium Exception

Before concluding our narrative, we offer a reminder, and an explanation, of the one period in which the government as a whole seemed to be acting in concert to deal with terrorism—the last weeks of December 1999 preceding the millennium.

In the period between December 1999 and early January 2000, information about terrorism flowed widely and abundantly. The flow from the FBI was particularly remarkable because the FBI at other times shared almost no information. That from the intelligence community was also remarkable, because some of it reached officials—local airport managers and local police departments—who had not seen such information before and would not see it again before 9/11, if then. And the terrorist threat, in the United States even more than abroad, engaged the frequent attention of high officials in the executive branch and leaders in both houses of Congress.

Why was this so? Most obviously, it was because everyone was already on edge with the millennium and possible computer programming glitches ("Y2K") that might obliterate records, shut down power and communication lines, or otherwise disrupt daily life. Then, Jordanian authorities arrested 16 al Qaeda terrorists planning a number of bombings in that country. Those in custody included two U.S. citizens. Soon after, an alert Customs agent caught Ahmed Ressam bringing explosives across the Canadian border with the apparent intention of blowing up Los Angeles airport. He was found to have confederates on both sides of the border.

These were not events whispered about in highly classified intelligence dailies or FBI interview memos. The information was in all major newspapers and highlighted in network television news. Though the Jordanian arrests only made page 13 of the *New York Times*, they were featured on every evening newscast. The arrest of Ressam was on front pages, and the original story and its follow-ups dominated television news for a week. FBI field offices around the country were swamped by calls from concerned citizens. Representatives of the Justice Department, the FAA, local police departments, and major airports had microphones in their faces whenever they showed themselves.[42]

After the millennium alert, the government relaxed. Counterterrorism went back to being a secret preserve for segments of the FBI, the Counterterrorist Center, and the Counterterrorism Security Group. But the experience showed that the government was capable of mobilizing itself for an alert against terrorism. While one factor was the preexistence of widespread concern about Y2K, another, at least equally important, was simply shared information. Everyone knew not only of an abstract threat but of at least one terrorist who had been arrested *in the United States*. Terrorism had a face—that of Ahmed Ressam—and Americans from Vermont to southern California went on the watch for his like.

In the summer of 2001, DCI Tenet, the Counterterrorist Center, and the Counterterrorism Security Group did their utmost to sound a loud alarm, its basis being intelligence indicating that al Qaeda planned something big. But the millennium phenomenon was not repeated. FBI field offices apparently saw no abnormal terrorist activity, and headquarters was not shaking them up.

Between May 2001 and September 11, there was very little in newspapers

or on television to heighten anyone's concern about terrorism. Front-page stories touching on the subject dealt with the windup of trials dealing with the East Africa embassy bombings and Ressam. All this reportage looked backward, describing problems satisfactorily resolved. Back-page notices told of tightened security at embassies and military installations abroad and government cautions against travel to the Arabian Peninsula. All the rest was secret.

# 12

# WHAT TO DO?
# A GLOBAL STRATEGY

## 12.1 REFLECTING ON A GENERATIONAL CHALLENGE

THREE YEARS AFTER 9/11, Americans are still thinking and talking about how to protect our nation in this new era. The national debate continues.

Countering terrorism has become, beyond any doubt, the top national security priority for the United States. This shift has occurred with the full support of the Congress, both major political parties, the media, and the American people.

The nation has committed enormous resources to national security and to countering terrorism. Between fiscal year 2001, the last budget adopted before 9/11, and the present fiscal year 2004, total federal spending on defense (including expenditures on both Iraq and Afghanistan), homeland security, and international affairs rose more than 50 percent, from $354 billion to about $547 billion. The United States has not experienced such a rapid surge in national security spending since the Korean War.[1]

This pattern has occurred before in American history. The United States faces a sudden crisis and summons a tremendous exertion of national energy. Then, as that surge transforms the landscape, comes a time for reflection and reevaluation. Some programs and even agencies are discarded; others are invented or redesigned. Private firms and engaged citizens redefine their relationships with government, working through the processes of the American republic.

Now is the time for that reflection and reevaluation. The United States should consider *what to do*—the shape and objectives of a strategy. Americans should also consider *how to do it*—organizing their government in a different way.

### Defining the Threat
In the post-9/11 world, threats are defined more by the fault lines within societies than by the territorial boundaries between them. From terrorism to global

361

disease or environmental degradation, the challenges have become transnational rather than international. That is the defining quality of world politics in the twenty-first century.

National security used to be considered by studying foreign frontiers, weighing opposing groups of states, and measuring industrial might. To be dangerous, an enemy had to muster large armies. Threats emerged slowly, often visibly, as weapons were forged, armies conscripted, and units trained and moved into place. Because large states were more powerful, they also had more to lose. They could be deterred.

Now threats can emerge quickly. An organization like al Qaeda, headquartered in a country on the other side of the earth, in a region so poor that electricity or telephones were scarce, could nonetheless scheme to wield weapons of unprecedented destructive power in the largest cities of the United States.

In this sense, 9/11 has taught us that terrorism against American interests "over there" should be regarded just as we regard terrorism against America "over here." In this same sense, the American homeland is the planet.

But the enemy is not just "terrorism," some generic evil.[2] This vagueness blurs the strategy. The catastrophic threat at this moment in history is more specific. It is the threat posed by *Islamist* terrorism—especially the al Qaeda network, its affiliates, and its ideology.[3]

As we mentioned in chapter 2, Usama Bin Ladin and other Islamist terrorist leaders draw on a long tradition of extreme intolerance within one stream of Islam (a minority tradition), from at least Ibn Taimiyyah, through the founders of Wahhabism, through the Muslim Brotherhood, to Sayyid Qutb. That stream is motivated by religion and does not distinguish politics from religion, thus distorting both. It is further fed by grievances stressed by Bin Ladin and widely felt throughout the Muslim world—against the U.S. military presence in the Middle East, policies perceived as anti-Arab and anti-Muslim, and support of Israel. Bin Ladin and Islamist terrorists mean exactly what they say: to them America is the font of all evil, the "head of the snake," and it must be converted or destroyed.

It is not a position with which Americans can bargain or negotiate. With it there is no common ground—not even respect for life—on which to begin a dialogue. It can only be destroyed or utterly isolated.

