travel, entry, and immigration—was not seen as a national security matter. Public figures voiced concern about the "war on drugs," the right level and kind of immigration, problems along the southwest border, migration crises originating in the Caribbean and elsewhere, or the growing criminal traffic in humans. The immigration system as a whole was widely viewed as increasingly dysfunctional and badly in need of reform. In national security circles, however, only smuggling of weapons of mass destruction carried weight, not the entry of terrorists who might use such weapons or the presence of associated foreign-born terrorists.

For terrorists, travel documents are as important as weapons. Terrorists must travel clandestinely to meet, train, plan, case targets, and gain access to attack. To them, international travel presents great danger, because they must surface to pass through regulated channels, present themselves to border security officials, or attempt to circumvent inspection points.

In their travels, terrorists use evasive methods, such as altered and counterfeit passports and visas, specific travel methods and routes, liaisons with corrupt government officials, human smuggling networks, supportive travel agencies, and immigration and identity fraud. These can sometimes be detected.

Before 9/11, no agency of the U.S. government systematically analyzed terrorists' travel strategies. Had they done so, they could have discovered the ways in which the terrorist predecessors to al Qaeda had been systematically but detectably exploiting weaknesses in our border security since the early 1990s.

We found that as many as 15 of the 19 hijackers were potentially vulnerable to interception by border authorities. Analyzing their characteristic travel documents and travel patterns could have allowed authorities to intercept 4 to 15 hijackers and more effective use of information available in U.S. government databases could have identified up to 3 hijackers.[32]

Looking back, we can also see that the routine operations of our immigration laws—that is, aspects of those laws not specifically aimed at protecting against terrorism—inevitably shaped al Qaeda's planning and opportunities. Because they were deemed not to be bona fide tourists or students as they claimed, five conspirators that we know of tried to get visas and failed, and one was denied entry by an inspector. We also found that had the immigration system set a higher bar for determining whether individuals are who or what they claim to be—and ensuring routine consequences for violations—it could potentially have excluded, removed, or come into further contact with several hijackers who did not appear to meet the terms for admitting short-term visitors.[33]

Our investigation showed that two systemic weaknesses came together in our border system's inability to contribute to an effective defense against the 9/11 attacks: a lack of well-developed counterterrorism measures as a part of border security and an immigration system not able to deliver on its basic commitments, much less support counterterrorism. These weaknesses have been reduced but are far from being overcome.

**Recommendation: Targeting travel is at least as powerful a weapon against terrorists as targeting their money. The United States should combine terrorist travel intelligence, operations, and law enforcement in a strategy to intercept terrorists, find terrorist travel facilitators, and constrain terrorist mobility.**

Since 9/11, significant improvements have been made to create an integrated watchlist that makes terrorist name information available to border and law enforcement authorities. However, in the already difficult process of merging border agencies in the new Department of Homeland Security—"changing the engine while flying" as one official put it[34]—new insights into terrorist travel have not yet been integrated into the front lines of border security.

The small terrorist travel intelligence collection and analysis program currently in place has produced disproportionately useful results. It should be expanded. Since officials at the borders encounter travelers and their documents first and investigate travel facilitators, they must work closely with intelligence officials.

Internationally and in the United States, constraining terrorist travel should become a vital part of counterterrorism strategy. Better technology and training to detect terrorist travel documents are the most important immediate steps to reduce America's vulnerability to clandestine entry. Every stage of our border and immigration system should have as a part of its operations the detection of terrorist indicators on travel documents. Information systems able to authenticate travel documents and detect potential terrorist indicators should be used at consulates, at primary border inspection lines, in immigration services offices, and in intelligence and enforcement units. All frontline personnel should receive some training. Dedicated specialists and ongoing linkages with the intelligence community are also required. The Homeland Security Department's Directorate of Information Analysis and Infrastructure Protection should receive more resources to accomplish its mission as the bridge between the frontline border agencies and the rest of the government counterterrorism community.

### A Biometric Screening System

When people travel internationally, they usually move through defined channels, or portals. They may seek to acquire a passport. They may apply for a visa. They stop at ticket counters, gates, and exit controls at airports and seaports. Upon arrival, they pass through inspection points. They may transit to another gate to get on an airplane. Once inside the country, they may seek another form of identification and try to enter a government or private facility. They may seek to change immigration status in order to remain.

Each of these checkpoints or portals is a screening—a chance to establish that people are who they say they are and are seeking access for their stated purpose, to intercept identifiable suspects, and to take effective action.

The job of protection is shared among these many defined checkpoints. By taking advantage of them all, we need not depend on any one point in the system to do the whole job. The challenge is to see the common problem across agencies and functions and develop a conceptual framework—an architecture—for an effective screening system.[35]

Throughout government, and indeed in private enterprise, agencies and firms at these portals confront recurring judgments that balance security, efficiency, and civil liberties. These problems should be addressed systemically, not in an ad hoc, fragmented way. For example:

**What information is an individual required to present and in what form?** A fundamental problem, now beginning to be addressed, is the lack of standardized information in "feeder" documents used in identifying individuals. Biometric identifiers that measure unique physical characteristics, such as facial features, fingerprints, or iris scans, and reduce them to digitized, numerical statements called algorithms, are just beginning to be used. Travel history, however, is still recorded in passports with entry-exit stamps called cachets, which al Qaeda has trained its operatives to forge and use to conceal their terrorist activities.

**How will the individual and the information be checked?** There are many databases just in the United States—for terrorist, criminal, and immigration history, as well as financial information, for instance. Each is set up for different purposes and stores different kinds of data, under varying rules of access. Nor is access always guaranteed. Acquiring information held by foreign governments may require painstaking negotiations, and records that are not yet digitized are difficult to search or analyze. The development of terrorist indicators has hardly begun, and behavioral cues remain important.

**Who will screen individuals, and what will they be trained to do?** A wide range of border, immigration, and law enforcement officials encounter visitors and immigrants and they are given little training in terrorist travel intelligence**.** Fraudulent travel documents, for instance, are usually returned to travelers who are denied entry without further examination for terrorist trademarks, investigation as to their source, or legal process.

**What are the consequences of finding a suspicious indicator, and who will take action?** One risk is that responses may be ineffective or produce no further information. Four of the 9/11 attackers were pulled into secondary border inspection, but then admitted. More than half of the 19 hijackers were flagged by the Federal Aviation Administration's profiling system when they arrived for their flights, but the consequence was that bags, not people, were

checked. Competing risks include "false positives," or the danger that rules may be applied with insufficient training or judgment. Overreactions can impose high costs too—on individuals, our economy, and our beliefs about justice.

- A special note on the importance of trusting subjective judgment: One potential hijacker was turned back by an immigration inspector as he tried to enter the United States. The inspector relied on intuitive experience to ask questions more than he relied on any objective factor that could be detected by "scores" or a machine. Good people who have worked in such jobs for a long time understand this phenomenon well. Other evidence we obtained confirmed the importance of letting experienced gate agents or security screeners ask questions and use their judgment. This is not an invitation to arbitrary exclusions. But any effective system has to grant some scope, perhaps in a little extra inspection or one more check, to the instincts and discretion of well trained human beings.

**Recommendation: The U.S. border security system should be integrated into a larger network of screening points that includes our transportation system and access to vital facilities, such as nuclear reactors. The President should direct the Department of Homeland Security to lead the effort to design a comprehensive screening system, addressing common problems and setting common standards with systemwide goals in mind. Extending those standards among other governments could dramatically strengthen America and the world's collective ability to intercept individuals who pose catastrophic threats.**

We advocate a system for screening, not categorical profiling. A screening system looks for particular, identifiable suspects or indicators of risk. It does not involve guesswork about who might be dangerous. It requires frontline border officials who have the tools and resources to establish that people are who they say they are, intercept identifiable suspects, and disrupt terrorist operations.

### The U.S. Border Screening System

The border and immigration system of the United States must remain a visible manifestation of our belief in freedom, democracy, global economic growth, and the rule of law, yet serve equally well as a vital element of counterterrorism. Integrating terrorist travel information in the ways we have described is the most immediate need. But the underlying system must also be sound.

Since September 11, the United States has built the first phase of a biometric screening program, called US VISIT (the United States Visitor and Immigrant Status Indicator Technology program). It takes two biometric

identifiers—digital photographs and prints of two index fingers—from travelers. False identities are used by terrorists to avoid being detected on a watchlist. These biometric identifiers make such evasions far more difficult.

So far, however, only visitors who acquire visas to travel to the United States are covered. While visitors from "visa waiver" countries will be added to the program, beginning this year, covered travelers will still constitute only about 12 percent of all noncitizens crossing U.S. borders. Moreover, exit data are not uniformly collected and entry data are not fully automated. It is not clear the system can be installed before 2010, but even this timetable may be too slow, given the possible security dangers.[36]

- Americans should not be exempt from carrying biometric passports or otherwise enabling their identities to be securely verified when they enter the United States; nor should Canadians or Mexicans. Currently U.S. persons are exempt from carrying passports when returning from Canada, Mexico, and the Caribbean. The current system enables non-U.S. citizens to gain entry by showing minimal identification. The 9/11 experience shows that terrorists study and exploit America's vulnerabilities.

- To balance this measure, programs to speed known travelers should be a higher priority, permitting inspectors to focus on greater risks. The daily commuter should not be subject to the same measures as first-time travelers. An individual should be able to preenroll, with his or her identity verified in passage. Updates of database information and other checks can ensure ongoing reliability. The solution, requiring more research and development, is likely to combine radio frequency technology with biometric identifiers.[37]

- The current patchwork of border screening systems, including several frequent traveler programs, should be consolidated with the US VISIT system to enable the development of an integrated system, which in turn can become part of the wider screening plan we suggest.

- The program allowing individuals to travel from foreign countries through the United States to a third country, without having to obtain a U.S. visa, has been suspended. Because "transit without visa" can be exploited by terrorists to enter the United States, the program should not be reinstated unless and until transit passage areas can be fully secured to prevent passengers from illegally exiting the airport.

Inspectors adjudicating entries of the 9/11 hijackers lacked adequate information and knowledge of the rules. All points in the border system—from consular offices to immigration services offices—will need appropriate electronic access to an individual's file. Scattered units at Homeland Security and the State

Department perform screening and data mining: instead, a government–wide team of border and transportation officials should be working together. A modern border and immigration system should combine a biometric entry–exit system with accessible files on visitors and immigrants, along with intelligence on indicators of terrorist travel.

Our border screening system should check people efficiently and welcome friends. Admitting large numbers of students, scholars, businesspeople, and tourists fuels our economy, cultural vitality, and political reach. There is evidence that the present system is disrupting travel to the United States. Overall, visa applications in 2003 were down over 32 percent since 2001. In the Middle East, they declined about 46 percent. Training and the design of security measures should be continuously adjusted.[38]

**Recommendation: The Department of Homeland Security, properly supported by the Congress, should complete, as quickly as possible, a biometric entry–exit screening system, including a single system for speeding qualified travelers. It should be integrated with the system that provides benefits to foreigners seeking to stay in the United States. Linking biometric passports to good data systems and decisionmaking is a fundamental goal. No one can hide his or her debt by acquiring a credit card with a slightly different name. Yet today, a terrorist can defeat the link to electronic records by tossing away an old passport and slightly altering the name in the new one.**

Completion of the entry-exit system is a major and expensive challenge. Biometrics have been introduced into an antiquated computer environment. Replacement of these systems and improved biometric systems will be required. Nonetheless, funding and completing a biometrics-based entry-exit system is an essential investment in our national security.

Exchanging terrorist information with other countries, consistent with privacy requirements, along with listings of lost and stolen passports, will have immediate security benefits. We should move toward real-time verification of passports with issuing authorities. The further away from our borders that screening occurs, the more security benefits we gain. At least some screening should occur before a passenger departs on a flight destined for the United States. We should also work with other countries to ensure effective inspection regimes at all airports.[39]

The international community arrives at international standards for the design of passports through the International Civil Aviation Organization (ICAO). The global standard for identification is a digital photograph; fingerprints are optional. We must work with others to improve passport standards and provide foreign assistance to countries that need help in making the transition.[40]

**Recommendation: The U.S. government cannot meet its own obligations to the American people to prevent the entry of terrorists without a major effort to collaborate with other governments. We should do more to exchange terrorist information with trusted allies, and raise U.S. and global border security standards for travel and border crossing over the medium and long term through extensive international cooperation.**

### Immigration Law and Enforcement

Our borders and immigration system, including law enforcement, ought to send a message of welcome, tolerance, and justice to members of immigrant communities in the United States and in their countries of origin. We should reach out to immigrant communities. Good immigration services are one way of doing so that is valuable in every way—including intelligence.

It is elemental to border security to know who is coming into the country. Today more than 9 million people are in the United States outside the legal immigration system. We must also be able to monitor and respond to entrances between our ports of entry, working with Canada and Mexico as much as possible.

There is a growing role for state and local law enforcement agencies. They need more training and work with federal agencies so that they can cooperate more effectively with those federal authorities in identifying terrorist suspects.

All but one of the 9/11 hijackers acquired some form of U.S. identification document, some by fraud. Acquisition of these forms of identification would have assisted them in boarding commercial flights, renting cars, and other necessary activities.

**Recommendation: Secure identification should begin in the United States. The federal government should set standards for the issuance of birth certificates and sources of identification, such as drivers licenses. Fraud in identification documents is no longer just a problem of theft. At many entry points to vulnerable facilities, including gates for boarding aircraft, sources of identification are the last opportunity to ensure that people are who they say they are and to check whether they are terrorists.[41]**

### Strategies for Aviation and Transportation Security

The U.S. transportation system is vast and, in an open society, impossible to secure completely against terrorist attacks. There are hundreds of commercial airports, thousands of planes, and tens of thousands of daily flights carrying more than half a billion passengers a year. Millions of containers are imported annually through more than 300 sea and river ports served by more than 3,700 cargo and passenger terminals. About 6,000 agencies provide transit services

through buses, subways, ferries, and light-rail service to about 14 million Americans each weekday.[42]

In November 2001, Congress passed and the President signed the Aviation and Transportation Security Act. This act created the Transportation Security Administration (TSA), which is now part of the Homeland Security Department. In November 2002, both the Homeland Security Act and the Maritime Transportation Security Act followed. These laws required the development of strategic plans to describe how the new department and TSA would provide security for critical parts of the U.S. transportation sector.

Over 90 percent of the nation's $5.3 billion annual investment in the TSA goes to aviation—to fight the last war. The money has been spent mainly to meet congressional mandates to federalize the security checkpoint screeners and to deploy existing security methods and technologies at airports. The current efforts do not yet reflect a forward-looking strategic plan systematically analyzing assets, risks, costs, and benefits. Lacking such a plan, we are not convinced that our transportation security resources are being allocated to the greatest risks in a cost-effective way.

- Major vulnerabilities still exist in cargo and general aviation security. These, together with inadequate screening and access controls, continue to present aviation security challenges.
- While commercial aviation remains a possible target, terrorists may turn their attention to other modes. Opportunities to do harm are as great, or greater, in maritime or surface transportation. Initiatives to secure shipping containers have just begun. Surface transportation systems such as railroads and mass transit remain hard to protect because they are so accessible and extensive.

Despite congressional deadlines, the TSA has developed neither an integrated strategic plan for the transportation sector nor specific plans for the various modes—air, sea, and ground.

**Recommendation: Hard choices must be made in allocating limited resources. The U.S. government should identify and evaluate the transportation assets that need to be protected, set risk-based priorities for defending them, select the most practical and cost-effective ways of doing so, and then develop a plan, budget, and funding to implement the effort. The plan should assign roles and missions to the relevant authorities (federal, state, regional, and local) and to private stakeholders. In measuring effectiveness, perfection is unattainable. But terrorists should perceive that potential targets are defended. They may be deterred by a significant chance of failure.**

Congress should set a specific date for the completion of these plans and hold the Department of Homeland Security and TSA accountable for achieving them.

The most powerful investments may be for improvements in technologies with applications across the transportation modes, such as scanning technologies designed to screen containers that can be transported by plane, ship, truck, or rail. Though such technologies are becoming available now, widespread deployment is still years away.

In the meantime, the best protective measures may be to combine improved methods of identifying and tracking the high-risk containers, operators, and facilities that require added scrutiny with further efforts to integrate intelligence analysis, effective procedures for transmitting threat information to transportation authorities, and vigilance by transportation authorities and the public.

### A Layered Security System

No single security measure is foolproof. Accordingly, the TSA must have multiple layers of security in place to defeat the more plausible and dangerous forms of attack against public transportation.

- The plan must take into consideration the full array of possible enemy tactics, such as use of insiders, suicide terrorism, or standoff attack. Each layer must be effective in its own right. Each must be supported by other layers that are redundant and coordinated.
- The TSA should be able to identify for Congress the array of potential terrorist attacks, the layers of security in place, and the reliability provided by each layer. TSA must develop a plan as described above to improve weak individual layers and the effectiveness of the layered systems it deploys.

On 9/11, the 19 hijackers were screened by a computer-assisted screening system called CAPPS. More than half were identified for further inspection, which applied only to their checked luggage.

Under current practices, air carriers enforce government orders to stop certain known and suspected terrorists from boarding commercial flights and to apply secondary screening procedures to others. The "no-fly" and "automatic selectee" lists include only those individuals who the U.S. government believes pose a direct threat of attacking aviation.

Because air carriers implement the program, concerns about sharing intelligence information with private firms and foreign countries keep the U.S. government from listing all terrorist and terrorist suspects who should be included. The TSA has planned to take over this function when it deploys a new screening system to take the place of CAPPS. The deployment of this system has been delayed because of claims it may violate civil liberties.

**Recommendation: Improved use of "no-fly" and "automatic selectee" lists should not be delayed while the argument about a successor to CAPPS continues. This screening function should be performed by the TSA, and it should utilize the larger set of watchlists maintained by the federal government. Air carriers should be required to supply the information needed to test and implement this new system.**

CAPPS is still part of the screening process, still profiling passengers, with the consequences of selection now including personal searches of the individual and carry-on bags. The TSA is dealing with the kind of screening issues that are being encountered by other agencies. As we mentioned earlier, these screening issues need to be elevated for high-level attention and addressed promptly by the government. Working through these problems can help clear the way for the TSA's screening improvements and would help many other agencies too.

The next layer is the screening checkpoint itself. As the screening system tries to stop dangerous people, the checkpoint needs to be able to find dangerous items. Two reforms are needed soon: (1) screening people for explosives, not just their carry-on bags, and (2) improving screener performance.

**Recommendation: The TSA and the Congress must give priority attention to improving the ability of screening checkpoints to detect explosives on passengers. As a start, each individual selected for special screening should be screened for explosives. Further, the TSA should conduct a human factors study, a method often used in the private sector, to understand problems in screener performance and set attainable objectives for individual screeners and for the checkpoints where screening takes place.**

Concerns also remain regarding the screening and transport of checked bags and cargo. More attention and resources should be directed to reducing or mitigating the threat posed by explosives in vessels' cargo holds. The TSA should expedite the installation of advanced (in-line) baggage-screening equipment. Because the aviation industry will derive substantial benefits from this deployment, it should pay a fair share of the costs. The TSA should require that every passenger aircraft carrying cargo must deploy at least one hardened container to carry any suspect cargo. TSA also needs to intensify its efforts to identify, track, and appropriately screen potentially dangerous cargo in both the aviation and maritime sectors.

### The Protection of Civil Liberties

Many of our recommendations call for the government to increase its presence in our lives—for example, by creating standards for the issuance of forms of

identification, by better securing our borders, by sharing information gathered by many different agencies. We also recommend the consolidation of authority over the now far-flung entities constituting the intelligence community. The Patriot Act vests substantial powers in our federal government. We have seen the government use the immigration laws as a tool in its counterterrorism effort. Even without the changes we recommend, the American public has vested enormous authority in the U.S. government.

At our first public hearing on March 31, 2003, we noted the need for balance as our government responds to the real and ongoing threat of terrorist attacks. The terrorists have used our open society against us. In wartime, government calls for greater powers, and then the need for those powers recedes after the war ends. This struggle will go on. Therefore, while protecting our homeland, Americans should be mindful of threats to vital personal and civil liberties. This balancing is no easy task, but we must constantly strive to keep it right.

This shift of power and authority to the government calls for an enhanced system of checks and balances to protect the precious liberties that are vital to our way of life. We therefore make three recommendations.

First, as we will discuss in chapter 13, to open up the sharing of information across so many agencies and with the private sector, the President should take responsibility for determining what information can be shared by which agencies and under what conditions. Protection of privacy rights should be one key element of this determination.

**Recommendation: As the President determines the guidelines for information sharing among government agencies and by those agencies with the private sector, he should safeguard the privacy of individuals about whom information is shared.**

Second, Congress responded, in the immediate aftermath of 9/11, with the Patriot Act, which vested substantial new powers in the investigative agencies of the government. Some of the most controversial provisions of the Patriot Act are to "sunset" at the end of 2005. Many of the act's provisions are relatively noncontroversial, updating America's surveillance laws to reflect technological developments in a digital age. Some executive actions that have been criticized are unrelated to the Patriot Act. The provisions in the act that facilitate the sharing of information among intelligence agencies and between law enforcement and intelligence appear, on balance, to be beneficial. Because of concerns regarding the shifting balance of power to the government, we think that a full and informed debate on the Patriot Act would be healthy.

**Recommendation: The burden of proof for retaining a particular governmental power should be on the executive, to explain (a) that the power actually materially enhances security and (b) that there is ade-**

**quate supervision of the executive's use of the powers to ensure protection of civil liberties. If the power is granted, there must be adequate guidelines and oversight to properly confine its use.**

Third, during the course of our inquiry, we were told that there is no office within the government whose job it is to look across the government at the actions we are taking to protect ourselves to ensure that liberty concerns are appropriately considered. If, as we recommend, there is substantial change in the way we collect and share intelligence, there should be a voice within the executive branch for those concerns. Many agencies have privacy offices, albeit of limited scope. The Intelligence Oversight Board of the President's Foreign Intelligence Advisory Board has, in the past, had the job of overseeing certain activities of the intelligence community.

**Recommendation: At this time of increased and consolidated government authority, there should be a board within the executive branch to oversee adherence to the guidelines we recommend and the commitment the government makes to defend our civil liberties.**

We must find ways of reconciling security with liberty, since the success of one helps protect the other. The choice between security and liberty is a false choice, as nothing is more likely to endanger America's liberties than the success of a terrorist attack at home. Our history has shown us that insecurity threatens liberty. Yet, if our liberties are curtailed, we lose the values that we are struggling to defend.

### Setting Priorities for National Preparedness

Before 9/11, no executive department had, as its first priority, the job of defending America from domestic attack. That changed with the 2002 creation of the Department of Homeland Security. This department now has the lead responsibility for problems that feature so prominently in the 9/11 story, such as protecting borders, securing transportation and other parts of our critical infrastructure, organizing emergency assistance, and working with the private sector to assess vulnerabilities.

Throughout the government, nothing has been harder for officials—executive or legislative—than to set priorities, making hard choices in allocating limited resources. These difficulties have certainly afflicted the Department of Homeland Security, hamstrung by its many congressional overseers. In delivering assistance to state and local governments, we heard—especially in New York—about imbalances in the allocation of money. The argument concentrates on two questions.

First, how much money should be set aside for criteria not directly related to risk? Currently a major portion of the billions of dollars appropriated for

state and local assistance is allocated so that each state gets a certain amount, or an allocation based on its population—wherever they live.

**Recommendation: Homeland security assistance should be based strictly on an assessment of risks and vulnerabilities. Now, in 2004, Washington, D.C., and New York City are certainly at the top of any such list. We understand the contention that every state and city needs to have some minimum infrastructure for emergency response. But federal homeland security assistance should not remain a program for general revenue sharing. It should supplement state and local resources based on the risks or vulnerabilities that merit additional support. Congress should not use this money as a pork barrel.**

The second question is, Can useful criteria to measure risk and vulnerability be developed that assess all the many variables? The allocation of funds should be based on an assessment of threats and vulnerabilities. That assessment should consider such factors as population, population density, vulnerability, and the presence of critical infrastructure within each state. In addition, the federal government should require each state receiving federal emergency preparedness funds to provide an analysis based on the same criteria to justify the distribution of funds in that state.

In a free-for-all over money, it is understandable that representatives will work to protect the interests of their home states or districts. But this issue is too important for politics as usual to prevail. Resources must be allocated according to vulnerabilities. We recommend that a panel of security experts be convened to develop written benchmarks for evaluating community needs. We further recommend that federal homeland security funds be allocated in accordance with those benchmarks, and that states be required to abide by those benchmarks in disbursing the federal funds. The benchmarks will be imperfect and subjective; they will continually evolve. But hard choices must be made. Those who would allocate money on a different basis should then defend their view of the national interest.

### Command, Control, and Communications

The attacks on 9/11 demonstrated that even the most robust emergency response capabilities can be overwhelmed if an attack is large enough. Teamwork, collaboration, and cooperation at an incident site are critical to a successful response. Key decisionmakers who are represented at the incident command level help to ensure an effective response, the efficient use of resources, and responder safety. Regular joint training at all levels is, moreover, essential to ensuring close coordination during an actual incident.

**Recommendation: Emergency response agencies nationwide should adopt the Incident Command System (ICS). When multiple agencies or multiple jurisdictions are involved, they should adopt a unified command. Both are proven frameworks for emergency response. We strongly support the decision that federal homeland security funding will be contingent, as of October 1, 2004, upon the adoption and regular use of ICS and unified command procedures. In the future, the Department of Homeland Security should consider making funding contingent on aggressive and realistic training in accordance with ICS and unified command procedures.**

The attacks of September 11, 2001 overwhelmed the response capacity of most of the local jurisdictions where the hijacked airliners crashed. While many jurisdictions have established mutual aid compacts, a serious obstacle to multi-jurisdictional response has been the lack of indemnification for mutual-aid responders in areas such as the National Capital Region.

Public safety organizations, chief administrative officers, state emergency management agencies, and the Department of Homeland Security should develop a regional focus within the emergency responder community and promote multi-jurisdictional mutual assistance compacts. Where such compacts already exist, training in accordance with their terms should be required. Congress should pass legislation to remedy the long-standing indemnification and liability impediments to the provision of public safety mutual aid in the National Capital Region and where applicable throughout the nation.

The inability to communicate was a critical element at the World Trade Center, Pentagon, and Somerset County, Pennsylvania, crash sites, where multiple agencies and multiple jurisdictions responded. The occurrence of this problem at three very different sites is strong evidence that compatible and adequate communications among public safety organizations at the local, state, and federal levels remains an important problem.

**Recommendation: Congress should support pending legislation which provides for the expedited and increased assignment of radio spectrum for public safety purposes. Furthermore, high-risk urban areas such as New York City and Washington, D.C., should establish signal corps units to ensure communications connectivity between and among civilian authorities, local first responders, and the National Guard. Federal funding of such units should be given high priority by Congress.**

### Private-Sector Preparedness
The mandate of the Department of Homeland Security does not end with government; the department is also responsible for working with the private

sector to ensure preparedness. This is entirely appropriate, for the private sector controls 85 percent of the critical infrastructure in the nation. Indeed, unless a terrorist's target is a military or other secure government facility, the "first" first responders will almost certainly be civilians. Homeland security and national preparedness therefore often begins with the private sector.

Preparedness in the private sector and public sector for rescue, restart, and recovery of operations should include (1) a plan for evacuation, (2) adequate communications capabilities, and (3) a plan for continuity of operations. As we examined the emergency response to 9/11, witness after witness told us that despite 9/11, the private sector remains largely unprepared for a terrorist attack. We were also advised that the lack of a widely embraced private-sector preparedness standard was a principal contributing factor to this lack of preparedness.

We responded by asking the American National Standards Institute (ANSI) to develop a consensus on a "National Standard for Preparedness" for the private sector. ANSI convened safety, security, and business continuity experts from a wide range of industries and associations, as well as from federal, state, and local government stakeholders, to consider the need for standards for private sector emergency preparedness and business continuity.

The result of these sessions was ANSI's recommendation that the Commission endorse a voluntary National Preparedness Standard. Based on the existing American National Standard on Disaster/Emergency Management and Business Continuity Programs (NFPA 1600), the proposed National Preparedness Standard establishes a common set of criteria and terminology for preparedness, disaster management, emergency management, and business continuity programs. The experience of the private sector in the World Trade Center emergency demonstrated the need for these standards.

**Recommendation: We endorse the American National Standards Institute's recommended standard for private preparedness. We were encouraged by Secretary Tom Ridge's praise of the standard, and urge the Department of Homeland Security to promote its adoption. We also encourage the insurance and credit-rating industries to look closely at a company's compliance with the ANSI standard in assessing its insurability and creditworthiness. We believe that compliance with the standard should define the standard of care owed by a company to its employees and the public for legal purposes. Private-sector preparedness is not a luxury; it is a cost of doing business in the post-9/11 world. It is ignored at a tremendous potential cost in lives, money, and national security.**

# 13

# HOW TO DO IT? A DIFFERENT WAY OF ORGANIZING THE GOVERNMENT

AS PRESENTLY CONFIGURED, the national security institutions of the U.S. government are still the institutions constructed to win the Cold War. The United States confronts a very different world today. Instead of facing a few very dangerous adversaries, the United States confronts a number of less visible challenges that surpass the boundaries of traditional nation-states and call for quick, imaginative, and agile responses.

The men and women of the World War II generation rose to the challenges of the 1940s and 1950s. They restructured the government so that it could protect the country. That is now the job of the generation that experienced 9/11. Those attacks showed, emphatically, that ways of doing business rooted in a different era are just not good enough. Americans should not settle for incremental, ad hoc adjustments to a system designed generations ago for a world that no longer exists.

We recommend significant changes in the organization of the government. We know that the quality of the people is more important than the quality of the wiring diagrams. Some of the saddest aspects of the 9/11 story are the outstanding efforts of so many individual officials straining, often without success, against the boundaries of the possible. Good people can overcome bad structures. They should not have to.

The United States has the resources and the people. The government should combine them more effectively, achieving unity of effort. We offer five major recommendations to do that:

- unifying strategic intelligence and operational planning against Islamist terrorists across the foreign–domestic divide with a National Counterterrorism Center;
- unifying the intelligence community with a new National Intelligence Director;

- unifying the many participants in the counterterrorism effort and their knowledge in a network-based information-sharing system that transcends traditional governmental boundaries;
- unifying and strengthening congressional oversight to improve quality and accountability; and
- strengthening the FBI and homeland defenders.

## 13.1 UNITY OF EFFORT ACROSS THE FOREIGN-DOMESTIC DIVIDE

**Joint Action**

Much of the public commentary about the 9/11 attacks has dealt with "lost opportunities," some of which we reviewed in chapter 11. These are often characterized as problems of "watchlisting," of "information sharing," or of "connecting the dots." In chapter 11 we explained that these labels are too narrow. They describe the symptoms, not the disease.

In each of our examples, no one was firmly in charge of managing the case and able to draw relevant intelligence from anywhere in the government, assign responsibilities across the agencies (foreign or domestic), track progress, and quickly bring obstacles up to the level where they could be resolved. Responsibility and accountability were diffuse.

The agencies cooperated, some of the time. But even such cooperation as there was is not the same thing as joint action. When agencies cooperate, one defines the problem and seeks help with it. When they act jointly, the problem and options for action are defined differently from the start. Individuals from different backgrounds come together in analyzing a case and planning how to manage it.

In our hearings we regularly asked witnesses: Who is the quarterback? The other players are in their positions, doing their jobs. But who is calling the play that assigns roles to help them execute as a team?

Since 9/11, those issues have not been resolved. In some ways joint work has gotten better, and in some ways worse. The effort of fighting terrorism has flooded over many of the usual agency boundaries because of its sheer quantity and energy. Attitudes have changed. Officials are keenly conscious of trying to avoid the mistakes of 9/11. They try to share information. They circulate—even to the President—practically every reported threat, however dubious.

Partly because of all this effort, the challenge of coordinating it has multiplied. Before 9/11, the CIA was plainly the lead agency confronting al Qaeda. The FBI played a very secondary role. The engagement of the departments of Defense and State was more episodic.

- Today the CIA is still central. But the FBI is much more active, along with other parts of the Justice Department.
- The Defense Department effort is now enormous. Three of its unified commands, each headed by a four-star general, have counterterrorism as a primary mission: Special Operations Command, Central Command (both headquartered in Florida), and Northern Command (headquartered in Colorado).
- A new Department of Homeland Security combines formidable resources in border and transportation security, along with analysis of domestic vulnerability and other tasks.
- The State Department has the lead on many of the foreign policy tasks we described in chapter 12.
- At the White House, the National Security Council (NSC) now is joined by a parallel presidential advisory structure, the Homeland Security Council.

So far we have mentioned two reasons for joint action—the virtue of joint planning and the advantage of having someone in charge to ensure a unified effort. There is a third: the simple shortage of experts with sufficient skills. The limited pool of critical experts—for example, skilled counterterrorism analysts and linguists—is being depleted. Expanding these capabilities will require not just money, but time.

Primary responsibility for terrorism analysis has been assigned to the Terrorist Threat Integration Center (TTIC), created in 2003, based at the CIA headquarters but staffed with representatives of many agencies, reporting directly to the Director of Central Intelligence. Yet the CIA houses another intelligence "fusion" center: the Counterterrorist Center that played such a key role before 9/11. A third major analytic unit is at Defense, in the Defense Intelligence Agency. A fourth, concentrating more on homeland vulnerabilities, is at the Department of Homeland Security. The FBI is in the process of building the analytic capability it has long lacked, and it also has the Terrorist Screening Center.[1]

The U.S. government cannot afford so much duplication of effort. There are not enough experienced experts to go around. The duplication also places extra demands on already hard-pressed single-source national technical intelligence collectors like the National Security Agency.

### Combining Joint Intelligence and Joint Action

A "smart" government would *integrate* all sources of information to see the enemy as a whole. Integrated all-source analysis should also inform and shape strategies to collect more intelligence. Yet the Terrorist Threat Integration Center, while it has primary responsibility for terrorism analysis, is formally proscribed from hav-

ing any oversight or operational authority and is not part of any operational entity, other than reporting to the director of central intelligence.[2]

The government now tries to handle the problem of joint management, informed by analysis of intelligence from all sources, in two ways.

- First, agencies with lead responsibility for certain problems have constructed their own interagency entities and task forces in order to get cooperation. The Counterterrorist Center at CIA, for example, recruits liaison officers from throughout the intelligence community. The military's Central Command has its own interagency center, recruiting liaison officers from all the agencies from which it might need help. The FBI has Joint Terrorism Task Forces in 84 locations to coordinate the activities of other agencies when action may be required.

- Second, the problem of joint operational planning is often passed to the White House, where the NSC staff tries to play this role. The national security staff at the White House (both NSC and new Homeland Security Council staff) has already become 50 percent larger since 9/11. But our impression, after talking to serving officials, is that even this enlarged staff is consumed by meetings on day-to-day issues, sifting each day's threat information and trying to coordinate everyday operations.

Even as it crowds into every square inch of available office space, the NSC staff is still not sized or funded to be an executive agency. In chapter 3 we described some of the problems that arose in the 1980s when a White House staff, constitutionally insulated from the usual mechanisms of oversight, became involved in direct operations. During the 1990s Richard Clarke occasionally tried to exercise such authority, sometimes successfully, but often causing friction.

Yet a subtler and more serious danger is that as the NSC staff is consumed by these day-to-day tasks, it has less capacity to find the time and detachment needed to advise a president on larger policy issues. That means less time to work on major new initiatives, help with legislative management to steer needed bills through Congress, and track the design and implementation of the strategic plans for regions, countries, and issues that we discuss in chapter 12.

Much of the job of operational coordination remains with the agencies, especially the CIA. There DCI Tenet and his chief aides ran interagency meetings nearly every day to coordinate much of the government's day-to-day work. The DCI insisted he did not make policy and only oversaw its implementation. In the struggle against terrorism these distinctions seem increasingly artificial. Also, as the DCI becomes a lead coordinator of the government's

operations, it becomes harder to play all the position's other roles, including that of analyst in chief.

The problem is nearly intractable because of the way the government is currently structured. Lines of operational authority run to the expanding executive departments, and they are guarded for understandable reasons: the DCI commands the CIA's personnel overseas; the secretary of defense will not yield to others in conveying commands to military forces; the Justice Department will not give up the responsibility of deciding whether to seek arrest warrants. But the result is that each agency or department needs its own intelligence apparatus to support the performance of its duties. It is hard to "break down stovepipes" when there are so many stoves that are legally and politically entitled to have cast-iron pipes of their own.

Recalling the Goldwater-Nichols legislation of 1986, Secretary Rumsfeld reminded us that to achieve better joint capability, each of the armed services had to "give up some of their turf and authorities and prerogatives." Today, he said, the executive branch is "stove-piped much like the four services were nearly 20 years ago." He wondered if it might be appropriate to ask agencies to "give up some of their existing turf and authority in exchange for a stronger, faster, more efficient government wide joint effort."[3] Privately, other key officials have made the same point to us.

We therefore propose a new institution: a civilian-led unified joint command for counterterrorism. It should combine strategic intelligence and joint operational planning.

In the Pentagon's Joint Staff, which serves the chairman of the Joint Chiefs of Staff, intelligence is handled by the J-2 directorate, operational planning by J-3, and overall policy by J-5. Our concept combines the J-2 and J-3 functions (intelligence and operational planning) in one agency, keeping overall policy coordination where it belongs, in the National Security Council.

**Recommendation: We recommend the establishment of a National Counterterrorism Center (NCTC), built on the foundation of the existing Terrorist Threat Integration Center (TTIC). Breaking the older mold of national government organization, this NCTC should be a center for joint operational planning *and* joint intelligence, staffed by personnel from the various agencies. The head of the NCTC should have authority to evaluate the performance of the people assigned to the Center.**

- Such a joint center should be developed in the same spirit that guided the military's creation of unified joint commands, or the shaping of earlier national agencies like the National Reconnaissance Office, which was formed to organize the work of the CIA and several defense agencies in space.

*NCTC—Intelligence.* The NCTC should lead strategic analysis, pooling all-source intelligence, foreign and domestic, about transnational terrorist organizations with global reach. It should develop *net* assessments (comparing enemy capabilities and intentions against U.S. defenses and countermeasures). It should also provide warning. It should do this work by drawing on the efforts of the CIA, FBI, Homeland Security, and other departments and agencies. It should task collection requirements both inside and outside the United States.

- The intelligence function (J-2) should build on the existing TTIC structure and remain distinct, as a national intelligence center, within the NCTC. As the government's principal knowledge bank on Islamist terrorism, with the main responsibility for strategic analysis and net assessment, it should absorb a significant portion of the analytical talent now residing in the CIA's Counterterrorist Center and the DIA's Joint Intelligence Task Force—Combatting Terrorism (JITF-CT).

*NCTC—Operations.* The NCTC should perform joint planning. The plans would assign operational responsibilities to lead agencies, such as State, the CIA, the FBI, Defense and its combatant commands, Homeland Security, and other agencies. The NCTC should *not* direct the actual execution of these operations, leaving that job to the agencies. The NCTC would then track implementation; it would look across the foreign-domestic divide and across agency boundaries, updating plans to follow through on cases.[4]

- The joint operational planning function (J-3) will be new to the TTIC structure. The NCTC can draw on analogous work now being done in the CIA and every other involved department of the government, as well as reaching out to knowledgeable officials in state and local agencies throughout the United States.

- The NCTC should *not* be a policymaking body. Its operations and planning should follow the policy direction of the president and the National Security Council.

---

Consider this hypothetical case. The NSA discovers that a suspected terrorist is traveling to Bangkok and Kuala Lumpur. The NCTC should draw on joint intelligence resources, including its own NSA counterterrorism experts, to analyze the identities and possible destinations of

these individuals. Informed by this analysis, the NCTC would then organize and plan the management of the case, drawing on the talents and differing kinds of experience among the several agency representatives assigned to it—assigning tasks to the CIA overseas, to Homeland Security watching entry points into the United States, and to the FBI. If military assistance might be needed, the Special Operations Command could be asked to develop an appropriate concept for such an operation. The NCTC would be accountable for tracking the progress of the case, ensuring that the plan evolved with it, and integrating the information into a warning. The NCTC would be responsible for being sure that intelligence gathered from the activities in the field became part of the government's institutional memory about Islamist terrorist personalities, organizations, and possible means of attack.

In each case the involved agency would make its own senior managers aware of what it was being asked to do. If those agency heads objected, and the issue could not easily be resolved, then the disagreement about roles and missions could be brought before the National Security Council and the president.

*NCTC—Authorities.* The head of the NCTC should be appointed by the president, and should be equivalent in rank to a deputy head of a cabinet department. The head of the NCTC would report to the national intelligence director, an office whose creation we recommend below, placed in the Executive Office of the President. The head of the NCTC would thus also report indirectly to the president. This official's nomination should be confirmed by the Senate and he or she should testify to the Congress, as is the case now with other statutory presidential offices, like the U.S. trade representative.

- To avoid the fate of other entities with great nominal authority and little real power, the head of the NCTC must have the right to concur in the choices of personnel to lead the operating entities of the departments and agencies focused on counterterrorism, specifically including the head of the Counterterrorist Center, the head of the FBI's Counterterrorism Division, the commanders of the Defense Department's Special Operations Command and Northern Command, and the State Department's coordinator for counterterrorism.[5] The head of the NCTC should also work with the director of the Office of Management and Budget in developing the president's counterterrorism budget.

- There are precedents for surrendering authority for joint planning while preserving an agency's operational control. In the international context, NATO commanders may get line authority over forces assigned by other nations. In U.S. unified commands, commanders plan operations that may involve units belonging to one of the services. In each case, procedures are worked out, formal and informal, to define the limits of the joint commander's authority.

The most serious disadvantage of the NCTC is the reverse of its greatest virtue. The struggle against Islamist terrorism is so important that any clear-cut centralization of authority to manage and be accountable for it may concentrate too much power in one place. The proposed NCTC would be given the authority of planning the activities of other agencies. Law or executive order must define the scope of such line authority.

The NCTC would not eliminate interagency policy disputes. These would still go to the National Security Council. To improve coordination at the White House, we believe the existing Homeland Security Council should soon be merged into a single National Security Council. The creation of the NCTC should help the NSC staff concentrate on its core duties of assisting the president and supporting interdepartmental policymaking.

We recognize that this is a new and difficult idea precisely because the authorities we recommend for the NCTC really would, as Secretary Rumsfeld foresaw, ask strong agencies to "give up some of their turf and authority in exchange for a stronger, faster, more efficient government wide joint effort." Countering transnational Islamist terrorism will test whether the U.S. government can fashion more flexible models of management needed to deal with the twenty-first-century world.

An argument against change is that the nation is at war, and cannot afford to reorganize in midstream. But some of the main innovations of the 1940s and 1950s, including the creation of the Joint Chiefs of Staff and even the construction of the Pentagon itself, were undertaken in the midst of war. Surely the country cannot wait until the struggle against Islamist terrorism is over.

"Surprise, when it happens to a government, is likely to be a complicated, diffuse, bureaucratic thing. It includes neglect of responsibility, but also responsibility so poorly defined or so ambiguously delegated that action gets lost."[6] That comment was made more than 40 years ago, about Pearl Harbor. We hope another commission, writing in the future about another attack, does not again find this quotation to be so apt.

## 13.2 UNITY OF EFFORT IN THE INTELLIGENCE COMMUNITY

In our first section, we concentrated on counterterrorism, discussing how to combine the analysis of information from all sources of intelligence with the joint planning of operations that draw on that analysis. In this section, we step back from looking just at the counterterrorism problem. We reflect on whether the government is organized adequately to direct resources and build the intelligence capabilities it will need not just for countering terrorism, but for the broader range of national security challenges in the decades ahead.

### The Need for a Change
During the Cold War, intelligence agencies did not depend on seamless integration to track and count the thousands of military targets—such as tanks and missiles—fielded by the Soviet Union and other adversary states. Each agency concentrated on its specialized mission, acquiring its own information and then sharing it via formal, finished reports. The Department of Defense had given birth to and dominated the main agencies for technical collection of intelligence. Resources were shifted at an incremental pace, coping with challenges that arose over years, even decades.

We summarized the resulting organization of the intelligence community in chapter 3. It is outlined below.

---

**Members of the U.S. Intelligence Community**
Office of the Director of Central Intelligence, which includes the Office of the Deputy Director of Central Intelligence for Community Management, the Community Management Staff, the Terrorism Threat Integration Center, the National Intelligence Council, and other community offices

The Central Intelligence Agency (CIA), which performs human source collection, all-source analysis, and advanced science and technology

National intelligence agencies:
- National Security Agency (NSA), which performs signals collection and analysis
- National Geospatial-Intelligence Agency (NGA), which performs imagery collection and analysis

- National Reconnaissance Office (NRO), which develops, acquires, and launches space systems for intelligence collection
- Other national reconnaissance programs

Departmental intelligence agencies:
- Defense Intelligence Agency (DIA) of the Department of Defense
- Intelligence entities of the Army, Navy, Air Force, and Marines
- Bureau of Intelligence and Research (INR) of the Department of State
- Office of Terrorism and Finance Intelligence of the Department of Treasury
- Office of Intelligence and the Counterterrorism and Counterintelligence Divisions of the Federal Bureau of Investigation of the Department of Justice
- Office of Intelligence of the Department of Energy
- Directorate of Information Analysis and Infrastructure Protection (IAIP) and Directorate of Coast Guard Intelligence of the Department of Homeland Security

The need to restructure the intelligence community grows out of six problems that have become apparent before and after 9/11:

- *Structural barriers to performing joint intelligence work.* National intelligence is still organized around the collection disciplines of the home agencies, not the joint mission. The importance of integrated, all-source analysis cannot be overstated. Without it, it is not possible to "connect the dots." No one component holds all the relevant information.

    By contrast, in organizing national defense, the Goldwater-Nichols legislation of 1986 created joint commands for operations in the field, the Unified Command Plan. The services—the Army, Navy, Air Force, and Marine Corps—organize, train, and equip their people and units to perform their missions. Then they assign personnel and units to the joint combatant commander, like the commanding general of the Central Command (CENTCOM). The Goldwater-Nichols Act required officers to serve tours outside their service in order to win promotion. The culture of the Defense Department was

transformed, its collective mind-set moved from service-specific to "joint," and its operations became more integrated.[7]

- *Lack of common standards and practices across the foreign-domestic divide.* The leadership of the intelligence community should be able to pool information gathered overseas with information gathered in the United States, holding the work—wherever it is done—to a common standard of quality in how it is collected, processed (e.g., translated), reported, shared, and analyzed. A common set of personnel standards for intelligence can create a group of professionals better able to operate in joint activities, transcending their own service-specific mind-sets.

- *Divided management of national intelligence capabilities.* While the CIA was once "central" to our national intelligence capabilities, following the end of the Cold War it has been less able to influence the use of the nation's imagery and signals intelligence capabilities in three national agencies housed within the Department of Defense: the National Security Agency, the National Geospatial-Intelligence Agency, and the National Reconnaissance Office. One of the lessons learned from the 1991 Gulf War was the value of national intelligence systems (satellites in particular) in precision warfare. Since that war, the department has appropriately drawn these agencies into its transformation of the military. Helping to orchestrate this transformation is the under secretary of defense for intelligence, a position established by Congress after 9/11. An unintended consequence of these developments has been the far greater demand made by Defense on technical systems, leaving the DCI less able to influence how these technical resources are allocated and used.

- *Weak capacity to set priorities and move resources.* The agencies are mainly organized around what they collect or the way they collect it. But the priorities for collection are national. As the DCI makes hard choices about moving resources, he or she must have the power to reach across agencies and reallocate effort.

- *Too many jobs.* The DCI now has at least three jobs. He is expected to run a particular agency, the CIA. He is expected to manage the loose confederation of agencies that is the intelligence community. He is expected to be the analyst in chief for the government, sifting evidence and directly briefing the President as his principal intelligence adviser. No recent DCI has been able to do all three effectively. Usually what loses out is management of the intelligence community, a difficult task even in the best case because the DCI's current authorities are weak. With so much to do, the DCI often has not used even the authority he has.

- *Too complex and secret.* Over the decades, the agencies and the rules surrounding the intelligence community have accumulated to a depth that practically defies public comprehension. There are now 15 agencies or parts of agencies in the intelligence community. The community and the DCI's authorities have become arcane matters, understood only by initiates after long study. Even the most basic information about how much money is actually allocated to or within the intelligence community and most of its key components is shrouded from public view.

The current DCI is responsible for community performance but lacks the three authorities critical for any agency head or chief executive officer: (1) control over purse strings, (2) the ability to hire or fire senior managers, and (3) the ability to set standards for the information infrastructure and personnel.[8]

The only budget power of the DCI over agencies other than the CIA lies in coordinating the budget requests of the various intelligence agencies into a single program for submission to Congress. The overall funding request of the 15 intelligence entities in this program is then presented to the president and Congress in 15 separate volumes.

When Congress passes an appropriations bill to allocate money to intelligence agencies, most of their funding is hidden in the Defense Department in order to keep intelligence spending secret. Therefore, although the House and Senate Intelligence committees are the authorizing committees for funding of the intelligence community, the final budget review is handled in the Defense Subcommittee of the Appropriations committees. Those committees have no subcommittees just for intelligence, and only a few members and staff review the requests.

The appropriations for the CIA and the national intelligence agencies—NSA, NGA, and NRO—are then given to the secretary of defense. The secretary transfers the CIA's money to the DCI but disburses the national agencies' money directly. Money for the FBI's national security components falls within the appropriations for Commerce, Justice, and State and goes to the attorney general.[9]

In addition, the DCI lacks hire-and-fire authority over most of the intelligence community's senior managers. For the national intelligence agencies housed in the Defense Department, the secretary of defense must seek the DCI's concurrence regarding the nomination of these directors, who are presidentially appointed. But the secretary may submit recommendations to the president without receiving this concurrence. The DCI cannot fire these officials. The DCI has even less influence over the head of the FBI's national security component, who is appointed by the attorney general in consultation with the DCI.[10]

**Combining Joint Work with Stronger Management**

We have received recommendations on the topic of intelligence reform from many sources. Other commissions have been over this same ground. Thoughtful bills have been introduced, most recently a bill by the chairman of the House Intelligence Committee Porter Goss (R–Fla.), and another by the ranking minority member, Jane Harman (D–Calif.). In the Senate, Senators Bob Graham (D–Fla.) and Dianne Feinstein (D–Calif.) have introduced reform proposals as well. Past efforts have foundered, because the president did not support them; because the DCI, the secretary of defense, or both opposed them; and because some proposals lacked merit. We have tried to take stock of these experiences, and borrow from strong elements in many of the ideas that have already been developed by others.

**Recommendation: The current position of Director of Central Intelligence should be replaced by a National Intelligence Director with two main areas of responsibility: (1) to oversee national intelligence centers on specific subjects of interest across the U.S. government and (2) to manage the national intelligence program and oversee the agencies that contribute to it.**

First, the National Intelligence Director should oversee *national intelligence centers* to provide all-source analysis and plan intelligence operations for the whole government on major problems.

- One such problem is counterterrorism. In this case, we believe that the center should be the intelligence entity (formerly TTIC) inside the National Counterterrorism Center we have proposed. It would sit there alongside the operations management unit we described earlier, with both making up the NCTC, in the Executive Office of the President. Other national intelligence centers—for instance, on counterproliferation, crime and narcotics, and China—would be housed in whatever department or agency is best suited for them.

- The National Intelligence Director would retain the present DCI's role as the principal intelligence adviser to the president. We hope the president will come to look directly to the directors of the national intelligence centers to provide all-source analysis in their areas of responsibility, balancing the advice of these intelligence chiefs against the contrasting viewpoints that may be offered by department heads at State, Defense, Homeland Security, Justice, and other agencies.

Second, the National Intelligence Director should manage the national intelligence program and oversee the component agencies of the intelligence community. (See diagram.)[11]

- The National Intelligence Director would submit a unified budget for national intelligence that reflects priorities chosen by the National Security Council, an appropriate balance among the varieties of technical and human intelligence collection, and analysis. He or she would receive an appropriation for national intelligence and apportion the funds to the appropriate agencies, in line with that budget, and with authority to reprogram funds among the national intelligence agencies to meet any new priority (as counterterrorism was in the 1990s). The National Intelligence Director should approve and submit nominations to the president of the individuals who would lead the CIA, DIA, FBI Intelligence Office, NSA, NGA, NRO, Information Analysis and Infrastructure Protection Directorate of the Department of Homeland Security, and other national intelligence capabilities.[12]

- The National Intelligence Director would manage this national effort with the help of three deputies, each of whom would also hold a key position in one of the component agencies.[13]
    - foreign intelligence (the head of the CIA)
    - defense intelligence (the under secretary of defense for intelligence)[14]
    - homeland intelligence (the FBI's executive assistant director for intelligence or the under secretary of homeland security for information analysis and infrastructure protection)

  Other agencies in the intelligence community would coordinate their work within each of these three areas, largely staying housed in the same departments or agencies that support them now.

  Returning to the analogy of the Defense Department's organization, these three deputies—like the leaders of the Army, Navy, Air Force, or Marines—would have the job of acquiring the systems, training the people, and executing the operations planned by the national intelligence centers.

  And, just as the combatant commanders also report to the secretary of defense, the directors of the national intelligence centers—e.g., for counterproliferation, crime and narcotics, and the rest—also would report to the National Intelligence Director.

- The Defense Department's military intelligence programs—the joint military intelligence program (JMIP) and the tactical intelligence and related activities program (TIARA)—would remain part of that department's responsibility.



**Executive Office of the President**

**POTUS**

National Intelligence Director

Staff

National Counterterrorism Center

**National Intelligence Centers**
(conduct "joint" collection and analysis – *Illustrative*)

WMD Proliferation

Int'l Crime & Narcotics

China / East Asia

Middle East

Russia / Eurasia

**Hire, Train, Acquire, Equip & Field**
(agencies support / staff the Nat'l Intel Centers)

Deputy NID Foreign Intelligence (CIA Dir.)
- CIA
  - Clandestine Services
  - All-Source Analysis
- Open Source Agency (new)

Deputy NID Defense Intelligence (USD Intelligence)
- DIA
- NSA
- NGA
- NRO
- Other

Deputy NID Homeland Intelligence (FBI/Intel Dir.)
- FBI
  - Intel & CT / CI
- DHS / IAIP
- Other DHS (e.g., CBP,TSA, Nat'l Labs, Coast Guard, etc.)

*Unity of Effort in Managing Intelligence*

- The National Intelligence Director would set personnel policies to establish standards for education and training and facilitate assignments at the national intelligence centers and across agency lines. The National Intelligence Director also would set information sharing and information technology policies to maximize data sharing, as well as policies to protect the security of information.

- Too many agencies now have an opportunity to say no to change. The National Intelligence Director should participate in an NSC executive committee that can resolve differences in priorities among the agencies and bring the major disputes to the president for decision.

The National Intelligence Director should be located in the Executive Office of the President. This official, who would be confirmed by the Senate and would testify before Congress, would have a relatively small staff of several hundred people, taking the place of the existing community management offices housed at the CIA.

In managing the whole community, the National Intelligence Director is still providing a service function. With the partial exception of his or her responsibilities for overseeing the NCTC, the National Intelligence Director should support the consumers of national intelligence—the president and policymaking advisers such as the secretaries of state, defense, and homeland security and the attorney general.

We are wary of too easily equating government management problems with those of the private sector. But we have noticed that some very large private firms rely on a powerful CEO who has significant control over how money is spent and can hire or fire leaders of the major divisions, assisted by a relatively modest staff, while leaving responsibility for execution in the operating divisions.

There are disadvantages to separating the position of National Intelligence Director from the job of heading the CIA. For example, the National Intelligence Director will not head a major agency of his or her own and may have a weaker base of support. But we believe that these disadvantages are outweighed by several other considerations:

- The National Intelligence Director must be able to directly oversee intelligence collection inside the United States. Yet law and custom has counseled against giving such a plain domestic role to the head of the CIA.

- The CIA will be one among several claimants for funds in setting national priorities. The National Intelligence Director should not be both one of the advocates and the judge of them all.

- Covert operations tend to be highly tactical, requiring close attention. The National Intelligence Director should rely on the relevant joint

mission center to oversee these details, helping to coordinate closely with the White House. The CIA will be able to concentrate on building the capabilities to carry out such operations and on providing the personnel who will be directing and executing such operations in the field.

- Rebuilding the analytic and human intelligence collection capabilities of the CIA should be a full-time effort, and the director of the CIA should focus on extending its comparative advantages.

**Recommendation: The CIA Director should emphasize (a) rebuilding the CIA's analytic capabilities; (b) transforming the clandestine service by building its human intelligence capabilities; (c) developing a stronger language program, with high standards and sufficient financial incentives; (d) renewing emphasis on recruiting diversity among operations officers so they can blend more easily in foreign cities; (e) ensuring a seamless relationship between human source collection and signals collection at the operational level; and (f) stressing a better balance between unilateral and liaison operations.**

The CIA should retain responsibility for the direction and execution of clandestine and covert operations, as assigned by the relevant national intelligence center and authorized by the National Intelligence Director and the president. This would include propaganda, renditions, and nonmilitary disruption. We believe, however, that one important area of responsibility should change.

**Recommendation: Lead responsibility for directing and executing paramilitary operations, whether clandestine or covert, should shift to the Defense Department. There it should be consolidated with the capabilities for training, direction, and execution of such operations already being developed in the Special Operations Command.**

- Before 9/11, the CIA did not invest in developing a robust capability to conduct paramilitary operations with U.S. personnel. It relied on proxies instead, organized by CIA operatives without the requisite military training. The results were unsatisfactory.

- Whether the price is measured in either money or people, the United States cannot afford to build two separate capabilities for carrying out secret military operations, secretly operating standoff missiles, and secretly training foreign military or paramilitary forces. The United States should concentrate responsibility and necessary legal authorities in one entity.

- The post-9/11 Afghanistan precedent of using joint CIA-military teams for covert and clandestine operations was a good one. We believe this proposal to be consistent with it. Each agency would concentrate on its comparative advantages in building capabilities for joint missions. The operation itself would be planned in common.

- The CIA has a reputation for agility in operations. The military has a reputation for being methodical and cumbersome. We do not know if these stereotypes match current reality; they may also be one more symptom of the civil-military misunderstandings we described in chapter 4. It is a problem to be resolved in policy guidance and agency management, not in the creation of redundant, overlapping capabilities and authorities in such sensitive work. The CIA's experts should be integrated into the military's training, exercises, and planning. To quote a CIA official now serving in the field: "One fight, one team."

**Recommendation: Finally, to combat the secrecy and complexity we have described, the overall amounts of money being appropriated for national intelligence and to its component agencies should no longer be kept secret. Congress should pass a separate appropriations act for intelligence, defending the broad allocation of how these tens of billions of dollars have been assigned among the varieties of intelligence work.**

The specifics of the intelligence appropriation would remain classified, as they are today. Opponents of declassification argue that America's enemies could learn about intelligence capabilities by tracking the top-line appropriations figure. Yet the top-line figure by itself provides little insight into U.S. intelligence sources and methods. The U.S. government readily provides copious information about spending on its military forces, including military intelligence. The intelligence community should not be subject to that much disclosure. But when even aggregate categorical numbers remain hidden, it is hard to judge priorities and foster accountability.

## 13.3 UNITY OF EFFORT IN SHARING INFORMATION

### Information Sharing

We have already stressed the importance of intelligence analysis that can draw on all relevant sources of information. The biggest impediment to all-source analysis—to a greater likelihood of connecting the dots—is the human or systemic resistance to sharing information.

The U.S. government has access to a vast amount of information. When databases not usually thought of as "intelligence," such as customs or immigra-

tion information, are included, the storehouse is immense. But the U.S. government has a weak system for processing and using what it has. In interviews around the government, official after official urged us to call attention to frustrations with the unglamorous "back office" side of government operations.

In the 9/11 story, for example, we sometimes see examples of information that could be accessed—like the undistributed NSA information that would have helped identify Nawaf al Hazmi in January 2000. But someone had to ask for it. In that case, no one did. Or, as in the episodes we describe in chapter 8, the information is distributed, but in a compartmented channel. Or the information is available, and someone does ask, but it cannot be shared.

What all these stories have in common is a system that requires a demonstrated "need to know" before sharing. This approach assumes it is possible to know, in advance, who will need to use the information. Such a system implicitly assumes that the risk of inadvertent disclosure outweighs the benefits of wider sharing. Those Cold War assumptions are no longer appropriate. The culture of agencies feeling they own the information they gathered at taxpayer expense must be replaced by a culture in which the agencies instead feel they have a duty to the information—to repay the taxpayers' investment by making that information available.

Each intelligence agency has its own security practices, outgrowths of the Cold War. We certainly understand the reason for these practices. Counterintelligence concerns are still real, even if the old Soviet enemy has been replaced by other spies.

But the security concerns need to be weighed against the costs. Current security requirements nurture overclassification and excessive compartmentation of information among agencies. Each agency's incentive structure opposes sharing, with risks (criminal, civil, and internal administrative sanctions) but few rewards for sharing information. No one has to pay the long-term costs of overclassifying information, though these costs—even in literal financial terms—are substantial. There are no punishments for *not* sharing information. Agencies uphold a "need-to-know" culture of information protection rather than promoting a "need-to-share" culture of integration.[15]

**Recommendation: Information procedures should provide incentives for sharing, to restore a better balance between security and shared knowledge.**

Intelligence gathered about transnational terrorism should be processed, turned into reports, and distributed according to the same quality standards, whether it is collected in Pakistan or in Texas.

The logical objection is that sources and methods may vary greatly in different locations. We therefore propose that when a report is first created, its data be separated from the sources and methods by which they are obtained. The

report should begin with the information in its most shareable, but still meaningful, form. Therefore the maximum number of recipients can access some form of that information. If knowledge of further details becomes important, any user can query further, with access granted or denied according to the rules set for the network—and with queries leaving an audit trail in order to determine who accessed the information. But the questions may not come at all unless experts at the "edge" of the network can readily discover the clues that prompt to them.[16]

We propose that information be shared horizontally, across new networks that transcend individual agencies.

- The current system is structured on an old mainframe, or hub-and-spoke, concept. In this older approach, each agency has its own database. Agency users send information to the database and then can retrieve it from the database.

- A decentralized network model, the concept behind much of the information revolution, shares data horizontally too. Agencies would still have their own databases, but those databases would be searchable across agency lines. In this system, secrets are protected through the design of the network and an "information rights management" approach that controls access to the data, not access to the whole network. An outstanding conceptual framework for this kind of "trusted information network" has been developed by a task force of leading professionals in national security, information technology, and law assembled by the Markle Foundation. Its report has been widely discussed throughout the U.S. government, but has not yet been converted into action.[17]

**Recommendation: The president should lead the government–wide effort to bring the major national security institutions into the information revolution. He should coordinate the resolution of the legal, policy, and technical issues across agencies to create a "trusted information network."**

- No one agency can do it alone. Well-meaning agency officials are under tremendous pressure to update their systems. Alone, they may only be able to modernize the stovepipes, not replace them.

- Only presidential leadership can develop government-wide concepts and standards. Currently, no one is doing this job. Backed by the Office of Management and Budget, a new National Intelligence Director empowered to set common standards for information use throughout the community, and a secretary of homeland security who helps

extend the system to public agencies and relevant private-sector databases, a government-wide initiative can succeed.

- White House leadership is also needed because the policy and legal issues are harder than the technical ones. The necessary technology already exists. What does not are the rules for acquiring, accessing, sharing, and using the vast stores of public and private data that may be available. When information sharing works, it is a powerful tool. Therefore the sharing and uses of information must be guided by a set of practical policy guidelines that simultaneously empower and constrain officials, telling them clearly what is and is not permitted.

"This is government acting in new ways, to face new threats," the most recent Markle report explains. "And while such change is necessary, it must be accomplished while engendering the people's trust that privacy and other civil liberties are being protected, that businesses are not being unduly burdened with requests for extraneous or useless information, that taxpayer money is being well spent, and that, ultimately, the network will be effective in protecting our security." The authors add: "Leadership is emerging from all levels of government and from many places in the private sector. What is needed now is a plan to accelerate these efforts, and public debate and consensus on the goals."[18]

## 13.4 UNITY OF EFFORT IN THE CONGRESS

### Strengthen Congressional Oversight of Intelligence and Homeland Security

Of all our recommendations, strengthening congressional oversight may be among the most difficult and important. So long as oversight is governed by current congressional rules and resolutions, we believe the American people will not get the security they want and need. The United States needs a strong, stable, and capable congressional committee structure to give America's national intelligence agencies oversight, support, and leadership.

Few things are more difficult to change in Washington than congressional committee jurisdiction and prerogatives. To a member, these assignments are almost as important as the map of his or her congressional district. The American people may have to insist that these changes occur, or they may well not happen. Having interviewed numerous members of Congress from both parties, as well as congressional staff members, we found that dissatisfaction with congressional oversight remains widespread.

The future challenges of America's intelligence agencies are daunting. They include the need to develop leading-edge technologies that give our policy-

makers and warfighters a decisive edge in any conflict where the interests of the United States are vital. Not only does good intelligence win wars, but the best intelligence enables us to prevent them from happening altogether.

Under the terms of existing rules and resolutions the House and Senate intelligence committees lack the power, influence, and sustained capability to meet this challenge. While few members of Congress have the broad knowledge of intelligence activities or the know-how about the technologies employed, all members need to feel assured that good oversight is happening. When their unfamiliarity with the subject is combined with the need to preserve security, a mandate emerges for substantial change.

Tinkering with the existing structure is not sufficient. Either Congress should create a joint committee for intelligence, using the Joint Atomic Energy Committee as its model, or it should create House and Senate committees with combined authorizing and appropriations powers.

Whichever of these two forms are chosen, the goal should be a structure—codified by resolution with powers expressly granted and carefully limited—allowing a relatively small group of members of Congress, given time and reason to master the subject and the agencies, to conduct oversight of the intelligence establishment and be clearly accountable for their work. The staff of this committee should be nonpartisan and work for the entire committee and not for individual members.

The other reforms we have suggested—for a National Counterterrorism Center and a National Intelligence Director—will not work if congressional oversight does not change too. Unity of effort in executive management can be lost if it is fractured by divided congressional oversight.

**Recommendation: Congressional oversight for intelligence—and counterterrorism—is now dysfunctional. Congress should address this problem. We have considered various alternatives: A joint committee on the old model of the Joint Committee on Atomic Energy is one. A single committee in each house of Congress, combining authorizing and appropriating authorities, is another.**

- The new committee or committees should conduct continuing studies of the activities of the intelligence agencies and report problems relating to the development and use of intelligence to all members of the House and Senate.

- We have already recommended that the total level of funding for intelligence be made public, and that the national intelligence program be appropriated to the National Intelligence Director, not to the secretary of defense.[19]

- We also recommend that the intelligence committee should have a subcommittee specifically dedicated to oversight, freed from the consuming responsibility of working on the budget.

- The resolution creating the new intelligence committee structure should grant subpoena authority to the committee or committees. The majority party's representation on this committee should never exceed the minority's representation by more than one.

- Four of the members appointed to this committee or committees should be a member who also serves on each of the following additional committees: Armed Services, Judiciary, Foreign Affairs, and the Defense Appropriations subcommittee. In this way the other major congressional interests can be brought together in the new committee's work.

- Members should serve indefinitely on the intelligence committees, without set terms, thereby letting them accumulate expertise.

- The committees should be smaller—perhaps seven or nine members in each house—so that each member feels a greater sense of responsibility, and accountability, for the quality of the committee's work.

The leaders of the Department of Homeland Security now appear before 88 committees and subcommittees of Congress. One expert witness (not a member of the administration) told us that this is perhaps the single largest obstacle impeding the department's successful development. The one attempt to consolidate such committee authority, the House Select Committee on Homeland Security, may be eliminated. The Senate does not have even this.

Congress needs to establish for the Department of Homeland Security the kind of clear authority and responsibility that exist to enable the Justice Department to deal with crime and the Defense Department to deal with threats to national security. Through not more than one authorizing committee and one appropriating subcommittee in each house, Congress should be able to ask the secretary of homeland security whether he or she has the resources to provide reasonable security against major terrorist acts within the United States and to hold the secretary accountable for the department's performance.

**Recommendation: Congress should create a single, principal point of oversight and review for homeland security. Congressional leaders are best able to judge what committee should have jurisdiction over this department and its duties. But we believe that Congress does have the obligation to choose one in the House and one in the Senate, and that this committee should be a permanent standing committee with a nonpartisan staff.**

**Improve the Transitions between Administrations**

In chapter 6, we described the transition of 2000–2001. Beyond the policy issues we described, the new administration did not have its deputy cabinet officers in place until the spring of 2001, and the critical subcabinet officials were not confirmed until the summer—if then. In other words, the new administration—like others before it—did not have its team on the job until at least six months after it took office.

**Recommendation: Since a catastrophic attack could occur with little or no notice, we should minimize as much as possible the disruption of national security policymaking during the change of administrations by accelerating the process for national security appointments. We think the process could be improved significantly so transitions can work more effectively and allow new officials to assume their new responsibilities as quickly as possible.**

- Before the election, candidates should submit the names of selected members of their prospective transition teams to the FBI so that, if necessary, those team members can obtain security clearances immediately after the election is over.

- A president-elect should submit lists of possible candidates for national security positions to begin obtaining security clearances immediately after the election, so that their background investigations can be complete before January 20.

- A single federal agency should be responsible for providing and maintaining security clearances, ensuring uniform standards–including uniform security questionnaires and financial report requirements, and maintaining a single database. This agency can also be responsible for administering polygraph tests on behalf of organizations that require them.

- A president-elect should submit the nominations of the entire new national security team, through the level of under secretary of cabinet departments, not later than January 20. The Senate, in return, should adopt special rules requiring hearings and votes to confirm or reject national security nominees within 30 days of their submission. The Senate should not require confirmation of such executive appointees below Executive Level 3.

- The outgoing administration should provide the president-elect, as soon as possible after election day, with a classified, compartmented list that catalogues specific, operational threats to national security; major military or covert operations; and pending decisions on the pos-

sible use of force. Such a document could provide both notice and a checklist, inviting a president-elect to inquire and learn more.

## 13.5 ORGANIZING AMERICA'S DEFENSES IN THE UNITED STATES

**The Future Role of the FBI**

We have considered proposals for a new agency dedicated to intelligence collection in the United States. Some call this a proposal for an "American MI-5," although the analogy is weak—the actual British Security Service is a relatively small worldwide agency that combines duties assigned in the U.S. government to the Terrorist Threat Integration Center, the CIA, the FBI, and the Department of Homeland Security.

The concern about the FBI is that it has long favored its criminal justice mission over its national security mission. Part of the reason for this is the demand around the country for FBI help on criminal matters. The FBI was criticized, rightly, for the overzealous domestic intelligence investigations disclosed during the 1970s. The pendulum swung away from those types of investigations during the 1980s and 1990s, though the FBI maintained an active counterintelligence function and was the lead agency for the investigation of foreign terrorist groups operating inside the United States.

We do not recommend the creation of a new domestic intelligence agency. It is not needed if our other recommendations are adopted—to establish a strong national intelligence center, part of the NCTC, that will oversee counterterrorism intelligence work, foreign and domestic, and to create a National Intelligence Director who can set and enforce standards for the collection, processing, and reporting of information.

Under the structures we recommend, the FBI's role is focused, but still vital. The FBI does need to be able to direct its thousands of agents and other employees to collect intelligence in America's cities and towns—interviewing informants, conducting surveillance and searches, tracking individuals, working collaboratively with local authorities, and doing so with meticulous attention to detail and compliance with the law. The FBI's job in the streets of the United States would thus be a domestic equivalent, operating under the U.S. Constitution and quite different laws and rules, to the job of the CIA's operations officers abroad.

Creating a new domestic intelligence agency has other drawbacks.

- The FBI is accustomed to carrying out sensitive intelligence collection operations in compliance with the law. If a new domestic intelligence agency were outside of the Department of Justice, the process of legal oversight—never easy—could become even more difficult.

Abuses of civil liberties could create a backlash that would impair the collection of needed intelligence.

- Creating a new domestic intelligence agency would divert attention of the officials most responsible for current counterterrorism efforts while the threat remains high. Putting a new player into the mix of federal agencies with counterterrorism responsibilities would exacerbate existing information-sharing problems.

- A new domestic intelligence agency would need to acquire assets and personnel. The FBI already has 28,000 employees; 56 field offices, 400 satellite offices, and 47 legal attaché offices; a laboratory, operations center, and training facility; an existing network of informants, cooperating defendants, and other sources; and relationships with state and local law enforcement, the CIA, and foreign intelligence and law enforcement agencies.

- Counterterrorism investigations in the United States very quickly become matters that involve violations of criminal law and possible law enforcement action. Because the FBI can have agents working criminal matters and agents working intelligence investigations concerning the same international terrorism target, the full range of investigative tools against a suspected terrorist can be considered within one agency. The removal of "the wall" that existed before 9/11 between intelligence and law enforcement has opened up new opportunities for cooperative action within the FBI.

- Counterterrorism investigations often overlap or are cued by other criminal investigations, such as money laundering or the smuggling of contraband. In the field, the close connection to criminal work has many benefits.

Our recommendation to leave counterterrorism intelligence collection in the United States with the FBI still depends on an assessment that the FBI—if it makes an all-out effort to institutionalize change—can do the job. As we mentioned in chapter 3, we have been impressed by the determination that agents display in tracking down details, patiently going the extra mile and working the extra month, to put facts in the place of speculation. In our report we have shown how agents in Phoenix, Minneapolis, and New York displayed initiative in pressing their investigations.

FBI agents and analysts in the field need to have sustained support and dedicated resources to become stronger intelligence officers. They need to be rewarded for acquiring informants and for gathering and disseminating information differently and more broadly than usual in a traditional criminal inves-

tigation. FBI employees need to report and analyze what they have learned in ways the Bureau has never done before.

Under Director Robert Mueller, the Bureau has made significant progress in improving its intelligence capabilities. It now has an Office of Intelligence, overseen by the top tier of FBI management. Field intelligence groups have been created in all field offices to put FBI priorities and the emphasis on intelligence into practice. Advances have been made in improving the Bureau's information technology systems and in increasing connectivity and information sharing with intelligence community agencies.

Director Mueller has also recognized that the FBI's reforms are far from complete. He has outlined a number of areas where added measures may be necessary. Specifically, he has recognized that the FBI needs to recruit from a broader pool of candidates, that agents and analysts working on national security matters require specialized training, and that agents should specialize within programs after obtaining a generalist foundation. The FBI is developing career tracks for agents to specialize in counterterrorism/counterintelligence, cyber crimes, criminal investigations, or intelligence. It is establishing a program for certifying agents as intelligence officers, a certification that will be a prerequisite for promotion to the senior ranks of the Bureau. New training programs have been instituted for intelligence-related subjects.

The Director of the FBI has proposed creating an Intelligence Directorate as a further refinement of the FBI intelligence program. This directorate would include units for intelligence planning and policy and for the direction of analysts and linguists.

We want to ensure that the Bureau's shift to a preventive counterterrorism posture is more fully institutionalized so that it survives beyond Director Mueller's tenure. We have found that in the past the Bureau has announced its willingness to reform and restructure itself to address transnational security threats, but has fallen short—failing to effect the necessary institutional and cultural changes organization-wide. We want to ensure that this does not happen again. Despite having found acceptance of the Director's clear message that counterterrorism is now the FBI's top priority, two years after 9/11 we also found gaps between some of the announced reforms and the reality in the field. We are concerned that management in the field offices still can allocate people and resources to local concerns that diverge from the national security mission. This system could revert to a focus on lower-priority criminal justice cases over national security requirements.

**Recommendation: A specialized and integrated national security workforce should be established at the FBI consisting of agents, analysts, linguists, and surveillance specialists who are recruited, trained, rewarded, and retained to ensure the development of an institutional**

**culture imbued with a deep expertise in intelligence and national security.**

- The president, by executive order or directive, should direct the FBI to develop this intelligence cadre.

- Recognizing that cross-fertilization between the criminal justice and national security disciplines is vital to the success of both missions, all new agents should receive basic training in both areas. Furthermore, new agents should begin their careers with meaningful assignments in both areas.

- Agents and analysts should then specialize in one of these disciplines and have the option to work such matters for their entire career with the Bureau. Certain advanced training courses and assignments to other intelligence agencies should be required to advance within the national security discipline.

- In the interest of cross-fertilization, all senior FBI managers, including those working on law enforcement matters, should be certified intelligence officers.

- The FBI should fully implement a recruiting, hiring, and selection process for agents and analysts that enhances its ability to target and attract individuals with educational and professional backgrounds in intelligence, international relations, language, technology, and other relevant skills.

- The FBI should institute the integration of analysts, agents, linguists, and surveillance personnel in the field so that a dedicated team approach is brought to bear on national security intelligence operations.

- Each field office should have an official at the field office's deputy level for national security matters. This individual would have management oversight and ensure that the national priorities are carried out in the field.

- The FBI should align its budget structure according to its four main programs—intelligence, counterterrorism and counterintelligence, criminal, and criminal justice services—to ensure better transparency on program costs, management of resources, and protection of the intelligence program.[20]

- The FBI should report regularly to Congress in its semiannual program reviews designed to identify whether each field office is appropriately addressing FBI and national program priorities.

- The FBI should report regularly to Congress in detail on the qualifications, status, and roles of analysts in the field and at headquarters. Congress should ensure that analysts are afforded training and career opportunities on a par with those offered analysts in other intelligence community agencies.

- The Congress should make sure funding is available to accelerate the expansion of secure facilities in FBI field offices so as to increase their ability to use secure email systems and classified intelligence product exchanges. The Congress should monitor whether the FBI's information-sharing principles are implemented in practice.

The FBI is just a small fraction of the national law enforcement community in the United States, a community comprised mainly of state and local agencies. The network designed for sharing information, and the work of the FBI through local Joint Terrorism Task Forces, should build a reciprocal relationship, in which state and local agents understand what information they are looking for and, in return, receive some of the information being developed about what is happening, or may happen, in their communities. In this relationship, the Department of Homeland Security also will play an important part.

The Homeland Security Act of 2002 gave the under secretary for information analysis and infrastructure protection broad responsibilities. In practice, this directorate has the job to map "terrorist threats to the homeland against our assessed vulnerabilities in order to drive our efforts to protect against terrorist threats."[21] These capabilities are still embryonic. The directorate has not yet developed the capacity to perform one of its assigned jobs, which is to assimilate and analyze information from Homeland Security's own component agencies, such as the Coast Guard, Secret Service, Transportation Security Administration, Immigration and Customs Enforcement, and Customs and Border Protection. The secretary of homeland security must ensure that these components work with the Information Analysis and Infrastructure Protection Directorate so that this office can perform its mission.[22]

### Homeland Defense
At several points in our inquiry, we asked, "Who is responsible for defending us at home?" Our national defense at home is the responsibility, first, of the Department of Defense and, second, of the Department of Homeland Security. They must have clear delineations of responsibility and authority.

We found that NORAD, which had been given the responsibility for defending U.S. airspace, had construed that mission to focus on threats coming from outside America's borders. It did not adjust its focus even though the intelligence community had gathered intelligence on the possibility that ter-

rorists might turn to hijacking and even use of planes as missiles. We have been assured that NORAD has now embraced the full mission. Northern Command has been established to assume responsibility for the defense of the domestic United States.

**Recommendation: The Department of Defense and its oversight committees should regularly assess the adequacy of Northern Command's strategies and planning to defend the United States against military threats to the homeland.**

The Department of Homeland Security was established to consolidate all of the domestic agencies responsible for securing America's borders and national infrastructure, most of which is in private hands. It should identify those elements of our transportation, energy, communications, financial, and other institutions that need to be protected, develop plans to protect that infrastructure, and exercise the mechanisms to enhance preparedness. This means going well beyond the preexisting jobs of the agencies that have been brought together inside the department.

**Recommendation: The Department of Homeland Security and its oversight committees should regularly assess the types of threats the country faces to determine (a) the adequacy of the government's plans—and the progress against those plans—to protect America's critical infrastructure and (b) the readiness of the government to respond to the threats that the United States might face.**

.  .  .

We look forward to a national debate on the merits of what we have recommended, and we will participate vigorously in that debate.

# APPENDIX A

# COMMON ABBREVIATIONS

| | |
|---|---|
| CAP | combat air patrol |
| CAPPS | Computer Assisted Passenger Prescreening System |
| CENTCOM | Central Command |
| CIA | Central Intelligence Agency |
| CONR | Continental U.S. NORAD Region |
| CSG | Counterterrorism Security Group |
| CTC | Counterterrorist Center |
| DIA | Defense Intelligence Agency |
| DCI | Director of Central Intelligence |
| ESU | Emergency Service Unit (NYPD) |
| FAA | Federal Aviation Administration |
| FBI | Federal Bureau of Investigation |
| FDNY | Fire Department of New York |
| FFTC | Florida Flight Training Center |
| FISA | Foreign Intelligence Surveillance Act |
| FISC | Foreign Intelligence Surveillance Court |
| INS | Immigration and Naturalization Service |
| ISID | Inter-Services Intelligence Directorate (Pakistan) |
| JCS | Joint Chiefs of Staff |
| JI | Jemaah Islamiah |
| JTTF | Joint Terrorism Task Force |
| KSM | Khalid Sheikh Mohammed |
| Legat | legal attaché |
| MAK | Mektab al Khidmat |
| MON | memorandum of notification |
| NEADS | Northeast Air Defense Sector |
| NCTC | National Counterterrorism Center |
| NGO | nongovernmental organization |
| NMCC | National Military Command Center |

| NORAD | North American Aerospace Defense Command |
| NTSB | National Transportation Safety Board |
| NSA | National Security Agency |
| NSC | National Security Council |
| NSPD | national security policy directive |
| NYPD | New York Police Department |
| OEM | Office of Emergency Management (New York City) |
| OFAC | Office of Foreign Assets Control |
| OIPR | Office of Intelligence Policy and Review |
| OMB | Office of Management and Budget |
| PAPD | Port Authority Police Department |
| PDD | presidential decision directive |
| PEOC | Presidential Emergency Operations Center |
| SEC | Securities and Exchange Commission |
| TSA | Transportation Security Administration |
| TTIC | Terrorist Threat Integration Center |
| UBL | Usama Bin Ladin |
| WMD | weapons of mass destruction |
| WTC | World Trade Center |
| WTO | World Trade Organization |

# APPENDIX B

# TABLE OF NAMES

## U.S. OFFICIALS

| | |
|---|---|
| Madeleine Albright | Secretary of State, 1997–2001 |
| Charles Allen | Assistant Director of Central Intelligence for Collection, 1998– |
| Richard Armitage | Deputy Secretary of State, 2001– |
| Larry Arnold | Commander, First Air Force and Commander of the Continental U.S. North American Aerospace Defense Command (NORAD) Region, 1997–2002 |
| John Ashcroft | Attorney General, 2001– |
| Monte Belger | Acting Deputy Administrator, Federal Aviation Administration 1997–2002 |
| Samuel "Sandy" Berger | National Security Advisor, 1997–2001; Deputy National Security Advisor 1993–1997 |
| J. Cofer Black | Director, DCI Counterterrorist Center, 1999–2002 |
| Joshua Bolten | White House Deputy Chief of Staff, 2001–2003 |
| Robert "Bear" Bryant | Deputy Director, Federal Bureau of Investigation, 1997–1999 |
| George H. W. Bush | 41st President of the United States, 1989–1993; Vice President, 1981–1989 |
| George W. Bush | 43rd President of the United States, 2001– |
| Andrew Card, Jr. | White House Chief of Staff, 2001– |
| Richard B. Cheney | Vice President of the United States, 2001– |
| Richard Clarke | National Counterterrorism Coordinator, NSC, 1997–2001 |
| William J. Clinton | 42nd President of the United States, 1993–2001 |
| William Cohen | Secretary of Defense, 1997–2001 |

Roger Cressey              NSC counterterrorism official, 1999–2001
Ralph Eberhart             Commander in Chief, NORAD and U.S. Space
                           Command, 2000–
Tommy Franks               Commander, U.S. Central Command (CENT-
                           COM), 2001–2003
Louis Freeh                Director, Federal Bureau of Investigation, 1993–2001
Scott Fry                  Director of Operations for the Joint Chiefs of
                           Staff, 1998–2000
Jane Garvey                Administrator, Federal Aviation Administration,
                           1997–2002
Newt Gingrich              Speaker of the House, 1995–1999
Rudolph Giuliani           Mayor, City of New York, 1994–2001
John Gordon                Deputy Director of Central Intelligence, 1997–2000
Al Gore, Jr.               Vice President of the United States, 1993–2001
Scott Gration              Fry's Chief Information Operations Officer,
                           2000–2001
Stephen Hadley             Deputy National Security Advisor, 2001–
Dennis Hastert             Speaker of the House, 1999–
Karl Inderfurth            Assistant Secretary of State for South Asia,
                           1997–2001
Donald Kerrick             Deputy National Security Advisor, 2000–2001
Zalmay Khalilzad           NSC Senior Director for Near East and South
                           Asia and Special Envoy to Afghanistan,
                           2001–2003
Anthony Lake               National Security Advisor, 1993–1997
Trent Lott                 Senate Majority Leader, 1996–2001
Mary McCarthy              NSC senior director for intelligence, 1998–2001
John McLaughlin            Deputy Director of Central Intelligence,
                           2000–2004
William Milam              U.S. Ambassador to Pakistan, 1998–2001
Norman Mineta              Secretary of Transportation, 2001–
Robert Mueller             Director, Federal Bureau of Investigation, 2001–
Richard Myers              Chairman of the Joint Chiefs, September 2001–;
                           Joint Chiefs Vice Chairman, 2000–2001
John O'Neill               FBI Special Agent in Charge for National Secu-
                           rity, New York Field Office, 1997–2001; Chief
                           of Security of the World Trade Center, killed
                           on 9/11
Paul O'Neill               Secretary of the Treasury, 2001–2002
James Pavitt               Deputy Director of Operations, CIA,
                           1999–2004
Thomas Pickard             Acting Director, Federal Bureau of Investigation,
                           June 25, 2001–September 4, 2001

| Thomas Pickering | Under Secretary of State, 1997–2000 |
| Colin Powell | Secretary of State, 2001– |
| Ronald Reagan | 40th President of the United States, 1981–1989 |
| Janet Reno | Attorney General, 1993–2001 |
| Condoleezza Rice | National Security Advisor, 2001– |
| Bill Richardson | Ambassador to the United Nations, 1997–1998 |
| Thomas Ridge | First Secretary of Homeland Security, 2003–; Homeland Security Advisor, 2001–2003 |
| Bruce Riedel | Senior Director for Near East and South Asia, NSC, 1997–2001 |
| Christina Rocca | Assistant Secretary of State for South Asia, 2001– |
| Michael Rolince | FBI Section Chief, International Terrorism Operations Section, 1998–2002 |
| Donald Rumsfeld | Secretary of Defense, 2001– |
| Peter Schoomaker | Commander, Special Operations Command, 1997–2000 |
| Gary Schroen | CIA Station Chief, Islamabad, 1996–1999 |
| Michael Sheehan | Counterterrorism Coordinator, U.S. Department of State, 1998–2000 |
| Hugh Shelton | Chairman of the Joint Chiefs of Staff, 1997–2001 |
| Walter Slocombe | Under Secretary of Defense for Policy, 1994–2001 |
| James Steinberg | Deputy National Security Advisor, 1996–2000 |
| Strobe Talbott | Deputy Secretary of State, 1994–2001 |
| George Tenet | Director of Central Intelligence, 1997–2004 |
| Larry Thompson | Deputy Attorney General, 2001–2003 |
| Dale Watson | Executive Assistant Director for Counterterrorism and Counterintelligence, FBI, 2001–2002 |
| Paul Wolfowitz | Deputy Secretary of Defense, 2001– |
| Anthony Zinni | Commander, U.S. Central Command (CENTCOM), 1997–2000 |

## OTHERS

| Abdullah bin Abdul Aziz | Crown Prince and de facto regent of Saudi Arabia, 1995– |
| Mohdar Abdullah | Yemeni; student in San Diego who assisted two 9/11 hijackers |
| Sayf al Adl | Egyptian; high-ranking member of al Qaeda military committee |
| Mahmud Ahmed | Director General of Pakistan's Inter-Services Intelligence Directorate, 1999–2001 |
| Mohammed Farrah Aidid | Somali warlord who challenged U.S. presence in Somalia in the early 1990s (deceased) |

| | |
|---|---|
| Ali Abdul Aziz Ali | (a.k.a. Ammar al Baluchi) Pakistani; KSM's nephew; financial and travel facilitator for 9/11 plot |
| Ahmad Khalil Ibrahim Samir al Ani | Iraqi intelligence officer who allegedly met with Atta in Prague, Czech Republic; currently in U.S. custody |
| Mohamed Atta | Egyptian; tactical leader of 9/11 plot; pilot/hijacker (AA 11) (deceased) |
| Mohammed Atef | (a.k.a. Abu Hafs al Masri) Egyptian; al Qaeda military commander (deceased) |
| Tawfiq bin Attash | (a.k.a. Khallad, Waleed bin Attash) Yemeni; senior al Qaeda operative connected to the U.S. embassy bombings, the USS *Cole* attack, and the 9/11 attacks; currently in U.S. custody |
| Anwar Aulaqi | U.S. citizen; Imam at Rabat mosque (San Diego, CA) and later at Dar al Hijra mosque (Falls Church, VA), who associated with two 9/11 hijackers |
| Abdullah Azzam | Palestinian; founder of the Maktab al Khidmat, which provided logistical support to mujahideen in Afghanistan (deceased) |
| Jamal al Badawi | Yemeni; co-conspirator arrested in Yemen for the USS *Cole* attack |
| Said Bahaji | German son of Moroccan immigrant; Hamburg cell associate |
| Saeed al Baluchi | Saudi; candidate 9/11 hijacker |
| Fayez Banihammad | Emirati; 9/11 hijacker (UA 175) (deceased) |
| Abu Ubaidah al Banshiri | Egyptian; al Qaeda military commander until 1996 (deceased) |
| Abu Bara al Yemeni | (a.k.a. Abu al Bara al Ta'izi, Suhail Shurabi, and Barakat) Yemeni; potential suicide bomber in original 9/11 plot |
| Ramzi Binalshibh | Yemeni; Hamburg cell member; coordinator for 9/11 plot; currently in U.S. custody |
| Omar Hassan Ahmed al Bashir | President of Sudan, 1989– |
| Abu Bakar Bashir | Indonesian; spiritual leader and founder of Jemaah Islamiya, al Qaeda–affiliated terrorist group in Southeast Asia |
| Omar al Bayoumi | Saudi; assisted two 9/11 hijackers in San Diego, CA |
| Khalil Deek | U.S. citizen; created electronic version of *Encyclopedia of Jihad*; believed to be involved in millen- |

|  |  |
|---|---|
| | nium plot to destroy tourist landmarks in Jordan |
| Caysan Bin Don | (a.k.a Isamu Dyson, a.k.a Clayton Morgan) U.S. citizen; met two 9/11 hijackers in Los Angeles and San Diego, CA |
| Zakariya Essabar | Moroccan; Hamburg cell associate |
| Jamal Ahmed Mohamed al Fadl | Sudanese; al Qaeda member who defected to the United States in 1996 |
| Ahmed al Ghamdi | Saudi; 9/11 hijacker (UA 175) (deceased) |
| Ali Abd al Rahman al Faqasi al Ghamdi | (a.k.a. Abu Bakr al Azdi) Saudi; candidate 9/11 hijacker; currently in U.S. custody |
| Hamza al Ghamdi | Saudi; 9/11 hijacker (UA 175) (deceased) |
| Saeed al Ghamdi | Saudi; 9/11 hijacker (UA 93) (deceased) |
| Saeed ("Jihad") al Ghamdi | Saudi; candidate 9/11 hijacker |
| Hassan Ghul | Pakistani; al Qaeda facilitator; currently in U.S. custody |
| Abu Hafs al Masri | *see* Mohammed Atef |
| Abu Hafs al Mauritani | Mauritanian; senior al Qaeda theologian |
| Wadi al Hage | U.S. citizen; al Qaeda operative; Bin Ladin's personal assistant; convicted in embassy bombings trial |
| Mushabib al Hamlan | Saudi; candidate 9/11 hijacker |
| Hani Hanjour | Saudi; 9/11 pilot/hijacker (AA 77) (deceased) |
| Mustafa al Hawsawi | Saudi; al Qaeda media committee member; financial and travel facilitator for 9/11 plot |
| Nawaf al Hazmi | Saudi; 9/11 hijacker (AA 77) (deceased) |
| Salem al Hazmi | Saudi; 9/11 hijacker (AA 77) (deceased) |
| Ahmad al Haznawi | Saudi; 9/11 hijacker (UA 93) (deceased) |
| Gulbuddin Hekmatyar | Afghani; founder and leader of the Hizb-e-Islami, a Taliban opposition group; Prime Minister of Afghanistan, 1993–1994; 1996 |
| Saddam Hussein | President of Iraq, 1979-2003 |
| Zein al Abideen Mohamed Hussein | (a.k.a. Abu Zubaydah) Palestinian; al Qaeda associate; currently in U.S. custody |
| Abu Hajer al Iraqi | *see* Mamdouh Mahmud Salim |
| Riduan Isamuddin | (a.k.a. Hambali) Indonesian; operational leader of Jemaah Islamiya; currently in U.S. custody |
| Ziad Jarrah | Lebanese; 9/11 pilot/hijacker (UA 93) (deceased) |
| Abderraouf Jdey | (a.k.a. Faruq al Tunisi) Tunisian/Canadian; candidate 9/11 hijacker |

| Mohamed al Kahtani | Saudi; candidate 9/11 hijacker; currently in U.S. custody |
| Mir Amal Kansi | Pakistani; extremist who killed two CIA employees at CIA headquarters in Virginia in 1993 (executed) |
| Hamid Karzai | Interim Leader and later President of Afghanistan, Dec. 2001– |
| Younis Khalis | Afghani; leader of Hizb-e-Islami; hosted UBL upon his return to Afghanistan in 1996 |
| Khallad | *see* Tawfiq bin Attash |
| Wali Khan Amin Shah | (a.k.a. Osama Asmurai) Turkmen; early associate of Usama Bin Ladin; convicted in Manila air (Bojinka) plot |
| Ibn al Khattab | Saudi; mujahid leader in Chechnya |
| L'Houssaine Kherchtou | (a.k.a. Joe the Moroccan, Abu Talal) Moroccan; former al Qaeda member who broke with Bin Ladin and became a U.S. government informant |
| Usama Bin Ladin | (UBL) Saudi; head of al Qaeda |
| Ibn al Shaykh al Libi | Libyan; head of jihadist training camp in Afghanistan |
| Ahmed al Nami | Saudi; 9/11 hijacker (UA 93) (deceased) |
| Sheikh Saeed al Masri | Egyptian; head of al Qaeda finance committee |
| Ahmed Shah Massoud | Leader of Afghanistan's Northern Alliance, a Taliban opposition group (assassinated Sept. 9, 2001) |
| Khalid al Mihdhar | Saudi; 9/11 hijacker (AA 77) (deceased) |
| Khalid Sheikh Mohammed | (KSM) (a.k.a. Mukhtar) Pakistani; mastermind of 9/11 attacks; currently in U.S. custody |
| Majed Moqed | Saudi; 9/11 hijacker (AA 77) (deceased) |
| Mounir el Motassadeq | Moroccan; Hamburg cell associate |
| Zacarias Moussaoui | French; arrested in the U.S. in connection with the 9/11 attacks |
| Hosni Mubarak | President of Egypt, 1981– |
| Pervez Musharraf | Leader of Pakistan, 1999– |
| Abdelghani Mzoudi | Moroccan; Hamburg cell associate |
| Qutaybah al Najdi | Saudi; candidate 9/11 hijacker |
| Abd al Rahim al Nashiri | (a.k.a. Mullah Bilal) Saudi; mastermind of USS *Cole* attack; currently in U.S. custody |
| Mullah Mohammed Omar | Leader of Afghanistan's Taliban, which ruled most of the country from 1996 to 2001 |
| Abdul Aziz al Omari | Saudi; 9/11 hijacker (AA 11) (deceased) |
| Muammar Qadhafi | Leader of Libya, 1970– |

| | |
|---|---|
| Fahd al Quso | Yemeni; al Qaeda co-conspirator arrested in Yemen for the USS *Cole* attack |
| Sayyid Qutb | Egyptian writer; member of Muslim Brotherhood (deceased) |
| Eyad al Rababah | Jordanian; Virginia resident who helped Hazmi and Hanjour |
| Abd al Rahim Ghulum Rabbani | (a.k.a. Abu Rahmah) Saudi; al Qaeda member who worked closely with KSM in Karachi and assisted many of the 9/11 hijackers |
| Sheikh Omar Abdel Rahman | (a.k.a. the Blind Sheikh) Egyptian cleric; convicted for crimes related to 1993 World Trade Center bombing and 1995 plots against other NY landmarks |
| Saud al Rashid | Saudi; candidate 9/11 hijacker |
| Ahmed Ressam | (a.k.a. Benni Antoine Noris) Algerian; convicted in millennium plot to bomb Los Angeles International Airport |
| Mamdouh Mahmud Salim | (a.k.a. Abu Hajer al Iraqi) Iraqi; chief procurement officer for al Qaeda in Sudan; arrested in connection with 1998 embassy bombings |
| Yazeed al Salmi | Saudi; briefly a housemate of a 9/11 hijacker in San Diego |
| Abdul Rasul Sayyaf | Afghani; head of the Hizbul-Ittihad El-Islami, and KSM's mentor |
| Aysel Senguen | German; fiancée of 9/11 hijacker Jarrah |
| Nawaz Sharif | Pakistani Prime Minister, 1990–1993, 1997–1999 |
| Marwan al Shehhi | Emirati; 9/11 pilot/hijacker (UA 175) (deceased) |
| Mohand al Shehri | Saudi; 9/11 hijacker (UA 175) (deceased) |
| Wail al Shehri | Saudi; 9/11 hijacker (AA 11) (deceased) |
| Waleed al Shehri | Saudi; 9/11 hijacker (AA 11) (deceased) |
| Mohamedou Ould Slahi | (a.k.a. Abu Musab) Mauritanian; recruited 9/11 hijackers in Germany |
| Yazid Sufaat | Malaysian; member of Jemaah Islamiya |
| Satam al Suqami | Saudi; 9/11 hijacker (AA 11) (deceased) |
| Madani al Tayyib | Saudi; former head of al Qaeda finance committee |
| Zuhair al Thubaiti | Saudi; candidate 9/11 hijacker |
| Fahad al Thumairy | Saudi; Imam of King Fahd mosque in Los Angeles; accredited diplomat at Saudi Consulate in Los Angeles |
| Hassan al Turabi | Sudan's longtime hard-line ideological leader and Speaker of the country's National Assembly |

|  | during the 1990s |
| --- | --- |
| Prince Turki bin Faisal | Saudi intelligence chief prior to 9/11 |
| Ramzi Yousef | (a.k.a. Abdul Basit) Pakistani; convicted master-mind of and co-conspirator in 1993 WTC bombing and Manila air (Bojinka) plots |
| Khalid Saeed Ahmad al Zahrani | Saudi; candidate 9/11 hijacker |
| Mohammed Haydar Zammar | German citizen from Syria; jihadist; possible recruiter of Hamburg cell members |
| Ayman al Zawahiri | Egyptian; UBL's deputy and leader of Egyptian Islamic Jihad terrorist group |
| Hamdan Bin Zayid | Emirati; Minister of State for Foreign Affairs of the United Arab Emirates |
| Abu Zubaydah | *see* Zein al Abideen Mohamed Hussein |

# APPENDIX C

# COMMISSION HEARINGS

The Commission held 12 public hearings during the course of its investigation, convening for a total of 19 days and receiving testimony from 160 witnesses. The following is a list of hearings and witnesses in order of their appearance. All witnesses appearing during the 2004 calendar year testified under oath.

## FIRST PUBLIC HEARING
*Alexander Hamilton Customs House, New York, N.Y.*
*March 31–April 1, 2003*

The Honorable George Pataki, Governor, State of New York
The Honorable Michael R. Bloomberg, Mayor, City of New York

### The Experience of the Attack
Harry Waizer, survivor, Cantor Fitzgerald, LP
David Lim, Police Department, Port Authority of New York and New Jersey
Lee Ielpi, Fire Department of New York (retired)
Lieutenant Colonel Brian Birdwell, United States Army
Craig Sincock, United States Army (retired)

### Representatives of the Victims
Stephen Push, Families of September 11
Mary Fetchet, Voices of September 11
Mindy Kleinberg, September 11 Advocates
Allison Vadhan, Families of Flight 93

### The Attackers, Intelligence, and Counterterrorism Policy
Daniel Byman, Georgetown University
Abraham D. Sofaer, Hoover Institution
Brian Jenkins, RAND Corporation
Magnus Ranstorp, University of St. Andrews

**Borders, Money, and Transportation Security**
Glenn Fine, Inspector General, U.S. Department of Justice
Lee Wolosky, Boies, Schiller & Flexner LLP
Gerald Dillingham, Director, Civil Aviation Issues, General Accounting Office

**Law Enforcement, Domestic Intelligence, and
    Homeland Security**
Michael Wermuth, RAND Corporation
Steven Brill, Author, *After: How America Confronted the September 12 Era*
Zoë Baird, Markle Foundation
Randy Larsen, ANSER Institute for Homeland Security

**Immediate Response to the Attacks**
Shawn Kelley, Assistant Chief, Arlington County Fire Department
William Baker, American Society of Civil Engineers
Ken Holden, Commissioner, New York City Department of
    Design and Construction

## SECOND PUBLIC HEARING
*Congress and Civil Aviation Security*
*Hart Senate Office Building, Washington, D.C.*
*May 22–23, 2003*

**Congressional Oversight**
Representative Nancy Pelosi (D-Calif.)
Senator John McCain (R-Az.)
Senator Joseph Lieberman (D-Conn.)

**Intelligence Oversight and the Joint Inquiry**
Senator Bob Graham (D-Fla.)
Senator Richard Shelby (R-Ala.)
Representative Porter Goss (R-Fla.)
Representative Jane Harman (D-Calif.)

**Affected Constituencies**
Senator Charles Schumer (D-N.Y.)
Senator Hillary Rodham Clinton (D-N.Y.)
Senator Jon Corzine (D-N.J.)
Senator Frank Lautenberg (D-N.J.)
Representative Jerrold Nadler (D-N.Y.)
Representative Christopher Shays (R-Conn.)

**State of the System: Civil Aviation Security
    on September 11**
Jane Garvey, former Administrator, Federal Aviation Administration
Kenneth Mead, Inspector General, Department of Transportation
James May, Air Transport Association of America

Bogdan Dzakovic, Civil Aviation Security Inspector,
    Transportation Security Agency

### September 11, 2001: The Attacks and the Response

The Honorable Norman Mineta, Secretary of Transportation
Major General Craig McKinley, Commander, 1st Air Force and the
    Continental United States NORAD Region (CONR)
Lieutenant General Mike Canavan (retired), former Associate Administrator for
    Civil Aviation Security, Federal Aviation Administrator

### Reforming Civil Aviation Security: Next Steps

Stephen McHale, Deputy Administrator, Transportation Security Agency
Major General O.K. Steele (retired), former Associate Administrator for
    Civil Aviation Security, Federal Aviation Administration
Mary Schiavo, former Inspector General, Department of Transportation

## THIRD PUBLIC HEARING

*Terrorism, al Qaeda, and the Muslim World*
*Russell Senate Office Building, Washington, D.C.*
*July 9, 2003*

### Al Qaeda

Rohan Gunaratna, Institute for Defence and Strategic Studies
Mamoun Fandy, United States Institute of Peace
Marc Sageman, University of Pennsylvania

### States and Terrorism

Laurie Mylroie, American Enterprise Institute
Judith Yaphe, National Defense University
Murhaf Jouejati, Middle East Institute and George Washington University
Mark Gasiorowski, Louisiana State University

### The Challenge within the Muslim World

Rachel Bronson, Council on Foreign Relations
Steven Emerson, The Investigative Project
Gilles Kepel, Institute of Political Studies, Paris
Dennis Ross, Washington Institute for Near East Policy

## FOURTH PUBLIC HEARING

*Intelligence and the War on Terrorism*
*Russell Senate Office Building, Washington, D.C.*
*October 14, 2003*

### Leadership of U.S. Intelligence

James R. Schlesinger, former Director of Central Intelligence and
    Secretary of Defense

John M. Deutch, former Director of Central Intelligence and
    Deputy Secretary of Defense

**Intelligence and National Security Policy**
James B. Steinberg, The Brookings Institution and former Deputy
    National Security Advisor

**Warning of Transnational Threats**
Richard Kerr, former Deputy Director of Central Intelligence
Mary O. McCarthy, former National Intelligence Officer for Warning,
    Central Intelligence Agency
John Gannon, Staff Director, House Select Committee on Homeland Security

## FIFTH PUBLIC HEARING
*Private/Public Sector Partnerships for Emergency Preparedness*
*Drew University, Madison, N.J.*
*November 19, 2003*

**Highlights of New Jersey's Public/Private Sector Partnerships**
The Honorable James E. McGreevey, Governor, State of New Jersey

**The Challenge of Private Sector Preparedness**
John Degnan, The Chubb Corporation

**Skyscraper Safety Issues from 9/11 Family Members**
Monica Gabrielle, Skyscraper Safety Campaign
Sally Regenhard, Skyscraper Safety Campaign

**Public/Private Initiatives Since 9/11**
Michael F. Byrne, Director, Office of National Capital Region Coordination,
    Department of Homeland Security
Dennis J. Reimer, Oklahoma National Memorial Institute for
    Prevention of Terrorism
Richard A. Andrews, National Center for Crisis and Continuity Coordination

**Private Sector Experience on 9/11**
William Y. Yun, Fiduciary Trust Company International

**Standards for Emergency Management and
    Business Continuity**
Glenn Corbett, John Jay College of Criminal Justice
Randall Yim, Director, National Preparedness Team, General Accounting Office

**Future Strategies for Private Sector Preparedness**
William G. Raisch, Greater New York Safety Council
Peter R. Orszag, The Brookings Institution
James Haviaris, Rockefeller Group Development Corporation
Thomas Susman, Ropes & Gray

## SIXTH PUBLIC HEARING
*Security and Liberty*
*Russell Senate Office Building, Washington, D.C.*
*December 8, 2003*

### Intelligence Collection within the United States
Larry D. Thompson, former Deputy Attorney General of the United States
Philip B. Heymann, former Deputy Attorney General of the United States
Stephen J. Schulhofer, New York University, School of Law

### Protecting Privacy, Preventing Terrorism
Judith A. Miller, former General Counsel, Department of Defense
Stewart A. Baker, former General Counsel, National Security Agency
Marc Rotenberg, Electronic Privacy Information Center

### Preventive Detention: Use of Immigration Laws and Enemy Combatant Designations to Combat Terrorism
Jan Ting, Temple University
Khaled Medhat Abou El Fadl, UCLA School of Law
David Martin, University of Virginia School of Law and former General
    Counsel, Immigration and Naturalization Service, Department of Justice

### Government Organization and Domestic Intelligence
The Honorable William P. Barr, former Attorney General of the United States
John J. Hamre, former Deputy Secretary of Defense
John MacGaffin, former Associate Deputy Director for Operations,
    Central Intelligence Agency

## SEVENTH PUBLIC HEARING
*Borders, Transportation, and Managing Risk*
*Hart Senate Office Building, Washington, D.C.*
*January 26–27, 2004*

### The Border Security System Prior to September 11
Mary A. Ryan, former Assistant Secretary for Consular Affairs,
    Department of State
Doris Meissner, former Commissioner, Immigration and Naturalization Service,
    Department of Justice

### An Incident in Florida
Jose E. Melendez-Perez, Inspector, Customs and Border Protection,
    Department of Homeland Security

### Visas and Watchlisting Today
Maura Harty, Assistant Secretary for Consular Affairs, Department of State
Russell E. Travers, Deputy Director, Information Sharing and Knowledge

Management Department, Terrorist Threat Integration Center,
Central Intelligence Agency

Donna A. Bucella, Director, Terrorist Screening Center, Federal Bureau
of Investigation

## The Response to September 11 on the Borders

James Ziglar, former Commissioner, Immigration and Naturalization Service,
Department of Justice

Robert C. Bonner, Commissioner, Customs and Border Protection,
Department of Homeland Security

Peter F. Verga, Principal Deputy Assistant Secretary for Homeland Defense,
Department of Defense

## Aviation Security on 9/11: The Regulators

Jane F. Garvey, former Administrator, Federal Aviation Administration

Cathal L. "Irish" Flynn, former Associate Administrator of Civil Aviation
Security, Federal Aviation Administration

Claudio Manno, Assistant Administrator for Intelligence, Transportation
Security Administration

## Aviation Security on 9/11: The Airlines

Edmond L. Soliday, former Vice President of Safety, Quality Assurance, and
Security, United Airlines

Andrew P. Studdert, former Chief Operating Officer, United Airlines

Gerard J. Arpey, Chief Executive Officer, American Airlines

Timothy J. Ahern, Vice President–DFW Hub, and former Vice President of
Safety, Security, and Environmental, American Airlines

## Acts of Courage in the Sky

Nydia Gonzalez, Manager, Southeast Reservations Center, American Airlines

## Risk Management after September 11

James M. Loy, Deputy Secretary, Department of Homeland Security

## EIGHTH PUBLIC HEARING

*Counterterrorism Policy*
*Hart Senate Office Building, Washington, D.C.*
*March 23–24, 2004*

## Diplomacy

The Honorable Madeleine K. Albright, former Secretary of State
The Honorable Colin L. Powell, Secretary of State

## The Military

The Honorable William S. Cohen, former Secretary of Defense
The Honorable Donald H. Rumsfeld, Secretary of Defense

## Intelligence Policy

The Honorable George J. Tenet, Director of Central Intelligence

**National Policy Coordination**

The Honorable Samuel R. Berger, former Assistant to the President for
National Security Affairs

Richard A. Clarke, former National Coordinator for Counterterrorism,
National Security Council

Richard L. Armitage, Deputy Secretary of State

## NINTH PUBLIC HEARING
*Hart Senate Office Building, Washington, D.C.*
*April 8, 2004*

The Honorable Condoleezza Rice, Assistant to the President for
National Security Affairs

## TENTH PUBLIC HEARING
*Law Enforcement and Intelligence*
*Hart Senate Office Building, Washington, D.C.*
*April 13–14, 2004*

**Law Enforcement, Counterterrorism, and Intelligence Collection in
the United States Prior to 9/11**

The Honorable Louis J. Freeh, former Director, Federal Bureau of Investigation

The Honorable Janet Reno, former Attorney General of the United States

**Threats and Responses in 2001**

Thomas J. Pickard, former Acting Director, Federal Bureau of Investigation

Ambassador J. Cofer Black, former Director, Counterterrorism Center,
Central Intelligence Agency

The Honorable John Ashcroft, Attorney General of the United States

**The Performance of the Intelligence Community**

The Honorable George J. Tenet, Director of Central Intelligence

**Preventing Future Attacks Inside the United States**

John O. Brennan, Director, Terrorist Threat Integration Center,
Central Intelligence Agency

Lieutenant General Patrick M. Hughes, Assistant Secretary for Information
Analysis, Department of Homeland Security

John S. Pistole, Executive Assistant Director for Counterterrorism and
Counterintelligence, Federal Bureau of Investigation

James L. Pavitt, Deputy Director of Operations, Central Intelligence Agency

**FBI Leadership and Initiatives Post-9/11**

The Honorable Robert S. Mueller III, Director, Federal Bureau of Investigation

Maureen Baginski, Executive Assistant Director for Intelligence,
Federal Bureau of Investigation

## ELEVENTH PUBLIC HEARING

*Emergency Response*
*New School University, New York, N.Y.*
*May 18–19, 2004*

Alan Reiss, former Director, World Trade Center, Port Authority of
    New York and New Jersey
Joseph Morris, former Chief, Port Authority of New York and
    New Jersey Police Department
Bernard B. Kerik, former Commissioner, New York Police Department
Thomas Von Essen, former Commissioner, Fire Department of New York
Richard Sheirer, former Director, New York City Office of
    Emergency Management
Raymond W. Kelly, Commissioner, New York Police Department
Nicholas Scoppetta, Commissioner, Fire Department of New York
Joseph F. Bruno, Director, New York City Office of Emergency Management
The Honorable Rudolph W. Giuliani, former Mayor, City of New York
Dennis Smith, Author, *Report from Ground Zero*
Jerome M. Hauer, former Commissioner, New York City Office of
    Emergency Management
Edward P. Plaugher, Chief, Arlington County Fire Department
The Honorable Michael R. Bloomberg, Mayor, City of New York
The Honorable Thomas J. Ridge, Secretary of Homeland Security

## TWELFTH PUBLIC HEARING

*The 9/11 Plot and National Crisis Management*
*National Transportation Safety Board Conference Center,*
    *Washington, D.C.*
*June 16–17, 2004*

### Al Qaeda

Mary Deborah Doran, Special Agent, Federal Bureau of Investigation
Patrick J. Fitzgerald, U.S. Attorney for the Northern District of Illinois
CIA Officials

### Outline of the 9/11 Plot

Jacqueline Maguire, Special Agent, Federal Bureau of Investigation
James N. Fitzgerald, Special Agent, Federal Bureau of Investigation
Adam B. Drucker, Supervisory Special Agent, Federal Bureau of Investigation
CIA Officials

### Military Response on 9/11

General Richard B. Myers, United States Air Force, Chairman,
    Joint Chiefs of Staff

Admiral (select) Charles Joseph Leidig, United States Navy,
    Deputy Director for Operations, National Military Command Center
General Ralph E. Eberhart, United States Air Force, Commander,
    North American Aerospace Defense Command (NORAD) and
    United States Northern Command
Major General Larry Arnold, United States Air Force (retired),
    former Commander, Continental United States NORAD Region (CONR)

**FAA Response on 9/11**

Monte R. Belger, former Acting Deputy Administrator, Federal Aviation
    Administration
Jeff Griffith, former Deputy Director, Air Traffic Control,
    Federal Aviation Administration
John S. White, former Facility Manager, Air Traffic Control Systems
    Command Center, Federal Aviation Administration
Benedict Sliney, Operations Manager, New York Terminal Radar Approach
    Control, Federal Aviation Administration

# NOTES

For simplicity, we have adopted the following citation conventions in these endnotes.

Dozens of government agencies and other entities provided the Commission with more than 2.5 million pages of documents and other materials, including more than 1,000 hours of audiotapes. In general, we cite documents and other materials by providing the agency or entity of origin, the type of document (e.g., memo, email, report, or record), the author and recipient, the title (in quotes) or a description of the subject, and the date. We use the following abbreviations for the agencies and entities that produced the bulk of these documents: AAL—American Airlines; CIA—Central Intelligence Agency; DCI—Director of Central Intelligence; DHS—Department of Homeland Security; DOD—Department of Defense; DOJ—Department of Justice; DOS—Department of State; DOT—Department of Transportation; EPA—Environmental Protection Agency; FAA—Federal Aviation Administration; FBI—Federal Bureau of Investigation; FDNY—Fire Department of New York; GAO—General Accounting Office; INS—Immigration and Naturalization Service; NEADS—Northeast Air Defense Sector; NSA—National Security Agency; NSC—National Security Council; NTSB—National Transportation Safety Board; NYPD—New York Police Department; OEM—Office of Emergency Management, City of New York; PANYNJ or Port Authority—Port Authority of New York and New Jersey; PAPD—Port Authority Police Department; SEC—Securities and Exchange Commission; Treasury—Department of Treasury; TSA—Transportation Security Administration; UAL—United Air Lines; USSS—United States Secret Service.

Interviews, meetings, briefings, and site visits conducted by Commissioners or by members of the Commission staff are cited, for example, as "George Tenet interview (Jan. 22, 2004)." Testimony by witnesses at one of the Com-

mission's 12 public hearings is cited as "Condoleezza Rice testimony, Apr. 8, 2004." Written statements for the record provided by witnesses at one of our public hearings are cited as "Thomas Ridge prepared statement, May 19, 2004."

At the request of intelligence community agencies (including the FBI), we use the first name and last initial, only the first name, or in a few instances an alias or title when referring to working-level employees in those agencies. At the request of several intelligence agencies, we cite most reports from the CIA and other intelligence agencies generically as "Intelligence report," followed by a description of the subject and date. In a few instances in which we were given access to highly sensitive documents or information, we cite generically to documents or information provided to the Commission.

Our investigation built on the work of many others, including the Joint Inquiry of the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001, which we refer to as the "Joint Inquiry." We cite as "Joint Inquiry report, Dec. 2002" the Report of the U.S. Senate Select Committee on Intelligence and U.S. House Permanent Select Committee on Intelligence, S. Rep. No. 107-351, H.R. Rep. No. 107-792, 107th Cong., 2d sess. (2002), indicating "classified version" where appropriate. Testimony presented during hearings conducted by the Joint Inquiry is cited as "Joint Inquiry testimony of George Tenet, Oct. 17, 2002," indicating "closed hearing" where appropriate. We cite interviews conducted by the Joint Inquiry staff as "Joint Inquiry interview of Cofer Black," with the date of the interview.

Another major source for our investigation were the thousands of interviews conducted by the Federal Bureau of Investigation during its investigation of the 9/11 attacks, which it refers to as "Penttbom." FBI agents write up their interviews on forms called 302s, which we cite as "FBI report of investigation, interview of John Smith, Oct. 4, 2001," using the date of the interview. We cite interviews conducted by other agencies by agency name and date of the interview; for example, an interview conducted by the Department of Justice Office of Inspector General is cited as "DOJ Inspector General interview of Mary Jones, July 9, 2002."

## 1 "We Have Some Planes"

1. No physical, documentary, or analytical evidence provides a convincing explanation of why Atta and Omari drove to Portland, Maine, from Boston on the morning of September 10, only to return to Logan on Flight 5930 on the morning of September 11. However, Atta reacted negatively when informed in Portland that he would have to check in again in Boston. Michael Touhey interview (May 27, 2004). Whatever their reason, the Portland Jetport was the nearest airport to Boston with a 9/11 flight that would have arrived at Logan in time for the passengers to transfer to American Airlines Flight 11, which had a scheduled departure time of 7:45 A.M. See Tom Kinton interview (Nov. 6, 2003); Portland International Jetport site visit (Aug. 18, 2003).

Like the other two airports used by the 9/11 hijackers (Newark Liberty International Airport and Washington Dulles International Airport), Boston's Logan International Airport was a "Category X" airport: i.e., among the largest facilities liable to highest threat, and generally subject to greater security requirements. See FAA report, "Civil Aviation Security Reference Handbook," May 1999, pp. 117–118. Though Logan was selected for two of the hijackings (as were both American and United Airlines), we found no evidence that the terrorists targeted particular airports or airlines. Nothing stands out about any of them with respect to the only security layer that was relevant to the actual hijackings: checkpoint screening. See FAA briefing materials, "Assessment and Testing Data for BOS, EWR, and IAD," Oct. 24, 2001. Despite security problems at Logan (see, e.g., two local Fox 25 television investigative reports in February and April 2001, and an email in August 2001 from a former FAA special agent to the agency's leadership regarding his concerns about lax security at the airport), no evidence suggests that such issues entered into the terrorists' targeting: they simply booked heavily fueled east-to-west transcontinental flights of the large Boeing aircraft they trained to fly that were scheduled to take off at nearly the same time. See Matt Carroll, "Fighting Terror Sense of Alarm; Airlines Foiled Police Logan Probe," *Boston Globe,* Oct. 17, 2001, p. B1.

2. CAPPS was an FAA-approved automated system run by the airlines that scored each passenger's profile to identify those who might pose a threat to civil aviation. The system also chose passengers at random to receive additional security scrutiny. Ten out of the 19 hijackers (including 9 out of 10 on the two American Airlines flights) were identified via the CAPPS system. According to the procedures in place on 9/11, in addition to those flagged by the CAPPS algorithm, American's ticket agents were to mark as "selectees" those passengers who did not provide correct responses to the required security questions, failed to show proper identification, or met other criteria. See FAA report, "Air Carrier Standard Security Program," May 2001, pp. 75–76; FAA record of interview, Donna Thompson, Sept. 23, 2001; Chuck Severance interview (Apr. 15, 2004); Jim Dillon interview (Apr. 15, 2004); Diane Graney interview (Apr. 16, 2004). It appears that Atta was selected at random. See Al Hickson briefing (June 8, 2004).

3. The call was placed from a pay phone in Terminal C (between the screening checkpoint and United 175's boarding gate). We presume Shehhi made the call, but we cannot be sure. Logan International Airport site visit (Aug. 15, 2003); see also FBI response to Commission briefing request no. 6, undated (topic 11).

4. Flight 11 pushed back from Gate 32 in Terminal B at 7:40. See AAL response to the Commission's February 3, 2004, requests, Mar. 15, 2004.

5. See UAL letter, "Flight 175—11Sep01 Passenger ACI Check-in History," July 11, 2002. Customer service representative Gail Jawahir recalled that her encounter with the Ghamdis occurred at "shortly before 7 A.M.," and when shown photos of the hijackers, she indicated that Mohand al Shehri resembled one of the two she checked in (suggesting they were Banihammad and Shehri). However, she also recalled that the men had the same last name and had assigned seats on row 9 (i.e., the Ghamdis), and that account has been adopted here. In either case, she almost certainly was dealing with one set of the Flight 175 hijackers. See FBI reports of investigation, interviews of Gail Jawahir, Sept. 21, 2001; Sept. 28, 2001. Even had the hijackers been unable to understand and answer the two standard security questions, the only consequence would have been the screening of their carry-on and checked bags for explosives. See FAA report, "Air Carrier Standard Security Program," May 2001, p. 76.

6. For Flight 11, two checkpoints provided access to the gate. The second was opened at 7:15 A.M.  The FAA conducted many screener evaluations between September 11, 1999, and September 11, 2001. At the primary checkpoints, in aggregate, screeners met or exceeded the average for overall, physical search, and X-ray detection, while falling below the norm for metal detection. No FAA Special Assessments (by "red teams") were done at Logan security checkpoints during the two years prior to September 11, 2001. See FAA briefing materials, "Assessment and Testing Data for BOS, EWR, and IAD," Oct. 24, 2001.

7. See Air Transport Association/Regional Airlines Association (ATA/RAA) report, "Air Carriers Checkpoint Operations Guide," Aug. 1999; FAA report, "Air Carrier Standard Security Program," May 2001, appendix VI.

8. Mary Carol Turano interview (Mar. 11, 2004); FBI reports of investigation, interview of Nilda Cora, Oct. 4, 2001; interview of William Thomas, Sept. 14, 2001; interview of Jennifer Gore, Sept. 12, 2001; interview of Claudia Richey, Sept. 15, 2001; interview of Rosarito Rivera, Sept. 25, 2001.

9. See TSA report, "Selectee Status of September 11th Hijackers," undated. For boarding and seating information, see AAL record, SABRE information on Flight 11, Sept. 11, 2001. These boarding times from the American system are approximate only; for Flight 11, they indicated that some passengers "boarded" after the aircraft had pushed back from the gate. See AAL response to the Commission's February 3, 2004, requests, Mar. 15, 2004.

10. See TSA report, "Selectee Status of September 11th Hijackers," undated; see also UAL letter, "Flight 175—11 Sep01 Passenger ACI Check-in History," July 11, 2002.

11. The Hazmis checked in at 7:29; the airline has not yet been able to confirm the time of Hanjour's check-in. However, it had to have taken place by 7:35, when he appears on the checkpoint videotape. See AAL record, SABRE information for Flight 77, Sept. 11, 2001; AAL response to the Commission's February 3, 2004, requests, Mar. 15, 2004; Metropolitan Washington Airports Authority videotape, Dulles main terminal checkpoints, Sept. 11, 2001.

12. See TSA report, "Selectee Status of September 11th Hijackers," undated; see also FAA report, "Selectee List AALA #77," undated; FBI report of investigation, interview of Vaughn Allex, Sept. 12, 2001; Vaughn Allex interview (July 13, 2004).

13. The FAA conducted many screener evaluations at Dulles between September 11, 1999, and September 11, 2001. While the test results for physical search exceeded the national average, both the metal detector and X-ray results were below average. See FAA briefing materials, "Assessment and Testing Data for BOS, EWR, and IAD," Oct. 24, 2001.

14. Metropolitan Washington Airports Authority videotape, Dulles main terminal checkpoints, Sept. 11, 2001; see also Tim Jackson interview (Apr. 12, 2004).

15. Metropolitan Washington Airports Authority videotape, Dulles main terminal checkpoints, Sept. 11, 2001; see also Tim Jackson interview (Apr. 12, 2004).

16. For investigation findings, see FAA report, "American Airlines Flight #77: Hijacking and Crash into the Pentagon, Sept. 11, 2001," undated. For screener evaluations, see Tim Jackson interview (Apr. 12, 2004).

17. See AAL record, SABRE information for Flight 77, Sept. 11, 2001; AAL response to the Commission's February 3, 2004, requests, Mar. 15, 2004.

18. UAL record, Flight 93 EWR bag loading status, Sept. 11, 2001; UAL record, Flight 93 EWR ACI passenger history, Sept. 11, 2001; UAL record, Flight 93 EWR full bag history, Sept. 11, 2001; TSA report, "Selectee Status of September 11th Hijackers," undated; FBI report, "The Final 24 Hours," Dec. 8, 2003.

19. The FAA conducted many screener evaluations at Newark between September 11, 1999, and September 11, 2001. Detection rates for metal detection, physical searches, and X-rays all met or exceeded the national averages. See FAA briefing materials, "Assessment and Testing Data for BOS, EWR, and IAD," Oct. 24, 2001; see also FAA report, "United Airlines Flight 93, September 11, 2001, Executive Report," Jan. 30, 2002.

20. UAL record, Flight 93 EWR ACI passenger history, Sept. 11, 2001; see also FBI report, "The Final 24 Hours," Dec. 8, 2003.

21. While Flights 11 and 77 were at or slightly above the average number of passengers for the respective flights that summer, Flights 175 and 93 were well below their averages. We found no evidence to indicate that the hijackers manipulated the passenger loads on the aircraft they hijacked. Financial records did not reveal the purchase of any tickets beyond those the hijackers used for themselves. See FBI response to Commission briefing request no. 6, undated (topic 8); AAL report, "Average Load Factor by Day-of-Week," undated (for Flights 11 and 77 from June 11, 2001, to Sept. 9, 2001); AAL response to the Commission's supplemental document requests, Jan. 20, 2004; UAL report, Flight 175 BOS-LAX Load Factors, undated (from June 1, 2001, to Sept. 11, 2001); UAL report, "Explanation of Load Factors," undated.

22. See AAL response to the Commission's February 3, 2004, requests, Mar. 15, 2004; AAL record, Dispatch Environmental Control/Weekly Flight Summary for Flight 11, Sept. 11, 2001; AAL report, "Flight Attendant Jump Seat Locations During Takeoff And Flight Attendant Typical Cabin Positions During Start of Cabin Service," undated; AAL report, "Passenger Name List, Flight 11/September 11," undated.

23. Commission analysis of NTSB and FAA air traffic control and radar data. See AAL record, Dispatch Environmental Control/Weekly Flight Summary for Flight 11, Sept. 11, 2001; NTSB report, "Flight Path Study—American Airlines Flight 11," Feb. 19, 2002; Bill Halleck and Peggy Houck interview (Jan. 8, 2004). The initial service assignments for flight attendants on American 11 would have placed Karen Martin and Bobbi Arestegui in first class; Sara Low and Jean Roger in business class; Dianne Snyder in the midcabin galley; Betty Ong and Amy Sweeney in coach; and Karen Nicosia in the aft galley. Jeffrey Collman would have been assigned to work in coach, but to assist in first class if needed. See AAL report, "Flight Attendant Jump Seat Locations During Takeoff And Flight Attendant Typical Cabin Positions During Start of Cabin Service," undated; Bob Jordan briefing (Nov. 20, 2003).

24. NTSB report, Air Traffic Control Recording—American Airlines Flight 11, Dec. 21, 2001; NTSB report, Air Traffic Control Recording—United Airlines Flight 175, Dec. 21, 2001. Given that the cockpit crew of American 11 had been acknowledging all previous instructions from air traffic control that morning within a matter of seconds, and that when the first reporting of the hijacking was received a short time later (the 8:19 call from Betty Ong) a number of actions had already been taken by the hijackers, it is most likely that the hijacking occurred at 8:14 A.M.

25. An early draft of an executive summary prepared by FAA security staff for the agency's leadership referred to an alleged report of a shooting aboard Flight 11. We believe this report was erroneous for a number of reasons—there is no evidence that the hijackers purchased firearms, use of a gun would be inconsistent with the otherwise

common tactics employed by the hijackers, the alleged shooting victim was seated where witness accounts place the stabbing victim (9B), and, most important, neither Betty Ong nor Amy Sweeney, the only two people who communicated to the ground from aboard the aircraft, reported the presence of a gun or a shooting. Both reported knives and stabbings. AAL transcript, telephone call from Betty Ong to Nydia Gonzalez, Sept. 11, 2001; AAL transcript, telephone call from Nydia Gonzalez to Craig Marquis, Sept. 11, 2001; AAL transcript, telephone call from Nancy Wyatt to Ray Howland, Sept. 11, 2001; Michael Woodward interview (Jan. 25, 2004). The General Accounting Office looked into the gun story and was unable to corroborate it. GAO report, summary of briefing re investigation, Aug. 30, 2002.

26. Craig Marquis interview (Nov. 19, 2003); Michael Woodward interview (Jan. 25, 2004); Jim Dillon interview (Apr. 15, 2004). See also AAL transcript, telephone call from Betty Ong to Nydia Gonzalez, Sept. 11, 2001. At the time of the hijacking, American Airlines flight attendants all carried cockpit keys on their person. See Craig Marquis, Craig Parfitt, Joe Bertapelle, and Mike Mulcahy interview (Nov. 19, 2003).

27. AAL transcript, telephone call from Nydia Gonzalez to Craig Marquis, Sept. 11, 2001; Obituary, "Daniel Lewin," *Washington Post*, Sept. 22, 2001, p. B7.

28. AAL transcript, telephone call from Betty Ong to Nydia Gonzalez, Sept. 11, 2001; AAL transcript, telephone call from Nydia Gonzalez to Craig Marquis, Sept. 11, 2001. Regarding the claim of a bomb, see Michael Woodward interview (Jan. 25, 2004).

29. Calls to American's reservations office are routed to the first open line at one of several facilities, among them the center in Cary, N.C. See Nydia Gonzalez interview (Nov. 19, 2003). On standard emergency training, see FAA report, "Air Carrier Standard Security Program," May 2001, pp. 139j–139o; Don Dillman briefing (Nov. 18, 2003); Bob Jordan briefing (Nov. 20, 2003). The call from Ong was received initially by Vanessa Minter and then taken over by Winston Sadler; realizing the urgency of the situation, he pushed an emergency button that simultaneously initiated a tape recording of the call and sent an alarm notifying Nydia Gonzalez, a supervisor, to pick up on the line. Gonzalez was paged to respond to the alarm and joined the call a short time later. Only the first four minutes of the phone call between Ong and the reservations center (Minter, Sadler, and Gonzalez) was recorded because of the time limit on the recently installed system. See Nydia Gonzalez interview (Nov. 19, 2003); Nydia Gonzalez testimony, Jan. 27, 2004.

30. AAL transcript, telephone call from Betty Ong to Nydia Gonzalez, Sept. 11, 2001.

31. See Nydia Gonzalez interview (Nov. 19, 2003); Craig Marquis interviews (Nov. 19, 2003; Apr. 26, 2004); AAL record, Dispatch Environmental Control/Weekly Flight Summary for Flight 11, Sept. 11, 2001; AAL transcript, telephone call from Bill Halleck to BOS ATC, Sept. 11, 2001. The Air Carrier Standard Security Program required airlines to immediately notify the FAA and FBI upon receiving information that an act or suspected act of airplane piracy was being committed.

32. See FAA recording, Boston Air Route Traffic Control Center, position 46R, at 8:25 A.M.; Air Traffic Control Recording—American Airlines Flight 11, Dec. 21, 2001. Starting at 8:22, Amy Sweeney attempted by airphone to contact the American Airlines flight services office at Logan, which managed the scheduling and operation of flight attendants. Sweeney's first attempt failed, as did a second at 8:24. When she got through to Nunez, the latter thought she had reported her flight number as 12. Michael Woodward, supervisor at the Boston office, hearing that a problem had been reported aboard an American airplane, went to American's gate area at Logan with his colleague Beth Williams. Woodward noted that the morning bank of flights had all departed Boston and the gate area was quiet. He further realized that Flight 12 had not even departed yet, so he and Williams returned to the office to try to clarify the situation. See FBI report, "American Airlines Airphone Usage," Sept. 20, 2001; Michael Woodward interview (Jan. 25, 2004). The phone call between Sweeney and Woodward lasted about 12 minutes (8:32–8:44) and was not taped. See AAL email, Woodward to Schmidt, "Flight 11 Account of events," Sept. 19, 2001; AAL notes, Michael Woodward handwritten notes, Sept. 11, 2001; FBI report of investigation, interview of Michael Woodward, Sept. 13, 2001; AAL report, interview of Michael Woodward, Sept. 11, 2001; AAL transcript, telephone call from Nancy Wyatt to Ray Howland, Sept. 11, 2001.

33. See AAL transcript, telephone call from Nydia Gonzalez to Craig Marquis, Sept. 11, 2001; NTSB report, "Flight Path Study—American Airlines Flight 11," Feb. 19, 2002. AAL transcript, telephone call from Nydia Gonzalez to Craig Marquis, Sept. 11, 2001; AAL transcript, telephone call from Nancy Wyatt to Ray Howland, Sept. 11, 2001.

34. Michael Woodward interview (Jan. 25, 2004).

35. AAL transcript, telephone call from Nydia Gonzalez to Craig Marquis, Sept. 11, 2001; Michael Woodward interview (Jan. 25, 2004); AAL, Michael Woodward notes, Sept. 11, 2001. Also at this time American Airlines completed its "lockout" procedure for Flight 11, which restricted access to information about a hijacked flight in accordance with the Air Carrier Standard Security program. See FAA report, "Air Carrier Standard Security Program," May 2001, p. 110.

36. AAL transcript, telephone call from Nancy Wyatt to Ray Howland, Sept. 11, 2001; Michael Woodward interview (Jan. 25, 2004).

37. AAL transcript, telephone call from Nydia Gonzalez to Craig Marquis, Sept. 11, 2001.

38. Ibid.; Michael Woodward interview (Jan. 25, 2004).

39. NTSB report, "Flight Path Study—American Airlines Flight 11," Feb. 19, 2002.

40. The 56 passengers represented a load factor of 33.33 percent of the airplane's seating capacity of 168, below the 49.22 percent for Flight 175 on Tuesdays in the three-month period prior to September 11, 2001. See UAL report, Flight 175 BOS-LAX Load Factors, undated (from June 1, 2001, to Sept. 11, 2001). Nine passengers holding reservations for Flight 175 did not show for the flight. They were interviewed and cleared by the FBI. FAA report, "Executive Summary," Sept. 12, 2001; FAA report, "Executive Summary, Chronology of a Multiple Hijacking Crisis, September 11, 2001," Sept. 17, 2001; UAL record, Flight 175 ACARS report, Sept. 11, 2001; UAL record, Flight 175 Flight Data Recap, Sept. 11, 2001.

41. FAA report, "Executive Summary," Sept. 12, 2001; FAA report, "Executive Summary, Chronology of a Multiple Hijacking Crisis, September 11, 2001," Sept. 17, 2001; NTSB report, "Flight Path Study—United Airlines 175," Feb. 19, 2002; NTSB report, Air Traffic Control Recording—United Airlines Flight 175, Dec. 21, 2001. At or around this time, flight attendants Kathryn Laborie and Alfred Marchand would have begun cabin service in first class; with Amy King and Robert Fangman in business class; and with Michael Tarrou, Amy Jarret, and Alicia Titus in economy class. See UAL report, "Flight 175 Flight Attendant Positions/Jumpseats," undated. United flight attendants, unlike those at American, did not carry cockpit keys. Instead, such keys were stowed in the cabin—on Flight 175, in the overhead bin above seats 1A and 1B in first class. See Don Dillman briefing (Nov. 18, 2003); Bob Jordan briefing (Nov. 20, 2003).

42. Asked by air traffic controllers at 8:37 to look for an American Airlines 767 (Flight 11), United 175 reported spotting the aircraft at 8:38. At 8:41, the flight crew reported having "heard a suspicious transmission" from another aircraft shortly after takeoff, "like someone keyed the mike and said everyone stay in your seats." See NTSB report, Air Traffic Control Recording—United Airlines Flight 175, Dec. 21, 2001.

43. See Marc Policastro interview (Nov. 21, 2003); FBI reports of investigation, interview of Lee Hanson, Sept. 11, 2001; interview of Marc Policastro, Sept. 11, 2001; interview of Louise Sweeney, Sept. 28, 2001; interview of Ronald May, Sept. 11, 2001. On both American 11 and United 175, Boeing 767 double-aisled aircraft, the hijackers arrayed themselves similarly: two seated in first class close to the cockpit door, the pilot hijacker seated close behind them, and at least one other hijacker seated close behind the pilot hijacker. Hijackers were seated next to both the left and right aisles. On American 77 and United 93, Boeing 757 single-aisle aircraft, the pilot hijacker sat in the first row, closest to the cockpit door. See FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, pp. 67-69; AAL schematics for Flight 11 and Flight 77; UAL schematics for Flight 175 and Flight 93.

44. NTSB report, "Flight Path Study—United Airlines 175," Feb. 19, 2002; NTSB report, Air Traffic Control Recording—United Airlines Flight 175, Dec. 21, 2001.

45. See FBI report of investigation, interview of Lee Hanson, Sept. 11, 2001.

46. Flight crew on board UAL aircraft could contact the United office in San Francisco (SAMC) simply by dialing *349 on an airphone. See FBI report of investigation, interview of David Price, Jan. 24, 2002. At some point before 9:00, SAMC notified United's headquarters of the emergency call from the flight attendant. See Marc Policastro interview (Nov. 21, 2003); FBI report of investigation, interview of Marc Policastro, Sept. 11, 2001; Rich Miles interiew (Nov. 21, 2003).

47. NTSB report, "Flight Path Study—United Airlines 175," Feb. 19, 2002.

48. See FBI reports of investigation, interview of Julie Sweeney, Oct. 2, 2001; interview of Louise Sweeney, Sept. 28, 2001.

49. See FBI report of investigation, interview of Lee Hanson, Sept. 11, 2001.

50. See ibid.; interview of Louise Sweeney, Sept. 28, 2001.

51. NTSB report, "Flight Path Study—United Airlines 175," Feb. 19, 2002.

52. AAL report, "Flight Attendant Jump Seat Locations During Takeoff And Flight Attendant Typical Cabin Positions During Start of Cabin Service," undated; AAL email, Young to Clark, "Flight Crews," Sept. 12, 2001; AAL record, Dispatch Environmental Control/Weekly Flight Summary for Flight 11, Sept. 11, 2001.

53. AAL record, System Operations Command Center (SOCC) log, Sept. 11, 2001, p. 2; NTSB report, "Flight Path Study—American Airlines Flight 77," Feb. 19, 2002. Flight attendant Renee May would likely have started working in the first-class galley; Michele Heidenberger would have been in the aft galley; Jennifer Lewis would have been in first class; and Kenneth Lewis would have been in the main cabin. On cabin service, see AAL report, "Flight Attendant Jump Seat Locations During Takeoff And Flight Attendant Typical Cabin Positions During Start of Cabin Service," undated. For cruising altitude, see NTSB report, "Flight Path Study—American Airlines Flight 77," Feb. 19, 2002. On events in the cabin, see FAA recording, Indianapolis Air Traffic Control Center, position HNN R, Sept. 11, 2001; FBI report of investigation, interview of Theodore Olson, Sept. 11, 2001; FBI report of investigation, interview of Ronald and Nancy May, Sept. 12, 2001; AAL record, Dispatch Environmental Control/Weekly Flight Summary for Flight 11, Sept. 11, 2001.

54. Air traffic control notified American's headquarters of the problem, and the airline began attempts to contact the flight by 8:59 via ACARS. See NTSB report, "Flight Path Study—American Airlines Flight 77," Feb. 19, 2002. On American 11, the transponder signal was turned off at 8:21; on United 175, the code was changed at 8:47; on American 77, the signal was turned off at 8:56; and on United 93, the signal was turned off at 9:41. See FAA report, "Summary of Air Traffic Hijack Events: September 11, 2001," Sept. 17, 2001; Richard Byard interview (Sept.

24, 2003); Linda Povinelli interview (Sept. 24, 2003); see also NTSB report, Air Traffic Control Recording—American Airlines Flight 77, Dec. 21, 2001; AAL record, Dispatch Environmental Control/Weekly Flight Summary for Flight 11, Sept. 11, 2001.

55. Gerard Arpey interview (Jan. 8, 2004); Larry Wansley interview (Jan. 8, 2004); AAL record, System Operations Command Center (SOCC) log, Sept. 11, 2001.

56. FBI report, "American Airlines Airphone Usage," Sept. 20, 2001; FBI report of investigation, interview of Ronald and Nancy May, Sept. 12, 2001.

57. The records available for the phone calls from American 77 do not allow for a determination of which of four "connected calls to unknown numbers" represent the two between Barbara and Ted Olson, although the FBI and DOJ believe that all four represent communications between Barbara Olson and her husband's office (all family members of the Flight 77 passengers and crew were canvassed to see if they had received any phone calls from the hijacked flight, and only Renee May's parents and Ted Olson indicated that they had received such calls). The four calls were at 9:15:34 for 1 minute, 42 seconds; 9:20:15 for 4 minutes, 34 seconds; 9:25:48 for 2 minutes, 34 seconds; and 9:30:56 for 4 minutes, 20 seconds. FBI report, "American Airlines Airphone Usage," Sept. 20, 2001; FBI report of investigation, interview of Theodore Olson, Sept. 11, 2001; FBI report of investigation, interview of Helen Voss, Sept. 14, 2001; AAL response to the Commission's supplemental document request, Jan. 20, 2004.

58. FBI report, "American Airlines Airphone Usage," Sept. 20, 2001; FBI report of investigation, interview of Theodore Olson, Sept. 11, 2001.

59. See FAA report, "Report of Aircraft Accident," Nov. 13, 2001; John Hendershot interview (Dec. 22, 2003); FAA report, "Summary of Air Traffic Hijack Events: September 11, 2001," Sept. 17, 2001; NTSB report, "Flight Path Study—American Airlines Flight 77," Feb. 19, 2002; Commission analysis of radar data.

60. See FAA report, "Summary of Air Traffic Hijack Events: September 11, 2001," Sept. 17, 2001; NTSB report, "Flight Path Study—American Airlines Flight 77," Feb. 19, 2002; FAA report, "Report of Aircraft Accident," Nov. 13, 2001.

61. See NTSB report, "Flight Path Study—American Airlines Flight 77," Feb. 19, 2002; TSA report, "Criminal Acts Against Civil Aviation for 2001," Aug. 20, 2002, p. 41.

62. The flight attendant assignments and seating included Chief Flight Attendant Deborah Welsh (first class, seat J1 at takeoff); Sandra Bradshaw (coach, seat J5); Wanda Green (first class, seat J4); Lorraine Bay (coach, seat J3); and CeeCee Lyles (coach, seat J6). See UAL response to Commission questions for the record, Apr. 5, 2004; FAA report, "Chronology of the September 11 Attacks and Subsequent Events Through October 24, 2001," undated; UAL records, copies of electronic boarding passes for Flight 93, Sept. 11, 2001; Bob Varcadipane interview (May 4, 2004); Newark Tower briefing (May 4, 2004).

63. Although the flight schedule indicates an 8:00 A.M. "departure," this was the time the plane left the gate area. Taxiing from the gate to the runway normally took about 15 minutes. Bob Varcadipane interview (May 4, 2004); Newark Tower briefing (May 4, 2004).

64. Commission analysis of FAA air traffic control data. On the FAA's awareness of multiple hijackings, see AAL transcript, telephone call from Nydia Gonzalez to Craig Marquis, Sept. 11, 2001; Craig Marquis interview (Nov. 19, 2003); AAL record, System Operations Command Center (SOCC) log, Sept. 11, 2001; UAL System Operations Control briefing (Nov. 20, 2003); Rich Miles interview (Nov. 21, 2003); UAL report, "Timeline: Dispatch/SMFDO Activities—Terrorist Crisis," undated.

65. FAA audio file, Boston Center, position 46R, 8:24:38 and 8:24:56; Peter Zalewski interview (Sept. 23, 2003).

66. On September 6, 1970, members of the Popular Front for the Liberation of Palestine hijacked a Pan American Boeing 747, a TWA Boeing 707, and a Swissair DC-8. On September 9, a British airliner was hijacked as well. An attempt to hijack an Israeli airliner was thwarted. The Pan American plane landed in Cairo and was blown up after its passengers were released. The other three aircraft were flown to Dawson Field, near Amman, Jordan; the passengers were held captive, and the planes were destroyed. The international hijacking crisis turned into a civil war, as the Jordanian government used force to restore its control of the country. See FAA report, Civil Aviation Reference Handbook, May 1999, appendix D.

The FAA knew or strongly suspected that Flight 11 was a hijacking 11 minutes after it was taken over; Flight 175, 9 minutes after it was taken over. There is no evidence to indicate that the FAA recognized Flight 77 as a hijacking until it crashed into the Pentagon.

67. FAA audio file, Herndon Command Center, line 5114, 9:07:13; FAA audio file, Herndon Command Center, position 15, 9:19. At 9:07, Boston Air Traffic Control Center recommended to the FAA Command Center that a cockpit warning be sent to the pilots of all commercial aircraft to secure their cockpits. While Boston Center sent out such warnings to the commercial flights in its sector, we could find no evidence that a nationwide warning was issued by the ATC system.

68. Ellen King interview (Apr. 5, 2004). FAA air traffic control tapes indicate that at 9:19 the FAA Air Traffic Control System Command Center in Herndon ordered controllers to send a cockpit warning to Delta 1989 because, like American 11 and United 175, it was a transcontinental flight departing Boston's Logan Airport.

69. For American Airlines' response, see AAL briefing (Apr. 26, 2004). For Ballinger's warnings, see Ed Ballinger interview (Apr. 14, 2004). A companywide order for dispatchers to warn cockpits was not issued until 9:21. See UAL report, "Timeline: Dispatch/SMFDO Activities—Terrorist Crisis," undated. While one of Ballinger's col-

leagues assisted him, Ballinger remained responsible for multiple flights. See Ed Ballinger interview (Apr. 14, 2004). American Airlines' policy called for the flight dispatcher to manage only the hijacked flight, relieving him of responsibilities for all other flights. On American Airlines' policy, see Craig Marquis, Craig Parfitt, Joe Bertapelle, and Mike Mulcahy interview (Nov. 19, 2003). United Airlines had no such "isolation" policy. UAL System Operations Control briefing (Nov. 20, 2003).

70. On FDR, see NTSB report, "Specialist's Factual Report of Investigation—Digital Flight Data Recorder" for United Airlines Flight 93, Feb. 15, 2002; on CVR, see FBI report, "CVR from UA Flight #93," Dec. 4, 2003; Commission review of Aircraft Communication and Reporting System (ACARS) messages sent to and from Flight 93 (which indicate time of message transmission and receipt); see UAL record, Ed Ballinger ACARS log, Sept. 11, 2001. At 9:22, after learning of the events at the World Trade Center, Melody Homer, the wife of co-pilot Leroy Homer, had an ACARS message sent to her husband in the cockpit asking if he was okay. See UAL record, ACARS message, Sept. 11, 2001.

71. On FDR, see NTSB report, "Specialist's Factual Report of Investigation—Digital Flight Data Recorder" for United Airlines Flight 93, Feb. 15, 2002; on CVR, see FBI report, "CVR from UA Flight #93," Dec. 4, 2003; FAA report, "Summary of Air Traffic Hijack Events: September 11, 2001," Sept. 17, 2001; NTSB report, Air Traffic Control Recording—United Airlines Flight 93, Dec. 21, 2001.

72. The 37 passengers represented a load factor of 20.33 percent of the plane's seating capacity of 182, considerably below the 52.09 percent for Flight 93 on Tuesdays in the three-month period prior to September 11 (June 11–September 4, 2001). See UAL report, Flight 93 EWR-SFO load factors, undated. Five passengers holding reservations for Flight 93 did not show for the flight. All five were interviewed and cleared by the FBI. FBI report, "Flight #93 'No Show' Passengers from 9/11/01," Sept. 18, 2001.

73. INS record, Withdrawal of Application for Admission for Mohamed al Kahtani, Aug. 4, 2001.

74. See FAA regulations, Admission to flight deck, 14 C.F.R. § 121.547 (2001); UAL records, copies of boarding passes for United 93, Sept. 11, 2001. One passenger reported that ten first-class passengers were aboard the flight. If that number is accurate, it would include the four hijackers. FBI report of investigation, interview of Lisa Jefferson, Sept. 11, 2001; UAL record, Flight 93 passenger manifest, Sept. 11, 2001. All but one of the six passengers seated in the first-class cabin communicated with the ground during the flight, and none mentioned anyone from their cabin having gone into the cockpit before the hijacking. Moreover, it is unlikely that the highly regarded and experienced pilot and co-pilot of Flight 93 would have allowed an observer into the cockpit before or after takeoff who had not obtained the proper permission. See UAL records, personnel files of Flight 93 pilots. For jumpseat information, see UAL record, Weight and Balance Information for Flight 93 and Flight 175, Sept. 11, 2001; AAL records, Dispatch Environmental Control/Weekly Flight Summary for Flight 11 and Flight 77, Sept. 11, 2001.

75. Like Atta on Flight 11, Jarrah apparently did not know how to operate the communication radios; thus his attempts to communicate with the passengers were broadcast on the ATC channel. See FBI report, "CVR from UA Flight #93," Dec. 4, 2003. Also, by 9:32 FAA notified United's headquarters that the flight was not responding to radio calls. According to United, the flight's nonresponse and its turn to the east led the airline to believe by 9:36 that the plane was hijacked. See Rich Miles interview (Nov. 21, 2003); UAL report, "United dispatch SMFDO activities—terrorist crisis," Sept. 11, 2001.

76. In accordance with FAA regulations, United 93's cockpit voice recorder recorded the last 31 minutes of sounds from the cockpit via microphones in the pilots' headsets, as well as in the overhead panel of the flight deck. This is the only recorder from the four hijacked airplanes to survive the impact and ensuing fire. The CVRs and FDRs from American 11 and United 175 were not found, and the CVR from American Flight 77 was badly burned and not recoverable. See FBI report, "CVR from UA Flight #93," Dec. 4, 2003; see also FAA regulations, 14 C.F.R. §§ 25.1457, 91.609, 91.1045, 121.359; Flight 93 CVR data. A transcript of the CVR recording was prepared by the NTSB and the FBI.

77. All calls placed on airphones were from the rear of the aircraft. There was one airphone installed in each row of seats on both sides of the aisle. The airphone system was capable of transmitting only eight calls at any one time. See FBI report of investigation, airphone records for flights UAL 93 and UAL 175 on Sept. 11, 2001, Sept. 18, 2001.

78. FAA audio file, Cleveland Center, position Lorain Radar; Flight 93 CVR data; FBI report, "CVR from UA Flight #93," Dec. 4, 2003.

79. FBI reports of investigation, interviews of recipients of calls from Todd Beamer, Sept. 11, 2001, through June 11, 2002; FBI reports of investigation, interviews of recipients of calls from Sandy Bradshaw, Sept. 11, 2001, through Oct. 4, 2001. Text messages warning the cockpit of Flight 93 were sent to the aircraft by Ed Ballinger at 9:24. See UAL record, Ed Ballinger's ACARS log, Sept. 11, 2001.

80. We have relied mainly on the record of FBI interviews with the people who received calls. The FBI interviews were conducted while memories were still fresh and were less likely to have been affected by reading the accounts of others or hearing stories in the media. In some cases we have conducted our own interviews to supplement or verify the record. See FBI reports of investigation, interviews of recipients of calls from Todd Beamer, Mark Bingham, Sandy Bradshaw, Marion Britton, Thomas Burnett, Joseph DeLuca, Edward Felt, Jeremy Glick, Lauren Grandcolas, Linda Gronlund, CeeCee Lyles, Honor Wainio.

81. FBI reports of investigation, interviews of recipients of calls from Thomas Burnett, Sept. 11, 2001; FBI reports of investigation, interviews of recipients of calls from Marion Britton, Sept. 14, 2001, through Nov. 8, 2001; Lisa Jefferson interview (May 11, 2004); FBI report of investigation, interview of Lisa Jefferson, Sept. 11, 2001; Richard Belme interview (Nov. 21, 2003).

82. See Jere Longman, *Among the Heroes—United Flight 93 and the Passengers and Crew Who Fought Back* (Harper-Collins, 2002), p. 107; Deena Burnett interview (Apr. 26, 2004); FBI reports of investigation, interviews of recipients of calls from Jeremy Glick, Sept. 11, 2001, through Sept. 12, 2001; Lyzbeth Glick interview (Apr. 22, 2004). Experts told us that a gunshot would definitely be audible on the CVR. The FBI found no evidence of a firearm at the crash site of Flight 93. See FBI response to Commission briefing request no. 6, undated (topic 11). The FBI collected 14 knives or portions of knives at the Flight 93 crash site. FBI report, "Knives Found at the UA Flight 93 Crash Site," undated.

83. FBI response to Commission briefing request no. 6, undated (topic 11); FBI reports of investigation, interviews of recipients of calls from Jeremy Glick, Sept. 11, 2001, through Sept. 12, 2001.

84. See FBI reports of investigation, interviews of recipients of calls from United 93.

85. FBI reports of investigation, interviews of recipients of calls from United 93. For quote, see FBI report of investigation, interview of Philip Bradshaw, Sept. 11, 2001; Philip Bradshaw interview (June 15, 2004); Flight 93 FDR and CVR data. At 9:55:11 Jarrah dialed in the VHF Omni-directional Range (VOR) frequency for the VOR navigational aid at Washington Reagan National Airport, further indicating that the attack was planned for the nation's capital.

86. Flight 93 FDR and CVR data.

87. Ibid.

88. Ibid.

89. Ibid. The CVR clearly captured the words of the hijackers, including words in Arabic from the microphone in the pilot headset up to the end of the flight. The hijackers' statements, the clarity of the recording, the position of the microphone in the pilot headset, and the corresponding manipulations of flight controls provide the evidence. The quotes are taken from our listening to the CVR, aided by an Arabic speaker.

90. In 1993, a Lufthansa aircraft was hijacked from its Frankfurt to Cairo route and diverted to JFK Airport in New York. The event lasted for 11 hours and was resolved without incident. Tamara Jones and John J. Goldman, "11-Hour Hijack Ends Without Injury in N.Y.," *Los Angeles Times*, Feb. 12, 1993, p. A1.

91. The second half of the twentieth century witnessed a tremendous growth of the air transport industry, and the FAA's corresponding responsibilities grew enormously from the 1960s through 2001. Throughout that time, the FAA focused on setting and maintaining safety and efficiency standards. Since no plane had been hijacked inside the United States since 1991, sabotage was perceived as the most significant threat to civil aviation. For a broader discussion of the perception of the threat, see section 3.3.

92. FAA report, "Administrator's Fact Book," July 2001; Benedict Sliney interview (May 21, 2004); John McCartney interview (Dec. 17, 2003).

93. FAA regulations, Air Traffic Control transponder and altitude reporting equipment and use, 14 CFR § 91.215 (2001).

94. DOD radar files, 84th Radar Evaluation Squadron, "9/11 Autoplay," undated; Charles Thomas interview (May 4, 2004); John Thomas interview (May 4, 2004); Joseph Cooper interview (Sept. 22, 2003); Tim Spence interview (Sept. 30, 2003). For general information on approaching terminals, see FAA report, "Aeronautical Information Manual," Feb. 19, 2004. Times assigned to audio transmissions were derived by the Commission from files provided by the FAA and the Northeast Air Defense Sector (NEADS) based on audio time stamps contained within the files provided by the sender. FAA tapes are certified accurate to Universal Coordinated Time by quality assurance specialists at FAA air traffic facilities. NEADS files are time-stamped as accurate to the Naval Observatory clock. We also compared audio times to certified transcripts when available.

95. FAA Boston Center site visit (Sept. 22–24, 2003).

96. NORAD's mission is set forth in a series of renewable agreements between the United States and Canada. According to the agreement in effect on 9/11, the "primary missions" of NORAD were "aerospace warning" and "aerospace control" for North America. *Aerospace warning* was defined as "the monitoring of man-made objects in space and the detection, validation, and warning of attack against North America whether by aircraft, missiles, or space vehicles." *Aerospace control* was defined as "providing surveillance and control of the airspace of Canada and the United States." See DOS memo, Exchange of Notes Between Canada and the United States Regarding Extension of the NORAD Agreement, Mar. 28, 1996; see also DOS press release, "Extension of NORAD Agreement," June 16, 2000 (regarding the extension of the 1996 Agreement unchanged). For NORAD's defining its job as defending against external attacks, see Ralph Eberhart interview (Mar. 1, 2004).

97. DOD report, "NORAD Strategy Review: Final Report," July 1992, p. 55.

98. For assumptions of exercise planners, see Paul Goddard and Ken Merchant interview (Mar. 4, 2004). For the authority to shoot down a commercial aircraft prior to 9/11, granted to NORAD but not used against Payne Stewart's plane in 1999 after the pilot and passengers lost consciousness, see Richard Myers interview (Feb. 17, 2004). A 1998 White House tabletop exercise chaired by Richard Clarke included a scenario in which a terrorist

group loaded a Learjet with explosives and took off for a suicide mission to Washington. Military officials said they could scramble fighter jets from Langley Air Force Base to chase the aircraft, but they would need "executive" orders to shoot it down. Chuck Green interview (Apr. 21, 2004). For no recognition of this threat, see Ralph Eberhart interview (Mar. 1, 2004).

99. Richard Myers interview (Feb. 17, 2004).

100. Donald Quenneville interview (Jan. 7, 2004); Langley Air Force Base 119th Fighter Wing briefing (Oct. 6–7, 2003).

101. Collin Scoggins interviews (Sept. 22, 2003; Jan. 8, 2004); FAA report, "Crisis Management Handbook for Significant Events," Feb. 15, 2000; DOD memo, CJCS instruction, "Aircraft Piracy (Hijacking) and Destruction of Derelict Airborne Objects," June 1, 2001.

102. See FAA regulations, Hijacked Aircraft, Order 7110.65M, para.10-2-6 (2001); David Bottiglia interview (Oct. 1, 2003); FAA report, "Crisis Management Handbook for Significant Events," Feb. 15, 2000. From interviews of controllers at various FAA centers, we learned that an air traffic controller's first response to an aircraft incident is to notify a supervisor, who then notifies the traffic management unit and the operations manager in charge. The FAA center next notifies the appropriate regional operations center (ROC), which in turn contacts FAA headquarters. Biggio stated that for American 11, the combination of three factors—loss of radio contact, loss of transponder signal, and course deviation—was serious enough for him to contact the ROC in Burlington, Mass. However, without hearing the threatening communication from the cockpit, he doubts Boston Center would have recognized or labeled American 11 "a hijack." Terry Biggio interview (Sept. 22, 2003); see also Shirley Miller interview (Mar. 30, 2004); Monte Belger interview (Apr. 20, 2004).

103. FAA regulations, Special Military Operations, Requests for Service, Order 7610.4J, paras. 7-1-1, 7-1-2 (2001); DOD memo, CJCS instruction, "Aircraft Piracy (Hijacking) and Destruction of Derelict Airborne Objects," June 1, 2001.

104. Ralph Eberhart interview (Mar. 1, 2004); Alan Scott interview (Feb. 4, 2004); Robert Marr interview (Jan. 23, 2004); FAA regulations, Position Reports within NORAD Radar Coverage, Order 7610.4J, para. 7-4-2 (2001); DOD memo, CJCS instruction, "Aircraft Piracy (Hijacking) and Destruction of Derelict Airborne Objects," June 1, 2001.

105. FAA regulations, Air/Ground Communications Security, Order 7610.4J, para. 7-1-6 (2001); FAA regulations, Vectors, Order 7610.4J, para. 7-2-3 (2001).

106. Peter Zalewski interview (Sept. 22, 2003); Terry Biggio interviews (Sept. 22, 2003; Jan. 8, 2004); Collin Scoggins interview (Sept. 22, 2003); Daniel Bueno interview (Sept. 22, 2003). For evidence of the numerous attempts by air traffic control to raise American 11, see FAA memo, "Full Transcript; Aircraft Accident; AAL11; New York, NY; September 11, 2001," Feb. 15, 2002, p. 7.

107. DOD radar files, 84th Radar Evaluation Squadron, "9/11 Autoplay," undated; Peter Zalewski interview (Sept. 22, 2003); John Schippani interview (Sept. 22, 2003).

108. Peter Zalewski interview (Sept. 22, 2003); John Schippani interview (Sept. 22, 2003).

109. FAA memo, "Full Transcript; Aircraft Accident; AAL11; New York, NY; September 11, 2001," Feb. 15, 2002, p. 11; Peter Zalewski interview (Sept. 23, 2003).

110. Peter Zalewski interview (Sept. 23, 2003); John Schippani interview (Sept. 22, 2003); Terry Biggio interviews (Sept. 22, 2003; Jan. 8, 2004); Robert Jones interview (Sept. 22, 2003).

111. FAA memo, "Full Transcript; Aircraft Accident; AAL11; New York, NY; September 11, 2001," Apr. 19, 2002, p. 2; FAA record, Boston Center daily record of facility operation, Sept. 11, 2001; Terry Biggio interviews (Sept. 22, 2003; Jan. 8, 2004); Daniel Bueno interview (Sept. 22, 2004). See also FAA memo, "Transcription of 9/11 Tapes," Oct. 2, 2003, p. 2; FAA audio file, Herndon Command Center, line 4525, 8:32–8:33.

112. See FAA memo, "Transcription of 9/11 Tapes," Oct. 2, 2003, pp. 2–3; FAA record, New England Region Daily Log, Sept. 11, 2001; Daniel Bueno interview (Sept. 22, 2003); Terry Biggio interviews (Sept. 22, 2003; Jan. 8, 2004).

113. FAA memo, "Full Transcript; Aircraft Accident; AAL11; New York, NY; September 11, 2001," Feb. 15, 2002, p. 12.

114. FAA memo, "Full Transcript; Aircraft Accident; AAL11; New York, NY; September 11, 2001," Jan. 28, 2002, p. 5.

115. FAA memo, "Full Transcript; Aircraft Accident; AAL11; New York, NY; September 11, 2001," Apr. 19, 2002, p. 5; Terry Biggio interview (Sept. 22, 2003); Collin Scoggins interviews (Sept. 22, 2003; Jan. 8, 2004); Daniel Bueno interview (Sept. 22, 2003).

116. On 9/11, NORAD was scheduled to conduct a military exercise, Vigilant Guardian, which postulated a bomber attack from the former Soviet Union. We investigated whether military preparations for the large-scale exercise compromised the military's response to the real-world terrorist attack on 9/11. According to General Eberhart, "it took about 30 seconds" to make the adjustment to the real-world situation. Ralph Eberhart testimony, June 17, 2004. We found that the response was, if anything, expedited by the increased number of staff at the sectors and at NORAD because of the scheduled exercise. See Robert Marr interview (Jan. 23, 2004).

117. For the distance between Otis Air Force Base and New York City, see William Scott testimony, May 23, 2003. For the order from NEADS to Otis to place F-15s at battle stations, see NEADS audio file, Weapons Director Technician position, channel 14, 8:37:15. See also interviews with Otis and NEADS personnel: Jeremy Powell interview (Oct. 27, 2003); Michael Kelly interview (Oct. 14, 2003); Donald Quenneville interview (Jan. 7, 2004), and interviews with Otis fighter pilots: Daniel Nash interview (Oct. 14, 2003); Timothy Duffy interview (Jan. 7, 2004). According to Joseph Cooper from Boston Center, "I coordinated with Huntress ["Huntress" is the call sign for NEADS]. I advised Huntress we had a hijacked aircraft. I requested some assistance. Huntress requested and I supplied pertinent information. I was advised aircraft might be sent from Otis." FAA record, Personnel Statement of Joseph Cooper, Oct. 30, 2001.

118. Robert Marr interview (Jan. 23, 2004); Leslie Filson, *Air War Over America* (First Air Force, 2003), p. 56; Larry Arnold interview (Feb. 3, 2004).

119. NEADS audio file, Weapons Director Technician position, channel 14; 8:45:54; Daniel Nash interview (Oct. 14, 2003); Michael Kelly interview (Oct. 14, 2003); Donald Quenneville interview (Jan. 7, 2004); Timothy Duffy interview (Jan. 7, 2004); NEADS audio file, Mission Crew Commander position, channel 2, 8:44:58; NEADS audio file, Identification Technician position, channel 5, 8:51:13.

120. FAA audio file, Boston Center, position 31R; NEADS audio file, Mission Crew Commander position, channel 2, 8:58:00; NEADS audio file, Mission Crew Commander position, channel 2, 8:54:55. Because of a technical issue, there are no NEADS recordings available of the NEADS senior weapons director and weapons director technician position responsible for controlling the Otis scramble. We found a single communication from the weapons director or his technician on the Guard frequency at approximately 9:11, cautioning the Otis fighters: "remain at current position [holding pattern] until FAA requests assistance." See NEADS audio file, channel 24. That corresponds to the time after the Otis fighters entered the holding pattern and before they headed for New York. NEADS controllers were simultaneously working with a tanker to relocate close to the Otis fighters. At 9:10, the senior director on the NEADS floor told the weapons director, "I want those fighters closer in." NEADS audio file, Identification Technician position, channel 5. At 9:10:22, the Otis fighters were told by Boston Center that the second tower had been struck. At 9:12:54, the Otis fighters told their Boston Center controller that they needed to establish a combat air patrol over New York, and they immediately headed for New York City. See FAA audio files, Boston Center, position 31R. This series of communications explains why the Otis fighters briefly entered and then soon departed the holding pattern, as the radar reconstruction of their flight shows. DOD radar files, 84th Radar Evaluation Squadron, "9/11 Autoplay," undated.

121. In response to allegations that NORAD responded more quickly to the October 25, 1999, plane crash that killed Payne Stewart than it did to the hijacking of American 11, we compared NORAD's response time for each incident. The last normal transmission from the Stewart flight was at 9:27:10 A.M. Eastern Daylight Time. The Southeast Air Defense Sector was notified of the event at 9:55, 28 minutes later. In the case of American 11, the last normal communication from the plane was at 8:13 A.M. EDT. NEADS was notified at 8:38, 25 minutes later. We have concluded there is no significant difference in NORAD's reaction to the two incidents. See NTSB memo, Aircraft Accident Brief for Payne Stewart incident, Oct. 25, 1999; FAA email, Gahris to Myers, "ZJX Timeline for N47BA accident," Feb. 17, 2004.

122. FAA memo, "Full Transcript; Aircraft Accident; UAL175; New York, NY; September 11, 2001," May 8, 2002, pp. 5–6.

123. FAA audio file, New York Center, position R42, 8:42–8:45; FAA memo, "Full Transcript; Aircraft Accident; UAL175; New York, NY; September 11, 2001," May 8, 2002, pp. 6–8; DOD radar files, 84th Radar Evaluation Squadron, "9/11 Autoplay," undated. The FAA-produced timeline notes, "Based on coordination received from [Boston Center] indicating a possible hijack, most of the controller's attention is focused on AAL 11." See FAA report, "Summary of Air Traffic Hijack Events September 11, 2001," Sept. 17, 2001; see also David Bottiglia interview (Oct. 1, 2003); FAA memo, "Full Transcript; Aircraft Accident; UAL175; New York, NY; September 11, 2001," May 8, 2002, p. 9.

124. FAA audio file, Herndon Command Center, New York Center position, line 5114, 8:48.

125. FAA memo, "Full Transcript; Aircraft Accident; UAL175; New York, NY; September 11, 2001," May 8, 2002, pp. 12, 14.

126. Ibid., p. 15. At 8:57, the following exchange between controllers occurred: "I got some handoffs for you. We got some incidents going over here. Is Delta 2433 going to be okay at thirty-three? I had to climb him for traffic. I let you United 175 just took off out of think we might have a hijack over here. Two of them." See FAA memo, "Full Transcript; Aircraft Accident; UAL175; New York, NY; September 11, 2001," May 8, 2002.

127. See FAA report, "Summary of Air Traffic Hijack Events September 11, 2001," Sept. 17, 2001; Evanna Dowis interview (Sept. 30, 2004); Michael McCormick interview (Dec. 15, 2003); FAA record, Personnel Statement of Michael McCormick, Oct. 17, 2001. See also FAA memo, "Full Transcript; Aircraft Accident; UAL175; New York, NY; September 11, 2001," May 8, 2002, p. 17.

128. FAA memo, "Full Transcript; Command Center; NOM Operational Position; September 11, 2001," Oct. 14, 2003, pp. 15–17.

129. FAA memo, "Full Transcript; Aircraft Accident; UAL175; New York, NY; September 11, 2001," Jan. 17, 2002, p. 3.

130. "N90 [New York Terminal Radar Approach] controller stated 'at approximately 9:00 a.m., I observed an unknown aircraft south of the Newark, New Jersey Airport, northeast bound and descending out of twelve thousand nine hundred feet in a rapid rate of descent, the radar target terminated at the World Trade Center.'" FAA report, "Summary of Air Traffic Hijack Events September 11, 2001," Sept. 17, 2001. Former NORAD official Alan Scott testified that the time of impact of United 175 was 9:02. William Scott testimony, May 23, 2003. We have determined that the impact time was 9:03:11 based on our analysis of FAA radar data and air traffic control software logic.

131. FAA audio file, Herndon Command Center, New York Center position, line 5114, 9:02:34.

132. Ibid., 9:03; FAA audio file, Herndon Command Center, Cleveland/Boston position, line 5115, 9:05; Michael McCormick interview (Oct. 1, 2003); David LaCates interview (Oct. 2, 2003).

133. FAA Audio File, Herndon Command Center, Boston Center position, line 5115, 9:05–9:07.

134. Joseph McCain interview (Oct. 28, 2003); Robert Marr (Jan. 23, 2004); James Fox interview (Oct. 29, 2003); Dawne Deskins interview (Oct. 30, 2003).

135. NEADS audio file, Mission Crew Commander position, channel 2, 9:07:32.

136. Daniel Nash interview (Oct. 14, 2003); Timothy Duffy interview (Jan. 7, 2004).

137. Because the Otis fighters had expended a great deal of fuel in flying first to military airspace and then to New York, the battle commanders were concerned about refueling. As NEADS personnel looked for refueling tankers in the vicinity of New York, the mission crew commander considered scrambling the Langley fighters to New York to provide backup for the Otis fighters until the NEADS Battle Cab (the command area that overlooks the operations floor) ordered "battle stations only at Langley." The alert fighters at Langley Air Force Base were ordered to battle stations at 9:09. Colonel Marr, the battle commander at NEADS, and General Arnold, the CONR commander, both recall that the planes were held on battle stations, as opposed to scrambling, because they might be called on to relieve the Otis fighters over New York City if a refueling tanker was not located, and also because of the general uncertainty of the situation in the sky. According to William Scott at the Commission's May 23, 2003, hearing, "At 9:09, Langley F-16s are directed to battle stations, just based on the general situation and the breaking news, and the general developing feeling about what's going on." See NEADS audio file, Mission Crew Commander, channel 2, 9:08:36; Robert Marr interview (Oct. 27, 2003); Larry Arnold interview (Feb. 3, 2004). See also Colonel Marr's statement that "[t]he plan was to protect New York City." Filson, *Air War Over America*, p. 60.

138. Commission analysis of FAA radar data and air traffic control transmissions.

139. The Indianapolis Center controller advised other Indianapolis Center personnel of the developing situation. They agreed to "sterilize" the airspace along the flight's westerly route so the safety of other planes would not be affected. John Thomas interview (May 4, 2004).

140. John Thomas interview (Sept. 24, 2003). According to the FAA-produced timeline, at 9:09 Indianapolis Center "notified Great Lakes Regional Operations Center a possible aircraft accident of AMERICAN 77 due to the simultaneous loss of radio communications and radar identification." FAA report, "Summary of Air Traffic Hijack Events September 11, 2001," Sept. 17, 2001.

141. FAA audio file, Herndon Command Center, National Operations Manager position, line 4525; FAA audio file, Herndon Command Center, National Traffic Management Officer east position, line 4530; FAA memo, "Full Transcription; Air Traffic Control System Command Center, National Traffic Management Officer, East Position; September 11, 2001," Oct. 21, 2003, p. 13.

142. Primary radar contact for Flight 77 was lost because the "preferred" radar in this geographic area had no primary radar system, the "supplemental" radar had poor primary coverage, and the FAA ATC software did not allow the display of primary radar data from the "tertiary" and "quadrary" radars.

143. David Boone interview (May 4, 2004); Charles Thomas interview (May 4, 2004); John Thomas interview (May 4, 2004); Commission analysis of FAA radar data and air traffic control software logic.

144. John Thomas interview (May 4, 2004); Charles Thomas interview (May 4, 2004). We have reviewed all FAA documents, transcripts, and tape recordings related to American 77 and have found no evidence that FAA headquarters issued a directive to surrounding centers to search for primary radar targets. Review of the same materials also indicates that no one within FAA located American 77 until the aircraft was identified by Dulles controllers at 9:32. For much of that time, American 77 was traveling through Washington Center's airspace. The Washington Center's controllers were looking for the flight, but they were not told to look for primary radar returns.

145. John White interview (May 7, 2004); Ellen King interview (Apr. 5, 2004); Linda Schuessler interview (Apr. 6, 2004); Benedict Sliney interview (May 21, 2004); FAA memo, "Full Transcription; Air Traffic Control System Command Center, National Traffic Management Officer, East Position; September 11, 2001," Oct. 21, 2003, pp. 14, 27.

146. John Hendershot interview (Dec. 22, 2003).

147. FAA memo, "Partial Transcript; Aircraft Accident; AAL77; Washington, DC; September 11, 2001," Sept. 20, 2001, p. 7.

148. NEADS audio file, Identification Technician position, channel 7, 9:21:10.

149. NEADS audio file, Mission Crew Commander, channel 2, 9:21:50; Kevin Nasypany interview (Jan. 22–23, 2004).

150. NEADS audio file, Mission Crew Commander, Channel 2, 9:22:34. The mission commander thought to put the Langley scramble over Baltimore and place a "barrier cap" between the hijack and Washington, D.C. Kevin Nasypany interview (Jan. 22–23, 2004).

151. NEADS audio file, Identification Technician position, channel 5, 9:32:10; ibid., 9:33:58.

152. For first quote, see NEADS audio file, Identification Technician position, channel 5, 9:35:50. For second quote, see NEADS audio file, Identification Technician position, channel 7, 9:36:34; Kevin Nasypany interview (Jan. 22–23, 2004). For the third quote, see NEADS audio file, Mission Crew Commander, channel 2, 9:39; 9:39:37; Kevin Nasypany interview (Jan. 22–23, 2004).

153. Dean Eckmann interview (Dec. 1, 2003); FAA memo, "Partial Transcript; Scramble Aircraft; QUIT25; September 11, 2001," Sept. 4, 2003, pp. 2–4 (Peninsular Radar position); FAA memo, "Partial Transcript; Scramble Aircraft; QUIT25; September 11, 2001," Sept. 4, 2003, pp. 2–5 (East Feeder Radar position).

154. NEADS audio file, Mission Crew Commander, channel 2, 9:38:02; Dawne Deskins interview (Oct. 30, 2003). The estimated time of impact of Flight 77 into the Pentagon is based on Commission analysis of FDR, air traffic control, radar, and Pentagon elevation and impact site data.

155. Joseph Cooper interview (Sept. 22, 2003); NEADS audio file, Identification Technician position, recorder 1, channel 7, 9:41.

156. NEADS audio file, Mission Crew Commander position, channel 2, 9:42:08.

157. FAA memo, "Full Transcript; Aircraft Accident; N591UA (UAL93); Somerset, PA; September 11, 2001," May 10, 2002, p. 10.

158. The United 93 timeline in FAA report, "Summary of Air Traffic Hijack Events September 11, 2001," Sept. 17, 2001, states that at 9:28:17 "a radio transmission of unintelligible sounds of possible screaming or a struggle from an unknown origin was heard over the ZOB [Cleveland Center] radio." See FAA memo, "Full Transcript; Aircraft Accident; N591UA (UAL93); Somerset, PA; September 11, 2001," May 10, 2002, p. 11.

159. The United 93 timeline in FAA report, "Summary of Air Traffic Hijack Events September 11, 2001," Sept. 17, 2001, states that at 9:28:54 a "second radio transmission, mostly unintelligible, again with sounds of possible screaming or a struggle and a statement, 'get out of here, get out of here' from an unknown origin was heard over the ZOB [Cleveland Center] radio." FAA audio file, Cleveland Center, Lorain Radar position; FAA memo, "Full Transcript; Aircraft Accident; N591UA (UAL93); Somerset, PA; September 11, 2001," May 10, 2002, p. 11. At 9:31:48, ExecJet 56 also called in, reporting that "we're just answering your call. We did hear that, uh, yelling too." The FAA responded at 9:31:51, "Okay, thanks. We're just trying to figure out what's going on." FAA memo, "Full Transcript; Aircraft Accident; N591UA (UAL93); Somerset, PA; September 11, 2001," May 10, 2002, p. 15.

160. FAA memo, "Full Transcript; Aircraft Accident; N591UA (UAL93); Somerset, PA; September 11, 2001," May 10, 2002, p. 15.

161. FAA memo, "Full Transcription; Air Traffic Control System Command Center, National Traffic Management Officer, East Position; September 11, 2001," Oct. 21, 2003, pp. 10, 13; FAA audio file, Herndon Command Center, New York Center position, line 5154.

162. FAA memo, "Full Transcript; Aircraft Accident; N591UA (UAL93); Somerset, PA; September 11, 2001," May 10, 2002, p. 19.

163. Ibid., p. 23.

164. FAA memo, "Full Transcription; Air Traffic Control System Command Center, National Traffic Management Officer, East Position; September 11, 2001," Oct. 21, 2003, pp. 16–17; FAA audio file, Cleveland Center, Lorain Radar position; FAA memo, "Full Transcript; Aircraft Accident; N591UA (UAL93); Somerset, PA; September 11, 2001," May 10, 2002, pp. 26–32.

165. FAA memo, "Full Transcription; Air Traffic Control System Command Center, National Traffic Management Officer, East Position; September 11, 2001," Oct. 21, 2003, pp. 17–19.

166. For 9:46 quotation, see ibid., pp. 19–20. For 9:49 discussion about military assistance, see ibid., p. 21.

167. For 9:53 discussion about scrambling aircraft, see ibid., p. 23. Neither Monte Belger nor the deputy director for air traffic services could recall this discussion in their interviews with us. Monte Belger interview (Apr. 20, 2004); Peter Challan interview (Mar. 26, 2004). Subsequently Belger told us he does not believe the conversation occurred. Monte Belger, email to the Commission, July 12, 2004. However, tapes from the morning reveal that at 9:53 a staff person from headquarters told the Command Center "Peter's talking to Monte now about scrambling." FAA memo, "Full Transcription; Air Traffic Control System Command Center, National Traffic Management Officer, East Position; September 11, 2001," Oct. 21, 2003, p. 23. For discussions about the status of United 93, see ibid., pp. 24–27.

168. Ibid., pp. 23–27. We also reviewed a report regarding seismic observations on September 11, 2001, whose authors conclude that the impact time of United 93 was "10:06:05±5 (EDT)." Won-Young Kim and G. R. Baum, "Seismic Observations during September 11, 2001, Terrorist Attack," spring 2002 (report to the Maryland Depart-

ment of Natural Resources). But the seismic data on which they based this estimate are far too weak in signal-to-noise ratio and far too speculative in terms of signal source to be used as a means of contradicting the impact time established by the very accurate combination of FDR, CVR, ATC, radar, and impact site data sets. These data sets constrain United 93's impact time to within 1 second, are airplane- and crash-site specific, and are based on time codes automatically recorded in the ATC audiotapes for the FAA centers and correlated with each data set in a process internationally accepted within the aviation accident investigation community. Furthermore, one of the study's principal authors now concedes that "seismic data is not definitive for the impact of UA 93." Email from Won-Young Kim to the Commission, "Re: UA Flight 93," July 7, 2004; see also Won-Young Kim, "Seismic Observations for UA Flight 93 Crash near Shanksville, Pennsylvania during September 11, 2001," July 5, 2004.

169. FAA memo, "Full Transcription; Air Traffic Control System Command Center, National Traffic Management Officer, East Position; September 11, 2001," Oct. 21, 2003, p. 31.

170. For 10:17 discussion, see ibid., p. 34. For communication regarding "black smoke," see FAA memo, "Full Transcript; Aircraft Accident; N591UA (UAL93) Somerset, PA; September 11, 2001," May 10, 2002, pp. 16–18 (Cleveland Center, Imperial Radar position). This report from the C-130H was recorded on ATC audio about 1 minute and 37 seconds after the impact time of United 93 as established by NTSB and Commission analysis of FDR, CVR, radar, and impact data sets—more than a minute before the earliest impact time originally posited by the authors of the seismic data report.

171. NEADS audio file, Identification Technician, channel 5, 10:07.

172. NEADS audio file, Mission Crew Commander, channel 2, 10:10.

173. NEADS audio file, Identification Technician, channel 4, 10:14.

174. DOD record, NEADS MCC/T Log Book, Sept. 11, 2001.

175. William Scott testimony, May 23, 2003.

176. Larry Arnold testimony, May 23, 2003.

177. See DOD record, NEADS MCC/T Log Book, Sept. 11, 2001. The entry in this NEADS log records the tail number not of American 77 but of American 11: "American Airlines #N334AA hijacked." See also DOD record, Surveillance Log Book, Sept. 11, 2001.

178. William Scott testimony, May 23, 2003; DOD briefing materials, "Noble Eagle; 9-11 Timeline," undated.

179. For lack of knowledge about the hijacking, see, e.g., White House transcript, Card interview with Ron Fournier of the Associated Press, Aug. 7, 2002. For information on the hijacking within the FAA, see the discussion of American 11 in section 1.2.

180. See White House record, Situation Room Log, Sept. 11, 2001; White House record, Presidential Emergency Operations Center (PEOC) Watch Log, Sept. 11, 2001; DOD record, Senior Operations Officer log, Sept. 11, 2001.

181. Jane Garvey interview (Jun. 30, 2004); Monte Belger interview (Apr. 20, 2004).

182. For notifications, see DOD record, Assistant Deputy Director Operations Passdown Log, Sept. 11, 2001. For the call to the FAA, see DOD record, Senior Operations Officer log, Sept. 11, 2001 ("9:00 NMCC called FAA, briefed of explosion at WTC possibly from aircraft crash. Also, hijacking of American Flight 11 from Boston to LA, now enroute to Kennedy"). For the scrambling of jets not being discussed, see Ryan Gonsalves interview (May 14, 2004).

183. Secret Service records show the motorcade arriving between 8:50 and 8:55. USSS record, shift log, Sept. 11, 2001 (8:55); USSS record, Command Post Protectee Log, Sept. 11, 2001 (8:50). For Andrew Card's recollection, see Andrew Card meeting (Mar. 31, 2004). For the President's reaction, see Andrew Card meeting (Mar. 31, 2004); White House transcript, President Bush interview with Bob Schieffer of CBS News, Apr. 17, 2002.

184. White House transcript, Rice interview with Evan Thomas of *Newsweek*, Nov. 1, 2001, p. 2; see also White House record, President's Daily Diary, Sept. 11, 2001.

185. White House transcript, Vice President Cheney interview with *Newsweek*, Nov. 19, 2001, p. 1.

186. For Rice's meeting, see White House transcript, Rice interview with Bob Woodward of the *Washington Post*, Oct. 24, 2001, pp. 360–361. For White House staff monitoring the news, see, e.g., White House transcript, Rice interview with Evan Thomas, Nov. 11, 2001, p. 388.

187. On White House staff reaction, see White House transcript, Rice interview with Bob Woodward, Oct. 24, 2001, p. 361; Andrew Card meeting (Mar. 31, 2004). On security enhancements, see USSS memo, interview with Carl Truscott, Oct. 1, 2001, p. 1. On security measures being precautionary, see Carl Truscott interview (Apr. 15, 2004).

188. For the time of the teleconference, see FAA record, Chronology ADA-30, Sept. 11, 2001. For recollections of the NMCC officer, see Charles Chambers interview (Apr. 23, 2004). For recollections of the FAA manager, see Michael Weikert interview (May 7, 2004). For Belger's reaction, see Monte Belger testimony, June 17, 2004.

189. For the times of the video teleconference, see White House record, Situation Room Communications Log, Sept. 11, 2001 (9:25 start); CIA notes, Cofer Black timeline, Sept. 11, 2001 (CIA representatives joining at 9:40); FAA record, Chronology ADA-30, Sept. 11, 2001 (FAA representatives joining at 9:40).

190. Patrick Gardner interview (May 12, 2004). For participants, see Jane Garvey interview (Oct. 21, 2003); Monte Belger interview (Apr. 20, 2004); Jeff Griffith interview (Mar. 31, 2004). On the absence of Defense officials, see John Brunderman interview (May 17, 2004). The White House video teleconference was not connected into the area of the NMCC where the crisis was being managed. Thus the director of the operations team—who was on the phone with NORAD—did not have the benefit of information being shared on the video teleconference. See, e.g., Charles Leidig interview (Apr. 29, 2004); Montague Winfield interview (Apr. 26, 2004); Patrick Gardner interview (May 12, 2004). Moreover, when the Secretary and Vice Chairman later participated in the White House video teleconference, they were necessarily absent from the NMCC and unable to provide guidance to the operations team. See DOD report, OT-2 Analysis of NMCC Response to Terrorist Attack on 11 SEP 01, Oct. 4, 2001; John Brunderman interview (May 17, 2004).

191. NSC notes, Paul Kurtz notes, Sept. 11, 2001; Paul Kurtz meeting (Dec. 22, 2003). For shootdown authority having already been conveyed, see DOD transcript, Air Threat Conference Call, Sept. 11, 2001.

192. Charles Leidig interview (Apr. 29, 2004). For the job of the NMCC in an emergency, see NMCC briefing (July 21, 2003).

193. For the Secretary's activities, see DOD memo, interview of Donald Rumsfeld, Dec. 23, 2002; Stephen Cambone interview (July 8, 2004).

194. Charles Leidig interview (Apr. 29, 2004). Secure teleconferences are the NMCC's primary means of coordinating emergencies, and they fall into two categories: "event" and "threat." Event conferences seek to gather information. If the situation escalates, a threat conference may be convened. On 9/11, there was no preset teleconference for a domestic terrorist attack. NMCC and National Military Joint Intelligence Center (NMJIC) briefing (July 21, 2003). For the content of the conferences on 9/11, see DOD transcript, Air Threat Conference Call, Sept. 11, 2001.

195. See DOD transcript, Air Threat Conference Call, Sept. 11, 2001; see also White House notes, Thomas Gould notes, Sept. 11, 2001.

196. On difficulties in including the FAA, see NMCC and NMJIC briefing (July 21, 2003); John Brunderman interview (May 17, 2004). On NORAD and the time of the FAA's joining, see DOD transcript, Air Threat Conference Call, Sept. 11, 2001. For the FAA representative, see Rayford Brooks interview (Apr. 15, 2004).

197. Richard Myers interview (Feb. 17, 2004); Charles Leidig interview (Apr. 29, 2004).

198. DOD transcript, Air Threat Conference Call, Sept. 11, 2001.

199. On the briefing, see ibid. The Vice Chairman was on Capitol Hill when the Pentagon was struck, and he saw smoke as his car made its way back to the building. Richard Myers interview (Feb. 17, 2004). For the Chairman being out of the country, see DOD record, Deputy Director for Operations Passdown Log, Sept. 11, 2001.

200. DOD transcript, Air Threat Conference Call, Sept. 11, 2001.

201. Ibid.

202. Ibid.

203. For the President being informed at 9:05, see White House record, President's Daily Diary, Sept. 11, 2001. For Card's statement, see White House transcript, Card interview with Ron Fournier, Aug. 7, 2002. For the President's reaction, see President Bush and Vice President Cheney meeting (Apr. 29, 2004).

204. For the President's activities, see Education Channel videotape, "Raw Footage of President Bush at Emma E. Booker Elementary School," Sept. 11, 2001 (remaining in classroom); Deborah Loewer meeting (Feb. 6, 2004) (in the holding room). For his calls, see White House record, President's Daily Diary, Sept. 11, 2001 (9:15 call to Vice President); Deborah Loewer meeting (Feb. 6, 2004) (call to Rice); President Bush and Vice President Cheney meeting (Apr. 29, 2004) (call to Pataki); White House record, Secure Switchboard Log, Sept. 11, 2001 (call to Mueller). For the decision to make a statement, see Ari Fleischer interview (Apr. 22, 2004). For the Secret Service's perspective, see Edward Marinzel interview (Apr. 21, 2004).

205. On the return to Washington, see Deborah Loewer meeting (Feb. 6, 2004); Andrew Card meeting (Mar. 31, 2004). On consulting with senior advisers, see Ari Fleischer interview (Apr. 22, 2004). On information about additional aircraft, see, e.g., Andrew Card meeting (Mar. 31, 2004). On decisions and the focus on the President's speech, see President Bush and Vice President Cheney meeting (Apr. 29, 2004); Ari Fleischer interview (Apr. 22, 2004); Andrew Card meeting (Mar. 31, 2004).

206. On the motorcade, see USSS record, shift log, Sept. 11, 2001 (departing 9:35, arriving 9:45); USSS record, Command Post Protectee Log, Sept. 11, 2001 (departing 9:36, arriving 9:42). Fleischer deduced from his notes that the President learned about the Pentagon while in the motorcade. Ari Fleischer interview (Apr. 22, 2004). For the President's actions and statements to the Vice President, see Ari Fleischer interview (Apr. 22, 2004); White House notes, Ari Fleischer notes, Sept. 11, 2001.

207. On not returning to Washington, see Edward Marinzel interview (Apr. 21, 2004); USSS memo, interview of Edward Marinzel, Oct. 3, 2001; Andrew Card meeting (Mar. 31, 2004). For additional sources on the President's desire to return, see White House transcript, Vice President Cheney interview with *Newsweek*, Nov. 19, 2001, p. 5. For the Vice President's recollection, see President Bush and Vice President Cheney meeting (Apr. 29, 2004). For time of departure, see USSS record, Command Post Protectee Log, Sept. 11, 2001. On Air Force One's objectives on takeoff, see Edward Marinzel interview (Apr. 21, 2004).

208. USSS memo, interview of Gregory LaDow, Oct. 1, 2001, p. 1. Shortly after the second attack in New York, a senior Secret Service agent charged with coordinating the President's movements established an open line with his counterpart at the FAA, who soon told him that there were more planes unaccounted for—possibly hijacked—in addition to the two that had already crashed. Though the senior agent told someone to convey this information to the Secret Service's operations center, it either was not passed on or was passed on but not disseminated; it failed to reach agents assigned to the Vice President, and the Vice President was not evacuated at that time. See Nelson Garabito interview (Mar. 11, 2004); USSS memo, interview of Nelson Garabito, Oct. 1, 2001; see also Terry Van Steenbergen interview (Mar. 30, 2004).

209. American 77's route has been determined through Commission analysis of FAA and military radar data. For the evacuation of the Vice President, see White House transcript, Vice President Cheney interview with *Newsweek*, Nov. 19, 2001, p. 2; USSS memo, interview of Rocco Delmonico, Oct. 1, 2001 (evacuation of the White House); see also White House notes, Mary Matalin notes, Sept. 11, 2001. On the time of entering the tunnel, see USSS report, "Executive Summary: U.S. Secret Service Timeline of Events, September 11–October 3, 2001," Oct. 3, 2001, p. 2. Secret Service personnel told us that the 9:37 entry time in their timeline was based on alarm data, which is no longer retrievable. USSS briefing (Jan. 29, 2004).

210. White House transcript, Vice President Cheney interview with *Newsweek*, Nov. 19, 2001, p. 4; President Bush and Vice President Cheney meeting (Apr. 29, 2004).

211. On Mrs. Cheney, see USSS report, "Executive Summary: U.S. Secret Service Timeline of Events, September 11–October 3, 2001," Oct. 3, 2001, p. 2 (time of arrival); White House transcript, Lynne Cheney interview with *Newsweek*, Nov. 9, 2001, p. 2 (joining the Vice President). For the contemporaneous notes, see White House notes, Lynne Cheney notes, Sept. 11, 2001. On the content of the Vice President's call, see White House transcript, Vice President Cheney interview with *Newsweek*, Nov. 19, 2001, p. 5. According to the Vice President, there was "one phone call from the tunnel. And basically I called to let him know that we were a target and I strongly urged him not to return to Washington right away, that he delay his return until we could find out what the hell was going on." For their subsequent movements, see White House transcript, Vice President Cheney interview with *Newsweek*, Nov. 19, 2001, p. 5; White House transcript, Lynne Cheney interview with *Newsweek*, Nov. 9, 2001, p. 2.

212. On communications problems, see, e.g., President Bush and Vice President Cheney meeting (Apr. 29, 2004). On lack of an open line, see, e.g., Deborah Loewer meeting (Feb. 6, 2004).

213. On the Vice President's call, see President Bush and Vice President Cheney meeting (Apr. 29, 2004). For the Vice President's time of arrival in the shelter conference room, see White House record, PEOC Shelter Log, Sept. 11, 2001 (9:58); USSS memo, OVP 9/11 Timeline, Nov. 17, 2001 (9:52; Mrs. Cheney arrived White House and joined him in tunnel); White House notes, Lynne Cheney notes (9:55; he is on phone with President); White House transcript, Lynne Cheney interview with *Newsweek*, Nov. 9, 2001, p. 2 ("And when I got there, he was on the phone with the President . . . But from that first place where I ran into him, I moved with him into what they call the PEOC"); White House transcript, Vice President Cheney interview with *Newsweek*, Nov. 19, 2001, p. 4 (9:35 or 9:36 arrival; he estimated a 15-minute stay); Carl Truscott interview (Apr. 15, 2004) (arrived with Rice and the Vice President in conference room; called headquarters immediately; call logged at 10:00); President Bush and Vice President Cheney meeting, Apr. 29, 2004 (Vice President viewed television footage of Pentagon ablaze in tunnel); White House transcript, Rice interview with Evan Thomas, Nov. 1, 2001, p. 388 (Rice viewed television footage of Pentagon ablaze in Situation Room). For the Vice President's recollection about the combat air patrol, see President Bush and Vice President Cheney meeting (Apr. 29, 2004); White House transcript, President Bush interview with Bob Woodward and Dan Balz, Dec. 17, 2001, p. 16.

214. President Bush and Vice President Cheney meeting (Apr. 29, 2004); see also White House transcript, Vice President Cheney interview with *Newsweek*, Nov. 19, 2001, pp. 7–8.

215. Douglas Cochrane meeting (Apr. 16, 2004); Condeleeza Rice meeting (Feb. 7, 2004). For Rice entering after the Vice President, see USSS report, "Executive Summary: U.S. Secret Service Timeline of Events, September 11–October 3, 2001," Oct. 3, 2001, p. 2; Carl Truscott interview (Apr. 15, 2004).

216. In reconstructing events that occurred in the PEOC on the morning of 9/11, we relied on (1) phone logs of the White House switchboard; (2) notes of Lewis Libby, Mrs. Cheney, and Ari Fleischer; (3) the tape (and then transcript) of the air threat conference call; and (4) Secret Service and White House Situation Room logs, as well as four separate White House Military Office logs (the PEOC Watch Log, the PEOC Shelter Log, the Communications Log, and the 9/11 Log).

217. DOD transcript, Air Threat Conference Call, Sept. 11, 2001. For one open line between the Secret Service and the FAA, see note 208. At Secret Service headquarters, personnel from the intelligence division were also on a phone conference with FAA headquarters. Chuck Green interview (Mar. 10, 2004). For notification of an inbound aircraft at 10:02, see USSS record, Intelligence Division timeline, Sept. 11, 2001; USSS record, Crisis Center Incident Monitor, Sept. 11, 2001. For the FAA's projection, see Tim Grovack interview (Apr. 8, 2004). For Secret Service updates, see DOD transcript, Air Threat Conference Call, Sept. 11, 2001.

218. White House notes, Lynne Cheney notes, Sept. 11, 2001; White House notes, Lewis Libby notes, Sept. 11, 2001.

219. For Libby's characterization, see White House transcript, Scooter Libby interview with *Newsweek*, Nov. 2001. For the Vice President's statement, see President Bush and Vice President Cheney meeting (Apr. 29, 2004). For the second authorization, see White House notes, Lynne Cheney notes, Sept. 11, 2001; White House notes, Lewis Libby notes, Sept. 11, 2001.

220. Joshua Bolten meeting (Mar. 18, 2004); see also White House notes, Lewis Libby notes, Sept. 11, 2001 ("10:15–18: Aircraft 60 miles out, confirmed as hijack—engage? VP: Yes. JB [Joshua Bolten]: Get President and confirm engage order").

221. For the Vice President's call, see White House record, Secure Switchboard Log, Sept. 11, 2001; White House record, President's Daily Diary, Sept. 11, 2001; White House notes, Lewis Libby notes, Sept. 11, 2001. Fleischer's 10:20 note is the first mention of shootdown authority. See White House notes, Ari Fleischer notes, Sept. 11, 2001; see also Ari Fleischer interview (Apr. 22, 2004).

222. DOD transcript, Air Threat Conference Call, Sept. 11, 2001.

223. On reports of another plane, see White House notes, Lynne Cheney notes, Sept. 11, 2001; White House notes, Lewis Libby notes, Sept. 11, 2001. On the Vice President's authorization, see ibid.; DOD transcript, Air Threat Conference Call, Sept. 11, 2001. For Hadley's statement, see DOD transcript, Air Threat Conference Call, Sept. 11, 2001.

224. For the quotation, see White House transcript, Libby interview with *Newsweek*, Nov. 2001. On the aircraft's identity, see White House record, White House Military Office Log, Sept. 11, 2001.

225. On the NMCC, see DOD transcript, Air Threat Conference Call, Sept. 11, 2001. On the Secret Service's contacts with the FAA, see notes 208, 217. On the Secret Service conveying information to the White House, see DOD transcript, Air Threat Conference Call, Sept. 11, 2001; Nelson Garabito interview (Mar. 11, 2004).

226. DOD transcript, Air Threat Conference Call, Sept. 11, 2001.

227. Ibid.

228. Ralph Eberhart interview (Mar. 1, 2004). On the morning of 9/11, General Eberhart was in his office at headquarters—roughly 30 minutes away from Cheyenne Mountain, where the operations center is located.

229. DOD record, Continental Region chat log, Sept. 11, 2001.

230. NEADS audio file, Mission Crew Commander position, channel 2, 10:32:12. For the text of the chat log message, see DOD record, Continental Region chat log, Sept. 11, 2001.

231. For the statements of NEADS personnel, see Robert Marr interview (Jan. 23, 2004) (NEADS commander); Kevin Nasypany interview (Jan. 22, 2004) (mission commander); James Fox interview (Oct. 29, 2004) (senior weapons director). On the understanding of leaders in Washington, see DOD transcript, Air Threat Conference Call, Sept. 11, 2001. For the orders to Langley pilots, see NEADS audio file, Weapons Director position, recorder 1, channel 2, 10:10–11.

232. For evidence of the President speaking to Rumsfeld, see White House notes, Ari Fleischer notes, Sept. 11, 2001. On inability to recall this conversation, see Donald Rumsfeld interview (Jan. 30, 2004).

233. DOD note, transcript of Air Threat Conference Call, Sept. 11, 2001.

234. Donald Rumsfeld interview (Jan. 30, 2004). At 11:15, Secretary Rumsfeld spoke to the President and told him DOD was working on refining the rules of engagement so pilots would have a better understanding of the circumstances under which an aircraft could be shot down. See, e.g., DOD notes, Stephen Cambone notes, Sept. 11, 2001. DOD did not circulate written rules of engagement until sometime after 1:00 P.M. See DOD memo, rules of engagement, Sept. 11, 2001 (faxed to Andrews Air Force Base at 1:45 P.M.).

235. David Wherley interview (Feb. 27, 2004).

236. The 113th Wing first learned from the FAA tower at Andrews that the Secret Service wanted fighters airborne. The FAA tower had been contacted by personnel at FAA headquarters, who were on an open line with senior agents from the President's detail. See Nelson Garabito interview (Mar. 11, 2004); Terry Van Steenbergen interview (Mar. 30, 2004). On the Secret Service agent relaying instructions, see USSS memo, Beauchamp to AD-Inspection, September 11 experience, Feb. 23, 2004. On the order to fly weapons free, see David Wherley interview (Feb. 27, 2004); DOD memo, interview of David Wherley, Oct. 3, 2001, p. 12.

237. President Bush and Vice President Cheney meeting (Apr. 29, 2004).

238. These estimates are based on analysis of Boeing 757 maximum operating speed data, FAA and military radar data, and assumptions regarding how the airplane would be operated en route to the Washington, D.C., area. The shortest time frame assumes maximum speed without regard to overspeed warnings, a straight-line path, and no time allowed for maneuvering or slowing to aim and crash the airplane into its target. The probable time frame allows for speeds consistent with the observed operation of the airplane prior to its final maneuvers and crash, as well as for maneuvers and slowing in the D.C. area to take aim. According to radar data, the fighters from Langley Air Force Base arrived over Washington at about 10:00 A.M. Two of the three Langley fighters were fully armed (i.e., with missiles and guns); the third fighter carried only guns. Craig Borgstrom interview (Dec. 1, 2003).

239. For the pilots' awareness, see Dean Eckmann interview (Dec. 1, 2003); Bradley Derrig interview (Dec. 1, 2003); Craig Borgstrom interview (Dec. 1, 2003). For the quotation, see Dean Eckmann interview (Dec. 1, 2003).

240. For no authority at 10:10, see NEADS audio file, Mission Crew Commander, channel 2. For shootdown

authority at 10:31, see DOD record, Continental Region chat log, Sept. 11, 2001. For possibility of ordering a shoot-down, see Larry Arnold interview (Feb. 2, 2004).

241. NEADS audio file, Identification Technician position, recorder 1, channel 4, 10:02:22.

## 2 The Foundation of the New Terrorism

1. "Text of World Islamic Front's Statement Urging Jihad Against Jews and Crusaders," *Al Quds al Arabi*, Feb. 23, 1998 (trans. Foreign Broadcast Information Service), which was published for a large Arab world audience and signed by Usama Bin Ladin, Ayman al Zawahiri (emir of the Egyptian Islamic Jihad), Abu Yasir Rifa'i Ahmad Taha (leader of the Egyptian Islamic Group), Mir Hamzah (secretary of the Jamiat ul Ulema e Pakistan), and Fazlul Rahman (head of the Jihad Movement in Bangladesh).

2. "Hunting Bin Ladin," PBS *Frontline* broadcast, May 1998 (online at www.pbs.org/wgbh/pages/frontline/shows/binladen/who/interview.html).

3. Usama Bin Ladin, "Declaration of War Against the Americans Occupying the Land of the Two Holy Places," Aug. 23, 1996 (trans., online at www.terrorismfiles.org/individuals/declaration_of_jihad1.html).

4. "Hunting Bin Ladin," PBS *Frontline* broadcast, May 1998.

5. Ibid.

6. For a classic passage conveying the nostalgic view of Islam's spread, see Henri Pirenne, *A History of Europe,* trans. Bernard Miall (University Books, 1956), pp. 25–26.

7. See Martin Marty and R. Scott Appleby, eds., *Fundamentalism Observed*, vol. 1 (Univ. of Chicago Press, 1994).

8. See Emmanuel Sivan, *Radical Islam: Medieval Theology and Modern Politics*, enlarged ed. (Yale Univ. Press, 1990).

9. From the perspective of Islamic, not Arab, history, the Baghdad Caliphate's destruction by the Mongols in 1292 marks the end not of Islamic greatness but of Arab dominance of the Muslim world. Moghul India, Safavid Persia, and, above all, the Ottoman Empire were great Islamic powers that arose long after the Baghdad Caliphate fell.

10. Bin Ladin, "Declaration of War," Aug. 23, 1996.

11. The Muslim Brotherhood, which arose in Egypt in 1928 as a Sunni religious/nationalist opposition to the British-backed Egyptian monarchy, spread throughout the Arab world in the mid–twentieth century. In some countries, its oppositional role is nonviolent; in others, especially Egypt, it has alternated between violent and nonviolent struggle with the regime.

12. Sayyid Qutb, *Milestones* (American Trust Publications, 1990). Qutb found sin everywhere, even in rural midwestern churches. Qutb's views were best set out in Sayyid Qutb, "The America I Have Seen" (1949), reprinted in Kamal Abdel-Malek, ed., *America in an Arab Mirror: Images of America in Arabic Travel Literature: An Anthology* (Palgrave, 2000).

13. For a good introduction to Qutb, see National Public Radio broadcast, "Sayyid Qutb's America," May 6, 2003 (online at www.npr.org/display_pages/features/feature_1253796.html).

14. "Bin Laden's 'Letter to America,'" *Observer Worldview*, Nov. 24, 2002 (trans., online at http://observer.guardian.co.uk/worldview/story/0,11581,845725,00.html). The al Qaeda letter was released in conjunction with the release of an audio message from Bin Ladin himself.

15. Ibid.

16. See *Arab Human Development Report 2003* (United Nations, 2003), a report prepared by Arabs that examines not only standard statistical data but also more sensitive social indicators recently identified by the Nobel Prize–winning economist Amartya Sen. It says little, however, about the political dimensions of economic and social trends. See Mark LeVine, "The UN Arab Human Development Report: A Critique," *Middle East Report*, July 26, 2002 (online at www.merip.org/mero/mer0072602.html).

17. President Bush, remarks at roundtable with Arab- and Muslim-American leaders, Sept. 10, 2002 (online at www.whitehouse.gov/news/releases/2002/09/20020910-7.html).

18. See, e.g., Intelligence report, interrogation of Zubaydah, Oct. 29, 2002; CIA analytic report, "Bin Ladin's Terrorist Operations: Meticulous and Adaptable," CTC 00-40017CSH, Nov. 2, 2000.

19. "Open resistance flared so quickly that only two months after the invasion . . . almost the entire population of Kabul climbed on their rooftops and chanted with one voice, 'God is great.' This open defiance of the Russian generals who could physically destroy their city was matched throughout the countryside." General (Ret.) Mohammed Yahya Nawwroz and Lester W. Grau, "The Soviet War in Afghanistan; History and Harbinger of Future War?" *Military Review* (Fort Leavenworth Foreign Military Studies Office), Sept./Oct. 1995, p. 2.

20. Rohan Gunaratna, *Inside Al Qaeda: Global Network of Terror* (Columbia Univ. Press, 2002), pp. 16–23. Regarding UBL's access to his family's fortune, see Rick Newcomb interview (Feb. 4, 2004); William Wechsler interview (Jan. 7, 2004).

21. Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements, *United States v. Enaam Arnaout*, No. 02-CR-892 (N.D. Ill. filed Jan. 6, 2003).

22. Intelligence report, Terrorism: Usama Bin Ladin's Historical Links to 'Abdallah Azzam, Apr. 18, 1997. By

most accounts, Bin Ladin initially viewed Azzam as a mentor, and became in effect his partner by providing financial backing for the MAK.

23. In his memoir, Ayman al Zawahiri contemptuously rejects the claim that the Arab mujahideen were financed (even "one penny") or trained by the United States. See Zawahiri, "Knights Under the Prophet's Banner," *Al Sharq al Awsat*, Dec. 2, 2001. CIA officials involved in aiding the Afghan resistance regard Bin Ladin and his "Arab Afghans" as having been militarily insignificant in the war and recall having little to do with him. Gary Schroen interview (Mar. 3, 2003).

24. See Abdullah Azzam, "Al Qaeda al Sulbah" (The solid foundation), *Al Jihad*, Apr. 1988, p. 46.

25. A wealth of information on al Qaeda's evolution and history has been obtained from materials seized in recent years, including files labeled "Tareekh Usama" (Usama's history) and "Tareekh al Musadat" (History of the Services Bureau). For descriptions of and substantial excerpts from these files, see Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements, *United States v. Arnaout,* Jan. 6, 2003. See also Intelligence report, Terrorism: Historical Background of the Islamic Army and bin Ladin's Move from Afghanistan to Sudan, Nov. 26, 1996; DOD document, "Al-Qaeda," AFGP-2002-000080 (translated). For a particularly useful insight into the evolution of al Qaeda—written by an early Bin Ladin associate, Adel Batterjee, under a pseudonym—see Basil Muhammad, *Al Ansar al Arab fi Afghanistan* (The Arab volunteers in Afghanistan) (Benevolence International Foundation (BIF) and World Association of Muslim Youth, 1991).

26. Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements, *United States v. Arnaout,* Jan. 6, 2003.

27. See FBI report of investigation, interview of Jamal al Fadl, Nov. 10, 1996; Gunaratna, *Inside Al Qaeda*, p. 23.

28. Daniel Benjamin and Steven Simon, *The Age of Sacred Terror* (Random House, 2002), pp. 6–7, 57–63, 83–85; *United States v. Rahman*, 189 F.3d 88, 104–105, 123–124 (2d Cir. Aug. 16, 1996).

29. Gunaratna, *Inside Al Qaeda*, pp. 25–27; DOD document, "Union Agreement between Jama'at Qaedat Ansar Allah (The Base Group of Allah Supporters) and Jama'at Al-Jihad (Jihad Group)," AFGP-2002-000081, undated; Benjamin and Simon, *Age of Sacred Terror*, p. 103.

30. Trial testimony of Jamal al Fadl, *United States v. Usama bin Laden*, No. S(7) 98 Cr. 1023 (S.D. N.Y.), Feb. 6, 2001 (transcript pp. 218–219, 233); Feb. 13, 2001 (transcript pp. 514–516); Feb. 20, 2001 (transcript p. 890). Fadl says this invitation was delivered by a Sudanese delegation that visited Bin Ladin in Afghanistan. See also CIA analytic report, "Al-Qa'ida in Sudan, 1992–1996: Old School Ties Lead Down Dangerous Paths," CTC 2003-40028CHX, Mar. 10, 2003.

31. See Intelligence report, Terrorism: Historical Background of the Islamic Army and bin Ladin's Move from Afghanistan to Sudan, Nov. 26, 1996.

32. Trial testimony of Fadl, *United States v. bin Laden*, Feb. 6, 2001 (transcript pp. 220–224).

33. For Bin Ladin's confrontation with the Saudi regime, see, e.g., Peter L. Bergen, *Holy War Inc.: Inside the Secret World of Osama bin Ladin* (Touchstone, 2001), pp. 80–82. On aid provided by a dissident member of the royal family, see Intelligence report, interrogation of KSM, Sept. 27, 2003; Intelligence report, interrogation of Khallad, Sept. 26, 2003. See also FBI report of investigation, interview of Fadl, Nov. 10, 1996.

34. Gunaratna, *Inside Al Qaeda*, p. 34.

35. Intelligence report, Bin Ladin's business activities in 1992, Mar. 31, 1994; Intelligence report, Terrorism: Historical Background of the Islamic Army and bin Ladin's Move from Afghanistan to Sudan, Nov. 26, 1996; CIA analytic report, "Old School Ties," Mar. 10, 2003.

36. Trial testimony of Fadl, *United States v. bin Laden*, Feb. 6, 2001 (transcript pp. 301–302, 305–306, 315–317, 367–368); Intelligence report, Terrorism: Historical Background of the Islamic Army and bin Ladin's Move from Afghanistan to Sudan, Nov. 26, 1996; CIA analytic report, "Old School Ties," Mar. 10, 2003.

37. See Intelligence report, Bin Ladin's business activities in 1992, Mar. 31, 1994; Intelligence report, Shipment of Arms and Boats to Yemen for Use by an Islamic Extremist, Aug. 9, 1996; Intelligence report, Terrorism: Responsibilities and Background of Islamic Army Shura Council, Dec. 19, 1996; CIA analytic report, "Old School Ties," Mar. 10, 2003; FBI reports of investigation, interviews of Fadl, Nov. 10, 1996; Nov. 12, 1996; CIA analytic report, "Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia," CTC 2002-40066CH, June 6, 2002. For Bin Ladin's involvement in the Bosnian conflicts, see Evan F. Kohlmann, *Al-Qaida's Jihad in Europe: The Afghan-Bosnian Network* (Berg, 2004).

38. Trial testimony of Fadl, *United States v. bin Laden*, Feb. 7, 2001 (transcript p. 354); FBI reports of investigation, interviews of Fadl, Nov. 10, 1996; Dec. 21, 1998; "RP Cops Aware of Long-Term Rightwing Muslim Connection," *Manila Times*, Apr. 26, 2002.

39. Trial testimony of Fadl, *United States v. bin Laden*, Feb. 7, 2001 (transcript pp. 354–355); FBI report of investigation, interview of Fadl, Feb. 4, 1998. See also Republic of Singapore, Ministry of Home Affairs, Report to Parliament, "The Jemaah Islamiyah Arrests and the Threat of Terrorism," Jan. 7, 2003.

40. Benjamin and Simon, *Age of Sacred Terror*, pp. 100, 235.

41. See CIA analytic report, "Arizona: Long-Term Nexus For Islamic Extremists," CTC 2002-30037H, May 15, 2002; Steven Emerson, *American Jihad* (Free Press, 2002), pp. 129–137.

42. Intelligence report, Fatwa to attack U.S. interests in Saudi Arabia and movement of explosives to Saudi Arabia, Jan. 8 1997; trial testimony of Fadl, *United States v. bin Laden*, Feb. 6, 2001 (transcript pp. 265–266); trial testimony of L'Houssaine Kherchtou, *United States v. bin Laden*, Feb. 21, 2001 (transcript p. 1163); FBI reports of investigation, interviews of Fadl, Nov. 10, 1996; Nov. 12, 1996; FBI report of investigation, interview of confidential source, Sept. 16, 1999.

43. On Wali Khan's relationship with Bin Ladin, see Intelligence report, Usama Bin Ladin's Historical Links to 'Abdallah Azzam, Apr. 18, 1997; FBI report of investigation, interview of Fadl, Nov. 10, 1996; Muhammad, *Al Ansar al Arab fi Afghanistan*. On the Blind Sheikh, Bin Ladin eventually spoke publicly of his admiration. See ABC News interview, "To Terror's Source," May 28, 1998. In late 1992, Abu Zubaydah confided to his diary that he was getting ready to go to one of al Qaeda's military camps: "Perhaps later I will tell you about the Qa'ida and Bin Ladin group." Intelligence report, translation of Abu Zubaydah's diary, June 9, 2002. Ramzi Yousef and Khalid Sheikh Mohammed masterminded the 1995 Manila air plot, and KSM helped fund Yousef's attempt to blow up the World Trade Center in 1993. Intelligence report, interrogation of KSM, Jan. 9, 2004. The Blind Sheikh was linked to Yousef and the 1993 World Trade Center attack, while Wali Khan was convicted together with Yousef for the Manila air conspiracy.

44. Intelligence report, Usama Bin Ladin Links to a Southern Yemeni Group, Mar. 5, 1997; FBI report of investigation, interview of Fadl, Nov. 10, 1996; CIA analytic report, "Old School Ties," Mar. 10, 2003, p. 4.

45. U.S. intelligence did not learn of al Qaeda's role in Somalia until 1996. Intelligence report, Bin Ladin's Activities in Somalia and Sudanese NIF Support, Apr. 30, 1997.

46. Intelligence report, Bin Ladin's Activities in Eritrea, Mar. 10, 1997; FBI report of investigation, interview of confidential source, Sept. 16, 1999; FBI report of investigation, interview of Essam Mohamed al Ridi, Dec. 7, 1999; trial testimony of Essam Mohamed al Ridi, *United States v. bin Laden*, Feb. 14, 2001 (transcript pp. 578–593); trial testimony of Fadl, *United States v. bin Laden*, Feb. 6, 2001 (transcript pp. 279–285). In June 1998, Bin Ladin was indicted on charges arising out of the Somalia attack in the U.S. District Court for the Southern District of New York.

47. For background about the attack on the training facility, see, e.g., Benjamin and Simon, *Age of Sacred Terror*, pp. 132, 242. On the proposed attack in Saudi Arabia, see Intelligence report, Fatwa to attack U.S. interests in Saudi Arabia and movement of explosives to Saudi Arabia, Jan. 8, 1997; FBI reports of investigation, interviews of Fadl, Nov. 12, 1996; Feb. 13, 1998. On associates taking credit, see Intelligence report made available to the Commission.

48. CIA analytic report, "Khobar Bombing: Saudi Shia, Iran, and Usama Bin Ladin All Suspects," CTC 96-30015, July 5, 1996; DIA analytic report, Defense Intelligence Threat Review 96-007, July 1996; Intelligence report made available to the Commission. See also Benjamin and Simon, *Age of Sacred Terror*, pp. 224–225, 300–302.

49. Intelligence report, Usama Bin Ladin's Attempts to Acquire Uranium, Mar. 18, 1997; CIA analytic report, "Usama Bin Ladin Trying to Develop WMD Capability?" CTC 97-30002, Jan. 6, 1997; trial testimony of Fadl, *United States v. bin Laden*, Feb. 7, 2001 (transcript pp. 357–366); Feb. 13, 2001 (transcript pp. 528–529); Feb. 20, 2001 (transcript pp. 982–985).

50. Trial testimony of Fadl, *United States v. bin Laden*, Feb. 13, 2001 (transcript p. 528).

51. CIA analytic report, "Old School Ties," Mar. 10, 2003.

52. Intelligence report, Establishment of a Tripartite Agreement Among Usama Bin Ladin, Iran, and the NIF, Jan. 31, 1997; Intelligence report, Cooperation Among Usama Bin Ladin's Islamic Army, Iran, and the NIF, Jan. 31 1997; FBI report of investigation, interview of Fadl, Nov. 10, 1996; trial testimony of Fadl, *United States v. bin Laden*, Feb. 6, 2001 (transcript pp. 290–293); FBI report of investigation, interview of confidential source, Sept. 16, 1999.

53. CIA analytic report, "Ansar al-Islam: Al Qa'ida's Ally in Northeastern Iraq," CTC 2003-40011CX, Feb. 1, 2003.

54. Ibid.; Intelligence report, al Qaeda and Iraq, Aug. 1, 1997.

55. Intelligence reports, interrogations of detainee, May 22, 2003; May 24, 2003. At least one of these reports dates the meeting to 1994, but other evidence indicates the meeting may have occurred in February 1995. Greg interview (June 25, 2004).

Two CIA memoranda of information from a foreign government report that the chief of Iraq's intelligence service and a military expert in bomb making met with Bin Ladin at his farm outside Khartoum on July 30, 1996. The source claimed that Bin Ladin asked for and received assistance from the bomb-making expert, who remained there giving training until September 1996, which is when the information was passed to the United States. See Intelligence reports made available to the Commission. The information is puzzling, since Bin Ladin left Sudan for Afghanistan in May 1996, and there is no evidence he ventured back there (or anywhere else) for a visit. In examining the source material, the reports note that the information was received "third hand," passed from the foreign government service that "does not meet directly with the ultimate source of the information, but obtains the information from him through two unidentified intermediaries, one of whom merely delivers the information to the Service." The same source claims that the bomb-making expert had been seen in the area of Bin Ladin's Sudan farm in December 1995.

56. Intelligence report, Possible Islamic Army Foreknowledge of an "Egyptian Operation" and Logistical and

Security Assistance Provided for the Attackers, Feb. 13, 1997; FBI report of investigation, interview of Fadl, Nov. 4, 1997.

57. Tim Carney interview (Dec. 4, 2003).

58. Trial testimony of L'Houssaine Kherchtou, *United States v. bin Laden*, Feb. 21, 2001 (transcript pp. 1280–1282).

59. On the Sudanese economy, see, e.g., Benjamin and Simon, *Age of Sacred Terror*, pp. 114–115, 132–133. For details about Saudi pressure on the Bin Ladin family, see, e.g., Frank G. interview (Mar. 2, 2004). Regarding management of Bin Ladin's finances, see CIA analytic report, "Usama Bin Ladin: Al-Qa'ida's Financial Facilitators," OTI IA 2001-134-HXC, Oct. 18, 2001; CIA analytic report, "Shaykh Sa'id: Al-Qa'ida's Loyal Senior Accountant," CTC 2003-30072H, July 2, 2003; Intelligence reports, interrogations of detainee, Sept. 17, 1998; Aug. 4, 1999. On the financial crisis in al Qaeda at this time, see trial testimony of L'Houssaine Kherchtou, *United States v. bin Laden*, Feb. 21, 2001 (transcript pp. 1282–1284).

60. Trial testimony of Fadl, *United States v. bin Laden*, Feb. 6, 2001 (transcript pp. 165–174, 190–205, 255–258); Feb. 7, 2001 (transcript pp. 382–391); trial testimony of L'Houssaine Kherchtou, *United States v. bin Laden*, Feb. 21, 2001 (transcript pp. 1282–1284).

61. Because the U.S. embassy in Khartoum had been closed in response to terrorist threats, the U.S. Ambassador to Sudan was working out of the embassy in Nairobi. The Sudanese regime notified him there by fax. See Tim Carney interview (Dec. 4, 2003); Donald Petterson interview (Sept. 30, 2003); DOS cable, Nairobi 7020, "Sudan: Foreign Minister on Developments re Terrorism and Peace," May 21, 1996. On the attempted assassination of Bin Ladin, see FBI report of investigation, interview of L'Houssaine Kherchtou, Oct. 15, 2000; FBI report of investigation, interview of confidential source, Sept. 16, 1999.

62. Intelligence report, interrogation of KSM, July 23, 2003.

63. Ahmed Rashid, *Taliban: Militant Islam, Oil and Fundamentalism in Central Asia* (Yale Univ. Press, 2000), p. 133; Steve Coll, *Ghost Wars: The Secret History of the CIA, Afghanistan, and bin Laden, from the Soviet Invasion to September 10, 2001* (Penguin, 2004), p. 9; Intelligence reports, interrogations of KSM, July 12, 2003; Sept. 27, 2003; Intelligence report, interrogation of Khallad, Sept. 27, 2003. The current Afghan Foreign Minister told us that one of Bin Ladin's planes landed in Islamabad for refueling. See Abdullah Abdullah interview (Oct. 23, 2003).

64. Rashid, *Taliban*, pp. 88–90.

65. See Owen Bennet Jones, *Pakistan: Eye of the Storm* (Yale Univ. Press, 2002); Raffat Pasha interview (Oct. 25, 2003); Rashid, *Taliban*; Waleed Ziad, "How the Holy Warriors Learned to Hate," *New York Times*, June 18, 2004, p. A31.

66. See, e.g., Marvin Weinbaum interview (Aug. 12, 2003); William Milam interview (Dec. 29, 2003). Milam described "strategic depth" as Pakistan's need for a friendly, pliable neighbor on the west due to its hostile relationship with India on the east.

67. On Pakistan's consent, see Ahmed Rashid interview (Oct. 27, 2003); see also Rashid, *Taliban*, p. 139; Intelligence report, Terrorism: Activities of Bin Ladin's in Pakistan, Afghanistan, and India, July 14, 1997; FBI investigation, interview of former al Qaeda associate, Mar. 19, 2001, p. 26. On the Afghanistan-Pakistan–centered network of guesthouses and training camps, see CIA analytic report, "Sketch of a South Asia–Based Terrorist Training and Logistic Network," DI TR 95-12, Dec. 1995; CIA analytic report, "The Rise of UBL and Al-Qa'ida and the Intelligence Community Response," Mar. 19, 2004 (draft), p. 11.

68. On Bin Ladin's money problems, see trial testimony of L'Houssaine Kherchtou, *United States v. bin Laden*, Feb. 21, 2003 (transcript pp. 1282–1286); Frank G. and Mary S. briefing (July 15, 2003); DOS cable, Nairobi 11468, "Sudan: Major Usama Bin Ladin Asset Deregistered," Aug. 6, 1996; Intelligence report, interrogation of KSM, July 30, 2003. See also Robert Block, "In War on Terrorism, Sudan Struck a Blow by Fleecing Bin Laden," *Wall Street Journal*, Dec. 3, 2001, p. A1.

69. FBI report of investigation, interview of confidential source, Sept. 16, 1999; trial testimony of Ashif Juma, *United States v. bin Laden*, Feb. 15, 2001 (transcript pp. 626–627); trial testimony of L'Houssaine Kherchtou, *United States v. bin Laden*, Feb. 22, 2001 (transcript pp. 1264–1267); FBI report of investigation, interview of L'Houssaine Kherchtou, Aug. 28, 2000. See also Intelligence report, interrogation of Khallad, Sept. 27, 2003.

70. See trial testimony of L'Houssaine Kherchtou, *United States v. bin Laden*, Feb. 22, 2001 (transcript pp. 1282–1286).

71. Intelligence report, interrogation of KSM, July 12, 2003; Gunaratna, *Inside Al Qaeda*, p. 41; Rashid, *Taliban*, pp. 19–21, 133.

72. For Bin Ladin's 1996 fatwa, see Bin Ladin, "Declaration of War," Aug. 23, 1996. On constraints from the Sudanese, see Intelligence report, interrogation of KSM, Feb. 20, 2004. On warnings from the Saudi monarchy, see Intelligence report, Timeline of events from 1993 bombing of World Trade Center through 9/11 (citing cables from Apr. 1997).

73. On Bin Ladin's promise to Taliban leaders, see government exhibit no. 1559-T, *United States v. bin Laden*. For the Bin Ladin interview, see CNN broadcast, interview of Bin Ladin by Peter Arnett on Mar. 20, 1997, May 9, 1997 (available online at http://news.findlaw.com/cnn/docs/binladen/binladenintvw-cnn.pdf). According to

KSM, Bin Ladin moved to Kandahar "by order of Emir Al-Mouminin," that is, Mullah Omar. See Intelligence report, interrogation of KSM, July 12, 2003. On the Taliban's invitation to UBL, see Mike briefing (Dec. 12, 2003); Rashid, *Taliban*, p. 129. Rashid has also described the move as part of Bin Ladin's plan to solidify his relationship with, and eventually gain control over, the Taliban. Ahmed Rashid interview (Oct. 27, 2003).

74. Intelligence report, unsuccessful Bin Ladin probes for contact with Iraq, July 24, 1998; Intelligence report, Saddam Hussein's efforts to repair relations with Saudi government, 2001.

75. Intelligence report, Iraq approach to Bin Ladin, Mar. 16, 1999.

76. CIA analytic report, "Ansar al-Islam: Al Qa'ida's Ally in Northeastern Iraq," CTC 2003-40011CX, Feb. 1, 2003. See also DIA analytic report, "Special Analysis: Iraq's Inconclusive Ties to Al-Qaida," July 31, 2002; CIA analytic report, "Old School Ties," Mar. 10, 2003. We have seen other intelligence reports at the CIA about 1999 contacts. They are consistent with the conclusions we provide in the text, and their reliability is uncertain. Although there have been suggestions of contacts between Iraq and al Qaeda regarding chemical weapons and explosives training, the most detailed information alleging such ties came from an al Qaeda operative who recanted much of his original information. Intelligence report, interrogation of al Qaeda operative, Feb. 14, 2004. Two senior Bin Ladin associates have adamantly denied that any such ties existed between al Qaeda and Iraq. Intelligence reports, interrogations of KSM and Zubaydah, 2003 (cited in CIA letter, response to Douglas Feith memorandum, "Requested Modifications to 'Summary of Body of Intelligence Reporting on Iraq–al Qaida Contacts (1990–2003),'" Dec. 10, 2003, p. 5).

77. On Gulf-based donors to Bin Ladin, see Frank G. and Mary S. briefing (July 15, 2003); CIA analytic report, "Saudi-Based Financial Support for Terrorist Organizations," CTC 2002-40117CH, Nov. 14, 2002. On the relationship between Bin Ladin and Omar, see Intelligence report, interrogation of detainee, Feb. 20, 2002. On relations between the Arabs in Afghanistan and the Taliban, see ibid. On financial relations, see CIA analytic report, "Ariana Afghan Airlines: Assets and Activities," OTI IR 1999-170CX, July 29, 1999; CIA, NID, "Near East: UAE: Imposition of Sanctions Could Disrupt Bin Ladin's Finances," June 9, 1999.

78. CIA analytic report, "Afghanistan: An Incubator for International Terrorism," CTC 01-40004, Mar. 27, 2001; CIA analytic report, "Al-Qa'ida Still Well Positioned to Recruit Terrorists," July 1, 2002, p. 1.

79. The number of actual al Qaeda members seems to have been relatively small during the period before 9/11, although estimates vary considerably, from the low hundreds to as many as 5,000. For the low hundreds, see Intelligence report, interrogation of KSM, Dec. 3, 2003. For 5,000, see Intelligence report, interrogation of Khallad, Nov. 26, 2003. Khallad added that because pledging *bayat* was secret, the number of al Qaeda members can only be speculative. On al Qaeda's training and indoctrination, see minutes from the August 1988 meeting leading to the official formation of al Qaeda, cited in Government's Evidentiary Proffer Supporting the Admissibility of Co-conspirator Statements, *United States v. Arnaout*, Jan. 6, 2003, p. 36.

80. By 1996, al Qaeda apparently had established cooperative relationships with at least 20 Sunni Islamic extremist groups in the Middle East, South Asia, Africa, and East Asia, as well as with elements of the Saudi opposition. See CIA analytic report, "Old School Ties," Mar. 10, 2003, p. 3. On ties with Southeast Asia and the Malaysian-Indonesian JI, see, e.g., Intelligence report, interrogation of Hambali, Sept. 5, 2003. On Pakistani militant ties to Bin Ladin, see CIA analytic report, "Terrorism: Extremists Planning Attacks Against US Interests in Pakistan," Nov. 29, 2001, p. 1 and appendix B; see also Gunaratna, *Inside Al Qaeda*, pp. 169–171, 199; Benjamin and Simon, *Age of Sacred Terror*, pp. 286–287. On Europe, see, e.g., trial testimony of Fadl, *United States v. bin Laden*, Feb. 6, 2001 (transcript pp. 301, 315–316), Feb. 7, 2001 (transcript p. 368). On London, see, e.g., Intelligence report, interrogation of detainee, Sept. 17, 1997. On Balkans, see Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements, *United States v. Arnaout,* Jan. 6, 2003; Kohlmann, *Al-Qaida's Jihad in Europe*.

81. See, e.g., "Tareekh Usama" and "Tareekh al Musadat" (described in note 25). See also FBI report of investigation, interviews of Mohammad Rashed Daoud al 'Owhali, Aug. 22–25, 1998; FBI report of investigation, interview of Nasser Ahmad Nasser al Bahri, Oct. 3, 2001, p. 8.

82. The merger was de facto complete by February 1998, although the formal "contract" would not be signed until June 2001. See Intelligence report, Incorporation of Zawahiri's Organization into Bin Ladin's Al-Qa'ida, and Recent [1998] Activities of Egyptian Associates of Al-Qa'ida, Sept. 22, 1998; see also Intelligence report, interrogation of detainee, Feb. 8, 2002.

83. FBI report of investigation, interview of confidential source, Sept. 16, 1999; FBI report of investigation, interview of L'Houssaine Kherchtou, Aug. 28, 2000; Benjamin and Simon, *Age of Sacred Terror*, pp. 123–124.

84. On the group's surveillance and photography activities, see trial testimony of L'Houssaine Kherchtou, *United States v. bin Laden*, Feb. 21, 2001 (transcript pp. 1499–1500); FBI reports of investigation, interviews of L'Houssaine Kherchtou, Aug. 18, 2000; Oct. 18, 2000; see also FBI report of investigation, interview of confidential source, Sept. 16, 1999. On Bin Ladin's use of technical equipment to promote his intelligence/security capabilities, see Intelligence report, Terrorism: Usama Bin Ladin's Intelligence Capabilities and Techniques, Dec. 5, 1996.

85. On the surveillance reports and the Hezbollah training camps, see FBI report of investigation, interview of confidential source, Sept. 16, 1999; see also Intelligence report, Al Qaeda Targeting Study of U.S. Embassy Nairobi, prepared 23 December 1993, Apr. 5, 1999; Intelligence report, Establishment of a Tripartite Agreement Among

Usama Bin Ladin, Iran, and the NIF, Jan. 31, 1997; Intelligence report, Cooperation Among Usama Bin Ladin's Islamic Army, Iran, and the NIF, Jan. 31 1997; FBI report of investigation, interview of Fadl, Nov. 10, 1996. Bin Ladin told his operatives he wanted them to study Hezbollah's 1983 truck bombing of U.S. marines in Lebanon that killed 241 and led to the American pullout from Lebanon. See, e.g., statement of Ali Mohamed in support of change of plea, *United States v. Ali Mohamed*, No. S(7) 98 Cr. 1023 (S.D. N.Y.), Oct. 20, 2000 (transcript p. 30); trial testimony of Fadl, *United States v. bin Laden*, Feb. 6, 2001 (transcript pp. 292–293); FBI report of investigation, interview of Fadl, Mar. 10, 1997; FBI report of investigation, interview of confidential source, Sept. 16, 1999.

86. Hugh Davies, "Saudis Detain Member of Anti-American Terror Group," *Daily Telegraph* (London), Aug. 2, 1997.

87. For general information on Hage, see Oriana Gill, "Hunting Bin Laden: A Portrait of Wadih El Hage, Accused Terrorist," PBS *Frontline* broadcast, Sept. 12, 2001. On returning to the United States, Hage was met at the airport by FBI agents, interrogated, and called the next day before the federal grand jury then investigating Bin Ladin. Because he lied to the grand jury about his association with Bin Ladin and al Qaeda, he was arrested immediately after the embassy bombings a year later. Testimony of Patrick Fitzgerald before the Senate Judiciary Committee, Oct. 21, 2003, pp. 3–4. On Hage's phone taps, see introduction of stipulation (government exhibit no. 36), *United States v. bin Laden*, Feb. 27, 2001 (transcript pp. 1575–1576). For Harun's fax, see government exhibit no. 300A-T, *United States v. bin Laden*.

88. "World Islamic Front's Statement Urging Jihad," *Al Quds al Arabi*, Feb. 23, 1998; closing statement by Asst. U.S. Attorney Ken Karas, *United States v. bin Laden*, May 1, 2001 (transcript pp. 5369, 5376–5377). On related activities in Kenya and Tanzania, see FBI report of investigation, interviews of Mohamed Sadeeq Odeh, Aug. 15–28, 1998.

89. FBI report of investigation, interviews of Mohamed Sadeeq Odeh, Aug. 15–28, 1998; closing statement by Asst. U.S. Attorney Ken Karas, *United States v. bin Laden*, May 1, 2001 (transcript pp. 5239, 5408, 5417).

90. For the Atef fax, see government exhibit no. 1636–T, *United States v. bin Laden*. For the fatwa, see government exhibit no. 1602-T, *United States v. bin Laden* (translation of "Clergymen in Afghanistan Issue a Fatwa calling for the Removal of American Forces from the Gulf," *Al Quds al Arabi*, May 14, 1998). For the interview, see ABC News interview, "To Terror's Source," May 28, 1998.

91. See closing statement by Asst. U.S. Attorney Ken Karas, *United States v. bin Laden*, May 2, 2001 (transcript pp. 5426–5439); see also FBI report of investigation, interviews of Mohammad Rashed Daoud al 'Owhali, Aug. 22–25, 1998, p. 9. Copies of the declarations issued by "The Islamic Army for the Liberation of the Holy Places" taking credit for the operation were recovered from a raid in Baku, Azerbaijan, after the bombings in September 1998. See also government exhibit no. 1557C-T, *United States v. bin Laden* ("The formation of the Islamic Army for the Liberation of the Holy Places"); government exhibit no. 1557D-T, *United States v. bin Laden* ("Al-Aqsa Mosque operation"); government exhibit no. 1557E-T, *United States v. bin Laden* ("The Holy Ka'ba operation").

92. Closing statement by Asst. U.S. Attorney Ken Karas, *United States v. bin Laden*, May 2, 2001 (transcript p. 5445).

93. ABC News interview, "Terror Suspect: An Interview with Osama Bin Laden," Dec. 22, 1998 (conducted in Afghanistan by ABC News producer Rahimullah Yousafsai).

# 3  Counterterrorism Evolves

1. Brief of the United States, *United States v. Ramzi Ahmed Yousef*, Lead No. 98-1041 (2d Cir. filed Aug. 25, 2000), pp. 42–43; John Miller and Michael Stone, with Chris Mitchell, *The Cell: Inside the 9/11 Plot, and Why the FBI and CIA Failed to Stop It* (Hyperion, 2002), pp. 95, 99.

2. On President Clinton's tasking the NSC, see Richard Clarke interview (Dec. 18, 2003). On the role of different U.S. government agencies, see Steve Coll, *Ghost War: The Secret History of the CIA, Afghanistan, and bin Laden, from the Soviet Invasion to September 10, 2001* (Penguin, 2004), p. 251.

3. Trial testimony of Brian Parr, *United States v. Yousef*, No. S12 93 CR 180 (KTD) (S.D. N.Y.), Oct. 22, 1997 (transcript p. 4694).

4. On the process of identification, see Joseph Malone interview (May 25, 2004).

5. *United States v. Salameh*, 152 F.3d 88, 107–108 (2d Cir. 1998); Miller and Stone, *The Cell*, pp. 104–105, 107, 109. Abouhalima had fled to the Middle East after the bombing, and was picked up by Egyptian authorities and returned to the United States in late March 1993. Brief of the United States, *United States v. Mohammed A. Salameh*, Lead No. 94-1312 (2d Cir. filed Jan. 17, 1997), p. 64 and n. ★★★.

6. *United States v. Salameh*, 152 F.3d at 107–108, n. 2; *United States v. Yousef*, 327 F.3d 56, 78–79 (2d Cir. 2003); Miller and Stone, *The Cell*, p. 119; Daniel Benjamin and Steven Simon, *The Age of Sacred Terror* (Random House, 2002), p. 12.

7. On Rahman's ties to the Farouq mosque, see Miller and Stone, *The Cell*, pp. 54–55. On Rahman's message, see *United States v. Rahman*, 189 F.3d 88, 104 (2d Cir. 1999); Brief for the United States, *United States v. Siddig Ibrahim Siddig Ali,* Lead No. 96-1044 (2d Cir. filed July 3, 1997), pp. 10, 15. See also DOS Inspector General report, "Review

of the Visa-Issuance Process Phase I: Circumstances Surrounding the Issuance of Visas to Sheikh Omar Ali Ahmed Abdel Rahman," Mar. 1994, pp. 6, 8, 36. On the informant's reports, see *United States v. Rahman*, 189 F.3d at 106–107. On the landmarks plot, see *United States v. Rahman*, 189 F.3d at 108–111, 123–127; Miller and Stone, *The Cell*, p. 116.

8. These prosecutions also had the unintended consequence of alerting some al Qaeda members to the U.S. government's interest in them. In February 1995, the government filed a confidential court document listing Usama Bin Ladin and scores of other people as possible co-conspirators in the New York City landmarks plot. Ali Mohamed, who was on the list, obtained a copy and faxed it to a close Bin Ladin aide for distribution. Statement of Ali Mohamed in support of change of plea, *United States v. Ali Mohamed,* No. S(7) 98 Cr. 1023 (S.D. N.Y.), Oct. 20, 2000 (transcript p. 29); Statements of Prosecutor and Judge, *United States v. Bin Laden,* No. S(7) 98 Cr. 1023 (S.D. N.Y.), Mar. 26, 2001 (transcript pp. 3338–3339); Patrick Fitzgerald interview (Jan. 28, 2004).

9. On Ajaj's travels to Khaldan and interactions with KSM, see *United States v. Salameh*, 152 F.3d at 107–108. Ajaj had entered the United States on a B-2 tourist visa at New York City on September 9, 1991. INS alien file, No. A72215823, Sept. 9, 1991.

10. On Yousef's capture and the Manila air plot, see *United States v.Yousef*, 327 F.3d at 79–82. On KSM, see Joint Inquiry report (classified version), pp. 324–328; CIA analytical report, "WTC 1993: The Solid Case for al-Qa'ida Involvement," CTC 2002-40084H, July 11, 2002; Intelligence report, interrogation of KSM, May 27, 2003; James Risen and David Johnston, "Threats and Reponses: Counterterrorism; Qaeda Aide Slipped Away Long Before Sept. 11 Attack," *New York Times*, Mar. 8, 2003, p. A12.

11. For a general history of the FBI, supporting the subsequent text (unless otherwise noted), see Athan G. Theoharis, et al., *The FBI: A Comprehensive Reference Guide* (Onyx Press, 1999); the FBI's authorized history, FBI report, "History of the FBI" (online at www.fbi.gov/libref/historic/history/historymain.htm); the FBI's history as told by the Federation of American Scientists, "History of the FBI," updated June 18, 2003 (online at www.fas.org/irp/agency/doj/fbi/fbi_hist.htm). For discussion of field office autonomy, see FBI letter, Kalish to Wolf, responses to questions posed by the Subcommittee on Commerce, Justice, State, and Judiciary of the House Appropriations Committee, May 24, 2004, pp. 47–48.

12. See, e.g., Dan C. interview (Aug. 27, 2003); Ruben Garcia interview (Apr. 29, 2004); DOJ Inspector General interview of William Gore, Oct. 24, 2002.

13. The Washington Field Office was originally assigned the East Africa bombings case because it generally has responsibility for investigating crimes overseas. When the attack was determined to be al Qaeda–related, responsibility shifted to the New York Field Office. See generally Kevin C. interview (Aug. 25, 2003). This created significant friction between agents in the respective offices. Edward Curran and Sidney Caspersen interview (Jan. 20, 2004). On the concept of the office of origin, see FBI memo, Kalish to Wolf, responses to questions from the Subcommittee on Commerce, Justice, State, and Judiciary of the House Appropriations Committee, pp. 47–48; testimony of Robert S. Mueller III before the Subcommittee on the Departments of Commerce, Justice, and State, the Judiciary and Related Agencies of the House Appropriations Committee, June 18, 2003; FBI report, "Counterterrorism Program Since September 2001," Apr. 14, 2004, p. 20.

14. On the impact of Watergate, see generally Kathryn Olmsted, *Challenging the Secret Government: The Post-Watergate Investigations of the CIA and FBI* (Univ. of North Carolina Press, 1996).

15. David M. Alpern with Anthony Marro and Stephan Lesher, "This Is Your New Your FBI," *Newsweek*, Jan. 5, 1976, p. 14.

16. On the Levi guidelines and the Smith modifications, see John T. Elliff, "Symposium: National Security and Civil Liberties: The Attorney General's Guidelines for FBI Investigations," *Cornell Law Review*, vol. 69 (Apr. 1984), p. 785. On the line between church and state, see Floyd Abrams, "The First Amendment and the War against Terrorism," *University of Pennsylvania Journal of Constitutional Law*, vol. 5 (Oct. 2002).

17. On Pan Am bombing investigation, see Commission analysis of U.S. counterterrorism strategy from 1968 to 1993; FBI report, "History of the FBI."

18. Louis Freeh interview (Jan. 6, 2004); Federation of American Scientists, "History of the FBI;" DOJ Inspector General report, "Federal Bureau of Investigation Casework and Human Resource Allocation," Sept. 2003, pp. iv, vi, viii, x, xiii.

19. For quote, see FBI report, "Congressional Budget Justification Book Fiscal Year 1995," undated, p. 6. On Freeh's efforts, see Howard M. Shapiro, "The FBI in the 21st Century," *Cornell International Law Journal*, vol. 28 (1995), pp. 219–228; Louis Freeh interview (Jan. 6, 2004). On Freeh's budget request, see FBI report, "Congressional Budget Justification Book Fiscal Year 1995," undated.

20. Janet Reno interview (Dec.16, 2003); Dale Watson interview (Feb. 5, 2004); Stephen Colgate interview (May 19, 2004); OMB budget examiner interview (Apr. 27, 2004).

21. On the plan, see FBI report, "Strategic Plan: 1998–2003, 'Keeping Tomorrow Safe,'" May 8, 1998. For Watson's recollections, see Dale Watson interview (Jan. 6, 2004).

22. For the mid-1990s numbers, see FBI memo, Freeh to Reno, "Reorganization of FBI Headquarters—Establishment of Counterterrorism Division and Investigative Services Division," Apr. 22, 1999. For the 1998–2001 num-

bers, see DOJ Inspector General report, "Review of the Federal Bureau of Investigation's Counterterrorism Program: Threat Assessment, Strategic Planning, and Resource Management," Sept. 2002, p. 67. For the failure to shift resources, see DOJ Inspector General report, "FBI Casework and Human Resource Allocation," Sept. 2003, pp. iv, vi, viii, x, xiii. For the comparison to drug agents, see testimony of Dick Thornburgh before the Subcommittee on Commerce, State, Justice, the Judiciary, and Related Agencies of the House Appropriations Committee, June 18, 2003, p. 20.

23. Dale Watson interview (Feb. 5, 2004); Virginia Bollinger interview (Feb. 2, 2004); Robert Bryant interview (Dec. 18, 2003).

24. On the state of information technology at FBI, see Virginia Bollinger interview (Jan. 28, 2004); Mark Miller interview (Dec. 23, 2003). On the lack of an overall assessment, see DOJ Inspector General report, "Review of the FBI's Counterterrorism Program," Sept. 2002, pp. ii–iii.

25. For training statistics, see DOJ Inspector General report, "Review of the FBI's Counterterrorism Program," Sept. 2002, p. 74. For translation resources, see FBI report, "FY 2002 Counterterrorism Division Program Plan Summary," undated, p. 4. Since 9/11, the FBI has recruited and processed more than 30,000 translator applicants. This has resulted in the addition of nearly 700 new translators. FBI report, "The FBI's Counterterrorism Program Since September 2001," Apr. 14, 2004. The FBI's hiring process includes language testing, a personnel security interview, polygraph, and a full background investigation. The FBI must maintain rigorous security and proficiency standards with respect to its permanent and contract employees. Even as the FBI has increased its language services cadre, the demand for translation services has also greatly increased. Thus, the FBI must not only continue to bring on board more linguists, it must also continue to take advantage of technology and best practices to prioritize its workflow, enhance its capabilities, and ensure compliance with its quality control program. FBI linguists interviews (July 31, 2003–May 10, 2004); Margaret Gulotta interview (May 10, 2004). See DOJ Inspector General report, "A Review of the FBI's Actions in Connection with Allegations Raised by Contract Linguist Sibel Edmonds," July 1, 2004; Sibel Edmonds interview (Feb. 11, 2004).

26. Wilson Lowery interview (Jan. 28, 2004); Janet Reno testimony, Apr. 13, 2004; Helen S. interview (Dec. 29, 2003); Stephen Colgate interview (May 19, 2004); Robert Dies interview (Feb. 4, 2004).

27. FBI report, "Director's Report on Counterterrorism," Sept. 1, 2001, pp. I-1–I-14. On FBI reorganization, see FBI memo, Freeh to Reno, "Reorganization of FBI Headquarters—Establishment of Counterterrorism Division and Investigative Services Division," Apr. 22, 1999. On Watson's observation, see Dale Watson interview (Feb. 4, 2004). On MAXCAP 05, see FBI memo, description of MAXCAP 05, undated (draft likely prepared after Aug. 31, 2001, for incoming Director Mueller). On field executives' views, see FBI report, Counterterrorism Division, International Terrorism Program, "Strategic Program Plan, FY 2001–06," undated, p. 30.

28. International terrorism intelligence cases were designated as 199 matters; international terrorism criminal cases were designated as 265 matters. In 2003, these designations were eliminated; all international terrorism matters now receive the same designation, 315.

29. For historical information on FISA, see Americo R. Cinquegrana, "The Walls (and Wires) have Ears: The Background and First Ten Years of the Foreign Intelligence Surveillance Act of 1978," *University of Pennsylvania Law Review,* vol. 137 (1989), pp. 793, 802–805. For the statute, see 50 U.S.C. §§ 1801 et seq. As enacted in 1978, FISA permitted orders authorizing electronic surveillance. It did not refer to physical searches. In 1994, the statute was amended to permit orders authorizing physical searches. See Pub. L. No. 103-359, 108 Stat. 3423, 3443 (Oct. 14, 1994); 50 U.S.C. §§ 1821–1829. See generally, William C. Banks and M. E. Bowman, "Executive Authority for National Security Surveillance," *American University Law Review,* vol. 50 (2000), pp. 1–130.

30. On the history of courts applying the primary purpose standard, see *In re Sealed Case,* 310 F.3d 717, 725–726 (FISC Ct. Rev. 2002), in which the FISC Court of Review concluded that these courts had ruled in error. See also DOJ report, "Final Report of the Attorney General's Review Team on the Handling of the Los Alamos National Laboratory Investigation" (hereinafter "Bellows Report"), May 2000, appendix D. On DOJ interpretation of FISA, see DOJ memo, Dellinger to Vatis, "Standards for Searchers Under Foreign Intelligence Act," Feb. 14, 1995; Royce Lamberth interview (Mar. 26, 2004); Bellows Report, pp. 711–712; DOJ Inspector General interview of Marion Bowman, May 28, 2003.

31. Bellows Report, pp. 711–712; DOJ Inspector General interview of Marion Bowman, May 28, 2003.

32. Bellows Report, pp. 712–714, n. 947, appendix D tabs 2, 3; Richard Scruggs interview (May 26, 2004); Larry Parkinson interview (Feb. 24, 2004). Because OIPR had ultimate authority to decide what was presented to the FISA Court, it wielded extraordinary power in the FISA process.

33. The group included representatives from the FBI, OIPR, and the Criminal Division. In addition, the U.S. Attorney for the Southern District of New York was given an opportunity to comment on the procedures. The procedures that were eventually issued were agreed to by all involved in the drafting process. As a member of the Commission, Gorelick has recused herself from participation in this aspect of our work.

34. On Reno's July 1995 memo, see DOJ Inspector General report, "A Review of the FBI's Handling of Intelligence Information Related to the September 11 Attacks," July 2004, pp. 27–34; Bellows Report, p. 709, appen-

dix D tab 23. Some barriers were proposed by OIPR in the FISA applications and subsequently adopted by the FISC; others, less formally recorded, were believed by the FBI to be equally applicable.

35. On the misapplication of the procedures and the role of OIPR, see Bellows Report, pp. 721–722; Marion Bowman interview (Mar. 6, 2004); Fran Fragos Townsend meeting (Feb. 13, 2004). On the OIPR as gatekeeper, see Michael Vatis interview (Jan. 21, 2004); Larry Parkinson interview (Feb. 24, 2004). On OIPR's stated defense, see David Kris interview (May 19, 2004); Richard Scruggs interview (May 26, 2004). On OIPR's threat, see Larry Parkinson interview (Feb. 24, 2004); Thomas A. interview (Mar. 16, 2004). On the lack of information flow, see Bellows Report, pp. 722, 724–725, 729–731.

36. For Bryant's comment, see David Kris interview (Jan. 15, 2004); Bellows Report, p. 714. On barriers between agents on same squads, see Larry Parkinson interview (Feb. 24, 2004); Michael Vatis interview (Jan. 21, 2004); DOJ Inspector General interview of Thomas A., May 28, 2003. On incorrect interpretation by field agents, see Joint Inquiry report, pp. 363, 367–368; Larry Parkinson interview (Feb. 24, 2004); Michael Vatis interview (Jan. 21, 2004); DOJ Inspector General interview of Thomas A., May 28, 2003; DOJ Inspector General interview of Jane, Nov. 4, 2002.

37. For an example of the barriers between agents, see DOJ emails, Jane to Steve B., interpreting the wall to apply to non-FISA information, Aug. 29, 2001; David Kris interview (Jan. 15, 2004). On the NSA barriers, see DOJ Inspector General interview of Jane, Nov. 4, 2002. These barriers were reinforced by caveats NSA began placing on all of its Bin Ladin–related reports and later on all of its counterterrorism-related reports—whether or not the information was subject to the attorney general's order—which required approval before the report's contents could be shared with criminal investigators. Ibid. On the several reviews of the process, see Bellows Report, pp. 709, 722; DOJ Inspector General report, "The Handling of FBI Intelligence Information Related to the Justice Department's Campaign Finance Investigation," July 1999, pp. 15–16, 255, 256, 328–330, 340, 344; GAO report, "FBI Intelligence Investigations: Coordination Within Justice on Counterintelligence Criminal Matters Is Limited," July 2001, pp. 3–5.

38. In December 1999, NSA began placing caveats on all of its Bin Ladin reports that precluded sharing of any of the reports' contents with criminal prosecutors or FBI agents investigating criminal matters without first obtaining OIPR's permission. These caveats were initially created at the direction of Attorney General Reno and applied solely to reports of information gathered from three specific surveillances she had authorized. Because NSA decided it was administratively too difficult to determine whether particular reports derived from the specific surveillances authorized by the attorney general, NSA decided to place this caveat on all its terrorism-related reports. In November 2000, in response to direction from the FISA Court, NSA modified these caveats to require that consent for sharing the information with prosecutors or criminal agents be obtained from NSA's Customer Needs and Delivery Services group. See DOJ memo, Reno to Freeh, E.O. 12333 authorized surveillance of a suspected al Qaeda operative, Dec. 24, 1999; NSA email, William L. to Brian C., "dissemination of terrorism reporting," Dec. 29, 1999; NSA memo, Ann D. to others, "Reporting Guidance," Dec. 30. 1999; Intelligence report, Nov. 6, 2000. See also discussion of the history of the NSA caveats in the notes to Chapter 8.

39. See DEA report, "DEA Staffing & Budget" (figures for 1972 to 2003) (online at www.usdoj.gov/dea/agency/staffing.htm). For USMS staffing, see DOJ information provided to the Commission.

40. On the number of agents, see INS newsletter, "INS Commissioner Meissner Announces Departure," Jan. 2001; INS news release, "INS to Hire More than 800 Immigration Inspectors Nationwide," Jan. 12, 2001; Gregory Bednarz prepared statement, Oct. 9, 2003, p. 5. On the INS's main challenges, see, e.g., Eric Holder interview (Jan. 28, 2004); Jamie Gorelick interview (Jan. 13, 2004); Doris Meissner interview (Nov. 25, 2003). On the White House views, see, e.g., White House press release, "Fact Sheet on Immigration Enforcement Act," May 3, 1995. On DOJ's concerns, see INS newsletter, Remarks of Attorney General Reno on Oct. 24, 2000, Jan. 2001, pp. 16, 26. To assess congressional views, we reviewed all conference and committee reports relating to congressional action on INS budget requests for fiscal years 1995 through 2001 and all Senate and House immigration hearings from 1993 to 2001. On outdated technology, see Gus de la Vina interview (Nov. 19, 2003); Doris Meissner interview (Nov. 25, 2003).

41. On Meissner's response, see Doris Meissner interview (Nov. 25, 2003). On the lookout unit, see Tim G. interview (Oct. 1, 2002). On the number of denials of entry, see Majority Staff Report, Hearing on "Foreign Terrorists in America: Five Years after the World Trade Center" before the Subcommittee on Technology, Terrorism, and Government Information of the Senate Judiciary Committee, Feb. 24, 1998, p. 145.

42. Majority Staff Report, Hearing on "Foreign Terrorists in America: Five Years after the World Trade Center," Feb. 24, 1998, p. 152; 8 U.S.C. § 1534(e)(1)(A). On the low level of removals, see Daniel Cadman interview (Oct. 9, 2003); Rocky Concepcion interview (June 15, 2004).

43. On the 1986 plan, see INS report, Investigations Division, "Alien Terrorists and Undesirables: A Contingency Plan," May 1986; Daniel Cadman interview (Oct. 17, 2003). On the 1995 plan, see INS memo, Bramhall to Bednarz and Hurst, "Draft Counter-Terrorism Strategy Outline," Aug. 11, 1995. On the 1997 plan, see INS email, Cadman to others, "EAC briefing document," Dec. 5, 1997 (attachment titled "Counterterrorism/National Secu-

rity Strategy and Casework Oversight"). On the work of the National Security Unit and the Intelligence Unit, see Daniel Cadman interview (Oct. 17, 2003); Cliff Landesman interview (Oct. 27, 2003).

44. For number of agents on Canadian border, the Canadian situation generally, and the inspector general's recommendations, see INS report, "Northern Border Strategy," Jan. 9, 2001; DOJ Inspector General report, "Followup Review of the Border Patrol Efforts Along the Northern Border," Apr. 2000 (inspection plan). On terrorists entering the United States via Canada, see, e.g., INS record, Record of Deportable Alien, Abu Mezer, June 24, 1996. Mezer was able to stay in the United States despite apprehensions for his illegal entries along the northern border.

45. The inspectors' views are drawn from our interviews with 26 border inspectors who had contact with the 9/11 hijackers. On the incomplete INS projects, see Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104–208, 110 Stat. 3009 (1996), §§ 110, 641.

46. For the 1996 law, see 8 U.S.C. § 1357 (1996). On unauthorized immigration, see Migration Policy Institute report, "Immigration Facts: Unauthorized Immigration to the United States," Oct. 2003 (online at www.migrationpolicy.org/pubs/two_unauthorized_immigration_us.pdf). On the initiation of city noncooperation, see New York Mayor Ed Koch's 1987 order prohibiting city line workers, but not police or the Department of Corrections, from transmitting information respecting any alien to federal immigration authorities. On backlogs, see testimony of Dr. Demetrios G. Papademetriou before the Subcommittee on Immigration, Border Security and Claims of the House Judiciary Committee, Mar. 11, 2004. On the overwhelmed INS, see James Ziglar testimony, Jan. 26, 2004.

47. On the relationship between the FBI and state and local police forces, see William Bratton et al. interview (Nov. 20, 2003); David Cohen interview (Feb. 4, 2004). On the New York JTTF, see Mary Jo White, "Prosecuting Terrorism in New York," *Middle East Quarterly*, spring 2001 (online at www.meforum.org/article/25). On the pre-9/11 number of JTTFs, see Louis Freeh prepared statement for the Joint Inquiry, Oct. 8, 2002, p. 18. On the effectiveness of JTTFs, see Washington Field Office agent interview (Aug.4, 2003); Phoenix JTTF member interview (Oct. 20, 2003); Phoenix Field Office agent interview (Oct. 21, 2003); Art C. interview (Dec. 4, 2003).

48. Treasury report, "1995 Highlights of The Bureau of Alcohol, Tobacco and Firearms," undated (online at www.atf.gov/pub/gen_pub/annualrpt/1995/index.htm); ATF report, "ATF Snapshot," Jan. 30, 1998 (online at www.atf.gov/about/snap1998.htm).

49. Dale Watson interview (Feb. 4, 2004); Frank P. interview (Aug. 26, 2003); Dan C. interview (Aug. 27, 2003); Louis Freeh interview (Jan. 8. 2004).

50. See Federal Aviation Reauthorization Act, Pub. L. No. 104–264, 110 Stat. 3213 (1996), codified at 49 U.S.C. § 40101; Federal Aviation Authorization Act, H.R. Rep. No. 104-848, 104th Cong., 2d sess. (1996) (notes on conference substitute for § 401). On responsibility for protection, see 49 U.S.C. § 44903(b). On sabotage, see FAA report, Aviation Security Advisory Committee, "Domestic Security Baseline Final Report," Dec. 12, 1996; FAA report, "Civil Aviation Security: Objectives and Priorities," Mar. 18, 1999 (staff working paper). See also Jane Garvey prepared statement, May 22, 2003; *Report of the President's Commission on Aviation Security and Terrorism* (Pan Am/Lockerbie Commission), May 15, 1990, pp. 113–114; *Final Report of the White House Commission on Aviation Safety and Security* (Gore Commission), Feb. 12, 1997. While the sabotage of commercial aircraft, including Pan Am 103 in 1998, had claimed many lives, hijackings had also been deadly, including the 1985 hijacking of an Egypt Air flight in which 60 people were killed and 35 injured; the 1986 hijacking of Pan Am 73 in which 22 people were killed and 125 injured; and the 1996 hijacking of an Ethiopian Airlines flight in which 123 people were killed. See FAA report, "Civil Aviation Security Reference Handbook," May 1999. Commissioners Ben-Veniste, Gorelick, and Thompson have recused themselves from our work on aviation security matters.

51. See GAO report, "Aviation Security: Additional Actions Needed to Meet Domestic and International Challenges," Jan. 27, 1994; GAO report, "Aviation Security: Urgent Issues Need to Be Addressed," Sept. 11, 1996; GAO report, "Aviation Security: Slow Progress in Addressing Long-Standing Screener Performance Problems," Mar. 16, 2000; GAO report, "Aviation Security: Long-Standing Problems Impair Airport Screeners' Performance," June 28, 2000; testimony of Kenneth M. Mead, DOT Inspector General, Joint Hearing on Actions Needed to Improve Aviation Security before the Subcommittee on Oversight of Government Management, Restructuring and the District of Columbia of the Senate Governmental Affairs Committee, Sept. 25, 2001. On rules regulating access to security sensitive areas of commercial airports, see FAA regulations, "Airport Security," 14 C.F.R. § 107; FAA report, "Air Carrier Standard Security Program," May 2001.

52. The FAA maintained formal agreements with the CIA, FBI, Department of State, Department of Defense, and NSA to receive data of interest as outlined in the agreement. In addition, the FAA posted liaisons with the CIA, FBI, and Department of State to facilitate the flow of intelligence and threat information. See Claudio Manno interview (Oct. 1, 2003); Matt K. interview (Feb. 13, 2004). FAA civil aviation security officials reported that the agency's intelligence watch received about 200 pieces of intelligence per day. See Claudio Manno interview (Oct. 1, 2003). The analysis regarding the passage of FBI information was based on a review of the FAA's Intelligence Case Files. The FBI analyst who worked on the 1998 tasking indicated that the information was shared with the FAA liaison to the Bureau, but the liaison did not recall having seen it. Cathal Flynn interview (Sept. 9, 2003); Matt K. interview (Feb. 13, 2004).

53. Regarding intelligence reports, the Daily Intelligence Summary (DIS) prepared by the FAA's Office of Civil Aviation Intelligence was reviewed first by an assistant to Acting Deputy Administrator Belger, who would inform him of any information that she felt merited his attention. Belger in turn would determine whether the information needed to be raised with Administrator Garvey. Garvey told us that she maintained an open door policy and counted on her security staff to keep her informed on any pressing issues. Jane Garvey interview (Oct. 21, 2003); Monte Belger interview (Nov. 24, 2003); Cathal Flynn interview (Sept. 9, 2003); Shirley Miller interview (Mar. 30, 2004); Claudio Manno interview (Oct. 1, 2003). Regarding the intelligence unit, see Nicholas Grant interview (May 26, 2004); Claudio Manno interview (Oct. 1, 2003); Mike Canavan interview (Nov. 4, 2003); Alexander T. Wells, *Commercial Aviation Safety* (McGraw-Hill, 2001), p. 308.

54. On the threat to civil aviation, see Lee Longmire interview (Oct. 28, 2003). On CAPPS, also known as CAPS (Computer Assisted Profiling System), see FAA security directive, "Threat to Air Carriers," SD 97-01, Oct. 27, 1997. The profile was derived from information on the Passenger Name Record and did not include factors such as race, creed, color, or national origin. In addition to those chosen by the algorithm, a number of other passengers were selected at random, both to address concerns about discrimination and to deter terrorists from figuring out the algorithm and gaming the system. On no-fly lists, see FAA security directive, "Threat to U.S. Air Carriers," SD 95, Apr. 24, 2000. Some of the individuals on the no-fly list were in U.S. custody as of 9/11. See Kevin G. Hall, Alfonso Chardy, and Juan O. Tamayo, "Mix-Up Almost Permitted Deportation of Men Suspected of Terrorist Activities," *Miami Herald*, Sept. 19, 2001; FAA security directive, "Threat to U.S. Aircraft Operators," SD 108-1, Aug. 28, 2001. On the Gore Commission, see *Final Report of the White House Commission on Aviation Safety and Security*, Feb. 12, 1997, p. 28. On the TIPOFF database (used to screen visa applicants and persons seeking permission to enter the United States against the names of known or suspected terrorists), see DOS cable, State 182167, "Fighting Terrorism: Visas Viper Procedures," Oct. 19, 2001. Finally, on the watchlist, officials told us that large lists were difficult to implement, particularly when they weren't accompanied by numeric data such as date of birth that would enable an air carrier to distinguish the terrorist from others around the world who had his or her name. In addition, the U.S. intelligence community was required to approve the "no-fly" listing of an individual in order to protect sources and methods. Matt Kormann interview (Feb. 13, 2004).

55. On selectees, see James Padgett interview (Oct. 7, 2003). Their bags were either screened for explosives or held off their flight until they were confirmed to be aboard. See FAA security directive, "Threat to Air Carriers," SD 97-01 Oct. 27, 1997. Under the previous noncomputerized profiling system, selectees were subject to secondary screening of their carry-on belongings, and checked baggage. See FAA security directive, "Threat to Air Carriers," SD 96-05, Aug. 19, 1996.

56. FAA report, "Air Carrier Standard Security Program," May 2001; FAA regulations, "Screening of Passengers and Property," 14 C.F.R. § 108.9 (1999); Leo Boivin interview (Sept. 17, 2003).

57. "Knives with blades under 4 inches, such as Swiss Army Knives, scout knives, pocket utility knives, etc. may be allowed to enter the sterile area. However, some knives with blades under 4 inches could be considered by a reasonable person to be a 'menacing knife' and/or may be illegal under local law and should not be allowed to enter the sterile area." See FAA regulations, Air Carriers Checkpoint Operations Guide, Aug. 1999; see also Air Transport Association Regional Airlines Association report, "Checkpoint Operations Guide," Aug. 1999; Cathal Flynn interview (Sept. 9, 2003); Lee Longmire interview (Oct. 28, 2003); Leo Boivin interview (Sept. 17, 2003). A 1994 FAA assessment of the threat to civil aviation in the United States stated that "system vulnerabilities also exist with respect to hijackings . . . aircraft can be hijacked with either fake weapons or hoax explosive devices. Cabin crew or passengers can also be threatened with objects such as short blade knives, which are allowable on board aircraft." See FAA report, "The Threat to U.S. Civil Aviation in the United States," Sept. 1994.

58. On random and continuous screening, see Janet Riffe interview (Feb. 26, 2004); FAA report, "Air Carrier Standard Security Program," May 2001. On the 9/11 hijackers, see Intelligence report, interrogation of Ramzi Binalshibh, Oct. 1, 2002; FAA records, Intelligence Case File 98–96.

59. Courtney Tucker interview (June 3, 2004); Kenneth Mead prepared statement, May 22, 2003. Some air carrier officials, however, enjoyed a strong reputation for leadership in aviation security, including United Airlines' Ed Soliday. Bruce Butterworth interview (Sept. 29, 2003); Cathal Flynn interview (Sept. 9, 2003); Steven Jenkins interview (Feb. 24, 2004).

60. Mike Morse interview (Sept. 15, 2003). Regarding training, see FAA report, "Air Carrier Standard Security Program," May 2001.

61. On a hardened cockpit door making little difference, see Tim Ahern interview (Oct. 8, 2004). For regulations governing the doors, see FAA regulations, "Miscellaneous Equipment" (emergency exit), 14 C.F.R. § 121.313 (2001); FAA regulations, "Closing and locking of flight crew compartment door," 14 C.F.R. § 121.587 (2001). Also compromising cockpit security was the use of common locks (one key fit the cockpits of all Boeing aircraft) and the absence of procedures to properly manage and safeguard cockpit keys. Michael Woodward interview (Jan. 25, 2004). For the quote on reinforced cockpit doors, see Byron Okada, "Air Rage Prompts Call for Safety Measures: The FAA Is Expected to Release a Report Today," *Fort Worth Star-Telegram*, Jan. 10, 2001, p. 1.

62. James Underwood interview (Sept. 17, 2004); Mike Canavan interview (Nov. 4, 2003).

63. Jane Garvey interview (Oct. 21, 2003).

64. As defined by statute, *covert action* "means an activity or activities of the United States Government to influence political, economic, or military conditions abroad, where it is intended that the role of the United States Government will not be apparent or acknowledged publicly, but does not include—(1) activities the primary purpose of which is to acquire intelligence[.]" 50 U.S.C. § 413b(e). Executive Order 12333, titled "United States Intelligence Activities," terms covert action "special activities," defined as "activities conducted in support of national foreign policy objectives abroad which are planned and executed so that the role of the United States Government is not apparent or acknowledged publicly, and functions in support of such activities[.]" E.O. 12333 § 3.4(h). Pursuant to that order, the CIA has primary responsibility for covert action; another nonmilitary agency may conduct covert action only if the president determines that it "is more likely to achieve a particular objective." Ibid. § 1.8(e).

65. See 50 U.S.C. § 401a(4).

66. DCI report, "National Foreign Intelligence Program Historical Data FY 1985 to FY 2003," Feb. 11, 2004.

67. For quote, see Joint Inquiry testimony of Michael Hayden, June 18, 2002; see also Michael Hayden interview (Dec. 10, 2003).

68. Michael Hayden interview (Dec. 10, 2003).

69. For the CIA's early years, see John Ranelagh, *The Agency: The Rise and Decline of the CIA* (Simon & Schuster, 1986). For the Agency's more recent history, see Robert M. Gates, *From the Shadows: The Ultimate Insider's Story of Five Presidents and How They Won the Cold War* (Simon & Schuster, 1996).

70. Regarding the dissolution of the OSS and creation of the CIG, see Michael Warner, *Central Intelligence: Origin and Evolution* (Center for the Study of Intelligence, 2001); Executive Order 9621, "Termination of the Office of Strategic Services and Disposition of its Functions," Sept. 20, 1945; "Presidential Directive on Coordination of Foreign Intelligence Activities," Jan. 22, 1946 (11 Fed. Reg. 1337, 1339).

71. Regarding fears of creating a U.S. Gestapo, see Amy Zegart, *Flawed by Design: The Evolution of the CIA, JCS and NSC* (Stanford Univ. Press, 1999), p. 268, n. 6.

72. National Security Act of 1947, Pub. L. No. 80-253, § 102(d)(3), codified at 50 U.S.C. § 403-3(d)(1).

73. On plausible deniability, see, e.g., Ranelagh, *The Agency*, pp. 341–345; Evan Thomas, *The Very Best Men: Four Who Dared: The Early Years of the CIA* (Simon & Schuster, 1995), pp. 230–235.

74. James Pavitt interview (Jan. 8, 2004).

75. Steve Kappes interview (May 7, 2004); James Pavitt interview (Jan. 8, 2004).

76. Jami Miscik interview (Aug. 29, 2003).

77. Mary McCarthy, Fritz Ermarth, and Charles Allen briefing (Aug. 14, 2003).

78. See Tom Mangold, *Cold Warrior: James Jesus Angleton, the CIA's Master Spy Hunter* (Simon & Schuster, 1991).

79. Ruth David interview (June 10, 2003).

80. "According to the 2002 Integrated Postsecondary Education Data System statistics, American colleges granted only six degrees in Arabic in the survey year." Joint Inquiry report (unclassified version), p. 344.

81. Leo Hazelwood interview (Aug. 25, 2003); Duane Clarridge interview (Sept. 16, 2003).

82. Charles Allen interview (Sept. 22, 2003); Duane Clarridge interview (Sept. 16, 2003); David Carey interview (Oct. 31, 2003); Leo Hazelwood interview (Aug. 25, 2003); John Helgerson interview (Sept. 5, 2003); Robert Vickers interview (Sept. 17, 2003); CIA Inspector General report, "The Agency's Counterterrorism Effort," Oct. 1994.

83. Cofer Black testimony, Apr. 13, 2004.

84. James Pavitt interview (Jan. 8, 2004).

85. George Tenet testimony, Mar. 24, 2004; George Tenet testimony, Apr. 14, 2004.

86. Richard Armitage interview (Jan. 12, 2004).

87. See Dana Priest, *The Mission: Waging War and Keeping Peace with America's Military* (W.W. Norton, 2003).

88. Michael Sheehan interview (Dec. 16, 2003).

89. See DOS report, Bureau of Consular Affairs, "1990 Report of the Visa Office," Oct. 1991; DOS Inspector General report, "Review of the Visa-Issuing Process; Phase I: Circumstances Surrounding the Issuance of Visas to Sheik Omar Ahmed Ali Abdel Rahman," Mar. 1994; Mary Ryan interviews (Sept. 29, 2003; Oct. 9, 2003); DOS briefing materials, presentation on consular systems delivered to the Information Resources Management Program Board, Apr. 26, 1995; DOS report, "History of the Department of State During the Clinton Presidency (1993–2001)," undated (online at www.state.gov/r/pa/ho/pubs/c6059.htm); Foreign Relations Authorization Act, Pub. L. No. 103-236 (1994), § 140(a).

90. See Gordon N. Lederman, *Reorganizing the Joint Chiefs of Staff: The Goldwater-Nichols Act of 1986* (Greenwood, 1999).

91. William Cohen interview (Feb. 5, 2004); John Hamre interview (Dec. 9, 2003); Hugh Shelton interview (Dec. 5, 2004); Cohen Group meeting (Dec. 12, 2003).

92. See Monterey Institute of International Studies report, "Nunn-Lugar-Domenici Domestic Preparedness and WMD Civil Support Teams," Oct. 2001 (online at http://cns.miis.edu/research/cbw/120city.htm); National Defense Authorization Act for Fiscal Year 1997, Pub. L. No. 104-201, 110 Stat. 2422 (1996); DOD report, "Domes-

tic Preparedness Program in the Defense Against Weapons of Mass Destruction," May 1, 1997 (online at www.defenselink.mil/pubs/domestic/toc.html).

93. John Hamre interview (Dec. 9, 2003); Henry Allen Holmes interview (Nov. 10, 2003); Brian Sheridan interview (Feb. 25, 2004).

94. Charles Allen interview (Jan. 27, 2004).

95. Commission analysis of U.S. counterterrorism strategy from 1968 to 1993.

96. President Reagan, "Remarks at the Annual Convention of the American Bar Association," July 8, 1985 (online at www.reagan.utexas.edu/resource/speeches/1985/70885a.htm).

97. See *Report of the President's Special Review Board* (Tower Commission) (GPO, 1987); Theodore Draper, *A Very Thin Line: The Iran-Contra Affairs* (Simon & Schuster, 1991).

98. James Pavitt interview (Jan. 8, 2004).

99. President Clinton, "Address to the Nation on the Strike on Iraqi Intelligence Headquarters," June 26, 1993.

100. President Clinton, "Address Before a Joint Session of the Congress on the State of the Union," Jan. 24, 1995; President Clinton, "Message to the Congress Transmitting Proposed Legislation To Combat Terrorism," Feb. 9, 1995; President Clinton, "Message to the Congress Transmitting Proposed Legislation To Combat Terrorism," May 3, 1995.

101. Presidential Decision Directive/NSC-39, "U.S. Policy on Counterterrorism," June 21, 1995.

102. President Clinton, "Remarks by the President in a Congressional Meeting," July 29, 1996.

103. President Clinton, "Remarks Announcing the Second Term National Security Team and an Exchange With Reporters," Dec. 5, 1996.

104. Presidential Decision Directive/NSC-62, "Protection Against Unconventional Threats to the Homeland and Americans Overseas," May 22, 1998; Presidential Decision Directive/NSC-63, "Critical Infrastructure Protection," May 22, 1998.

105. President Clinton, "Commencement Address at the United States Naval Academy in Annapolis, Maryland," May 22, 1998.

106. See Ernest R. May, "Intelligence: Backing into the Future," *Foreign Affairs*, Summer 1992.

107. For Congress's domestic orientation, see Lee H. Hamilton, *How Congress Works and Why You Should Care* (Indiana Univ. Press, 2004), pp.18–19. For presidential focus prior to 9/11, see President Clinton, "Commencement Address at the United States Naval Academy in Annapolis, Maryland," May 22, 1998; President Clinton, "Keeping America Secure for the 21st Century," Jan. 22, 1999.

108. Hamilton, *How Congress Works*, p. 17. Our review of the classified schedules of authorization from 1995 to 2001 found that Congress generally supported the top line requests made by the administration for intelligence, never reducing it by more than 2 or 3 percent; however, the congressional oversight committees did reallocate the administration's requests significantly, sometimes increasing programs like counterterrorism that they believed were being underfunded. On the intelligence budget, see George Tenet prepared statement, Mar. 24, 2004, pp. 23–26. The DCI added that frustrations with getting additional funding requests arose mainly from the administration. See ibid.

109. Joint Committee on the Organization of Congress, Final Report, Dec. 1993; "Contract with America," 1994; Statement of Rep. Saxby Chambliss, Hearing on Intelligence Gaps in Counterterrorism before the Special Oversight Panel on Terrorism of the House Armed Services Committee, Sept. 5, 2002.

110. Hamilton, *How Congress Works*, p. 106; Richard Durbin interview (Apr. 27, 2004); Dianne Feinstein interview (June 1, 2004); Peter Hoekstra interview (June 2, 2004); Chris Shays interview (June 2, 2004); Dana Priest, "Congressional Oversight of Intelligence Criticized," *Washington Post,* Apr. 27, 2004, p. A1. For Tenet quote, see George Tenet testimony, Mar. 24, 2004.

111. For neglect of airline security, see Commission analysis of the *Congressional Daily Digest* and the *Congressional Record* using the search term "aviation security." See also FAA briefing materials, "FAA Hearing/Briefing Activity Prior to September 11, 2001," undated. For the focus on the Southwest border, see Commission analysis of the hearing records of the subcommittees on immigration of the House and Senate Judiciary committees from 1993 through 2001. On restricting the FBI's appropriations, see Robert Dies interview (Feb. 4, 2004); Stephen Colgate interview (May 19, 2004). On sanctions on Pakistan, see Strobe Talbott interview (Jan. 15, 2004); Karl Inderfurth interview (Feb. 18, 2004); Christina Rocca interview (Jan. 29, 2004). On the lack of time for oversight, see Hamilton, *How Congress Works*, p. 112; see also Center for Strategic and International Studies meeting (July 23, 2003); Jay Rockefeller meeting (Oct. 16, 2003). On the Senate Appropriations Committee, the long-serving Chair (Ted Stevens) and Ranking Minority Member (Daniel Inouye) of the Defense Appropriations Subcommittee conduct at least weekly oversight sessions of the intelligence community, always behind closed doors, the effectiveness of which we cannot judge.

112. Although some members of the House sought the creation of a Select Committee on Terrorism in the beginning of 2001, the Speaker asked the intelligence ccommittee to set up a terrorism working group instead. Under Rep. Saxby Chambliss and Rep. Jane Harman, it held several briefings before 9/11 and became a subcommittee of the Intelligence Committee immediately afterward.

113. Rep. Christopher Shays of Connecticut, chairman of the National Security Subcommittee of the Government Reform Committee, held 12 wide-ranging hearings on terrorism between 1999 and July 2001, with special attention on domestic preparedness and response to terrorist attack. Though the intelligence oversight panels' work was largely secret, the intelligence community's annual worldwide threat testimony before the Senate Select Committee on Intelligence was public testimony (typically followed by a closed session). From 1997 through 2001, the threat of terrorism rose on the priority list from third (1997–1998) to second (1999–2000) to first in 2001. See Commission analysis of congressional hearings on terrorism.

114. Congress created three commissions in 1998. One, chaired jointly by former senators Gary Hart and Warren Rudman, examined national security challenges for the twenty-first century. This commission included stark warnings about possible domestic terrorist attacks and recommended a new institution devoted to identifying and defending vulnerabilities in homeland security. See Phase III Report of the U.S. Commission on National Security/21st Century, "Road Map for National Security: Imperative for Change," Feb. 15, 2001. A second, chaired by former governor James G. Gilmore of Virginia, studied domestic preparedness to cope with attacks using weapons of mass destruction and presented five reports. See, e.g., Fifth Annual Report to the President and the Congress of the Advisory Panel to Assess Domestic Response Capabilities for Terrorism Involving Weapons of Mass Destruction, "Forging America's New Normalcy: Securing our Homeland, Preserving our Liberty," Dec. 15, 2003. The third, chaired by L. Paul Bremer, the former State Department counterterrorism coordinator, with vice chair Maurice Sonnenberg, a member of the President's Foreign Intelligence Advisory Board, focused specifically on terrorist threats and what could be done to prepare for them. See Report of the National Commission on Terrorism, "Countering the Threat of International Terrorism," June 2000.

# 4 Responses to Al Qaeda's Initial Assaults

1. On financing of Egyptian terrorists, see Intelligence report, Sudanese links to Egypt's Gama'at al-Islamiya and training of Egyptians, July 14, 1993; Intelligence report, funding by Bin Ladin of Gama'at al-Islamiya by Bin Ladin and composition of its Sudanese wing, July 22, 1993. On aid to Yemeni terrorists, see DOS memo, attached to Bin Ladin "Viper" file, Aug. 28, 1993. CTC documents describing Bin Ladin as an "extremist financier" include Intelligence report, Bin Ladin links to materials related to WMD, Mar. 20, 1997; Intelligence report, Bin Ladin's financial support to Egyptian, Algerian, and Libyan extremists, June 17, 1997.

2. Richard Clarke interview (Dec. 18. 2003). Of the 200 people at the Center, the new Bin Ladin unit had about 12. Mike interview (Dec. 11, 2003). Staffing of the UBL unit had risen to 40–50 employees by Sept. 11, 2001, out of about 390 CTC employees. Richard interview (Dec. 11, 2003); CIA response to Commission questions for the record, Jan. 21, 2004.

3. On Fadl, see, e.g., Intelligence reports on historical background of Bin Ladin's army (Nov. 26, 1996; Apr. 18, 1997); on the structure of al Qaeda and leadership composition (Dec. 18, 1996; Dec. 19, 1996; Dec. 19, 1996); on roles and responsibilities of the organizational component (Dec. 19, 1996); on objectives and direction (Jan. 8, 1997; Jan. 27, 1997); on the financial infrastructure and networks (Dec. 30, 1996; Jan. 3, 1997); on connections and collaboration with other terrorist groups and supporters (Jan 8, 1997; Jan. 31, 1997; Jan 31, 1997; Feb. 7, 1997); on activities in Somalia (Apr. 30, 1997); on Bin Ladin's efforts to acquire WMD materials (Mar. 18, 1997). On the other walk-in source, see CIA cable, Jan. 3, 1997. Material from the Nairobi cell was introduced into evidence during the testimony of FBI Special Agent Daniel Coleman, *United States v. Usama Bin Laden*, No. S(7) 98 Cr. 1023 (S.D. N.Y.), Feb. 21, 2001 (transcript pp. 1078–1088, 1096–1102).

4. Mike interview (Dec. 11, 2003).

5. Daniel Benjamin and Steven Simon, *The Age of Sacred Terror* (Random House, 2002), pp. 269–270; Mike interview (Dec. 11, 2003); Richard Clarke interview (Dec. 18, 2003); George Tenet interview (Jan. 22, 2004).

6. On Sudanese discussions with Saudi officials, see Frank interview (Mar. 18, 2004); Ron interview (Mar. 18, 2004). Timothy Carney believed the Saudis told Sudan that they did not want Bin Ladin. Timothy Carney interview (Dec. 4, 2003).

7. The CIA official who held one-on-one discussions with Erwa said that Erwa never offered to expel Bin Ladin to the United States or render him to another country. Mark interview (May 12, 2004). For Carney's instructions and the lack of a U.S. indictment, see Timothy Carney interview (Dec. 4, 2003). On the indictment issue and the supposed Sudanese offer to give up Bin Ladin, see Samuel Berger interview (Jan. 14, 2004).

In early May 1996, the CIA received intelligence that Bin Ladin might be leaving Sudan. Though this reporting was described as "very spotty," it would have been passed along to the DCI's office because of high concern about Bin Ladin at the time. But it did not lead to plans for a U.S. operation to snatch Bin Ladin, because there was no indictment against him. Ron interview (Mar. 18, 2004); Frank interview (Mar. 18, 2004). It appears, however, that if another country had been willing to imprison Bin Ladin, the CIA might have tried to work out a scenario for apprehending him. CIA cable, May 8, 1996. The Sudanese government did not notify the United States that Bin Ladin had left the country until about two days after his departure. DOS cable, Nairobi 07020, "Sudan: Foreign Minister on Developments," May 21, 1996.

480 NOTES TO CHAPTER 4

President Clinton, in a February 2002 speech to the Long Island Association, said that the United States did not accept a Sudanese offer and take Bin Ladin because there was no indictment. President Clinton speech to the Long Island Association, Feb. 15, 2002 (videotape of speech). But the President told us that he had "misspoken" and was, wrongly, recounting a number of press stories he had read. After reviewing this matter in preparation for his Commission meeting, President Clinton told us that Sudan never offered to turn Bin Ladin over to the United States. President Clinton meeting (Apr. 8, 2004). Berger told us that he saw no chance that Sudan would have handed Bin Ladin over and also noted that in 1996, the U.S. government still did not know of any al Qaeda attacks on U.S. citizens. Samuel Berger interview (Jan. 14, 2004).

Alleged Sudanese offers to cooperate on counterterrorism have been the subject of much recent controversy. After repeatedly demanding that Sudan stop supporting terrorist groups, in 1993 the U.S. government designated the country a state sponsor of terrorism. Diplomatic discussions continued but had little impact on Sudanese support for terrorism or on other issues, such as human rights. In the fall of 1995, the United States conducted a Sudan policy review and, supported by a vocal segment of Congress, the White House sought to pressure and isolate the Sudanese. Susan Rice interview (Jan. 9, 2004).

After Bin Ladin left Sudan in May 1996, some State Department officials, including Ambassador Carney, criticized the NSC's hard-line policy, which he felt provided no "carrots" for Sudanese moderates to cooperate on counterterrorism. He also faulted the NSC for not reopening the U.S. embassy in Khartoum (closed in early 1996) when security concerns there were reevaluated. State's Sudan desk officer agreed, noting that the embassy was an excellent vehicle for gathering information on terrorists. According to one State official, NSC policymakers' views were too firmly set to engage and test the Sudanese on counterterrorism. Timothy Carney interview (Dec. 4, 2003); David Shinn interview (Aug. 29, 2003); Stephen Schwartz interview (Dec. 30, 2003).

But supporters of the tough line, such as the NSC's Susan Rice, argued that any conciliatory statements from Khartoum belied its unhelpful actions. For example, she noted, though Sudan did eventually expel Bin Ladin, his al Qaeda network retained a presence in the country. Susan Rice interview (Jan. 9, 2004). In addition, the CIA's Africa Division, whose operatives had engaged the Sudanese on counterterrorism in early 1996, would conclude that "there is no indication that Sudanese involvement with terrorism has decreased in the past year." They saw the Sudanese gestures toward cooperating as "tactical retreats" aimed at deceiving Washington in hopes of having sanctions removed. CIA memo, Walter to Acting DCI, "Africa Division's Recommendations Regarding Sudan," Dec. 17, 1996. The CIA official who ran the Sudanese portfolio and met with the Sudanese on numerous occasions told us the Sudanese were not going to deliver, and the perceived moderates "were just flat-out lying." Mark interview (May 12, 2004).

In February 1997, the Sudanese sent letters to President Clinton and Secretary of State Albright, extending an invitation for a U.S. counterterrorism inspection mission to visit Sudan. The Sudanese also used private U.S. citizens to pass along offers to cooperate. Mansoor Ijaz interview (May 7, 2004); Janet McElligot interview (Oct. 20, 2003). But these offers were dismissed because the NSC viewed Sudan as all talk and little action. U.S. officials also feared that the Sudanese would exploit any positive American responses, including trips to the region by U.S. officials, for their own political purposes. See Joint Inquiry interview of David Williams, June 26, 2002. Today, Sudan is still listed as a state sponsor of terrorism.

8. Mike interview (Dec. 11, 2003). On local contacts, see Gary Schroen interview (Mar. 3, 2004). On "Jeff's" views, see CIA memo, "DCI Talking Points Regarding Operations Against Usama Bin Ladin," Aug. 25, 1997.

9. See Joint Inquiry briefing by Mike, Sept. 12, 2002. For briefings to the NSC, see NSC email, Clarke to Berger, "Threat Warning: Usama bin Ladin," Mar. 7, 1998; Mary McCarthy interview (Dec. 8, 2003); CIA memos, summary of weekly Berger/Tenet meeting, May 1, 1998.

10. CIA memos, summary of weekly Berger/Tenet meeting, May 1, 1998.

11. Karl Inderfurth interview (Feb. 18, 2004).

12. Peter Tomsen interview (Oct. 8, 2003).

13. For State Department officials' views, see Strobe Talbott interview (Jan. 15, 2004); Karl Inderfurth interview (Feb. 18, 2004).

14. On the civil war and UNOCAL, see Karl Inderfurth interview (Feb. 18, 2004); Robin Raphel interview (Dec. 8, 2003). The former UNOCAL chief for the pipeline project, Marty Miller, denied working exclusively with the Taliban and told us that his company sought to work with all Afghan factions to bring about the necessary stability to proceed with the project. Marty Miller interview (Nov. 7, 2003). UNOCAL hired, among others, Robert Oakley, the former ambassador to Pakistan. Oakley told us that he counseled the company about the internal dynamics of Afghanistan and Pakistan but never lobbied the State Department on UNOCAL's behalf. Robert Oakley interview (Sept. 7, 2003); see also "Advisory Consulting Agreement" between UNOCAL and Oakley, Oct. 1996. On giving the Taliban a chance, see Marvin Weinbaum interview (Aug. 12, 2003).

15. See Madeleine Albright, speech at Nashir Bagh refugee camp in western Pakistan, Nov. 18, 1997. For a description of the Richardson mission, see Bill Richardson interview (Dec. 15, 2003); Karl Inderfurth interview (Feb. 18, 2004).

16. Marvin Weinbaum interview (Aug. 12, 2003). See also Strobe Talbott interview (Jan. 15, 2004). For Zinni's

view, see Anthony Zinni interview (Jan. 29, 2004).

17. Gary Schroen interview (Mar. 3, 2004). For more details, see Steve Coll, *Ghost Wars: The Secret History of the CIA, Afghanistan, and bin Laden, from the Soviet Invasion to September 10, 2001* (Penguin, 2004), p. 379.

18. Coll, *Ghost Wars*, pp. 343, 391; Gary Schroen interview (Mar. 3, 2004); Joint Inquiry briefing by Mike, Sept. 12, 2002.

19. For a description of the plan, the content of briefing papers, and the Berger-Tenet meeting, see CIA memo, Jeff to Tenet, "Information Paper on Usama Bin Ladin," Feb. 12, 1998 (with attached paper for Tenet's meeting with Berger on Feb. 13, 1998, "Next Steps Against Usama Bin Ladin"). The paper also briefly noted other options the CIA could be pursuing against bin Ladin: paramilitary or sabotage attacks—possibly lethal—against Bin Ladin's facilities in Kandahar and Sudan, or even intelligence support for U.S. military strikes. On the Kansi operation, see Coll, *Ghost Wars*, p. 373.

20. NSC note, Simon to Berger, update on Feb. 24 meeting, Feb. 27, 1998.

21. Joint Inquiry briefing by Mike, Sept. 12, 2002; NSC email, Clarke to Berger, "Threat Warning: Usama Bin Ladin," Mar. 7, 1998.

22. Mike interview (Jan. 6, 2004); CIA email, Schroen to Mike, "Capture Op," May 5, 1998; CIA cable, "Comments on [Tribals'] Planning for UBL Rendition," May 6, 1998. For the modification of the plan, see CIA memo, "Tentative Timeline for the Bin Ladin Capture Operation," May 19, 1998. For details on some CIA officers' concerns, see Coll, *Ghost Wars*, pp. 393–394.

23. CIA cable, "19 May 98 Briefing for JSOC," May 27, 1998; CIA cable, "Developments in the [Tribals'] Operation at the HQs End," May 26, 1998; Joint Inquiry interview of Michael Canavan, Sept. 3, 2002.

24. CIA memos, summary of weekly Berger/Tenet meeting, May 1, 1998.

25. CIA memo, summary of Covert Action Planning Group meeting, May 18, 1998; CIA memo, "Tentative Timeline for the Bin Ladin Capture Operation," May 19, 1998. The summary of the meeting notes that the initiative was not an assassination, despite the inaccurate comments of some in the NSC.

26. Mike interviews (Dec. 11, 2003; Jan. 6, 2004); Jeff interview (Dec. 17, 2003); Mary Jo White interview (May 17, 2004).

27. CIA cable, "20–24 May 98 Full Mission Profile of the U.S. Side of the Bin Ladin Capture Operation," May 27, 1998; CIA cable, "Developments in the [Tribals'] Operation at the HQs End," May 26, 1998.

28. CIA memo, summary of weekly Berger/Tenet meeting, May 20, 1998. It is unclear if a decision had been made at this point on where to bring Bin Ladin.

29. Mike interview (Dec. 11, 2003); CIA cable, "The [Tribals] Operations," May 29, 1998.

30. Richard Clarke interview (Dec. 18, 2003), in which he also noted that Tenet did not approve of the plan. For Clarke's comments to the NSC, see CIA cable, "Info from State on Status of Political Approvals for [Tribals]," May 29, 1998. See Jeff interview (Dec. 17, 2003); James Pavitt interview (Jan. 8, 2004); George Tenet interview (Jan. 22, 2004), in which he also said he did not tell the Principals Committee his reasons for canceling the operation because there was no reason for the principals to hear details of an unsound plan. See also Samuel Berger interview (Jan. 14, 2004).

31. CIA memo, DDO to Berger, "Timing of the UBL Rendition Operation," June 15, 1998; for Schroen, see CIA cable, "Comments on [Tribals'] Planning for UBL Rendition," May 6, 1998.

32. See, e.g., Samuel Berger interview (Jan. 14, 2004).

33. On Saudi disruptions generally, see CIA report, "Additional Background on the Saudi discovery of an UBL Network in Saudi Arabia," undated (appears to be May 1998). On the DCI's visits to Saudi Arabia, see Intelligence reports made available to the Commission.

34. See Intelligence reports made available to the Commission.

35. Coll, *Ghost Wars*, pp. 400–402.

36. CIA note, Pillar to Wentworth/Ramanujam, summary of Aug. 5, 1998, CSG meeting on Bin Ladin, Aug. 6, 1998.

37. See, e.g., CIA briefing materials, "Bombings in Nairobi and Dar es Salaam—An Update," Aug. 14, 1998.

38. DOD memo, "Chronology of Planning," Dec. 14, 1998.

39. Richard Clarke interview (Dec. 18, 2003).

40. NSC email, Clarke to Berger, Aug. 8, 1998; Samuel Berger interview (Jan. 14, 2004); CIA memo, "Khowst and the Meeting of Islamic Extremist Leaders on 20 Aug.," Aug. 17, 1998.

41. NSC notes, checklist re military strikes, Aug. 14, 1998 (author appears to be Clarke). On the military plans, see DOD memo, "Chronology of Planning," Dec. 14, 1998.

42. President Clinton meeting (Apr. 8, 2004); Samuel Berger interview (Jan. 14, 2004).

43. NSC emails, Simon to Kerrick, Aug. 5, 1998. For the report of Bin Ladin's comment, see, e.g., NSC email, Clarke to Berger, July 15, 1998. EMPTA stands for O-ethyl methylphosphonothioic acid.

44. NSC memo, McCarthy to Berger, re Shifa, Aug. 11, 1998; Samuel Berger interview (Jan. 14, 2004).

45. For a timeline of the decisionmaking events, see NSC memo to Steinberg et al., Aug. 17, 1999. The list of concurrences is drawn from talking points prepared for Berger's use with the main four leaders of the House and

Senate; the list explicitly mentions the Attorney General. NSC email, Clarke to Berger, Aug. 19, 1998. Reno told us she did not mention her concerns to the President but discussed them with Berger, Tenet, White House Counsel Charles Ruff, and DOJ staff. Janet Reno interview (Dec. 16, 2003).

46. NSC email, Clarke to Kerrick, "Timeline," Aug. 19, 1998; Samuel Berger interview (Jan. 14, 2004). We did not find documentation on the after-action review mentioned by Berger. On Vice Chairman Joseph Ralston's mission in Pakistan, see William Cohen interview (Feb. 5, 2004). For speculation on tipping off the Taliban, see, e.g., Richard Clarke interview (Dec. 18, 2003).

47. NSC email, Clarke to Kerrick, "Timeline," Aug. 19, 1998.

48. For initial support by Gingrich and Lott, see, e.g., Steven Thomma and Richard Parker, "U.S. Strikes Afghan, Sudan Sites, Retaliating for Embassy Attacks," *Philadelphia Inquirer*, Aug. 21, 1998, p. A1. For a reaction to the later criticism by Gingrich's office, see NSC email, Simon to Berger, Sept. 10, 1998.

49. Editorial, "Punish and Be Damned," *Economist*, Aug. 29, 1998, p. 16. For a summary of skeptical public reaction, see Benjamin and Simon, *Age of Sacred Terror,* pp. 354–363.

50. See NSC memo, McCarthy and Clarke to Berger, Apr. 17, 2000, reporting that on balance, they think the CIA claim was valid. See also President Clinton meeting (Apr. 8, 2004); Vice President Gore meeting (Apr. 9, 2004); Samuel Berger interview (Jan. 14, 2004); George Tenet interview (Jan. 22, 2004); Richard Clarke interview (Dec. 19, 2003).

51. Samuel Berger interview (Jan. 22, 2004). President Clinton told us that he had directed his national security team to focus exclusively on responding to the embassy bombings. President Clinton meeting (Apr. 8, 2004). See also William Cohen testimony, Mar. 23, 2004. When "wag the dog" allegations were again raised during the December 1998 Desert Fox campaign over Iraq, Defense Secretary Cohen, formerly a Republican senator, told members of Congress that he would have resigned if he believed the President was using the military for any purpose other than national security. William Cohen interview (Feb. 5, 2004).

52. Samuel Berger interview (Jan. 22, 2004).

53. CIA analytic report, "Foreign Terrorist Threat in the U.S.: Revisiting our 1995 Estimate," Apr. 1997.

54. Daniel Benjamin interview (Dec. 4, 2003).

55. On the Balkan crises, see Tim Judah, *The Serbs: History, Myth and the Destruction of Yugoslavia* (Yale Univ. Press, 2000).

56. On Clarke's obsession with terrorism and Bin Ladin, see Richard Clarke interview (Feb. 3, 2004); Richard A. Clarke, *Against All Enemies: Inside America's War on Terror* (Free Press, 2004), p. 234. On the CSG and the Small Group, see Samuel Berger interview (Jan. 11, 2004).

57. NSC memo, "Political Military Plan DELENDA," Sept. 1998 (attached to NSC memo, Clarke to Rice, Jan. 25, 2001).

58. Ibid. See also NSC memo, Clarke to Berger, Sept. 7, 1998.

59. Handwritten note from Steinberg on NSC memo, Clarke to Berger, Apr. 14, 2000. For the views of Small Group members, see William Cohen interview (Feb. 5, 2004); Hugh Shelton interview (Feb. 5, 2004); President Clinton meeting (Apr. 8, 2004); Samuel Berger interview (Jan. 14, 2004); Madeleine Albright interview (Jan. 7, 2004); James Steinberg interview (Dec. 5, 2003).

60. Richard Clarke interview (Jan. 12, 2004); DOD memo, Slocombe to Cohen, Aug. 27, 1998.

61. DOD memo, "Towards a More Aggressive Counterterrorism Posture," undated, pp. 1, 7. The principal author of this paper was Thomas Kuster, a career civil servant and former special forces officer. He told us that this paper was drafted in September 1998. On this episode, see Thomas Kuster interviews (Dec. 9, 2003; Mar. 5, 2004); Allen Holmes interview (Mar. 10, 2004); Jan Lodal interview (Mar. 5, 2004).

62. DOS cable, Islamabad 06863, "Afghanistan: Demarche to Taliban on New Bin Ladin Threat," Sept. 14, 1998. See also NSC memo, Clarke to principals, "Possible New Attacks on US by UBL Network," Sept. 12, 1998, which suggested language for the demarche, including a warning that future attacks would bring "severe consequences." NSC email, Clarke to Berger, Sept. 19, 1998, indicates that the State Department used both its embassy in Islamabad and a direct call to Mullah Omar's office to deliver the warning.

63. DOS memo, "Mullah Omar's 8/22 Contact with State Department," Aug. 22, 1998.

64. DOS cable, Islamabad 007665, "High-Level Taliban Official Gives the Standard Line on Bin Ladin with a Couple of Nuances," Oct. 12, 1998.

65. NSC memo, Sept. 24, 1998; Coll, *Ghost Wars*, p. 414.

66. The CIA in particular pressed the Saudis hard on intelligence sharing. DCI Tenet met with Crown Prince Abdullah, Ambassador Bandar, the minister of defense and aviation, and other senior officials repeatedly and pressed them on counterterrorism. See, e.g., CIA memo, Tenet to Berger, Tenet's meeting with Crown Prince Abdullah in Jeddah, June 7, 1998. As late as July 3, 2001, the DCI was pressing Bandar, conveying the urgent need for information. CIA cable, DCI meeting with Bandar, July 3, 2001.

67. See, e.g., Mike interview (Dec. 11, 2003). The Saudis, however, were reluctant to provide details of incomplete investigations and highly sensitive to any information related to Saudi nationals, particularly those in the Kingdom. See CIA memo, Saudi CT Cooperation, June 18, 1998.

68. CIA talking points, Vice President's meeting with Crown Prince Abdullah, Sept. 24, 1998; NSC memo,

Simon to Berger, "Talking Points for Lott-Gingrich Meeting," Sept. 24, 1998.

69. NSC memo, Wechsler, summary of conclusions of Nov. 16, 1998, meeting of Working Group on UBL's Finances.

70. Rick Newcomb interview (Feb. 4, 2004); Treasury memo, Office of Foreign Asset Control to DOS, "Draft Cable on Meeting with Two of UBL's Brothers," May 19, 2000; DOS cable, State 035243, "January 2000 Meeting Regarding UBL Finances," Feb. 27, 2000; Frank G. interview (Mar. 2, 2004). The U.S. government team learned that the Bin Ladin family sold UBL's share of the inheritance and, at the direction of the Saudi government, placed the money into a specified account then frozen by the Saudi government in 1994.

71. NSC memo, Clarke to Berger, Roadmap, Nov. 3, 1998. According to Clarke, Tenet's deputy, John Gordon, agreed that there was no senior CIA manager to answer these questions and promised to fix that.

72. DOS memo, McKune to Albright, "State Sponsorship of Terrorism: Pakistan," Feb. 1998. For the rejection of the proposed designation, see handwritten notes on the McKune memo.

73. Madeleine Albright interview (Jan. 7, 2004).

74. NSC memo, Simon to NSC officials, Oct. 6, 1998. Links between Pakistan's military intelligence service and Harakat ul Ansar trainees at Bin Ladin camps near Khowst were also discussed in DOS memo, Inderfurth to Talbott, "Pakistani Links to Kashmiri Militants," Aug. 23, 1998.

75. William Milam interview (Dec. 29, 2003).

76. By the fall of 1999, the Glenn, Pressler, and Symington amendments prohibited most economic and military assistance to Pakistan. Clinton administration officials told us that these sanctions made it impossible to offer "carrots" to Pakistan, and that before 9/11, waiving sanctions was not feasible because of the Musharraf coup, nonproliferation concerns, and Congress's pro-India orientation. Karl Inderfurth interview (Feb. 18, 2004); Strobe Talbott interview (Feb. 8, 2004).

77. Strobe Talbott interview (Feb. 8, 2004). Berger agreed with Talbott that using other sticks, such as blocking loans from international financial institutions, would have risked a collapse of the Pakistani government and the rise of Islamists to power in a nuclear-armed country. Samuel Berger interview (Jan. 14, 2004).

78. DOS memo, Pickering to Albright, "Berger meeting on UBL," Nov. 3, 1998.

79. White House reports made available to the Commission. President Clinton met with Prime Minister Sharif on December 2, 1999, and called him on December 18, 1999.

80. NSC email, Clarke to Berger, Dec. 9, 1998. The event described in the intelligence report was said to have occurred on November 17, 1998. Intelligence officials now tell us that there are some doubts about the accuracy of the report.

81. Michael Sheehan interview (Dec. 16, 2003). For Sheehan's background, see Madeleine Albright, with Bill Woodward, *Madam Secretary* (Miramax, 2003), pp. 369–370. For one of Sheehan's warnings, see DOS cable, Abu Dhabi 002212, "Messages for the Taliban," Apr. 9, 1999.

82. Michael Sheehan interviews (Dec. 16, 2003; March 2004). For Albright's views, see Madeleine Albright interview (Jan. 7, 2004). NSC memo, Principals' Decision Paper, Mar. 8, 1999. In May 1999, Albright approved a State Department diplomatic strategy calling for increased high-level pressure on the Taliban and the three countries that recognized it—and for unilateral sanctions if this failed. DOS memo, Inderfurth, Indyk, and Sheehan to Albright, "A New Bin Ladin Strategy," May 15, 1999.

83. NSC email, Riedel to Berger and Clarke, June 8, 1999.

84. See Karl Inderfurth interview (Feb. 18, 2004); DOS memo, Inderfurth to Albright, May 6, 1999; Michael Sheehan interview (Dec. 16, 2003). Although Sheehan told us he was initially skeptical about supporting the Northern Alliance, he eventually came around in the fall of 2000.

85. For aid to the exile groups, see Karl Inderfurth interview (Feb. 18, 2004); Peter Tomsen interview (July 14, 2004). The aid was later cut because of alleged accounting deficiencies. For the diplomat's views, see Christina Rocca interview (Jan. 29, 2004). But Peter Tomsen, the State Department's special envoy to the Afghan resistance in the late 1980s, believed that neither administration did enough to assemble an anti-Taliban ruling coalition inside and outside Afghanistan. Peter Tomsen interview (Oct. 8, 2003); see also letter from Peter Tomsen to the Commission, June 30, 2004.

86. NSC memo, Clarke to Berger, Roadmap, May 18, 1999.

87. DOS memo, Inderfurth to Albright, May 6, 1999; DOS memo, Oakley to Pickering, "Designating the Taliban a FTO," Apr. 22, 1999; Executive Order 13129, July 4, 1999. Since 1979, the secretary of state has had the authority to name "state sponsors of terrorism," subjecting such countries to significant economic sanctions. Being designated a "foreign terrorist organization" also brings sanctions and stigmatizes a regime. While the U.S. government did not use either designation against the Taliban, the sanctions under this executive order mimicked the sanctions that would have been implemented under them.

88. UN Security Council Resolution (UNSCR) 1267, Oct. 15, 1999. UNSCR 1267 demanded that the Taliban render Bin Ladin to justice within 30 days; upon noncompliance, UN member states were called on to restrict takeoff and landing rights of Taliban-owned aircraft. The sanctions also required member states to freeze Taliban funds and financial resources. But Taliban "charter flights" continued to fly between Afghanistan and the UAE. Judy Pasternak and Stephen Braun, "Emirates Looked Other Way While Al Qaeda Funds Flowed," *Los Angeles*

*Times,* Jan. 20, 2002, p. A1. Enforcing the financial restrictions also proved a challenge—especially in the Middle East. Anthony Wayne interview (Jan. 14, 2004); Frank G. interview (Mar. 2, 2004); DOS report, "Usama Bin Ladin Intelligence Update," Nov. 19, 1999.

89. NSC email, Clarke to Berger, Oct. 30, 1999.

90. Ibid.; NSC memo, Benjamin to CSG, Nov. 12, 1999. Earlier, Clarke had worried that the expulsion of Bin Ladin might mean he would move to Somalia or Libya, where he might be even harder to target. NSC email, Clarke to Berger, Oct. 8, 1998.

91. See Intelligence report, relations between al Qaeda and the Taliban, Feb. 20, 2002.

92. Intelligence report, March 2000.

93. UNSCR 1333, Dec. 19, 2000.

94. Edmund Hull interview (Oct. 18, 2003).

95. Ambassador Milam characterized UNSCR 1267 and UNSCR 1333 as "punchless." DOS cable, Islamabad 000656, "Options for dealing with Afghan terrorism problem," Feb. 6, 2001. But Ambassador Sheehan indicated that even if UNSCR 1333 failed to stop the arms flow from Pakistan to the Taliban, it had enormous symbolic importance. He also noted that UNSCR 1333 must have stigmatized the Taliban because they "went ballistic over the sanctions." Sheehan added that UNSCR 1333 made Saudi Arabia and the UAE "very nervous" about their relationships with the Taliban. Michael Sheehan interview (Dec. 16, 2003).

96. White House cable to U.S. Embassy, Islamabad, message to Prime Minister Sharif, June 16, 1999; Madeleine Albright prepared statement, Mar. 24, 2004.

97. White House cable to U.S. Embassy, Islamabad, message to Prime Minister Sharif, June 16, 1999; Samuel Berger interview (Jan. 14, 2004); President Clinton meeting (Apr. 8, 2004); NSC memo, Clarke and McCarthy to Berger, Aug. 2, 1999.

98. President Clinton meeting (Apr. 8, 2004); DOS memo, Sheehan to Albright, "S/CT Update on Critical Issues," July 9, 1999.

99. Samuel Berger interview (Jan. 14, 2004); President Clinton meeting (Apr. 8, 2004).

100. Thomas Pickering interview (Dec. 22, 2003).

101. See Executive Order 13099, Aug. 20, 1998.

102. CIA talking points, information on Bin Ladin for the DCI's Sept. 2, 1998, briefing to the Senate Select Committee on Intelligence, Sept. 2, 1998.

103. For the Tirana raid and resulting operations, see Benjamin and Simon, *Age of Sacred Terror,* pp. 261, 264; Clarke, *Against All Enemies,* p. 183; CIA talking points, "CIA Operation Results in Capture of Two Bin Ladin Operatives," July 7, 1998; CIA memo, Jeff to Tenet, "Biweekly Developments in CT Policy," July 15, 1998. For other operations, see NSC memo, Benjamin to Berger, Oct. 9, 1998. For the arrest of Abu Hajer, see CIA report, "Apprehension of Senior UBL Lieutenant in Germany," Sept. 22, 1998; NSC memo, Benjamin to Berger, Oct. 9, 1998; NSC email, Clarke to Berger, Sept. 17, 1998. For an overview of the CIA's efforts to disrupt al Qaeda, see Joint Inquiry testimony of George Tenet, Oct. 17, 2002. For Clarke's comment to Berger, see NSC email, Clarke to Berger, Sept. 25, 1998.

104. For ambush attempts, see Joint Inquiry report (classified version), pp. 312–313; CIA memo, "Status of the Bin Ladin Capture Operation," Sept. 30, 1998 (part of materials for Small Group meeting). For CIA officials' doubts, see James Pavitt interview (Jan. 8, 2004); Jeff interview (Dec. 17, 2003). On the quality of the tribals' reporting, see Charles Allen interview (Jan. 27, 2004). The tribals' extensive reporting on Bin Ladin's location is reflected in near daily UBL Situation Reports prepared for the DCI from December 1998 to January 2001.

105. See Martin Sieff, "Terrorist Is Driven by Hatred for U.S., Israel," *Washington Times,* Aug. 21, 1998, p. 1. Regarding the leak, see Mary C. interview (Oct. 25, 2003); Richard Taylor interview (Dec. 10, 2003); Don Kerr interview (Sept. 9, 2003).

106. NSC memo, Clarke to Berger, Roadmap, Nov. 3, 1998; NSC talking points, Nov. 3, 1998. The quoted sentence is in boldface.

107. NSC memo, summary of conclusions of Oct. 26, 1998, CSG Meeting, Oct. 28, 1998; NSC notes, CSG Agenda: "Bin Ladin Penetration of the United States," Oct. 26, 1998. For the threat against Washington, see NSC memo, Clarke to Berger, Weekly Report, July 3, 1998; NSC email, Clarke to various NSC staff, Sept. 7, 1998; NSC memo, Clarke to Berger, Roadmap, Nov. 3, 1998.

108. NSC memo, summary of conclusions of Oct. 26, 1998, CSG meeting, Oct. 28, 1998.

109. Indictment, *United States v. Usama Bin Laden,* No. 98 Cr. (S.D. N.Y. unsealed Nov. 4, 1998), p. 3. For the reports concerning Derunta, see NSC memo, Clarke to Berger, Roadmap, Nov. 3, 1998.

110. NSC email, Clarke to Berger, Nov. 4, 1998. Evidence on Iraqi ties to al Qaeda is summarized in chapter 2.

111. Patrick Fitzgerald testimony, June 16, 2004.

112. The PDB was a summary of Intelligence report, planning by UBL to hijack U.S. airplane, Dec. 4, 1998. For the immediate responses, see NSC memo, summary of conclusions of Dec. 4, 1998, CSG meeting; FAA security directive, "Threat to Air Carriers," SD 108-98, Dec. 8, 1998. We requested declassification of this document; the declassified document was delivered on July 13, 2004.

113. On further information, see Intelligence report, possible arrest of persons involved in hijacking plan, Dec. 18, 1998; Intelligence report, timeframe for completion of hijacking operation, Dec. 24, 1998; Intelligence report, claim that Bin Ladin postponed hijacking, Jan. 8, 1999; CIA analytic report, "Reporting on Al-Qaida plans to Use Aircraft as Terrorist Weapons," Aug. 26, 2002. After 9/11, the U.S. government checked again with the foreign government to determine if there could be any connection between the attacks and these 1998–1999 reports. The foreign government had no intelligence of such links, but judged that the 1998 plan could have influenced planning for the 9/11 operation. Ibid.

On the FBI followup in 1998–1999, see FBI memo, Jack S. to FAA ACI, "FBI Investigative Efforts," Jan. 27, 1999; FAA records, information in FAA Intelligence Case File 98-0199B. A Saudi who had just completed pilot training, boarding a flight to return to Saudi Arabia, had been arrested at JFK Airport in late November 1998. He had been carrying an inert hand grenade, which was detected by a checkpoint screener. The terminal was evacuated, and police found miscellaneous gun parts, pistol ammunition, and military paraphernalia in the man's checked bags. FAA record, "Security Summary NY-99-007," undated. The man was released after a few days in jail and, assisted by the local Saudi consulate, had returned to Saudi Arabia. The new threat information caused the FBI and the CIA to look again at this case. FBI agents found that the man's statements about his flight training were true and that his firearms were legally registered. The Saudi investigators reported that the Saudi had enjoyed shooting at a gun club in Texas, where he had completed his flight training for a commercial pilot's license. The Saudis further indicated that the man had no apparent political motive, and the results of a security investigation in the Kingdom were negative. FAA memo, Matthew K. to Jack S. and Tom K., Saudi national, Jan. 17, 1999; FBI memo, Jack S. to FAA ACI, "FBI Investigative Efforts," Jan. 27, 1999; Intelligence report (to FAA), Saudi information, Apr. 13, 1999. For the expiration of the FAA security directive, see FAA security directive, SD 108-95; FAA record, "SD/EA Status: 108 Security Directives," May 20, 2002.

114. NSC notes, Clarke briefing notes for Berger for Small Group, Dec. 17, 1998; CIA memo, "Bin Ladin Ready to Attack," Dec. 18, 1998.

115. NSC notes, Clarke briefing notes for Berger for Small Group, Dec. 17, 1998; NSC memo, Benjamin to Berger, Dec. 18, 1998; DOD memo, "UBL Campaign: Talking Points for Qandahar Attack," Jan. 11, 1999; Hugh Shelton interview (Feb. 5, 2004).

116. NSC memo, Benjamin to Berger, Dec. 18, 1998; DOD order, Execute Order (EXORD), Dec. 18, 1998.

117. NSC memo, Benjamin to Berger, Dec. 18, 1998; Mike interview (Jan. 6, 2004); CIA emails, Mike to Schroen, "Urgent re UBL," and Schroen's response, Dec. 20, 1998.

118. John Maher III interview (Apr. 4, 2004). Maher said he found General Zinni's figures to be "shockingly high." On the principals' decision against recommending an attack, see NSC memo, Clarke to Berger, Jan. 12, 1999. See also George Tenet interview (Jan. 22, 2004); Mike interview (Feb. 6, 2004).

119. CIA email, Mike to Schroen, "Your Note," Dec. 21, 1998; CIA email, Schroen to Mike, "Re Urgent re UBL," Dec. 20, 1998.

120. John Maher III interview (Apr. 22, 2004).

121. CIA report, "Further Options Available Against UBL," Nov. 18, 1998; CIA talking points, "Options for Attacking the Usama Bin Ladin Problem," Nov. 24, 1998. On the MON, see Randy Moss interview (Feb. 6, 2004); James Baker interview (Feb. 4, 2004).

122. NSC note, Dec. 20, 1998. There is no indication as to who wrote this note or to whom it was directed. It was cleared with Berger, Reno, Assistant Attorney General Randy Moss, and CTC's "Jeff," and briefed in substance to Leon Fuerth, national security adviser to Vice President Gore, and to Deputy DCI Gordon. See also attached CIA memo, Gordon to Berger, Dec. 21, 1998; NSC memo, Berger to President Clinton, Dec. 24, 1998.

123. NSC memo, Berger to President Clinton, Dec. 24, 1998; Randy Moss interview (Feb. 6, 2004); James Baker interview (Feb. 4, 2004). Both Moss and Baker told us they concluded that killing Bin Ladin did not violate the assassination ban contained in Executive Order 12333.

124. NSC memo, Berger to President Clinton, Dec. 24, 1998; Janet Reno interview (Dec. 16, 2003). See also Randy Moss interview (Feb. 6, 2004). Tenent told us he does not recall this episode.

125. CIA cable, message from the DCI, Dec. 26, 1998.

126. CIA cable, instructions passed to tribals and response, Dec. 27, 1998.

127. CIA cable, comments on tribals' response, Dec. 27, 1998. "Mike" noted that the tribals' reaction had "attracted a good deal of attention" back at CIA headquarters. CIA cable, comments from Schroen, Dec. 28, 1998. Schroen commented that the tribals' response was an effort to appear statesmanlike and take the moral high ground.

128. See President Clinton meeting (Apr. 8, 2004); Samuel Berger interview (Jan. 1, 2004); Richard Clarke interview (Jan. 12, 2004). For a CIA senior intelligence manager, operator, and lawyer's view, see George Tenet interview (Jan. 22, 2004); Gary Schroen interview (Jan. 6, 2004); Doug B. interview (Nov. 17, 2003); Mike interview (Jan. 6, 2004).

129. James Baker interview (Feb. 4, 2004); President Clinton meeting (Apr. 8, 2004).

130. NSC memo, McCarthy to CIA, Dec. 1999.

131. NSC memo, Clarke to Berger, Jan. 12, 1999.

132. NSC email, Ward to Clarke and others, Jan. 5, 1999.

133. NSC memo, Clarke to Berger, Jan. 12, 1999.

134. NSC email, Clarke to Kerrick, Feb. 10, 1999; Charles Allen interview (Jan. 27, 2004).

135. NSC email, Clarke to Berger, Feb. 11, 1999. The email in fact misspells "boogie" as "boggie."

136. NSC email, Riedel to NSC front office, Feb. 16, 1999. The email does not provide Riedel's source. For Berger's authorization, see NSC notes, TNT note, Feb. 12, 1999.

137. DOD memo, "Chronology of Planning," Dec. 14, 1998.

138. DOS cable, Washington 157093, "Aug. 21 telephone conversation between POTUS and Prime Minister Sharif," Aug. 26, 1998. Sharif was cordial but disagreed with the U.S. decision to strike.

139. Anthony Zinni interview (Jan. 29, 2004).

140. Ibid.

141. DOD memo, Headquarters SOC, "Planning Directive for Infinite Resolve," Dec. 23, 1998. On basing options, see DOD memo, "Summary of Conclusions: AC-130 Deployment Decision Paper," Jan. 12, 1999.

142. NSC memo, Clarke to Berger and Steinberg, Roadmap for Feb. 2, 1999, Small Group meeting, undated; John Maher III interview (Apr. 22, 2004); Anthony Zinni interview (Jan. 29, 2004); Peter Schoomaker interview (Feb. 19, 2004).

143. Peter Schoomaker interview (Feb. 19, 2004); William Boykin interview (Nov. 7, 2003).

144. Hugh Shelton interview (Feb. 5, 2004).

145. President Clinton meeting (Apr. 8, 2004); William Cohen interview (Feb. 5, 2004).

146. Hugh Shelton interview (Feb. 5, 2004); William Boykin interview (Nov. 7, 2003).

147. General Zinni reminded us that in addition to severing military-to-military relations with Pakistan after the 1998 nuclear test, the United States had not shipped to Pakistan the F-16s Pakistan had bought prior to the test. Instead, the United States kept the money Pakistan paid for the F-16s to fund storage of the aircraft. Meanwhile, Pakistani pilots were crashing and dying. "Guess how they [felt] about the United States of America," Zinni said. Nevertheless, Zinni told us that Musharraf was someone who would actually work with the United States if he was given the chance to do so. Anthony Zinni interview (Jan. 29, 2004).

148. William Boykin interview (Nov. 7, 2003).

149. Richard Clarke interview (Jan. 12, 2004).

150. William Cohen testimony (Mar. 23, 2004).

151. CIA report, "UBL Situation Report," Feb. 2, 1999. Public sources include Coll, *Ghost Wars*, pp. 447–449; Benjamin and Simon, *Age of Sacred Terror*, p. 281.

152. CIA cable, "Update on Location of an Activity at Sheikh Ali's Camps," Feb. 7, 1999.

153. DOD order, MOD 001 to CJCS warning order, Feb. 8, 1999.

154. CIA reports, "UBL Situation Report," Feb. 6–10, 1999.

155. CIA cable, "Support for Military Contingency Planning," Feb. 10, 1999.

156. NSC email, Clarke to Kerrick, Feb. 10, 1999.

157. CIA talking points, "CIA Operations Against UBL," Feb. 10, 1999.

158. CIA reports, "UBL Situation Reports," Feb. 11–12, 1999.

159. John Maher III interview (Apr. 22, 2004); Richard Clarke interview (Jan. 12, 2004); Gary Schroen interview (Mar. 3, 2004); Mike interview (Jan. 6, 2004).

160. Mike briefing (Mar. 11, 2004); John Maher III interview (Apr. 22, 2004).

161. NSC memo, Clarke, secure teleconference between UAE Chief of Staff Muhammad bin Zayid and Clarke, Mar. 7, 1999.

162. Mike interview (Jan. 6, 2004). Maher told us he thinks it "almost impossible" that the CIA cleared Clarke's call. John Maher III interview (Apr. 22, 2004).

163. Days before overhead imagery confirmed the location of the hunting camp, Clarke had returned from a visit to the UAE, where he had been working on counterterrorism cooperation and following up on a May 1998 UAE agreement to buy F-16 aircraft from the United States. His visit included one-on-one meetings with Army Chief of Staff bin Zayid, as well as talks with Sheikh Muhammad bin Rashid, the ruler of Dubai. Both agreed to try to work with the United States in their efforts against Bin Ladin. NSC memo, Clarke to Berger, Trip Report, Feb. 8, 1999; Theodore Kattouf interview (Apr. 21, 2004). On February 10, as the United States considered striking the camp, Clarke reported that during his visit bin Zayid had vehemently denied rumors that high-level UAE officials were in Afghanistan. NSC email, Clarke to Kerrick, UBL update, Feb. 10, 1999. Subsequent reporting, however, suggested that high-level UAE officials had indeed been at the desert camp. CIA memo, "Recent High Level UAE Visits to Afghanistan," Feb. 19, 1999. General Shelton also told us that his UAE counterpart said he had been hunting at a desert camp in Afghanistan at about this time. Hugh Shelton interview (Feb. 5, 2004).

164. Mike briefing (Mar. 3, 2004). Talking points for the DCI to use at a late March Small Group meeting note that concurrently with the UAE being "tipped off" to the CIA's knowledge of the camp, one of the tribal network's major subsources (within Bin Ladin's Taliban security detail) was dispatched to the north, further handicapping reporting efforts. CIA talking points, "Locating Bin Ladin," Mar. 29, 1999.

165. Theodore Kattouf interview (Apr. 21, 2004). Kattouf was the U.S. ambassador to the UAE from 1999 to 2001. He indicated that high-level UAE officials would agree to restrict Afghan flights but told him that the government had a difficult time enforcing this. For communications with the UAE, see White House letter, President Clinton to bin Zayid, July 23, 1999; DOS memo, Sheehan to Albright, "Signs of Progress on our UBL strategy," Sept. 12, 1999.

166. DOS memo, Indyk and Sheehan to Albright, "UAE Gives Ultimatum to Taliban on Bin Laden," July 16, 1999, and attached transcript of conversation between Hamdan bin Zayid and Mullah Mutawakkil, "Informal Translation of UAE Note," July 14, 1999; DOS cable, Abu Dhabi 04644, "Taliban Refuse to Expel Bin Laden Despite UAEG Ultimatum: Need to Stiffen UAE Resolve to Take the Necessary Next Steps," July 19, 1999.

167. DOS memo, Indyk and Sheehan to Albright, "UAE Gives Ultimatum to Taliban on Bin Laden," July 16, 1999.

168. Jeff interview (Dec. 17, 2003). Schroen, however, told us that the tribals' reporting was 50–60 percent accurate. Gary Schroen interview (Mar. 3, 2004).

169. For discussion of the Taliban generally, see Ahmed Rashid, *Taliban: Militant Islam, Oil and Fundamentalism in Central Asia* (Yale Univ. Press, 2000).

170. Ibid.; Benjamin and Simon, *Age of Sacred Terror*, pp. 338–399; George Tenet interview (Jan. 22, 2004).

171. George Tenet interview (Jan. 22, 2004).

172. Richard interview (Dec. 12, 2003); Gary Schroen interview (Mar. 3, 2004).

173. John Maher III interview (Apr. 22, 2004). For an account of the reporting from this period written by Mike, see CIA memo, Jeff to Tenet, "Tracking Usama Bin Ladin, 14–20 May 1999," May 21, 1999. Mike's account was also used to prepare the DCI for a May 25, 1999, Principals Committee meeting. CIA briefing materials, "Background Information: Evaluating the Quality of Intelligence on Bin Ladin (UBL) in Qandahar, 13–20 May, 1999," undated (probably May 25, 1999).

174. CIA email, Mike to Schroen, "Re: Your Note," May 17, 1999.

175. John Maher III interview (Apr. 22, 2004).

176. George Tenet interview (Jan. 22, 2004); John Gordon interview (May 13, 2004).

177. Samuel Berger interview (Jan. 14, 2004).

178. The May 1999 intelligence on Bin Ladin's location in Kandahar came as criticism of the CIA over the recent bombing of the Chinese embassy in Belgrade was at its peak. The DCI later testified that this bombing was the result of a CIA mistake. Testimony of George Tenet before the House Permanent Select Committee on Intelligence, July 22, 1999. On Bin Ladin's whereabouts during the December 1998 episode, see John Maher III interview (Apr. 22, 2004).

179. Cruise missiles were readied for another possible strike in early July 1999. But none of the officials we have interviewed recalled that an opportunity arose at that time justifying the consideration of a strike. See, e.g., John Maher III interview (Apr. 22, 2004).

180. Hugh Shelton interview (Feb. 5, 2004); DOD briefing materials, UBL JCS Focused Campaign, undated.

181. NSC memo, Benjamin to Berger and Steinberg, Apr. 29, 1999; NSC email, Clarke to Berger, May 26, 1999.

182. NSC memo, Clarke to Berger, June 24, 1999. For Clarke's request to Berger to convene the Small Group, see NSC memo, Clarke to Berger, Analysis/Options re UBL, Jun. 13, 1999. See also NSC email, Storey to Berger and Clarke, June 24, 1999.

183. Berger notes on NSC memo, Clarke to Berger, June 24, 1999.

184. NSC memo, Clarke to Berger, June 24, 1999.

185. NSC memo, Clarke to Berger, UBL review for Dec. 3, 1999, Small Group meeting, Dec. 2, 1999.

186. NSC memo, CSG agenda, Sept. 24, 1999.

187. According to CTC talking points for the CSG in June 1999, more than 40 members of al Qaeda had been imprisoned over the past year. CIA talking points, C/CTC TPs/Backgrounder for CSG, June 7, 1999. Figures cited in the DCI's letter to President Clinton in October, however, are slightly different: CTC had helped render 32 terrorists to justice since July 1998, more than half of whom were al Qaeda. CIA letter, Tenet to President Clinton, "CIA's Counterterrorism Efforts," Oct. 16, 1999.

188. See CIA cable, "Usama Bin Ladin: The Way Ahead," Aug. 25, 1999, soliciting comments from various stations on "possible new approaches to capturing UBL and disrupting operations." The evolution of some of this thinking can be seen throughout the summer of 1999. See, e.g., CIA briefing materials, CTC UBL Update: "Must Do Some Fundamental Rethinking," July 20, 1999 (Afghan assets are not capable of mounting a UBL capture operation or ambush); CIA briefing materials, CTC UBL Update: "Problems with Capturing UBL," Aug. 3, 1999 (tribals are good reporters but are unlikely to capture Bin Ladin because of the risks involved, so there is a need to identify a new group to undertake a capture operation).

189. July 1999 Memorandum of Notification.

190. See James Baker interview (Feb. 4, 2004); Janet Reno interview (Dec. 16, 2003); Randy Moss interview (Jan. 22, 2004); George Tenet interview (Jan. 22, 2004). On the Pakistani and Uzbek capture teams, see CIA memo,

NOTES TO CHAPTER 4

"Outline of Program to Build Pakistan Team to Seek the Capture and Rendition of Usama Bin Ladin and his Lieutenants," July 27, 1999; CIA memo, CIA Outline of Program to Build Uzbek and other teams to Seek the Capture and Rendition of Usama Bin Ladin and his Lieutenants, July 27, 1999; CIA briefing materials, talking points for the DCI for the Aug. 3 Small Group meeting, Aug. 3, 1999 (Other Pakistani Involvement in Efforts to Capture UBL; Uzbek and other programs). On the Uzbeks' readiness, see CIA briefing materials, "Executive Summary for UBL Conference," Sept. 16, 1999.

191. CIA briefing materials, "Executive Summary for UBL Conference," Sept. 16, 1999. For its preface, the Plan quoted a memo Tenet had sent to the CIA's senior management in December 1998: "We are at war with Usama bin Ladin."

192. Ibid. See also the following briefings of the Plan: CIA briefing materials, CTC/NSC Briefing on the Plan, Sept. 29, 1999; CIA briefing materials, Executive Summary: UBL Conference, prepared for Berger, Nov. 30, 1999; CIA briefing materials, CTC briefing for the NSC Small Group, Dec. 2/3, 1999.

193. This figure increased through the fall of 1999, from less than 5 percent on September 16 to less than 10 percent by November 30, and finally to less than 15 percent by early December. CIA briefing materials, "Executive Summary for UBL Conference," Sept. 16, 1999; CIA briefing materials, Executive Summary: UBL Conference, prepared for Berger, Nov. 30, 1999; CIA briefing materials, CTC briefing for the NSC Small Group, Dec. 2/3, 1999. On Massoud, see also CIA briefing materials, "DDCI UBL Update," Oct. 29, 1999; CIA briefing materials, "DCI UBL Update," Nov. 12, 1999.

194. CIA briefing materials, "Executive Summary for UBL Conference," Sept. 16, 1999. For the JSOC estimate, see CIA briefing materials, Executive Summary: UBL Conference, prepared for Berger, Nov. 30, 1999.

# 5 Al Qaeda Aims at the American Homeland

1. Though KSM and Bin Ladin knew each other from the anti-Soviet campaign of the 1980s, KSM apparently did not begin working with al Qaeda until after the 1998 East Africa embassy bombings. Intelligence reports, interrogations of KSM, Nov. 21, 2003; Jan. 9, 2004; Feb. 19, 2004.

2. Those detainees are Khalid Sheikh Mohammed, Abu Zubaydah, Riduan Isamuddin (also known as Hambali), Abd al Rahim al Nashiri, Tawfiq bin Attash (also known as Khallad), Ramzi Binalshibh, Mohamed al Kahtani, Ahmad Khalil Ibrahim Samir al Ani, Ali Abd al Rahman al Faqasi al Ghamdi (also known as Abu Bakr al Azdi), and Hassan Ghul.

3. On KSM's relationship to Yousef and his ethnicity, see CIA analytic report, Khalid Sheik Muhammad's Nephews, CTC 2003-300013, Jan. 31, 2003. On KSM's biography, see Intelligence report, interrogation of KSM, July 12, 2003; FBI electronic communication, requests for information on KSM colleges/universities, June 10, 2002.

4. In an uncorroborated post-capture claim that may be mere bravado, KSM has stated that he considered assassinating Rabbi Meir Kahane when Kahane lectured in Greensboro at some point between 1984 and 1986. Intelligence report, interrogation of KSM, July 12, 2003. On KSM's connection to Sayyaf, see Intelligence reports, interrogations of KSM, July 3, 2003; July 12, 2003; FBI electronic communication, "Summary of Information . . . with regard to . . . KSM," July 8, 1999. On KSM's battle experience and his electronics work, see Intelligence reports, interrogations of KSM, July 3, 2003; July 12, 2003. On KSM's anti-Soviet activities, see Intelligence report, interrogation of KSM, Feb. 17, 2004 (in which KSM says he apparently met Bin Ladin for the first time when the Sayyaf group and Bin Ladin's Arab mujahideen group were next to each other along the front line).

5. Intelligence report, interrogation of KSM, July 12, 2003 (in which KSM also notes that his group continued fighting in the Jalalabad area, and his brother Abid was killed there). KSM claims that Ramzi Yousef visited the NGO's establishment in Jalalabad while Yousef was undergoing training. KSM adds that between 1993 and 1996, he traveled to China, the Philippines, Pakistan, Bosnia (a second time), Brazil, Sudan, and Malaysia. Most, if not all, of this travel appears to have been related to his abiding interest in carrying out terrorist operations. Although KSM claims that Sheikh Abdallah was not a member, financier, or supporter of al Qaeda, he admits that Abdallah underwrote a 1995 trip KSM took to join the Bosnia jihad. Intelligence report, interrogation of KSM, July 23, 2003.

6. On KSM's learning of Yousef's plans, see Intelligence report, interrogation of KSM, Jan. 9, 2004 (in which KSM also contends that Yousef never divulged to him the intended target of the attack). On KSM/Yousef phone conversations, see Intelligence report, interrogation of KSM, Feb. 17, 2004 (in which KSM also says that most of his phone conversations with Yousef were social in nature, but that Yousef did discuss mixing explosives ingredients once or twice and that on one occasion, Yousef asked him to send the passport Yousef had in his true name, Abdul Basit). On KSM's money transfer, see FBI report, Tradebom investigation, Mar. 20, 1993.

7. Evidence gathered at the time of Yousef's February 1995 arrest included dolls wearing clothes containing nitrocellulose. FBI evidence, Manila air investigation. On KSM's rationale for attacking the United States, see Intelligence report, interrogation of KSM, Sept. 5, 2003 (in this regard, KSM's statements echo those of Yousef, who delivered an extensive polemic against U.S. foreign policy at his January 1998 sentencing). On the Manila air plot, see Intelligence reports, interrogations of KSM, Apr. 17, 2003; July 12, 2003 (in which KSM also says *bojinka* is not Serbo-Croatian for "big bang," as has been widely reported, but rather a nonsense word he adopted after hearing

it on the front lines in Afghanistan). According to KSM, the plot was to receive financing from a variety of sources, including associates of co-conspirator Wali Khan and KSM's own funds. Intelligence reports, interrogations of KSM, Nov. 26, 2003; Jan. 9, 2004; Feb. 19, 2004. On activities during the summer of 1994, see Intelligence reports, interrogations of KSM, May 3, 2003; July 12, 2003; Nov. 10, 2003; Feb. 21, 2004; Feb. 24, 2004.

8. On recruiting Wali Khan in Karachi, see FBI report of investigation, interview of Abdul Hakim Murad, Apr. 13, 1995; Intelligence report, interrogation of KSM, July 12, 2003 (in which KSM recounts how he knew Wali Khan from Afghanistan). On the testing of the timer, see Brief for the United States of America, *United States v. Ramzi Ahmed Yousef,* No. 98-1041(L) (2d Cir. filed Aug. 25, 2000), pp. 85–86, 88–91. The latter explosion caused the death of a passenger and extensive damage to the aircraft, which was forced to make an emergency landing in Okinawa. In 1996, Yousef was convicted on charges arising out of the Bojinka plot, including the bombing of the Philippine Airlines flight. See ibid., p. 8. On KSM's travels, see generally Intelligence report, interrogation of KSM, July 12, 2003. Yousef managed to escape to Pakistan, but his accomplice, Murad—whom KSM claims to have sent to Yousef with $3,000 to help fund the operation—was arrested and disclosed details of the plot while under interrogation. Contrary to Murad's confession, in which he described his intended role as one of the five operatives who would plant bombs on board the targeted aircraft, KSM has said that Murad's role was limited to carrying the $3,000 from Dubai to Manila. Intelligence reports, interrogations of KSM, Feb. 19, 2004; (two reports); Feb. 24, 2004; Apr. 2, 2004. This aspect of KSM's account is not credible, as it conflicts not just with Murad's confession but also with physical evidence tying Murad to the very core of the plot, and with KSM's own statements elsewhere that Murad was involved in planning and executing the operation. Intelligence reports, interrogations of KSM, Aug. 18, 2003; Jan. 9, 2004; Feb. 24, 2004 (in which KSM also claims that while he was in Qatar in February 1995, he and Yousef consulted by telephone regarding the cargo carrier plan, and Yousef proceeded with the operation despite KSM's advice that he hide instead). We have uncovered no evidence that KSM was present at the guesthouse in Islamabad where Yousef's arrest took place, as has been suggested in the press.

9. Intelligence report, interrogation of KSM, July 12, 2003. KSM's presence in Bosnia coincided with a police station bombing in Zagreb where the timing device of the bomb (a modified Casio watch) resembled those manufactured by KSM and Yousef in the Philippines for the Manila air operation. FBI report, Manila air investigation, May 23, 1999. On the Sudanese trip and Afghanistan, see Intelligence report, interrogation of SM, July 12, 2003 (in which KSM also claims to have encountered Sayf al Adl while in Yemen; apparently KSM has not divulged the substance of this meeting).

10. Intelligence report, interrogation of KSM, Jan. 9, 2004. In another interrogation report, however, KSM downplays the significance of his relationship to Yousef in enabling him to meet with Bin Ladin. Specifically, KSM notes that Yousef was not a member of al Qaeda and that Yousef never met Bin Ladin. Intelligence report, interrogation of KSM, Feb. 19, 2004.

11. Intelligence reports, interrogations of KSM, July 12, 2003; Jan. 9, 2004; Feb. 19, 2004. With respect to KSM's additional proposal to bomb cargo planes by shipping jackets containing nitrocellulose, KSM states that Bin Ladin expressed interest in changing the operation so that it would involve a suicide operative. Intelligence report, interrogation of KSM, Nov. 10, 2003.

12. Intelligence report, interrogation of KSM, Feb. 19, 2004.

13. Probably inflating his own role, KSM says he and a small group of colleagues, including Yousef and Wali Khan, were among the earliest advocates of attacking the United States. KSM asserts that Bin Ladin and some of the other jihadist leaders concentrated on overthrowing Arab regimes and argued for limiting confrontation with the United States to places like Somalia. On KSM's description of Bin Ladin's agenda, see Intelligence report, interrogation of KSM, Nov. 13, 2003. As discussed in chapter 2, we do not agree with this assessment. On Bin Ladin's reactions to KSM's proposal, see Intelligence reports, interrogations of KSM, July 12, 2003; Jan. 9, 2004; Feb. 19, 2004. On KSM's intent to target the United States and Bin Ladin's interest in Somalia, see Intelligence report, interrogation of KSM, Nov. 13, 2003.

14. On KSM's independence, see Intelligence report, interrogation of KSM, Jan. 9, 2004. Even after he began working with Bin Ladin and al Qaeda, KSM concealed from them his ongoing relationship with Sayyaf. Intelligence report, interrogation of KSM, July 30, 2003. Although KSM says he would have accepted the support of another organization to stage a 9/11-type operation, there is no evidence he ever peddled this idea to any other group. Intelligence report, interrogation of KSM, Feb. 19, 2004. On his travels after meeting Bin Ladin, see Intelligence report, interrogation of KSM, July 12, 2003. Hambali also was one of the founders of Konsojaya, a Malaysian company run by a close associate of Wali Khan. FBI report, Manila air investigation, May 23, 1999. Hambali claims he was asked to serve on the company's board of directors as a formality and insists that he did not recognize the "Arabs" who were to run the company or play any role in its operations. Intelligence report, interrogation of Hambali, Nov. 19, 2003.

15. Intelligence reports, interrogations of KSM, July 12, 2003; Feb. 19, 2004 (two reports). KSM maintains that he provided similar services for other mujahideen groups at this time, including the Libyan Islamic Fighting Group and a group headed by Abu Zubaydah. Intelligence report, interrogation of KSM, Feb. 19, 2004.

16. On KSM's understanding of Bin Ladin's commitment, see Intelligence report, interrogation of KSM, Feb.

19, 2004. On KSM's assistance to al Qaeda, see Intelligence reports, interrogations of KSM, July 12, 2003 (two reports). On Bin Ladin's decision to approve 9/11 operation, see Intelligence report, interrogation of KSM, Jan. 9, 2004. KSM has observed that the East Africa bombings and the subsequent bombing of the USS *Cole* yielded a recruiting bonanza for al Qaeda, as increasing numbers of Arab youth became enamored of the idea of waging jihad against the United States. Intelligence report, interrogation of KSM, Sept. 5, 2003.

17. On KSM's decision to move to Kandahar, see Intelligence report, interrogation of KSM, Jan. 9, 2004. On the media committee, see Intelligence report, interrogation of KSM, July 12, 2003 (in which KSM also says that as head of the media committee, he would take charge of producing the propaganda video al Qaeda issued following the bombing of the USS *Cole*). On the oath, see Intelligence report, interrogation of KSM, Nov. 13, 2003 (in which KSM also claims his reluctance stemmed from a concern that he would lose the ability to persevere with the 9/11 operation should Bin Ladin subsequently decide to cancel it).

18. On a possible Southeast Asian operation, see Intelligence report, interrogation of Hambali, Sept. 4, 2003. On a possible U.S. operation, see Intelligence reports, interrogations of KSM, June 27, 2003; July 14, 2003. On a possible Israeli operation, see Intelligence report, interrogation of KSM, June 30, 2003. On other possible targets discussed with Atef, see Intelligence report, interrogation of Hambali, Sept. 4, 2003 (Thailand); Intelligence report, interrogation of KSM, Apr. 4, 2004 (Singapore, Indonesia, Maldives).

19. For an example of KSM's popularity, see Intelligence report, interrogation of al Qaeda facilitator, Oct. 11, 2002. See also Intelligence report, interrogation of Abu Zubaydah, Nov. 7, 2002; Intelligence report, interrogation of Nashiri, Feb. 10, 2003.

20. Intelligence reports, interrogations of Hambali, Jan. 14, 2003; Mar. 5, 2004.

21. Rohan Gunaratna, *Inside Al Qaeda: Global Network of Terror* (Columbia Univ. Press, 2002), pp. 187, 199.

22. On the trip to Karachi, see Intelligence report, interrogation of Hambali, Sept. 12, 2003. On Hambali's relationship with Atef and receipt of al Qaeda funds, see Intelligence report, interrogation of Hambali, Mar. 5, 2004. Al Qaeda began providing funds to JI for terrorist operations as early as 1999. Intelligence report, interrogation of detainee, Mar. 3, 2004.

23. On Hambali's role as coordinator, see Intelligence report, interrogation of detainee, Mar. 4, 2004. On Sufaat, see Intelligence report, interrogation of KSM, Apr. 12, 2003; Intelligence report, interrogation of detainee, Apr. 30, 2003. In 1987, Sufaat received a bachelor's degree in biological sciences, with a minor in chemistry, from California State University, Sacramento. Sufaat did not start on the al Qaeda biological weapons program until after JI's December 2000 church bombings in Indonesia, in which he was involved. Intelligence report, interrogation of Hambali, Sept. 8, 2003. On Sufaat's schooling, see Intelligence report, interrogation of detainee, Dec. 14, 2001.

24. Intelligence report, interrogation of KSM, June 9, 2003. KSM also maintains that he persuaded Hambali to focus on "soft" targets in Singapore, such as oil tankers, the U.S. and Israeli embassies, and Western airlines. Intelligence report, interrogation of KSM, June 24, 2003.

25. As discussed in greater detail in section 5.2, Khallad was sent by Bin Ladin to Kuala Lumpur to case U.S. airline flights in the Far East for possible future attacks there, whereas Hazmi and Mihdhar were on the first leg of their travel from Karachi to Los Angeles, where they would arrive on January 15, 2000. Intelligence report, interrogation of KSM, July 31, 2003. On Hambali's assistance at KSM's request, see Intelligence report, interrogation of KSM, July 31, 2003; Intelligence report, interrogation of Khallad, Aug. 8, 2003. On assistance to Moussaoui, see Intelligence report, interrogation of KSM, Mar. 24, 2003; Intelligence report, interrogation of detainee, Apr. 9, 2002. According to statements attributed to Hambali and Sufaat, in each of these instances the al Qaeda guests were lodged at Sufaat's condominium, an apartment on the outskirts of Kuala Lumpur. Intelligence report, interrogation of detainee, Jan. 22, 2002; Intelligence reports, interrogations of Hambali, Sept. 8, 2003; Sept. 12, 2003.

26. On Hambali's relationship with Bin Ladin, see Intelligence reports, interrogations of Hambali, Aug. 29, 2003; Sept. 5, 2003 (in which Hambali also explains his relationship with al Qaeda as follows: he received his marching orders from JI, but al Qaeda would lead any joint operation involving members of both organizations). On Hambali's objections, see Intelligence report, interrogation of KSM, July 8, 2003. On KSM's coordination with Hambali, see Intelligence report, interrogation of KSM, Apr. 17, 2003. On KSM's recognition of Hambali's domain, see Intelligence report, interrogation of KSM, Aug. 18, 2003. According to KSM, his close relationship with Hambali prompted criticism from Bashir, the JI leader, who thought Hambali should focus more directly on Indonesia and Malaysia instead of involving himself in al Qaeda's broader terrorist program. Indeed, KSM describes Hambali as an al Qaeda member working in Malaysia. Intelligence report, interrogation of KSM, Aug. 18, 2003. Nashiri observes that al Qaeda's standard security practice dictated that no senior member could manage terrorist activities in a location where another senior member was operating. Intelligence report, interrogation of Nashiri, Jan. 14, 2003. Yet al Qaeda's deference to Hambali's turf apparently had limits. Khallad says he and Hambali never discussed the intended Southeast Asia portion of the original 9/11 plan. Intelligence report, interrogation of Khallad, Apr. 27, 2004.

27. On Nashiri's recruitment, see FBI report of investigation, interview of Nasser Ahmad Naser al Bahri, a.k.a. Abu Jandal, Sept. 17–Oct. 2, 2001. On Nashiri's refusal to swear allegiance, see Intelligence report, interrogation of

KSM, Nov. 21, 2003. On Nashiri's idea for his first terrorist operation and his travels, see Intelligence reports, interrogations of Nashiri, Nov. 21, 2002; Dec. 26, 2002.

28. Intelligence report, interrogation of Nashiri, Dec. 26, 2002. Although Nashiri's account of this episode dates his return to Afghanistan in 1996, the 1997 date is likely more accurate. On Nashiri's involvement in the missile-smuggling and embassy-bombing plots, see Intelligence report, seizure of antitank missiles in Saudi Arabia, June 14, 1998; FBI report of investigation, interview of Mohammad Rashed Daoud al Owahli, Sept. 9, 1998, p. 6.

29. For Nashiri's version, which may not be true, see Intelligence report, interrogation of Nashiri, Dec. 26, 2002. On communication between Nashiri and Bin Ladin about attacking U.S. vessels, see Intelligence report, interrogation of Nashiri, Nov. 21, 2002. The reporting of Nashiri's statements on this subject is somewhat inconsistent, especially as to the exact timing of the original proposal. Some corroboration does exist, however, for Nashiri's claim that the original proposal was his. A detainee says that 9/11 hijacker Khalid al Mihdhar told him about the maritime operation sometime in late 1999 and credited Nashiri as its originator. Intelligence report, interrogation of detainee, Dec. 2, 2001.

30. Intelligence report, interrogation of Nashiri, Jan. 27, 2003. Nashiri claims not to have had any telephone or email contact with Bin Ladin while planning the *Cole* operation; rather, whenever Bin Ladin wanted to meet, he would have an al Qaeda member travel to Pakistan to summon Nashiri by telephone. Ibid.

31. As an example of Nashiri's status, see FBI report of investigation, interview of Abu Jandal, Sept. 17–Oct. 2, 2001 (in which Nashiri is described as widely known to be one of al Qaeda's most committed terrorists and, according to one of his mujahideen colleagues, so extreme in his ferocity in waging jihad that he "would commit a terrorist act 'in Mecca inside the Ka'aba itself' [the holiest site in Islam] if he believed there was a need to do so"). On Nashiri's role on the Arabian Peninsula, see Intelligence report, interrogation of Khallad, Jan. 14, 2004. Nashiri also enjoyed a reputation as a productive recruiter for al Qaeda. See Intelligence report, interrogation of Abu Zubaydah, Aug. 29, 2002. On Nashiri's discretion, see, e.g., Intelligence report, interrogation of Nashiri, Nov. 20, 2002. On Nashiri seeking Bin Ladin's approval, see Intelligence report, interrogation of KSM, Jan. 14, 2004. On the *Limburg* operation, see Intelligence report, interrogation of Nashiri, May 21, 2003. On Nashiri's security concerns, see Intelligence report, interrogation of Nashiri, Feb. 20, 2003.

32. See Intelligence reports, interrogations of KSM, July 1, 2003; Sept. 5, 2003.

33. For KSM's learning from the first World Trade Center bombing and his interest in a more novel form of attack, see Intelligence report, interrogation of KSM, July 1, 2003. For KSM's interest in aircraft as weapons and speculation about striking the World Trade Center and CIA, see Intelligence report, interrogation of KSM, Feb. 19, 2004. KSM has stated that he and Yousef at this time never advanced the notion of using aircraft as weapons past the idea stage. Intelligence report, interrogation of KSM, Apr. 2, 2004.

After 9/11, some Philippine government officials claimed that while in Philippine custody in February 1995, KSM's Manila air plot co-conspirator Abdul Hakim Murad had confessed having discussed with Yousef the idea of attacking targets, including the World Trade Center, with hijacked commercial airliners flown by U.S.-trained Middle Eastern pilots. See Peter Lance, *1000 Years for Revenge: International Terrorism and the FBI—the Untold Story* (HarperCollins, 2003), pp. 278–280. In Murad's initial taped confession, he referred to an idea of crashing a plane into CIA headquarters. Lance gave us his copy of an apparent 1995 Philippine National Police document on an interrogation of Murad. That document reports Murad describing his idea of crashing a plane into CIA headquarters, but in this report Murad claims he was thinking of hijacking a commercial aircraft to do it, saying the idea had come up in a casual conversation with Yousef with no specific plan for its execution. We have seen no pre-9/11 evidence that Murad referred in interrogations to the training of other pilots, or referred in this casual conversation to targets other than the CIA. According to Lance, the Philippine police officer, who after 9/11 offered the much more elaborate account of Murad's statements reported in Lance's book, claims to have passed this added information to U.S. officials. But Lance states the Philippine officer declined to identify these officials. Peter Lance interview (Mar. 15, 2004). If such information was provided to a U.S. official, we have seen no indication that it was written down or disseminated within the U.S. government. Incidentally, KSM says he never discussed his idea for the planes operation with Murad, a person KSM regarded as a minor figure. Intelligence report, interrogation of KSM, Apr. 2, 2004.

34. Intelligence report, 1996 Atef study on airplane hijacking operations, Sept. 26, 2001.

35. Intelligence reports, interrogations of KSM, July 12, 2003; Nov. 6, 2003. Abu Zubaydah, who worked closely with the al Qaeda leadership, has stated that KSM originally presented Bin Ladin with a scaled-down version of the 9/11 plan, and that Bin Ladin urged KSM to expand the operation with the comment, "Why do you use an axe when you can use a bulldozer?" Intelligence report, interrogation of Abu Zubaydah, May 16, 2003. The only possible corroboration we have found for Abu Zubaydah's statement is Khallad's suggestion that Bin Ladin may have expanded KSM's original idea for an attack using planes. Intelligence report, interrogation of Khallad, Apr. 22, 2004. Neither Abu Zubaydah nor Khallad claims to have been present when KSM says he first pitched his proposal to Bin Ladin in 1996.

36. For the scheme's lukewarm reception, see Intelligence report, interrogation of KSM, Nov. 6, 2003. For Bin Ladin's response, see Intelligence reports, interrogations of KSM, Aug. 18, 2003; Feb. 19, 2004.

37. Intelligence report, interrogation of KSM, Feb. 19, 2004.

38. For KSM's joining al Qaeda, see Intelligence report, interrogation of KSM, Nov. 13, 2003. KSM has provided inconsistent information about whether Bin Ladin first approved his proposal for what became the 9/11 attacks in late 1998 or in early 1999. Compare Intelligence reports, interrogations of KSM, Aug. 18, 2003; Jan. 9, 2004; Feb. 19, 2004; Apr. 3, 2004. For KSM's antipathy to the United States, see Intelligence report, interrogation of KSM, Feb. 19, 2004. For Atef's role, see Intelligence report, interrogation of KSM, Jan. 9, 2004. For Atef's death, see DOS report, "Comprehensive List of Terrorists and Groups Identified Under Executive Order 13224," Dec. 31, 2001.

39. Intelligence report, interrogation of KSM, Aug. 18, 2003.

40. Intelligence reports, interrogations of KSM, Aug. 18, 2003; Feb. 20, 2004; Apr. 30, 2004. An earlier KSM interrogation report, however, states that Bin Ladin preferred the Capitol over the White House as a target. Intelligence report, interrogation of KSM, Apr. 17, 2003. KSM has admitted that his statement in a post-9/11 interview with Al Jazeera reporter Yosri Fouda—that an al Qaeda "reconnaissance committee" had identified 30 potential targets in the United States during the late 1990s—was a lie designed to inflate the perceived scale of the 9/11 operation. Intelligence report, interrogation of KSM, Feb. 23, 2004. For the specific targets, see Intelligence report, selection of 9/11 targets, Aug. 13, 2003 (citing KSM interrogation).

41. For the four individuals, see Intelligence report, interrogation of KSM, Aug. 18, 2003. Abu Bara al Yemeni is also known by the names Abu al Bara al Taizi, Suhail Shurabi, and Barakat. Ibid. KSM has also stated that he did not learn of the selection of Hazmi and Mihdhar for the planes operation until November 1999. Intelligence report, interrogation of KSM, Apr. 2, 2004. For Mihdhar's and Hazmi's eagerness, see Intelligence reports, interrogations of KSM, Jan. 9, 2004; Feb. 20, 2004 . For Bin Ladin's instruction, see Intelligence report, interrogation of KSM, Feb. 20, 2004. Hazmi obtained a B-1/B-2 multiple-entry visa issued at Jiddah, Saudi Arabia, on April 3, 1999; Mihdhar obtained the same type of visa at the same location on April 7, 1999. DOS records, NIV applicant details for Hazmi and Mihdhar, Nov. 8, 2001. Hazmi and Mihdhar both obtained new passports shortly before they applied for visas. FBI report, "Summary of Penttbom Investigation," Jan. 31, 2003, p. 9.

42. For Hazmi and Mihdhar's city of birth, see CIA analytic report, "11 September: The Plot and the Plotters," CTC 2003-40044HC, June 1, 2003, pp. 49–50. For their travel to Bosnia, see Intelligence report, interrogation of Saudi al Qaeda member, Oct. 3, 2001. For their visits to Afghanistan, see Intelligence reports, interrogations of detainee, Feb. 5, 2002; Feb. 11, 2002; Intelligence reports, interrogations of Saudi al Qaeda member, Oct. 2, 2001; Oct. 18, 2001.

43. Intelligence reports, interrogations of Khallad, June 25, 2003; Sept. 5, 2003.

44. For Khallad's visa application under a false name and its rejection, see DOS record, visa application of Salah Saeed Mohammed bin Yousaf (alias for Khallad), Apr. 3, 1999; Intelligence report, interrogation of Khallad, Aug. 20, 2003. Khallad's visa denial was based not on terrorism concerns but apparently on his failure to submit sufficient documentation in support of his application. See DOS record, NIV applicant detail, Mar. 31, 2004. For Khallad's 1999 mission to Yemen, see Intelligence report, interrogation of Khallad, Aug. 20, 2003. For the U.S. point of contact, see Intelligence report, interrogation of Khallad, Aug. 22, 2003. Khallad claims he cannot remember his U.S. contact's full name but says it sounded like "Barzan." According to the CIA, "Barzan" is possibly identifiable with Sarbarz Mohammed, the person who resided at the address in Bothell, Washington, that Khallad listed on his visa application as his final destination. Ibid. For his contacts with "Barzan" and his arrest, see ibid.; Intelligence report, interrogation of Khallad, Aug. 20, 2003. Nashiri has confirmed that Khallad had been assigned to help procure explosives for the ship-bombing plot, and that his arrest caused work on the operation to stop temporarily. Intelligence report, interrogation of Nashiri, Feb. 21, 2004.

45. For the interventions, see Intelligence report, interrogation of Khallad, Aug. 20, 2003. Khallad has provided inconsistent information as to his release date. Ibid. (June 1999); Intelligence report, interrogation of Khallad, Jan. 6, 2004 (August 1999). Khallad's brother reportedly has confirmed that Khallad was released from custody only after negotiations with the Yemeni director for political security in which a deal was struck prohibiting Khallad and his associates from conducting operations in Yemen. Intelligence report, interrogation of detainee, Oct. 1, 2002. For his giving up on a visa and his return to Afghanistan, see Intelligence reports, interrogations of Khallad, July 31, 2003; Aug. 22, 2003.

46. For KSM's realization of visa complications, see Intelligence report, interrogation of KSM, Aug. 18, 2003. According to both KSM and Khallad, Abu Bara never applied for a U.S. visa. Intelligence report, interrogation of KSM, Feb. 20, 2004; Intelligence report, interrogation of Khallad, Feb. 17, 2004. KSM has noted that Ramzi Binalshibh, another Yemeni slated early on to participate in the 9/11 attacks, likewise would prove unable to acquire a U.S. visa the following year. Intelligence report, interrogation of KSM, Jan. 7, 2004. For KSM's desire to keep Khallad and Abu Bara involved, see Intelligence report, interrogation of KSM, Aug. 18, 2003. For Saudis being chosen for the planes operation, see Intelligence reports, interrogations of KSM, Jan. 7, 2004; Jan. 23, 2004. For KSM's splitting the operation into two parts, see Intelligence report, interrogation of KSM, Aug. 18, 2003; Intelligence report, interrogation of Khallad, Apr. 27, 2004.

47. For the second part of the operation, see Intelligence report, interrogation of KSM, Aug. 18. 2003. For the

alternate scenario, see Intelligence report, interrogation of KSM, Apr. 30, 2004; Intelligence report, interrogation of Khallad, Apr. 21, 2004. Khallad has provided contradictory statements about the number of planes to be destroyed in East Asia. Intelligence reports, interrogations of Khallad, Aug. 13, 2003; Apr. 5, 2004. According to Khallad, Thailand, South Korea, Hong Kong, and Malaysia were likely origins of the flights because Yemenis did not need visas to enter them. Intelligence report, interrogation of Khallad, Aug. 13, 2003. For the importance of simultaneity, see Intelligence report, interrogation of KSM, Aug. 18, 2003.

48. For the four operatives' training, see Intelligence report, interrogation of KSM, Aug. 18, 2003. For the elite nature of the course and Nibras's participation, see Intelligence reports, interrogations of Khallad, Sept. 8, 2003; Sept. 11, 2003; Intelligence report, interrogation of KSM, July 15, 2003. For KSM's view, see ibid.; Intelligence report, interrogation of KSM, Aug. 18, 2003. For KSM's visit, see Intelligence report, interrogation of KSM, Feb. 20, 2004.

49. For a description of the camp and the commando course, see Intelligence report, interrogation of KSM, July 15, 2003. For Bin Ladin's interest and the decision on the number of trainees, see Intelligence report, interrogation of Khallad, Sept. 8, 2003.

50. For the nature of the commando course, see Intelligence report, interrogation of Khallad, Sept. 8, 2003. KSM claims that the course proved so rigorous that Mihdhar quit after a week and returned to his family in Yemen. Intelligence report, interrogation of KSM, Aug. 18, 2003. However, two of Mihdhar's al Qaeda colleagues who were present during the training have provided different accounts. Khallad apparently has stated both that Bin Ladin pulled Mihdhar and Nawaf al Hazmi out of the course early and that Mihdhar actually completed the course. See Intelligence reports, interrogations of Khallad, Sept. 1, 2003; May 21, 2004. See also FBI report of investigation, interview of Abu Jandal, Oct. 2, 2001 (indicating that Mihdhar completed the course).

51. For instruction on Western culture and travel, see Intelligence reports, interrogations of KSM, Mar. 24, 2003; June 15, 2004; Intelligence report, interrogation of Khallad, Aug. 21, 2003. For KSM's mid-1999 activity and Bin Ladin's payment, see Intelligence report, interrogation of KSM, Feb. 20, 2004. According to KSM, he received a total of $10,000 from Bin Ladin for 9/11-related expenses. Intelligence report, interrogation of KSM, Apr. 5, 2004.

52. For Khallad, Abu Bara, and Hazmi's travels, see Intelligence report, interrogation of KSM, May 30, 2003. Khallad has provided a second version, namely that all three traveled together to Karachi. Intelligence report, interrogation of Khallad, July 31, 2003. For Hazmi and Atta's simultaneous presence in Quetta, see Intelligence reports, interrogations of KSM, Feb. 20, 2004; Mar. 31, 2004. KSM maintains it was a coincidence. Ibid.

53. Intelligence report, interrogation of KSM, Mar. 31, 2004. In his initial post-capture statements, KSM claimed that Mihdhar did not have to attend the training because he had previously received similar training from KSM. Intelligence report, interrogation of KSM, Mar. 24, 2003. KSM subsequently expressed uncertainty about why Bin Ladin and Atef excused Mihdhar from the training. Intelligence report, interrogation of KSM, Feb. 20, 2004.

54. For the varying accounts of the course's length, see Intelligence reports, interrogations of KSM, Aug. 18, 2003; Feb. 20, 2004; Intelligence reports, interrogations of Khallad, Nov. 6, 2003; July 31, 2003. For KSM's description, see Intelligence reports, interrogations of KSM, Mar. 24, 2003; Aug. 18, 2003; Feb. 20, 2004. For Khallad's description, see Intelligence report, interrogation of Khallad, Apr. 5, 2004. KSM says that he permitted the trainees to view Hollywood films about hijackings only after he edited the films to cover the female characters. Intelligence report, interrogation of KSM, Nov. 10, 2003. For the use of game software and discussions of casing flights, see Intelligence report, interrogation of Khallad, Nov. 6, 2003. For KSM's instructions regarding casing, see Intelligence report, interrogation of Khallad, July 31, 2003. For visits to travel agencies, see Intelligence report, interrogation of Khallad, Aug. 13, 2003.

55. For the travels of Khallad, Abu Bara, and Hazmi via Karachi, see Intelligence report, interrogation of KSM, Aug. 18, 2003. For Mihdhar's travel from Yemen, see FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing 265A-NY-280350, serial 24808).

56. For the operatives' knowledge, see Intelligence report, interrogation of KSM, Aug. 18, 2003. For Hazmi and Mihdhar being sent to Malaysia, see Intelligence report, interrogation of KSM, July 29, 2003. For passport doctoring, see Intelligence report, interrogation of KSM, Aug. 18, 2003. For casing, see Intelligence report, interrogation of KSM, July 29, 2003. For Khallad and Abu Bara's departure, as well as Hazmi's travel, see Intelligence report, interrogation of KSM, July 31, 2003. Khallad maintains that Abu Bara did not participate in the casing operation and simply traveled to Kuala Lumpur as Khallad's companion. Intelligence report, interrogation of Khallad, May 30, 2003.

57. For the trip's original purpose and Bin Ladin's suggestion, see Intelligence report, interrogation of Khallad, July 31, 2003. On Malaysia, Endolite, and the financing of Khallad's trip, see Intelligence report, interrogation of Khallad, Aug. 22, 2003.

58. On informing Hambali, see Intelligence report, interrogation of KSM, Aug. 18, 2003. For Hambali's assistance, see Intelligence report, interrogation of Khallad, July 31, 2003; Intelligence report, interrogation of Hambali, Sept. 4, 2003. For the colleague who spoke Arabic, see Intelligence report, interrogation of Khallad, May 30, 2003.

59. For the dates of Khallad's travel, his mistake in seating, and his other efforts to case flights, see Intelligence reports, interrogations of Khallad, July 31, 2003; Aug. 21, 2003. Khallad says he put the box cutter alongside tubes

of toothpaste and shaving cream with metallic exteriors, so that if the metal detector at the airport was triggered, the inspector would attribute the alarm to the other items. He also carried art supplies, which he hoped would explain the presence of a box cutter if anyone asked. Ibid.

60. For Khallad's return to Kuala Lumpur, see Intelligence report, interrogation of Khallad, May 30, 2003. For Hazmi's arrival and stay at the clinic, see Intelligence report, interrogation of Khallad, July 31, 2003. For Mihdhar's arrival, see FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing 265A-NY-280350, serial 24808). For their stay at Sufaat's apartment, see CIA analytic report, "The Plot and the Plotters," June 1, 2003, p. 11; Intelligence report, interrogation of Khallad, Aug. 22, 2003. For Khallad's discussions with Hazmi and Khallad's knowledge of the operation, see Intelligence report, interrogation of Khallad, July 31, 2003.

61. For the Bangkok meeting, see CIA analytic report, "The Plot and the Plotters," June 1, 2003, pp. 49–50. For relocation of the meeting to Bangkok, see Intelligence reports, interrogations of Khallad, Aug. 18, 2003; Jan. 7, 2004. Fahd al Quso, a close friend of Khallad's, accompanied Nibras on the trip to Bangkok to take money to Khallad. Quso claims that the amount was $36,000. FBI report of investigation, interview of Quso, Jan. 31, 2001. Khallad claims that it was only $10,000 to $12,000. Intelligence reports, interrogations of Khallad, May 30, 2003; Aug. 18, 2003. Khallad has identified contradictory purposes for the money: a donation to charities benefiting amputees, see Intelligence report, interrogation of Khallad, Aug. 8, 2003; and to advance the ship-bombing operation, see Intelligence report, interrogation of Khallad, Jan. 7, 2004. Khallad has explicitly denied giving any of the money he received from Nibras and Quso to Hazmi and Mihdhar. Intelligence reports, interrogations of Khallad, Aug. 8, 2003; Jan. 7, 2004. Given the separate reporting from KSM that he gave Hazmi and Mihdhar $8,000 each before they traveled to the United States, we have insufficient evidence to conclude that the Nibras/Quso money helped finance the planes operation. Intelligence report, interrogation of KSM, June 15, 2004. For Hazmi and Mihdhar's interest in traveling to Bangkok, see Intelligence report, interrogation of Khallad, Jan. 7, 2004. For Hambali's assistance, see Intelligence report, interrogation of Khallad, Aug. 8, 2003. For Abu Bara's return to Yemen, see Intelligence report, interrogation of Khallad, May 30, 2003.

62. For the hotel arrangements, see Intelligence report, interrogation of Khallad, Jan. 7, 2004. For the two groups not meeting with each other, see Intelligence report, interrogation of Khallad, Aug. 18, 2003. For Khallad's subsequent actions, see Intelligence report, interrogation of Khallad, July 31, 2003.

63. For Bin Ladin's cancellation of the East Asian operation, see Intelligence report, interrogation of KSM, Aug. 18, 2003. For Hazmi and Mihdhar's departure, see Intelligence report, interrogation of Khallad, Aug. 8, 2003. For their arrival in Los Angeles, see FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing 265A-NY-280350-CG, serial 4062; 265A-NY-280350-302, serial 7134).

64. On Atta's family background, see FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing FBI electronic communication from Cairo dated Sept. 13, 2001); CIA analytic report, "The Plot and the Plotters," June 1, 2003, p. 23. For details on his study in Germany, see German Bundeskriminalamt (BKA) report, investigative summary re Atta, June 24, 2002; Federal Prosecutor General (Germany), response to Commission letter, June 25, 2004, pp. 3–4. Atta's host family in Hamburg soon asked him to move out. Between 1993 and 1998, Atta shared a one-bedroom apartment in Hamburg with a fellow student, who moved out after having problems with Atta and was succeeded by another roommate. See German BKA report, investigative summary re Atta, June 24, 2002. On Atta's character, see German BKA investigation of Said Bahaji, summary of interrogation of Shahid Nickels on Oct. 30, 2001.

65. On the Muslim student association in Hamburg, see Intelligence report, interrogation of Ramzi Binalshibh, Oct. 2, 2002. On the Muslim-Christian working group and Atta, see German BKA investigation of Bahaji, summary of interrogation of Michael Krause on Oct. 11, 2001; German BKA investigation of Bahaji, summary of interrogation of Nickels on Oct. 30, 2001. Much of the information about Atta and his friends in Hamburg comes from Nickels, a German national who converted to Islam while in high school and spent considerable time with Atta's circle between 1997 and 1999. Nickels testified at the trials in Germany of Mounir el Motassadeq and Abdelghani Mzoudi on 9/11-related charges.

66. German BKA investigation of Bahaji, summary of interrogation of Nickels on Oct. 30, 2001, pp. 8, 15; federal prosecutor's closing argument, Motassadeq trial, Feb. 5, 2003. On Atta's fundamentalism, see FBI electronic communication, "Khaled A. Shoukry," June 17, 2002.

67. German BKA report, investigative summary re Binalshibh, July 4, 2002; Federal Prosecutor General (Germany), response to Commission letter, June 25, 2004, pp. 3–4; FBI report of investigation, interview of Fuad Omar Bazarah, Apr. 9, 2004; Intelligence report, interrogation of Binalshibh, Sept. 24, 2002. Binalshibh used various names, such as Ramzi Omar and Ramzi al Sheiba. In May 1998, months before he was expelled from school, German authorities had issued a warrant to arrest and deport "Ramzi Omar." German BKA report, investigative summary re Binalshibh, July 4, 2002. But Binalshibh was no longer using this alias, so the German authorities did not discover that he and Ramzi Omar were the same person until after the attacks of September 11. Ibid.

68. Intelligence report, interrogation of Binalshibh, Oct. 2, 2002; German BKA investigation of Bahaji, summary of interrogation of Nickels on Oct. 30, 2001; German BKA report, investigative summary re Binalshibh, July 4, 2002.

69. German BKA report, investigative summary re Binalshibh, July 4, 2002.

70. CIA analytic report, "The Plot and the Plotters," June 1, 2003, p. 23; German BKA report, investigative summary re Shehhi, July 9, 2002.

71. German BKA report, investigative summary re Shehhi, July 9, 2002; Federal Prosecutor General (Germany), response to Commission letter, June 25, 2004, pp. 3–4; FBI electronic communication, summary of testimony of Mohamed Abdulla Mohamed Awady on Oct. 24, 2003, at the Mzoudi trial, Dec. 5, 2003.

72. German BKA report, investigative summary re Shehhi, July 9, 2002.

73. Ibid.

74. FBI electronic communication, summary of testimony of Mohamed Abdulla Mohamed Awady on Oct. 24, 2003, at the Mzoudi trial, Dec. 5, 2003.

75. Federal prosecutor's closing argument, Motassadeq trial, Feb. 5, 2003.

76. German BKA report, investigative summary re Jarrah, July 18, 2002; Federal Prosecutor General (Germany), response to Commission letter, June 25, 2004, pp. 3–4. In 1999, Jarrah and Senguen allegedly married in an Islamic ceremony not recognized under German law. Senguen has only acknowledged that she and Jarrah were engaged. German BKA report, investigative summary re Jarrah, July 18, 2002.

77. German BKA report, investigative summary re Jarrah, July 18, 2002.

78. Ibid.

79. Ibid.

80. On Jarrah's accommodations in Hamburg and his meeting with Binalshibh, see ibid. On Jarrah and Zammar, see German BKA investigation of Bahaji, summary of interrogation of Nickels on Oct. 30, 2001; see generally Intelligence report, interrogation of Binalshibh, Nov. 6, 2003; Intelligence report, "Terrorism: Background Information on Usama Bin Ladin Associate Muhammad Haydar Zammar," Jan. 14, 2002. For Zammar encouraging jihad, see Intelligence report, interrogation of detainee, Jan. 14, 2002.

81. Intelligence report, interrogation of Binalshibh, Nov. 6, 2003; German BKA investigation of Bahaji, summary of interrogation of Nickels on Oct. 30, 2001. On one occasion, German authorities intercepted a call in which such a gathering was mentioned. An individual phoning Zammar's house on February 17, 1999, was told that he was away on a trip to a distant, "bad" region, but that "people" at 54 Marienstrasse knew where he was. The same conversation revealed that these "people" included "Said, Mohamed Amir, [and] Omar," likely a reference to the apartment's original occupants, Said Bahaji, Atta, and Binalshibh. Federal Prosecutor General (Germany), response to Commission letter, June 25, 2004, p. 9. Shehhi also appears to have lived there briefly, in November 1998 and again in the summer of 1999. German BKA report, investigative summary re Shehhi, July 9, 2002. The Marienstrasse apartment remained an important location for the group even after Binalshibh, Atta, and Shehhi all moved out, as some of their closest associates, including Zakariya Essabar and Abdelghani Mzoudi, moved in. See German BKA report, investigative summary re Binalshibh, July 4, 2002.

82. German BKA report, investigative summary re Bahaji, Mar. 6, 2002. A document containing a biography of Bin Ladin—seized from the residence of Said Bahaji, a member of Atta's circle—also contains the phrase "Dar el Ansar," which refers to the name of a guesthouse Bin Ladin established in Afghanistan for mujahideen recruits. Ibid.

83. German BKA investigation of Bahaji, summary of interrogation of Nickels on Nov. 7, 2001; German BKA report, investigative summary re Bahaji, Mar. 6, 2002; federal prosecutor's closing argument, Motassadeq trial, Feb. 5, 2003. The diskettes seized from Bahaji's residence also contained bomb-making instructions. Federal Prosecutor General (Germany), response to Commission letter, June 25, 2004, p. 10. A videotape of Bahaji's October 9, 1999, wedding at the Quds mosque, recovered by German authorities after the September 11 attacks, depicts Binalshibh giving a speech denouncing Jews as a problem for all Muslims. On the videotape, Binalshibh also reads a Palestinian war poem, and Shehhi and Mzoudi sing a jihad song. Also shown attending the wedding are Jarrah and Zammar. FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing 265A-NY-280350-BN-415).

84. German BKA report, investigative summary re Essabar; CIA report, interrogation of Binalshibh, May 27, 2003; federal prosecutor's closing argument, Motassadeq trial, Feb. 5, 2003. After arriving in Afghanistan in 2001, he became a member of al Qaeda's media committee. Intelligence report, interrogations of KSM and Binalshibh, May 27, 2003.

85. German BKA report, investigative summary re Motassadeq, Oct. 22, 2001.

86. German BKA report, investigative summary re Mzoudi, Jan. 13, 2003; German BKA report, investigative summary re Motassadeq, Oct. 22, 2001. Mzoudi and Motassadeq were both tried in Germany on charges related to the 9/11 attacks. Mzoudi was acquitted in February 2004, in part because Binalshibh was not produced as a witness. Motassadeq was convicted in 2003 for being an accessory to the attacks and received a 15-year prison sentence, but his conviction was reversed. See Richard Bernstein, "Germans Free Moroccan Convicted of a 9/11 Role," *New York Times*, Apr. 8, 2004, p. A18.

87. Summary of Judgment and Sentencing Order by Hanseatic Regional High Court, Motassadeq trial, Feb. 19, 2003; German BKA investigation of Bahaji, summary of interrogation of Nickels on Oct. 30, 2001. According to Nickels, who was distancing himself from the group by this time, "Atta was just too strange." Ibid.

88. Shehhi and other members of the group used to frequent a library in Hamburg to use the Internet. According to one of the librarians, in 1999 Shehhi, unprompted, inveighed against America, and boasted that "something was going to happen" and that "there would be thousands of dead people." FBI electronic communication, summary of testimony of Angela Duile on Aug. 28, 2003, at Mzoudi trial, Oct. 27, 2003. Another witness who lived in the same dormitory as Motassadeq testified that in late 1998 or early 1999, he overheard a conversation in which Motassadeq told someone that "we will do something bad again" and that "we will dance on their graves." The conversation also contained a reference to the "burning of people." FBI electronic communication, summary of testimony of Holger Liszkowski on Sept. 9, 2003, at Mzoudi trial, Nov. 17, 2003. On another occasion, according to the same witness, Motassadeq apparently identified Atta as "our pilot." Another witness recalled Atta ominously observing in 1999 that the United States was not omnipotent and that "something can be done." German BKA investigation of Bahaji, summary of interrogation of Nickels on Nov. 20, 2001.

89. Intelligence reports, interrogations of Binalshibh, Oct. 7, 2002; May 20, 2003.

90. Intelligence report, interrogation of Binalshibh, May 20, 2003. A detainee has confirmed Binalshibh's account about being advised to go to Afghanistan rather than trying to travel directly to Chechnya. The detainee dates the Slahi meeting to October 1999. Intelligence report, interrogation of detainee, Oct. 17, 2003. The detainee, however, also suggests that Slahi and Binalshibh may have met earlier in 1999 in Frankfurt, through a mutual acquaintance. Intelligence report, interrogation of detainee, Oct. 27, 2003. The acquaintance apparently tells a different story, claiming that Slahi introduced him to Binalshibh and Jarrah at Slahi's home in 1997 or 1998, and that he later lived with them in Hamburg. Intelligence report, interrogation of detainee, July 2, 2003.

91. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 8; Intelligence reports, interrogations of Binalshibh, Sept. 24, 2002; Mar. 4, 2003; May 20, 2003.

92. On meetings with Atef and Bin Ladin, see Intelligence reports, interrogations of Binalshibh, Dec. 10, 2002; Mar. 4, 2003; Mar. 31, 2003; Intelligence report, interrogation of KSM, Feb. 20, 2004. Atta reportedly had between two and five meetings with Bin Ladin before leaving Kandahar and was the only 9/11 hijacker who knew the entire scope of the operation from the outset. Intelligence report, comments of Binalshibh on Atta, Apr. 21, 2003.

93. Intelligence report, interrogation of Binalshibh, Dec. 10, 2002. According to KSM, Bin Ladin designated Hazmi to be Atta's second in command. Intelligence report, interrogation of KSM, Feb. 20, 2004.

94. In addition, Atta obtained a new passport in June 1998, even though his current one was still valid for nearly a year, a sign that he may have been following the al Qaeda practice of concealing travel to Pakistan. Federal Prosecutor General (Germany), response to Commission letter, June 25, 2004, p. 11.

95. German BKA report, investigative summary re Motassadeq, Oct. 22, 2001; Summary of Judgment and Sentencing Order by Hanseatic Regional High Court, Motassadeq trial, Feb. 19, 2003. Motassadeq continued to handle some of Shehhi's affairs even after Shehhi returned to Hamburg. Most importantly, in March 2000, Motassadeq paid Shehhi's semester fees at the university, to ensure Shehhi's continued receipt of scholarship payments from the UAE. Ibid.

96. German BKA report, investigative summary re Motassadeq, Oct. 22, 2001. After 9/11, Motassadeq admitted to German authorities that Shehhi had asked him to handle matters in a way that would conceal Shehhi's absence. Motassadeq also would claim later that he did not know why his friends had gone to Afghanistan, saying he thought they were planning to go fight in Chechnya. For assistance provided by both Motassadeq and Bahaji, see Federal Prosecutor General (Germany), response to Commission letter, June 25, 2004, pp. 13–14.

97. Jarrah encountered a minor problem during his return trip to Hamburg. On January 30, 2000, while transiting Dubai on his way from Karachi to Germany, Jarrah drew questioning from UAE authorities about an overlay of the Qu'ran that appeared on one page of his passport. The officials also noticed the religious tapes and books Jarrah had in his possession, but released him after he pointed out that he had lived in Hamburg for a number of years and was studying aircraft construction there. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 13.

98. Intelligence report, interrogation of Binalshibh, Sep. 24, 2002; FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, pp. 11, 13. According to a KSM interrogation report, Shehhi may have been present for at least some of the training that Atta and Binalshibh received in Karachi. Intelligence report, interrogation of KSM, Mar. 31, 2004.

99. Intelligence report, interrogation of Binalshibh, Nov. 6, 2003. Binalshibh and the others kept their distance from Zammar even before visiting Afghanistan and getting their instructions from Bin Ladin and Atef. Ibid.

100. On Atta, see FBI analytic report, "The 11 September Hijacker Cell Model," Feb. 2003, p. 28. On Jarrah, see German BKA report, investigative summary re Jarrah, July 18, 2002. Note that although Jarrah's attitude was now much more congenial, he told Senguen nothing about being in Afghanistan. On Shehhi's wedding celebration, see German BKA report, investigative summary re Shehhi, July 9, 2002; on his changed appearance and behavior, see FBI electronic communication, summary of testimony of Mohamed Abdulla Mohamed Awady on Oct. 24, 2003, at the Mzoudi trial, Dec. 5, 2003.

101. German BKA report, investigative summary re Jarrah, July 18, 2002.

102. On Ali Abdul Aziz Ali, also known as Ammar al Baluchi, see FBI report, "Summary of Penttbom Investi-

gation," Feb. 29, 2004, p. 78. Ali, in turn, would ship these materials to his uncle, KSM, in Karachi. Intelligence report, interrogation of Ali Abdul Aziz Ali, Feb. 11, 2004. On Jarrah, see German BKA report, investigative summary re Jarrah**,** July 18, 2002. Following his sudden decision to study aircraft engineering in Hamburg, Jarrah had expressed interest in becoming a pilot around the end of 1998, well before he traveled to Afghanistan. According to Senguen, Jarrah told her about friends of his who had interrupted their studies to join the Germany army so that they could become pilots. Jarrah's pre-Afghanistan interest in aviation also is confirmed by a January 22, 1999, email recovered after the September 11, 2001, attacks, in which Jarrah told a friend from Beirut that he might "come next year and . . . have something to tell about airplanes." Ibid. On Binalshibh, see Intelligence report, interrogation of Binalshibh, Sept. 24, 2002.

103. Summary of Judgment and Sentencing Order by Hanseatic Regional High Court, Motassadeq trial, Feb. 19, 2003, pp. 10–11. Zacarias Moussaoui later would benefit from the results of all this research. Following his August 2001 arrest, the FBI discovered among his possessions a fax copy of an advertisement for U.S. flight schools. According to Binalshibh, notes in the margin of the advertisement were written by Atta. Intelligence report, interrogation of Binalshibh, Dec. 19, 2002.

104. DOS record, NIV applicant detail, Marwan al Shehhi, Mohamed Atta, Ziad Jarrah, Nov. 8, 2001. The visa applications were destroyed by the State Department according to routine document handling practices before their significance was known.

105. DOS records, visa applications of Ramzi Binalshibh, May 17, 2000; June 15, 2000; Oct. 25 2000. CIA analytic report, "The Plot and the Plotters," June 1, 2003, pp. 9–10; German BKA report, investigative summary re Binalshibh, July 4, 2002. Atta had twice explored the possibility of obtaining a U.S. green card shortly before his November 1999 trip to Afghanistan. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 8. Both Binalshibh and Jarrah listed the same person as a point of contact in the United States, an Indonesian national who had previously lived in Hamburg. Although this individual knew some members of the Hamburg cell, including Mohamed Atta and Razmi Binalshibh, there is no indication that any of the hijackers actually contacted him while they were in the United States. See German BKA report, investigative summary re Jarrah**,** July 18, 2002. Binalshibh had applied for a visa years earlier along with Fuad Bazarah, a co-worker in Yemen whose father contacted the U.S. embassy on Binalshibh's behalf. Bazarah obtained a visa application and moved to Los Angeles, but Binalshibh's application was denied. Bazarah would later live in Los Angeles with Ramez Noaman, an individual who knew Nawaf al Hazmi in San Diego. FBI electronic communication, "Penttbom," Oct. 23, 2001.

106. Intelligence report, interrogation of KSM, Sept. 9, 2003; CIA analytic report, Al Qaeda travel issues, Jan. 2004, p. 1. On the role of KSM, see, e.g., Intelligence report, interrogation of Binalshibh, Oct. 11, 2002. On the role of Abu Zubaydah, see, e.g., Intelligence report, biographical information on Abu Zubayda, Feb. 25, 2002. Al Qaeda also relied on outside travel facilitators, including fraudulent document vendors, corrupt officials, travel agencies, and smugglers, to help move operatives around the world by obtaining fraudulent documents, arranging visas (real or fake), making airline reservations, etc. See CIA analytic report, "Clandestine Travel Facilitators: Key Enablers of Terrorism," Dec. 31, 2002; CIA analytic report, Al Qaeda travel issues, Jan. 2004.

107. On passport collection schemes, see Intelligence report, interrogation of KSM, Sept. 9, 2003. On recycled passports, see Intelligence report, Collection of passports June 7, 2002.

108. See Intelligence reports, interrogations of KSM, Nov. 12, 2003; May 25, 2004; CIA analytic report, Al Qaeda travel issues, Jan. 2004, pp. 1, 3, 19. A detainee has admitted attending several security and specialized courses, including ones in counterfeiting and seal removal. Intelligence report, interrogation of al Qaeda associates, Apr. 11, 2002. Atta reportedly learned alteration techniques in Afghanistan, cleaning Ramzi Binalshibh's passport of its Pakistani visa and travel cachets. CIA analytic report, Al Qaeda travel issues, Jan. 2004, p. 1.

109. Intelligence report, Information on Mujahideen Travel, Mar. 13, 2002.

110. Intelligence report, interrogation of KSM, July 25, 2003. A small amount of the plot's backing came from Shehhi's own funds. He received a salary from the UAE military, which was sponsoring his studies in Germany, through December 23, 2000. Binalshibh apparently used some of this money to wire just over \$10,000 to Shehhi in the United States and pay some of his own plot-related expenses. Adam Drucker interview (Jan. 12, 2004); FBI Report, "Summary of Penttbom Investigation," Feb. 29, 2004, pp. 20–22.

111. CIA analytic report, "Terrorism: Amount of Money It Takes to Keep al-Qa'ida Functioning," Aug. 7, 2002; CIA analytic report, "Terrorism: Al-Qa'ida Operating on a Shoestring," undated (post-9/11); Frank G. interview (Mar. 2, 2004).

112. In the wake of the East Africa embassy bombings, the NSC led trips to Saudi Arabia in 1999 and 2000 to meet with Saudi officials on terrorist financing. These meetings, and subsequent interviews of Bin Ladin family members in the United States, helped the U.S. government revise its understanding of Bin Ladin's wealth. Rick Newcomb interview (Feb. 4, 2004); William Wechsler interview (Jan. 7, 2004).

113. See William Wechsler interview (Jan. 7, 2004); Rick Newcomb interview (Feb. 4, 2004); Frank G. interview (Mar. 2, 2004); Frank G. and Mary S. briefing (July 15, 2003). See also DOS cable, State 035243, "January 2000 Meeting Regarding UBL Finances," Feb. 27, 2000; DOS cable, Riyadh 000475, "The Saudi Binladin Group: Builders to the King," Feb. 16, 1999; Treasury memo, Office of Foreign Asset Control to DOS, Draft Cable on Meet-

ing with Two of UBL's Brothers, May 19, 2000; Youssef M. Ibrahim, "Saudis Strip Citizenship from Backers of Militants," *New York Times*, Apr. 10, 1994, p. 15; "Saudi Family Disassociates Itself from 'Terrorist' Member," Associated Press, Feb. 19, 1994.

114. Frank G. and Mary S. briefing (July 15, 2003); Frank G. interview (Mar. 2, 2004); Intelligence report, interrogation of KSM, July 30, 2003; Robert Block, "In War on Terrorism, Sudan Struck a Blow by Fleecing Bin Laden," *Wall Street Journal*, Dec. 3, 2001, p. A1. Despite substantial evidence to the contrary and his own assertion that Bin Ladin arrived in Afghanistan with no money, KSM has told his interrogators that he believes the bulk of the money (85–95 percent) for the planes operation came from Bin Ladin's personal fortune. Intelligence reports, interrogations of KSM, July 30, 2003; Apr. 5, 2004; June 15, 2004.

115. Frank G. interview (Mar. 2, 2004); CIA analytic report, Financial Support for Terrorist Organizations, CTC 2002-40117CH, Nov. 14, 2002. The United States was not a primary source of al Qaeda funding, although some funds raised in the United States may have made their way to al Qaeda or its affiliated groups. Frank G. and Mary S. briefing (July 15, 2003).

116. Frank G. interview (Mar. 2, 2004); CIA analytic report, "Identifying al-Qa'ida's Donors and Fundraisers: A Status Report," CTC 2002-40029CH, Feb. 27, 2002.

117. CIA analytic report, "Identifying al-Qa'ida's Donors and Fundraisers: A Status Report," Feb. 27, 2002; CIA analytic report, spectrum of al Qaeda donors, CTC 2003-30199HC, Oct. 30, 2003; Frank G. interview (Mar. 2, 2004).

118. CIA analytic report, "How Bin Ladin Commands a Global Terrorist Network," CTC 99-40003, Jan. 27, 1999; CIA analytic report, "Gauging the War against al-Qa'ida's Finances," CTC 2002-30078CH, Aug. 8, 2002; CIA analytic report, paper on Al-Haramain, CTC 2002-30014C, Mar. 22, 2002.

119. CIA analytic report, "Al Qa'ida's Financial Ties to Islamic Youth Programs," CTC 2002-40132HCX, Jan. 17, 2003; CIA analytic report, Al Qaeda Financial Network, CTC 2002-40094H, Aug. 7, 2002.

120. Frank G. interview (Mar. 2, 2004); CIA analytic report, Financial Links of Al Qaeda Operative, CTC 2002-30060CH, June 27, 2002.

121. Frank G. and Mary S. briefing (July 15, 2003). The Taliban's support was limited to the period immediately following Bin Ladin's arrival in Afghanistan, before he reinvigorated fund-raising efforts. By 9/11, al Qaeda was returning the favor, providing substantial financial support to the Taliban.

122. David Aufhauser interview (Feb. 12, 2004). We have found no evidence that Saudi Princess Haifa al Faisal provided any funds to the conspiracy, either directly or indirectly. See Adam Drucker interview (May 19, 2004).

123. On limited Saudi oversight, see Bob Jordan interview (Jan. 14, 2004). In Saudi Arabia, *zakat* is broader and more pervasive than Western ideas of charity, in that it functions not only as charity but also as social welfare, educational assistance, foreign aid, a form of income tax, and a source of political influence.

124. A *hawala*, at least in the "pure" form, transfers value without the use of a negotiable instrument or other commonly recognized method for the exchange of money. For example, a U.S. resident who wanted to send money to a person in another country, such as Pakistan, would give her money, in dollars, to a U.S.-based hawaladar. The U.S. hawaladar would then contact his counterpart in Pakistan, giving the Pakistani hawaladar the particulars of the transaction, such as the amount of money, the code, and perhaps the identity of the recipient. The ultimate recipient in Pakistan would then go to the Pakistani hawaladar and receive his money, in rupees, from whatever money the Pakistani hawaladar has on hand. As far as the sender and ultimate recipient are concerned, the transaction is then complete. The two hawaladars would have a variety of mechanisms to settle their debt, either through offsetting transactions (e.g., someone in Pakistan sending money to the United States using the same two hawaladars), a periodic settling wire transfer from the U.S. hawaladar's bank to the Pakistani hawaladar's bank, or a commercial transaction, such as the U.S. hawaladar paying a debt or an invoice, in dollars, that the Pakistani hawaladar owes in the United States. Hawalas typically do not have a large central control office for settling transactions, maintaining instead a loose association with other hawaladars to transfer value, generally without any formal or legally binding agreements. See Treasury report, "A Report to Congress in Accordance with Section 359 of the [USA PATRIOT Act]" Nov. 2002; Treasury report, "Hawala: The Hawala Alternate Remittance System and its Role in Money Laundering," undated (prepared by the Financial Crimes Enforcement Network in cooperation with INTERPOL, probably in 1996).

125. Frank G. and Mary S. briefing (July 15, 2003); CIA analytic report Al-Qa'ida Financiers, CTC 2002-30138H, Jan. 3, 2003. Moreover, because al Qaeda initially was living hand to mouth, there was no need to store funds.

126. CIA analytic report, "Pursuing the Bin Ladin Financial Target," CTC 01-40003HCS, Apr. 12, 2001; CIA analytic report, "Couriers, Hawaladars Key to Moving Al-Qa'ida Money," CTC 2003-40063CH, May 16, 2003.

127. For al Qaeda spending, see Frank G. and Mary S. briefing (July 15, 2003). The 1998 U.S. embassy bombings in East Africa cost approximately $10,000. CIA analytic report, "Gauging the War on Terrorism: Most 11 September Practices Still Viable," Jan. 30, 2002; Intelligence report, interrogation of KSM, June 3, 2003. Although there is evidence that al Qaeda experienced funding shortfalls as part of the cyclical fund-raising process (with more money coming during the holy month of Ramadan), we are not aware of any intelligence indicating that terror-

ist acts were interrupted as a result. For al Qaeda expenditures, see, e.g., CIA analytic report, "Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures," CTC IR 98-40006, Nov. 17, 1998. For payments to the Taliban, see Frank G. and Mary S. briefing (July 15, 2003); CIA analytic report, "Terrorism: Amount of Money It Takes to Keep al-Qa'ida Functioning," PWR080702-05, Aug. 7, 2002. On start-up funds, see Frank G. interview (Mar. 2, 2004).

128. Doug Wankel interview (Mar. 15, 2004); Frank G. and Mary S. briefing (July 15, 2003). Although some reporting alleges that Bin Ladin may have been an investor, or even had an operational role, in drug trafficking before 9/11, this intelligence cannot be substantiated. Ibid. Frank G. interview (Mar. 2, 2004). No evidence indicates any such involvement in drug trafficking, and none of the detained al Qaeda operatives has indicated that this was a method of fund-raising.

129. "Conflict diamonds" refers to rough diamonds that finance armed conflict in Africa. The international community has tried to restrict trade in such gems. FBI report, "Allegations of Al Qaeda Trafficking in Conflict Diamonds," July 18, 2003; CIA analytic report, "Terrorism: Assessing al-Qa'ida and Hizballah Ties to Conflict Diamonds," CTC 2002-40121CH, Jan. 13, 2003; CIA analytic report, "Couriers, Hawaladars Key to Moving Al-Qa'ida Money," CTC 2003-40063CH, May 16, 2003; DOS cable, Brussels 05994, "WP Reporter Claims More Witnesses to 2001 Al-Qaida/Conflict Diamonds Link," Dec. 12, 2002; DOS cable, Brussels 001054, terrorism and conflict diamonds, Mar. 1, 2002. Greg R. interviews (Oct. 3, 2003; July 6, 2004); Alan White interview (June 23, 2004); FBI situation reports and supporting documents from the Sierra Leone trip, Feb. 2004.

130. Highly publicized allegations of insider trading in advance of 9/11 generally rest on reports of unusual pre-9/11 trading activity in companies whose stock plummeted after the attacks. Some unusual trading did in fact occur, but each such trade proved to have an innocuous explanation. For example, the volume of put options—investments that pay off only when a stock drops in price—surged in the parent companies of United Airlines on September 6 and American Airlines on September 10—highly suspicious trading on its face. Yet, further investigation has revealed that the trading had no connection with 9/11. A single U.S.-based institutional investor with no conceivable ties to al Qaeda purchased 95 percent of the UAL puts on September 6 as part of a trading strategy that also included *buying* 115,000 shares of American on September 10. Similarly, much of the seemingly suspicious trading in American on September 10 was traced to a specific U.S.-based options trading newsletter, faxed to its subscribers on Sunday, September 9, which recommended these trades. These examples typify the evidence examined by the investigation. The SEC and the FBI, aided by other agencies and the securities industry, devoted enormous resources to investigating this issue, including securing the cooperation of many foreign governments. These investigators have found that the apparently suspicious consistently proved innocuous. Joseph Cella interview (Sept. 16, 2003; May 7, 2004; May 10–11, 2004); FBI briefing (Aug. 15, 2003); SEC memo, Division of Enforcement to SEC Chair and Commissioners, "Pre-September 11, 2001 Trading Review," May 15, 2002; Ken Breen interview (Apr. 23, 2004); Ed G. interview (Feb. 3, 2004).

131. The hijackers spent more than $270,000 in the United States, and the costs associated with Moussaoui were at least $50,000. The additional expenses included travel to obtain passports and visas, travel to the United States, expenses incurred by the plot leaders and facilitators, and the expenses incurred by the people selected to be hijackers who ultimately did not participate. For many of these expenses, we have only fragmentary evidence and/or unconfirmed detainee reports, and can make only a rough estimate of costs. The $400,000 to $500,000 estimate does not include the cost of running training camps in Afghanistan, where the hijackers were recruited and trained, or the marginal cost of the training itself. Finally, the architect of the plot, KSM, put the total cost at approximately $400,000, apparently excluding Moussaoui's expenses. Intelligence reports, interrogations of KSM, June 3, 2003; Apr. 5, 2004. Our investigation has uncovered no evidence that the 9/11 conspirators employed hawala as a means to move the money that funded the operation. Indeed, the surviving plot participants have either not mentioned hawala or have explicitly denied using it to send money to the United States. Adam Drucker interview (Jan. 12, 2004); Intelligence report, interrogation of KSM, April 5, 2004; Intelligence report, interrogation of detainee, Apr. 2, 2004; Intelligence report, interrogation of Ramzi Binalshibh, Apr. 7, 2004. On domestic U.S. and foreign government funding, see, e.g., Adam Drucker interviews (Jan. 12, 2004; May 19, 2004); Dennis Lormel interview (Jan. 16, 2004); FBI response to Commission question for the record, July 13, 2004. As discussed in chapter 7, we have examined three transactions involving individuals in San Diego. Based on all of the evidence, we have concluded that none of these transactions involved a net transfer of funds to the hijackers.

132. Shehhi received a salary from the UAE military, which was sponsoring his studies in Germany. Adam Drucker interview (Jan. 12, 2004). For funds received by facilitators, see Intelligence report, interrogation of KSM, Apr. 5, 2004; Intelligence report, interrogation of Binalshibh, Apr. 9, 2004. Notwithstanding persistent press reports to the contrary, there is no convincing evidence that the Spanish al Qaeda cell, led by Imad Barkat Yarkas and al Qaeda European financier Mohammed Galeb Kalaje Zouaydi, provided any funding to support the 9/11 attacks or the Hamburg participants. Zouaydi may have provided funds to Hamburg associate Mamoun Darkazanli—see, e.g., FBI letterhead memorandum, Yarkas and Spanish Cell investigation, Jan. 8, 2003—but there is no evidence that Zouaydi provided money to the plot participants or that any of his funds were used to support the plot. Adam Drucker interview (Jan. 12, 2004); Ed G. interview (Feb. 3, 2004).

## 6 From Threat to Threat

1. President Clinton was a voracious reader of intelligence. He received the President's Daily Brief (PDB), Senior Executive Intelligence Brief (SEIB), and the State Department's intelligence updates daily, as well as other products episodically. Berger, Clarke, and Chief of Staff John Podesta received daily Bin Ladin "Situation Reports" from the CIA detailing Bin Ladin's reported location and movements. Berger told us he would tell President Clinton if there was anything in these reports that he needed to know. Samuel Berger interview (Jan. 14, 2004). Information on distribution of Bin Ladin Situation Reports provided to the Commission by CIA.

2. President Clinton spoke of terrorism in numerous public statements. In his August 5, 1996, remarks at George Washington University, he called terrorism "the enemy of our generation." He usually spoke of terrorism in two related contexts: new technologies and the greater openness engendered by post–Cold War globalization; and weapons of mass destruction (WMD), especially—and increasingly over time—the threat from biological and chemical weapons. President Clinton repeatedly linked terrorist groups and WMD as transnational threats for the new global era. See, e.g., President Clinton remarks, "On Keeping America Secure for the 21st Century," Jan. 22, 1999 (at the National Academy of Sciences, Washington, D.C.), in which he spoke directly to these topics.

3. President Clinton spoke of the Y2K computer problem in his January 19, 1999, State of the Union address. On Y2K concerns, see John Podesta interview (Jan. 15, 2004). On concerns about extremist groups exploiting millennial opportunities, see, e.g., CIA briefing materials, CTC for the DCI, "Millennium Threat," Dec. 16, 1999.

4. Judith Miller, "Holy Warriors: Dissecting a Terror Plot from Boston to Amman," *New York Times*, Jan. 15, 2001, p. A1; CIA analytic report, "Bin Ladin's Terrorist Operations: Meticulous and Adaptable," CTC 00-400117, Nov. 2, 2000 (appendix B: "Bin Ladin's Role in the Anti-U.S. 'Millennial' Plots").

5. Ibid. On Hoshar and Hijazi, see Jason Burke, *Al Qaeda: Casting a Shadow of Terror* (I. B. Tauris, 2003), p. 188. Khaldan and Derunta were terrorist training camps in Afghanistan controlled by Abu Zubaydah. While the camps were not al Qaeda facilities, Abu Zubaydah had an agreement with Bin Ladin to conduct reciprocal recruiting efforts whereby promising trainees at the camps could be invited to join al Qaeda. See Intelligence report, interrogation of Abu Zubaydah, July 10, 2002.

6. Miller, "Holy Warriors," Jan. 15, 2001; CIA analytic report, "Bin Ladin's Terrorist Operations," Nov. 2, 2000 (appendix B).

7. CIA analytic report, "Bin Ladin's Terrorist Operations," Nov. 2, 2000 (appendix B).

8. FBI electronic communication, "Ahmed Ressam; Usama bin Ladin; Sbih Benyamin; Lucia Garofalo; Bouabide Chamchi," Dec. 29, 1999; Miller, "Holy Warriors," Jan. 15, 2001. The *Encyclopedia* is a multivolume instruction manual containing lessons on weapons handling, tactics, covert operations, bomb making, and other topics. The manual was originally created in the late 1980s by Afghanistan-based extremists, who considered it essential for waging terrorist operations and guerrilla warfare in the jihad against the Soviets. For more on the origins of the *Encyclopedia*, see Intelligence report, interrogation of Abu Zubaydah, June 24, 2003. Although Deek's precise role within the extremist community is unknown, his name appears variously as a staff member, instructor, and technical guru for the Khaldan and Derunta terrorist training camps in Afghanistan. Intelligence has revealed no extant links to the al Qaeda inner circle. For more on Deek, see FBI electronic communication, "Usama Bin Laden; Penttbomb; Taliban," May 25, 2002.

9. Testimony of Dale Watson before the Senate Select Committee on Intelligence, Feb. 9, 2000, p. 4; Miller, "Holy Warriors," Jan. 15, 2001.

10. Testimony of Dale Watson before the Senate Select Committee on Intelligence, Feb. 9, 2000, pp. 3–4; FBI electronic communication, "Ahmed Ressam; Usama bin Ladin; Sbih Benyamin; Lucia Garofalo; Bouabide Ghamchi," Dec. 29, 1999; Miller, "Holy Warriors," Jan. 15, 2001. On the fate of Hoshar and Hijazi's accomplices, see DOS cable, Amman 05158, "Security Court Convicts UBL Suspects of Plotting," Sept. 18, 2000.

11. NSC note, Clarke to Berger, Dec. 4, 1999; Richard Clarke interview (Jan. 12, 2004). In the margin next to Clarke's suggestion to attack al Qaeda facilities in the week before January 1, 2000, Berger wrote "no."

12. NSC memo, Berger to President Clinton, Dec. 9, 1999.

13. NSC email, Clarke to Berger, Dec. 14, 1999. The State Department, through the U.S. embassy in Riyadh, also asked the Saudis to relay the same threat to the Taliban. The diplomat said the United States was delivering "a strong and unmistakable message to the Taliban that should such attacks occur, they and Bin Ladin will be subject to swift and serious response." See DOS cable, Riyadh 003900, "Saudis on USG Warning to Taliban Concerning UBL Threats," Dec. 14, 1999. Berger wrote President Clinton that the State Department's warning seemed to barely register with the Taliban. See NSC memo, Berger to President Clinton, terrorist threat at the millennium, Dec. 18, 1999.

14. See NSC memo, talking points for Zinni, Dec. 20, 1999; Anthony Zinni interview (Jan. 19, 2004); NSC email, Clarke to Berger, Dec. 22, 1999 (in which Clarke writes that "the Milam mission has largely failed"); NSC memo, Riedel re Milam call (attached to the Clarke email).

15. George Tenet interview (Jan. 22, 2004); George Tenet prepared statement, Mar. 24, 2004, p. 22.

16. Randy Moss interview (Feb. 6, 2004). In sending the draft MON to the CIA, the NSC's senior director for intelligence programs, Mary McCarthy, cited only the August 1998 and July 1999 MONs as relevant prece-

dents—indicating that these new authorities were limited to using the capture and rendition approach. There was no indication that this MON authorized kill authority, although lethal force could be used in self-defense. See NSC memo, McCarthy to CIA, Dec. 1999.

17. CIA cable, "DCI message and update on Millennium threat," Dec. 20, 1999; NSC email, Cressey to Berger's office and others, Dec. 23, 1999.

18. Trial testimony of Ahmed Ressam, *United States v. Mokhtar Haouari*, No. S4 00 Cr. 15 (S.D. N.Y.), July 3, 2001 (transcript pp. 536–569); July 5, 2001 (transcript p. 624); FBI report of investigation, interviews of Ahmed Ressam, May 10, 2001; May 24, 2001. Ressam's recruitment by Abderraouf Hannachi (a Khaldan alumnus) is noted in Deposition of Ahmed Ressam, *In re: Letters Rogatory*, *August 1, 2001* (S.D. N.Y.), Jan. 23, 2002 (transcript pp. 32–33). See also PBS *Frontline* broadcast, "Trail of a Terrorist," Oct. 25, 2001 (online at www.pbs.org/wgbh/pages/frontline/shows/trail).

19. Trial testimony of Ressam, *United States v. Haouari*, July 3, 2001 (transcript pp. 570–584); FBI report of investigation, interview of Ressam, Aug. 7, 2001.

20. FBI report of investigation, interview of Ressam, May 10, 2001; Hal Bernton, Mike Carter, David Heath, and James Neff, "The Terrorist Within: The Story Behind One Man's Holy War Against America," *Seattle Times*, June 23–July 7, 2002 (part 11, "The Ticking Bomb").

21. Trial testimony of Ressam, *United States v. Haouari*, July 5, 2001 (transcript p. 605); Deposition of Ressam, *In re: Letters Rogatory* (S.D. N.Y.), Jan. 23, 2002 (transcript p. 23).

22. Trial testimony of Ressam, *United States v. Haouari,* July 3, 2001; Bernton, Carter, Heath, and Neff, "The Terrorist Within," June 23–July 7, 2002 (part 6, "It Takes a Thief"). A friend of Ressam's, Fateh Kamel, would pay Ressam for stolen passports, credit cards and other identity documents. Kamel is now serving eight years in prison in France for activities related to association with terrorist enterprises. Bruce Crumley, "Fighting Terrorism: Lessons from France," *Time*, Sept. 24, 2001 (online at www.time.com/time/nation/article/0,8599,176139,00.html). Ressam testified that he also sold stolen documents to Mohktar Haouari. See trial testimony of Ressam, *United States v. Haouari*, July 5, 2001 (transcript pp. 631–632).

23. PBS *Frontline* broadcast, "Trail of a Terrorist." Leo Nkounga was the document broker and an illegal alien in Canada from Cameroon who failed to surrender himself for deportation in 1993. Canadian deportation order, Adjudication file no. AOT93-0077, Sept. 15, 1993. He said he obtained two genuine Canadian passports for Ressam by submitting fake baptismal certificates to Canadian authorities. CBC News broadcast, *Disclosure*, "Target Terrorism," Mar. 26, 2002 (online at www.cbc.ca/disclosure/archives/020326_leo/resources.html). Ressam told border officials that he did not have a visa for Pakistan because he was only transiting on his way to India. FBI report of investigation, interview of Ressam, May 15, 2001, p. 7.

24. FBI case profile (part of materials provided to Dale Watson), "Abdelghani Meskini," Feb. 8, 2000. Meskini, who spoke English, was to drive Ressam and to give him money, but Ressam never showed since he was arrested at the border. Meskini was arrested on Dec. 30, 1999, and charged with material support and interstate fraud. See Testimony of Dale Watson before the Senate Select Committee on Intelligence, Feb. 9, 2000, pp. 11–12. On passports and visas provided by Haouari, see *United States v. Haouari*, 319 F. 3d 88, 91 (2d Cir. 2002).

25. INS alien file, No. A73603119, Abdel Hakim Tizegha. There is no record of Tizegha's entry into the United States.

26. Trial testimony of Ressam, *United States v. Haouari*, July 5, 2001 (transcript pp. 605–607, 613); FBI report of investigation, interview of Ressam, May 10, 2001; Opening Statement, *United States v. Ahmed Ressam*, No. CR99-666C JCC (W.D. Wash.), Mar. 13, 2001 (transcript p. 33).

27. Trial testimony of Diana Dean and Mark Johnson, *United States v. Ressam*, Mar. 13, 2001 (transcript pp. 116, 165). On the unraveling of the Ressam case, see Bernton, Carter, Heath and Neff, "The Terrorist Within," June 23–July 7, 2002 (part 15, "Puzzle Pieces").

28. Trial testimony of Mark Johnson, *United States v. Ressam*, Mar. 13, 2001 (transcript p. 124).

29. NSC memo, Berger to President Clinton, terrorism threat at the millennium, Dec. 9, 1999.

30. NSC email, Clarke to Berger, Dec. 11, 1999.

31. Samuel Berger interview (Jan. 14, 2004); George Tenet interview (Jan. 22, 2004).

32. NSC memo, Berger to President Clinton, terrorist threat at the millennium, Dec. 18, 1999.

33. NSC email, Clarke to Berger, roadmap for Small Group, Dec. 22, 1999; NSC email, Cressey to Berger and others, Dec. 23, 1999.

34. NSC memo, "The Millennium Terrorist Alert—Next Steps," undated (attached to NSC draft memo, "Review of Terrorism Alert and Lessons Learned," Jan. 3, 2000). In the original document, the quotation is underlined, not italicized. See also NSC memo, "Principals Meeting: Millennium Terrorism," undated (likely Dec. 1999); NSC email, Clarke to Berger, roadmap for Small Group, Dec. 22, 1999.

35. NSC email, Clarke to Berger, roadmap for Small Group, Dec. 22, 1999.

36. Samuel Berger interview (Jan. 14, 2004). See also Richard Clarke interview (Jan. 12, 2004); Roger Cressey interview (Dec. 15, 2003).

37. Trial testimony of Diana Dean, *United States v. Ressam,* Mar. 13, 2001 (transcript p. 124).

38. Vanderbilt University, Television News Archive, Dec. 22, 1999–Jan. 4, 2000.

39. On the FBI's standard operating procedure, see Samuel Berger interview (Jan. 14, 2004); John Podesta interview (Jan. 15, 2004); James Steinberg interview (Dec. 4, 2003); Richard Clarke interviews (Dec. 18, 2004; Jan. 12, 2004); Paul Kurtz interview (Dec. 16, 2003).

40. See James Steinberg interview (Dec. 4, 2003). According to Steinberg, the millennium crisis was the only time that the FBI effectively shared information with the NSC. Before that, White House officials complained, they got nothing from the FBI—and were told that they were being deliberately kept out of the loop on grounds of propriety. See also Samuel Berger interview (Jan. 14, 2004); Richard Clarke interview (Jan. 12, 2004); Roger Cressey interview (Dec. 15, 2003). In fact, it was completely appropriate for the NSC to be briefed by the FBI on its national security investigations. Moreover, the legal bar to sharing information was often exaggerated. Only information actually presented to the grand jury could not be disclosed. See Rule 6(e) of the Federal Rules of Criminal Procedure, which establishes rules for grand jury secrecy.

41. Intelligence report, Activities of Bin Ladin associates, Dec. 29, 1999; Intelligence report, review of 9/11 hijackers' activities, Sept. 23, 2002; CIA cable, "Activities of Bin Ladin Associate Khalid Revealed," Jan. 4, 2000.

42. Intelligence report, meetings between Khallad and perpetrators of the 9/11 attacks, May 30, 2003.

43. Intelligence report, Activities of Bin Ladin associates, Jan. 2, 2000; CIA cable, "Activities of Bin Ladin Associate Khalid Revealed," Jan. 4, 2000; CIA email, CTC to NSA, Another UBL related report, Jan. 3, 2000.

44. CIA cable, "Activities of Bin Ladin Associate Khalid Revealed," Jan. 4, 2000. His Saudi passport—which contained a visa for travel to the United States—was photocopied and forwarded to CIA headquarters. This information was not shared with FBI headquarters until August 2001. An FBI agent detailed to the Bin Ladin unit at CIA attempted to share this information with colleagues at FBI headquarters. A CIA desk officer instructed him not to send the cable with this information. Several hours later, this same desk officer drafted a cable distributed solely within CIA alleging that the visa documents had been shared with the FBI. She admitted she did not personally share the information and cannot identify who told her they had been shared. We were unable to locate anyone who claimed to have shared the information. Contemporaneous documents contradict the claim that they were shared. DOJ Inspector General interview of Doug M., Feb. 12, 2004; DOJ Inspector General interview of Michael, Oct. 31, 2002; CIA cable, Jan. 5, 2000; DOJ Inspector General report, "A Review of the FBI's Handling of Intelligence Information Related to the 9/11 Attacks," July 2, 2004, p. 282.

45. CIA cables, "Identification of UBL Associate Khalid Transiting Dubai," Jan. 4, 2000; "UBL Associate Travel to Malaysia—Khalid Bin Muhammad bin 'Abdallah al-Mihdhar," Jan. 5, 2000; "Arrival of UBL Associate Khalid Bin Muhammad bin 'Abdallah al-Mihdhar," Jan. 6, 2000.

46. CIA cable, "UBL Associates Travel to Malaysia and Beyond—Khalid Bin Muhammad bin 'Abdallah al-Midhar," Jan. 6, 2000.

47. CIA cable, "UBL Associates Depart Malaysia," Jan. 8, 2000.

48. CIA cable, "UBL Associates: Flight Manifest," Jan. 9, 2000. None of the CIA personnel at CIA headquarters or in the field had checked NSA databases or asked NSA to do so. If this had been done, on the basis of other unreported intelligence associated with the same sources, analysts would have been able to quickly learn "Nawaf" was likely Nawaf al Hazmi. Such analysis was not conducted until after 9/11. After 9/11 it also was determined that Salahsae was part of a name being used by Tawfiq bin Attash, also known as Khallad. One reason he was traveling around East Asia at this time is that he was helping to plan possible hijackings on aircraft in connection with an early idea for what would become the 9/11 plot.

49. CIA cable, "Efforts to Locate al-Midhar," Jan. 13, 2000. We now know that two other al Qaeda operatives flew to Bangkok to meet Khallad to pass him money. See chapter 8. That was not known at the time. Mihdhar was met at the Kuala Lumpur airport by Ahmad Hikmat Shakir, an Iraqi national. Reports that he was a lieutenant colonel in the Iraqi Fedayeen have turned out to be incorrect. They were based on a confusion of Shakir's identity with that of an Iraqi Fedayeen colonel with a similar name, who was later (in September 2001) in Iraq at the same time Shakir was in police custody in Qatar. See CIA briefing by CTC specialists (June 22, 2004); Walter Pincus and Dan Eggen, "Al Qaeda Link to Iraq May Be Confusion over Names," *Washington Post*, June 22, 2004, p. A13.

50. Richard interview (Dec. 11, 2003); CIA briefing materials, UBL unit briefing slides, Jan. 3–Jan. 14, 2000; Intelligence reports, "UBL Situation Report," Jan. 5, 10, 12, 2000; CIA email, Rob to John and others, "Malaysia—for the record," Jan. 6, 2000.

51. CIA cable, "Efforts to Locate al-Midhar," Jan. 13, 2000.

52. CIA cable, "UBL Associates: Identification of Possible UBL Associates," Feb. 11, 2000.

53. CIA cable, "UBL Associates: Identification of Possible UBL Associates," Mar. 5, 2000. Presumably the departure information was obtained back in January, on the days that these individuals made their departures. Because these names were watchlisted with the Thai authorities, we cannot yet explain the delay in reporting the news. But since nothing was done with this information even in March, we do not attribute much significance to this failure alone.

54. See, e.g., Joint Inquiry testimony of George Tenet, Oct. 17, 2002, pp. 110–112; DOJ Inspector General interview of John, Nov. 1, 2002.

55. CIA briefing, CTC Update, "Islamic Extremist Terrorist Threat," Jan. 5, 7, 2000; George Tenet interview (Jan. 22, 2004). Tenet described the millennium alert as probably the most difficult operational environment the CIA had ever faced.

56. NSC memo, Clarke to Berger, "Post-Millennium Soul Searching," Jan. 11, 2000.

57. NSC memo, "Review of Terrorism Alert and Lessons Learned," Jan. 3, 2000 (draft). This paper is part of a packet Clarke sent to Deputy Attorney General Thompson, copying White House officials, on Sept. 17, 2001.

58. NSC memo, McCarthy to Berger, need for new strategy, Jan. 5, 2000.

59. NSC memo, Kurtz to Berger, roadmap for March 10 PC meeting, Mar. 8, 2000.

60. NSC memo, Cressey to Berger, Summary of Conclusions for March 10, 2000, PC on Millennium After-Action Review, Apr. 3, 2000; Samuel Berger letter to the Commission, "Comments on Staff Statements 5–8," May 13, 2004, p. 9.

61. NSC memo, "The Millennium Terrorist Alert—Next Steps," undated.

62. DOS memo, Sheehan and Inderfurth to Albright, "Pakistan Trip Report—A Counterterrorism Perspective," Jan. 26, 2000; DOS cable, Islamabad 00396, "Inderfurth Delegation Meeting with General Musharraf," Jan. 24, 2000.

63. In February 2000, the CIA began receiving information about a possible Bin Ladin–associated plot to attack Air Force One with Stinger missiles if President Clinton visited Pakistan; this information was deemed credible by early March. The CIA also reviewed reported threats to the President in Bangladesh and India. CIA briefing, "Reported Plan To Attack U.S. Presidential Plane If He Visits Pakistan," Feb. 18, 2000; NSC email, Clarke to Berger, terrorism update, Feb. 29, 2000; CIA briefing, chief of CTC for the President, "Threats to the President's Visit to Asia," Mar. 2, 2000; NSC memo, Kurtz, "Summary of Conclusions of March 14, 2000 Meeting on Clinton Trip to South Asia;" NSC email, Kurtz to Berger, two new threats to assassinate the President in Bangladesh, Mar. 16, 2000. Berger told us that the Secret Service was vehemently opposed to a presidential visit to Islamabad; it took the extraordinary step of meeting twice with the President and offering very serious warnings. Samuel Berger interview (Jan. 14, 2004).

64. President Clinton meeting (Apr. 8, 2004). President Clinton told us he offered Musharraf aid and help in improving U.S.-Pakistani relations. A conversation that day between the two leaders in the presence of several close advisers is described in DOS cable, State 073803, "Memorandum of the President's Conversation with Pervez Musharraf on March 25, 2000," Apr. 19, 2000. A third meeting was apparently held in front of additional aides. Berger told that President Clinton did not want to press the Bin Ladin issue too heavily at the main meeting because ISID (Inter-Services Intelligence Directorate) members were present. Samuel Berger interview (Jan. 14, 2004).

65. NSC email, Camp for Berger, "Musharraf's Proposed Afghanistan Trip," May 8, 2000. Clarke wrote Berger that Musharraf seemed to have "said the right things to Omar." NSC email, Clarke to Berger, May 11, 2000.

66. DOS cable, Islamabad 002902, "Summary of May 26, 2000 Meeting Between Pickering and Musharraf," May 29, 2000.

67. DOS cable, Islamabad 79983, "DCI Meets with Chief Executive General Musharraf," June 21, 2000. Musharraf agreed to create a counterterrorism working group to coordinate efforts between Pakistani agencies and the CIA. Tenet noted that he was not asking the Pakistanis to deliver Bin Ladin next Tuesday; the DCI said he was "ambitious, but not crazy."

68. DOS cable, State 185645, "Concern that Pakistan is Stepping up Support to Taliban's Military Campaign in Afghanistan," Sept. 26, 2000.

69. UN Security Council Resolution (UNSCR) 1333, Dec. 19, 2000. UNSCR 1333 also called for countries to withdraw their officials and agents from the Taliban-held part of Afghanistan. Sheehan said that the new UN sanctions were aimed at the Taliban's primary supporters: Pakistan, Saudi Arabia, and the United Arab Emirates. Michael Sheehan interview (Dec. 16, 2003).

70. Madeleine Albright prepared statement, Mar. 23, 2004, p. 11; Madeleine Albright interview (Jan. 7, 2004).

71. Michael Sheehan interview (Dec. 16, 2003).

72. The CIA appears to have briefed President Clinton on its "Next Steps and New Initiatives" in February 2000, noting the need to hire and train the right officers with the necessary skills and deploy them to the right places, as well as to work with foreign liaison. The CIA noted in its briefing that the President should press foreign leaders to maintain pressure on terrorists. See CIA briefing materials, "Targeting the Terrorists: Next Steps and New Initiatives," Feb. 1, 2000 (for the President); NSC email, Cressey to Berger, "CT Briefing for Clinton," Feb. 8, 2000.

73. For the CTC's perspective, see CIA briefing materials, "Talking Points for the DCI for the Principals Committee meeting on Terrorism: The Millennium Alert—After Action Review," Mar. 9, 2000. Deputy Chief of CTC Ben Bonk noted in the talking points that the CTC had obligated 50 percent of its fiscal year 2000 budget by Jan. 31, 2000, spending about 15 percent of its budget directly on the millennium surge. He stated that without a supplemental, it would be impossible for the CTC to continue at its current pace, let alone increase the operational tempo. On Tenet meeting with Berger, see George Tenet interview (Jan. 28, 2004).

74. Joan Dempsey interview (Nov. 12, 2003); George Tenet interview (Jan. 22, 2004). Tenet called the supple-

mental appropriation "a lifesaver." See, for example, the request for supplemental appropriations in CIA briefing materials, "Targeting the Terrorists: Next Steps and New Initiatives," Feb. 1, 2000 (for the President).

75. Richard Clarke interview (Feb. 3, 2004).

76. James Pavitt interview (Jan. 8, 2004).

77. Richard Clarke interviews (Dec. 18, 2003; Feb. 3, 2004).

78. CIA memos, summary of weekly Berger/Tenet meeting, Apr. 5, 12, 2000; NSC memo, "April 19, 2000 Agenda for Deputies Committee Meeting on CT: The Millennium Threat FY00 and FY01 Budget Review;" NSC memo, "Summary of Conclusions of April 18, 2000 CSG Meeting," Apr. 26, 2000. On May 2, 2000, Berger was updated on budget issues relating to the CIA and other agencies; there was agreement on the most critical items to be funded, but not on the source of that funding. In CIA's case, it had already reprogrammed over $90 million, but Tenet wanted to use most of this money on non-counterterrorism programs. NSC memo, Kurtz to Berger, "Budget Issues," May 2, 2000. On June 29, 2000, the President authorized raising the CIA's covert action funding ceiling. NSC memo, McCarthy to CSG, "DCI Wants to Raise Funding Ceiling," May 8, 2000; NSC memo, McCarthy to others July 7, 2000 (appendix on authorities). But funding issues in other agencies remained unresolved. Clarke complained that neither Treasury nor Justice would identify offsets. Clarke encouraged OMB to tell both departments that if they would not identify offsets then OMB would. NSC email, Clarke to Rudman and Mitchell, May 9, 2000. On August 1, 2000, Clarke wrote Berger that one of five goals by the end of the Clinton administration was to secure appropriations for cybersecurity and millennium after-action review projects. NSC memo, Clarke to Berger, "Goals and Wildcards," Aug. 1, 2000. As late as September 2000, Clarke was advising Berger that unfunded counterterrorism requests continued to be his number one priority. NSC note, Clarke to Berger, Sept. 9, 2000.

79. Executive Order 13099 (Aug. 20, 1998); Rick Newcomb interview (Feb. 4, 2004); Robert McBride interview (Nov. 19–20, 2003); NSC memo, Kurtz to Berger, June 28, 2000. OFAC did freeze accounts belonging to Salah Idris, the owner of the al Shifa facility bombed in response to the East Africa embassy bombings. Idris filed suit against his bank and OFAC. OFAC subsequently authorized the unfreezing of those accounts. James Risen, "To Bomb Sudan Plant, or Not: A Year Later, Debates Rankle," *New York Times,* Oct. 27, 1999, p. A1. The inability to freeze funds is attributed in part to a lack of intelligence on the location of Bin Ladin's money, OFAC's reluctance or inability to rely on what classified information there may have been, and Bin Ladin's transfer of assets into the hands of trusted third parties or out of the formal financial system by 1998. Even if OFAC had received better intelligence from the intelligence community, it would have been powerless to stop the bulk of the problem. Al Qaeda money flows depended on an informal network of hawalas and Islamic institutions moving money from Gulf supporters to Afghanistan. These funds would not therefore have touched the U.S. formal financial system. OFAC's authorities are only against U.S. persons, financial institutions, and businesses. Frank G. and Mary S. briefing (July 15, 2003); Rick Newcomb interview (Feb. 4, 2003).

80. Executive Order 13129; Treasury memo, Newcomb to Johnson, "Blocking of Taliban-Controlled Assets," undated (probably Oct. 18, 1999).

81. DOS cable, State 184471, Sept. 30, 1999; 18 U.S.C. § 2339B.

82. The Financial Action Task Force, a multilateral government organization dedicated to standard setting, focused on money laundering, particularly as it related to crimes such as drug trafficking and large-scale fraud that involved vast amounts of illegally procured money. Although the UN General Assembly adopted the International Convention for the Suppression of Financing Terrorism in December 1999, the convention did not enter into force until April 2002.

83. Doug M. interview (Dec. 16, 2003); Frank G. interview (Mar. 2, 2004). See also Mike interview (Dec. 11, 2003), setting forth the goals of the UBL station; none relate specifically to terrorist financing. Another witness recalled that the UBL station made some effort to gather intelligence on al Qaeda financing, but it proved to be too hard a target, the CIA had too few sources and, as a result, little quality intelligence was produced. Ed G. interview (Feb. 3, 2004). Some attributed the problem to the CIA's separation of terrorist-financing analysis from other counterterrorism activities. Within the Directorate of Intelligence, a group was devoted to the analysis of all financial issues, including terrorist financing. Called the Office of Transnational Issues (OTI), Illicit Transaction Groups (ITG), it dealt with an array of issues besides terrorist financing, including drug trafficking, drug money laundering, alien smuggling, sanctions, and corruption. ITG was not part of the CTC, although it rotated a single analyst to CTC. Moreover, OTI analysts were separated from the operational side of terrorist financing at CTC, which planned operations against banks and financial facilitators. William Wechsler interview (Jan. 7, 2004); Frank G. and Mary S. briefing (July 15, 2003).

84. CIA analytic report, "Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions," OTI 97-10035CX, Dec. 1997.

85. Mike interview (Dec. 11, 2003).

86. CIA analytic reports, "Usama Bin Ladin: Some Saudi Financial Ties Probably Intact," OTI IR 99-005CX, Jan. 11, 1999; "How Bin Ladin Commands a Global Terrorist Network," CTC 99-40003, Jan. 27, 1999; "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007, Apr. 9, 1999.

87. See NSC memo, Kurtz to Berger, June 28, 2000; NSC document, TNT to Berger, Nov. 3, 1998, roadmap for Small Group, undated. The problem continued until 9/11. Intelligence reporting was so limited that one CIA intelligence analyst told us that, unassisted, he could read and digest the universe of intelligence reporting on al Qaeda financial issues in the three years prior to the 9/11 attacks. Frank G. and Mary S. briefing (July 15, 2003).

88. Richard Clarke interview (Feb. 3, 2004); see, e.g., NSC memo, Clarke to CSG, "Concept of Operations for Task Force Test of the Foreign Terrorist Asset Tracking Center," Nov. 1, 2000; Treasury memo, Romey to Sloan, "FTAT SCIF," May 17, 2001; Treasury memo, Newcomb to Sloan, "Response to Romey Memo," May 23, 2001. Despite post-9/11 declarations to the contrary, on the eve of 9/11 FTAT had funds appropriated, but no people hired, no security clearances, and no space to work. Treasury memo, Newcomb to Dam, "Establishing the Foreign Asset Tracking Center," Aug. 3, 2001. One Treasury official described CIA's posture as "benign neglect" toward the Foreign Terrorist Asset Tracking Center (FTATC), and characterized the CIA as believing that financial tracking had limited utility. Treasury memo, Mat Burrows to O'Neill, "Your PC on Counterterrorism on 4 September," Sept. 4, 2001. National Security Advisor Rice told us she and her staff had determined by spring 2001 that terrorist financing proposals were a good option, so Treasury continued to plan to establish an office for 24 financing analysts. Condoleezza Rice meeting (Feb. 7, 2004). In fact, as noted above, Treasury failed to follow through on the establishment of the FTATC until after 9/11.

89. This assessment is based on an extensive review of FBI files and interviews with agents and supervisors at FBI Headquarters and various field offices.

90. Although there was an increased focus on money laundering, several significant legislative and regulatory initiatives designed to close vulnerabilities in the U.S. financial system failed to gain traction. Some of these, such as a move to control foreign banks with accounts in the United States, died as a result of banking industry pressure. Others, such as the regulation of money remitters within the United States, were mired in bureaucratic inertia and a general antiregulatory environment. In any event, it is an open question whether such legislative or regulatory initiatives would have significantly harmed al Qaeda, which generally made little use of the U.S. financial system to move or store its money.

91. Treasury report, "The 2001 National Money Laundering Strategy," Sept. 2001.

92. NSC email, Berger's office to executive secretaries, "Millennium Alert After Action Review," Mar. 9, 2000.

93. PDD-62, "Protection Against Unconventional Threats to the Homeland and Americans Overseas," May 22, 1998, pp. 8–9; NSC email, Berger's office to executive secretaries, "Millennium Alert After Action Review," Mar. 9, 2000.

94. PDD-62, May 22, 1998; PDD-39, "U.S. Policy on Counterterrorism," June 21, 1995, p. 2.

95. NSC email, Berger's office to executive secretaries, "Millennium Alert After Action Review," Mar. 9, 2000.

96. PDD-62, May 22, 1998, p. 9. Congress had authorized the Alien Terrorist Removal Court at the request of the Justice Department in 1996, and it was established in 1997. Clarke noted the court had not been "highly useful." NSC email, Berger's office to executive secretaries, "Millennium Alert After Action Review," Mar. 9, 2000. Indeed, it had not been used at all.

97. PDD-62, May 22, 1998, p. 8; NSC memo, Clarke, "Summary of Conclusions for March 31, 2000 Millennium Alert Immigration Review Meeting," Apr. 13, 2000. One provision from PDD-62 *not* updated and reiterated in 2000 was a directive to CIA to ensure that names (and aliases) of terrorists were collected and disseminated to State, INS, and the FBI in a timely way, so that the border agencies could place them on a watchlist and the FBI could identify them in the United States.

98. NSC email, Berger's office to executive secretaries, "Millennium Alert After Action Review," Mar. 9, 2000.

99. Richard Clarke interview (Feb. 3, 2004); Samuel Berger interview (Jan. 14, 2004); Scott Fry interview (Dec. 29, 2003); Scott Gration interview (March 3, 2004); NSC email, Clarke to Berger, Mar. 2, 2000. Clarke apparently took the comment as a presidential instruction to take another look at what additional actions could be taken against Bin Ladin. Given diplomatic failures to directly pressure the Taliban through Pakistan, the NSC staff saw increased support to the Northern Alliance and Uzbeks as alternative options. NSC memo, "The Millennium Terrorist Alert—Next Steps," undated.

100. A good account of the episode is found in Steve Coll, *Ghost Wars: The Secret History of the CIA, Afghanistan, and bin Laden, from the Soviet Invasion to September 10, 2001* (Penguin, 2004), pp. 487–491; see also ibid., pp. 495–496, 502–503, 517–519; Richard interview (Dec. 11, 2003). "Richard" told us the attack had already occurred when CIA headquarters heard about it; "within this building, they were breathless," he remarked. The CIA concern was apparently over possible casualties and whether, by sharing intelligence with Massoud on Bin Ladin's possible location, the CIA might have violated the assassination ban. Tenet did not recall the incident, saying it was no doubt just "a blip" on his screen within the context of the millennium alerts. George Tenet interview (Jan. 22, 2004). The incident was, however, noticed by the NSC counterterrorism staff, which pointedly asked to be kept in the loop in the future. NSC memo, "Review of Terrorism Alert and Lessons Learned," Jan. 3, 2000 (draft).

101. See, e.g., CIA officers' visits to Tashkent noted in CIA briefing materials, DCI Update, "Islamic Extremist Terrorist Threat," Feb. 18, 2000; CIA briefing materials, EXDIR Update, Visit to Tashkent, Apr. 5, 2000. CTC teams were deployed to Afghanistan to meet with Massoud on March 13–21, 2000, and possibly on April 24–28,

2000. CIA briefing materials, EXDIR Update, "Islamic Extremist Terrorist Threat," Mar. 6, 2000; CIA briefing materials, "CTC PowerPoint," Apr. 3, 2000. Massoud's representatives also met with Clarke, the State Department's Michael Sheehan, and CIA senior managers in Washington. CIA briefing materials, "DDO Update," May 22, 2000.

102. On Black and Clarke's positions, see Cofer Black interview (Dec. 9, 2003); Roger Cressey interview (Dec. 15, 2003). On reasons for caution, see, e.g., Strobe Talbott interview (Jan. 15, 2004).

103. See, e.g., CIA briefing materials, CTC Update for the DDCI, July 7, 2000 ("Direct engagement with Massoud will enhance our ability to report on UBL and increase retaliation options if . . . we are attacked by UBL").

104. The deputy chief for operations of CTC, "Henry," told us that going into the Afghanistan sanctuary was essential. He and Black proposed direct engagement with Massoud to the CIA's senior management, but the idea was rejected because of what "Henry" called "a question of resources"—the CIA did not have effective means to get personnel in or out of Afghanistan. When he proposed sending a CIA team into northern Afghanistan to meet with Massoud in August 2000, the idea was turned down; local helicopters were not deemed airworthy, and land access was too risky. Henry interview (Nov. 18, 2003); Henry briefing (Apr. 22, 2004).

105. The alleged attempt was reported on August 10, 2000; see CIA memo, Bonk to McCarthy and Clarke, "Attempted Interdiction of Suspect Bin Ladin's Convoy," Aug. 11, 2000. For doubts as to whether the tribals made this attempt, see Cofer Black interview (Dec. 9, 2003); Richard interview (Dec. 11, 2003).

106. The Joint Chiefs of Staff Warning Order of July 6, 1999, was still in effect. See DOD memo, "Military Response Options," Oct. 23, 2000.

107. The 13 options included B-2 bombers, missiles, AC-130 gunships, the armed UAV, and raids to capture and destroy al Qaeda leaders and targets. DOD briefing materials, Joint Chiefs of Staff, "Operation Infinite Resolve Brief," June 2000.

108. Scott Gration interview (Mar. 3, 2004). See also Scott Fry interview (Dec. 29, 2003).

109. This quotation is taken from Daniel Benjamin and Steven Simon, *The Age of Sacred Terror* (Random House, 2002), p. 318. President Clinton confirmed that he made this statement. President Clinton meeting (Apr. 8, 2004).

110. President Clinton meeting (Apr. 8, 2004); Hugh Shelton interview (Feb. 5, 2004); William Cohen interview (Feb. 5, 2004).

111. Scott Gration interview (Mar. 3, 2004); Scott Fry interview (Dec. 29, 2003).

112. NSC memo, Clarke to CSG members, "Follow-Up to bin Ladin Review," Apr. 25, 2000. See also CIA briefing materials, "DDCI Update," Apr. 21, 2000 (J-39 "has decided to do everything possible to support CIA's UBL efforts"). This reportedly included J-39's belief that it would be able to pay for all costs—though, as it turned out, that would not be the case. CIA managers were reluctant to go ahead with either the telescope or the Predator options. Executive Director David Carey told us they saw the projects as a "distraction" that would pull personnel and resources away from other, high-priority activities, such as worldwide disruptions. The telescope program, for instance, was considered too challenging and risky for the CIA's Afghan assets; development continued through the summer, but the idea was eventually dropped. David Carey interview (Oct. 31, 2003); Scott Fry interview (Dec. 29, 2003); Scott Gration interview (Mar. 3, 2004).

113. According to Charles Allen, the CIA's senior management, especially within the Directorate of Operations, was originally averse to the Predator program mostly because of the expense—approximately $3 million, which the directorate claimed it did not have. Charles Allen interview (Jan. 27, 2004). The argument between CIA and DOD over who would pay for proposed operations continued for months. On the CIA side see, for example, CIA briefing materials, "DDO Update," May 22, 26, 2000 (at which the DCI was told that unless funding was identified within the next 10 days, the military advised that the Predator could not be deployed that fiscal year; the military was waiting for an NSC request that it fund the projects). See also NSC memo, Clarke to Tenet, June 25, 2000 ("The other CSG agencies are unanimous that the Predator project is our highest near-term priority and that funding should be shifted to it"). Clarke noted that the CSG plan was to use DOD money to jump-start the program. On the cost-sharing agreement, see NSC memo, Kurtz to Berger, June 28, 2000; NSC memo, "Small Group agenda," June 29, 2000. Eventually, "after some pushing," the CIA found $2 million from its funds to pay for two months of trial flights. DOD agreed to fund $2.4 million. NSC memo, Kurtz to Berger, June 28, 2000.

114. NSC memo, Kurtz to Berger, June 28, 2000. On UAV tests, see CIA briefing materials, "DCI Update," July 14, 2000. On modifications, see NSC memo, Clarke to Berger, update, July 18, 2000.

115. NSC memo, Clarke to Berger, "Predator," Aug. 11, 2000.

116. NSC memo, Cressey to Berger, Aug. 18, 2000 (underlining in the original); NSC memo, Cressey to Berger, Aug. 21, 2000 (attaching informational memo to President Clinton).

117. NSC note, Clarke to Berger, Sept. 9, 2000.

118. John Maher III interview (Apr. 22, 2004). The CIA's Ben Bonk told us he could not guarantee from analysis of the video feed that the man in the white robe was in fact Bin Ladin, but he thinks Bin Ladin is the "highest probability person." (Bin Ladin is unusually tall.) Ben Bonk briefing (Mar. 11, 2004). Intelligence analysts seem to have determined this might have been Bin Ladin very soon after the September 28 sighting; two days later, Clarke wrote to Berger that there was a "very high probability" Bin Ladin had been located. NSC note, Clarke to Berger, "Procedures for Protecting Predator," Sept. 30, 2000.

119. NSC note, Clarke to Berger, "Procedures for Protecting Predator," Sept. 30, 2000. Clarke pointed to a silver lining: "The fact that its existence has become at least partially known, may for a while change the al Qida movement patterns," he wrote, but "it may also serve as a healthy reminder to al Qida and the Taliban that they are not out of our thoughts or sight." Ibid.

120. Clarke wrote to Berger that "it might be a little gloomy sitting around the fire with the al Qida leadership these days." NSC note, Clarke to Berger, Sept. 9, 2000.

121. For the number of dead and wounded, see Indictment, *United States v. Jamal Ahmed Mohammed Ali al-Badawi*, No. S12 98 Cr. 1023 (KTD) (S.D. N.Y. filed May 15, 2003), p. 16.

122. See Intelligence report, interrogation of Abd al Rahim al Nashiri, Feb. 21, 2004. For Khallad, see Intelligence report, interrogation of Khallad, Aug. 20, 2003. For Khamri and Nibras's full names, Quso's responsibility to film the attack, and Nibras and Quso delivering money, see Indictment, *United States v. al-Badawi*, May 15, 2003, pp. 13–14. Badawi was supposed to film the attack but had to travel, so he instructed Quso to do it instead. FBI notes, notes of Nov. 11 and 13 executive conference call, Nov. 13, 2000, p. 2. For Quso's admission of delivering money, see Al S. interviews (Aug. 26, 2003; Sept. 15, 2003).

123. For Bin Ladin's decision, Nashiri's trip to protest, and Nashiri's instructions, see Intelligence report, interrogation of Nashiri, Feb. 21, 2004. For a report that Nashiri did not instruct the operatives to attack, see Intelligence report, interrogation of Nashiri, Nov. 21, 2002.

124. For the attack, see Indictment, *United States v. al-Badawi*, May 15, 2003, p. 16. For Quso not filming the attack, see FBI report of investigation, interview of Fahd Mohammed Ahmad al-Quso, Feb. 3, 2001, p. 8. Quso apparently fell asleep and missed the attack. See FBI notes, notes of Nov. 11 and 13 executive conference call, Nov. 13, 2000, p. 2.

125. For Bin Ladin's order to evacuate and subsequent actions, see Intelligence report, interrogation of Abu Zubaydah, Dec. 13, 2003. For Bin Ladin's, Atef's, and Zawahiri's movements, see Intelligence report, interrogation of Khallad, Sept. 27, 2003.

126. Intelligence report, Terrorism Activities, Oct. 1, 2001.

127. For the media committee, the video, and its effect, see Intelligence report, autobiography of KSM, July 12, 2003; Intelligence report, interrogation of KSM, Apr. 4, 2003. On the bombing of the *Cole* sparking jihadist recruitment, see Intelligence report, interrogation of Khallad, Sept. 5, 2003.

128. See Barbara Bodine interview (Oct. 21, 2003); Al S. interviews (Aug. 26, 2003; Sept. 15, 2003). On the problems with having Americans bring firearms into the country, see also NSC email, Clarke to Berger, USS *Cole*—situation report for PC meeting, Oct. 13, 2000. U.S. officials cannot travel to a country without the clearance of the U.S. ambassador to that country.

129. For suspicion of Egyptian Islamic Jihad, see NSC memo, Berger to President Clinton, update on *Cole* attack, Oct. 12, 2000. For McLaughlin's statement, see John McLaughlin interview (Jan. 21, 2004). In this vein, the State Department advised the investigation not to rush to judgment that al Qaeda was responsible. Barbara Bodine interview (Oct. 21, 2003).

130. For Yemen barring the FBI, see Al S. interviews (Aug. 26, 2003; Sept. 15, 2003). For the CIA's characterization, see CIA report, threat to U.S. personnel in Yemen, Oct. 18, 2000. For the high-level interventions, see Samuel Berger interview (Jan. 14, 2004); Kenneth Pollack interview (Sept. 24, 2003); CIA cable, CIA talking points for Tenet's call to chief of Yemen intelligence, Oct. 26, 2000. On secondhand information, see John McLaughlin interview (Jan. 21, 2004).

131. FBI notes, notes of Nov. 11 and 13 executive conference call, Nov. 13, 2000; FBI electronic communication, "Summary of information from Yemen intelligence," Jan. 10, 2001.

132. For the FBI agent's role, see Al S. interviews (Aug. 26, 2003; Sept. 15, 2003). For Yemen providing the photograph, see FBI electronic communication, "Summary of information from Yemen intelligence," Jan. 10, 2001. For the source identifying the photograph, see FBI electronic communication, "Source reporting on al Qaeda," Jan. 16, 2001.

133. For Khallad's involvement in the embassy bombings, see FBI report of investigation, interview of Mohammad Rashed Daoud al Owhali, Sept. 9, 1998. For Yemen identifying Nashiri, see FBI electronic communication, "Information provided by Yemen intelligence," Dec. 17, 2000.

134. Richard Clarke interview (Feb. 3, 2004). Richard Miniter offers an account of the Clinton administration's deliberations about the *Cole* in Richard Miniter, *Losing Bin Laden: How Bill Clinton's Failures Unleashed Global Terror* (Regnery, 2003), pp. 222–227. Berger told us the account is "a crock." Samuel Berger interview (Jan. 14, 2004). Clarke was less critical. Richard Clarke interview (Feb. 3, 2004).

135. For the additional covert action authorities, see NSC memo, McCarthy to Berger, new covert action authorities, Oct. 31, 2000. For Tenet developing options, see NSC memo, Berger to President Clinton, update on *Cole* investigation, Nov. 25, 2000.

136. For Berger's authorization, see NSC memo, TNT to Berger, responding to Taliban's September overture, Oct. 20, 2000. For Berger's statement, see NSC memo, Berger to TNT, reply to Oct. 20, 2000, memo. For the admin-

istration working with Russia, see NSC memo, Berger to President Clinton, update on *Cole* investigation, Nov. 25, 2000.

137. President Clinton meeting (Apr. 8, 2004).

138. Samuel Berger interview (Jan. 14, 2004).

139. In the first ten days after the bombing, between October 13 and 23, at least three high-level briefing items discussed responsibility for the attack. The next such briefing item we can find summarized the evidence for the new Bush administration on January 25, 2001. On the guidance, and the presumed reasons for it, see Barbara Bodine interview (Oct. 21, 2003); Pattie Kindsvater interview (Mar. 29, 2004); Ben Bonk statement during John McLaughlin interview (Jan. 21, 2004); see also John McLaughlin interview (Jan. 21, 2004); Richard interview (Dec. 11, 2003).

140. For Clarke's statement, see NSC email, Clarke to Berger, Nov. 7, 2000. For the November 10 briefing, see CIA briefing materials, preliminary findings regarding the *Cole* attack for the Nov. 10, 2000, Small Group meeting, undated (appears to be Nov. 10, 2000). For Berger and Clarke's communication with the President, see NSC memo, Berger to President Clinton, USS *Cole* investigation update, Nov. 25, 2000.

141. See Gregory Newbold interview (Sept. 29, 2003); William Cohen interview (Feb. 5, 2004). For Shelton tasking Franks, see DOD memo, Joint Chiefs of Staff tasking, Mod 005 to Joint Planning Directive to U.S. Central Command, Nov. 30, 2000. For Shelton briefing Berger, see NSC memo, Berger to President Clinton, USS *Cole* investigation update, Nov. 25, 2000. For the 13 options, see also DOD briefing materials, Operation Infinite Resolve Contingency Plan Brief, undated. For the briefing to Kerrick, see DOD briefing materials, briefing to Lt. Gen. Kerrick, Dec. 20, 2000. For the briefing of other DOD officials, see DOD briefing materials, "Evolution of Infinite Resolve Planning, Summary of TLAM Availability (1998–2001), Evolution of the Armed Predator Program," Mar. 19, 2004, p. 5.

142. NSC memo, Berger to President Clinton, USS *Cole* investigation update, Nov. 25, 2000.

143. Ibid. For Clarke's ideas, see NSC memo, Clarke to Sheehan and Hull, "Ultimatum Strategy with the Taliban," Nov. 25, 2000.

144. CIA briefing materials, "Intelligence Assessment: The Attack on the USS Cole," Dec. 21, 2000.

145. Ibid.

146. President Clinton meeting (Apr. 8, 2004); Samuel Berger interview (Jan. 14, 2004).

147. For Albright's advisers, see DOS memo, Inderfuth to Albright, Dec. 19, 2000; DOS memo, Hull and Eastham to Albright, preparation for Principals Committee meeting, Dec. 21, 2000. See also DOS briefing materials, talking points for Principals Committee meeting, Dec. 21, 2000; William Cohen interview (Feb. 5, 2004); Hugh Shelton interview (Feb. 5, 2004).

148. Richard Clarke interview (Feb. 3, 2004)

149. Richard Clarke, *Against All Enemies: Inside America's War on Terror* (Free Press, 2004), p. 224. Sheehan has not disavowed Clarke's quote.

150. George Tenet interview (Jan. 28, 2004).

151. Pattie Kindsvater interview (Mar. 29, 2004). For Clarke's awareness, see NSC email, Clarke to Cressey, "Considerations," Oct. 25, 2000.

152. For the lack of meaningful targets, see Scott Fry interview (Dec. 29, 2003); Walter Slocombe interview (Dec. 19, 2003).

153. CIA memo, Black to Clarke, "NSC Requests on Approaches for Dealing with Problems in Afghanistan," Dec. 29, 2000.

154. See Samuel Berger letter to the Commission, "Comments on Staff Statements 5–8," May 13, 2004. For the Blue Sky memorandum's proposals being rolled into proposals considered by the new administration, see George Tenet interview (Jan. 28, 2004); John McLaughlin interview (Jan. 21, 2004). On the internal CIA draft of the Blue Sky memorandum, Deputy Director for Operations James Pavitt added a handwritten note that he posed no objection if the memorandum was for transition discussion purposes, but "I do not believe a proposal of this magnitude should be on the table for implementation" so late in the Clinton administration. He also questioned the proposal for support to Massoud. CIA memo, "Options to Undermine Usama Bin Ladin and al-Qa'ida," Dec. 18, 2000.

155. NSC memo, "Strategy for Eliminating the Threat from the Jihadist Networks of al Qida: Status and Prospects," undated (appears to be Dec. 29, 2001), attached to NSC memo, Clarke to Rice, Jan. 25, 2001.

156. Ben Bonk interview (Jan. 21, 2004); John McLaughlin interview (Jan. 21, 2004).

157. Robert McNamara, Jr., interview (Apr. 19, 2004).

158. President Bush and Vice President Cheney meeting (Apr. 29, 2004); Condoleezza Rice meeting (Feb. 7, 2004); James Pavitt interview (Jan. 8, 2004). Pavitt also recalls telling the President-elect that killing Bin Ladin would not end the threat. Vice President–elect Cheney, Rice, Hadley, and White House Chief of Staff–designate Andrew Card also attended the briefing, which took place about a week before the inauguration. The President noted that Tenet did not say he did not have authority to kill Bin Ladin. Tenet told us he recalled the meeting with Bush but not what he said to the President-elect. George Tenet interview (Jan. 28, 2004). He told us, however, that if circumstances changed and he needed more authority, he would have come back to either President Clinton or Pres-

ident Bush and asked for the additional authority. See George Tenet testimony, Mar. 24, 2004. The Blair House CIA briefing is recounted in some detail in Bob Woodward, *Bush at War* (Simon & Schuster, 2002), pp. 34–35.

159. President Clinton meeting (Apr. 8, 2004).

160. President Bush and Vice President Cheney meeting (Apr. 29, 2004).

161. NSC briefing materials, "CT Briefing for Bush-Cheney Transition Team, APNSA-Designate Rice, "Policy, Organization, Priorities," undated. Powell was briefed by the full CSG, at his request.

162. Richard Clarke interview (Feb. 3, 2004); Samuel Berger interview (Jan. 14, 2004); Condoleezza Rice meeting (Feb. 7, 2004); Roger Cressey interview (Dec. 15, 2003); Paul Kurtz interviews (Dec. 16, 2003; Dec. 22, 2003).

163. Condoleezza Rice meeting (Feb. 7, 2004); Stephen Hadley meeting (Jan. 31, 2004). Hadley told us that he was able to do less policy development than in a normal two-month transition.

164. Public references by candidate and then President Bush about terrorism before 9/11 tended to reflect these priorities, focusing on state-sponsored terrorism and WMD as a reason to mount a missile defense. See, e.g., President Bush remarks, Warsaw University, June 15, 2001.

165. Rice and Zelikow had been colleagues on the NSC staff during the first Bush administration and were coauthors of a book concerning German unification. See Philip Zelikow and Condoleezza Rice, *Germany Unified and Europe Transformed: A Study in Statecraft* (Harvard Univ. Press, 1995). As the Executive Director of the Commission, Zelikow has recused himself from our work on the Clinton-Bush transition at the National Security Council.

166. Philip Zelikow interview (Oct. 8, 2003).

167. Condoleezza Rice meeting (Feb. 7, 2004).

168. Ibid.

169. Richard Clarke interviews (Dec. 18, 2003; Feb. 3, 2004); Roger Cressey interview (Dec. 15, 2003). As Clarke put it, "There goes our ability to get quick decisions." Richard Clarke interview (Feb. 3, 2004). However, Paul Kurtz told the Commission that even though Clarke complained about losing his seat on the Principals Committee on terrorism issues, Kurtz saw no functional change in Clarke's status. Paul Kurtz interviews (Dec. 16, 2003; Dec. 22, 2003).

170. President Bush and Vice President Cheney meeting (Apr. 29, 2004); George Tenet interview (Jan. 28, 2004).

171. President Bush and Vice President Cheney meeting (Apr. 29, 2004).

172. NSC memo, Clarke to Rice, al Qaeda review, Jan. 25, 2001 (italics and underlining of the word *urgently* in original). Clarke's staff called on other occasions for early Principals Committee decisions, including in a "100 Day Plan" that called for cabinet-level decisions on the Northern Alliance, Uzbekistan, Predator, and the *Cole*. See NSC memo, Fenzel to Rice, Feb. 16, 2001. Other requests for early PCs are found in NSC email, Fenzel to Hadley, "Early PC Meeting Priorities," Feb. 2, 2001; NSC email, Cressey to NSC Front Office, "TNT Meeting Priorities," Feb. 7, 2001; NSC email, Cressey to Moran, "Aid to NA," Feb. 12, 2001; NSC memo, Cressey to Rice, Mar. 2, 2001.

173. NSC memo, Clarke to Rice, al Qaeda review, Jan. 25, 2001.

174. The Bush administration held 32 Principals Committee meetings on subjects other than al Qaeda before 9/11. Condoleezza Rice testimony, Apr. 8, 2004; White House information provided to the Commission. Rice told us the Administration did not need a principals meeting on al Qaeda because it knew that al Qaeda was a major threat. Condoleezza Rice meeting (Feb. 7, 2004) Condoleezza Rice testimony, Apr. 8, 2004.

175. CNN broadcast, "CNN Ahead of the Curve," Oct. 13, 2000. Vice presidential candidate Dick Cheney also urged swift retaliation against those responsible for bombing the destroyer, saying: "Any would-be terrorist out there needs to know that if you're going to attack, you'll be hit very hard and very quick. It's not time for diplomacy and debate. It's time for action." Associated Press, "Cheney: Swift Retaliation Needed," Oct. 13, 2000.

176. George Tenet interview (Jan. 28, 2004).

177. NSC memo, Clarke to Rice, al Qaeda review, Jan. 25, 2001.

178. NSC memo, Clarke to Vice President Cheney, Feb. 15, 2001.

179. CIA briefing materials, "UBL Strategic Overview and USS COLE Attack Update," Mar. 27, 2001. These briefing slides appear to have been recycled from slides prepared on Jan. 10, 2001.

180. In early March, Cressey wrote Rice and Hadley that at a belated wedding reception at Tarnak Farms for one of Bin Ladin's sons, the al Qaeda leader had read a new poem gloating about the attack on the *Cole*. NSC email, Cressey to Rice and Hadley, "BIN LADIN on the USS COLE," Mar. 2, 2001. A few weeks later, Cressey wrote Hadley that while the law enforcement investigation went on, "we know all we need to about who did the attack to make a policy decision." NSC email, Cressey to Hadley, "Need for Terrorism DC Next Week," Mar. 22, 2001. Around this time, Clarke wrote Rice and Hadley that the Yemeni prime minister had told State Department counterterrorism chief Hull that while Yemen was not saying so publicly, Yemen was 99 percent certain that Bin Ladin was responsible for the *Cole*. NSC email, Clarke to NSC Front Office, "Yemen's View on the USS Cole," Mar. 24, 2001. In June, Clarke wrote Rice and Hadley that a new al Qaeda video claimed responsibility for the *Cole*. NSC email, Clarke to Rice and Hadley, "Al Qida Video Claims Responsibility for Cole Attack," June 21, 2001. Later that month, two Saudi jihadists arrested by Bahraini authorities during the threat spike told their captors that their al Qaeda training camps in Afghanistan had held celebratory parties over the *Cole* attack. NSC email,

510 NOTES TO CHAPTER 6

Clarke to NSC Front Office and others, "Captured Al Qida Terrorist Met UBL Then Were to Attack US in Saudi Arabia," June 29, 2001.

181. President Bush and Vice President Cheney meeting (Apr. 29, 2004).

182. Condoleezza Rice meeting (Feb. 7, 2004); Donald Rumsfeld meeting (Jan. 30, 2004); Paul Wolfowitz interview (Jan. 20, 2004); Stephen Hadley meeting (Jan. 31, 2004).

183. See CIA memo, "History of Funding for CIA Counterterrorism," Aug. 12, 2002. One of Clarke's concerns had been the level of funding for counterterrorism in the new administration's first budget. See, e.g., NSC memo, Clarke to Vice President Cheney, Feb. 15, 2001.

184. NSC note to Hadley, undated (attached to NSC memo, Cressey to Rice, aid to Northern Alliance and Uzbekistan, Mar. 2, 2001).

185. Condoleezza Rice meeting (Feb. 7, 2004). Rice remembered President Bush using this phrase in May 2001, when warnings of terrorist threats began to multiply. However, speaking on background to the press in August 2002, Richard Clarke described a directive from the President in March 2001 to "stop swatting at flies" and "just solve this problem." A reporter then said to Clarke that he understood Bush to have given that direction in May, and Clarke said: "No, it was March." Fox News transcript, "Clarke Praises Bush Team in '02," Mar. 24, 2004 (online at www.foxnews.com/printer_friendly_story/0,3566,115085,00.html).

186. Barton Gellman, "A Strategy's Cautious Evolution: Before Sept. 11, the Bush Anti-Terror Effort Was Mostly Ambition," *Washington Post*, Jan. 20, 2001, p. A1.

187. President Bush and Vice President Cheney meeting (Apr. 29, 2004).

188. NSC notes, John Bellinger notes from March 7, 2001, meeting; NSC email, Cressey to Rice and Hadley, "BIN LADIN on the USS COLE," Mar. 2, 2001; CIA briefing materials, Deputies Committee Briefing, "Countering the Threat from al-Qa'ida," Mar. 7, 2001.

189. Condoleezza Rice meeting (Feb. 7, 2004). On the Iraq PC, see Bob Woodward, *Plan of Attack* (Simon & Schuster, 2004), p. 13. On the Sudan PC, see NSC memo, "Summary of Conclusions for March 27, 2001 Principals Committee Meeting on Sudan," Apr. 10, 2001; CIA notes, Houdek's notes on March 27, 2001, Principals Committee meeting. On others, see NSC document, list of meetings, Jan. 20 to Sept. 11, 2001, undated.

190. CIA briefing materials, "U.S. Policy Against Al Qa'ida" (for the Apr. 30, 2001, Deputies Committee meeting). On the DC meeting, see also NSC email, Clarke to NSC Front Office, "Request for DC on al Qida Terrorism," Apr. 16, 2001. DCI Tenet had already talked with Rice and Hadley about Bin Ladin and al Qaeda, the Taliban, and the Predator program. See, e.g., CIA memos, summary of weekly Rice/Tenet meeting, Jan. 24, 2001; Feb. 7, 2001; Mar. 8, 2001 (when Rice received CIA assessments on the possible impact of Taliban actions against al Qaeda and on the likely regional impact of increased aid to anti-Taliban groups in Afghanistan). Both Secretary Powell and Secretary Rumsfeld appear to have already been briefed on these topics by the DCI as well. See, e.g., CIA briefing materials, talking points on the Predator for DCI meeting with Rumsfeld, Feb. 9, 2001; CIA briefing materials, talking points on Bin Ladin, the Taliban and Afghanistan for DCI meetings with Powell, Feb. 13, 2001; Mar. 13, 2001.

191. NSC memo, Summary of Conclusions for Apr. 30, 2001, Deputies Committee meeting.

192. Ibid.

193. NSC memo, Policy Coordinating Committee (PCC) Chairman's Summary Paper, "Key Issues for Al-Qida Deputies Meeting," Apr. 19, 2001.

194. For threats considered by the CSG, see NSC memo, agenda for March 19 CSG videoconference, Mar. 19, 2001 (agenda item about UBL interest in targeting a passenger plane at Chicago airport); NSC memo, agenda for CSG threat videoconference, May 17, 2001 (agenda item, "UBL: Operation Planned in US"). For Clarke's concern about an al Qaeda presence in the United States, see NSC briefing materials, TNT to Rice, counterterrorism briefing for Bush/Cheney transition team, undated, which noted that al Qaeda had "sleeper cells" in more than 40 countries, including the United States; NSC memo, "Strategy for Eliminating the Threat from the Jihadist Networks of al Qida: Status and Prospects," undated (appears to be Dec. 29, 2000), attached to NSC memo, Clarke to Rice, Jan. 25, 2001, discussing al Qaeda's presence in the United States. For Clarke's concerns about an attack on the White House, see NSC email, Clarke to Rice, briefing on Pennsylvania Ave, Mar. 23, 2001.

195. For the President's announcement, see White House press release, "Statement by the President, Domestic Preparedness Against Weapons of Mass Destruction," May 8, 2001 (online at www.whitehouse.gov/news/releases/2001/05/print/02010508.html).

196. CIA memo, summary of weekly Rice/Tenet meeting, May 29, 2001.

197. Ibid.

198. Richard interview (Dec. 11, 2003).

199. CIA memo, summary of weekly Rice/Tenet meeting, May 29, 2001.

200. NSC memo, Hadley to Armitage, Wolfowitz, McLaughlin, and O'Keefe, "Next Steps on al-Qida," June 7, 2001.

201. NSC memo, draft National Security Presidential Directive, undated; Condoleezza Rice testimony, Apr. 8, 2004.

202. See, e.g., Condoleezza Rice testimony, Apr. 8, 2004; Richard Clarke interview (Feb. 3, 2004).

203. Richard Clarke interview (Jan. 12, 2004).

204. Condoleezza Rice meeting (Feb. 7, 2004).

205. DOS cable, State 111711, "Demarche on Threat by Afghan-based Terrorists," June 27, 2001. Under Secretary of State for Political Affairs Marc Grossman knew of Sheehan's severe demands and instructed Ambassador Milam to reiterate them to the Taliban. Marc Grossman interview (Jan. 20, 2004).

206. In early July 2001, shortly before retiring, Ambassador Milam met one last time with Taliban Deputy Foreign Minister Jalil in Islamabad. Milam tried to dispel any confusion about where Bin Ladin fit into U.S.–Taliban relations—the Saudi terrorist was the issue, and he had to be expelled. DOS cable, Islamabad 3628, "Taliban's Mullah Jalil's July 2 Meeting With The Ambassador," July 3, 2001. The State Department's South Asia bureau called for a less confrontational stance toward the Taliban. It opposed a policy to overthrow the Taliban and was cautious about aiding the Northern Alliance. DOS memo, Rocca to Grossman, "Your Participation in Deputies Committee Meeting, Friday, June 29, 2001," June 28, 2001; see DOS memo, "Pakistan/Afghanistan DC-Covert Action Issue," undated (appears to be mid-June 2001); Richard Armitage interview (Jan. 12, 2004).

207. For the Deputies Committee meeting, see NSC memo, Summary of Conclusions of June 29, 2001, Deputies Committee meeting, undated (attached to NSC memo, Biegun to executive secretaries, July 6, 2001). For officials who were impatient with the pace of the Deputies' Committee review, see, e.g., Richard Armitage interview (Jan. 12, 2004); John McLaughlin interview (Jan. 21, 2004). For Clarke's arguments, see NSC memo, PCC Chairman's Summary Paper, "Key Issues for Al-Qida Deputies Meeting," Apr. 19, 2001. See also Richard Armitage testimony, Mar. 24, 2004; Stephen Hadley meeting (Jan. 31, 2004).

208. For Clarke and Black renewing their push, see, e.g., Cofer Black interview (Dec. 9, 2003). For Clarke's suggestion, see NSC email, Cressey to Moran, various matters concerning al Qaeda, Feb. 12, 2001.

209. Condoleezza Rice meeting (Feb. 7, 2004); Stephen Hadley meeting (Jan. 31, 2004); Zalmay Khalilzad interview (Nov. 21, 2003). For Clarke's view, see NSC memo, Clarke to Rice, al Qaeda review, Jan. 25, 2001.

210. For the draft authorities, see CIA briefing materials, talking points for DCI meeting with Rice on the draft Afghanistan counterterrorism finding and the draft UBL Memorandum of Notification, Mar. 28, 2001. For the draft explicitly stating that the goal was not to overthrow the Taliban, see Jonathan F. interview (Jan. 19, 2004).

211. See NSC email, Clarke to Khalilzad, Crawford, and Cressey, "Option for integrated al Qida-Afghan-Pakistan paper," June 30, 2001. For State's view, see DOS memo, "U.S. Engagement with the Taliban on Usama Bin Laden," undated (attached to NSC memo, Biegun to executive secretaries, July 16, 2001).

212. For an outline of the policy, see NSC memo, "Afghanistan: A Comprehensive Strategy," undated (attached to NSC memo, Biegun memo to executive secretaries, Sept. 7, 2001). For the September 10 meeting, see NSC memo, Biegun to executive secretaries, Summary of Conclusions for Sept. 10, 2001, Deputies Committee meeting on Afghanistan, India, and Pakistan, Sept. 26, 2001.

213. For the September 10 meeting, see NSC memo, Biegun to executive secretaries, Summary of Conclusions for Sept. 10, 2001, Deputies Committee meeting on Afghanistan, India and Pakistan, Sept. 26, 2001. For Armitage's view, see Richard Armitage interview (Jan. 12, 2004).

214. Colin Powell prepared statement, Mar. 23, 2004, p. 5.

215. For reviewing the possibility of more carrots, see DOS memo, Hull and Usrey to Grossman, "Deputies Committee Meeting on Terrorism and al Qaida," Apr. 20, 2001. For the possibility of lifting sanctions, see Colin Powell interview (Jan. 21, 2004); Richard Armitage interview (Jan. 12, 2004); DOS memo, "Engagement with Pakistan: From Negative to Positive," undated (appears to be May 29, 2001).

216. Condoleezza Rice meeting (Feb. 7, 2004).

217. For Rice's view on Sattar, see Condoleezza Rice meeting (Feb. 7, 2004). For Sattar urging the United States to engage the Taliban, see DOS cable, State 109130, "The Secretary's Lunch With Pakistani Foreign Minister Abdul Sattar," June 22, 2001. For the deputies agreeing to review objectives, see NSC memo, Summary of Conclusions of June 29, 2001, Deputies Committee meeting, undated (attached to NSC memo, Biegun to executive secretaries, July 6, 2001). For Clarke urging Hadley, see NSC memo, Clarke to Hadley, "DC on Pakistan," June 27, 2001.

218. See White House letter, President Bush to Musharraf, Aug. 4, 2001. For Rocca's view, see DOS memo, "Engagement with Pakistan: From Negative to Positive," undated (possibly May 29, 2001); Christina Rocca interview (Jan. 29, 2004). For Armitage's comment, see Richard Armitage interview (Jan. 12, 2004).

219. For the Vice President's call, see CIA briefing materials, "Efforts to Counter the Bin Ladin Threat," Sept. 12, 2001. For Powell's meetings, see DOS cable, State 041824, "Secretary's 26 February Meeting With Saudi Crown Prince Abdullah," Mar. 8, 2001; DOS cable, State 117132, "The Secretary's June 29 Meeting With Saudi Crown Prince Abdullah," July 5, 2001.

220. Paul Wolfowitz interview (Jan. 20, 2004); Donald Rumsfeld interview (Jan. 30, 2004).

221. For Shelton's recollection, see Hugh Shelton interview (Feb. 5, 2004). For Sheridan's departure, see Austin Yamada interview (Dec. 23, 2003); Brian Sheridan interview (Feb. 24, 2004).

222. Donald Rumsfeld interview (Jan. 30, 2004). Rumsfeld had been a member of the Bremer-Sonnenberg Commission on Terrorism, created by Congress in 1998.

223. Tommy Franks interview (Apr. 9, 2004).

224. For Annex B, see NSC memo, draft National Security Presidential Directive, undated (attached to NSC email, Biegun to executive secretaries, July 13, 2001). The annex said that Pentagon planning was also to include options to eliminate weapons of mass destruction that the al Qaeda network might acquire or make.

225. Stephen Hadley meeting (Jan. 31, 2004).

226. Condoleezza Rice meeting (Feb. 7, 2004).

227. President Bush and Vice President Cheney meeting (Apr. 29, 2004).

228. Ibid.

229. John Ashcroft interview (Dec. 17, 2003).

230. NSC email, Clarke to Rice and Hadley, "Courtesy call on AG," Feb. 22, 2001.

231. On the FBI strategy, see FBI report, Counterterrorism Division, International Terrorism Program, "Strategic Program Plan FY 2001–2006," undated (appears to be from summer 2000). On Watson's recollections, see Dale Watson interview (Jan. 6, 2004). On the FBI budget proposal, see statement of Attorney General John Ashcroft, Hearing on U.S. Federal Efforts to Combat Terrorism before the Subcommittee on Commerce, Justice, and State, the Judiciary, and Related Agencies of the Senate Appropriations Committee, May 9, 2001. See DOJ memo, Comments on Staff Statement 12, Apr. 7, 2004.

232. Testimony of John Ashcroft, Hearing on U.S. Federal Efforts to Combat Terrorism before the Subcommittee on Commerce, Justice, and State, the Judiciary, and Related Agencies of the Senate Appropriations Committee, May 9, 2001. On DOJ's priorities, see DOJ memo, Ashcroft to Heads of Department Components, "Guidance for Preparing FY 2003 Budgets," May 10, 2001. On Watson's reaction, see Dale Watson interview (Jan. 6, 2004).

233. DOJ letter, Ashcroft to Daniels, transmitting the Department of Justice FY 2003 budget request, Sept. 10, 2001; Thomas Pickard interview (Jan. 21, 2004). Pickard told us that he approached Ashcroft and asked him to reconsider DOJ's denial of the FBI's original counterterrorism budget request in light of the continuing threat. It was not uncommon for FBI budget requests to be reduced by the attorney general or by OMB before being submitted to Congress; this had occurred during the previous administration.

234. In chapter 3, we discuss how this problem arose. By 2001, it had become worse. During 2000, the FBI had erred in preparing some of its applications for FISA surveillance, misstating how much information had been shared with criminal prosecutors and the nature of the walls between the intelligence and law enforcement functions within the FBI. In March 2001, Judge Royce Lamberth, chief judge of the FISA Court, chastised the FBI, sending a letter to Ashcroft announcing he was banning an offending supervisory agent from appearing before the court. Judge Lamberth also met personally with Ashcroft and his acting deputy, Robert Mueller, to complain about the performance of the FBI and the Office of Intelligence Policy and Review (OIPR). Judge Lamberth letter to Ashcroft, Mar. 9, 2001; John Ashcroft interview (Dec. 17, 2003). In May 2001, Ashcroft altered the FISA application process to ensure greater accuracy. See DOJ memo, Ashcroft to Freeh, "The Foreign Intelligence Surveillance Act (FISA) Process," May 18, 2001.

In July 2001, the General Accounting Office criticized the way the 1995 procedures were being applied and criticized OIPR and FBI for not complying with the information-sharing requirements of the 1995 procedures. This was the third report in as many years by a government agency indicating that the procedures were not working as planned. In October 2000, December 2000, and March 2001, proposals for reform to the 1995 procedures were put forth by senior DOJ officials. None resulted in reform. One impediment was that the respective DOJ components could not agree on all the proposed reforms. A second impediment was a concern that such reforms would require a challenge to the FISA Court's position on the matter. This was considered risky because the FISA Court of Review had never convened, and one of the judges had previously voiced skepticism regarding the constitutionality of the FISA statute. Deputy Attorney General Larry Thompson did ask the court to accept the modifications described in the text, which were distributed as part of his August 2001 memorandum reaffirming the 1995 procedures. See DOJ memo, Thompson to the Criminal Division, the Office of Intelligence Policy and Review, and the FBI, "Intelligence Sharing," Aug. 6, 2001.

235. This tasking may have occurred before Rice's March 15, 2001, meeting with Tenet. See CIA memo, "Talking Points for DCI Meeting with Rice," Mar. 15, 2001. For Rice's recollections, see Condoleezza Rice meeting (Feb. 7, 2004). Attorney General John Ashcroft told us he told Rice on March 7, 2001, that his lawyers had determined that the existing legal authorities for covert action against Bin Ladin were unclear and insufficient, and that he suggested new, explicit kill authorities be developed. John Ashcroft testimony, Apr. 13, 2004. On the CIA draft documents, see CIA memo, "Talking Points for the DCI on the Draft Afghanistan Counterterrorism Finding and the Draft UBL MON," Mar. 27, 2001. For the description of the meeting, see CIA memo, Moseman to Tenet, Mar. 28, 2001.

236. NSC memo, Sturtevant to Griffin, Levin, Krongard, Watson, and others, July 12, 2001.

237. See, e.g., NSC note, Clarke to Berger, Sept. 23, 2000; Richard Clarke interview (Feb. 3, 2004).

238. CIA memo, Black to Clarke, Jan. 25, 2001. For a Joint Staff view, see, e.g., Scott Gration interview (Mar. 3, 2004). The mission commander for the Predator flights, Air Force Major Mark A. Cooter, had registered his opposition to redeploying the aircraft back in December 2000: "given the cost/benefit from these continued missions it seems senseless." DOD letter, Cooter to Alec B., "Continued Flight Operations," Nov. 14, 2000 (attached to CIA memo, Black to DCI and others, Predator Operation, Nov. 17, 2000).

239. See NSC memo, Summary of Conclusions of Deputies Committee meeting, Apr. 30, 2001. This document noted a consensus in favor of reconnaissance missions commencing in July. But DDCI McLaughlin told us that he and Black believed that no such decision had been made at the meeting. Hadley told us he believed that a decision had been made at the meeting to fly such missions. See John McLaughlin interview (Jan. 2, 2004). See also CIA briefing materials, "Summary of April 30, 2001 Deputies Committee meeting," May 3, 2001; Stephen Hadley meeting (Jan. 31, 2004). For Rice's perspective, see Condoleezza Rice meeting (Feb. 7, 2004).

240. Allen described the "quibbling" over financing the Predator program as "ridiculous." Charles Allen interview (Jan. 27, 2004). For a CIA senior management perspective, see, e.g., John McLaughlin interview (Jan. 21, 2004). The Defense Department's view is suggested in CIA briefing materials, "Summary of April 30, 2001 Deputies Committee meeting," May 3, 2001.

241. George Tenet interview (Jan. 28, 2004); Charles Allen interview (Jan. 27, 2004).

242. John Maher III interview (Apr. 22, 2004); Scott Gration interview (Mar. 3, 2004); John Jumper interview (Mar. 3, 2004).

243. On Hadley's efforts and directions, see NSC memo, Hadley to McLaughlin, Wolfowitz, and Myers, "Re: Predator," July 11, 2001. On Rice's intervention, see Condoleezza Rice meeting (Feb. 7, 2004).

244. On the Deputies Committee meeting, see NSC memo, Biegun to executive secretaries, July 31, 2001; CIA memo, Campbell to McLaughlin, Pavitt, and others, Aug. 2, 2001. The White House told us that it cannot find a formal Summary of Conclusions for this meeting.

245. NSC memo, Hadley to Armitage, Wolfowitz, Myers, and McLaughlin, resolving Predator issues, Aug. 3, 2001 (including McLaughlin's handwritten comment); NSC email, Clarke to Rice and Hadley, "Need to place a call to Tenet," Aug. 8, 2001.

246. John Maher III interview (Apr. 22, 2004); John Jumper interview (Mar. 3, 2004); see also Scott Gration interview (Mar. 3, 2004).

247. NSC memo, Clarke to Rice, "Observations at the Principals Meeting on Al Qida," Sept. 4, 2001 (text italicized here is underlined in the original).

248. Ibid.

249. Ibid.

250. Condoleezza Rice testimony, Apr. 8, 2004.

251. CIA memo, Black to Tenet, Sept. 4, 2001.

252. Various interviews with participants, as well as the Maher memo (see note 255 below), make it clear that the meeting focused on Predator, not the presidential directive.

253. Condoleezza Rice meeting (Feb. 7, 2004).

254. Ibid.; NSC memo, Cressey to Rice, September 4 PC on counterterrorism, Sept. 3, 2001.

255. CIA memo, Maher to limited group, "Principals Committee meeting, Sept. 4, 2001," Sept. 4, 2001. We have not found a formal summary of conclusions, which would usually be prepared after a Principals Committee meeting.

256. Ibid.

257. Ibid.

258. Ibid.

259. NSC memo, Clarke to CSG members, Sept. 7, 2001.

260. On Massoud's assassination, see Coll, *Ghost Wars*, pp. 574–575. On the Sept. 10 meeting, see NSC memo, Biegun to executive secretaries, "Summary of Conclusions for Sept. 10, 2001 Deputies Committee meeting on Afghanistan, India and Pakistan," Sept. 26, 2001. Note that the agenda for this meeting, distributed on September 7, 2001, listed its topics as "Pakistan, India, and Afghanistan"; the Summary of Conclusions, written after 9/11, flipped the order of the topics.

261. NSC memo, Hadley to Tenet, Sept. 10, 2001.

# 7  The Attack Looms

1. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004 (classified version), p. 16.

2. Intelligence report, interrogation of KSM, May 19, 2003. Although KSM's stated reasons for sending Hazmi and Mihdhar to California do not seem especially compelling, we have uncovered no evidence tending to establish any more plausible explanation for the California destination. The possibility that the two hijackers were pursuing another al Qaeda mission on the West Coast, while certainly conceivable—see, e.g., CIA analytic report,

"Alternate View: Two 11 September Hijackers Possibly Involved in Previous US Plot," CTC 2002-30064, July 5, 2002—conflicts with the organization's preference for having its 9/11 operatives concentrate on that mission exclusively.

3. Intelligence reports, interrogations of KSM, May 19, 2003; Aug. 14, 2003.

4. Intelligence report, interrogation of KSM, Aug. 18, 2003. According to Hambali, in late 1999 or early 2000 KSM sent an al Qaeda operative named Issa al Britani to visit Hambali in Malaysia. At the end of the visit, Issa provided Hambali with two addresses—one in the United States ("possibly in California") and one in South Africa—and told Hambali he could contact "people in those locations" if he "needed help." Hambali claims he never contacted anyone at either address or passed either address to anyone else, and claims not to remember the addresses. Intelligence report, interrogation of Hambali, Sept. 12, 2003. In an assessment of KSM's reporting, the CIA concluded that protecting operatives in the United States appeared to be a "major part" of KSM's resistance efforts. For example, in response to questions about U.S. zip codes found in his notebooks, KSM provided the less than satisfactory explanation that he was planning to use the zip codes to open new email accounts. CIA report, Intelligence Community Terrorist Threat Assessment, "Khalid Shaykh Muhammed's Threat Reporting—Precious Truths, Surrounded by a Bodyguard of Lies," Apr. 3, 2003, pp. 4–5.

5. Notably, as discussed in chapter 5, precisely such arrangements—in the form of lodging and travel assistance provided by Hambali's minions—were in place when the first contingent of operatives (including Hazmi and Mihdhar) journeyed to Kuala Lumpur in late 1999 and early 2000.

6. Intelligence report, interrogation of KSM, May 19, 2003.

7. Intelligence reports, interrogations of KSM, May 19, 2003; Aug. 14, 2003. KSM also has stated that in addition to providing Hazmi and Mihdhar with a San Diego telephone book, he gave them another directory "possibly covering Long Beach, California." Intelligence report, interrogation of KSM, June 15, 2004.

8. Although Hazmi and Mihdhar told immigration authorities on January 15, 2000, that they would be staying at the Sheraton Hotel in Los Angeles, their names do not appear in the hotel's registration records for the second half of January. FBI searches of the records of other hotels near the airport and smaller establishments in Culver City failed to locate the hijackers, as did our own investigation. See FBI report, "Hijackers Timeline," Nov. 14, 2003 (Apr. 3, 1999, entry, citing 265A-NY-280350-CG, serial 4062; 265A-NY-280350-302, serial 7134); Commission investigation in Culver City; Vicki G. interview (Sept. 30, 2003).

9. For the FBI source's claims, see FBI letterhead memorandum, Penttbom investigation, Oct. 8, 2002. For Abdullah's recollections, see FBI report of investigation, interview of Mohdar Abdullah, Jan. 15, 2002. Other reporting indicates that Hazmi and Mihdhar spent time at the King Fahd mosque. A scholar lecturing at the mosque was reportedly approached by either Hazmi or Mihdhar about performing a wedding ceremony. Khalil A. Khalil interview (Feb. 24, 2004). On "Khallam," see FBI electronic communication, "Fahad Althumairy," Sept. 4, 2002; FBI electronic communication, "Ziyat Kharfan," Jan. 8, 2002 (giving description of visitor with whom Hazmi and Mihdhar met at mosque). The Khallam story has never been corroborated. The FBI considered the possibility that Khallam might be Khallad, the al Qaeda member whose role in the 9/11 plot and the *Cole* attack we discussed in chapter 5. This speculation was based on reporting that Khallad was in the United States in June 2000 and was seen in the company of Fahad al Thumairy, an imam at the mosque. FBI electronic communication, investigation of *Cole* bombing, interview of witness, Mar. 19, 2003; CIA cable, source reporting, Mar. 18, 2003. Neither we nor the FBI have found any travel documentation establishing Khallad's presence in the United States at any time. We doubt that the person allegedly seen with Thumairy actually was Khallad.

10. Patrick J. McDonnell, "Saudi Envoy in L.A. Is Deported," *Los Angeles Times*, May 10, 2003, p. B1; Michael Isikoff and Daniel Klaidman, with Jamie Reno, "Failure to Communicate," *Newsweek*, Aug. 4, 2003, p. 34. As of January 2000, Thumairy was employed by the Saudi Arabian Ministry of Islamic Affairs, Religious Endowments and Religious Guidance, to act as the consulate's liaison to the mosque. FBI electronic communication, "Fahad Al Thumairy," Sept. 4, 2002. Before 9/11, Saudi imams employed by the ministry often were dispatched to help serve Muslim communities around the world, sometimes—as in Thumairy's case—with diplomatic status in the host country. On Thumairy's leadership, see FBI letterhead memorandum, investigation of Mohammed bin Suleiman al Muhanna, July 9, 2003; FBI letterhead memorandum, investigation of Mohamed Ibrahim Aliter, Dec. 2, 2002.

11. FBI electronic communication, "Abdulaziz Alroomi," Apr. 2, 2003.

12. FBI letterhead memorandum, investigation of Khaled Charif, Dec. 4, 2002. After 9/11, arguments arose within the Saudi government over whether to allow reputedly radical imams, including Thumairy, to work for the Saudi government in the United States. FBI letterhead memorandum, investigation of Mohammed bin Suleiman al Muhanna, July 9, 2003. In May 2003, the U.S. government settled the matter, at least in Thumairy's case, by refusing to let him back into the country. DOS memo, Karl Hoffman to the Commission, June 8, 2004, and the attached materials.

13. On Thumairy's religious views, see FBI letterhead memorandum, investigation of Mohamed Aliter, Dec. 2, 2002; Fahad al Thumairy interviews (Feb. 23–25, 2004). However, two witnesses we interviewed who knew Thumairy and used to hear him preach at the King Fahd mosque deny that he promoted extremism. Sami A. Mekhemar interview (Apr. 21, 2004); Interview (Apr. 23, 2004). Despite the disparate views as to whether Thumairy

qualified as an extremist while he was in Los Angeles, it does appear that both the Saudi Arabian government and the leadership of the mosque attempted to discipline him in the summer of 2002 and early 2003 for espousing extremist views. Thumairy denies incurring any such disciplinary measures. Fahad al Thumairy interviews (Feb. 23–25, 2004); FBI letterhead memorandum, investigation of Mohammed bin Suleiman al Muhanna, July 9, 2003. On Bayoumi, see Khalil A. Khalil interview (Feb. 24, 2004). Bayoumi and Thumairy had numerous telephonic contacts between December 1998 and December 2000. Specifically, Bayoumi called Thumairy's home telephone 10 times during this period, and Thumairy called Bayoumi's cellular and home phones 11 times between December 3 and December 20, 2000. FBI electronic communication, "Fahad Al-Thumairy," Nov. 20, 2002. Bayoumi recalls consulting with Thumairy, solely on religious matters, both by telephone and in person at the mosque. Omar al Bayoumi interview (Oct. 16–17, 2003). As to Thumairy's contact with Mohdar Abdullah, see FBI electronic communication, "Fahad Althumairy," Oct. 25, 2002; FBI report of investigation, interview of Mohdar Abdullah, July 23, 2002. According to one individual, Abdullah visited the mosque frequently and was "very close" to radical followers of Thumairy. FBI electronic communication, "Fahad Althumairy," Oct. 25, 2002.

14. We have checked, for example, the records for apartments where Thumairy is known to have placed Saudi visitors during 2001. The most intriguing lead concerns an Arabic-speaking taxicab driver, Qualid Benomrane, who was arrested on immigration charges in early 2002. When asked to look at a series of photographs that included the 19 hijackers involved in the 9/11 attacks, Benomrane responded ambiguously, seeming first to pick out the photographs of Hazmi and Mihdhar but then denying that he recognized them. Later in the interview, Benomrane told the FBI about driving "two Saudis" around Los Angeles and to San Diego's Sea World after being introduced to them by Thumairy at the King Fahd mosque before 9/11. According to Benomrane, someone at the consulate had asked Thumairy to assist the two Saudis, who had recently arrived in Los Angeles and had moved to an apartment near the mosque. FBI electronic communication, "Fahad Althumairy," Sept. 4, 2002; Ashour E. interview (May 20, 2004); FBI reports of investigation, interviews of Qualid Moncef Benomrane, Mar. 7, 2002; Mar. 13, 2002; May 23, 2002. Working with agencies of the U.S. government, we have attempted to locate and interview Benomrane overseas, since he was deported in 2002. After checking many possible avenues of corroboration for this story, our investigation has not substantiated the hypothesis that Benomrane's "two Saudis" were Hazmi and Mihdhar. In fact, we have established that Benomrane did not obtain a taxi license, or even a driver's license, until months after he could be supposed to have chauffeured Hazmi and Mihdhar. Moreover, before his deportation, Benomrane described the two Saudis as sons of a sick father who was seeking medical treatment in Los Angeles. Ibid. We have found evidence corroborating this account.

15. FBI document made available to the Commission; Caysan Bin Don interview (Apr. 20, 2004); Omar al Bayoumi interview (Oct. 16–17, 2003); Interview (Apr. 23, 2004). In Bin Don's presence, Bayoumi met with a still-unidentified consular employee whom Bayoumi already knew and whom Bin Don says he saw in Anaheim as recently as November 2003. The employee provided Bayoumi with Qur'ans and other religious materials during the February 1, 2000, meeting. Omar al Bayoumi interview (Oct. 16–17, 2003). At the time of the February 1, 2000, restaurant encounter, Bin Don, a U.S. citizen, went by the name Isamu Dyson.

16. Caysan Bin Don interview (Apr. 20, 2004); FBI report of investigation, interview of Isamu Dyson, Oct. 8, 2001.

17. See Caysan Bin Don interview (Apr. 20, 2004); FBI report of investigation, interview of Isamu Dyson, Oct. 8, 2001. Bin Don himself has been inconsistent about visiting the mosque. In his initial interviews, he recalled praying with Bayoumi at the consulate before lunch and visiting the mosque only once, after the meal; when we interviewed him recently, however, he stated that both prayer sessions took place at the mosque. For Bayoumi's visits to Los Angeles, see FBI report of investigation, recovery of hotel records, Jan. 15, 2002. Although Bayoumi might deny visiting the mosque on February 1 to conceal some contact he may have made there that day, we have seen no evidence of such contact.

18. Saudi Civil Aviation Authority employment records for Bayoumi, Mar. 2000–Jan. 2002 (provided by the FBI); FBI report of investigation, "Connections of San Diego PENTTBOMB Subjects to the Government of Saudi Arabia," undated; FBI letterhead memorandum, investigation of Bayoumi, Apr. 15, 2002. While in San Diego, Bayoumi was officially employed by Ercan, a subsidiary of a contractor for the Saudi Civil Aviation Administration, although a fellow employee described Bayoumi as a "ghost employee," noting that he was one of many Saudis on the payroll who was not required to work. In April 2000, Bayoumi received a promotion and his status was also adjusted from "single" to "married" (despite the fact that he was already married). As a result, his salary was raised and his "other allowances" stipend increased significantly, from approximately $465 to $3,925 a month, remaining at that level until December 2000. In January 2001, the stipend was reduced to $3,427. It stayed constant until August 2001, when Bayoumi left the United States. Saudi Civil Aviation Authority employment records for Bayoumi, Mar. 2000–Jan. 2002 (provided by the FBI); Richard L. Lambert prepared statement, June 26, 2003, pp. 7–9; FBI reports of investigation, interviews of Samuel George Coombs, Apr. 8, 2002; July 24, 2002; Aug. 26, 2002.

19. On Bayoumi's activities, see FBI electronic communication, interview of Bayoumi, Sept. 17, 2003. Although Bayoumi admits knowing Thumairy, no telephone records document any contact between the two just before Bayoumi's lunch with Hazmi and Mihdhar in Los Angeles. Nor do individuals who regard Thumairy as an extremist

place Bayoumi in Thumairy's circle of associates. KSM has denied knowing Bayoumi. Intelligence report, interrogation of KSM, Aug. 18, 2003.

Bayoumi was once the subject of an FBI counterterrorism investigation, prompted by allegations about him that appear to have been groundless. On the closing of the investigation, see FBI electronic communication, "Omar Ahmed Al Bayoumi," June 7, 1999. Another possible source of suspicion is his passport, which contains a cachet that intelligence investigators associate with possible adherence to al Qaeda. It is a marking that can be obtained by especially devout Muslims. Although we believe the marking suggests the need for further inquiry, it is not the kind of fraudulent manipulation that would conclusively link the document with a terrorist organization. INS records, copy of Bayoumi passport; CIA analytic report, Al-Qa'ida Travel Issues, CTC 2004-40002H, Nov. 14, 2003, pp. ii, 18.

20. On Abdullah's assistance to the hijackers, see FBI electronic communication, Abdullah investigation, May 19, 2004. In a post-9/11 interview with law enforcement, Abdullah claimed that Bayoumi specifically asked him "to be the individual to acclimate the hijackers to the United States, particularly San Diego, California." FBI report of investigation, interview of Mohdar Abdullah, July 23, 2002. Bayoumi, however, denies even introducing Hazmi and Mihdhar to Abdullah, much less asking him to assist them. Omar al Bayoumi interview (Oct. 16–17, 2003).

21. FBI report of investigation, interview of Mohdar Abdullah, July 23, 2002; FBI electronic communication, "Osama Bassnan," Oct. 17, 2001; FBI report of investigation, interview of Mohdar Abdullah, Sept. 22, 2001; FBI electronic communication, "Shareef Abdulmuttaleb el Arbi," Feb. 4, 2003. For the possibility of the notebook belonging to someone else, see FBI report, Behavioral Analysis Activity, Oct. 4, 2001.

22. FBI electronic communication, interview of Charles Sabah Toma, May 18, 2004.

23. On Abdullah's claims of advance knowledge, see FBI electronic communication, interview, May 17, 2004. On Abdullah's telephone use after August 25, 2001, and acting strangely, see FBI report of investigation, interview, Sept. 24, 2001; FBI report of investigation, interview of Mohdar Abdullah, July 23, 2002; Danny G. interviews (Nov. 18, 2003; May 24, 2004).

24. The hijackers' mode of transportation and the exact date of their arrival in San Diego are not known. On their locating Bayoumi on February 4 and his assistance, see Richard L. Lambert prepared statement, June 26, 2003, pp. 6–7; Omar al Bayoumi interview (Oct. 16–17, 2003); FBI report of investigation, interview of Omar al Bayoumi, Aug. 4–5, 2003. The rental application states that Hazmi and Mihdhar resided in Bayoumi's apartment from January 15 to February 2, 2000, but Bayoumi denies it, and we have found no reason to dispute his denial. According to Bayoumi, he was in such a hurry to complete the rental transaction that he signed the application form without reading it. Bayoumi also denies receiving any money from Hazmi or Mihdhar for helping them with the apartment. Omar al Bayoumi interview (Oct. 16–17, 2003). On opening an account, see FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 12.

Contrary to highly publicized allegations, we have found no evidence that Hazmi or Mihdhar received money from another Saudi citizen, Osama Bassnan.

25. Omar al Bayoumi interview (Oct. 16–17, 2003). According to Bayoumi, he originally intended to hold the party at his own apartment, but moved it to the hijackers' apartment when one of the guests created an awkward social circumstance by bringing his wife; Bayoumi solved the problem by having the friend's wife stay with his own wife in Bayoumi's apartment and moving the party to the hijackers' residence. Bayoumi maintains that a visiting sheikh was the party's principal honoree. Ibid. Although Bin Don has recalled that the party was intended to welcome Hazmi and Mihdhar to the community, this is belied by the hijackers' apparent decision to sequester themselves in the back room, and by the account of another party attendee. Caysan Bin Don interview (Apr. 20, 2004); Khalid Abdulrab al Yafai interview (Feb. 24, 2004). Of the two operatives, only Mihdhar appears briefly on the video shot by Bin Don. Bayoumi videotape of party (provided by the FBI).

26. On the hijackers' efforts to relocate, see Omar al Bayoumi interview (Oct. 16–17, 2003); Interview (Apr. 23, 2004); FBI report, "San Diego Brief to 9/11 Commission," June 26, 2003, p. 17. Telephone records indicate that on February 9 and February 14, 2000, Bayoumi's cell phone was used to call the landlord of the operatives' acquaintance, Hashim al Attas, who had decided to vacate his apartment. On February 15, 2000, when the landlord returned a page from Bayoumi's cell phone, Hazmi answered the phone. Steve O. interview (Nov. 17, 2003); FBI report of investigation, interview of George Harb, Oct. 30, 2001. Hazmi and Mihdhar appear to have used Bayoumi's cell phone until telephone service (subscribed in Hazmi's name) was installed in their apartment.

27. FBI report of investigation, interview of George Harb, Sept. 16, 2001. The hijackers may actually have lived in Attas's apartment for a short while. Bayoumi has stated that he recalls hearing that Hazmi and Mihdhar moved into the apartment for two weeks but then returned to their original apartment while Bayoumi was in Washington, D.C. FBI report of investigation, interview of Omar al Bayoumi, Aug. 4–6, 2003. This account is confirmed by Attas's girlfriend, who recalls that Attas met Mihdhar and Hazmi either through friends or at the mosque, and that the pair moved into Attas's apartment for approximately two weeks before moving out and taking Attas's furnishings with them. FBI report, "San Diego Brief to 9/11 Commission," June 26, 2003, p. 18.

28. Interview (Apr. 23, 2004). Hazmi and Mihdhar did not officially vacate their first apartment until May 31, 2000. FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing 265A-NY-280350-SD, serial 1445). The exact details

of the hijackers' move to their final San Diego address are not altogether clear, as their landlord—who has been interviewed many times by the FBI and once by us—has provided various accounts of how he first met them. See also FBI electronic communication, Penttbom investigation, Oct. 3, 2001. On Mihdhar's travels, see Interview (Apr. 23, 2004); FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004 (classified version), p. 46. On Hazmi's departure, see FBI report, "San Diego Brief to 9/11 Commission," June 26, 2003, p. 18.

29. On the purchase of the car, see FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing Bank of America records). Law enforcement officials recovered the blue 1988 Toyota from the parking lot at Dulles International Airport on September 11. On the wire transfer, see FBI report of investigation, interview, Sept. 17, 2001. After 9/11, the mosque administrator came forward because he feared he had unwittingly aided the hijackers. He recalled Hazmi and Mihdhar arriving at the mosque on their own and describing themselves as clerks employed by the Saudi Arabian government. The two said they needed help finding a school where they could study English, which neither spoke well enough, in the administrator's opinion, to permit them to become pilots. The administrator also suspected that Mihdhar might have been an intelligence agent of the Saudi government. After first declining Hazmi's request for a loan, the administrator agreed to permit him to use the administrator's bank account to receive the $5,000 wire transfer. Claiming to have been suspicious of the entire transaction, the administrator distanced himself from Hazmi and Mihdhar, but not before they had received the assistance they needed. Ibid. We have no evidence contradicting the administrator's account.

30. On visits to other mosques, see FBI letterhead memorandum, investigation of Ali Ahmad Mesdaq, Jan. 28, 2002; FBI reports of investigation, interviews of Samir Abdoun, Oct. 28, 2001; May 15, 2002. On Bayoumi's assistance, see Richard L. Lambert prepared statement, June 26, 2003, p. 7; FBI electronic communication, "Jay Steven Barlow," Sept. 24, 2002. On April 12, 2000, Hazmi registered for a one-month class in conversational English. FBI report, "Hijackers Timeline," Nov. 14, 2003 (Apr. 12, 2000, entry, citing Bank of America records).

31. Even before learning of Abdullah's alleged jailhouse conversations, we attempted to interview him in November 2003, while he was incarcerated and awaiting deportation. Through counsel, Abdullah refused to be interviewed unless he was released from custody. The U.S. Department of Justice declined to obtain an order of use immunity so that Abdullah's testimony could be compelled. See Commission letter to Daniel Levin, DOJ, Dec. 31, 2003; DOJ letter, Daniel Levin to the Commission, Jan. 5, 2004. On Abdullah's deportation, see FBI electronic communication, Abdullah investigation, July 1, 2004. Abdullah appears to be at liberty in Yemen, although he claims Yemeni authorities are watching him. H. G. Reza, "Deported Friend of Terrorists in Report," *Los Angeles Times*, June 17, 2004, p. A31.

32. On Awadallah, see FBI electronic communication, interview of Osama Awadallah, June 6, 2002; FBI electronic communication, interview of Osama Awadallah, Feb. 4, 2003. On Bakarbashat, see FBI report of investigation, interview of Omar Bakarbashat, Sept. 17, 2001; FBI electronic communication, Penttbom investigation, Apr. 11, 2002. Another associate of Hazmi and Mihdhar allegedly referred to them after the September 11 attacks as "more than heroes." FBI letterhead memorandum, "Diah Thabet," Oct. 25, 2002.

33. On Anwar Aulaqi, see Wade A. interview (Oct. 16, 2003). The FBI investigated Aulaqi in 1999 and 2000 after learning that he may have been contacted by a possible procurement agent for Bin Ladin. During this investigation, the FBI learned that Aulaqi knew individuals from the Holy Land Foundation and others involved in raising money for the Palestinian terrorist group Hamas. Sources alleged that Aulaqi had other extremist connections. FBI electronic communication, background searches, Feb. 3, 2000; FBI report of investigation, interview, Sept. 24, 2001; FBI electronic communication, interview, Oct. 8, 2002. None of this information was considered strong enough to support a criminal prosecution. For evidence of possible early contacts between Hazmi/Mihdhar and Aulaqi, see Steve O. interview (Nov. 17, 2003), noting that four calls took place between Aulaqi's phone and Bayoumi's phone on February 4, 2000, the day Bayoumi helped Hazmi and Mihdhar find an apartment and perhaps lent them his phone.

One witness remembered meeting Hazmi through Aulaqi and Mohdar Abdullah, and later meeting Mihdhar at Aulaqi's mosque. This same witness recalled seeing Hazmi and Mihdhar in the guest room on the second floor of the mosque and, on one occasion, leaving the room just after Aulaqi, at the conclusion of a meeting. FBI reports of investigation, interviews of Samir Abdoun, Oct. 28, 2001; May 15, 2002; FBI report of investigation, interview of Anwar Aulaqi, Sept. 25, 2001; FBI electronic communication, Penttbom investigation, Sept. 15, 2002.

34. FBI reports of investigation, interviews of Anwar Aulaqi, Sept. 17, 2001; Sept. 19, 2001.

35. Aulaqi took a position at the Dar al Hijra mosque in early 2001. By the time we sought to interview him in 2003, he had left the United States, reportedly returning to Yemen. We attempted to locate and interview him in Yemen, working with U.S. agencies and the Yemeni government, as well as other governments that might have knowledge of his whereabouts. Those attempts were unsuccessful.

36. Whereas Hazmi managed to speak broken English, Mihdhar did not even have this much command of the language, which he appeared uninterested in learning. Interview (Apr. 23, 2004); FBI report of investigation, interview of Omar Bakarbashat, Sept. 17, 2001; FBI report of investigation, interview of Ramez Noaman, Oct. 1, 2001. On April 4, 2000, Hazmi took his first flying lesson, a one-hour introductory session at the National Air College in San Diego. Exactly one month later, Hazmi and Mihdhar purchased flight equipment from an instructor at the

Sorbi Flying Club in San Diego. On May 5, both of them took a lesson at Sorbi, followed by a second lesson at the same school five days later. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 18.

37. On the Sorbi Flying Club, see FBI report of investigation, interview of Khaled al Kayed, Sept. 15, 2001. For other instructors' views, see FBI electronic communication, Penttbomb investigation, Apr. 11, 2002.

38. On Mihdhar's phone calls, see, e.g., FBI report, "Hijackers Timeline," Nov. 14, 2003 (Mar. 20, 2000, entry, citing 265A-NY-280350-19426). On Mihdhar's travels, see FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004 (classified version), p. 17. On KSM's views, see Intelligence report, interrogation of KSM, May 19, 2003. On Mihdhar's status, see INS record, NIIS record of Mihdhar, June 10, 2000.

39. On KSM's communication methods, see Intelligence report, interrogation of KSM, Oct. 15, 2003. Even here, the West Coast operatives' language limitation posed a problem, as KSM had to send emails in Arabic using the English alphabet. Ibid. In addition to having his nephew Ali Abdul Aziz Ali transmit funds to the operatives in the United States, KSM used Ali as an intermediary for telephone messages. Intelligence report, interrogation of detainee, Jan. 7, 2004. On Khallad's role, see Intelligence reports, interrogations of KSM, Oct. 15, 2003; Aug. 18, 2003; Intelligence report, interrogation of Khallad, Feb. 17, 2004. On KSM's annoyance with and views on Mihdhar, see Intelligence reports, interrogations of KSM, June 15, 2004; May 19, 2003.

40. Intelligence report, interrogation of Khallad, Feb. 17, 2004; FBI report of investigation, interview, Sept. 24, 2001; FBI electronic communication, Penttbom investigation, Sept. 15, 2001; FBI electronic communication, interview, July 26, 2002; Interview (Apr. 23, 2004); FBI electronic communication, Penttbom investigation, Sept. 15, 2001. Both KSM and Khallad were aware of Hazmi's interest in finding a bride, and KSM reportedly went so far as to promise Hazmi a monthly stipend of $700 in the event he succeeded in marrying. Intelligence reports, interrogations of KSM, Aug. 6, 2003; Jan. 9, 2004. Although Hazmi did not use his housemate's telephone to make calls, he apparently received calls on it, including calls from an individual named Ashraf Suboh, who called the house 16 times between July 20 and November 18, 2000. Suboh's name and address appear in a printed email recovered during searches at an al Qaeda site in Pakistan in May 2002. The document was dated Jan. 9, 2001, and included his name and a mailing address. FBI letterhead memorandum, San Diego investigation, July 2, 2002.

41. Salmi arrived in San Diego on August 7, 2000, and three days later moved into the house where Hazmi resided. Omar al Bayoumi—who reported (at least nominally) to Salmi's uncle at the Saudi Civil Aviation ministry—found this accommodation for Salmi, although Salmi claims not to have known Bayoumi before coming to San Diego. FBI report of investigation, interview of Yazeed al Salmi, Oct. 8, 2001. On Salmi's move to Abdullah's house in La Mesa, see FBI report of investigation, interview of Salmi, Sept. 21, 2001. On possible financial links, see FBI report, "Hijackers Timeline," Nov. 14, 2003 (citing 265A-NY-280350-302, serial 59279); FBI electronic communication, Information and questions re Salmi interview, June 9, 2004; FBI report of investigation, interview of Salmi, June 17, 2004. For Salmi's possible link to Hanjour, see FBI report of investigation, interview of Abdullah, July 23, 2002. We made efforts with the assistance of the FBI to interview Salmi, but without success. The FBI interviewed Salmi on its own in June 2004 but failed to ask about his reported childhood ties to Hanjour. FBI report of investigation interview of Yazeed al Salmi, June 14, 2004.

42. At KSM's direction, Khallad notified Hazmi that another operative, who turned out to be Hanjour, would be joining Hazmi soon. Intelligence report, interrogation of Khallad, Feb. 17, 2004. On Hazmi's work at the gas station and his statement about becoming famous, see FBI report of investigation, interview, May 21, 2002. The owner of the gas station, Osama Mustafa, and the manager of the station, Iyad Kreiwesh, have both been the subject of FBI counterterrorism investigations. The investigations did not yield evidence of criminal conduct. Thumairy, the Saudi imam in Los Angeles, allegedly presided over Kreiwesh's wedding at the King Fahd mosque, witnessed by Abdullah and Benomrane, likely around September 2000. FBI report of investigation, interview of Mohdar Abdullah, July 23, 2002; 4377 Parks Avenue, San Diego record, "Application to Rent and Rental Deposit," Sept. 21, 2000.

43. On Hanjour's travel to San Diego, see INS record, NIIS record of Hanjour, Dec. 8, 2000. Hazmi's housemate remembers him taking an unexplained trip to the San Diego airport around this time. FBI report of investigation, interview, Sept. 24, 2001. On Hanjour and Hazmi leaving San Diego and the visit to the gas station, see FBI report of investigation, interview of Mohdar Abdullah, Sept. 19, 2001. On Hazmi's comment to his housemate, see Interview (Apr. 23, 2004). Although Hazmi's housemate claims that the "Hani" whom Hazmi introduced him to is not the same person pictured in Hanjour's photograph, we have little doubt that the housemate did in fact see Hanjour on the day he and Hazmi left San Diego. Ibid.; FBI electronic communication, Penttbom investigation, Sept. 15, 2001.

44. On Hazmi's contact with Abdullah, see FBI report of investigation, interview of Mohdar Abdullah, Sept. 19, 2001; FBI report of investigation, interview of Ramez Noaman, Oct. 1, 2001. On Hazmi's contact with his housemate, see FBI reports of investigation, interviews, Sept. 24, 2001; July 26, 2002. On Hazmi's contact to acquaintances in San Diego, see Danny G. interviews (Nov. 18, 2003; May 24, 2004).

45. For Shehhi's arrival, see INS record, NIIS record of Shehhi, May 29, 2000; Customs record, secondary inspection record of Shehhi, May 29, 2000. For Shehhi going to New York City, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (May 30, 2000, entry citing Dresdner bank records). For Atta's travel to the Czech Republic,

see ibid. (June 2, 2000, entry citing Teletype, Sept. 21, 2001, 280350-PR, serial 111). Upon entry, Atta received the customary authorization to stay six months as a tourist. For Atta's arrival in Newark on June 3, 2000, see INS record, non-NIIS record of Atta, June 3, 2000. For Atta's apparent motivation, see CIA analytic report, "11 September: The Plot and the Plotters," CTC 2003-40044HC, June 1, 2003, p. 13; Intelligence reports, interrogations of Binalshibh, Oct. 2, 2002; Mar. 3, 2004.

46. Demonstrating Atta and Shehhi's uncertainty regarding flight schools, Atta emailed a New Hampshire school on June 5, 2000, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 265A-NY-280350-302, serial 3975); and inquired with a New Jersey school on June 22, 2000, see ibid. (citing 265A-NY-280350-NK, serial 15965). As they looked at flight schools on the East Coast, Atta and Shehhi stayed in a series of short-term rentals in New York City. Ibid. (June 19, 2000, entry citing 265A-NY-280350-302, serials 80926, 86069; June 25, 2000, entry citing 265A-NY-280350-302, serial 74902). For Jarrah's travel and training, see INS record, NIIS record of Jarrah, June 27, 2000; FBI letterhead memorandum, profile of Jarrah, Mar. 20, 2002. For Jarrah living with instructors, see ibid. For Jarrah purchasing a vehicle, see FBI briefing materials, Penttbom, Dec. 10–11, 2003, p. 150 (citing 265A-NY-280350-302, serials 21113, 66098).

47. For Atta and Shehhi visiting the Oklahoma school, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (July 2, 2000, entry citing FBI electronic communication, Sept. 13, 2001). For Moussaoui's enrollment, see Superseding Indictment, *United States v. Moussaoui*, Crim. No. 01-455-A (E.D. Va. filed July 16, 2002), para. 44. For Atta's initial training in Florida, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (July 7, 2000, entry citing 265A-NY-280350-TP-5382). Atta and Shehhi did not take their return flight to New York, and there are no travel records indicating how they traveled from Oklahoma to Florida. Ibid. (July 7, 2000, entry citing FBI electronic communication, Sept. 19, 2001). For Atta and Shehhi's enrollment in the advanced course, see ibid. (July 17, 2000, entry citing 265A-NY-280350, serial 4234; 265A-NY-280350-CE, serial 632). The two also soon rented an apartment and opened a joint bank account. Ibid. (July 13, 2000, entry citing 265A-NY-280350-TP-5679; July 7, 2000, entry citing 265A-NY-280350-302-16752). Atta bought a car. FBI briefing materials, Penttbom, Dec. 10–11, 2003, p. 150. For their solo flights, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (July 30, 2000, entry citing 265A-NY-280350-CE-624, 632). For passing the test, see ibid. (Aug. 14, 2000, entry citing 265A-NY-280350-302, serials 9715, 26590). For Atta and Shehhi continuing training, see ibid. (Sept. 1, 2000, entry citing 265A-NY-280350-2435). For Jarrah's training, see ibid. (June 27, 2000, entry citing 265A-NY-280350-TP (FD-302), serial 1442).

48. Ali reportedly received the money sent to the United States from KSM in Pakistan and via courier. Intelligence reports, interrogations of detainee, Feb. 11, 2004 (two reports). Ramzi Binalshibh wired some funds withdrawn from Shehhi's bank account in Germany, a total of more than $10,000 in four transfers between June 13 and September 27, 2000. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, pp. 16–17; German BKA (Bundeskriminalamt) report, investigative summary re Binalshibh, July 4, 2002, pp. 39–41.

49. Adam Drucker interview (Jan. 12, 2004); wire transfer documents (provided by the FBI), pp. 6–37. Ali did provide identification for his initial wire transfer to Hazmi in April that, along with some contact information he provided when he made subsequent transfers, helped the FBI unravel his aliases after 9/11. Intelligence reports, interrogations of detainee, Feb. 11, 2004 (two reports).

50. The applications of Atta and Shehhi for student status include the same supporting financial documentation. See INS record, Atta application to change status, Sept. 19, 2000; INS record, Shehhi application to change status, Sept. 15, 2000. For Atta and Shehhi's enrolling at Jones Aviation, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Sept. 23, 2000, entry citing SunTrust Financial Records). For Atta and Shehhi's behavior, see FBI report of investigation, interview of Ivan Chirivella, Sept. 15, 2001. For their failure, haste, and return to Huffman, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Oct. 4, 2000, entry citing 265A-NY-280350-TP, serial 1474; 265A-NY-280350-302, serial 1361).

51. For Jarrah's certificate, see FBI letterhead memorandum, profile of Jarrah, Mar. 20, 2002. For Jarrah's leaving the United States, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Oct. 7, 2000, entry citing 265A-NY-280350-302-7134). For Jarrah and Senguen's travel to Paris, see FBI letterhead memorandum, profile of Jarrah, Mar. 20, 2002. For Jarrah's return to the United States, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Oct. 29, 2000, entry citing INS NIIS Report; 265A-NY-280350-302, serial 7134). For their telephone contact, see FBI letterhead memorandum, profile of Jarrah, Mar. 20, 2002. For their email contact, see FBI electronic communication, Penttbom investigation, Sept. 18, 2001, p. 5.

52. For Binalshibh's deposit, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (June 27, 2000, entry citing 265A-NY-280350-TP (FD-302), serial 1442; 265A-NY-280350-TP, serial 9500). For his May and June visa applications, see DOS records, Binalshibh visa applications, May 31, 2000; June 30, 2000; July 18, 2000; FBI briefing materials, Penttbom, Dec. 10–11, 2003, pp. 136–137; CIA analytic report, "The Plot and the Plotters," June 1, 2003, pp. 10, 12. For his September application in Yemen, see DOS record, Binalshibh visa application, Sept. 16, 2000. For his October application in Berlin, see DOS record, Binalshibh visa application, Nov. 1, 2000. Even after the last application was rejected, Binalshibh sought ways to get a visa, such as by marrying a U.S. citizen. He corresponded by email with a woman in California, but Atta told him to discontinue this effort. Intelligence report, interrogation of Binalshibh, Sept. 24, 2002.

Essabar may have been intended to replace Binalshibh. Like Atta, Shehhi, and Jarrah, Essabar obtained a new passport even though his old one was nearly a year from expiration, evidently to conceal his prior travel to Afghanistan during the first half of 2000. On December 12, 2000, and January 28, 2001—after Binalshibh's four U.S. visa applications had been denied—Essabar made two unsuccessful U.S. visa applications, stating that he wished to visit the United States during the week of February 15, 2001. DOS records, Essabar visa applications, Dec. 12, 2000; Jan. 8, 2001. See Federal Prosecutor General (Germany), response to Commission letter, June 25, 2004, p. 14. Neither Binalshibh nor Essabar were denied visas based on terrorism concerns.

53. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004 (classified version), p. 82.

54. For KSM sending Moussaoui to Malaysia, see Intelligence Report, interrogation of KSM, Mar. 24, 2003. For Moussaoui not finding a flight school, see Intelligence report, interrogation of detainee, Jan. 22, 2002. For the ammonium nitrate purchase, see Intelligence report, interrogation of detainee, Apr. 9, 2002; Intelligence report, interrogation of detainee, Apr. 12, 2004. For the cargo planes operation, see Intelligence report, interrogation of detainee, Apr. 12, 2004. For KSM's reaction, see Intelligence Report, interrogation of KSM, Mar. 24, 2003. For Moussaoui's and Binalshibh's trips and Moussaoui's emails, see FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004 (classified version), p. 85. There are no witnesses who report that Moussaoui and Binalshibh actually met in London, but Moussaoui's subsequent travel to Afghanistan implies that he received instructions from Binalshibh. See ibid., p. 86. Somewhere in his travels, Moussaoui obtained the funds he would bring to the United States. He declared $35,000 upon arrival on February 23, 2001, and he deposited $32,000 into a Norman, Oklahoma, bank account on February 26. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 78.

55. For Hanjour's entry, see INS record, NIIS record of Hanjour, Oct. 3, 1991. For his university studies, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Oct. 14, 1991, entry citing 265A-NY-280350-PX, serial 3792). For Hanjour being religious, see FBI letterhead memorandum, Penttbom investigation, Jan. 4, 2004, p. 10. One witness interviewed by the FBI after 9/11 remembers Hanjour and Nawaf al Hazmi becoming so entranced during a prayer that both men began to cry. FBI report of investigation, interview of Mourad Jdaini, Sept. 22, 2001. For Hanjour's trip to Afghanistan, his initial studies in the United States, his rejection by the Saudi flight school, and his desire for flight training in the United States, see Intelligence report, interviews of Saudi hijackers' families, Dec. 22, 2001; FBI report of investigation, interview of Adnan Khalil, Sept. 29, 2001.

56. For Hanjour's 1996 trip to the United States, see, e.g., FBI report, "Hijackers Timeline," Dec. 5, 2003 (Apr. 1, 1996, entry citing 265A-NT-280350, serial 2746; 265A-NT-280350-302, serial 9130). For his interest in flight training in Florida and his training in California, see FBI report of investigation, interview of Adnan Khalil, Sep. 14, 2001; FBI report, "Hijackers Timeline," Dec. 5, 2003 (Sept. 3, 1996, entry citing 265A-NY-280350-SF, serial 1847). For his 1996 flight instruction in Arizona and return to Saudi Arabia, see ibid. (Sept. 29, 1996, entry citing 265A-NY-280350-IN, serial 953; Nov. 26, 1996, entry citing INS: 265A-NY-280350-NK). For his return to Florida, see FBI letterhead memorandum, investigation of Bandar al Hazmi, Jan. 15, 2002. For his 1998 flight training in Arizona, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Feb. 2, 1998, entry citing 265A-NY-280350-IN, serial 4468). For his flight training in Arizona with his two friends, see ibid. (Feb. 24, 2000, entry citing 265A-NY-280350-IN, serial 4468). Hanjour initially was nervous if not fearful in flight training. FBI letterhead memorandum, investigation of Lotfi Raissi, Jan. 4, 2004, p. 11. His instructor described him as a terrible pilot. FBI letterhead memorandum, interview of James McRae, Sept. 17, 2001.

We have seen no evidence of a familial relationship between Bandar al Hazmi and hijackers Nawaf al Hazmi and Salem al Hazmi. Tim T. interview (Jan. 5, 2004); Ken Williams interview (May 11, 2004). Bandar al Hazmi claims he met Hanjour in Florida, as they were both studying at the same English-language institute. FBI letterhead memorandum, investigation of Bandar al Hazmi, Jan. 15, 2002. Rayed Abdullah, who knew Bandar al Hazmi from high school, says he moved to Florida to become a commercial pilot after speaking with Bandar al Hazmi, and claims he met Hanjour upon arriving in Florida. FBI report of investigation, interview of Rayed Abdullah, Sept. 15, 2001; FBI letterhead memorandum, investigation of Abdullah Rayed Abdullah, Nov. 16, 2001, p. 8. This account is not credible, because Abdullah arrived in the United States on November 15, 1997, the day *before* Hanjour arrived. Ken Williams interview (May 11, 2004); FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 265A-NY-280350-NK, serial 1379). The three of them did attend language school together but not until after all three had arrived in the United States. FBI report of investigation, interview of Rayed Abdullah, Sept. 15, 2001. The Phoenix FBI office remains suspicious of Abdullah and Hazmi and their association with Hanjour. Ken Williams interview (May 11, 2004). (Williams is the FBI agent who authored what is referred to as the "Phoenix memo," discussed in chapter 8.)

For Hanjour obtaining his pilot's license in three months, see FBI report of investigation, interview of Amro Hassan, Sept. 17, 2001, p. 2. For Hanjour receiving his commercial pilot's license, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Apr. 15, 1999, entry citing 265A-NY-280350-PX, serial 334). For Hanjour's apparent return to Saudi Arabia, see ibid. (Apr. 28, 1999, entry citing INS I-94, 265A-NY-280350-NK, serial 1379). Bandar al Hazmi continued his training at Arizona Aviation with intermittent trips home to Saudi Arabia, before departing the United States for the last time in January 2000. Tim T. interview (Jan. 5, 2004); FBI report of investigation, interview of Amro Hassan, Sept. 19, 2001. Rayed Abdullah trained at Arizona Aviation and obtained a private pilot's license in December 1998. FBI letterhead memorandum, investigation of Rayed Abdullah, May 5, 2001, p. 9. Abdullah then

worked as a computer programmer in Arizona before resuming flight training during the summer of 2001. FBI report of investigation, interview of Rayed Abdullah, Sept. 16, 2001, p. 5.

57. Intelligence report, interviews of Saudi hijackers' families, Dec. 22, 2001.

58. Al Qaeda figures at the university or in Tucson included Mubarak al Duri, reportedly Bin Ladin's principal procurement agent for weapons of mass destruction; Muhammad Bayazid, an al Qaeda arms procurer and trainer; Wadi al Hage, an operative convicted for the East Africa bombings; and Wail Julaidan, a Saudi extremist with ties to al Qaeda. CIA and FBI joint analytic report, "Arizona: Long Term Nexus for Islamic Extremists," May 15, 2002, p. 3.

59. Rayed Abdullah, who lived and trained with Hanjour, was a leader at the Islamic Cultural Center in Phoenix and reportedly gave extremist speeches at the mosque. Ken Williams interview (Jan. 7, 2004); FBI electronic communication, Rayed Abdullah, Sept. 22, 2003. Another Hanjour associate, Faisal al Salmi, took flight training with Rayed Abdullah but wanted to keep his training secret. FBI letterhead memorandum, investigation of Rayed Abdullah, May 5, 2001; FBI report of investigation, interview of Malek Seif, Oct. 25, 2001. When polygraphed on whether he had taken flight training at the behest of an organization, al Salmi's negative response was deemed deceptive. FBI electronic communication, investigation of Zakaria Soubra, June 5, 2002, p. 8.

60. For al Qaeda activity in Arizona, see Ken Williams interview (Jan. 7, 2004). On al Qaeda directing individuals in the Phoenix area to enroll in flight training without telling them why, see FBI electronic communication, investigation of Rayed Abdullah, Sept. 22, 2003. Ghassan al Sharbi, who was captured in March 2002 in Pakistan along with Abu Zubaydah, studied at Embry-Riddle Aeronautical University in Prescott, Arizona. Greg Krikorian, "Detainee Facing Deportation Summoned to Probe," *Los Angeles Times*, Jan. 24, 2003; Ken Williams interview (Jan. 7, 2004). Although Sharbi has not been tied to the 9/11 attacks, he reportedly attended the training camps in Afghanistan and swore *bayat* to Bin Ladin during the summer of 2001. FBI memorandum, investigation of Hamed al Sulami, Aug. 1, 2002, p. 6.

After he left the camps, Sharbi looked for his friend Hamdan al Shalawi, another student in Arizona, for a secret project. Shalawi reportedly trained in the camps in November 2000, learning how to conduct "Khobar Towers"–type attacks that he and a colleague planned to execute in Saudi Arabia. FBI electronic communication, investigation of Hamdan al Shalawi, Oct. 16, 2003, p. 2; Intelligence report, trace request on Shalawi, Nov. 27, 2000. Shalawi, however, denies this, claiming to have been studying in Arizona at the time, which neither the FBI nor we have been able to confirm. Shalawi was involved in a widely publicized incident in November 1999, when he and his friend Muhammed al Qudhaieen were detained because the crew of a cross-country America West flight reported that Qudhaieen had attempted to open the cockpit door on two occasions. FBI letterhead memorandum, Hamed al Sulami, July 25, 2002, p. 7. After the 9/11 attacks, FBI agents in Phoenix considered whether the incident was a "dry run" for the attacks. See, e.g., FBI letterhead memorandum, investigation of Fahad al Wahedi, Nov. 8, 2002, p. 4. In our interviews of Shalawi and Qudhaieen, they both claimed that Qudhaieen was only looking for the lavatory on the plane. Mohammad al Qudhaieen interview (Oct. 25, 2003); Hamdan al Shalawi interview (Oct. 22, 2003). Shalawi admits having gone to Afghanistan, but only once in the late 1980s after the war with the Soviet Union. Shalawi interview (Oct. 22, 2003).

Finally, another admitted associate of Hani Hanjour in Arizona, Hamed al Sulami, has had telephone contact with Sulayman al Alwan, a radical Saudi cleric from Qassim Province who was reported to be Abu Zubaydah's spiritual advisor and, as discussed later in this chapter, may have had a role in recruiting one or more of the muscle hijackers. FBI memorandum, investigation of Hamed al Sulami, Aug. 1, 2002, p. 2; FBI memorandum, investigation of Fahad al Wahedi, Nov. 8, 2002, p. 4; CIA analytic report, "The Plot and the Plotters," June 1, 2003, p. 27.

61. For Hanjour's meeting KSM, experience in the camp, and incorporation into the 9/11 operation, see Intelligence report, interrogation of KSM, Feb. 20, 2004. It is unknown how Hanjour got to the camps or who may have directed him to go there. For new arrivals' procedures, see Intelligence report, interrogation of KSM, May 15, 2003.

62. For Hanjour returning home and obtaining a visa, see DOS records, visa applications for Hanjour, Sept. 10, 2000; Sept. 25, 2000. For Hanjour's statement to his family, see Intelligence report, interviews of Saudi hijackers' families, Dec. 22, 2001. For the meeting, see Intelligence report, interrogation of detainee, Jan. 7, 2004.

63. Ali initially gave Hanjour $3,000 to open the account and later deposited another $5,000 into the account. See FBI report, financial timeline of 9/11 hijackers, Dec. 9, 2004, p. 36 (Dec. 5, 2000, and Jan. 28, 2001, entries). Intelligence report, interrogation of detainee, Feb. 11, 2004. Hanjour also maintained another account, into which more than $9,600 was deposited. While in the United States, he accessed both accounts via ATM. FBI Report, "Summary of Penttbom Investigation," Feb. 29, 2004, pp. 9, 11, 13, 17–18, 19. For Hanjour's travel and supposed destination, see INS record, NIIS record of Hanjour, Dec. 8, 2000; DOS record, Hanjour visa application, Sept. 25, 2000. For his enrollment but failure to attend, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Nov. 6, 2000, entry citing 265A-NY-280350-302, serial 11165; 265A-NY-280350-SF, serial 160).

64. For Hanjour's refresher training, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Dec. 13, 2000, entry citing 265A-NY-280350-IN, serial 29652). For his desire to train on multi-engine planes, his language difficulties, the instructor's advice, and his reaction, see FBI report of investigation, interview of Rodney McAlear, Apr. 10,

2002. For his training at Pan Am International Flight Academy and completion by March 2001, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Feb. 8, 2001, entries citing 265A-NY-280350, serial 2870; 265A–NY-280350-PX, serials 334, 1033). For the Academy's instructor's reaction, see FBI report of investigation, interview of James Milton, Apr. 12, 2002; FBI electronic communication, Penttbom investigation, Sept. 16, 2001, pp. 2–3. For his perseverance, see ibid., p. 3. For vacating their apartment, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Mar. 31, 2001, entry citing 265A-NY-280350-PX, serial 762). During the cross-country drive, Hazmi received a speeding ticket in Oklahoma on April 1, 2001. Ibid. (citing 265A-NY-280350-W, serial 693, items k2453, k2454; 265A-NY-280350-OC, serial 1541; 265A-NY-280350-302, serials 58753, 58757). For arrival in Virginia, see ibid. (citing 265A-NY-280350-NH, serial 1859).

65. For Atta's training at Huffman, see, e.g., FBI report, "Hijackers Timeline," Dec. 5, 2003 (Nov. 19, 2000, entry citing 265A-280350-TP-5382). For Atta's certificate, see ibid. (Nov. 20, 2000, entry citing FAA records). For Shehhi's training at Huffman, see FBI report of investigation, interview of Erik Seiberlich, Sept. 12, 2001. For Shehhi's certificate, see FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 20. For Atta and Shehhi taking the commercial pilot test, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Dec. 19, 2000, entry citing 265A-NY-280350-302-9715, serial 26590). For Atta and Shehhi's commercial pilot licenses, see ibid. (Dec. 21, 2000, entries citing FAA records; 265A-NY-280350-302-2340). For Atta and Shehhi's simulator training, see ibid. (Dec. 30, 2000, entry citing 265A-NY-280350-302, serial 1177). For Jarrah's training, see ibid. (Dec. 15, 2000, entries citing 265D-NY-280350-1399, serial 8048).

66. For Jarrah's trip to Beirut and return trip with Senguen, see FBI letterhead memorandum, profile of Jarrah, Mar. 20, 2002. For Senguen accompanying Jarrah to flight training, see German BKA report, investigative summary re Jarrah, July 18, 2002, p. 60. According to Binalshibh, Senguen visited Jarrah in order to verify that he actually was studying to become a pilot. Intelligence report, interrogation of Binalshibh, June 9, 2004. For Jarrah's second trip to Beirut and visiting Senguen, see FBI letterhead memorandum, profile of Jarrah, Mar. 20, 2002; FBI electronic communication, Penttbom investigation, Sept. 18, 2001, p. 5.

67. For Atta's trip to Germany and meeting with Binalshibh, see Intelligence reports, interrogations of Binalshibh, Sept. 24, 2002; Dec. 10, 2002; FBI Penttbom timeline briefing (Dec. 10–11, 2003). For Atta giving money to Binalshibh, see ibid. For Atta returning to Florida, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Jan. 10, 2001, entry citing INS NIIS report; 265A-NY-280350-302, serial 7134). For Binalshibh's trip to Afghanistan, see FBI Penttbom timeline briefing (Dec. 10–11, 2003).

68. For Shehhi's trip, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Jan. 11 and 12, 2001, entries citing 265A-NY-280350-TP, serials 11182, 11183; 265A-NY-280350-OUT, serials 2248, 2256, Intelligence report). We do not have information on what Shehhi did in Morocco. Atta's cell phone was used on January 2 to call the Moroccan embassy in Washington, D.C. before Shehhi left. FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing cellular telephone records). Shehhi's trip occurred at a time when Abdelghani Mzoudi, one of the Hamburg cell associates, was also in Morocco. Mzoudi claims he went home to Morocco to get married but could not because he was injured in a car accident there. German BKA report, investigative summary re Mzoudi, Jan. 13, 2003, p. 43. He denies having met with Shehhi, and neither German nor U.S. investigators have uncovered evidence of a meeting. See Federal Prosecutor General (Germany), response to Commission letter, June 25, 2004. For Shehhi's family contacting the UAE embassy, which contacted Hamburg police, and the UAE official's search, see German BKA report, investigative summary re Shehhi, July 9, 2002, p. 23. For Shehhi's call home, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 265A-NY-280350-BN-98). For the search being called off, see German BKA report, investigative summary re Shehhi, July 9, 2002, p. 24.

69. Reports that Atta was in the Prague airport on May 30–31, 2000, and that he was turned back because he lacked a visa appear to be a case of mistaken identity: a Pakistani traveler with a name similar to Atta's attempted to enter the Czech Republic from Saudi Arabia via Germany but was forced to return to Germany because he lacked a valid Czech visa. CIA cable, report re traveler to Prague, Dec. 8, 2001.

70. For Czech source reporting and credibility assessment, see CIA briefing (Jan. 28, 2004); Eliska T. interview (May 20, 2004). For the information being reported to CIA, see CIA briefing (Jan. 28, 2004). For the leak and the ministers' statements, see CIA briefing (Jan. 28, 2004); Shirley interview (Apr. 29, 2004). On April 4, 2001, Atta cashed an $8,000 check at a bank in Virginia Beach; he appears on a bank surveillance tape. For FBI evidence of Atta being in Virginia Beach, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Apr. 4, 2001, entry citing 265A-NY-280350-302-615, 688, 896, 898). For FBI evidence of Atta being in Coral Springs, see ibid. (Apr. 11, 2001, entries citing 265A-NY-280350-302, serial 381; 265A-NY-280350-MM, serials 3817, 5214). For Czech government finding no evidence of Atta's presence and having evidence that Ani was not in Prague, see CIA briefing (Jan. 28, 2004). Aside from scrutinizing various official records, the Czech government also reviewed surveillance photos taken outside the Iraqi embassy. CIA briefing (Jan. 28, 2004); Shirley interview (Apr. 29, 2004). None of the people photographed that day resembled Atta, although the surveillance only operated from 8:00 A.M. to 3:00 P.M. CIA cable, review of surveillance photos, Feb. 27, 2002. For Ani's denials of any meetings and request to superiors, see CIA briefing (Jan. 28, 2004); Intelligence report, interrogation of Ahmad Khalil Ibrahim Samir al Ani, Oct. 1, 2003. For KSM's denial of the meeting, see Shirley interview (Apr. 29, 2004). Binalshibh has stated that Atta and

he were so close that Atta probably would have told him of a meeting with an Iraqi official. Intelligence report, interrogation of Binalshibh, Oct. 2, 2002. Binalshibh also stated that Bin Ladin was upset with Iraqi leader Saddam Hussein for committing atrocities against Iraqi Muslims, and that Bin Ladin would never have approved such a meeting. Intelligence report, interrogation of Binalshibh, Oct. 4, 2002. For Atta not using an alias during his July 2001 trip, see FBI memo, Penttbom investigation, Jan. 14, 2002.

71. Atta was admitted as a tourist for an eight-month stay, even though the legal limit for tourists is six months. Shehhi was admitted for a four-month "business" stay. The Atta and Shehhi applications to change status were ultimately adjudicated on July 17 and August 9, 2001. Each received until October 1, 2001, to complete his studies. For Atta's INS inspection, see INS records, NIIS record of Atta, Jan. 10, 2001; copy of Atta's Egyptian passport; Atta's inspection results; student/school form presented by Atta; primary and secondary inspectors interviews (Mar. 25, 2004). For Shehhi's INS inspection, see INS records, NIIS record of Shehhi, Jan. 18, 2001; Shehhi's inspection results; primary inspector interview (Mar. 26, 2004); secondary inspector interview (Mar. 22, 2004).

72. For Atta and Shehhi staying in Norcross and Decatur, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Jan. 25, 2001, entry citing 265A-NY-280350-3631; 265A-NY-280350-AT-141). For the plane rental in Lawrenceville, see ibid. (Jan. 31, 2001, entry citing 265A-NY-280350, serial 13850). These locations are all near Atlanta. For return to Virginia, see ibid. (citing 265A-NY-280350-NF-48). For mailbox rental, see ibid. (Feb. 20, 2001, entry citing 265A-NY-280350-NF-48, 51). For check cashing, see FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 26. For return to Georgia, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Feb. 21, 2001, entry citing 65A-NY-280350-302, serial 49563). For Jarrah staying in Decatur, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Mar. 15, 2001, entry citing 265A-NY-280350, serial 15661). For Atta-Jarrah call, see FBI letterhead memorandum, profile of Jarrah, Mar. 20, 2002. For Jarrah's apparent visit with Senguen, see INS records, NIIS record for Jarrah, Feb. 25, 2001 (with departure date of Mar. 30, 2001); NIIS record for Jarrah, Apr. 13, 2001. For Atta and Shehhi returning to Virginia Beach, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Apr. 3, 2001, entry citing FBI electronic communication, Sept. 17, 2001). For Atta closing the mailbox, see ibid. (Apr. 4, 2001, entry citing FBI electronic communication, Sept. 18, 2001).

73. For Atta and Shehhi arriving in Virginia, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Apr. 3, 2001, entry citing 265A-NY-280350-302-615, 688, 896, 898). For Hazmi and Hanjour arriving in Virginia, see ibid. (Apr. 4, 2001, entry citing 265A-NY-280350-NH, serial 1859). For their attendance at the Dar al Hijra mosque, see FBI electronic communication, request for interviews, Aug. 6, 2002.

74. For Aulaqi moving to Virginia, see FBI electronic communication, analysis related to Penttbom investigation, Oct. 23, 2001. For his denial of contacts with Hazmi and Hanjour, see FBI report of investigation, interview of Anwar Aulaqi, Sept. 17, 2001.

75. The apartment was already occupied by two other individuals. The al Qaeda operatives spent little time with their roommates, but did mention at one point that they had considered going to Afghanistan for jihad. FBI report of investigation, interview of Ahmad Ahmad, Oct. 4, 2002. For Hazmi and Hanjour meeting Rababah, see FBI electronic communication, request for interviews of certain individuals, Aug. 6, 2002. For Rababah seeking work at the mosque, his meeting them, and his assistance in finding them an apartment, see FBI report of investigation, interview of Eyad al Rababah, June 10, 2002. For Hazmi and Hanjour renting the apartment, see FBI report of investigation, interview of Derar Mohammed Saleh, Jan. 16, 2003.

76. For FBI agents' suspicions, see Jim B. interview (Nov. 6, 2003). Rababah was reluctant to admit meeting the hijackers at the mosque and initially told a story about meeting them for the first time at a store. Rababah attributed his initial prevarication to wanting to protect the mosque from anti-Arab sentiment following September 11. FBI report of investigation, interview of Eyad al Rababah, June 10, 2002; Robert B. interview (Nov. 6, 2003). For Rababah's deportation, see Peter A. interview (Oct. 10, 2003).

77. FBI report of investigation, interview of Eyad al Rababah, June 10, 2002.

78. For Rababah going to the apartment and finding new roommates, see FBI report of investigation, interview of Eyad al Rababah, June 10, 2002. For the trips to Connecticut and New Jersey, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (May 8, 2001, entries citing 265A-NY-280350-NH, serial 1859); FBI electronic communication, summary of Penttbom investigation, June 3, 2002. For the telephone calls, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (May 8, 2001, entry citing 265A-NY-280350-NH, serial 1859). For return to Connecticut and Rababah not seeing the hijackers again, see ibid. (May 10, 2001, entry citing 265A-NY-280350-NH, serial 1859); FBI report of investigation, interview of Eyad al Rababah, June 10, 2002.

79. For the apartment rental in New Jersey, see FBI report of investigation, interview of Eyad al Rababah, June 10, 2002; FBI report, "Hijackers Timeline," Dec. 5, 2003 (May 21, 2001, entry citing 265A-NY-280350-302, serials 25453, 25445). For the landlord finding six people, see FBI report of investigation, interview of Jimi Nouri, Sept. 19, 2001. Although no specific evidence places Omari in the apartment, the muscle hijackers based in New Jersey likely lived together, as they apparently conducted other activities jointly, such as obtaining identification cards. See, e.g., FBI report, "Hijackers Timeline," Dec. 5, 2003 (July 1, 2001, entries citing 265A-NY-280350-FD-302, serials 4718, 11815, 20900, 21529).

80. For Atta's renting the apartment, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 265A-NY-

280350-302, serial 381; 265A-NY-280350-MM, serial 3817). For Shehhi's presence in Florida, see, e.g., ibid. (Apr. 13, 2001, entry citing 265A-NY-280350-302, serial 17575).

81. For Shehhi's ticket purchase, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (Apr. 13, 2001, entry citing 265A-NY-280350-302, serial 17575; Apr. 18, 2001 entry citing 265A-NY-280350-CG, serial 1928; 265A-NY-280350-302, serial 16379; Apr. 19, 2001, entry citing CIA report; 265A-NY-280350-302, serial 17575). For Shehhi's visit with Atta's father, see ibid. (Apr. 20, 2001, entry citing CIA report). For Atta having license during April 26, 2001, traffic stop and Shehhi spending two weeks abroad, see ibid. (citing 265A-NY-280350-MM, serial 2746; May 2, 2001, entry citing 265A-NY-280350-302, serial 16379; 265A-NY-280350-CG, serial 1928); FBI Penttbom timeline briefing (Dec. 10-11, 2003).

82. For Shehhi's return, see INS record, NIIS record of Shehhi, May 2, 2001. For Atta and Jarrah obtaining driver's licenses, see FBI report, "Hijackers Timeline," Dec. 5, 2003 (May 2, 2001, entry citing 265A-NY-280350-MM, serial 59). Also on May 2, Atta and two unidentified companions appeared at the Miami District Immigration Office, where an inspector reduced Atta's authorized length of stay by two months, correcting the mistake made back in January. Interview of inspector (Mar. 25, 2004).

83. For a description of the muscle hijackers, see CIA analytic report, "The Plot and the Plotters," June 1, 2003, pp. 34–52.

84. On Banihammad, see CIA analytic report, "Facilitating Disaster: An Overview of 11 September Finance," CTC 2002-40093H, Aug. 22, 2002, p. 4

85. Intelligence reports, interviews of Saudi hijackers' families, Dec. 22, 2001; July 17, 2002; Saudi Arabian Mabahith briefing (Oct. 17, 2003) (disclosing that two of the muscle hijackers had married shortly before joining the plot and only one, Wail al Shehri, was employed, as a physical education teacher).

86. CIA analytic report, "The Plot and the Plotters," June 1, 2003, p. 25.

87. Ibid.

88. Ibid., p. 26.

89. Ibid., p. 25. On Nawaf's efforts on behalf of his brother, see CIA analytic report, "Afghanistan Camps Central to 11 September Plot: Can al-Qa'ida Train on the Run?" CTC 2003-40071CH, June 20, 2003, p. 1; Intelligence report, interrogation of detainee, Oct. 18, 2001.

90. Intelligence report, interrogation of Binalshibh, Feb. 18, 2004; Intelligence report, interrogations of KSM and another detainee, Feb. 18, 2004; Intelligence report, interrogation of Abu Zubaydah, Feb. 19, 2004; Intelligence report, interrogation of Nashiri, Feb. 2004; Intelligence report, interrogation of detainee, Feb. 18, 2004.

91. Intelligence report, interrogation of KSM, Jan 7, 2004. Khallad agrees about the recruit pool, but also argues that operatives' ethnicity was important for symbolic reasons, citing the Nairobi and Dar es Salaam embassy bombings and the planes operation as examples. In the planes operation, Khallad notes, Bin Ladin selected operatives from Mecca (Mihdhar and the Hazmi brothers) and would have used more had they been available. Moreover, with respect to the remaining Saudi muscle hijackers, Khallad claims Bin Ladin chose them because he wanted the 9/11 attacks to resound across Saudi Arabia, especially among the southern tribes and those of the hijackers themselves. According to Khallad, Bin Ladin wanted operatives from strong tribal areas of Saudi Arabia and chose two Saudi brothers from the al Shehri tribe, of which their father was a leader. Intelligence report, interrogation of Khallad, Feb. 18, 2004.

92. CIA analytic report, "The Plot and the Plotters," June 1, 2003, pp. 24, 26. According to Saudi authorities, none of the hijackers had any record of extremist activity, but Satam al Suqami and Salem al Hazmi both had minor criminal offense records. Saudi Arabian Mabahith briefing (Oct. 17, 2003).

93. CIA analytic report, "Afghanistan Camps Central to 11 September Plot," June 20, 2003, pp. 1–2.

94. For trainer's comments, see Intelligence report, interrogation of detainee, Feb. 8, 2002. For Omari's, Ghamdi's, and Shehri's backgrounds, see CIA analytic report, "The Plot and the Plotters," June 1, 2003, p. 27; Intelligence reports, interviews of Saudi hijackers' families, Dec. 22, 2001; July 17, 2002.

95. CIA analytic report, "The Plot and the Plotters," June 1, 2003, p. 26; Intelligence reports, interviews of Saudi hijackers' families, Dec. 22, 2001; July 17, 2002. According to Saudi authorities, a substantial number of the hijackers isolated themselves and became religious only within a few months of leaving the Kingdom. All but Ahmad al Haznawi, who called his aunt to inquire about his sick mother, ceased contact with their families about six months before the attacks. Saudi Arabian Mabahith briefing (Oct. 17, 2003).

96. CIA analytic report, "The Plot and the Plotters," June 1, 2003, p. 26; Intelligence reports, interviews of Saudi hijackers' families, Dec. 22, 2001; July, 17, 2002.

97. On Khattab, see CIA analytic report, "The Plot and the Plotters," June 1, 2003, p. 26, n. 2. For KSM's claim, see Intelligence report, interrogation of KSM, May 15, 2003. For difficulties traveling to Chechnya, see also Saudi Arabian Mabahith briefing (Oct. 17, 2003).

98. Intelligence reports, interrogations of Khallad, Sept. 5, 2003; Mar. 26, 2004; Jan. 8, 2004; Jan. 7, 2004. Khallad claims he also encouraged Salem al Hazmi to participate in a suicide operation. Intelligence report, interrogation of Khallad, Apr. 13, 2004.

99. Intelligence reports, interrogations of KSM, May 15, 2003; Jan. 9, 2004; Oct. 21, 2003. KSM does acknowl-

edge that the commander of al Faruq training camp was known to urge trainees to swear bayat. Moreover, peer pressure certainly appears to have been a factor in swaying recruits to choose "martyrdom." Intelligence report, interrogation of KSM, Apr. 30, 2004.

100. Intelligence report, interrogation of KSM, Feb. 18, 2004; Intelligence report, interrogation of Khallad, Jan. 8, 2004.

101. Intelligence report, interrogation of Khallad, Feb. 18, 2004; Intelligence report, interrogation of KSM, Jan. 7, 2004; Intelligence report, interrogation of detainee, Feb. 8, 2003.

102. CIA analytic report, "Afghanistan Camps Central to 11 September Plot," June 20, 2003, pp. 2–3.

103. Ibid., p. 8; Intelligence report, interrogation of KSM, May 15, 2003.

104. Intelligence reports, interrogations of KSM, May 15, 2003; Jan. 9, 2004; Apr. 2, 2004; Intelligence report, interrogation of Khallad, Apr. 13, 2004; Intelligence report, interrogation of detainee, Apr. 14, 2004. For description of martyrdom video filming, see Intelligence report, interrogation of KSM, May 21, 2004.

105. Intelligence report, interrogation of Khallad, Apr. 13, 2004; Intelligence reports, interrogations of KSM, Aug. 20, 2003; Apr. 13, 2004; Apr. 5, 2004; Apr. 3, 2004.

Dates of U.S. visas obtained in 2000: Ahmed al Ghamdi (September 3), Saeed al Ghamdi (September 4), Hamza al Ghamdi (October 17), Mohand al Shehri (October 23), Wail and Waleed al Shehri (October 24), Ahmed al Nami (October 28), Ahmad al Haznawi (November 12), Majed Moqed (November 20), and Satam al Suqami (November 21). Five Saudi muscle hijackers obtained visas in 2001: Ahmed al Nami (April 23), Saeed al Ghamdi (June 12), Khalid al Mihdhar (June 13), Abdul Aziz Omari (June 18) and Salem al Hazmi (June 20). For Nami, Ghamdi, and Mihdhar, this was their second visa, and each applied using a new passport. Banihammad, the only non-Saudi muscle hijacker, also obtained his visa much later than most of the Saudi muscle hijackers, on June 18, 2001. See Commission analysis of DOS records; CIA analytic report, "The Plot and the Plotters," June 1, 2003, p. 55. According to KSM, the three hijackers who obtained their first visas much later than the others were not replacements for unsuccessful candidates. KSM simply wanted to get as many hijackers into the United States as possible to enhance the odds for success, even if each flight ended up with as many as six or seven. Intelligence report, interrogation of KSM, Feb. 20, 2004.

106. Only the passports of Satam al Suqami and Abdul Aziz al Omari were recovered after 9/11. Both had been doctored. According to KSM, two hijacker passports were damaged in the doctoring process. These may have belonged to Saeed al Ghamdi and Ahmed al Nami, as both acquired new passports and new U.S. visas, although the old visas were still valid. Of the hijacker visa applications we were able to review, all were incomplete. Tourist visas were granted anyway. On obtaining "clean" passports and the two damaged passports, see Intelligence reports, interrogations of KSM, July 3, 2003; Sept. 9, 2003. Wail and Waleed al Shehri had a family member in the Saudi passport office who provided them with new passports for their trip to the United States. See CIA analytic report, Al Qaeda Travel Issues, CTC 2004-40002H, Jan. 2004, p. 12.

107. Intelligence report, interrogation of Khallad, Apr. 5, 2004; Intelligence report, interrogation of KSM, Mar. 20, 2004. The candidate operatives were

1. **Muhammad Mani Ahmad al Kahtani.** Currently in custody, he is the last known Saudi muscle candidate to be sent to the United States, in early August 2001, to round out the number of hijackers. As discussed later in this chapter, he was refused entry. Secretary of Defense interview with David Frost (BBC), June 27, 2004, available at www.defenselink.mil. CIA analytic report, "Threat Threads: Recent Advances in Understanding 11 September," CTC 2002-30086CH, Sept. 16, 2002, p. 4; Intelligence report, interrogation of KSM, July 3, 2003; Intelligence report, interrogation of detainee, Apr. 3, 2003.

2. **Khalid Saeed Ahmad al Zahrani.** He traveled to Afghanistan illegally after being prohibited by Saudi authorities from leaving Saudi Arabia. After being assigned to a mission in the U.S., he secretly reentered the Kingdom but failed in an attempt to have his name removed from the list of prohibited travelers so that he could obtain a U.S. visa. See Intelligence reports, interrogations of detainee, Apr. 20, 2002; Oct. 4, 2002; Apr. 3, 2003.

3. **Ali Abd al Rahman al Faqasi al Ghamdi.** (aka Abu Bakr al Azdi) He reportedly was to have been part of the planes operation but was held in reserve by Bin Ladin for a later, even larger operation. Like other muscle hijackers, he reportedly set out for Chechnya but diverted to Afghanistan. See Intelligence reports, interrogations of Abu Bakr al Azdi, July 23, 2003; Sept. 25, 2003; Intelligence report, interrogation of Khallad, Nov. 6, 2003.

4 and 5. **Saeed al Baluchi** and **Qutaybah al Najdi.** Both were sent to Saudi Arabia via Bahrain, where Najdi was stopped and briefly questioned by airport security officials. Both were so frightened by the experience that they withdrew from the operation. KSM urged Baluchi to obtain a U.S. visa, but Baluchi refused, fearing that he might be watchlisted at the U.S. embassy. See Intelligence report, interrogation of Khallad, July 9, 2003; Intelligence reports, interrogations of KSM, Mar. 27, 2003; July 3, 2003; Feb. 20, 2004.

6. **Zuhair al Thubaiti:** He has reportedly admitted membership in al Qaeda, stating "proudly" that

he was among a select number of operatives who had the personal endorsement of Bin Ladin. He was not ultimately selected for the 9/11 attacks because the al Qaeda leadership considered him too high-strung and lacking the necessary temperament. CIA analytic report, "Threat Threads," Sept. 16, 2002, p. 3; Intelligence reports, interrogations of detainee, May 21, 2002; June 17, 2002; June 20, 2002; Intelligence reports, interrogations of KSM, Feb. 20, 2004 (two reports).

7. **Saeed Abdullah Saeed ("Jihad") al Ghamdi.** He arranged to travel to Afghanistan in March 2000, swore allegiance to Bin Ladin (agreeing to serve as a suicide operative), and was sent to Saudi Arabia by KSM with 9/11 hijacker Ahmad al Haznawi to obtain a U.S. visa, but his visa application was denied because he appeared to be intending to immigrate. DOS record, Ghamdi visa application, Nov. 13, 2000. CIA analytic report, "Threat Threads," Sept. 16, 2002, p. 4; Intelligence reports, interrogations of detainee, Apr. 11, 2002; Sept. 11, 2002; Intelligence report, interrogation of KSM, Feb. 20, 2004.

8. **Saud al Rashid.** Describing him as headstrong and immature, KSM says he disappeared after being sent to Saudi Arabia for a U.S. visa, either because he had second thoughts or because his family interceded and confiscated his passport. Passport photos of Rashid and three 9/11 hijackers—Nawaf al Hazmi, Mihdhar, and Omari—were found together during a May 2002 raid in Karachi. After discovery of the photos in 2002, Rashid turned himself in to the Saudi authorities, but he has since been released from custody. In a Commission interview, he has admitted training in Afghanistan but denies hearing of al Qaeda before returning from Afghanistan or meeting Bin Ladin, KSM, or any 9/11 hijacker other than Ahmad al Haznawi, whom he claims seeing only once or twice at a guesthouse. He has no credible explanation why photos of him were found with those of three other hijackers, or why others identified him as a candidate hijacker. See Intelligence report, interrogation of KSM, Mar. 27, 2003; June 11, 2003; July 3, 2003; Feb. 20, 2004; Intelligence report, interrogation of Khallad, July 9, 2003; Saud al Rashid interview (Feb. 24, 2004).

9. **Mushabib al Hamlan.** Sent to Saudi Arabia to acquire a U.S. visa, he and his travel companion, 9/11 hijacker Ahmed al Nami, both applied for and received visas on October 28, 2000. Hamlan never returned to Afghanistan, probably dropping out either because he changed his mind or because his family intervened.

In December 1999, while still in high school in Saudi Arabia, Hamlan became involved with a group that gathered periodically to watch jihad propaganda tapes, and was encouraged by a mentor named Bandar Marui to pursue jihad, especially as practiced in the Bosnia-Herzegovina and Russian-Afghan wars and a book titled *Gladiator of Passion*. As instructed, Hamlan acquired a passport, on February 15, 2000, and agreed to go to Afghanistan after the hajj in mid-March 2000. He and two travel companions obtained Pakistani visas in Sharjah, UAE, and traveled to Islamabad, where al Qaeda facilitator Hassan Ghul took them to a guesthouse managed by Abu Zubaydah. Days later, two men helped Hamlan cross the Pakistan-Afghanistan border.

At the Khaldan camp, Hamlan received military training courses. Upon hearing that the camp was to be closed, he and others traveled to al Faruq camp near Kandahar, where they received more training. He also met and proclaimed allegiance to Bin Ladin at this time. Injured during a further training session, Hamlan was assigned to guard the airport, where he met future hijacker Ahmed al Nami (whose recent laser eye surgery had interrupted his training). An individual named Abu Basir al Yemeni indoctrinated the two in Bin Ladin's anti-U.S. position and extolled the virtues of martyrdom. Hamlan and Nami eventually agreed to approach Abu Hafs al Mauritani about participating in a suicide operation. The day after visiting Abu Hafs, Hamlan and Nami heard from Abu Basir that Bin Ladin was planning an attack against the United States. After taking their passports, Abu Basir arranged for Hamlan and Nami to meet Bin Ladin and instructed them to use the following phrase to express their desire to become martyrs: "I want to be one of this religion's bricks and glorify this religion." The al Qaeda leader accepted both applicants.

In October 2000, Abu Basir took Hamlan and Nami to Kandahar to meet KSM, who impressed on them the high expectations for martyrs and instructed them on using coded telephone numbers. He returned their passports, which had been altered and now contained forged tourism stamps for Singapore, Malaysia, Turkey, and Egypt. KSM told them to meet with Atef before returning to Saudi Arabia, where they should contact hijacker future 9/11 hijacker Waleed al Shehri for additional documentation.

After meeting with Atef, Hamlan and Nami traveled by car and by air to an address KSM had given them in Tehran, where arrangements were made for them to fly to Qatar. From Qatar they traveled onward to the UAE and then to Mecca. Nami contacted KSM and received coded instructions to go to Jeddah, call Waleed al Shehri, and obtain visas at the U.S. consulate. In Jeddah, they briefly shared an apartment with Shehri, who provided them with directions to the consulate and showed them how to fill out the visa application. After acquiring visas, Hamlan and Nami presented their passports to Shehri for inspection and returned to Mecca. Nami called KSM, who told them to return to Afghanistan the next day.

Despite instructions to the contrary, Hamlan insisted on calling his family before leaving Saudi Arabia because he had begun to have second thoughts after acquiring the visa. Told by his brother that their mother had fallen ill. Hamlan decided not to return to Afghanistan even after Nami reminded him of his

allegiance to Bin Ladin and commitment to complete the suicide mission. In Riyadh, he told his brothers that he had been on jihad in Chechnya. Fearing that they might ask for his passport, he removed the U.S. visa—as later confirmed by forensic analysis performed by Saudi authorities. Hamlan returned to college and resumed living with his parents, who confiscated his passport.

Thereafter, Hamlan received a visit at the college from a former associate at al Faruq camp, Khalid al Zahrani, who asked why he had not returned to Afghanistan. Zahrani admitted having been sent by KSM to convince Hamlan to return to Afghanistan. Hamlan never did. Intelligence report, interrogation of detainee, Mar. 16, 2003.

10. **Abderraouf Jdey, a.k.a. Faruq al Tunisi.** A Canadian passport holder, he may have trained in Afghanistan with Khalid al Mihdhar and Nawaf al Hazmi and received instruction from KSM with Atta and Binalshibh. A letter recovered from a safehouse in Pakistan, apparently written by Sayf al Adl, also suggests that Jdey was initially part of the 9/11 operation at the same time as the Hamburg group. A videotape of Jdey's martyrdom statement was found in the rubble of Atef's house near Kabul following a November 2001 airstrike, together with a martyrdom video of Binalshibh. While both Binalshibh and Khallad confirm Jdey's status as an al Qaeda recruit, KSM says Jdey was slated for a "second wave" of attacks but had dropped out by the summer of 2001 while in Canada. FBI briefing (June 24, 2004); Intelligence report, interrogation of Binalshibh, Sept. 11, 2003; Intelligence report, interrogation of Khallad, May 21, 2004; Intelligence report, interrogation of KSM, July 1, 2003.

108. On the few operatives fully aware of the plot and Abu Turab's training, see Intelligence report, interrogation of KSM, Feb. 23, 2004. Abu Turab was the son-in-law of Ayman al Zawahiri. Intelligence report, interrogation of Zubaydah, Feb. 18, 2004. KSM also taught the muscle hijackers English and provided lessons about airplanes. Intelligence report, interrogation of KSM, Apr. 2, 2004. Binalshibh also has discussed this training in post-capture statements, describing it as hand-to-hand combat training. Intelligence report, interrogation of Binalshibh, Jan. 8, 2004. According to Binalshibh, after returning to Afghanistan, muscle hijacker recruits fought on the front lines alongside the Taliban and participated in the March 2001 destruction of the giant Buddha statues in Bamian Province, Afghanistan. Intelligence report, interrogation of Binalshibh, Mar. 31, 2004.

109. Intelligence report, interrogation of KSM, Feb. 23, 2004. According to KSM, the muscle hijackers learned about the specific targets and the Atta's completed operational plan only in late August. Intelligence report, interrogation of KSM, Apr. 2, 2004.

110. On the facilitator's comments, see Intelligence reports, interrogations of detainee, Sept. 14, 2002; Oct. 3, 2002; May 5, 2003 (two reports), in which he claims also to have assisted the Hamburg pilots and Binalshibh. On KSM's funding of the hijackers, see Intelligence reports, interrogations of KSM, June 15, 2004; July 25, 2003.

111. On Ali's role and the transit of the hijackers, see Intelligence report, interrogation of detainee, Feb. 12, 2004. According to the detainee, the operatives arrived with their own money to buy plane tickets and anything else they needed. Ali referred them to places where they could obtain travelers checks. He also helped Ahmed al Ghamdi, one of the earliest operatives to transit Dubai, acquire a mobile phone account so that the operatives could use that number as a travel agency point of contact. Ibid.

112. In May 2001, however, Ali asked KSM to participate in a suicide mission and offered to travel to the United States and assist the operatives there. As discussed in a set of Atta-Binalshibh exchanges in August 2001, Ali (referred to by the nickname "Losh") appears to have contacted Atta and expressed the desire to join the operation. Ali actually applied for a U.S. visa on August 27, 2001, listing his intended arrival date as September 4 for a one-week stay. His application was denied because he appeared to be an economic immigrant. DOS record, visa application of Ali Abdul Aziz Ali, Aug. 27, 2001. Intelligence report, interrogation of detainee, Nov. 17, 2003; Intelligence report, documents captured with KSM, Sept. 24, 2003; CIA notes, "DRG Research Notes," Jan. 17, 2004; FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 72.

113. Intelligence reports, interrogations of detainee, May 6, 2003; Jan. 8, 2004. See also Intelligence report, interrogation of Binalshibh, Sept. 11, 2003. Hawsawi's role as financial facilitator appears to have begun when he and hijacker Banihammad opened bank accounts at the same UAE bank while Banihammad was his way to the United States. Banihammad, who was from the UAE, was familiar with the country's procedures and helped Hawsawi complete his account application. Banihammad gave Hawsawi roughly $3,000 and granted him power of attorney over his account so that Hawsawi could forward the bank card to him in the United States. After Banihammad arrived in the United States, Hawsawi deposited $4,900 into the account. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 29.

114. All but 2 of the 15 muscle hijackers were admitted as tourists, affording a six-month stay in the United States (except in the case of Mihdhar, who received four months). The first pair to arrive were Waleed al Shehri (Flight 11) and Satam al Suqami (Flight 11), who flew from the UAE to London and arrived in Orlando on April 23, 2001, where Atta most likely met them. Suqami was admitted as a business visitor, allowing him only a one-month stay and thus making him an illegal overstay by May 21, 2001. INS records, NIIS records of Waleed al Shehri and Satam al Suqami, Apr. 23, 2001. Suqami was the only hijacker not to obtain a U.S. identification document.

Shehri and another individual (presumably Suqami) settled in Hollywood, Florida, moving into a motel on April 30. FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing London EC, serial 2236; 315N-NY-280350-302, serial 7134; 315N-NY-280350, serial 8082).

The next set, Ahmed al Ghamdi (Flight 175) and Moqed (Flight 77), arrived at Dulles Airport on May 2, 2001, on a flight from London originating in Dubai. INS records, NIIS records of Ghamdi and Moqed, May 2, 2001. Although Customs declarations of the two indicate that Moqed claimed to be carrying more than $10,000, the Customs Service generated no report of this event. Both Ghamdi and Moqed gave the Hyatt Hotel in Washington as their intended destination, but instead moved into the apartment in Alexandria, Virginia, that Nawaf al Hazmi and Hani Hanjour had rented. FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing flight manifest and Customs records, referenced in 265A-NY-280350, serial 2746; 265A-NY-280359-RY, serial 5; 265A-NY-280350-302, New Hampshire ECs dated Sept. 28, 2001, Sept. 29, 2001; 265A-NY-280350, serial 9776; 265A-NY-280350-IN, serial 5151; 265A-NY-280350-302).

Hamza al Ghamdi (Flight 175), Mohand al Shehri (Flight 175), and Ahmed al Nami (Flight 93) arrived in Miami on May 28, 2001. INS records, NIIS records of Hamza al Ghamdi, Mohand al Shehri, and Ahmed al Nami, May 28, 2001. The three had taken a flight from London after starting out in Dubai. Atta probably picked up the group at the airport, having rented a Ford Explorer for the day. Shehri and Nami gave the Sheraton in Miami as their intended destination, but do not appear to have stayed there. Marwan al Shehhi helped them settle in Florida. Within a few days, Shehhi found the group an apartment in Delray Beach, Florida. FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 265A-NY-280350-NK, serial 2851; 265A-NY-280350-CG, serial 1928; 265A-NY-280350-NK, serial 2851; 265A-NY-280350-DL, serial 1778; 265A-NY-280350-DL, 838; 265D-NY-280350-A, serial 16; 265A-NY-280350-NK, serial 2851; 265A-NY-280350-MM-302, serial 11703).

Haznawi (Flight 93) and Wail al Shehri (Flight 11) arrived in Miami from London on June 8, 2001 using the same route as the previous three. INS records, NIIS records of Haznawi and Wail al Shehri (June 8, 2001). FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 265A-NY-280350-RY, serial 5).

Saeed al Ghamdi (Flight 93) and Banihammad (Flight 175) arrived in Orlando from London on June 27, 2001. INS records, NIIS records of Saeed al Ghamdi and Banihammad, June 27, 2001. Saeed al Ghamdi was questioned by immigration authorities as a possible intending immigrant, as he spoke little English, had no return ticket, and listed no address on his arrival record. INS record, inspection results for Ghamdi, June 27, 2001; primary inspector interview (Mar. 17, 2004); secondary inspector interview (Apr. 19, 2004). Ghamdi and Banihammad presumably stayed with the hijackers who preceded them or with Atta and Shehhi in the Hollywood, Florida, apartment. Post-9/11 investigation revealed that during this time period Atta and Shehhi also checked into hotels or rented apartments with unidentified males, probably the newly arrived muscle hijackers. FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 265A-NY-280350-302-19615; 265A-NY-280350-MM, serial 3255; 265A-NY-280350-MM-302, serial 34927; 265A-NY-280350-MM-Sub, serial 3255; 265A-NY-280350-RY, serial 5; 265A-NY-280350-MM-302, serial 34927; 265A-NY-280350-MM, serials 48418, 2374, 4449, 4696; 265A-NY-280350, serials 925, 449, 18695).

The remaining hijackers entered the United States through New York. Salem al Hazmi (Flight 77) and Omari (Flight 11) arrived at JFK on June 29, 2001, from Dubai with a connection in Zurich. INS records, arrival records of Salem al Hazmi and Omari, June 29, 2001. They likely were picked up by Salem's older brother Nawaf—who was then living in Paterson, New Jersey, with Hani Hanjour—the following day, for on June 30, Nawaf had a minor car accident traveling eastbound on the George Washington Bridge, toward JFK. FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing Bern EC Sept. 15, 2001; INS NIIS report; 265A-NY-280350-302, serial 7134; 265A-NY-280350-HQ, serial 11297; Bern EC (Omari PNR, Swiss Air); 265A-NY-280350-302, serial 60839). On Salem al Hazmi in the Paterson apartment, see FBI report of investigation, interview of Jimi Nouri, Oct. 6, 2001, p. 5.

115. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, pp. 29–41; Adam Drucker interview (Jan. 12, 2004).

116. In some cases, bank employees completed the Social Security number fields on the new account application with a hijacker's date of birth or visa control number, but did so on their own to complete the form. Adam Drucker interview (Jan. 12, 2004). Contrary to persistent media reports, no financial institution filed a Suspicious Activity Report (SAR)—which U.S. law requires banks to file within 30 days of a suspicious transaction—with respect to any transaction of any of 19 hijackers before 9/11. A number of banks did file SARs after 9/11, when the hijackers' names became public. Adam Drucker interview (Jan. 12, 2004); James Sloan interview (Nov. 14, 2003). Nor should SARs have been filed. The hijackers' transactions themselves were not extraordinary or remarkable. See Commission analysis of financial transactions; Adam Drucker interview (Jan. 12, 2004); Dennis Lormel interview (Jan. 16, 2004).

117. Intelligence report, interrogation of Khallad, Mar. 26, 2004; Intelligence report, interrogation of KSM, May 19, 2003.

118. Intelligence reports, interrogations of detainee, Nov. 27, 2001; Feb. 5, 2002.

119. FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 315N-NY-280350-DL, serial 2812; 315N-NY-280350-302, serial 21529; 315N-NY-280350-NK, serials 21529, 11815, 4718).

120. Intelligence reports, interrogations of detainee, Oct. 18, 2001; Mar. 13, 2002; Intelligence report, interrogation of detainee, Mar. 7, 2002; Intelligence reports, interrogations of KSM, Aug. 20, 2003; Sept. 12, 2003, July 16, 2004; Intelligence report, interrogation of Khallad, Sept. 12, 2003; Intelligence report, interrogation of detainee, Sept. 30, 2003; CIA analytic report, "Iran and al-Qa'ida: Ties Forged in Islamic Extremism," CTC 2004-40009HCX, March 2004, pp. i, 6–12.

121. Intelligence report, analysis of Hezbollah, Iran, and 9/11, Dec. 20, 2001; Intelligence report, interrogation of Binalshibh, July 16, 2004.

122. Ibid.; Intelligence report, Hezbollah activities, Oct. 11, 2001; Intelligence report, operative's travel to Saudi Arabia, Aug. 9, 2002.

123. Intelligence reports, hijacker activities, Oct. 11, 2001; Oct. 29, 2001; Nov. 14, 2001; Intelligence report, operative's claimed identification of photos of two Sept. 11 hijackers, Aug. 9, 2002.

124. Intelligence reports, hijacker activities, Nov. 14, 2001; Oct. 2, 2001; Oct. 31, 2001.

125. Intelligence reports, hijacker activities, Oct. 19, 2001; Dec. 7, 2001.

126. Intelligence report, interrogation of KSM, July 16, 2004; Intelligence report; interrogation of Binalshibh, July 16, 2004.

127. Intelligence report, analysis of Hezbollah, Iran, and 9/11, Dec. 20, 2001.

128. Intelligence report, Hezbollah and Sunni terrorist activities, Sept. 21, 2001; Intelligence report, Hezbollah denies involvement in 9/11, Sept. 22, 2001.

129. For Atta and Shehhi's efforts, see FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, pp. 25–37.

130. Ibid., pp. 29–41.

131. FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 315N-NY-280350-302, serials 12436, 7134); see Intelligence report, interrogation of KSM, June 15, 2004; Intelligence report, interrogation of Binalshibh, June 9, 2004. Another example of unusual travel was a trip by Suqami on July 10 from Fort Lauderdale to Orlando; he stayed at a hotel in Lake Buena Vista with an unidentified male through July 12. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 31.

132. FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 315N-NY-280350-302, serial 27063; 315N-NY-280350-DL, serial 2245); Commission investigation in Las Vegas.

133. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2001, pp. 41–44.

134. FBI letterhead memorandum, profile of Jarrah, Mar. 20, 2002.

135. FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 315N-NY-280350-302, serial 7228; 315N-NY-280350-F, serial 99; 315N-NY-280350-NK, serial 263). Documents from Sawyer Aviation in Phoenix, Arizona, show Hanjour joining the flight simulator club on June 23, 2001, with Faisal al Salmi, Rayed Abdullah, and Lotfi Raissi. FBI report of investigation, interview of Jennifer Stangel, Sept. 14, 2001. But the documents are inconclusive, as there are no invoices or payment records for Hanjour, while such documents do exist for the other three. FBI memo, Penttbom investigation, Oct. 7, 2001; FBI memo, Penttbom investigation, summary of dispatch sheets, Oct. 12, 2001; Don W. and Steve B. interview (Jan. 6, 2004). One Sawyer employee identified Hanjour as being there during the time period, though she was less than 100 percent sure. FBI report of investigation, interview of Tina Arnold, Oct. 17, 2001. Another witness identified Hanjour as being with Salmi in the Phoenix area during the summer of 2001. FBI letterhead memorandum, investigation of Lotfi Raissi, Jan. 4, 2004, p. 18. Documentary evidence for Hanjour, however, shows that he was in New Jersey for most of June, and no travel records have been recovered showing that he returned to Arizona after leaving with Hazmi in March. Nevertheless, the FBI's Phoenix office believes it plausible that Hanjour returned to Arizona for additional training. FBI electronic communication, Penttbom investigation, Feb. 19, 2002.

136. Intelligence report, interrogation of Binalshibh, Oct. 1, 2002.

137. CIA cable, communications analysis, Sept. 11, 2003.

138. On Hazmi, see FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 46. On obtaining photo identification, see ibid.; FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 315N-NY-280350-NK, serial 1243; 315N-NY-280350-BS, serial 352; 315N-NY-280350-302, serials 33059, 64343).

139. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 47.

140. For Binalshibh moving the muscle hijackers, see Intelligence report, interrogation of Binalshibh, June 9, 2004. According to Binalshibh, he took each of the muscle hijackers shopping for clothes and set them up with email accounts during their time in Karachi. Ibid. For meeting with Atta and Bin Ladin, see Intelligence reports, interrogations of Binalshibh, Sept. 24, 2002; Feb. 18, 2004. Binalshibh has provided inconsistent information about who else was present during his meeting with Bin Ladin. In one interview, Binalshibh claimed he attended two different meetings, one of which was attended by Bin Ladin, Atef, KSM, and Abu Turab al Jordani, and the second of which was attended just by Bin Ladin, Atef, and KSM. More recently, however, Binalshibh has mentioned only one meeting and has claimed he alone met with Bin Ladin because Atef and KSM were busy with other matters. Compare Intelligence report, interrogation of Binalshibh, Dec. 11, 2002, with Intelligence report, interrogation of Binalshibh, Feb. 18, 2004.

141. On Binalshibh's meeting with Bin Ladin, Intelligence reports, interrogations of Binalshibh, Dec. 11, 2002; Sept. 24, 2002; Feb. 18, 2004; Apr. 7, 2004. KSM claims that the White House and the Capitol were both acceptable targets and had been on the list since the spring of 1999. Intelligence report, interrogation of KSM, Apr. 2, 2004. On Binalshibh's receipt of money, Intelligence reports, interrogations of Binalshibh, Oct. 23, 2002; Dec. 11, 2002. In one report, Binalshibh says that Atef provided him with $3,000; in another he claims it was $5,000.

142. Intelligence reports, interrogations of Binalshibh, Sept. 24, 2002; Oct. 23, 2002; Dec. 11, 2002.

143. Intelligence reports, interrogations of Binalshibh, Sept. 24, 2002; Dec. 11, 2002.

144. Intelligence reports, interrogations of Binalshibh, Oct. 1, 2002; Mar. 7, 2003; Apr. 8, 2004.

145. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 48. Intelligence reports, interrogations of Binalshibh, Oct. 1, 2002; Mar. 7, 2003; Dec. 21, 2002. Atta had a stopover in Zurich, where he bought two Swiss Army knives and withdrew 1,700 Swiss francs from his SunTrust bank account. He may have intended to use the knives during the attacks. It is unknown why he withdrew the money. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 47.

Although U.S. authorities have not uncovered evidence that anyone met with Atta or Binalshibh in Spain in July 2001, Spanish investigators contend that members of the Spanish al Qaeda cell were involved in the July meeting and were connected to the 9/11 attacks. In an indictment of the Spanish cell members dated September 17, 2003, the Spanish government relies on three main points. First is a 1997 trip to the United States by Ghasoub al Abrash Ghalyoun, a Syrian living in Spain. During the trip, Ghalyoun videotaped a number of U.S. landmarks, including the World Trade Center. The Spanish indictment alleges that an al Qaeda courier was in Ghalyoun's town in Spain shortly after the trip and that the courier probably delivered the tape to al Qaeda leaders in Afghanistan. Second, the Spanish government contends that during the relevant time period, an individual named Muhammed Belfatmi was near the town where the Atta-Binalshibh meeting took place. and that Belfatmi traveled to Karachi shortly before September 11 on the same flight as Said Bahaji, one of Atta's Hamburg associates, and even stayed at the same hotel. Finally, Spanish authorities rely on an intercepted telephone conversation between cell leader Imad Eddin Barakat Yarkas and an individual named "Shakur" in August 2001, in which "Shakur" describes himself as entering "the field of aviation" and "slitting the throat of the bird." "Shakur" has been identified by Spanish authorities as Farid Hilali. Although we cannot rule out the possibility that other facts will come to light as the Spanish case progresses to trial, we have not found evidence that individuals in Spain participated in the July meeting or in the 9/11 plot. See Baltasar Garzon interview (Feb. 13, 2004); Indictment, Central Investigating Court No. 5, Madrid, Sept. 17, 2003, pp. 151–200, 315–366; Superseding Indictment, Central Investigating Court No. 5, Madrid, April 28, 2004.

146. Intelligence reports, interrogations of Binalshibh, Oct. 1, 2002; Mar. 7, 2003; Apr. 17, 2003.

147. Intelligence reports, interrogations of Binalshibh, Oct. 1, 2002; Mar. 7, 2003; Sept. 11, 2003; Oct. 11, 2003; Feb. 18, 2004; Apr. 7, 2004. KSM claims to have assigned the Pentagon specifically to Hanjour, the operation's most experienced pilot. Intelligence report, interrogation of KSM, Feb. 20, 2004.

148. Intelligence reports, interrogations of Binalshibh, Mar. 7, 2003; Oct. 11, 2003. Binalshibh since has denied that the term *electrical engineering* was used to refer to a potential nuclear target despite having said so earlier. Intelligence report, interrogation of Binalshibh, Sept. 11, 2003. KSM has admitted that he considered targeting a nuclear power plant as part of his initial proposal for the planes operation. See chapter 5.2. He has also stated that Atta included a nuclear plant in his preliminary target list, but that Bin Ladin decided to drop that idea. Intelligence report, interrogation of KSM, Mar. 12, 2002.

149. Intelligence reports, interrogations of Binalshibh, Oct. 1, 2002; Mar. 7, 2003; Feb. 18, 2004.

150. Intelligence reports, interrogations of Binalshibh, Sept. 24, 2002; Oct. 1, 2002; Mar. 7, 2003; Apr. 17, 2003.

151. On Binalshibh's new phones, see Intelligence report, interrogation of Binalshibh, Dec. 21, 2002. On Binalshibh's call to KSM, see Intelligence reports, interrogations of Binalshibh, Oct. 1, 2002; Mar. 31, 2003. CIA cable, Sept. 10, 2003; CIA report, Director's Review Group, Oct. 2003.

152. Intelligence report, interrogation of KSM, Oct. 31, 2003; Intelligence report, interrogation of Binalshibh, Nov. 1, 2003. KSM may also have intended to include these documents as part of the historical file he maintained about the 9/11 operation. He says the file included letters and email communications among those involved with the attacks, but was lost in Afghanistan when he fled after September 11. Intelligence report, interrogation of KSM, Oct. 15, 2003.

153. Intelligence reports, interrogations of Binalshibh, Nov. 1, 2003; Oct. 11, 2003; Intelligence report, interrogation of KSM, Oct. 31, 2002.

154. Intelligence reports, interrogations of Binalshibh, Oct. 31, 2002; Dec. 19, 2002; Apr. 17, 2003; Oct. 11, 2003; Nov. 1, 2003; Intelligence report interrogation of KSM, Sept. 11, 2003.

155. FBI letterhead memorandum, Penttbom investigation, Mar. 20, 2002, p. 60; FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 315N-NY-280350-302, serial 20874); Jarrah travel documents (provided by the FBI).

156. Intelligence reports, interrogations of Binalshibh, Dec. 11, 2002; Apr. 8, 2004.

157. According to Binalshibh, Jarrah was not aware of Moussaoui or the wire transfers. Intelligence reports,

interrogations of Binalshibh, Dec. 11, 2002; Apr. 17, 2003. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004 (classified version), pp. 89–90.

158. FBI report, Moussaoui, Zacarias, a.k.a. Shaqil, Aug. 18, 2001, pp. 7, 11; FBI briefing materials, Penttbom, Dec. 10–11, 2003, p. 148 (citing 315N-NY-280350-302, serial 98252).

159. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004 (classified version), p. 90; DOJ Inspector General interview of John Weess, Oct. 22, 2002; FBI letterhead memorandum, "Moussaoui, Zacarias," Aug. 31, 2001.

160. Intelligence report, interrogation of KSM, July 2, 2003; Intelligence report, interrogation of KSM, Sept. 11, 2003.

161. Intelligence reports, interrogations of KSM, July 1, 2003; July 8, 2003. In addition to Moussaoui, the two al Qaeda operatives identified by KSM as candidates for the second wave of attacks were Abderraouf Jdey, a.k.a. Faruq al Tunisi (a Canadian passport holder, discussed earlier as a candidate hijacker) and Zaini Zakaria, a.k.a. Mussa (a Jemaah Islamiah member who worked in Hambali's Malaysia stronghold and was directed by Atef to enroll in flight training sometime in 2000, according to KSM). Intelligence report, interrogation of KSM, July 8, 2003; Intelligence report, interrogation of Hambali, Mar. 4, 2004.

162. Intelligence report, interrogation of Binalshibh, Apr. 17, 2003. According to Binalshibh, KSM said that the operative had been raised and educated in Europe and that his arrest resulted, at least in part, from his having been insufficiently discreet. KSM identified this operative as an exception in Bin Ladin's overall record of selecting the right people for the 9/11 attacks. Intelligence report, interrogation of Binalshibh, Dec. 18, 2002. Subsequently, however, Binalshibh has sought, somewhat incredibly, to exculpate a host of individuals, including Moussaoui, from complicity in the 9/11 plot. Intelligence report, interrogation of Binalshibh, Apr. 2, 2004.

163. For Binalshibh's claims, see Intelligence reports, interrogations of Binalshibh, Nov. 7, 2002; Feb. 13, 2003; Feb. 27, 2003. On KSM, see intelligence report, interrogation of KSM, July 2, 2003.

164. Jarrah returned to the United States on August 5, 2001. INS record, arrival record of Jarrah, Aug. 5, 2001.

165. FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 315N-NY-280350-302, serial 14139; Boston electronic communication). The communications were recovered from materials seized during the March 2003 capture of KSM. For background, see Intelligence reports, interrogations of KSM, Aug. 13, 2002 (two cables); Intelligence report, documents captured with KSM, Sept. 24, 2003.

166. Intelligence reports, interrogation of KSM, Aug. 12, 2003. Binalshibh, however, has denied that *law* and *politics* referred to two separate targets; he claims that both terms referred to the U.S. Capitol, even though in the context of the exchange it seems clear that two different targets were contemplated. Intelligence report, interrogations of Binalshibh, Sept. 11, 2003 (two reports).

167. CIA notes, "DRG Research Notes," Jan. 17, 2004. In another exchange between Atta and Binalshibh on September 9—two days before the attacks—it still appears as though the White House would be the primary target for the fourth plane and the U.S. Capitol the alternate. See CIA report, Documents captured with KSM, Sept. 24, 2003.

168. On the Atta–Binalshibh communication, see Intelligence report, interrogation of Binalshibh, Sept. 11, 2003. On Kahtani's attempt to enter the U.S., see INS record, withdrawal of application for admission of Kahtani, Aug. 4, 2001. For Hawsawi, see Intelligence report, interrogation of detainee, Apr. 3, 2003.

169. On Atta's trip to Newark, see FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 50. On arrivals in Florida, see FBI report, "Hijackers Timeline," Dec. 5, 2004 (citing 315N-NY-280350, serials 388, 5860; 315N-NY-280350-BS, serial 294; 315N-NY-280350-302, serial 66933). On travel to Las Vegas, see ibid. (citing 315N-NY-280350-LV, serial 53299; 315N-NY-280350-302, serial 110). Atta's flight from Washington, D.C., arrived in Las Vegas within an hour of Hazmi and Hanjour's arrival. Ibid. The three hijackers stayed in Las Vegas only one night, departing on August 14. Ibid. (citing 315N-NY-280350-DL, serial 829; 315N-NY-280350-SD, serial 569; 315N-NY-280350-302, serial 165970). Detainee interviews have not explained the Las Vegas meeting site. See, e.g., Intelligence report, interrogation of Binalshibh, Nov. 5, 2003.

170. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, pp. 52–57. Hanjour successfully conducted a challenging certification flight supervised by an instructor at Congressional Air Charters of Gaithersburg, Maryland, landing at a small airport with a difficult approach. The instructor thought Hanjour may have had training from a military pilot because he used a terrain recognition system for navigation. Eddie Shalev interview (Apr. 9, 2004).

171. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, pp. 57–60. According to Binalshibh, Atta deliberately selected morning flights because he anticipated that the most people would be at work then. Intelligence report, interrogation of Binalshibh, June 3, 2004.

172. Intelligence reports, interrogations of Binalshibh, Oct. 1, 2002; Dec. 17, 2002; Dec. 21, 2002.

173. On KSM's receipt of date of attacks, see Intelligence report, interrogations of KSM and Binalshibh, May 27, 2003. Although Binalshibh also has claimed that he called KSM with the date after receiving the information from Atta, KSM insists that he learned of the date in a letter delivered by Essabar, and that it would have been a serious breach of communications security to communicate the date over the phone. Intelligence reports, interrogations of Binalshibh, Oct. 1, 2002; Dec. 17, 2002. Intelligence report, interrogation of KSM, Feb. 20, 2004. Most

recently, Binalshibh has claimed that he neither called nor sent a letter to KSM, but rather passed a verbal message via Essabar. Intelligence report, interrogation of Binalshibh, Apr. 8, 2004. On Binalshibh's communication to Essabar, see Intelligence reports, interrogations of Binalshibh, Dec. 17, 2002; Nov. 6, 2003; Apr. 8, 2004.

174. On Binalshibh's travel, see FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004 (classified version), p. 84. On Binalshibh's communication with Atta, see Intelligence report, Documents captured with KSM, Sept. 24, 2003; Intelligence report, interrogation of Binalshibh, Sept. 11, 2003. On Atta's call to his father, see Intelligence report, re Atta, Sept. 13, 2001. On Jarrah's letter, see German BKA report, investigative summary re Jarrah, July 18, 2002, p. 67.

175. Shortly after 9/11, Abdullah told at least one witness that the FBI was asking questions about his having received a phone a call from Hazmi in August. FBI report of investigation, interview, Sept. 24, 2001. In a July 2002 FBI interview, Abdullah asked whether the FBI had taped the call. FBI report of investigation, interview of Mohdar Abdullah, July 23, 2002. Also on possibility of Hazmi-Abdullah contact shortly before 9/11, see Danny G. interviews (Nov. 18, 2003; May 24, 2004). On the change in Abdullah's mood, see FBI report of investigation, interview of Mohdar Abdullah, July 23, 2001. On the sudden interest of Abdullah and Salmi in proceeding with marriage plans, see FBI report of investigation, interview, Sept. 24, 2001; FBI report of investigation, interview of Samir Abdoun, Oct. 21, 2001. On anticipated law enforcement interest in gas station employees and September 10, 2001, meeting, see FBI report of investigation, interview, May 21, 2002.

176. Intelligence report, interrogation of detainee, Feb. 5, 2002.

177. Intelligence reports, interrogations of KSM, Aug. 14, 2003; Feb. 20, 2004.

178. Intelligence reports, interrogations of KSM, June 3, 2003; Feb. 20, 2004; Apr. 3, 2004.

179. Intelligence reports, interrogations of detainee, Nov. 27, 2001; Feb. 5, 2002. Intelligence report, interrogation of detainee, May 30, 2002.

180. Intelligence report, interrogation of KSM, Jan. 9, 2004; Intelligence report, interrogation of detainee, June 27, 2003; Intelligence report, interrogation of detainee, Feb. 5, 2002. KSM also says that he and Atef were so concerned about this lack of discretion that they urged Bin Ladin not to make any additional remarks about the plot. According to KSM, only Bin Ladin, Atef, Abu Turab al Jordani, Binalshibh, and a few of the senior hijackers knew the specific targets, timing, operatives, and methods of attack. Intelligence reports, interrogations of KSM, Oct. 27, 2003; Feb. 23, 2004. Indeed, it was not until midsummer that Egyptian Islamic Jihad leader Ayman al Zawahiri learned of the operation, and only after his group had cemented its alliance with al Qaeda and Zawahiri had become Bin Ladin's deputy. Intelligence report, interrogation of KSM, Jan. 9, 2004.

181. See Intelligence report, interrogation of KSM, July 24, 2003.

182. On Omar's opposition, see, e.g., Intelligence report, interrogation of detainee, May 30, 2002, in which the detainee says that when Bin Ladin returned after the general alert during July, he spoke to his confidants about Omar's unwillingness to allow an attack against the United States to originate from Afghanistan. See also Intelligence report, interrogation of KSM, Oct. 27, 2003. There is some discrepancy about the position of Zawahiri. According to KSM, Zawahiri believed in following the injunction of Mullah Omar not to attack the United States; other detainees, however, have said that Zawahiri was squarely behind Bin Ladin. Intelligence report, interrogation of detainee, June 20, 2002; Intelligence report, interrogation of detainee, June 27, 2003; Intelligence report, interrogation of KSM, Sept. 26, 2003.

183. Intelligence report, interrogation of KSM, Jan. 9, 2004; Intelligence reports, interrogations of detainee, June 27, 2003; Dec. 26, 2003. On Abu Hafs's views, see Intelligence report, interrogation of detainee, Oct. 7, 2003.

184. Intelligence reports, interrogations of KSM, Oct. 27, 2003; Sept. 27, 2003, in which KSM also says Bin Ladin had sworn bayat to Omar upon first moving to Afghanistan, following the Shura Council's advice. KSM claims he would have disobeyed even had the council ordered Bin Ladin to cancel the operation. Intelligence report, interrogation of KSM, Jan. 9, 2004.

185. See Intelligence report, interrogation of KSM, July 24, 2003.

186. Abdul Faheem Khan interview (Oct. 23, 2003); see also Arif Sarwari interview (Oct. 23, 2003).

187. Intelligence reports, interrogations of KSM, May 8, 2003; July 24, 2003.

188. FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 315N-NY-280350, serial 3112; Western Union records; 315N-NY-280350-302, serials 28398, 37864). In addition, Nawaf al Hazmi attempted to send Hawsawi the debit card for Mihdhar's bank account, which still contained approximately $10,000. The package containing the card was intercepted after the FBI found the Express Mail receipt for it in Hazmi's car at Dulles Airport on 9/11. FBI report, "Summary of Penttbom Investigation," Feb. 29, 2004, p. 61.

189. FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 315N-NY-280350-WF, serial 64; 315N-NY-280350-BA, serials 273, 931, 628; 315N-NY-280350-302, serials 10092, 17495).

190. FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 315N-NY-280350, serials 6307, 9739). In the early morning hours of September 11, Jarrah made one final call to Senguen from his hotel. FBI report, "Hijackers Timeline," Dec. 5, 2003. The conversation was brief and, according to Senguen, not unusual. FBI electronic communication, Penttbom investigation, Sept. 18, 2001, pp. 5–6.

191. FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 315N-NY-280350-FD-302; 315N-NY-280350-

SD, serial 1522; 315N-NY-280350-302, serials 16597, 5029, 6072, 11098, 11114, 11133, 4119; 315N-NY-280350-BS, serials 349, 19106, 16624; 315N-NY-280350-CD, serial 373; 315N-NY-280350, serials 7441, 21340; 315N-NY-280350-AT, serial 135). There have been many speculations about why Atta scheduled the Portland flight. Although he may have believed that security was more relaxed at the smaller airport, he and Omari had to pass through security again at Logan. Ibid. (citing 315N-NY-280350-BS, serial 2909). Interrogation of detainees has produced no solid explanation for the trip. See, e.g., Intelligence report, interrogation of Binalshibh, Mar. 3, 2004.

192. FBI report, "Hijackers Timeline," Dec. 5, 2003 (citing 315N-NY-280350, serial 2268; 315N-NY-280350-302, serials 32036, 9873; 315N-NY-280350-LO, serial 2).

## 8 "The System Was Blinking Red"

1. Beginning in December 1999, these briefings were conducted based on slides created by the CIA's Bin Ladin unit. See Richard interview (Dec. 11, 2003). We were able to review the slides to identify the subjects of the respective briefings.

2. The exact number of persons who receive the PDB varies by administration. In the Clinton administration, up to 25 people received the PDB. In the Bush administration, distribution in the pre-9/11 time period was limited to six people. The Commission received access to about four years of articles from the PDB related to Bin Ladin, al Qaeda, the Taliban, and key countries such as Afghanistan, Pakistan, and Saudi Arabia, including all the Commission requested. The White House declined to permit all commissioners to review these sensitive documents. The Commission selected four representatives—the Chair, the Vice Chair, Commissioner Gorelick, and the Executive Director—as its review team. All four reviewed all of the more than 300 relevant articles. Commissioner Gorelick and the Executive Director prepared a detailed summary, reviewed by the White House for constitutional and especially sensitive classification concerns, that was then made available to all Commissioners and designated staff. Except for the August 6, 2001, PDB article, the summary could not include verbatim quotations, for example the titles of the articles, but could paraphrase the substance. Two of the articles—the December 4, 1998, hijacking article (in chapter 4) and the August 6, 2001, article discussing Bin Ladin's plans to attack in the United States (in this chapter)—were eventually declassified.

3. The CIA produced to the Commission all SEIB articles relating to al Qaeda, Bin Ladin, and other subjects identified by the Commission as being relevant to its mission from January 1998 through September 20, 2001.

4. See CIA, SEIB, "Sunni Terrorist Threat Growing," Feb. 6, 2001; CIA cable, "Intelligence Community Terrorist Threat Advisory," Mar. 30, 2001.

5. See NSC email, Clarke to Rice, Briefing on Pennsylvania Avenue, Mar. 23, 2001.

6. See NSC email, Clarke to Rice and Hadley, Terrorism Update, Mar. 30, 2001; NSC email, Clarke to Rice, Terrorist Threat Warning, Apr. 10, 2001.

7. See FBI electronic communication, heightened threat advisory, Apr. 13, 2001.

8. See NSC email, Cressey to Rice and Hadley, Threat Update, Apr. 19, 2001; CIA, SEIB, "Bin Ladin Planning Multiple Operations," Apr. 20, 2001; NSC memo, Clarke for Hadley, "Briefing Notes for al Qida Meeting," undated (appears to be from April 2001).

9. For threats, see CIA, SEIB, "Bin Ladin Public Profile May Presage Attack," May 3, 2001; CIA, SEIB, "Bin Ladin Network's Plans Advancing," May 26, 2001; FBI report, Daily UBL/Radical Fundamentalist Threat Update, ITOS Threat Update Webpage, May 7, 2001 (the walk-in's claim was later discredited). For Attorney General briefing, see CIA briefing materials, "Briefing for the Attorney General, 15 May 2001, Al-Qa'ida," undated. For more threats and CSG discussion, see Intelligence report, Threat Report, May 16, 2001; NSC memo, CSG agenda, May 17, 2001.

10. See CIA, SEIB, "Terrorist Groups Said Cooperating on US Hostage Plot," May 23, 2001; FAA information circular, "Possible Terrorist Threat Against American Citizens," IC-2001-08, June 22, 2001 (this IC expired on August 22, 2001); CIA, SEIB, "Bin Ladin Network's Plans Advancing," May 26, 2001; NSC email, Clarke to Rice and Hadley, "A day in the life of Terrorism intelligence," May 24, 2001.

11. See NSC email, Clarke to Rice and Hadley, Stopping Abu Zubaydah's attacks, May 29, 2001. For threat level, see White House document, "Selected Summer 2001 Threat Response Activities," undated, pp. 1–2 (provided to the Commission by President Bush on Apr. 29, 2004).

12. The information regarding KSM was not captioned as a threat. It was part of a longer cable whose subject line was "Terrorism: Biographical Information on Bin Ladin Associates in Afghanistan." The cable reported further that KSM himself was regularly traveling to the United States. See Intelligence report, June 12, 2001. This was doubted by the CIA's Renditions Branch, which had been looking for KSM since 1997. It noted, however, that if the source was talking about the "real" KSM, the CIA had both "a significant threat and opportunity to pick him up." See CIA cable, request additional information on KSM, June 26, 2001. A month later, a report from the source indicated that the information regarding KSM's travel to the United States was current as of the summer of 1998. It noted further, however, that KSM continued his old activities but not specifically the travel to the United States. Significantly, it confirmed that the source was talking about the "real" KSM. See CIA cable, follow-up source on

KSM, July 11, 2001. As noted in chapter 7, KSM has said that it was generally well known by the summer of 2001 that he was planning an operation in the United States. Roger Cressey told us he did not recall seeing this reporting, although he would have had access to it. Roger Cressey interview (June 23, 2004).

For the summer threat reporting and actions taken in response, see NSC memo, Clarke/Cressey agenda for June 22 CSG meeting, June 20, 2001; CIA, SEIB, "Bin Ladin and Associates Making Near-Term Threats," June 25, 2001; CIA, SEIB, "Bin Ladin Planning High-Profile Attacks," June 30, 2001; CIA cable, "Threat UBL Attack Against US Interests Next 24–48 Hours," June 22, 2001; FBI report, Daily UBL/Radical Fundamentalist Threat Update, ITOS Threat Update Webpage, June 22, 2001.

13. DOS cable, Riyadh 02326, "U.S. Visa Express Program Transforms NIV Scene in Saudi Arabia," Aug. 19, 2001; NSC memo, Current US Terrorism Alert, July 3, 2001.

14. See CIA cable, "Possible Threat of Imminent Attack from Sunni Extremists," June 23, 2001; CIA, SEIB, "Bin Ladin Attacks May be Imminent," June 23, 2001; CIA, SEIB, "Bin Ladin and Associates Making Near-Term Threats," June 25, 2001.

15. See NSC memo, Clarke to CSG regarding that day's CSG meeting, June 22, 2001; NSC memo, Current U.S. Terrorism Alert, July 3, 2001. For the readiness of FESTs, see NSC email, Clarke to Rice and Hadley, Terrorism Threat Update, June 25, 2001.

16. See NSC email, Clarke to Rice and Hadley, Possibility of an al Qaeda Attack, June 25, 2001; CIA report, Foreign Broadcast Information Service, "MBC TV Carries Video Report on Bin Ladin, Followers in Training," June 24, 2001; CIA, SEIB, "Bin Ladin Threats Are Real," June 30, 2001; John McLaughlin interview (Jan. 21, 2004); CIA cable, "Continued Threat/Potential Attack by UBL," June 29, 2001.

17. See NSC email, Clarke to Rice and Hadley, Possibility of an al Qaeda Attack, June 28, 2001; NSC email, Clarke for Rice and others, Terrorist Alert, June 30, 2001.

18. See NSC email, Clarke to Rice and others, Terrorist Alert, June 30, 2001; CIA, SEIB, "Bin Ladin Planning High-Profile Attacks," June 30, 2001; CIA, SEIB, "Planning for Bin Ladin Attacks Continues, Despite Delays," July 2, 2001.

19. FBI report, National Law Enforcement Telecommunications System (NLETS) message, "National Threat Warning System—Potential Anti-U.S. Terrorist Attacks," July 2, 2001.

20. By July 3, DCI Tenet had asked about 20 of his counterparts in friendly foreign intelligence services to detain specific al Qaeda members and to generally harass al Qaeda–affiliated cells. NSC memo, Current U.S. Terrorism Alert, July 3, 2001. For specific disruption activities and maintaining alert, see NSC email, Clarke to Rice and Hadley, Threat Updates, July 6, 2001; Richard Clarke interview (Jan. 12, 2004).

21. For the Cheney call see President Bush and Vice President Cheney meeting (Apr. 29, 2004). For the Hadley call see NSC email, Clarke to Rice and Edelman, Terrorism Alert, July 2, 2001. For the G-8 summit see Associated Press Online, "Bush Faced Threat at G-8 Summit," Sept. 26, 2001.

22. Veronica C. interview (May 25, 2004); INS memo, Veronica C. to Cadman, "Briefing at the NSC," July 9, 2001; Roger Cressey interview (June 23, 2004). The Customs representative, Ricardo C., did send out a general advisory that was based solely on historical facts, such as the Ressam case, to suggest there was a threat. Ricardo C. interview (June 12, 2004).

23. See CIA memo, "CTC Briefing for the Attorney General on the Usama Bin Ladin Terrorist Threat," July 5, 2001, and the accompanying CIA briefing materials, "DCI Update Terrorist Threat Review," July 3, 2001.

24. See NSC email, Clarke to Rice and Hadley, Threat Updates, July 6, 2001.

25. Ibid.; see also FBI memo, Kevin G. to Watson, "Protective Services Working Group (PSWG) Meeting Held at FBIHQ 7/9/01," July 16, 2001, and accompanying attendance sheets.

26. FBI report, Daily UBL/Radical Fundamentalist Threat Update, ITOS Threat Update Webpage, July 20, 2001.

27. Thomas Pickard interview (Apr. 8, 2004).

28. See CIA, SEIB, "Bin Ladin Plans Delayed but Not Abandoned," July 13, 2001; CIA, SEIB, "One Bin Ladin Operation Delayed, Others Ongoing," July 25, 2001; NSC memo, Cressey to CSG, Threat SVTS, July 23, 2001.

29. FAA information circular, "Continued Middle Eastern Threats to Civil Aviation," IC-2001-04A, July 31, 2001.

30. George Tenet interview (Jan. 28, 2004).

31. See CIA, SEIB, "Bin Ladin Threats Are Real," June 30, 2001. For Tenet's response to DOD's concerns about possible deception, see CIA memo, weekly meeting between Rice and Tenet, July 17, 2001; John McLaughlin interview (Jan. 21, 2004); Richard interview (Dec. 11, 2003).

32. NSC email, Clarke to Rice and Hadley, Threats Update, July 27, 2001.

33. FBI report, NLETS message, "Third Anniversary of the 1998 U.S. Embassy Bombings in East Africa Approaches; Threats to U.S. Interests Continue," Aug. 1, 2001.

34. CIA cable, "Threat of Impending al Qaeda Attack to Continue Indefinitely," Aug. 3, 2001.

35. CIA letter, Tenet to the Commission, Mar. 26, 2004; Barbara S. interview (July 13, 2004); Dwayne D. interview (July 13, 2004).

36. President Bush and Vice President Cheney meeting (Apr. 29, 2004). For Rice's reaction to the August 6 PDB article, see Condoleezza Rice testimony, Apr. 8, 2004.

37. The CTC analyst who drafted the briefing drew on reports over the previous four years. She also spoke with an FBI analyst to obtain additional information. The FBI material was written up by the CIA analyst and included in the PDB. A draft of the report was sent to the FBI analyst to review. The FBI analyst did not, however, see the final version, which added the reference to the 70 investigations. Barbara S. interviews (Apr. 12, 2004); Joint Inquiry interview of Jen M., Nov. 20, 2002. Because of the attention that has been given to the PDB, we have investigated each of the assertions mentioned in it.

The only information that actually referred to a hijacking in this period was a walk-in at an FBI office in the United States who mentioned hijackings among other possible attacks. The source was judged to be a fabricator. FBI report, Daily UBL/Radical Fundamentalist Threat Update, ITOS Threat Update Webpage, Aug. 1, 2001.

The FBI conducted an extensive investigation of the two individuals who were stopped after being observed taking photographs of two adjacent buildings that contained FBI offices. The person taking the photographs told the FBI that he was taking them for a co-worker in Indiana who had never been to New York and wanted to see what it looked like. The picture taker was in New York to obtain further information regarding his pending citizenship application. He had an appointment at 26 Federal Plaza, where the relevant INS offices were located. This same building houses portions of the FBI's New York Field Office. Before going into the building the individual pulled out the camera and took four photographs. When the FBI attempted to contact the co-worker (and roommate) who had requested some photographs, it was determined that he had fled without receiving his last paycheck after learning that the FBI had asked his employer some questions about him. Further investigation determined that he was an illegal alien using forged identity documents. Despite two years of investigation, the FBI was unable to find the co-worker or determine his true identity. The FBI closed the investigation on June 9, 2003, when it concluded that it was unable to connect the men's activities to terrorism. Matthew interview (June 18, 2004); FBI case file, no. 266A-NY-279198.

The 70 full-field investigations number was a generous calculation that included fund-raising investigations. It also counted each individual connected to an investigation as a separate full-field investigation. Many of these investigations should not have been included, such as the one that related to a dead person, four that concerned people who had been in long-term custody, and eight that had been closed well before August 6, 2001. Joint Inquiry interview of Elizabeth and Laura, Nov. 20, 2002; FBI report, "70 UBL Cases," undated (produced to the Joint Inquiry on Aug. 12, 2002).

The call to the UAE was originally reported by the CIA on May 16. It came from an anonymous caller. Neither the CIA nor the FBI was able to corroborate the information in the call. FBI report, Daily UBL/Radical Fundamentalist Threat Update, ITOS Threat Update Webpage, May 16, 2001.

38. See CIA, SEIB, "Bin Ladin Determined to Strike in US," Aug. 7, 2001; see also Roger Cressey interview (June 23, 2004). The Deputy Director of Central Intelligence testified that the FBI information in the PDB was omitted from the SEIB because of concerns about protecting ongoing investigations, because the information had been received from the FBI only orally, and because there were no clear, established ground rules regarding SEIB contents. John McLaughlin testimony, Apr. 14, 2004.

39. Intelligence report, Consideration by Abu Zubaydah to Attack Targets in the United States, Aug. 24, 2001.

40. George Tenet interview (July 2, 2004).

41. Condoleezza Rice testimony, Apr. 8, 2004; Condoleezza Rice meeting (Feb. 7, 2004).

42. Stephen Hadley meeting (Jan. 31, 2004).

43. It is also notable that virtually all the information regarding possible domestic threats came from human sources. The information on overseas threats came mainly from signals intelligence. Officials believed that signals intelligence was more reliable than human intelligence. Roger Cressey interview (June 23, 2004).

44. NSC memo, Clarke to Rice, al Qaeda review, Jan. 25, 2001 (attaching NSC memo, "Strategy for Eliminating the Threat from the Jihadists Networks of al Qida: Status and Prospects," Dec. 2000). Clarke had also mentioned domestic terrorist cells in connection with the possibility of reopening Pennsylvania Avenue. See NSC email, Clarke to Rice, Briefing on Pennsylvania Avenue, Mar. 23, 2001.

45. Roger Cressey interview (June 23, 2004).

46. This approach was consistent with how this same issue was addressed almost exactly a year earlier, despite the fact that by 2001 the threat level was higher than it had ever been previously. On June 30, 2000, NSC counterterrorism staffers met with INS, Customs, and FBI officials to review border and port security measures. The NSC staff's Paul Kurtz wrote to then national security adviser Samuel Berger, "We noted while there was no information regarding potential attacks in the U.S. they should inform their officers to remain vigilant." NSC email, Kurtz to Berger, Steinberg, and Rudman, warning re: UBL threat reporting, June 30, 2000.

47. FAA briefing materials, Office of Civil Aviation Security, "The Transnational Threat to Civil Aviation," undated (slide 24). The presentation did indicate, however, that if a hijacker was intending to commit suicide in a spectacular explosion, the terrorist would be likely to prefer a domestic hijacking. Between July 27 and September 11, 2001, the FAA did issue five new Security Directives to air carriers requiring them to take some specific secu-

rity measures. Two continued certain measures that had been in place for at least a year. Others related only to carrying specific passengers. See FAA security directives, SD 108-98, July 27, 2001; SD 108-00, July 27, 2001; SD 108-00, July 27, 2001; SD 108-01, Aug. 21, 2001; SD 108-01, Aug. 31, 2001. In order to issue more general warnings without directing carriers to take specific action, the FAA issued Information Circulars. Of the eight such circulars issued between July 2 and September 11, 2001, five highlighted possible threats overseas. See FAA information circulars, "Possible Terrorist Threat—Arabian Peninsula," IC-2001-11, July 18, 2001; "Recent Terrorist Activity in the Middle East," IC-2001-03B, July 26, 2001; "Continued Middle Eastern Threats to Civil Aviation," IC-2001-04A, July 31, 2001; "Violence Increases in Israel," IC-2001-07A, Aug. 28, 2001; "ETA Bombs Airports in Spain," IC-2001-13, Aug. 29, 2001. One, issued on August 16, warned about the potential use of disguised weapons. FAA information circular, "Disguised Weapons," IC-2001-12, Aug. 16, 2001.

48. FAA report, "Record of Air Carrier Briefings—4/18/01 to 9/10/01," undated.

49. See Condoleezza Rice testimony, Apr. 8, 2004; NSC memo, U.S. Terrorism Alert, July 3, 2001; FBI electronic communication, Heightened Threat Advisory, Apr. 13, 2001. For the lack of NSC direction, see Roger Cressey interview (June 23, 2004).

50. Thomas Pickard interview (Apr. 8, 2004). For example, an international terrorism squad supervisor in the Washington Field Office told us he was not aware of an increased threat in the summer of 2001, and his squad did not take any special actions to respond to it. The special agent in charge of the Miami Field Office told us he did not learn of the high level of threat until after September 11. See Washington Field Office agent interview (Apr. 1, 2004); Hector Pesquera interview (Oct. 3, 2003).

51. Dale Watson interview (Jan. 6, 2004).

52. See Thomas Pickard interviews (Jan. 21, 2004; Apr. 8, 2004); Thomas Pickard testimony, Apr. 13, 2004; Thomas Pickard letter to the Commission, June 24, 2004; John Ashcroft testimony, Apr. 13, 2004. We cannot resolve this dispute. Pickard recalls the alleged statement being made at a briefing on July 12. The Department of Justice has informed us that the only people present at that briefing were Pickard, Ashcroft, Deputy Attorney General Larry Thompson, and Ashcroft's chief of staff, David Ayres. There are no records of the discussions at these briefings. Thompson and Ayres deny Ashcroft made any such statement. Dale Watson, who did not attend any of the briefings, told us that Pickard complained after one of the briefings that Ashcroft did not want to be briefed on the threats because "nothing ever happened." Ruben Garcia, head of the FBI's Criminal Division, who attended some of Pickard's briefings of the Attorney General but not the one at which Pickard alleges Ashcroft made the statement, recalls that Ashcroft was "not enthusiastic" about the classified portions of the briefings that related to counterterrorism. We have been told that Pickard and Ashcroft did not have a good relationship. This may have influenced their views on the facts surrounding their meetings. Larry Thompson interview (Jan. 29, 2004); Dale Watson interview (June 3, 2004); Ruben Garcia interview (Apr. 29, 2004); Thompson and Ayres letter to the Commission, July 12, 2004.

53. See Thomas Pickard interviews (Jan. 21, 2004; Apr. 8, 2004); John Ashcroft meeting (Dec. 17, 2003); John Ashcroft testimony, Apr. 13, 2004.

54. Indeed, the number of FISA warrants in effect in the summer of 2001 may well have been less than it was at the beginning of the year. Because of problems with inaccuracies in the applications, FISAs were allowed to lapse rather than be renewed with continuing inaccuracies. Michael Rolince interview (Apr. 12, 2004); Marion Bowman interview (Mar. 6, 2004).

55. See CIA cable, Base/FBI comments on draft cable, Nov. 27, 2000; FBI electronic communication, USS *Cole* investigation, Nov. 21, 2000; FBI electronic communication, USS *Cole* investigation, Jan. 10, 2001 (draft).

56. For the recollection of the FBI agent, see Al S. interviews (Aug. 26, 2003; Sept. 15, 2003). See also FBI report of investigation, interview of source, July 18, 2000; attachment to FBI electronic communication, USS *Cole* investigation, Jan. 10, 2001 (draft); FBI electronic communication, UBL investigation, Jan. 16, 2001.

57. For speculation regarding identities, see CIA cable, "Photo of UBL Associate," Dec. 27, 2000. Retrospective analysis of available information would have answered that question, but that analysis was not done until after 9/11. For analysis, see Intelligence report, Retrospective review of 11 September 2001 hijackers' activities, Sept. 23, 2002.

58. CIA cable, "Request for January 2000 Malaysian Surveillance Photos," Dec. 12, 2000; CIA cable, "Photo of UBL Associate," Dec. 27, 2000; CIA cable, "Review of Malaysia 'Khaled' Photos," Jan. 5, 2001.

59. The CIA knew that Mihdhar and Khallad had both been to Bangkok in January 2000. They had not yet discovered that Khallad, traveling under an alias, had actually flown to Bangkok with Mihdhar. Still, as Director Tenet conceded in his testimony before the Joint Inquiry, the Kuala Lumpur meeting took on additional significance once Khallad was identified as having attended the meeting. See Joint Inquiry report, p. 149.

60. For Tenet and Black testimony, see Joint Inquiry testimony of George Tenet, Oct. 17, 2002; Joint Inquiry testimony of Cofer Black, Sept. 26, 2002. For documents not available to CIA personnel who drafted the testimony, see, e.g., FBI electronic communication, UBL investigation, Jan. 16, 2001; FBI emails between Al S. and Michael D., re: source, Jan. 9-11, 2001; FBI electronic communication, USS *Cole* investigation, Jan. 4, 2001; DOJ Inspector General interview of Jennifer M., Dec. 9, 2002. For the views of the FBI investigators, see DOJ Inspec-

tor General interviews of Steve B., Sept. 16, 2002; Nov. 14, 2002; Al S. interviews (Aug. 26, 2003; Sept. 15, 2003). The DOJ Inspector General came to the same conclusion. See DOJ Inspector General report, "A Review of the FBI's Handling of Intelligence Information Related to the September 11 Attacks" (hereinafter "DOJ IG 9/11 Report"), July 2, 2004, pp. 308–310.

61. DOJ Inspector General interview of Michael D., Nov. 6, 2002; Michael D. interview (May 4, 2004); DOJ Inspector General interview of Chris, Nov. 27, 2002.

62. For the internal CIA reports to which the FBI did not have access, see CIA cable, "UBL Operative Khallad," Jan. 3, 2001; CIA cable, source debriefing, Jan. 5, 2001. The FBI agent informed us that he was unaware how such internal CIA communications worked, or that the operational cables even existed, and so did not know to ask for them. Such messages are routinely not shared in order to protect intelligence sources and methods. In this case, application of the routine procedure did not serve that purpose because the FBI agent was aware of the source's identity as well as the methods used to obtain the information. Moreover, the FBI agent also may have been absent from the room when the identification was made. The source had brought a sheaf of documents with him that the FBI agent left the room to copy while the interview of the witness continued. Because of the circumstances of the interview site, the agent would have been absent for a significant period of time. In addition, the case officer was frequently given photographs from a broad range of CIA stations to show to this particular witness. He did not focus on the purpose of showing the photographs; he was only concerned with whether the source recognized the individuals. DOJ Inspector General interview of Michael D., Nov. 6, 2002; Michael D. interview (May 4, 2004); DOJ Inspector General interview of Chris, Nov. 27, 2002.

63. John interview (Apr. 2, 2004). See also CIA email, Dave to John, "Re: Liaison Response," May 18, 2001. The old reporting from early 2000 that was reexamined included CIA cable, "Transit of UBL Associate Khalid Through Dubai," Jan. 4, 2000; CIA cable, "Recent Influx of Suspected UBL Associates to Malaysia," Jan. 5, 2000; CIA cable, "UBL Associates: Flight Manifest for MH072," Jan. 9, 2000; CIA cable, "UBL Associates: Identification of Possible UBL Associates," Mar. 5, 2000. For cable information, see CIA records, audit of cable databases.

64. For a record of the exchange between John and Dave, see CIA emails, Dave to John, May 17, 18, 24, 2001; CIA email, Richard to Alan, identification of Khallad, July 13, 2001. For the account of John's FBI counterpart, see Michael Rolince interview (Apr. 12, 2004). For John's focus on Malaysia, see DOJ Inspector General interview of John, Nov. 1, 2002.

65. DOJ Inspector General interview of John, Nov. 1, 2002.

66. For the account of the desk officer, see DOJ Inspector General interview of Michael D., Oct. 31, 2002. For cable information, see CIA records, audit of cable databases.

67. DOJ Inspector General interviews of Jane, Nov. 4, 2002; July 16, 2003.

68. DOJ Inspector General interview of Jane, Nov. 4, 2002; DOJ Inspector General interview of Dave, Oct. 31, 2002.

69. DOJ Inspector General interviews of Jane, Nov. 4, 2002; July 16, 2003.

70. DOJ Inspector General interview of Jane, Nov. 4, 2002; DOJ Inspector General interview of Dave, Oct. 31, 2002; DOJ Inspector General interview of Russ F., Sept. 17, 2002; DOJ Inspector General interview of Steve B., Sept. 16, 2002.

71. "Jane" did not seek OIPR's permission to share this information at the meeting. "Jane" also apparently did not realize that one of the agents in attendance was a designated intelligence agent, so she could have shared all of the information with that agent regardless of the caveats. No one who was at the meeting suggested that option, however. DOJ Inspector General interview of Steve B., Sept. 16, 2002; DOJ Inspector General interview of Jane, July 16, 2003. These caveats were different from the legal limits we discussed in section 3.2. The Attorney General's July 1995 procedures concerned FISA information developed in an FBI intelligence investigation. This, however, was NSA information. These particular caveats were the result of the Justice Department's and NSA's overabundance of caution in December 1999. During the millennium crisis, Attorney General Reno authorized electronic surveillance of three U.S. persons overseas. Because the searches were not within the United States, no FISA warrant was needed. Reno approved the surveillances pursuant to section 2.5 of Executive Order 12333 with the proviso that the results of these particular surveillances not be shared with criminal investigators or prosecutors without the approval of the Office of Intelligence Policy and Review. Because of the complexity of determining whether particular reporting was the fruit of particular surveillances, NSA decided to place these caveats on all its Bin Ladin–related reporting, not just reporting on the surveillances authorized by Reno. As a result, these caveats were placed on the reports relating to Mihdhar even though they were not covered by Reno's December 1999 order. See DOJ memo, Reno to Freeh, FISA surveillance of a suspected al Qaeda operative, Dec. 24, 1999; NSA email, William L. to Karen C., "distribution restrictions," Dec. 10, 1999; NSA email, William L. to Anthony L., "doj restrictions," Dec. 20, 1999; NSA email, William L. to Brian C., "dissemination of terrorism reporting," Dec. 29, 1999. See also NSA memo, Ann D. to others, "Reporting Guidance," Dec. 30, 1999.

In May 2000, it was brought to the Attorney General's attention that these caveats prevented certain attorneys in the Terrorism and Violent Crime Section (TVCS) from reading the reporting. After discussions with NSA, the caveats were changed to specifically permit dissemination of these reports to designated attorneys in the TVCS and

two attorneys in the U.S. Attorney's Office for the Southern District of New York. See NSA memo, Joan R. to Townsend and Reynolds, "Resumed Delivery of Classified Intelligence to TVCS," June 9, 2000; NSA memo, Hayden to Asst. Attorney General, "Proposal to Provide UBL-related Product to U.S. Attorney's Office/Southern District of New York," Aug. 30, 2000.

72. For the facts known by Dave at this time, see CIA records, audit of cable databases; see also CIA email, Dave to John, timeline entries, May 15, 2001. For CIA analyst's role, see DOJ Inspector General interview of Dave, Oct. 31, 2002. For Jane's account, see DOJ Inspector General interview of Jane, July 16, 2003.

73. DOJ Inspector General interview of Mary, Oct. 29, 2002.

74. For Mary's account, see DOJ Inspector General interview of Mary, Oct. 29, 2002. For the reporting regarding Mihdhar and Hazmi, see CIA cable, Khalid's passport, Jan. 4, 2000; CIA cable, Mihdhar's visa application, Jan. 5, 2000; CIA cable, Hazmi entered U.S., Mar. 6, 2000. For Mary's cable access information, see CIA records, audit of cable databases.

75. DOJ Inspector General interview of Mary, Oct. 29, 2002; DOJ Inspector General interview of Jane, Nov. 4, 2002.

76. DOJ Inspector General interview of Mary, Oct. 29, 2002; Intelligence report, Watchlisting of Bin Ladin–related individuals, Aug. 23, 2001; Joint Inquiry testimony of Christopher Kojm, Sept. 19, 2002. The watchlist request included Mihdhar, Nawaf al Hazmi, Salah Saeed Mohammed Bin Yousaf (they did not yet realize this was an alias for Tawfiq bin Attash, a.k.a. Khallad), and Ahmad Hikmat Shakir (who assisted Mihdhar in Kuala Lumpur).

77. Jane told investigators that she viewed this matter as just another lead and so assigned no particular urgency to the matter. DOJ Inspector General interviews of Jane, July 16, 2003; Nov. 4, 2002. For the draft lead, see attachment to FBI email, Jane to Craig D., "Re: FFI Request," Aug. 28, 2001. For the final version, see FBI electronic communication, "Request to Open a Full Field Investigation," Aug. 28, 2001.

78. FBI email, Craig D. to John L., "Fwd: Re: FFI Request," Aug. 28, 2001; FBI email, John L. to Steve and others, "Fwd: Re: FFI Request," Aug. 28, 2001. For an introduction to these legal limits and "the wall," see section 3.2. In December 2000, pursuant to concerns of the FISA Court, the New York Field Office began designating certain agents as either intelligence or criminal agents. Intelligence agents could see FISA materials and any other information that bore cautions about sharing without obtaining the FISA Court's permission or permission from the Justice Department's OIPR. FBI electronic communication, "Instructions re FBI FISA Policy," Dec. 7, 2000.

79. While one witness recalls a discussion with a senior FBI official, that official denies that such a discussion took place. The other alleged participant does not recall such a meeting. John interview (Apr. 2, 2004); Michael Rolince interview (Apr. 12, 2004); Jane interview (July 13, 2004); DOJ Inspector General interview of Rodney M., Nov. 5, 2002. For investigation's goal, see FBI electronic communication, "Request to Open a Full Field Investigation," Aug. 28, 2001.

80. DOJ Inspector General interviews of Jane, July 16, 2003; Nov. 4, 2002; DOJ Inspector General interviews of Steve B., Sept. 16, 2002; Nov. 14, 2002; Jane interview (July 13, 2004). FBI email, Jane to John L., "Fwd: Re: FFI Request," Aug. 29, 2001.

The analyst's email, however, reflects that she was confusing a broad array of caveats and legal barriers to information sharing and rules governing criminal agents' use of information gathered through intelligence channels. There was no broad prohibition against sharing information gathered through intelligence channels with criminal agents. This type of sharing occurred on a regular basis in the field. The court's procedures did not apply to all intelligence gathered regardless of collection method or source. Moreover, once information was properly shared, the criminal agent could use it for further investigation.

81. FBI email, Jane to Steve, NSLU Response, Aug. 29, 2001. "Jane" says she only asked whether there was sufficient probable cause to open the matter as a criminal case and whether the criminal agent could attend any interview if Mihdhar was found. She said the answer she received to both questions was no. She did not ask whether the underlying information could have been shared. Jane interview (July 13, 2004). The NSLU attorney denies advising that the agent could not participate in an interview and notes that she would not have given such inaccurate advice. The attorney told investigators that the NSA caveats would not have precluded criminal agents from joining in any search for Mihdhar or from participating in any interview. Moreover, she said that she could have gone to the NSA and obtained a waiver of any such caveat because there was no FISA information involved in this case. There are no records of the conversation between "Jane" and the attorney. "Jane" did not copy the attorney on her email to the agent, so the attorney did not have an opportunity to confirm or reject the advice "Jane" was giving to the agent. DOJ Inspector General interview of Sherry S., Nov. 7, 2002.

"Jane" asked the New York agent assigned to the Mihdhar search to sign a FISA acknowledgment form indicating the agent understood how he had to treat FISA information. Because no FISA information was involved, she should not have required him to sign such a form. To the extent she believed, incorrectly, that the Attorney General's 1995 procedures applied to this situation, there was in fact an exception in place for New York. DOJ Inspector General interview of Sherry S., Nov. 7, 2002. More fundamentally, "Jane" apparently understood the welter of restrictions to mean, in workday shorthand, that any information gathered by intelligence agencies should

not be shared with criminal agents. This was incorrect. DOJ Inspector General interviews of Jane, July 16, 2003; Nov. 4, 2002.

82. FBI emails between Steve B. and Jane, re: NSLU Response, Aug. 29, 2001. While the agent expressed his frustration with the situation to "Jane," he made no effort to press the matter further by discussing his concerns with either his supervisor or the chief division counsel in New York.

83. Attorney General Ashcroft testified to us that this and similar information-sharing issues arose from Attorney General Reno's 1995 guidelines, discussed in chapter 3, and specifically from a March 1995 memorandum of then Deputy Attorney General Jamie Gorelick. John Ashcroft testimony, Apr. 13, 2004; DOJ memo, Gorelick to White, "Instructions on Separation of Certain Foreign Counterintelligence and Criminal Investigations," Mar. 4, 1995.

We believe the Attorney General's testimony does not fairly or accurately reflect the significance of the 1995 documents and their relevance to the 2001 discussions. Whatever the merits of the March 1995 Gorelick memorandum and the subsequent July 1995 Attorney General procedures on information sharing, they did not apply to the information the analyst decided she could not share with the criminal agent. As discussed earlier, the reason "Jane" decided she could not share information was because the initial information on Mihdhar had been analyzed by the NSA. This reason was unrelated to either of the 1995 documents. The Gorelick memorandum applied to two particular criminal cases, neither of which was involved in the summer 2001 information-sharing discussions. As the FBI agent observed in his email, Part A of the 1995 procedures applied only to information obtained pursuant to a FISA warrant. None of the Mihdhar material was FISA information. There was an exemption for the Southern District of New York from Part B of the 1995 procedures, so they did not apply. Also, the 1995 procedures did not govern whether information could be shared between intelligence and criminal agents within the FBI, a separation that the Bureau did not begin making formally until long after the procedures were in place. The 1995 procedures governed only the sharing of information with criminal prosecutors. Even in that situation, the restriction obliged running the information through the OIPR screen.

What had happened, as we discussed in chapter 3, was a growing battle within the Justice Department during the 1990s, and between parts of Justice and the FISA Court, over the scope of OIPR's screening function and the propriety of using FISA-derived information in criminal matters. The FISA Court's concern with FBI sloppiness in its FISA applications also began to take a toll: the court began designating itself as the gatekeeper for the sharing of intelligence information; the FBI was required to separately designate criminal and intelligence agents; and the court banned one supervisory FBI agent from appearing before it. By late 2000, these factors had culminated in a set of complex rules and a widening set of beliefs—a bureaucratic culture—that discouraged FBI agents from even seeking to share intelligence information. Neither Attorney General acted to resolve the conflicting views within the Justice Department. Nor did they challenge the strict interpretation of the FISA statute set forth by the FISA Court and OIPR. Indeed, this strict interpretation remained in effect until the USA PATRIOT Act was passed after 9/11.

Simply put, there was no legal reason why the information the analyst possessed could not have been shared with the criminal agent. On August 27, "Jane" requested the NSA's permission to share the information with the criminal agents, but she intended for the information only to help the criminal agents in their ongoing *Cole* investigation. She still did not believe they could be involved in the intelligence investigation even if the NSA permitted the information to be shared. DOJ IG 9/11 Report, July 2, 2004, p. 339. The next day the NSA notified its representative at FBI headquarters that it had approved the passage of the information to the criminal agents. NSC email, Carlene C. to Richard K., "Response to FBI Sanitization Request," Aug. 28, 2001. Thus, "Jane" had permission to share the information with the criminal agent prior to their August 29 emails.

84. DOJ Inspector General interview of Robert F., Dec. 18, 2002; FBI electronic communication, Los Angeles lead, Sept. 10, 2001.

85. Hazmi and Mihdhar used their true names to obtain California driver's licenses and open New Jersey bank accounts. Hazmi also had a car registered and had been listed in the San Diego telephone book. Searches of readily available databases could have unearthed the driver's licenses, the car registration, and the telephone listing. A search on the car registration would have unearthed a license check by the South Hackensack Police Department that would have led to information placing Hazmi in the area and placing Mihdhar at a local hotel for a week in early July 2001. The hijackers actively used the New Jersey bank accounts, through ATM, debit card, and cash transactions, until September 10. Among other things, they used their debit cards to pay for hotel rooms; and Hazmi used his card on August 27 to purchase tickets on Flight 77 for himself and his brother (and fellow hijacker), Salem al Hazmi. These transactions could have helped locate them if the FBI had obtained the bank records in time. There would have been no easy means, however, to determine the existence of these accounts, and obtaining bank cooperation pre-9/11 might have been problematic. The most likely means of successfully finding the men in the short time available was one not often used pre-9/11 for suspected terrorists: an FBI BOLO (be on the lookout) combined with a media campaign. This alone might have delayed or disrupted the plot, even if the men had not been physically located before September 11. But this would have been considered only if the FBI believed that they were about to carry out an imminent attack. No one at the FBI—or any other agency—believed that at the time.

See FBI report, financial spreadsheet re: 9/11 hijackers, undated; South Hackensack, N.J., Police Department report, Detective Bureau Report, Oct. 17, 2001 (case no. 20018437). According to Ramzi Binalshibh, had KSM known that Moussaoui had been arrested, he would have canceled the 9/11 attacks. Intelligence report, interrogation of Ramzi Binalshibh, Feb. 14, 2003. The publicity regarding Mihdhar and Hazmi might have had a similar effect because they could have been identified by the airlines and might have jeopardized the operation.

86. Joint Inquiry report, pp. xiii, 325–335; DOJ IG 9/11 Report, July 2, 2004, pp. 59–106.

87. FBI electronic communication, Phoenix memo, July 10, 2001.

88. Ibid.; Joint Inquiry report, pp. 325–335; DOJ IG 9/11 Report, July 2, 2004, pp. 59–106.

89. DOJ Inspector General interview of Kenneth Williams, July 22, 2003.

90. Unlike Moussaoui, the typical student at Pan Am Flight Academy holds an FAA Airline Transport Pilot rating or the foreign equivalent, is employed by an airline, and has several thousand flight hours. Moussaoui also stood out for several other reasons. He had paid nearly $9,000 in cash for the training, yet had no explanation for the source of these funds; he had asked to fly a simulated flight from London's Heathrow Airport to New York's John F. Kennedy Airport; and he was also particularly interested in the operation of the aircraft doors. FBI electronic communication, Request OIPR permission to contact U.S. Attorney's Office regarding Zacarias Moussaoui, Aug. 18, 2001. For a detailed, step-by-step chronology of activities taken regarding Moussaoui prior to September 11, see DOJ IG 9/11 Report, July 2, 2004, pp. 109–197.

91. FBI electronic communication, Request OIPR permission to contact U.S. Attorney's Office regarding Zacarias Moussaoui, Aug. 18, 2001.

92. DOJ Inspector General interview of Harry S., June 6, 2002; DOJ Inspector General interview of Greg J., July 9, 2002; FBI letterhead memorandum, Zacarias Moussaoui, Aug. 19, 2001.

93. DOJ IG 9/11 Report, July 2, 2004, p. 128.

94. Criminal search warrants must be approved by Department of Justice attorneys before submission to the court. Therefore, approval from the Minneapolis U.S. Attorney's Office was required before a criminal search warrant could be obtained. DOJ Inspector General interview of Coleen Rowley, July 16, 2002. Another agent, however, said that he spoke to an Assistant U.S. Attorney in the Minneapolis office and received advice that the facts were almost sufficient to obtain a criminal warrant. DOJ Inspector General interview of Greg J., July 9, 2002. The Assistant United States Attorney said that if the FBI had asked for a criminal warrant that first night, he would have sought it. He believed that there was sufficient probable cause for a criminal warrant at that time. DOJ Inspector General interview of William K., May 29, 2003. Mary Jo White, the former U.S. Attorney for the Southern District of New York, told us that based on her review of the evidence known pre-9/11, she would have approved a criminal search warrant. Mary Jo White interview (May 17, 2004). Because the agents never presented the information to the Minneapolis U.S. Attorney's Office before 9/11, we cannot know for sure what its judgment would have been or whether a judge would have signed the warrant. In any event, the Minneapolis agents were concerned that if they tried to first obtain a criminal warrant but the U.S. Attorney's Office or the judge refused, the FISA Court might reject an application for a FISA warrant on the grounds that the agents were attempting to make an end run around the criminal process. Therefore, it was judged too risky to seek a criminal warrant unless it was certain that it would be approved. DOJ Inspector General interview of Greg J., July 9, 2002. In addition, FBI headquarters specifically instructed Minneapolis that it could not open a criminal investigation. DOJ IG 9/11 Report, July 2, 2004, p. 138. Finally, the Minneapolis Field Office mistakenly believed that the 1995 Attorney General procedures required OIPR's approval before it could contact the U.S. Attorney's Office about obtaining a criminal warrant.

95. The FISA definition of "foreign power" includes "a group engaged in international terrorism or activities in preparation therefor."

96. FBI electronic communication, Request to contact U.S. Attorney's Office regarding Zacarias Moussaoui, Aug. 18, 2001. For CTC contact, see FBI email, Harry S. to Chuck F., "Please Pass To [desk officer]," Aug. 24, 2001; FBI email, Harry S. to Chuck F., "Re: Fwd: 199M-MP-60130 (Zacarias Moussaoui)," Aug. 24, 2001.

97. DOJ Inspector General interview of Greg J., July 9, 2002; FBI electronic communication, Moussaoui investigation, Aug. 22, 2002; FBI electronic communication, Moussaoui investigation, Aug. 30, 2002.

98. FBI letterhead memorandum, Zacarias Moussaoui, Aug. 21, 2001; CIA cable, subjects involved in suspicious 747 flight training, Aug. 24, 2001; CIA cable, "Zacarias Moussaoui and Husayn 'Ali Hasan Ali-Attas," Aug. 28, 2001; Joseph H., interview (May 4, 2004); FBI letterhead memorandum, Zacarias Moussaoui, Sept. 5, 2001.

99. FBI teletype, "Zacarias Moussaoui—International Terrorism," Sept. 4, 2001.

100. DOJ Inspector General interview of Greg J., July 9, 2002.

101. Minneapolis may have been more concerned about Moussaoui's intentions because the case agent and the supervisory agent were both pilots. They were, therefore, more highly sensitized to the odd nature of Moussaoui's actions and comments regarding flying. DOJ Inspector General interview of Greg J., July 9, 2002; DOJ Inspector General interview of Harry S., June 20, 2002.

102. DOJ Inspector General interview of Michael Rolince, May 5, 2004; Michael Rolince interview (Apr. 12, 2004); DOJ IG 9/11 Report, July 2, 2004, pp. 168–170, 188.

103. CIA briefing materials, DCI Update, "Islamic Extremist Learns to Fly," Aug. 23, 2001. Deputy Director of Central Intelligence John McLaughlin testified that he was told about Moussaoui several days before Tenet was briefed, although he did not recall the specific date of the briefing. John McLaughlin testimony, Apr. 14, 2004.

104. George Tenet interviews (Jan. 28, 2004; July 2, 2004).

105. For the renewed request, see FBI letterhead memorandum, Zacarias Moussaoui, Sept. 11, 2001. For the initial British response, see British Security Service memo, re: Zacarias Moussaoui, Sept. 12, 2001; information provided to the Commission by the British government; British liaison telex, "Zacarias Moussaoui—Background Information," Sept. 13, 2001. See also Joseph H. interview (May 4, 2004).

106. Joint Inquiry report (classified version), pp. 340–341. Notably, the FBI analyst "Mary" who was looking at the Mihdhar information suggested that the U.S. government talk to Ressam to see if he knew anything about Mihdhar. See CIA email, Mary to John, seeking identification by Ressam, Aug. 21, 2001. There is no evidence that Ressam was asked about Moussaoui or Mihdhar prior to 9/11.

107. According to Ramzi Binalshibh, had KSM known that Moussaoui had been arrested, he would have cancelled the 9/11 attacks. Intelligence report, interrogation of Ramzi Binalshibh, Feb. 14, 2003.

108. Joint Inquiry report (classified version), pp. 329–331; Joint Inquiry interview of Mike, Alice, Larry, John, Terry, Aug. 12, 2002.

109. CIA cable, Key UBL personalities, Sept. 25, 2000.

110. CIA cable, Mukhtar information, May 23, 2002.

111. CIA cable, Biographical Information on Key UBL Associates in Afghanistan, June 11, 2001; Intelligence report, biographical information on Bin Ladin associates in Afghanistan, June 12, 2001. For the subsequent identification, see CIA cable, follow-up source on KSM, July 11, 2001.

112. For the reporting identifying Mukhtar as KSM, see CIA cable, source information re: KSM, Aug. 28, 2001.

113. John interview (Apr. 2, 2004).

# 9 Heroism and Horror

1. For the WTC's layout, see Port Authority diagrams, "World Trade Center Concourse Level," "Concourse Level," and "Plaza Level," undated. For the number of square feet of office space, see Federal Emergency Management Agency (FEMA) report, "World Trade Center Building Performance Study," undated. For the number of workers and passersby, see Port Authority briefing (May 13, 2004).

For the dimensions, see FEMA report, "World Trade Center Building Performance Study," undated. In addition, the outside of each tower was covered by a frame of 14-inch-wide steel columns; the centers of the steel columns were 40 inches apart. These exterior walls bore most of the weight of the building. The interior core of the buildings was a hollow steel shaft, in which elevators and stairwells were grouped. Ibid. For stairwells and elevators, see Port Authority response to Commission interrogatory, May 2004.

2. See Port Authority response to Commission interrogatory, May 2004.

3. Ibid. These deviations were necessary because of the placement of heavy elevators and machine rooms, and were located between the 42nd and 48th floors and the 76th and 82nd floors in both towers. For the doors being closed but unlocked, see Port Authority briefing (May 13, 2004).

4. For rooftop access and evacuations, see Port Authority response to Commission interrogatory, May 2004. For the helipad not conforming, see PANYNJ interview 14 (July 8, 2004). In the interests of promoting candor and protecting privacy, we agreed not to identify most individuals we interviewed. Individuals are identified by a code, and individuals' ranks or units are disclosed only in a broad manner.

5. For the 1993 attack's effect, see Alan Reiss testimony, May 18, 2004. For the attack's testing the city's response capability, see FDNY report, "Report from the Chief of Department, Anthony L. Fusco," in William Manning, ed., *The World Trade Center Bombing: Report and Analysis* (FEMA, undated), p. 11.

6. For the towers' loss of power and the other effects, see New York City report, "Report of the World Trade Center Review Committee," 1995, p. 4. For generators' shutting down, see Port Authority briefing (May 13, 2004). For the rescue efforts, see FDNY report, "Report from the Chief of Department, Anthony L. Fusco," in Manning, ed., *The World Trade Center Bombing*, p. 11. For the evacuation time, see PANYNJ interview 5 (May 15, 2004).

7. For information on rooftop evacuations, see Port Authority response to Commission interrogatory, May 2004; NYPD interview 25, Aviation (June 21, 2004). For the rappel rescue, see Port Authority response to Commission interrogatory, May 2004. For figure of 15 hours, see "World Trade Center Bombing," *NY Cop Online Magazine*, Dec. 12, 2000 (online at www.nycop.com). For the general false impression, see Civilian interview 3 (May 4, 2004); Commission analysis of letters written to the Occupational Safety and Health Administration (OSHA) concerning the September 11 attacks. For the WTC fire safety plan, see Port Authority response to Commission interrogatory, May 2004.

8. For the upgrades, see Port Authority memorandum to the Commission for Nov. 3, 2003, meeting; Port Authority briefing (May 13, 2004).

9. For the upgrades, see Port Authority memorandum to the Commission for Nov. 3, 2003, meeting; Port

Authority response to Commission interrogatory, May 2004. For the fire alarm, see PANYNJ interview 10 (June 16, 2004); PANYNJ interview 7 (June 2, 2004).

10. Port Authority memorandum to Commission for Nov. 3, 2003 meeting; WTC interview 6 (May 25, 2004).

11. For fire safety teams, see PANYNJ Interview 7 (Jun. 2, 2004). For fire drill procedures, see Civilian interview 1 (Mar. 2, 2004); Civilian interview 10 (Mar. 24, 2004). For aids to the September 11 evacuation, see, e.g., Civilian interview 14 (Apr. 7, 2004); Civilian interview 20 (May 4, 2004); Civilian interview 21 (May 4, 2004); Civilian Interview 13 (Mar. 25, 2004).

12. For instructions to civilians, see, e.g., Civilian interview 20 (May 4, 2004); Civilian interview 21 (May 4, 2004); Civilian interview 12 (May 4, 2004); Stanley Praimnath testimony, May 18, 2004 (videotaped). For civilians' participation, see Civilian interview 10 (Mar. 24, 2004); Civilian interview 15 (Apr. 21, 2004); Commission analysis of letters written to OSHA concerning the September 11 attacks. For civilians not being instructed not to evacuate up, see Port Authority briefing (May 13, 2004). For the standard fire drill announcement, see Port Authority response to Commission interrogatory, May 2004. For civilians' recollection, see Civilian interview 1 (Mar. 2, 2004); Civilian interview 13 (Mar. 25, 2004); Civilian interview 10 (Mar. 24, 2004). For Port Authority acknowledgment of lack of a protocol, see PANYNJ interview 2 (Apr. 14, 2004).

13. For SPI transition, see PANYNJ Interview 11 (Jun. 23, 2004); Alan Reiss prepared statement, May 18, 2004, p. 8. For fire safety plan, see PANYNJ Interview 8 (June 6, 2004).

14. See Port Authority Police Department (PAPD) report, "Port Authority of New York and New Jersey," undated (online at www.panynj.gov).

15. PANYNJ interview 4 (May 10, 2004).

16. For 40,000 officers, see NYPD information provided to the Commission, July 9, 2004. For standard operating procedures, see NYPD regulations, "Patrol Guide: Rapid Mobilization," and "Patrol Guide: Mobilization Readiness Levels," Jan. 1, 2000.

17. For the 35 radio zones, see NYPD report, "Radio Zones," undated. For other citywide radio channels, see, e.g., NYPD report, "Transit Patrol VHF," undated; NYPD interview 18, ESU (Feb. 24, 2004).

18. For the NYPD supervising the emergency call system and employing more than 1,200 people, see NYPD report, "Communications Section," undated (online at www.nyc.gov/html/nypd/html/otsd/ commsec.html). For fire emergencies being transferred to the FDNY dispatch, see FDNY interview 28, Dispatch (Jan. 29, 2004).

19. See FDNY email to the Commission, July 9, 2004; Thomas Von Essen interview (Apr. 7, 2004). For operations being headed by the sole five-star chief, see FDNY regulations, "Regulations" chapter of "Operational Procedures and Policies," July 1999.

20. For department organization, see FDNY report, "Unit Location Chart," Sept. 11, 2001; FDNY regulations, "Firefighting Procedures," "Engine Company," and "Ladder Company Operations" chapters of "Operational Procedures and Policies," July 1999.

21. FDNY interview 48, SOC (Mar. 11, 2004).

22. FDNY interview 28, Dispatch (Jan. 29, 2004). Each center was staffed at all times with a supervisor and seven dispatchers who worked in 12-hour tours. Positions included a decision dispatcher, responsible for directing the appropriate fire apparatus to the scene; a voice alarm or notification dispatcher, responsible for intra- and interagency communications; a radio in and radio out dispatcher who tracked the movement of fire apparatuses; and three alarm dispatchers, responsible for sending the appropriate number of units to a fire scene to correspond with the designated alarm level. Ibid.

23. FDNY regulations, "Communications" chapter of "Operational Procedures and Policies," July 1999; FDNY interview 60, HQ (May 11, 2004); FDNY interview 64, HQ (June 30, 2004).

24. FDNY report, "Report from the Chief of Department, Anthony L. Fusco," in Manning, ed., *The World Trade Center Bombing*, p. 11.

25. PANYNJ interview 1 (Nov. 6, 2003); PANYNJ interview 4 (May 10, 2004). In early 2001, New York provided its firefighters with new digital radios. The procurement process for these radios remains controversial, and they proved unpopular with the rank and file, who believed that adequate training in their use had not been provided. The new radios were withdrawn shortly after they had been introduced into the field. While the new radios briefly were in service, the WTC repeater channel could be left on at all times, because the new radios operated on entirely different frequencies and thus were not vulnerable to interference from the repeater system. Thomas Von Essen interview (Apr. 7, 2004). For the new radios permitting the repeater to stay on, see PANYNJ interview 1 (Nov. 6, 2003); PANYNJ interview 4 (May 10, 2004).

26. For civilian fatalities, see New York City press release, Office of the Mayor Press Release No. 042-01, Feb. 8, 2001. For firefighter fatalities, see Terry Golway, *So Others Might Live* (Basic Books, 2002), p. 304.

27. For the creation of the Office of Emergency Management (OEM), see Rudolph Giuliani interview (Apr. 20, 2004). For OEM's purposes, see Richard Sheirer interview (Apr. 7, 2004). For OEM's sending field responder, see ibid.; OEM interview 1 (Feb. 12, 2004). Other data monitored by OEM's Watch Command included Emergency Medical Service data regarding patterns of illness (to spot a potential epidemic in its early stages), live video feeds from New York Harbor and city streets, and television news channels. Richard Sheirer interview (Apr. 7, 2004);

OEM interview 3 (Mar. 16, 2004). The Watch Command's monitoring of EMS data proved instrumental in an extremely early identification and then highly effective containment of the 1999 West Nile outbreak, which likely would have resulted in many more fatalities but for OEM. Richard Sheirer interview (Apr. 7, 2004).

28. Richard Sheirer testimony (May 18, 2004); OEM interview 3 (Mar. 16, 2004).

29. New York City memo, "Direction and Control of Emergencies in the City of New York," July 2001 (signed by Mayor Giuliani).

30. For the exact time of impact, see FAA analysis of American 11 radar returns and Commission analysis of FAA radar data and air traffic control software logic. For the zone of impact, see National Institute of Standards and Technology (NIST) report, "Interim Report on the Federal Building Fire Safety Investigation of the World Trade Center," June 28, 2004. On people alive on the 92nd floor and above after the impact, see Commission analysis of conditions on tower floors and advice received by civilians in the towers based on (1) calls to NYPD 911 from or concerning people in the towers on September 11, 2001, and (2) transcripts of recorded calls to the Port Authority police desk from people in the towers on September 11, 2001 (hereafter "Commission analysis of 911/PAPD calls"). Everyone alive on the 91st floor was able to evacuate. Civilian interview 7 (Mar. 22, 2004); Civilian interview 6 (Mar. 22, 2004). For civilians being alive but trapped, see Commission analysis of 911/PAPD calls; Civilian interview 17 (May 11, 2004); Civilian interview 2 (Mar. 19, 2004).

31. For fire in the 77th floor elevator and damage to the 22nd floor, see Commission analysis of 911/PAPD calls; Port Authority transcripts of recorded Port Authority calls and radio channels, Sept. 11, 2001, vol. II, channel 8, p. 4 (22nd floor). For a fireball in the lobby, see PAPD interview 1, WTC Command (Oct. 14, 2003); Civilian interview 14 (Apr. 7, 2004). Burning jet fuel descended at least one elevator bank. FDNY interview 4, Chief (Jan. 8, 2004). For the roofs being engulfed and the winds, see, e.g., NYPD interview 16, Aviation (Apr. 1, 2004).

32. Commission analysis of 911/PAPD calls.

33. Ibid.

34. For the on-duty fire safety director's perspective, see WTC interview 6 (May 25, 2004). For the chiefs being told by the Port Authority fire safety director that the evacuation order was given earlier, see PANYNJ interview 13 (Nov. 20, 2003). For him no longer being the designated fire safety director, see PANYNJ interview 11 (June 23, 2004).

35. For public announcements not being heard, see, e.g., Civilian interview 6 (Mar. 22, 2004); Civilian interview 7 (Mar. 22, 2004); Civilian interview 9 (Mar. 23, 2004); Civilian interview 14 (Apr. 7, 2004); Commission analysis of 911/PAPD calls. The evacuation tone was heard in some locations below the impact. Civilian interview 7 (Mar. 22, 2004); Commission analysis of 911/PAPD calls. For some emergency intercoms being unusable, see WTC interview 9 (June 8, 2004); Port Authority transcripts of recorded Port Authority calls and radio channels, Sept. 11, 2001. For evidence that some were usable, see WTC interview 6 (May 25, 2004).

36. For callers being disconnected, see Commission analysis of 911/PAPD calls. For the standard operating procedure and only a few people being available, causing calls to be transferred, see FDNY interview 28, Dispatch (Jan. 29, 2004). For delays and terminations, see Commission analysis of 911/PAPD calls.

37. For operators' and dispatchers' situational awareness and instructions to callers, see Commission analysis of 911/PAPD calls. For standard operating procedures for a high-rise fire, see FDNY interview 28, Dispatch (Jan. 29, 2004). For the fire chiefs' view, see FDNY interview 61, Chief (May 12, 2004); FDNY interview 62, Chief (May 12, 2004). For many injuries occurring during the evacuation, see Zachary Goldfarb and Steven Kuhr, "EMS Response to the Explosion," in Manning, ed., *The World Trade Center Bombing*, p. 94.

38. FDNY interview 15, Chief (Jan. 14, 2004): FDNY interview 4, Chief (Jan. 8, 2004).

39. For operators' and dispatchers' lack of knowledge, see Commission analysis of 911/PAPD calls. For operators departing from protocol, see ibid.

40. Commission analysis of 911/PAPD calls; Port Authority transcripts of recorded Port Authority calls and radio channels, Sept. 11, 2001, vol. II, channel 9, pp. 1–2, 23–24; channel 10, pp. 2, 6, 23.

41. See Civilian interview 6 (Mar. 22, 2004); Civilian interview 7 (Mar. 22, 2004); Civilian interview 14 (Apr. 7, 2004); Civilian interview 9 (Mar. 23, 2004). For Port Authority employees remaining, see Civilian interview 6 (Mar. 22, 2004); Civilian interview 7 (Mar. 22, 2004), Port Authority report, *September 11 Special Awards Ceremony*, vol. 1, undated (recognitions 2, 3, 4, and 5).

42. For trouble reaching exits, see, e.g., Civilian interview 9 (Mar. 23, 2004). For "locked" doors, see, e.g., Civilian interview 6 (Mar. 22, 2004); Civilian Interview 14 (Apr. 7, 2004); WTC interview 9 (June 8, 2004); Civilian interview 7 (Mar. 22, 2004).

43. For smoke rising and its effect, see Commission analysis of 911/PAPD calls. For people jumping, see Civilian interview 13 (Mar. 25, 2004); Commission analysis of 911/PAPD calls; Port Authority transcripts of recorded Port Authority calls and radio channels, vol. II, WTC channel 26 (channel W), Sept. 11, 2001, pp. 4–6.

44. There is no evidence of a dispute between Morgan Stanley and the Port Authority over the Port Authority's "defend in place" evacuation policy before September 11. For occupants who were unaware of what happened, see, e.g., Civilian interview 1 (Mar. 2, 2004). For civilians concluding that the incident had occurred in the other building, see Civilian interview 13 (Mar. 25, 2004); Civilian interview 1 (Mar. 2, 2004). For others being aware that

a major incident had occurred, see, e.g., Civilian interview 13 (Mar. 25, 2004); Civilian interview 10 (Mar. 24, 2004). Some of them could actually feel the heat from the explosion in the North Tower. See, e.g., Civilian interview 10 (Mar. 24, 2004); Civilian interview 15 (Apr. 21, 2004). For people deciding to leave or being advised to do so by fire wardens, see, e.g., Civilian interview 1 (Mar. 2, 2004); Civilian interview 8 (Mar. 23, 2004); Civilian statement 1, undated. For Morgan Stanley occupying 20 floors and ordering its employees to leave, see Civilian interview 19 (June 6, 2004).

45. Port Authority, transcripts of recorded Port Authority calls and radio channels, Sept. 11, 2001, vol. II, channel 17, p. 1; PANYNJ interview 7 (June 2, 2004). Fire command stations were equipped with manuals containing prescripted announcements corresponding to a number of specified emergencies. Once the FDNY arrived on the scene, however, all decisions relating to evacuation or other emergency procedures were left to its discretion.

46. When a notable event occurred, it was standard procedure for the on-duty deputy fire safety director to make an "advisory" announcement to tenants who were affected by or might be aware of the incident, in order to acknowledge the incident and to direct tenants to stand by for further instructions. The purpose of advisory announcements, as opposed to "emergency" announcements (such as to evacuate), was to reduce panic. PANYNJ interview 7 (June 2, 2004); Port Authority response to Commission interrogatory, May 2004. For the content of the announcement, see, e.g., Brian Clark testimony, May 18, 2004 (videotaped); Civilian interview 3 (May 4, 2004); Civilian interview 13 (Mar. 25, 2004); Civilian statement 1, undated. For the protocol and prescripted announcements and the death of the director of fire safety and the deputy fire safety director, see PANYNJ interview 7 (June 2, 2004); PANYNJ interview 12 (July 7, 2004). For people not thinking a second plane would hit, see, e.g., PANYNJ interview 7 (June 2, 2004). For the quotation, see FDNY interview 63, Chief (May 16, 2004). For civilians remaining, see Civilian interview 1 (Mar. 2, 2004); Civilian interview 13 (Mar. 25, 2004); Civilian interview 8 (Mar. 23, 2004); Civilian interview 16 (Apr. 27, 2004); Commission analysis of letters written to OSHA concerning the September 11 attacks. For civilians returning after evacuating, see Civilian interview 1 (Mar. 2, 2004); Civilian interview 11 (Mar. 25, 2004); Civilian interview 4 (Mar. 16, 2004); Commission analysis of letters written to OSHA concerning the September 11 attacks.

47. For advice on the ground floor, see Civilian interview 4 (Mar. 16, 2004). Nineteen of them returned upstairs, where 18 died; the 20th was told by her supervisor, who was in the group, to leave rather than return upstairs. The supervisor also survived. Civilian interview 4 (Mar. 16, 2004). For advice in the sky lobbies, see, e.g., Civilian interview 15 (Apr. 21, 2004). For security officials not being part of the fire safety staff, see PANYNJ interview 7 (June 2, 2004).

48. For people told to stand by, see Port Authority transcripts of recorded Port Authority calls and radio channels, Sept. 11, 2001, vol. II, channel 8, pp. 7–8. For people advised to leave, see ibid., vol. II, channel 9, pp. 2, 4, 9.

49. It is also not known if the deputy fire safety director received the order by the PAPD to evacuate the complex; however, the Port Authority has told us that deputy fire safety directors did not generally take direct orders from the PAPD under the regular chain of command. PANYNJ interview 7 (June 2, 2004). For the announcement, see Civilian interview 16 (Apr. 27, 2004); Civilian interview 13 (Mar. 25, 2004). For the announcement's deviating from protocol, see PANYNJ interview 7 (June 2, 2004).

50. For senior leaders' response by 9:00 A.M., see FDNY interview 18, Chief (Jan. 22, 2004); FDNY interview 54, Chief (Apr. 15, 2004); FDNY interview 5, Chief (Dec. 16, 2003); FDNY interview 52, Chief (Apr. 5, 2004); FDNY interview 27, HQ (Jan. 28, 2004). For the Chief of Department's and Chief of Operation's actions, see FDNY interview 18, Chief (Jan. 22, 2004). For senior leaders' response by 9:59, see FDNY report, McKinsey & Company, "FDNY Report," Aug. 19, 2002, p. 32.

51. FDNY interview 60, HQ (May 11, 2004); see FDNY record, computer-aided dispatch report, Sept. 11, 2001, 08:47:20–9:00:00.

52. For the chief's and companies' arrival, see Jules Naudet and Gedeon Naudet, video footage, Sept. 11, 2001; FDNY interview 4, Chief (Jan. 8, 2004). For burned civilians, see FDNY interview 29, Battalion 1 (Jan. 29, 2004). For the building's physical conditions, see FDNY interview 16, Battalion 1 (Jan. 20, 2004). For conditions in the lobby, see Jules Naudet and Gedeon Naudet, video footage, Sept. 11, 2001.

53. For the initial incident commander and command post location, see Jules Naudet and Gedeon Naudet, video footage, Sept. 11, 2001; FDNY interview 4, Chief (Jan. 8, 2004). For the transfer of incident command, see FDNY interview 15, Chief (Jan. 14, 2004). For ascertaining building systems' status from building personnel, see FDNY interview 4, Chief (Jan. 8, 2004); PANYNJ interview 13 (Nov. 20, 2003); FDNY interview 15, Chief (Jan. 14, 2004). For speaking with OEM and PAPD officials, see FDNY interview 15, Chief (Jan. 14, 2004); Jules Naudet and Gedeon Naudet, video footage, Sept. 11, 2001.

54. For the ladder and engine companies' climb, see FDNY interview 59, Battalion 2 (Apr. 22, 2004); Jules Naudet and Gedeon Naudet, video footage, Sept. 11, 2001. For tactical 1, see FDNY interview 59, Battalion 2 (Apr. 22, 2004). For other units lining up in the lobby, see Jules Naudet and Gedeon Naudet, video footage, Sept. 11, 2001.

55. For FDNY instructing building personnel and PAPD to evacuate the South Tower, see FDNY interview

4, Chief (Jan. 8, 2004); FDNY interview 15, Chief (Jan. 14, 2004); PANYNJ interview 13 (Nov. 20, 2003). For lack of concern about a second plane, see FDNY interview 63, Chief (May 16, 2004).

56. FDNY interview 4, Chief (Jan. 8, 2004); FDNY interview 15, Chief (Jan. 14, 2004).

57. For their situational awareness, see FDNY interview 4, Chief (Jan. 8, 2004); FDNY interview 15, Chief (Jan. 14, 2004) (quotation).

58. Peter Hayden testimony, May 18, 2004 (videotaped).

59. On the lack of information, see FDNY interview 4, Chief (Jan. 8, 2004); FDNY interview 15, Chief (Jan. 14, 2004).

60. On the staging areas, see FDNY interview 47, Chief (Mar. 11, 2004); FDNY interview 44, Chief (Mar. 8, 2004); FDNY interview 33, EMS (Feb. 9, 2004). For EMS's response, see Jules Naudet and Gedeon Naudet, video footage, Sept. 11, 2001. For private ambulances responding, see FDNY interview 35, EMS (Feb. 10, 2004).

61. NYPD recordings, City Wide 1, Special Operations Division, and Divisions 1, 2, and 3 radio channels, Sept. 11, 2001.

62. For the Chief of Department's actions, see NYPD interview 8, HQ (Feb. 24, 2004). For the number of officers, see NYPD regulations, "Patrol Guide: Rapid Mobilization," Jan. 1, 2000; NYPD recordings, City Wide 1 and Divisions 1, 2, and 3 radio channels, Sept. 11, 2001.

63. For shifting the mobilization point, see NYPD interview 17, 1st Precinct (Apr. 1, 2004). For stationing officers around the perimeter, see NYPD recordings, City Wide 1, Special Operations Division, and Divisions 1, 2, and 3 radio channels, Sept. 11, 2001. For officers being diverted, see, e.g., NYPD interview 21, 6th Precinct (May 4, 2004).

64. For the helicopters' dispatch, see NYPD records, "Aviation Unit Flight Data Sheets," Sept. 11, 2001. For communications with air traffic controllers and their situational awareness, see NYPD interview 12, Aviation (Mar. 10, 2004); NYPD interview 14, Aviation (Mar. 11, 2004); NYPD interview 13, Aviation (Mar. 10, 2004); NYPD interview 16, Aviation (Apr. 1, 2004).

65. NYPD recording, Special Operations Division radio channel, Sept. 11, 2001.

66. For the third helicopter, see NYPD records, "Aviation Unit Flight Data Sheets," Sept. 11, 2001. For the helicopters' subsequent actions and protocol, see NYPD interview 12, Aviation (Mar. 10, 2004); NYPD interview 14, Aviation (Mar. 11, 2004); NYPD interview 13, Aviation (Mar. 10, 2004); NYPD interview 16, Aviation (Apr. 1, 2004); NYPD interview 15, ESU (Mar. 11, 2004).

67. Commission analysis of 911/PAPD calls; NYPD recordings, City Wide 1, Special Operations, and Division 1, 2, and 3 radio channels, Sept. 11, 2001.

68. NYPD memo, requests for departmental recognition 4 and 6, Jun. 26, 2002. For those on the 22nd floor apparently not being located, see PANYNJ recognition 1, undated.

69. NYPD interview 15, ESU (Mar. 11, 2004); NYPD interview 18, ESU (Feb. 24, 2004).

70. For other officers' positioning, see NYPD interview 20, Manhattan South Task Force (May 4, 2004); NYPD interview 21, 6th Precinct (May 4, 2004); NYPD interview 19, 13th Precinct (May 4, 2004); NYPD interview 4, Housing (Feb. 17, 2004); PAPD interview 4, Port Authority Bus Terminal Command (Nov. 20, 2003). For officers assisting in the North Tower evacuation, see NYPD memo, request for departmental recognition 1 and 2, June 26, 2002.

71. NYPD recording, Transit Division 1 radio channel, Sept. 11, 2001.

72. NYPD recordings, City Wide 1, Special Operations Division, and Divisions 1, 2, and 3 radio channels, Sept. 11, 2001.

73. For the on-site commanding officer's actions, see PAPD interview 1, WTC command (Oct. 14, 2003). For the on-duty sergeant's initial instructions, see PAPD statement 3, WTC Command (Nov. 12, 2001). For his instructions to meet at the desk, see PAPD statement 3, WTC Command (Nov. 12, 2001); PAPD statement 12, WTC Command (Mar. 28, 2002). On the scarcity of radios, see PAPD statement 9, PATH Command (Jan. 28, 2002); PAPD statement 8, WTC Command (Jan. 12, 2002).

74. PAPD interview 7, WTC Command (Nov. 25, 2003).

75. For the response, see PAPD statement 2, WTC Command (Nov. 10, 2001). For the lack of such written standard operating procedures, see PAPD interview 3, LaGuardia Airport Command (Nov. 20, 2003); PAPD regulations, "Manual of Police Division Instructions," undated (in existence before 9/11). Instead, the PAPD relied on tradition to dictate its response procedures. On the lack of interoperable frequencies, see PANYNJ interview 4 (May 10, 2004); PAPD statement 9, PATH Command (Jan. 28, 2002).

76. For the evacuation order, see PAPD statement 3, WTC Command (Nov. 12, 2001); PAPD interview 1, WTC Command (Oct. 14, 2003). For its transmission, see Port Authority transcripts of recorded Port Authority calls and radio channels, Sept. 11, 2001, vol. II, channel W, p. 7.

77. PAPD statement 1, Administrative Command, Nov. 2, 2001; PAPD statement 4, Administrative Command, Nov. 24, 2001.

78. For the Emergency Operations Center's activation, see OEM interview 3 (Mar. 16, 2004); OEM interview 2 (Mar. 4, 2004). For the request for search teams, see OEM interview 5 (Mar. 19, 2004). For the senior OEM offi-

cial's arrival, see OEM interview 4 (Mar. 18, 2004). For other OEM officials' arrival, see Richard Sheirer interview (Apr. 7, 2004); OEM interview 6 (Mar. 24, 2004).

79. For the time of impact, see FAA analysis of United Airlines Flight 175 radar returns and Commission analysis of FAA radar data and air traffic control software logic. For the impact zone, see NIST report, "Interim Report on the Federal Building and Fire Safety Investigation of the World Trade Center," June 18, 2004, appendix H-41. For portions undamaged, see Civilian interview 10 (Mar. 24, 2004). For stairwell A remaining passable, see Civilian interview 8 (Mar. 23, 2004); Civilian interview 1 (Mar. 2, 2004); Civilian interview 13 (Mar. 25, 2004); Civilian interview 4 (Mar. 16, 2004).

80. For the sky lobby, see Civilian interview 10 (Mar. 24, 2004). For the condition of people on the impact floors, see Civilian interview 10 (Mar. 24, 2004); Civilian interview 4 (Mar. 16, 2004); Commission analysis of 911/PAPD calls. For events in the sky lobby after impact, see Civilian interview 10 (Mar. 24, 2004).

81. For conditions in the impact zone above the 78th floor, see Civilian interview 4 (Mar. 16, 2004); Civilian interview 3 (May 4, 2004); Commission analysis of 911/PAPD calls. For conditions on the 81st floor, see Civilian interview 4 (Mar. 16, 2004); Civilian interview 3 (May 4, 2004).

82. For the four people, see Civilian interview 1 (Mar. 2, 2004); Civilian interview 13 (Mar. 25, 2004); Civilian interview 4 (Mar. 16, 2004); Civilian interview 8 (Mar. 23, 2004). For the first person to descend stairwell A, see Civilian interview 13 (Mar. 25, 2004).

83. For civilians ascending the stairs, see Civilian interview 8 (Mar. 23, 2004); Civilian interview 16 (Apr. 27, 2004); Civilian interview 1 (Mar. 2, 2004); Commission analysis of letters written to OSHA concerning the September 11 attacks. For the intention of the group ascending the stairwell and the conditions, see Civilian interview 8 (Mar. 23, 2004).

84. On civilians finding locked doors, see, e.g., Civilian interview 16 (Apr. 27, 2004); Commission analysis of letters written to OSHA concerning the September 11 attacks. On the lock release order, see Port Authority transcripts of recorded Port Authority calls and radio channels, Sept. 11, 2001, vol. II, channel X, pp. 25–31; Port Authority response to Commission interrogatory, May 2004. The Security Command Center did not control access areas in the Observation Deck and other private tenant spaces. It is unknown whether there were any prior or subsequent orders or attempts to release the building's locks.

85. For trouble descending, see Brian Clark testimony, May 18, 2004 (videotaped); Richard Fern testimony, May 18, 2004 (videotaped); Commission analysis of letters written to OSHA concerning the September 11 attacks. The conditions of stairwell C are unknown. For conditions in stairwells, see, e.g., Civilian Interview 1 (Mar. 2, 2004); Civilian Interview 13 (Mar. 25, 2004).

86. For some civilians remaining, see Civilian interview 10 (Mar. 24, 2004). For some civilians ascending, see, e.g., Civilian interview 1 (Mar. 2, 2004); Civilian interview 11 (Mar. 25, 2004).

87. For conditions in the 90s and 100s, see Commission analysis of 911/PAPD calls. For the 105th floor and the condition of the less affected area, see Civilian interview 16 (Apr. 27, 2004). For the other areas of the 105th, 88th, and 89th floors, see Commission analysis of 911/PAPD calls.

88. For the callers, see Commission analysis of 911/PAPD calls. There are many variables to consider in determining whether, and to what extent, stairwell A was actually a viable exit. Knowing that the stairway was initially passable from at least the 91st floor down, we can conclude that it was likely open from top to bottom, on floors farther removed from the impact. However, in areas near the impact zone some doors leading to the stairwell may have jammed. We know that access to stairway A was possible from at least the 81st and 84th floors, and from several other floors between the 84th and 91st floor. It is likely that access was possible from floors higher up as well. It is not known, however, whether 911 callers had a clear path to the stairwell entrance from their locations. Damage caused by the impact of the plane, and the resulting smoke and heat, may have prevented some from being able to reach the entrance to the staircase; but the stated locations of at least some callers indicate that they were near stairwell A on their floor. Based on conditions described by civilians who descended stairwell A from at or above the impact zone, we conclude that stairwell A may have become effectively impassable as the morning progressed.

89. Commission analysis of 911/PAPD calls.

90. Brian Clark testimony, May 18, 2004 (videotaped); Civilian interview 1 (Mar. 2, 2004); Commission analysis of 911/PAPD calls.

91. Commission analysis of 911/PAPD calls.

92. Civilian interview 1 (Mar. 2, 2004); Civilian interview 8 (Mar. 23, 2004); Civilian interview 13 (Mar. 25, 2004); Civilian interview 4 (Mar. 16, 2004); Commission analysis of 911/PAPD calls.

93. OEM interview 1 (Feb. 12, 2004); PANYNJ interview 7 (June 2, 2004); Civilian interview 13 (Mar. 25, 2004); Civilian interview 1 (Mar. 2, 2004); Civilian interview 8 (Mar. 23, 2004).

94. Civilian interview 8 (Mar. 23, 2004); Civilian interview 1 (Mar. 2, 2004); Civilian interview 4 (Mar. 16, 2004); Civilian interview 13 (Mar. 25, 2004); NYPD interview 15, ESU (Mar. 11, 2004).

95. Civilian interview 6 (Mar. 22, 2004); Civilian interview 7 (Mar. 22, 2004) (quotation); Civilian interview 9 (Mar. 3, 2004); Civilian interview 14 (Apr. 7, 2004).

96. Commission analysis of 911/PAPD calls. It is not clear whether callers from below the impact were trapped

in offices or otherwise obstructed from proceeding, or were simply calling to seek advice. In any case, the 911 operators and FDNY dispatchers who advised them did not appear to be basing their advice on these or other factual considerations.

97. Port Authority transcripts of recorded Port Authority calls and radio channels, Sept. 11, 2001.

98. For the evacuation route for civilians, see Civilian interview 6 (Mar. 22, 2004); Civilian interview 7 (Mar. 22, 2004); Civilian interview 14 (Apr. 7, 2004); Civilian interview 9 (Mar. 23, 2004); PANYNJ interview 7 (Jun. 2, 2004).

99. FDNY interview 40, Battalion 4 (Feb. 12, 2004); FDNY interview 16, Battalion 1 (Jan. 20, 2004); FDNY interview 24, Battalion 6 (Jan. 23, 2004); FDNY interview 29, Battalion 1 (Jan. 29, 2004); NYPD interview 6, ESU (Feb. 19, 2004); NYPD interview 10, ESU (Mar. 1, 2004); FDNY interview, transcript 10, Battalion 2, Dec. 6, 2001.

100. Civilian interview 7 (Mar. 22, 2004); Civilian interview 6 (Mar. 22, 2004); PAPD interview 4, Port Authority Bus Terminal Command (Nov. 20, 2003); NYPD interview 10, ESU (Mar. 1, 2004). For people killed by debris, see, e.g., WTC interview 9 (June 8, 2004).

101. FDNY records, computer-aided dispatch report, alarm box 8087, Sept. 11, 2001, 09:10:02; FDNY interview 45, HQ (Mar. 8, 2004).

102. For the 23 engines and 13 ladders dispatched, see FDNY records, computer-aided dispatch report, Sept. 11, 2001, 09:08:28–09:15:00. For units that self-dispatched, see FDNY interview 60, HQ (May 11, 2004); FDNY report, McKinsey & Company, "FDNY Report," Aug. 19, 2002, p. 35. For units riding heavy, see ibid., p. 131; FDNY interview 25, Battalion 1 (Jan. 23, 2004); FDNY interview 21, Battalion 1 (Jan. 22, 2004); FDNY interview 7, Battalion 4 (Jan. 9, 2004); FDNY interview 9, Battalion 8 (Jan. 9, 2004); FDNY interview 50, Battalion 11 (Mar. 17, 2004); FDNY interview 31, Battalion 1 (Jan. 30, 2004); FDNY interview 34, Battalion 1 (Feb. 9, 2004). For extra personnel being a particular issue for SOC companies, see FDNY report, 9/11 fatalities list. For firefighters responding when told not to, see FDNY interview 46, Battalion 10 (Mar. 9, 2004). For firefighters responding from firehouses separately from the on-duty unit, see FDNY interview 46, Battalion 10 (Mar. 9, 2004); FDNY interview, transcript 26, Battalion 2, Jan. 16, 2002; FDNY interview, transcript 14, Battalion 32, Dec. 12, 2001; FDNY interview, transcript 19, Battalion 2, Jan. 8, 2002. For firefighters responding from home, see FDNY interview 14, Battalion 1 (Jan. 13, 2004); FDNY interview 17, Battalion 6 (Jan. 22, 2004); FDNY interview 19, Battalion 4 (Jan. 22, 2004); FDNY interview, transcript 6, Battalion 6 (Oct. 12, 2001); FDNY interview 11, Battalion 1 (Jan. 13, 2004); FDNY interview, transcript 2, Battalion 2, Oct. 9, 2001. For numerous additional FDNY personnel reporting, see FDNY interview 3, Chief (Jan. 7, 2004); FDNY interview 8, Fire Marshall (Jan. 9, 2004).

103. FDNY interview 15, Chief (Jan. 14, 2004); Jules Naudet and Gedeon Naudet, video footage, Sept. 11, 2001.

104. For FDNY personnel requesting the repeater's activation, see FDNY interview 4, Chief (Jan. 8, 2004). For one button on the repeater channel being activated, see PANYNJ interview 1 (Nov. 6, 2003); PANYNJ interview 4 (May 10, 2004); Port Authority records, measurements of repeater activation tones on Sept. 11, 2001, undated. For it being unclear who triggered activation, see WTC interview 6 (May 25, 2004). For the mechanics of activating the repeater, see PANYNJ interview 1 (Nov. 6, 2003); PANYNJ interview 4 (May 10, 2004).

105. For the testing of the repeater system, see Port Authority recording, WTC channel 30 (repeater channel), Sept. 11, 2001. For the master handset not being able to transmit, see PANYNJ interview 1 (Nov. 6, 2003); PANYNJ interview 4 (May 10, 2004); Port Authority records, measurements of repeater activation tones on Sept. 11, 2001, undated. For the chief on the handset not being able to hear, see Port Authority recording, WTC channel 30 (repeater channel), Sept. 11, 2001. On why he could not hear, see PANYNJ interview 1 (Nov. 6, 2003); PANYNJ interview 4 (May 10, 2004). For the repeater channel being in use in the South Tower, see Port Authority recording, WTC channel 30 (repeater channel), Sept. 11, 2001.

106. FDNY interview 15, Chief (Jan. 14, 2004); FDNY interview 4, Chief (Jan. 8, 2004); FDNY interview 5, Chief (Dec. 16, 2003). For the quotation, see Joseph Pfeifer testimony, May 18, 2004 (videotaped).

107. Peter Hayden testimony, May 18, 2004 (videotaped).

108. FDNY interview 15, Chief (Jan. 14, 2004); FDNY interview 4, Chief (Jan. 8, 2004); FDNY interview 5, Chief (Dec. 16, 2003).

109. On units ascending to the impact zone, see, e.g., FDNY interview 16, Battalion 1 (Jan. 20, 2004); FDNY interview 40, Battalion 4 (Feb. 12, 2004). On tasks below the impact zone, see FDNY interview 9, Battalion 8 (Jan. 9, 2004); FDNY interview, transcript 16, Battalion 31, Dec. 20, 2001. For rescuing civilians on the 22nd floor, see PANYNJ recognition 1, undated.

110. See FDNY interview 58, Division 3 (Apr. 22, 2004). For units using tactical 1, see FDNY interview 15, Chief (Jan. 14, 2004); FDNY interview 40, Battalion 4 (Feb. 12, 2004); FDNY interview 23, Chief (Jan. 23, 2004).

111. See FDNY interview 29, Battalion 1 (Jan. 29, 2004); FDNY interview 16, Battalion 1 (Jan. 20, 2004); Jules Naudet and Gedeon Naudet, video footage, Sept. 11, 2001. For equipment being carried, see ibid.

112. FDNY interview 38 , Battalion 4 (Feb. 11, 2004). For the working elevator, see FDNY interview 23, Chief (Jan. 23, 2004).

113. FDNY interview 38, Battalion 4 (Feb. 11, 2004); FDNY interview 25, Battalion 1 (Jan. 23, 2004); FDNY

interview 40, Battalion 4 (Feb. 12, 2004); FDNY interview 24, Battalion 6 (Jan. 23, 2004); FDNY interview 10, Battalion 1 (Jan. 12, 2004); FDNY interview 20, Battalion 6 (Jan. 22, 2004).

114. FDNY interview 23, Chief (Jan. 23, 2004); FDNY interview 30, Battalion 4 (Jan. 30, 2004); FDNY interview 13, Battalion 1 (Jan. 13, 2004); FDNY interview 29, Battalion 1 (Jan. 29, 2004); FDNY interview 26, Battalion 8 (Jan. 28, 2004).

115. FDNY interview 40, Battalion 4 (Feb. 12, 2004); FDNY interview 20, Battalion 6 (Jan. 22, 2004); FDNY interview 16, Battalion 1 (Jan. 20, 2004); FDNY interview 29, Battalion 1 (Jan. 29, 2004); FDNY interview 13, Battalion 1 (Jan. 13, 2004); NYPD interview 6, ESU (Feb. 19, 2004); FDNY interview 23, Chief (Jan. 23, 2004); FDNY interview 25, Battalion 1 (Jan. 23, 2004).

116. For the instruction to return to the lobby, see FDNY interview 5, Chief (Dec. 16, 2003); Jules Naudet and Gedeon Naudet video footage, Sept. 11, 2001. For the rumor being debunked, the other chief continuing operations, and no evidence of units returning, see Jules Naudet and Gedeon Naudet, video footage, Sept. 11, 2001; FDNY interview 15, Chief (Jan. 14, 2004). For the chief in lobby asked about helicopters, see FDNY interview, transcript 7, Chief, Oct. 23, 2001. For the rejection of helicopters, see Rudolph Giuliani interview (Apr. 20, 2004).

117. For the diminished communications, see FDNY interview 29, Battalion 1 (Jan. 29, 2004); FDNY interview, transcript 5, Battalion 6 (Oct. 12, 2001); FDNY interview 42, Field Comm (Feb. 13, 2004); Jules Naudet and Gedeon Naudet, video footage, Sept. 11, 2001; FDNY interview 15, Chief (Jan. 14, 2004); FDNY interview 5, Chief (Dec. 16, 2003). For lobby chiefs hearing nothing in response, see FDNY interview 15, Chief (Jan. 14, 2004); FDNY interview 5, Chief (Dec. 16, 2003).

118. For firefighters on the 54th floor, see NYPD interview 23, Intelligence (June 10, 2004). For firefighters on the 44th floor, see PAPD interview 7, WTC Command (Nov. 25, 2004). For firefighters between the 5th and 37th floors, see, e.g., FDNY interview 29, Battalion 1 (Jan. 29, 2004); FDNY interview 40, Battalion 4 (Feb. 12, 2004).

119. For their commencing operations, see Port Authority recording, WTC channel 30 (repeater channel), Sept. 11, 2001. For OEM field responder joining, see OEM interview 1 (Feb. 12, 2004). For units not rerouting to South Tower, see OEM interview 1 (Feb. 12, 2004); Port Authority recording, WTC channel 30 (repeater channel), Sept. 11, 2001; FDNY interview, transcript 4, Battalion 4, Oct. 9, 2001; FDNY interview, transcript 20, Battalion 10 (Jan. 10, 2001).

120. For the ladder company in stairwell B, see Port Authority recording, WTC channel 30 (repeater channel), Sept. 11, 2001. For the other ladder company, see OEM interview 1 (Feb. 12, 2004). For the senior chief's perspective, see Port Authority recording, WTC channel 30 (repeater channel), Sept. 11, 2001.

121. Port Authority recording, WTC channel 30 (repeater channel), Sept. 11, 2001.

122. For the chiefs' situational awareness, see Port Authority recording, WTC channel 30 (repeater channel), Sept. 11, 2001; FDNY interview 4, Chief (Jan. 8, 2004); FDNY 15, Chief (Jan. 14, 2004); FDNY interview 43, Chief (Mar. 3, 2004). For the senior chief's perspective, see Port Authority recording, WTC channel 30 (repeater channel), Sept. 11, 2001.

123. Port Authority recording, WTC channel 30 (repeater channel), Sept. 11, 2001. It is unknown whether the lobby chief ceased to communicate on the repeater channel because of technical problems or because he simply switched channels in order to be able to communicate with chiefs outside the South Tower. The FDNY strongly maintains that there must have been a technical problem resulting from the impact of one of the planes, because they do not believe this chief would have switched channels without first so advising on the repeater channel. FDNY letter to the Commission, July, 2, 2004. However, the repeater channel subsequently worked very well for FDNY personnel on the 78th floor and in an elevator on the 40th floor. Port Authority recording, WTC channel 30 (repeater channel), Sept. 11, 2001.

124. FDNY interview 37, Battalion 35 (Feb. 10, 2004); FDNY interview 2, Battalion 48 (Dec. 15, 2003); FDNY interview, transcript 11, Battalion 32, Dec. 12, 2001.

125. On the need for more companies, see FDNY interview 6, HQ (Jan. 8, 2004). For only two units being dispatched, see OEM interview 1 (Feb. 12, 2004); Port Authority recording, WTC channel 30 (repeater channel), Sept. 11, 2001; FDNY interview, transcript 4, Battalion 4, Oct. 9, 2001; FDNY interview, transcript 20, Battalion 10, Jan. 10, 2001. For the delayed dispatch, see FDNY records, computer-aided dispatch report, alarm box 8087, Sept. 11, 2001, 09:03:00–09:10:02. For units staged at the Brooklyn-Battery tunnel, see ibid., alarm box 1377, Sept. 11, 2001, 08:52:59–09:47:05. On units who parked and walked, see FDNY interview 46, Battalion 10 (Mar. 9, 2004); FDNY interview, transcript 24, Battalion 35, Jan. 25, 2002; FDNY interview, transcript 22, Battalion 7, Jan. 16, 2002. For confusion about the towers, see FDNY interview, transcript 8, Chief, Oct. 23, 2001; Port Authority recording, WTC channel 30 (repeater channel), Sept. 11, 2001. On the inability to find the staging area, see FDNY interview 2, Battalion 48 (Dec. 15, 2003); FDNY interview, transcript 17, Battalion 12, Dec. 20, 2001. On jumpers and debris, see FDNY interview 2, Battalion 48 (Dec. 15, 2003); FDNY interview 22, Battalion 28 (Jan. 22, 2004); FDNY interview 39, Battalion 35 (Feb. 11, 2004); FDNY interview, transcript 11, Battalion 32, Dec. 12, 2001; FDNY interview, transcript 15, Battalion 48, Dec. 13, 2001; FDNY interview, transcript 17, Battalion 12, Dec. 20, 2001.

126. For the chief's perspective, see FDNY interview 43, Chief (Mar. 3, 2004). For the four companies, see FDNY interview, transcript 13, Battalion 11, Dec. 12, 2001.

127. FDNY interview 43, Chief (Mar. 3, 2004). For finding working elevator in North Tower, see FDNY interview 53, Battalion 11 (Apr. 14, 2004).

128. For the second alarm, see FDNY interview 6, HQ (Jan. 8, 2004). For the other units, see FDNY records, computer-aided dispatch report, alarm box 1377, Sept. 11, 2001, 09:42:45–09:47:05. For some having gone through the tunnel and responded to the Marriott, see FDNY interview, transcript 15, Battalion 48, Dec. 13, 2001.

129. Port Authority recording, WTC channel 30 (repeater channel), Sept. 11, 2001.

130. FDNY interview 42, Field Comm (Feb. 13, 2004); FDNY interview 45, HQ (Mar. 8, 2004); FDNY interview 46, Battalion 10 (Mar. 9, 2004); FDNY interview 18, Chief (Jan. 22, 2004); FDNY interview 27, HQ (Jan. 28, 2004); FDNY interview 47, Chief (Mar. 11, 2004); OEM interview 6 (Mar. 24, 2004).

131. FDNY interview 42, Field Comm (Feb. 13, 2004).

132. Ibid.

133. FDNY interview 27, HQ (Jan. 28, 2004).

134. For no chief fearing a total collapse, see FDNY interview 45, HQ (Mar. 8, 2004); Thomas Von Essen interview (Apr. 7, 2004); FDNY interview 52, Chief (Apr. 5, 2004); FDNY interview 4, Chief (Jan. 8, 2004); FDNY interview 15, Chief (Jan. 14, 2004); FDNY interview 5, Chief (Dec. 16, 2003). For one chief's perspective, see FDNY interview 52, Chief (Apr. 5, 2004). For the opinion not being conveyed, see FDNY interview 4, Chief (Jan. 8, 2004); FDNY interview 15, Chief (Jan. 14, 2004); FDNY interview 5, Chief (Dec. 16, 2003).

135. FDNY interview 5, Chief (Dec. 16, 2003).

136. For the fifth alarm, see FDNY records, computer-aided dispatch report, alarm box 2033, Sept. 11, 2001, 09:54:29. On numbers dispatched, see ibid., Sept. 11, 2001, 08:47:20–09:54:29. For the paramedic, see FDNY interview 32, Chief (Feb. 9, 2004).

137. NYPD interview 8, HQ (Feb. 24, 2004). Each Level 4 mobilization fields about 1,000 officers.

138. NYPD interview 8, HQ (Feb. 24, 2004).

139. NYPD interview 15, ESU (Mar. 11, 2004); NYPD interview 18, ESU (Feb. 24, 2004).

140. For the ESU team's arrival in the North Tower and attempt to talk with the FDNY chiefs without OEM intervention, see Jules Naudet and Gedeon Naudet, video footage, Sept. 11, 2001; NYPD interview 5, ESU (Feb. 19, 2004); NYPD interview 6, ESU (Feb. 19, 2004). For the decision to have the ESU team ascend, see NYPD interview 15, ESU (Mar. 11, 2004); NYPD interview 18, ESU (Feb. 24, 2004). For the first ESU team in the South Tower checking in with the FDNY command post there, see OEM interview 1 (Feb. 12, 2004).

141. For the ESU teams' preparations and one team entering the South Tower, see NYPD interview 15, ESU (Mar. 11, 2004); NYPD interview 18, ESU (Feb. 24, 2004). For the fifth team's status at 9:59, see NYPD interview 15, ESU (Mar. 11, 2004); NYPD interview 18, ESU (Feb. 24, 2004); NYPD interview 7, ESU (Feb. 20, 2004). For the team at the North Tower, see NYPD interview 11, ESU (Mar. 9, 2004); NYPD interview 10, ESU (Mar. 1, 2004).

142. NYPD interview 6, ESU (Feb. 19, 2004).

143. New York City Police Museum interview of Kenneth Winkler, Apr. 17, 2003 (videotaped); NYPD interview 15, ESU (Mar. 11, 2004).

144. NYPD interview 22, Intelligence (June 10, 2004); NYPD interview 23, Intelligence (June 10, 2004); NYPD interview 24, Intelligence (June 15, 2004).

145. NYPD interview 20, Manhattan South Task Force (May 4, 2004); NYPD interview 21, 6th Precinct (May 4, 2004); NYPD interview 19, 13th Precinct (May 4, 2004); NYPD interview 4, Housing (Feb. 17, 2004); PAPD interview 4, Port Authority Bus Terminal Command (Nov. 20, 2003).

146. NYPD interview 19, 13th Precinct (May 4, 2004); NYPD interview 2, Transit (Jan. 2, 2004).

147. For the instructions to civilians, see NYPD interview 3, HQ (Jan. 15, 2004). For the officers at 5 WTC and the concourse, see NYPD memo, requests for departmental recognition 3 and 5, June 26, 2002; NYPD memo, request for departmental recognition 3, June 26, 2002. For officers in the South Tower, see NYPD memo, request for departmental recognition 6, June 26, 2002; NYPD memo, request for departmental recognition 4, June 26, 2002.

148. For the Chief of Department's instructions, see NYPD interview 8, HQ (Feb. 24, 2004). For the helicopter's perspective, see NYPD recordings, City Wide 1 and Special Operations Division radio channels, Sept. 11, 2001. For pilot's belief and the helicopter not hovering, see NYPD interview 12, Aviation (Mar. 10, 2004). For the other helicopter, see NYPD interview 16, Aviation (Apr. 1, 2004); NYPD interview 1, Aviation (Sept. 26, 2003).

149. For the warning, see NYPD recording, Special Operations Division radio channel, Sept. 11, 2001. For no pilot predicting a collapse, see, e.g., NYPD interview 12, Aviation (Mar. 10, 2004); NYPD interview 14, Aviation (Mar. 11, 2004).

150. For the 911 call, see Commission analysis of 911/PAPD calls. For the inaccurate conveyance, see NYPD report, McKinsey & Company, "NYPD Call-routing and Message Dispatch: Draft Summary Report," July 23, 2002.

151. For the initial responders and the assignments, see PAPD statement 3, WTC Command, Nov. 12, 2001; PAPD statement 12, WTC Command, Mar. 28, 2002. For officers assigned to rescue, see Port Authority transcripts

of recorded Port Authority calls and radio channels, Sept. 11, 2001, vol. II, channel W, p. 26. For others climbing toward the impact zone, see PAPD statement 4, Administration Command, Nov. 24, 2001.

152. For the PAPD Superintendent and inspector's ascent, see PAPD statement 3, WTC Command, Nov. 12, 2001. For the PAPD Chief's and officers' ascent, see PANYNJ statement 1, Feb. 1, 2002. For the calls to the PAPD desk, see Port Authority transcripts of recorded Port Authority calls and radio channels, Sept. 11, 2001, vol. II, channel 10, pp. 16–17.

153. For officers responding on their own initiative, see PAPD interview 8, JFK Command (Mar. 31, 2004); PAPD statement 11, WTC Command, Mar. 28, 2002. For the desk's instructions, see PAPD statement 10, Port Authority Bus Terminal Command, Mar. 20, 2002; PAPD interview 3, LaGuardia Command (Nov. 20, 2003). For formulating an ad hoc plan, see PAPD interview 3, LaGuardia Command (Nov. 20, 2003); PAPD statement 6, Port Authority Bus Terminal Command, Jan. 4, 2002. For poor situational awareness, see PAPD statement 7, Administrative Command, Jan. 6, 2002; PAPD interview 8, JFK Command (Mar. 31, 2004). For the lack of equipment, see PAPD interview 9, LaGuardia Command (Apr. 1, 2004); PAPD statement 13, Port Newark Command, Mar. 5, 2002.

154. On the PAPD officer reaching the 44th floor, see PAPD interview 7, WTC Command (Nov. 25, 2003). For the PAPD teams, see PAPD, statement 4, Administrative Command, Nov. 24, 2001; PAPD interview 1, WTC Command (Oct. 14, 2003). For the officers climbing, see PAPD statement 3, WTC Command, Nov. 12, 2001. For officers on the ground floors, see PAPD interview 4, Port Authority Bus Terminal Command (Nov. 20, 2003); PAPD interview 2, Holland Tunnel Command (Oct. 27, 2003); PAPD statement 2, WTC Command, Nov. 10, 2001.

155. On remaining in the bunker, see OEM interview 3 (Mar. 16, 2004). For the evacuation order, see OEM interview 4 (Mar. 18, 2004). On liaisons and OEM, see OEM interview 3 (Mar. 16, 2004). For field responders' placement, see OEM interview 6 (Mar. 24, 2004); OEM interview 1 (Feb. 12, 2004); Richard Sheirer interview (Apr. 7, 2004); OEM interview 7 (Mar. 31, 2004); FDNY interview, transcript 25, OEM, Oct. 17, 2001.

156. NIST report, "Progress Report on the Federal Building and Fire Safety Investigation of the WTC," June 18, 2004, appendix H, p. 40.

157. For information about 911 calls, see Commission analysis of 911/PAPD calls. For people alive on the 92nd and 79th floors, see ibid.; Civilian interview 5 (May 26, 2004). For civilians being assisted, see PAPD interview 4, Port Authority Bus Terminal Command (Nov. 6, 2004); NYPD interview 10, ESU (Mar. 1, 2004); FDNY interview, transcript 10, Battalion 2, Dec. 6, 2001. For injured civilians being assisted, see FDNY interview, transcript 10, Battalion 2, Dec. 6, 2001; FDNY interview 40, Battalion 4 (Feb. 12, 2004); PAPD interview 6, Lincoln Tunnel Command (Nov. 24, 2003).

158. For the overall command post, see FDNY interview 52, Chief (Apr. 5, 2004). For the North Tower lobby, see FDNY interview 4, Chief (Jan. 8, 2004). For South Tower staging, see FDNY interview 6, HQ (Jan. 8, 2004). For EMS staging areas, see FDNY interview 32, Chief (Feb. 9, 2004); FDNY interview 35, EMS (Feb. 10, 2004).

159. For situational awareness in North Tower lobby, see FDNY interview 15, Chief (Jan. 14, 2004). For overall command post, see FDNY interview 52, Chief (Apr. 5, 2004).

160. For the collapse's effect on the firefighters, see FDNY interview 29, Battalion 1 (Jan. 29, 2004); FDNY interview 40, Battalion 4 (Feb. 12, 2004); FDNY interview 25, Battalion 1 (Jan. 23, 2004); FDNY interview 24, Battalion 6 (Jan. 23, 2004); FDNY interview 23, Chief (Jan. 23, 2004); FDNY interview 16, Battalion 1 (Jan. 20, 2004). For the reaction of firefighters not facing the south, see FDNY interview 7, Battalion 4 (Jan. 9, 2004); FDNY interview 10, Battalion 1 (Jan. 12, 2004); FDNY interview 12, Battalion 4 (Jan. 13, 2004); FDNY interview 26, Battalion 8 (Jan. 28, 2004); FDNY interview 29, Battalion 1 (Jan. 29, 2004); FDNY interview 16, Battalion 1 (Jan. 20, 2004).

161. It is possible that the repeater channel satellite on the roof of 5 WTC was damaged or destroyed when the South Tower collapsed. That the repeater channel stopped recording transmissions at 9:59 does not mean transmissions no longer could be made on it.

162. For the FDNY boat radioing of the collapse, see FDNY recording, FDNY Manhattan Dispatch Channel, Sept. 11, 2001. For the van being abandoned, see FDNY interview 42, Field Comm (Feb. 13, 2004). For the order one minute after the collapse, see FDNY interview 4, Chief (Jan. 8, 2004); Jules Naudet and Gedeon Naudet, video footage, Sept. 11, 2001. For the subsequent order, see FDNY interview 40, Battalion 4 (Feb. 12, 2004).

163. For evacuation instructions, our analysis is based on more than 100 interviews we conducted and our review of 500 internal FDNY interview transcripts. For three firefighters hearing "imminent collapse," see FDNY interview, transcript 20, Battalion 10, Jan. 10, 2002; FDNY interview, transcript 23, Battalion 7, Jan. 21, 2002; FDNY interview, transcript 21, Battalion 8, Jan. 9, 2002.

164. For firefighters hearing orders over tactical 1, see, e.g., FDNY interview 40, Battalion 4 (Feb. 12, 2004); FDNY interview 29, Battalion 1 (Jan. 29, 2004). For one chief giving the instruction, see FDNY interview 23, Chief (Jan. 23, 2004).

165. For the chief on the 35th floor and the first instruction, see FDNY interview 23, Chief (Jan. 23, 2004). For the chief on the 23rd floor, see FDNY interview 29, Battalion 1 (Jan. 29, 2004); FDNY interview 16, Battalion 1 (Jan. 20, 2004). For the chief on the 35th floor hearing of the South Tower collapse and taking subsequent

action, see FDNY interview 23, Chief (Jan. 23, 2004). For firefighters beginning to evacuate because of these chiefs, see, e.g., FDNY interview 16, Battalion 1 (Jan. 20, 2004); FDNY interview, transcript 9, Battalion 6, Dec. 5, 2001.

166. For radios not working in high-rise environments, see FDNY interview 9, Battalion 8 (Jan. 9, 2004); FDNY interview 13, Battalion 1 (Jan. 13, 2004). For tactical 1 being overburdened, see FDNY interview 16, Battalion 1 (Jan. 20, 2004). For the quotation, see FDNY interview, transcript 9, Battalion 6, Dec. 5, 2001.

167. For off-duty firefighters in the North Tower, see NYPD interview 6, ESU (Feb. 19, 2004); FDNY interview 24, Battalion 6 (Jan. 23, 2004). For firefighters dispatched to the South Tower, see FDNY interview 53, Battalion 11 (Apr. 14, 2004); FDNY interview, transcript 20, Battalion 10, Jan. 10, 2001.

168. For units stopping or delaying evacuation to help, see FDNY interview 40, Battalion 4 (Feb. 12, 2004); FDNY interview 59, Battalion 2 (Apr. 22, 2004); FDNY interview, transcript 3, Battalion 2, Oct. 9, 2001; FDNY interview, transcript 5, Battalion 6, Oct. 12, 2001. For companies first trying to regroup, see FDNY interview, transcript 3, Battalion 2, Oct. 9, 2001; FDNY interview, transcript 4, Battalion 4, Oct. 9, 2001. For the lack of urgency, see FDNY interview 57, SOC (Apr. 15, 2004); FDNY interview 25, Battalion 1 (Jan. 23, 2004); FDNY interview 16, Battalion 1(Jan. 20, 2004); FDNY interview, transcript 9, Battalion 6, Dec. 5, 2001; FDNY interview, transcript 4, Battalion 4, Oct. 9, 2001; FDNY interview, transcript 3, Battalion 2, Oct. 9, 2001. For the belief that urgency would have increased on learning of the South Tower's collapse, see FDNY interview, transcript 9, Battalion 6, Dec. 5, 2001; FDNY interview, transcript 5, Battalion 6, Oct. 12, 2001. For firefighters sitting and not evacuating, see FDNY interview 16, Battalion 1 (Jan. 20, 2004); NY State Court interview 1 (June 22, 2004). For firefighters not leaving while others remained and convincing others to stay with them, see FDNY interview, transcript 4, Battalion 4, Oct. 9, 2001; FDNY interview 57, SOC (Apr. 15, 2004).

169. FDNY interview 57, SOC (Apr. 15, 2004); FDNY interview 55, Battalion 8 (Apr. 15, 2004); FDNY interview, transcript 9, Battalion 6, Dec. 5, 2001; FDNY interview 59, Battalion 2 (Apr. 22, 2004); FDNY interview 10, Battalion 1 (Jan. 12, 2004); FDNY interview 7, Battalion 4 (Jan. 9, 2004); FDNY interview 13, Battalion 1 (Jan. 13, 2004); FDNY interview 23, Chief (Jan. 23, 2004); FDNY interview 26, Battalion 8 (Jan. 28, 2004); FDNY interview 12, Battalion 4 (Jan. 13, 2004).

170. FDNY interview 59, Battalion 2 (Apr. 22, 2004).

171. For hotel's damage, see Jules Naudet and Gedeon Naudet, video footage, Sept. 11, 2001. For individuals in the lobby, see FDNY interview 43, Chief (Mar. 3, 2004); FDNY interview 36, Chief (Feb. 10, 2004); FDNY interview 1, Chief (Mar. 26, 2004). On assisting the civilians, see FDNY interview 43, Chief (Mar. 3, 2004). For the line of 20 men and the 4 survivors, see FDNY interview, transcript 13, Battalion 11, Dec. 12, 2001.

172. For the two companies and their actions, see FDNY interview 22, Battalion 28 (Jan. 22, 2004); FDNY interview 37, Battalion 35 (Feb. 10, 2004); FDNY interview 39, Battalion 35 (Feb. 11, 2004); FDNY interview 41, Battalion 35 (Feb. 12, 2004); FDNY interview, transcript 12, Battalion 35, Dec. 12, 2001. For the PAPD having cleared the area, see PAPD statement 3, WTC command, Nov. 12, 2001. For FDNY personnel checking the area afterward, see FDNY interview, transcript 12, Battalion 35, Dec. 12, 2001.

173. For the senior leaders confirming the collapse, and the Chief of Department issuing a radio order, see FDNY interview 52, Chief (Apr. 5, 2004). For his ordering the post's relocation and two companies to respond, see FDNY interview 45, HQ (Mar. 8, 2004).

174. For the chiefs' delay in learning of the collapse, see FDNY interview 4, Chief (Jan. 8, 2004); FDNY interview 56, Chief (Apr. 23, 2004). On one chief's view of the North Tower, see FDNY interview 51 (Apr. 2, 2004); FDNY interview 36, Chief (Feb. 10, 2004).

175. For firefighters' actions after the collapse, see FDNY interview 49, Chief (Mar. 17, 2004); FDNY interview 52, Chief (Apr. 5, 2004); FDNY interview 36, Chief (Feb. 10, 2004); FDNY interview 45, HQ (Mar. 8, 2004); FDNY interview 51 (Apr. 2, 2004); FDNY interview 22, Battalion 28 (Jan. 22, 2004); FDNY interview 1, Chief (Mar. 26, 2004); FDNY interview, transcript 1, Battalion 7, Jan. 28, 2001; FDNY interview, transcript 12, Battalion 35, Dec. 12, 2001. For some not knowing about the collapse but others knowing and remaining to help, see FDNY interview 49, Chief (Mar. 17, 2004); FDNY interview 52, Chief (Apr. 5, 2004); FDNY interview 36, Chief (Feb. 10, 2004); FDNY interview 45, HQ (Mar. 8, 2004). For the quotation, see FDNY interview 49, Chief (Mar. 17, 2004). For the firefighter directing those exiting, see FDNY interview 29, Battalion 1 (Jan. 29, 2004); FDNY interview 24, Battalion 6 (Jan. 23, 2004). For the using a bullhorn, see FDNY interview 52, Chief (Apr. 5, 2004). For the three senior members' actions, see FDNY interview 51 (Apr. 2, 2004).

176. NYPD recordings, City Wide 1 and Special Operations Division radio channels, Sept. 11, 2001; see also NYPD interview 12, Aviation (Mar. 10, 2004); NYPD interview 14, Aviation (Mar. 11, 2004); NYPD interview 13, Aviation (Mar. 10, 2004); NYPD interview 16, Aviation (Apr. 1, 2004).

177. NYPD recordings, City Wide 1, Special Operations Division, and Divisions 1, 2, and 3 radio channels, Sept. 11, 2001; NPYD interview 15, ESU (Mar. 11, 2004); NYPD interview 18, ESU (Feb. 24, 2004).

178. For the ESU teams' situational awareness, see, e.g., NYPD interview 5, ESU (Feb. 19, 2004); NYPD interview 6, ESU (Feb. 19, 2004). For the evacuation order, see NYPD interview 15, ESU (Mar. 11, 2004); NYPD interview 18, ESU (Feb. 24, 2004).

179. For the message being clearly heard, see, e.g., NYPD interview 5, ESU (Feb. 19, 2004); NYPD interview

6, ESU (Feb. 19, 2004). For the subsequent exchange, see NYPD interview 6, ESU (Feb. 19, 2004); NYPD interview 5, ESU (Feb. 19, 2004); NYPD interview 15, ESU (Mar. 11, 2004); NYPD interview 18, ESU (Feb. 24, 2004).

180. For the ESU team's perspective, see NYPD interview 5, ESU (Feb. 19, 2004); NYPD interview 6, ESU (Feb. 19, 2004). For a firefighter stating he would not take instructions from the NYPD, see FDNY interview 38, Battalion 4 (Feb. 11, 2004). For a firefighter alleging that ESU officers passed him without sharing evacuation instruction, see FDNY interview 57, SOC (Apr. 15, 2004). A member of the only ESU team that this firefighter could have encountered above the 11th floor states that his team did share its evacuation instruction with firefighters it encountered. NYPD interview 6, ESU (Feb. 19, 2004).

181. NYPD interview 11, ESU (Mar. 9, 2004); NYPD interview 10, ESU (Mar. 1, 2004).

182. NYPD interview 7, ESU (Feb. 20, 2004); NYPD interview 15, ESU (Mar. 11, 2004); NYPD interview 18, ESU (Feb. 24, 2004).

183. NYPD interview 22, Intelligence (June 10, 2004); NYPD interview 23, Intelligence (June 10, 2004); NYPD interview 24, Intelligence (June 15, 2004).

184. NYPD interview 20, Manhattan South Task Force (May 4, 2004); NYPD interview 21, 6th Precinct (May 4, 2004); NYPD interview 4, Housing (Feb. 17, 2004); PAPD interview 4, Port Authority Bus Terminal Command (Nov. 20, 2003).

185. For officers being in the concourse, see NYPD recordings, City Wide 1, Special Operations Division, and Divisions 1, 2, and 3 radio channels, Sept. 11, 2001. For the survivors' actions, see NYPD memo, requests for departmental recognition 3, 4, 5 and 6, June 26, 2002; NYPD interview 19, 13th Precinct (May 4, 2004); NYPD interview 2, Transit (Jan. 2, 2004).

186. For the collapse's effect, see PAPD interview 3, LaGuardia Command (Nov. 20, 2003). For officers not receiving the evacuation order, see PAPD interview 7, WTC Command (Nov. 25, 2003); PAPD interview 5, Lincoln Tunnel Command (Nov. 24, 2003). For officers deciding to evacuate, see PAPD interview 10, GW Bridge Command (Sept. 25, 2003); PAPD statement 5, Lincoln Tunnel Command (Dec. 10, 2001). For officers slowing their descent, see PAPD interview 10, GW Bridge Command (Sept. 25, 2003).

187. For the North Tower collapsing at 10:28:25, see NIST report, "Progress Report on the Federal Building and Fire Safety Investigation of the WTC," June 18, 2004, appendix H, p. 40. For those in stairwell B who survived the North Tower's collapse, see FDNY report, Division 3 report on operations on Sept. 11, 2001, undated; Dennis Cauchon and Martha Moore, "Miracles Emerge from Debris," *USA Today*, Sept. 6, 2002, p. A1.

188. According to the number of death certificates issued by the New York City Medical Examiner's Office, the WTC attacks killed 2,749 nonterrorists, including nonterrorist occupants of the hijacked aircraft. New York City Office of the Chief Medical Examiner report, "WTC Victim List," undated (as of July 9, 2004). The Pentagon attack killed 184 nonterrorists, including the occupants of the hijacked aircraft. FBI report, list of Pentagon victims, undated (as of July 9, 2004). Forty nonterrorists died in the crash of United Airlines Flight 93 in Pennsylvania. FBI report, list of Flight 93 victims, undated (as of July 9, 2004). Our conclusion that these first responder death totals were the largest in U.S. history is based on our inability to find contrary evidence. For FDNY fatalities, see FDNY report, September 11 tribute, undated (online at www.ci.nyc.ny.us/html/fdny/media/tribute/tribute.html). For PAPD fatalities, see PAPD report, "In Memoriam," undated (online at www.panynj.gov/AboutthePortAuthority /PortAuthorityPolice/InMemoriam/). For NYPD fatalities, see NYPD report, "NYPD Memorial: 2001 Heroes," undated (online at www.ci.nyc.ny.us/html/nypd/html/memorial_01.html).

189. Rudolph Giuliani interview (Apr. 20, 2004); OEM interview 3 (Mar. 16, 2004); Richard Sheirer interview (Apr. 7, 2004); Thomas Von Essen interview (Apr. 7, 2004); Bernard Kerik interview (Apr. 6, 2004).

190. The Incident Command System (ICS) is a formalized management structure for command, control, and coordination during an emergency response. ICS provides a means to coordinate the efforts of individual agencies as they work toward the three main priorities of most emergencies—life safety, incident stability, and property/environment conservation. Within ICS, incident command is organized into five major components: the command function, the planning section, the operations section, the logistics section, and the finance/administration section. When multiple agencies or jurisdictions are involved in a response, ICS provides for and can evolve into a unified command, with a decisionmaker from each key agency represented at the incident command level. For the system being used on 9/11, see, e.g., Arlington County, Virginia, report, Titan Systems Corp., "Arlington County: After-Action Report on the Response to the September 11 Terrorist Attack on the Pentagon," 2002, pp. 11, A-20–A-21.

191. Grant C. Peterson, "Introduction: Arlington County and the After-Action Report," July 28, 2003 (presented at conference in Arlington, Va., "Local Response to Terrorism: Lessons Learned from the 9/11 Attack on the Pentagon").

192. For the death toll, see FBI report, list of Pentagon victims, undated. For patient care and victim disposition, see Arlington County, "After-Action Report," pp. B-1, B-12–B-15.

193. For reasons the response was mainly a success, see Arlington County, "After-Action Report," pp. 11–12; Edward Plaugher interview (Oct. 16, 2003). For preparations for the International Monetary Fund and the World

Bank meetings, see "Washington Is Seeking Support to Handle Protests at 2 Meetings," *New York Times*, Aug. 18, 2001, p. A8; Arlington County, "After-Action Report," pp. 12, A-4, C-26.

194. For a list of the response agencies, see James Schwartz and Christopher Combs, "Incident Command, Joint Operations Center and Incident Communications," July 28, 2003 (presented at conference in Arlington, Va., "Local Response to Terrorism: Lessons Learned from the 9/11 Attack on the Pentagon"). When the Bureau of Alcohol, Tobacco, and Firearms moved from the Department of the Treasury to the Department of Justice after 9/11 in connection with the creation of DHS, it was renamed the Bureau of Alcohol, Tobacco, Firearms and Explosives (still abbreviated ATF); see ATF press release, "ATF Moves to the Department of Justice," Jan. 24, 2003.

195. For the establishment of incident command on September 11, see Arlington County, "After-Action Report," appendix 1, p. 1-1; Schwartz and Combs, "Incident Command."

196. Arlington County, "After-Action Report," appendix 1, p. 1-1. Other sources put the time of the partial collapse as late as 10:14. See Edward P. Plaugher, "Fire & EMS," July 28, 2003 (presented at conference in Arlington, Va., "Local Response to Terrorism: Lessons Learned from the 9/11 Attack on the Pentagon").

197. Ibid., pp. A-30–A-31.

198. Edward A. Flynn, "Law Enforcement," July 28, 2003 (presented at conference in Arlington, Va., on "Local Response to Terrorism: Lessons Learned from the 9/11 Attack on the Pentagon").

199. Arlington County, "After-Action Report," pp. 12–13.

200. For the estimate, see NIST report, "WTC Investigation Progress," June 22–23, 2004. For the updated death certificate information, see New York City report, "WTC Victim List," June 21, 2004. The analysis in this paragraph is based upon the following sources: CNN, "September 11: A Memorial," updated 2004 (online at www.cnn.com/SPECIALS/2001/memorial/index.html); company contacts, June 29, 2004 (online at http://worldtradeaftermath.com/wta/contacts/companies_list.asp?letter=a); CNN, WTC tenants, 2001 (online at www.cnn.com/SPECIALS/2001/trade.center/tenants1.html); September 11 personal tributes, June 19, 2004 (online at www.legacy.com/LegacyTribute/Sept11.asp); September 11 personal profiles, Oct. 11, 2003 (online at www.september11victims.com/september11Victims); *New York Times*, *Portraits: 9/11/01: The Collected "Portraits of Grief"* (Times Books, 2002). It is possible that a person who worked above the impact zone had not yet reached his or her office and was killed below the impact zone, either by falling debris, by the fireballs that exploded into the lobby, or by being trapped in an elevator. Individuals below the impact zone may have been killed for the same reasons. Individuals may also have been killed while in the process of evacuating.

201. Ironically, had the towers remained up longer, scores more first responders would have died. Twenty-six additional FDNY companies—more than 150 firefighters—were en route at the time of the South Tower's collapse, and scores more PAPD officers on Church and Vesey were preparing to enter the towers.

202. The "advisory" announcement directed by protocol (without the expanded instruction for occupants to return to their floors) would have given greater leeway to those who judged, based on a firsthand awareness of conditions on their floors (e.g., some could feel heat from North Tower explosion), that evacuation was warranted. In retrospect, occupants would only have had to reach a point below the 77th floor to be safe.

203. Appended to the directive was a list of different types of emergencies with designated Incident Commanders. Terrorist incidents were subdivided according to the types of attack. Conventional weapons and bomb threats were assigned to the NYPD, while chemical, biological, and nuclear attacks designated "NYPD or FDNY" as the Incident Commander. The directive noted: "The handling of a threat of a chemical or biological release or the use of conventional weapons falls to the NYPD. Dealing with the consequences of the explosion or release is the responsibility of the FDNY. The investigation that follows, once the consequences of the event have been mitigated, is the responsibility of the NYPD. Any conflicts regarding the issue of Command at these incidents will be resolved by OEM." New York City memo, Office of the Mayor, "Direction and Control of Emergencies in the City of New York," July 2001.

204. For the NYPD clearing lanes, see, e.g., FDNY interview 43, Chief (Mar. 3, 2004).

205. For the Mayor and Police Commissioner's consultation with the FDNY Chief of Department, see Rudolph Giuliani interview (Apr. 20, 2004).

206. The FDNY's lack of command and control had some unintended positive consequences. One battalion chief was dispatched to the South Tower but instead responded to the North Tower, where he was instrumental in saving many lives after the South Tower collapsed. Some FDNY units dispatched to the South Tower—where they would have perished—instead were mistakenly sent to the North Tower and in many cases survived.

207. For the FDNY addressing these issues, see generally FDNY report, McKinsey & Company, "FDNY Report," Aug. 19, 2002; Peter Hayden interview (Jan. 14, 2004). For the PAPD not changing standard operating procedures or training, see PAPD regulations, "Manual of Police Division Instructions," undated (in existence before and after 9/11); Barry Pickard interview (Nov. 24, 2003).

208. One instance in which the FDNY/NYPD rivalry may have had an impact on the total fatalities was the alleged failure of ESU officers descending past at least two firefighters after 9:59 in the North Tower to share their evacuation instructions. It should be noted, however, that at least one firefighter has conceded that he, too, descended past other stationary firefighters without telling them to evacuate. In addition, according to one of the ESU offi-

cers and one of the firefighters in the North Tower, at least some FDNY personnel were unwilling to take evacuation orders from police that morning.

209. Based on more than 100 interviews we conducted and our review of 500 internal FDNY interview transcripts, we conclude that out of these 32 companies, all on-duty members of 19 companies are likely to have known to evacuate (Engine Companies 1, 4, 7, 9, 15, 16, 21, 24, 28, 33, 39, and 65; Ladder Companies 1, 5, 6, 8, 9, 110; and Rescue 1). We also conclude that at least some members of each of five companies knew to evacuate (two firefighters from Ladder Company 10; the officer of Ladder Company 20; all but the officer of Engine Company 10; at least two firefighters from Squad 18; and at least three firefighters from Engine 6). We do not know whether members of the eight other companies knew to evacuate (Engine Companies 55, 207, and 226; Rescue 2, 3, and 4; Hazmat 1; and Squad 1) because they all died, and we have come across no on-point eyewitness accounts related to their operations. It is very possible that at least some of these firefighters did hear the evacuation order but nevertheless failed to evacuate in the only 29-minute period between the collapse of the two towers. In addition, it is possible that several of the eight companies for which we have no record of their receiving evacuation instructions were in the South Tower and thus died in its earlier collapse.

210. Eric Lipton, "A New Weapon for Firefighters," *New York Times*, May 30, 2004, p. 27.

## 10 Wartime

1. All times are Eastern Daylight Time. Sometime around 10:30, after the decision had already been made not to return to Washington, a reported threat to "Angel"—the code word for Air Force One—was widely disseminated in the Presidential Emergency Operations Center (PEOC) and aboard Air Force One. Notes from the morning indicate that Vice President Cheney informed President Bush in a phone conversation shortly after 10:30 that an anonymous threat had been phoned into the White House that was viewed as credible. At about the same time, news of the threat was conveyed on the air threat conference call.

The Secret Service's Intelligence Division tracked down the origin of this threat and, during the day, determined that it had originated in a misunderstanding by a watch officer in the White House Situation Room. The director of the White House Situation Room that day disputes this account. But the Intelligence Division had the primary job of running down the story, and we found their witnesses on this point to be credible. During the afternoon of September 11 the leadership of the Secret Service was satisfied that the reported threat to "Angel" was unfounded.

At the White House press briefing on September 12, spokesperson Ari Fleischer described the threat to Air Force One as "real and credible." White House transcript, Press Briefing by Ari Fleischer, Sept. 12, 2001 (online at www.whitehouse.gov/news/releases/2001/09/print/20010912-8.html). Fleischer told us he cited the information in good faith. Indeed, Fleischer had conferred with Vice President Cheney and Karen Hughes before the briefing, and they had decided to let people know about the threat, all of them believing it was true. According to Fleischer, only weeks later did he learn—from press reports—that the threat was unfounded. We have not found any evidence that contradicts his account. Ari Fleischer interview (Apr. 22, 2004); Chuck Green interview (Mar. 10, 2004); Deborah Loewer meeting (Feb. 6, 2004); Ralph Sigler meeting (May 10, 2004); Andrew Card meeting (Mar. 31, 2004); Edward Marinzel interview (Apr. 21, 2004); Secret Service briefing (Jan. 29, 2004).

2. Edward Marinzel interview (Apr. 21, 2004); USSS memo, interview with Edward Marinzel, Oct. 3, 2001; President Bush and Vice President Cheney meeting (Apr. 29, 2004); Ari Fleischer interview (Apr. 22, 2004); Deborah Loewer meeting (Feb. 6, 2004); White House record, PEOC Watch Log, Sept. 11, 2001.

3. Commission analysis of Air Force One radar data; Edward Marinzel interview (Apr. 21, 2004); USSS memo, interview with Edward Marinzel, Oct. 3, 2001; Deborah Loewer meeting (Feb. 6, 2004).

4. White House record, Situation Room Communications Log, Sept. 11, 2001.

5. White House transcript, Rice interview with Bob Woodward of the *Washington Post*, Oct. 24, 2001, p. 367. In the interview, Rice also said the President characterized the war as "global in nature." Ibid.

6. See White House transcript, Rice interview with Scott Pelley of CBS, Aug. 2, 2002, p. 408; but see Rice's statement to Bob Woodward: "In the first video conference, the assumption that everybody kind of shared was that it was global terrorists. . . . I don't believe anybody said this is likely al Qaeda. I don't think so." White House transcript, Rice interview with Bob Woodward, Oct. 24, 2001, p. 367.

7. NSC memo, Summary of Conclusions of Deputies Committee Meeting (held by secure teleconference), Sept. 11, 2001.

8. The Secretary's decision was broadcast on the air threat conference call at 10:43. A minute later, Secretary Rumsfeld spoke to the Vice President, and he asked Rumsfeld to run the issue by the President. At 10:45 conferees were told to "hold off" on Defcon 3, but a minute later the order was reinstated. Rumsfeld believed the matter was urgent and, having consulted DOD directives, concluded he had the authority to issue the order and would brief the President. Rumsfeld briefed the President on the decision at 11:15. See DOD transcript, Air Threat Conference Call, Sept. 11, 2001; Stephen Cambone interviews (July 8, 2004; July 12, 2004); DOD notes, Stephen Cambone notes, Sept. 11, 2001.

9. The 9/11 crisis tested the U.S. government's plans and capabilities to ensure the continuity of constitutional government and the continuity of government operations. We did not investigate this topic, except as needed in order to understand the activities and communications of key officials on 9/11. The Chair, Vice Chair, and senior staff were briefed on the general nature and implementation of these continuity plans.

10. White House transcript, Statement by the President in His Address to the Nation, Sept. 11, 2001 (online at www.whitehouse.gov/news/releases/2001/09/20010911-16.html).

11. White House transcript, Rice interview with Bob Woodward, Oct. 24, 2001, p. 371.

12. Joshua Bolten meeting (Mar. 18, 2004); see also Steven Brill, *After: How America Confronted the September 12 Era* (Simon & Schuster, 2003), pp. 50–51.

13. The collapse of the World Trade Center towers on the morning of September 11 coated Lower Manhattan with a thick layer of dust from the debris and fire. For days a plume of smoke rose from the site. Between September 11 and September 21, 2001, EPA issued five press releases regarding air quality in Lower Manhattan. A release on September 16 quoted the claim of the assistant secretary for labor at OSHA that tests show "it is safe for New Yorkers to go back to work in New York's financial district." (OSHA's responsibility extends only to indoor air quality for workers, however.) The most controversial press release, on September 18, quoted EPA Administrator Christine Whitman as saying that the air was "safe" to breathe. This statement was issued the day after the financial markets reopened. The EPA Office of Inspector General investigated the issuance of these press releases and concluded that the agency did not have enough data about the range of possible pollutants other than asbestos to make a judgment, lacked public health benchmarks for appropriate levels of asbestos and other pollutants, and had imprecise methods for sampling asbestos in the air; it also noted that more than 25 percent of the bulk dust samples collected before September 18 showed the presence of asbestos above the agency's 1 percent benchmark. EPA Inspector General report, "EPA's Response to the World Trade Center Collapse: Challenges, Successes, and Areas for Improvement," Aug. 21, 2003.

We do not have the expertise to examine the scientific accuracy of the pronouncements in the press releases. The issue is the subject of pending civil litigation.

We did examine whether the White House improperly influenced the content of the press releases so that they would intentionally mislead the public. The EPA press releases were coordinated with Samuel Thernstrom, associate director for communications at the White House Council on Environmental Quality. Oral reports, interviews with EPA officials, and materials on the EPA's Web site were not coordinated through the White House. Although the White House review process resulted in some editorial changes to the press releases, these changes were consistent with what the EPA had already been saying without White House clearance. See, e.g., David France and Erika Check, "Asbestos Alert; How much of the chemical does the World Trade Center wreckage contain?" *Newsweek Web Exclusive*, Sept. 14, 2001 (quoting EPA Administrator Whitman as saying the air quality is not a health problem); Andrew C. Revkin, "After the Attacks: The Chemicals; Monitors Say Health Risk From Smoke Is Very Small," *New York Times*, Sept. 14, 2001, p. A6 (EPA says levels of airborne asbestos below threshold of concern); Hugo Kugiya, "Terrorist Attacks; Asbestos Targeted in Cleanup Effort; EPA's Whitman: 'No reason for concern,'" *Newsday*, Sept. 16, 2001, p. W31 (Whitman says there is no reason for concern given EPA tests for asbestos). There were disputes between the EPA's communications person and the White House coordinator regarding the press releases. The EPA communications person said she felt extreme pressure from the White House coordinator, and felt that they were no longer her press releases. EPA Inspector General interview of Tina Kreisher, Aug. 28, 2002. The White House coordinator, however, told us that these disputes were solely concerned with process, not the actual substance of the releases. Samuel Thernstrom interview (Mar. 31, 2004). Former EPA administrator Christine Whitman agreed with the White House coordinator. Christine Whitman interview (June 28, 2004) The documentary evidence supports this claim. Although Whitman told us she spoke with White House senior economic adviser Lawrence Lindsey regarding the need to get the financial markets open quickly, she denied he pressured her to declare the air was safe due to economic expediency. We found no evidence of pressure on EPA to say the air was safe in order to permit the markets to reopen. Moreover, the most controversial release that specifically declared the air safe to breathe was released after the markets had already reopened.

The EPA did not have the health-based benchmarks needed to assess the extraordinary air quality conditions in Lower Manhattan after 9/11. The EPA and the White House therefore improvised and applied standards developed for other circumstances in order to make pronouncements regarding air safety, advising workers at Ground Zero to use protective gear and advising the general population that the air was safe. Whether those improvisations were appropriate is still a subject for medical and scientific debate. See EPA Inspector General report, "EPA's Response to the World Trade Center Collapse," Aug. 21, 2003, pp. 9–19.

14. Brill, *After*, pp. 47–50.

15. We studied this episode and interviewed many of the participants. The NYSE, Amex, and Nasdaq have developed plans for coordination and cooperation in the event of a disaster affecting one or all of them, but these plans do not include other exchanges or international components. The White House efforts during the crisis were coordinated by the President's Working Group on Financial Markets, a group created in the 1980s.

16. Brill, *After*, pp. 53–55, 89–91. Following interim reports in 1999 and 2000, a congressional commission

chaired by former senators Gary Hart and Warren Rudman, and directed by retired general Charles Boyd, had, in January 2001, recommended the creation of a cabinet department dedicated to "homeland security." In May 2001, President Bush named Vice President Cheney to head a task force on problems of national preparedness. His recently hired coordinator, Admiral Steven Abbot, had started work just before the 9/11 attack.

17. Ashcroft told us that he established a "hold until cleared" policy because of the high rate of flight from deportation proceedings. John Ashcroft testimony, Apr. 13, 2004. For closure of hearings and secrecy of the detainee names, see DOJ email, Chief Immigration Judge Michael Creppy to all immigration judges, "Cases requiring special procedures," Sept. 21, 2001. This policy has been challenged in two U.S. courts of appeals. The Sixth Circuit held that there is a constitutional right of public access to these hearings; the Third Circuit reached the opposite result. The Supreme Court has not yet decided to resolve this "circuit split." See *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002); *North Jersey Media Group, Inc. v. Ashcroft*, 308 F.3d 198 (3d Cir. 2002), *cert. denied*, 123 S.Ct. 2215 (2003). For the length of the clearance process, see DOJ Inspector General report, "The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks," Apr. 2003, p. 51.

18. DOJ Inspector General report, "The September 11 Detainees," Apr. 2003, pp. 142–150, 195–197.

19. John Ashcroft testimony, Apr. 13, 2004; DOJ record, "Special Interest Cases," Sept. 16, 2003. These numbers do not add up to 768 because we have not included all categories. Some of those remanded to the Marshals Service were held as material witnesses, and individuals were released "on bond" only after they were "cleared" by the FBI of any connection to 9/11. For the response to our questions about the 9/11 detainee program, see DOJ emails, Daniel Levin to the Commission, July 9, 2004; July 13, 2004. There is one exception to the statement in the text that the detainees were lawfully held on immigration charges; one detainee was held for a short time "despite the fact that there was no valid immigration charge." DOJ Inspector General report, "The September 11 Detainees," Apr. 2003, p. 15, n. 22. See also Khaled Medhat Abou El Fadl testimony, Dec. 8, 2003.

20. Intelligence report, interrogation of KSM, May 10, 2003.

21. The complete title of the Act is Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Pub. L. No. 107-56, 115 Stat. 273 (signed into law Oct. 26, 2001).

22. John Ashcroft interview (Dec. 17, 2003).

23. On the early development of the Patriot Act, see, e.g., Brill, *After*, pp. 73–76, 120–125.

24. During the morning of September 11, the FAA suspended all nonemergency air activity in the national airspace. While the national airspace was closed, decisions to allow aircraft to fly were made by the FAA working with the Department of Defense, Department of State, U.S. Secret Service, and the FBI. The Department of Transportation reopened the national airspace to U.S. carriers effective 11:00 A.M. on September 13, 2001, for flights out of or into airports that had implemented the FAA's new security requirements. See FAA response to Commission questions for the record, June 8, 2004.

25. After the airspace reopened, nine chartered flights with 160 people, mostly Saudi nationals, departed from the United States between September 14 and 24. In addition, one Saudi government flight, containing the Saudi deputy defense minister and other members of an official Saudi delegation, departed Newark Airport on September 14. Every airport involved in these Saudi flights was open when the flight departed, and no inappropriate actions were taken to allow those flights to depart. See City of St. Louis Airport Authority, Lambert–St. Louis International Airport response to Commission questions for the record, May 27, 2004; Los Angeles International Airport response to Commission questions for the record, June 2, 2004; Greater Orlando Aviation Authority, Orlando International Airport response to Commission questions for the record, June 8, 2004; Metropolitan Washington Airports Authority, Washington Dulles International Airport response to Commission questions for the record, June 8, 2004; Port Authority of New York and New Jersey, JFK Airport response to Commission questions for the record, June 4, 2004; Massachusetts Port Authority, Logan International Airport, and Hanscom Airfield response to Commission questions for the record, June 17, 2004; Las Vegas–McCarran International Airport response to Commission questions for the record, June 22, 2004; Port Authority of New York and New Jersey, Newark Airport response to supplemental question for the record, July 9, 2004.

Another particular allegation is that a flight carrying Saudi nationals from Tampa, Florida, to Lexington, Kentucky, was allowed to fly while airspace was closed, with special approval by senior U.S. government officials. On September 13, Tampa police brought three young Saudis they were protecting on an off-duty security detail to the airport so they could get on a plane to Lexington. Tampa police arranged for two private investigators to provide security on the flight. They boarded a chartered Learjet. Dan Grossi interview (May 24, 2004); Manuel Perez interview (May 27, 2004); John Solomon interview (June 4, 2004); Michael Fendle interview (June 4, 2004). The plane took off at 4:37 P.M., after national airspace was open, more than five hours after the Tampa airport had reopened, and after other flights had arrived at and departed from that airport. Hillsborough County Aviation Authority, Tampa International Airport response to Commission questions for the record, June 7, 2004. The plane's pilot told us there was "nothing unusual whatsoever" about the flight other than there were few airplanes in the sky. The company's owner and director of operations agreed, saying that "it was just a routine little trip for us" and that he would have

heard if there had been anything unusual about it. The pilot said he followed standard procedures and filed his flight plan with the FAA prior to the flight, adding, "I was never questioned about it." Christopher Steele interview (June 14, 2004); Barry Ellis interview (June 14, 2004). FAA records confirm this account. FAA supplemental response to Commission questions for the record, June 8, 2004. When the plane arrived at Lexington Blue Grass Airport, that airport had also been open for more than five hours. Lexington-Fayette Urban County Airport Board, Blue Grass Airport response to Commission questions for the record, June 8, 2004. The three Saudi nationals debarked from the plane and were met by local police. Their private security guards were paid, and the police then escorted the three Saudi passengers to a hotel where they joined relatives already in Lexington. Mark Barnard interview (June 7, 2004). The FBI is alleged to have had no record of the flight and denied that it occurred, hence contributing to the story of a "phantom flight." This is another misunderstanding. The FBI was initially misinformed about how the Saudis got to Lexington by a local police officer in Lexington who did not have firsthand knowledge of the matter. The Bureau subsequently learned about the flight. James M. interview (June 18, 2004).

26. Richard Clarke interview (Jan. 12, 2004).

27. Andrew Card meeting (Mar. 31, 2004); President Bush and Vice President Cheney meeting (Apr. 29, 2004); Condoleezza Rice meeting (Feb. 7, 2004); Prince Bandar interview (May 5, 2004); Richard Clarke interview (Jan. 12, 2004); Richard Clarke testimony, Mar. 24, 2004 ("I would love to be able to tell you who did it, who brought this proposal to me, but I don't know"). Instead, the matter was handled as follows. Within days of September 11, fearing reprisals against Saudi nationals, Rihab Massoud, the deputy chief of mission at the Saudi embassy in Washington, D.C., called Dale Watson, the FBI's assistant director for counterterrorism, and asked for help in getting some of its citizens out of the country. Rihab Massoud interview (May 11, 2004). At about the same time, Michael Rolince, chief of the FBI's international terrorism operations section, also heard from an FBI official in Newark about a proposed flight of Saudis out of the country. Michael Rolince interview (June 9, 2004). We believe this was the Saudi deputy defense minister's flight. Rolince says he told the Newark official that the Saudis should not be allowed to leave without having the names on their passports matched to their faces, and their names run through FBI case records to see whether they had surfaced before. Rolince and Watson briefed Robert Mueller, the director of the FBI, about the issue and how they were handling it. The State Department played a role as well in flights involving government officials or members of the royal family. State coordinated with the FBI and FAA to allow screening by the FBI of flights with Saudi nationals on board. There is no evidence that State tried to limit the screening. DOS record, Log of USA 9-11 Terrorist Attack Task Force, Sept. 13, 2001; Jack S. interview (June 14, 2004). The FBI effectively approved the Saudi flights at the level of a section chief. Having an opportunity to check the Saudis was useful to the FBI. This was because the U.S. government did not, and does not, routinely run checks on foreigners who are *leaving* the United States. This procedure was convenient to the FBI, as the Saudis who wished to leave in this way would gather and present themselves for record checks and interviews, an opportunity that would not be available if they simply left on regularly scheduled commercial flights.

28. These flights were screened by law enforcement officials, primarily the FBI. For example, one flight, the so-called Bin Ladin flight, departed the United States on September 20 with 26 passengers, most of them relatives of Usama Bin Ladin. Screening of this flight was directed by an FBI agent in the Baltimore Field Office who was also a pilot. This agent, coordinating with FBI headquarters, sent an electronic communication to each of the field offices through which the Bin Ladin flight was scheduled to pass, including the proposed flight manifest and directing what screening should occur. He also monitored the flight as it moved around the country—from St. Louis to Los Angeles to Orlando to Washington Dulles, and to Boston Logan—correcting for any changes in itinerary to make sure there was no lapse in FBI screening at these locations. Again, each of the airports through which the Bin Ladin flight passed was open, and no special restrictions were lifted to accommodate its passage. James C. interview (June 3, 2004).

The Bin Ladin flight and other flights we examined were screened in accordance with policies set by FBI headquarters and coordinated through working-level interagency processes. Michael Rolince interview (June 9, 2004). Although most of the passengers were not interviewed, 22 of the 26 people on the Bin Ladin flight were interviewed by the FBI. Many were asked detailed questions. None of the passengers stated that they had any recent contact with Usama Bin Ladin or knew anything about terrorist activity. See, e.g., FBI report of investigation, interview of Mohammed Saleh Bin Laden, Sept. 21, 2001. As Richard Clarke noted, long before 9/11 the FBI was following members of the Bin Ladin family in the United States closely. Richard Clarke testimony, Mar. 24, 2004. Two of the passengers on this flight had been the subjects of preliminary investigations by the FBI, but both their cases had been closed, in 1999 and March 2001, respectively, because the FBI had uncovered no derogatory information on either person linking them to terrorist activity. Their cases remained closed as of 9/11, were not reopened before they departed the country on this flight, and have not been reopened since. FBI electronic communication, Summary of Information Regarding Flights taken by Saudi Citizens Out of the U.S. Shortly After September 11, 2001, Oct. 29, 2003, pp. 9–10.

29. Michael Rolince interview (June 9, 2004). Massoud corroborates this account. He said the FBI required the names and personal information of all departing passengers sponsored for departure by the Saudi Embassy. Rihab Massoud interview (May 11, 2004).

30. Jack S. interview (June 14, 2004).

31. The FBI checked a variety of databases for information on the Bin Ladin flight passengers and searched the aircraft. Because it was not clear to us whether the TIPOFF terrorist watchlist was checked by the FBI, the Terrorist Screening Center checked the names of individuals on the flight manifests of six Saudi flights against the current TIPOFF watchlist at our request prior to our hearing in April 2004. There were no matches. At our request, based on additional information, the Terrorist Screening Center in June and July 2004 rechecked the names of individuals believed to be on these six flights, the names of individuals on three more charter flights, the names of individuals on the flight containing the Saudi Deputy Defense Minister, and the names of Saudi nationals on commercial flights that journalists have alleged are suspect. There were no matches. Tim D. interviews (Apr. 12, 2004; June 30, 2004; July 9, 2004); FBI memo, Terrorist Screening Center to Director's Office, "Request by 9/11 Commission Task Force to screen the airline passenger lists through the TDSB and TIPOFF databases," Mar. 30, 2004.

32. White House transcript, Vice President Cheney interview with Charlie Gibson of ABC, Sept. 4, 2002, p. 11.

33. "The only . . . true advice I receive is from our war council." White House transcript, President Bush interview with Bob Woodward and Dan Balz of the *Washington Post*, Dec. 20, 2001.

34. On Secretary Rumsfeld's remarks, see White House transcript, President Bush interview with Bob Woodward and Dan Balz, Dec. 20, 2001. The President's adviser, Karen Hughes, who was in the interview, listed the points Rumsfeld made at the smaller NSC meeting. Ibid.

35. On the President's tasking in the earlier meeting held that day, see NSC memo, Summary of Conclusions for NSC Meeting Held on September 12, 2001, Dec. 17, 2001. On the paper that went beyond al Qaeda, see NSC memo, Deputies Draft Paper (attached to Agenda for NSC Meeting Scheduled for Sept. 12, 2001). The Summary of Conclusions for the afternoon meeting indicates that the paper was discussed.

On giving priority to preventing terrorists from acquiring weapons of mass destruction, see White House transcript, Hadley interview with Dan Balz and Bob Woodward, Jan. 11, 2002, p. 535.

36. NSC memo, Summary of Conclusions for Principals Committee Meeting Held on September 13, 2001. In addition to the usual members of President Bush's war cabinet, Secretary of Transportation Mineta and FAA security chief Canavan also attended.

37. DOS cable, State 158711, "Deputy Secretary Armitage's Meeting with General Mahmud: Actions and Support Expected of Pakistan in Fight Against Terrorism," Sept. 14, 2001. On September 14, 2001, the U.S. Embassy in Islamabad sent Musharraf's answer to the State Department by cable.

38. DOS cable, Islamabad 5123, "Musharraf Accepts the Seven Points," Sept. 14, 2001.

39. NSC memo, Summary of Conclusions of NSC Meeting Held on September 13, 2001. According to the Summary of Conclusions, this meeting of the President and his advisers took place in the White House Situation Room; however, the agenda alerting agencies to the meeting specified that it would be conducted via the secure video teleconference system (SVTS). Thus, it is unclear whether the attendees met face-to-face at the White House or held their meeting remotely via SVTS.

40. State Department memo, "Gameplan for Polmil Strategy for Pakistan and Afghanistan," Sept. 14, 2001 (tasked by President Bush). The paper was sent to the White House on September 14, 2001. The demand to free all imprisoned foreigners reflected the U.S. government's concern about the welfare of several foreign aid workers in Afghanistan who had been imprisoned by the Taliban in August 2001. Two young American women, Heather Mercer and Dayna Curry of the organization "Shelter Now International," were among those arrested and charged with promoting Christianity. The Taliban and other Islamists found their activities an affront to Islam and in violation of Afghanistan's laws and the regime's tenets. Wendy Chamberlin interview (Oct. 28, 2003). Powell stated that the President wanted to get the hostages out but that desire would not restrain American action. White House transcript, President Bush interview with Bob Woodward and Dan Balz, Dec. 20, 2001.

41. State Department memo, "Gameplan for Polmil Strategy for Pakistan and Afghanistan," Sept. 14, 2001.

42. White House transcript, President Bush interview with Bob Woodward and Dan Balz, Dec. 20, 2001.

43. Stephen Hadley meeting (Jan. 31, 2004). Hadley told us that the White House was not satisfied with the Defense Department's plans to use force in Afghanistan after 9/11. Ibid.; see also White House transcript, Rice interview with John King of CNN, Aug. 2, 2002, p. 421.

44. Tommy Franks interview (Apr. 9, 2004).

45. NSC memo, Hadley to recipients, "Discussion Paper for NSC meeting at Camp David on 14 September," Sept. 14, 2001.

46. CIA memo, "Going to War," Sept. 15, 2001.

47. White House transcript, President Bush interview with Bob Woodward and Dan Balz, Dec. 20, 2001.

48. DOD briefing materials, "Evolution of Infinite Resolve Planning (AQ, UBL)," undated (provided to the Commission on Mar. 19, 2004). According to Deputy National Security Advisor Stephen Hadley, the President responded to Shelton by saying that the boots-on-the-ground option was an interesting idea. He wanted to know what the CIA would do when ground forces were in Afghanistan. White House transcript, Hadley interview with Dan Balz and Bob Woodward, Jan. 11, 2002, p. 545.

49. NSC memo, "Conclusions of National Security Council Meeting," Sept. 17, 2001; White House transcript, President Bush interview with Bob Woodward and Dan Balz, Dec. 20, 2001.

50. NSC memo, "Conclusions of National Security Council Meeting," Sept. 17, 2001.

51. See NSC memo, Rice to Cheney, Powell, O'Neill, Rumsfeld, Ashcroft, Gonzales, Card, Tenet, and Shelton, Sept. 16, 2001.

52. NSC memo, "Conclusions of National Security Council Meeting," Sept. 17, 2001.

53. NSC memo, Summary of Conclusions of Terrorist Fund-raising Meeting Held on September 18, 2001.

54. DOS briefing materials, "Fact Sheet on Response to Terrorist Attacks in US," Sept. 17, 2001.

55. DOS cable, State 161279, "Deputy Secretary Armitage–Mamoud Phone Call," Sept. 18, 2001.

56. White House transcript, Vice President Cheney interview with Dan Balz and Bob Woodward, Jan. 18, 2002, pp. 7–8.

57. Stephen Hadley meeting (Jan. 31, 2004).

58. See National Security Presidential Directive 9, Oct. 25, 2001.

59. President Bush and Vice President Cheney meeting (Apr. 29, 2004). On Iran, see Condoleezza Rice testimony, Apr. 8, 2004.

60. Richard A. Clarke, *Against All Enemies: Inside America's War on Terror* (Free Press, 2004), p. 32. According to Clarke, he responded that "al Qaeda did this." When the President pressed Clarke to check if Saddam was involved and said that he wanted to learn of any shred of evidence, Clarke promised to look at the question again, but added that the NSC and the intelligence community had looked in the past for linkages between al Qaeda and Iraq and never found any real linkages. Ibid.

61. President Bush told us that Clarke had mischaracterized this exchange. On the evening of September 12, the President was at the Pentagon and then went to the White House residence. He dismissed the idea that he had been wandering around the Situation Room alone, saying, "I don't do that." He said that he did not think that any president would roam around looking for something to do. While Clarke said he had found the President's tone "very intimidating," ("Clarke's Take on Terror," CBSnews.com, Mar. 21, 2004, online at www.cbsnews.com/stories /2004/03/19/60minutes/printable607356.shtml), President Bush doubted that anyone would have found his manner intimidating. President Bush and Vice President Cheney meeting (Apr. 29, 2004). Roger Cressey, Clarke's deputy, recalls this exchange with the President and Clarke concerning Iraq shortly after 9/11, but did not believe the President's manner was intimidating. Roger Cressey interview (June 23, 2004).

62. NSC memo, Kurtz to Rice, Survey of Intelligence Information on any Iraq Involvement in the September 11 Attacks, Sept. 18, 2001. On *60 Minutes* (CBS, Mar. 21, 2004), Clarke said that the first draft of this memo was returned by the NSC Front Office because it did not find a tie between Iraq and al Qaeda; Rice and Hadley deny that they asked to have the memo redone for this reason.

63. See DOD notes, Victoria Clarke notes, Sept. 11, 2001; DOD notes, Stephen Cambone notes, Sept. 11, 2001. Cambone's notes indicate this exchange took place at 2:40 P.M. on September 11, 2001. Steven Cambone interview (July 15, 2004).

64. Condoleezza Rice meeting (Feb. 7, 2004). For an account of Rumsfeld's and Wolfowitz's position on Iraq, see Bob Woodward, *Bush at War* (Simon & Schuster, 2002), pp. 83–84. Rice told us that the *Bush at War* account of the Camp David discussions on Iraq accorded with her memory.

65. DOD memo, Office of the Under Secretary of Defense for Policy, "War on Terrorism: Strategic Concept," Sept. 14, 2001.

66. Colin Powell interview (Jan. 21, 2004). Rumsfeld told Bob Woodward that he had no recollection of Wolfowitz's remarks at Camp David. DOD transcript, "Secretary Rumsfeld Interview with the Washington Post," Jan. 9, 2002 (online at www.defenselink.mil/transcripts/2002/t02052002_t0109wp.html).

67. Colin Powell interview (Jan. 21, 2004). Powell raised concerns that a focus on Iraq might negate progress made with the international coalition the administration was putting together for Afghanistan. Taking on Iraq at this time could destroy the international coalition. Ibid.

68. Colin Powell interview (Jan. 21, 2004).

69. White House transcript, President Bush interview with Bob Woodward and Dan Balz, Dec. 20, 2001.

70. Condoleezza Rice meeting (Feb. 7, 2004).

71. NSC memo, "Conclusions of National Security Council Meeting," Sept. 17, 2001.

72. Condoleezza Rice testimony, Apr. 8, 2004; see also Bob Woodward, *Plan of Attack* (Simon & Schuster, 2004), p. 22.

73. DOD memo, Wolfowitz to Rumsfeld, "Preventing More Events," Sept. 17, 2001. We review contacts between Iraq and al Qaeda in chapter 2. We have found no credible evidence to support theories of Iraqi government involvement in the 1993 WTC bombing. Wolfowitz added in his memo that he had attempted in June to get the CIA to explore these theories.

74. DOD memo, Wolfowitz to Rumsfeld, "Were We Asleep?" Sept. 18, 2001.

75. DOD memo, Rumsfeld to Shelton, "Some Thoughts for CINCs as They Prepare Plans," Sept. 19, 2001. In a memo that appears to be from Under Secretary of Defense Douglas Feith to Rumsfeld, dated September 20, the author expressed disappointment at the limited options immediately available in Afghanistan and the lack of ground options. The author suggested instead hitting terrorists outside the Middle East in the initial offensive, perhaps delib-

erately selecting a non–al Qaeda target like Iraq. Since U.S. attacks were expected in Afghanistan, an American attack in South America or Southeast Asia might be a surprise to the terrorists. The memo may have been a draft never sent to Rumsfeld, or may be a draft of points being suggested for Rumsfeld to deliver in a briefing to the President. DOD memo, Feith to Rumsfeld, "Briefing Draft," Sept. 20, 2001.

76. Hugh Shelton interview (Feb. 5, 2004).

77. Tommy Franks interview (Apr. 9, 2004).

78. NSC memo, memorandum of conversation from meeting of President Bush with Prime Minister Blair, Sept. 20, 2001.

79. Tommy Franks interview (Apr. 9, 2004).

80. White House transcript, President Bush's Address to a Joint Session of Congress and the American People, Sept. 20, 2001. British Prime Minister Tony Blair attended the session.

81. Ibid. Several NSC officials, including Clarke and Cressey, told us that the mention of the *Cole* in the speech to Congress marked the first public U.S. declaration that al Qaeda had been behind the October 2000 attack. Clarke said he added the language on this point to the speech. Richard Clarke interview (Feb. 3, 2004); Roger Cressey interview (Dec. 15, 2003).

82. White House transcript, President Bush's Address to a Joint Session of Congress and the American People, Sept. 20, 2001. President Bush told the *Washington Post* that he considered having Powell deliver the ultimatum to the Taliban, but determined it would have more impact coming directly from the president. White House transcript, President Bush interview with Bob Woodward and Dan Balz, Dec. 20, 2001.

83. White House transcript, President Bush's Address to a Joint Session of Congress and the American People, Sept. 20, 2001.

84. Ibid.

85. Tommy Franks interview (Apr. 9, 2004). Vice Chairman of the Joint Chiefs of Staff Richard Myers and Major General Del Dailey, commander of Joint Special Operations Command, also attended the September 21 meeting. The meeting was in direct response to the President's September 17 instruction to Rumsfeld to develop a military campaign plan for Afghanistan. The original "Infinite Justice" name was a continuation of a series of names begun in August 1998 with Operation Infinite Reach, the air strikes against Bin Ladin's facilities in Afghanistan and Sudan after the embassy bombings. The series also included Operation Infinite Resolve, a variety of proposed follow-on strikes on al Qaeda targets in Afghanistan.

86. DOD Special Operations Command and Central Command briefings (Sept. 15–16, 2003; Apr. 8–9, 2004; Apr. 28, 2004); Tommy Franks interview (Apr. 9, 2004). On death of Atef, see Daniel Benjamin and Steven Simon, *Age of Sacred Terror*, p. 349; Henry, "The CIA in Afghanistan, 2001–2002," *Studies in Intelligence* (classified version), vol. 47, no. 2 (2003), pp. 1, 11. See Donald Rumsfeld testimony, Mar. 23, 2004 (nearly two-thirds of the known leaders of al Qaeda had been killed or captured).

## 11 Foresight—and Hindsight

1. Roberta Wohlstetter, *Pearl Harbor: Warning and Decision* (Stanford Univ. Press, 1962), p. 387.

2. Intelligence Community analytic report, "The Foreign Terrorist Threat in the United States," NIE 95-13, July 1995, pp. v, vii–viii, 10–11, 13, 18.

3. Intelligence Community analytic report, "The Foreign Terrorist Threat in the US: Revisiting Our 1995 Estimate," ICB 97-8, Apr. 1997, p. 1.

4. For Bin Ladin being mentioned in only two other sentences, see ibid.

5. Titles are drawn from articles in the National Intelligence Daily and the Senior Executive Intelligence Brief.

6. John McLaughlin interview (Jan. 21, 2004).

7. Ibid.; Pattie Kindsvater interview (Sept. 12, 2003).

8. Tim Weiner, "U.S. Hard Put to Find Proof Bin Laden Directed Attacks," *New York Times*, Apr. 13, 1999, p. A1.

9. Paul R. Pillar, *Terrorism and U.S. Foreign Policy* (Brookings Institution Press, 2001), p. 23; see also ibid., pp. 5, 21–22.

10. For a concise statement of the role of the national estimate process, see Task force sponsored by the Council on Foreign Relations, *Making Intelligence Smarter: The Future of U.S. Intelligence* (Council on Foreign Relations, 1996), pp. 34–35 (additional views of Richard Betts).

11. Waldo Heinrichs, *Threshold of War: Franklin D. Roosevelt and American Entry into World War II* (Oxford Univ. Press, 1988), p. 215.

12. For the response being routine, see Gordon Prange, *At Dawn We Slept: The Untold Story of Pearl Harbor* (McGraw-Hill, 1981), pp. 732–733. For a brief summary of these routines and the reasons why the intercepts were not properly digested, see Graham Allison and Philip Zelikow, *Essence of Decision*, 2d ed. (Longman, 1999), p. 194, n. 72.

13. PDBs were not routinely briefed to congressional leaders, though this item could have been in some other intelligence briefing. It was not circulated in the NID or SEIB. For the September 1998 report, see Intelligence report, "Terrorism: Possible Attack on a U.S. City," Sept. 8, 1998.

14. For the August report, see Intelligence report, "Terrorism: Alleged Threat by Arab Terrorists to Attack the World Trade Center in New York," Aug. 12, 1998. An FAA civil aviation security official believed the plan was improbable because Libyan planes were required to operate within airspace limitations and the Libyans did not possess aircraft with the necessary range to make good on the threat. Jack S. interview (June 13, 2004). On September 30, 1999, the FAA closed the file on the August report after investigation could not corroborate the report, and the source's credibility was deemed suspect. FAA report, Transportation Security Intelligence ICF Report 980162, undated; but see FAA/TSA rebuttal to the Joint Inquiry's Sept. 18, 2002, staff statement, undated, p. 1 (stating that the FAA did not formally analyze this threat). The Algerian hijackers had placed explosives in key areas of the cabin. However, there was some speculation in the media based on reports from a passenger aboard the plane that the hijackers had discussed crashing it into the Eiffel Tower. FAA report, FAA Intelligence Case File 94-305, undated.

15. For Murad's idea, see chapter 5, note 33.

16. For Clarke's involvement in the 1996 Olympics, see Richard Clarke interview (Dec. 18, 2003). For the 1998 exercise, see Chuck Green interview (Apr. 21, 2004); NSC briefing paper, Nov. 10, 1998.

17. For the report of the National Transportation Safety Board, see NTSB report, "Aircraft Accident Brief," Mar. 13, 2002 (online at www.ntsb.gov/Publictn/2002/aab0201.htm). For the early 2000 CSG discussion, see NSC note, CSG SVTS agenda, Jan. 31, 2000.

18. Richard Clarke testimony, Mar. 24, 2004.

19. FAA memo, Office of Civil Aviation Security Intelligence, "Usama Bin Ladin/World Islamic Front Hijacking Threat," Intelligence Note 99-06, Aug. 4, 1999, pp. 5–6.

20. Ibid.

21. As part of his 34-page analysis, the attorney explained why he thought that a fueled Boeing 747, used as a weapon, "must be considered capable of destroying virtually any building located anywhere in the world." DOJ memo, Robert D. to Cathleen C., "Aerial Intercepts and Shoot-downs: Ambiguities of Law and Practical Considerations," Mar. 30, 2000, p. 10. Also, in February 1974, a man named Samuel Byck attempted to commandeer a plane at Baltimore Washington International Airport with the intention of forcing the pilots to fly into Washington and crash into the White House to kill the president. The man was shot by police and then killed himself on the aircraft while it was still on the ground at the airport.

22. For NORAD's hypothesis of aircraft as weapons, see, e.g., Ralph Eberhardt interview (Mar. 1, 2004). For the 2001 Positive Force 01 exercise, see DOD briefing (Apr. 29, 2004); Tom Cecil and Mark Postgate interview (June 7, 2004).

23. For the Gates report's recommendations, see DCI task force report, "Improving Intelligence Warning," May 29, 1992. For strengthening of the warning official, see DCI memo, "Warning," July 17, 1992. For the recommendations languishing, see Charles Allen interview (Sept. 22, 2003). For CTC having responsibility for warning, see Robert Vickers interview (Sept. 17, 2003). For the Board's warnings, see, e.g., Community Counterterrorism Board report, "Intelligence Community Terrorist Threat Advisory: Bin Ladin Orchestrating Possible Anti-US Attacks," June 30, 2000.

24. CIA briefing materials, "DCI Update," Aug. 23, 2001.

25. James Pavitt interview (Jan. 8, 2004). For more on this meeting, see Condoleezza Rice meeting (Feb. 7, 2004); George Tenet interview (Jan. 28, 2004).

26. For the briefing to the President-elect, see James Pavitt interview (Jan. 8, 2004). The CIA's formal analysis of what would happen if Bin Ladin alone was removed as compared with the importance of shutting down the sanctuary was offered in several places. See, e.g., CIA analytic report, "Likely Impact of Taliban Actions Against Al Qaeda," Feb. 21, 2001 (provided as background for Tenet meetings with Rice on Feb. 23 and Mar. 7, 2001).

27. Richard Clarke testimony, Mar. 24, 2004.

28. Mike interview (Dec. 11, 2003) (reading from CIA email, Mike to Winston Wiley, Aug. 27, 1997).

29. For President Bush's statement of al Qaeda's responsibility for the *Cole* attack, see White House transcript, "Address to a Joint Session of Congress and the American People," Sept. 20, 2001 (online at www.whitehouse.gov/news/releases/2001/09/20010920-8.html).

30. For Pavitt's view, see James Pavitt interview (Jan. 8, 2004).

31. Hugh Shelton interview (Feb. 5, 2004). Zinni was concerned about excessive collateral damage caused by Tomahawk strikes. See Anthony Zinni interview (Jan. 29, 2004).

32. For Shelton's view, see Hugh Shelton interview (Feb. 5, 2004). For Cohen's view, see William Cohen interview (Feb. 5, 2004).

33. Russell Honore interview (Oct. 29, 2003).

34. James Pavitt interview (Jan. 8, 2004).

35. Ibid.

36. Cofer Black interview (Dec. 9, 2003).

37. Rich interview (Dec. 11, 2003).

38. CIA memo, Tenet to Gordon and others, "Usama Bin Ladin," Dec. 4, 1998, p. 2.

39. See, e.g., Joan Dempsey interview (Nov. 12, 2003); Jeff B. interview (Dec. 11, 2003); Louis Andre interview

(Nov. 10, 2003); Mary C. interview (Oct. 25, 2003); Maureen Baginski interview (Nov. 15, 2003); Thomas Wilson interview (Dec. 4, 2003). Assistant DCI Charles Allen did redouble his efforts to coordinate and improve collection at the tactical level, but this was not a plan to address larger weaknesses in the fundamental capabilities of the intelligence community. See Charles Allen interview (Sept. 22, 2003).

40. For Dempsey's action, see Joan Dempsey interview (Nov. 12, 2003). For Minihan's view, see Joint Inquiry interview of Kenneth Minihan, Sept. 12, 2002. For the CIA viewing the memorandum as intended for non-CIA intelligence agencies, see Dave Carey interview (Oct. 31, 2003).

41. George Tenet interview (Jan. 22, 2004); James Pavitt interview (Jan. 8, 2004).

42. For the *New York Times* article about the Jordanian arrests, see Reuters, "Jordan Seizes 13 and Links Them to Afghan Explosives Training," *New York Times*, Dec. 16, 1999, p. A13. For the Ressam story being on the front page, see, e.g., Sam Howe Verhovek with Tim Weiner, "Man Seized with Bomb Parts at Border Spurs U.S. Inquiry," *New York Times*, Dec. 18, 1999, p. A1. For television coverage, see Vanderbilt University Television News Archive, Dec. 13, 22–31, 1999.

## 12 What to Do? A Global Strategy

1. For spending totals, see David Baumann, "Accounting for the Deficit," *National Journal*, June 12, 2004, p. 1852 (combining categories for defense discretionary, homeland security, and international affairs).

2. White House press release, "National Strategy for Combating Terrorism," Feb. 2003 (online at www.whitehouse.gov/news/releases/2003/02/20030214-7.html).

3. "Islamist terrorism is an immediate derivative of *Islamism*. This term distinguishes itself from *Islamic* by the fact that the latter refers to a religion and culture in existence over a millennium, whereas the first is a political/religious phenomenon linked to the great events of the 20th century. Furthermore Islamists define themselves as 'Islamiyyoun/Islamists' precisely to differentiate themselves from 'Muslimun/Muslims.' . . . Islamism is defined as 'an Islamic militant, anti-democratic movement, bearing a holistic vision of Islam whose final aim is the restoration of the caliphate.'" Mehdi Mozaffari, "Bin Laden and Islamist Terrorism," *Militaert Tidsskrift*, vol. 131 (Mar. 2002), p. 1 (online at www.mirkflem.pup.blueyonder.co.uk/pdf/islamistterrorism.pdf). The Islamist movement, born about 1940, is a product of the modern world, influenced by Marxist-Leninist concepts about revolutionary organization. "Islamists consider Islam to be as much a religion as an 'ideology,' a neologism which they introduced and which remains anathema to the ulamas (the clerical scholars)." Olivier Roy, *The Failure of Political Islam*, trans. Carol Volk (Harvard Univ. Press, 1994), p. 3. Facing political limits by the end of the 1990s, the extremist wing of the Islamist movement "rejected the democratic references invoked by the moderates; and as a result, raw terrorism in its most spectacular and destructive form became its main option for reviving armed struggle in the new millennium." Gilles Kepel, *Jihad: The Trail of Political Islam*, trans. Anthony Roberts (Harvard Univ. Press, 2002), p. 14.

4. Opening the Islamic Conference of Muslim leaders from around the world on October 16, 2003, then Malaysian prime minister Mahathir Mohamad said: "Today we, the whole Muslim *ummah* [community of believers] are treated with contempt and dishonour. Our religion is denigrated. Our holy places desecrated. Our countries are occupied. Our people are starved and killed. None of our countries are truly independent. We are under pressure to conform to our oppressors' wishes about how we should behave, how we should govern our lands, how we should think even." He added: "There is a feeling of hopelessness among the Muslim countries and their people. They feel that they can do nothing right. They believe that things can only get worse. The Muslims will forever be oppressed and dominated by the Europeans and Jews." The prime minister's argument was that the Muslims should gather their assets, not striking back blindly, but instead planning a thoughtful, long-term strategy to defeat their worldwide enemies, which he argued were controlled by the Jews. "But today the Jews rule the world by proxy. They get others to fight and die for them." Speech at the Opening of the Tenth Session of the Islamic Summit Conference, Oct. 16, 2003 (online at www.oicsummit2003.0rg.my/speech_03.php).

5. CIA map, "Possible Remote Havens for Terrorist and Other Illicit Activity," May 2003.

6. For the numbers, see Tariq interview (Oct. 20, 2003).

7. For Pakistan playing a key role in apprehending 500 terrorists, see Richard Armitage testimony, Mar. 23, 2004.

8. For Pakistan's unpoliced areas, see Tasneem Noorani interview (Oct. 27, 2003).

9. Pakistanis and Afghanis interviews (Oct. 2003); DOD Special Operations Command and Central Command briefings (Sept. 15–16, 2004); U.S. intelligence official interview (July 9, 2004).

10. Pervez Musharraf, "A Plea for Enlightened Moderation: Muslims Must Raise Themselves Up Through Individual Achievement and Socioeconomic Emancipation," *Washington Post*, June 1, 2004, p. A23.

11. For a review of ISAF's role, see NATO report, "NATO in Afghanistan," updated July 9, 2004 (online at www.nato.int/issues/afghanistan).

12. United States Institute of Peace report, "Establishing the Rule of Law in Afghanistan," Mar. 2004, pp. 1–3 (online at www.usip.org/pubs/specialreports/sr117.html).

13. For the change, see Lakhdar Brahimi interview (Oct. 24, 2003); U.S. officials in Afghanistan interview (Oct.

2003). For the request that the United States remain, see Kandahar province local leaders interview (Oct. 21, 2003). For the effect of the United States leaving, see Karim Khalili interview (Oct. 23, 2003).

14. Some have criticized the Bush administration for neglecting Afghanistan because of Iraq. Others, including General Franks, say that the size of the U.S. military commitment in Afghanistan has not been compromised by the commitments in Iraq. We have not investigated the issue and cannot offer a judgment on it.

15. Even if the U.S. forces, stretched thin, are reluctant to take on this role, "a limited, but extremely useful, change in the military mandate would involve intelligence sharing with civilian law enforcement and a willingness to take action against drug warehouses and heroin laboratories." United States Institute of Peace report, "Establishing the Rule of Law in Afghanistan," Mar. 2004, p. 17.

16. For barriers to Saudi monitoring of charities, see, e.g., Robert Jordan interview (Jan. 14, 2004); David Aufhauser interview (Feb. 12, 2004).

17. For the Saudi reformer's view, see Members of *majlis al-shura* interview (Oct. 14, 2003).

18. Neil MacFarquhar, "Saudis Support a Jihad in Iraq, Not Back Home," *New York Times,* Apr. 23, 2004, p. A1.

19. Prince Bandar Bin Sultan, "A Diplomat's Call for War," *Washington Post*, June 6, 2004, p. B4 (translation of original in *Al-Watan,* June 2, 2004).

20. President Clinton meeting (Apr. 8, 2004).

21. For Jordan's initiatives, see testimony of William Burns before the Subcommittee on the Middle East and Central Asia of the House International Relations Committee, Mar. 19, 2003 (online at www.house.gov /international_relations/108/burn0319.htm). For the report, see United Nations Development Programme report, *Arab Human Development Report 2003: Building a Knowledge Society* (United Nations, 2003) (online at www.miftah.org/Doc/Reports/Englishcomplete2003.pdf).

22. DOD memo, Rumsfeld to Myers, Wolfowitz, Pace, and Feith, "Global War on Terrorism," Oct. 16, 2003 (online at www.usatoday.com/news/washington/executive/rumsfeld-memo.htm).

23. For the statistics, see James Zogby, *What Arabs Think: Values, Beliefs, and Concerns* (Zogby International, 2002). For fear of a U.S. attack, see Pew Global Attitudes Project report, *Views of a Changing World: June 2003* (Pew Research Center for the People and the Press, 2003), p. 2. In our interviews, current and former U.S. officials dealing with the Middle East corroborated these findings.

24. For polling soon after 9/11, see Pew Research Center for the People and the Press report, "America Admired, Yet Its New Vulnerability Seen as Good Thing, Say Opinion Leaders; Little Support for Expanding War on Terrorism" (online at http://people-press.org/reports/print.php3?ReportID=145). For the quotation, see Pew Global Attitudes Project report, "War With Iraq Further Divides Global Publics But World Embraces Democratic Values and Free Markets," June 3, 2003 (online at www.pewtrusts.com/ideas/ideas_item.cfm?content_ item_id=1645&content_type_id=7).

25. For the Occidentalist "creed of Islamist revolutionaries," see, e.g., Avishai Margalit and Ian Buruma, *Occidentalism: The West in the Eyes of Its Enemies* (Penguin Press, 2004).

26. We draw these statistics, significantly, from the U.S. government's working paper circulated in April 2004 to G-8 "sherpas" in preparation for the 2004 G-8 summit. The paper was leaked and published in *Al-Hayat*. "U.S. Working Paper for G-8 Sherpas," *Al-Hayat*, Feb. 13, 2004 (online at http://english.daralhayat.com/Spec/02-2004/Article-20040213-ac40bdaf-c0a8-01ed-004e-5e7ac897d678/story.html).

27. Richard Holbrooke, "Get the Message Out," *Washington Post*, Oct. 28, 2001, p. B7; Richard Armitage interview (Jan. 12, 2004).

28. Testimony of George Tenet, "The Worldwide Threat 2004: Challenges in a Changing Global Context," before the Senate Select Committee on Intelligence, Feb. 24, 2004.

29. U.S. Department of Energy Advisory Board report, "A Report Card on the Department of Energy's Nonproliferation Programs with Russia," Jan. 10, 2001, p. vi.

30. For terrorists being self-funding, see United Nations report, "Second Report of the [UN] Monitoring Group, Pursuant to Security Council Resolution 1390," Sept. 19, 2002, p. 13.

31. For legal entry, see White House report, Office of Homeland Security, "The National Strategy for Homeland Security," July 2002, p. 20 (online at www.whitehouse.gov/homeland/book/index.html). For illegal entry, see Chicago Council on Foreign Relations task force report, *Keeping the Promise: Immigration Proposals from the Heartland* (Chicago Council on Foreign Relations, 2004), p. 28.

32. The names of at least three of the hijackers (Nawaf al Hazmi, Salem al Hazmi, and Khalid al Mihdhar) were in information systems of the intelligence community and thus potentially could have been watchlisted. Had they been watchlisted, the connections to terrorism could have been exposed at the time they applied for a visa or at the port of entry. The names of at least three of the hijackers (Nawaf al Hazmi, Salem al Hazmi, and Khalid al Mihdhar), were in information systems of the intelligence community and thus potentially could have been watchlisted. Had they been watchlisted, their terrorist affiliations could have been exposed either at the time they applied for a visa or at the port of entry. Two of the hijackers (Satam al Suqami and Abdul Aziz al Omari) presented passports manipulated in a fraudulent manner that has subsequently been associated with al Qaeda. Based on our review of their visa and travel histories, we believe it possible that as many as eleven additional hijackers (Wail al Shehri,

Waleed al Shehri, Mohand al Shehri, Hani Hanjour, Majed Moqed, Nawaf al Hazmi, Hamza al Ghamdi, Ahmed al Ghamdi, Saeed al Ghamdi, Ahmed al Nami, and Ahmad al Haznawi) held passports containing these same fraudulent features, but their passports have not been found so we cannot be sure. Khalid al Mihdhar and Salem al Hazmi presented passports with a suspicious indicator of Islamic extremism. There is reason to believe that the passports of three other hijackers (Nawaf al Hazmi, Ahmed al Nami, and Ahmad al Haznawi) issued in the same Saudi passport office may have contained this same indicator; however, their passports have not been found, so we cannot be sure.

33. Khallad Bin Attash, Ramzi Binalshibh, Zakariya Essabar, Ali Abdul Aziz Ali, and Saeed al Ghamdi (not the individual by the same name who became a hijacker) tried to get visas and failed. Kahtani was unable to prove his admissibility and withdrew his application for admission after an immigration inspector remained unpersuaded that he was a tourist. All the hijackers whose visa applications we reviewed arguably could have been denied visas because their applications were not filled out completely. Had State visa officials routinely had a practice of acquiring more information in such cases, they likely would have found more grounds for denial. For example, three hijackers made statements on their visa applications that could have been proved false by U.S. government records (Hani Hanjour, Saeed al Ghamdi, and Khalid al Mihdhar), and many lied about their employment or educational status. Two hijackers could have been denied admission at the port of entry based on violations of immigration rules governing terms of admission—Mohamed Atta overstayed his tourist visa and then failed to present a proper vocational school visa when he entered in January 2001; Ziad Jarrah attended school in June 2000 without properly adjusting his immigration status, an action that violated his immigration status and rendered him inadmissible on each of his six subsequent reentries into the United States between June 2000 and August 5, 2001. There were possible grounds to deny entry to a third hijacker (Marwan al Shehhi). One hijacker violated his immigration status by failing to enroll as a student after entry (Hani Hanjour); two hijackers overstayed their terms of admission by four and eight months respectively (Satam al Suqami and Nawaf al Hazmi). Atta and Shehhi attended a flight school (Huffman Aviation) that the Justice Department's Inspector General concluded should not have been certified to accept foreign students, see DOJ Inspector General's report, "The INS' Contacts with Two September 11 Terrorists: A Review of the INS's Admissions of Atta and Shehhi, its Processing of their Change of Status Applications, and its Efforts to Track Foreign Students in the United States," May 20, 2002.

34. John Gordon interview (May 13, 2004).

35. For a description of a layering approach, see Stephen Flynn, *America the Vulnerable: How the U.S. Has Failed to Secure the Homeland and Protect Its People from Terrorism* (HarperCollins, 2004), p. 69.

36. The logical and timely rollout of such a program is hampered by an astonishingly long list of congressional mandates. The system originated in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 and applied to all non-U.S. citizens who enter or exit the United States at any port of entry. Pub. L. No. 104-208, 110 Stat. 3009 (1996), § 110. The Data Management Improvement Act of 2000 altered this mandate by incorporating a requirement for a searchable centralized database, limiting the government's ability to require new data from certain travelers and setting a series of implementation deadlines. Pub. L. No. 106-215, 114 Stat. 337 (2000), § 2(a). The USA PATRIOT Act mandated that the Attorney General and Secretary of State "particularly focus" on having the entry-exit system include biometrics and tamper-resistant travel documents readable at all ports of entry. Pub. L. No. 107-56, 115 Stat. 272 (2001), § 1008(a). In the Enhanced Border Security and Visa Entry Reform Act, Congress directed that, not later than October 26, 2004, the attorney general and the secretary of state issue to all non-U.S. citizens only machine-readable, tamper-resistant visas and other travel and entry documents that use biometric identifiers and install equipment at all U.S. ports of entry to allow biometric authentication of such documents. Pub. L. No. 107-173, 116 Stat. 543 (2002), § 303(b). The Act also required that increased security still facilitate the free flow of commerce and travel. Ibid. § 102(a)(1)(C). The administration has requested a delay of two years for the requirement of tamper-proof passports. Testimony of Thomas Ridge before the House Judiciary Committee, Apr. 21, 2004 (online at www.dhs.gov/dhspublic/display?theme=45&content=3498&print=true). Program planners have set a goal of collecting information, confirming identity, providing information about foreign nationals throughout the entire immigration system, and ultimately enabling each point in the system to assess the lawfulness of travel and any security risks.

37. There are at least three registered traveler programs underway, at different points in the system, designed and run by two different agencies in the Department of Homeland Security (outside the U.S. VISIT system), which must ultimately be the basis for access to the United States.

38. For the statistics, see DOS report, "Workload Statistics by Post Regions for All Visa Classes" June 18, 2004. One post-9/11 screening process, known as Condor, has conducted over 130,000 extra name-checks. DOS letter, Karl Hofmann to the Commission, Apr. 5, 2004. The checks have caused significant delays in some cases but have never resulted in visas being denied on terrorism grounds. For a discussion of visa delays, see General Accounting Office report, "Border Security: Improvements Needed to Reduce Time Taken to Adjudicate Visas for Science Students and Scholars," Feb. 2004. We do not know all the reasons why visa applications have dropped so significantly. Several factors beyond the visa process itself include the National Security Entry-Exit Registration System, which requires additional screening processes for certain groups from Arab and Muslim countries; the Iraq war; and per-

haps cyclical economic factors. For the cost to the United States of visa backlogs, see National Foreign Trade Council report, "Visa Backlog Costs U.S. Exporters More Than $30 Billion Since 2002, New Study Finds," June 2, 2004 (online at www.nftc.org/newsflash/newsflash.asp?Mode=View&articleid=1686&Category=All).

39. These issues are on the G-8 agenda. White House press release, "G-8 Secure and Facilitated Travel Initiative (SAFTI)," June 9, 2004 (online at www.whitehouse.gov/news/releases/2004/06/20040609-51.html). Lax passport issuance standards are among the vulnerabilities exploited by terrorists, possibly including two of the 9/11 hijackers. Three models exist for strengthened prescreening: (1) better screening by airlines, such as the use of improved document authentication technology; (2) posting of border agents or inspectors in foreign airports to work cooperatively with foreign counterparts; and (3) establishing a full preinspection regime, such as now exists for travel to the United States from Canada and Ireland. All three models should be pursued, in addition to electronic prescreening .

40. Among the more important problems to address is that of varying transliterations of the same name. For example, the current lack of a single convention for transliterating Arabic names enabled the 19 hijackers to vary the spelling of their names to defeat name-based watchlist systems and confuse any potential efforts to locate them. While the gradual introduction of biometric identifiers will help, that process will take years, and a name match will always be useful. The ICAO should discuss the adoption of a standard requiring a digital code for all names that need to be translated into the Roman alphabet, ensuring one common spelling for all countries.

41. On achieving more reliable identification, see Markle Foundation task force report, *Creating a Trusted Information Network for Homeland Security* (Markle Foundation, 2003), p. 72 (online at www.markle.org).

42. General Accounting Office report, *Mass Transit: Federal Action Could Help Transit Agencies Address Security Challenges*, GAO-03-263, Dec. 2002 (online at www.gao.gov/new.items/d03263.pdf).

# 13 How to Do It? A Different Way of Organizing the Government

1. The Bush administration clarified the respective missions of the different intelligence analysis centers in a letter sent by Secretary Ridge, DCI Tenet, FBI Director Mueller, and TTIC Director Brennan to Senators Susan Collins and Carl Levin on April 13, 2004. The letter did not mention any element of the Department of Defense. It stated that the DCI would define what analytical resources he would transfer from the CTC to TTIC no later than June 1, 2004. DCI Tenet subsequently told us that he decided that TTIC would have primary responsibility for terrorism analysis but that the CIA and the Defense Intelligence Agency would grow their own analysts. TTIC will have tasking authority over terrorism analysts in other intelligence agencies, although there will need to be a board to supervise deconfliction. George Tenet interview (July 2, 2004). We have not received any details regarding this plan.

2. "TTIC has no operational authority. However, TTIC has the authority to task collection and analysis from Intelligence Community agencies, the FBI, and DHS through tasking mechanisms we will create. The analytic work conducted at TTIC creates products that inform each of TTIC's partner elements, as well as other Federal departments and agencies as appropriate." Letter from Ridge and others to Collins and Levin, Apr. 13, 2004.

3. Donald Rumsfeld prepared statement, Mar. 23, 2004, p. 20.

4. In this conception, the NCTC should plan actions, assigning responsibilities for operational direction and execution to other agencies. It would be built on TTIC and would be supported by the intelligence community as TTIC is now. Whichever route is chosen, the scarce analytical resources now dispersed among TTIC, the Defense Intelligence Agency's Joint Interagency Task Force—Combatting Terrorism (JITF-CT), and the DCI's Counterterrorist Center (CTC) should be concentrated more effectively than they are now.

- The DCI's Counterterrorist Center would become a CIA unit, to handle the direction and execution of tasks assigned to the CIA. It could have detailees from other agencies, as it does now, to perform this operational mission. It would yield much of the broader, strategic analytic duties and personnel to the NCTC. The CTC would rely on the restructured CIA (discussed in section 13.2) to organize, train, and equip its personnel.
- Similarly, the FBI's Counterterrorism Division would remain, as now, the operational arm of the Bureau to combat terrorism. As it does now, it would work with other agencies in carrying out these missions, retaining the JTTF structure now in place. The Counterterrorism Division would rely on the FBI's Office of Intelligence to train and equip its personnel, helping to process and report the information gathered in the field.
- The Defense Department's unified commands—SOCOM, NORTHCOM, and CENTCOM—would be the joint operational centers taking on DOD tasks. Much of the excellent analytical talent that has been assembled in the Defense Intelligence Agency's JITF-CT should merge into the planned NCTC.
- The Department of Homeland Security's Directorate for Information Analysis and Infrastructure Protection should retain its core duties, but the NCTC should have the ultimate responsibility for producing *net* assessments that utilize Homeland Security's analysis of domestic vulnerabilities and integrate all-source analysis of foreign intelligence about the terrorist enemy.
- The State Department's counterterrorism office would be a critical participant in the NCTC's work, taking the lead in directing the execution of the counterterrorism foreign policy mission.

The proposed National Counterterrorism Center should offer one-stop shopping to agencies with counterterrorism and homeland security responsibilities. That is, it should be an authoritative reference base on the transnational terrorist organizations: their people, goals, strategies, capabilities, networks of contacts and support, the context in which they operate, and their characteristic habits across the life cycle of operations—recruitment, reconnaissance, target selection, logistics, and travel. For example, this Center would offer an integrated depiction of groups like al Qaeda or Hezbollah worldwide, overseas, and in the United States.

The NCTC will not eliminate the need for the executive departments to have their own analytic units. But it would enable agency-based analytic units to become smaller and more efficient. In particular, it would make it possible for these agency-based analytic units to concentrate on analysis that is tailored to their agency's specific responsibilities.

A useful analogy is in military intelligence. There, the Defense Intelligence Agency and the service production agencies (like the Army's National Ground Intelligence Center) are the institutional memory and reference source for enemy order of battle, enemy organization, and enemy equipment. Yet the Joint Staff and all the theater commands still have their own J-2s. They draw on the information they need, tailoring and applying it to their operational needs. As they learn more from their tactical operations, they pass intelligence of enduring value back up to the Defense Intelligence Agency and the services so it can be evaluated, form part of the institutional memory, and help guide future collection.

In our proposal, that reservoir of institutional memory about terrorist organizations would function for the government as a whole, and would be in the NCTC.

5. The head of the NCTC would thus help coordinate the operational side of these agencies, like the FBI's Counterterrorism Division. The intelligence side of these agencies, such as the FBI's Office of Intelligence, would be overseen by the National Intelligence Director we recommend later in this chapter.

6. The quotation goes on: "It includes gaps in intelligence, but also intelligence that, like a string of pearls too precious to wear, is too sensitive to give to those who need it. It includes the alarm that fails to work, but also the alarm that has gone off so often it has been disconnected. It includes the unalert watchman, but also the one who knows he'll be chewed out by his superior if he gets higher authority out of bed. It includes the contingencies that occur to no one, but also those that everyone assumes somebody else is taking care of. It includes straightforward procrastination, but also decisions protracted by internal disagreement. It includes, in addition, the inability of individual human beings to rise to the occasion until they are sure it is the occasion—which is usually too late. . . . Finally, as at Pearl Harbor, surprise may include some measure of genuine novelty introduced by the enemy, and some sheer bad luck." Thomas Schelling, foreword to Roberta Wohlstetter, *Pearl Harbor: Warning and Decision* (Stanford Univ. Press, 1962), p. viii.

7. For the Goldwater-Nichols Act, see Pub. L. No. 99-433, 100 Stat. 992 (1986). For a general discussion of the act, see Gordon Lederman, *Reorganizing the Joint Chiefs of Staff: The Goldwater-Nichols Act of 1986* (Greenwood, 1999); James Locher, *Victory on the Potomac: The Goldwater-Nichols Act Unifies the Pentagon* (Texas A&M Univ. Press, 2003).

8. For a history of the DCI's authority over the intelligence community, see CIA report, Michael Warner ed., *Central Intelligence; Origin and Evolution* (CIA Center for the Study of Intelligence, 2001). For the Director's view of his community authorities, see DCI directive, "Director of Central Intelligence Directive 1/1: The Authorities and Responsibilities of the Director of Central Intelligence as Head of the U.S. Intelligence Community," Nov. 19, 1998.

9. As Norman Augustine, former chairman of Lockheed Martin Corporation, writes regarding power in the government, "As in business, cash is king. If you are not in charge of your budget, you are not king." Norman Augustine, *Managing to Survive in Washington: A Beginner's Guide to High-Level Management in Government* (Center for Strategic and International Studies, 2000), p. 20.

10. For the DCI and the secretary of defense, see 50 U.S.C. § 403-6(a). If the director does not concur with the secretary's choice, then the secretary is required to notify the president of the director's nonconcurrence. Ibid. For the DCI and the attorney general, see 50 U.S.C. § 403-6(b)(3).

11. The new program would replace the existing National Foreign Intelligence Program.

12. Some smaller parts of the current intelligence community, such as the State Department's intelligence bureau and the Energy Department's intelligence entity, should not be funded out of the national intelligence program and should be the responsibility of their home departments.

13. The head of the NCTC should have the rank of a deputy national intelligence director, e.g., Executive Level II, but would have a different title.

14. If the organization of defense intelligence remains as it is now, the appropriate official would be the under secretary of defense for intelligence. If defense intelligence is reorganized to elevate the responsibilities of the director of the DIA, then that person might be the appropriate official.

15. For the information technology architecture, see Ruth David interview (June 10, 2003). For the necessity of moving from need-to-know to need-to-share, see James Steinberg testimony, Oct. 14, 2003. The Director still has no strategy for removing information-sharing barriers and—more than two years since 9/11—has only appointed a working group on the subject. George Tenet prepared statement, Mar. 24, 2004, p. 37.

16. The intelligence community currently makes information shareable by creating "tearline" reports, with the nonshareable information at the top and then, below the "tearline," the portion that recipients are told they can share. This proposal reverses that concept. All reports are created as tearline data, with the shareable information at the top and with added details accessible on a system that requires permissions or authentication.

17. See Markle Foundation Task Force report, *Creating a Trusted Information Network for Homeland Security* (Markle Foundation, 2003); Markle Foundation Task Force report, *Protecting America's Freedom in the Information Age* (Markle Foundation, 2002) (both online at www.markle.org).

18. Markle Foundation Task Force report, *Creating a Trusted Information Network*, p. 12. The pressing need for such guidelines was also spotlighted by the Technology and Privacy Advisory Committee appointed by Secretary Rumsfeld to advise the Department of Defense on the privacy implications of its Terrorism Information Awareness Program. Technology and Privacy Advisory Committee report, *Safeguarding Privacy in the Fight Against Terrorism* (2004) (online at www.sainc.com/tapac/TAPAC_Report_Final_5-10-04.pdf). We take no position on the particular recommendations offered in that report, but it raises issues that pertain to the government as a whole—not just to the Department of Defense.

19. This change should eliminate the need in the Senate for the current procedure of sequential referral of the annual authorization bill for the national foreign intelligence program. In that process, the Senate Armed Services Committee reviews the bill passed by the Senate Select Committee on Intelligence before the bill is brought before the full Senate for consideration.

20. This recommendation, and measures to assist the Bureau in developing its intelligence cadre, are included in the report accompanying the Commerce, Justice and State Appropriations Act for Fiscal Year 2005, passed by the House of Representatives on July 7, 2004. H.R. Rep. No. 108-576, 108th Cong., 2d sess. (2004), p. 22.

21. Letter from Ridge and others to Collins and Levin, Apr. 13, 2004.

22. For the directorate's current capability, see Patrick Hughes interview (Apr. 2, 2004).