# MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley (1944-2013)<br>Jodi Westbrook Flowers / Donald A. Migliori, *Co-Chairs*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Robert T. Haefele, *Co-Liaison Counsel*<br>MOTLEY RICE LLC | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

**VIA ECF**

August 28, 2017

The Honorable Sarah Netburn, U.S. Magistrate Judge
United States District Court for the S.D.N.Y.
Thurgood Marshall U.S. Courthouse, Room 430
40 Foley Square
New York, NY 10007

      Re:    *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (SN)

Dear Judge Netburn:

    We write on behalf of the Plaintiffs' Executive Committees regarding the Court's July 25, 2017 Order (ECF No. 3647), directing the parties to submit letters supporting their respective positions regarding the disagreements identified in the parties' July 18, 2017 joint submission about proposed deposition protocols. The proposal submitted for the court's consideration on July 18 identified six areas of disagreement. We identify each area below and offer support for plaintiffs' positions.

**Issue 1: Applicability of Paragraph 6 to Defendants in Jurisdictional Discovery.**

    The Parties have been unable to agree as to whether the witness disclosure requirements referenced in paragraph 6 apply to claims against defendants who are not in merits discovery. Plaintiffs believe an obligation to identify witnesses with knowledge relevant to jurisdictional claims and defenses should extend to the jurisdictional discovery defendants.

    The jurisdictional discovery defendants' resistance to identifying witnesses with relevant knowledge is confounding to plaintiffs. The identification of knowledgeable witnesses is a very basic discovery obligation under the Federal Rules. In fact, while the local rules of this district strongly disfavor interrogatories, they expressly authorize the service at the commencement of discovery of interrogatories "seeking names of witnesses with knowledge or information relevant to the subject matter of the action." Local Rule 33.3.

The Honorable Sarah Netburn
August 28, 2017
Page 2

---

Plaintiffs refrained from serving such interrogatories on the jurisdictional defendants based on Judge Maas' assessment that interrogatory practice would not substantially advance discovery proceedings in this MDL. Nevertheless, the witness identification procedure adopted in this MDL and discussed in paragraph six of the proposed deposition protocol, fills a critical void resulting from the restriction on service of interrogatories. The application of that requirement to the jurisdictional discovery defendants is particularly critical, given that several of those defendants have produced virtually no documents in response to plaintiffs' document requests.

### Issue 2: Location of Depositions

The Parties have been unable to agree about the location of depositions. Plaintiffs' view is that, unless by agreement otherwise, to the extent possible, all depositions should be taken in the forum. Where not possible, then the Parties may agree to a location in the United Kingdom, Paris, or Rome. Where a witness or a party claims the witness cannot travel to those locations, the witness or party may explain the reasons and petition to conduct the deposition elsewhere. Locations as to which the State Department has issued a "Travel Warning" are presumptively unacceptable locations to notice depositions. Plaintiffs also ask that each corporate or organizational defendant be required to exercise good faith efforts to arrange for the depositions of its former employees.

The court has "substantial discretion" in setting the site of a deposition.[1] Federal Rule 26 provides that, upon motion by a party and for good cause shown, the court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . that the disclosure or discovery may be had only on specified terms and conditions, including a designation of time or place . . . ."[2] The *Mill-Run* court recognized that, though case law bears a general presumption that a defendant's deposition will be held in the district of the defendant's residence, "this rule is often honored in the breach."[3] Because courts retain substantial discretion to designate the site of a deposition, the presumption is "merely a decision rule that facilitates determination when other relevant factors do not favor one side over the other."[4] Particularly as to corporate defendants that are subject to the court's jurisdiction or that do business in the United States, the general rule in favor of requiring depositions at a foreign locale is suspended, such that "the foreign corporation's agents are frequently compelled for deposition on American soil."[5] In fact, the standard presumption carries little weight when other factors weigh to

---

[1] *Mill-Run Tours, Inc. v. Khashoggi*, 124 F.R.D. 547, 550 (S.D.N.Y. 1989) (ordering depositions of Saudi defendants in New York); *see Sugarhill Records, Ltd. v. Motown Record Corp.*, 105 F.R.D. 166, 171 (S.D.N.Y. 1985); *Tomingas v. Douglas Aircraft Co.*, 45 F.R.D. 94, 97 (S.D.N.Y. 1968).

[2] Fed. R. Civ. P. 26.

[3] *Id.* at 550 (citing *Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1365 (7th Cir. 1985); *South Seas Catamaran, Inc. v. M/V "LEEWAY,"* 120 F.R.D. 17, 21 n.5 (D.N.J. 1988); *Haymes v. Smith*, 73 F.R.D. 572, 575 (W.D.N.Y. 1976); *Tomingas*, 45 F.R.D. at 96-97.

[4] *Id.*; *see also Invensas Corp. v. Renesas Elecs. Corp.*, 2012 U.S. Dist. LEXIS 92455, *6 (D. Del. June 27, 2012) (citing cases and holding various courts have identified "complications" associated with taking depositions in Japan that "may have a detrimental impact on the discovery process" and determining that in absence of showing that party depositions should occur in Japan, equitable result points to depositions in Delaware).

[5] *Custom Form Mfg., Inc. v. Omron Corp.*, 196 F.R.D. 333, 336 (N.D. Ind. 2000) (ordering depositions to be taken in the U.S., versus Japan, to ensure sovereignty issues are not implicated and the court's authority is not compromised); *see also Sugarhill Records*, 105 F.R.D. at 171 ("Corporate defendants are frequently deposed in places other than the location of

The Honorable Sarah Netburn
August 28, 2017
Page 3

_____

the contrary – for example, where the plaintiff had little choice but to initiate litigation in a particular forum.[6]  That is so here.

