# Exhibit 1

# Declaration of Stephen K. Moore

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (FM) <br> ECF Case |

## DECLARATION OF STEPHEN K. MOORE

I, Stephen K. Moore, do hereby declare:

1. I am a former Special Agent for the Federal Bureau of Investigation ("FBI"). I received my law enforcement and investigator training at the FBI Academy in Quantico, VA in 1983-84 and worked for the Bureau for nearly 25 years until my retirement in 2008. During the course of my career, I worked on numerous criminal investigations involving domestic and international terrorism.

2. From 1996 through September 2001, I was assigned to the FBI's Los Angeles office and worked on counter-terrorism investigations and highly classified intelligence matters.

3. Within days of the 9/11 attacks, I was placed in charge of the Los Angeles task force team on PENTTBOM, the FBI's investigation of the 9/11 attacks. The team that I directed and supervised included at times over 400 team members and was one of the largest components of the FBI's investigation. My work with the Los Angeles PENTTBOM team continued through 2003.

4. A key part of our work was to investigate the activities in Southern California of the first two al Qaeda hijackers to arrive in the United States, Nawaf al-Hazmi ("Hazmi") and Khalid al-Mihdhar ("Mihdhar"), who came to Los Angeles on January 15, 2000, stayed there for several weeks, and then relocated to San Diego. A central focus of that work was to identify the persons who provided Hazmi and Mihdhar with financial and logistical support.

**P. 1**

5. My Los Angeles PENTTBOM team investigated thousands of leads in total. I made all strategic investigative decisions on our case, and participated in the daily "All S.A.C." investigative conference calls, which included the head of every U.S. FBI office. I conducted daily briefings for my task force and provided information on a regular basis to FBI headquarters for Director Mueller's daily briefing to the President. I prepared or reviewed the PENTTBOM reports generated by my team and participated in significant witness interviews.

6. Based on evidence we gathered during the course of our investigation, I concluded that diplomatic and intelligence personnel of the Kingdom of Saudi Arabia knowingly provided material support to the two 9/11 hijackers and facilitated the 9/11 plot. My colleagues in our investigation shared that conclusion.

7. We determined that Fahad al-Thumairy ("Thumairy") was a representative of the Saudi Arabia Ministry of Islamic Affairs who was granted diplomatic status by Saudi Arabia and posted at Saudi Arabia's Los Angeles Consulate. Thumairy also served as an Imam at the King Fahad Mosque, which was funded by the Saudi royal family and named after the Saudi King. We learned that Thumairy controlled that Mosque both religiously and financially. He had a reputation for extreme anti-U.S. views and was aligned and inspired a radical faction inside the Mosque.

8. We determined that Thumairy and another Saudi employee who we believed was a Saudi intelligence agent, Omar al-Bayoumi ("Bayoumi"), were active participants in a terror cell associated with al Qaeda that provided substantial financial and logistical support to Hazmi and Mihdhar.

**P. 2**

9. Based on our investigation we determined that at the time Thumairy provided that assistance, he knew that Hazmi and Mihdhar were al Qaeda terrorists on a pre-planned complex mission in the United States that would involve the use of airplanes.

10. We learned that the al Qaeda plotters were methodical in their preparations for the attacks and would not have sent Hazmi and Mihdhar to Los Angeles without a support structure in place. It would be essential that Hazmi and Mihdhar were given cover and properly handled upon their arrival. Neither Hazmi nor Mihdhar could speak English. They were completely unfamiliar with life and customs in the United States and lacked even the most basic skills to begin pilot training. They would have had zero chance for success without a support structure waiting for them.

11. We found that Thumairy was the primary point of contact for Hazmi and Mihdhar in Los Angeles. We concluded that Thumairy was aware in advance of their arrival and, through the King Fahad Mosque, had already provided a place for them to stay in Los Angeles.

12. We found evidence of an extensive prior relationship between Bayoumi and Thumairy. This included personal visits of Bayoumi to the King Fahad Mosque. We found that Thumairy and Bayoumi had a history of numerous phone communications during the same period that Bayoumi and others were providing Hazmi and Mihdhar with essential support.

