UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001

Civil Action No. 03 MDL 1570 (GBD) (SN)
ECF Case

This document relates to:

*Ashton, et al. v. Kingdom of Saudi Arabia*, No. 17-cv-02003
*Ashton, et al. v. al Qaeda, et al.,* No. 02-cv-6977

**MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS TO DISMISS OF THE KINGDOM OF SAUDI ARABIA AND THE SAUDI HIGH COMMISSION**

James P. Kreindler, Esq. (JK7084)
Steven R. Pounian, Esq. (SP5795)
Justin T. Green, Esq.
Andrew J. Maloney, III, Esq.
Megan W. Benett, Esq.
Kreindler & Kreindler LLP
750 Third Avenue
New York, NY 10017
(212) 687-8181
(212) 972-9432 fax

*Attorneys for Ashton Plaintiffs*

TABLE OF CONTENTS

I. THE *ASHTON* COMPLAINT AND SUBMISSIONS COMPEL JASTA JURISDICTIONAL DISCOVERY OF THE KSA ..... 4

A. Plaintiffs are entitled to jurisdictional discovery to confirm their allegations and proof that the KSA knowingly provided key support to two hijackers in California that allowed the 9/11 plot to succeed. ..... 7

B. Jurisdictional discovery will validate plaintiffs' allegations and proof that the KSA knowingly created a Somali charity in San Diego to launder $375,000 to al Qaeda in 1998-2001 ..... 17

C. Jurisdictional discovery will substantiate plaintiffs' proof that the KSA: "cleansed" the hijackers' passports and facilitated their travel to the U.S.; knew that Bayoumi and the hijackers were associated with al Qaeda; and issued a fraudulent passport to the 9/11 plot mastermind. ..... 24

D. Plaintiffs are entitled to jurisdictional discovery concerning the 1999 "dry run" of the 9/11 attacks carried out by an al Qaeda operative and funded by the KSA. ..... 25

E. Plaintiffs are entitled to jurisdictional discovery to establish the KSA's control and misuse of the AHIF, including an al Qaeda money laundering scheme and the AHIF's takeover of the Saudi Embassy in Kabul. ..... 27

1. KSA's domination of the AHIF. ..... 27
2. KSA/AHIF money laundering of $150,000 to al Qaeda in 2000. ..... 29
3. The KSA allowed the AHIF to take over the Saudi Embassy in Kabul after Saudi diplomats left in 1998. ..... 30
4. The need for jurisdictional discovery. ..... 30

F. Plaintiffs are entitled to jurisdictional discovery of the KSA's domination and control of the MWL/IIRO; the KSA's use of the MWL/IIRO to conduct government business; and the KSA's direct involvement in the Afghan orphan money laundering scheme that funded the al Qaeda camps where the 19 hijackers received their training. ..... 33

1. The KSA's top-to-bottom control of the MWL/IIRO. ..... 33

2. The KSA/MWL/IIRO Afghan orphan money laundering scheme to fund al Qaeda and its training camps attended by the 9/11 hijackers ........ 36

3. Jurisdictional discovery must proceed. ........ 38

G. Plaintiffs are entitled to complete their discovery of WAMY and obtain jurisdictional discovery of the KSA ........ 40

H. Plaintiffs are entitled to jurisdictional discovery of the SHC and KSA regarding the funding of al Qaeda through the al Qaeda controlled "KA Stan" ........ 42

II. A JURISDICTIONAL DISCOVERY ORDER SHOULD BE ENTERED ........ 45

III. FOLLOWING THE COMPLETION OF DISCOVERY, THIS COURT SHOULD HOLD AN EVIDENTIARY HEARING ON JURISDICTION ........ 45

IV. KSA'S ARGUMENTS TO DENY DISCOVERY LACK MERIT ........ 46

A. The *Ashton* plaintiffs first filed suit this past March and have not waived discovery. .. 47

B. The KSA's motion is based on inadmissible legal conclusions and hearsay from three government reports, and those reports confirm plaintiffs' allegations and need of jurisdictional discovery. ........ 47

1. The statements in the 9/11 Report that there is "no evidence" or "no credible evidence" are not "factual findings" but inadmissible legal conclusions ........ 48

2. The 9/11 Commission never considered key allegations and proof ........ 49

3. It is doubtful whether the sentences cited by the KSA from the 9/11 Report are "trustworthy" under FRE 803(8) ........ 50

4. The 9/11 Report substantiates plaintiffs' allegations and the need for discovery. ........ 53

5. The two other government reports cited by the KSA, while likely inadmissible, also confirm plaintiffs' allegations, show that the criminal investigation of Saudi government actors is ongoing and demonstrate the need for discovery. 55

C. The KSA's claims that plaintiffs' exhibits are inadmissible demonstrate the need for discovery. ........ 56

D. Traditional proximate cause is the proper jurisdictional test under the JASTA. ........... 58

E. The KSA's reliance on *Twombly* and *Iqbal* is misplaced. ........................................... 60

F. The KSA's Constitutional arguments require no response. .......................................... 62

CONCLUSION ............................................................................................................. 62

# TABLE OF AUTHORITIES

***Cases***

*1964 Realty LLC v. Consulate of the State of Qatar*, 2015 WL 5197327 (S.D.N.Y. 2015)..... 5, 12

*APWU v. Potter*, 343 F.3d 619 (2d Cir. 2003)........................................................................ 45

*Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193 (2016)............................... 32, 33, 39

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................. 61

*Bailey v. J & B Trucking Services, Inc.*, 590 F.Supp.2d 4 (D.D.C. 2009).................................. 15

*Beech Aircraft Corp. v. Rainey,* 488 U.S. 153 (1988) ............................................................... 48

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................ 60, 61

*Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685 (7th Cir. 2008)......................................................................................................... 16, 23, 59

*Burrage v. United States*, 134 S.Ct. 881 (2014) ....................................................................... 60

*Bolivian Republic of Venezuela v. Helmerich & Payne Inter. Drilling Co.,* 137 S.Ct. 1312 (2017)................................................................................................................... 2, 45

*Doe v. Bin Laden*, 663 F.3d 64 (2d Cir. 2011)........................................................................... 4

*EM Ltd. v. Republic of Argentina*, 473 F.3d 463 (2d Cir. 2007) ............................................... 32

*EM Ltd. v. Banco Central De La Republica Argentina*, 800 F.3d 78 (2d Cir. 2015), *cert. dismissed, 136 S.Ct. 1731 (2016)* ................................................................................. 39

*Filecom S.A. v. France Telecom S.A.*, 157 F.3d 922 (2d Cir. 1998)........................................... 46

*Filus v. Lot Polish Airlines,* 907 F.2d 1328 (2d Cir.1990) ............................................. 4, 5, 6, 22

*First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172 (2d Cir. 1998) ................. *passim*

*Fountain v. Karim*, 838 F.3d 129 (2d Cir. 2016)........................................................................ 46

*Funk v. Belneftekhim*, 861 F.3d 354 (2d Cir. 2017)..................................................................... 5

*Gabay v. Mostazafan Foundation of Iran*, 151 F.R.D. 250 (S.D.N.Y. 1993) .............................. 5

*Gibbs v. City of New York*, 714 F.Supp.2d 419 (E.D.N.Y. 2010)......................................... 14, 16

*Gill v. Arab Bank, PLC*, 893 F.Supp.2d 494 (E.D.N.Y. 2012)................................. 22, 23, 38, 59

*Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995) ........................................... 58

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) .................................................. 11, 17, 58

*Hamm v. United States*, 483 U.S. 135 (2d Cir. 2007)................................................................ 12

*Hines v. Brandon Steel Decks, Inc.*, 886 F.2d 299 (11th Cir. 1989)............................................ 48

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ........................................................ 59

*In re Air Disaster at Lockerbie, Scotland on December 21, 1988*, 37 F.3d 804
(2d Cir. 1994).................................................................................................................. 17, 22

*In re September 11 Litigation*, 621 F.Supp. 2d 131 (S.D.N.Y. 2009) ............................. 50, 51, 54

*In re Terrorist Attacks on September 11, 2001*, 134 F.Supp.3d 774 (2015)............................. 3, 57

*In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659 (2d Cir. 2013).......................... 6, 23

*Kamen v. American Tel. & Tel.*, 791 F.2d 1006 (2d Cir. 1986) ............................................ 6, 7, 8

*Kerns v. United States*, 585 F.3d 187 (4th Cir. 2009)................................................................. 12

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d.1123 (D.C. Cir.
2004) ..................................................................................................................... 46, 59, 60

*Kirschenbaum v. 650 Fifth Ave. & Related Props.,* 830 F.3d 107 (2d Cir. 2016)........................ 39

*Kirschenbaum v. 650 Fifth Ave. and Related Props*., __ F. Supp.3d __, 2017 WL
2807703 (S.D.N.Y 2017)................................................................................................. 5, 40

*Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45 (2d Cir. 2013)........................................... 15

*Linde v. Arab Bank*, 97 F.Supp.3d 287 (E.D.N.Y. 2015) ......................................... 16, 23, 59, 60

*Liu v. Republic of China*, 892 F.2d 1419 (9th Cir. 1989) .......................................................... 14

*London v. Polishook*, 189 F.3d 196 (2d Cir. 1999) ..................................................................... 6

*Lotes Co., Ltd. v. Hon Hai Precision Industry Co.*, 753 F.3d 395 (2d Cir. 2014)........................ 46

*Mateo v. Perez*, 1999 WL 216651 (S.D.N.Y. 2009).................................................................... 5

*Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169 (5th Cir. 1994)............................................... 12

*Mukaddam v. Permanent Mission of Saudi Arabia*, 136 F.Supp.2d 257 (S.D.N.Y. 2001) .. 5, 6, 12

*N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247 (2004) ..................................................................... 16

*National Council of Resistance of Iran v. Department of State*, 373 F.3d 152 (D.C. Cir. 2004) . 23

*Nelson v. American-West African Line*, 86 F.2d 730 (2d Cir. 1936)........................................... 15

*Paroline v. United States*, 134 S.Ct. 1710 (2014)....................................................................... 60

*Perez v. Van Groningen & Sons, Inc*, 41 Cal. 3d 962 (1986).......................................... 12, 14, 15

*Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36 (D.C.Cir. 2000)............................ 45

*Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*, 235 F.3d 738
(2d Cir. 2000)................................................................................................................ 3, 4, 45

*Riviello v. Waldron*, 47 N.Y.2d 297 (1979)........................................................................... 12, 14

*Robinson v. Gov't of Malaysia*, 269 F.3d 133 (2d Cir. 2001) .................................................... 46

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir 2013) .................................................... 16, 23, 59, 60

*Rux v. Republic of Sudan*, 461 F.3d 461 (4th Cir. 2006) .................................................... 16, 59

*Sokolow v. Palestine Liberation Organization*, 60 F.Supp.3d (S.D.N.Y. 2014) .................. *passim*

*Strauss v. Credit Lyonanais*, 925 F.Supp.2d 414 (E.D.N.Y. 2014) ................................ 22, 23, 38

*Swarma v. Al-Awadi*, 622 F.3d 123 (2d Cir. 2010) ........................................................... 16

*Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002) .................................................... 61, 62

*Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995) ........................................................ 16

*United States v. Anderson*, 747 F.3d 51 (2d Cir. 2014) ...................................................... 11

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir.1991) .................................................... 48

*United States v. Davidson*, 308 F.Supp.2d 461)(S.D.N.Y. 2004) ......................................... 48

*United States v. Delacruz*, 862 F.3d 163 (2d Cir. 2017) ..................................................... 58

*United States v. International Bhd. of Teamsters*, 141 F.3d 405 (2d Cir. 1998) ......................... 16

*United States v. Mohamed*, 203 F.App'x 879 (9th Cir. 2006) ....................................... 20, 21

*United States v. One Assortment of 89 Firearms*, 465 U.S. 354 (1984) ................................ 49

*University of Texas Southwestern Medical Center v. Nasser*, 133 S.Ct. 2517 (2013) ................ 60

*Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983) ........................................... 2

*Weiss v. National Westminster Bank PLC*, 453 F.Supp.2d 609 (E.D.N.Y. 2006) ................. 23, 38

*Weiss v. National Westminster Bank*, 768 F.3d 202 (2d Cir. 2014) .......................... 19, 23, 25, 59

*Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247 (2d Cir. 2000) ............ 33

***Statutes***

18 U.S.C. §2331 ........................................................................................................ 16

18 U.S.C. § 2 ........................................................................................................... 11

18 U.S.C. § 371 ........................................................................................................ 11

18 U.S.C. § 2333 .................................................................................................... 2, 11

18 U.S.C. § 2333 note ............................................................................................... 58

18 U.S.C. § 2339A ................................................................................................... 11

18 U.S.C. § 2339B ................................................................................................... 11

18 U.S.C. § 2339C ................................................................................................... 11

26 U.S.C. §501(c)(3) ................................................................................................ 18

28 U.S.C. §1605B ........................................ 1, 11, 12

***Rules***

Fed. R. Evid. 803(8)........................................ *passim*

The *Ashton* plaintiffs are the surviving family members and estate representatives of 865 decedents killed in the 9/11 attacks along with many persons who suffered serious personal injuries.

The motion to dismiss of the Kingdom of Saudi Arabia ("KSA") is premature. This Court must first allow plaintiffs to conduct limited discovery "to verify allegations of specific facts"[1] necessary to show jurisdiction under the Justice Against Sponsors of Terrorism Act ("JASTA").[2]

As detailed in their complaint together with the accompanying affidavit and exhibits, the *Ashton* plaintiffs' specific allegations and facts show that the KSA:

- knowingly provided the critical support network to the first two hijackers in the United States that allowed the 9/11 plot to take seed;
- engaged in a variety of "charity" money laundering schemes in the United States and around the world to fund al Qaeda, including financing the 9/11 plot itself as well as the camps where the 19 hijackers were trained; and
- facilitated the 9/11 plot by providing the hijackers with cleansed passports, enabling them to obtain U.S. visas.

The KSA personnel involved in these key support operations were knowing, willing participants acting pursuant to the instructions of senior KSA officials and they represented a large element inside the KSA government that was allied with al Qaeda and its cause. Indeed, the KSA commended those personnel for their "good work" for participating in the 9/11 plot and rewarded them with bonuses and promotions.

These facts establish jurisdiction under JASTA, which Congress enacted in 2016 over a Presidential veto

---

[1] *First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176-77 (2d Cir. 1998).
[2] 28 U.S.C. §1605B.

> to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against…foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.…[3]

The JASTA amendment of the Foreign Sovereign Immunities Act ("FSIA") was clearly authorized, as "Congress has the undisputed power to decide, as a matter of federal law, whether and under what circumstances foreign nations should be amenable to suit in the United States."[4]

Jurisdiction under JASTA is closely intertwined with the merits of this case, as this Court's authority to entertain the suit is based on the issues of tortious conduct; whether that conduct was within the scope of the actor's office, employment or agency; proximate cause; and agency – alter-ego. Earlier this year the Supreme Court recognized "that merits and jurisdiction will sometimes come intertwined" in FSIA cases and that if the resolution of jurisdiction requires that the court "decide some, or all, of the merits issues, so be it."[5]

Because the merits are at stake, however, this Court must enforce procedural safeguards so that the plaintiffs can adequately present their case. The KSA's Rule 12(b)(1) jurisdictional challenge has all of the hallmarks of a Rule 56 summary judgment motion and necessitates discovery.

The *Ashton* plaintiffs attach a detailed proposed jurisdictional discovery plan which specifies the limited documents and depositions requested from the KSA and others that this Court can and should order. Some of that discovery, which involves other named defendants, is already ongoing or planned.

---

[3] 18 U.S.C. §2333 note.

[4] *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493 (1983).

[5] *Bolivian Republic of Venezuela v. Helmerich & Payne Inter. Drilling Co.*, 137 S.Ct. 1312, 1319 (2017) ("Helmerich").

In addition, in cases where the merits are implicated, the Second Circuit has ruled that FSIA jurisdiction should be resolved at an evidentiary hearing, not on cold papers, and that the district court should issue findings of fact.[6] Such a hearing, after limited discovery, is compelled here by the need to weigh witness credibility, the complexity of the proof and inferences, the gravity of the allegations and the extraordinary circumstances of this case.

