```
 1    L9ENWTCC

 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    ------------------------------x
      IN RE:  TERRORIST ATTACKS ON
 4    SEPTEMBER 11, 2001.
                                        03 MD 1570 (GBD)(SN)
 5
      ------------------------------x   Telephone Conference
 6
                                        New York, N.Y.
 7                                       September 14, 2021
                                        3:48 p.m.
 8    Before:

 9                     HON. SARAH NETBURN,

10                                       U.S. Magistrate Judge

11                          APPEARANCES

12    KREINDLER & KREINDLER LLP
           Attorneys for Plaintiffs' Executive Committee
13    BY:  STEVEN R. POUNIAN
           ANDREW MALONEY
14         JAMES KREINDLER
           MEGAN BENETT
15         -and-
      MOTLEY RICE LLC
16    BY:  ROBERT T. HAEFELE
           JODI FLOWERS
17         JADE HAILESELASSIE
           C. ROSS HEYL
18         -and-
      ANDERSON KILL P.C.
19    BY:  JERRY S. GOLDMAN
           BRUCE STRONG
20         -and-
      COZEN O'CONNOR P.C.
21    BY:  SEAN P. CARTER
           SCOTT TARBUTTON
22         STEPHEN COZEN

23    KELLOGG HANSEN TODD FIGEL & FREDERICK PLLC
           Attorneys for Defendant The Kingdom of Saudi Arabia
24    BY:  MICHAEL K. KELLOGG
           GREGORY G. RAPAWY
25         ANDREW C. SHEN
```

1

2                             APPEARANCES (Continued)

3    SPEISER KRAUSE
          Attorneys for Ashton Plaintiffs
4    BY:  JEANNE O'GRADY

5    MOLO LAMKEN LLP
          Attorneys for Defendant Dallah Avco
6    BY:  ROBERT K. KRY

7    BERNABEI & KABAT, PLLLC
          Attorneys for Saudi individual and corporate defendants
8    BY:  ALAN KABAT

9    AUDREY STRAUSS
          United States Attorney for the
10        Southern District of New York
     SARAH S. NORMAND
11   JEANNETTE VARGAS
          Assistant United States Attorneys

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Previous portion electronically recorded)

2        THE COURT:  I have a question for you.  I thought I

3   understood from Ms. Normand's presentation that the second

4   category -- obviously category one has been produced.  That is

5   what you were just referring to.

6        MR. POUNIAN:  Right.

7        THE COURT:  But the second category was documents that

8   were withheld in this litigation so they were responsive on

9   discovery requests or subpoenas I should say, and withheld

10  because of various privilege assertions.  And presumably but

11  for those privilege assertions, you would have received them

12  earlier in the litigation.

13        With respect to categories three and four, it is not

14  my understanding that those are documents that were withheld in

15  this litigation.  I recognize that they are related to the 9/11

16  attacks broadly, but it is not my understanding that those are

17  documents were requested by subpoena and withheld on various

18  privilege grounds and that you would have otherwise received

19  but for the privilege assertions that have now been released.

20        MR. POUNIAN:  They were not withheld, your Honor, on

21  the grounds of privilege I don't believe.  But they were

22  withheld as part of this core records approach that the

23  government had used in producing documents.  We had asked for

24  several of these documents from the Pentagon investigation

25  specifically items related to witness statements regarding

1    Fahad al-Thumairy's extremism, witness statements from people

2    at the King Fahad Mosque who were testifying, who had told the

3    FBI about Fahad al-Thumairy extremism, that were never

4    produced, things that were referenced in, for instance, the

5    9/11 Commission report that was issued in 2004 that we were

6    never given an opportunity to see.  Those would be in the

7    PENTTBOM investigation.  There's also phone records related

8    there to individuals at issue here.  All of these things were

9    requested in our original April 2018 subpoena.  The government

10   claimed they were just going to focus on a group of documents

11   that they selected and that's one of the issues here.  There is

12   also --

13        THE COURT:  Sorry.  Before we move on, I appreciate

14   the recollection.  The core records approach, which was

15   obviously litigated, was mostly a question about both relevancy

16   and burden, and the Court concluded that the FBI's approach was

17   reasonable, and so this is a roundabout way of me focusing on

18   these second categories which pushes us deeper into 2022, that

19   these were documents that you were not getting in this

20   litigation not because of privilege, but for other reasons, and

21   it seems to me that holding up the litigation for those

22   documents, this category of documents would be a revisiting of

23   my earlier decision, which, like I said, was quite well

24   litigated on whether or not that narrowing was appropriate in

25   the first instance.

