M2m2TerC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   In re:  TERRORIST ATTACKS ON           03 MDL 1570 (GBD)
                 SEPTEMBER 11, 2001
 4
     ------------------------------x
 5
     HAVLISH, et al.,                       03 Civ. 9848 (GBD)
 6
                       Plaintiffs,
 7
             v.
 8   BIN LADEN, et al.,
 9                     Defendants.
10   ------------------------------x
11   JOHN DOES 1 through 7,                 20 Misc. 740 (GBD)
12                     Plaintiffs,
13           v.
14   THE TALIBAN, et al.,
15                     Defendants.
16   ------------------------------x       Remote Conference
17                                         New York, N.Y.
18                                         February 22, 2022
19                                         9:30 a.m.
20
21   Before:
22
23           HON. SARAH NETBURN,
24                                         Magistrate Judge
25
```

M2m2TerC

1                                        APPEARANCES

2   DO CAMPO & THORNTON, P.A.
            Attorneys for John Does 1-7 Plaintiffs
3   BY:   JOHN THORNTON
            ORLANDO DO CAMPO
4           DANIELA JARAMILLO

5
    JENNER & BLOCK, LLP
6           Attorneys for Havlish Creditors
    BY:   LEE S. WOLOSKY
7           DOUGLASS A. MITCHELL

8           – and –

9   WIGGINS CHILDS PANTAZIS FISHER GOLDFARB, PLLC
            Attorneys for Havlish Creditors
10  BY:   DENNIS G. PANTAZIS
            TIMOTHY B. FLEMING
11
            – and –
12
    RAMEY & HAILEY
13          Attorneys for Havlish Creditors
    BY:   RICHARD D. HAILEY
14

15  KREINDLER & KREINDLER
            Attorneys for Ashton Plaintiffs
16  BY:   MEGAN WOLFE BENETT
            JAMES P. KREINDLER
17          ANDREW J. MALONEY III

18          – and –

19  SPEISER KRAUSE, P.C.
            Attorneys for Ashton Plaintiffs
20  BY:   JEANNE M. O'GRADY

21          – and –

22  SHER TREMONTE, LLP
            Attorneys for Ashton Plaintiffs
23  BY:   MICHAEL TREMONTE

24          – and –

25

M2m2TerC

1                                        APPEARANCES
                                         (continued)
2

3       BAUMEISTER & SAMUELS, PC
             Attorneys for Ashton Plaintiffs
4       BY:  THEA CAPONE

5

        MOTLEY RICE LLC
6            Attorneys for Burnett Plaintiffs
        BY:  ROBERT T. HAEFELE
7            JODI WESTBROOK FLOWERS
             DONALD MIGLIORI
8

9       ANDERSON KILL P.C.
             Attorneys for O'Neill Plaintiffs
10      BY:  JERRY S. GOLDMAN
             BRUCE STRONG
11

12      COZEN O'CONNOR
             Attorneys for Federal Insurance Plaintiffs
13      BY:  SEAN P. CARTER
             J. SCOTT TARBUTTON
14

15      DAMIAN WILLIAMS
             United States Attorney for the
16           Southern District of New York
        BY:  JEANNETTE A. VARGAS
17           Assistant United States Attorneys

18

        KELLOGG HANSEN TODD FIGEL & FREDERICK PLLC
19           Attorneys for Kingdom of Saudi Arabia
        BY:  GREGORY G. RAPAWY
20

21      WHITE & CASE, LLP
             Attorneys for Republic of the Sudan
22      BY:  CHRISTOPHER M. CURRAN
             NICOLE ERB
23           CLAIRE A. DeLELLE

24
        Also Present:
25      Joseph Borson, Department of Justice - Civil Division


                      SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

M2m2TerC

```
 1              (Case called)
 2              THE COURT:  Good morning, everybody.  This is
 3    Judge Netburn.  I think we are ready to begin.
 4              This case is alternatively captioned In Re: Terrorists
 5    Attacks on September 11, 03 MD 1570; in addition, today's
 6    conference relates to Havlish v. bin Laden, 03 Civ. 9848; and
 7    John Does 1 through 7 v. the Taliban, 20 Misc. 740.
 8              I'm going to identify the parties that I believe are
 9    here.  I know we have a number of lawyers on the line.  I'm
10    going to ask that only the lawyers who anticipate speaking
11    identify themselves when their case is called so we can have
12    those appearances made.  If somebody who does not initially
13    state an appearance wishes to be heard later, we can have you
14    state your appearance at that time.  But for these purposes, I
15    think I will just hear from the people who intend to speak.
16              So I will begin with a representative for the
17    plaintiffs for the John Does 1 through 7 parties.
18              MR THORNTON:  Good morning, your Honor.  John Thornton
19    on behalf of John Does 1 through 7, and my partner and
20    associate are on the call also.
21              THE COURT:  Thank you.
22              And on behalf of Havlish plaintiffs.
23              MR. WOLOSKY:  Good morning, your Honor.  This is Lee
24    Wolosky, from Jenner & Block, for the Havlish plaintiffs.  My
25    partner Doug Mitchell is on the line, as well.
```

M2m2TerC

```
1              THE COURT:  Thank you.

2              Let me hear, who do we have on behalf of the United

3    States?

4              MS. VARGAS:  Good morning, your Honor.  This is

5    Jeanette Vargas from the U.S. Attorney's office on behalf of

6    the United States.  Also on the line is Joseph Borson, from the

7    United States Department of Justice.

8              THE COURT:  Thank you.

9              And on behalf of the Federal Insurance plaintiffs?

10             MR. CARTER:  Good morning, your Honor.  Sean Carter

11   from Cozen O'Connor.