Because the Muslim world has fallen behind the West politically, economically, and militarily for the past three centuries, and because few tolerant or secular Muslim democracies provide alternative models for the future, Bin Ladin's message finds receptive ears. It has attracted active support from thousands of disaffected young Muslims and resonates powerfully with a far larger number who do not actively support his methods. The resentment of America and the West is deep, even among leaders of relatively successful Muslim states.[4]

Tolerance, the rule of law, political and economic openness, the extension

of greater opportunities to women—these cures must come from within Muslim societies themselves. The United States must support such developments.

But this process is likely to be measured in decades, not years. It is a process that will be violently opposed by Islamist terrorist organizations, both inside Muslim countries and in attacks on the United States and other Western nations. The United States finds itself caught up in a clash *within* a civilization. That clash arises from particular conditions in the Muslim world, conditions that spill over into expatriate Muslim communities in non-Muslim countries.

Our enemy is twofold: al Qaeda, a stateless network of terrorists that struck us on 9/11; and a radical ideological movement in the Islamic world, inspired in part by al Qaeda, which has spawned terrorist groups and violence across the globe. The first enemy is weakened, but continues to pose a grave threat. The second enemy is gathering, and will menace Americans and American interests long after Usama Bin Ladin and his cohorts are killed or captured. Thus our strategy must match our means to two ends: dismantling the al Qaeda network and prevailing in the longer term over the ideology that gives rise to Islamist terrorism.

Islam is not the enemy. It is not synonymous with terror. Nor does Islam teach terror. America and its friends oppose a perversion of Islam, not the great world faith itself. Lives guided by religious faith, including literal beliefs in holy scriptures, are common to every religion, and represent no threat to us.

Other religions have experienced violent internal struggles. With so many diverse adherents, every major religion will spawn violent zealots. Yet understanding and tolerance among people of different faiths can and must prevail.

The present transnational danger is Islamist terrorism. What is needed is a broad political-military strategy that rests on a firm tripod of policies to

- attack terrorists and their organizations;
- prevent the continued growth of Islamist terrorism; and
- protect against and prepare for terrorist attacks.

**More Than a War on Terrorism**

Terrorism is a tactic used by individuals and organizations to kill and destroy. Our efforts should be directed at those individuals and organizations.

Calling this struggle a war accurately describes the use of American and allied armed forces to find and destroy terrorist groups and their allies in the field, notably in Afghanistan. The language of war also evokes the mobilization for a national effort. Yet the strategy should be balanced.

The first phase of our post-9/11 efforts rightly included military action to topple the Taliban and pursue al Qaeda. This work continues. But long-term success demands the use of all elements of national power: diplomacy, intelli-

gence, covert action, law enforcement, economic policy, foreign aid, public diplomacy, and homeland defense. If we favor one tool while neglecting others, we leave ourselves vulnerable and weaken our national effort.

Certainly the strategy should include offensive operations to counter terrorism. Terrorists should no longer find safe haven where their organizations can grow and flourish. America's strategy should be a coalition strategy, that includes Muslim nations as partners in its development and implementation.

Our effort should be accompanied by a preventive strategy that is as much, or more, political as it is military. The strategy must focus clearly on the Arab and Muslim world, in all its variety.

Our strategy should also include defenses. America can be attacked in many ways and has many vulnerabilities. No defenses are perfect. But risks must be calculated; hard choices must be made about allocating resources. Responsibilities for America's defense should be clearly defined. Planning does make a difference, identifying where a little money might have a large effect. Defenses also complicate the plans of attackers, increasing their risks of discovery and failure. Finally, the nation must prepare to deal with attacks that are not stopped.

### Measuring Success

What should Americans expect from their government in the struggle against Islamist terrorism? The goals seem unlimited: Defeat terrorism anywhere in the world. But Americans have also been told to expect the worst: An attack is probably coming; it may be terrible.

With such benchmarks, the justifications for action and spending seem limitless. Goals are good. Yet effective public policies also need concrete objectives. Agencies need to be able to measure success.

These measurements do not need to be quantitative: government cannot measure success in the ways that private firms can. But the targets should be specific enough so that reasonable observers—in the White House, the Congress, the media, or the general public—can judge whether or not the objectives have been attained.

Vague goals match an amorphous picture of the enemy. Al Qaeda and its affiliates are popularly described as being all over the world, adaptable, resilient, needing little higher-level organization, and capable of anything. The American people are thus given the picture of an omnipotent, unslayable hydra of destruction. This image lowers expectations for government effectiveness.

It should not lower them too far. Our report shows a determined and capable group of plotters. Yet the group was fragile, dependent on a few key personalities, and occasionally left vulnerable by the marginal, unstable people often attracted to such causes. The enemy made mistakes—like Khalid al Mihdhar's unauthorized departure from the United States that required him to enter the country again in July 2001, or the selection of Zacarias Moussaoui as a par-

ticipant and Ramzi Binalshibh's transfer of money to him. The U.S. government was not able to capitalize on those mistakes in time to prevent 9/11.

We do not believe it is possible to defeat all terrorist attacks against Americans, every time and everywhere. A president should tell the American people:

- No president can promise that a catastrophic attack like that of 9/11 will not happen again. History has shown that even the most vigilant and expert agencies cannot always prevent determined, suicidal attackers from reaching a target.

- But the American people are entitled to expect their government to do its very best. They should expect that officials will have realistic objectives, clear guidance, and effective organization. They are entitled to see some standards for performance so they can judge, with the help of their elected representatives, whether the objectives are being met.

## 12.2  ATTACK TERRORISTS AND THEIR ORGANIZATIONS

The U.S. government, joined by other governments around the world, is working through intelligence, law enforcement, military, financial, and diplomatic channels to identify, disrupt, capture, or kill individual terrorists. This effort was going on before 9/11 and it continues on a vastly enlarged scale. But to catch terrorists, a U.S. or foreign agency needs to be able to find and reach them.

**No Sanctuaries**
The 9/11 attack was a complex international operation, the product of years of planning. Bombings like those in Bali in 2003 or Madrid in 2004, while able to take hundreds of lives, can be mounted locally. Their requirements are far more modest in size and complexity. They are more difficult to thwart. But the U.S. government must build the capacities to prevent a 9/11-scale plot from succeeding, and those capabilities will help greatly to cope with lesser but still devastating attacks.