Courts in this district consider five factors in deciding whether to order depositions of foreign defendants in the forum,[7] and the federal court in the District of Columbia adds two additional related factors to consider.[8]  The factors identified in the Southern District of New York are: (1) the relative safety and security concerns;[9] (2) the parties' relative ability to bear the associated costs;[10] (3) the relative burdens on counsel and witnesses;[11] (4) the relative litigation efficiency (e.g., the number of people traveling, the volume of documents to be transported, the availability of litigation resources);[12] and (5) the need for the court's availability to supervise depositions.[13]  The District of Columbia district has also emphasized the need to ensure that sovereignty issues are not implicated, and the court's authority is not compromised.[14] Notably, the *Mill-Run* court specifically declined to consider the defendant's potential criminal liability in the forum as a factor weighing against conducting depositions in the forum, noting that "it would be anomalous if the [defendant's] indictment were to give [the defendant] an advantage in this civil litigation by being considered as a factor making it 'inconvenient' for him to appear here for deposition."[15]

_____

the principal place of business, especially in the forum, for the convenience of all parties and in the general interests of judicial economy"); *SEC v. Banc de Binary*, 2014 U.S. Dist. LEXIS 34373, at *28-29 (D. Nev. Mar. 14, 2014) (ordering deposition in Washington, D.C., versus Cyprus, which is defendant's principal place of business).

[6] *Mill-Run*, 124 F.R.D at 550 (explaining that New York was the appropriate location for the depositions where defendants reside in various countries and the transactions at issue occurred in New York, such that New York is the "only focal point for all of the parties"); *SEC v. Aly*, 16 Civ. 3853 (PGG) (GWG), 2017 U.S. Dist. LEXIS 28872, at *3-4 (S.D.N.Y. Mar. 1, 2017); *Doe v. Karadzic*, 93 Civ. 878 (PKL) (HBP), 93 Civ. 1163 (PKL) (HBP), 1997 U.S. Dist. LEXIS 1073, at *9 (S.D.N.Y., Feb. 3, 1997).

[7] See *Mill-Run*, 124 F.R.D. at 550-51 and *Dubai Islamic Bank v. Citibank, N.A*., Case No. 99 Civ. 1930 (RMB)(THK), 2002 U.S. Dist. LEXIS 9794, at *43, 49-50 (S.D.N.Y. May 31, 2002).

[8] See *In re Vitamin Antitrust Litig*., Misc. No. 99-197 (TFH), MDL No. 1285, 2001 U.S. Dist. LEXIS 25070, at *30-32 (D.D.C. Sept. 11, 2001), where the court ordered depositions of defendants residing in Japan, Germany, France, and Switzerland to be in the U.S.  In so ordering, the District of Columbia federal court identified the following factors as relevant to its decision to order the depositions to occur in the forum: "(1) the burden on the parties of holding the depositions in the United States relative to the burden of holding the depositions abroad, including the burdens imposed on the witnesses and the parties' counsel; (2) the court's ability to supervise depositions in the contested location; (3) whether depositions would be impeded by any legal or procedural barriers in another nation; and (4) the potential affront to the sovereignty of a foreign nation if a deposition pursuant to the Federal Rules of Civil Procedure is held within its borders." *Id* (adding factors 3 and 4).

[9] *Aly*, 2017 U.S. Dist. LEXIS 28872, at *3; *DIB v. Citibank,* 2002 U.S. Dist. LEXIS 9794, at *43, 49; *Karadzic*, 1997 U.S. Dist. LEXIS 1073, at *12-14; *see United States v. $160,066.98 from Bank of Am*., 202 F.R.D. 624, 628 (S.D. Cal. 2001).

[10] *Mill-Run,* 124 F.R.D. at 550; *see Aly*, 2017 U.S. Dist. LEXIS 28872, at *3.

[11] *Mill-Run*, 124 F.R.D. at 551 (convenience); see *SEC v. Aly*, 2017 U.S. Dist. LEXIS 28872, at *3; *In re Vitamin Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25070, at *30-31.

[12] *DIB v. Citibank*, 2002 U.S. Dist. LEXIS 9794, at *49; *Mill-Run*, 124 F.R.D. at 551; *see Aly*, 2017 U.S. Dist. LEXIS 28872, at *3.

[13] *Mill-Run*, 124 F.R.D. at 551 (considered part of litigation efficiency); *DIB v. Citibank*, 2002 U.S. Dist. LEXIS 9794, at *50; *In re Vitamin Antitrust Litig*., 2001 U.S. Dist. LEXIS 25070, at *31; *$160,066.98 from Bank of Am*., 202 F.R.D. at 629.

[14] *In re Vitamin Antitrust Litig*., 2001 U.S. Dist. LEXIS 25070, at *31-32.

[15] *Mill-Run*, 124 F.R.D at 552; *see Karadzic*, 1997 U.S. Dist. LEXIS 1073, at *14 (citing *Mill-Run* with agreement).

The Honorable Sarah Netburn
August 28, 2017
Page 4

      The factors specific to this MDL strongly support Plaintiffs' view that the depositions should take place in the forum, and particularly not in Riyadh or Dubai, locations defendants proposed. Plaintiffs satisfy the "good cause" standard of Rule 26(c) of the Federal Rules of Civil Procedure, as shown through an analysis of the relevant factors.