13. We determined that Bayoumi was instructed to visit Thumairy at the Saudi Consulate and that on February 1, 2000, Bayoumi came from his home in San Diego to the Consulate. We learned that Bayoumi drove his car up to the Consulate's non-public gate, where he was buzzed in by Saudi personnel and parked in the Consulate's interior private garage. We determined that Bayoumi and Thumairy held a private meeting inside the non-public offices of the Consulate and that the purpose of this meeting was for Thumairy to direct Bayoumi

regarding the assistance needed by Hazmi and Mihdhar and to confirm the plans for a lunch meeting that Thumairy had arranged for Bayoumi, Hazmi and Mihdhar at the "Mediterranean Gourmet" restaurant in Los Angeles later that day.

14. Immediately after his meeting with Thumairy, Bayoumi first mistakenly went to another "Mediterranean" establishment which he thought was the one that Thumairy had told him to meet Hazmi and Mihdhar. Realizing his mistake, Bayoumi then found the correct nearby restaurant where Hazmi and Mihdhar were waiting as planned. They had lunch with Bayoumi and thereafter Bayoumi took Hazmi and Mihdhar under his care. The investigation detailed how Bayoumi brought the two men to San Diego, helped them find, lease and pay for an apartment near to where Bayoumi lived, provided them with funds, assimilation and safety and introduced them to various others including Mohdar Abdullah, who provided additional assistance to them, helping them with identification, obtaining a car, language skills, additional help with assimilation and most significantly, pilot training.

15. Our investigation learned that on June 9, 2000, Hazmi and Mihdhar drove from San Diego to Los Angeles with Mohdar Abdullah and went to the King Fahad Mosque for a meeting to discuss their plans, likely with Thumairy and others. We identified the Los Angeles motel where Hazmi, Mihdhar and Abdullah stayed overnight and how they dropped off Mihdhar the following day at Los Angeles International Airport for his flight home. We then learned that Hazmi returned to the King Fahad Mosque before returning to San Diego.

16. We also learned that Thumairy invited Hazmi to lead the prayers at the King Fahad Mosque where Thumairy was an Imam. We determined that this was a significant and unusual honor for Thumairy to bestow on Hazmi, a young Saudi visitor who was not even a member of the Mosque, and showed that Thumairy had an awareness of Hazmi's mission.

17. We found substantial evidence that Bayoumi was an undercover Saudi intelligence officer based on numerous witness statements; the fact that he was paid by Saudi Arabia with laundered funds in a manner typical of clandestine arrangements used by a foreign intelligence agency; his regular videotaping of people and events; and the consistent patterns of deception in his dealings.

18. I have read the statement in the 9/11 Commission Report that "we have not found evidence that Thumairy provided assistance to the two operatives {Hazmi and Mihdhar]." In light of the proof assembled in our investigation, this statement is incorrect. There was clearly evidence that Thumairy provided assistance to Hazmi and Mihdhar.

19. I also disagree with the statement in the 9/11 Commission Report that Bayoumi is "an unlikely candidate for clandestine involvement with Islamist extremists." Again, this statement is incorrect. Based on the proof in our investigation, Bayoumi himself was a clandestine agent and associated with radical extremists, including Thumairy.

20. It is noteworthy that both Bayoumi and Thumairy left the United States several weeks before the 9/11 attacks. Thumairy returned to the United States on December 24, 2001. In 2002, we sought to question Thumairy regarding his involvement with Hazmi, Mihdhar and the 9/11 plot but were unable to do so before he left the country.

21. To my knowledge, Thumairy has never been the subject of a genuine law enforcement interview conducted by the actual agents who investigated him, including myself.

22. We believed that Thumairy and Bayoumi were directed to assist Hazmi and Mihdhar. This was a key subject that we wanted to raise in questioning Thumairy to explore his employment and the superiors that he reported to inside the Los Angeles Consulate, the Washington, D.C. Embassy and the Ministry of Islamic Affairs.

23. Much of the PENTTBOM investigation remains classified. I have taken care in preparing this declaration not to reference any of that classified information.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: September 15, 2017
      New York, New York

_____
Stephen K. Moore