In moving to dismiss, the KSA offers none of the actual evidence in its possession. The KSA, for instance, has not submitted a single declaration of a KSA government official rebutting the *Ashton* complaint's detailed allegations. Instead the KSA relies merely on inadmissible legal conclusions and hearsay from three U.S. government reports. And those reports provide added justification for plaintiffs' discovery requests, as they confirm the details of the substantial assistance the KSA provided to the hijackers; the various KSA-al Qaeda charity funding schemes; and that before 9/11 "the Saudi government was treating [al Qaeda] with special consideration."[7]

The KSA's claim that plaintiffs "waived" discovery, KSA brief at 2, is false and simply a veiled effort to avoid the merits. The *Ashton* plaintiffs first sued the KSA in March 2017, after JASTA had been enacted. All of their fellow death and injury plaintiffs (except for *O'Neill*) brought their first claims against the KSA this year. The *Ashton* plaintiffs joined in the Plaintiffs' Executive Committee's June 2017 document requests and now have presented their jurisdictional discovery plan. The KSA has refused to produce any discovery.

This Court's decision in the *Federal Insurance* and *O'Neill* cases against KSA,[8] was prior to JASTA and did not address the key allegations – made for the first time in the *Ashton*

---

[6] *Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*, 235 F.3d 738 (2d Cir. 2000).
[7] KSA Ex. 4 at 2.
[8] *In re Terrorist Attacks on September 11, 2001*, 134 F.Supp.3d 774 (2015).

complaint and the attached affidavits – which demonstrate the central role that the KSA played in causing the attacks. JASTA eliminated the "entire tort rule" and the discretionary function exception which provided the central basis for the prior dismissal. Discovery must be granted to fulfill the intent of Congress through JASTA to allow the 9/11 families to present their case.

## I. THE *ASHTON* COMPLAINT AND SUBMISSIONS COMPEL JASTA JURISDICTIONAL DISCOVERY OF THE KSA

In FSIA cases, the Second Circuit has held that "generally a plaintiff may be allowed limited discovery with respect to the jurisdictional issue…." *First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998). Such discovery is permitted "to verify allegations of specific facts crucial to an immunity determination." *Id.*

*First City* overturned a district court's FSIA jurisdictional dismissal of Iraq's central government bank - which had already complied with court orders to produce documents and answer interrogatories - and held that additional relevant discovery of a second defendant bank must be completed before jurisdiction could be determined. *Id.* at 177.

In *Filus v. Lot Polish Airlines,* 907 F.2d 1328 (2d Cir.1990), the Second Circuit held that the district court erred by denying FSIA jurisdictional discovery of a Soviet government manufacturer, finding that such discovery was appropriate and "not wholly fanciful" based on the allegations in plaintiffs' complaint and a *Wall Street Journal* advertisement placed by another Soviet entity. *Id.* at 1332-33.

And in *Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*, 235 F.3d 738, 748 (2d Cir. 2000), the Second Circuit remanded the case to the district court with instructions to proceed with discovery, including depositions of the top officers of a French government entity, "to assist the court in undertaking an FSIA jurisdiction analysis…." *See also Doe v. Bin Laden*, 663 F.3d 64, 71 (2d Cir. 2011)(in case brought against Afghanistan arising from the 9/11 attacks,

"limited discovery to determine whether jurisdiction exists should proceed."); *Funk v. Belneftekhim*, 861 F.3d 354, 366 (2d Cir. 2017)(upholding the district court's decision to order limited jurisdictional discovery regarding whether the defendant was a foreign state entity).

Courts in this District have routinely allowed FSIA jurisdictional discovery. *E.g., Kirschenbaum v. 650 Fifth Ave. and Related Props.*, __ F. Supp.3d __, 2017 WL 2807703 (S.D.N.Y 2017), *appeal docketed*, No. 17-3258 (2d Cir. 2017)(parties conducted "lengthy and contentious discovery" on issue whether real estate partnership was alter-ego of Iranian government); *1964 Realty LLC v. Consulate of the State of Qatar*, 2015 WL 5197327 *8 (S.D.N.Y. 2015)(in case where FSIA jurisdiction hinged on agent's authority, court acknowledged that "of course, Plaintiff can provide no insight into what specific authority [the agent] was given by Defendant" and therefore that "limited jurisdictional discovery as to these factual issues… is necessary before the Court can make any determination…."); *Mukaddam v. Permanent Mission of Saudi Arabia*, 136 F.Supp.2d 257, 260-62 (S.D.N.Y. 2001)(determination of FSIA subject matter jurisdiction in action against the KSA must await the conclusion of jurisdictional discovery on key issue of plaintiff's employment status); *Mateo v. Perez*, 1999 WL 216651 *3 (S.D.N.Y. 2009)(in defamation suit there was a material fact dispute as to whether consul's actions "were taken in furtherance of his consular duties" and court found that "the parties should be given 'a fair opportunity' to engage in jurisdictional discovery and submit to the Court the evidence needed to resolve that issue.").

A plaintiff's demand for jurisdictional discovery is founded on the allegations of the complaint and can be supplemented by documents, statements or other materials which need not be admissible but demonstrate that discovery could provide relevant jurisdictional evidence. *Filus*, 907 F.2d at 1333; *Gabay v. Mostazafan Foundation of Iran*, 151 F.R.D. 250, 256-57

(S.D.N.Y. 1993)("although many of plaintiff's supporting documents—which include newspaper articles, publications…, and a complaint filed by a former employee… do not constitute evidence admissible at trial, they suggest that admissible evidence might well be obtained if discovery were permitted."); *see In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 679 (2d Cir. 2013)(personal jurisdiction discovery could proceed based on allegations in complaint which "suggest the possibility" that a defendant "may have provided direct aid to members of al Qaeda" and "raise a plausible inference that he may have intended his alleged indirect support of al Qaeda to cause injury in the United States."). The plaintiff is given the benefit of all reasonable factual inferences that may be drawn from the allegations and supplementary materials. *Filus*, 907 F.2d at 1333; *Mukaddam*, 136 F.Supp.2d at 260.

Discovery is particularly necessary because the KSA's jurisdictional challenge under the JASTA is a direct attack on the merits of plaintiffs' case, and the Rule 56 safeguards that protect the right to discovery are implicated. *See London v. Polishook*, 189 F.3d 196, 198 (2d Cir. 1999)(in non-FSIA case, where subject matter jurisdiction "is so intertwined with the merits that its resolution depends on the resolution of the merits, the trial court should employ the standard applicable to a motion for summary judgment."); *Kamen v. American Tel. & Tel.*, 791 F.2d 1006, 1011 (2d Cir. 1986)(while a 12(b)(1) motion cannot be converted into a Rule 56 motion, courts can use the "guidelines" from summary judgment practice and "have required that the party asserting jurisdiction be permitted discovery of facts demonstrating jurisdiction, at least where the facts are peculiarly within the knowledge of the opposing party.").

**A. Plaintiffs are entitled to jurisdictional discovery to confirm their allegations and proof that the KSA knowingly provided key support to two hijackers in California that allowed the 9/11 plot to succeed**

Jurisdictional discovery is compelled by the plaintiffs' detailed allegations, facts and evidence that at least three officers of the KSA – (1) the accredited KSA diplomat Fahad al-Thumairy ("Thumairy"), (2) Omar al-Bayoumi ("Bayoumi"), likely a KSA intelligence agent, and (3) the more senior KSA person(s) who "directed" and "tasked" Thumairy and Bayoumi – knowingly organized the critical support network in California for Nawaf Hazmi ("Hazmi") and Khalid Midhdar ("Midhdar"), both longstanding al Qaeda jihadists and the first two 9/11 hijackers to arrive in the United States. Complaint ¶¶ 44.b. – 44.i.; Aff. ¶¶ 7-9; Ex. 1; Ex. 2.[9] The plaintiffs' evidence includes the attached declaration of former FBI Special Agent Stephen Moore, who led the Los Angeles task force team on the FBI's investigation of the 9/11 attacks. Ex. 1.

That FBI team determined that Thumairy and Bayoumi were active participants in an al Qaeda associated support cell and that Thumairy knew that Hazmi and Midhdar were al Qaeda terrorists on a complex mission in the United States that would involve the use of aircraft. Ex. 1 at 3. Thumairy knew that the two men were coming to Los Angeles and that he would be their primary point of contact. *Id.* He arranged a place for them to stay upon their arrival in Los Angeles. *Id.* Thumairy and Bayoumi, together with others under their direction, subsequently provided vital assistance for Hazmi and Midhdar, including cover, transportation, lodging, an apartment, communication, social activities, funding, English language and social skills, assimilation and flight training. Aff. ¶¶ 7-9.

---

[9] References herein are to the *Ashton* Complaint ("Complaint"), the accompanying attorney's affidavit ("Aff.") and that affidavit's two Appendices ("App.") and Exhibits ("Ex.").

The FBI team found substantial evidence that Bayoumi was an undercover Saudi intelligence officer, and that he was "associated with radical extremists, including Thumairy." Ex. 1 at 2, 5. In addition, absent help from the KSA's officers, the hijackers would have had "zero chance of success." Ex. 1 at 3.

As detailed in the accompanying attorneys' affidavit and attached exhibits, the facts clearly demonstrate a reasonable basis for plaintiffs to conduct jurisdictional discovery of the KSA and others to confirm the facts regarding:

- the specific assistance provided to the 9/11 hijackers by the three (or more) KSA officers, Aff. ¶¶ 7-9;
- the KSA job responsibilities, scope of employment and authority of Thumairy, Bayoumi and the more senior officer(s) with the KSA who "tasked" and "directed" Thumairy and Bayoumi to provide assistance to the hijackers, *id.*;
- the knowledge of those KSA officers and the KSA regarding the two hijackers, their ties to al Qaeda and their mission inside the United States, including their particular interest in learning to fly commercial jet aircraft, *id.*;
- the persons who Thumairy and Bayoumi assigned to assist the hijackers, including Modhar Abdullah, Omar Benomrane and Osama Basnan, and the assistance they provided, including identification, English language training, acclimation to U.S. culture, transportation, shelter, pilot training and cover, *id.*;
- the extensive prior relationship between Bayoumi and Thumairy, their numerous documented phone calls and their February 1, 2000 private meeting at the Saudi Consulate to confirm Bayoumi's lunch meeting with the two hijackers that day, *id.*;
- Thumairy's false statements to U.S. investigators that he did not know Bayoumi and did nothing to assist the hijackers, *id.*;
- Bayoumi's false statements to U.S. investigators, including that he first met Hazmi and Mihdhar by happenstance and only for several minutes, when the three men actually sat down for a planned lunch meeting; that he didn't know where the hijackers lived in San Diego, even though he arranged an apartment for them in his own building, filled out their apartment application, personally guaranteed their lease and furnished the necessary deposit and rent money; that he saw them once briefly in San Diego, when he held a party for them and they had numerous meetings, *id.*;

- the numerous phone contacts between Bayoumi and personnel at the KSA Embassy in Washington, including the KSA's Khalid al-Sowailem ("Sowailem"), a diplomat and "Head of the Office of Da'awa in the United States" for the Saudi Ministry of Islamic Affairs at the Saudi Embassy in Washington, D.C., who was the superior of Thumairy and Omar Abdi Mohamed, *id.* at ¶ 21;

- the marker placed by the KSA in Bayoumi's passport which showed KSA's knowledge of Bayoumi's extremism and support for al Qaeda, *id.* at ¶¶ 42, 216;

- the contacts between Bayoumi and Anwar Aulaqi, later named by U.S. authorities as a Specially Designated Global Terrorist ("SDG Terrorist") and killed by a CIA drone strike, who spoke on the phone four times on the day that Hazmi and Midhdar arrived in San Diego, February 4, 2000, and also in December 2000 when Hazmi left San Diego, *id.* at ¶¶ 16-17;

- the KSA covert and illegal employment of Bayoumi, who was in the United States using a fraudulent student visa, and the promotion and significant salary and "other allowances" increases given by the KSA to Bayoumi in April 2000 (while he was assisting the hijackers), which continued through September 2001, *id.* at ¶¶ 8, 10-15;

- the post 9/11 admissions of (1) Saudi Prince Turki that the KSA knew in late 1999 or early 2000 that Hazmi and Midhdar were dangerous "watch list" terrorists; and (2) Saudi Prince Bandar that "Saudi security was actively following the movements of most of the [9/11] terrorists with precision", *id.* at ¶¶ 46-47;

- the history of support for al Qaeda from elements at all levels of the Saudi government during the decade prior to 9/11, *id.* at ¶¶ 60-61, App. 2;

The KSA fails to offer any of the evidence in its possession to refute the plaintiffs' detailed allegations and proof of the knowing assistance provided by the KSA's officers to Hazmi and Midhdar. Instead, the KSA states that plaintiffs have "no evidence" regarding the meeting and conversation between Thumairy and Bayoumi before Bayoumi met with the hijackers. KSA brief at 34. But plaintiffs have alleged and shown:

- on February 1, 2000, Thumairy and Bayoumi met alone inside the private offices of the Saudi Consulate, after Bayoumi had been "buzzed in" by KSA security and parked his car in the Consulate's private interior garage, Ex. 1 at 3;

- during that meeting, Thumairy told Bayoumi about the assistance Hazmi and Midhdar needed and confirmed the plans for a lunch meeting that Thumairy had

arranged for Bayoumi and the two hijackers at the "Mediterranean Gourmet" restaurant later that day, Ex. 1 at 3-4;

- the circumstances confirm that it was Thumairy who arranged the meeting with Hazmi and Midhdar, because after leaving the Saudi Consulate Bayoumi misleadingly told his companion that they would go to lunch at a local "Mediterranean" restaurant where he had previously dined with his family; but Bayoumi mistakenly took his companion to a Mediterranean-named business that was not a restaurant and needed directions to find the actual "Mediterranean Gourmet", Ex. 5 at 2-3.

The KSA makes the outrageous claim that "the only plausible inference to be drawn from Plaintiffs' allegations" is that Bayoumi was an innocent "obliging and gregarious" person "merely helping fellow Muslims and Saudi Arabians...." KSA brief at 29-30. This is belied by:

- the conclusions of FBI investigators that Bayoumi was a Saudi undercover intelligence agent with ties to al Qaeda, Ex. 1 at 2, 5; Ex. 13 at 15;

- Bayoumi's admissions that he was a religious follower of two radical anti-U.S. imams, Thumairy and Aulaqi, and his frequent meetings and contacts with them, together with his extremely close friendship with Osama Basnan, a known al Qaeda sympathizer, Ex. 6 at 6; Ex. 12 at 2;

- the marker of association with al Qaeda that the KSA placed in Bayoumi's passport, 9/11 Report at 516 n.19;

- Bayoumi's covert employment with the KSA and fraudulent student visa, Ex. 2 at 4; Ex. 14 at 7-8;

- The substantial assistance that Bayoumi provided to the hijackers, including finding them an apartment immediately next door to his apartment in San Diego; co-signing their lease and lending them over $9,000, and his repeated contacts with the hijackers, Ex. 8; Ex. 10 at 3;

- the repeated lies that Bayoumi told 9/11 investigators, in particular his efforts to hide his ties to the hijackers, Thumairy and Basnan, Aff. ¶ 9.

Plaintiffs are entitled to confirm the facts through discovery of the KSA and others before this Court can consider any jurisdictional motion. Plaintiffs' discovery plan includes the key depositions of Thumairy, Bayoumi and Sowailem (who also has critical knowledge regarding other KSA money laundering allegations in the *Ashton* plaintiffs' complaint, *see* Section I.B.,

*infra*) and document requests concerning the employment, authority and superiors of Thumairy and Bayoumi. Aff. at App. 1.