1      MR. POUNIAN:  I understand, your Honor.  I believe

2  that the executive order itself reflects the fact that the

3  government has now in effect changed its position and now

4  believes that it makes sense that for the purpose of full

5  accountability, for purposes of making certain that the record

6  is complete, that we have all of the facts before us that are

7  necessary for our case, which is specifically referenced here

8  in this order, that these specific documents, that these

9  specific documents be provided.  And they are tailored, they

10  are limited to references to the individual subjects of the

11  subfile investigation.

12      So these documents were in essence part of the subfile

13  by virtue of the fact that the subfile investigation continued

14  investigation of these specific individuals.  The last

15  category, your Honor, doesn't even include things from PENTTBOM

16  or the subfile investigation, but actually the individual

17  investigations of the Saudi government officials, which we

18  asked for in our subpoena.

19      MR. CARTER:  Your Honor, this is Sean Carter.

20      May I briefly address this issue as well?

21      THE COURT:  Go ahead.

22      MR. CARTER:  Your Honor, my recollection is that the

23  government's burden claims and resort to the core documents

24  approach were bound up in its representations that the subfile

25  investigation was active and ongoing and that all of the

1    documents encompassed within that were classified and therefore

2    sensitive.  And the government's view is that, because of those

3    features of the documents and the active status of the

4    investigation, the review of the documents would take sort of a

5    painstaking process and therefore be too burdensome.

6          And so the grounds for relieving the United States of

7    the obligation to respond to the subpoena specifically

8    requesting these documents were removed by virtue of both the

9    closure of the investigation and by virtue of the President's

10   executive order directing the government to do this, thus

11   eliminating any potential burden claim.  But these were always

12   of central relevance and of key importance and directly at

13   issue in the subpoena.  Were it not for the open and active

14   status of the investigation, we certainly would have been

15   entitled to them, and the government's burden claims would not

16   have been well founded under those circumstances and certainly

17   aren't now.

18         Just turning the Court's attention to the latest

19   category, as Ms. Normand mentioned, there is a specific

20   requirement there that the government conduct a review of any

21   separate or subfiles that were created to look into any

22   potential agency relationship of these subjects to any foreign

23   government.  It is our understanding, has always been our

24   understanding that there would have been particular subfiles

25   and files established to try and figure out what these people

1    were in fact doing for the Saudi government during these time

2    periods.  So this is, you know, a central category of relevance

3    that was walled off only by virtue of a burden claim that was

4    bound up in the open status of the investigation and classified

5    nature of the documents, both of which have just changed.

6              THE COURT:  Thank you.

7              MR. POUNIAN:  Your Honor, may I raise one more thing

8    here.

9              THE COURT:  All right.

10             MR. POUNIAN:  Your Honor, in the report that was just

11   issued over this past weekend, it references an example of the

12   type of material that would be in the PENTTBOM file that would

13   not necessarily be in the other privileged documents that are

14   going to be produced.

15             For instance, it says that approximately one month

16   after 9/11 someone was interviewed and stated that she meet

17   Bayoumi multiple times and Bayoumi was always talking about how

18   the Islamic community needs to take action, and he told her and

19   her husband on several occasions they were at jihad, they were

20   at jihad.

21             This is specific evidence that would be in the

22   Pentagon investigation of a witness interview referring to

23   Bayoumi's state of mind and motivation and the reason why he

24   would be joining in this effort along with these other Saudi

25   government employees to provide a support network for the

1    hijackers.

2            We believe there's similar statements like that of

3    Mr. Thumairy, and those were not produced to us in this case

4    yet.  And those are what we would expect would be produced on

5    January 1 pursuant to the President's order.

6            As I said, we would like them to be produced sooner,

7    but we understand that that may not be possible, but they had

8    promised at one point to do this as expeditiously as possible.

9    And perhaps there could be some items that could be put on a

10   faster schedule.  I don't know.  But this is an example, your

11   Honor, of the type of material that was collected during the

12   PENTTBOM investigation that is of great relevance to the

13   inquiry here.

14           THE COURT:  Mr. Pounian, what is your view about dual

15   tracks of expert witnesses.  It's my understanding that maybe

16   half of your experts are going to be historians who are going

17   to be describing for the Court the history of the region and

18   other relevant historical facts.  What would preclude you from

19   exchanging those reports on a faster track?

20           MR. POUNIAN:  Your Honor, we believe that the evidence

21   that's being produced impacts all of the expert's reports.

22   They are all interrelated, number one.  But they are also

23   relating these facts about history, about religion, about the

24   terrorist groups that are involved.  They're relating those

25   things about which they have expertise to the particular facts

1     of the case.  Like, for instance, in this report over the

2     weekend there's five different terror groups that are

3     referenced.  Those all requires an expert to really explain who

4     are these groups, how are they related, how are they related to

5     al-Qaeda, how could they possibly have any relationship to the

6     people who are at work here.