12             THE COURT:  Thank you.

13             And on behalf of Burnett plaintiffs?

14             MS. FLOWERS:  Good morning, your Honor.  It's Jodi

15   Flowers on behalf of the Burnett plaintiffs, and also with me

16   is my partner Don Migliori.

17             THE COURT:  Thank you.

18             On behalf of O'Neill plaintiffs?

19             MR. GOLDMAN:  Good morning, your Honor.  This is Jerry

20   Goldman on behalf of the O'Neill plaintiffs.  I have my partner

21   Bruce Strong on the line, and I have others listening.  Thank

22   you.

23             THE COURT:  Thank you.

24             And on behalf of Ashton plaintiffs?

25             MS. BENETT:  Good morning, your Honor.  This is Megan
```

M2m2TerC

Benett for the Ashton plaintiffs.  We have Michael Tremonte, of

Sher Tremonte, who will be putting in a notice of appearance

this morning.  He and I will be the two people who will be

speaking on behalf of Ashton.

THE COURT:  Thank you.

Any other plaintiff groups that I haven't identified

who intend to speak this morning?  All right.

And I think we may have some representatives of

defendants, though I don't know that they are going to be

participating.

Do we have a lawyer on the phone on behalf of the

Kingdom of Saudi Arabia?

MR. RAPAWY:  Yes, your Honor.  This is Gregory Rapawy

of Kellogg Hansen.  I do not anticipate speaking this morning,

but I am on the line.

THE COURT:  Okay.  Thank you.  And on behalf of the

Republic of the Sudan?

MS. ERB:  Good morning, your Honor.  This is Nicole

Erb.  I'm joined by Chris Curran and Claire DeLelle.  And

likewise, we do not intend to speak this morning.

THE COURT:  Thank you.  And any other defendant groups

who are on the line who would like to state their appearance?

Okay.  Hearing none, I will assume that is our set of

lawyers.

I understand we also have a line open for the public

M2m2TerC

1    and the press.  I will remind everybody who is listening in

2    that this is a court proceeding.  Any recording or

3    rebroadcasting of today's proceeding is strictly prohibited.

4          We have a court reporter on the line.  To facilitate

5    that person's job, we want to make sure that we are not

6    speaking over one another — everybody will have an opportunity

7    to be heard — that people are speaking slowly, and that you

8    state your name each and every time you speak so that the court

9    reporter knows to whom to attribute all statements.

10         Okay.  I believe we have two primary matters on our

11   agenda today.

12         First, we have the writs of execution against the

13   assets held at the Federal Reserve Bank of New York.  The

14   government has said that these writs need to be addressed to

15   facilitate the implementation of the President's foreign

16   policy, so we will begin by talking about whether there is an

17   efficient way to achieve that goal without having to resolve

18   all of the questions surrounding the entitlements to those

19   funds.

20         And second, there are currently stays on the writs of

21   execution targeting the Afghanistan bank funds, so we will

22   address that and, more broadly, how we want to move the

23   litigation on these funds forward.

24         So let me begin with the first item, and probably I

25   will address my comments in the first instance to Ms. Vargas.

M2m2TerC

1              So according to the government's statement of

2     interest, the Havlish and Doe writs are currently standing in

3     the way of implementing the division of the DAB funds that are

4     currently held at the Federal Reserve, and the government has

5     requested that these issues be dealt with in advance of all

6     other issues.  This will allow the executive branch to carry

7     out its foreign policy providence and, as it represents to us,

8     apparently the funds are needed to address a major Afghanistan

9     humanitarian crisis.

10             And so I would like to begin the crisis about thinking

11     about the best way that we can get out of the government's way

12     so that it can execute its foreign policy.

13             My understanding is that the Havlish and Doe writs may

14     be satisfied with far less than the $7 billion that are

15     currently being held in the Federal Reserve.  So given this, is

16     it the government's view that modifying the Havlish and Doe

17     writs to attach a smaller sum, which I understand would be

18     likely something less than the $3.5 billion, would permit the

19     transactions that are contemplated by President Biden's

20     February 11 executive order and the OFAC license that he also

21     issued on that same day?

22             Ms. Vargas, let me begin with you.

23             MS. VARGAS:  Yes, your Honor.  Thank you.

24             The government does believe that that would be

25     satisfactory.  What we are looking for is an order entered

M2m2TerC

1    expeditiously clarifying that the Doe and Havlish writs are

2    null and void and have no effect as to the 3.5 billion in

3    licensed assets but that those writs can remain in effect to

4    the extent permissible by law as to all other assets pending

5    further order of this Court.

6          As your Honor has observed, the Doe writ is for

7    approximately 138 million.  The Havlish writ is nominally in

8    the amount of approximately $6.8 billion; but, as set forth in

9    our statement of interest, TRIA permits attachment only to the

10   extent of compensatory damages.  The Havlish plaintiffs do not

11   disagree with this position; and, therefore, the unlicensed

12   funds that will remain in the account of the Federal Reserve

13   Bank of New York after the 3.5 billion in licensed funds are

14   removed will be more than sufficient to satisfy both the Doe

15   and Havlish writs combined when the Havlish writ is

16   appropriately modified to reflect compensatory damages only.

17         And alternatively, as set forth at length in the

18   government's statement of interest, the licensed funds are not

19   subject to attachment under TRIA as a matter of law as the

20   licensed funds are not blocked assets within the meaning of the

21   statute.

22         But for our purposes, what we need is an order simply

23   stating that the writs are null and void and have no effect as

24   to the 3.5 in licensed assets.  And we understand that the Doe

25   and Havlish plaintiffs do not object to this requested relief.

M2m2TerC