A complex international terrorist operation aimed at launching a catastrophic attack cannot be mounted by just anyone in any place. Such operations appear to require

- time, space, and ability to perform competent planning and staff work;
- a command structure able to make necessary decisions and possessing the authority and contacts to assemble needed people, money, and materials;

- opportunity and space to recruit, train, and select operatives with the needed skills and dedication, providing the time and structure required to socialize them into the terrorist cause, judge their trustworthiness, and hone their skills;
- a logistics network able to securely manage the travel of operatives, move money, and transport resources (like explosives) where they need to go;
- access, in the case of certain weapons, to the special materials needed for a nuclear, chemical, radiological, or biological attack;
- reliable communications between coordinators and operatives; and
- opportunity to test the workability of the plan.

Many details in chapters 2, 5, and 7 illustrate the direct and indirect value of the Afghan sanctuary to al Qaeda in preparing the 9/11 attack and other operations. The organization cemented personal ties among veteran jihadists working together there for years. It had the operational space to gather and sift recruits, indoctrinating them in isolated, desert camps. It built up logistical networks, running through Pakistan and the United Arab Emirates.

Al Qaeda also exploited relatively lax internal security environments in Western countries, especially Germany. It considered the environment in the United States so hospitable that the 9/11 operatives used America as their staging area for further training and exercises—traveling into, out of, and around the country and complacently using their real names with little fear of capture.

To find sanctuary, terrorist organizations have fled to some of the least governed, most lawless places in the world. The intelligence community has prepared a world map that highlights possible terrorist havens, using no secret intelligence—just indicating areas that combine rugged terrain, weak governance, room to hide or receive supplies, and low population density with a town or city near enough to allow necessary interaction with the outside world. Large areas scattered around the world meet these criteria.[5]

In talking with American and foreign government officials and military officers on the front lines fighting terrorists today, we asked them: If you were a terrorist leader today, where would you locate your base? Some of the same places come up again and again on their lists:

- western Pakistan and the Pakistan-Afghanistan border region
- southern or western Afghanistan
- the Arabian Peninsula, especially Saudi Arabia and Yemen, and the nearby Horn of Africa, including Somalia and extending southwest into Kenya
- Southeast Asia, from Thailand to the southern Philippines to Indonesia
- West Africa, including Nigeria and Mali
- European cities with expatriate Muslim communities, especially cities

in central and eastern Europe where security forces and border controls are less effective

In the twentieth century, strategists focused on the world's great industrial heartlands. In the twenty-first, the focus is in the opposite direction, toward remote regions and failing states. The United States has had to find ways to extend its reach, straining the limits of its influence.

Every policy decision we make needs to be seen through this lens. If, for example, Iraq becomes a failed state, it will go to the top of the list of places that are breeding grounds for attacks against Americans at home. Similarly, if we are paying insufficient attention to Afghanistan, the rule of the Taliban or warlords and narcotraffickers may reemerge and its countryside could once again offer refuge to al Qaeda, or its successor.

**Recommendation: The U.S. government must identify and prioritize actual or potential terrorist sanctuaries. For each, it should have a realistic strategy to keep possible terrorists insecure and on the run, using all elements of national power. We should reach out, listen to, and work with other countries that can help.**

We offer three illustrations that are particularly applicable today, in 2004: Pakistan, Afghanistan, and Saudi Arabia.

### Pakistan

Pakistan's endemic poverty, widespread corruption, and often ineffective government create opportunities for Islamist recruitment. Poor education is a particular concern. Millions of families, especially those with little money, send their children to religious schools, or madrassahs. Many of these schools are the only opportunity available for an education, but some have been used as incubators for violent extremism. According to Karachi's police commander, there are 859 madrassahs teaching more than 200,000 youngsters in his city alone.[6]

It is hard to overstate the importance of Pakistan in the struggle against Islamist terrorism. Within Pakistan's borders are 150 million Muslims, scores of al Qaeda terrorists, many Taliban fighters, and—perhaps—Usama Bin Ladin. Pakistan possesses nuclear weapons and has come frighteningly close to war with nuclear-armed India over the disputed territory of Kashmir. A political battle among anti-American Islamic fundamentalists, the Pakistani military, and more moderate mainstream political forces has already spilled over into violence, and there have been repeated recent attempts to kill Pakistan's president, Pervez Musharraf.

In recent years, the United States has had three basic problems in its relationship with Pakistan:

- On terrorism, Pakistan helped nurture the Taliban. The Pakistani army and intelligence services, especially below the top ranks, have long been ambivalent about confronting Islamist extremists. Many in the government have sympathized with or provided support to the extremists. Musharraf agreed that Bin Ladin was bad. But before 9/11, preserving good relations with the Taliban took precedence.

- On proliferation, Musharraf has repeatedly said that Pakistan does not barter with its nuclear technology. But proliferation concerns have been long-standing and very serious. Most recently, the Pakistani government has claimed not to have known that one of its nuclear weapons developers, a national figure, was leading the most dangerous nuclear smuggling ring ever disclosed.

- Finally, Pakistan has made little progress toward the return of democratic rule at the national level, although that turbulent process does continue to function at the provincial level and the Pakistani press remains relatively free.

Immediately after 9/11, confronted by the United States with a stark choice, Pakistan made a strategic decision. Its government stood aside and allowed the U.S.-led coalition to destroy the Taliban regime. In other ways, Pakistan actively assisted: its authorities arrested more than 500 al Qaeda operatives and Taliban members, and Pakistani forces played a leading part in tracking down KSM, Abu Zubaydah, and other key al Qaeda figures.[7]

In the following two years, the Pakistani government tried to walk the fence, helping against al Qaeda while seeking to avoid a larger confrontation with Taliban remnants and other Islamic extremists. When al Qaeda and its Pakistani allies repeatedly tried to assassinate Musharraf, almost succeeding, the battle came home.

The country's vast unpoliced regions make Pakistan attractive to extremists seeking refuge and recruits and also provide a base for operations against coalition forces in Afghanistan. Almost all the 9/11 attackers traveled the north-south nexus of Kandahar–Quetta–Karachi. The Baluchistan region of Pakistan (KSM's ethnic home) and the sprawling city of Karachi remain centers of Islamist extremism where the U.S. and Pakistani security and intelligence presence has been weak. The U.S. consulate in Karachi is a makeshift fortress, reflecting the gravity of the surrounding threat.[8]

During the winter of 2003–2004, Musharraf made another strategic decision. He ordered the Pakistani army into the frontier provinces of northwest Pakistan along the Afghan border, where Bin Ladin and Ayman al Zawahiri have reportedly taken refuge. The army is confronting groups of al Qaeda fighters and their local allies in very difficult terrain. On the other side of the frontier, U.S. forces in Afghanistan have found it challenging to organize effective joint

operations, given Pakistan's limited capabilities and reluctance to permit U.S. military operations on its soil. Yet in 2004, it is clear that the Pakistani government is trying harder than ever before in the battle against Islamist terrorists.[9]

Acknowledging these problems and Musharraf's own part in the story, we believe that Musharraf's government represents the best hope for stability in Pakistan and Afghanistan.