### A.  Safety and Security Concerns

      Plaintiffs oppose defendants' proposal to create a rule dictating that depositions must be held in Jeddah and Dubai upon the sole election of the deponent, and without consideration of the feasibility of other locations or factors.  As to Saudi Arabia, the U.S. Department of State has issued a travel warning.[16]  As to Dubai, the State Department has issued safety and security statements for United States citizens traveling to the UAE.[17]  And *both locations* are associated with the murder of a process server shot to death while serving process on defendants *in this multidistrict MDL*.[18]

      Courts have deemed safety to be a determinative factor in deciding against a presumptive location for a deposition.[19]  In *SEC v. Aly*, citing State Department warnings about U.S. citizen travel to Pakistan and finding that travel to Pakistan "pose[d] a significant and unjustified risk," the court wrote that "the paramount factor that suggests the deposition should not take place in Pakistan is the issue of safety."[20]  In *U.S. v. $160,066.98 from Bank of Am.*, foreign national claimants in a forfeiture proceeding moved for an order requiring depositions to be taken in Pakistan.[21]  In denying the claimants' request and ordering the depositions to be taken in the forum, the court found as a "dispositive factor" that the United States government had issued a security warning for Americans considering travel to Pakistan.  The court "decline[d] to order American citizens at this time to undertake such a journey to conduct civil discovery."  *Id.* at 628.

      In *DIB v. Citibank*, the defendant bank (Citibank) sought to require the plaintiff bank (Dubai Islamic Bank or DIB) to produce witnesses in the United States.  Although the *DIB v Citibank* case presents the issue in the converse from our circumstances (where the foreign plaintiff was looking to require the depositions in a foreign site), the case is nonetheless instructive because the court similarly weighed the factors relevant to each of the parties. *Id.* at *40-49. There, the court weighed DIB's assertions that its witnesses may feel endangered in New York against the fact that "the State Department has issued warnings to Americans traveling abroad in general, and to the Middle East in particular." *Id.* at *42.  The court found the dangers asserted were asymmetrical and concluded that the depositions of DIB's witnesses would take place in the New York forum.

---

[16] U.S. Dep't of State, Saudi Arabia Travel Warning (Mar. 29, 2017), *available* at https://travel.state.gov/content/passports/en/alertswarnings/saudi-arabia-travel-warning.html.

[17] U.S. Dep't of State, United Arab Emirates, Safety and Security, *available* at https://travel.state.gov/content/passports/en/country/united-arab-emirates.html.

[18] *See* Affidavit of Nelson Tucker (executed March 14, 2003), filed in *Burnett v. Al Baraka*, 1:02-cv-1616-JR, ECF Docket No. 95-2 (Mar. 24, 2003).

[19] *$160,066.98 from Bank of Am.*, 202 F.R.D. at 628; *see Aly*, 2017 U.S. Dist. LEXIS 28872, at *3 (finding safety the "paramount factor"); *DIB v. Citibank*, 2002 U.S. Dist. LEXIS 9794, at *43, 49; *Karadzic*, 1997 U.S. Dist. LEXIS 1073, at *13-14 (finding "extremely serious questions concerning safety" warranted conducting depositions in the forum).

[20] *Aly*, 2017 U.S. Dist. LEXIS 28872, at *4-5.

[21] *$160,066.98 from Bank of Am.*, 202 F.R.D. at 625.

The Honorable Sarah Netburn
August 28, 2017
Page 5

_____

      Even where "extremely serious questions concerning safety" were in some dispute, courts have nonetheless erred on the side of caution, ordering depositions in the forum. In *Doe v. Karadzic*, the parties disputed the nature of the conditions in the site where defendant proposed for the deposition. But where plaintiffs offered evidence of unrest that would cause them to feel threatened in attending the depositions, the court ordered the depositions to be conducted in the forum.[22]

      In this MDL, the issue of safety should be at least as dispositive as the cases cited above. Neither counsel, their support staff, their consultants, nor the parties should be ordered to conduct depositions in locations as to which the United States has issued Travel Warnings or other indications that the locations present serious questions concerning safety. Here, the U.S. Department of State has issued a travel warning for Saudi Arabia.[23] This travel warning addresses the threat posed by terrorist groups such as ISIS and its affiliates who target places frequented by U.S. citizens and other Westerners.[24] Similarly, the State Department warns U.S. citizens to "exercise a high level of security awareness" if traveling to the U.A.E. citing "the global threat of terrorism, including the possibility of terrorist attacks against U.S. citizens and interests in the Gulf and Arabian Peninsula" due to threats posed by ISIS, al-Qaida, and others who "may employ a wide variety of tactics, including suicide operations, assassination, kidnapping, hijacking, and bombing."

      Lastly, and perhaps most importantly, in addition to the State Department's admonitions about the dangers of traveling to either of the locations that defendants have proposed as presumptively acceptable locations, the Court should not require plaintiffs' counsel, nor any of their staff, consultants, nor the plaintiffs, to accept as a presumptively acceptable location for conducting discovery a site associated with the murder of a process server in litigation where the gravamen of the claims against defendants in those locations is that they are responsible for terrorist attacks in the United States against the plaintiffs or their relatives.

      In November 2002, Nelson Tucker, then-President of California-based Process Service Network, hired a process server in Riyadh, Saudi Arabia, to serve notice on the Saudi royals, charities, banks and businesses listed as defendants in the *Burnett* case, the first of the cases filed in this MDL. According to affidavit testimony of Mr. Tucker, after hiring the process server and entrusting the documents to him, that was the last contact the two men would have. Tucker's efforts to reach the server, into January 2003, failed. The process server had apparently disappeared. In February 2003, Tucker hired a private investigator in Saudi Arabia to learn what happened. On March 10, Tucker's investigator reported that based on his investigation, he had "reasonable belief" that the server had been murdered. Later information revealed that the process server was found

---

[22] 1997 U.S. Dist. LEXIS 1073, at *13-14.