***Tortious conduct.*** The plaintiffs' allegations and facts showing that the KSA's officials provided repeated, substantial and knowing assistance to operatives of al Qaeda, which was then designated by the United States as a Foreign Terrorist Organization ("FTO"), Ex. 7, constitute tortious acts under federal and state law for aiding and abetting and conspiracy that provide the foundation for FSIA jurisdiction. 28 U.S.C. § 1605B; 18 U.S.C. §§ 2, 371, 2333, 2339A, 2339B, 2339C; *Halberstam v. Welch*, 705 F.2d 472, 488 (D.C. Cir. 1983)(defendant liable in tort for murder carried out by her companion during a burglary, where defendant provided substantial assistance for an ongoing burglary scheme which she knew involved "some type of personal property crime at night" and "violence and killing is a foreseeable risk" of such crime).

The knowledge of the KSA's officers and the KSA itself can reasonably be inferred from the evidence. *See United States v. Anderson*, 747 F.3d 51, 69 (2d Cir. 2014)("extensive phone call contacts" support inference that the defendant was a knowing conspirator). The repeated false statements of Thumairy and Bayoumi are evidence of their involvement in a crime and their attempt to conceal the details of the plot and the person(s) who told them to help the two hijackers. *Id.* at 66 ("defendant's 'false exculpatory statement ... offers evidence from which it could be inferred that the [defendant] ... surmised he was implicated in some sort of criminal activity"); *Halberstam*, 705 F.2d at 481 (defendant's "protestations at trial that she knew absolutely *nothing* about Welch's wrongdoing" provided basis for inference that "she knew he was engaged in illegal activities.")(emphasis original).

***Scope of employment.*** Discovery will confirm the plaintiffs' allegations and facts that those tortious acts were committed by the KSA and its officers "while acting within the scope of

his or her office, employment, or agency…." 28 U.S.C.§1605B(b)(2). Other courts have ruled that scope of employment discovery is necessary before considering a sovereign's jurisdictional motion. *Kerns v. United States*, 585 F.3d 187, 196 (4th Cir. 2009)(when jurisdiction and the merits of FTCA claim hinged on whether an employee was acting in the scope of employment, plaintiff "should be afforded an opportunity – at minimum – to conduct discovery on the intertwined scope-of-employment issue."); *see Hamm v. United States*, 483 U.S. 135, 137 (2d Cir. 2007)(scope of employment issue in Federal Tort Claims Act case was addressed "[a]fter the completion of discovery"); *1964 Realty,* 2015 WL 5197327 *8 (discovery of agent's authority necessary before court could consider jurisdictional motion).

The KSA itself has previously been required to produce such jurisdictional discovery. *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994)(where jurisdiction hinged on whether a Saudi pilot's actions were "within the scope of his employment as required… under the FSIA," the district court decided the issue only "[a]fter discovery was complete."); *see Mukaddam*, 136 F.Supp.2d at 261-62 n.19 (jurisdictional discovery of the KSA on employment issue was appropriate because "[w]hether plaintiff is a civil servant is a mixed question of law and fact….").

The allegations and proof show that the KSA's diplomat Thumairy and covert agent Bayoumi were being instructed by one or more senior KSA official(s) and used the KSA's facilities and cover to provide substantial assistance to the hijackers. Complaint 44.b.; Aff. ¶¶ 7-9; Ex. 1 at 3, 5; Ex. 2 at 3-4.

An act undertaken at the employer's direction is within the scope of employment. *Riviello v. Waldron*, 47 N.Y.2d 297, 303 (1979)(the test for scope of employment is "clearly intended to cover an act undertaken at the explicit direction of the employer"); *Perez v. Van*

*Groningen & Sons, Inc*, 41 Cal. 3d 962, 970 (1986)(where the employee was following his employer's instructions, the act was within scope of employment as a matter of law).

Moreover, through their knowing and intentional support for the two hijackers in California, Thumairy and Bayoumi were promoting the Saudi government's pre-9/11 policies, when the KSA, emboldened by its religious leaders, provided significant financial and logistical support to al Qaeda across the world, including backing for prior terror attacks on the United States in 1993 (Somalia) and 1998 (U.S. Embassy bombings). Aff. at App. 2, ¶¶ 70, 196; Ex. 47 at 13. That support for al Qaeda, much of which emanated from the KSA's Ministry of Islamic Affairs that directed Thumairy, was given to advance the KSA's fundamental goal to "propagate" the Wahhabi brand of Islam around the world. Aff. ¶¶ 57-61.

Indeed, the KSA was well aware that both Thumairy and Bayoumi had ties to extremism: Thumairy was a radical cleric who preached anti-U.S. views at a Los Angeles mosque; the KSA placed a mark on Bayoumi's passport to indicate his affiliation with al Qaeda; and Bayoumi had frequent contact with al Qaeda members and sympathizers. Aff. ¶ 216. Also, in April 2000, shortly after he started helping Hazmi and Midhdar, the KSA rewarded Bayoumi with a promotion, pay raise and a significant increase in his "other allowances" payment, which continued through September 2001. Aff. ¶¶ 13-14. This is circumstantial evidence that the only work that Bayoumi was actually doing – providing assistance to the two hijackers – was valued by the KSA and within the scope of his employment. *See Sokolow v. Palestine Liberation Organization*, 60 F.Supp.3d at 517 n.11 (S.D.N.Y. 2014)(promotions and pay increases provide circumstantial evidence that criminal conduct was within scope of employment), *vacated on other grounds sub nom.*, *Waldman v. Palestine Liberation Organization*, 835 F.3d 317 (2d Cir. 2016). In addition, the KSA demonstrated its complicity for the 9/11 attacks by intentionally

deceiving U.S. government investigators about Bayoumi's employment in a report signed by a KSA official who falsely claimed to be Bayoumi's private employer. Aff. ¶ 13.

These facts amply demonstrate that discovery is warranted to confirm the conduct, authority and motives of Thumairy, Bayoumi and the KSA officer(s) who directed them. Under California law, where the relevant tortious acts occurred, "an employer can be liable for his employees' unauthorized *intentional* torts" provided that the "risks are created by or inherent in the employer's enterprise." *Perez*, 41 Cal.3d at 967 (emphasis in original). In *Liu v. Republic of China*, 892 F.2d 1419 (9th Cir. 1989), the Ninth Circuit ruled that a foreign sovereign was liable under California law for the assassination in the United States of a journalist ordered by Taiwan's intelligence director "to silence a known critic" of the government. While the sovereign argued that the director did not consult with others in the government and was "motivated by a personal grudge," the court held that a "'mixed motive' is sufficient" and found proof that the director acted "partly for the benefit of the employer." *Id.* at 1423, 1427-29.

The test in New York also recognizes that an employer can be held responsible for unauthorized intentional or criminal acts, but states that rule somewhat differently, providing liability for tortious conduct that "was not so 'unforeseeable' as to make it unfair to charge the [employer] with responsibility." *Sokolow*, 60 F.Supp.3d at 517. Moreover, "the employer need not have foreseen the precise act or the exact manner of the injury as long as the general type of conduct may have been reasonably expected." *Riviello*, 47 N.Y.2d at 303. And an employer can be held responsible for the intentional acts of an employee who has personal motives that are being carried out together with the employer's work. *Gibbs v. City of New York*, 714 F.Supp.2d 419 (E.D.N.Y. 2010)(a police detective, even if his "secretly-held motives were mixed" in malicious prosecution of plaintiff, was acting within the scope of his employment).

The scope of employment is a fact-intensive inquiry ordinarily decided at a hearing or trial. *Perez,* 41 Cal.3d at 968; *Sokolow*, 60 F.Supp.3d at 517. The issue often hinges on circumstantial evidence regarding the employee's intent. In *Nelson v. American-West African Line*, 86 F.2d 730 (2d Cir. 1936) (L. Hand, J.), the Second Circuit held that there was a fact question for the jury whether a drunken boatswain who assaulted and started a fight with a sleeping crewmember was acting in the scope of employment, because: "motives may be mixed; men may vent their spleen upon others and yet mean to further their master's business; that meaning, that intention is the test." *Id.* at 731.

Jurisdictional discovery is also relevant to confirm the applicable law. Under the FSIA, state law applies to the scope of employment issue, including the choice of law rules of the forum state, here New York. Under its rules, the law of the place with the "greatest interest" in the relevant issue is applied. *Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 48-49 (2d Cir. 2013). *Licci* involved injuries in a terrorist attack in Israel and held that the law of the place of the defendant's allegedly tortious acts (New York) had the greater interest in applying its law. *Id.* Here, California law likely governs because the tortious assistance to the hijackers occurred in California where the KSA's officers were employed. *Id.*; *see Bailey v. J & B Trucking Services, Inc.*, 590 F.Supp.2d 4, 10 (D.D.C. 2009)(under District of Columbia choice of law rules, the scope of employment issue in a tort action arising from truck accident and injury in the District was governed by the law of Maryland, as it was the domicile of employer and employee and the location of their employment relationship). While the KSA claims that New York law applies as the place of injury, it overlooks the injuries and deaths at the Pentagon in Virginia and in Shanksville, Pennsylvania; fails to address the Second Circuit decision in *Licci;* and overlooks the location of its tortious conduct by California-based KSA officers Thumairy and

Bayoumi. KSA cites *Swarma v. Al-Awadi*, 622 F.3d 123, 144 (2d Cir. 2010), but that case is inapposite because it involved an alleged tort where both the conduct and injury occurred in New York.

The KSA relies on New York law cases involving distinguishable circumstances where employees acted solely for strictly "personal motives" and do not address scope of employment discovery. *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995) (sexual assault); *N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247 (2004)(sexual assault); *Swarma*, 622 F.3d 123 (sexual abuse); *United States v. International Bhd. of Teamsters*, 141 F.3d 405 (2d Cir. 1998) (embezzling from employer). But the KSA ignores the allegations and facts that Thumairy and Bayoumi were directed by one or more superiors and were motivated to help al Qaeda by the KSA's own support for the organization prior to 9/11. Aff. ¶¶ 7-9, App. 2. Indeed, the KSA relies on a 2005 FBI/CIA report, but overlooks its conclusion that before the 9/11 attacks, the KSA granted "special consideration" to al Qaeda. KSA Ex. 4 at 2.

***Causation***. As discussed below in Section IV.D., the proximate cause test is the only relevant standard under the JASTA and it has been uniformly applied in FSIA cases under the Anti-Terrorism Act, 18 U.S.C. §2331 *et seq.* ("ATA"). *Rux v. Republic of Sudan*, 461 F.3d 461, 474 (4th Cir. 2006); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d.1123, 1127-1130 (D.C. Cir. 2004); *see also Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir 2013); *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685, 695-99 (7th Cir. 2008); *Linde v. Arab Bank*, 97 F.Supp.3d 287, 323-28 (E.D.N.Y. 2015), *appeal docketed*, No. 16-2119 (2d Cir. argued May 16, 2017); *Sokolow*, 60 F.Supp.3d at 515, 522.

Once discovery is granted to confirm the facts, plaintiffs will prove that the deaths and injuries suffered in the 9/11 attacks were "caused by" the KSA's tortious conduct as specified

under JASTA. The hijackers, who could not speak English and were unfamiliar with American culture, arrived in California and were immediately provided with cover, transportation, housing and other help through a support structure provided by Thumairy, Bayoumi and other KSA official(s). Aff. ¶¶ 9, 216. Without that critical assistance, they would have had "zero chance for success" and the 9/11 plot would never have taken seed but would have been uncovered and thwarted. Ex. 1 at 3.

Moreover, causation is not considered in isolation but must be determined by considering the totality of the acts that were committed by the KSA: "causation may be established when an increasing number of defendant's faults creates an inference that the totality must have caused the harm." *In re Air Disaster at Lockerbie, Scotland on December 21, 1988*, 37 F.3d 804, 823 (2d Cir. 1994); *see Halberstam*, 705 F.2d at 488 ("although the *amount of assistance* Hamilton gave Welch may not have been overwhelming as to any given burglary in the five-year life of this criminal operation, it added up over time to an essential part of the pattern.")(emphasis in original). The piecemeal approach advocated by the KSA fails to consider whether its tortious acts, viewed in their totality, were a proximate cause of the 9/11 attacks.

**B. Jurisdictional discovery will validate plaintiffs' allegations and proof that the KSA knowingly created a Somali charity in San Diego to launder $375,000 to al Qaeda in 1998-2001**

Plaintiffs are entitled to discovery regarding their allegations that the KSA engaged in a money laundering scheme in California that sent money to al Qaeda in 1998-2001 and funded the 9/11 attacks, specifically:

- From 1995 through September 11, 2001, the KSA assigned Omar Abdi Mohamed ("Abdi Mohamed") to work in San Diego as a clandestine employee of the KSA Ministry of Islamic Affairs inside the U.S. and Abdi Mohamed fraudulently obtained a "religious worker" visa to enter the U.S. and intentionally concealed from the U.S. authorities that he was working for the KSA. Complaint ¶ 39c.; Aff. ¶ 30.

- Through Abdi Mohamed, the KSA proceeded to create the Western Somali Relief Agency ("WSRA"), a California non-profit corporation, and fraudulently obtained charitable tax status for the WSRA under 26 U.S.C. §501(c)(3), as a cover for its illegal operations. *Id*.

- The WSRA never actually did any charitable work and its hidden objective, in violation of various federal and state laws, was to provide a front to launder money from various al Qaeda affiliated organizations to al Qaeda. Complaint ¶¶ 39c.-e.; Aff. ¶¶ 29-37.

- Between December 1998 and February 2001, the money laundering scheme received "donations" totaling $326,838 from the Global Relief Foundation ("GRF") and $5,000 from the Al Haramain Islamic Foundation ("AHIF"). Ex. 44 at 5-6. After 9/11, both the GRF and the AHIF were directly linked to providing material support for al Qaeda and as a result were designated by the U.S. Treasury in 2002 as SDG Terrorist organizations. Aff. ¶¶ 30, 31.

- The $5,000 AHIF donation was initiated and approved by the KSA's Soliman Buthe ("Buthe") – an "unpaid volunteer" for the AHIF – in March 2000, the same month that Buthe engaged in a money laundering scheme to transfer $150,000 from the AHIF's accounts to al Qaeda. Section I.E.2., *infra*; Aff. ¶¶ 84-85. Both the $5,000 AHIF check to WSRA and the $150,000 transfer were intentionally removed from the AHIF's books by the KSA's Shoumar. Buthe was named by the U.S. as an SDG Terrorist for his role in laundering the $150,000 in AHIF funds to al Qaeda. *Id.*

- Between December 1998 and May 2001, Abdi Mohamed used the WSRA account to write 65 checks totaling $375,000 to Dahab Shil, a Somali money transfer company that was regularly used by al Qaeda to surreptitiously receive funds. Complaint ¶ 39e.; Ex. 44 at 5-6; Aff. ¶¶ 29-30. At that time, the Dahab Shil office in Karachi, Pakistan was controlled by al Qaeda and run by a Somali citizen who the U.S. authorities found was in contact with "other Somalis possibly linked to al-Qaida who were living in the United States and may have been involved in terrorist financing operations." Aff. ¶ 32; Ex. 48 at 5.

- The al Qaeda mastermind behind the 9/11 attacks, Khalid Sheikh Mohamed, operated out of Karachi, where he received and then dispersed approximately $400,000 to the hijackers to carry out the 9/11 attacks. Complaint ¶ 39e.; Ex. 33; 9/11 Report at 499 n. 131. The source of that cash was never traced during the 9/11 investigation. 9/11 Report at 172.

- A modus operandi identical to the WSRA scheme was used by the KSA in 1998 when U.S. authorities found that "elements of the Saudi Government" engaged in a money laundering scheme based at the King Fahd Mosque in Los Angeles. Ex. 13 at 25. The KSA diplomat and Imam Thumairy was responsible for that

Mosque's finances. Ex. 1 at 2. The scheme involved sending funds to "Somali non-profit organizations in San Diego," which then transmitted the funds through a Somali money transfer company to "entities affiliated with Usama Bin Ladin." Ex. 13 at 25-26. The FBI concluded that "this scheme may allow the Saudi Government to provide al-Qa'ida with funding through covert or indirect means." *Id.*

- During the time that Abdi Mohamed carried out the WSRA scheme, the KSA paid him a monthly salary and he was rewarded with "raises and bonuses for good work," including a bonus directly from Prince Sultan, the KSA's Deputy Prime Minister. Aff. ¶ 34. He received a personal visit from his supervisor Sowailem and was in regular contact with Sowailem and other superiors from the KSA's Ministry of Islamic Affairs at the Saudi Embassy in Washington, D.C. Aff. ¶¶ 35-36. Abdi Mohamed made two trips to Saudi Arabia in 1997 and 2000. Aff. ¶ 36. At no time during the period of his employment did the KSA suggest that he was not performing his job properly.