7              And it's the same with the religious group within the

8     Ministry of Islamic Affairs, the religious officials who were

9     working there and their motivations and, you know, how they

10    viewed their role to be.

11             So we don't really think it would make sense to do

12    this in a piecemeal fashion, and I don't think there would

13    really be any advantage at the end of the day in terms of

14    timing to do it that way.  We think it makes more sense to have

15    them all produced at the same time.

16             THE COURT:  All right.

17             MR. CARTER:  Your Honor.  It's Sean Carter.  Could I

18    just very briefly touch upon an issue related to that, and one

19    sort of broader-picture issue.

20             THE COURT:  Sure.

21             MR. CARTER:  You know, I think fundamentally at issue

22    here is sort of a basic due process principle about the

23    traditional opportunity afforded a party to collect facts and

24    evidence before being compelled to present his or her case in

25    chief and in principle.

1          You know, in the terrorism arena, as *Owens* and other

2    of the decisions make very clear, experts play a very unique

3    and compelling and critical role in the presentation of that

4    case in principle, including in areas where jurisdiction under

5    one of the FSIA's terrorism-related exceptions are in issue.

6          The executive order makes clear that all of the

7    categories of documents, the policy reflected here is a

8    compelling interest stated by the President that the plaintiffs

9    in this litigation will have the benefits of these facts and

10   evidence for purposes of their pursuit of accountability.

11         As your Honor mentioned, there's numerous references

12   to the litigation specifically and in the preamble to the

13   overall effort of the families to pursue accountability.

14         So, the executive order, the fulfillment of the

15   executive order's goals and purpose indicates that the

16   plaintiffs should have the opportunity to collect this evidence

17   before presenting their case in principle, including their

18   experts.

19         As to this dual-track idea, you know, I think it's

20   important to understand that any presentation of a case is sort

21   of a collective endeavor, and all the different piece parts

22   relate to one another and are integrated as part of a

23   collective whole through which the parties, you know, decide

24   how best to put their evidence forward.  So dual tracking

25   experts disrupts that traditional sort of process of trying to

1    do the best to present the most coherent streamlined and

2    integrated case possible.

3            THE COURT:  Thank you.

4            Why don't I turn to Mr. Rapawy.

5            MR. RAPAWY:  Thank you, your Honor.  Gregory Rapawy

6    from Kellogg Hansen for Saudi Arabia.

7            I was glad to hear the Court say at the outset of this

8    hearing that it is inclined to set firm deadlines.  I think

9    that is an appropriate approach here, perhaps a necessary one.

10   And I think that in considering the arguments that you have

11   just heard from plaintiffs, you should, and I am sure you will,

12   note the point that Mr. Pounian began by saying that plaintiffs

13   are not in control of this process.

14           In a sense that is, of course, true.  We are dealing

15   with the executive order that the President has issued.  But

16   the other side of that coin is the process that has just

17   concluded, the three years and three months of jurisdictional

18   discovery supervised by the Court, is the process that gave

19   plaintiffs what they were entitled to.  And we are dealing now

20   with an additional second voluntary production by a nonparty

21   over and beyond what plaintiffs were entitled to under the FSIA

22   and certainly under due process.

23           In response to some of Mr. Pounian's comments, I would

24   like to make clear that, in our view, which we are eager to

25   present to the Court, jurisdictional discovery has revealed no

1  evidence to support the key allegation that prompted Judge

2  Daniels to order it, and that is to say no evidence that Musaed

3  al-Jarrah or on any other Saudi Arabian official, senior or

4  otherwise, directed Omar al-Bayoumi Fahad al-Thumairy or anyone

5  else to assist the 9/11 hijackers nor any evidence that

6  al-Bayoumi or al-Thumairy themselves directed anyone else to

7  help the hijackers.  And that is not because the process, as

8  the Court well knows, has been anything less than thorough and

9  searching.  It is because those things did not happen.

10       And the FBI's decision to release additional material

11  from an investigation that is now closed is not likely to

12  change that outcome.  Based on the record that is currently

13  before the Court, the Court has no basis to conclude that

14  anything the FBI is likely to produce will change that state of

15  affairs.

16       Certainly the document that was released last Saturday

17  is not a basis to extend discovery.  It does not support

18  plaintiff's theory that al-Bayoumi and al-Thumairy received

19  directions from a senior Saudi official.  It does not even

20  mention the third subject of the investigation, Musaed

21  al-Jarrah, at all, and there is nothing in it to suggest that

22  the investigative theory from the previous partially released

23  2012 summary report that al-Jarrah had tasked the other two men

24  with assisting the hijackers ever bore fruit.

25       In our view, the extensive discovery that has occurred

1    to date, including the depositions that have already been

2    taken, has only discredited plaintiffs' allegations.  I will

3    not rehearse the amount of discovery that has already gone on.