```
1          THE COURT:  Terrific.  That was going to be my next
2     question.
3          And so that would be, just so I am clear, the proposal
4     is simply an order that would effect those writs.  They don't
5     need to file new writs of execution, is that correct?
6          MS. VARGAS:  That's correct from the government's
7     perspective.  What we require, under paragraph 5 of our
8     license, the license states that the Federal Reserve Bank must
9     comply with any applicable orders, rulings, writs, or other
10    judicial process of the United States federal courts, which is
11    why this is at issue.  Therefore, we need an order that will
12    allow the Fed to have confidence that these writs do not
13    prevent any transfer of the licensed funds.
14         THE COURT:  Okay.  And if we issue that order
15    expeditiously, is that all that the government needs at this
16    time for it to carry out its foreign policy agenda?
17         MS. VARGAS:  At this present time, that's correct,
18    your Honor.
19         THE COURT:  Okay.  Thank you.
20         Let me turn now to John Thornton on behalf of the Doe
21    plaintiffs and then to Mr. Wolosky on behalf of the Havlish
22    plaintiffs to confirm that both parties are in agreement that
23    the best way to proceed, and on your consent, is to issue an
24    order indicating that the licensed funds are unavailable for
25    the attachment of the writ.
```

M2m2TerC

1          Let me turn to Mr. Thornton first.

2          MR THORNTON:  Thank you, your Honor.

3          From the way that was described, we would not object

4     to that approach, you know, obviously with the understanding

5     that our writ is not null and void; it's just that our writ

6     doesn't reach those $3 1/2 billion that are licensed.

7          THE COURT:  Thank you.

8          Mr. Wolosky?

9          MR. WOLOSKY:  Your Honor, we have no objection; but,

10    similarly, we believe that, as a matter of law, the Havlish

11    writ that was served in August or September currently does not

12    encompass the funds that the government wishes to move as a

13    result of the actions, both the blocking and the licensing

14    actions that the executive branch took on February 11.  So

15    certainly, to the extent that the Court wishes to enter an

16    order making that clear with respect to the 3.5, the Havlish

17    plaintiffs have no objection.

18         Your Honor has authority under New York CPLR Section

19    5240 to modify writs, if your Honor wishes to, to provide

20    assurance to the government by means of clarification with

21    respect to the funds that it wishes to move.

22         Again, we certainly don't think that an order -- we

23    would not agree that an order nullifying a writ would be

24    appropriate; but certainly modifying the writ, if the Court and

25    the government thinks it is necessary to make clear that the

M2m2TerC

1    writ -- the Havlish writ does not encumber the 3.5 billion that

2    the government wishes to move and which has now been licensed,

3    we have no objection to that.

4            THE COURT:  Okay.  Thank you.

5            Does any other party wish to be heard exclusively on

6    the question about how to act with respect to President Biden's

7    executive order and the OFAC license in connection with the

8    funds in the Federal Reserve?

9            Okay.  I don't know that this has ever happened, but

10   hearing nobody from any of the plaintiffs' executive

11   committees, I think we can move forward on that issue.

12           So I'm going to direct Ms. Vargas, if you can work

13   with the lawyers for the Doe and Havlish plaintiffs on

14   preparing an order for my signature, obviously the sooner you

15   get it to me, the sooner I will sign it and the funds will be

16   made available to the executive.  So I will just be on the

17   lookout for that draft order.  If you can get it to me as soon

18   as possible, I will sign it.

19           MS. VARGAS:  Thank you, your Honor.  We will work on

20   it and get it to you very shortly.

21           MS. BENETT:  Your Honor, this is Megan Benett on

22   behalf of the Ashton plaintiffs.

23           I just wanted to make sure I understood that, at least

24   on our behalf, there is no objection, of course, to rendering

25   the Havlish and Doe writs null and void with respect to the

M2m2TerC

1    licensed assets, and we would of course agree that that should

2    move expeditiously.

3           To the extent that an order would address anything

4    concerning those writs and the modification, for example, of

5    the Havlish writ, I think that that would be something we would

6    want to be heard on.  But, again, I don't think that's

7    necessary in the context of moving forward with rendering the

8    writs null and void with respect to the licensed assets.

9           THE COURT:  I'm not sure exactly what it is you are

10   referring to, Ms. Benett.  What precisely do you wish to be

11   heard on with respect to the Havlish writ?

12          MS. BENETT:  Well, to the --

13          THE COURT:  I know you want to be heard on the issue

14   of stay, but on issue of the writ itself.

15          MS. BENETT:  As we raised in the letter to the Court

16   that we submitted, we don't necessarily agree with

17   Mr. Wolosky's position that the Court has the authority to

18   modify the writ under Article 52 of the New York CPLR.  That's

19   one of the issues that we think would warrant some further

20   briefing and that we believe we have an interest in presenting

21   our position on that to the Court.

22          MR. TREMONTE:  Your Honor, this is Michael Tremonte,

23   on behalf also of the Ashton plaintiffs.

24          I just wonder if it is helpful to formulate this

25   precisely to see if in fact we are all in agreement.

M2m2TerC

1          It sounds as though the government and everyone else