- In an extraordinary public essay asking how Muslims can "drag ourselves out of the pit we find ourselves in, to raise ourselves up," Musharraf has called for a strategy of "enlightened moderation." The Muslim world, he said, should shun militancy and extremism; the West—and the United States in particular—should seek to resolve disputes with justice and help better the Muslim world.[10]

- Having come close to war in 2002 and 2003, Pakistan and India have recently made significant progress in peacefully discussing their longstanding differences. The United States has been and should remain a key supporter of that process.

- The constant refrain of Pakistanis is that the United States long treated them as allies of convenience. As the United States makes fresh commitments now, it should make promises it is prepared to keep, for years to come.

**Recommendation: If Musharraf stands for enlightened moderation in a fight for his life and for the life of his country, the United States should be willing to make hard choices too, and make the difficult long-term commitment to the future of Pakistan. Sustaining the current scale of aid to Pakistan, the United States should support Pakistan's government in its struggle against extremists with a comprehensive effort that extends from military aid to support for better education, so long as Pakistan's leaders remain willing to make difficult choices of their own.**

### Afghanistan

Afghanistan was the incubator for al Qaeda and for the 9/11 attacks. In the fall of 2001, the U.S.-led international coalition and its Afghan allies toppled the Taliban and ended the regime's protection of al Qaeda. Notable progress has been made. International cooperation has been strong, with a clear UN mandate and a NATO-led peacekeeping force (the International Security Assistance Force, or ISAF). More than 10,000 American soldiers are deployed today in Afghanistan, joined by soldiers from NATO allies and Muslim states. A central government has been established in Kabul, with a democratic constitution, new currency, and a new army. Most Afghans enjoy greater freedom, women

and girls are emerging from subjugation, and 3 million children have returned to school. For the first time in many years, Afghans have reason to hope.[11]

But grave challenges remain. Taliban and al Qaeda fighters have regrouped in the south and southeast. Warlords control much of the country beyond Kabul, and the land is awash in weapons. Economic development remains a distant hope. The narcotics trade—long a massive sector of the Afghan economy—is again booming. Even the most hardened aid workers refuse to operate in many regions, and some warn that Afghanistan is near the brink of chaos.[12]

Battered Afghanistan has a chance. Elections are being prepared. It is revealing that in June 2004, Taliban fighters resorted to slaughtering 16 Afghans on a bus, apparently for no reason other than their boldness in carrying an unprecedented Afghan weapon: a voter registration card.

Afghanistan's president, Hamid Karzai, is brave and committed. He is trying to build genuinely national institutions that can overcome the tradition of allocating powers among ethnic communities. Yet even if his efforts are successful and elections bring a democratic government to Afghanistan, the United States faces some difficult choices.

After paying relatively little attention to rebuilding Afghanistan during the military campaign, U.S. policies changed noticeably during 2003. Greater consideration of the political dimension and congressional support for a substantial package of assistance signaled a longer-term commitment to Afghanistan's future. One Afghan regional official plaintively told us the country finally has a good government. He begged the United States to keep its promise and not abandon Afghanistan again, as it had in the 1990s. Another Afghan leader noted that if the United States leaves, "we will lose all that we have gained."[13]

Most difficult is to define the security mission in Afghanistan. There is continuing political controversy about whether military operations in Iraq have had any effect on the scale of America's commitment to the future of Afghanistan. The United States has largely stayed out of the central government's struggles with dissident warlords and it has largely avoided confronting the related problem of narcotrafficking.[14]

**Recommendation: The President and the Congress deserve praise for their efforts in Afghanistan so far. Now the United States and the international community should make a long-term commitment to a secure and stable Afghanistan, in order to give the government a reasonable opportunity to improve the life of the Afghan people. Afghanistan must not again become a sanctuary for international crime and terrorism. The United States and the international community should help the Afghan government extend its authority over the country, with a strategy and nation-by-nation commitments to achieve their objectives.**

- This is an ambitious recommendation. It would mean a redoubled effort to secure the country, disarm militias, and curtail the age of warlord rule. But the United States and NATO have already committed themselves to the future of this region—wisely, as the 9/11 story shows—and failed half-measures could be worse than useless.

- NATO in particular has made Afghanistan a test of the Alliance's ability to adapt to current security challenges of the future. NATO must pass this test. Currently, the United States and the international community envision enough support so that the central government can build a truly national army and extend essential infrastructure and minimum public services to major towns and regions. The effort relies in part on foreign civil-military teams, arranged under various national flags. The institutional commitments of NATO and the United Nations to these enterprises are weak. NATO member states are not following through; some of the other states around the world that have pledged assistance to Afghanistan are not fulfilling their pledges.

- The U.S. presence in Afghanistan is overwhelmingly oriented toward military and security work. The State Department presence is woefully understaffed, and the military mission is narrowly focused on al Qaeda and Taliban remnants in the south and southeast. The U.S. government can do its part if the international community decides on a joint effort to restore the rule of law and contain rampant crime and narcotics trafficking in this crossroads of Central Asia.[15]

We heard again and again that the money for assistance is allocated so rigidly that, on the ground, one U.S. agency often cannot improvise or pitch in to help another agency, even in small ways when a few thousand dollars could make a great difference.

The U.S. government should allocate money so that lower-level officials have more flexibility to get the job done across agency lines, adjusting to the circumstances they find in the field. This should include discretionary funds for expenditures by military units that often encounter opportunities to help the local population.

### Saudi Arabia

Saudi Arabia has been a problematic ally in combating Islamic extremism. At the level of high policy, Saudi Arabia's leaders cooperated with American diplomatic initiatives aimed at the Taliban or Pakistan before 9/11. At the same time, Saudi Arabia's society was a place where al Qaeda raised money directly from individuals and through charities. It was the society that produced 15 of the 19 hijackers.