[23] *See* U.S. Dep't of State, Saudi Arabia Travel Warning (Mar. 29, 2017).

[24] *Id*; s*ee also Karadzic*, 1997 U.S. Dist. LEXIS 1073, at *13 (noting defendant's own characterization of the conditions in Srpska as "difficult" and the uncontroverted fact that the U.N had peace-keeping forces in the region were, at the least, extremely serious questions concerning safety which pointed toward conducting depositions in New York).

The Honorable Sarah Netburn
August 28, 2017
Page 6

---

shot dead in a car on a road leading into the United Arab Emirates, where several defendants reside. In his possession were 9/11-lawsuit papers waiting to be served.[25]

Under the circumstances, the proper location for the depositions to take place, where possible, is the forum, and neither of the two additional sites proposed by defendants is a site for the court to order as a presumptively acceptable location for discovery to be ordered.

### B.  Relative Ability to Bear Associated Costs

The circumstances here are analogous to those in the *Dubai Islamic Bank* case inasmuch as this MDL, like the *Dubai Islamic Bank* case, concerns multiple witnesses and highly contentious issues, where "requiring depositions to take place in Dubai [or Saudi Arabia], or even London, would entail both sides to send abroad, for a far longer period than any one witness would be required to travel to New York, an entourage of lawyers, reporters, and translators, not to mention countless boxes of relevant documentary materials. The logistical and financial burden of such an operation . . . greatly exceeds that of sending . . . witnesses to New York for one or two days each."[26] As the *Mill-run* court observed, "[w]herever depositions are held in this case, the costs will be substantial."[27] In this MDL, it will be very costly for the lawyers and others involved in taking depositions to travel overseas for extended periods of time to conduct depositions versus having a single witness per deposition travel to the United States.[28]

Where most of the defendants in the litigation are corporate (or sovereign) entities, while most of the plaintiffs are individuals injured or family members of individuals killed in the 9/11 attacks, the ability to bear the costs weighs heavily in favor of the single witness per deposition traveling to New York, versus the multiple lawyers, consultants, and support staff traveling overseas for multiple extended periods for depositions.[29] Moreover, in a number of instances, defendants' witnesses who are anticipated to testify are individuals who have travelled either to the U.S. or Europe fairly extensively, indicating that travel is not necessarily a burden for them.[30]

Accordingly, the court should determine that the factor of cost weighs in favor of ordering the depositions to be taken, where possible, in the forum.

---

[25] Affidavit of Nelson Tucker (executed March 14, 2003), filed in Burnett v. Al Baraka, 1:02-cv-1616-JR, ECF Docket No. 95-2 (Mar. 24, 2003); Maureen Hayden, Suing Osama, INDIANAPOLIS MONTHLY, Jan. 2004, 101, at 142; *see also In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 490 (S.D.N.Y. 2010).

[26] *Dubai Islamic Bank*, 2002 U.S. Dist. LEXIS at *49.

[27] *Mill-Run*, 124 F.R.D at 550.

[28] *See Karadzic*, 1997 U.S. Dist. LEXIS 1073, at *11 (holding that the convenience factor supported conducting defendant's deposition in New York where deposition in Srpska, Bosnia and Herzegovina, would require international travel of several attorneys and a reporter but deposition in New York would require the travel of only one individual).

[29] *See Mill-Run*, 124 F.R.D at 550 (citing *Tomingas*, 45 F.R.D. at 97 (defendants better able to bear costs of travel; required to attend deposition in forum district)).

[30] Plaintiffs' counsel in *Mill-Run* raised this very argument. Specifically, Plaintiff's counsel submitted an article from *US Magazine* including a picture of the Saudi deponent at her California residence and quoting her as referring to another residence in New York. Although the court mentioned that "this would not normally be very compelling evidence," the court noted ". . . since the defendants have themselves produced no evidence of their residence, it need not be disregarded altogether." *Mill-Run*, 124 F.R.D. at 551 n.2.

The Honorable Sarah Netburn
August 28, 2017
Page 7

---

### C. Convenience

As recognized by the *Mill-Run* court, "[t]he general factor of 'convenience' incorporates a number of considerations" and "[a]lthough less important than any hardship on the parties, the convenience of counsel should be taken into account."[31] In particular, analysis of the convenience factor involves consideration of (1) the convenience of counsel, (2) the defendants' residence, and (3) the extent to which travel to and from a deposition would disrupt the defendants' affairs.[32]

Regular overseas travel to conduct multiple, extended depositions in this MDL would be extremely costly and would also present tremendous inconvenience to all counsel, consultants, reporters, videographers, and plaintiffs, in contrast to having a single witness per deposition travel to the forum. As the court in the *Dubai Islamic Bank* case recognized, it was both a financial *and logistical* burden.[33] As noted in *Mill-Run*, "the interests of counsel would best be served by holding the depositions in New York, since the attorneys all practice here." Access to office space, office facilities (phones, computers, copiers, staff), and the almost million pages of documents produced in the litigation all balance in favor of conducting depositions in the forum.