Plaintiffs' allegations – and the substantial proof underlying them from the criminal proceedings brought against Abdi Mohamed in the Southern District of California – compel the need for jurisdictional discovery of the KSA concerning its WSRA money laundering scheme. The KSA holds the key evidence sought in plaintiffs' discovery plan regarding Abdi Mohamed's employment, authority and instructions, the KSA's involvement in the WSRA scheme, the WSRA's records and the ultimate beneficiary of the covert funds sent to Dahab Shil.

**Tortious conduct**. Sending money to al Qaeda, a designated FTO, through a covert money laundering scheme is tortious conduct. *Weiss v. National Westminster Bank*, 768 F.3d 202, 207 (2d Cir. 2014). The plaintiffs offer detailed allegations and proof that the Saudi government used the WSRA to launder dirty money for al Qaeda:

- The vast majority of the laundered WSRA money (about $330,000) came from two organizations - GRF and AHIF - that were major al Qaeda funding agents, which led them to be named as SDG Terrorists after 9/11. Aff. ¶¶ 30-31.

- The identical modus operandi was used in 1998 by "elements of the Saudi government" to fund al Qaeda through Somali "non-profit organizations" in San Diego via a Somali transfer agency. Ex. 13 at 25-26.

- The KSA's Abdi Mohamed received the AHIF's check in March 2000 from the KSA's Buthe, who at the same time was laundering other AHIF money to al Qaeda and was later designated as an SDG Terrorist for another al Qaeda money laundering operation in March 2000. Aff. ¶¶ 84-85.

- The KSA, through its employment of Abdi Mohamed in the U.S. and its operation of the WSRA, engaged in fraud, false statements, secrecy and repeated violations of federal and state law, evidencing its knowing participation in criminal terrorist activity. Aff. ¶ 30.

- The WSRA sent $375,000 to Dahab Shil, a Somali transfer company regularly used by al Qaeda to surreptitiously move funds and the known contact point between al Qaeda and the U.S. Somali community was Dahab Shil's office in Karachi, which was controlled and operated by al Qaeda. Aff. ¶¶ 29, 32.

- During the same time the laundered funds were sent to Dahab Shil, al Qaeda was actively running its principal terrorist operation through Karachi, where the 9/11 mastermind Khalid Sheik Mohamed was located and distributed an estimated $400,000 to the 19 hijackers. Aff. ¶ 33.

The Ninth Circuit's affirmance of Abdi Mohamed's criminal conviction, which the KSA cites to suggest that WSRA had nothing to do with terrorism, actually provides added support for plaintiffs' claims. KSA brief at 43 n.43, *citing United States v. Mohamed*, 203 F.App'x 879 (9th Cir. 2006). The Ninth Circuit observed that while the U.S. government decided to bring only immigration-based and not terrorism-based charges against Abdi Mohamed, that in imposing a prison sentence the district court was allowed to consider, as relevant conduct, Abdi Mohamed's "mysterious circumstances" which were "proven by a preponderance of the evidence," namely

> that Mohamed had received money from organizations that would later be designated Specially Designated Global Terrorists and that this money's destination was unknown, that he had undisclosed employment with the government of Saudi Arabia, and that he had extensive foreign travel despite no apparent income to support it.

*Id.* at 880. The court found these circumstances "so unusual as to differentiate his case from a normal case of immigration fraud." *Id.*

***Scope of employment.*** The KSA completely fails to address or offer the actual facts in its possession regarding its covert assignment of Abdi Mohamed in the U.S. or its fraudulent

WSRA money laundering scheme. Plaintiffs are entitled to jurisdictional discovery, not the KSA's self-serving speculation.

The only "proof" offered by the KSA regarding Abdi Mohamed's KSA employment is a citation to Webster's dictionary. KSA Brief at 42-43. Based on Abdi Mohamed's job title as a "Propagator," the KSA suggests that he was a harmless missionary. That is hardly a proper response to the obligations of the KSA under JASTA and the Federal Rules or the grave allegations that the KSA provided key financing to al Qaeda through WSRA. Plaintiffs are entitled to their discovery plan's request for records concerning Abdi Mohamed's employment and WSRA, and a deposition of Abdi Mohamed's KSA supervisor Sowailem. Aff. at App. 1-2, 3, 8.

The allegations and proof show that Abdi Mohamed was being supervised by the KSA and set up the WSRA according to instructions provided to him by his superiors. While the WSRA money laundering operation was ongoing between 1998-2001, Abdi Mohamed: (1) was visited by his supervisor from the Ministry, the KSA's diplomat Sowailem; (2) received regular correspondence from Sowailem and other officials at the Ministry; (3) was subject to work rules imposed by the Ministry; and (4) was told by the KSA's officials that he was doing "good work" and given pay raises and bonuses. Aff. ¶¶ 34-36.

The evidence shows that the "good work" that Abdi Mohamed performed for the KSA was its WSRA scheme. He entered the U.S. in 1995 on the pretext that he would teach at a San Diego mosque - but never actually worked there. Aff. ¶ 37. He was convicted in 2005 by a federal jury and sent to prison for making false material statements to conceal from federal investigators that he was a covert agent of the KSA rather than a "religious worker" at that mosque. *Id.* There is simply no evidence that Abdi Mohamed did anything for the KSA other

than operate WSRA. The proof that Abdi Mohamed was rewarded for "good work" and received bonuses from the KSA is "relevant circumstantial evidence" that supports plaintiffs' allegations that Abdi Mohamed was "acting within the scope of [his] employment." *Sokolow*, 60 F.Supp.3d at 517 n.11.

***Causation***. In assessing proximate causation, this Court must consider all of the material support provided by the KSA to al Qaeda, including the various "charity" money schemes. *Lockerbie*, 37 F.3d at 823.

Whether considered alone or together with the other KSA support, the $375,000 provided to al Qaeda via WSRA was a proximate cause of the 9/11 attacks. That cash arrived at the precise time that al Qaeda was paying for the 19 hijackers' transportation, lodging and flight training and was practically equal to the $400,000 that investigators estimated that al Qaeda spent on the attack. Aff. ¶¶ 30, 33; *Strauss v. Credit Lyonanais*, 925 F.Supp.2d 414, 433 (E.D.N.Y. 2014) ("Hamas carried out the attacks during the same period of time within which the money was transferred"); *Gill v. Arab Bank, PLC*, 893 F.Supp.2d 494, 507 (E.D.N.Y. 2012)(the timing and amount of the terrorist funding is relevant to determine proximate cause). And in the words of the Second Circuit, it is "not wholly fanciful," *Filus*, 907 F.2d at 1333, that discovery will show that the $375,000 was the money distributed by Khalid Sheik Mohamed in Karachi to the 19 hijackers.

KSA argues that the flow of money through the WSRA and Dahab Shil cut the proximate cause chain. KSA Brief at 44. But plaintiffs' allegations and facts provide ample support for discovery on causation. As discussed above, the involvement of WSRA and Dahab Shil show that the cash transfers bear the fingerprints of both the KSA and al Qaeda. Where an intermediary has been knowingly used as the conduit to fund an FTO such as al Qaeda, courts

have found proximate cause and liability. *Linde*, 97 F.Supp.3d at 329 (funding into charity accounts at bank and direct funding); *Strauss*, 925 F.Supp.2d at 433 (money transferred through various charities allegedly controlled by the terrorist group); *Gill*, 893 F.Supp.2d at 507; *see Weiss*, 768 F.3d at 209; *Boim*, 549 F.3d at 698.

Here, WSRA was a charity in name only under the KSA's control that during the entire course of its existence performed only one function: laundering money for al Qaeda. Plaintiffs are entitled to discovery to confirm the KSA's employment, authority and direction of its employee Abdi Mohamed; the abuse of the corporate form through the KSA's creation of WSRA and obtaining federal charitable status; and also that the KSA "so dominates and controls" WSRA "that they must be considered principal and agent" and that it is appropriate "to look past their separate juridical identities and to treat them as aliases." *Weiss v. National Westminster Bank PLC*, 453 F.Supp.2d 609, 622-23 (E.D.N.Y. 2006), *citing National Council of Resistance of Iran v. Department of State*, 373 F.3d 152, 157 (D.C. Cir. 2004)(Roberts, J.).

The KSA relies on distinguishable cases where plaintiffs did not allege actual material support to a terrorist group. KSA Brief at 16-17, 64. In *Rothstein*, which involved money transferred by a bank to the government of Iran, the Second Circuit found "no nonconclusory allegation… that plausibly shows that the moneys UBS transferred to Iran were in fact sent to Hizbollah or Hamas…" 708 F.3d at 97. Likewise, in *Terrorist Attacks*, 714 F.3d at 124, there were no "factual allegations that the money allegedly donated by the…defendants to the purported charities actually was transferred to al Qaeda and aided in the September 11, 2001 attacks." *See Strauss*, 925 F.Supp.2d at 432-33 (distinguishing *Rothstein*). The *Ashton* plaintiffs have made such factual allegations.

**C. Jurisdictional discovery will substantiate plaintiffs' proof that the KSA: "cleansed" the hijackers' passports and facilitated their travel to the U.S.; knew that Bayoumi and the hijackers were associated with al Qaeda; and issued a fraudulent passport to the 9/11 plot mastermind**

Jurisdictional discovery set forth in the discovery plan of the passport files of the hijackers and others involved in the plot will confirm that: (1) the KSA had specific knowledge that the hijackers and KSA's Bayoumi were affiliated with al Qaeda; and (2) the KSA knowingly facilitated the 9/11 plot by (a) issuing the hijackers "cleansed" Saudi passports to allow them to obtain U.S. travel visas and (b) providing a fraudulent Saudi passport for the Pakistani mastermind behind the attacks.

***Passport indicators***. The KSA issued certain of its passports with a secret marker to signal that the passport holder was associated with Islamic extremism and al Qaeda. This indicator was unknown to U.S. authorities until after the 9/11 attacks. Aff. ¶¶ 40-42; Ex. 53 at 8, 10.

Many if not all of the 15 Saudi hijackers had the marker in their passports. Ex. 53 at 8. The passports of hijackers Hazmi and Midhdar, as well as the KSA's Bayoumi, had a marker. Aff. ¶¶ 41-42. The 9/11 Commission noted that Bayoumi's marker "suggests the need for further inquiry" but it never completed that task. 9/11 Report at 516 n. 19.

***"Cleansed" and fraudulent passports***. Zacarias Moussaoui ("Moussaoui"), an admitted and convicted al Qaeda terrorist who worked closely with Osama Bin Laden, stated that Bin Laden told him that the KSA's Prince Turki routinely arranged for al Qaeda members to get "cleansed" Saudi passports before they applied for their U.S. visas to remove signs of travel to Pakistan or Afghanistan. Complaint ¶ 42m.; Aff. ¶ 44; Ex. 54 at 17-18. Most of the Saudi hijackers successfully applied for their U.S. visas with such new passports. Ex. 53 at 8. Had the passports not been cleansed by the KSA, the U.S. authorities would have been alerted to each

hijacker's travel history and the visas necessary to conduct the 9/11 plot would likely have been denied. The KSA also issued a fraudulent Saudi passport in July 2001 to the Pakistani who was al Qaeda's mastermind behind the 9/11 attacks: Khalid Sheikh Mohamed. Complaint ¶ 42.k.; Aff. ¶ 45.

***Jurisdictional discovery is necessary.*** Discovery of the passport information will demonstrate that the Saudi government was aware of the fact that the hijackers were al Qaeda operatives, yet continued to issue them new "cleansed" passports and withheld the information from U.S. authorities. Indeed, after 9/11 the KSA's Prince Turki admitted that Hazmi and Midhdar were on a KSA "terror watch list" and the KSA's Prince Bandar admitted that the KSA had been following the movements of the hijackers "with precision." Aff. ¶¶ 46-47.

The allegations and proof of the KSA's knowing facilitation of the 9/11 plot by providing cleansed and fraudulent passport documents plainly demonstrates logistical support to al Qaeda that was a cause of the attacks. *See Weiss*, 768 F.3d at 207 (bank could be liable under the ATA for knowingly providing "financial services" to a terrorist organization).

### D. Plaintiffs are entitled to jurisdictional discovery concerning the 1999 "dry run" of the 9/11 attacks carried out by an al Qaeda operative and funded by the KSA

Plaintiffs are also entitled to the requests in their jurisdictional discovery plan concerning the KSA's contacts, instructions, sponsorship and support for an al Qaeda operative Hamdan Shalawi ("Shalawi") and al Qaeda sympathizer Mohamed Qudhaieen ("Qudhaieen"), who together carried out the November 1999 "dry run" of the 9/11 attacks. Complaint ¶¶ 44.k.-m.. Shalawi had a long history with al Qaeda: he attended a terrorist training camp run by Osama Bin Laden in the late 1980's. Aff. ¶ 51. During an America West flight from Arizona to Washington, D.C., the two men changed their seats without permission and Qudhaieen went to

the front of the plane (despite being directed to the bathroom at the rear of the plane) and attempted to open the cockpit door twice while Shalawi observed the responses of the flight crew and passengers. Aff. ¶ 50. The FBI concluded that the two men were trying "to test the security procedures…in preparation for and in furtherance of UBL/Al Qaeda operations." Ex. 13 at 24-25. Shalawi subsequently attended an al Qaeda training camp in Afghanistan in 2000 at the same time as several other 9/11 hijackers. Aff. ¶ 54.

Shalawi and Qudhaieen came to the U.S. as "graduate students" sponsored and paid by the KSA. Aff. ¶ 52. But their activities and contacts suggest that school was a cover for their actual purpose in the U.S. Shalawi was an imam at the KSA – funded Islamic Center of Tempe, where he met and formed a relationship with hijacker Hani Hanjour, who attended services led by Shalawi. *Id.* As for Qudhaieen, the FBI found that he had a "profile…similar to al-Bayoumi…" because he was "in the United States as a student and does not have a visible means of income…"; "is in frequent contact with Saudi Government establishments in the United States"; "runs a 'Saudi Club'" (which was part of the KSA's Embassy); and, "was receiving money from the Saudi Government…." *Id.*

The KSA paid the airfare of Shalawi and Qudhaieen for the "dry run" flight and the two men were ostensibly on the trip to attend a symposium at a KSA – sponsored event attended by high ranking KSA officials, most notably defendant Abdullah Naseef ("Naseef"), former Muslim World League ("MWL") Secretary-General, Vice-Chairman of the Shura Council and one of the founders of al Qaeda. Aff. ¶¶ 49, 52.

The "dry run" provided key logistical support for al Qaeda's 9/11 attack and constitutes tortious conduct. Plaintiffs are entitled to jurisdictional discovery to demonstrate that the two men committed this overt act as part of the 9/11 conspiracy. The dry run was a proximate cause

of the 9/11 attacks because it provided al Qaeda with a real-life test to develop its strategies to successfully subdue the passengers and crew members and take over control of the aircraft.

The KSA's suggestion that this Court should deny discovery and adopt as a matter of law the hearsay statements of both men that Qudhaieen, a frequent flyer, was only "looking for the lavatory" when he rattled the cockpit door strains credulity, given the statements of a flight attendant and passenger who watched Qudhaieen "walk directly to the cockpit and try to get into the cockpit." KSA brief at 37; Ex. 59 at 3. Also, the KSA's claim that there is an insufficient basis to allow discovery concerning Shalawi's attendance an al Qaeda training camp in Afghanistan in 2000 is contradicted by the proof that Shalawi closed his Arizona bank account in July 2000; made no appearance at Arizona State University during the entire 2000-2001 academic year; knew hijacker Hani Hanjour; admitted attending an al Qaeda camp run by Osama Bin Laden in the late 1980's; and was found by the FBI to have attended a terror training camp in Afghanistan in 2000 at the same time as several 9/11 hijackers. KSA brief at 38; Aff. ¶¶ 51, 52, 54.