4    The Court is well familiar with it.  The tens of thousands of

5    pages from Saudi Arabia and for that matter from the FBI,

6    including documents to which, in any ordinary case, and I

7    recognize this is not an ordinary case, but in any ordinary

8    case they would not have had even a fraction of that material

9    either from institutions that were protected from disclosure by

10   the Vienna Conventions or as against the FBI, the release of

11   documents subject to the Privacy Act, the grand jury material.

12   I cannot go on this public record into any detail into what

13   that material has shown, but the Court has seen a great deal of

14   it in the course of this process, and it has not got plaintiffs

15   what they need.

16          Our position, and I understand that the Court has

17   stayed discovery, but our position has been that expert

18   discovery can and should proceed alongside the FBI process, and

19   does not in any way need to await the conclusion of that

20   process.

21          Let me make clear that in saying that that Saudi

22   Arabia does not oppose and never has opposed the United States'

23   decision to release investigative materials to the public.  The

24   embassy has publicly supported the President's decision to

25   declassify these documents, and that is consistent with Saudi

1    Arabia's longstanding position going back many years.  What we

2    do object to is an indefinite delay of our renewed motion to

3    dismiss.  Because if the history of this case has taught the

4    Court anything, it is that there will always be one more thing

5    that plaintiffs want, one more thing that they demand and say

6    that they are entitled to in order to prove their claims.

7         For many years it was the 28 pages from the 2002 joint

8    inquiry report that were declassified in 2016, and those were

9    going to break the case open until they were declassified, and

10   they didn't.

11        Then after that -- this was actually before your Honor

12   was I think supervising discovery, I think it was during the

13   tenure of Judge Maas, it was the jailhouse testimony of

14   Zacarias Moussaoui, which delayed the case for months, because

15   that was going to be critical evidence -- the same word that

16   Mr. Pounian used today -- critical evidence the plaintiffs

17   needed to prove their case.  And then it became a footnote in

18   one of Judge Daniels' opinions dismissing the case before

19   JASTA.

20        And then after that it was JASTA itself.  And they

21   went to Congress and argued, as they had every right to do,

22   that they would look forward to their day in court once they

23   had jurisdictional discovery under a more favorable

24   jurisdictional standard, which they got, and yet they are not

25   how looking forward to that renewed motion to dismiss after

this lengthy jurisdictional process in which the Court has
taken great pains to implement JASTA's requirements.

And then even after that it was the 2012 FBI report,
and the third name that was originally concealed but turned out
to be Musaed al-Jarrah -- that's in the public record now -- as
the third main subject of the investigation.  And when that was
released that was going to change everything too, until it
didn't.

And now it's the 2015 report which they have.  And
they can get to their experts, and their experts can say what
they like about it.  That was going to change everything, too,
until it's come out, and now they want until March.

And if your Honor gives them until March, then as sure
as we are all sitting here today, in March there will be more.
There will be requests to reopen depositions.  There will be
requests for more documents.  There will be another round of
discovery because of things that they say are new in what was
produced.  There was a certain point at which the Court will
have to draw a line, and we submit that we are at that point.

The September 15 deadline which was stayed is not
crucial.  The exact date is not critical, the beginning of
November is perhaps not unreasonable.  But there should be a
deadline.  Not only should there be an initial deadline for
expert discovery to begin, but there should be a schedule for
expert discovery to proceed.  There should be a deadline for

rebuttal reports.  We requested for now 45 days to prepare those.  We think that's still appropriate, given the volume of material that the plaintiffs are apparently planning to produce.

We don't think the reply reports need to be built into the schedule, but one way or the other the Court should decide. Our view, which is presented in the papers, is that reply reports are only necessary or appropriate when new matters are raised in rebuttal reports, and we don't plan to raise any new material in our rebuttal reports.

If there are no reply reports, we would like to start taking expert depositions after plaintiffs serve their initial reports.  We think that's the most efficient way to do things. If there are reply reports, then we have to wait, because we don't -- I think it would be prejudicial to us to begin taking depositions before, of experts who had a report still left to serve and then have the ability to fix basically problems in their reports in response to their depositions.

THE COURT:  Can I ask you a question Mr. Rapawy. Sorry to interrupt you.  But I think out of respect to the President's actions I think I have to move the deadline to file expert reports, at least to accommodate that first disclosure.

My question for you is what position -- and I don't know if you can give me your view right now -- but what position your client would take, if after the filing of an

expert report, let's say several months later, another piece of

information is released that the plaintiffs wish to rely on.

Would you object to relying on that in whatever motion is

ultimately filed to Judge Daniels, whether it's a motion to

dismiss or some other filing if it came after the deadline for

expert discovery?