2     shares the view that, with respect to the licensed funds, that

3     is to say, the portion of the DAB assets authorized by the OFAC

4     license to be transferred for the benefit of the Afghan people,

5     it sounds like we all agree that as a matter of law those

6     funds, the licensed funds, are not subject to attachment in

7     this litigation.  And I think if that alone is the basis for

8     the Court's order directing the release of those funds so that

9     the administration can fulfill its foreign policy objectives, I

10    don't think there is any controversy here at all as to this

11    piece.

12          THE COURT:  Okay.  I really hope there is no hold-up

13    here.  So I am going to direct that Ms. Vargas communicate with

14    the Havlish and Doe plaintiffs, as they are the only ones who

15    currently have writs attached to those funds as far as I am

16    aware, and to submit something on the -- a proposed order on

17    the MDL docket as soon as you can.  I will wait 24 hours to

18    sign that order.  If anybody wishes to be heard with respect to

19    that order, you can file it within that 24-hour window.  But I

20    will sign that order, assuming it is otherwise appropriate,

21    within 24 hours after the 24-hour window expires.  And

22    certainly to the extent you can let me know before 24 hours

23    that there is no objection, we will go ahead and get that up.

24          All right.  Thank you.  Let's move forward on the next

25    phase, which is in connection with these writs of execution.

M2m2TerC

They have been stayed.  Both the Havlish and the Doe plaintiffs
have requested that we lift those stays.  And so the next
question is how we should proceed with respect to those writs
and briefing on the issue with respect to entitlement to any of
the DAB funds.

So let me first hear from the Havlish plaintiffs on
how they think the most efficient way is for us to proceed at
this point.

MR. WOLOSKY:  Thank you, your Honor.  This is Lee
Wolosky for the Havlish plaintiffs.

The position of the Havlish creditors is that the
Court should lift the stay of enforcement in order to allow
these proceedings to move forward in accordance with normally
applicable procedures under New York law which assure that no
MDL party will be prejudiced.

This matter is certainly unique in many respects, but
what we are asking for is not.  We are asking the Court to move
forward with the next procedural step that parties holding
writs of execution must take in order to keep enforcement of
those writs.

The stay was put in place to permit the government to
file its statement of interest.  That has now happened.  The
government does not oppose the lifting of the stay consistent
with the views expressed in its statement of interest.  And
once the stay is lifted, all parties will have, as the

M2m2TerC

1   White House said in its February 11 statement when it blocked

2   the funds at issue, "a full opportunity to have their claims

3   heard in U.S. courts."

4           Other MDL parties oppose lifting the stay but, as my

5   partner Doug Mitchell will explain in a moment, lifting the

6   stay will afford them a full opportunity to have their claims

7   heard by the Court.  Significantly, the Havlish creditors have

8   no objection to their participation in the briefing following

9   the filing of the Havlish and Doe's motions for turnover.

10          I'm going to turn it over to my partner Doug Mitchell,

11  who will address with greater specificity the procedures that

12  we envision will govern in the event that the Court lifts the

13  stay.

14          THE COURT:  Thank you.

15          MR. MITCHELL:  Your Honor, this is Doug Mitchell, and

16  I will be brief.

17          But as Mr. Wolosky noted, under Federal Rule of Civil

18  Procedure 69(a), New York law applies to the resolution of and

19  the litigation of issues relating to judgment enforcement

20  proceedings subject to any application of TRIA in the context

21  of those judgment enforcement proceedings.

22          If we look at CPLR 5225 and/or 5227, both of those

23  enforcement procedures contemplate filing a special proceeding

24  to litigate claims relating to assets of a debtor that are held

25  in the hands of a garnishee such as the New York Federal

M2m2TerC

1    Reserve Bank.  Those provisions also specifically reference

2    another section, 5239, which allows claims by adverse parties

3    to raise their claims and to litigate their interest with

4    respect to those assets; and then it also provides the Court

5    with a framework for resolving those differing competing claims

6    and making final determinations about the disposition of the

7    assets that are subject to the writs filed by the Havlish

8    plaintiffs and the Doe plaintiffs.  And, consequently, your

9    Honor, we think that the New York law that has been in place

10   for quite some time governing the litigation of issues involved

11   with enforcing judgments against assets held by garnishees will

12   provide the Court and the parties with a full and fair

13   opportunity to be heard on any and all issues that will be

14   involved in this enforcement proceeding.  We also think that

15   the methodology to get that opportunity or to start that

16   process requires lifting the stay so that that process can be

17   implemented and the parties can move forward within that

18   framework.

19        THE COURT:  How quickly after we lift the stay would

20   you anticipate filing your application?

21        MR. WOLOSKY:  Your Honor, Lee Wolosky again.

22        We would propose filing our motion for turnover two

23   weeks from today, March 8.

24        THE COURT:  Okay.  And then just so I understand your

25   position, once you file your motion for turnover, interested

M2m2TerC

1    parties would be permitted to then participate either as an

2    interpleader or otherwise, is that correct?