The Kingdom is one of the world's most religiously conservative societies, and its identity is closely bound to its religious links, especially its position as the guardian of Islam's two holiest sites. Charitable giving, or *zakat*, is one of the five pillars of Islam. It is broader and more pervasive than Western ideas of charity—functioning also as a form of income tax, educational assistance, foreign aid, and a source of political influence. The Western notion of the separation of civic and religious duty does not exist in Islamic cultures. Funding charitable works is an integral function of the governments in the Islamic world. It is so ingrained in Islamic culture that in Saudi Arabia, for example, a department within the Saudi Ministry of Finance and National Economy collects zakat directly, much as the U.S. Internal Revenue Service collects payroll withholding tax. Closely tied to zakat is the dedication of the government to propagating the Islamic faith, particularly the Wahhabi sect that flourishes in Saudi Arabia.

Traditionally, throughout the Muslim world, there is no formal oversight mechanism for donations. As Saudi wealth increased, the amounts contributed by individuals and the state grew dramatically. Substantial sums went to finance Islamic charities of every kind.

While Saudi domestic charities are regulated by the Ministry of Labor and Social Welfare, charities and international relief agencies, such as the World Assembly of Muslim Youth (WAMY), are currently regulated by the Ministry of Islamic Affairs. This ministry uses zakat and government funds to spread Wahhabi beliefs throughout the world, including in mosques and schools. Often these schools provide the only education available; even in affluent countries, Saudi-funded Wahhabi schools are often the only Islamic schools. Some Wahhabi-funded organizations have been exploited by extremists to further their goal of violent jihad against non-Muslims. One such organization has been the al Haramain Islamic Foundation; the assets of some branch offices have been frozen by the U.S. and Saudi governments.

Until 9/11, few Saudis would have considered government oversight of charitable donations necessary; many would have perceived it as interference in the exercise of their faith. At the same time, the government's ability to finance most state expenditures with energy revenues has delayed the need for a modern income tax system. As a result, there have been strong religious, cultural, and administrative barriers to monitoring charitable spending. That appears to be changing, however, now that the goal of violent jihad also extends to overthrowing Sunni governments (such as the House of Saud) that are not living up to the ideals of the Islamist extremists.[16]

The leaders of the United States and the rulers of Saudi Arabia have long had friendly relations, rooted in fundamentally common interests against the Soviet Union during the Cold War, in American hopes that Saudi oil supplies would stabilize the supply and price of oil in world markets, and in Saudi hopes that America could help protect the Kingdom against foreign threats.

In 1990, the Kingdom hosted U.S. armed forces before the first U.S.-led war

against Iraq. American soldiers and airmen have given their lives to help protect Saudi Arabia. The Saudi government has difficulty acknowledging this. American military bases remained there until 2003, as part of an international commitment to contain Iraq.

For many years, leaders on both sides preferred to keep their ties quiet and behind the scenes. As a result, neither the U.S. nor the Saudi people appreciated all the dimensions of the bilateral relationship, including the Saudi role in U.S. strategies to promote the Middle East peace process. In each country, political figures find it difficult to publicly defend good relations with the other.

Today, mutual recriminations flow. Many Americans see Saudi Arabia as an enemy, not as an embattled ally. They perceive an autocratic government that oppresses women, dominated by a wealthy and indolent elite. Saudi contacts with American politicians are frequently invoked as accusations in partisan political arguments. Americans are often appalled by the intolerance, anti-Semitism, and anti-American arguments taught in schools and preached in mosques.

Saudis are angry too. Many educated Saudis who were sympathetic to America now perceive the United States as an unfriendly state. One Saudi reformer noted to us that the demonization of Saudi Arabia in the U.S. media gives ammunition to radicals, who accuse reformers of being U.S. lackeys. Tens of thousands of Saudis who once regularly traveled to (and often had homes in) the United States now go elsewhere.[17]

Among Saudis, the United States is seen as aligned with Israel in its conflict with the Palestinians, with whom Saudis ardently sympathize. Although Saudi Arabia's cooperation against terrorism improved to some extent after the September 11 attacks, significant problems remained. Many in the Kingdom initially reacted with disbelief and denial. In the following months, as the truth became clear, some leading Saudis quietly acknowledged the problem but still did not see their own regime as threatened, and thus often did not respond promptly to U.S. requests for help. Though Saddam Hussein was widely detested, many Saudis are sympathetic to the anti-U.S. insurgents in Iraq, although majorities also condemn jihadist attacks in the Kingdom.[18]

As in Pakistan, Yemen, and other countries, attitudes changed when the terrorism came home. Cooperation had already become significant, but after the bombings in Riyadh on May 12, 2003, it improved much more. The Kingdom openly discussed the problem of radicalism, criticized the terrorists as religiously deviant, reduced official support for religious activity overseas, closed suspect charitable foundations, and publicized arrests—very public moves for a government that has preferred to keep internal problems quiet.

The Kingdom of Saudi Arabia is now locked in mortal combat with al Qaeda. Saudi police are regularly being killed in shootouts with terrorists. In June 2004, the Saudi ambassador to the United States called publicly—in the Saudi press—for his government to wage a jihad of its own against the terrorists. "We must all, as a state and as a people, recognize the truth about these criminals,"

he declared, "[i]f we do not declare a general mobilization—we will lose this war on terrorism."[19]

Saudi Arabia is a troubled country. Although regarded as very wealthy, in fact per capita income has dropped from $28,000 at its height to the present level of about $8,000. Social and religious traditions complicate adjustment to modern economic activity and limit employment opportunities for young Saudis. Women find their education and employment sharply limited.

President Clinton offered us a perceptive analysis of Saudi Arabia, contending that fundamentally friendly rulers have been constrained by their desire to preserve the status quo. He, like others, made the case for pragmatic reform instead. He hopes the rulers will envision what they want their Kingdom to become in 10 or 20 years, and start a process in which their friends can help them change.[20]

There are signs that Saudi Arabia's royal family is trying to build a consensus for political reform, though uncertain about how fast and how far to go. Crown Prince Abdullah wants the Kingdom to join the World Trade Organization to accelerate economic liberalization. He has embraced the *Arab Human Development Report,* which was highly critical of the Arab world's political, economic, and social failings and called for greater economic and political reform.[21]

Cooperation with Saudi Arabia against Islamist terrorism is very much in the U.S. interest. Such cooperation can exist for a time largely in secret, as it does now, but it cannot grow and thrive there. Nor, on either side, can friendship be unconditional.