In particular, access to and from Saudi Arabia poses a significant issue. For example, in addition to the travel risks referenced previously, Saudi Arabia has some of the most restrictive travel policies in the world and does not grant visas to Israelis or people with Israeli visa stamps in their passport. *Saudi Arabia: Israelis Banned but Jews now Allowed to Work Here*, Times of Israel (Dec. 31, 2014). This bar to entry, which does not exist in the United States, could pose a significant obstacle for consultants anticipated to attend depositions to aid Plaintiffs' counsel, as well as Plaintiffs' counsel who have traveled to Israel and have Israeli indicia on their passports.

Of perhaps greater significance, women traveling to Saudi Arabia must be met by a sponsor at the airport, and are subject to a host of other restrictions. Indeed, under Saudi law, a woman cannot drive a car, travel without accompaniment, or even leave her home without covering her hair and wearing a floor-length abaya.[34] Further, married women, including non-Saudis, must have the formal approval of their husbands to leave the country. Thus, female attorneys in the case who will be participating in depositions would be required to retain a sponsor, and submit to a range of unwelcome restrictions simply to represent their clients. Again, these archaic restrictions, which do not exist in the United States, present a significant inconvenience for certain Plaintiffs' counsel.[35]

Finally, given that defendants in the litigation include the Kingdom of Saudi Arabia and a bank in which the sovereign of the United Arab Emirates holds a substantial interest, there exists significant concern that depositions conducted in territories of those sovereigns could be unduly

---

[31] *Mill-Run*, 124 F.R.D. at 551.

[32] *Robert Smalls Inc. v. Hamilton*, No. 09 CIV.7171 (DAB)(JLC), 2010 WL 2541177, at *2 (S.D.N.Y. June 10, 2010) (citing *Mill-Run*, 124 F.R.D. at 551).

[33] *Dubai Islamic Bank*, 2002 U.S. Dist. LEXIS at *49.

[34] Katherine Zoepf, *Saudi Women Realize Their Rights*, THE NEW YORKER (Jan. 11 2016), available at http://www.newyorker.com/magazine/2016/01/11/sisters-in-law.

[35] The practice of religions other than Islam in Saudi Arabia is prohibited, and as a result it would be impossible for non-Muslim counsel to observe their faiths in the Kingdom.

subject to the intelligence apparatus of either of those nations. Notably, under Saudi law, unlike the United States, attorney-client privilege, as we interpret the privilege in the United States, does not exist, which could significantly undermine application of this basic ethical principle of the U.S. judicial system while in Saudi Arabia.[36]

In contrast to the tremendous inconvenience of multiple people traveling overseas for each individual deposition, the circumstances suggest that, though likely to be claimed, the burden on the defendants' witnesses would pale in comparison. Many of the witnesses anticipated to testify are individuals who have travelled either to the U.S. or within Europe fairly extensively. Thus, setting the deposition location in New York would not unduly inconvenience the defendants or disrupt the defendants' affairs.

Accordingly, the court should determine that, under these circumstances, the factor of convenience weighs heavily in favor of Plaintiffs.

### D. Litigation Efficiency and Need for Judicial Supervision

Courts should take into account litigation efficiency, particularly where cases require judicial supervision. *See Mill-Run*, 124 F.R.D. at 551; *Robert Smalls Inc.*, 2010 WL at *3 (S.D.N.Y. June 10, 2010). Much like the restrictions to accessibility discussed more fully above, depositions conducted overseas, particularly in the Middle East, would significantly restrict the taking of depositions. Simply considering the issue of access to documents and office facilities, little efficiency is preserved in conducting depositions either where the witnesses reside or in other remote locations. For example, in some cases it is desirable to depose corporate officers at their place of business so that counsel have easy access to corporate documents. But here, most all of the documents should already have been produced and are resident in the litigation databases in the United States and the witnesses are unlikely to have prompt access additional documents that might be sought.

As the *Mill-Run* court recognized, "[a] much more compelling factor here is the need for judicial supervision. Although a judge or magistrate could conceivably resolve discovery disputes at an overseas deposition by telephone, such a procedure is costly and unwieldy."[37] In this MDL, where history has shown that, despite the sides' best efforts to work through disputes collegially, the frequency with which discovery disputes have necessitated the court's aid indicates that depositions are likely to generate further disagreement requiring court supervision. Conducting depositions overseas would hamper the court's ability to supervise disputes by introducing added variabilities related to significant time differences (e.g., in the recent three days of depositions of a DIB witness, the deposition was concluded for the day by the time the courts were available in the United States) and the ready availability of reliable technical facilities for such undertakings as international conference calling.[38] In contrast, conducting depositions in New York would accelerate the

---

[36] See Mohammed Al-Ghamdi, The Dispute Resolution Review, Saudi Arabia (9th ed. May 2017), *available* at http://thelawreviews.co.uk/edition/the-dispute-resolution-review-edition-9/1140976/saudi-arabia.

[37] *Mill-Run*, 124 F.R.D. at 551.