**E. Plaintiffs are entitled to jurisdictional discovery to establish the KSA's control and misuse of the AHIF, including an al Qaeda money laundering scheme and the AHIF's takeover of the Saudi Embassy in Kabul**

**1. KSA's domination of the AHIF**

The KSA created the Al Haramain Islamic Foundation in Pakistan in the late 1980's and in 1992 the AHIF moved to Saudi Arabia and was "officially launched" by the KSA's then – Prince Salman. Complaint ¶ 48.a.; Aff. ¶¶ 66, 67. According to the West Point Combating Terrorism Center, the AHIF was "functionally an extension of al-Qa'ida." Aff. ¶ 67. The AHIF and al Qaeda remained synonymous through 9/11. The KSA now admits that the AHIF was "one of the biggest terror-financing operations in the world and the funding organ and channel

for the Nairobi, Kenya and Dar es Salaam bombings in 1998." Ex. 47 at 3. Yet U.S. investigators confirmed that prior to 9/11, the "[AHIF's] direct overseers are members of the [Saudi] Royal Family…" and that "significant contributors [to the AHIF] are members of the Royal Family." Ex. 13 at 27.

From 1992 through 9/11, the AHIF was led by Saleh bin Abdulaziz Al Ash-Shaikh ("Ash-Shaikh"), who from 1995 served as the KSA's Deputy Minister of Islamic Affairs and then, starting in 1999, as the KSA's Minister of Islamic Affairs. Complaint ¶ 48.b.; Aff. ¶ 68. Ash-Shaikh was, in the words of the AHIF, "[t]he superintendent of all [AHIF] activities." Ex. 85 at 2. The word "superintendent" is defined as "one who has the oversight and charge of a place, institution, department, organization, or operations with the power of direction." *Webster's Third New International Dictionary* 2294 (2002). Ash-Shaikh held meetings of the AHIF's "Administrative Board" in his office at KSA's Ministry of Islamic Affairs. Ex. 86 at 3-4. Ash-Shaikh appointed the AHIF's "Board of Directors and senior management personnel." Complaint ¶ 48.c.; Ex. 87 at 2.

Ash-Shaikh not only exercised the power of direction over the AHIF as its "superintendent," but controlled the AHIF through the Ministry of Islamic Affairs, which had offices and personnel at Saudi Embassies and Consulates around the world. For example, the 2001 report of the AHIF office in Bangladesh states that the AHIF "is operating under the supervision of the Saudi Ministry of Islamic Affairs." Ex. 88 at 4.

In 2004, the KSA dissolved the AHIF and took over its assets. Ex. 89 at 6. The disposition of those assets remains unknown. Aff. ¶ 73. Despite his role as the head of an al Qaeda terror-financing operation, Ash-Shaikh remains today in his position as the KSA's Minister of Islamic Affairs.

The following two events show how the KSA was involved with and directed the AHIF to provide key support for al Qaeda and the 9/11 attacks.

**2. KSA/AHIF money laundering of $152,000 to al Qaeda in 2000**

Soliman Buthe had a high level full-time position with the KSA in the City of Riyadh, governed by Prince Salman, the AHIF's benefactor. Aff. ¶ 75. In 2000, Buthe travelled to the U.S. to engage in a money laundering scheme to carry $152,000 in cash donated to the AHIF for "Chechnya refugees" and deliver the money to al Qaeda. Complaint ¶ 39.aa; Aff. ¶¶ 75-85. As a result, Buthe was named an SDG Terrorist. *Id.* at ¶ 39.cc.; Aff. ¶ 75.

A variety of facts and circumstances show that the $152,000 transfer was directed by the KSA. Buthe ran the scheme out of his KSA office: his business cards for his job with the KSA and his "volunteer" AHIF role used the same office address and phone number. Aff. ¶ 76. Buthe claimed he was an AHIF "unpaid volunteer" but was undoubtedly compensated by the KSA for the substantial time he spent planning and conducting the scheme. *Id.;* Ex. 93 at 3. Buthe's lawyer herself defended his actions by arguing that "the funds that the AHIF transferred and collected… were part of a Saudi government project which was approved at the highest levels of…the Saudi … government[]." Aff. ¶ 79; Ex. 99 at 7. After Buthe was named as an SDG Terrorist, the KSA gave him two promotions, additional responsibilities, substantial benefits (including free schooling for his children) and paid him in cash (because his bank accounts were frozen by the SDG Terrorist designation). Aff. ¶ 83. And the KSA denied U.S. investigators access to key AHIF banking records that would have confirmed the receipt and distribution of the laundered funds. Aff. ¶ 80. Plaintiffs seek those records as part of their jurisdictional discovery plan. Aff. at App – 1-9. Finally, another KSA employee, Abdelaziz S.

Al-Shoumar ("Shoumar"), did AHIF's accounting and worked with Buthe to hide the money trail by keeping the laundered funds off the books. Aff. ¶¶ 82, 85.

**3. The KSA allowed the AHIF to take over the Saudi Embassy in Kabul after Saudi diplomats left in 1998**

After the KSA closed its Embassy in Kabul, Afghanistan in September 1998, the KSA allowed its Embassy buildings to be used by the AHIF and al Qaeda. Complaint ¶¶ 43c.-d. Coalition forces arriving to defeat the Taliban government found that the AHIF was operating in the Saudi Embassy building. Aff. ¶¶ 88-93. According to German government officials and news reports, the AHIF's "Saudi leader" in Afghanistan "had been given orders from Riyadh to operate in the Saudi Arabian embassy" and "acknowledged he had received orders from Riyadh to continue helping Saudi families living in Kabul even after the beginning of U.S. air strikes." Aff. ¶ 89. Moreover, the Saudi Ambassador's residence was transformed into an al Qaeda guesthouse run by Osama Bin Laden's head of security. Aff. ¶¶ 88, 90-93. The guesthouse was visited by al Qaeda members heading for the training camps. *Id.*

Despite closing its Embassy, the KSA maintained diplomatic relations with the Taliban government until after 9/11. Aff. ¶ 87. The circumstances indicate that the KSA "closed" its Embassy in Kabul (to appease the U.S. after the August 1998 U.S. Embassy bombings) but instructed the AHIF to maintain a de facto diplomatic office of the KSA in the building.

**4. The need for jurisdictional discovery**

Jurisdictional discovery is clearly supported by the facts which show that the AHIF was created and tightly controlled by the KSA and that the KSA abused the corporate form of the AHIF for its own purposes:

- the AHIF was created by the KSA and brought to Saudi Arabia under the supervision of Prince Salman; Aff. ¶ 66;

- the AHIF's "direct overseers are members of the Royal family"; Ex. 13 at 436;

- the KSA's Minister of Islamic Affairs Ash-Shaikh was the "superintendent" in control of the AHIF; held board meetings in his KSA office; and exercised his control through Ministry of Islamic Affairs officials located at KSA's Embassies around the world; Aff. ¶ 69;

- the AHIF money laundering scheme was "approved at the highest levels of…the Saudi … government" and KSA employees Buthe (who worked under Prince Salman) and accountant Shoumar did work on the scheme (while using his KSA email account); Aff. ¶¶ 79, 82;

- the AHIF was instructed by Riyadh to take over and operate the KSA Embassy in Kabul; Aff. ¶ 89;

- after Buthe was named an SDG Terrorist for his KSA/AHIF work, the KSA not only continued to employ Buthe but rewarded him with promotions, additional pay and a variety of valuable benefits; Aff. ¶ 83;

- the KSA rejected U.S. government requests and subpoenas issued to the AHIF; Aff. ¶ 80.

Plaintiffs' discovery plan includes the deposition of Ash-Shaikh, who led the AHIF at all relevant times as its "superintendent." Aff. ¶ 69. He has the key knowledge of the KSA's direct involvement and its participation and control of AHIF. His deposition is particularly important because the AHIF (while still under Ash-Shaikh's control) initially appeared before this Court but subsequently failed to respond to discovery requests and eventually defaulted. Aff. ¶ 63. Ash-Shaikh was also the superior of Thumairy, Sowailem and Abdi Mohamed and has knowledge regarding their appointment, authority and employment. In addition, plaintiffs seek a deposition of defendant Buthe, together with documents evidencing the KSA's direct role in the money laundering scheme, the KSA's control of the AHIF, the AHIF's use of the KSA's Kabul Embassy and the KSA's termination of the AHIF and the disposition of its assets.

KSA's continued employment, promotions and various monetary benefits given to Buthe after his designation as an SDG Terrorist provides circumstantial evidence that Buthe was acting

within the scope of employment. *Sokolow*, 60 F.Supp.3d at 517-18 & n.11 (fact that employees involved in terrorism remained on the Palestinian Authority payroll and received promotions was circumstantial evidence that their acts were done in the scope of their employment).

In addition to discovery of the facts regarding the KSA's direct involvement in the AHIF laundering scheme, plaintiffs should be allowed jurisdictional discovery on the issues of agency and alter-ego, including the KSA's control over the AHIF and the KSA's disregard of the AHIF's independence. *First City*, 150 F.3d at 177 (although the district court allowed an initial round of discovery of the sovereign's national bank, the Second Circuit remanded for additional discovery on the alter-ego issue); *Weiss*, 453 F.Supp.2d at 623 (inquiry into facts regarding control and domination of charities by Hamas was appropriate).

Discovery is appropriate based on the plaintiffs' allegations and proof of the shared leadership and personnel of the KSA and AHIF; the money laundering schemes involving the AHIF run by the KSA's Abdi Mohamed and Buthe out of the KSA's offices; and the direction exercised by the KSA over the AHIF. *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S.611, 632-33 (1983)("*Bancec*")(courts may adopt equitable principles and need not "adhere blindly to the corporate form where doing so would cause…an injustice"). The KSA's refusal to allow the AHIF to answer U.S. government subpoenas evidences that the KSA was in command of AHIF. *Arch Trading*, *Corp. v. Republic of Ecuador*, 839 F.3d 193, 207 (2016) (requirement that sovereign provide a letter before agent could grant access to financial records demonstrates control).

The cases cited by the KSA that deny discovery are plainly distinguishable. KSA brief at 69. In *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 479, 486 (2d Cir. 2007), plaintiff failed to claim that a bank was an alter-ego of the sovereign, and "the record makes clear" that the

relevant FSIA immunity exception did not apply. The plaintiffs in *Arch Trading*, a case with a "vanishingly thin, if any, connection to the United States," made only general, conclusory averments and "did not specify—and on appeal still have not specified—what discovery they might seek." 839 F.3d at 207. One case cited by the KSA actually allowed jurisdictional discovery. *Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000)(regarding question of whether a bank was controlled by and alter-ego of the sovereign "the magistrate judge afforded the parties two years of discovery solely on the jurisdictional issue" before ruling that there was no jurisdiction).

**F. Plaintiffs are entitled to jurisdictional discovery of the KSA's domination and control of the MWL/IIRO; the KSA's use of the MWL/IIRO to conduct government business; and the KSA's direct involvement in the Afghan orphan money laundering scheme that funded the al Qaeda camps where the 19 hijackers received their training**

As detailed in the Complaint and the proof set forth below, the MWL/IIRO was not only subject to extensive control of the KSA but the KSA acted through the MWL/IIRO and abused their charitable form to provide material support to al Qaeda. Complaint ¶¶ 42, 43. a., b., n., q., t., 46.

**1. The KSA's top-to-bottom control of the MWL/IIRO**

The daily operations of the MWL/IIRO were conducted and supervised by a KSA Minister who served as the MWL Secretary General and the IIRO Chairman. The Minister in that position from 2000 - 9/11/2001 was also a member of the KSA's governing body, the Ulema, and his immediate predecessor from 1996-2000 was also a member of the KSA's Supreme Council of Islamic Affairs and Shura Council. An extensive network of the KSA's officials and employees exercised top-to-bottom control of the MWL/IIRO:

- The KSA's King issued decrees directly to the MWL/IIRO. Aff. ¶¶ 117, 123, 124.

- The KSA's Grand Mufti and Head of the KSA's Senior Council of the Ulema, *i.e.* the KSA's religious leader, chaired the MWL's Constitutive Council, and set policies for the MWL/IIRO. Aff. ¶ 137.

- The KSA's Chairman of its Supreme Council of Islamic Affairs supervised the KSA Minister who served as Secretary General and President of the MWL/IIRO. Aff. ¶¶ 121, 126, 159.

- The KSA's King appointed the KSA Minister who served as the Secretary General and President of the MWL/IIRO. Aff. ¶ 117.

- The KSA's Ministry of Islamic Affairs directed and oversaw the details of the MWL/IIRO's work not only from its Riyadh headquarters but through the Ministry's religious attachés in KSA's Embassies and Consulates around the world. Aff. ¶¶ 130, 133, 162.

- The KSA's Ministry of Foreign Affairs supervised and issued instructions to the MWL/IIRO not only through its Riyadh headquarters but through its Ambassadors in KSA's Embassies around the world. Aff. ¶¶ 124, 128, 146, 157, 158.

- Numerous KSA Embassy full-time employees simultaneously held MWL/IIRO positions directing the work of the MWL/IIRO in a variety of capacities and KSA Embassy, Consulate and other employees were assigned to perform MWL/IIRO work. Aff. ¶¶ 143, 145, 146.

Numerous facts demonstrate the extensive and detailed day-to-day control that the KSA exercised over the MWL/IIRO:

- The KSA conferred its government diplomatic status to the MWL/IIRO and represented to other nations that the MWL/IIRO personnel were part of the Saudi government. Aff. ¶¶ 146, 148, 150, 157.

- The KSA's King directed the MWL/IIRO to undertake specific construction and refugee projects and the KSA's Ministries ordered the MWL/IIRO to undertake specific projects and conduct travel on behalf of the KSA, including Saudi government classified matters. Aff. ¶¶ 123, 124, 126, 127, 128, 133, 134, 135.

- The KSA funded nearly the entire annual budget of MWL/IIRO "in furtherance of national policy." Aff. ¶ 127. In 2000, the KSA furnished 98.5% of the MWL revenues, a total of SR80 million Saudi Riyals (approximately $21.3 million). Aff. ¶¶ 127, 138.

- The offices of the MWL/IIRO were located inside the KSA's Embassies around the world. Aff. ¶¶ 143, 145, 152.

- The KSA made major and minor personnel decisions for the MWL/IIRO, including selecting, hiring and firing employees and provided KSA employees on "loan" to manage MWL/IIRO projects. Aff. ¶¶ 98, 127, 129, 137, 144, 146, 153.

- The KSA made routine MWL/IIRO funding decisions: third party funding applications required pre-approval and certification from the KSA Embassy, the KSA's Ministry of Foreign Affairs had to formally approve MWL grants before they could proceed. Aff. ¶¶ 127, 128, 130, 131, 132, 154, 160.

- A KSA Embassy representative was authorized to make IIRO purchasing decisions as part of a local committee. Aff. ¶ 156.

- The specific criteria used to make MWL/IIRO funding decisions were mandated by the KSA's Ministry of Foreign Affairs. Aff. ¶ 128.

- The KSA's full time Embassy and religious attaché employees worked for and held titles with the MWL/IIRO; for example, a KSA Chargé d'Affairs was an IIRO "office supervisor," and a Saudi Ministry Religious Attaché was the head of an IIRO office. Aff. ¶¶ 143, 145.

- Numerous detailed aspects of MWL/IIRO operations were directed by the KSA, such as the specifics of an employee's work program; instructions from the KSA to MWL/IIRO employees not to talk to the press; and the particulars regarding the distribution of a clothing aid program. Aff. ¶¶ 129, 135, 168.

- The KSA requested and obtained "full diplomatic immunity" for MWL/IIRO employees and at the KSA's request MWL/IIRO employees obtained diplomatic license plates. Aff. ¶¶ 150, 157.

- As a practice, the KSA issued Saudi diplomatic passports to the MWL office directors in Europe, Africa, Australia and the Middle East. MWL and IIRO officials traveled using official KSA passports. Aff. ¶ 148.