          MR. RAPAWY:  There's exactly two questions there, if I

may your Honor.  One is whether the expert can supplement the

report.  And I think there is an established standard for

supplementing the report, and if they meet that standard for

supplementing the report, then we would not object to the

supplementation.

          Now, I say that reserving our rights to disagree on

any particular, any particular instance about whether a

particular piece of evidence is genuinely new.  But if it is

new and material, it would be appropriate for supplementation.

          With regard to the jurisdictional statements of fact

and evidence, our position would be we do think that those need

to be pretty close to final, and I think that there should be a

showing of good cause to amend them based on something that's,

again, genuinely new and genuinely wasn't available before.

And I think that that good cause standard would be the same as

for any other situation in which new evidence comes in after a

deadline has been set and a scheduling report, and I think that

is an appropriate way to deal with that problem.

1          THE COURT:  This may be an unnecessary focus right

2     now, but the question I'm asking is not if the document --

3     let's say a smoking gun document is issued in response to that

4     fourth tranche which we anticipate will be released around late

5     or early March.  If at that point expert reports are already

6     in, but let's just for the purposes of this conversation assume

7     that the briefing for that motion has not begun, would you

8     object to the plaintiffs relying on that document?

9          MR. RAPAWY:  If it's genuinely new and material, your

10    Honor, I don't think we could object to that, and I think our

11    objection would be rejected anyway.  Obviously it's a

12    hypothetical, and it's certainly possible that we would

13    disagree.  In fact, if the past is any guide, we probably will

14    wind up disagreeing about whether facts are new and material.

15    But we don't think that that is a reason to push the entire

16    process out until the conclusion of the process in the FBI

17    report -- I'm sorry, in the executive order, particularly in

18    light of the fact that plaintiffs have already had that first

19    round of jurisdictional discovery, if you can call it just one

20    round, including the multiple motions to compel against both

21    Saudi Arabia and the FBI.

22          Is that responsive to your Honor's question?

23          THE COURT:  It is.  Thank you.

24          MR. RAPAWY:  And then it's sort of -- oh, and I think,

25    one thing which I also would bring up that we had raised in the

1    letter is the *Daubert* motions.  I think those can be provided

2    in parallel with the renewed motion to dismiss.  I think they

3    should be.  Obviously we haven't seen expert reports yet.  We

4    don't know for sure if there will be any *Daubert* motions, but

5    it certainly seems like a possibility the schedule ought to

6    contemplate, and I think doing it in parallel with the renewed

7    motions-to-dismiss practice, so that it basically all lands on

8    Judge Daniels' desk at the same time would be the most

9    efficient way to do that.

10           And just to sum up, your Honor, the particular

11   deadlines, while they are important, are less important than

12   the fact that there be deadlines, and that is because

13   jurisdictional discovery under the FSIA, as the court knows

14   well, is limited because it is taken before plaintiffs even

15   establish that the Court has jurisdiction over a foreign

16   sovereign.

17           That process should not be held open indefinitely so

18   that the government can review and rereview its files in a sort

19   of extrajudicial discovery mechanism, and I think that an

20   interest that the Court should bear in mind here, recognizing

21   the interest that the Court has stated in respect to the

22   executive order, but there is also at stake in this case the

23   right of a foreign sovereign to an adjudication of its immunity

24   defense as close to the outset of the case as reasonably

25   possible.  On the record that we have made so far, we are

1    confident we will prevail on that motion and I think that if

2    plaintiffs disagreed with that, you would not see them so eager

3    to push this deadline out.

4              That's all that I have, your Honor.

5              THE COURT:  Thank you.

6              Let me ask, for Mr. Carter, anyone else wish to

7    respond.

8              MR. POUNIAN:  I would like to respond, your Honor, if

9    I may.

10             THE COURT:  Sure.

11             MR. POUNIAN:  Steve Pounian for the plaintiffs.  Your

12   Honor had mentioned, like, smoking-gun evidence.  You know,

13   it's clear that in the view of Saudi Arabia, when they view the

14   evidence and how they portray it, they don't see connections

15   between things.  Their witnesses don't remember things.  They

16   refuse to answer questions about things they should know about.

17             But it is clear in any case involving a terrorist, in

18   any case involving criminal activity of this nature that's

19   organized and has a state sponsor of this nature that they're

20   not going to come forward and simply say, you know, I did meet

21   that person or I did do that.

22             And, for instance, in this report that was just

23   produced over this weekend, we now know for the first time that

24   Mutaib al-Sudairy, a diplomat at the embassy in Washington who

25   had full diplomatic privileges, who had full immunity from

1    prosecution, was brought into Saudi Arabia, given that

2    protection -- brought in from Saudi Arabia, given the

3    protection by the Saudi embassy, and sent into the middle of

4    the United States into Missouri to meet with an al-Qaeda

5    procurement officer with whom he lived for four months.