3              MR. WOLOSKY:  Lee Wolosky again, your Honor.

4              That is correct.  We do not oppose any MDL parties

5    participating in the briefing.  And obviously other motion

6    practice that is underway with respect to the finalization of

7    money damage awards would proceed unobstructed and

8    concurrently.

9              THE COURT:  Thank you.

10             Mr. Thornton, on behalf of the John Doe plaintiffs,

11   anything that you want to add to that proposal or are you in

12   agreement with what the Havlish creditors are proposing?

13             MR THORNTON:  Your Honor, we are basically in

14   agreement with what they are proposing and the schedule.  We

15   just see this as a situation, a very straightforward situation,

16   where we have a writ that I believe we have had since September

17   and that the stay was initiated in order for the government to

18   give its statement of interest.  It's done that.  The

19   government doesn't oppose the matter moving forward, so we

20   think the matter should move forward.  We are fine with March

21   8.  We think we can file our turnover motion by March 8.

22             As far as the booty thing and who gets to say anything

23   about the briefing, our feeling is that there are only two

24   parties in this matter that have valid writs of execution

25   against the funds at issue and that those two parties — us and

M2m2TerC

the Havlish creditors and writ holders — have some common

questions of fact that we will both address in our motions, and

that, in the normal course, people that don't share those

commonalities don't have -- you know, aren't allowed to come in

and brief concerning them.

We are concerned about, and we filed a motion, as you

know, a letter motion, concerning the fact that we are in the

MDL with the rest of the September 11th plaintiffs who don't

have judgments, even, against the same parties, let alone writs

of execution, and we are concerned that the process not get

slowed down from what the normal process would be under the

prosecution of a writ under New York law.

THE COURT:  Thank you.  Understood.

All right.  Let me turn to the members of the

plaintiffs' executive committee.  I believe that there are

lawyers who wish to be heard.

Why don't I just begin, Mr. Carter, do you wish to be

heard?

MR. CARTER:  Yes, your Honor.  Thank you.

From my perspective, as one of the long-serving chairs

of the plaintiffs' executive committee, I think I come at this

with an eye towards the overarching case management issues that

some of the other counsel may not be as sensitized to, and also

mindful of the other issues that are going to require the

Court's attention in the very near term, including our motion

M2m2TerC

1      under Rule 54(b) based on the decisions in *Kaplan* and

2      *Honickman*.

3              It seems to us that one of the obvious challenges in

4      this moment is that recent developments have prompted numerous

5      plaintiffs' groups to file applications seeking, in effect, to

6      be placed on equal footing with the Havlish and Doe plaintiffs

7      in this context.  And part of the difficulty with that is that

8      the procedural status and degree of advancement of those

9      plaintiffs' claims against the Taliban varies quite

10     significantly.

11             On the one hand of the spectrum, we have the Havlish

12     and Doe plaintiffs who have secured monetary judgments again

13     the Taliban and served writs of execution.  You then have

14     certain plaintiffs in the federal action who secured liability

15     judgments against the Taliban in 2006 and filed proofs to

16     obtain a monetary award as to the Taliban in 2007, which the

17     Court has addressed in other contexts, but not as to the

18     Taliban.  You have other plaintiffs who likewise received

19     liability --

20             THE COURT:  Mr. Carter?  Sorry.

21             MR. CARTER:  Yes.

22             THE COURT:  Mr. Carter, can you speak a little more

23     slowly?

24             MR. CARTER:  Yes, sure.

25             You then have other plaintiffs who likewise received

M2m2TerC

1   liability default judgments in 2006 and have moved more

2   recently in the past few months for monetary awards as to the

3   Taliban.  There are then additional plaintiffs who were added

4   to complaints in which the Taliban was named as a defendant,

5   but not until after the 2006 liability defaults were entered,

6   who are now seeking both liability and monetary judgments.  And

7   beyond that, there are plaintiffs who are, in one way or

8   another, taking action now to validate claims against the

9   Taliban in the first instance.

10          And so as a practical matter, it seems to me that it

11   will be very difficult for the Court to harmonize the

12   procedural status of the claims of all of those different

13   groups.  And it also seems clear that plaintiffs who took

14   earlier action will have good reason to argue that they would

15   be prejudiced by having their rights deferred while less

16   advanced claims catch up.

17          And even beyond that, any attempt to achieve this sort

18   of equal footing result would require the Court to undertake

19   what appears to be a very expansive scope of work in a very

20   short period of time, and I think some of the comments you

21   heard from other counsel about the set of activities that will

22   be set in motion by the commencement of the turnover proceeding

23   underscore that.

24          So at least from my perspective, all of those

25   considerations call out for a concerted effort on the part of

M2m2TerC

1    the plaintiffs who have presented applications to the Court on

2    this front to sit down in earnest to try to work out a

3    framework that would obviate the need for the Court to address

4    competing priority and allocation arguments, and that would in