**Recommendation: The problems in the U.S.–Saudi relationship must be confronted, openly. The United States and Saudi Arabia must determine if they can build a relationship that political leaders on both sides are prepared to publicly defend—a relationship about more than oil. It should include a shared commitment to political and economic reform, as Saudis make common cause with the outside world. It should include a shared interest in greater tolerance and cultural respect, translating into a commitment to fight the violent extremists who foment hatred.**

## 12.3 PREVENT THE CONTINUED GROWTH OF ISLAMIST TERRORISM

In October 2003, reflecting on progress after two years of waging the global war on terrorism, Defense Secretary Donald Rumsfeld asked his advisers: "Are we capturing, killing or deterring and dissuading more terrorists every day than the madrassas and the radical clerics are recruiting, training and deploying

against us? Does the US need to fashion a broad, integrated plan to stop the next generation of terrorists? The US is putting relatively little effort into a long-range plan, but we are putting a great deal of effort into trying to stop terrorists. The cost-benefit ratio is against us! Our cost is billions against the terrorists' costs of millions."[22]

These are the right questions. Our answer is that we need short-term action on a long-range strategy, one that invigorates our foreign policy with the attention that the President and Congress have given to the military and intelligence parts of the conflict against Islamist terrorism.

## Engage the Struggle of Ideas

The United States is heavily engaged in the Muslim world and will be for many years to come. This American engagement is resented. Polls in 2002 found that among America's friends, like Egypt—the recipient of more U.S. aid for the past 20 years than any other Muslim country—only 15 percent of the population had a favorable opinion of the United States. In Saudi Arabia the number was 12 percent. And two-thirds of those surveyed in 2003 in countries from Indonesia to Turkey (a NATO ally) were very or somewhat fearful that the United States may attack them.[23]

Support for the United States has plummeted. Polls taken in Islamic countries after 9/11 suggested that many or most people thought the United States was doing the right thing in its fight against terrorism; few people saw popular support for al Qaeda; half of those surveyed said that ordinary people had a favorable view of the United States. By 2003, polls showed that "the bottom has fallen out of support for America in most of the Muslim world. Negative views of the U.S. among Muslims, which had been largely limited to countries in the Middle East, have spread. . . . Since last summer, favorable ratings for the U.S. have fallen from 61% to 15% in Indonesia and from 71% to 38% among Muslims in Nigeria."[24]

Many of these views are at best uninformed about the United States and, at worst, informed by cartoonish stereotypes, the coarse expression of a fashionable "Occidentalism" among intellectuals who caricature U.S. values and policies. Local newspapers and the few influential satellite broadcasters—like al Jazeera—often reinforce the jihadist theme that portrays the United States as anti-Muslim.[25]

The small percentage of Muslims who are fully committed to Usama Bin Ladin's version of Islam are impervious to persuasion. It is among the large majority of Arabs and Muslims that we must encourage reform, freedom, democracy, and opportunity, even though our own promotion of these messages is limited in its effectiveness simply because we are its carriers. Muslims themselves will have to reflect upon such basic issues as the concept of jihad, the position of women, and the place of non-Muslim minorities. The United

States can promote moderation, but cannot ensure its ascendancy. Only Muslims can do this.

The setting is difficult. The combined gross domestic product of the 22 countries in the Arab League is less than the GDP of Spain. Forty percent of adult Arabs are illiterate, two-thirds of them women. One-third of the broader Middle East lives on less than two dollars a day. Less than 2 percent of the population has access to the Internet. The majority of older Arab youths have expressed a desire to emigrate to other countries, particularly those in Europe.[26]

In short, the United States has to help defeat an ideology, not just a group of people, and we must do so under difficult circumstances. How can the United States and its friends help moderate Muslims combat the extremist ideas?

**Recommendation: The U.S. government must define what the message is, what it stands for. We should offer an example of moral leadership in the world, committed to treat people humanely, abide by the rule of law, and be generous and caring to our neighbors. America and Muslim friends can agree on respect for human dignity and opportunity. To Muslim parents, terrorists like Bin Ladin have nothing to offer their children but visions of violence and death. America and its friends have a crucial advantage—we can offer these parents a vision that might give their children a better future. If we heed the views of thoughtful leaders in the Arab and Muslim world, a moderate consensus can be found.**

That vision of the future should stress life over death: individual educational and economic opportunity. This vision includes widespread political participation and contempt for indiscriminate violence. It includes respect for the rule of law, openness in discussing differences, and tolerance for opposing points of view.

**Recommendation: Where Muslim governments, even those who are friends, do not respect these principles, the United States must stand for a better future. One of the lessons of the long Cold War was that short-term gains in cooperating with the most repressive and brutal governments were too often outweighed by long-term setbacks for America's stature and interests.**

American foreign policy is part of the message. America's policy choices have consequences. Right or wrong, it is simply a fact that American policy regarding the Israeli–Palestinian conflict and American actions in Iraq are dominant staples of popular commentary across the Arab and Muslim world. That does not mean U.S. choices have been wrong. It means those choices must be integrated with America's message of opportunity to the Arab and Muslim

world. Neither Israel nor the new Iraq will be safer if worldwide Islamist terrorism grows stronger.

The United States must do more to communicate its message. Reflecting on Bin Ladin's success in reaching Muslim audiences, Richard Holbrooke wondered, "How can a man in a cave outcommunicate the world's leading communications society?" Deputy Secretary of State Richard Armitage worried to us that Americans have been "exporting our fears and our anger," not our vision of opportunity and hope.[27]

**Recommendation: Just as we did in the Cold War, we need to defend our ideals abroad vigorously. America does stand up for its values. The United States defended, and still defends, Muslims against tyrants and criminals in Somalia, Bosnia, Kosovo, Afghanistan, and Iraq. If the United States does not act aggressively to define itself in the Islamic world, the extremists will gladly do the job for us.**

- **Recognizing that Arab and Muslim audiences rely on satellite television and radio, the government has begun some promising initiatives in television and radio broadcasting to the Arab world, Iran, and Afghanistan. These efforts are beginning to reach large audiences. The Broadcasting Board of Governors has asked for much larger resources. It should get them.**

- **The United States should rebuild the scholarship, exchange, and library programs that reach out to young people and offer them knowledge and hope. Where such assistance is provided, it should be identified as coming from the citizens of the United States.**

### An Agenda of Opportunity

The United States and its friends can stress educational and economic opportunity. The United Nations has rightly equated "literacy as freedom."