[38] *See, e.g., $160,066.98 from Bank of Am.*, 202 F.R.D. at 629 ("Claimants' proposal that the court remain on telephone standby fails to account for significant time zone differences. Moreover, they substantiate no confirmation that reliable technical facilities will be readily available for such undertakings as international conference calling, and the like.").

resolution of these disputes and minimize the risk that any deposition will be interrupted for a significant period. Thus, consideration of litigation efficiency, together with other pertinent factors, tips the balance in favor of conducting the defendants' depositions in the forum.[39]

### E. Legal and Procedural Impediments and Sovereignty Concerns of Overseas Depositions

Defendants' proposal that the Court approve of Saudi Arabia and Dubai as presumptively acceptable locations and require the parties to submit to depositions in those locations does not account for (1) the potential for cumbersome legal and procedural requirements under the laws of those nations that may impede the deposition-taking process, and (2) the potential that voluntary Federal Rules-type depositions may be an affront to the sovereignty of either Saudi Arabia or the United Arab Emirates. To the extent that a deposition in those nations would be such an affront, the Court should not order deposition to be conducted in those locations.[40]

Access to information about the process for obtaining deposition testimony is limited. Even the State Department's website indicates that "The Department of State does not currently have any country specific information on Saudi Arabia regarding judicial assistance."[41] Regardless, we know that Saudi Arabia's legal system is unique, and can be described as a modified civil code system founded in Islamic shariah, having its origins in the Holy Koran, the teachings of the Prophet Mohammed and the texts of the Islamic religious scholars commenting on and explaining such teachings.[42] Thus, in contrast to the United States, scholarly opinion, rather than the authority of precedent in court decisions or legislation, is the basis of the Saudi legal system. *Id.* In other words, unlike the United States, precedent in Saudi Arabia is non-binding. *Id.*

Further, there are no specific rules in Saudi Arabia governing the discovery of documents. *Id.* However, commentators note that "litigation in Saudi Arabia is document-driven. Oral testimony and argument is rare and is considered to be of little probative value. Notwithstanding the focus on documents in Saudi Arabian litigation, a litigant's ability to compel any testimony or discover documents from the opposing party is *extremely limited*." *Id.* (emphasis added). Other commentators note that with regard to the lack of a discovery process in Saudi Arabia, the parties are free to disclose only the documentation or information that helps their case, ". . . and nothing that does not."[43]

---

[39] *Mill-Run*, 124 F.R.D. at 551; *Dubai Islamic Bank*, 2002 U.S. Dist. LEXIS at *50; *$160,066.98 from Bank of Am.*, 202 F.R.D. at 629; *In re Vitamin Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25070, at *31.

[40] *In re Vitamin Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25070, at *56; *see, e.g., McKesson Corp. v. Islamic Republic of Iran*, 185 F.R.D. 70, 81 (D.D.C. 1999). In light of this issue, Plaintiffs likewise withdraw corollary proposals for any other location that would represent an affront to a sovereign nation. *See, e.g. In re Vitamin Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25070, at *56 (discussing the view that depositions in France would be an affront to French sovereignty).

[41] *See* U.S. Department of State, Legal Considerations, Saudi Arabia, *available* at https://travel.state.gov/content/travel/en/legal-considerations/judicial/country/judicial-assistance-country-specific-information.html?cid=SA.

[42] Mohammed Al-Ghamdi, The Dispute Resolution Review, Saudi Arabia (9th ed. May 2017), *available* at http://thelawreviews.co.uk/edition/the-dispute-resolution-review-edition-9/1140976/saudi-arabia.

[43] Nidal N. Kadasa, *Litigation Procedures and Strategies: Saudi Arabia*, World Trademark Rev. (2015).

Under the circumstances, and without significantly more counterbalancing information, concerns about legal and procedural impediments and sovereignty concerns should tilt the scales further in favor of conducting in the forum all depositions that can be conducted there.[44]

### Issue 3: Friday Depositions

The Parties are in disagreement as to whether the provision in the penultimate sentence of paragraph 32 of the proposed deposition protocol (ECF No. 3646-1 at 6) should prevent depositions on Fridays in the event that the deposition concerns a Party (but not as a witness) who observes Friday as a religious holiday.

Plaintiffs' Position: Though respectful of each Party's right to worship as he or she may please, a Party's worship practices should not govern whether depositions may be conducted unless the party is the witness. Plaintiffs would agree to add "individual Parties" to the "best efforts" section (*e.g.*, "… to accommodate conflicts due to religious observance of counsel and individual Parties…").

Though mindful that instances may arise where a party's presence may be necessary for a deposition to proceed (*e.g.*, where the witness is a party), the mere fact that a party may be a Muslim who may observe Friday prayers as a non-work day (not all Muslims do), should not prevent depositions from being scheduled on any Friday. Because most, and perhaps all, of the defendants are either Muslim individuals or Islamic organizations, it is conceivable that every deposition will be implicated by this rule thus limiting depositions to only four days a week. Rather than imposing an across-the-board prohibition, Plaintiffs propose that the parties be left to work the issue out on a case-by-case basis.

### Issue 4: Exchange of documents before discovery depositions that precede depositions to perpetuate trial testimony

Plaintiffs' Position: No less than fourteen (14) days before the date of the Discovery Deposition [preceding a deposition to perpetuate trial testimony], the Parties shall exchange any applicable Rule 26 disclosures that pertain to the witness, a proffer of the witness's expected testimony, and a copy of each document the party that noticed the deposition to perpetuate testimony for trial anticipates using at the deposition to perpetuate testimony.

Plaintiffs summarized this proposal previously in our correspondence of April 21, 2017 (ECF No. 3527 at 4), wherein we identified concerns that Defendants may notice depositions to perpetuate trial testimony without affording the Plaintiffs notice as to who the witness is or even the subjects about which the witness was expected to testify. The proposals are intended to avoid a trial

---

[44] U.S. officials have commented that investigations involving witnesses in Saudi Arabia have been inhibited by a unique interpretation of Islamic law adopted by the Saudi government, prohibiting non-Muslims from interrogating Saudi citizens on Saudi soil. *See, e.g.,* Charles M. Sennott, *Why bin Laden plot relied on Saudi hijackers,* THE BOSTON GLOBE, Mar. 3, 2002, at A1, *available* at http://archive.boston.com/news/packages/underattack/news/driving_a_wedge/part1.shtml; *see also 14 indicted in Khobar Towers bombing; Iran involvement seen,* SAVANNAH MORNING NEWS, Jun. 22, 2001, *available* at http://savannahnow.com/stories/062201/LOCsaudiap.shtml#.WaReV2youUl (FBI investigations into Khobar Tower attacks hampered by Saudis requiring FBI to route questions to suspects through Saudi authorities).

by ambush, where all of the testimony is taken in depositions where the witnesses and the subjects of their testimony are unknown to the party that did not call the witnesses.