- MWL/IIRO employees travelling abroad represented themselves to be representatives of the Saudi government. Aff. ¶¶ 147, 149.

- The KSA routinely handled a variety of financial transactions for the MWL/IIRO, including bank transfers, money transfer authorizations, payroll payments, real estate transactions and legal matters. Aff. ¶ 154.

- The KSA assigned its Embassy and military employees to handle various MWL/IIRO projects, including programs for schools, mosques, orphanages, food delivery and other aid in nations around the world. Aff. ¶ 155.

- The head of the MWL/IIRO in Canada testified in 1999 that "I work for the government of Saudi Arabia" and "am an employee of that government"; that "the IIRO is the relief branch of that organization [the MWL] which means that we are controlled in all of our activities and plans by the government of Saudi Arabia"; and, that the MWL/IIRO "has to abide by the policy of the Government of Saudi Arabia" and that "[i]f anybody deviates from that, he would be fired; he would not work at all with IIRO or with the [MWL]...." Aff. ¶ 153.

**2. The KSA/MWL/IIRO Afghan orphan money laundering scheme to fund al Qaeda and its training camps attended by the 9/11 hijackers**

Plaintiffs are entitled to jurisdictional discovery of the allegations and proof that for over a decade prior to the 9/11 attacks, high ranking KSA officials laundered money through the MWL/IIRO to fund al Qaeda's Afghanistan training camps.

The position of Secretary General/President of the MWL/IIRO was a KSA Minister level appointment nominated by the KSA's King. Aff. ¶ 120-21. Naseef held that position in late 1988 when he met with Osama Bin Laden in Pakistan and together with Wael Jelaidan ("Jelaidan") developed a plan for the MWL/IIRO to provide support for Bin Laden's jihadists in Pakistan and Afghanistan. Aff. ¶ 118.

Starting in the early 1990's, while Naseef remained at the helm of the MWL/IIRO, its Pakistan office – then headed by Jelaidan – routinely siphoned funds from its Afghan orphan program to al Qaeda and concocted phony paperwork to cover the fraud. The details of the fraud were later provided to investigators by Jamal al Fadl, an al Qaeda defector now in the U.S. federal witness protection program. Aff. ¶¶ 99-105.

Documents confirm that the MWL/IIRO's headquarters was aware no later than 1994 of major discrepancies in the orphan lists and that many orphans were not receiving funds. Aff. ¶ 102. Nevertheless, the IIRO employee in Pakistan who implemented the scheme through 1995

under Jelaidan's guidance was promoted to the IIRO's Jeddah headquarters and put in charge of the "Relief Section". Aff. ¶¶ 105-106.

In 1997, the new KSA Minister placed in charge of the MWL/IIRO, Abdullah Bin Saleh al Obaid ("Obaid"), acknowledged that funds had been "misused" to support "extremist groups" but claimed that the episode was a "closed chapter." Aff. ¶ 100. That statement was false, however, as the same orphan program scheme was still ongoing and continued at full steam to funnel MWL/IIRO money to al Qaeda.

A 2001 Ernst & Young accounting of the IIRO's records concluded that from 1996-2001 over half of the orphan program's funds in Pakistan and Afghanistan were missing (including over $260,000 on one project) and that there was evidence of the IIRO's "fraudulent intentions" because of forged receipts, false invoices and fake purchases. Aff ¶ 101. MWL/IIRO records state that the orphan program dispersed $4 million during the Islamic calendar year from March 2000-March 2001. Aff. ¶ 104.

The KSA was an active, knowing and longstanding participant in the scheme:

- The MWL/IIRO was led by a KSA Minister who publically acknowledged the fraud, said it was a "closed chapter," yet, as shown by the Ernst & Young report, continued the longstanding practice of diverting funds to al Qaeda. Aff. ¶¶ 100-101.

- Despite the public reports of the fraud, the KSA and its Royal family continued through 2001 to furnish the main contributions earmarked for the Afghan projects of the MWL/IIRO and did nothing to stop the laundering scheme. Aff. ¶¶ 99-104.

- Prior to 9/11, the KSA Embassy in Pakistan said it was "steering the work" of the MWL/IIRO in Afghanistan. Aff. ¶ 167.

Various government investigators confirmed that the IIRO funds were used to provide direct support for al Qaeda training camps in Afghanistan prior to 9/11 where all of the 19 hijackers received their training. Aff. ¶¶ 54, 108, 109; 9/11 Report at 234-35. For example, the

U.S. State Department concluded that "IIRO has been cited as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime." Aff. ¶ 109; Ex. 135 at 2.

**3. Jurisdictional discovery must proceed**

Plaintiffs are entitled to conduct and complete their ongoing discovery to confirm the facts of the knowing involvement of the KSA in the Afghan orphan money laundering scheme to provide material financial support to al Qaeda. Aff. ¶¶ 91-119. Plaintiffs' discovery plan includes depositions of the KSA Ministers Naseef and Obaid who led the MWL/IIRO and Jelaidan, who played a number of roles supporting al Qaeda through the MWL/IIRO as well as other KSA run organizations that supported terror. *See* Aff. App. 1-9. Naseef, Obaid and Jelaidan are all named defendants in this litigation. In addition, plaintiffs are still conducting document discovery of the MWL/IIRO, with motions to compel documents due on December 1, 2017. That discovery must be completed before the KSA's motion can be addressed. *First City*, 150 F.3d at 177 (discovery of alleged alter-ego Rafidain Bank must be concluded before district court could consider motion to dismiss of Iraq's central government bank).

That MWL/IIRO scheme to fund al Qaeda was a proximate cause of the 9/11 attacks; not only was the timing, location and amount of the funding highly significant in relation to 9/11, but the U.N. and U.S. confirmed that MWL/IIRO "directly supported" and was the "principal sponsor" of the al Qaeda training camps where the 19 hijackers received their training. Ex. 134 at 3; Ex. 135 at 2; *see Strauss*, 925 F.Supp.2d at 433; *Gill*, 893 F.Supp.2d at 507.

In addition, the allegations and facts compel document discovery of the KSA on alter-ego and agency. The "[f]actors to be considered include whether the organizations share leadership, whether they commingle finances, publications, offices, and personnel, and whether one operates as a division of the other." *Weiss*, 453 F. Supp.2d at 623. The KSA routinely ignored the

"separate status" of the MWL/IIRO, deprived it of the "independence from close political control," required "approvals for ordinary business decisions from a political actor" and issued "policies and directives" for the MWL/IIRO "to act directly on behalf of the sovereign state." *EM Ltd. v. Banco Central De La Republica Argentina*, 800 F.3d 78, 91 (2015), *cert. dismissed,* 136 S.Ct. 1731 (2016).

A KSA Minister was put in charge of the day-to-day operations of the MWL/IIRO and a network of KSA officials – including the KSA's King, Grand Mufti, the Chairman of KSA's Supreme Council, its Ministers of Islamic Affairs and Foreign Affairs, Ambassadors, religious attachés, diplomats, military and others in Saudi Arabia and around the world – participated in directing and carrying out the MWL/IIRO's work. Aff. ¶¶ 117-168. The KSA itself conducted the basic functions of the MWL/IIRO, including nearly all fundraising; making project and grant decisions; setting grant criteria; approving grants; making purchasing and employment decisions; providing offices; loaning employees; defining work programs; issuing job instructions; aiding grant distribution; and handling financial transactions. Highly relevant are the facts establishing that the MWL/IIRO actively held itself out to the world as the KSA. MWL/IIRO officers travelled as KSA officials on government passports. Aff. ¶ 149. MWL/IIRO personnel enjoyed the KSA's "full diplomatic immunity" and had diplomatic license plates. Aff. ¶¶ 150, 157. The officers of the MWL/IIRO understood that they worked for and were employed by the KSA. Aff. ¶ 153. Notably, the MWL/IIRO asserted sovereign immunity before this Court. Aff. ¶ 97.

None of the cases cited by the KSA address situations that involve anywhere near the degree of control that the KSA exercised over the MWL/IIRO. Jurisdictional discovery should be allowed because plaintiffs present more than "an adequate basis for expecting that they would be able to rebut the *Bancec* presumption…." *Arch Trading*, 839 F.3d at 207.

The KSA cites *Kirschenbaum v. 650 Fifth Ave. & Related Props.,*830 F.3d 107 (2d Cir. 2016), *cert. denied,* 137 S.Ct. 1332 (2017), but that case amply demonstrates the necessity for discovery. The KSA ignores that the Second Circuit remanded the case for further proceedings, and that the district court allowed extensive discovery, which revealed that Iran had gone to great lengths to obscure its actual role in controlling the subject real estate partnership. *Kirschenbaum*, 2017 WL 2807703 at *1 and *41. On remand, the lower court determined at a bench trial that the partnership was Iran's alter-ego because members of the partnership took instructions from high-ranking Iranian political officials, including Iran's U.N. Ambassador; held positions in Iran's government or were beholden to Iran for their appointments; received direction from a charitable foundation under the Iranian government's control; and allowed Iran to control the partnership's finances. *Id.* **6-12, **54-56. The allegations and facts regarding the KSA's control over the MWL/IIRO (and AHIF, WAMY and SHC) detail similar claims that compel discovery.

**G. Plaintiffs are entitled to complete their discovery of WAMY and obtain jurisdictional discovery of the KSA**

World Assembly of Muslim Youth (WAMY) was previously known as Lajnat al Bir al Islamiya ("LBI"), which changed its name to Benevolence International Foundation (BIF), but WAMY, LBI and BIF are the same organization. Aff. ¶¶ 169, 170. WAMY has longstanding ties to al Qaeda, and prior to 9/11 had two officers who were founders of al Qaeda. Aff. ¶¶ 171, 172. As set forth in the Complaint, the U.S. State Department found that WAMY's LBI and BIF provided al Qaeda with financial, logistical and military support for its operations during the decade prior to 9/11. Complaint ¶¶ 39. a., v., z.; Aff. ¶ 173.

For example, the WAMY office in Canada (under the direction of WAMY's U.S. President Abdullah Bin Laden, Osama Bin Laden's nephew) maintained a bank account

"WAMY o/a [operating as] BIF." Aff. ¶ 174. In March 2001 that account received $50,293 via wire from Saudi Arabia and in March-June 2001 WAMY sent $50,246 for BIF's orphan program in Afghanistan with the knowledge that the money would be diverted to al Qaeda. Complaint ¶ 39. v.; Aff. ¶ 174.

During the decade prior to 9/11, KSA officials were in positions of authority directing the day-to-day operations of WAMY: (1) WAMY Secretary General Maneh al Johani ("Johani") was also a member of the KSA's Shura Council and the Head of its sub-committee on Islamic Affairs, Aff. ¶ 184; (2) WAMY President Ash-Shaikh was the KSA's Minister of Islamic Affairs, Aff. ¶ 180; (3) WAMY Vice Chairman Naseef (one of the founders of al Qaeda) was a Vice Chairman of the KSA's Shura Council, Aff. ¶ 185, as well as the former President of the MWL/IIRO; (4) WAMY Trustee Hussein al Ayed worked for the KSA's Ministry of Islamic Affairs, Aff. ¶ 186; (5) WAMY's U.S. President Abdullah Bin Laden was KSA's Administrative Attaché with diplomatic status at the Saudi Embassy in Washington, Aff. ¶ 176; (6) WAMY U.S. employee Mohamed Faris, was paid by the Saudi Embassy in Washington. Complaint ¶¶ 47. f, i.-k.; Aff. ¶ 189.

Discovery of WAMY is currently ongoing (its final round of documents are due on November 30, 2017, with additional discovery to follow), and to date has shown not only the shared employees but also that the KSA directed WAMY funding decisions; paid WAMY employees; made purchasing decisions; directed scholarship grants; and funded WAMY projects. Complaint ¶ 47. a.-s.; Aff. ¶¶ 180, 189, 190, 191, 192, 193.

Plaintiffs must complete their discovery of WAMY and should be allowed to conduct discovery of the KSA on the issues of the alter-ego-agency. *First City*, 150 F.3d at 177.

### H. Plaintiffs are entitled to jurisdictional discovery of the SHC and KSA regarding the funding of al Qaeda through the al Qaeda controlled "KA Stan"

While the Saudi High Commission ("SHC") has filed separate motion papers, the KSA admits that the SHC "is an arm of the Saudi Arabian government" and "[a]ctions taken by the Saudi High Commission may be viewed as actions of the government of Saudi Arabia...". Complaint ¶ 49.6; Aff. ¶ 207. The SHC was created by decision of the President of the Council of Ministers of Saudi Arabia and was a "primary instrument" of KSA's foreign policy. Aff. ¶ 208. During the decade prior to 9/11, the SHC was continuously headed by Prince Salman, and the members of the SHC's Executive Committee and Supreme Commission were KSA officials who made grant decisions based on the KSA's foreign policy. Complaint ¶ 49. c., g.; Aff. ¶ 208. The Director of the SHC was a KSA employee and member of the KSA civil service and reported to other KSA employees. Complaint ¶ 49. d.1.; Aff. ¶ 208. The KSA decided the recipients and amounts of all grants made by the SHC. Aff. ¶ 208. The SHC was staffed with civil servant employees of the KSA detailed from other KSA Ministries and administrative organs, and such employees were paid by their respective Ministries and administrative organs, rather than by the SHC. Complaint ¶ 49. i.; Aff. ¶ 208.

Following 9/11, the U.S. government determined that the SHC had been a longstanding supporter of terrorism against the U.S. The Defense Department determined that the SHC was "in a position to provide financial support to terrorist organizations willing to attack US persons or interests…" and the State Department called the SHC one of the "Dirty Dozen" terror supporting organizations in Bosnia with known links to terrorism. Aff. ¶¶ 200, 201.

During the Bosnia war from 1992 to 1995, the SHC not only provided millions of dollars of funding to al Qaeda through the Third World Relief Agency (TWRA), but directly supported

al Qaeda in various ways, including food and supplies, use of SHC vehicles (including vehicles with United Nations license plates), access to SHC buildings and employment of al Qaeda members with the SHC. Complaint ¶¶ 43. s., t.; Aff. ¶¶ 197-202. Hijackers Hazmi and Midhdar fought in Bosnia as members of a mujahidin force that was funded by the SHC. Aff. ¶ 202.

Starting in 1996 through 1999, under the pretext of doing construction work in Bosnia, the SHC sent millions of dollars to a construction company called KA Stan through the SHC's offices in Mostar and Sarajevo, Bosnia. Complaint ¶ 39. v.; Aff. ¶ 204. Both of those SHC office locations were headed by al Qaeda members. Aff. ¶ 199. KA Stan itself was controlled by al Qaeda founder Jelaidan and al Qaeda supporters Yasin Kadi and Chafiq Ayadi. Aff. ¶ 203. All three men were designated as SDG Terrorists following 9/11. Aff. ¶ 203. The U.S. government announced that it had "credible information that Wa'el Julaidan is an associate of Osama bin Laden and several of bin Laden's top lieutenants" and "has directed organizations that have provided financial and logistical support to al Qaida." Aff. ¶ 203.

Plaintiffs have alleged and present facts which show that a significant portion of the funds sent to KA Stan were used to fund al Qaeda. KA Stan corporate documents from 1998 show that the SHC made numerous money transfers for purported construction projects in Bosnia, and that a large proportion of the funds were not used for construction. Aff. ¶ 204. For instance, the SHC paid KA Stan a total of 1,000,000DM (approximately $600,000) for an "Arab Institute" project in Mostar, but only 313,000DM (about $200,000) was spent, leaving 687,000DM ($400,000). Aff. ¶ 204. Nevertheless, Kadi told the U.S. Treasury Department that "[t]he company ceased to be financially viable during the course of 1998, with its expenses outstripping its income." Aff. ¶ 204.

In 2000, the SHC's President Prince Salman visited Bosnia with Wael Jelaidan, purportedly to view various KA Stan projects. Aff. ¶ 205. Following the 9/11 attacks, after the KSA rebuffed U.S. requests for information related to Jelaidan by saying they had "nothing new," the General Counsel of the U.S. Treasury Department testified to the Congressional Joint Inquiry that "I think that taxes credulity, or there is another motive we are not being told." Aff. ¶ 205.