6           Now, that fact in and of itself, that would not be a

7    smoking gun.  But then we look at the phone records and the

8    phone records show that Mr. Sudairy called Mr. Bayoumi --

9    Mr. Bayoumi called Mr. Sudairy five times, times that are

10   significant logistic support to the hijackers right around the

11   time they are moving from Los Angeles to San Diego.

12          Now that fact itself of the phone calls may not be

13   important, but you combine that with the fact that he's living

14   with an al-Qaeda procurement officer, well, then there is

15   another fact, that Mr. Sudairy came to San Diego the year

16   before and met with Mr. Bayoumi at the mosque and also stayed

17   in the same house that the hijackers eventually stayed in.

18          So you take all these facts together just from

19   Mr. Sudairy and you take this report and you're wondering,

20   like, okay, I guess Saudi Arabia doesn't think that adds up to

21   a support scheme, but you take those facts with the other facts

22   that we're trying to get, we're trying to nail down from the

23   government, from the FBI that they've put together over all

24   these years.  Now we've waited, the families have waited 20

25   years for this.  They're willing to wait another six months so

that this case is determined on a full record.  And I don't
want to have expert reports submitted and then have 50 motions
and they make.  They prepared great motions, your Honor, but we
shouldn't be nitpicking all of these issues now, and we
shouldn't be arguing them in advance like this.  We should let
the experts put forward reports based on the full record.

I would love it if the Court said to the DOJ, let's
get everything, can you do everything by, you know, November 15
or December 15.  That would be great.  We would want it done
tomorrow.  We want the evidence now.

But, I mean, this is kind of key stuff we are just
finding out about now.  It's just the very nature of this type
of activity.  It's not something that is going to be staring
out at you right in the face.  It has to be developed, you
know, circumstantial, brick by brick, and that's how every
terrorist support case is done.  And that's how they're all
presented, your Honor.  We have to be given the opportunity to
do that here.

Oh, and there's one other fact about Mr. Sudairy I
have to mention.  His brother, who assigned him to go to the
United States the first time when he met with Mr. Bayoumi, his
brother is a deputy minister of the Ministry of Islamic
Affairs, and he's also a director of the Al-Haramain
Organization, which was named as a terrorist organization.  So
there's a cancer here, there was a cancer within this Ministry

1      of Islamic Affairs that we are addressing here in this case,

2      and it's not a simple issue.

3              We are not the FBI.  We are not the CIA.  We don't

4      have the powers to go in and do the work that has to be done to

5      ferret this out.  And we need those documents, your Honor.  We

6      need the basic facts to do that.

7              And, you know, we can talk about legal standards and

8      everything until we are blue in the face, but it is not going

9      to get to the truth of what we get here.  And when Mr. Rapawy

10     talks about the standards here, about this case, he never talks

11     about the agency standard, what the legal standard is.  He

12     doesn't refer to the JASTA standard that has just been

13     established by the Second Circuit in the Kaplan case this

14     summer, because those cases establish a test that I think we

15     are going to meet in this case.  And he doesn't want to do

16     that.  He just keeps referring to carefully worded language

17     that seems to, you know, doesn't meet a standard, but it's not

18     really what the legal standard is in this case.  I don't know

19     if Mr. Carter has anything to add, but I just wanted.

20             MR. HAEFELE:  Your Honor, this is Robert Haefele.  I

21     do have something to add if you would listen to me for a

22     moment.

23             THE COURT:  Go ahead, Mr. Haefele.

24             MR. HAEFELE:  Thank you, your Honor.

25             I just wanted to respond to a few things that

1   Mr. Rapawy did say as well.

2           First of all, the plaintiffs have never said that

3   there is any sing particular document, if we just got this

4   document that that's all we would need.  Throughout the

5   litigation, as you have referenced earlier today, we have tried

6   to work with the DOJ to prioritize certain documents and try

7   and get certain things through as promptly as possible.  But

8   we've never said this is the only thing that we need.

9           Plaintiffs are entitled to a fulsome response to the

10  discovery requests, and, you know, Mr. Rapawy indicated we've

11  already gotten what we're entitled to but plaintiffs are

12  entitled to the full response to the subpoena, and the

13  President's executive order seems to make clear that there's

14  more evidence that the government has that we are entitled to.

15  The Kingdom's notion that throughout all of this discovery

16  that's happened -- which, by the way, we have had to fight

17  tooth and nail to get, that the Kingdom's unilateral assessment

18  is that there is nothing there, ignores, as Mr. Pounian just

19  said, ignores the plaintiff's collection of evidence and the

20  manner in which those pieces of evidence pieced together make a

21  fulsome picture.