5    turn obviate the need for the Court to decide all of the

6    pending judgment applications under whatever approach the Court

7    might ultimately find most appropriate.

8         And again, an agreement on that front would then allow

9    the parties and the Court to focus the remaining briefing on

10   the scope and application of Section 201 of the Terrorism Risk

11   Insurance Act, and that can be quite focused if the plaintiffs

12   are all on the same page.  It does seem to me that those

13   conversations are likely to be more fruitful if they are

14   occurring before briefing begins in earnest on the turnover

15   proceedings.  That could happen very soon.  But it does strike

16   us that it would be beneficial for the Court to urge the

17   parties to sit down with one another and try and work out some

18   agreements on this framework.

19        THE COURT:  Thank you, Mr. Carter.  I agree with a lot

20   of what you said.  I also don't see how, even if the Court were

21   able to undertake the Herculean task of addressing all of the

22   pending or anticipated motions with respect to claims against

23   the Taliban, those claims would ever even be on equal footing

24   with the Doe and Havlish plaintiffs, given that they have

25   secured judgments and filed their writs.  It would seem to me,

1   under firm circuit law, that they would be a priority for any

2   claim.

3            And so that to me is yet another reason why having a

4   fire drill with respect to the outstanding and anticipated

5   motions seems to be time not well spent.  So I appreciate your

6   suggestion that coming up with a way to focus the Court's

7   attention on the issues that are most important and would

8   address the parties' realistic needs is the best way to

9   proceed.  So thank you for those comments.

10           MR. CARTER:  Certainly, your Honor.

11           THE COURT:  I know Ms. Benett said she wanted to be

12   heard, so I will turn to Ms. Benett or Mr. Tremonte.

13           MS. BENETT:  Thank you, your Honor.  I think I will

14   defer to Mr. Tremonte on this.

15           MR. TREMONTE:  Thank you, your Honor.  It is Michael

16   Tremonte.

17           I think we are largely in agreement with Mr. Carter's

18   suggestion, I think on the understanding that the stay would

19   remain in place while the parties are conferring towards the

20   goal that Mr. Carter articulated.  We do believe that the stay

21   should remain in place at this juncture.  The touchstone, of

22   course, is that we want all the 9/11 families to be treated

23   fairly and so, consistent with that important goal, any

24   proposal, you know, would need to be, at least in the short

25   term, against the backdrop of the stay remaining in place.

M2m2TerC

1          If the Court is inclined to instruct the parties to

2     meet and confer, as Mr. Carter suggested, I think we would

3     likely be in agreement with that.  Alternatively, another

4     procedure that would be consistent with ensuring fairness to

5     all of the 9/11 families would be to address the pending

6     motions for final damages judgments, to schedule briefing on

7     the threshold questions of attachability of the remaining

8     blocked assets under TRIA, and we think at the same time to

9     schedule briefing on the question of the appropriate proceeding

10    for enforcing the judgments.  And that, of course, is a

11    potentially very consequential set of issues as to enforcement

12    and, again, it is one with respect to which the interested

13    parties, the full range of interested parties should be heard,

14    and there is clear authority for that, in our view, under the

15    CPLR.

16          THE COURT:  Can I interrupt you for a second?

17          MR. TREMONTE:  Yes.

18          THE COURT:  What is the authority?  Your clients, as I

19    understand it, have no judgments against these entities for

20    which you could attach to the funds.  So what standing does

21    your client have, do you have to challenge the procedural

22    mechanism by which the Havlish and Doe plaintiffs seek to

23    proceed on their execution?  I understand that you might have a

24    right to, whether it is sort of interplead or otherwise join

25    the turnover proceeding, but why do you have a say on how they

M2m2TerC

1    proceed as a procedural matter?

2         MR. TREMONTE:  Yes, your Honor.

3         So in addition to the interpleader rights, which we

4    agree that we clearly have, we think that we are also

5    interested persons within the meaning of CPLR 5240, and that is

6    a provision that affords the Court very broad powers upon the

7    motion of an interested party or, frankly, on the Court's own

8    initiative within the clear language of the provision to

9    modify, limit, and condition the use of any enforcement

10   procedure.  And so we think at a minimum that provision affords

11   us standing to be heard and to brief the issues in connection

12   with the appropriate procedure, especially in connection with

13   such a unique set of circumstances as this one, where ensuring

14   fairness to the 9/11 families, to all of them, not just a very

15   small minority, is of paramount importance.  So that is the --

16        THE COURT:  Understood.  I don't think it needs to be

17   said, but obviously I also am interested in fairness.  I still

18   don't understand how you would be, under the law, an interested

19   party other than speculatively because your clients have no

20   judgment and some motions have been filed, some motions are

21   anticipated.  Who know when those will actually be addressed.

22   But the interest that you hold at this point is essentially

23   speculative until you have a judgment.  I understand that you

24   have an interest generally because your interest is in

25   providing fairness and equity to all of the 9/11 families, but

M2m2TerC