- The international community is moving toward setting a concrete goal—to cut the Middle East region's illiteracy rate in half by 2010, targeting women and girls and supporting programs for adult literacy.

- Unglamorous help is needed to support the basics, such as textbooks that translate more of the world's knowledge into local languages and libraries to house such materials. Education about the outside world, or other cultures, is weak.

- More vocational education is needed, too, in trades and business skills. The Middle East can also benefit from some of the programs to bridge the digital divide and increase Internet access that have already been developed for other regions of the world.

Education that teaches tolerance, the dignity and value of each individual, and respect for different beliefs is a key element in any global strategy to eliminate Islamist terrorism.

**Recommendation: The U.S. government should offer to join with other nations in generously supporting a new International Youth Opportunity Fund. Funds will be spent directly for building and operating primary and secondary schools in those Muslim states that commit to sensibly investing their own money in public education.**

Economic openness is essential. Terrorism is not caused by poverty. Indeed, many terrorists come from relatively well-off families. Yet when people lose hope, when societies break down, when countries fragment, the breeding grounds for terrorism are created. Backward economic policies and repressive political regimes slip into societies that are without hope, where ambition and passions have no constructive outlet.

The policies that support economic development and reform also have political implications. Economic and political liberties tend to be linked. Commerce, especially international commerce, requires ongoing cooperation and compromise, the exchange of ideas across cultures, and the peaceful resolution of differences through negotiation or the rule of law. Economic growth expands the middle class, a constituency for further reform. Successful economies rely on vibrant private sectors, which have an interest in curbing indiscriminate government power. Those who develop the practice of controlling their own economic destiny soon desire a voice in their communities and political societies.

The U.S. government has announced the goal of working toward a Middle East Free Trade Area, or MEFTA, by 2013. The United States has been seeking comprehensive free trade agreements (FTAs) with the Middle Eastern nations most firmly on the path to reform. The U.S.-Israeli FTA was enacted in 1985, and Congress implemented an FTA with Jordan in 2001. Both agreements have expanded trade and investment, thereby supporting domestic economic reform. In 2004, new FTAs were signed with Morocco and Bahrain, and are awaiting congressional approval. These models are drawing the interest of their neighbors. Muslim countries can become full participants in the rules-based global trading system, as the United States considers lowering its trade barriers with the poorest Arab nations.

**Recommendation: A comprehensive U.S. strategy to counter terrorism should include economic policies that encourage development, more open societies, and opportunities for people to improve the lives of their families and to enhance prospects for their children's future.**

**Turning a National Strategy into a Coalition Strategy**

Practically every aspect of U.S. counterterrorism strategy relies on international cooperation. Since 9/11, these contacts concerning military, law enforcement, intelligence, travel and customs, and financial matters have expanded so dramatically, and often in an ad hoc way, that it is difficult to track these efforts, much less integrate them.

**Recommendation: The United States should engage other nations in developing a comprehensive coalition strategy against Islamist terrorism. There are several multilateral institutions in which such issues should be addressed. But the most important policies should be discussed and coordinated in a flexible contact group of leading coalition governments. This is a good place, for example, to develop joint strategies for targeting terrorist travel, or for hammering out a common strategy for the places where terrorists may be finding sanctuary.**

Presently the Muslim and Arab states meet with each other, in organizations such as the Islamic Conference and the Arab League. The Western states meet with each other in organizations such as NATO and the Group of Eight summit of leading industrial nations. A recent G-8 summit initiative to begin a dialogue about reform may be a start toward finding a place where leading Muslim states can discuss—and be seen to discuss—critical policy issues with the leading Western powers committed to the future of the Arab and Muslim world.

These new international efforts can create durable habits of visible cooperation, as states willing to step up to their responsibilities join together in constructive efforts to direct assistance and coordinate action.

Coalition warfare also requires coalition policies on what to do with enemy captives. Allegations that the United States abused prisoners in its custody make it harder to build the diplomatic, political, and military alliances the government will need. The United States should work with friends to develop mutually agreed-on principles for the detention and humane treatment of captured international terrorists who are not being held under a particular country's criminal laws. Countries such as Britain, Australia, and Muslim friends, are committed to fighting terrorists. America should be able to reconcile its views on how to balance humanity and security with our nation's commitment to these same goals.

The United States and some of its allies do not accept the application of full Geneva Convention treatment of prisoners of war to captured terrorists. Those

Conventions establish a minimum set of standards for prisoners in internal conflicts. Since the international struggle against Islamist terrorism is not internal, those provisions do not formally apply, but they are commonly accepted as basic standards for humane treatment.

**Recommendation: The United States should engage its friends to develop a common coalition approach toward the detention and humane treatment of captured terrorists. New principles might draw upon Article 3 of the Geneva Conventions on the law of armed conflict. That article was specifically designed for those cases in which the usual laws of war did not apply. Its minimum standards are generally accepted throughout the world as customary international law.**

### Proliferation of Weapons of Mass Destruction

The greatest danger of another catastrophic attack in the United States will materialize if the world's most dangerous terrorists acquire the world's most dangerous weapons. As we note in chapter 2, al Qaeda has tried to acquire or make nuclear weapons for at least ten years. In chapter 4, we mentioned officials worriedly discussing, in 1998, reports that Bin Ladin's associates thought their leader was intent on carrying out a "Hiroshima."

These ambitions continue. In the public portion of his February 2004 worldwide threat assessment to Congress, DCI Tenet noted that Bin Ladin considered the acquisition of weapons of mass destruction to be a "religious obligation." He warned that al Qaeda "continues to pursue its strategic goal of obtaining a nuclear capability." Tenet added that "more than two dozen other terrorist groups are pursuing CBRN [chemical, biological, radiological, and nuclear] materials."[28]

A nuclear bomb can be built with a relatively small amount of nuclear material. A trained nuclear engineer with an amount of highly enriched uranium or plutonium about the size of a grapefruit or an orange, together with commercially available material, could fashion a nuclear device that would fit in a van like the one Ramzi Yousef parked in the garage of the World Trade Center in 1993. Such a bomb would level Lower Manhattan.[29]

The coalition strategies we have discussed to combat Islamist terrorism should therefore be combined with a parallel, vital effort to prevent and counter the proliferation of weapons of mass destruction (WMD). We recommend several initiatives in this area.