One example of this effort arose in the context of the recent deposition of Dr. Hussein Hassan, the witness that DIB recently called to perpetuate his trial testimony. That deposition proceeded on August 1, 2, and 3 (pursuant to protocols that the parties agreed upon, but agreed would have no precedential value for the case-wide protocols). Leading into the deposition, plaintiffs repeatedly asked DIB's counsel for information about the witness, including requests for a copy of the witness's curriculum vitae, copies of documents on which the witness would rely for his trial testimony in the deposition, and a statement of the areas of his anticipated (trial) testimony. No CV was provided. DIB declined to identify documents the witness relied on for his testimony, but simply asserted that he had not relied on any documents that DIB and the Plaintiffs had not already exchanged in discovery.

As for the statement of the areas of testimony, DIB explained that the witness, Dr. Hassan, chair of DIB's Sharia Board, would testify about the role of the Sharia Board at DIB. Relying on that articulation of the areas of testimony, plaintiffs constrained the subjects of their discovery deposition premised on the areas of testimony identified by DIB. Mr. Cottreau's identification to this Court of the area of Dr. Hassan's testimony was as follows:

> In terms of a list of questions or what we are going to do with [Dr. Hassan], I have told [plaintiffs' counsel] essentially in a meet-and-confer process that [Dr. Hassan] is going to rebut their allegations and to talk generally about what the actual function of the Sharia board is. Very simple, very simple deposition. If you take a look at their motions to compel, . . . they have page after page after page of what they think the Sharia board does do in their motions to compel and . . . seem to be . . . up to speed . . . on the board.

Transcript of April 21, 2017 hearing, at 6.

Notwithstanding its prior proffers, during the direct examination of Dr. Hassan's trial perpetuation testimony, DIB's counsel spent substantial time in the deposition eliciting from Dr. Hassan testimony about his own personal views that Islam is a peaceful religion and that views that ascribe violent conduct to adherents of Islam are incompatible with the faith. This impropriety of this conduct is clear.

**Issue 5: Duration of Depositions**

The parties have been unable to agree about the duration of depositions. Defendants have proposed a presumptive seven-hour limitation, with a complex procedure for delineating up to an additional three hours in a limited selection of designated depositions. This MDL presents multiple factors to warrant a presumptively longer duration. To obviate the burden on the Court and the parties of making multiple requests for additional time throughout the complex MDL, plaintiffs propose a presumptive duration of ten hours for deposition in most cases, and doubling the time where interpreters are necessary.

While Plaintiffs will make every effort to complete depositions in as short a duration as possible (indeed, plaintiffs completed the recent discovery deposition of Dr. Hassan in just over four hours), many factors recognized as good cause reasons for necessitating additional time are implicated in this MDL – including, for example: (i) the parties are numerous with both common and diverse interests; (ii) testimony is anticipated to span extended periods of time; (iii) due to anticipated language variations among witnesses and in documents to be used in depositions, interpreters are anticipated to be necessary in a number of the depositions; (iv) due to the volume of documents produced in the MDL, witnesses are anticipated to be asked to comment on numerous or lengthy documents; and (v) the MDL proceeding involves complex issues of fact and law.[45]

Due to the nature of this complex, multiparty litigation, where the relevant time period reaches back to at least the early 1990s, the witnesses speak varied languages, and the volumes of collected documents are in multiple languages, plaintiffs have proposed that, rather than making serial requests throughout the litigation, the practical suggestion is to increase the presumptive duration for most depositions from seven hours to ten hours. Given that plaintiffs' counsel, perhaps even more so than defense counsel (who are likely paid hourly rates and have their expenses reimbursed), have an incentive to complete depositions in an expeditious manner, we anticipate that some depositions will be completed within a single seven-hour day. But making such a determination before the deposition proceedings begin – and indeed, almost before *any* deposition proceedings begin – would be an impossible task.

In one narrow circumstance, the parties seem to be a bit closer. Both sides agree that the duration of a deposition should be extended where an interpreter is necessary. Defendants have proposed to increase the time by 50%, Plaintiffs have proposed that the time be doubled. Plaintiffs' rationale, borne in experience from other cases where the time for depositions has been substantially increased when interpreters have been used, is that when interpreters are needed, every question and every answer is repeated at least twice. In many instances, discussion becomes necessary to clarify an interpretation. In fact, in addition to the Advisory Committee note stating that depositions of longer duration are appropriate when interpreters are involved, some practitioners have proposed a rule of thumb that use of interpreters may warrant as much as tripling the duration of a deposition.[46]

**Issue 6: Attorney/Witness Consultation**

The parties were unable to agree about when counsel and a deponent may consult during deposition proceedings. The Plaintiffs concern here is to "insure that the testimony taken during a deposition is completely that of the deponent, rather than a version of that testimony which has been edited or glossed by the deponent's lawyer."[47] After further assessment of the case law in this

---

[45] *See* Fed. R. Civ. P. 30, Notes of Advisory Committee on 2000 amendments. In the Notes, the Advisory Committee indicates that, among factors that parties should consider in determining whether extended time is warranted, are (1) whether the witness needs an interpreter, (2) whether the examination will cover events occurring over a long period of time, (3) whether the witness will be questioned about numerous or lengthy documents, (4) whether the litigation involved multiple parties, and (5) whether additional time is necessary "for a fair examination of the deponent".