The SHC makes the claim that "[t]he funds allegedly transferred by then-Prince Salman from his *personal* accounts are not within the scope of employment." SHC Brief at 17. But the SHC's prior Motion to Dismiss confirmed that "King Fahad vested in SHC and its President, Prince Salman, sole authority to collect donations and provide aid and humanitarian relief in Bosnia-Herzegovina, so KSA would 'speak with one voice' as a nation toward Bosnia-Herzegovina." Aff. ¶ 195. It taxes credulity to claim that any payments made by Prince Salman were not part of that "one voice" and outside the scope of his work.

Plaintiffs are entitled to obtain discovery of the KSA and the SHC to pursue their allegations and proof that KA Stan was used as a vehicle for the SHC to fund al Qaeda. That discovery should include confirmation that the SHC offices in Bosnia were under the control of al Qaeda; the SHC funds sent to KA Stan were to support al Qaeda; and, show communications with Jelaidan, Kadi and Ayadi. The amount of funding of al Qaeda through KA Stan in 1996-99 was significant and occurred at the same time that al Qaeda was planning and preparing the 9/11 plot.

## II. A JURISDICTIONAL DISCOVERY ORDER SHOULD BE ENTERED

This Court should instruct the parties to meet and agree to the extent possible on a discovery plan. A conference should then be scheduled for the Court to resolve any disputes and decide the best sequence and method for the jurisdictional discovery. A "district court retains 'considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction.'" *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003), *citing Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C.Cir. 2000). The Court must engage in a "delicate balancing." *First City*, 150 F.3d at 176. On one hand, the court should consider "the comity concerns implicated by allowing jurisdictional discovery from a foreign sovereign." *Id.* At the same time, the court "must give the plaintiff 'ample opportunity to secure and present evidence relevant to the existence of jurisdiction.'" *Phoenix Consulting*, 216 F.3d at 40.

## III. FOLLOWING THE COMPLETION OF DISCOVERY, THIS COURT SHOULD HOLD AN EVIDENTIARY HEARING ON JURISDICTION

The Supreme Court held earlier this year that "where jurisdictional questions turn upon further factual development, the trial judge may take evidence and resolve relevant factual disputes." *Helmerich*, 137 S.Ct. at 1316-17. In *Helmerich*, no hearing was necessary because the immunity question was "purely a legal one" and the parties had stipulated to "all relevant facts." *Id.* at 1324.

This case requires an evidentiary hearing because the jurisdictional determination directly implicates the merits and turns on sharply disputed fact issues and the credibility of the KSA's witnesses. In *Reiss*, 235 F.3d at 748, the Second Circuit held that an evidentiary hearing was necessary in an FSIA case because the key question on the merits – the authority of the defendant's officer – was "inextricably intertwined with the issue of FSIA jurisdiction."

> We think it essential for the district court to afford the parties the opportunity to present evidentiary material at a hearing on the question of FSIA jurisdiction. The district court should afford broad latitude to both sides in this regard and resolve disputed factual matters by issuing findings of fact.

*Id.; see also Filecom S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998)(in an FSIA jurisdictional motion, the district court "may hold an evidentiary hearing, if it considers that such a hearing is warranted, in resolving the question of jurisdiction" and "should resolve the disputed factual matters by means of findings of fact."), *overruled on other grounds*, *Lotes Co., Ltd. v. Hon Hai Precision Industry Co.*, 753 F.3d 395 (2d Cir. 2014); *Fountain v. Karim*, 838 F.3d 129, 137 (2d Cir. 2016) (in FTCA case where jurisdiction hinged on the merits issue of scope of employment, the district court should not have granted a 12(b)(1) dismissal "without first holding an evidentiary hearing").

At the evidentiary hearing, the plaintiffs have the "burden of production" to present evidence to demonstrate a prima facie case of jurisdiction, while the KSA has the ultimate burden of persuasion to establish its immunity by a preponderance of the evidence. *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001). The FSIA plaintiff's initial "burden of production" is akin to the introduction of sufficient evidence to avoid a directed verdict at trial. *Owens v. Republic of Sudan,* 174 Supp. 3d 242, 276 (D.D.C. 2016)("the burden of production means that the plaintiff must provide *some* evidence that could convince a factfinder of the jurisdictional fact in question")(emphasis in original).

## IV. KSA'S ARGUMENTS TO DENY DISCOVERY LACK MERIT

The KSA offers none of the key liability evidence in its possession relevant to JASTA jurisdiction. *See Kilburn*, 376 F.3d at 1132 (Libya "did not proffer testimony denying that they had provided material support for those acts"). There is no proper reason to deny plaintiffs discovery of the basic facts that support their jurisdictional claims.

**A. The *Ashton* plaintiffs first filed suit this past March and have not waived discovery**

The KSA makes the blatantly false claim that "[p]laintiffs waived…discovery by repeated failures to request it appropriately." KSA brief at 2. The *Ashton* plaintiffs sued the KSA for the first time this past March, joined in the Plaintiffs' Executive Committee's June 2017 document requests and attach their jurisdictional discovery plan as an appendix to this opposition. Likewise, except for a single death case (the *O'Neill* action), none of the thousands of 9/11 victims asserting death or injury claims (including *Burnett* and all of the other plaintiffs who later joined the Consolidated Amended Complaint ("CAC")) brought suit against the KSA before this past March. Moreover, the KSA has refused to produce any discovery before this motion is decided. Further, the CAC plaintiffs who previously sued the KSA requested discovery under the non-commercial tort exception and certainly did not waive their right to jurisdictional discovery under JASTA.

**B. The KSA's motion is based on inadmissible legal conclusions and hearsay from three government reports, and those reports confirm plaintiffs' allegations and need of jurisdictional discovery**

As set forth below, the key "factual" proof underlying the KSA's motion consists of several inadmissible legal/political conclusions and hearsay statements from the 9/11 Report and two other U.S. government reports. This Court should wait until jurisdictional discovery has been completed before hearing the parties and making a determination regarding whether the cited portions of the reports are admissible. As detailed below, those reports highlight why jurisdictional discovery is critical – and provide no excuse for the KSA to avoid its discovery obligations. The Supreme Court declared in its landmark decision on the subject that "the admission of a report containing 'conclusions' is subject to the ultimate safeguard—the

opponent's right to present evidence tending to contradict or diminish the weight of those conclusions." *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 168 (1988).

The testimony, documents and other discovery within the KSA's possession regarding its funding of al Qaeda and the assistance it provided to the 9/11 hijackers is obviously the best evidence on the jurisdictional issue. Discovery of the KSA must proceed in any event. Absent discovery, plaintiffs would be denied their fundamental right to present evidence as contemplated by *Rainey*.

**1. The statements in the 9/11 Report that there is "no evidence" or "no credible evidence" are not "factual findings" but inadmissible legal conclusions**

Fed. R. Evid. 803(8) allows "factual findings" but does not permit the introduction of legal conclusions from a government investigation reports. *Hines v. Brandon Steel Decks, Inc.*, 886 F.2d 299, 308 (11th Cir. 1989); *United States v. Davidson*, 308 F.Supp.2d 461, 476 (S.D.N.Y. 2004) (report of FBI agent that there was insufficient evidence of a crime did not constitute a "factual finding" admissible under Fed. R. Evid. 803(8)); *see United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir.1991)(legal conclusions of experts are inadmissible).

The hearsay statements relied upon by the KSA in the 9/11 Report – that it "found no evidence" of Saudi government funding or "we have not found evidence" regarding Thumairy or "we have seen no credible evidence" concerning Bayoumi – are inadmissible legal conclusions.

As the Eleventh Circuit held:

> Legal conclusions are inadmissible because the jury would have no way of knowing whether the preparer of the report was cognizant of the requirements underlying the legal conclusion and, if not, whether the preparer might have a higher or lower standard than the law requires.

*Hines*, 886 F.2d at 308.

The 9/11 Commission did not apply uniform fact-finding criteria typical of a government investigation, such as "probable cause," but made its "no evidence" conclusions based on *ad hoc* standards devised from criminal law. The Commission's Chairs and staff, led by a former prosecutor, confirmed that any allegation against the Saudi government or its employees had to be "certain" and "backed up conclusively"; otherwise, the allegation should "not be made at all." Ex. 252 at 2; Ex. 253 at 2; Aff. ¶¶ 213-14.

This "certain" and "conclusive" standard is akin to the "beyond a reasonable doubt" test, a completely different and much higher test than the "more likely than not" preponderance standard that applies in this civil case. *See United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361 (1984)("an acquittal on criminal charges does not prove that the defendant is innocent" or "negate the possibility that a preponderance of the evidence could show that [defendant] was engaged in an unlicensed firearms business.").

Indeed, as the lead FBI investigator of the Los Angeles team on 9/11 states "[t]here was clearly evidence that Thumairy provided assistance to Hazmi and Midhdar." Ex. 1 at 5.

Fed. R. Evid. 803(8) does not allow the KSA to import legal "no evidence" conclusions based on a heightened criminal standard of proof into this civil case. Further, the assertions upon which the KSA relies are not factual findings but inadmissible legal conclusions.

**2. The 9/11 Commission never considered key allegations and proof**

The "no evidence" conclusions relied upon by the KSA are not only inadmissible but provide no logical basis for the KSA's claims that it was exonerated by the 9/11 Report, as most of the plaintiffs' key allegations and proof were never actually considered by the 9/11 Commission. The Commission itself acknowledged its time limitations and that it could not and did not review all of the available evidence and that new information would come to light. 9/11

Report at xvii; Ex. 254. The Commission never considered the evidence that Thumairy and Bayoumi were "tasked" by a superior to assist the two hijackers; that Thumairy "immediately assigned an individual to take care of them"; or that "Bayoumi tasked Mohdar [Abdullah] to assist al-Hazmi and al-Midhdar." Ex. 2 at 3-4. Nor did it know that the KSA had intentionally deceived U.S. investigators to hide the facts that Bayoumi was working for the KSA. Aff. ¶¶ 10-13. And there is no mention whatsoever in the 9/11 Report of the money laundering schemes that the KSA used to fund al Qaeda including:

- the KSA's WSRA charity in name only;
- the King Fahad Mosque money transfers via Somali charities;
- the decade-long MWL/IIRO Afghan orphan charity fraud;
- the AHIF funds secreted out of the United States by the KSA's Buthe;
- the KA Stan in Bosnia; and
- the WAMY "orphan program" in Canada.

Indeed, the 9/11 Commission never studied any of the ties between the AHIF, MWL, IIRO and WAMY and the KSA which show that the KSA installed its officers to lead these organizations and actively controlled and directed their activities.

**3. It is doubtful whether the sentences cited by the KSA from the 9/11 Report are "trustworthy" under Fed. R. Evid. 803(8)**

Judge Hellerstein previously reviewed the 9/11 Report and concluded that "few parts of the report satisfy the rules of admissibility" because they "are based on sources that are not completely trustworthy or acceptable in American courts." *In re September 11 Litigation*, 621 F.Supp. 2d 131, 156 (S.D.N.Y. 2009). Plaintiffs address the various admissibility questions below.

***The fact sources underlying the conclusions were not reliable.*** The legal conclusions cited by the KSA were based on hearsay memorandum reports of unsworn interviews of the culpable Saudi actors Thumairy and Bayoumi that were conducted in Saudi Arabia under the supervision of Mabahith, *i.e.* Saudi intelligence. No transcripts or recordings of those interviews have been released. Moreover, the interviews were facilitated by Prince Bandar, the Saudi Ambassador to the United States, who himself was a subject of FBI investigation based on links between his staff's phone numbers and al Qaeda's leadership as well as questionable cash payments he and his wife Princess Haifa made to Basnan, a known al Qaeda sympathizer. Ex. 13 at 9-10, 18, 20, 427 429; Aff. ¶ 213.

The conclusions were also based on layer upon layer of hearsay from detainee interrogations. The Commission cites undisclosed intelligence reports that were based on "communications" that relied on observations that may or may not have been first hand, and may or may not have been obtained through torture. 9/11 Report at 146, 513-14 n.1, 516 n. 19 (citing intelligence interrogation of Khalid Sheik Mohamed that he "denied knowing Bayoumi"); *In re September 11 Litigation*, 621 F.Supp.2d at 156-57 (questioning the admissibility of findings based on "torture or other questionable investigative techniques"). And because most of the Commission's underlying documents have not yet been made public, it is impossible for the plaintiffs to know how the Commission reached its conclusions.

***The Commission had no defined fact-finding standards and used a heightened criminal standard of "certainty" for Saudi government actors.*** The Commission's use of legal conclusions and lack of consistent objective standards, *see* Section IV.B.1., *supra*, shed further doubt on the trustworthiness of the conclusions cited by the KSA.

***The Commission gave heavy weight to diplomatic and political concerns***. The Commission's "sweeping" mandate included not only the facts and circumstances of the 9/11 attacks but U.S. diplomacy, foreign relations and policy. The Commission described Saudi Arabia as a "problematic ally," had numerous contacts with high level Saudi officials and made a series of broad policy recommendations supporting improved relations between the United States and Saudi Arabia, for example: "[c]ooperation with Saudi Arabia against Islamist terrorism is very much in the U.S. interest." 9/11 Report at 371, 374. The Commission's forward looking diplomatic and political point of view plainly influenced its investigation and conclusions regarding the support provided to al Qaeda prior to 9/11 by the Saudi government. It is evident that the Commission was loath to make any findings that could be viewed as an attack on the KSA.

***The Commission could not obtain evidence held by the KSA and recognized its limitations***. The 9/11 Commission faced unusual evidentiary limitations; this was not a typical accident inquiry where investigators could assemble all of the key facts and issue final conclusions. The vast majority of the relevant evidence held by the KSA was never produced. Witnesses were provided for interviews under limited circumstances – with no transcripts or recordings allowed and Saudi government police in attendance. Basic documents necessary for cross-examination of the witnesses (as set forth in plaintiffs' discovery plan) were never produced. The Commission had to complete its work by an arbitrary mid-2004 deadline, and specifically acknowledged that all of the important information had not been collected and that "[n]ew information will inevitably come to light." 9/11 Report at xvii.

***Discovery is relevant to the admission of the reports under FRE 803(8)***. Much of the key information underlying the 9/11 Report has never been disclosed despite repeated requests

by the plaintiffs. That information directly bears on the trustworthiness of the report and is sought from the government as part of the plaintiffs' discovery plan. Aff. at App. 1-11.

**4. The 9/11 Report substantiates plaintiffs' allegations and the need for discovery**

***The KSA's method of funding al Qaeda through "charity" money laundering***. The KSA cites the Commission's inadmissible legal conclusion that it "found no evidence that the Saudi government as an institution or senior Saudi officials individually funded the organization." But the Commission immediately qualified that statement by describing the precise method the KSA used to fund al Qaeda for over a decade prior to the 9/11 attacks: "[t]his conclusion does not exclude the likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda." 9/11 Report at 171.

As detailed above, plaintiffs have shown that "charities" were repeatedly used by the Saudi government to launder money for al Qaeda, its training camps and the 9/11 attacks, including the AHIF, MWL/IIRO, WAMY, WSRA; the Afghan orphan charity fraud; the scheme of SDG Terrorist Buthe; and the SHC in Bosnia.

Moreover, the sentence relied upon by the KSA is vague to the point of being meaningless. What is meant by "the Saudi government *as an institution*"? Does that refer only to the KSA's King – or does it also include the KSA's religious leadership? Who are the "senior" Saudi officials? Did the Commission question Moussaoui, who identified numerous Saudi government officials who donated to al Qaeda? Aff. ¶ 61.