22          You cannot, as Mr. Rapawy continues to try and do, you

23  cannot look at every single individual piece of evidence

24  singularly and determine yes or no without looking at the whole

25  picture together.  And the 2016 EC that came out on Saturday is

1   a good example of that.  Without knowing who the individuals

2   are that are identified in that document, even the media seems

3   to be saying that there's no Saudi officials in it.  There's

4   eight Saudi officials that are referenced in that document

5   that -- eight Saudi officials a lot of them with the Ministry

6   of Islamic Affairs, many of them had diplomatic credentials

7   that were Saudi officials.  So for Mr. Rapawy to say that there

8   was nothing in that document that connected to anything in

9   plaintiff's case is absolutely a farce.

10          So, notwithstanding the Kingdom's objections, the

11  plaintiffs are entitled to collect the information and they're

12  entitled to get what the government has said that it has.

13          THE COURT:  Thank you.

14          MR. HAEFELE:  Thank you.

15          MR. CARTER:  Your Honor, this is Sean Carter.  I don't

16  want to belabor this, but just very quickly.

17          THE COURT:  I'm happy to hear from you Mr. Carter, but

18  I don't want to try this case on this discovery call.

19          MR. CARTER:  Yes.

20          THE COURT:  If you want to discuss how you are going

21  to prove your case, you don't need to talk about that now.

22          MR. CARTER:  I don't, your Honor.

23          I just wanted to address, you know, Mr. Rapawy's

24  suggestion about a parallel process here, and I think his

25  comments effective acknowledge that if we go down that road,

```
1    there's going to be briefing as to every proposed
2    supplementation of an expert report.  There's going to be
3    briefing and disputes related to every proposal to use a piece
4    of information that comes in later as a result of the
5    President's executive order, and there is just going to be
6    massive complication that will only serve to delay the
7    proceeding and complicate it even further.  That's all, your
8    Honor.
9                THE COURT:  Mr. Carter, your colleague Mr. Pounian,
10   his proposal at the outset was let's just sit tight for 45 days
11   and have you all file a letter for me in early November.  I am
12   not quite sure what the benefit of that will be, because I
13   assume your position then will be the same as now, but I am
14   wondering if you have a particular view as to why rather than
15   sitting deadlines now we should have a wait-and-see approach.
16               MR. CARTER:  Your Honor, we can set deadlines provided
17   that they accommodate the process reflected in the executive
18   order, which, you know, involves the declassification of the
19   precise categories of information classification that were the
20   subject of the subpoena we served six days after being
21   authorized to conduct discovery in this case.  We can have an
22   expert deadline set after that.  Our thinking with regard to
23   maintaining a dialogue with the Court as this goes forward is
24   there are likely to be the issues surrounding this process that
25   we could deal with on a proactive basis.
```

1          I think Ms. Normand mentioned, for example, that there

2     will likely be, you know, information produced publicly, and

3     then a process for the DOJ to give us a bit more pursuant to

4     the protective order.  So we thought that an ongoing dialogue

5     with the Court about those issues would keep the process moving

6     and prevent us from having any sort of backlog at the end of

7     the process.

8          THE COURT:  Understood.  Okay.

9          Anybody else wish to be heard?

10

11         MR. KRY:  Your Honor, this is Rob Kry for Dallah Avco.

12    I don't have much to add to what Mr. Rapawy has already said,

13    but I will echo those points, and just note that they apply

14    with even greater force to Dallah Avco.  As your Honor might

15    recall, Dallah Avco was a Saudi government contractor whose

16    essentially only connection to this case was that it provided

17    certain outsourced human resources functions to a Saudi

18    government project, and in connection with that did process

19    some of the payroll for people attached to that project, like

20    Mr. al-Bayoumi.

21         Dallah Avco never directed the work of employees on

22    that project.  It never supervised the work of employees on

23    that project.  It was really just performing those outsourced

24    functions.  So when Mr. Rapawy says that nothing in the FBI's

25    productions over the past year has remotely incriminated his

1    client, that applies a hundred times over with respect to

2    Dallah Avco.  Conversely, your Honor, when Mr. Rapawy pointed

3    out that the Kingdom had already endured three and a half years

4    of jurisdictional discovery, Dallah Avco has been in

5    jurisdictional discovery at this point for eight years.  We had

6    our first document requests served against us back in 2013.  So

7    this has been a very, very long process.  So, just like the

8    Kingdom, we are also interested in being cleared of these

9    allegations sooner rather than later.

10          With respect to the specifics of the process, we defer

11   to Mr. Rapawy.  We would just, you know, your Honor, like he

12   did, that whatever date your Honor sets be sooner rather than

13   later and respect the very weighty interests that are on our

14   side of the case, too.

15          THE COURT:  Thank you.

16          All right.  Thank you, everybody.  I appreciate

17   everybody's arguments and your submissions.  I am going to take

18   all of this under advisement and issue a scheduling order in

19   the next few days.  That order will be firm and will not be

20   subject to revision, and it at a minimum is going to permit

21   expert discovery to be produced at some time after at least

22   that second tranche.