```
 1    I'm not sure as a legal proposition that you have an interest

 2    as the law understands it.

 3              MR. TREMONTE:  Your Honor, so here is where I think it

 4    is so important to keep the stay in place at least long enough

 5    to brief this and related issues.  The potential prejudice to

 6    the overwhelming majority of 9/11 families of having no

 7    opportunity to be heard on precisely this issue would be

 8    overwhelming, and so we think at a minimum the appropriate next

 9    step for the Court to take is to, with the stay remaining in

10    place, to afford an opportunity to arguably interested parties

11    to brief that very issue.  It's a complicated issue.  There is

12    not a lot of precedent on it, although what precedent there is

13    clearly affords the Court very broad equitable powers.  And we

14    would argue that this situation is a very strong candidate for

15    the exercise of those equitable powers because of the interests

16    at stake and because of the fortuity of the situation we find

17    ourselves in as a result of a foreign policy decision that

18    nobody could have really accurately predicted in terms of its

19    temporal current.

20              So for those reasons, among others, we think really

21    what is appropriate here is keep the stay in place and let us

22    brief that very issue in addition to the threshold questions,

23    which are federal law questions, of the attachability of the

24    blocked assets.

25              THE COURT:  If we were to enter judgment tomorrow on
```

1    behalf of your clients as against the Taliban, hypothetically

2    speaking, so that you had the third judgment that you could

3    execute against the DAB funds, are you aware of any law that

4    would allow you to jump over the Doe and Havlish plaintiffs?

5    Doesn't their priority mean that, no matter what, they get to

6    go first?

7         MR. TREMONTE:  That is a critical threshold question

8    that is inextricable from the fairness question and, in our

9    view, from the equities questions.  Our position is that all

10   9/11 families should be on an equal footing.  And again --

11        THE COURT:  I understand that's your position, but are

12   you aware of any law?  I understand that that's your desire,

13   your goal, the objective here.  But are you aware of any law

14   that would allow a third-in-line judgment holder to jump

15   judgment holder one and two?

16        MR. TREMONTE:  Certain --

17        THE COURT:  My understanding of Second Circuit law,

18   and I am looking at *CSX Transportation v. Island Rail Terminal*,

19   I'm not aware of any law that would allow judgment holder

20   number three, which there is none at this point, but were there

21   to become one, I'm not aware of any law that would allow that

22   judgment holder to jump in line in order to get priority.  And

23   so I want to make sure -- I understand the goal and the

24   objective of fairness and equity, but I want to make sure that

25   we are acting in a way that is consistent with the law and it

1    seems to me unfair to the Doe and Havlish judgment holders to

2    hold up their execution if, under all circumstances of the law,

3    they are first in line.  What is the authority to prejudice

4    them in your client's interest when they are going to be third

5    in line or farther in line than Doe and Havlish?

6              MR. TREMONTE:  So, your Honor, I think there are

7    potentially multiple sources of legal authority here that could

8    potentially come into play, although I want to emphasize again,

9    in terms of the prejudice analysis, it would be, I think,

10   inarguably, much more prejudicial to the majority of 9/11

11   families that if they are in fact interested persons within the

12   meaning of 5240 and if, moreover, it is an appropriate exercise

13   of the Court's equitable powers under that provision of the

14   CPLR to adjust the enforcement mechanisms here, then it is

15   overwhelmingly prejudicial to them to not even afford them an

16   opportunity to brief whether or not they qualify under the

17   statute as such.

18             And then, in addition to that, there are also

19   potentially issues with, you know, defects or infirmities to

20   the writs that also would need to be briefed.  So I think there

21   are multiple potential sources of legal authority, beginning

22   with 5240; and, on top of that, there is the prejudice analysis

23   which argues very, very strongly in favor of a brief

24   continuance of the stay to afford the parties an opportunity to

25   brief the relevant procedures.

M2m2TerC

1      THE COURT:  Why would you be addressing any --

2      MR. TREMONTE:  And there are multiple cases --

3      THE COURT:  Why would you be addressing any --

4      MR. TREMONTE:  I'm sorry, your Honor.

5      THE COURT:  Why would you be addressing any defect of

6  the writ on this particular mechanism, meaning wouldn't that be

7  something that you would address once the stay is lifted?

8      MR. TREMONTE:  Right.  I think if we are briefing the

9  question of the Court's authority to modify enforcement

10  procedures to ensure fairness, it would make sense, in our

11  view, to simultaneously brief issues going to defects in the

12  infirmities in the writs of execution that would also impact

13  priority.

14      But, again, to be very, very clear, we are not looking

15  to jump ahead.  We are looking to be on equal footing.  And I

16  think there is legal authority for us to argue that it is

17  within the Court's power to put in place procedures to

18  effectuate that under these circumstances.

19      THE COURT:  Okay.  Any other counsel for one of the

20  plaintiffs' groups wish to be heard.

21      MS. FLOWERS:  Your Honor, this is Jodi Flowers.  I

22  just wanted to offer a citation for you for your question

23  previously.  That would be *Plymouth Ventures Partners II L.P.*

24  *v. GRT Source, LLC*.  It is Court of Appeals of New York,

25  December 16, 2021.  It doesn't have a number yet.  N.E.3d 2021

M2m2TerC

Westlaw number 59268932021.  It discusses Section 5240's –– the

Court's power under 5240, and I suggest that it might be a

place for the Court to look, quoting, "where the Court needs to

avoid expense, embarrassment, disadvantage, or other prejudice

to parties or courts," the Court can look at it, inseparable

powers, the precise question that we are talking about.

            And I have to take issue with the statement by I

believe it was counsel for the Doe plaintiffs that there are

only two interests at issue here.  I think we have been clear

that we believe there are more.  For Burnett, for example, we

do have default judgments against the Taliban and have had them

since 2006 on behalf of 5,000 plaintiffs, over 5,000

plaintiffs, 5,182 plaintiffs.  And these are also people who

have their damages liquidated as against Iran.  So like with

other procedures before this Court, it is not a heavy stretch

to say that a joint tortfeasor can be held liable for those

same damages.

            So I appreciate and sympathize with the amount of

papers that came in as a result of these developments, but a