**Strengthen Counterproliferation Efforts**. While efforts to shut down Libya's illegal nuclear program have been generally successful, Pakistan's illicit trade and the nuclear smuggling networks of Pakistani scientist A.Q. Khan have revealed that the spread of nuclear weapons is a problem of global dimensions. Attempts to deal with Iran's nuclear program are still underway. Therefore, the

United States should work with the international community to develop laws and an international legal regime with universal jurisdiction to enable the capture, interdiction, and prosecution of such smugglers by any state in the world where they do not disclose their activities.

**Expand the Proliferation Security Initiative**. In May 2003, the Bush administration announced the Proliferation Security Initiative (PSI): nations in a willing partnership combining their national capabilities to use military, economic, and diplomatic tools to interdict threatening shipments of WMD and missile-related technology.

The PSI can be more effective if it uses intelligence and planning resources of the NATO alliance. Moreover, PSI membership should be open to non-NATO countries. Russia and China should be encouraged to participate.

**Support the Cooperative Threat Reduction Program.** Outside experts are deeply worried about the U.S. government's commitment and approach to securing the weapons and highly dangerous materials still scattered in Russia and other countries of the Soviet Union. The government's main instrument in this area, the Cooperative Threat Reduction Program (usually referred to as "Nunn-Lugar," after the senators who sponsored the legislation in 1991), is now in need of expansion, improvement, and resources. The U.S. government has recently redoubled its international commitments to support this program, and we recommend that the United States do all it can, if Russia and other countries will do their part. The government should weigh the value of this investment against the catastrophic cost America would face should such weapons find their way to the terrorists who are so anxious to acquire them.

**Recommendation: Our report shows that al Qaeda has tried to acquire or make weapons of mass destruction for at least ten years. There is no doubt the United States would be a prime target. Preventing the proliferation of these weapons warrants a maximum effort—by strengthening counterproliferation efforts, expanding the Proliferation Security Initiative, and supporting the Cooperative Threat Reduction program.**

### Targeting Terrorist Money

The general public sees attacks on terrorist finance as a way to "starve the terrorists of money." So, initially, did the U.S. government. After 9/11, the United States took aggressive actions to designate terrorist financiers and freeze their money, in the United States and through resolutions of the United Nations. These actions appeared to have little effect and, when confronted by legal challenges, the United States and the United Nations were often forced to unfreeze assets.

The difficulty, understood later, was that even if the intelligence community might "link" someone to a terrorist group through acquaintances or communications, the task of tracing the money from that individual to the terrorist group, or otherwise showing complicity, was far more difficult. It was harder still to do so without disclosing secrets.

These early missteps made other countries unwilling to freeze assets or otherwise act merely on the basis of a U.S. action. Multilateral freezing mechanisms now require waiting periods before being put into effect, eliminating the element of surprise and thus virtually ensuring that little money is actually frozen. Worldwide asset freezes have not been adequately enforced and have been easily circumvented, often within weeks, by simple methods.

But trying to starve the terrorists of money is like trying to catch one kind of fish by draining the ocean. A better strategy has evolved since those early months, as the government learned more about how al Qaeda raises, moves, and spends money.

**Recommendation: Vigorous efforts to track terrorist financing must remain front and center in U.S. counterterrorism efforts. The government has recognized that information about terrorist money helps us to understand their networks, search them out, and disrupt their operations. Intelligence and law enforcement have targeted the relatively small number of financial facilitators—individuals al Qaeda relied on for their ability to raise and deliver money—at the core of al Qaeda's revenue stream. These efforts have worked. The death or capture of several important facilitators has decreased the amount of money available to al Qaeda and has increased its costs and difficulty in raising and moving that money. Captures have additionally provided a windfall of intelligence that can be used to continue the cycle of disruption.**

The U.S. financial community and some international financial institutions have generally provided law enforcement and intelligence agencies with extraordinary cooperation, particularly in supplying information to support quickly developing investigations. Obvious vulnerabilities in the U.S. financial system have been corrected. The United States has been less successful in persuading other countries to adopt financial regulations that would permit the tracing of financial transactions.

Public designation of terrorist financiers and organizations is still part of the fight, but it is not the primary weapon. Designations are instead a form of diplomacy, as governments join together to identify named individuals and groups as terrorists. They also prevent open fundraising. Some charities that have been identified as likely avenues for terrorist financing have seen their donations

diminish and their activities come under more scrutiny, and others have been put out of business, although controlling overseas branches of Gulf-area charities remains a challenge. The Saudi crackdown after the May 2003 terrorist attacks in Riyadh has apparently reduced the funds available to al Qaeda—perhaps drastically—but it is too soon to know if this reduction will last.

Though progress apparently has been made, terrorists have shown considerable creativity in their methods of moving money. If al Qaeda is replaced by smaller, decentralized terrorist groups, the premise behind the government's efforts—that terrorists need a financial support network—may become outdated. Moreover, some terrorist operations do not rely on outside sources of money and may now be self-funding, either through legitimate employment or low-level criminal activity.[30]

## 12.4    PROTECT AGAINST AND PREPARE FOR TERRORIST ATTACKS

In the nearly three years since 9/11, Americans have become better protected against terrorist attack. Some of the changes are due to government action, such as new precautions to protect aircraft. A portion can be attributed to the sheer scale of spending and effort. Publicity and the vigilance of ordinary Americans also make a difference.

But the President and other officials acknowledge that although Americans may be safer, they are not safe. Our report shows that the terrorists analyze defenses. They plan accordingly.

Defenses cannot achieve perfect safety. They make targets harder to attack successfully, and they deter attacks by making capture more likely. Just increasing the attacker's odds of failure may make the difference between a plan attempted, or a plan discarded. The enemy also may have to develop more elaborate plans, thereby increasing the danger of exposure or defeat.

Protective measures also prepare for the attacks that may get through, containing the damage and saving lives.

**Terrorist Travel**
More than 500 million people annually cross U.S. borders at legal entry points, about 330 million of them noncitizens. Another 500,000 or more enter illegally without inspection across America's thousands of miles of land borders or remain in the country past the expiration of their permitted stay. The challenge for national security in an age of terrorism is to prevent the very few people who may pose overwhelming risks from entering or remaining in the United States undetected.[31]

In the decade before September 11, 2001, border security—encompassing