[46] *See* Craig Allely, *Key Steps to Successful Foreign Depositions*, Litigation, Summer 2011, https://apps.americanbar.org/litigation/litigationnews/trial_skills/032712-tips-successful-depositions.html.

[47] *Hall v. Clifton Precision*, 150 F.R.D. 525, 527 (E.D. Pa. 1993). In *Clifton Precision*, the court described a deposition as

The Honorable Sarah Netburn
August 28, 2017
Page 13

---

district, however, Plaintiffs can agree to the Defendants' proposal if it is modestly revised to include an admonition that "attorney-witness conferences should be kept to a minimum" and "they should not be employed to coach the witness or to shape the witness's testimony in any manner."

In the parties' July 18, 2017 letter, Plaintiffs proposed language that would have prohibited attorney-witness consultation at any time during a deposition except to determine whether a disclosure would violate a privilege, confidentiality, or a court order. Defendants' proposed language would have prohibited attorney-witness consultation during a deposition only if a question were pending, except that the witness could consult to determine whether disclosure would violate a privilege, confidentiality, or a court order. While Defendant's language is close to the current rule, it nonetheless omits essential admonitions to insure the requirement of Federal Rule 30(c) that examinations proceed as they would at trial,[48] and to dissuade counsel from abusing breaks as an opportunity to coach witnesses and reshape testimony.

For years, courts in the Second Circuit followed the practice described in *Clifton Precision*. In fact, the *Clifton Precision* decision cites the New York Eastern District's then-current local rule, which prohibited attorneys from initiating any private conferences during the deposition, except to assert a privilege.[49] And, in *Neroni v. Grannis*,[50] a 2015 decision in the Northern District of New York, the court entered an order setting guidelines for discovery depositions that prohibited counsel and client witnesses from "initiat[ing] or engag[ing] in private off-the-record conferences during depositions or during breaks or recesses, except for the purpose of deciding whether to assert a privilege." The order further provided that any conferences that occurred during the deposition, breaks or recesses "are a proper subject for inquiry by deposing counsel to ascertain whether there has been any witness-coaching and, if so, what" and required counsel who participated in such conferences to note on the record that the conference occurred, and the purpose and outcome of the conference.[51]

In 2011, the Southern and Eastern Districts revised the local rules that applied in those districts in this regard. The old rule (formerly Local Rule 30.6) broadly prohibited attorneys from initiating conferences with client-deponents at any time during the deposition, except to determine

---

       a question-and-answer conversation between the deposing lawyer and the witness. There is no proper need for the witness's own lawyer to act as an intermediary, interpreting questions, deciding which questions the witness should answer, and helping the witness to formulate answers. The witness comes to the deposition to testify, not to indulge in a parody of Charlie McCarthy, with lawyers coaching or bending the witness's words to mold a legally convenient record. It is the witness -- not the lawyer -- who is the witness.

*Id.* at 528.

[48] Rule 30(c) of the Federal Rules of Civil Procedure provides that "[t]he examination and cross-examination of a deponent proceed as they would at trial under the Federal Rules of Evidence, except Rules 103 and 615. Fed. R. Civ. P. 30(c); s*ee Gavrity v. City of New York*, 12-CV-6004 (KAM)(VMS), 2014 U.S. Dist. LEXIS 132035, at *4 (E.D.N.Y. Sept. 19, 2014).

[49] *Id.* at 527; *see* Standing Orders of the Court on Effective Discovery in Civil Cases, 102 F.R.D. 339, 351 (E.D.N.Y. 1984).

[50] *Neroni v. Grannis,* Civil Action No. 3:11-CV-1485 (LEK/DEP), 2015 U.S. Dist. LEXIS 162079 (N.D.N.Y. Dec. 3, 2015).

[51] *Id.* at 8, 10.

whether to assert a privilege. The new rule (now Local Rule 30.4) more narrowly prohibits "discussions between counsel and client during a deposition . . . when a question is pending."[52]

In the Committee Note to the revised rule, the drafters clarified that the new rule set a "minimum standard" and that, by implementing the new rule, the Committee did not "intend any negative implication that other types of obstructive conduct during depositions may not be dealt with by appropriate orders of the Court." Committee Note, Rule 30.4. So, while a consultation between counsel and client-deponent, *by itself*, is not prohibited obstructive conduct, where circumstances indicate that the consultation is used to coach the witness and reshape testimony, the conduct may be considered obstructive to the goal of conducting the deposition free of witness coaching and proceeding with an examination under Rule 30(c), as it would proceed at trial.

Respectfully,

/s/ Robert T. Haefele
ROBERT T. HAEFELE
*PLAINTIFFS' EXECUTIVE COMMITTEES*

cc: The Honorable George B. Daniels, via ECF
All Counsel of Record via ECF

---

[52] *Gavrity*, 2014 U.S. Dist. LEXIS 132035, at *7 (quoting *Few v. Yellowpages.com, LLC*, No. 13 Civ. 4107 (RA)(MHD), 2014 US. Dist LEXIS 96672, at *3 (S.D.N.Y. July 7, 2014).