In a later instance cited by the KSA where the Commission stated that it had "seen no evidence that any foreign government – or foreign government official – supplied any funding" for the 9/11 plot itself, the Commission literally had *no* evidence whatsoever that anyone supplied the funding for the plot. KSA brief at 4; 9/11 Commission Report at 172. Earlier on

the same page the Commission observed that "the U.S. government has not been able to determine the origin of the money used for the 9/11 attacks." *Id.* The absence of evidence before the Commission in 2004, however, does not indicate that such evidence does not exist. Plaintiffs have presented allegations and facts of such funding – specifically the $375,000 sent by the KSA's WSRA "charity" to al Qaeda in 1998-2001 – that compel discovery. *See* Section I.B., *supra.*

***The KSA's substantial assistance to the two hijackers in California.*** Numerous statements in the 9/11 Report and related Commission documents concerning Thumairy and Bayoumi are consistent with and provide additional support for the plaintiffs' allegations, facts and inferences and the need for discovery. Aff. ¶ 216.

***The "background facts" cited by the KSA regarding its pre-9/11 relationship with al Qaeda.*** The KSA improperly cites a series of alleged facts from the 9/11 Report out of context to suggest that it did not support al Qaeda. For example: (1) the KSA states that it froze all $9.9 million of Osama Bin Laden's assets in 1994, but at that time Bin Laden actually received $12 million from his brother, more than what the KSA "froze"; (2) the KSA quotes a report that the 1995 Saudi Arabia bombing terrorists were "inspired" by Bin Laden, but in 1996 the Saudi government told the U.S. that Bin Laden was not responsible for that bombing; (3) the KSA states that in 1996 Bin Laden feared that the KSA was trying to have him killed, but that same year the KSA refused Sudan's offer to turn over Bin Laden, and gave permission for the plane carrying Bin Laden and his family to transit over Saudi Arabia on its way to Afghanistan; (4) the KSA claims that a 1996 Bin Laden "fatwa" attacked the Saudi monarchy, but that same fatwa praised the 1993 attack on U.S. soldiers in Somalia that was supported by the KSA through its SHC; (5) the KSA claims that it had to disrupt potential al Qaeda attacks inside Saudi Arabia, but

the only al Qaeda attacks in Saudi Arabia prior to 9/11 involved U.S. targets; (6) the KSA claims that the highest levels of the Saudi government were trying to expel Bin Laden from Afghanistan before 9/11, but the Saudi government sent trucks and millions of dollars to the Taliban, maintained diplomatic relations with Afghanistan until after 9/11, allowed flights to continue between the two countries and removed its diplomats from Kabul but allowed the AHIF to take over the Embassy. KSA brief at 21-22; Aff. ¶ 217.

**5. The two other government reports cited by the KSA, while likely inadmissible, also confirm plaintiffs' allegations, show that the criminal investigation of Saudi government actors is ongoing and demonstrate the need for discovery**

***The 2005 FBI/CIA Summary***. The KSA does not and cannot justify the admission under Fed. R. Evid. 803(8) of this heavily redacted executive summary – where the underlying report upon which the summary is based still remains confidential. KSA Ex. 4 at 2. There is no proper basis for this Court to determine the trustworthiness of the summary. Moreover, similar to the 9/11 Report, the law enforcement agencies involved in drafting the summary - and the 2015 Review Commission Report addressed below – plainly assess the evidence against a criminal law standard, not the civil preponderance test that applies here.

Nevertheless, the summary shows that the KSA was duplicitous prior to 9/11 in its handling of al Qaeda: the agencies conclude that the Saudi government "on the one hand it was denouncing al-Qa'ida as a threat, yet on the other hand it was…*treating the group with special consideration*." KSA Ex. 4 at 2 (emphasis added). Such "special consideration" is echoed by Moussaoui, who described how the KSA was akin to "two heads of the snake" and that Saudi government officials supported al Qaeda to demonstrate their Wahhabi "credentials" to the KSA's religious leadership. Aff. ¶¶ 60-61.

The summary also confirms that:

- There is evidence that “official Saudi entities [redacted]…provide financial and logistical support to individuals in the United States and throughout the world, some of whom are associated with terrorism-related activity.”
- “The Saudi government and many of its agencies have been infiltrated and exploited by individuals associated with or sympathetic to al-Qa’ida.”
- “The Saudi government…support[s] the propagation of the conservative Wahhabi-Salafi sect of Islam in the United States. Jihadists adhere to and interpret this sect’s beliefs to justify their actions.”

KSA Ex. 4 at 2.

***2015 Review Commission Report.*** The report confirms that the 9/11 investigation is active and that there is “ongoing internal debate within the FBI” between two investigation teams concerning information “regarding the presence of witting assistance to al-Hazmi and al-Midhdar” and the Commission recommended that the FBI “continue the investigation.” KSA Ex. 5 at 103.

The Review Commission also confirms that Thumairy “met al-Hazmi and al-Midhdar” (but does not present the details) and notes that: “[a] 2012 FBI summary of the status of the effort reported... that al-Thumairy ‘immediately assigned an individual to take care of al-Hazmi and al-Midhdar during their time in the Los Angeles area.’” KSA Ex. 5 at 101, 102 n.330.

This information and the ongoing criminal investigation show that key facts regarding Thumairy and Bayoumi remain to be confirmed and underscore the plaintiffs’ right to conduct jurisdictional discovery of the KSA.

**C. The KSA’s claims that plaintiffs’ exhibits are inadmissible demonstrate the need for discovery**

The KSA repeatedly claims that various government reports and other documents cited by the plaintiffs are not admissible, but such claims – whether or not they are true – demonstrate

precisely why jurisdictional discovery must be granted. Plaintiffs are entitled to discovery to convert the known facts into evidence that can be used at a hearing.

***The "28 Pages" of the Joint Congressional Committee Report***. The 28 pages released in July 2016 provided key additional facts that underlie plaintiffs' allegations and provide the basis for discovery. These include evidence uncovered by the FBI in 1998 that the KSA was using the King Fahad Mosque in Los Angeles to conduct money laundering to al Qaeda through various Somali charities in San Diego and a Somali money transfer agency; close ties between the AHIF and the KSA, including members of the Royal family; phone links between the unlisted number for Prince Bandar's Colorado home and al Qaeda's top leadership; and payments made by Prince Bandar to Basnan, Bayoumi's close friend and an al Qaeda sympathizer. Ex. 13 at 18-21, 25-26.

***The 2012 FBI Report***. The KSA labels this FBI investigation summary report the "Florida Bulldog Memorandum" - a reference to the watchdog group that successfully filed the suit to obtain its production - but it is an investigation summary prepared by the FBI. Ex. 2; KSA brief at 23. The authenticity of the report is confirmed by the 9/11 Review Commission Report, which cites the 2012 FBI Report for the fact that Thumairy "immediately assigned an individual to take care of al-Hazmi and al-Mihdhar during their time in the Los Angeles area." KSA Ex. 5 at 102 n.330. The Report sets forth facts from the government criminal investigation that properly form a basis for plaintiffs' discovery requests.

***Moussaoui's testimony***. The KSA relies on the misleading argument that this Court "previously rejected Moussaoui's statement as immaterial." KSA brief at 62, *citing Terrorist Attacks,* 134 F.Supp.3d at 787 n. 13. That finding, however, was based on the entire tort rule, which no longer applies under JASTA. This Court's opinion referenced the KSA's argument

that Moussaoui should be ignored because: "dispositively, he never suggests that any alleged donation occurred in the United States." KSA Reply Mem., ECF No. 2948, p. 15.

In addition, the KSA complains that Moussaoui lacks credibility. That is plainly an issue of fact for this Court to consider at the jurisdictional hearing when deciding if the plaintiffs have met their burden of production, and it is ultimately a matter for this Court to resolve at trial. As the Second Circuit recently held, district courts have "considerable discretion in resolving evidentiary inconsistencies" and "a factfinder who determines that a witness has been 'inaccurate, contradictory and even untruthful in some respects' may nevertheless find the witness 'entirely credible in the essentials of his testimony.'" *United States v. Delacruz*, 862 F.3d 163, 176 (2d Cir. 2017)(citations omitted).

**D. Traditional proximate cause is the proper jurisdictional test under the JASTA**

JASTA, by using the words "caused by," adapts the traditional tort standard of proximate cause as the jurisdictional test. *Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536 (1995)(the words "caused by" in an admiralty jurisdiction statute reference "what tort law has traditionally called 'proximate causation.'"). The statute's terms do not mention "but for" causation, which would have been clearly at odds with JASTA's express purpose to provide the "broadest possible basis . . . to seek relief against…foreign countries…that have provided material support, directly or indirectly, to foreign organizations . . . that engage in terrorist activities against the United States." 18 U.S.C. §2333 note. Moreover, JASTA included a new aiding and abetting cause of action based on the common law rule set forth in *Halberstam*, which does not require "but for" causation. 705 F.2d at 482-85.

No terrorism case has ever imposed a "but for" standard. The ATA cause of action, which JASTA references and incorporates, has been uniformly interpreted to apply only a

proximate cause standard. *Rothstein*, 708 F.3d at 95 (the ATA requires "proof of proximate cause"); *Boim*, 549 F.3d at 695-99 (ATA cause of action for financing terrorism did not require "but for" causation); *Rux v. Republic of Sudan*, 461 F.3d 461, 474 (4th Cir. 2006)(rejecting additional requirement of "but for" cause and holding that "proximate cause is the appropriate standard to apply" on FSIA jurisdiction); *Kilburn*, 376 F.3d. at 1127-1130 (proximate cause, not "but for" cause, was the appropriate standard in case involving material support of terrorists who tortured and murdered plaintiff's decedent); *Linde*, 97 F.Supp.3d at 287 (bank which knowingly provided financial services to terrorist groups was a proximate cause of plaintiffs' injuries and the ATA did not impose a "but for" requirement); *Gill*, 893 F.Supp.2d at 507 ("'[b]ut for' cause cannot be required" under the ATA).

In *Sokolow*, this Court applied a proximate cause test under the ATA that "Plaintiffs must demonstrate by a preponderance of the evidence that it was reasonably foreseeable that Defendants' actions would cause the resulting injuries" and determined that a "but for" causation was inapplicable: "a direct connection between providing material support to the terrorist organization and injury to Plaintiffs is not required." 60 F.Supp.3d at 522.

Congress expressly recognized that "but for" causation was not required in the ATA's civil remedy, because it was based on the principle that a known terrorist organization such as al Qaeda was "so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 7 (2010). The ATA establishes civil liability where the material support knowingly provided by the defendant to a terrorist group is a proximate cause of a plaintiff's injury and "does not require a showing that [the defendant] knew it was providing material support for terrorist activity." *Weiss*, 768 F.3d at 207. The application of a "but for" standard "would effectively annul the civil liability

provisions of the ATA" and "render it practically impossible for an ATA plaintiff to recover from a defendant that has knowingly provided material support to a terrorist group over an extended period of time." *Linde,* 97 F.Supp.3d at 323-24.

The KSA's claim that JASTA's "caused by" standard requires proximate and "but for" causation is contrary to the statute's text. Nearly identical arguments with regard to the ATA have been uniformly rejected. *Kilburn*, 376 F.3d at 1127; *Sokolow*, 60 F.Supp.3d at 522; *Linde*, 97 F.Supp.3d at 323. Contrary to the KSA's arguments, the Second Circuit in *Rothstein* did not impose a "but for" test under the ATA, KSA's brief at 15, but a "proximate cause" standard. 708 F.3d at 95; *see Linde,* 97 F.Supp.3d at 324-25. The KSA cites a string of plainly distinguishable Supreme Court cases, none of which involve the same JASTA language, the ATA or circumstances analogous to terrorism cases. *Burrage v. United States*, 134 S.Ct. 881, 891 (2014)("but for" causation required under criminal statute which imposed enhanced sentence where death or injury "results from" the conduct); *University of Texas Southwestern Medical Center v. Nasser*, 133 S.Ct. 2517 (2013) (under Title VII case for retaliation "because" of certain criteria, plaintiff must establish the desire to retaliate was the "but for" cause of his firing); *see Linde*, 97 F.Supp.3d at 325-26. And the KSA ignores subsequent Supreme Court authority which rejected a "but for" causation test in a case involving criminal restitution for child pornography, finding that "alternative and less demanding causal standards are necessary in certain circumstances to vindicate the law's purposes." *Paroline v. United States*, 134 S.Ct. 1710, 1724 (2014).

**E. The KSA's reliance on *Twombly* and *Iqbal* is misplaced**

Having no basis to properly deny jurisdictional discovery, the KSA keeps repeating its mantra that the plaintiffs' allegations are "conclusory" under the Supreme Court decisions in *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). KSA brief at 2, 25-27, 29, 37, 43, 61. Both of those cases, however, involve completely distinguishable circumstances where the plaintiffs failed to allege facts integral to their causes of action.

The *Twombly* Court found that an antitrust complaint did not set forth an "independent allegation of actual agreement" necessary to show a conspiracy, and that claims of "parallel behavior" did not necessarily indicate any unlawful agreement. 550 U.S. at 564. The Court ruled that there was no "probability requirement" but rather the claim need only be "plausible" and present "enough fact to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Id.* at 545. The Court expressly reaffirmed its decision in *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 514 (2002), which upheld the sufficiency of a discrimination complaint because it "detailed the events leading to [plaintiff's] termination, provided relevant dates, and included the ages and nationalities of at least some of the relevant persons involved with his termination." *Twombly*, 550 U.S. at 569-70.

In *Iqbal*, the Court observed that the discrimination claim at issue was quite limited in scope and did not include "the unconstitutional conduct of…subordinates under a theory of respondeat superior." 556 U.S. at 676. Rather, the only claim was whether the Attorney General and FBI Director had "purposefully adopted a policy of classifying post–September–11 detainees as 'of high interest' because of their race, religion, or national origin." *Id.* at 682. But the Court found that the complaint failed to contain "any factual allegation" that those officials had a "discriminatory state of mind." *Id.* at 683.

As discussed herein, the *Ashton* plaintiffs set forth in detail the KSA's tortious acts, the relevant locations and dates, the names of the involved KSA officers, agents and employees and

how those acts are causally linked to the 9/11 attacks. The level of specificity is far greater than what the Supreme Court approved in *Swierkiewicz*. Unlike *Twombly* and *Iqbal*, the *Ashton* complaint contains detailed allegations and proof of all elements of a JASTA cause of action.

**F. The KSA's Constitutional arguments require no response**

The KSA's Constitutional arguments (1) do not apply to the *Ashton* plaintiffs, who first brought suit against the KSA this past March, and were never bound by a prior KSA judgment; and (2) are contrary to binding Second Circuit authority and asserted only for later review. KSA brief at 71, 75.

## CONCLUSION

The Kingdom of Saudi Arabia's motion to dismiss should be denied, or consideration of that motion should be deferred, and this Court should allow the plaintiffs to conduct jurisdictional discovery. A discovery conference should be held to consider the proposed discovery, the KSA's objections and to set a discovery schedule. Following the completion of discovery, the Court should hold an evidentiary hearing to address jurisdiction under the JASTA.

Dated: New York, New York
November 9, 2017

Respectfully submitted,

s/ James P. Kreindler

James P. Kreindler, Esq. (JK7084)
Steven R. Pounian, Esq. (SP5795)
Justin T. Green, Esq.
Andrew J. Maloney, III, Esq.
Megan W. Benett, Esq.
Kreindler & Kreindler LLP
750 Third Avenue
New York, NY 10017
(212) 687-8181
(212) 972-9432 fax

*Attorneys for Ashton Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of November, 2017, I served a true and correct copy of the foregoing MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS TO DISMISS OF THE KINGDOM OF SAUDI ARABIA AND THE SAUDI HIGH COMMISSION via this Court's ECF/CM system to all parties registered to receive service and via UPS overnight mail, with a complete set of Exhibits upon:

Michael K. Kellogg, Esq.
Mark C. Hansen, Esq.
Gregory G. Rapawy,
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
Summer Square 1615 M Street, N.W., Suite 400
Washington, D.C. 20026-3209
*Attorneys for The Kingdom of Saudi Arabia*

Lawrence S. Robbins, Esq.
Roy T. Englert, Jr.
Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP
1801 K Street, N.W., Suite 411
Washington, D.C. 20009
*Attorneys for the Saudi High Commission for Relief of Bosnia & Herzegovina*

s/ James P. Kreindler
James P. Kreindler, Esq.