23          I need to think a little bit more about holding

24   everything off until March, recognizing all of the various

25   competing interests, all of which I think are weighty.  I just

1   need to sit on it for a little bit before I set a schedule, but

2   I will do that this week, and will issue my order forthwith.

3          It will not contemplate rebuttal reports.  There will

4   be an opportunity for expert reports there will be an

5   opportunity for -- I should say there will be rebuttal reports

6   filed by the defendants, but it will not have a deadline for

7   reply reports.  I am not anticipating that there will be any

8   sort of reply reports by the Plaintiffs' Executive Committee,

9   and it will assume that expert depositions take place after the

10  exchange of the reports so that the depositions can be

11  conducted on a record where both sides have one another's

12  experts beforehand.

13         So, at a minimum, you can contemplate a schedule that

14  has the plaintiffs filing their reports, rebuttal reports by

15  the defendants, and then a period of time for depositions.

16         I will issue an order, like I said, this week with

17  those dates.

18         MR. CARTER:  Your Honor, this is Sean Carter.  I had

19  one question related to what your Honor just described.  We

20  have never been clear as to whether Dallah Avco intends to

21  offer affirmative expert reports.  I think it would be helpful

22  for the Court to know that in framing out the schedule.

23         THE COURT:  Thank you.

24         And Mr. Kry, do you have a view on that?  Is Dallah

25  Avco anticipating filing affirmative reports, or only reports

1   in reply to the plaintiffs' reports?

2           MR. KRY:  Your Honor, at this point we anticipate

3   submitting one report that is going to be on the question of

4   Saudi employment law.

5           Not having seen plaintiffs' reports, I don't know

6   whether it would qualify as a rebuttal report or not.

7           The one thing we don't want is to further draw out the

8   report process.  So if it's your Honor's position that if we

9   file a report that wouldn't qualify as a rebuttal report, that

10  plaintiff needs to have a chance to respond to that, then I

11  think the appropriate way to accommodate that would be to set a

12  deadline for us that gives plaintiff a chance to respond, but

13  does not at all extend the schedule with respect to discovery

14  against the Kingdom.

15          THE COURT:  Thank you.

16          Anything further?

17          I thought I heard someone else from the plaintiffs

18  trying to speak

19          MR. POUNIAN:  You did, your Honor.  This Steve Pounian

20  again.

21          Thank you, your Honor.  On the reply report issue, I

22  would like to be heard on that, because we didn't really

23  address it in the discussion.  I thought we were just

24  discussing today the expert deadline, the specific stay of

25  that.

1          But with regard to the reply report, Saudi Arabia in
2    this case has the burden of proof.  It's kind of a unique issue
3    in terms of -- a unique case in terms of the burdens here.  The
4    plaintiffs have a burden, initial burden of production on the
5    jurisdictional issue, but then once that burden is met, Saudi
6    Arabia has the burden of proof on the issue.  So their expert
7    reports are really part of their case that they are presenting
8    to meet their burden of proof.  So I believe in that
9    circumstance it makes sense for us to have the opportunity to
10   reply to what they are putting forward on their burden of
11   proof, if that is what they are doing.  If they are just
12   responding to our burden of production, that's a different
13   question.

14          THE COURT:  I am not sure I understand why you would
15   need a reply report.  I am not questioning your recitation of
16   the burden, but your expert presumably will have an opportunity
17   to respond during a deposition to any questions that are asked
18   and any challenges that are raised, and it may be that your
19   expert then gives testimony either by way of declaration or --
20   I know you've raised the prospect of live testimony at the
21   motion stage, but it is unclear to me why a report would be
22   necessary.

23          MR. POUNIAN:  I understand, your Honor.  Mr. Rapawy
24   had mentioned taking depositions before his reports were filed
25   or during that process.  And that's I guess that's what got my,

1    particularly got my rankles up on that issue.

2              THE COURT:  Right.  But I just said that we would have

3    a full exchange of reports and then expert depositions.

4              MR. POUNIAN:  Well, I understand your Honor.  I guess

5    part of it also is, depending on what is in their reports,

6    there may be a need to reply, or I guess they could conceivably

7    do it at the deposition, but I think it would make sense to

8    have it in done in a formal sense in terms of a reply depending

9    on what is in the reports.  I mean, it is hard to know until

10   you see the reports at this point.

11             THE COURT:  Understood.  Okay.  Wonderful.

12             Thank you, everybody.  I appreciate everybody's time

13   and attention on this issue, and I hope everybody remains

14   healthy and safe.

15             We are adjourned.

16             (Adjourned)

17

18

19

20

21

22

23

24

25