lot of this work has already been done by this Court, a lot of

hard work on determining the damages; and I believe that if we

had the benefit of a little bit of time, we could address those

fully and come up with a procedure that's not onerous to this

Court and doesn't derail the proceedings.

            You know, I'm not going to repeat the arguments in our

M2m2TerC

1   papers, I would simply just say that we are very concerned that

2   lifting the stay could create a rush to judgments.  I would

3   like to believe Mr. Wolosky that no MDL party will be

4   prejudiced, but absent the ability to brief these threshold

5   issues before we are so off to the races I think will prejudice

6   at least my plaintiffs.

7            THE COURT:  Thank you.

8            Would Mr. Thornton or Mr. Wolosky or Mr. Mitchell wish

9   to be heard in response?

10           MR. WOLOSKY:  It is Lee Wolosky.  Just briefly, your

11  Honor.

12           Again, just to situate us, all we are here today

13  asking the Court to do is to lift the stay.  Obviously no money

14  is going anywhere.  All issues that have been raised on this

15  conference can and should be briefed.

16           And also, if it gives the Court assurance, you know,

17  we are happy to continue to meet and confer with the other

18  parties, as we have been, as we move forward.

19           Thank you, your Honor.

20           THE COURT:  Thank you.  All right.  Does anybody else

21  wish to be heard?

22           MR THORNTON:  Your Honor, John Thornton on behalf of

23  the Doe plaintiffs.

24           I didn't hear anything that had any foundation in law

25  for authority that would stop or that, you know, could be used

M2m2TerC

1    to prevent just the normal prosecution of our writ.  And I also

2    didn't hear anything that I thought made any practical sense,

3    and so we would oppose it.  We think that it would prejudice

4    our plaintiffs, our clients' rights, and so we don't see any

5    reason not to simply allow us to move forward on the writs, as

6    the government thinks we should, and we don't see any reason to

7    tie our ability to do that to an unrelated, factually unrelated

8    group of plaintiffs.

9              Thank you.

10             THE COURT:  Thank you.  I think that's a good point.

11   The Doe judgments, I believe, are a little more than $100

12   million, and with $3.5 billion assets that are available, I

13   think there is a fair question whether or not they should be

14   treated, at a minimum, on a separate track.  And so I would

15   like everybody to be thinking about whether or not the Doe

16   plaintiffs, who are not part of the 9/11 case otherwise, only

17   by virtue of these funds, whether or not there is any objection

18   to lifting the stay for execution with respect to their

19   judgment.

20             So here is what I would like.  First and foremost, I

21   will turn back to Ms. Vargas, I would like you to get me a

22   proposed order so that the executive carry out its foreign

23   policy objectives as quickly as possible.  As I have indicated,

24   I will give the parties 24 hours from the filing of that

25   proposed order to file any objections or raise any issues, and

M2m2TerC

1   at the 24-hour expiration, assuming there is no reason not to,

2   I will go ahead and sign that proposed order.

3          So Ms. Vargas, you can also notify your point of

4   contact at the Department of State that that's going to be the

5   procedure so that they are starting to get themselves organized

6   with respect to those assets.

7          MS. VARGAS:  Thank you, your Honor.

8          THE COURT:  Thank you.

9          With respect to the lifting of the stay, I'm going to

10  hold off on lifting it today to give the parties an opportunity

11  to be heard.  I am hoping I'm not going to get full-blown

12  memoranda of law.  I think letter briefs should be adequate to

13  raise the issues, and I will direct that those are filed by

14  next Monday, which I believe is the 28th of February.

15         I assume the Havlish and Doe parties would like to be

16  heard in opposition to that.  I know that you are interested in

17  moving this as quickly as possible, so I will assume that you

18  will get your opposition submissions in soon thereafter, but I

19  will give you the -- I don't know how long these briefs are

20  going to be or how much time you will need to oppose them, so

21  we will defer to the Doe and Havlish plaintiffs.  If you can

22  just let me know when you anticipate filing your objections to

23  those briefs and then we will take all of that under

24  advisement.

25         Separately I would like, as Mr. Carter raised, to have

M2m2TerC

1    the parties speak about a proposal for the turnover proceedings

2    if and when the stay is lifted, and so I will ask for a

3    proposal from the parties on how that should be borne out as

4    well, and I will direct that that be filed next Wednesday,

5    which I believe is March 2.  I don't have my calendar in front

6    of me, but I think that's right.  Yes.  March 2.  If you can

7    file a letter application with the Court with a proposal,

8    having had a meet-and-confer with both the Doe and Havlish

9    judgment holders as well as the relevant members of the

10   plaintiffs' executive committee and any other interested

11   plaintiffs as to how we would proceed assuming the stay is

12   lifted, and we will take all of that under advisement.

13           I think that addresses all of the issues that I wanted

14   to cover today.  Anything further from the -- oh, and if I can

15   ask, as well, with respect to the letter that's filed on March

16   2, if the parties can specifically address this issue in

17   connection with the Doe plaintiffs, given that they are not

18   9/11 plaintiffs and their judgment is relatively small in

19   connection with the funds available.  So I would also like to

20   hear whether or not there is any objection to allowing that

21   application to proceed at a quicker pace or on a separate track

22   so that those plaintiffs who are really just being brought in

23   to the morass of the MDL can execute their judgment.

24           All right.  With that, let me turn to the Havlish and

25   the Doe judgment holders.  Anything further you would like to

M2m2TerC

1    discuss today?

2                MR. WOLOSKY:  Lee Wolosky.  No, your Honor, for

3    Havlish.

4                MR THORNTON:  John Thornton.  No, your Honor, for the

5    Doe plaintiffs.

6                THE COURT:  Great.  Thank you.

7                Ms. Vargas, anything further from the government?

8                MS. VARGAS:  Not at this time, your Honor.

9                THE COURT:  Okay.  And anything further from any of

10   the other plaintiffs' counsel who have spoken today?

11               A VOICE:  No, your Honor.

12               A VOICE:  No, your Honor.

13               A VOICE:  No, your Honor.

14               THE COURT:  All right.  Thank you very much.

15   Ms. Vargas, I will look out for your proposed order.  I hope

16   everybody remains healthy and safe.

17               We are adjourned.  Thank you.

18               COUNSEL:  Thank you.

19                                  oOo

20

21

22

23

24

25